# 07 CV 3644

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X

ANTHONY MANGANIELLO,

                                        Plaintiff,                        CIVIL ACTION No.:

    - Against-

THE CITY OF NEW YORK,

DET. LUIS AGOSTINI, individually

and as a New York City Police Detective

SHAWN ABATE, individually and as a New York City

 Police Detective, DEREK PARKER individually

and as a New York City Police Detective,

 LT. HENRY SCOTT individually and as a New York

City Police Lieutenant, P.O. ALEX PEREZ, individually

and as a New York City Police officer,

P.O. MIRIAN NIEVES, individually and as a New York City

Police officer, MICHAEL PHIPPS individually

and as the Commanding Officer of the 43rd Precinct,

JOHN McGOVERN, individually and as a New York City

Police Detective Sergeant,  ROBERT MARTINEZ, individually

and as a New York City Police Detective, GERYL MCCARTHY,

individually and as a New York City Police Deputy Inspector,



MAY 0 8 2007

U.___, ___, ___.
CASHIERS

                        DEFENDANTS

--------------------------------------------------------------------------X

## COMPLAINT IN A CIVIL ACTION

1.      Plaintiff brings this action for compensatory damages, punitive damages

and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as said rights are secured by said statutes and the Constitution of the United States.

## JURISDICTION

2.     This Court has original jurisdiction under 28 U.S.C. § 1331, 1343,  U.S.C. § 1988

and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

## VENUE

3.     Venue properly lies in the Southern District of New York under 28 U.S.C. § 1391(b),

in that this is the District in which the claim arose.

## JURY DEMAND

4.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to

Fed. R. Civ. P. 38(b).

## PARTIES

5.     At all relevant times, plaintiff Anthony Manganiello was and is a citizen of State of New

York and the County of Westchester.

6.     Defendant, THE CITY OF NEW YORK, was and is a municipal corporation duly

organized and existing under and by virtue of the laws of the State of New York.

7.      Defendant, THE CITY OF NEW YORK, maintains the New York City Police

Department, a duly authorized public authority and/or police department, authorized to

perform all functions of a police department as per the applicable sections of the New

York State Criminal Procedure Law, acting under the direction and supervision of the

aforementioned municipal corporation, the City of New York.

8.      At all times relevant herein Luis Agostini was a duly sworn police officer and detective

of the New York City Police department and was acting under the supervision of said department and according to his official duties.

9.    At all times relevant herein, Luis Agostini was acting under the color of law.

10.    At all times relevant herein Derek Parker was a duly sworn police officer and detective of the New York City Police department and was acting under the supervision of said department and according to his official duties.

11.    At all times relevant herein, Derek Parker was acting under the color of law.

12.    At all times relevant herein Shawn Abate was a duly sworn police officer and detective of the New York City Police department and was acting under the supervision of said department and according to his official duties.

13.    At all times relevant herein, Shawn Abate was acting under the color of law.

14.    At all times relevant herein Lt. Harry Scott was a duly sworn police officer and Lieutenant of the New York City Police department and was acting under the supervision of said department and according to his official duties.

15.    At all times relevant herein, Harry Scott was acting under the color of law.

16.    At all times relevant herein Commander Michael Phipps was a duly sworn police officer and Commanding Officer of the New York City Police department.

17.    At all times relevant herein Commander Michael Phipps was the Commanding Officer of the 43rd Precinct and was in a policy making position and was otherwise responsible for setting and overseeing policies, customs and practices at the 43rd Precinct.

18.    At all times relevant herein, Michael Phipps was acting under the color of law.

19.    At all times relevant herein John McGovern was a duly sworn police officer and
Detective Sargent of the New York City Police department and was acting under the
supervision of said department and according to his official duties.

20.    At all times relevant herein John McGovern was acting under the color of law.

21.    At all times relevant herein Deputy Inspector Geryl McCarthy was a duly sworn police
officer and Deputy Inspector of the 43rd precinct of the New York City Police department
and was acting under the supervision of said department and according to her official
duties.

22.    At all times relevant herein Deputy Inspector Geryl McCarthy was acting under the color
of law.

23.    At all times relevant herein Alex Perez was a duly sworn police officer of the New York
City Police department and was acting under the supervision of said department and
according to his official duties.

24.    At all times relevant herein, Alex Perez was acting under the color of law.

25.    At all times relevant herein Miriam Nieves was a duly sworn police officer of the New
York City Police  department and was acting under the supervision of said department
and according to his official duties.

26.    At all times relevant herein, Miriam Nieves was acting under the color of law.

27.    At all times relevant herein Detectives Shawn Abate, Luis Agosini, Miriam Nieves, Alex
Perez, Lt. Harry Scott, Sgt. John McGovern,  Commander Michael Phipps and Deputy
Inspector Geryl McCarthy were assigned to the 43rd Precinct of the New York City Police

Department.

28.    At all times relevant herein, the defendants acted jointly and in concert with each other.

## COUNT I: MALICOUS PROSECUTION UNDER 42 USC 1983

29.    Plaintiff repeats and reiterates each and everyone of the foregoing allegations as if more fully stated herein.

30.    On or about February 12, 2001, Albert Acosta while employed as a Security Officer for Parkchester South Condominium Inc., (hereinafter "Parkchester") was murdered in the basement of 1700 Metropolitan Ave., Bronx, N.Y.

31.    Ballistics testing showed that Acosta's death was caused by two bullets from a .22 caliber gun.

32.    On the aforementioned date, Plaintiff was a Security Officer employed by Parkchester and was arrested for suspicion of the murder of Albert Acosta.

33.    There were no witnesses to the murder of Albert Acosta.

34.    There was no direct evidence linking Plaintiff to the murder of Albert Acosta.

35.    After Plaintiff was arrested, he was transported to the 43rd Precinct.

36.    Upon information and belief, Plaintiff was arrested because a custodian named Walter Cobb stated that while walking outside he heard shots and shortly thereafter saw the Plaintiff emerging from the building and because there was a white streak of plaster on his uniform, which was similar to plaster that was found near the crime scene.

37.    The aforementioned plaster could not be connected to the room where the homicide occurred and in fact was a common substance found in all of the buildings at Parkchester.

38.    Initially, Mr. Cobb told Sgt. Rolf Ohle of Parkchester, who was the first person to respond to the scene that he heard shots and it sounded like they came from outside the building.

39.    Mr. Cobb did not mention anything about Mr. Manganiello coming out of the building shortly after the shooting to Sgt. Ohle.

40.    Mr. Cobb has given inconsistent versions of where he heard the shots coming from, when he heard the shots, whether he saw the Plaintiff shortly after the shots and what the Plaintiff allegedly said to him.

41.    There were several reasons to question the veracity of Mr. Cobb.

42.    The initial handwritten notes prepared by various officers of the interviews with Cobb were given to Detective Luis Agostini.

43.    Among other things, Detective Luis Agostini destroyed the notes and/or intentionally or recklessly lost the notes to keep the Plaintiff and his attorney from effectively questioning Cobb's credibility.

44.    Upon information and belief, the statements of Cobb in the original handwritten notes differed from what Cobb ultimately testified to both before the grand jury and at trial.

45.    Agostini and Abate knew that there were reasons to question the credibility of Cobb, but they forwarded the information provided by Cobb to the Bronx County District, without making a full disclosure that Cobb's credibility was questionable.

46.    An employee from Verizon was present in the room directly across from where Acosta was found and did not hear any gun shots at the time Mr. Cobb states he heard the shots.

47.   The employee from Verizon did not see the Plaintiff in the area where Acosta's body was found at the time that Walter Cobb stated that he heard shots and saw the Plaintiff leaving the scene.

48.   Likewise three other employees of Parkchester were in the basement where Acosta was later found and they did not hear any shots, nor did they see Plaintiff in the vicinity.

49.   Approximately one hour and a half prior to Acosta being found, the Plaintiff was at an apartment on the fifth floor in response to a call of an altercation and was present with several New York City police officers at the time.

50.   After this call, Plaintiff left the building and did not return until after a call came over the radio that a Parkchester Security officer was down in the basement.

51.   Among other transmissions, Sgt. Ohle transmitted over the radio that a Parkchester Security guard was down.

52    Additionally, upon information and belief, additional transmissions that Acosta had been shot were broadcast over the Parkchester radio system.

53.   Upon arriving at the scene, Plaintiff was arrested and taken to the 43rd Precinct.

54.   While Plaintiff was at the 43rd Precinct, he was being questioned aggressively by Detectives Luis Agostini and Shawn Abate.

55.   While Plaintiff was being questioned, his brother Mario Manganiello, a police officer with the City of Mount Vernon went to the 43rd Precinct and saw the Plaintiff sitting in a chair in an undershirt, in a shaken condition and had apparently been interrogated as a suspect for the murder of Acosta.

56.  Upon seeing the Plaintiff, Mario Manganiello called an attorney for his brother.

57.  After Mario Manganiello called an attorney, Lt. Harry Scott approached Mario

Manganiello and said to Mario, that this didn't have to go this way, you're a cop and now

you got your brother lawyered up, what's the first thing you think and I'm sorry that it has

to go like this.

58.  In retaliation for the Plaintiff seeking legal representation, the defendants assumed that

the Plaintiff must have been the murderer  and the defendants conspired and set out on a

course of actions more fully described herein to maliciously prosecute the Plaintiff, deny

him his constitutional rights, deny him due process, deny him his right of confrontation,

and deny him a fair trial in that in furtherance of these goals among other things, they

fabricated evidence, destroyed and/or intentionally or recklessly "Lost" exculpatory

evidence, suborned perjury and committed perjury.

59.  After being arrested, Plaintiff's clothes and hands were tested for chemical and ballistic

analysis, all of which revealed that he did not fire a gun.

60.  Upon information and belief, on February 12, 2001, an Assistant District Attorney named

Dondes advised the defendant Detectives that there was no probable cause to arrest

Plaintiff and to charge him with the homicide of Albert Acosta and Dondes further did

not authorize the arrest.

61.  Upon information and belief, Detective Luis Agostini committed a course of actions to

create and fabricate evidence that would create probable cause to believe that Plaintiff

committed the homicide of Albert Acosta.

62.   After Assistant District Attorney Dondes advised Luis Agostini that there was no

probable cause to charge Plaintiff with the Homicide of Albert Acosta, Luis Agostini

conspired with other defendant officers, including but not limited to Parker, Abate,

Martinez, Nieves and Perez to create and fabricate evidence against the Plaintiff to link

him to the homicide of Albert Acosta.

63.    Detective Luis Agostini was directly and actively involved in the continuation of criminal

proceedings against plaintiff.

64.    Detective Shawn Abate was directly and actively involved in the continuation of criminal

proceedings against plaintiff.

65.    Detective Robert Martinez was directly and actively involved in the continuation of

criminal proceedings against plaintiff.

66.    As more fully set forth herein, all defendants were directly and actively involved in the

continuation of criminal proceedings against plaintiff.

67.    At all times mentioned, herein there was a lack of probable cause to commence and

continue criminal proceedings against plaintiff.

68.    At all times herein, the defendants acted with malice in continuing criminal proceedings

against plaintiff.

69.    Luis Agositini and Robert Martinez conspired with Derek Parker to get witnesses to come

forward with false testimony that Plaintiff either possessed a .22 caliber gun and/or was

trying to purchase a weapon prior to the homicide of Acosta.

70.    Detective Derek Parker recruited an inmate who was incarcerated at Riker's Island

Correctional facility named Terrance Alston to provide testimony that the Plaintiff

approached him while he was in Parkchester and solicited him to kill another security officer over a dispute because of a girl.

71.   Detective Derek Parker know or should have known that the statements of Alston were false because Terrance Alston was a known liar, and a known criminal who would say anything to lessen his time of incarceration.

72.   Detective Luis Agostini knew or should have known that the statements of Alston were false because Terrance Alston was a known liar and a known criminal who would say anything to lessen his time of incarceration.

73.   Upon information and belief, Detectives Parker and Agostini promised Alston that he would be released from custody early and/or other valuable consideration in exchange for Alston's agreement to provide false testimony.

74.   Detectives Luis Agostini, Shawn Abate and Derek Parker forwarded the statements of Terrance Alston to the Office of the District Attorney for Bronx County, with knowledge that the information provided by Alston was fabricated.

75.   On or about March 1, 2001, Detective Agostini coerced Michael Booth, a known criminal, loan shark, bookie and liar to give fabricated evidence including a statement that Plaintiff had approached Booth and asked him to sell Plaintiff a "rod" , which is a street term for a gun.

76.   At the time Booth gave the aforementioned statement, Agostini knew or should have known that it was false.

77.   Upon information and belief, Agostini coerced Booth into giving the statement and/or gave explicit or implicit assurances to Booth that his criminal activities would be

tolerated by the 43rd Precinct in consideration for the fabricated testimony against Plaintiff.

78.    At the aforementioned time Agostini improperly suggested facts to Booth and unduly influenced his statements and testimony.

79.    Agositini caused the false statements of Booth to be furnished to members of the Bronx County District Attorney's office.

80.    Upon information and belief on or about February 27, 2001 Luis Agostini coerced Chris Tartone into stating that he had overheard Plaintiff asking people where he could buy a gun prior to Acosta being murdered.

81.    Upon information and belief. Among other things on or about February 27, 2001 Agostini provided Chris Tartone with assurances, either explicitly or implicitly that Terrance Alston, a person with whom Chris Tartone had a family or other relationship, including a business relationship, would benefit by Tartone's statement that he had overheard Plaintiff asking people where he could buy a gun prior to Acosta being murdered.

81.    Agostini knew or should have known that the statements provided were false.

82.    Agostini forwarded the aforementioned statements of Chris Tartone to the office of the Bronx District Attorney with knowledge that the statements were false.

83.    Upon information and belief on or about February 27, 2001 coerced Chris Tartone into stating that he had overheard Plaintiff asking people where he could buy a gun prior to Acosta being murdered.

84.    The aforementioned and below mentioned actions by Agostini, Abate and Parker and the

other defendants were done with Malice and to frame Plaintiff for a homicide which he did not commit and to deny him the rights and privileges guaranteed by the U.S. Constitution.

85.    Upon information and belief, Agostini, Martinez, Parker and Abate produced Alston and/or Booth for grand jury testimony and pressured them implicitly or explicitly to give perjured testimony, thereby suborning perjury.

86.    Detective Derek Parker told Detective Luis Agostini that Terrance Alson was prepared to offer the aforementioned testimony.

87.    Detective Luis Agostini knew or should have known that the testimony and statements of Terrance Alston was false.

88.    Terrance Alston also told Agostini and Parker that Johnny Baker sold Plaintiff a firearm, and upon interviewing Johnny Baker, Baker stated that Alston was lying and he refused to testify that he had sold Plaintiff a gun.

89.    Upon information and belief, either Parker, Martinez or Agostini offered or promised Alston a reduction in his sentence, earlier parole and/or other favorable treatment in exchange for this testimony.

90.    By doing the aforementioned, Agostini, Martinez and Parker suborned perjurious testimony and fabricated evidence against Plaintiff.

91.    Agostini recruited Chris Tartone to testify that he had overheard Plaintiff asking others if they knew where he could buy a gun.

92.    Agostini knew or should have known that said testimony was false.

93. Agostini recruited Mark Damon to testify that he sold a .22 caliber hand gun to Plaintiff.

94. By doing so, Agostini suborned perjurious testimony and fabricated evidence against Plaintiff.

95. Upon information and belief, Agostini threatened to charge Damon with the murder of Acosta or other crimes if he did not testify against Plaintiff.

96. Agostini knew or should have known that said testimony was false.

97. By doing the aforementioned, Agostini suborned perjurious testimony and fabricated evidence against Plaintiff.

98. Agostini recruited Michael Booth, a known loan shark and Bookie to give false testimony that the Plaintiff had tried to buy a gun from him.

99. Upon information and belief, Agostini threatened to charge Booth with the murder of Acosta or other crimes if he did not testify against Plaintiff.

100. Upon information and belief, Agostini promised favorable treatment and noninterference of Booth's criminal activities in cooperation for the aforementioned testimony.

101. Agostini knew or should have known that said testimony was false.

102. By doing so, Agostini suborned perjurious testimony and fabricated evidence against Plaintiff.

103. On or about March 1, 2001, Agositini created a DD5 which contained false information allegedly made by Police officers Ortiz and Rodriguez, which stated in sum and substance that said they responded to dispute at 8:35 a.m., at 1700 Metropolitan Ave., and

Manganiello asked if they needed him and they said no and Manganielloe left, whereas, Manganiello actually left with the officers and they had previously given statements to that effect.

104. Agostini created the foregoing false statements of officers Ortiz and Rodriguez in an attempt to fabricate evidence and undercut Plaintiff's alibi and further support the testimony of Cobb, which Agostini knew to be false.

105. On April 20, 2001, Luis Agostini signed a felony complaint accusing the Plaintiff of Murder in the second degree, Manslaughter in the first degree, criminal possession of a weapon in the second degree, thereby instituting a criminal proceeding against the Plaintiff.

106. At the time Agostini signed the felony complaint, there was no probable cause to charge the Plaintiff with these crimes, and Agostini conspired with and acted in concert with the other defendants in manufacturing evidence against the Plaintiff to create probable cause.

107. Agostini commenced the aforementioned felony complaint against the Plaintiff to obtain a collateral objective outside the legitimate ends of the legal process, namely to effectuate retribution for having sought the counsel of an attorney, having exercised his civil liberties and in refusing to be further subject to bullying by Detectives Agostini and Abate.

108. Defendants Parker, Abate, Martinez, Perez and Nieves continuted the proceedings against the Plaintiff to obtain a collateral objective outside the legitimate ends of the legal process, namely to secure a conviction against Plaintiff for a crime which he did not commit and to effectuate retribution for having sought the counsel of an attorney, having

exercised his civil liberties and in refusing to be further subject to bullying by Detectives Agostini and Abate.

109.    All of the defendants acted with intent to do harm to plaintiff without excuse or justification.

110.    During the initial investigation, officers and detectives took handwritten notes of interviews with witnesses and gathered evidence, including but not limited to statements which contained information that was exculpatory to the Plaintiff, which contained information that would have been useful for cross examination of witnesses and which would have tended to undermine the case against Plaintiff.

111.    Among the evidence gathered was Plaintiff's memo book, which would have confirmed his presence elsewhere around the time the homicide occurred.

112.    Among the evidence gathered were copies of radio transmissions from the Parkchester radio system which showed that it was broadcast over the radio that Acosta had been shot, before the Plaintiff had arrived on the scene.

113.    All of the foregoing notes and evidence was given to Luis Agostini.

114.    Luis Agostini did not voucher the aforementioned materials, he did not provide them to the District Attorney's office, nor did he label, safeguard or preserve them.

115.    To hinder the Plaintiff's defense, Agostini destroyed and/or intentionally or recklessly lost all of the foregoing material.

116.    On or about March 8, 2001 Robert Martinez received information that Patrolmen of the 43rd precinct recovered a loaded .22 caliber automatic weapon at 1641 Metropolitan Ave.,

while arresting Cynthia Taylor.

117. Upon information and belief, Ballistics tests were conducted which analyzed whether the weapon recovered could have been the murder weapon of Acosta.

118. Upon information and belief, Martinez, Abate and/or Agostini suppressed the results of the ballistics tests and failed to inform the grand jury of the fact that a loaded .22 had been recovered from another person near the crime scene about two weeks after the murder.

119. On or about April 23, 2001, Alex Perez provided false testimony before the grand jury to assist in and secure an indictment against the Plaintiff for the homicide of Albert Acosta including that among other things, there were no radio transmissions identifying that it was a Parkchester Security officer who was shot and that when she arrived, Albert Acosta wasn't there, but had already been removed to Jacobi Hospital.

120. Alex Perez gave the foregoing testimony to fabricate probable cause against the Plaintiff and secure and indictment against the Plaintiff for the murder of Albert Acosta.

121. On or about April 23, 2001, Miriam Nieves provided false testimony before the grand jury to assist in and secure an indictment against the Plaintiff for the homicide of Albert Acosta.

122. To give the impression that Plaintiff was the murderer, Miriam Nieves testified that after responding to where Albert Acosta had been murdered, she left the room and saw Plaintiff who said to her "I don't want to go in there...That's my partner in there".

123. Miriam Nieves testified falsely that there had been no broadcast providing the identity of Acosta, to create the impression that the Plaintiff could only have known it was Albert

Acosta if he was the murderer.

124.    Miriam Nieves provided the aforementioned testimony to the grand jury to fabricate

probable cause to believe that the Plaintiff committed the murder of Albert Acosta and to

secure an indictment, even though there was no probable cause to believe that Plaintiff

had committed the homicide of Albert Acosta.

125.    Defendants failed to set forth facts before the grand jury which would have vitiated

probable cause.

126.    All of the foregoing testimony caused a grand jury to return an indictment against the

Plaintiff for the above referenced charges arising out of the death of Albert Acosta.

127.    But for the aforementioned false, fabricated and perjured testimony there was no probable

cause to believe that the Plaintiff had in any way committed acts resulting in the death of

Albert Acosta.

128.    On or about June 18, 2004, Luis Agostini falsely testified in a pre-trial hearing at the

Bronx Supreme Court to further the continuation of the criminal charges against the

Plaintiff.

129.    Among other things, during the aforementioned hearing, Luis Agostini testified falsely

that he received a hand written piece of paper from Plaintiff's employer, which was found

in the Plaintiff's locker which said "I feel like killing somebody".

130.    Among other things, during the aforementioned hearing, Luis Agostini testified falsely

that he had not received or lost any exculpatory evidence.

131.    Among other things, during the aforementioned hearing, Luis Agostini testified falsely

that Plaintiff was evasive during questioning and answered questions in a suspicious

manner.

132.   Among other things, during the aforementioned hearing, Luis Agostini testified falsely

that Plaintiff's attorney, after speaking with Plaintiff, asked Agostini whether the shooting

was intentional.

133.   Luis Agostini provided the aforementioned false testimony to create and fabricate

probable cause to believe that Plaintiff committed the homicide of Albert Acosta.

134.   On or about June 18, 2004, Miriam Nieves falsely testified in a pre-trial hearing at the

Bronx Supreme Court to further the continuation of the criminal charges against the

Plaintiff.

135.   Among other things, during the aforementioned hearing, Miriam Nieves testified falsely

that upon arriving at the scene where Acosta had been murdered, she did not know who

Acosta was or that it was a Parkchester security officer who had been shot.

136.   Among other things, during the aforementioned hearing, Miriam Nieves testified falsely

that as she was exiting the crime scene, she saw Manganiello coming into the basement

and Plaintiff said he wanted to go into the room- his partner was there.

137.   Among other things, during the aforementioned hearing, Miriam Nieves testified falsely

that at the point when Plaintiff made the comment to her, she didn't know that the

individual laying inside was parkchester police officer and that radio transmissions didn't

identify the individual.

138.   Among other things, during the aforementioned hearing, Miriam Nieves testified falsely

that when Plaintiff stated he wanted to see his partner Ms. Nieves became suspicious

because she thought how did he know it was his partner in there, he didn't even go into the room.

139.    Miriam Nieves provided the aforementioned fabricated testimony to create the false impression that because Plaintiff knew who was in the room, he must have been the murderer.

140.    Upon information and belief, Luis Agostini and/or Shawn Abate pressured and/or conspired with Miriam Nieves to provide false testimony to create and fabricate the impression that there was probable cause to believe the Plaintiff committed the homicide of Albert Acosta.

141.    The aforementioned testimony by Miriam Nieves was false, fabricated and designed to create the impression that there was probable cause to believe that the Plaintiff committed the homicide of Albert Acosta.

142.    On or about June 18, 2004, Alex Perez falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

143.    Among other things, during the aforementioned hearing, Alex Perez, testified that the radio transmissions that were broadcast did not say that it was a Parkchester security officer that was shot.

144.     Perez gave the aforementioned false testimony to create the impression that because Plaintiff knew it was Acosta who had been murdered, he must have committed the homicide because Acosta's identity had not been revealed over the radio.

145.     Alex Perez knew the testimony was false and testified to continue the prosecution of a case against the Plaintiff.

146.   On or about June 18, 2004, Shawn Abate falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

147.   Among other things, he received a call that a man was shot but he did not know taht it was an officer.

148.   Among other things, during the aforementioned hearing, Shawn Abate provided false testimony that the Plaintiff was evasive to the questions he was being asked.

149.   The aforementioned testimony by Shawn Abate was false, fabricated and designed to create the impression that there was probable cause to believe that the Plaintiff committed the homicide of Albert Acosta.

150.   During the course of the proceedings, Detectives Luis Agostini, Shawn Abate and other officers at the 43rd precinct, suppressed and refused to forward evidentiary material including paperwork prepared by the crime scene unit, results of scientific tests, among other evidence to the Bronx County District attorneys office to prevent the Plaintiff and his criminal defense lawyers from gaining access to said materials.

151.   The aforementioned materials contained exculpatory information and information which tended to negate the case against the Plaintiff and the defendants suppressed and attempted to suppress said material in furtherance of their conspiracy to wrongfully and maliciously prosecute the plaintiff.

152.   On or about July 6, 2004, during the trial of the Plaintiff, Detectives Luis Agonstini and Shawn Abate caused Michael Booth and Chris Tartone to furnish false, fabricated and perjurious testimony at the Bronx Supreme Courthouse.

153.   Defendants caused the aforementioned individuals to provide false testimony in an effort
to convict Plaintiff of the murder of Albert Acosta, in spite of Plaintiff's innocence.

154.   On or about June 28, 2004, Miriam Nieves, provided false, fabricated and perjurious
testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of
Albert Acosta.

155.   At the aforementioned date and place, among other things, Miriam Nieves testified that
the radio transmissions broadcast concerning the shooting of Albert Acosta did not
identify that it was a Parkchester security guard that had been shot.

156.   At the aforementioned date and place, among other things, Miriam Nieves testified that
there were no Parkchester personnel present when she arrived at the crime scene.

157.   At the aforementioned date and place, among other things, Miriam Nieves testified that
after leaving the room where Acosta had been shot, she encountered Anthony
Manganiello who said to her "something in regards to going into the room and that was
his partner".

158.   The aforementioned testimony by Miriam Nieves was false when given and was offered
in an attempt to create a false impression that Plaintiff must have been the murder
because he knew it was Acosta who was shot, even though there was no radio broadcast
identifying the victim.

159.   The aforementioned testimony by Nieves was offered in an attempt to secure a guilty
verdict against Plaintiff for the homicide of Albert Acosta, despite Plaintiff's innocence.

160.   On or about June 28, 2004, Alex Perez, provided false, fabricated and perjurious
testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of

Albert Acosta.

161. The aforementioned testimony by Alex Perez was false when given and was offered in an attempt to create a false impression that Plaintiff must have been the murder because he knew it was Acosta who was shot, even though there was no radio broadcast identifying the victim.

162. The aforementioned testimony by Perez was offered in an attempt to secure a guilty verdict against Plaintiff for the homicide of Albert Acosta, despite Plaintiff's innocence.

163. At the aforementioned date and place, among other things, Alex Perez testified that the radio transmissions broadcast concerning the shooting of Albert Acosta did not identify that it was a Parkchester security guard that had been shot.

164. On or about June 28, 2004, Luis Agostini, provided false, fabricated and perjurious testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of Albert Acosta.

165. At the aforementioned date and place, among other things, Agostini testified that he accidentally lost evidence concerning the Plaintiff's case.

166. Upon information and belief, Agostinti intentionally destroyed exculpatory evidence and evidence which tended to undercut the case against the Plaintiff.

167. Agostini destroyed the aforementioned evidence for the purpose of continuing the baseless prosecution against the Plaintiff and for the purpose of securing a conviction against the Plaintiff for the homicide of Albert Acosta, despite the Plaintiff's innocence

168. On or about June 30, 2004, Luis Agostini falsely testified at the aforementioned trial that

he on the date of Albert Acosta's murder, he asked the Plaintiff what his address was and the Plaintiff responded "I dont know, I don't know".

169. On or about June 30, 2004, Luis Agostini falsely testified at the aforementioned trial that on the date of Albert Acosta's murder, he asked the Plaintiff for his phone number, and the Plaintiff responded "its unlisted".

170. Luis Agosinti provided the foregoing testimony with knowledge that it was and with the intent of continuing the baseless prosecution against the Plaintiff and for the purpose of securing a conviction against the Plaintiff for the homicide of Albert Acosta, despite the Plaintiff's innocence.

171. The prosecution of Plaintiff was continued by the defendants even after it was apparent that he was innocent.

172. Defendants further failed to set forth facts and withheld facts during their testimony which would have vitiated against probable cause and/or guilt of the aforementioned crimes charged.

173. Defendants continued criminal proceedings against plaintiff despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

174. All of the foregoing was a proximate cause of the injuries more fully described herein to plaintiff.

175. On or about July 9, 2004, a panel of duly sworn and empaneled jury in the Bronx County Supreme Court found Plaintiff not guilty of the homicide of Albert Acosta and not guilty of all charges lodged against him under the aforementioned felony complaint and

subsequent indictment.

176.    All of the charges commenced and continued by the defendants were resolved in the favor of the Plaintiff.

177.    Defendants' actions violated the Plaintiff's civil rights including but not limited to his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution including but not limited to the right to due process, the right not to be unreasonably seized, the right to a fair trial, right not to be prosecuted with the use of fabricated evidence and/or perjurious testimony, the right not be arrested and imprisoned without probable case, the right of confrontation, and defendants further Maliciously prosecuted Plaintiff, subjected him to abuse of process, denied him his due process, denied him a fair trial, unreasonably seized the Plaintiff and violated his civil and constitutional rights.

178.    Defendants' actions violated clearly established rights.

179.    Defendants' action shocks the conscience.

180.    No reasonable officer in the position of the defendants would have believed the actions of the defendants herein was objectively reasonable.

181.    Each defendant had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

182.    Defendant Lt. Henry Scott conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

183.    Defendant Lt. Henry Scott was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had

the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

184.   Defendant Michael Phipps conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

185.   Defendant Michael Phipps was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

186.   Defendant John McGovern conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

187.   Defendant John McGovern was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

188.   Defendant Deputy Inspector Geryl McCarthy conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

189.   Defendant Deputy Inspector Geryl McCarthy was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

190.   All of the defendants named herein, conspired and acted in concert to deny Plaintiff a fair trial, to deny him the rights identified herein and to maliciously prosecute him.

191.    At all times relevant herein defendants lacked probable cause to continue criminal

proceedings against plaintiff, acted with malice in continuing criminal proceedings

against plaintiff, misrepresented and falsified evidence throughout all phases of the

criminal proceeding, and failed to make a full statement of facts known throughout all

phases of the proceedings, all of which was done to secure the conviction of the Plaintiff

for the murder of Albert Acosta, despite his innocence.

192.    As a direct and proximate result of the foregoing acts committed by the defendants, the

Plaintiff's liberty was constrained in that he was incarcerated for approximately ten days

and forced to endure the harassment, humiliations, hardships and inhumanities associated

with prison life, in that after said 10 days, his freedom of travel was restricted and

conditions of bail were placed upon his freedom and licenses were suspended and/or

revoked including his license to possess firearms, and his police certification.

193.    Plaintiff suffered great humiliation, ridicule, and mental anguish, depression, mental

shock, mental trauma, post traumatic stress disorder, emotional and mental suffering, he

suffered severe damage to his career and reputation, suffered substantial economic losses

as a result of his unlawful prosecution, was forced to incur substantial attorneys' fees in

connection with his defense.


### COUNT II
### CUSTOM,  POLICY AND MONNELL LIABILITY


194.    Plaintiff repeats and reiterates each and every one of the foregoing allegations as if more

fully stated herein.

195.    At all times relevant herein the City of New York had a custom, policy and practice of

improper training, improper supervision, allowing and permitting constitutional

violations, tacitly permitting the subornation of perjury, tacitly permitting the fabrication

of evidence, tacitly permitting the destruction and withholding of exculpatory evidence

and the commencement and continuation of criminal prosecutions without probable cause

and of other improper police practices at the 43rd Precinct, which amounted to a deliberate

indifference of plaintiff's rights.

196.    At all times relevant herein Deputy Inspector Geryl McCarthy was the officer in charge

of the 43rd Precinct and the other defendants named herein worked under her command.

197.    At all times relevant herein Deputy Inspector Geryl McCarthy acted in accordance with

the aforementioned custom, policy and practice, thereby allowed improper police

procedures to be used and failed to prevent the occurrences described herein.

198.    At all times relevant herein John McGovern was the officer in charge of the Detectives

Bureau of the 43rd Precinct and the other defendants named herein, including but not

limited to defendants Martinez, Agostini, Abate, Nieves and Perez worked under his

command.

199.    At all times relevant herein John McGovern acted in accordance with the

aforementioned custom, policy and practice, thereby allowed improper police procedures

to be used and failed to prevent the occurrences described herein.

200.    At all times relevant herein Michael Phipps was the officer in charge of the 43rd Precinct

and the other defendants named herein, including but not limited to defendants Martinez,

Agostini, Abate, Nieves and Perez worked under his command.

201.    At all times relevant herein Michael Phipps acted in accordance with the

aforementioned custom, policy and practice, thereby allowed improper police procedures

to be used and failed to prevent the occurrences described herein.

202.    At all times relevant herein Henry Scott was the officer in charge of the 43rd Precinct

and the other defendants named herein, including but not limited to defendants Martinez,

Agostini, Abate, Nieves and Perez worked under his command.

203.    At all times relevant herein Henry Scott acted in accordance with the aforementioned

custom, policy and practice, thereby allowed improper police procedures to be used and

failed to prevent the occurrences described herein.

204.    At all times hereinafter mentioned the defendants, either personally or through their

employees, were acting under color of state law and/or in compliance with the official

rules, regulations, laws, statutes, customs, usages and/or practices of the City of New

York.

205.    Defendants continued criminal proceedings against plaintiff despite a lack of

credible evidence against him, and notwithstanding their knowledge that said

proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional

rights.

206.    The acts complained of were carried out by the aforementioned individual

defendants in their capacities as police officers and officials pursuant to the customs,

policies, usages, practices, procedures, and rules of the City of New York, the New York

City Police Department under the supervision of ranking officers of said department,

office and the 43rd precinct.

207.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY

OF NEW YORK, as implemented by the New York City Police Department, were the

moving force behind the constitutional violations suffered by plaintiff.

208.    Apart from the foregoing practices and policies, defendant CITY OF NEW YORK

exhibited a deliberate indifference toward the training and supervision of detectives and

police officers in the 43rd precinct.

209. The City of New York intentionally and/or recklessly failed to properly instruct, train and/or supervise the detectives and police officers with regard to their obligations to discontinue a criminal prosecution when evidence is discovered which negates probable cause and exonerates the accused and further intentionally and/or recklessly failed to properly instruct, train and/or supervise detectives and police officers with regard to their obligations to maintain and timely disclose all evidence favorable to the defense on the issues of guilt or innocence and punishment, pursuant to the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; and to provide criminal defendants with a fair trial pursuant to their obligations under the Fourth Amendment to the United States Constitution.

210. The City of New York Intentionally and/or recklessly failed to train and supervise Detectives and Police officers with regard to their obligations to avoid pressuring potential witnesses to give untruthful, erroneous, incomplete and/or misleading statements; intentionally and/or recklessly failed to properly instruct, train and/or supervise police officers and detectives  with regard to their obligations to avoid adopting a "win-at- all-costs" approach to Criminal Prosecutions which involves, inter alia, the following misconduct: coaching and/or permitting witnesses to give inaccurate, false and/or misleading testimony; tailoring witness testimony to explain inconsistencies and losing and destroying evidence.

211. All of the foregoing were direct and proximate causes of the violations of Plaintiff's civil rights and the injuries complained of herein.

## COUNT III
PUNITIVE DAMAGES

212. Plaintiff repeats and realleges each and every one of the foregoing allegations with the same force and effect as if fully set forth herein at length.

213. The foregoing acts were done recklessly, intentionally, wantonly and with gross indifference to the rights of plaintiff, thereby entitling him to punitive and exemplary damages.

## COUNT IV:
ATTORNEYS FEES AND COSTS UNDER 42 U.S.C. § 1988

214. Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as if fully set forth herein at length.

215. The foregoing events constitute violations of plaintiff's statutory and constitutional rights, thereby entitling him to attorneys fees, costs and disbursements as permitted by 28 U.S.C. § 1988.

WHEREFORE, plaintiff requests judgment against defendants in an amount to be determined by the jury for nominal damages, compensatory damages, punitive and exemplary damages, attorneys fees, together with costs and disbursements, including interest on the judgment commencing from the date of injury.

Yours etc.,

OSORIO & ASSOCIATES, LLC

BY:  _____

Michael H. Joseph, Esq. (MJ8838)
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168

Dated: White Plains, New York
April 30, 2007