Manganiello asked if they needed him and they said no and Manganielloe left, whereas, Manganiello actually left with the officers and they had previously given statements to that effect.

104. Agostini created the foregoing false statements of officers Ortiz and Rodriguez in an attempt to fabricate evidence and undercut Plaintiff's alibi and further support the testimony of Cobb, which Agostini knew to be false.

105. On April 20, 2001, Luis Agostini signed a felony complaint accusing the Plaintiff of Murder in the second degree, Manslaughter in the first degree, criminal possession of a weapon in the second degree, thereby instituting a criminal proceeding against the Plaintiff.

106. At the time Agostini signed the felony complaint, there was no probable cause to charge the Plaintiff with these crimes, and Agostini conspired with and acted in concert with the other defendants in manufacturing evidence against the Plaintiff to create probable cause.

107. Agostini commenced the aforementioned felony complaint against the Plaintiff to obtain a collateral objective outside the legitimate ends of the legal process, namely to effectuate retribution for having sought the counsel of an attorney, having exercised his civil liberties and in refusing to be further subject to bullying by Detectives Agostini and Abate.

108. Defendants Parker, Abate, Martinez, Perez and Nieves continuted the proceedings against the Plaintiff to obtain a collateral objective outside the legitimate ends of the legal process, namely to secure a conviction against Plaintiff for a crime which he did not commit and to effectuate retribution for having sought the counsel of an attorney, having

exercised his civil liberties and in refusing to be further subject to bullying by Detectives Agostini and Abate.

109. All of the defendants acted with intent to do harm to plaintiff without excuse or justification.

110. During the initial investigation, officers and detectives took handwritten notes of interviews with witnesses and gathered evidence, including but not limited to statements which contained information that was exculpatory to the Plaintiff, which contained information that would have been useful for cross examination of witnesses and which would have tended to undermine the case against Plaintiff.

111. Among the evidence gathered was Plaintiff's memo book, which would have confirmed his presence elsewhere around the time the homicide occurred.

112. Among the evidence gathered were copies of radio transmissions from the Parkchester radio system which showed that it was broadcast over the radio that Acosta had been shot, before the Plaintiff had arrived on the scene.

113. All of the foregoing notes and evidence was given to Luis Agostini.

114. Luis Agostini did not voucher the aforementioned materials, he did not provide them to the District Attorney's office, nor did he label, safeguard or preserve them.

115. To hinder the Plaintiff's defense, Agostini destroyed and/or intentionally or recklessly lost all of the foregoing material.

116. On or about March 8, 2001 Robert Martinez received information that Patrolmen of the 43rd precinct recovered a loaded .22 caliber automatic weapon at 1641 Metropolitan Ave.,

while arresting Cynthia Taylor.

117. Upon information and belief, Ballistics tests were conducted which analyzed whether the weapon recovered could have been the murder weapon of Acosta.

118. Upon information and belief, Martinez, Abate and/or Agostini suppressed the results of the ballistics tests and failed to inform the grand jury of the fact that a loaded .22 had been recovered from another person near the crime scene about two weeks after the murder.

119. On or about April 23, 2001, Alex Perez provided false testimony before the grand jury to assist in and secure an indictment against the Plaintiff for the homicide of Albert Acosta including that among other things, there were no radio transmissions identifying that it was a Parkchester Security officer who was shot and that when she arrived, Albert Acosta wasn't there, but had already been removed to Jacobi Hospital.

120. Alex Perez gave the foregoing testimony to fabricate probable cause against the Plaintiff and secure and indictment against the Plaintiff for the murder of Albert Acosta.

121. On or about April 23, 2001, Miriam Nieves provided false testimony before the grand jury to assist in and secure an indictment against the Plaintiff for the homicide of Albert Acosta.

122. To give the impression that Plaintiff was the murderer, Miriam Nieves testified that after responding to where Albert Acosta had been murdered, she left the room and saw Plaintiff who said to her "I don't want to go in there...That's my partner in there".

123. Miriam Nieves testified falsely that there had been no broadcast providing the identity of Acosta, to create the impression that the Plaintiff could only have known it was Albert

Acosta if he was the murderer.

124. Miriam Nieves provided the aforementioned testimony to the grand jury to fabricate probable cause to believe that the Plaintiff committed the murder of Albert Acosta and to secure an indictment, even though there was no probable cause to believe that Plaintiff had committed the homicide of Albert Acosta.

125. Defendants failed to set forth facts before the grand jury which would have vitiated probable cause.

126. All of the foregoing testimony caused a grand jury to return an indictment against the Plaintiff for the above referenced charges arising out of the death of Albert Acosta.

127. But for the aforementioned false, fabricated and perjured testimony there was no probable cause to believe that the Plaintiff had in any way committed acts resulting in the death of Albert Acosta.

128. On or about June 18, 2004, Luis Agostini falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

129. Among other things, during the aforementioned hearing, Luis Agostini testified falsely that he received a hand written piece of paper from Plaintiff's employer, which was found in the Plaintiff's locker which said "I feel like killing somebody".

130. Among other things, during the aforementioned hearing, Luis Agostini testified falsely that he had not received or lost any exculpatory evidence.

131. Among other things, during the aforementioned hearing, Luis Agostini testified falsely

that Plaintiff was evasive during questioning and answered questions in a suspicious manner.

132. Among other things, during the aforementioned hearing, Luis Agostini testified falsely that Plaintiff's attorney, after speaking with Plaintiff, asked Agostini whether the shooting was intentional.

133. Luis Agostini provided the aforementioned false testimony to create and fabricate probable cause to believe that Plaintiff committed the homicide of Albert Acosta.

134. On or about June 18, 2004, Miriam Nieves falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

135. Among other things, during the aforementioned hearing, Miriam Nieves testified falsely that upon arriving at the scene where Acosta had been murdered, she did not know who Acosta was or that it was a Parkchester security officer who had been shot.

136. Among other things, during the aforementioned hearing, Miriam Nieves testified falsely that as she was exiting the crime scene, she saw Manganiello coming into the basement and Plaintiff said he wanted to go into the room- his partner was there.

137. Among other things, during the aforementioned hearing, Miriam Nieves testified falsely that at the point when Plaintiff made the comment to her, she didn't know that the individual laying inside was parkchester police officer and that radio transmissions didn't identify the individual.

138. Among other things, during the aforementioned hearing, Miriam Nieves testified falsely that when Plaintiff stated he wanted to see his partner Ms. Nieves became suspicious

because she thought how did he know it was his partner in there, he didn't even go into the room.

139. Miriam Nieves provided the aforementioned fabricated testimony to create the false impression that because Plaintiff knew who was in the room, he must have been the murderer.

140. Upon information and belief, Luis Agostini and/or Shawn Abate pressured and/or conspired with Miriam Nieves to provide false testimony to create and fabricate the impression that there was probable cause to believe the Plaintiff committed the homicide of Albert Acosta.

141. The aforementioned testimony by Miriam Nieves was false, fabricated and designed to create the impression that there was probable cause to believe that the Plaintiff committed the homicide of Albert Acosta.

142. On or about June 18, 2004, Alex Perez falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

143. Among other things, during the aforementioned hearing, Alex Perez, testified that the radio transmissions that were broadcast did not say that it was a Parkchester security officer that was shot.

144. Perez gave the aforementioned false testimony to create the impression that because Plaintiff knew it was Acosta who had been murdered, he must have committed the homicide because Acosta's identity had not been revealed over the radio.

145. Alex Perez knew the testimony was false and testified to continue the prosecution of a case against the Plaintiff.

146. On or about June 18, 2004, Shawn Abate falsely testified in a pre-trial hearing at the Bronx Supreme Court to further the continuation of the criminal charges against the Plaintiff.

147. Among other things, he received a call that a man was shot but he did not know taht it was an officer.

148. Among other things, during the aforementioned hearing, Shawn Abate provided false testimony that the Plaintiff was evasive to the questions he was being asked.

149. The aforementioned testimony by Shawn Abate was false, fabricated and designed to create the impression that there was probable cause to believe that the Plaintiff committed the homicide of Albert Acosta.

150. During the course of the proceedings, Detectives Luis Agostini, Shawn Abate and other officers at the 43rd precinct, suppressed and refused to forward evidentiary material including paperwork prepared by the crime scene unit, results of scientific tests, among other evidence to the Bronx County District attorneys office to prevent the Plaintiff and his criminal defense lawyers from gaining access to said materials.

151. The aforementioned materials contained exculpatory information and information which tended to negate the case against the Plaintiff and the defendants suppressed and attempted to suppress said material in furtherance of their conspiracy to wrongfully and maliciously prosecute the plaintiff.

152. On or about July 6, 2004, during the trial of the Plaintiff, Detectives Luis Agonstini and Shawn Abate caused Michael Booth and Chris Tartone to furnish false, fabricated and perjurious testimony at the Bronx Supreme Courthouse.

153. Defendants caused the aforementioned individuals to provide false testimony in an effort to convict Plaintiff of the murder of Albert Acosta, in spite of Plaintiff's innocence.

154. On or about June 28, 2004, Miriam Nieves, provided false, fabricated and perjurious testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of Albert Acosta.

155. At the aforementioned date and place, among other things, Miriam Nieves testified that the radio transmissions broadcast concerning the shooting of Albert Acosta did not identify that it was a Parkchester security guard that had been shot.

156. At the aforementioned date and place, among other things, Miriam Nieves testified that there were no Parkchester personnel present when she arrived at the crime scene.

157. At the aforementioned date and place, among other things, Miriam Nieves testified that after leaving the room where Acosta had been shot, she encountered Anthony Manganiello who said to her "something in regards to going into the room and that was his partner".

158. The aforementioned testimony by Miriam Nieves was false when given and was offered in an attempt to create a false impression that Plaintiff must have been the murder because he knew it was Acosta who was shot, even though there was no radio broadcast identifying the victim.

159. The aforementioned testimony by Nieves was offered in an attempt to secure a guilty verdict against Plaintiff for the homicide of Albert Acosta, despite Plaintiff's innocence.

160. On or about June 28, 2004, Alex Perez, provided false, fabricated and perjurious testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of

Albert Acosta.

161. The aforementioned testimony by Alex Perez was false when given and was offered in an attempt to create a false impression that Plaintiff must have been the murder because he knew it was Acosta who was shot, even though there was no radio broadcast identifying the victim.

162. The aforementioned testimony by Perez was offered in an attempt to secure a guilty verdict against Plaintiff for the homicide of Albert Acosta, despite Plaintiff's innocence.

163. At the aforementioned date and place, among other things, Alex Perez testified that the radio transmissions broadcast concerning the shooting of Albert Acosta did not identify that it was a Parkchester security guard that had been shot.

164. On or about June 28, 2004, Luis Agostini, provided false, fabricated and perjurious testimony at the Bronx Supreme Courthouse in the trial of Plaintiff for the murder of Albert Acosta.

165. At the aforementioned date and place, among other things, Agostini testified that he accidentally lost evidence concerning the Plaintiff's case.

166. Upon information and belief, Agostinti intentionally destroyed exculpatory evidence and evidence which tended to undercut the case against the Plaintiff.

167. Agostini destroyed the aforementioned evidence for the purpose of continuing the baseless prosecution against the Plaintiff and for the purpose of securing a conviction against the Plaintiff for the homicide of Albert Acosta, despite the Plaintiff's innocence

168. On or about June 30, 2004, Luis Agostini falsely testified at the aforementioned trial that

he on the date of Albert Acosta's murder, he asked the Plaintiff what his address was and the Plaintiff responded "I dont know, I don't know".

169. On or about June 30, 2004, Luis Agostini falsely testified at the aforementioned trial that on the date of Albert Acosta's murder, he asked the Plaintiff for his phone number, and the Plaintiff responded "its unlisted".

170. Luis Agosinti provided the foregoing testimony with knowledge that it was and with the intent of continuing the baseless prosecution against the Plaintiff and for the purpose of securing a conviction against the Plaintiff for the homicide of Albert Acosta, despite the Plaintiff's innocence.

171. The prosecution of Plaintiff was continued by the defendants even after it was apparent that he was innocent.

172. Defendants further failed to set forth facts and withheld facts during their testimony which would have vitiated against probable cause and/or guilt of the aforementioned crimes charged.

173. Defendants continued criminal proceedings against plaintiff despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

174. All of the foregoing was a proximate cause of the injuries more fully described herein to plaintiff.

175. On or about July 9, 2004, a panel of duly sworn and empaneled jury in the Bronx County Supreme Court found Plaintiff not guilty of the homicide of Albert Acosta and not guilty of all charges lodged against him under the aforementioned felony complaint and

subsequent indictment.

176. All of the charges commenced and continued by the defendants were resolved in the favor of the Plaintiff.

177. Defendants' actions violated the Plaintiff's civil rights including but not limited to his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution including but not limited to the right to due process, the right not to be unreasonably seized, the right to a fair trial, right not to be prosecuted with the use of fabricated evidence and/or perjurious testimony, the right not be arrested and imprisoned without probable case, the right of confrontation, and defendants further Maliciously prosecuted Plaintiff, subjected him to abuse of process, denied him his due process, denied him a fair trial, unreasonably seized the Plaintiff and violated his civil and constitutional rights.

178. Defendants' actions violated clearly established rights.

179. Defendants' action shocks the conscience.

180. No reasonable officer in the position of the defendants would have believed the actions of the defendants herein was objectively reasonable.

181. Each defendant had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

182. Defendant Lt. Henry Scott conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

183. Defendant Lt. Henry Scott was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had

the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

184. Defendant Michael Phipps conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

185. Defendant Michael Phipps was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

186. Defendant John McGovern conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

187. Defendant John McGovern was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

188. Defendant Deputy Inspector Geryl McCarthy conspired, aided, abetted and acted in concert with the other defendants in maliciously prosecuting the plaintiff.

189. Defendant Deputy Inspector Geryl McCarthy was aware of the aforementioned civil rights violations and wrongful acts being done by the detectives and officers under his command, and he had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant, but failed to do so thereby proximately causing plaintiff's injuries.

190. All of the defendants named herein, conspired and acted in concert to deny Plaintiff a fair trial, to deny him the rights identified herein and to maliciously prosecute him.

191. At all times relevant herein defendants lacked probable cause to continue criminal proceedings against plaintiff, acted with malice in continuing criminal proceedings against plaintiff, misrepresented and falsified evidence throughout all phases of the criminal proceeding, and failed to make a full statement of facts known throughout all phases of the proceedings, all of which was done to secure the conviction of the Plaintiff for the murder of Albert Acosta, despite his innocence.

192. As a direct and proximate result of the foregoing acts committed by the defendants, the Plaintiff's liberty was constrained in that he was incarcerated for approximately ten days and forced to endure the harassment, humiliations, hardships and inhumanities associated with prison life, in that after said 10 days, his freedom of travel was restricted and conditions of bail were placed upon his freedom and licenses were suspended and/or revoked including his license to possess firearms, and his police certification.

193. Plaintiff suffered great humiliation, ridicule, and mental anguish, depression, mental shock, mental trauma, post traumatic stress disorder, emotional and mental suffering, he suffered severe damage to his career and reputation, suffered substantial economic losses as a result of his unlawful prosecution, was forced to incur substantial attorneys' fees in connection with his defense.

## COUNT II
### CUSTOM, POLICY AND MONNELL LIABILITY

194. Plaintiff repeats and reiterates each and every one of the foregoing allegations as if more fully stated herein.

195. At all times relevant herein the City of New York had a custom, policy and practice of improper training, improper supervision, allowing and permitting constitutional

violations, tacitly permitting the subornation of perjury, tacitly permitting the fabrication of evidence, tacitly permitting the destruction and withholding of exculpatory evidence and the commencement and continuation of criminal prosecutions without probable cause and of other improper police practices at the 43rd Precinct, which amounted to a deliberate indifference of plaintiff's rights.

196. At all times relevant herein Deputy Inspector Geryl McCarthy was the officer in charge of the 43rd Precinct and the other defendants named herein worked under her command.

197. At all times relevant herein Deputy Inspector Geryl McCarthy acted in accordance with the aforementioned custom, policy and practice, thereby allowed improper police procedures to be used and failed to prevent the occurrences described herein.

198. At all times relevant herein John McGovern was the officer in charge of the Detectives Bureau of the 43rd Precinct and the other defendants named herein, including but not limited to defendants Martinez, Agostini, Abate, Nieves and Perez worked under his command.

199. At all times relevant herein John McGovern acted in accordance with the aforementioned custom, policy and practice, thereby allowed improper police procedures to be used and failed to prevent the occurrences described herein.

200. At all times relevant herein Michael Phipps was the officer in charge of the 43rd Precinct and the other defendants named herein, including but not limited to defendants Martinez, Agostini, Abate, Nieves and Perez worked under his command.

201. At all times relevant herein Michael Phipps acted in accordance with the aforementioned custom, policy and practice, thereby allowed improper police procedures to be used and failed to prevent the occurrences described herein.

202. At all times relevant herein Henry Scott was the officer in charge of the 43rd Precinct

and the other defendants named herein, including but not limited to defendants Martinez, Agostini, Abate, Nieves and Perez worked under his command.

203. At all times relevant herein Henry Scott acted in accordance with the aforementioned custom, policy and practice, thereby allowed improper police procedures to be used and failed to prevent the occurrences described herein.

204. At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the City of New York.

205. Defendants continued criminal proceedings against plaintiff despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

206. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the New York City Police Department under the supervision of ranking officers of said department, office and the 43rd precinct.

207. The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York City Police Department, were the moving force behind the constitutional violations suffered by plaintiff.

208. Apart from the foregoing practices and policies, defendant CITY OF NEW YORK exhibited a deliberate indifference toward the training and supervision of detectives and police officers in the 43rd precinct.

209. The City of New York intentionally and/or recklessly failed to properly instruct, train and/or supervise the detectives and police officers with regard to their obligations to discontinue a criminal prosecution when evidence is discovered which negates probable cause and exonerates the accused and further intentionally and/or recklessly failed to properly instruct, train and/or supervise detectives and police officers with regard to their obligations to maintain and timely disclose all evidence favorable to the defense on the issues of guilt or innocence and punishment, pursuant to the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; and to provide criminal defendants with a fair trial pursuant to their obligations under the Fourth Amendment to the United States Constitution.

210. The City of New York Intentionally and/or recklessly failed to train and supervise Detectives and Police officers with regard to their obligations to avoid pressuring potential witnesses to give untruthful, erroneous, incomplete and/or misleading statements; intentionally and/or recklessly failed to properly instruct, train and/or supervise police officers and detectives with regard to their obligations to avoid adopting a "win-at-all-costs" approach to Criminal Prosecutions which involves, inter alia, the following misconduct: coaching and/or permitting witnesses to give inaccurate, false and/or misleading testimony; tailoring witness testimony to explain inconsistencies and losing and destroying evidence.

211. All of the foregoing were direct and proximate causes of the violations of Plaintiff's civil rights and the injuries complained of herein.

## COUNT III
## PUNITIVE DAMAGES

212. Plaintiff repeats and realleges each and every one of the foregoing allegations with the same force and effect as if fully set forth herein at length.

213. The foregoing acts were done recklessly, intentionally, wantonly and with gross indifference to the rights of plaintiff, thereby entitling him to punitive and exemplary damages.

## COUNT IV:
## ATTORNEYS FEES AND COSTS UNDER 42 U.S.C. § 1988

214. Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as if fully set forth herein at length.

215. The foregoing events constitute violations of plaintiff's statutory and constitutional rights, thereby entitling him to attorneys fees, costs and disbursements as permitted by 28 U.S.C. § 1988.

WHEREFORE, plaintiff requests judgment against defendants in an amount to be determined by the jury for nominal damages, compensatory damages, punitive and exemplary damages, attorneys fees, together with costs and disbursements, including interest on the judgment commencing from the date of injury.

Yours etc.,

OSORIO & ASSOCIATES, LLC

BY: _____
Michael H. Joseph, Esq. (MJ8838)
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168

Dated: White Plains, New York
April 30, 2007