UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

ANTHONY MANGANIELLO,

                                                      Plaintiff,

                        -against-

THE CITY OF NEW YORK, DET. LUIS AGOSTINI,
individually and as a New York City Police Detective,
SHAWN ABATE, individually and as a New York City
Police Detective, DEREK PARKER, individually and as a
New York City Police Detective, LT. HENRY SCOTT,
individually and as a New York City Police Lieutenant,
P.O. ALEX PEREZ, individually and as a New York City
Police Officer, P.O. MIRIAN NIEVES, individually and as
a New York City Police Officer, MICHAEL PHIPPS,
individually and as a the Commanding Officer of the 43rd
Precinct, JOHN McGOVERN, individually and as a New
York City Police Detective Sergeant, ROBERT
MARTINEZ, individually and as a New York City Police
Detective, GERYL McCARTHY, individually and as a
New York City Police Deputy Inspector,

                                                     Defendants.

------------------------------------------------------------------ x

**DEFENDANTS'
STATEMENT OF
UNCONTESTED MATERIAL
FACTS PURSUANT TO
LOCAL RULE 56.1**

07 Civ. 3644 (HB)

       Pursuant to Local Rule 56.1(a) of the Local Civil Rules of the United States District Court for the Southern District of New York, defendants City of New York, retired Detective Luis Agostini, retired Detective Shawn Abate, retired Detective Derek Parker, retired Lieutenant Harry Scott (sued herein as "Lt. Henry Scott"), retired Police Officer Alex Perez, retired Police Officer Miriam Nieves, Inspector Michael Phipps, Lieutenant John McGovern, retired Detective Richard Martinez (sued herein as "Robert Martinez"), and retired Deputy Inspector Geryl McCarthy respectfully submit this statement of material facts as to which they contend there is no genuine issue to be tried.

1. On the morning of February 12, 2001, a security guard named Albert Acosta, employed by Parkchester South Comdominium Security Department (hereinafter "Parkchester Security"), was found lying face down in the basement of 1700 Metropolitan Avenue, located in the Parkchester South Condominium Complex, with a gunshot wound to his head. (See New York City Police Department Complaint Report dated February 12, 2001, attached as Exhibit "A" to the Declaration of Hillary A. Frommer, hereinafter the "Frommer Declaration").

2. Mr. Acosta was transported to Jacobi Medical Center where he was subsequently pronounced dead. (See Parkchester South Condominium Security Department memorandum from Sergeant Ohle to Chief Bellamy, dated February 12, 2001, attached as Exhibit "B" to the Frommer Declaration).

3. Plaintiff Anthony Manganiello was employed as a security guard with Parkchester Security and was working in the vicinity of 1700 Metropolitan Avenue on February 12, 2001. (See excerpts from deposition transcript of Anthony Manganiello dated December 21, 2007, pp. 109-136, attached as Exhibit "C" to the Frommer Declaration).

4. On February 12, 2001, plaintiff had access to the basement of 1700 Metropolitan Avenue. (See Exhibit C, p. 117).

5. Plaintiff was equipped with a radio that enabled him to receive and make transmissions only to other Parkchester Security personnel and to the Parkchester Security central dispatcher. (See Exhibit C, pp. 121-122).

6. On February 12, 2001, plaintiff was not able to hear any radio transmissions broadcast by the New York City Police Department or any of its members. (See Exhibit C, p. 122).

7. At 10:14 a.m., the Parkchester Security Department received a telephone call that there was a man down in the basement of 1700 Metropolitan Avenue. (See handwritten log book notes from Parkchester Security regarding dispatches for February 12, 2001, attached as Exhibit "D" to the Frommer Declaration).

8. After Parkchester Security received that telephone call, plaintiff radioed the Parkchester dispatcher and requested to take a personal break to a location far away from his assigned post. (See Exhibit D).

9. Immediately after receiving that radio transmission from plaintiff, at 10:15 a.m. on February 12, 2001, the Parkchester Security central dispatcher transmitted over the Parkchester radio system that there was a man down in the basement of 1700 Metropolitan Oval. (See Exhibit B; Exhibit D; New York City Police Department Complaint Follow-Up Informational dated February 12, 2001, attached as Exhibit "E" to the Frommer Declaration).

10. In that radio transmission, the Parkchester Security central dispatcher did not identify the victim and did not indicate that the victim was a Parkchester security guard. (See Exhibit A, Exhibit D; Exhibit E).

11. Plaintiff did not respond to that radio transmission. (See Exhibit E).

12. Plaintiff claims that he went to 1700 Metropolitan Avenue because he heard a radio broadcast from Parkchester Security that identified Albert Acosta as the victim. (See Exhibit C, p. 139).

13. At 10:15 a.m., the Parkchester Security dispatcher attempted to call both plaintiff and Albert Acosta via telephone to inform them that there was a man down in the basement of 1700 Metropolitan Avenue. (See Exhibit D).

3

14. At 10:15 a.m., a call to 911 was made and the New York City Police Department central radio dispatcher broadcast over the NYPD radio system that there was a "10-13" at 1700 Metropolitan Avenue. (See Memobook entry for February 12, 2001 of Police Officer Miriam Nieves, attached as Exhibit "F" to the Frommer Declaration).

15. A "10-13" is a code used by the New York City Police Department to indicate that there is a uniformed person in distress. (See excerpts from deposition of Harry Scott dated December 19, 2007, p. 30, attached as Exhibit "G" to the Frommer Declaration).

16. That initial NYPD "10-13" radio transmission did not identify the victim of the crime and did not state that the victim was a Parkchester security guard. (See Exhibit G; excerpts from transcript of deposition of Miriam Nieves dated March 13, 2008, pp. 11-12, 27, attached as Exhibit "H" to the Frommer Declaration).

17. Police Officer Miriam Nieves and her partner Police Officer Alex Perez responded to the NYPD "10-13" radio transmission and went to 1700 Metropolitan Avenue. (See Exhibit F; Exhibit H).

18. At the time they arrived at the scene, neither officer had heard any radio transmission identifying the victim. (See Exhibit H).

19. Several other members of the New York City Police Department arrived at the scene and detectives from the 43rd Precinct Detective Squad commenced an investigation. Later in the day on February 12, 2001, Detective Luis Agostini was assigned as the case detective. (See Exhibit G, p. 30; excerpt of transcript of deposition of Luis Agostini dated December 20, 2007, p. 113, attached as Exhibit "I" to the Frommer Declaration).

20. The police investigation concluded on or about April 20, 2001 when the Bronx County District Attorney's Office procured a warrant for plaintiff's arrest and directed the 43rd

Precinct Detective Squad to arrest plaintiff. (See Affidavit of Shawn Abate dated April 11, 2008, attached as Exhibit "J" to the Frommer Declaration).

21. Detective Abate took plaintiff into custody on April 20, 2001. (See Exhibit J).

22. As of April 20, 2001, the Bronx County District Attorney's Office had been provided with all of the information the police obtained during the course of the homicide investigation. (See Exhibit I, p. 127).

23. Prior to plaintiff's arrest on April 20, 2001, Detective Agostini gave all of the documents, evidence and information the police had obtained during the course of the homicide investigation to the Bronx County District Attorney's Office. (See Exhibit I, p. 127).

24. As of April 20, 2001, the District Attorney's Office was aware that the radio transmissions made from the Parkchester Security central dispatcher between 10:15 a.m. and 10:21 a.m. on February 12, 2001 did not identify the victim in the basement of 1700 Metropolitan Avenue. (See Exhibit D; Exhibit E; Exhibit H).

25. In fact, at trial, Matias Colon, testified that he was the Parkchester Security dispatcher on February 12, 2001 and when he dispatched over the Parkchester Security radio system that there was a man down in 1700 Metropolitan Avenue, he did not broadcast that the victim was Albert Acosta or that it was a Parkchester security guard because he did not know the victim's identity. Mr. Colon further testified at trial that he specifically dispatched that there was a man down at 1700 Metropolitan Avenue to plaintiff, who responded to Mr. Colon that he did not understand the radio transmission. (See excerpt from trial transcript in the matter of The People of the State of New York against Anthony Manganiello, Indictment No. 2207/01 dated June 28, 2004, pp. 415-432, attached as Exhibit "K" to the Frommer Declaration).

26. Mr. Colon also testified at trial that when he called 911 to obtain police assistance, he still did not know the identity of the victim at 1700 Metropolitan Avenue. (See Exhibit K).

27. As of April 20, 2001, the District Attorney's Office was aware that a gunshot residue test that had been performed on plaintiff's hands did not have a positive result. (See Exhibit I, pp. 75-76, 127-128).

28. The District Attorney's Office was aware that a civilian witness named Walter Cobb was directly outside the basement entrance to 1700 Metropolitan Avenue when he heard four gun shots. Immediately after hearing the gun shots, Mr. Cobb saw plaintiff exit the basement of 1700 Metropolitan Avenue. (See Exhibit H, p. 127; New York City Police Department Complaint Follow-Up Informational dated February 12, 2001, attached as Exhibit "L" to the Frommer Declaration).

29. In fact, Mr. Cobb, a former marine, testified at plaintiff's criminal trial on June 28, 2004 that immediately after he heard what he believed to be gun shots from either a .22 caliber or .25 caliber gun, the door to the basement of 1700 Metropolitan Avenue flew open and plaintiff came out. (see Exhibit K, pp. 41-51).

30. As of April 20, 2001, the District Attorney's Office was aware that two civilian witnesses, Christopher Tartone and Michael Booth, each identified plaintiff from Precinct photobooks and each gave a written statement attesting to the fact that plaintiff had inquired about purchasing a gun. (See Exhibit H; New York City Police Department Complaint Follow-Up Informational dated March 1, 2001, and New York City Police Department 43rd Detective Squad Defendant/Suspect/Witness Statement dated March 1, 2001 Subject: Interview Michael Booth, attached as Exhibit "M" to the Frommer Declaration; New York City Police Department

Complaint Follow-Up Informational dated March 1, 2001 Subject: Michael Booth Viewed Photo Book, attached as Exhibit "N" to the Frommer Declaration; New York City Police Department Complaint Follow-Up Informational dated February 27, 2001 Subject Interviewed Chris Tartone and New York City Police Department 43rd Detective Squad Defendant/Subject/Witness Statement dated February 27, 2001, attached as Exhibit "O" to the Frommer Declaration).

31. Specifically, Mr. Booth's statement indicated that plaintiff had approached him in early February asking about a gun. (See Exhibit M).

32. Mr. Booth testified at trial that in late January or early February 2001, plaintiff approached him while he was sitting in his car and asked Mr. Booth if he knew where plaintiff could "get a rod from." Mr. Booth also testified that he understood that plaintiff was looking for a gun. (See Exhibit K, pp. 609-616).

33. Information provided to the District Attorney's Office included that Mr. Acosta had been shot and killed with a .22 caliber gun. (New York City Police Department Request for Laboratory Examination, attached as Exhibit "P" to the Frommer Declaration).

34. As of April 20, 2001, the District Attorney's Office was aware that a civilian witness named Terrance Alston claimed to have information about the Acosta homicide. (See Exhibit I, pp. 127, 159, 177, 188, 211-212).

35. The District Attorney's Office was aware that Mr. Alston claimed to know someone who sold plaintiff a .22 caliber gun. (See Exhibit I, pp. 159, 177, 188, 211-212).

36. Prior to April 20, 2001, the Assistant District Attorney was present when civilian witness Mark Damon stated that, in January 2001, he had sold a .22 caliber gun to a Parkchester Security Guard described as a heavy set Italian man with a thick mustache. (See New York City

7

Police Department Complaint Follow-Up Informational dated April 7, 2001, attached as Exhibit "Q" to the Frommer Declaration).

37. Mr. Damon told the District Attorney's Office that Terrance Alston directed him to sell the gun. (See Exhibit Q).

38. The District Attorney's Office and not any of the individual defendants, made the decision to prosecute plaintiff and independently determined what charges to bring against him. (See Exhibit G, p. 138; Exhibit J; Affidavit of Luis Agostini dated April 14, 2008, attached as Exhibit "R" to the Frommer Declaration; excerpts from transcript of deposition of Derek Parker dated January 30, 2008, pp. 111-114, attached as Exhibit "S" to the Frommer Declaration; excerpt of transcript of deposition of John McGovern dated February 7, 2008, pp. 79-81, attached as Exhibit "T" to the Frommer Declaration; excerpts of transcript of deposition of Geryl McCarthy dated February 7, 2008, pp. 60-62, attached as Exhibit "U" to the Frommer Declaration).

39. The District Attorney's Office prepared the Criminal Court Complaint. (Exhibit R; Complaint, Criminal Court of the City of New York County of Bronx The People of the State of New York v. Anthony Manganiello, Docket Number 2001BX024949, attached as Exhibit "V" to the Frommer Declaration).

40. Detective Agostini reviewed the Criminal Court Complaint and, believing that all of the facts contained therein were accurate to the best of his knowledge, signed the document. (See Exhibit R).

41. The District Attorney's Office made the determination to present the case to a Grand Jury. (See Exhibit J; Exhibit R; Exhibit T).

42. Detective Agostini did not make the decision to pursue a criminal prosecution or to present t a case against plaintiff before a Grand Jury. (See Exhibit R).

43. Detective Agostini never urged or encouraged the District Attorney's Office to prosecute plaintiff. (See Exhibit R).

44. Detective Agostini did not withhold any information from the District Attorney's Office. (See Exhibit R).

45. In fact, Detective Agostini informed the District Attorney's Office that a man named Terrance Alston had provided him with some information regarding the Acosta homicide that Detective Agostini could not verify. (See Exhibit I, pp. 152-153, 156).

46. Detective Agostini performed a background check of Mr. Alston and forwarded that information to the District Attorney's Office. (See Exhibit I, pp. 152-153).

47. Detective Agostini testified before the Grand Jury but he did not testify as to any witness statements obtained during the course of the police investigation into the homicide of Albert Acosta. (See Exhibit R).

48. Detective Agostini testified truthfully before the Grand Jury. (See Exhibit R).

49. Detective Abate did not make the decision to pursue a criminal prosecution against plaintiff. (See Exhibit J).

50. Detective Abate had no input in the District Attorney's decsion to present a case against plaintiff to the Grand Jury or to seek an indictment against plaintiff. (See Exhibit J).

51. At the Grand Jury, Detective Abate testified that he took plaintiff into police custody on April 20, 2001. Detective Abate was not requested and did not testify as to any of the facts of the police investigation into the homicide of Albert Acosta. (See Exhibit J).

52. Detective Abate testified truthfully and to the best of his ability before the Grand Jury. (See Exhibit J).

53. Detective Abate did not withhold any information from the District Attorneys' Office. (See Exhibit J).

54. Detective Martinez did not speak to anyone at the District Attorney's Office regarding the criminal prosecution of plainitff. (See excerpts of transcript of deposition of Richard Martinez dated December 19, 2007, pp. 79-80, attached as Exhibit "W" to the Frommer Declaration).

55. Detective Martinez did not withhold any information from, or fabricate any information provided to, the District Attorney's Office. (See Exhibit W, p. 102).

56. Detective Martinez did not testify before the Grand Jury and did not coerce or threaten any witness to make statements or testify in connection with plaintiff's prosecution. (See Exhibit W, pp. 29, 103)

57. Detective Parker did not have any conversations with anyone from the District Attorney's Office regarding its prosecution of plaintiff. (See Exhibit S, pp. 111, 115).

58. Detective Parker did not testify before the Grand Jury and did not coerce or threaten any witness to make statements or testify in connection with plaintiff's prosecution. (See Exhibit S, p. 80, 113).

59. Detective Parker did not offer or make a deal with any witness to provide information regarding the Acosta homicide or to testify before the Grand Jury. (See Exhibit S, p. 58).

60. Lieutenant Scott did not testify before the Grand Jury and he did not coerce or threaten any individual to testify before the Grand Jury. (See Exhibit G, pp. 131, 137).

61. Lieutenant Scott did not withhold any information from, or fabricate any information provided to, the District Attorney's Office. (See Exhibit G, p. 137).

62. Lieutenant McGovern did not speak with anyone at the Bronx County District Attorney's Office regarding the prosecution of plaintiff. (See Exhibit T, pp. 79).

63. Lieutenant McGovern did not testify before the Grand Jury. (See Exhibit T, p. 79).

64. Lieutenant McGovern did not fabricate any information that was provided to the District Attorney's Office. (See Exhibit T, pp. 79-80).

65. Inspector McCarthy did not oversee the police homicide investigation. She was not responsible for reviewing police documents prepared in connection with that investigation. (See Exhibit U, p. 62).

66. Inspector McCarthy did not speak with anyone at the Bronx County District Attorney's Office regarding the prosecution of plaintiff. (See Exhibit U, pp. 60-61).

67. Inspector McCarthy did not testify before the Grand Jury. (See Exhibit U, p. 60).

68. Three civilian witnesses testified before the Grand Jury. One witness testified that plaintiff was present at the scene of the crime immediately after the fatal shots were fired. (See Decision and Order dated July 23, 2001 in the matter of The People of the State of New York against Anthony Manganiello, attached as Exhibit "X" to the Frommer Declaration).

69. A second civilian witness testified that plaintiff was heard asking individuals if anyone was selling a gun. (See Exhibit X).

70. A third civilian witness testified that he heard plaintiff say that he intended to kill another security guard. (See Exhibit X).

71. On April 26, 2001, the Grand Jury indicted plaintiff for Murder in the Second Degree and Manslaughter in the First Degree. (See Indictment Number 2207-01, Grand Jury Number 42140/2001 in the matter of People of the State of New York against Anthony Manganiello, attached as Exhibit "Y" to the Frommer Declaration).

72. On August 6, 2001, the Honorable Patricia Anne Williams, Acting Justice of the Supreme Court ruled that there were no improprieties before the Grand Jury that indicted plaintiff and that the integrity of the Grand Jury was not impaired in any way. The court also ruled that there was sufficient evidence presented to the Grand Jury to support the charges contained in the indictment. (See Supplemental Decision and Order dated August 6, 2001 in the matter of The People of the State of New York against Anthony Manganiello, Indictment Number 2207-01, attached as Exhibit "Z" to the Frommer Declaration).

Dated: New York, New York
April 17, 2008

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 3-212
New York, New York 10007
(212) 788-0823

By: _____
Hillary A. Frommer (HF 9286)
Senior Counsel