# EXHIBIT G

ORIGINAL

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -X
ANTHONY MANGANIELLO,

          Plaintiff,

      -against-            Index No.
                       07 Civ. 3644(HB)

THE CITY OF NEW YORK, DET. LUIS AGOSTINI,
individually and as a New York City Police
Detective, SHAWN ABATE, individually and as
a New York City Police Detective, DEREK PARKER,
individually and as a New York City Police
Detective, LT. HENRY SCOTT, individually and as a
New York City Police Lieutenant, P.O. ALEX PEREZ,
individually and as a New York City Police
Officer, P.O. MIRIAN NIEVES, individually and as
a New York City Police Officer, MICHAEL PHIPPS,
individually and as a the Commanding Officer of
the 43rd Precinct, JOHN McGOVERN, individually
and as a New York City Police Detective Sergeant,
ROBERT MARTINEZ, individually and as a New York
City Police Detective, GERYL McCARTHY,
individually and as a New York City Police
Deputy Inspector,

          Defendants.

- - - - - - - - - - - - - - - - - - - - -X
          December 19, 2007
          1:20 p.m.

     DEPOSITION of LIEUTENANT HARRY SCOTT



DELCO Reporting, Inc.
Court Reporting • Legal Video • Videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
or a Voice Number Fax 914 684 6551  212 679 1952

LIEUTENANT HARRY SCOTT

28

1    few pages and give it to the detective that it --

2    the case that it pertains to.  If it had personal

3    stuff in it, I would keep it or throw it away.

4         Q.    Okay.  And after you gave it to the

5    detective who it was assigned to, was it your

6    expectation that that would be placed in a case

7    folder?

8              MS. FROMMER:  Objection.  You can

9              answer.

10        A.    Not just my expectation, it would be

11   departmental procedure that it would be put in

12   the folder.

13        Q.    Okay.  Now, what did you do when you

14   arrived at the scene of where Acosta had been

15   murdered?

16        A.    Well, on the radio, I heard -- on

17   the police radio, I heard that there was a

18   dispute with a knife.  And then shortly

19   thereafter, we heard -- I heard on the radio a

20   signal 10-13, which means that an officer is in

21   trouble.  And I responded to the location with --

22   it was either Sergeant McGovern or Napolitano.

23   There may have been some other detectives in the

24   car.  And I think that there was another car full



LIEUTENANT HARRY SCOTT

30

1          MS. FROMMER:  You can answer.

2          A.    I don't have knowledge if uniformed

3    patrol responded to that incident.

4          Q.    Now, where were you when you

5    received a call of a 10-13?

6          MS. FROMMER:  Objection.

7          A.    I was in my office.

8          MS. FROMMER:  You can answer.  You

9    can answer.

10          A.    I was in my office.

11          Q.    Now, when you say 10-13, did respond

12    -- did -- well, to the best your recollection,

13    what exactly came over the radio?

14          A.    I don't remember word for word, but

15    basically it was a report of a uniformed officer

16    in distress.

17          Q.    Was there an indication that it was

18    a Parkchester security officer or an SPO special

19    patrol officer?

20          A.    At first, no.

21          Q.    Okay.  Was there a subsequent

22    response -- I'm sorry.  Strike that.

23          Was there a subsequent transmission

24    indicating that it was a special patrol officer

LIEUTENANT HARRY SCOTT

136

1        A.    Definitely.

2        Q.    Okay.  Are you aware that the

3    District Attorney's Office obtained an arrest

4    warrant in April of 2001 for the arrest of Mr.

5    Manganiello?

6        A.    Yes.

7        Q.    Did you play any role in personally

8    obtaining that warrant?

9        A.    No.

10        Q.    If a district attorney's office

11    obtain an arrest warrant, has the D.A.'s Office

12    made the decision that there's probable cause to

13    arrest?

14        A.    Definitely.

15        Q.    And would it be fair to say that if

16    the D.A.'s office obtained an arrest warrant,

17    that the D.A.'s office would evaluate the

18    evidence?

19            MR. JOSEPH:  Objection.  Well, I

20        can't tell him not to answer over

21        objection.

22        A.    Yes, especially in the Bronx.

23        Q.    And would it be fair to say that if

24    the Direct Attorney's Office obtains an arrest



**LIEUTENANT HARRY SCOTT**

137

1    warrant, that the District Attorney Office has

2    evaluated the credibility of witnesses?

3              A.    Yes.

4              Q.    Did you fabricate any statements or

5    evidence in the case against Mr. Manganiello?

6              A.    No.

7              Q.    Did you withhold any information

8    from the District Attorney's Office about Mr.

9    Manganiello?

10             A.    No.

11             Q.    Did you falsify any information

12   about the homicide investigation?

13             A.    Definitely not.

14             Q.    Did you coerce any witness to

15   testify against Mr. Manganiello?

16             A.    No.

17             Q.    Did you coerce any witness to make a

18   statement in connection with the homicide

19   investigation?

20             A.    No.

21             Q.    Did you threaten any witness to

22   testify again Mr. Manganiello?

23             A.    No.

24             Q.    Did you threaten any witness to make

dalco

1    a statement as concerning the homicide

2    investigation?

3         A.    No.

4         Q.    And you testified that you did not

5    testify at the grand jury; is that correct?

6         A.    Correct, I did not.

7              MS. FROMMER:   Okay.  I have nothing

8         further.

9

10   FURTHER EXAMINATION BY

11   MR. JOSEPH:

12        Q.    Sir, on February 12th, 2001, did you

13   have a radio that -- on which you can hear what

14   the Parkchester security was broadcasting?

15        A.    If they have a P.D. -- if they have

16   one of our radios, yeah, I could monitor it.

17        Q.    Well, was there also a radio system

18   among the security officers at Parkchester?

19        A.    Yes.

20        Q.    Did you have one of those radios?

21        A.    No.

22        Q.    Did you have any ability to monitor

23   what those Parkchester security officers were

24   saying back and forth?

LIEUTENANT HARRY SCOTT

1                C E R T I F I C A T I O N

2

3     STATE OF NEW YORK          )

4                                )    ss.

5     COUNTY OF PUTNAM           )

6                   I, RAYMOND ROGENER, JR., Court

7     Reporter and Notary Public within and for the

8     County of Putnam, State of New York, do hereby

9     certify:

10                  That I reported the proceedings that

11    are hereinbefore set forth, and that such

12    transcript is a true and accurate record of said

13    proceedings.

14                  AND, I further certify that I am not

15    related to any of the parties to this action by

16    blood or marriage, and that I am in no way

17    interested in the outcome of this matter.

18

19                  IN WITNESS WHEREOF, I have hereunto

20    set my hand.

21

22

23    RAYMOND ROGENER, JR.

24                    Court Reporter

# EXHIBIT H

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -X

ANTHONY MANGANIELLO,

                    Plaintiff,


        -against-                CASE No:

                                07-CV-3644

THE CITY OF NEW YORK, et al.

                    Defendants.

- - - - - - - - - - - - - - - - - - - - -X

                March 13, 2007

                11:15 a.m.


DEPOSITION of MIRIAM NIEVES, a witness on

behalf of the NEW YORK CITY POLICE DEPARTMENT,

a Defendant herein, taken pursuant to Court

Order, and held at the Offices Of New York

Corporation Counsel, 100 Church Street, New

York, New York, before Mary T. Slavik, RPR, a

Certified Court Reporter and Notary Public of

the State of New York.

DALCO Reporting, inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6099
800.DAL.8779  dalcoreporting.com

MIRIAM NIEVES

1        A.    No.

2        Q.    Did you keep a memo book?

3        A.    Then, yes.

4        Q.    What happened to the memo book

5    that you kept on February 12, 2001?

6              MS. SELIGMAN-WEISS:  Object to the

7        form.

8              Only if you know.

9        A.    No clue.

10        Q.    When did you last see the memo

11    book that you had on February 12, 2001?

12        A.    When I went to court.

13        Q.    And can you tell me on February

14    12, 2001, what was the nature of the call

15    that you responded to?

16        A.    I believe it was officer down,

17    1013.

18        Q.    Are those the words that came over

19    the radio to the best of your recollection?

20        A.    To the best of my recollection,

21    yes.

22        Q.    Do you have a recollection of the

23    call coming over, a security guard down?

24        A.    No.

MIRIAM NIEVES

13

1      A.   I can't recall exactly who.

2      Q.   Was there a Sergeant Ohle there

3   from the Parkchester security police

4   department?

5      A.   I don't remember.

6           MS. SELIGMAN-WEISS:  What was that

7      name?

8      Q.   O-h-l-e.

9           Were there other Parkchester

10   security officers present when you first

11   arrived?

12      A.   I don't remember.

13      Q.   Are you aware if the Parkchester

14   security police department was one of the

15   individuals who made the call to the 911

16   dispatch?

17           MS. SELIGMAN-WEISS:  Object to the

18      form.

19      A.   No.

20      Q.   Between the time you arrived --

21   strike that.

22           Between the time you received the

23   call and the 1013, and the time you arrived

24   at the scene, were there other radio

14

1    dispatches concerning this incident?

2                MS. SELIGMAN-WEISS:  Object to the

3        form.

4        A.    Not that I remember.

5        Q.    Are you aware if there were any

6    radio dispatches which indicated that there

7    was a Parkchester security officer that was

8    in fact down?

9                MS. SELIGMAN-WEISS:  Same

10        objection.

11        A.    Say that again?

12        Q.    From the time you received the

13    first call, the 1013, and the time you

14    arrived at the scene, were there any other

15    radio dispatches that identified the

16    officer as a Parkchester security guard?

17        A.    Not that I heard.

18                MS. SELIGMAN-WEISS:  Note my

19        objection, please.

20        Q.    Did you testify in the -- strike

21    that.

22                What did you do next after you

23    arrived at the scene?

24        A.    We were there a few minutes and

27

1       objection.

2           A.    That that's what the report said?

3           Q.    No.   Did you testify that the

4       radio transmission in fact mentioned the

5       possibility that it was a Parkchester

6       security officer that had been shot?

7               MS. SELIGMAN-WEISS:   Object to the

8           form.

9           A.    I don't remember hearing that;

10      therefore, I couldn't testify to it.

11          Q.    Take a look at page 174.

12          A.    If I read it and that's what the

13      paper said, maybe.

14          Q.    Well, why don't you read the last

15      question and answer.

16              MS. SELIGMAN-WEISS:   Do you have

17          copies of this?

18              MR. JOSEPH:   It's been provided.

19              MS. SELIGMAN-WEISS:   Well, do you

20          want to mark it?

21              MR. JOSEPH:   I'm just asking her

22          to read it.

23              MS. SELIGMAN-WEISS:   It's an

24          exhibit.

```
 1                      C E R T I F I C A T I O N

 2

 3            STATE OF NEW YORK    )

 4

 5            COUNTY OF WESTCHESTER )

 6

 7                    I, MARY T. SLAVIK, RPR, Court

 8            Reporter and Notary Public within and

 9            for the County of Westchester, State

10            of New York, do hereby certify:

11                    That I reported the proceedings

12            that are hereinbefore set forth, and

13            that such transcript is a true and

14            accurate record of said proceedings.

15                    AND, I further certify that I am

16            not related to any of the parties to

17            this action by blood or marriage, and

18            that I am in no way interested in the

19            outcome of this matter.

20                    IN WITNESS WHEREOF, I have

21            hereunto set my hand.

22

23            ---------------------------------------

24              MARY T. SLAVIK, RPR
```

