# EXHIBIT K

6015415

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF BRONX : CRIMINAL TERM : PART  T-13

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    THE PEOPLE OF THE STATE OF NEW YORK,    :Ind. No.

5                    -against-                     :2207/01

6    ANTHONY MANGANIELLO,                      :TRIAL

7                          Defendant(s). :

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9                              851 Grand Concourse
                               Bronx, New York    10451
10                             June 28th, 2004

11

12   B E F O R E:

13                   HONORABLE MARTIN MARCUS,
                            JUSTICE SUPREME COURT & jury.

14   A P P E A R A N C E S:

15                   ROBERT T. JOHNSON, ESQ.
                     District Attorney, Bronx County
16                   BY: CHRISTINE SCACCIA, ESQ.
                        SUZANNE MCELWREATH, ESQ.
17                   Assistant District Attorney

18
     FOR THE DEFENDANT(S):
19
                     MURRAY RICHMAN, ESQ.
20                   RENEE HILL, ESQ.
                     2027 Williamsbridge Road
21                   Bronx, NY

22

23

24                              Lorraine L. Ramsey
                                Senior Court Reporter
25

Cobb - People - Direct      41

1      Q.      And what unit were you assigned to in

2   the Marines?

3      A.      From?

4      Q.      What unit?

5      A.      First Marines, First Marine Division.

6      Q.      Did you have any specialization within

7   the Marine Corps?

8      A.      Weapons.  I was in a weapons company.

9      Q.      Now, I want to direct your attention

10   specifically to February 12th of 2001, okay?

11           You have to answer.

12      A.      I'm not logging in on that.

13      Q.      Were you working as a member of

14   Parkchester on that day?

15      A.      Yes, I was.

16      Q.      And what building were you assigned to

17   that day?

18      A.      1700 Metropolitan Avenue.

19      Q.      What time did your day begin as a

20   porter in Parkchester?

21      A.      Usually eight o'clock in the morning.

22      Q.      And now, were you normally assigned to

23   1700?

24      A.      I'm what they call a miscellaneous

25   man.  When someone is off, calls in sick or is

Cobb - People - Direct      42

1   absent, I'm assigned to it, those buildings, any

2   particular building.

3        Q.    So, on February 12th was it 1700 that

4   was your assignment?

5        A.    Yes.

6        Q.    And now as a porter do you work alone

7   or are there other porters in the building; how

8   does it work?

9        A.    We -- you're, you usually are assigned

10  to two buildings at a time.

11       Q.    So what other building were you

12  assigned to that day, do you remember?

13       A.    The building next to it, I don't

14  remember offhand right now.

15            You've aged me.

16       Q.    Now, when you --

17            First of all, if you don't mind me

18  asking, how old are you, sir?

19       A.    I'm 69.

20       Q.    And when you worked as a porter in

21  1700, where was your work, where did your work

22  particularly take you within the building?

23       A.    usually we start from the bottom up.

24       Q.    The bottom being the main or the

25  street level?

Cobb - People - Direct     43

1      A.      Of the main floor or the floor below

2    which happens to be the basement, the basement in

3    this particular building happened to be the main

4    floor.

5      Q.      Now, with respect to the basement of

6    1700 Metropolitan, how would you gain access into

7    the basement?

8      A.      The access to the entrance to the main

9    or rather the main entrance it's off on the

10   right-hand side, this one the back entrance

11   happened to be on the avenue, which was nearest to

12   me, that's where I entered.

13     Q.      Okay.  So there was a main entrance to

14   the basement, right?

15     A.      A little further up and to the

16   right-hand side from me.

17     Q.      On the street, you didn't have to go

18   --

19     A.      On the street, not on the actual

20   Metropolitan Avenue.

21     Q.      And the door that leads into this

22   basement, was that a door that was, how was that

23   door kept, was it secured in any way?

24     A.      It's a typical door in, entrance in

25   and out.

Cobb - People - Direct      44

1        Q.      Okay.  And did you need anything

2   special to gain entry into that basement?

3        A.      We have, each building or each porter

4   is, assigned to any specific building, is given a

5   key, in this instance it's called a comp key.

6        Q.      A comp key?

7        A.      A comp key, electronic key.

8        Q.      What would you have to do with this

9   key in order to gain entrance into the building?

10                   THE COURT:  Just --

11       A.      At what time?

12                   THE COURT:  I'm sorry.  Are we

13           still talking about the main door?

14                   MS. SCACCIA:   Into the basement,

15           I'm talking about the main door into the

16           basement.

17                   THE WITNESS:  The entrance which I

18           entered into at that moment which was the

19           back entrance.

20                   THE COURT:  There a difference.

21           Are you making a distinction between the back

22           entrance and the main entrance to the

23           basement?

24                   THE WITNESS:  It didn't make a

25           difference as long as you gain entrance to

Cobb - People - Direct       45

1       the building and this, in this instance when

2       I walked in, the entrance was on the

3       Metropolitan side which happened to be the

4       back entrance or exit.

5       Q.      Did you need a key at both entrances?

6       A.      Both, the same key applies to both

7    entrance and exit and main entrance.

8       Q.      Now, other than workers, do

9    tenants have keys to gain access to the basement

10   areas?

11      A.      If you live and you occupy, you rent,

12   whatever, yeah, your key, particular key opens

13   and let's you in and out of that particular

14   building.

15      Q.      Okay.

16      A.      Not to the building adjacent, that's

17   the ways they're made.

18      Q.      Sir, now if you open the door with

19   your key and walk into the basement of 1700

20   Metropolitan Avenue, what is located in the

21   basement?

22      A.      Principally the floor.

23              As you walk, walk in the hall, the

24   hallway is L shaped from what I remember and

25   various doors which are what they call, up to this

Cobb - People - Direct      46

1   point, call carriage rooms.

2        Q.      And is anything kept in these rooms?

3        A.      At one time, not to my knowledge as of

4   what happened then.

5        Q.      Now, these rooms, are they open or are

6   they secured in any way?

7        A.      They're secured or closed.

8        Q.      And how are they secured, is it the

9   same kind of comp key or something else?

10       A.      No, different keys for each different

11  door, depending on what's in there, what was in

12  there previously or for someone to gain access to

13  them you would have to go to the main office and

14  get keys for them.

15       Q.      Even if a tenant had a key to get into

16  the basement, you could not use such keys for

17  these rooms?

18       A.      No.

19       Q.      Who has the keys to these individual

20  carriage rooms?

21       A.      Whoever needs access to them would

22  have to go to the office and/or someone be sent to

23  security or someone sent over specifically.

24       Q.      So, Mr. Cobb, now I want to take you

25  back specifically to February 12th of 2001.

Cobb - People - Direct      47

1              You said you got to work at about

2    eight or so that day, your normal hours, correct?

3        A.      Uh-hum.

4        Q.      And that now you were saying as you

5    were approaching,  you were approaching 1700, the

6    building, from the street; what street were you

7    walking on?

8        A.      Metropolitan Avenue.

9        Q.      Okay.  And now, the carriage rooms

10   that are located in the basement of 1700, do they

11   have any windows or other doors that face out onto

12   Metropolitan Avenue?

13       A.      Several have, but the windows were

14   facing out, one particular window facing out to

15   Metropolitan Avenue.

16       Q.      And now, you're walking along.

17              Could you tell us what, if anything,

18   you remember happening as you're now walking

19   towards the basement of 1700?

20       A.      A few steps ahead of me was what they

21   call a ramp to get into the building, but prior to

22   that, there's one particular window I happen to

23   hear.

24       Q.      What did you hear?

25       A.      Four shots.

Cobb - People - Direct     48

1     Q.     Now, the shots that you heard, did you

2   have any idea where they appeared to be coming

3   from?

4     A.     From one particular, only one

5   particular window as I approached the ramp.

6     Q.     Other than hearing the shots, at that

7   moment in time, did you see anything else around

8   you on the street?

9     A.     No, ma'am.

10     Q.     And could you describe for the ladies

11   and gentlemen of the jury what these shots sounded

12   like to you?

13     A.     Well, I'm familiar, being that I was

14   in the United States Marine Corps, with firearms

15   and they sounded muffled to me, like they came

16   from a 22 or a 25.

17     Q.     Why do you say 22 or 25, what makes

18   you say that?

19     A.     The caliber, less power in the shell,

20   less noise. A higher caliber would make much more

21   noise and coming in a, let's say empty basement,

22   would make a much louder noise.

23          Anything below that would sound like

24   a fire cracker. But I can tell the difference.

25     Q.     Okay. So now, after you hear these

Cobb - People - Direct        49

1    four shots, what do you do?

2        A.      What do I?

3        Q.      What do you do?

4        A.      I forgot it completely for the brief

5    moment.  I had made my turn to the small ramp to

6    gain entrance to the building.

7        Q.      And what happens?

8        A.      As I use my comp key or was about to

9    use my comp key, the door flies open.  I didn't

10   touch,  I didn't even get to physically touch the

11   door.  The door flew open.

12       Q.      What causes the door to fly open,

13   Mr. Cobb?

14       A.      Someone exiting it from the inside to

15   the outside.

16       Q.      Okay.  And this person who was exiting

17   it, had you ever seen this person before, ever?

18       A.      At that particular moment I saw him,

19   yes.

20       Q.      And did you recognize this person?

21       A.      Yes,  I did.

22       Q.      And who did you recognize the person

23   to be?

24               Who was it?

25       A.      Well, I don't know him but I found out

Cobb - People - Direct      50

1    later because he work in the place, I know him by

2    sight.

3        Q.    Okay.  And how did you recognize him

4    as working in your place?

5        A.    Because of the uniform he had.

6        Q.    This is an individual who you said you

7    had seen by sight?

8        A.    Yes, on the premises.

9        Q.    Did you see, when you saw this

10   individual, was he dressed in any uniform?

11       A.    Yes.

12       Q.    Mr. Cobb, I'm going to ask you to take

13   a look around the courtroom today and indicate for

14   us if you see the person you saw open the door on

15   February 12th, 2001 here in this courtroom?

16       A.    Yes, ma'am.

17       Q.    Where is he?

18       A.    Directly to my left.

19       Q.    Okay.

20            MR. RICHMAN:  Indicating the

21       defendant.

22       Q.    Now, when the defendant, Mr.

23   Manganiello opened the door, did you say something

24   to him, Mr. Cobb?

25       A.    Yes,  I did.

Cobb - People - Direct    51

1    Q.    What did you say to him?

2    A.    Absent-mindedly, I don't know why it

3    came out of me, I thought I heard -- not thought,

4    I retract it -- "I heard some shots".

5    Q.    And what did he say when you said

6    that?

7    A.    What did I what?

8    Q.    What did he say when you said that?

9    A.    "So did I" and pointed over my left

10    shoulder.

11    Q.    Indicating what?

12    A.    You go this way, I go that way.

13    MR. RICHMAN:  Objection.

14    THE COURT:  Tell us what he did or

15    said.

16    A.    He said to me, "I did, you go this way

17    and I go that way."  He pointed directly to my

18    left shoulder which happens to be the north side.

19    Parkchester is divided into four quadrants.

20    Q.    Now, after Mr. Manganiello said "you

21    go this way" and pointed over your shoulder, which

22    way did he go?

23    A.    From my back directly to my rear to my

24    right.

25    Q.    And in relation to the way you

cpE                        Booth - People - Direct

1              Bronx County.

2                        THE COURT:  You may inquire.

3                        MS. SCACCIA:  Thank you, Your Honor.

4    DIRECT EXAMINATION

5    BY MS. SCACCIA:

6         Q.      Good afternoon, Mr. Booth.

7         A.      Good afternoon.

8         Q.      Mr. Booth, I'm gonna try to speak nice and

9    loud.  I'm gonna ask you to do the same, okay.

10               Can you answer?

11        A.      Little louder.

12        Q.      Little louder.  I'll move closer.

13               How old are you, sir?

14        A.      Thirty-nine.

15        Q.      And do you work?

16        A.      Excuse me?.

17        Q.      Do you work?

18        A.      Yeah.

19        Q.      What type of work do you do?

20        A.      Work at Hunts Point Fruits and Vegetables.

21        Q.      Now, Mr. Booth, are you familiar with the

22   area of Parkchester here in Bronx County?

23        A.      Yes, I am.

24        Q.      And how is it that you're familiar with that

25   area?

cpE                                Booth - People - Direct

1          A.      I used to work there years ago.

2          Q.      Other than working there, did you ever hang

3    out in the area?

4          A.      Yeah.

5          Q.      How often would you go around Parkchester or

6    be by there?

7          A.      About three times a week.

8          Q.      And was that true to in the year 2001, would

9    you go there for the years leading up to 2001 about

10   three times a week?

11         A.      Yes.

12         Q.      During the time that you used to go to

13   either work or pass by the area of Parkchester, did you

14   come to know some of the people who worked and lived in

15   that area?

16         A.      Yeah.

17         Q.      And where would you come in contact with

18   those people?

19         A.      All over.

20         Q.      During the course of the time that you were

21   frequenting Parkchester, did you come to know any of

22   the security guards?

23         A.      Yes.

24         Q.      What about a security guard by the name of

25   Mr. Anthony Manganiello?

cpE                           Booth - People - Direct

1         A.     Yes.

2         Q.     Do you see Mr. Manganiello here in court?

3         A.     Yes.

4         Q.     Where is he and what is he wearing?

5         A.     Gray suit (indicating).

6                MR. RICHMAN:  Indicating the defendant.

7         Q.     Now, when you say that you became familiar

8    with who Mr. Manganiello was, were the two of you

9    friends?

10        A.     Just knew each other, acquaintances.

11        Q.     Where did you meet Mr. Manganiello?

12        A.     In the pizzeria.

13        Q.     At this pizzeria, where is it in relation to

14   Parkchester?

15        A.     In Parkchester.

16        Q.     What street, though?

17        A.     Metropolitan Avenue.

18        Q.     And how often would you see Mr. Manganiello?

19        A.     Once or twice a week.

20        Q.     When you saw him, was he usually in uniform

21   or civilian clothing?

22        A.     I wouldn't -- both.

23        Q.     Now, did you have any sort of conversations

24   with Mr. Manganiello when you would see him?

25        A.     No.  Just hi, good-bye.

cpE                          Booth - People - Direct

1          Q.      Did you ever socialize with him in other

2    places other than this Parkchester area?

3          A.      No.

4          Q.      I want to direct your attention now to early

5    2001.

6                  Were you still frequenting Parkchester two

7    to three times a week?

8          A.      Yeah.

9          Q.      And would you still see Mr. Manganiello when

10   you went there?

11         A.      Yeah, once in awhile.

12         Q.      Did there come a point in time during that

13   time period when you had an unusual conversation?

14                      MR. RICHMAN:  Objection.

15                      THE COURT:  Come up, please.

16                      (Whereupon, a discussion was held off

17       the record between the Court and Counsel.)

18                      THE COURT:  Objection withdrawn?

19                      MR. RICHMAN:  Yes, sir.

20         Q.      Do you want me to repeat the question?

21         A.      Yeah, please.

22         Q.      During the time period of early February,

23   late January 2001, did there come a point in time when

24   you had a conversation with Mr. Manganiello during that

25   time period that was not the usual conversation you had

1      with him?

2              A.      Yeah.

3              Q.      Can you please tell us, first of all, where

4      you were when this conversation took place?

5              A.      I was in front of the bank and Macy's.

6              Q.      What were you doing?

7              A.      Waiting for my friend.

8                      THE COURT:  Sorry, waiting for your

9              friend?

10                     THE WITNESS:  Yeah.

11             Q.      Were you inside, outside?  Where exactly

12     were you?

13             A.      I was sitting in my car.

14             Q.      And what happens?

15             A.      He came up to the window and asked me for a

16     rod.

17             Q.      Let's slow down.  Who came up to your

18     window?

19             A.      Short, fat guy (indicating).

20             Q.      You said -- you're pointing with your hand.

21     Can you please tell --

22                     MR. RICHMAN:  I hope he's not pointing

23             at me.

24             Q.      Can you please tell us, Mr. Booth, and be

25     specific, who came up to your window?

1        A.      Anthony.  That's his name.

2        Q.      And when he came up to your window, what did

3    he say?

4        A.      Where can he get a rod from.

5        Q.      A rod?

6        A.      Yes.  Yes.

7        Q.      What did you understand that to mean?

8                    MR. RICHMAN:  Objection.

9                    THE COURT:  Sustained.

10       Q.      What did you say to Mr. Manganiello when he

11   asked you if you knew where he could get a rod from?

12       A.      I said, "No.  I don't play with nothing like

13   that.  "So I closed the window on him.

14       Q.      I can't -- you're mumbling.

15       A.      I said -- I told him that "I don't play with

16   nothing like that."  I closed the window on him.

17       Q.      After he said that to you, what happens

18   next?

19       A.      I just shut the window.

20       Q.      After that conversation, did Mr. Manganiello

21   ever approach you in any sort of similar way again?

22       A.      No.

23       Q.      When it initially happened, Mr. Booth, this

24   conversation, did you immediately tell anybody about

25   it?

cpE                        Booth - People - Direct

1          A.      I don't remember.

2          Q.      Well, did you tell anybody of a law

3    enforcement nature about it as soon as it happened?

4          A.      I don't remember.

5          Q.      At some point in March of 2001 do detectives

6    come to speak to you?

7          A.      Yes.

8          Q.      And at that point, do you tell the

9    detectives what you told us here in court today?

10         A.      Yes.

11         Q.      And did the detectives ask you to sign or

12   write out a statement to the effect?

13         A.      Yes.

14         Q.      About what happened?

15         A.      Yes.

16         Q.      And did you do that?

17         A.      Yes.

18         Q.      Prior to this unusual conversation that you

19   had with Mr. Manganiello, did you ever have any

20   problems with him?

21         A.      No.

22         Q.      Since the conversation that he asks you for

23   the rod, have you had any problems?

24         A.      No.

25         Q.      And lastly, Mr. Booth, when you responded to

cpE                              Booth - People - Cross

1    Mr. Manganiello about you don't play with nothing like

2    that, what did you mean, you don't play with?

3         A.    I only assume it was a gun.

4              MS. SCACCIA:  Your Honor, I have no

5         further questions of this witness.

6    CROSS-EXAMINATION

7    BY MR. RICHMAN:

8         Q.    You assumed it was a gun; is that correct?

9              Now, Mr. Booth --

10             THE COURT:  Did you get an answer?

11             MR. RICHMAN:  I'm sorry.

12        Q.    You assumed it was a gun?

13        A.    Yeah, I assumed.

14        Q.    And could you tell us when did this happen?

15        A.    Excuse me.

16        Q.    When did this happen?

17        A.    2001.

18        Q.    Are you sure?

19        A.    I think.  I think.

20        Q.    And what month, do you remember?

21        A.    It was cold.  March.

22        Q.    How were you dressed?

23        A.    Huh?

24        Q.    How were you dressed?

25        A.    February maybe.  March, February.

1          C-O-L-O-N.  Parkchester Security.

2                    THE COURT:  You may inquire.

3                    MS. SCACCIA:  May I?

4                    THE COURT:  Yes.

5      DIRECT EXAMINATION

6      BY MS. SCACCIA:

7          Q.     Good afternoon, Officer Colon.

8          A.     Good afternoon, ma'am.

9          Q.     Officer Colon, how long have you worked at

10     Parkchester?

11         A.     Going on 22 years.

12         Q.     Back on February 12th of 2001, were you

13     working as a Parkchester officer that day?

14         A.     Yes, ma'am, I was.

15         Q.     And what was your assignment that day?

16         A.     I was dispatcher.

17         Q.     And the dispatcher's office, is that

18     referred to as Central?

19         A.     Central, right.

20         Q.     What hours did you work?

21         A.     Eight to four.  Eight A.M. to four P.M.

22         Q.     And when you work as a dispatcher, what are

23     your duties?

24         A.     To relay calls, incoming calls to officers

25     in the field.

cpB

S.P.O. Colon - People - Direct

1 Q. And now the calls that you relay to the

2 officers in the field, do you get them sometimes from

3 civilians who are calling for assistance?

4 A. Yes, ma'am.

5 Q. And the calls that you get from civilians

6 that are calling for assistance, do they come over a

7 telephone or a land line?

8 A. Both.

9 Q. And what about do you receive communications

10 from officers who are already out in the field?

11 A. Also from officers in the field that get

12 complaints from tenants.

13 Q. How do the officers communicate with

14 Central?

15 A. Beg your pardon.

16 Q. How do the officers out in the field

17 communicate with Central?

18 A. By radio.

19 Q. Now, as part of your duties of being a

20 dispatcher for the eight to four shift on February 12th

21 of 2001, if you dispatched an officer to a particular

22 job, would you have to make notations of that?

23 A. Yes, ma'am, we do.

24 Q. And how are those notations -- what do you

25 make those notations in?

1    A.    We have a book that we write down the events

2    of the day.

3    Q.    And since you were working dispatch that

4    day, you were the keeper of this book?

5    A.    Yes, ma'am.

6    Q.    On that eight to four shift, aside from

7    yourself, was Officer Albert Acosta working and on duty

8    that day?

9    A.    Yes, ma'am, he was.

10    Q.    Was he also doing an eight to four?

11    A.    Eight to four, yes, ma'am.

12    Q.    And how about Officer Manganiello?

13    A.    He was also working that day eight to four.

14    Q.    By the way, do you see Officer Manganiello

15    here today?

16    A.    He's sitting over there (indicating).

17         MR. RICHMAN:  So stipulated.

18         THE COURT:  Indicating the defendant.

19    Q.    Now, from the time that you began your shift

20    as dispatcher, did you have an occasion to send Officer

21    Manganiello on any jobs that day?

22    A.    Yes, I did.

23    Q.    By the way, what section was Officer

24    Manganiello assigned to that day?

25    A.    It was the East section.

1    Q.   And within the East section, are there

2   different -- is there a separation of areas?

3    A.   We have East, South and West.  He was in

4   East.

5    Q.   Those are quadrants?

6    A.   In quadrants, right.

7    Q.   Now, within the quadrants -- within the

8   Eastern quadrant, are there different sectors?

9    A.   Within the one quadrant?

10   Q.   Uh-hmm?

11   A.   It's one section, whole.

12   Q.   Okay.  And when officers are assigned to

13  that quadrant, is it one assignment or are they broken

14  down in any way?

15   A.   It's broken down in sections.

16   Q.   Okay.

17   A.   Like --

18   Q.   What sections is the Eastern quadrant broken

19  down into?

20   A.   East Adam Boy and East Charlie David.

21   Q.   Which means AB, CD?

22   A.   Right.

23   Q.   Do you know which section Officer

24  Manganiello was assigned to?

25   A.   That day he had East Charlie David.

cpB                          S.P.O. Colon - People - Direct

1    Q.    Who was assigned to East Adam Boy?

2    A.    Officer Acosta.

3    Q.    Now, getting back to dispatching Officer

4    Manganiello, where was the first place that you were

5    involved in dispatching him to?

6    A.    What's the question?

7    Q.    Where did you send -- where, if anywhere,

8    did you send Officer Manganiello that day?

9    A.    A call came in about a dispute over the

10   police radio.  It was relayed to me by the sergeant on

11   duty.

12        So, being that that post was Officer

13   Manganiello's post, I relayed the message over the

14   police -- over our radio to him to go to that -- to

15   that corner, 1700 Metropolitan Avenue.

16   Q.    And 1700 Metropolitan Avenue is in the

17   Charlie David section of the Eastern quadrant?

18   A.    Exactly, ma'am.  Charlie David.

19   Q.    And when you dispatched Officer Manganiello

20   to that call in the morning, did you make notations of

21   it in your logbook?

22   A.    Yes, ma'am, I did.

23   Q.    When you called Officer Manganiello to go

24   there, did he respond to you?  Did he receive your

25   message?

cpB                          S.P.O. Colon - People - Direct                          416

1       A.      Yes, he did.

2       Q.      After that communication with Officer

3   Manganiello that morning, what's the next communication

4   you recall having with him?

5       A.      As we usually do, it's the normal that we,

6   on calls like a dispute, we always send a backup unit.

7       Q.      Okay.

8       A.      That day Officer Acosta was his backup, so I

9   sent him over.

10      Q.      Now, do you recall about what time in the

11  morning this was?

12      A.      It was just before 9:00, somewhere around

13  there.  I can't recall exactly.

14      Q.      Does there come a point in time after this

15  initial call that you, once again, have contact with

16  Officer Manganiello in any way?

17      A.      Not before that.

18      Q.      No, after that.

19      A.      Oh, after that, I was waiting for the

20  disposition of the final call.  That never came.

21      Q.      Okay.  What if any further communications do

22  you have with Manganiello that day?

23      A.      Well, I had a call from a telephone

24  repairman.

25      Q.      And now when you say "a call from a

1    telephone repairman," that was how, on the telephone or

2    on your radio?

3          A.      On the telephone.

4          Q.      Okay.  And based upon this phone call from a

5    telephone repairman, did you become aware of a

6    situation at a Parkchester location?

7          A.      Right.  Yes, ma'am.

8          Q.      Where was this situation located?

9          A.      At 1700 Metropolitan Avenue.

10               The telephone repairman indicated to me that

11   there was a man --

12                      MR. RICHMAN:  Objection.

13                      THE COURT:  Overruled.

14                      MS. SCACCIA:  You can answer.

15         A.      There was a man laying down, apparently

16   sleeping, because he could hear him snore.

17         Q.      And this was where?

18         A.      On the floor of the -- we call it the --

19   it's a room there, you know, a large room.

20         Q.      In what building?

21         A.      1700 Metropolitan Avenue.

22         Q.      Once you get this telephone call from the

23   telephone man, what if anything do you do?

24         A.      I immediately I call Officer Manganiello and Y f5

25   Officer Acosta --

cpB
S.P.O. Colon - People - Direct

1    Q.    How do you call --

2    A.    -- to respond.

3    Q.    How do you call them?

4    A.    "Central to East Charlie David."

5    Q.    Okay, and it is -- "Central to East Charlie

6    David" means you're talking to who, Acosta or

7    Manganiello?

8    A.    Officer Manganiello.

9    Q.    And this is over a radio?

10   A.    Over the radio.

11   Q.    So, you call "Central to East Charlie

12   David."  What happens?

13   A.    I indicated to East Charlie David that there

14   was a man down at 1700 Met in that room.

15   Q.    And the room is located where within the

16   building?  What floor?

17   A.    It's in the basement.

18   Q.    Now, when you put this message out to

19   Officer Manganiello, do you get any response from him?

20   A.    I heard him call.  He didn't understand my

21   call, it appears, so he was trying to get another post

22   to relay the message to me.

23   Q.    And what if any transmission did you

24   continue to make?

25   A.    I kept saying that -- I called the sergeant.

1    I was trying to get somebody to go over there to check

2    up on a so-called man down without knowing really what

3    was going on down there.

4        Q.    When this information, "man down," was

5    communicated to you, did you know whether or not the

6    man down was a civilian or an officer?

7        A.    I had no idea who it was.

8        Q.    At some -- do you continue to make

9    communications over the air?

10       A.    Right.

11       Q.    Who are you attempting to communicate with

12   to get people over to that building?

13       A.    I couldn't reach Officer Manganiello and

14   Officer Acosta, so I relayed the message to the

15   sergeant.

16       Q.    That is my question.  During this

17   communication period where you're trying to reach

18   Officer Manganiello in E Charlie David, are you also

19   trying to reach Officer Acosta to send him to the

20   basement of 1700?

21       A.    Yes, ma'am.  Yes.

22       Q.    Please tell us, these radio communications

23   that you were making that day as the Central dispatcher

24   from Parkchester, were they being recorded that day?

25       A.    Yes, ma'am.

S.P.O. Colon - People - Direct

1      Q.      And the transmission that you have just told

2    us about, was that transmission recorded that day?

3      A.      Yes, ma'am, it was.

4      Q.      And was that transmission from that day

5    preserved on an audio cassette?

6      A.      Yes, ma'am.

7              MS. SCACCIA:  Your Honor, at this point

8    I'm going to ask to have the following tape marked

9    as People's, I believe I'm up to 6.

10             (Whereupon, the item referred to is

11   marked People's Exhibit 6 for identification.)

12             THE COURT OFFICER:  People's Exhibit 6

13   marked for identification.

14     Q.      Officer Colon, prior to coming to court

15   today and testifying here before these ladies and

16   gentlemen, have you had an opportunity to listen to the

17   tape that was maintained regarding this transmission

18   and review your paperwork regarding the transmission

19   that you sent out on February 12th of 2001?

20     A.      Not until this morning I had an opportunity

21   to listen to somebody.

22     Q.      And based upon your review of the tape and

23   the documents pertaining to that tape, does that tape

24   fairly and accurately capture the message that you sent

25   out to East quadrant Adam Boy/Charlie David about the

cpB                        S.P.O. Colon - People - Direct                    425

1   man down at 1700?

2        A.    Yes, it does, ma'am.

3                MS. SCACCIA:  Based upon that, Your

4   Honor, I'm going to ask, with the assistance of Mr.

5   Longueira from the Video Unit and with the head

6   phones for the jurors, that that tape be played and

7   I move it into evidence.

8                MR. RICHMAN:  No objection.

9                THE COURT:  It's received in evidence.

10  But a portion of the tape previously indicated is

11  received in evidence.

12                MS. SCACCIA:  Yeah.

13                MR. RICHMAN:  Only that line.

14                THE COURT:  Come up, please.

15                (Whereupon, a discussion was held off

16  the record between the Court and Counsel.)

17                (Continued on the following page.)

18

19

20

21

22

23

24

25

1          (Whereupon, the following took

2     place in the robing room in the presence of

3     the Court and all counsel, outside of the

4     presence of the defendant.)

5          THE COURT:  All right.  We are back

6     here in response to the defense counsel's

7     statement before the jury.  I don't know how

8     he put it, "Only that portion," or "Only that

9     one statement."

10          MS. SCACIA:  According to where we

11     left off this morning, your Honor stated

12     that --

13          THE COURT:  No, what Mr. Richman

14     just said in front of the jury.

15          MS. SCACIA:  He said that, "Only

16     one line."

17          MR. RICHMAN:  "Only that line."

18          THE COURT:  "Only that line."

19     Okay.  So we have had a conversation off the

20     record.  I'm not placing it on the record,

21     and as I understand it, Mr. Richman is

22     maintaining his position that I should not

23     let in the one portion of the tape that I did

24     let in, that single transmission, that given

25     that, I'm allowing it in, he is withdrawing

26-8   S.F.C. Colon - People - Direct                    42

1      his objection to the rest of the tape coming

2      into evidence.

3                Is that correct?

4                MR. RICHMAN:  Yes.

5                THE COURT:  With the understanding

6      that you are preserving your objection to the

7      one statement.

8                MR. RICHMAN:  Any portion thereof,

9      and that one portion has been admitted, I

10     would rather have the jury hear the entire

11     tape, rather than just that one line.

12               THE COURT:  Just, I mean, just, you

13     keep calling it a portion thereof.  It's a

14     portion of the tape.  It's an entire

15     transmission.

16               Be that as it may, given also what

17     you have said, I feel that it's only

18     appropriate to indicate to the jury that I

19     was accepting in evidence only a part of it

20     based on your objection, and you are now

21     withdrawing that objection, and so I'm

22     receiving the entire tape in evidence.

23               MS. SCACIA:  And I wasn't allowed

24     to offer it.

25               THE COURT:  Just so it's clear,

1    what I'm going to tell the jury is that while

2    the People had asked to offer the entire tape

3    in evidence, based on your objection I

4    limited it to the single portion I indicated

5    I was receiving in evidence.  You are now

6    withdrawing your objection to the entire

7    tape, and now the entire tape is received in

8    evidence; okay?

9                    That's a yes?

10                   MR. RICHMAN:  Yes.

11                   THE COURT:  Okay.

12                   (Whereupon, the following took

13    place in open court, in the presence of the

14    Court, all counsel, the defendant, and the

15    jury.)

16                   THE COURT:  All right, ladies and

17    gentlemen.  I indicated earlier that I was

18    receiving only a portion of the tape in

19    evidence, and I just want to let you know,

20    the people had offered all of the tape in

21    evidence, and it was based on Mr. Richman's

22    objection out of your presence that I limited

23    it to only a portion of the tape.

24                   Mr. Richman is now withdrawing that

25    objection, so I'm receiving the entire tape

S.P.C. Colon - People - Direct

1          in evidence as People's 6.

2                    (Whereupon, People's Exhibit 6 was

3          marked and received in evidence.)

4                    THE COURT OFFICER:  So marked.

5                    (Whereupon, a tape was played.)

6          Q      Officer Colon, the transmissions that

7     we just heard, are those the transmissions that

8     were made that day between you and Officer

9     Manganiello?

10         A      Yes, ma'am.

11         Q      When Officer Manganiello uses the

12    phrase 10-8, what is that?

13         A      That's when an officer requests a

14    break.

15         Q      And "10-8 to the west" means what?

16         A      It means that he wants to take a break

17    in the west section.

18         Q      And in relation to the east section, is

19    the west section directly opposite that?

20         A      The furthest point.

21         Q      Now, aside from these radio

22    communications, does there come a point in time

23    that morning when Officer Manganiello contacts you

24    by another way?

25         A      Yes, ma'am.

1          Q        How does he contact you?

2          A        He called me on the phone, stating that

3    he was serving a violation for improper garbage

4    disposal at 14 Metropolitan Oval.

5          Q        At 14 what?

6          A        14 Metropolitan Oval.

7          Q        14, just those two numbers,

8    Metropolitan Oval?

9          A        Yes, ma'am.

10         Q        How far is that from 1700 Metropolitan

11   Avenue?

12         A        It's the farthest point from 1700.

13         Q        And is 14 Met Oval within the confines

14   of the eastern quadrant, Charlie David?

15         A        It's the last building the opposite

16   way.

17         Q        And do you recall what time Officer

18   Manganiello called you about issuing a summons for

19   garbage?

20         A        It was after 10:00, like 10:15 or

21   10:20, somewhere around there.

22         Q        Was it before or after you started

23   dispatching his call?

24                  MS. SCACIA:  Well, withdrawn.

25         Q        Officer Colon, is there something that

IC-c  S.P.O. Colon - People - Direct                    429

1    would tell you precisely when Officer Manganiello

2    called you to tell you about issuing a garbage

3    summons?

4                    MR. RICHMAN:  Objection.  He

5         answered 10:00, 10:15.

6                    THE COURT:  I'm sorry?

7                    MR. RICHMAN:  He answered.

8                    THE COURT:  Overruled.

9         Q     You can answer.

10        A     Can I hear it again, please.

11        Q     Sure.  Is there something that would

12   allow you to know exactly when Officer Manganiello

13   called you about issuing a summons for garbage?

14        A     I found that odd, because --

15        Q     No, no, no.  You are not -- you are

16   saying that you don't recall exactly the time he

17   called as you sit here on the witness stand;

18   right?

19        A     Yes, ma'am.  You're right.

20        Q     Is there something that would help you

21   to remember when he called about issuing a summons

22   for garbage?

23        A     The fact that I was --

24                    MR. RICHMAN:  Objection.

25                    THE COURT:  The question is, is

IC-c  S.P.O. Colon - People - Direct                43

1         there a document or something else that would

2         refresh your recollection.

3                   THE WITNESS:  Oh, yes.  Yes, sir.

4         I'm sorry.  I didn't get it.

5         Q      What document would help you do that?

6         A      That was -- I wrote it down in the

7    book.

8         Q      The log book?

9         A      The log book.  It's ten something.

10                  MS. SCACIA:  Okay.  I'm now going

11        to ask to have this page marked for

12        identification as People's Exhibit Number 7.

13                  (Whereupon, People's Exhibit 7 was

14        marked for identification.)

15                  THE COURT OFFICER:  People's

16        Exhibit 7, marked for identification.

17                  MS. SCACIA:  May it be shown to the

18        witness?

19        Q      Officer Colon, if you could, look at

20   that document to yourself.  Do not read it out

21   loud, and after you finish looking at it, let us

22   know if that refreshes your recollection as to

23   what time Officer Manganiello called to say he was

24   issuing a summons for garbage.

25                  (Whereupon, there was a pause in

P.O. Colon - People - Direct                               43

1           the proceedings.)

2     A       Yes, ma'am.  That's 1940 hours.

3     Q       Twenty to ten?

4     A       1940.

5     Q       Okay.  Thank you.

6             He called and told you about the

7     summons for issuing the garbage prior to you

8     getting the communication about a man down?

9     A       Yes, ma'am.

10    Q       After you had the transmissions that we

11    have just listened to on the Park Chester radio,

12    did there come a point in time when you called 911

13    from a telephone?

14    A       Yes, ma'am.

15    Q       And when -- was that after you finished

16    making those radio transmissions we heard?

17    A       Yes, ma'am.

18    Q       I'm now going to ask to have the

19    portion of the tape, which is -- a portion of

20    People's 3 in evidence, played for the members of

21    the jury.

22            THE COURT:  This is now People's 3?

23            MS. SCACIA:  People's 3.

24            (Whereupon, a tape was played.)

25    Q       Officer Colon, is that you that we hear

1   calling 911?

2        A        Yes, ma'am.

3        Q        And you called 911 to get the police

4   department help over to the location?

5        A        Yes.

6        Q        When the operator on the 911 tape is

7   asking you about a man being down, do you still

8   have any idea of who is down in the basement?

9        A        I have no idea.

10       Q        And when you are saying that you sent

11  officers over there, in your mind, what officers

12  did you send over there?

13       A        I sent Sergeant Ohle to investigate,

14  because I couldn't get Officer Manganiello or

15  Officer Acosta, therefore I sent Sergeant owly and

16  Officer Nieves.

17       Q        And you do that, once again, by Park

18  Chester radio?

19       A        Radio, yes, ma'am.

20       Q        And then you make the phone call that

21  we heard to 911?

22       A        Then, after Sergeant Ohle informs me

23  that there was an officer there, so I called right

24  away 911.

25            MS. SCACIA:  Your Honor, I have no