EXHIBIT **3**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ANTHONY MANGANIELLO,

                    Plaintiff,

                              Index NO.
              -against-      07 CIV 3644 (HB)

THE CITY OF NEW YORK, DET. LUIS AGOSTINI,
individually and as a New York City Police
Detective, SHAWN ABATE, individually and as
a New York City Police Detective, DEREK
PARKER, individually and as a New York City
Police Detective, LT. HENRY SCOTT,
individually and as a New York City Police
Lieutenant, P.O. ALEX PEREZ, individually
and as a New York City Police Officer, P.O.
MIRIAN NIEVES, individually and as a New
York City Police Officer, MICHAEL PHIPPS,
individually and as the Commanding Officer
of the 43rd Precinct, JOHN McGOVERN,
individually and as a New York City Police
Sergeant, ROBERT MARTINEZ, individually and
as a New York City Police Detective, GERYL
McCARTHY, individually and as a New York
City Police Inspector,

                    Defendants.
-----------------------------------------X
                    December 20, 2007
                    10:25 a.m.


          DEPOSITION of DET. LUIS AGOSTINI



DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6095
800 DAL 8779  dalcoreporting.com

14

```
1              Agostini
2      Q      Did you ever work with a
3   confidential informant in connection with
4   the Acosta investigation?
5      A      Not my confidential informant,
6   no.
7      Q      I'm not going to ask for the
8   identity of any confidential informants, but
9   what was your experience working with
10  confidential informants generally?
11     A      When I was in narcotics I had a
12  couple of CI's we call them, and some of
13  them give you good information and some of
14  them don't.
15     Q      As a detective working with a
16  CI, what responsibility if any did you have
17  to verify the information given as to
18  whether it was good or not?
19          MS. FROMMER: Objection. You
20  can answer.
21     A      You can do recon or you can do
22  further interviews.
23     Q      What's recon?
24     A      Okay, that's basically go to the
25  area, they don't know who you are, and try
```

15

```
1              Agostini
2   to find out if this is — you know, if they
3   are selling crack or something else, what he
4   is not saying, what he is saying. Just try
5   to verify that they are selling that product
6   at that specific location.
7      Q      In other words, does recon
8   involve attempting to corroborate what a
9   confidential informant has told you?
10     A      Yes.
11     Q      When you say further
12  investigation, what do you mean by that?
13     A      What do you mean?
14     Q      You said you can do recon and
15  further investigation. What do you mean by
16  further investigation?
17     A      Sometimes interview other people
18  that have been arrested at that specific
19  location.
20     Q      Is that also another step to
21  attempt to corroborate what information a
22  confidential informant has given you?
23     A      Yes.
24     Q      As one working with confidential
25  informants, did you keep what's called a CI
```

16

```
1              Agostini
2   file?
3      A      Yes.
4      Q      As part of working with a
5   confidential informant, what documents
6   generally are kept in a CI file?
7      A      I can't remember.
8      Q      Would you do a background check
9   on a particular confidential informant to
10  see what crimes he had been involved in in
11  the past?
12     A      Yes.
13     Q      Does the level of criminal
14  activity affect your judgment as to a
15  confidential informant's reliability?
16          MS. FROMMER: Objection. You
17  can answer.
18     Q      In general.
19     A      Rephrase that.
20     Q      What I am looking for, sir, what
21  factors if any do you look for in a
22  confidential informant's background to
23  determine whether or not they are
24  believable?
25     A      Most confidential informants
```

17

```
1              Agostini
2   have a criminal history. So we are not
3   looking for a Boy Scout or whatever, but you
4   try to find out whether let's say if the
5   certain person there that's dealing drugs,
6   has he had any arrest connection to that
7   person.
8      Q      Is there any system for putting
9   up a red flag if a confidential informant
10  gives you information that is false?
11          MS. FROMMER: Objection. You
12  can answer.
13     Q      In the calendar year 2001, was
14  there any procedure to determine, to put up
15  a red flag so to speak when a confidential
16  informant gave you false information?
17          MS. FROMMER: I am going to
18      object. That he had used when he was
19      in narcotics. He was not in narcotics
20      in February of 2001.
21          MR. JOSEPH: I'll rephrase the
22      question.
23     Q      In your experience, sir, working
24  with confidential informants, was there any
25  procedure by which you put a red flag so to
```

5 (Pages 14 to 17)

18

```
 1           Agostini
 2  speak if it turned out that a confidential
 3  informant had given you false information?
 4       MS. FROMMER: Objection. You
 5  can answer if you can.
 6    A    Basically if he gives you once
 7  or twice bad information what your
 8  supervisor would say is drop him. You just
 9  drop him, and that's it, he won't be your
10  confidential informant any more.
11    Q    Is that a procedure you had
12  followed in general when working with
13  confidential informants?
14       MS. FROMMER: Objection. You
15  can answer.
16    A    Well, that procedure I've never
17  done.
18    Q    Was that a procedure that you
19  would follow in the event that a
20  confidential informant gave you false
21  information?
22       MS. FROMMER: Objection. You
23  can answer.
24    A    Yes.
25    Q    On February 12, 2001, did you
```

19

```
 1           Agostini
 2  become involved in the investigation into
 3  the homicide of Albert Acosta?
 4    A    Yes.
 5    Q    How did you become so involved?
 6    A    I was the assisting investigator
 7  for Detective Shawn Abate.
 8       MS. FROMMER: A-B-A-T-E.
 9    Q    And were you partnered up so to
10  speak with Abate that day?
11       MS. FROMMER: Objection. You
12  can answer.
13    A    Yes.
14    Q    How did you learn of the
15  homicide of Albert Acosta initially?
16    A    Initially, I was at the 43rd
17  Precinct, and I'm not sure whether it was a
18  call from the station house downstairs or it
19  was by radio, but we were informed that a
20  1013 was going on at Parkchester.
21    Q    1013 is an officer down or
22  officer in peril?
23    A    Or officer in danger, yes.
24    Q    What other information was
25  conveyed to you in that initial
```

20

```
 1           Agostini
 2  transmission?
 3    A    I believe, but I can't remember,
 4  it was someone in uniform, something like
 5  that, someone in uniform.
 6    Q    Was there any indication on the
 7  initial transmission that it was an SPO,
 8  special patrol officer, or Parkchester
 9  security officer?
10    A    No, we did not know that.
11    Q    At some time did you learn that?
12    A    I guess when we got to the
13  scene, yes.
14    Q    Sir, is it your testimony that
15  there was no subsequent transmission over
16  the radio indicating that the person who was
17  in trouble on the 1013 was actually a
18  Parkchester security officer?
19       MS. FROMMER: Objection. You
20  can answer.
21    A    I can't remember that.
22    Q    Sir, as you sit here right now,
23  do you have any recollection as to whether
24  there was a subsequent transmission after
25  that first transmission identifying the
```

21

```
 1           Agostini
 2  individual involved in the 1013 as a
 3  Parkchester security officer?
 4       MS. FROMMER: Objection. You
 5  can answer.
 6    A    Okay, as far as transmission I
 7  don't know, but I know when I got to the
 8  scene that's when I learned.
 9    Q    Did you have a radio on while
10  you were en route to the scene?
11    A    Yes.
12    Q    Who did you arrive at the scene
13  with?
14    A    Detective Ramirez.
15    Q    What information were you given
16  at the scene?
17    A    I believe at the scene we were
18  given that it was a Parkchester security
19  person down, and that he was taken to Jacobi
20  Hospital.
21    Q    At the point in time you
22  arrived, was the victim already removed?
23    A    Yes.
24    Q    And who gave you this
25  information?
```

6 (Pages 18 to 21)

22

Agostini

1
2    A   I can't say for sure, but I
3    believe it was Detective Abate.
4    Q   Was Detective Abate already on
5    the scene prior to your arrival?
6    A   Yes.
7    Q   When you arrived at the scene,
8    were you given any other information beside
9    what you just told us?
10   MS. FROMMER:  When he first
11   arrived at the scene?
12   MR. JOSEPH:  Yes.
13   A   No, just basically that me and
14   my partner, Detective Ramirez, we were going
15   to Jacobi Hospital to see if the victim was
16   speaking.
17   Q   And immediately after arriving
18   at the scene, did you then leave and go to
19   Jacobi Hospital?
20   A   A couple of minutes after, yes.
21   Q   Who did you go to Jacobi
22   Hospital with?
23   A   Detective Ramirez.
24   Q   At this point when you go to the
25   hospital, are you made aware of any

Agostini

1
2    A   Just on the spiral book.
3    Q   What happened to that spiral
4    book at the end of February 12, 2001?
5    A   It was missing with the other
6    documents.
7    Q   On February 12, 2001, was it
8    missing?
9    A   No.
10   Q   When did it go missing?
11   A   It went missing -- the last time
12   I saw was something like January, around
13   approximately January, February of 2003, and
14   that's when I was in the 43rd squad, and
15   then I got transferred over to the deputy
16   commissioner's office.
17   Q   I just asked you when it went
18   missing.
19   A   I can't tell you.
20   Q   At the end of the day on
21   February 12, 2001, what did you do with that
22   spiral notebook?
23   A   I kept it with my records.
24   Q   What other records were with
25   that spiral notebook?

23

Agostini

1
2    suspects?
3    A   No.
4    Q   How long were you at the
5    hospital?
6    A   Approximately 30 minutes maybe.
7    Q   Do you have a recollection of
8    what time you initially arrived at the scene
9    of Acosta's homicide?
10   A   No.
11   Q   Are there any records which
12   would indicate when you actually arrived?
13   A   If there was a DD5 maybe.
14   Q   Did you keep a memo book?
15   A   Yes.
16   Q   In that memo book did you jot
17   down times?
18   A   We don't keep memo books, I'm
19   sorry.
20   Q   Did you keep a spiral book?
21   A   Yes.
22   Q   Aside from a spiral book, did
23   you keep any other type of documentation
24   that would document what you do during the
25   course of the day?

Agostini

1
2    A   Just spiral notebook, basically
3    the spiral notebook.
4    Q   Were there any other records
5    kept with the spiral notebook?
6    A   I can't remember what other
7    records.
8    Q   Where did you keep those
9    records?
10   A   In my desk.
11   Q   Let's step back to February 12,
12   2001.  After you left Jacobi Hospital, where
13   did you go?
14   A   I believe we went back to the
15   scene.
16   Q   And did you speak to anybody
17   when you got to the scene?
18   A   I don't remember who we spoke to
19   when we got to the scene, but I remember us
20   interviewing someone.
21   Q   Who did you interview?
22   A   It was a prior dispute that
23   happened that morning that Parkchester
24   responded to.  So we just went up there, and
25   we interviewed the residents there.

**dalco**
court reporting & legal video

7 (Pages 22 to 25)

**26**

1          Agostini
2     Q     Who told you to go to that
3     dispute?
4     A     I can't remember.
5     Q     Do you know why you went to that
6     dispute?
7     A     To interview, just in case, you
8     know, maybe they know who did this.
9     Q     Did you go to apartment 5E at
10    1700 Metropolitan Avenue or Oval?
11    A     Yes.
12    Q     What was your understanding of
13    why you were going there?
14    A     Basically to interview the
15    residents there that they had a prior
16    dispute early in the morning and that
17    Parkchester security responded to it.
18    Q     At this point, was it your
19    suspicion that maybe someone involved in
20    that earlier dispute had done this to Mr.
21    Acosta?
22    A     That could be a possibility.
23    Q     Sir, that morning, did you go to
24    the apartment 5E to verify whether or not
25    Mr. Manganiello, Anthony Manganiello, had

**27**

1          Agostini
2     been there earlier that morning?
3     A     No, not specifically him.
4     Q     Did you go there to verify
5     whether any --
6     A     Yes, Parkchester security, yes.
7     Q     Was there any particular member
8     of Parkchester security that you went there
9     to verify their attendance?
10         MS. FROMMER: Objection. You
11    can answer.
12    A     No, not -- well, you know, not
13    specifically, no. Because -- wait a minute.
14         MR. JOSEPH: Can we have this
15    marked as, I believe we are up to 10,
16    right?
17         MS. FROMMER: I have we are on
18    10 now. This is going to be 10.
19         MR. JOSEPH: I have the
20    interview --
21         MS. FROMMER: I'm sorry, you're
22    correct.
23         MR. JOSEPH: Can you mark this
24    No. 11.
25         (Document was marked as

**28**

1          Agostini
2     Plaintiff's Exhibit 11 for
3     identification, as of this date.)
4          MR. JOSEPH: For the record, it
5     is also Defendant's Exhibit A, in
6     evidence, dated 6/28/04. The document
7     came to me in this condition.
8          MS. FROMMER: For the record, I
9     have seen this document, A-I-D in
10    evidence.
11    Q     I ask you to look at Exhibit No.
12    11, ask you if you recognize what that
13    document is?
14    A     It's a radio call.
15    Q     Was this the radio call
16    concerning the incident at apartment 5E at
17    1700 Metropolitan and the shooting of Mr.
18    Acosta on February 12, 2001?
19    A     Yes.
20    Q     Does this document refresh your
21    recollection as to whether at 10:24 or
22    thereabouts there was a radio transmission
23    indicating that a Parkchester security guard
24    had been shot at a location?
25    A     Transmission that I heard?

**29**

1          Agostini
2     Q     I am asking you if looking at
3     this document, does it refresh your
4     recollection?
5          MS. FROMMER: That one existed
6     or one that he heard?
7          MR. JOSEPH: The one that he
8     heard.
9     A     I can't remember that I heard
10    one. By looking at this I can see that
11    there is one, yes.
12    Q     Sir, by looking at this
13    document, Exhibit 11, do you agree that
14    there was a radio transmission at 10:24 over
15    the NYPD system stating that a Parkchester
16    security guard had been shot?
17    A     At what time?
18    Q     10:24.
19    A     10:20, I'm not sure.
20    Q     Somewhere between 10:20 and
21    10:24; is that correct?
22    A     Yes, yes.
23         MR. JOSEPH: Let's have this
24    marked as Exhibit No. 12. For the
25    record, it's also Bates stamped 795.

8 (Pages 26 to 29)

30

| | |
|---|---|
| 1 | Agostini |
| 2 | (Document was marked as |
| 3 | Plaintiff's Exhibit 12 for |
| 4 | identification, as of this date.) |
| 5 | Q    By the say, sir, do you have any |
| 6 | access to the radio transmissions from the |
| 7 | Parkchester security? |
| 8 | A    Yes. |
| 9 | Q    And did you learn that a |
| 10 | Sergeant Ohle had made a transmission over |
| 11 | the Parkchester radio stating that one of |
| 12 | his officers or a security officer was down? |
| 13 | MS. FROMMER: Objection. |
| 14 | A    I can't remember that. |
| 15 | Q    I show you what was marked as |
| 16 | Exhibit No. 12. Do you recognize that |
| 17 | document? |
| 18 | A    Yes. |
| 19 | Q    What do you recognize it to be? |
| 20 | A    The interview with the people at |
| 21 | 1700 Metropolitan Avenue. |
| 22 | Q    Apartment 5E? |
| 23 | A    5E. |
| 24 | Q    Did you ask the people at |
| 25 | apartment 5E at all whether Anthony |

31

| | |
|---|---|
| 1 | Agostini |
| 2 | Manganiello had responded to the call? |
| 3 | A    I didn't know anything about an |
| 4 | Anthony Manganiello at the time. |
| 5 | Q    Thank you. |
| 6 | Is it fair to say that at the point |
| 7 | in time when you arrived back at Parkchester |
| 8 | condominiums Anthony Manganiello was not a |
| 9 | suspect for the shooting of Mr. Albert |
| 10 | Acosta? |
| 11 | MS. FROMMER: Objection. You |
| 12 | can answer. |
| 13 | A    No, he was not a suspect. |
| 14 | Q    Did you ask the tenant at |
| 15 | apartment 5E whether all the police officers |
| 16 | left together or if they left at different |
| 17 | times? |
| 18 | MS. FROMMER: Objection. |
| 19 | A    I don't remember. |
| 20 | Q    When you interviewed the |
| 21 | tenants, I believe Miss Fosuaa, F-O-S-U-A-A, |
| 22 | did you take handwritten notes of what they |
| 23 | said? |
| 24 | A    Like I said, I don't remember. |
| 25 | I could have. |

32

| | |
|---|---|
| 1 | Agostini |
| 2 | Q    Would it be part of your normal |
| 3 | practice to take handwritten notes as the |
| 4 | people are speaking as part of your |
| 5 | investigation in February of 2001? |
| 6 | MS. FROMMER: Objection. You |
| 7 | can answer. |
| 8 | A    Yes. |
| 9 | Q    In February of 2001, was it your |
| 10 | practice to take down as close as you can |
| 11 | word for word what is said by a witness at |
| 12 | the scene of an investigation? |
| 13 | MS. FROMMER: Objection. |
| 14 | A    Not word for word, no. |
| 15 | Q    Are the DD5's a summary of your |
| 16 | written notes, or are they word for word? |
| 17 | MS. FROMMER: Objection. You |
| 18 | can answer. |
| 19 | A    Summary. |
| 20 | Q    Is it possible that there are |
| 21 | things in the written notes that aren't on |
| 22 | your DD5's in general? |
| 23 | MS. FROMMER: Objection. |
| 24 | A    Rephrase it. |
| 25 | Q    Sir, are there details which at |

33

| | |
|---|---|
| 1 | Agostini |
| 2 | the time may not seem significant which are |
| 3 | in your handwritten notes that may not get |
| 4 | on the DD5's? |
| 5 | MS. FROMMER: Objection. |
| 6 | A    Sometimes, yes. |
| 7 | Q    Would it be fair to say that |
| 8 | usually there is more information in your |
| 9 | handwritten notes that in a DD5, correct? |
| 10 | MS. FROMMER: Objection. |
| 11 | A    Not necessarily, no. |
| 12 | Q    But would you say that — |
| 13 | A    Sometimes you write things in a |
| 14 | book and you brief it, but then later on you |
| 15 | remember more by memory what they said, not |
| 16 | specifically that you had it written. |
| 17 | Q    Is it fair to say that sometimes |
| 18 | you have more information in the handwritten |
| 19 | notes than appear on the DD5's? |
| 20 | MS. FROMMER: Objection. |
| 21 | A    Basically the same I would say. |
| 22 | Q    Now, do you have any |
| 23 | recollection right now as to whether you |
| 24 | took the handwritten notes of what the |
| 25 | tenants said at 5E at 1700 Metropolitan |



42

Agostini

1 an inventory form that crime scene will fill
2 out?
3     MS. FROMMER: Objection. You
4 can answer if you know.
5     A    I don't know.
6     Q    Sir, is there an indication on
7 this form as to what time this form was
8 filled out?
9     MS. FROMMER: Objection.
10     A    It says here 12:25.
11     Q    Does it contain Mr. Anthony
12 Manganiello's pedigree information?
13     A    Yes.
14     MS. FROMMER: I am just going to
15 object to this document being called a
16 form. This is what has been identified
17 here as a blank piece of paper with
18 handwritten notes on it. There is no
19 indication that this is any preprinted
20 form let alone any preprinted NYPD
21 form, so I am going to object to that
22 being referred to as a form. As I
23 said, it's a blank piece of paper with
24 handwritten notations.

43

1     Agostini
2     MR. JOSEPH: I'll amend my
3 question from form to document.
4     MS. FROMMER: Document is fine.
5     Q    Typically, when crime scene does
6 gun swap residue tests, do they write down
7 the person's name and identifying
8 information who they are taking it from?
9     MS. FROMMER: Objection. You
10 can answer if you know what happens.
11     A    Sir, this is the first gun
12 residue thing that I have seen, you know,
13 that they were going to do.
14     Q    Sir, does it appear at some time
15 prior to 12:25 p.m. at the 43rd Precinct
16 Anthony Manganiello provided his name, date
17 of birth, address and Social Security
18 number?
19     MS. FROMMER: Objection.
20     A    I don't know who he provided it
21 to.
22     Q    Do you know whether Mr.
23 Manganiello did in fact provide his name,
24 address, Social Security number and date of
25 birth at the 43rd Precinct?

44

1     Agostini
2     MS. FROMMER: Objection.
3     A    Not to me.
4     Q    Do you know if he provided it to
5 anybody?
6     MS. FROMMER: Objection. You
7 can answer.
8     A    I don't know.
9     Q    What did you say when you first
10 walked into the door, what if anything did
11 you say to Anthony Manganiello, and what did
12 he say to you?
13     MS. FROMMER: Objection. You
14 can answer.
15     A    When he first came through the
16 door I thought in my mind I was interviewing
17 the victim's partner.
18     Q    By the way, were you aware that
19 or did you have any knowledge that
20 Parkchester security officers aren't
21 partnered up in a traditional sense, they
22 walk around separately sharing a quadrant?
23     A    No, I don't know that.
24     MS. FROMMER: Objection.
25     Q    Did you ever become aware of

45

1     Agostini
2 that on February 12, 2001?
3     MS. FROMMER: Objection. You
4 can answer.
5     A    I don't know.
6     Q    What did you say to him, and
7 what did he say to you?
8     MS. FROMMER: Objection.
9     Q    What did you say to Anthony
10 Manganiello, if anything, and what did
11 Anthony Manganiello say to you?
12     MS. FROMMER: Objection to the
13 form. He can answer.
14     MR. JOSEPH: Off the record.
15     (Whereupon, a discussion was
16 held off the record.)
17     A    Basically I was asking him, you
18 know, like what happened, his pedigree, and,
19 you know, see if anybody has a problem with
20 the victim.
21     Q    And did he provide you with his
22 name?
23     A    Yes, I believe he did.
24     Q    Did he provide you with his
25 pedigree information?

46

Agostini

1
2    A    No.
3    Q    What pedigree information did he
4 not provide you with?
5    A    When I asked him, "Where do you
6 live?" that's a basic question for anybody
7 when you interview, he said, "I don't know."
8 And then when I asked him, "What's your
9 telephone number?" and he goes, "Unlisted,"
10 right.
11    Q    Did you ask him any additional
12 questions?
13    A    Yes, I asked him about what
14 happened to his finger.
15    Q    What did he say?
16    A    He said that picking up his
17 treadmill I believe, he cut himself picking
18 up his treadmill.
19    Q    Did you have any reason to
20 believe he didn't cut his finger picking up
21 his treadmill?
22    A    No.
23    Q    Did you have any reason to
24 believe that his telephone number was not
25 unlisted?

47

Agostini

1
2    MS. FROMMER: Objection. You
3 can answer.
4    A    Well, this is a police
5 investigation. Whether it's unlisted or
6 not, I am asking you what's your phone
7 number. I mean any other person will give
8 you the phone number, will give you the
9 address where they live.
10    Q    Did you at some time prepare an
11 arrest report?
12    A    Yes.
13    Q    What did it say on the arrest
14 report? Is there something that says
15 "address" on the form?
16    A    Yes.
17    Q    What did you put down under
18 that?
19    A    I don't remember what I put
20 down.
21    Q    Did you put down Mr.
22 Manganiello's address?
23    A    Most likely.
24    Q    And that information would have
25 come from Anthony Manganiello, correct?

48

Agostini

1
2    A    I would say that's correct, yes.
3    Q    That would have been information
4 you received on February 12, 2001, right?
5    MS. FROMMER: Objection.
6    Q    Did you receive that information
7 from Anthony Manganiello on February 12,
8 2001?
9    A    Yes.
10    Q    What other information was on
11 the arrest report?
12    A    I can't remember.
13    Q    What happened to the arrest
14 report?
15    A    It was with the file.
16    Q    Was that also one of the
17 documents which was lost?
18    A    Yes.
19    Q    Was Mr. Manganiello's date of
20 birth on the arrest report?
21    A    It could have been. I don't
22 remember.
23    Q    Was Mr. Manganiello's Social
24 Security number on the arrest report?
25    A    If he gives it to me, yes.

49

Agostini

1
2    Q    Did you put down something for
3 his Social Security number?
4    A    It all depends. I mean I can't
5 remember that. Some defendants give you
6 Social and some don't.
7    Q    As you sit here right now, do
8 you have any recollection as to Anthony
9 Manganiello providing you with his Social
10 Security number?
11    A    I don't have any recollection,
12 no.
13    Q    Do you have any recollection as
14 you sit here right now as to whether Mr.
15 Manganiello provided you with his date of
16 birth on February 12, 2001?
17    A    I have no recollection.
18    Q    What other information goes on
19 an arrest report typically?
20    A    Basically the charges of what he
21 has been either arrested or whatever.
22    Q    Let's go back.
23    After he says he cut his finger
24 on the treadmill, what did you say to him
25 next?

13 (Pages 46 to 49)

dalco
court reporting & legal video

50

Agostini

2  A   Well, did he run today.

3  Q   What did he say?

4  A   I believe he said no.

5  Q   Do you have any reason to

6  believe he didn't run the day prior?

7  A   No.

8  Q   Did you ask him if he ran the

9  day prior?

10  A   No.

11  Q   Did you ask him if he walked on

12  the treadmill as opposed to running?

13  A   No.

14  Q   Did you ask him whether someone

15  else in his family used a treadmill?

16  A   No.

17  Q   Did you ask him who else he

18  lived with?

19  A   I don't remember that.

20  Q   Did you ask him if maybe he cut

21  his finger moving his girlfriend's

22  treadmill?

23      MS. FROMMER: Objection.

24  A   No, because I asked him how he

25  got that, and he told me how he got it.

51

Agostini

2  Q   Did you believe him?

3  A   Not -- yes, I guess I believed

4  him at the time. Yes.

5  Q   Let me see if I understand the

6  process here. You asked him what his name

7  is, and he told you, correct?

8  A   Yes.

9  Q   You asked him for his address,

10  and he says he doesn't remember, correct?

11  A   Yes.

12  Q   But his address wound up on an

13  arrest report prepared on February 12, 2001?

14      MS. FROMMER: Objection to that

15  question.

16  A   Okay, I believe he says "I don't

17  know" regarding to his address, not that I

18  don't remember. And as far as the arrest

19  report, the address and everything else, if

20  it was there, this happened late that night,

21  not during the interview.

22  Q   So then after that, your next

23  question to him was what is your telephone

24  number?

25  A   Yes.

52

Agostini

2  Q   And he indicated that it was

3  unlisted, correct?

4  A   Correct.

5  Q   What was your next question to

6  Anthony Manganiello?

7  A   I don't remember what is the

8  next question.

9  Q   Do you remember any of the other

10  questions you asked him?

11  A   Did the victim have a problem

12  with anybody, or did he have a problem with

13  him?

14  Q   And what was his response?

15  A   I don't remember what his

16  response was.

17  Q   Did he tell you that he had a

18  problem with the victim?

19  A   No, he didn't say that.

20  Q   Was there anything that led you

21  to believe that Mr. Anthony Manganiello had

22  a problem with the victim on February 12,

23  2001?

24  A   No.

25      MS. FROMMER: Objection.

53

Agostini

2  Q   What other questions did you ask

3  him?

4  A   I think basically that's it.

5  Q   What happens after you asked him

6  those questions?

7  A   After I asked him those

8  questions, and I would say maybe 15 minutes

9  or whatever that he was there, Detective

10  Rubin Gonzalez comes in and says that

11  Anthony Manganiello's attorney called, and

12  asked us not to question him.

13  Q   What was your impression at that

14  point?

15  A   Then I was suspicious.

16  Q   Is it fair to say that the fact

17  that an attorney called made you suspicious?

18  A   The fact that he didn't answer

19  me, that he told me that he doesn't know

20  where he lives and his phone is unlisted, I

21  mean most people who we interview, I

22  interviewed a whole bunch of people, nobody

23  has ever told me that. And the fact that he

24  told me that, and all of a sudden an

25  attorney calls, yes, it rose my suspicions.

14 (Pages 50 to 53)

54

Agostini

1
2    Q   Because an attorney had called
3  and he gave you an evasive answer, did that
4  somehow in your mind connect him to the
5  murder of Albert Acosta?
6        MS. FROMMER: Objection. You
7  can answer.
8    A   To me it just rose my suspicion,
9  that's all.
10   Q   At that point in time you
11 learned that Anthony Manganiello's attorney
12 had called and directed you not to question
13 him any further, did that make him, Anthony
14 Manganiello, a suspect in your mind for the
15 shooting of Albert Acosta?
16   A   No. It just rose my suspicion.
17 I wasn't the lead detective here. I was
18 just, you know —
19   Q   Prior to the attorney calling,
20 did you take Anthony Manganiello's memo
21 book?
22   A   Prior to, no.
23   Q   Did Shawn Abate take Anthony
24 Manganiello's memo book prior to the
25 attorney calling?

55

Agostini

1
2    A   I don't know that.
3    Q   Prior to the attorney calling,
4  did you remove Mr. Anthony Manganiello's
5  jacket from him?
6        MS. FROMMER: Objection. You
7  can answer.
8    A   No.
9    Q   Prior to the attorney calling,
10 did Shawn Abate remove Anthony Manganiello's
11 jacket from him?
12   A   No.
13   Q   Prior to the attorney calling,
14 did anybody remove Anthony Manganiello's
15 jacket from him?
16       MS. FROMMER: Objection.
17   A   No.
18   Q   Prior to the attorney calling,
19 did anybody remove Anthony Manganiello's
20 memo book?
21       MS. FROMMER: Objection.
22   A   No.
23   Q   Now, before the attorney called,
24 did Anthony Manganiello's brother, Mario
25 Manganiello, appear at the 43rd Precinct?

56

Agostini

1
2    A   The brother appeared I believe
3  with the lawyer.
4    Q   Now, do you know how many times
5  the brother appeared at the station —
6        MS. FROMMER: Objection.
7    Q   — that day?
8    A   How many times he came into --
9    Q   Yes.
10   A   Once, twice.
11   Q   Is it your testimony that the
12 first time Mario Manganiello walked into the
13 43rd Precinct he walked in with a lawyer?
14       MS. FROMMER: Objection. You
15 can answer.
16   A   I believe so.
17   Q   Did you discuss the fact that an
18 attorney called on behalf of Anthony
19 Manganiello with any other detectives in the
20 squad?
21   A   Not that I know of. I just —
22 when me and Shawn Abate was in the room and
23 Detective Rubin Gonzalez told us, that's all
24 that I knew. Rubin Gonzalez and Shawn
25 Abate, I didn't discuss it with anybody

57

Agostini

1
2  else, no.
3    Q   And what was your response when
4  you heard that a lawyer had called?
5    A   I had no response.
6    Q   Did that in any way anger you?
7        MS. FROMMER: Objection.
8    A   No. It just rose my suspicions,
9  that's all, my suspicion.
10   Q   Did you speak with Lieutenant
11 Scott at all about a lawyer having called
12 for Anthony Manganiello?
13   A   Not that I can remember.
14   Q   Do you remember either you or
15 Lieutenant Scott using the phrase Anthony
16 Manganiello was lawyered up?
17       MS. FROMMER: Objection.
18   A   Not that I know.
19   Q   Have you ever heard that term
20 used?
21   A   Yes.
22   Q   What does that term mean to you?
23   A   Basically when a defendant is
24 either under arrest or whatever, wants a
25 lawyer, he doesn't want to speak to the


court reporting & legal video

15 (Pages 54 to 57)

58

Agostini

1  police.
2  **Q      And does that in your mind mean**
3  **that the person is probably guilty?**
4       MS. FROMMER: Objection.
5    A    From my mind, I won't say
6  guilty. I don't know, guilty of something.
7  **Q      At the point in time that you**
8  **stopped questioning Anthony Manganiello on**
9  **February 12, 2001, was there any evidence at**
10 **all that connected him to the shooting of**
11 **Albert Acosta?**
12      MS. FROMMER: Objection. You
13  can answer.
14    A    Just that he came from the
15  scene, and to me, I thought it was his
16  partner. So I wanted to question him
17  whether he knew what happened to his
18  partner.
19 **Q      My question, sir, was there any**
20 **evidence at all on February 12, 2001, at the**
21 **point in time you stopped questioning him**
22 **that directly connected Anthony Manganiello**
23 **to the homicide of Albert Acosta?**
24      MS. FROMMER: Objection.

59

Agostini

1    A    No, no.
2  **Q      Sir, on February 12, 2001, did**
3  **you have any probable cause to believe that**
4  **Anthony Manganiello was involved in the**
5  **death of Albert Acosta?**
6       MS. FROMMER: Objection. You
7  can answer.
8    A    I didn't have probable cause.
9  **Q      At some time on February 12,**
10 **2001, was Anthony Manganiello arrested?**
11      MS. FROMMER: Objection. You
12  can answer.
13    A    He was arrested, yes.
14 **Q      For what crime was he arrested?**
15    A    For -- I can't remember, but I
16  guess murder.
17 **Q      What was the basis for arresting**
18 **Anthony Manganiello for murder on February**
19 **12, 2001?**
20    A    Well, basically the -- well, he
21  was arrested, what's called -- I can't
22  remember. The arrest paperwork was just
23  paperwork saying that -- I forgot the --
24      MS. FROMMER: Explain it, if you

60

Agostini

1  can.
2    A    Well, basically if the DA
3  doesn't approve of arresting someone for
4  murder, but since he was placed in a cell,
5  you have to cancel the arrest. That was
6  basically -- it was a cancelled arrest.
7  **Q      For an arrest to be cancelled**
8  **there was an underlying arrest, correct?**
9    A    Yes.
10 **Q      Who made the decision to make**
11 **that underlying arrest?**
12    A    My supervisors.
13 **Q      Which supervisor?**
14    A    That I could recall, it was
15  Inspector Garger.
16 **Q      Prior to arresting Anthony**
17 **Manganiello, did you speak with Lieutenant**
18 **Scott at all about effectuating an arrest of**
19 **Anthony Manganiello?**
20    A    Well, sir, I just want to make
21  it clear, okay. When he was put in a cell
22  it wasn't my decision, and it wasn't my case
23  at the time.
24 **Q      So it was Shawn Abate's decision**

61

Agostini

1  to arrest Anthony Manganiello on February
2  12, 2001?
3    A    I don't know.
4  **Q      Were you present when Shawn**
5  **Abate discussed the Anthony Manganiello case**
6  **with any supervisor --**
7       MS. FROMMER: Objection.
8  **Q      -- on February 12, 2001?**
9    A    Not that I can remember.
10 **Q      Did you discuss with Shawn Abate**
11 **why he was arresting Anthony Manganiello?**
12      MS. FROMMER: Objection.
13    A    Why? No, I didn't discuss why
14  he was arresting him.
15 **Q      Sir, did you say to Shawn Abate,**
16 **"There is no probable cause to believe he**
17 **was involved in this murder. Why are you**
18 **arresting him?"**
19    A    I didn't say that.
20      MS. FROMMER: Objection.
21 **Q      Did anybody say that?**
22    A    I don't know.
23 **Q      Who else was there?**
24    A    It was a whole bunch of people

16 (Pages 58 to 61)

62

1          Agostini
2   there.
3       Q    Who else was directly involved
4   in making this arrest —
5          MS. FROMMER: Objection.
6       Q    — on February 12, 2001?
7       A    Well, the detective that's going
8   to make the arrest, the supervisors there,
9   the ADA. There is a whole bunch of people
10  involved. I don't know.
11      Q    Was Lieutenant Scott present
12  when the decision or the discussion about
13  arresting Anthony Manganiello came up?
14      A    I don't remember.
15      Q    Was Sergeant McGovern present
16  when the discussion about arresting Anthony
17  Manganiello came up on February 12, 2001?
18         MS. FROMMER: Objection.
19      A    I don't remember.
20      Q    Sir, to be a detective do you
21  have to have a pretty good memory?
22         MS. FROMMER: Objection. That's
23   harassment. I am going to instruct him
24   not to answer that. You are asking him
25   whether he remembers a conversation

63

1   over six years ago. I am instructing
2   him not to answer. Your question is
3   harassing.
4       Q    Can you tell me at what time
5   Anthony Manganiello was placed in a cell?
6       A    I could say an approximate.
7       Q    That's fine.
8       A    Somewhere between I would say
9   3:00 and 4:00.
10      Q    Is it fair to say that between
11  3:00 and 4:00 p.m. on —
12      A    Yes.
13      Q    — on February 12, 2001, Mr.
14  Anthony Manganiello was placed in a cell?
15      A    Approximately, yes.
16      Q    Prior to 3 o'clock p.m. was
17  Anthony Manganiello free to leave?
18      A    Sir, that was not my decision.
19      Q    I didn't ask you whose decision
20  it was. I asked prior to 3 o'clock p.m. on
21  February 12, 2001, was he free to leave?
22      A    I can't tell you that. I don't
23  know. It's not my decision.
24      Q    Whose decision was it?

64

1          Agostini
2       A    The investigator in charge,
3   Detective Abate, or the supervisors.
4       Q    Which supervisors?
5       A    It could be Lieutenant Scott was
6   there, Inspector Garger that I can remember
7   and some other people.
8       Q    To the best of your
9   recollection, what if anything did
10  Lieutenant Scott do as part of the process
11  of initiating Anthony Manganiello's arrest?
12         MS. FROMMER: Objection.
13      Q    If anything.
14      A    I don't remember.
15      Q    Now, at some point, did Mr.
16  Anthony Manganiello indicate to you that he
17  wasn't feeling well?
18      A    Yes.
19      Q    What did he say?
20      A    I think something about
21  shortness of breath or something like that,
22  but I can't remember.
23      Q    Did EMS come to the precinct?
24      A    Yes.
25      Q    And did they perform an

65

1          Agostini
2   examination of Anthony Manganiello?
3         MS. FROMMER: Objection.
4       A    I believe so, yes.
5         MR. JOSEPH: Let's have this
6   marked as 14.
7          (Document was marked as
8   Plaintiff's Exhibit 14 for
9   identification, as of this date.)
10      Q    Sir, I'm showing you what has
11  been marked as Exhibit 14, ask if you
12  recognize the document?
13         MS. FROMMER: For the record, I
14  have seen this document, but this
15  document has some yellow highlights on
16  this one. My document does not have
17  yellow highlights on it. Also, it is
18  three-whole punched.
19         MR. JOSEPH: For the record, the
20  document came to me in this condition.
21  I attach no significance to either.
22      Q    Do you recognize the document,
23  sir?
24      A    Yes, I do.
25      Q    What do you recognize it to be?

17 (Pages 62 to 65)

dalco

66

1          Agostini
2   A    EMS, conferred with EMS.
3   Q    Is it a DD5 that you prepared
4   and signed on February 12, 2001, documenting
5   your conversation with EMS?
6   A    Yes.
7   Q    And what were you told by EMS?
8   A    I don't remember.
9   Q    Did you document, did you write
10  down in your document you prepared what EMS
11  told you?
12  A    I don't remember that either.
13  Q    Did you sign this DD5?
14  A    Yes.
15  Q    Did you type the words that Mr.
16  Manganiello was suffering from shortness of
17  breath?
18  A    Yes.
19  Q    By the way, was Lieutenant Scott
20  present when you spoke with EMS?
21  A    I don't remember.
22  Q    Did you report what EMS said to
23  Lieutenant Scott?
24  A    I don't remember that either.
25  Q    Do you remember any EMS worker

67

1          Agostini
2   saying Anthony Manganiello was fine?
3   A    I don't remember that.
4   Q    Now, is there any reason Anthony
5   Manganiello couldn't go to the hospital
6   after EMS found he was suffering from
7   shortness of breath at 12:05 p.m. on
8   February 12, 2001?
9   A    That's not my decision.
10  Q    Whose decision was that?
11  A    Whoever the investigator is, he
12  makes -- him and the supervisor make that
13  decision.
14  Q    At about 12:05 p.m. on February
15  12, 2001, did Shawn Abate and whoever the
16  supervisor may have been make a decision
17  that Mr. Anthony Manganiello could not go to
18  the hospital?
19       MS. FROMMER: Objection.
20  A    I don't know that.
21  Q    Were you present when it was
22  discussed whether or not Anthony Manganiello
23  could go to the hospital?
24       MS. FROMMER: Objection.
25  A    I don't remember that.

68

1          Agostini
2   Q    After Mr. Manganiello's attorney
3   called, was Anthony Manganiello's jacket
4   taken from him?
5   A    I didn't see anyone take his
6   jacket.
7   Q    Do you know if it was done?
8   A    Yes, it was done.
9   Q    How do you know it was done?
10  A    Because I had to voucher the
11  jacket at the end of the day.
12  Q    Who provided you with a jacket
13  to voucher?
14  A    I don't remember.
15  Q    Do you know if Anthony
16  Manganiello's memo book was taken from him?
17  A    I believe it was taken, yes.
18  Q    Was that memo book vouchered?
19  A    I don't think that was
20  vouchered, no.
21  Q    Did you consider Anthony
22  Manganiello's memo book to be a piece of
23  evidence?
24  A    Yes.
25  Q    Is it a procedure in the 43rd

69

1          Agostini
2   Precinct where a piece of evidence had to be
3   vouchered in February of 2001?
4        MS. FROMMER: Objection. You
5   can answer.
6   A    Well, it didn't have to be
7   vouchered that same day, because I might
8   look through it during the week to see if I
9   find something else, and once I am through
10  with inspecting the whole memo book then I
11  voucher it.
12  Q    Did you ever voucher Anthony
13  Manganiello's memo book?
14  A    I don't believe I did.
15  Q    Did anybody ever voucher Anthony
16  Manganiello's memo book?
17       MS. FROMMER: Objection.
18  A    I don't think so, no.
19  Q    How long did it take you to look
20  through the memo book?
21  A    I don't know.
22  Q    What happened to the memo book
23  after you looked through it or took
24  possession of it?
25       MS. FROMMER: Objection.

18 (Pages 66 to 69)

dalco

70

```
 1          Agostini
 2    A    I put it with my files.
 3    Q    And where is that memo book now?
 4    A    It's missing with the files.
 5    Q    Do you have a recollection of
 6  what information was contained in Anthony
 7  Manganiello's memo book?
 8    A    I don't remember that.
 9    Q    Do you have any recollection as
10  to whether a sergeant signed off on Anthony
11  Manganiello's memo book in the early
12  morning?
13         MS. FROMMER: Objection.
14    A    I don't remember that either.
15    Q    Now, do you know whose decision
16  it was to take gunshot residue swaps from
17  Anthony Manganiello's hand?
18    A    I don't know, no.
19         MS. FROMMER: Objection.
20    Q    Did you ever learn what the test
21  results were from those gunshot residue
22  tests?
23    A    I believe the district attorney
24  told me that it was something like
25  inconclusive.
```

71

```
 1          Agostini
 2    Q    Did she mention the word
 3  "negative"?
 4    A    I don't remember that.
 5    Q    Prior to speaking with the
 6  district attorney, did you ever see those
 7  gunshot residue test results?
 8    A    Yes, I saw them.
 9    Q    When did you see them for the
10  first time?
11    A    I believe when they came to the
12  precinct.
13    Q    When was that?
14    A    I don't know.  I don't remember.
15    Q    Can you give me an
16  approximation?
17         MS. FROMMER: Objection.
18    A    No, I can't.
19    Q    Did these gunshot residue tests
20  come to the precinct prior to Mr.
21  Manganiello being arrested in April of 2001?
22    A    Prior, yes.
23    Q    What happened to those gunshot
24  residue tests after you received them?
25    A    They were with the file.
```

72

```
 1          Agostini
 2    Q    Were those also lost?
 3    A    Yes.
 4    Q    Were those gunshot residue tests
 5  provided to the district attorney's office
 6  before they were lost?
 7         MS. FROMMER: Objection.  You
 8  can answer.
 9    A    Like I said, I believe she saw
10  them and she relayed to me what they were,
11  because it was very confusing to me.
12    Q    When did the district attorney
13  relay the results of the gunshot residue
14  tests to you?
15    A    I don't remember.
16    Q    Was it shortly before Anthony
17  Manganiello's criminal trial in 2004?
18         MS. FROMMER: Objection.
19    A    Yes.  Not shortly.  It was
20  before I guess his arrest, I believe.  So in
21  April, he was arrested in April.
22    Q    Sir, did you provide the
23  assistant district attorney with the gunshot
24  residue tests prior to April of 2001?
25    A    Prior to?
```

73

```
 1          Agostini
 2    Q    Yes.  Prior to Anthony
 3  Manganiello's arrest in April of 2001.
 4    A    No.
 5    Q    Did you think that —
 6    A    Do you mean April?  You said
 7  April.
 8    Q    Yes.
 9    A    Yes, she was the one that told
10  me the result.  Like I say, I couldn't read
11  the results.  She told me the results.
12    Q    Why couldn't you read the
13  results?
14    A    Because it was very confusing to
15  me.
16    Q    What was confusing?
17    A    There was a lot of things there
18  that I didn't know.  I never seen this
19  document before.  It's not to say that it
20  was positive or negative.  There was a whole
21  bunch of words there.  She told me it was
22  inconclusive.
23    Q    Did you ever call the crime lab
24  and ask them what it meant?
25    A    No.
```



19 (Pages 70 to 73)

74

Agostini

1  Q    Did you have the ability to call
2  someone in the crime lab to confer with them
3  about the result of the gunshot residue test
4  in 2001?
5        MS. FROMMER: Objection. You
6  can answer.
7  A    I took the district attorney's
8  word for it.
9  Q    Sir, do you have any forensics
10  training at all?
11  A    No.
12  Q    Were there people in February of
13  2001 with the crime lab of the New York City
14  Police Department who had extensive
15  forensics training?
16        MS. FROMMER: Objection. You
17  can answer.
18  A    What I believe was this test,
19  what I believe, was either mailed to another
20  state to do. The people in crime scene in
21  New York didn't do it. So for me to ask
22  them about it, because they didn't do it,
23  that's why I took the word from the DA's
24  office.

75

Agostini

1  Q    Could you have called the people
2  in the other state who did the test and
3  asked what do these words mean?
4        MS. FROMMER: Objection.
5  A    I could have.
6  Q    Is there any reason you didn't?
7  A    Because I took the word of the
8  DA's office.
9  Q    Prior to his arrest in 2001, did
10  you provide those gunshot residue tests to
11  the ADA?
12        MS. FROMMER: Which arrest?
13        MR. JOSEPH: April 2001.
14        MS. FROMMER: You can answer.
15  Q    Do you understand my question?
16  A    Yes. They looked at it. Did I
17  provide? Did they make copies. I don't
18  know whether they made copies or not, but
19  they saw the document.
20  Q    So is it your testimony that
21  prior to August of 2001 when Anthony
22  Manganiello was arrested the district
23  attorney's office had the results of the
24  gunshot residue test?

76

Agostini

1        MS. FROMMER: April.
2  Q    Prior to April of 2001 when
3  Anthony Manganiello was arrested for the
4  homicide of Albert Acosta, is it your
5  testimony that the district attorney's
6  office had the gunshot residue tests?
7        MS. FROMMER: Objection. Prior
8  to the date in April when he was
9  arrested?
10        MR. JOSEPH: Yes.
11        MS. FROMMER: You can answer.
12  A    Did they have it?
13  Q    Yes.
14  A    I know they looked at it because
15  she told me what it said. I don't know
16  whether -- did they have it like in their
17  possession? Yes, they had it in their
18  possession. I don't know whether they made
19  copies or not. I know I received that
20  document back. Whether they have copies or
21  not I don't know.
22  Q    Sir, what's your understanding
23  of an inconclusive gunshot residue test, the
24  significance of an inconclusive gunshot

77

Agostini

1  residue test?
2  A    That it could be yes or it could
3  be no.
4  Q    Did you make any attempts to
5  further investigate why the test itself was
6  inconclusive?
7        MS. FROMMER: Objection.
8  A    No.
9  Q    Did you ever take any steps to
10  learn what type of metals would be on a
11  person's hand after a 22-caliber handgun was
12  fired?
13        MS. FROMMER: Objection.
14  A    No.
15  Q    Now, did you speak with Anthony
16  Manganiello's brother, Mario, at the point
17  in time when he first showed up with a
18  lawyer?
19  A    I never spoke to him.
20  Q    You never spoke to Mario
21  Manganiello at all?
22  A    No.
23  Q    At some point, what did you see
24  Mario do when he arrived?

Agostini

1
2    A    I believe I saw him, the lawyer
3    and the father.
4    Q    What did you see them do?
5    A    Just come in and started talking
6    to somebody, but they weren't talking to me.
7    Q    Who were they speaking to, if
8    you recall?
9    A    I don't remember.
10    Q    What is the next thing you
11    recall?
12    A    The next thing I recall is that
13    the brother, the lawyer, and I can't be sure
14    of the father, but I know that the lawyer
15    and the brother went into the room where we
16    had Anthony and they spoke to him in closed
17    doors.
18    Q    What happened next?
19    A    And then what happened next was
20    I can remember, me, Shawn, and I don't know
21    who else were outside, we were talking, the
22    lawyer comes out and he says, "Was it
23    intentional?"
24    Q    What's the name of this lawyer?
25    A    I believe his last name is Ross.

Agostini

1
2    Q    Who did he say this to?
3    A    Well, he basically — we were in
4    a group, so he just said it.
5    Q    How far were you standing from
6    Mr. Ross when he said this?
7    A    Like this, me, Shawn and then
8    some other group, and then he came and he
9    says, "Was it intentional?"
10    Q    Did you understand what he meant
11    by that?
12        MS. FROMMER: Objection. You
13    can answer.
14    A    In my view?
15    Q    Yes.
16    A    In my view, I think that Anthony
17    told him that he shot him and he just to
18    know was it intentional or was it an
19    accidental discharge.
20    Q    And what happened next?
21    A    That's it. We didn't even
22    respond to what he said. I believe in my
23    opinion he found out what he said, and he
24    just turned around and walked away.
25    Q    By the way, did you tell the

Agostini

1
2    assistant district attorney that the lawyer
3    said that? ·
4    A    Of course, yes.
5    Q    Did you make a DD5 note that the
6    lawyer said that to you?
7    A    I believe so.
8    Q    Where is that DD5, sir?
9    A    I don't know. If it's there
10    it's there. If not, it's missing with the
11    documents.
12    Q    Would that be an admission in
13    your eyes?
14        MS. FROMMER: Objection.
15    Q    Would the fact that Mr.
16    Manganiello's lawyer asked you quote unquot(
17    was it intentional, did you view that as an
18    admission of guilt on Mr. Anthony
19    Manganiello's behalf?
20        MS. FROMMER: Objection.
21    A    It rose my suspicion even more.
22    Q    Is that something you would have
23    documented somewhere?
24        MS. FROMMER: Objection.
25    A    Well, sir, like I said, I wasn't

Agostini

1
2    the lead detective on this. Shawn Abate
3    was. I don't know whether he put it in a
4    DD5 or not, because he said it in front of
5    both of us. I wasn't the lead detective. I
6    don't know if he did it or not, but I
7    remember what he said.
8    Q    Would it be unusual for Mr.
9    Abate not to put that in the DD5 anywhere?
10        MS. FROMMER: Objection.
11    A    It all depends. I don't know
12    how he is.
13    Q    Have you worked with Mr. Abate
14    in the past?
15    A    Yes.
16    Q    Did you consider him to be a
17    meticulous or detail-oriented detective?
18        MS. FROMMER: Objection.
19    A    Yes.
20    Q    Would it be unusual for a
21    detailed-oriented detective not to put
22    something like a lawyer asking him whether
23    it was intentional in a DD5?
24        MS. FROMMER: Objection.
25    A    Like I say, I know what he said.

94

1    Agostini
2    A   I wasn't there, sir.
3    Q   At some time, did you speak with
4  an assistant district attorney named Dondes,
5  D-O-N-D-E-S?
6    A   Yes.
7    Q   Was that on February 12, 2001?
8    A   Yes.
9    Q   For what reason did you speak to
10  ADA Dondes?
11    A   It was Shawn Abate that was
12  speaking with him. Shawn Abate I believe
13  was trying to obtain a search warrant for
14  Manganiello's vehicle.
15    Q   Do you know how he went about
16  obtaining the search warrant? Did he make
17  written notes? Did he just say something
18  over the phone?
19    MS. FROMMER: Objection.
20    A   I don't remember.
21    Q   Did you see him type up any sort
22  of affidavit?
23    MS. FROMMER: Objection.
24    A   He was doing something in the
25  computer, but I didn't see it.

95

1    Agostini
2    Q   When you say computer, at the
3  point in time in February of 2001, did the
4  43rd Precinct have computers?
5    A   It wasn't the 43rd Precinct. We
6  went to the DA's office.
7    Q   When did you go to the DA's
8  office?
9    A   I believe, I believe shortly --
10  you know, I am thinking. I can't remember
11  exactly, but some time that night.
12    Q   Was that on February 12, 2001?
13    A   Yes.
14    Q   And what did you say to the ADA,
15  and what did the ADA say to you?
16    MS. FROMMER: Objection.
17    A   I didn't say anything to him.
18  Shawn Abate was doing all the talking.
19    Q   What did you hear Shawn Abate
20  say to the ADA?
21    A   I don't remember.
22    Q   At the point in time when you
23  spoke with the ADA on February 12, 2001, had
24  the gunshot residue test come back?
25    A   Okay, I didn't speak to the DA

9

1    Agostini
2  until late at night when I asked him we
3  don't have enough to arrest him. Other than
4  that, if anything was spoken with the DA it
5  was Detective Abate.
6    Q   Who said, "We don't have enough
7  to arrest him"?
8    A   That's what the DA said. He
9  said it to me, Dondes.
10    Q   Did ADA Dondes say that in
11  response to anything that you said?
12    MS. FROMMER: Objection. You
13  can answer.
14    A   No. It happened right after we
15  executed the search warrant to the car, and
16  we didn't find any weapons or evidence.
17  That's when I conferred with him, and he
18  says he is not going to authorize the
19  arrest.
20    Q   Let's back up a second.
21    Who actually was on a computer
22  preparing something to obtain a search
23  warrant?
24    A   I believe it was ADA Dondes.
25    Q   Did Abate sign any paperwork to

97

1    Agostini
2  obtain that search warrant?
3    MS. FROMMER: Objection.
4    A   Not that I can remember, but for
5  a search warrant you do have to sign
6  something I believe, but I don't remember
7  that.
8    Q   Did Abate keep a copy of the
9  piece of paper which he signed to obtain a
10  search warrant?
11    MS. FROMMER: Objection. You
12  can answer.
13    A   That would stay with the file,
14  with the investigative file.
15    Q   The investigative file, is that
16  the ADA's file, or is that your case file?
17    A   Well, I believe ADA's would have
18  a copy of that search warrant. They have
19  their copy, and then they give us copies.
20    Q   And what happened to that piece
21  of paper, what happened to your copy of
22  that, of the search warrant application?
23    MS. FROMMER: Objection.
24    A   That would be Detective Abate's
25  copy.



25 (Pages 94 to 97)

102

```
 1            Agostini
 2    Q   Sir, I show you what has been
 3  marked as Exhibit 16 and ask you if you
 4  recognize that?
 5        MS. FROMMER: For the record, I
 6  have seen this document.
 7    A   Yes.
 8    Q   What do you recognize it to be?
 9    A   I believe this came from Anthony
10  Manganiello's memo book.
11    Q   Did it come from his memo book
12  or from his locker?
13    A   I believe his locker, yes, his
14  locker.
15    Q   Did you search Mr. Anthony
16  Manganiello's locker at Parkchester on
17  February 12, 2001?
18    A   I didn't search it.
19    Q   Were you present when other
20  people searched it?
21    A   Yes.
22    Q   Did anybody have a warrant to
23  search Mr. Anthony Manganiello's locker?
24    A   No. I believe it was his
25  supervisors that did it. It was nobody from
```

103

```
 1  NYPD.
 2    Q   What members if any from NYPD
 3  were present when the locker was being
 4  searched?
 5    A   I remember I was present. I
 6  don't know who was with me.
 7    Q   Was that a note that was given
 8  to you on February 12, 2001?
 9    A   I don't remember whether I saw
10  it that day or the next day, so I can't
11  remember whether I saw it that day or not.
12    Q   Was Exhibit No. 16 a note that
13  was given to you either on February 12,
14  2001, or February 13, 2001?
15    A   Well, it was given to me, but I
16  don't recall what specific day. Like I
17  can't remember.
18    Q   Would it be fair to say that
19  Exhibit 16 was given to you either on the
20  day of Mr. Acosta's murder or within a few
21  days thereafter?
22        MS. FROMMER: Objection. You
23  can answer.
24    A   I don't remember what day this
25
```

104

```
 1            Agostini
 2  was given to me.
 3    Q   Sir, what did you do with this
 4  note after it was given to you?
 5    A   What I did with this note? I
 6  brought it with me to the precinct.
 7    Q   After you went to the precinct,
 8  what did you do with Exhibit 16?
 9    A   I kept it with the file.
10    Q   Did you ever provide the
11  assistant district attorney's office with a
12  copy of this note?
13    A   I don't know if I provided them
14  with a copy of it. All I know is when I
15  made my whole investigative report I gave it
16  to them, and they were supposed to make
17  copies of everything. I don't know whether
18  they did make copies or not, but I gave my
19  whole report.
20    Q   When did you give them that
21  report?
22    A   That I don't remember a specific
23  date.
24    Q   Was it before or after the file
25  was lost?
```

105

```
 1            Agostini
 2    A   Oh, it was before.
 3    Q   Did this note we have, Exhibit
 4  16, raise any suspicion in your mind as to
 5  whether Anthony Manganiello was involved in
 6  the homicide of Albert Acosta?
 7    A   No, but I can see his frame of
 8  mind, that's all, not that he killed Albert
 9  Acosta, but just what he wrote there was his
10  frame of mind.
11    Q   Tell me what he wrote there so
12  we have it on the record, and tell me how
13  that influences, gives you a view as to his
14  frame of mind.
15        MS. FROMMER: Objection. You
16  can answer.
17    A   It says, "I pray every day that
18  I will," I don't know what this word is,
19  "have to kill someone." I don't know what
20  that is.
21    Q   Does that appear to say never?
22    A   I am looking at it, and I can't
23  see it.
24    Q   You can't see a word that
25  appears to be N-E-V-E-R there?
```



27 (Pages 102 to 105)

104

106

1           Agostini
2      A    That's a U or V. I'm not sure
3  whether that's a U or a V.
4      Q    Sir, did you ever give testimony
5  at a pretrial hearing and under oath that
6  said this note said, "I feel like killing
7  somebody"?
8      A    I don't remember that.
9      Q    Sir, did you give testimony in
10 the Bronx Criminal Court on June 18, 2004,
11 before Judge Martin?
12     A    I don't remember that judge, and
13 I don't remember the date.  You are telling
14 me things that I can't remember.
15     Q    Let me just show you this.
16          For the record I am showing the
17 witness a copy of the transcript of June 18,
18 2004.  And sir, does this refresh your
19 recollection as to whether you gave
20 testimony in the case of the People of the
21 State of New York against Anthony
22 Manganiello in a pretrial hearing on
23 June 18, 2004?
24     A    Where is my name?
25     Q    Keep turning the pages, you'll

105

107

1           Agostini
2  see your name.
3          MS. FROMMER:  Do you want him to
4      read the entire transcript?
5          MR. JOSEPH:  No, of course not.
6          MS. FROMMER:  If you would like
7      to find from the beginning of his
8      testimony, and I can perhaps stipulate
9      that that is the beginning of the
10     testimony.
11     Q    Sir, I am directing your
12 attention to page 11.  I ask you if this
13 refreshes your recollection as to whether
14 you testified on the date we have been
15 discussing?
16          MS. FROMMER:  If we can have him
17     start at page ten that identifies him
18     as identifying himself.
19          MR. JOSEPH:  Off the record.
20          (Whereupon, a discussion was
21     held off the record.)
22     A    Yes, that's me.
23     Q    Can you turn to page 21.
24     A    21?
25     Q    Yes.

108

1           Agostini
2      By the way, sir, in this
3  proceeding, did you swear to tell the truth,
4  the whole truth and nothing but the truth so
5  help you God?
6      A    Yes.
7      Q    On page 21 did you testify that
8  you recovered a note from Anthony
9  Manganiello's locker saying, "I feel like
10 killing somebody"?
11     A    That's what I testified to.
12     Q    Is that what the note said?
13     A    It says "never," I guess.  I
14 don't know whether I had that note on me
15 this day or not.  I'm not sure.
16     Q    Do you know if this note which
17 is Exhibit No. 16 was ever provided to
18 Anthony Manganiello's defense lawyer?
19          MS. FROMMER:  Objection.  You
20     can answer if you can.
21     A    I wouldn't know.
22     Q    Did you testify in a pretrial
23 proceeding on June 18, 2004, that you
24 recovered a note from Mr. Manganiello's
25 locker saying, "I feel like killing

109

1           Agostini
2  somebody"?
3          MS. FROMMER:  Objection.  You
4      can answer.
5      A    Well, you know, I remember what
6  the note said.  I don't know if I had the
7  note on me.
8      Q    Sir, I am asking you did you
9  give that testimony?
10     A    Yes, I did.
11     Q    And what information were you
12 tying to convey?
13     A    What do you mean convey?  I'm
14 not conveying anything.
15          MS. FROMMER:  Objection.
16     A    I am just trying to say what the
17 note said.
18     Q    Sir, were you tying to provide
19 evidence as to Anthony Manganiello's state
20 of mind by testifying as to what you
21 believe, what you testified the note said?
22          MS. FROMMER:  Objection.
23     A    I was trying to say what the
24 note said, of course.
25     Q    Sir, after June 14, 2004, did

114

Agostini

1
2  A    That was --
3       MS. FROMMER: Objection. Which
4  conversation with the ADA?
5       MR. JOSEPH: The conversation in
6  which the ADA advised that there was
7  not sufficient evidence to arrest
8  Anthony Manganiello.
9       MS. FROMMER: You can answer.
10  A    After? Say it again, please.
11  Rephrase it.
12  Q    Okay. When you became in charge
13  of this investigation, was that before ADA
14  Dondes told you there was not sufficient
15  evidence to go forward with the arrest?
16  A    Yes.
17  Q    When you became in charge of the
18  investigation, did you take possession of
19  the case folder?
20  A    The case folder we don't take
21  possession of. It could be the next day or
22  whenever, but the case became mine right
23  after his death. As far as taking,
24  gathering the, no, that's not – that's not
25  the way. It doesn't happen.

115

Agostini

1
2  Q    How does it happen?
3  A    Well, you know, everybody brings
4  in their DD5's and they put it in a specific
5  let's say basket, and at the end of the day
6  the case detective takes it with him. So it
7  could have been that night, it could have
8  been in the morning.
9  Q    So is it fair to say somewhere
10  on either February 12 or February 13 of that
11  year you took possession of the case file?
12  A    Yes.
13  Q    And what was in the case file at
14  the point in time that you took possession
15  of it?
16  A    I don't remember.
17  Q    Do you recall one way or another
18  whether other detectives had given you
19  handwritten notes of witness interviews
20  taken at the scene of the Acosta homicide?
21       MS. FROMMER: Objection. You
22  can answer.
23  A    I don't remember that.
24  Q    Do you remember whether Anthony
25  Manganiello's memo book was in that case

116

Agostini

1
2  folder?
3  A    I don't remember.
4  Q    Do you have any recollection as
5  you sit here right now looking through
6  Anthony Manganiello's memo book?
7  A    Yes.
8  Q    Do you have any recollection of
9  what the contents were of Anthony
10  Manganiello's memo book?
11  A    No, I can't remember. Just some
12  writings, but I don't remember what was in
13  it.
14  Q    Was there anything written in
15  there which in any way tied Anthony
16  Manganiello to the Albert Acosta homicide?
17       MS. FROMMER: Objection.
18  A    I can't remember, because I
19  don't have it in front of me.
20  Q    When was the last time you saw
21  the memo book?
22  A    Some time that year.
23  Q    In 2001?
24  A    Yes.
25  Q    Do you know one way or another

117

Agostini

1
2  whether there was information which tended
3  to show he was not involved in the homicide
4  of Albert Acosta in the memo book?
5       MS. FROMMER: Objection.
6  A    I don't remember, because I have
7  to look at the memo book. I can't remember.
8  Q    As the investigation progressed,
9  did other detectives provide you with
10  handwritten notes of what they had done as
11  part of the investigation?
12  A    Yes.
13       MS. FROMMER: Objection. You
14  can answer.
15  A    Yes.
16  Q    What did you do with those
17  handwritten notes when they were received by
18  you?
19  A    They were all put with the file.
20  Q    From when to when were you
21  assigned to the 43rd Precinct?
22  A    I believe March of 1997 until
23  February of 2003.
24  Q    And during that time period, was
25  there a file cabinet where homicide cases

118

1        Agostini
2   were stored?
3      A    Yes.
4      Q    And the homicide case folder for
5   the investigation of the death of Albert
6   Acosta, was that file placed in that file
7   cabinet?
8      A    Not inside, no.
9      Q    Where was it placed?
10     A    It was placed in a big box.
11     Q    And is there any reason the big
12  box was not placed in the cabinet?
13     A    It wouldn't fit.
14     Q    Was there also a storage room at
15  the 43rd Precinct at the time you were there
16  whereby boxes relating to homicide
17  investigations were stored by year?
18         MS. FROMMER: Objection. You
19  can answer.
20     A    By year? There is, there is a
21  storage room that is stored by year, yes.
22     Q    What's that storage room called?
23  Does it have a specific name?
24     A    No. Storage room.
25     Q    Is there any type of index

119

1        Agostini
2   that's kept for that storage room?
3          MS. FROMMER: Objection.
4      A    Not that I know of.
5      Q    Did you ever put the big box
6   which you described as a case folder for the
7   Acosta homicide into that storage room?
8      A    I can't remember that.
9      Q    Is there any reason why you
10  wouldn't put the box in that storage room?
11     A    No, there is no reason.
12     Q    When we talk about this box you
13  are referring to, is it the same thing as a
14  case file?
15     A    Yes.
16     Q    When was the last time you saw
17  the case file into the investigation of the
18  Acosta homicide?
19     A    I believe I saw the case file,
20  it was some time in like say approximately,
21  that I can remember, January of 2003,
22  somewhere around there, January, December,
23  whatever, somewhere around that time.
24     Q    At that time, were you still
25  assigned to the 43rd Precinct?

120

1        Agostini
2      A    Yes.
3      Q    And where was it in January of
4   2003?
5      A    It was in a room where they had
6   lockers, some of the detectives had lockers.
7      Q    Was that a room where it was
8   sort of a personal locker room for the
9   detectives?
10         MS. FROMMER: Objection. You
11  can answer.
12     A    Yes, it could be say personal.
13     Q    Was that considered an
14  appropriate place to store a case file?
15     A    Yes. There was a lot of case
16  files other than mine there.
17         MS. FROMMER: Objection.
18     Q    At what time did you leave the
19  43rd Precinct?
20     A    February, 2003.
21     Q    In February of 2003, did the
22  homicide of Acosta get transferred to
23  another detective?
24     A    No, because it was closed.
25     Q    The case had not gone to trial

121

1        Agostini
2   yet, correct?
3      A    Correct.
4      Q    How is a case categorized as
5   closed?
6      A    When there is an arrest made.
7      Q    Once an arrest is made is there
8   any further work done on the file?
9      A    No.
10     Q    After April 20, 2001, when
11  Anthony Manganiello was arrested, did you do
12  any further work on the case file?
13     A    No.
14     Q    In the 43rd Precinct was there a
15  place where closed files were stored?
16     A    Closed files?
17     Q    Yes.
18     A    The closed files in the 43rd
19  Precinct are everywhere. They could be next
20  to my desk, they could be inside a closet.
21  There is a lot of files everywhere in the
22  43rd Precinct. There is not a specific
23  place where there is closed files.
24     Q    Are closed files also kept in
25  that storage room where homicides are

31 (Pages 118 to 121)

dalco

122

```
1              Agostini
2    indexed so to speak by year?
3        A    Yes.
4        Q    Is there any reason that
5    Acosta's file wasn't put in that storage
6    room?
7        A    I don't know what reason, why it
8    wasn't put there.
9        Q    Who put it on top of the locker
10   in the locker room?
11       A    It wasn't me.
12       Q    Who was it?
13       A    I don't know.
14       Q    When was the last time you had
15   possession of that file?
16       A    The last time I saw it it was
17   underneath my desk.  Then I came one day and
18   the squad was like cleaned, it was totally
19   cleaned, and I said, "What happened to all
20   the boxes?"  Somebody cleaned up, they moved
21   it next door.
22       Q    Is it your testimony that
23   someone else put the boxes next door?
24       A    Yes.
25       Q    Sir, did you give testimony at
```

123

```
1              Agostini
2    the trial of Anthony Manganiello?
3        A    Yes.
4        Q    Did you testify that you put the
5    box on top of the locker?
6        A    No.
7        Q    I am going to show you page 281,
8    line 24, going on to the next page.  I am
9    going to ask you to read that, the question
10   and answer.
11       A    Yes.
12       Q    Sir, in 2004, at the criminal
13   trial of Anthony Manganiello, did you
14   testify that you put the case file on top of
15   the locker?
16       A    Yes.  Once I found the locker, I
17   mean once I found the box on the locker I
18   took it, and I was looking through it, then
19   I put it right back on top of the locker.
20       Q    Sir, did you consider the top of
21   a personal locker to be a safe place to keep
22   the case file?
23           MS. FROMMER:  Objection.
24       A    Well, there was nowhere else to
25   put it, and nobody figures that they are
```

124

```
1              Agostini
2    going to steal things in a precinct.
3        Q    My question was did you consider
4    that a safe place in terms of record keeping
5    to keep that file?
6        A    There was no other place to put
7    it.
8        Q    Can you give me a yes or no
9    answer, sir.
10       A    Yes, it is.
11       Q    By the way, when you left the
12   43rd Precinct, did you alert your
13   supervisors to that, to the location of this
14   file?
15       A    No.
16       Q    How was the file marked?
17       A    It had homicide number whatever
18   it is, and it had my last name on it.
19       Q    Did it have the victim's last
20   name on it?
21       A    I don't know.
22       Q    Did it have Mr. Manganiello's
23   last name on it?
24       A    I don't know.
25       Q    Was there any way for anybody to
```

125

```
1              Agostini
2    know what this file was by looking at the
3    outside?
4        A    Yes.  It had homicide number.
5    Whenever it's homicide that means it's an
6    important file.
7        Q    Is there a term that's used for
8    a case where an arrest has been made but the
9    case has not yet gone to trial?
10           MS. FROMMER:  Objection.  You
11   can answer.
12       A    I don't know what term is that.
13       Q    Is there a place where after a
14   case goes to trial and or is resolved by a
15   plea there is a place where the file goes?
16           MS. FROMMER:  Objection.
17       Q    Does it stay in the 43rd
18   Precinct?
19       A    It stays in the 43rd Precinct.
20       Q    Sir, were you aware at the time
21   that you left this case file sitting on top
22   of a locker that it contained material known
23   as Rosario material?
24           MS. FROMMER:  Objection.  You
25   can answer.
```

32 (Pages 122 to 125)

126

Agostini

2   A   Yes.

3   Q   Do you know what Rosario
4 material is?

5   A   Yes.

6   Q   What is it?

7   A   Written statements.

8   Q   And are these written statements
9 that are required to be turned over to a
10 defense lawyer defending a criminal case?

11   MS. FROMMER: Objection. I'm
12 going to instruct him not to answer.
13 It calls for a legal definition of what
14 Rosario is.

15   MR. JOSEPH: I'm asking for his
16 understanding.

17   MS. FROMMER: You can answer
18 what your understanding of Rosario is
19 for you.

20   A   Rosario material for me is
21 written evidence that I turn over to the
22 DA's office.

23   Q   Do you know what the purpose of
24 that material is?

25   A   Evidence.

127

Agostini

2   Q   And did you ever turn over the
3 handwritten statements of the various
4 officers who took witness statements to the
5 ADA?

6   A   Sir, my whole file I gave to the
7 DA so she can make copies. As far as I am
8 giving them from my hand those statements
9 that you are saying, no, I give them the
10 whole file, and they make whatever copies
11 they have to make, whatever is in there they
12 are supposed to make.

13   Q   When did you give the whole file
14 to the ADA's office?

15   A   I can't remember.

16   Q   Was it before Anthony
17 Manganiello was arrested in April of 2001 or
18 after?

19   A   I can't say.

20   Q   Can you give me any indication
21 at all as to when this file was given to the
22 ADA?

23   A   I don't know. I can't guess a
24 day.

25   Q   Sir, do you have a recollection

128

Agostini

2 of physically giving the file concerning
3 Anthony Manganiello to a specific ADA?

4   A   Yes.

5   Q   What was the name of the ADA?

6   A   ADA Scaccia.

7   MR. JOSEPH: S-C-A-C-C-I-A.

8   Q   By the way, were the results of
9 the gunshot residue test in the box when you
10 gave it to ADA Scaccia?

11   A   Yes.

12   Q   Now, while at the 43rd Precinct
13 back in 2001 through 2004, after an arrest
14 had been made but before it had been
15 resolved by plea or conviction, was a
16 detective still assigned to monitor the
17 file?

18   A   Monitor it, no.

19   Q   Was a detective still assigned
20 to a file for any reason?

21   MS. FROMMER: Objection.

22   A   Only if it's open.

23   Q   Is it your testimony that after
24 a case is closed by arrest the detectives
25 have no further responsibility for

129

Agostini

2 maintaining the file?

3   MS. FROMMER: Objection. That's
4 not what his testimony was.

5   A   Only if they go to court they
6 have to get the file and bring it to court
7 so they can testify, but in between that
8 they have no dealings with the file.

9   Q   Sir, are you aware that there
10 still are a number of DD5's that were not
11 lost?

12   A   Yes.

13   MS. FROMMER: Objection.

14   Q   Can you explain to me why or how
15 it is that the DD5's were not lost but all
16 these other documents were?

17   MS. FROMMER: Objection.

18   A   Well, sir, the copies that you
19 received, which is copies of the DD5's, are
20 the copies that the DA squad has, okay.
21 Like I say, I gave them my file, they have
22 to do the copies.

23   Q   Now, what supervisor if any
24 supervised your case investigation into the
25 investigation of the murder of Albert

33 (Pages 126 to 129)

dalco

130

Agostini

1  Acosta?
2     A    I would say it was my lieutenant
3  at the time, I believe it was Lieutenant
4  Scott.
5     Q    Now, how often did you speak
6  with Lieutenant Scott?
7        MS. FROMMER: About this case or
8  in general?
9        MR. JOSEPH: About this case.
10       MS. FROMMER: You can answer.
11    A    Various times. I can't say. I
12 can't say a number.
13    Q    What if anything did Lieutenant
14 Scott do to supervise your work?
15    A    Well, he signs the DD5's.
16    Q    Did you give Lieutenant Scott
17 every DD5 that was written up on this file?
18    A    Yes.
19    Q    Did you give Lieutenant Scott
20 all the DD5's concerning Chris Cartone?
21    A    Yes.
22    Q    Did you give Lieutenant Scott
23 all the DD5's concerning Terrence Alston?
24    A    All, all of my work, all the

131

Agostini

1  DD5's goes with whoever supervises there.
2     Q    Did Lieutenant Scott see all the
3  DD5's concerning Terrence Alston?
4        MS. FROMMER: Objection.
5     A    I can't say what he saw.
6     Q    Did you give it to him is my
7  question?
8     A    The thing is I put it in his
9  desk. He can look at it, another sergeant
10 can look at it or another sergeant. I can't
11 say that he is the one that only looks at
12 this file. It could be the sergeant. The
13 lieutenant can be off so the sergeant will
14 look at it.
15    Q    Assuming in the time period
16 between February 12 and April 20, what
17 sergeant or sergeants would have looked at
18 your DD5's if Lieutenant Scott was not
19 available?
20    A    Whatever sergeant that I had.
21    Q    Who were the sergeants?
22    A    I believe it was Sergeant
23 McGovern, I believe Sergeant Martinez and
24 Lieutenant Scott, and I can't remember who

132

Agostini

1  else.
2     Q    Is that Richard Martinez?
3     A    No.
4     Q    Or Robert Martinez?
5     A    No.
6     Q    Did you ever have a conversation
7  with Lieutenant Scott or any of your other
8  supervisors concerning Terrence Alston?
9        MS. FROMMER: Objection. You
10 can answer.
11    A    I probably did.
12    Q    Do you have a recollection of
13 it?
14    A    No.
15    Q    Did Lieutenant Scott ever ask
16 you if Mr. Alston was quote unquote full of
17 shit?
18       MS. FROMMER: Objection. You
19 can answer.
20    A    Not that I remember, no.
21    Q    Is that something that would
22 stick out in your mind?
23    A    Yes.
24    Q    Did Lieutenant Scott ever ask

133

Agostini

1  you if any of the other witnesses on the
2  Acosta homicide were full of shit?
3        MS. FROMMER: Objection. You
4  can answer.
5     A    Not that I can remember.
6     Q    Did you give Lieutenant Scott or
7  the other sergeants the DD5's concerning
8  Johnny Baker?
9     A    They all go through the
10 sergeant.
11    Q    Is that a yes?
12    A    And the lieutenant. Well,
13 somebody has to get them, yes.
14    Q    Did you give either Lieutenant
15 Scott or the sergeants all the DD5's
16 concerning Mark Damon?
17    A    Yes.
18    Q    What's a SARRS inquiry,
19 S-A-R-R-S?
20    A    I believe that has to do with a
21 gang.
22    Q    And did you ask that a SARRS
23 inquiry be done in the Acosta homicide case?
24    A    You know what? I can't remember

34 (Pages 130 to 133)

dalco

138

Agostini

1 information?

3    A    I don't remember, sir.

4    Q    **What information did Sal Miro**
5 **have?**

6    A    You know what, there is a DD5
7 there somewhere. I have to look at it. I
8 can't remember by just memory.

9    Q    **As you sit here right now, do**
10 **you have any recollection of the substance**
11 **of the conversation between you and Sal**
12 **Miro?**

13    A    I can't say.

14    Q    **By the way, did you ever ask Sal**
15 **Miro to handwrite his own statement out?**

16    A    Sal Miro?

17    Q    **Correct.**

18    A    No, I don't think Sal Miro wrote
19 anything.

20    Q    **As part of your practice in**
21 **investigations, did you ask people to write**
22 **out their own statement stating what they**
23 **knew?**

24        MS. FROMMER: Objection.

25    A    No, not necessarily.

139

Agostini

2    Q    **What factors would influence**
3 **whether you did that or not?**

4        MS. FROMMER: Objection.

5    A    Only if they heard or saw
6 themselves that, you know, we would do a lot
7 of canvasses. Canvasses are just
8 interviewing witness, and we don't make them
9 write stuff.

10    Q    **But what factors if any**
11 **influence whether or not you are going to**
12 **ask a witness to write something out?**

13        MS. FROMMER: Objection. He
14    just answered. You can answer again.

15    A    Whether they knew or saw
16 something themselves.

17    Q    **So if they had personal**
18 **knowledge of something important you would**
19 **have them write out their own statement?**

20        MS. FROMMER: Objection.

21    A    Yes.

22        MS. FROMMER: Can we just take a
23    two-minute break.

24        (Whereupon, a recess was taken.)

25        MR. JOSEPH: Let's mark these as

140

Agostini

2 the next two.

3        (Documents were marked as
4    Plaintiff's Exhibits 18 and 19 for
5    identification, as of this date.)

6    Q    **Sir, I show you what has been**
7 **marked as Exhibit No. 18. I ask you if you**
8 **recognize this document.**

9        MS. FROMMER: For the record,
10    this has been Bates stamped as 807.

11    Q    **Do you recognize this document,**
12 **sir?**

13    A    Yes, a DD5.

14    Q    **Is it a DD5 that you prepared?**

15    A    No. My name is like half torn
16 from here. Can you make it out?

17    Q    **Yes.**

18    A    You could?

19    Q    **Yes.**

20    A    Well, I can't.

21        MR. JOSEPH: Counsel, is there
22    any dispute that this is his DD5?

23        MS. FROMMER: No.

24    Q    **Sir, did you write down on**
25 **February 12, 2001, at approximately 4:55**

141

Agostini

2 **p.m., did you interview Sergeant Ohle from**
3 **Parkchester?**

4    A    Yes.

5    Q    **Did Sergeant Ohle indicate to**
6 **you that there were no problems between Mr.**
7 **Manganiello and Mr. Acosta?**

8    A    That's what he stated here.

9    Q    **Did he at any time indicate to**
10 **you that there was a shoving match on the**
11 **morning of the incident between —**

12    A    Not here.

13    Q    **Did he indicate to you anywhere?**

14    A    Did he indicate it to me?

15    Q    **Did Sergeant Ohle at any point**
16 **tell you that there had been a shoving match**
17 **between Anthony Manganiello and Mr. Acosta**
18 **on the day that Mr. Acosta was murdered?**

19    A    Not that I can remember.

20    Q    **Is that the sort of thing you**
21 **would have made a note of somewhere?**

22    A    Yes.

23    Q    **If he said that, would it be in**
24 **your DD5?**

25    A    Yes.

36 (Pages 138 to 141)

150

Agostini

1           Agostini
2  Parker. I don't know.
3     Q    Were you made aware that
4  Terrence Alston had worked as a confidential
5  informant?
6        MS. FROMMER: Objection. You
7  can answer.
8     A    I don't know whether he was a
9  confidential informant or not.
10    Q    Did you ask?
11    A    No.
12    Q    Did you take any steps to verify
13  Mr. Alston's credibility?
14    A    Credibility in what?
15    Q    In the information he was giving
16  you, in the information he was giving you.
17    A    Yes.
18    Q    What steps did you take?
19    A    Well, whatever he told me I went
20  out there and tried to find out whether it
21  was true or not.
22    Q    Did Mr. Alston ever give you any
23  information that turned out to be false?
24    A    Yes.
25    Q    How did that affect your view as

151

Agostini

1  to his credibility?
2    A    I didn't like him. I really
3  didn't like him. Me and him had
4  differences.
5    Q    Why didn't you like him?
6    A    Because he would say something,
7  certain things. You know, he would like
8  hide things.
9    Q    What do you mean by that?
10    A    Meaning not tell me like if he
11  does have somebody, he is not going to tell
12  me who it is.
13    Q    What else?
14    A    Basically that's it.
15    Q    Did that raise any suspicions on
16  your part whether Mr. Alston was believable?
17    A    Like I said, I had my
18  differences with him, okay. You know, he
19  says he has somebody, and I am trying to
20  look for this body and he says, "I will give
21  it to you in four weeks" or whatever. I had
22  my doubts with him, yes.
23    Q    Can you explain to me why you
24  had your doubts with him?

152

Agostini

1    A    Like I said, I just said if he
2  gave me a person, I went to check out a
3  certain person and it wasn't true.
4    Q    Did you know what he was in
5  Rikers Island for?
6    A    I could get --
7        MS. FROMMER: Don't guess.
8    A    I don't know.
9    Q    If I were to suggest to you
10  attempted murder, would that ring a bell?
11        MS. FROMMER: Objection.
12    A    I don't remember.
13    Q    Did you ever do a background
14  check on Terrence Alston?
15    A    I probably did, yes.
16    Q    Was that background check kept
17  in the case file?
18    A    Yes.
19    Q    Is that one of the documents
20  that's also missing?
21    A    Yes.
22    Q    Do you know if the ADA had a
23  copy of that background check?
24    A    I gave my case file to them. I

153

Agostini

1  don't know whether they made the copies or
2  not.
3    Q    Was the background check in the
4  case file when you gave it to the ADA?
5    A    Yes.
6    Q    Do you remember any information
7  about the background check on Mr. Alston?
8    A    The only thing I can remember is
9  that he is a gang member.
10    Q    Do you remember what gang he was
11  a member of?
12    A    Bloods.
13    Q    Was Mr. Alston African American?
14    A    Yes.
15    Q    In that section of the Bronx,
16  did the Bloods tend to be African American?
17        MS. FROMMER: Objection.
18    A    Tend, no. I have seen a lot of
19  Spanish also, yes.
20    Q    Did you become aware of any
21  problems between the Bloods and Mr.
22  Acosta --
23        MS. FROMMER: Objection.
24    Q    -- as part of your

dalco
court reporting & legal video

162

```
 1           Agostini
 2    A   Yes.
 3    Q   Was this document prepared
 4 shortly after the interview with Terrence
 5 Alston?
 6    A   Yes.
 7    Q   Did you write down accurately
 8 what Mr. Alston said?
 9    A   Okay, hold on. Yes.
10    Q   In fact, did Mr. Alston tell you
11 that the security guard approached him to
12 purchase the weapon or the security guard
13 approached him and tried to hire him to do a
14 hit?
15    A   Now that I am reading it I see
16 he was trying to hire him to do a hit.
17    Q   Did Mr. Alston agree to do a
18 hit?
19    A   I don't know. Does it say? I
20 don't know. This doesn't say whether he
21 agreed to do it.
22    Q   Did Mr. Alston say that Terrence
23 asked how much, and he did not give a price,
24 Terrence stated the Parkchester officer
25 asked, "Do you need a gun," and Terrence
```

163

```
 1           Agostini
 2 stated, "No, I have one"?
 3    A   Well, that to me is saying that
 4 Terrence was supposed to do it, yes.
 5    Q   Does it also say that Terrence
 6 took possession of keys with which to commit
 7 this murder?
 8        MS. FROMMER: Objection.
 9    A   I have to read it, because I
10 can't remember.
11    Q   Go right ahead.
12    A   I can't see the key thing.
13    Q   Did Terrence say that he met
14 twice with a Parkchester security officer in
15 furtherance of this agreement?
16    A   As I am reading, yes. You're
17 asking me by memory. I can't remember all
18 this what's there. If I am reading it I can
19 read it, but I can't remember it.
20    Q   Now, did you pursue any criminal
21 charges against Mr. Alston for agreeing to
22 commit a murder?
23    A   Well, sir, you know, that wasn't
24 proven. I didn't think I had enough to
25 arrest him just based on what he said. Just
```

164

```
 1           Agostini
 2 what he said I don't have a basis on
 3 arresting him for it.
 4    Q   What more would you need?
 5    A   I would have to do further
 6 investigation on it.
 7    Q   Did you believe Mr. Alston that
 8 he had agreed to kill somebody?
 9    A   Yes, at the time, yes.
10    Q   You don't believe his confession
11 was enough to arrest him for agreeing to
12 commit a murder?
13    A   A lot of people say a lot of
14 things, and it doesn't mean anything.
15    Q   Let me ask you this, sir:  In
16 Exhibit 20 does he say he was approached in
17 September of 2000?
18        MS. FROMMER: Exhibit 22 for
19    clarity of the record.
20    A   Yes, September of 2000.
21    Q   By the way, do you know when Mr.
22 Alston went to Rikers Island?
23    A   No, I don't know.
24    Q   I am showing you what was
25 previously marked as Exhibit No. 9. Have
```

165

```
 1           Agostini
 2 you seen this document before?
 3    A   Yes, I have seen it.
 4    Q   Now, was this document used as
 5 part of your investigation into the homicide
 6 of Albert Acosta?
 7    A   Yes.
 8    Q   Is this a statement taken by
 9 Detective Ramos from Terrence Alston?
10    A   Yes.
11    Q   Does Terrence Alston in this
12 statement indicate that his conversation
13 occurred in August of 2000, not September?
14    A   It says, "late August of 2000."
15    Q   Did it raise any concerns for
16 you that Mr. Alston had given two different
17 dates?
18        MS. FROMMER: Objection.
19    A   Well, sir, September, August,
20 you know, I am giving you January, February.
21 I don't know either.
22    Q   Sir, in this one, at this point
23 did Mr. Alston indicate that he was given a
24 master key to the buildings in Parkchester?
25    A   That's what he stated to Ramos.
```

42 (Pages 162 to 165)

dalco

166

```
1              Agostini
2      Q    Was he ever able to produce a
3  copy of that master key?
4          MS. FROMMER: Objection. You
5  can answer.
6      A    Not that I know.
7      Q    Did you ask him where was the
8  key you were given by the security officer?
9      A    I didn't ask him that question.
10     Q    Is there a reason why you didn't
11 ask him that question?
12     A    Like I said, I didn't do this
13 interview.
14     Q    Did you see this interview?
15     A    I saw the interview, yes.
16     Q    Did you review this interview
17 before you met with Mr. Alston?
18     A    Yes.
19     Q    Is there a reason why you didn't
20 ask him to produce some of the evidence?
21     A    Because he was in jail.
22         MS. FROMMER: Objection.
23     Q    Did you ask him where the
24 evidence was?
25     A    No, I didn't ask him.
```

167

```
1              Agostini
2      Q    Did he indicate to you or did he
3  indicate at least in here that he got sent
4  to jail in August of 2000, I'm sorry, in
5  October of 2000, not August of 2000?
6      A    It says here August, 2000.
7          MS. FROMMER: Down here
8  (indicating).
9      A    I went to court in October.
10     Q    And got remanded, correct?
11     A    And pled out to attempted
12 possession of a weapon and got remanded.
13     Q    And remanded means sent to
14 prison, correct?
15     A    Yes.
16     Q    That would mean that Terrence
17 Alston was sent to Rikers Island in October
18 of 2000?
19     A    Yes.
20     Q    Four months prior to the murder?
21     A    Yes.
22     Q    Did that raise any concerns for
23 you as to how he had information about a
24 murder that happened four months after he
25 was sent to jail?
```

168

```
1              Agostini
2          MS. FROMMER: Objection. You
3  can answer.
4      A    A murder?
5      Q    In other words, did it raise any
6  questions in your mind as a detective
7  performing an investigation as to how this
8  Bloods member has information about a
9  homicide that happened four months after he
10 get sent to jail?
11     A    Somebody called him.
12     Q    Who called him?
13     A    I don't know who called him.
14 Somebody must have gave him information.
15     Q    Who?
16     A    I don't know.
17     Q    Did you ask him?
18     A    I don't know. I didn't ask him.
19     Q    Why not?
20     A    Because I didn't ask him.
21     Q    Why didn't you ask him?
22     A    I just didn't ask him.
23     Q    Was it your job to evaluate the
24 credibility —
25     A    My job was to interview him and
```

169

```
1              Agostini
2  to see what he knew about the murder.
3      Q    And did part of what he knew
4  about the murder come from what people were
5  telling him?
6          MS. FROMMER: Objection.
7      A    I don't know that. I don't know
8  that.
9      Q    When you said a few minutes ago
10 someone called him, what did you mean by
11 that?
12     A    If he is in jail, either
13 somebody visited him, somebody called him or
14 somebody gave him information. It could
15 have been another inmate. It could have
16 been somebody -- somebody gave him
17 information that this murder happened.
18     Q    Is that something you would have
19 wanted to know?
20     A    But my job was to interview him
21 to see what he knew about the murder, not
22 how he obtained the information, this and
23 that. My information, my thing was to see
24 what he knew about the murder, what he knew.
25     Q    Isn't how he knew about the
```

dalco
court reporting & legal video

43 (Pages 166 to 169)

170

```
 1        Agostini
 2  murder as important as what he knew?
 3       MS. FROMMER: Objection.
 4   A   No.
 5   Q   Sir, did you find it unusual
 6  that he didn't provide this information in
 7  October of 2000?
 8       MS. FROMMER: Objection.
 9   A   October of 2000 provide
10  information? No.
11   Q   He got sentenced in October of
12  2000, correct?
13   A   Yes.
14   Q   And as part of the sentencing if
15  a criminal defendant provides information on
16  other crimes they can get a lighter sentence
17  sometimes, right?
18       MS. FROMMER: Objection.
19   A   Maybe.
20   Q   Is that why people become
21  confidential informants?
22       MS. FROMMER: Objection.
23   Q   Is that one of the reasons
24  people become confidential informants?
25   A   That's one of the reasons they
```

171

```
 1        Agostini
 2  do, yes.
 3       MS. FROMMER: Objection.
 4   Q   In October of 2000 when Mr.
 5  Alston was pleading guilty and being
 6  sentenced, did he mention that a Parkchester
 7  cop tried to hire him to commit a murder?
 8   A   I didn't ask him that question,
 9  and I didn't know him at that time.
10   Q   Why didn't you ask him why he
11  didn't provide this information sooner?
12       MS. FROMMER: Objection.
13   A   Sooner than the murder?
14   Q   As part of his plea bargain.
15   A   Sir, I can't read his mind. He
16  is a Blood member, okay. He is a gang
17  member. They are not going to provide
18  information to the police. They don't even
19  like the police.
20   Q   Why was he giving information to
21  you?
22       MS. FROMMER: Objection.
23   A   I didn't know him at that time.
24   Q   You were a member of the Police
25  Department, correct?
```

172

```
 1        Agostini
 2   A   Yes.
 3   Q   Why is it that Terrence Alston,
 4  a gang member, was providing information to
 5  you?
 6   A   I didn't know him in the year
 7  2000.
 8   Q   I am asking 2001.
 9   A   He did.
10   Q   In February, 2001, why did this
11  Blood gang member call you?
12   A   Why did he?
13   Q   Yes.
14   A   Because he said he had
15  information.
16   Q   And was Mr. Alston given
17  anything in exchange for this information?
18       MS. FROMMER: Objection.
19   A   Not that I know of.
20   Q   Do you know if there was a
21  procedure by which his sentence could be
22  reduced for providing this information?
23       MS. FROMMER: Objection.
24   A   That I know of, you have to
25  speak to the DA's office, the DA's office
```

173

```
 1        Agostini
 2  and whoever is in charge of Alston.
 3   Q   Would that be Mr. Alston's
 4  handler?
 5   A   Could be. I don't know if
 6  Detective Parker was his handler, but
 7  Detective Parker was the one that was
 8  relaying everything. I don't know. I don't
 9  know with this Alston.
10   Q   Did you ever have a conversation
11  with Detective Parker and ask him what Mr.
12  Alston was getting in exchange for this
13  information, if anything?
14       MS. FROMMER: Objection.
15   A   Not that I can remember.
16   Q   Is the motivation of a known
17  gang member who is providing information
18  something that you would want to consider as
19  a detective investigating a homicide?
20       MS. FROMMER: Objection.
21   A   Like I said, I don't remember.
22  I don't remember these conversations.
23   Q   My question is is that an
24  important factor for you as a detective?
25       MS. FROMMER: Objection.
```

44 (Pages 170 to 173)

dalco
court reporting & videotape

174

1        Agostini
2      A    My important factor is to get
3  the story, to get what he knows. I don't
4  care whether they are going to let him go,
5  reduce his sentence. I don't care what they
6  do with him. My job is to get this
7  information and to solve the homicide,
8  that's my job.
9      Q    Is it part of your job to take
10 some steps to verify whether the information
11 you are getting is reliable?
12     A    Yes.
13     Q    What steps did you take to
14 verify whether the information Mr. Alston
15 provided about a Parkchester security
16 officer trying to hire him to do a hit was
17 reliable?
18     A    Hire him to do a hit? I can't
19 verify that, because he is in jail. I can't
20 verify that.
21     Q    Was anybody else present when
22 this happened?
23     A    That's not what he said. He
24 would have mentioned something that he was
25 present with somebody else.

175

1        Agostini
2      Q    Did you ask him what he did with
3  the key?
4      A    I didn't ask him that. I didn't
5  ask him those questions about keys.
6      Q    Would it have been a valuable
7  piece of evidence if he could produce the
8  key?
9          MS. FROMMER: Objection.
10     A    The key had to do with what?
11     Q    The master key to the buildings
12 for Parkchester which he says he was given
13 by this Parkchester security guard so he can
14 do a hit.
15         MS. FROMMER: Objection. Please
16     watch your tone, counselor.
17     A    But the key had nothing to do
18 with my investigation. I don't care about a
19 key. I don't care about a key.
20     Q    Now, how many times did you
21 speak to Terrence Alston at Rikers Island?
22     A    I can't remember. I'm not going
23 to guess either. I don't remember.
24     Q    Was it more than once?
25         MS. FROMMER: Personally speak

176

1        Agostini
2  to him?
3          MR. JOSEPH: Yes.
4          MS. FROMMER: How many times did
5  you personally go to Rikers Island to
6  speak to him?
7          THE WITNESS: I don't know. One
8  or two times, but I'm not sure.
9      Q    Did you ever speak to Terrence
10 Alston outside of Rikers Island?
11     A    Yes.
12     Q    Where?
13     A    On the phone. He called.
14     Q    Did you take notes when he
15 called?
16     A    No. I don't take notes.
17     Q    Did you write down what he said
18 to you when he called?
19     A    No.
20     Q    Did you record the
21 conversations?
22     A    No.
23     Q    At the 43rd Precinct in 2001,
24 did you have the capability to record
25 conversations on squad phones?

177

1        Agostini
2      A    We don't have a tape recorder.
3      Q    On February 15, 2001, did
4  Terrence Alston tell you that a friend of
5  his named Johnny Baker sold Anthony
6  Manganiello a gun?
7          MS. FROMMER: Objection.
8      A    That's what he says here on the
9  thing, yes.
10     Q    Is that what he told you?
11     A    That's what he said, yes.
12     Q    I show you what's been
13 previously marked as Plaintiff's Exhibit 10.
14 Do you recognize this document?
15     A    Yes, I do.
16     Q    What do you recognize it to be?
17     A    Interview with a Johnny Baker,
18 which I say I can't remember him. I can't
19 remember a Johnny Baker, but this is the
20 interview I did with Johnny Baker.
21     Q    Do you have any recollection as
22 you sit here today of that interview?
23     A    Recollection, no. I just
24 remember that I interviewed someone and
25 basically asked him did he sell a gun to the

45 (Pages 174 to 177)

dalco

178

Agostini

1 effect of Alston, and he said no.
2 **Q    Did you ask him specifically did**
3 **he sell a 22-caliber weapon to a Parkchester**
4 **security officer?**
5 A    I can't remember that. I can't
6 remember that off memory.
7 **Q    Is that what's indicated in your**
8 **DD5?**
9 A    Yes, that's what it says.
10 **Q    Did Mr. Baker indicate to you**
11 **that he did not sell a 22-caliber handgun to**
12 **any Parkchester security officer?**
13    MS. FROMMER: For the record, I
14    want you to look and see if that
15    mentions the caliber of the gun. If
16    you can show me on Plaintiff's
17    Exhibit 10 where .22 is written.
18    MR. JOSEPH: He's looking at
19    Damon. Sorry.
20    MS. FROMMER: Does it say
21    anywhere on that interview what caliber
22    gun?
23 **Q    Sir, did Mr. Baker deny selling**
24 **a firearm of any caliber to any Parkchester**

179

Agostini

1 security officer?
2    MS. FROMMER: Objection. You
3    can answer.
4 A    That's correct. He said he had
5 no knowledge.
6 **Q    Did you believe him?**
7 A    Yes.
8 **Q    Did you question Mr. Alston**
9 **about this?**
10 A    Yes.
11 **Q    And how did you do that? Did**
12 **you go to Rikers? Did you call him on the**
13 **phone?**
14 A    I believe it was the phone.
15 That's when I had a big argument over the
16 phone that the guy that he said that he sold
17 the gun to, I questioned him, and he was
18 saying, "Why did you interview him? Why did
19 you question him? I told you not to do
20 that," this and that.
21 **Q    I don't know what "this and**
22 **that" is. Can you explain to me what you**
23 **mean by "this and that"?**
24 A    Meaning he didn't want me to

180

Agostini

1 interview the person, okay, that sold the
2 gun to the security officer without him
3 present.
4 **Q    And was that significant to you?**
5 A    Yes.
6 **Q    Why was that significant to you?**
7 A    Because he told me that this
8 person, Johnny, whoever he is, sold the gun,
9 and he didn't do it.
10 **Q    Right.**
11 A    Exactly.
12 **Q    You say you had a big fight with**
13 **Terrence Alston.**
14 A    Just an argument over this.
15 **Q    What did you say to him, and**
16 **what did he say to you?**
17    MS. FROMMER: Objection.
18 A    I don't remember context. The
19 context was that I interviewed this person,
20 and he is not the guy that sold the gun.
21 **Q    Did you understand Mr. Alston**
22 **wanted to be present because he was**
23 **attempting to influence what the witness**
24 **said?**

181

Agostini

1    MS. FROMMER: Objection.
2 A    I don't know what was his
3 motive.
4 **Q    Did you ask him, "Why do you**
5 **have to be there when I interview a**
6 **witness?"**
7    MS. FROMMER: Objection.
8 A    No, I didn't ask him that.
9 **Q    Did you ask him anything along**
10 **those lines?**
11 A    No.
12    MS. FROMMER: Objection.
13 **Q    Did it raise any concerns for**
14 **you about his believability at this point?**
15    MS. FROMMER: Objection. You
16    can answer.
17 A    Yes, it is.
18 **Q    And did you ask him why this**
19 **witness is saying he didn't do what Mr.**
20 **Alston is saying he did?**
21    MS. FROMMER: Objection.
22 A    I don't remember what he said.
23 I don't remember the conversation.
24 **Q    Did you make any notes about**

46 (Pages 178 to 181)

182

```
 1              Agostini
 2   that conversation?
 3       A   I said no, I don't make notes of
 4   the conversations like that.
 5       Q   Whatever was said in that
 6   conversation between you and Mr. Alston, did
 7   that in your view tend to undermine Mr.
 8   Alston's credibility?
 9           MS. FROMMER: Objection.
10       A   Somewhat, but I know he was
11   playing games, because he was in jail and
12   maybe he wanted to be out of jail before he
13   gave me like the correct person who did it.
14   So he was like playing games. To me he was
15   playing games.
16       Q   What do you mean he was playing
17   games?
18       A   Meaning get him out first and he
19   will give me the correct person.
20       Q   Did he indicate to you that he
21   wanted you to get him out?
22       A   I think he indicated to the DA's
23   office that he wants to be out if he is
24   giving this information.
25       Q   Was he let out?
```

183

```
 1              Agostini
 2       A   He was let out.
 3       Q   When was he let out?
 4       A   I don't remember.
 5       Q   Was it in 2001?
 6       A   It was the same year, yes.
 7       Q   Do you remember about what
 8   month?
 9       A   I don't remember, no.
10       Q   Was it prior to Mr.
11   Manganiello's arrest in April of 2001?
12           MS. FROMMER: Objection.
13       Q   Was Mr. Alston released from
14   jail before Anthony Manganiello was arrested
15   in April of 2001?
16       A   Yes.
17       Q   Do you know what Mr. Alston's
18   sentence was?
19       A   No.
20       Q   If I were to suggest a number of
21   four years, would that ring any bells?
22           MS. FROMMER: Objection.
23       A   No.
24       Q   Did you find it unusual that a
25   felon's sentence got dramatically cut for
```

184

```
 1              Agostini
 2   providing information?
 3           MS. FROMMER: Objection.
 4       A   I don't know what was the
 5   sentence or what was the deal with him.
 6       Q   Did you ever ask?
 7       A   Like I said, no, and I didn't
 8   care.
 9       Q   Let me get the time line down.
10           When did you have this
11   conversation with Alston about Mr. Baker
12   denying selling firearms?
13       A   I believe it was right after
14   this date, February 17th, but I don't
15   remember what specific day was that.
16       Q   What was your next involvement
17   with Mr. Alston after that fight on the
18   phone?
19           MS. FROMMER: Objection. You
20   can answer.
21       Q   Or argument over the phone.
22       A   I believe the next involvement
23   was, and I wasn't even involved with him any
24   more, it was Detective Parker and the DA's
25   office, they brought in I believe it was
```

185

```
 1              Agostini
 2   Alston and the kid that he supposedly
 3   produced.
 4       Q   Is that Mr. Damon?
 5       A   Yes, to the DA's office.
 6       Q   And at this point, did you raise
 7   any concerns to the DA's office about what
 8   happened between you and Mr. Baker and Mr.
 9   Alston?
10       A   Yes. They already knew.
11       Q   And did you ever have a
12   conversation with Detective Parker about
13   that?
14       A   Not that I can recall. I don't
15   remember whether I did. I mean if I did I
16   probably, but I can't remember.
17       Q   Sir, after Mr. Baker denied
18   selling any weapons, did you have any
19   concerns with a murder prosecution going
20   forward against Anthony Manganiello?
21           MS. FROMMER: Objection.
22       A   Did I have any concerns?
23       Q   Yes.
24       A   No. My job is to proceed with
25   the investigation.
```

47 (Pages 182 to 185)

dalco

186

1       Agostini
2       Q    Did you have any concerns about
3   the integrity of the evidence which Mr.
4   Alston was presenting in this case?
5       MS. FROMMER: Objection.
6       A    There is no evidence. I found
7   the guy to give me no evidence at all.
8   Johnny whoever he is didn't give me
9   anything, so no.
10      Q    After that telephone
11  conversation, did you have any further
12  dealings at all with Terrence Alston?
13      A    That I can remember, okay, that
14  I could remember, my memory, the next time
15  that I could remember is seeing him at the
16  DA's office with Damon.
17      Q    Do you know how Mr. Damon got
18  brought to the ADA's office?
19      A    No, I don't know. He was there
20  when I arrived.
21      MR. JOSEPH: Off the record.
22      (Whereupon, a discussion was
23  held off the record.)
24      (Document was marked as
25  Plaintiff's Exhibit 23 for

187

1       Agostini
2   identification, as of this date.)
3       Q    I'm showing you, sir, what's
4   been marked as Plaintiff's Exhibit 23.
5       MS. FROMMER: For the record,
6   this is a document that has some
7   handwriting on it. I have seen this
8   document before. I have never seen it
9   with this handwriting. This is not my
10  handwriting, and I believe that Mr.
11  Joseph will represent that it's not his
12  handwriting, nor does he know how the
13  handwriting got there.
14      MR. JOSEPH: Correct.
15      MS. FROMMER: You don't know who
16  Jerry Smith is?
17      MR. JOSEPH: No.
18      Q    Sir, do you know who Jerry Smith
19  is?
20      A    No.
21      Q    Do you recognize Plaintiff's
22  Exhibit 23?
23      A    Yes.
24      Q    What do you recognize it to be?
25      A    It's the interview with Mark

188

1   Damon.
2       Q    Did you play any role in getting
3   Mark Damon to appear at the assistant
4   district attorney's office?
5       A    No. I didn't play a role in it.
6   I knew he was coming in, okay, but like I
7   said, I really have, you know, no dealings
8   with Terrence. So that was between
9   Detective Parker and ADA Scaccia. When they
10  called me to say, "He's here. Come to the
11  DA's office," that was the first time I ever
12  seen this person.
13      Q    How did you know he was coming
14  in?
15      A    Because the DA was telling me he
16  was supposed to come in, the kid was
17  supposed to come in.
18      Q    How old was this kid?
19      A    It says here he is 17 years old.
20      Q    Was he with his parents?
21      A    No. He was there by himself.
22      Q    And did this gentleman live in
23  the Parkchester area?
24      A    Let me see. Yes, 1491

189

1       Agostini
2   Metropolitan.
3       Q    Was he also a gang member?
4       A    Like I say, I didn't know who he
5   was, so I couldn't run him. I don't know
6   who he was. I don't know if I ran him
7   afterward, so I didn't know who he was prior
8   to me meeting him.
9       Q    Do you have any recollection of
10  running him after you met him?
11      A    No.
12      Q    After you met him for the first
13  time, did you do any investigation at all
14  into Mr. Damon's background?
15      A    I can't remember if I did or
16  not.
17      Q    How old was Mr. Alston?
18      A    I don't know.
19      Q    Ball park.
20      MS. FROMMER: Objection.
21      A    Ball park, I can't.
22      Q    Was he in the same age range as
23  Mr. Damon?
24      MS. FROMMER: Objection.
25      A    No.

48 (Pages 186 to 189)

dalco

190

Agostini

1
2      Q      Was he more than five years
3  older than Mr. Damon?
4          MS. FROMMER: Objection. If he
5      said he can't give a ball park I am
6      going to object. That's prejudicial.
7      I am going to instruct him not to
8      answer that. 16-year-olds look like
9      they are 42 these days. I am going to
10     instruct him not to answer.
11     Q      Did you ever ask how Mr. Damon
12  knew Mr. Alston?
13     A      No.
14     Q      What if anything did Mr. Damon
15  say in your presence?
16     A      He said what he stated here
17  (indicating).
18     Q      Are you referring to Exhibit 23?
19     A      Yes.
20     Q      Did you prepare Exhibit 23?
21     A      Yes.
22     Q      And did you write down
23  accurately what was said by Mr. Damon?
24     A      Basically.
25     Q      What do you mean by basically?

191

Agostini

1
2      A      I mean, you know, I didn't have
3  a pad and I wrote. I hear what he's saying
4  and then I put it on paper, not word by
5  word, of course.
6      Q      Is Exhibit 23 an accurate
7  recount to the best of your recollection of
8  what Mr. Damon said?
9      A      Yes.
10     Q      Now, did you find it odd that
11  Mr. Alston had produced another witness now
12  claiming that he sold Anthony Manganiello a
13  gun?
14          MS. FROMMER: Objection.
15     A      I knew he knew. Like I always
16  said, he knew, he knows, I'm sorry, who he
17  gave the gun to, but he gave me a wrong
18  person. But I always knew that he knows the
19  right person. And that's what I thought,
20  this person was the right person, instead of
21  the other guy, whoever he was, that I
22  interviewed.
23     Q      Did it ever raise any concerns
24  to you that Mr. Alston was making up stories
25  to get out of jail?

192

Agostini

1
2          MS. FROMMER: Objection.
3      A      Was he making up stories? You
4  know what, that was not for me to determine
5  that, whether he wanted to get out of jail
6  just to determine this. This person came
7  up, he said what he had to say in front of
8  the DA's office, in front of Derek Parker,
9  okay, and he said he sold it.
10     Q      Did you provide Mr. Damon with
11  any information concerning the crime prior
12  to being in the DA's office with him?
13     A      I didn't speak to Damon.
14     Q      Did you speak to Mr. Parker at
15  all about Mr. Damon prior to meeting him in
16  the DA's office that date?
17     A      Prior, I didn't know who was
18  coming. Like I said, the first time I knew
19  about this person was that day, right.
20     Q      Did Mr. Damon ever recant his
21  story?
22     A      Yes.
23     Q      When did he recant his story?
24     A      Prior to the trial.
25     Q      How did Mr. Damon recant his

193

Agostini

1
2  story?
3      A      Basically he was summoned to the
4  DA's office, the DA spoke to him, and he
5  recanted the story. And I believe one of
6  their ADA investigators started talking to
7  Damon, and he said no, that Alston made him
8  say it.
9      Q      When did this happen?
10     A      You have to tell me the trial,
11  when was the trial? I don't remember what
12  date.
13     Q      When in relation to the trial
14  did this occur?
15     A      Maybe a week. No, no, I don't
16  know if the trial was going on, or before
17  the trial. But I'm not sure if the trial
18  was going on, but he came to be interviewed,
19  and that's when he recanted.
20     Q      Did he recant in your presence?
21     A      He recanted to them first, and
22  then I sat down with the investigator and he
23  said that Murdock, whatever, Alston made him
24  say it.
25     Q      Did he say why Alston made him

49 (Pages 190 to 193)

dalco

194

Agostini

1 say it?

2

3    A    No.

4    Q    Do you know if that information

5 was ever provided to the defense lawyers for

6 Anthony Manganiello?

7    A    The DA knew about it. It's not

8 my job to give the defense information. The

9 DA should have done that.

10    Q    The first time you met Mark

11 Damon, did you have any reason to question

12 whether he was telling the truth?

13    A    As a matter of fact, I looked at

14 him and he was a quiet kid, soft spoken, and

15 I believed him.

16    Q    Did you do anything to verify

17 whether he had any criminal involvement in

18 the past?

19    A    Maybe I did, but I don't

20 remember.

21    Q    If he did, would that

22 information be placed into the case file?

23    A    Yes.

24    Q    And was that information also

25 lost?

195

Agostini

1

2    A    Yes.

3    Q    By the way, did you have any

4 further contact with Detective Parker after

5 that initial meeting with Mr. Damon?

6    A    After?

7    Q    Yes.

8    A    I'm not sure I did, but I can't

9 remember.

10    Q    Were you aware at any time of

11 Detective Parker being fired?

12    MS. FROMMER: Objection.

13    A    No, I don't know if he was

14 fired.

15    Q    Are you aware of any

16 disciplinary matters that happened to

17 Detective Parker because of Mark Damon?

18    MS. FROMMER: Objection.

19    A    No. The only thing I know about

20 Detective Parker is I think he wrote a book

21 or something. I believe he wrote a book,

22 but that's it.

23    Q    In Terrence Alston's statement

24 did he also say to you that the security

25 guard wanted Acosta killed over a dispute

196

Agostini

1

2 with a girl?

3    MS. FROMMER: Why don't you look

4 at the two DD5's before you answer that

5 question.

6    A    I believe that was on Ramos'

7 thing.

8    MS. FROMMER: I am showing him

9 my copy of Plaintiff's Exhibit 9.

10    A    He said this to Ramos. He

11 didn't say this to me.

12    Q    Were you aware of that

13 statement?

14    A    Yes.

15    Q    Did you speak to Mr. Acosta's

16 girlfriend?

17    A    Yes, I did.

18    Q    Did she indicate that she knew

19 Anthony Manganiello in any way?

20    A    I can't remember her name or

21 whatever. I remember talking to her. She

22 said she knew both of them, but she had, I

23 guess, nothing to do with him.

24    Q    Anthony Manganiello?

25    A    Yes.

197

Agostini

1

2    Q    Now, as far as Mr. Acosta's

3 girlfriend was concerned, there was no

4 problem between her and Anthony Manganiello?

5    A    Correct.

6    Q    And did that cause you concern

7 about the believability of what Mr. Alston

8 was telling you?

9    A    No, because it could be

10 anything. It could be maybe that someone is

11 infatuated with a person but won't tell the

12 person.

13    Like I like her, but I'm not

14 going to tell her that I like her, and she

15 won't know that I'm a problem (indicating).

16    MS. FROMMER: Thank you. I'm

17 flattered.

18    Q    Aside from what you told us, did

19 you have any other argument with Mr. Alston?

20    A    No. Basically that was it.

21    Q    By the way, did you ask Mr.

22 Damon, the 17-year-old kid, how he came in

23 possession of a firearm?

24    MS. FROMMER: Objection.

25    A    Sir, I didn't talk to him.

**dalco**

50 (Pages 194 to 197)

198

1          Agostini
2     Q    You were there in the DA's
3  office, correct?
4     A    Yes, and I didn't talk to him.
5  You know what, this Alston guy didn't want
6  me to talk to him, so it was like ADA, Derek
7  Parker and the kid. I didn't ask him any
8  questions. I just listened.
9     Q    And by the way, in 2001, was it
10  a felony to sell a firearm?
11     A    To sell a firearm, yes.
12     Q    Was Mr. Damon ever charged with
13  the sale of a firearm?
14          MS. FROMMER: Objection.
15     A    No.
16     Q    Why not?
17     A    I didn't have enough. There was
18  no gun.
19     Q    Without the presence of the gun,
20  did you feel that you could charge Mark
21  Damon for sale of a gun based on his
22  confession?
23          MS. FROMMER: Objection.
24     A    I don't think so.
25     Q    What information would you need

199

1          Agostini
2  or what evidence would you need to charge
3  Mr. Damon with possession of a firearm or
4  sale of a firearm?
5          MS. FROMMER: Objection.
6     A    Probably just the gun and
7  someone else who he sold it to.
8     Q    I believe you said Mr. Alston
9  was a Blood. Do you know if he was a member
10  of a local Blood organization that was
11  centered in Parkchester?
12          MS. FROMMER: Objection.
13     A    I don't know that.
14     Q    Do you know where his gang so to
15  speak was based?
16          MS. FROMMER: Objection.
17     A    No.
18     Q    Was Mr. Damon at any time asked
19  where he got this gun from?
20          MS. FROMMER: Objection.
21     A    Like I said, I didn't ask him,
22  and I can't remember if anybody else asked
23  him.
24     Q    Was Mr. Damon asked, did he
25  write out his own statement?

200

1          Agostini
2     A    I didn't ask him that.
3     Q    Did you see him write out his
4  own statement?
5     A    I don't think so.
6     Q    Did you ever see a statement
7  written by Mr. Damon?
8     A    I don't think I seen one.
9     Q    Do you know if Detective Parker
10  took a statement from him?
11     A    I don't know.
12     Q    At the point in time that you
13  met with Mr. Damon and Mr. Parker in ADA
14  Scaccia's office, was Mr. Alston still in
15  custody?
16     A    Well, sir, if you see the DD5 of
17  the meeting, I believe Alston was present.
18     Q    Right.
19     A    Right.
20     Q    What I am asking you is was he
21  present in handcuffs in a prison uniform, or
22  did he arrive on his own?
23          MS. FROMMER: Objection.
24     A    I believe he arrived on his own.
25     Q    Was it your understanding that

201

1          Agostini
2  Mr. Alston had gained his freedom by
3  producing a witness who would tie Anthony
4  Manganiello to the death of Albert Acosta?
5          MS. FROMMER: Objection.
6     A    Well, my impression was that
7  they let him out so he can give us the
8  information, yes.
9          MR. JOSEPH: Let's have this
10  marked as 24.
11          ( Document was marked as
12  Plaintiff's Exhibit 24 for
13  identification, as of this date.)
14     Q    Do you know where Alston lived
15  when he wasn't in jail?
16     A    I believe it was Parkchester.
17     Q    I am going to show you Exhibit
18  No. 24. Do you recognize that?
19     A    Yes.
20     Q    Did you sign that document?
21     A    Yes.
22     Q    And what is this document?
23     A    This is the arrest of Anthony
24  Manganiello.
25     Q    Is this known as a felony



51 (Pages 198 to 201)

202

Agostini

1    complaint?

2    A    Yes.

3    Q    And did you sign a felony

4    complaint accusing Anthony Manganiello of

5    murder in the second degree, two counts, and

6    one count of manslaughter?

7    A    Yes.

8    Q    And did you do that on April 20,

9    2001?

10    A    April 20th, yes.

11    Q    And why did you accuse Anthony

12    Manganiello of murder —

13    MS. FROMMER: Objection.

14    Q    — on April 20, 2001?

15    A    I received an arrest warrant for

16    his arrest.

17    Q    Did you fill out any paperwork

18    for that arrest warrant?

19    A    I filled out numerous paperwork.

20    Q    Where is that paperwork now?

21    A    It's missing.

22    Q    Do you know when that paperwork

23    went missing?

24    A    Some time between I would say

203

Agostini

1    maybe January of 2003 until February or

2    whatever the next year.

3    Q    What exactly did you say to

4    obtain the arrest warrant?

5    MS. FROMMER: Objection.

6    Q    What is your recollection?

7    A    What did I say? I just

8    presented evidence, my evidence of witnesses

9    and their accounts.

10    Q    What account of what witnesses

11    did you present to obtain a search warrant?

12    MS. FROMMER: Objection. Arrest

13    warrant.

14    A    I presented — I forgot his

15    name, Cobb and Alston.

16    Q    Apart from Cobb and Alston, did

17    you present any other witnesses?

18    A    Yes. I believe Booth and

19    Cartone.

20    Q    Anybody else?

21    A    That I can remember, no.

22    Q    When you say you presented a

23    witness, what do you mean? Did you write

24    down a statement as to what they told you?

204

Agostini

1    Did you present them for testimony?

2    A    I presented them for — I

3    believe some of them for testimony, yes.

4    Q    What I am asking you is, I am

5    asking you about your obtaining the arrest

6    warrant, not any grand jury testimony.

7    MS. FROMMER: I think he is

8    trying to find out when you say

9    "present" what you meant by that? Did

10    you actually physically bring an

11    individual? Did you present paperwork?

12    Did you have a box of evidence?

13    Am I right, that's what you're

14    asking?

15    MR. JOSEPH: Yes.

16    A    And my answer is I don't

17    remember whether this went to the grand jury

18    first and then I received the arrest

19    warrant. All I know is I was home, my boss

20    called me, says, "Come in. You got to get

21    an arrest warrant for him. Go to the DA."

22    Q    Who was your boss that called

23    you? Was it Scott?

24    A    No, no. It was Sergeant

205

Agostini

1    Napalotano. I went to the DA's office, and

2    we obtained an arrest from the judge.

3    Q    By the way, when you obtained

4    the arrest warrant, did you advise the judge

5    that Mr. Alston had given you false

6    information in the past?

7    A    I didn't speak to the judge.

8    The judge asked me questions, and I signed

9    it, and that was it.

10    Q    The thing you signed, did it

11    have any statement in which you swore that

12    Alston, the information provided by Alston

13    was credible and reliable?

14    MS. FROMMER: Objection.

15    A    Well, I didn't say Alston.

16    MS. FROMMER: I think you did.

17    I think you did.

18    Q    You said Cobb, Alston, Booth and

19    Cartone.

20    MS. FROMMER: Do you want to

21    amend any of that?

22    THE WITNESS: To the judge?

23    MS. FROMMER: No. The question

24    that he asked you was what witnesses

52 (Pages 202 to 205)

206

1          Agostini
2   did you present to the DA in getting
3   the arrest warrant, and I believe the
4   answer you gave was Cobb, Alston, Booth
5   and Cartone.
6          MR. JOSEPH: Correct.
7       A   I don't know whether they went
8   to the grand jury before I got this warrant.
9   I'm not sure. I'm not sure how it went
10  through.
11         MR. JOSEPH: Let's take two
12  minutes.
13         (Whereupon, a recess was taken.)
14         MS. FROMMER: I have been handed
15  a transcript of a hearing on April 23rd
16  of 2001, regarding Mr. Manganiello's
17  criminal prosecution which appears to
18  be part of a transcript regarding an
19  arraignment. And according to this it
20  was represented by the ADA that the
21  case was going to proceed to the grand
22  jury and had not yet proceeded to the
23  grand jury as of April 23rd of 2001.
24      Q   So, sir, assuming that prior to
25  arresting Mr. Manganiello a case had not

207

1          Agostini
2   been presented to a grand jury, what did you
3   do to obtain an arrest warrant?
4          MS. FROMMER: Objection. You
5   can answer.
6       A   That right there, it says
7   partially presented before his arrest,
8   partially presented to the grand jury.
9          MS. FROMMER: I don't know what
10  that means, but according to this
11  document it was represented that the
12  case had not been presented.
13         MR. JOSEPH: It's on page nine.
14         MS. FROMMER: I understand that,
15  but we don't know what that was.
16      A   I don't know whether it was
17  partially presented to them. I don't know.
18      Q   Sir, is it fair to say that you
19  can only make an arrest based on grand jury
20  presentment if there has been an indictment,
21  correct?
22      A   I don't know.
23      Q   At the time of an arraignment,
24  defendant would obviously already be
25  arrested, correct?

208

1          Agostini
2       A   Right.
3       Q   Now, at the point in time when
4   Mr. Manganiello was arrested by you, was
5   there a grand jury; had there been a grand
6   jury indictment?
7       A   I'm not sure. I don't remember.
8       Q   Can you tell me assuming for a
9   few minutes that there was no grand jury
10  presentment prior to the arrest, how would
11  you have obtained his arrest warrant? What
12  was the procedure?
13      A   Presenting evidence I guess to
14  the judge, in front of the judge.
15      Q   Now, when you present evidence
16  in front of a judge, is there a transcript
17  taken?
18      A   Sir, I can't remember that.
19      Q   When you present evidence in
20  front of a judge, is it you presenting the
21  evidence in front of a judge as to what
22  other witnesses have said, or are you
23  presenting what you have seen, heard,
24  smelled, and there are other witnesses being
25  called, also?

209

1          Agostini
2          MS. FROMMER: Objection.
3       A   I don't remember this, sir. I
4   can't remember this.
5       Q   When you presented the
6   information to the judge, did you advise the
7   judge that Mr. Alston had given you false
8   information in the past?
9          MS. FROMMER: Objection.
10      A   That I know I don't speak to a
11  judge about that, but I can't remember any
12  conversation with this judge. I cannot
13  remember any conversation with this judge,
14  and I don't think I would mention this
15  Alston guy to him.
16      Q   By the way, what evidence
17  created probable cause to believe that Mr.
18  Manganiello had murdered Albert Acosta on
19  the day you arrested him?
20      A   My conversation with Cobb, okay,
21  as he was walking down the street, and he
22  heard four shots from the basement. And as
23  he was walking towards the basement Anthony
24  Manganiello comes out of the basement, and
25  he asked Anthony Manganiello, "Did you hear



53 (Pages 206 to 209)

210

Agostini

1 the shots?"
2
3        And he said, "Yeah. You go this
4 way and I go this way."
5     Q    Anything else?
6     A    Alston, the statement that
7 Alston gave, the statement that Damon gave.
8 Booth gave a statement that Manganiello was
9 looking for a gun. And the pizza owner,
10 Cartone, overheard Anthony Manganiello
11 looking for a gun at his pizza shop, that
12 evidence.
13     Q    Did you consider the evidence
14 given by Mr. Huello?
15     A    I don't know who he is.
16        MS. FROMMER: Do you want to
17 represent who he is, because he will be
18 better able to answer your question?
19     Q    Did you consider any evidence
20 given by a Verizon worker who was in the
21 basement at the point in time Mr. Cobb
22 entered the basement?
23     A    What do you mean? I never spoke
24 to Huello.
25     Q    Did you speak to Cobb?

211

Agostini

2     A    Yes.
3     Q    Did you review DD5's concerning
4 what Mr. Huello had said?
5     A    I need to review them again. He
6 didn't say it to me.
7     Q    Did you ever call Mr. Huello
8 asking him to come in and speak to you about
9 what he saw?
10     A    No, because he was already
11 interviewed.
12     Q    Who interviewed him?
13     A    I don't know. I have to look at
14 the DD5.
15     Q    We will come back to that.
16     Q    Did you believe Mr. Alston's
17 story that he had agreed to do a hit for
18 hire essentially, commit murder for hire?
19     A    He never made that statement to
20 me.
21     Q    What specifically did Mr. Alston
22 say that caused you to believe that there
23 was probable cause to arrest Anthony
24 Manganiello for the murder of Albert Acosta?
25     A    Basically he said his story that

212

Agostini

1
2 Parkchester security was looking either for
3 a gun for him to make a hit, okay. He
4 pointed him out on a book, photo, a book
5 photo, okay, and then he gave up Damon.
6     Q    Now, did you testify a couple of
7 seconds ago that Mr. Alston never said to
8 you that a Parkchester security guard wanted
9 to hire him to commit a murder?
10     A    He never said it to me.
11     Q    He never did?
12     A    No.
13     Q    Let me direct your attention to
14 Exhibit 22. Can you read the first
15 paragraph.
16     A    So then he did. After reading
17 this he did.
18     Q    So Mr. Alston did in fact say to
19 you that a Parkchester security guard wanted
20 to hire him to commit an act of murder?
21     A    Yes, according to this.
22     Q    Did you believe him?
23     A    Yes.
24     Q    Did you arrest him for the
25 murder, for conspiracy to commit murder?

213

Agostini

1
2     A    I didn't have enough. He didn't
3 do it.
4     Q    Did you arrest him for attempted
5 murder?
6     A    No, because he didn't do it.
7     Q    Did you arrest him for
8 conspiracy?
9     A    We don't even know what other
10 security guard was he looking for.
11     Q    Sir, is it fair to say that you
12 in part based your decision to arrest Mr.
13 Manganiello on the word of someone who lied
14 to you?
15        MS. FROMMER: Objection. You
16 can answer.
17     A    He didn't lie to me, but I
18 believed Damon. I believed Damon, and I
19 believed Cobb.
20     Q    You also mentioned a name Booth;
21 is that correct?
22     A    Yes.
23     Q    Do you know if Mr. Booth was
24 involved in some criminal activity?
25     A    I didn't know whether he was

54 (Pages 210 to 213)

dalco

214

1          Agostini
2 involved in criminal activity, but they said
3 he was the neighborhood bookie.
4      Q     Did they say he was a loan
5 shark?
6      A     I don't know that. Bookie and
7 loan shark are two different things.
8      Q     One loans money for high
9 interest, the other takes bets, correct?
10          MS. FROMMER: Objection.
11     A     I don't know he was a loan
12 shark. I just heard he is a neighborhood
13 bookie.
14     Q     What is your understanding of
15 what a bookie does?
16     A     Takes bets.
17     Q     And is that legal or illegal?
18     A     It's illegal.
19     Q     And after you learned that Mr.
20 Booth had been involved in this illegal
21 activity, what if anything did you do?
22          MS. FROMMER: Objection.
23     A     Learning as in what?
24     Q     In other words, did you
25 investigate Mr. Booth concerning this

215

1          Agostini
2 illegal activity?
3      A     No.
4      Q     Why not?
5      A     Because I didn't.
6      Q     You were a detective, correct?
7      A     Yes.
8      Q     Is it part of your job to
9 investigate crimes including bookmaking?
10     A     No, not bookmaking. That's
11 totally different. That goes into whatever
12 that is, vice. They handle cases like that.
13     Q     Did you pass Mr. Booth's name
14 along to vice?
15     A     I passed it through SARRS I
16 believe, and whatever, HIDTA, whatever. I
17 know I probably ran checks on him.
18     Q     Did you learn that he was a
19 known gang member?
20     A     Not that I recall, no.
21     Q     Did you know that he had
22 affiliations with organized criminal
23 families?
24     A     That I heard, yes.
25     Q     What criminal families was Mr.

216

1          Agostini
2 Booth affiliated with?
3          MS. FROMMER: Objection.
4      A     I don't remember.
5      Q     Was it the Genovese family?
6      A     I don't remember, sir.
7      Q     Mr. Booth worked at the Hunts
8 Point Fruit Market, correct?
9          MS. FROMMER: Objection.
10     A     Mr. Booth worked there? I don't
11 know whether he worked there or not.
12     Q     Was there an element of
13 organized crime in 2001 that was known to
14 have controlled the Hunts Point Fruit
15 Market?
16     A     I don't know that.
17     Q     What did you hear about Mr.
18 Booth and his involvement with organized
19 crime?
20          MS. FROMMER: Objection.
21     A     The only thing I heard was that
22 maybe, maybe he had an uncle that was mobbed
23 up in Hunts Point, but that was it.
24     Q     Did you ever ask him?
25     A     I don't know. I don't know

217

1          Agostini
2 whether I asked him or not.
3      Q     The possibility that a witness
4 coming forward on the murder case is maybe
5 mobbed up, was that an important factor for
6 you?
7      A     No.
8      Q     Did you ever consider that maybe
9 Mr. Booth was involved in the murder of
10 Albert Acosta?
11          MS. FROMMER: Objection.
12     A     No.
13     Q     Did you ever receive any
14 information that Mr. Acosta owed Mr. Booth
15 money?
16     A     No.
17     Q     Did you ever receive any
18 information that other security guards
19 working for Parkchester owed Mr. Booth
20 money?
21     A     No.
22     Q     Now, what happened to the SARRS
23 check that you performed for Mr. Booth, on
24 Mr. Booth?
25     A     Well, it's in the case file.

**dalco**
court reporting & legal video

55 (Pages 214 to 217)

218

1    Agostini
2    **Q**    **Was that documentation also**
3    **lost?**
4    A    Everything. It's in the case
5    file.
6    **Q**    **Was there documentation in that**
7    **SARRS report which indicated that Mr. Booth**
8    **had been involved in criminal activity**
9    **previously?**
10    MS. FROMMER: Objection.
11    A    I don't remember, sir.
12    **Q**    **By the way, did you tell the ADA**
13    **that Mr. Booth was reputed to be a bookie?**
14    MS. FROMMER: Objection.
15    A    I believe I did, yes.
16    **Q**    **Were any charges brought against**
17    **Mr. Booth as a result of his bookmaking**
18    **activity?**
19    MS. FROMMER: Objection.
20    A    We can never prove anything with
21    him.
22    **Q**    **Did you try?**
23    A    Did I try proving what? Buying
24    or betting with him, no.
25    **Q**    **Isn't it true in exchange for**

219

1    Agostini
2    the information he provided in this case Mr.
3    **Booth was left alone to his criminal**
4    **activity in the vicinity of the 43rd**
5    **Precinct?**
6    MS. FROMMER: Objection.
7    A    Left alone, no, sir.
8    **Q**    **From the point in time that he**
9    **gave you the statement in 2001 until 2004**
10    **when Mr. Manganiello was tried, was Mr.**
11    **Booth ever arrested?**
12    MS. FROMMER: Objection.
13    A    No, not that I know of. Not by
14    me.
15    **Q**    **By the way, you say Chris**
16    **Cartone owned a pizzeria, correct?**
17    A    I don't know if he owned it, but
18    I guess he was there as manager or whatever,
19    whatever it is. I don't know specifically
20    if he owned it or not.
21    **Q**    **Are you aware if Mr. Cartone had**
22    **some employment at the pizzeria?**
23    A    Yes.
24    **Q**    **Was the pizzeria a known place**
25    **where people dropped numbers?**

220

1    Agostini
2    MS. FROMMER: Objection.
3    A    Sir, I have never been to that
4    pizzeria, never to that pizzeria, only to
5    pick up and to interview him. Other than
6    for me to eat there or do I frequent that
7    pizzeria that I would know if they are doing
8    numbers in there, no, I have never been to
9    that pizzeria.
10    **Q**    **Have you ever been to the**
11    **pizzeria?**
12    A    Yes.
13    **Q**    **Is the pizzeria located within**
14    **the vicinity of the 43rd Precinct?**
15    A    Yes.
16    **Q**    **Had you received information**
17    **that the pizzeria was linked to Mr. Booth's**
18    **gambling operations?**
19    MS. FROMMER: Objection.
20    A    No.
21    **Q**    **Did you ever receive information**
22    **that Mr. Cartone was linked to Mr. Booth's**
23    **gambling operations?**
24    MS. FROMMER: Objection.
25    A    No.

221

1    Agostini
2    **Q**    **What did Mr. Booth say to you?**
3    A    Off memory?
4    **Q**    **Yes.**
5    A    Basically that he was parked in
6    Parkchester by Macy's, and that Manganiello
7    approach him and asked him for a rod. And
8    he said, "Are you crazy?" You can do
9    whatever years, "you can go to jail for
10    that."
11    **Q**    **Did he say it was a fishing rod?**
12    **What did he say?**
13    A    No, a rod.
14    **Q**    **Do you know what he meant by**
15    **rod?**
16    A    Yes, a gun.
17    **Q**    **By the way, did you give Mr.**
18    **Manganiello's name to Mr. Booth?**
19    A    Mr. Booth, did I give him the
20    name? I don't know. I don't know whether I
21    gave him the name or not. I know he picked
22    him out of a book.
23    **Q**    **And did Mr. Booth indicate to**
24    **you that he had sold Mr. Manganiello a gun?**
25    A    No.

56 (Pages 218 to 221)

222

Agostini

2  Q    Where did you speak to Mr.
3  Booth?
4  A    I picked up Mr. Booth at the
5  pizzeria. I don't know what he looked like.
6  Cartone says, "That's him."
7  Q    What happened after you picked
8  him up?
9  A    We went to the precinct, and
10  that's where I spoke to him.
11  Q    Did he speak to you voluntarily?
12  A    Yes.
13  Q    Did you indicate to him there
14  would be any consequences if he didn't
15  provide you information?
16  MS. FROMMER: Objection.
17  A    No, no consequences.
18  Q    Did you tell him you would pass
19  his name on to organized crime?
20  A    Yes, I would. Yes, I did.
21  Q    Why did you say that?
22  A    Because he had these betting
23  slips in the back of his pocket.
24  Q    How did you come to learn that?
25  A    Because when I was talking to

223

Agostini

2  him he was very reluctant to talk to me, and
3  then I saw a knife on his pocket. So I
4  said, "Do you have a weapon?" So to protect
5  myself I said, "Come here." So I checked
6  him, and that was in his back pocket.
7  Q    Where did you frisk him?
8  A    At the precinct.
9  Q    And where in the precinct?
10  A    In the 43rd squad lunchroom.
11  Q    Is that also an interrogation
12  room?
13  MS. FROMMER: Objection.
14  A    No, it's a lunchroom.
15  Q    Was he in handcuffs at any
16  point?
17  A    No.
18  Q    What kind of knife did he have?
19  A    I don't remember, sir.
20  Q    Was possession of a knife at
21  that time a crime?
22  A    It is, yes.
23  Q    Did you arrest him for
24  possession of a criminal weapon?
25  A    No.

224

Agostini

2  Q    Why not?
3  A    Because I didn't.
4  Q    Was there a reason why you
5  didn't enforce the law at this particular
6  point?
7  A    No.
8  Q    You said you found betting slips
9  on him. Can you describe what those are?
10  A    All I saw, and I saw them for
11  the first time, it was a big paper like this
12  (indicating), and there were names and
13  numbers and money on whatever. I couldn't
14  make it out. That's not my expertise.
15  Q    Did you realize this was
16  something involved in a criminal activity?
17  A    That's what it looked like, yes.
18  Q    Did you ask him?
19  A    Yes, I did.
20  Q    What did he say?
21  A    And he says, "Okay, okay. I'll
22  tell you. What do you want to know?"
23  Q    So he asked you what do you want
24  to know?
25  A    Yes.

225

Agostini

2  Q    What did you say to him?
3  A    I said okay, I told him, "This
4  ain't hard. I just want to know what this
5  person asked you."
6  Q    When you say "this person," how
7  did you know who you were talking about?
8  A    I don't know what words he used.
9  I'm not sure what words he used. Then he
10  described what happened.
11  Q    Before we get to that I want to
12  know when you said "it's not hard," what did
13  you mean by that?
14  A    Meaning all he has to do is say
15  what he has to say. I'm not asking him to
16  confess to a crime where I am going to
17  arrest him.
18  Q    If he told you what you wanted
19  to know you indicated to him you wouldn't
20  arrest him, right?
21  MS. FROMMER: Objection.
22  A    I wasn't going to arrest him.
23  Q    If he didn't tell you anything,
24  would those slips have found their way to
25  the organized crime department?



226

```
1        Agostini
2        MS. FROMMER: Objection.
3     A   I would have made inquiries on
4  it.
5     Q   After Mr. Booth gave you the
6  information you wanted, did you make
7  inquiries on it?
8     A   I'm not sure whether I did or
9  not. I don't think so.
10    Q   Did you document anywhere in the
11 file that you had found possible gambling
12 paraphernalia and a knife on Mr. Booth at
13 the point in time he was giving you this
14 statement?
15       MS. FROMMER: Objection.
16    A   I believe the betting, whatever
17 that thing, I put it with the file.
18    Q   And what happened to that?
19    A   It disappeared.
20    Q   Was that with the file when you
21 provided it to the ADA?
22    A   Everything was there.
23    Q   What about the knife?
24    A   No, not the knife. He kept the
25 knife.
```

227

```
1        Agostini
2     Q   So did you allow this bookmaker
3  to walk out of the 43rd Precinct with a
4  criminal weapon?
5        MS. FROMMER: Objection.
6     A   Well, he said it was a working
7  knife, that he works with a knife. So he
8  left, yes.
9     Q   In your view at the time, was it
10 a knife that would fall under the definition
11 of dangerous weapon in the penal law?
12       MS. FROMMER: Objection.
13    A   I don't remember the knife, sir.
14 I just can't remember the knife.
15    Q   When you said to Mr. Booth, sir,
16 "it's not hard," I want to know, what to the
17 best of your recollection were your words?
18    A   I don't remember. I said this
19 is what happened, whatever it is that I
20 said, I said I just want to know what
21 happened.
22    Q   When you said "this is what
23 happened," what did you mean by that?
24       MS. FROMMER: Objection.
25    A   I don't know what words I used.
```

228

```
1        Agostini
2     Q   Did the words involve the name
3  Anthony Manganiello?
4     A   I don't believe I used his name.
5  I don't believe I used his name.
6     Q   Did you ask him about a
7  Parkchester security officer?
8     A   That could have been it, but I
9  can't remember.
10    Q   Did you mention that in the same
11 sentence to him concerning another
12 Parkchester security officer being shot?
13       MS. FROMMER: Objection.
14    A   I can't remember.
15    Q   Where did you speak to Mr. Chris
16 Cartone?
17    A   I spoke to him first at the
18 pizzeria, and I believe he was busy. And I
19 said, "Do me a favor, just come to the
20 precinct tonight before you go home. I need
21 to speak to you."
22       He said, "okay," and he did
23 come.
24    Q   How was it that you learned that
25 Mr. Cartone had some pertinent information?
```

229

```
1        Agostini
2     A   I believe it was through Sal
3  Miro.
4     Q   And what did Mr. Cartone tell
5  you?
6     A   Basically Mr. Cartone said that
7  one day he was working at the pizzeria, and
8  he mentioned his name, Manganiello, that's
9  what he said, came in and was inquiring
10 about buying a gun.
11    Q   Who did he say he was inquiring
12 about?
13    A   About?
14       MS. FROMMER: Objection.
15    Q   Who was he speaking to when he
16 was asking about a gun?
17    A   Just people in the pizzeria.
18    Q   Did he tell you that Mr.
19 Manganiello was walking around the pizzeria
20 asking people for a gun?
21       MS. FROMMER: Objection.
22    A   All I know is he said he
23 overheard him asking somebody or talking to
24 somebody about him buying a gun.
25    Q   Did Mr. Booth ever recant his
```

230

1      Agostini
2  statement?
3      A    No.
4      Q    Did Mr. Cartone recant his
5  statement?
6      A    No.
7      Q    Were you aware of any
8  affiliation or association between Booth and
9  Alston?
10       MS. FROMMER: Objection.
11      A    No.
12      Q    Did you put Mr. Cartone's name
13  into the SARRS inquiry?
14      A    I must have. When you have all
15  these people you run them through
16  everything. Do I remember? No, I don't
17  remember.
18      Q    Where is the background check
19  that you ran on Mr. Cartone?
20      A    It's with the file.
21       MS. FROMMER: Objection.
22      Q    Are these documents lost, also?
23      A    Yes.
24      Q    Do you have any recollection of
25  Mr. Cartone's name coming up as being linked

231

1      Agostini
2  to organized crime?
3       MS. FROMMER: Objection.
4      A    Not that I know of, no.
5      Q    And by the way, did you happen
6  to search Mr. Cartone at all?
7      A    No.
8      Q    Did you threaten to arrest Mr.
9  Cartone in any way?
10      A    No.
11      Q    When you were speaking to Mr.
12  Booth, did you indicate to him that if he
13  didn't provide you the information he might
14  be facing criminal charges for the homicide
15  of Acosta?
16      A    No.
17      Q    Did you ever come across any
18  information that was inconsistent with what
19  Cobb told you?
20      A    No. Well, yes, there is one DD5
21  there that someone, I don't know who, I
22  think Sergeant Hall, whatever, stated that
23  Manganiello didn't hear the shots.
24      Q    Well, didn't Sergeant Hall also
25  say that Mr. Cobb said it sounded like he

232

1      Agostini
2  heard the shots from outside the building?
3      A    Well, he didn't tell me that.
4  Sergeant Hall -- I know I spoke to Cobb, and
5  Cobb told me in person that he heard the
6  shots coming from the basement. He was
7  walking towards the basement, and as he
8  opened the door Manganiello was opening the
9  door at the same time. And he asked
10  Manganiello, "Did you hear the shots?" And
11  Manganiello said, "Yes, I heard it. You go
12  run this way, and I run this way."
13      Q    Did you ever speak to Sergeant
14  Hall?
15      A    I don't think so.
16      Q    Did you ever come across a DD5
17  documenting a conversation with Sergeant
18  Hall?
19      A    Sir, I did a lot of interviews.
20  I don't know. You have to show it to me.
21  As far as I recall right now I can tell you
22  I don't recall, unless you show me
23  something.
24      Q    By the way, what time did Mr.
25  Cobb say he heard these shots?

233

1      Agostini
2      A    I can't recall the time.
3      Q    Would it be important to you to
4  know when Mr. Cobb told you?
5      A    You are asking me by memory, and
6  I'm telling you I can't remember.
7       MS. FROMMER: If you would like
8  to show him something to refresh his
9  memory feel free.
10       MR. JOSEPH: Let's have this
11  marked as 25.
12       (Document was marked as
13  Plaintiff's Exhibit 25 for
14  identification, as of this date.)
15      Q    Sir, I show you what has been
16  marked as Exhibit 25. Do you recognize this
17  document?
18       And again, for the record, there
19  is a number on top and highlighted portions.
20  The record came to me in this condition.
21       MS. FROMMER: And red
22  underlines.
23       MR. JOSEPH: Red underlines.
24      Q    Have you seen this document
25  before?



234

Agostini

1          **Agostini**
2    A   Yes, I have seen this.
3    **Q**   **Were you aware that Mr. Ohle had**
4  **given a statement that it sounded like to**
5  **him that shots came from outside, and he**
6  **gave that statement on the day of the**
7  **incident?**
8        MS. FROMMER: Objection. You
9  can answer.
10   A   Yes, I have seen this before.
11   **Q**   **Were you aware that Mr. Cobb**
12  **immediately after the shooting occurred gave**
13  **a statement in which he said it sounded like**
14  **the shots came from outside to Sergeant**
15  **Ohle?**
16       MS. FROMMER: Objection.
17   A   Well, that's what this statement
18  says, that Sergeant Ohle says, that's what
19  Sergeant Ohle says that Cobb said. I
20  interviewed Cobb, and he didn't say what he
21  said here.
22   **Q**   **Did you interview Sergeant Ohle?**
23   A   No, not that I know of. I don't
24  know.
25   **Q**   **Would you give some weight to**

235

1          **Agostini**
2  **what the sergeant of a special patrol**
3  **officer's unit says?**
4       MS. FROMMER: Objection.
5   A   Give some weight? I don't know.
6  They're in the same Parkchester unit.
7  People say things to protect people.
8   **Q**   **What do you mean by that?**
9   A   What?
10   **Q**   **What do you mean by that?**
11   A   I don't know. It's his
12  sergeant.
13   **Q**   **Are you saying you believed**
14  **Sergeant Ohle was being untruthful to**
15  **protect Officer Manganiello?**
16       MS. FROMMER: Objection. You
17  can answer.
18   A   Not to protect Manganiello, but
19  they are officers involved here in his unit,
20  okay. I don't know what he -- I know Cobb
21  didn't say that to me.
22   **Q**   **Did you ask Sergeant Ohle if**
23  **Cobb made a statement which was inconsistent**
24  **with what he was telling you?**
25       MS. FROMMER: Objection.

236

1          **Agostini**
2   A   I don't think I spoke to
3  Sergeant Ohle.
4   **Q**   **Was there a reason you didn't**
5  **speak to Sergeant Ohle?**
6   A   I just wanted to speak to Cobb.
7   **Q**   **I'm showing you Exhibit No. 4.**
8  **Have you seen this document before?**
9   A   I know I seen it before, yes. I
10  just have to read it.
11   **Q**   **Take your time.**
12   A   Yes.
13   **Q**   **At the point in time you**
14  **believed Mr. Cobb's statement provided**
15  **probable cause to believe Mr. Manganiello**
16  **was involved in the murder of Albert Acosta,**
17  **were you aware that Mr. Huello had given the**
18  **statement that's before you in Exhibit 4?**
19   A   Yes.
20   **Q**   **At any time did you attempt to**
21  **interview Mr. Huello?**
22   A   He was interviewed already by
23  Detective Martinez.
24   **Q**   **And you trusted Detective**
25  **Martinez; is that correct?**

237

1          **Agostini**
2   A   Yes, of course.
3   **Q**   **He is a good detective?**
4   A   Right.
5   **Q**   **He writes down things**
6  **accurately?**
7   A   I would hope so.
8   **Q**   **According to what the notes that**
9  **Detective Martinez took, Mr. Huello was**
10  **present when Mr. Cobb entered the basement,**
11  **correct?**
12       MS. FROMMER: Objection.
13  According to the DD5.
14   **Q**   **According to the DD5.**
15   A   According to the DD5, yes.
16   **Q**   **And according to the DD5, Mr.**
17  **Huello didn't see Officer Manganiello; is**
18  **that correct?**
19   A   Who are you saying?
20   **Q**   **According to the DD5, Mr. Huello**
21  **did not see Anthony Manganiello in the**
22  **basement, correct?**
23   A   Correct.
24   **Q**   **And the room where Mr. Huello**
25  **says he was was directly across from the**

238

1          Agostini
2    room where Mr. Acosta was later found,
3    correct?
4          MS. FROMMER: Objection.
5     A    That's correct.
6     Q    And Mr. Huello states that he
7    didn't hear any shots; is that correct?
8     A    That's what he states.
9     Q    And did that raise any concerns
10   to you as to the reliability of Mr. Cobb's
11   statement?
12    A    No, sir, because Mr. Huello came
13   after the shots, not before.
14    Q    So did that --
15    A    Because when he was going to go
16   into the basement and he saw him coming and
17   he told him to go this way and that way, Mr.
18   Cobb did go that way. He didn't enter the
19   basement.
20    Q    Are you sure about that?
21    A    That's what he stated to me.
22    Q    Mr. Cobb told you after he sees
23   Mr. Manganiello he left the vicinity and
24   then came back?
25    A    He said he walked up the street,

239

1          Agostini
2    but then came back saying like there is no
3    cops coming, you know.
4     Q    Did you make a note of that?
5     A    Did I make a note of that? I
6    know I interviewed him.
7     Q    Did you write it down?
8     A    I probably did. It's probably
9    with the file.
10    Q    Did you put it in the DD5?
11    A    I don't know. I don't think so.
12    Q    Is that an important piece of
13   information?
14    A    Yes. He was already
15   interviewed.
16    Q    Did you ever prepare a DD5
17   concerning an interview with Walter Cobb?
18    A    I don't know. You'll have to
19   show me. I don't remember.
20    Q    I am going to show you what has
21   been marked as Plaintiff's Exhibit 1.
22   According to the DD5 in front of you in
23   Exhibit 1, did Mr. Cobb tell your fellow
24   detective, Detective Martinez, that he
25   walked up the block and came back, or did he

240

1          Agostini
2    tell Detective Martinez that as the door was
3    closing after Mr. Manganiello left he
4    grabbed the door to keep it from closing and
5    entered?
6          MS. FROMMER: Objection.
7     A    That's what he is saying to
8    Detective Martinez, yes.
9     Q    And there is no reason for
10   Detective Martinez to write down something
11   incorrectly, correct?
12        MS. FROMMER: Objection.
13    A    Correct.
14    Q    Did it concern you that Mr. Cobb
15   was telling you a different story than he
16   had told Detective Martinez?
17        MS. FROMMER: Objection.
18    A    Well, I interviewed Cobb, okay,
19   and I don't think this either going through
20   the door -- when I interviewed him he says
21   that he told him to go that way, and Cobb
22   said, "I started to walk up, but then I
23   stopped." He didn't see anything else, so
24   he came back. He went through the door and
25   he continued his work. He didn't mention

241

1          Agostini
2    anything about the door closing or anything
3    like that to me.
4     Q    Did the fact that Mr. Cobb had
5    given inconsistent statements to you and to
6    Detective Martinez cause you any concern?
7          MS. FROMMER: Objection.
8     A    To me the door thing, that's not
9    a big deal to me.
10    Q    Is it a big deal that Mr. Cobb
11   immediately after allegedly seeing Mr.
12   Manganiello leave the building entered the
13   basement and Mr. Huello was already in the
14   basement at the time and didn't hear any
15   shots? Is that significant?
16        MS. FROMMER: Objection.
17    A    It was after, correct? He
18   noticed Mr. Huello after the shots, not
19   before.
20    Q    Sir, according to the statement
21   that Mr. Huello gave to Detective Martinez
22   in Exhibit No. 4, Mr. Huello states that he
23   was in the basement at the point in time
24   that Cobb entered the basement, correct?
25        MS. FROMMER: Objection.

dalco

242

```
 1          Agostini
 2    A    At what time?
 3    Q    Look at the DD5.
 4    A    At what time did he come into
 5  the basement?  It could have been -- when he
 6  came to the basement it was after the shots.
 7    Q    Sir, according to --
 8    A    When he told him to go that way
 9  and he started walking that way and he came
10  back to the basement and opened the basement
11  and he went into the basement, that's when
12  the Verizon guy was there.  That was after
13  the shots.
14    Q    Sir, anywhere, is there any
15  written record that Cobb told you, ever
16  stated to anybody that after he heard the
17  shots he left the area and then came back?
18        MS. FROMMER:  Objection.
19    A    I don't know that.  I don't know
20  if -- I know he told me that.  I don't know
21  whether he told that to anybody else.
22    Q    Would you put that in a DD5 if
23  he told you that?
24    A    Sometimes no.  Sometimes he was
25  already interviewed.  I mean him walking
```

243

```
 1          Agostini
 2  over there and coming back, I don't think
 3  that's a big deal.
 4    Q    Sir, if Mr. Huello entered the
 5  basement prior to Mr. Cobb being on the
 6  scene and if he was there continuously until
 7  Cobb arrives and he doesn't hear any shots,
 8  is that significant to you?
 9        MS. FROMMER:  Objection.
10    A    I don't know if he was there or
11  not.  He could have came in through the
12  back.  I don't know.
13    Q    Did you make any attempt to
14  interview Mr. Huello to find out?
15    A    Well, no.  He was interviewed
16  already.
17    Q    Sir, what time does Mr. Cobb say
18  he entered the basement?
19    A    I don't remember.
20    Q    If you look at his statement to
21  Detective Martinez, does that refresh your
22  recollection?
23    A    He says 10:10.
24    Q    Did you ever try to find out
25  what time Mr. Huello actually entered the
```

244

```
 1          Agostini
 2  basement?
 3    A    If it's not there I can't
 4  remember.
 5    Q    Did you ever speak with an SPO
 6  Nieves?
 7    A    I spoke to a lot of SPO's.  I
 8  don't know who is who.
 9    Q    Did you ever let Lieutenant
10  Scott know that you found gambling
11  paraphernalia and a knife on Mr. Booth?
12        MS. FROMMER:  Objection.
13    A    Did I let him know?  I let him
14  know everything about the case.
15    Q    Did you also let Lieutenant
16  Scott know that information provided by
17  Terrence Alston turned out to be false?
18        MS. FROMMER:  Objection.  You
19    can answer.
20    A    Of course.
21    Q    Did he authorize you to continue
22  speaking with Terrence Alston or using him
23  as an informant on this investigation?
24    A    He doesn't have to authorize me
25  to do anything.  It's my case.
```

245

```
 1          Agostini
 2        MS. FROMMER:  Objection.
 3    Q    Did he express any concerns to
 4  you?
 5    A    No.
 6    Q    Did he express any concern about
 7  you not providing the gambling paraphernalia
 8  to the vice squad?
 9        MS. FROMMER:  Objection.
10    A    No.
11    Q    Did he approve of what you were
12  doing?
13        MS. FROMMER:  Objection.
14    A    I don't know whether he approved
15  or not.  I can't say he was jumping up for
16  joy.  I don't know.
17    Q    By the way, before you signed
18  the felony complaint, did you discuss with
19  any of your supervisors what evidence there
20  was to provide probable cause against
21  Anthony Manganiello for the homicide of
22  Albert Acosta?
23        MS. FROMMER:  Objection.
24    A    I can't remember, sir.
25    Q    Did you ever advise ADA Scaccia
```

250

Agostini

1  
2  phone, that he really didn't see who shot
3  the person, who shot the person.
4  **Q   Did you take a written statement**
5  **from him?**
6  A   No. I just made a DD5 on it.
7  **Q   Did that sound believable to you**
8  **at the time?**
9  A   Yes.
10  **Q   Did you do any further**
11  **investigation into this individual?**
12  A   Might have. I don't know
13  whether I did a check on him or not, but I
14  wouldn't know. I don't know.
15  **Q   Would you consider the statement**
16  **given to you by that cab driver and the**
17  **statement given to you by Mr. Vasquez to be**
18  **inconsistent?**
19  MS. FROMMER: Objection.
20  A   Inconsistent, no. What do you
21  mean inconsistent?
22  **Q   In other words, did he tell the**
23  **gentleman, did the cab driver tell you he**
24  **was speaking on the phone saying he**
25  **witnessed the incident, then he told you a**

251

Agostini

1  
2  different story?
3  A   Yes. He basically said what the
4  cab driver said, but he said that it was a
5  lie. He was making things up over the
6  phone.
7  **Q   Did that raise any suspicions**
8  **for you?**
9  A   No.
10  MR. JOSEPH: Let's have this
11  marked as the next exhibit.
12  (Document was marked as
13  Plaintiff's Exhibit 28 for
14  identification, as of this date.)
15  **Q   Sir, I'm showing you what has**
16  **been marked as Exhibit 28. I will ask you**
17  **if you have ever seen this document?**
18  MS. FROMMER: For the record,
19  that's Bates stamped 801.
20  A   Okay.
21  **Q   Have you seen this document**
22  **before?**
23  A   Yes.
24  **Q   Is this a document that you**
25  **utilized as part of your investigation into**

252

Agostini

1  
2  **the homicide of Albert Acosta?**
3  A   Yes.
4  **Q   And according to this document,**
5  **SPO Nieves went to get the key for Mr.**
6  **Huello, the Verizon employee, at about 9:25,**
7  **correct?**
8  MS. FROMMER: Objection.
9  A   He was directed to pick up, yes.
10  **Q   And how far is the main security**
11  **office to 1700 Metropolitan Avenue?**
12  MS. FROMMER: Objection.
13  A   It's far. I don't know how far.
14  By miles I don't know, but it's not across
15  the street.
16  **Q   Are you aware that Mr. Nieves**
17  **was using a vehicle?**
18  MS. FROMMER: Objection.
19  A   No, I don't.
20  **Q   By the way, did Mr. Huello**
21  **remain at the scene of the basement, or did**
22  **he go with Mr. Nieves?**
23  A   I didn't talk to him. I didn't
24  talk to Huello.
25  **Q   Did this ever raise any concerns**

253

Agostini

1  
2  to you that the information that Mr. Cobb
3  was giving you was accurate?
4  MS. FROMMER: Objection.
5  A   I always thought Mr. Cobb was
6  accurate, always.
7  **Q   But did you look at any of the**
8  **other information or documents in your file**
9  **which may have indicated otherwise?**
10  MS. FROMMER: Objection.
11  A   No.
12  **Q   By the way, was a Band-Aid taken**
13  **off Mr. Manganiello's hand?**
14  A   I saw a Band-Aid. I don't know
15  if it was taken or who took it.
16  **Q   Do you know if any tests were**
17  **done on it?**
18  A   I don't remember if there were
19  tests made or what it came back to. I can't
20  remember that.
21  **Q   By the way, did you ever tell**
22  **the ADA that there was this other person**
23  **riding in a cab talking about the murder?**
24  A   Sir, she has all the DD5's. I
25  probably told her. I don't know if I -- you

64 (Pages 250 to 253)

258

1     Agostini
2  me.
3     Q    Why don't you take a look at
4  Plaintiff's Exhibit 29.
5            MS. FROMMER: Again, this is a
6     document that has not only yellow
7     highlighting but handwritten notations
8     and circles in the upper right-hand
9     corner.
10    Q    Sir, is this a document that you
11 created?
12    A    Yes.
13    Q    Can you tell me what part of
14 that document you created?
15    A    Which part?
16    Q    Sir, apart from the yellow
17 highlights and the statement "two weeks
18 later," did you create the rest of the
19 information on this document, except for
20 what I just said?
21    A    Yes.
22    Q    Now, did PO's Rodriguez and
23 Ortiz change their story at all when they
24 spoke with you on March 1, 2001?
25           MS. FROMMER: Objection.

259

1     Agostini
2     Q    Did Police Officers Ortiz and
3  Rodriguez give you a slightly different
4  story than they had given to Mr. Martinez on
5  the day of the incident?
6            MS. FROMMER: Objection.
7     A    Yes.
8     Q    And do you have any explanation
9  to why the statement given to you was
10 different than the one given to Mr.
11 Martinez?
12           MS. FROMMER: Objection.
13    A    Why? No. This is the statement
14 that I took, and that's the statement
15 Detective Martinez took.
16    Q    And would the statement that Mr.
17 Manganiello left separately from the
18 officers fit into your theory of the case
19 better than the statements that Mr. Martinez
20 took?
21           MS. FROMMER: Objection.
22    A    Say it again, sir.
23    Q    In other words, would the fact
24 that Mr. Manganiello left with two police
25 officers tend to undermine Cobb's story?

260

1     Agostini
2            MS. FROMMER: Objection.
3     A    No, no. Because it says here,
4  "When they completed they all left." We
5  don't know who is "all," and the Parkchester
6  cop left. So he could have left at any
7  time.
8     Q    Are you aware of Detective
9  Martinez testifying yesterday?
10    A    They are not saying they left
11 together. They are saying they all left and
12 the Parkchester cop left. It's not saying
13 what time that he left.
14    Q    So it's your testimony that you
15 don't believe Exhibit No. 6 states that Mr.
16 Manganiello and Officers Ortiz and Rodriguez
17 left at the same time?
18           MS. FROMMER: Objection.
19    A    I don't know. I wasn't there.
20    Q    Did you ever question Police
21 Officer Ortiz and Rodriguez as to why this
22 seems to indicate they left at the same time
23 as Mr. Manganiello?
24    A    No.
25           MS. FROMMER: Objection.

261

1     Agostini
2     A    No, I didn't question them on
3  that.
4     Q    Did you give any consideration
5  to the fact that Officers Ortiz and
6  Rodriguez told Detective Martinez on the day
7  of the incident that Officer Manganiello
8  seemed perfectly normal?
9            MS. FROMMER: Objection.
10    A    Why wouldn't he be normal?
11    Q    Sir, did you give that fact any
12 consideration?
13           MS. FROMMER: Objection. You
14    can answer.
15    A    No, sir. This call if it did
16 come it came in before the shooting, so he
17 would be calm.
18    Q    Sir, you made a point in
19 Exhibit No. 29 to write down that the
20 officers did not see Mr. Manganiello leave
21 the building; is that correct?
22           MS. FROMMER: Objection.
23    A    Correct.
24    Q    Did that statement in your eyes
25 support what Mr. Cobb was saying?

262

1          **Agostini**
2          MS. FROMMER:  Objection.
3      A    Well, it didn't support
4  anything.  It was just that they didn't see
5  him leave the building.
6      **Q    Now, if they did —**
7      A    That it could be a possibility
8  that he is still in the building or he is
9  somewhere.
10     **Q    But if he did leave the**
11 **building, then is it fair to say that it**
12 **makes it less likely that he's still in the**
13 **building?**
14         MS. FROMMER:  Objection.
15     A    No.  He could come back.
16     **Q    Sir, do you have any witness who**
17 **said that they saw Mr. Manganiello reenter**
18 **the building?**
19     A    No.
20     **Q    By the way, what date did you**
21 **interview Officers Ortiz and Rodriguez?**
22     A    On this one, it was March 1,
23 2001.
24     **Q    And did you take any handwritten**
25 **notes about what they said?**

263

1          **Agostini**
2      A    I probably did.
3      **Q    What happened to those**
4  **handwritten notes?**
5      A    That's with the case.
6      **Q    Do you know where they are**
7  **presently?**
8      A    They are missing.
9          MR. JOSEPH:  I think that's all
10 I have.
11         MS. FROMMER:  Let's take a few
12 minutes.
13         (Whereupon, a recess was taken.)
14         MS. FROMMER:  I have nothing.
15         (Time noted:  3:27 p.m.)
16
17
18
19
20
21
22
23
24
25

264

1
2          A C K N O W L E D G M E N T
3
4  UNITED STATES DISTRICT COURT)
5                              ss:
6  SOUTHERN DISTRICT OF NEW YORK)
7
8          I, DET. LUIS AGOSTINI, hereby
9  certify that I have read the transcript of
10 my testimony taken under oath in my
11 deposition of DECEMBER 20, 2007; that the
12 transcript is a true, complete and correct
13 record of what was asked, answered and said
14 during this deposition, and that the answers
15 on the record as given by me are true and
16 correct.
17
18
19          DET. LUIS AGOSTINI
20
21 Subscribed and sworn to
22 before me this    day
23 of      , 2008.
24
25      NOTARY PUBLIC

265

1          I N D E X
2
3  WITNESS      EXAMINATION BY        PAGE
4  DET. LUIS    MR. JOSEPH           4
5  AGOSTINI
6
7          E X H I B I T S
8  PLAINTIFF'S EXHIBITS
9  FOR IDENTIFICATION              PAGE

10     11      Document       27
11     12      Document       30
12     13      Two-Page document   39
13     14      Document       65
14     15      Two-page document  84
15     16      Document       101
16     17      Document       136
17     18, 19  Documents      140
18     20, 21  Documents      143
19     22      Two-page document  160
20     23      Document       186
21     24      Document       201
22     25      Document       233
23     26, 27  Documents      248
24     28      Document       251
25     29      Document       254

**dalco**
court reporting & legal video

67 (Pages 262 to 265)

149:3 177:5 248:6
names 224:12
Napalotano 205:2
narcotics 14:11 17:19
   17:19
NASSAU 266:4
necessarily 33:11
   138:25
need 147:22 162:25
   164:4 198:25 199:2
   211:5 228:20
negative 71:3 73:20
   136:17,21 156:16
   157:12 247:12,23
negatives 100:14,21
neighborhood 214:3
   214:12 246:17,19
never 5:19,20 18:16
   34:23 73:18 77:20
   77:21 105:21
   108:13 187:8
   210:23 211:19
   212:7,10,11 218:20
   220:3,4,8
New 1:2,7,8,9,9,10,11
   1:12,14,15,15 2:3,4
   2:5 3:6,12,14,14
   5:4,14,14 37:24
   74:14,22 106:21
   264:6 266:2,8
Nieves 1:12 244:6
   252:5,16,22
night 51:20 95:11
   96:2 113:22 115:7
nine 207:13
normal 32:2 136:13
   261:8,10
Notary 2:4 4:15 5:3
   264:25 266:7
   267:25
notations 42:25
   258:7
note 37:16 80:5 91:5
   103:8,13 104:4,5,12
   105:3 106:6 108:8
   108:12,14,16,24
   109:6,7,17,21,24
   110:2,9,11,14,20,23
   111:16,20 112:11
   113:7 141:21 239:4
   239:5
notebook 24:22,25

25:2,3,5
noted 263:15
notes 31:22 32:3,16
   32:21 33:3,9,19,24
   37:14,20 42:19
   82:21 94:17 115:19
   117:10,17 160:25
   161:8 176:14,16
   181:25 182:3 237:8
   255:21 262:25
   263:4 266:16
notice 83:3
noticed 241:18
notification 136:11
   136:21
number 43:18,24
   46:9,24 47:7,8
   48:24 49:3,10
   51:24 91:9 124:17
   125:4 129:10
   130:13 183:20
   233:19
numbers 219:25
   220:8 224:13
numerous 202:20
NYPD 29:15 42:21
   103:2,3
N-E-V-E-R 105:25

O

O 4:1 5:1 264:2
oath 106:5 264:10
object 17:18 42:16,22
   190:6
objecting 40:6
objection 13:15
   14:19 16:16 17:11
   18:4,14,22 19:11
   20:19 21:4 27:10
   30:13 31:11,18
   32:6,13,17,23 33:5
   33:10,20 36:18,25
   37:18 38:2,24
   40:23 42:4,10 43:9
   43:19 44:2,6,13,24
   45:3,8,12 47:2 48:5
   50:23 51:14 52:25
   54:6 55:6,16,21
   56:6,14 57:7,17
   58:5,13,25 59:7,12
   61:8,13,21 62:5,18
   62:22 64:12 65:3

67:19,24 69:4,17,25
   70:13,19 71:17
   72:7,18 74:6,17
   75:5 76:8 77:8,14
   79:12 80:14,20,24
   81:10,18,24 82:18
   83:25 85:14 88:16
   88:21 89:14 90:18
   90:24 91:6 92:15
   92:21 93:25 94:19
   94:23 95:16 96:12
   97:3,11,23 98:5,21
   99:18 101:9,14
   103:23 105:15
   108:19 109:3,15,22
   114:3 115:21
   116:17 117:5,13
   118:18 119:3
   120:10,17 123:23
   125:10,16,24
   126:11 128:21
   129:3,13,17 131:5
   132:10,19 133:4
   138:24 139:4,13,20
   143:2 144:24
   146:24 147:18
   148:8 150:6 152:12
   153:18,24 154:11
   154:24 155:16,20
   155:25 156:24
   158:21,25 159:14
   160:10 161:3 163:8
   165:18 166:4,22
   168:2 169:6 170:3
   170:8,18,22 171:3
   171:12,22 172:18
   172:23 173:14,20
   173:25 175:9,15
   177:7 179:3 180:18
   181:2,8,13,16,22
   182:9 183:12,22
   184:3,19 185:21
   186:5 189:20,24
   190:4 191:14 192:2
   195:12,18 197:24
   198:14,23 199:5,12
   199:16,20 200:23
   201:5 202:14 203:6
   203:13 205:15
   207:4 209:2,9
   213:15 214:10,22
   216:3,9,20 217:11

218:10,14,19 219:6
   219:12 220:2,19,24
   222:16 223:13
   225:21 226:2,15
   227:5,12,24 228:13
   229:14,21 230:10
   230:21 231:3 234:8
   234:16 235:4,16,25
   237:12 238:4 240:6
   240:12,17 241:7,16
   241:25 242:18
   243:9 244:12,18
   245:2,9,13,23
   246:10,15 247:22
   249:4 250:19 252:8
   252:12,18 253:4,10
   254:18 255:8 256:4
   256:24 258:25
   259:6,12,21 260:2
   260:18,25 261:9,13
   261:22 262:2,14
objections 4:5
obtain 94:13 96:22
   97:2,9 203:5,12
   207:3
obtained 169:22
   205:3,4 208:11
obtaining 94:16
   204:6
obviously 142:19
   207:24
occasion 156:23,25
occur 193:14
occurred 154:8
   165:13 234:12
October 167:5,9,17
   170:7,9,11 171:4
odd 148:10 191:10
offhand 257:4
office 24:16 37:17
   72:5 74:25 75:9,24
   76:7 83:6,12,20
   95:6,8 104:11
   126:22 127:14
   157:9 172:25,25
   182:23 184:25
   185:5,7 186:16,18
   188:5,12 192:8,12
   192:16 193:4 198:3
   200:14 205:2
   252:11
officer 1:11,12,13

11:15,24 12:3,5,13
   19:21,22,23 20:8,9
   20:18 21:3 30:12
   38:5,7 86:13
   162:24 163:14
   166:8 174:16 178:5
   178:13 179:2 180:3
   228:7,12 235:15
   237:17 254:15,20
   254:23 255:18,19
   255:21,25 256:6
   257:2 260:21 261:7
officers 30:12 31:15
   44:20 127:4 142:8
   235:19 256:23
   257:6,7,7,14,24
   259:2,18,25 260:16
   261:5,20 262:21
officer's 235:3
Oh 105:2
Ohle 30:10 141:2,5
   141:15 234:3,15,18
   234:19,22 235:14
   235:22 236:3,5
okay 14:24 21:6
   51:16 60:22 95:25
   111:5 114:12
   129:20 143:21
   151:19 155:10
   162:9 171:16 180:2
   186:13 188:7 192:9
   209:20 212:3,5
   224:21,21 225:3
   228:22 235:20
   240:18 251:20
old 188:19,20 189:17
older 190:3
once 11:16 18:6
   56:10 69:9 91:6
   113:5 121:7 123:16
   123:17 175:24
open 128:22
opened 101:5 232:8
   242:10
opening 232:8
operating 86:20
operations 220:18,23
opinion 79:23
opposed 50:12
order 2:2 142:25
ordering 88:14
organization 199:10



organized 215:22
216:13,18 222:19
225:25 231:2 246:9
originals 100:10
Ortiz 38:5 256:23
257:8 258:23 259:2
260:16,21 261:5
262:21
OSORIO 3:3
outcome 266:20
outside 78:21 87:10
125:3 176:10 232:2
234:5,14
oval 26:10 84:21
overheard 210:10
229:23
owed 217:14,19
owned 219:16,17,20
owner 146:15 210:9
o'clock 63:17,21

P

P 3:1,1 4:1
pad 191:3
page 107:12,17,23
108:7 111:13 112:2
112:2,17,18,19
123:7,8 207:13
pages 106:25 112:25
paper 42:18,24 97:9
97:21 111:10 191:4
224:11
papers 7:23
paperwork 59:23,24
96:25 98:7 112:23
145:23,25 202:18
202:20,21,23
204:12
paragraph 212:15
paraphernalia
226:12 244:11
245:7
parents 188:21
park 189:19,21 190:5
20:8,18 21:3,18
25:23 26:17 27:6,8
28:23 29:15 30:7
30:11 31:7 35:2
39:7 44:20 86:4,5
36:15,24 102:16

110:25 141:3 154:5
159:10,21 162:24
163:14 165:24
171:6 174:15
175:12,13 178:4,13
178:25 188:24
199:11 201:16
212:2,8,19 217:19
221:6 228:7,12
235:6 247:3 260:5
260:12
parked 221:5
Parker 1:9 8:16,19
8:22 9:6,13,19
149:17 150:2
157:18 173:6,7,11
184:24 185:12
188:10 192:8,14
195:4,11,17,20
198:7 200:9,13
246:5
part 16:4 32:2,4
64:10 82:15,16
117:11 138:20
151:17 153:25
165:5 169:3 170:14
171:14 174:9
206:18 213:12
215:8 251:25
254:11,12 256:17
258:13,15
partially 207:7,8,17
particular 12:9 16:9
27:7 156:25 224:5
parties 4:4,9 266:18
partner 22:14 44:17
58:17,19
partnered 19:9 44:21
parts 143:16
pass 215:13 222:18
passed 215:15
passenger 248:10
249:21
patrol 20:8 35:24
235:2
patrols 89:12
pedigree 42:13 45:18
45:25 46:3
penal 227:11
people 15:17 30:20
30:24 32:4 34:9
53:21,22 61:25

62:9 64:7 74:13,21
75:2 102:20 106:20
138:21 164:13
169:4 170:20,24
219:25 229:17,20
230:15 235:7,7
254:16 255:10
257:22
Perez 1:11 254:15,20
254:23 255:17,19
255:22,25 256:6
perfectly 261:8
perform 64:25
performed 217:23
performing 168:7
peril 19:22
period 117:24 131:16
permitted 91:23
person 9:9 17:5,7
20:16 21:19 34:20
47:7 58:4 134:6,11
152:3,4 156:7,10,20
161:12,13,13 180:2
180:9,20 182:13,19
188:13 191:18,19
191:20,20 192:6,19
197:11,12 225:5,6
232:5 249:5,25
250:3,3 253:22
personal 120:8,12
123:21 139:17
147:16
personally 175:25
176:5
personnel 34:10
36:21
personnel's 111:4
person's 43:7 77:12
pertinent 228:25
Phipps 1:12 10:10,12
phone 47:6,8 53:20
94:18 176:13
179:14,15,17
184:18,21 248:3,11
250:2,24 251:6
phones 176:25
photo 160:12 212:4,5
photocopies 100:9
photographs 100:15
phrase 57:15
physically 128:2
204:11

pick 220:5 252:9
picked 93:23 221:21
222:4,7
picking 46:16,17,20
picture 160:12
pictures 100:2
piece 42:18,24 68:22
69:2 97:9,20 175:7
239:12
pistol 98:23 99:2,3,5
99:7,11 101:6
pizza 210:9,11
pizzeria 145:11,17,21
146:15 148:6
219:16,22,24 220:4
220:4,7,9,11,13,17
222:5 228:18 229:7
229:17,19
place 120:14 121:15
121:23 123:21
124:4,6 125:13,15
137:14,15 219:24
266:11
placed 12:13 60:5
63:6,15 118:6,9,10
118:12 194:22
Plains 3:6 93:24
Plaintiff 1:4 3:4
Plaintiff's 28:2 30:3
39:25 65:8 84:8
101:24 136:5 140:4
143:7 160:22
177:13 178:17
186:25 187:4,21
196:9 201:12
233:13 239:21
248:15 251:13
254:7 256:11
257:17 258:4 265:8
play 188:3,6
playing 182:11,14,15
182:16
Plaza 5:14
plea 125:15 128:15
171:14
pleading 171:5
please 5:10 85:15
92:7 114:10 175:15
248:13
pled 167:11
pocket 222:23 223:3
223:6

point 21:21 22:24
26:18 31:6 36:5
38:18 53:14 54:10
58:8,22 64:15
77:17,24 89:11,17
89:24 90:5 95:3,22
98:11 113:13
115:14 141:15
158:15 165:22
181:15 185:6
200:12 208:3
210:21 216:8,14,23
219:8 223:16 224:6
226:13 236:13
241:23 261:18
pointed 212:4
police 1:8,9,10,10,11
1:12,14,15,16 5:14
11:14,24 12:3,5,13
31:15 34:10 36:21
37:24 47:4 58:2
74:15 87:6 91:20
92:3 171:18,19,24
255:18,19,21,25
256:6,23 257:7,13
259:2,24 260:20
portions 233:19
positive 73:20
possession 69:24
76:18,19 92:19,20
100:20 110:24
111:15 114:18,21
115:11,14 122:15
163:6 167:12
197:23 199:3
223:20,24
possibility 26:22
217:3 262:7
possible 32:20 154:9
226:11
post 86:5 87:4,5,8
PO's 258:22
practice 32:3,10
138:20 147:14
practices 83:11,19
pray 105:17
precinct 1:13 19:17
34:7 35:15,19,23
36:3 38:11,20
43:15,25 55:25
56:13 64:23 69:2
71:12,20 85:6,7,8

8
8
9
9
1
1
12
12
12
17
22
22
25
preju
prepa
prepa
161
239
prepa
66:1
140:
prepa
prepri
presen
193:
present
41:17
62:15
87:22
103:4,
174:2
200:1?
203:18
206:2?
237:10
presente
203:23
207:7,8
presentin
208:13,
presently
Presentm
208:10
pretrial 1(
108:22
Pretty 62:2
Previous 1
Previously
177:13 2
Price 162:2
Prior 12:19
13:4,7,10,



82

Agostini

1  Agostini
2  I'm not going to write what everybody else
3  says, you know, between me and him.
4  **Q   Well, sir, were you a detective**
5  **assigned to the investigation of the**
6  **homicide of Albert Acosta?**
7  A   No.  Detective Abate was.
8  **Q   I didn't ask you if you were a**
9  **lead.  I asked you if you were a detective**
10  **assigned to that.**
11  MS. FROMMER:  You can answer if
12  you were a detective assigned to the
13  case.
14  A   I was assisting.
15  **Q   As part of being an assistant,**
16  **was it part of your job to document**
17  **evidence?**
18  MS. FROMMER:  Objection.
19  A   Yes.
20  **Q   Did you ever take any**
21  **handwritten notes stating that a lawyer**
22  **said, that Mr. Manganiello's lawyer said,**
23  **"Was it intentional?"**
24  A   I can't remember whether I took
25  one or not.

83

1  Agostini
2  **Q   Sir, do you know what a 71030**
3  **notice is?**
4  A   No.
5  **Q   Are you aware that there is a**
6  **disclosure that a district attorney's office**
7  **has to make to a defendant identifying what**
8  **statements are attributed to him?**
9  MS. FROMMER:  Are you asking
10  whether he is familiar with the
11  practices of the Bronx District
12  Attorney's office?
13  MR. JOSEPH:  Yes.
14  MS. FROMMER:  You can answer if
15  you can, Detective.
16  A   Are they supposed to give
17  evidence?
18  MS. FROMMER:  No.  Are you aware
19  of the practices and procedures of the
20  Bronx District Attorney's office?
21  THE WITNESS:  No.
22  **Q   Sir, do you know of any reason**
23  **why the district attorney would not disclose**
24  **that statement had it been made?**
25  MS. FROMMER:  Objection.  I am

84

1  Agostini
2  going to instruct him not to answer
3  questions about what an attorney's
4  mindset is or is not.
5  MR. JOSEPH:  Let's have this
6  marked, a two-page document.
7  (Two-page document was marked as
8  Plaintiff's Exhibit 15 for
9  identification, as of this date.)
10  **Q   Sir, I show you what has been**
11  **marked as Exhibit No. 15.**
12  MS. FROMMER:  This was disclosed
13  to me?
14  MR. JOSEPH:  Yes.
15  **Q   Sir, do you recognize that**
16  **document?**
17  A   No, I do not.
18  **Q   Sir, did you tell any of the**
19  **assistant district attorneys that Anthony**
20  **Manganiello had said to you that at**
21  **12:10 p.m., "I was at the oval when the call**
22  **came over"?**
23  A   I don't remember that, no.
24  **Q   Did you inform the assistant**
25  **district attorney of everything that Anthony**

85

1  Agostini
2  **Manganiello had said to you?**
3  A   Yes.
4  **Q   Now, where did you go after**
5  **Anthony Manganiello's brother left the**
6  **precinct?**
7  A   Stayed at the precinct.
8  **Q   Did you stay at the precinct**
9  **until your tour was over that day?**
10  A   I'm not sure.  I can't remember.
11  **Q   At any time, did you have a**
12  **conversation in which Anthony Manganiello's**
13  **brother, Mario Manganiello, was mentioned?**
14  MS. FROMMER:  Objection.  Could
15  you repeat that, please.
16  **Q   Did you have a conversation with**
17  **any other detectives or your supervisor**
18  **discussing Mario Manganiello, Anthony**
19  **Manganiello's brother?**
20  MS. FROMMER:  At any time?
21  MR. JOSEPH:  On February 12,
22  2001.
23  A   Yes.
24  **Q   What was said?**
25  A   Basically when we were at the

22 (Pages 82 to 85)

dalco
court reporting & legal video

86

```
 1          Agostini
 2  precinct something about a call came up that
 3  his brother, I guess his car was in
 4  Parkchester and his brother was seen by
 5  Parkchester, and there was a foot post,
 6  meaning a cop guarding the car, and when his
 7  brother saw the cop he fled, the brother
 8  fled in a car. That's what was said.
 9      Q    In whose car did he flee?
10      A    I don't know. I don't know
11  whose car he fled in.
12      Q    So you are saying there was a
13  uniformed officer from the 43rd Precinct
14  guarding Anthony Manganiello's car in
15  Parkchester, correct?
16      A    That's correct.
17      Q    Do you know how they saw or
18  identified Mario Manganiello?
19      A    No, I don't.
20      Q    Was he operating the vehicle at
21  the time?
22      A    I believe he was in a vehicle.
23      Q    When he saw the cop at
24  Parkchester, what do you mean he fled?
25      A    My understanding, because I
```

87

```
 1          Agostini
 2  wasn't there, my understanding was that I
 3  don't know whether he was going to approach
 4  the car or not, but the foot post came up.
 5      Q    What do you mean foot post?
 6      A    Police uniform guarding the car.
 7  When he came across and Mario saw the foot
 8  post there he went to his car and fled.
 9      Q    So is it your testimony that
10  Mario was actually outside of his vehicle?
11      A    I wasn't there.
12      Q    It's your testimony that it was
13  relayed to you —
14      A    I don't know whether he was out
15  of his vehicle or not.
16      Q    I asked you what was relayed to
17  you.
18      A    That wasn't relayed to me.
19      Q    What information if any was
20  relayed to you?
21      A    Just what I just said.
22      Q    Who was present with you when
23  that information was relayed to you?
24      A    Well, that came over basically
25  the radio, and I know Detective Shawn Abate
```

88

```
 1          Agostini
 2  was at the precinct and I was at the
 3  precinct. That's all I can remember.
 4      Q    What if anything did Shawn Abate
 5  say concerning Mario Manganiello?
 6      A    I don't know what he said.
 7      Q    Did you or Shawn Abate have any
 8  conversations with Lieutenant Scott
 9  concerning the presence of Mr. Mario
10  Manganiello somewhere around Anthony
11  Manganiello's car?
12      A    I don't remember that.
13      Q    Do you have a recollection of
14  anyone ordering that Mario Manganiello be
15  stopped?
16          MS. FROMMER: Objection.
17      A    I don't have a recollection of
18  that.
19      Q    Do you know if Mario Manganiello
20  was stopped and detained —
21          MS. FROMMER: Objection.
22      Q    — on February 12, 2001?
23      A    I don't know whether he was
24  stopped and detained, but he was brought
25  back to the precinct.
```

89

```
 1          Agostini
 2      Q    Do you know whose decision it
 3  was to bring Mario Manganiello back to the
 4  precinct?
 5      A    I do not know.
 6      Q    And by the way, did Shawn Abate
 7  bring Mario Manganiello back to the
 8  precinct?
 9      A    Shawn Abate was in the 43rd
10  Precinct with me.
11      Q    At the point in time that the
12  uniformed patrols brought Mario Manganiello
13  back?
14          MS. FROMMER: Objection. He
15      said he doesn't know who brought him
16      back.
17      Q    At the point in time when
18  somebody brought Mario Manganiello back to
19  the precinct, was Shawn Abate sitting in the
20  43rd Precinct with you?
21      A    He was at the 43rd Precinct with
22  me.
23      Q    How about Lieutenant Scott, was
24  Lieutenant Scott also with you at the point
25  in time that somebody brought Mario
```

23 (Pages 86 to 89)



dalco
court reporting & legal video