EXHIBIT **6**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x

ANTHONY MANGANIELLO,

                    Plaintiff,


          -against-


THE CITY OF NEW YORK, ET AL.,

                    Defendants.

-----------------------------------------------x


                    January 30, 2008

                    1:25 p.m.


          Deposition of Defendant DERRICK PARKER

pursuant to Notice, at the offices of

CORPORATION COUNSEL, 100 Church Street, New

York, New York 10007, before Stephen Kleinman,

a Notary Public within and for the State of

New York.

DALCO REPORTING. INC.170 Hamilton Avenue, White Plains, New York 10601
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com



**2**

APPEARANCES:

OSORIO & ASSOCIATES, L.L.C.
   Attorneys for Plaintiff
   184 Martine Avenue
   White Plains, New York 10601
BY:  MICHAEL H. JOSEPH, ESQ.


MICHAEL A. CARDOZO, ESQ.
   Corporation Counsel
   Attorney for Defendants
   100 Church Street
   New York, New York 10007
BY:  HILLARY A. FROMMER, ESQ.

**4**

1     S T I P U L A T I O N S
2
3    IT IS HEREBY STIPULATED AND AGREED by and
4  between the attorneys for the respective parties
5  hereto that all objections, except as to form,
6  shall be reserved to the time of trial.
7    IT IS FURTHER STIPULATED AND AGREED that
8  the sealing and filing of the within deposition
9  are hereby waived.
10    IT IS FURTHER STIPULATED AND AGREED that
11  the within deposition may be subscribed and sworn
12  to by the witness being examined before a Notary
13  Public other than the Notary Public before whom
14  this deposition was begun.

**3**

------------------ I N D E X ------------------
WITNESS     EXAMINATION BY    PAGE
DERRICK PARKER  MR. JOSEPH    5, 114
      MS. FROMMER    110


------------ INFORMATION REQUESTS ------------
DIRECTIONS (DI):  20, 33, 71, 72,90, 102, 102,
        103, 104, 105, 105, 107, 108,
        117, 118, 120, 120, 122
INSERT:    None
RULINGS (RL):    20, 33, 71, 105, 107, 120
REQUESTS (RQ):  53
CERTIFIED (CE):  None
MOTIONS (MO):  None


--------------- E X H I B I T S ---------------
PLAINTIFFS   DESCRIPTION    PAGE
Exhibit 30   Indictment    24
Exhibit 31   Book    55

**5**

1     P R O C E E D I N G S
2        * * * *
3  DERRICK PARKER, called as a
4    witness, having been duly sworn
5    by a Notary Public, was examined
6    and testified as follows:
7  EXAMINATION BY
8  MR. JOSEPH:
9    Q.   Could you please state your
10  name.
11    A.   Derrick Parker.
12    Q.   And what is your business
13  address.
14    A.   One Police Plaza, New York, New
15  York 10038.
16    Q.   Sir, have you ever given a
17  deposition before?
18    A.   Yes.
19    Q.   In what matter or matters have
20  you given a deposition before?
21    A.   Civil cases.
22    Q.   Okay.  What are the name or
23  names of the civil cases?
24    MS. FROMMER:  I am going to
25    object.  They were not in the context

6

PARKER

1
2     of his employment as a police officer.
3         MR. JOSEPH: I will rephrase
4     the question.
5         Q.    Were you ever involved in any
6     civil suit arising out of your work as a
7     police officer?
8         A.    No.
9         Q.    Okay.  Did you review any
10    documents prior to today's testimony?
11        A.    I did, yes.
12        Q.    Okay.  What documents did you
13    review?
14        A.    I saw a DD5 yesterday.
15        Q.    What DD5 was it?  What did it
16    pertain to?
17        A.    It pertained to the case that
18    we are here on.
19        Q.    What specifically was the DD5
20    about?
21        A.    About my involvement or the
22    trip to the DA's office with reference to
23    this case.
24        Q.    Are you currently employed?
25        A.    Yes.

7

PARKER

1
2         Q.    By whom?
3         A.    Self-employed.
4         Q.    What do you do?
5         A.    Security and PI work.
6         Q.    Okay.  At some point were you
7     employed by the City of New York?
8         A.    Yes.
9         Q.    Can you tell me approximately
10    what dates?
11        A.    From 1982 to 2002.
12        Q.    Can you tell me, in 2002, did
13    you retire, were you fired or something else?
14        MS. FROMMER:  Objection.  You
15    can answer.
16        A.    Retired.
17        Q.    Was there any particular reason
18    you retired?
19        A.    Twenty years.
20        Q.    Only because you had twenty
21    years in?
22        A.    That was one of the reasons,
23    yeah, twenty years.
24        Q.    Okay.  What were the other
25    reasons?

8

PARKER

1
2         A.    There was an incident arising
3     out of my brother going to Atlantic City on a
4     trip that the Department thought was
5     improper.
6         Q.    Okay.  Was there an IAB charge
7     arising out of that trip?
8         A.    It was kicked back to the
9     command level.  It wasn't IAB.
10        Q.    Okay.  Was there a sustained
11    finding in that matter?
12        A.    There was.
13        MR. JOSEPH:  Is there a reason
14    it hasn't been produced?
15        MS. FROMMER:  Because it was
16    not a civilian complaint.
17        Q.    Were there any other sustained
18    complaints arising out of your work as a
19    police officer?
20        A.    No.
21        Q.    What was the finding by the
22    command level?
23        A.    Warned and admonished.
24        Q.    What specifically were you
25    warned and admonished for?

9

PARKER

1
2         A.    That my brother's presence in
3     Atlantic City could have been interpreted --
4     that it could have been interpreted two
5     different ways.  That is what it was.
6         Q.    Okay.  Was there any other
7     reason you retired?
8         A.    No.  That was it.
9         Q.    What was your last assignment
10    prior to retiring?
11        A.    70 Detective Squad.
12        Q.    From approximately when to when
13    were you at the 70?
14        A.    From November of 2001 until I
15    retired in January of 2002.
16        Q.    Okay.  Prior to November 2001,
17    what was your assignment?
18        A.    The intelligence division.
19        Q.    From when to when were you in
20    the intelligence division?
21        A.    From 1999 to 2001.
22        Q.    What were your responsibilities
23    in the intelligence division?
24        A.    I was asked to create -- to
25    track the music industry as far as the

3 (Pages 6 to 9)

10

PARKER

1   investigations of rap and rap artists.
2   Q.   Okay. From 1999 through 2000,
3   was that your sole responsibility?
4   A.   Yes, and occasionally they
5   would ask me to do gang work.
6   Q.   Were you ever stationed at the
7   43rd Precinct?
8   A.   No.
9   Q.   Were you ever a homicide
10   detective?
11   A.   Yes.
12   Q.   Okay. From when to when,
13   about?
14   A.   1987 to '96.
15   Q.   And where were you a homicide
16   detective?
17   A.   75 Detective Squad, 81st
18   Detective Squad, Brooklyn North homicide and
19   Cold Case Squad.
20   Q.   Okay. And Brooklyn, that is
21   one the busiest homicide squads there are,
22   correct?
23   MS. FROMMER: Objection. You
24   can answer.

11

PARKER

1   A.   You said Brooklyn?
2   Q.   Correct. The Brooklyn homicide
3   squad that you were assigned to, is that one
4   of the busiest homicide squads?
5   A.   Yes, it is pretty busy.
6   Q.   Okay. So would it be fair to
7   say that you have an understanding of what is
8   necessary prior to commencing a murder
9   charge?
10   MS. FROMMER: Objection. You
11   can answer.
12   A.   I understand what details are
13   in a murder charge, yeah.
14   Q.   What standards, if any, were
15   there that had to be fulfilled before a
16   murder charge was brought against an
17   individual by the NYPD?
18   MS. FROMMER: At what time?
19   MR. JOSEPH: Let's start with
20   in 2000, 2001.
21   MS. FROMMER: He was not a
22   homicide detective in 2000 and 2001.
23   MR. JOSEPH: Okay.
24   Q.   In 2000 and 2001, as part of

12

PARKER

1   your gang and hip-hop activities, did you
2   also investigate murder cases?
3   A.   Yes.
4   Q.   Okay. And had the standards
5   changed at any point from when you started in
6   1987 through 2001 --
7   MS. FROMMER: Objection.
8   Q.   -- for commencing a murder
9   charge?
10   MS. FROMMER: Objection. You
11   can answer.
12   A.   I don't know what you mean by
13   "standards."
14   Q.   Okay. In your own words, when
15   you first began in 1987, what was necessary,
16   if anything, for the NYPD prior to arresting
17   somebody and charging them for murder?
18   A.   Well, there is a lot of
19   different factors. I mean to do a homicide
20   investigation, you just don't go about doing
21   a murder investigation. You have to have
22   witnesses. You have to have evidence. You
23   have to have ballistics evidence, forensic
24   evidence, things like that.

13

PARKER

1   I mean you just don't proceed
2   on arresting someone. I mean the DA has to
3   be involved. There is a lot of factors in
4   making an arrest.
5   Q.   Okay. You listed a bunch of
6   factors.
7   Was there any particular test
8   that had to be met prior to somebody being
9   arrested or charged with murder?
10   MS. FROMMER: Objection. You
11   can answer, if you know.
12   A.   I don't know what you mean by
13   "test."
14   Q.   Okay. We will come back to
15   that.
16   A.   Okay.
17   Q.   Prior to being a homicide
18   detective, what if anything did you do? What
19   was your assignment?
20   A.   I was an undercover cop in
21   narcotics.
22   Q.   Okay. Where?
23   A.   In the Bronx.
24   Q.   And from approximately when to

4 (Pages 10 to 13)

14

                    PARKER

1
2  when?
3      A.    From 1984 to 1987.
4      Q.    When you were an undercover cop
5  doing narcotics, was there also another
6  undercover detective Luis Agostini?  Did you
7  know him?
8      A.    I don't know him.
9      Q.    Okay.  Did you ever know Sean
10 Abate from undercover narcotics work?
11     A.    I don't know him either.
12     Q.    I think I asked you this
13 just in regard to the undercover narcotics
14 work.
15          But aside from the undercover
16 narcotics work, did you know Luis Agostini?
17     A.    No.
18     Q.    Okay.  How about, did you know
19 Lieutenant Harry Scott?
20     A.    No.
21     Q.    Did you know an Officer Alex
22 Perez?
23     A.    No.
24     Q.    Okay.  How about an Officer
25 Miriam Nieves?

15

                    PARKER

1
2      A.    It doesn't ring a bell, no.
3      Q.    Did you know an Officer Michael
4  Phipps?
5      A.    Him I know as inspector.
6      Q.    And what was your work history
7  or relationship with Michael Phipps?
8          MS. FROMMER:  Objection.  You
9  can answer.
10     A.    We had no work history.  He was
11 just the commanding officer, I think, of the
12 43rd Precinct.
13     Q.    Okay.  How did you come work
14 with Michael Phipps, if at all, during your
15 career?
16          MS. FROMMER:  Objection.  You
17 can answer.
18     A.    I never worked with Michael
19 Phipps.  Again, I explained to you, he was
20 the commanding officer of the 43rd Precinct.
21     Q.    Is he just someone whose name
22 you knew?
23     A.    Yes.
24     Q.    Okay.  Did you also know a John
25 McGovern?

16

                    PARKER

1
2          MS. FROMMER:  Objection.  You
3  can answer.
4      A.    No.
5      Q.    Okay.  How about Gerald
6  McCarthy?
7      A.    No.
8      Q.    And with respect to the time
9  you were in the intel department, did you
10 ever work with the detectives in the 43rd
11 Precinct?
12     A.    I met with some detectives,
13 yeah.
14     Q.    How often would you meet with
15 the detectives in the 43rd Precinct?
16          MS. FROMMER:  Objection.  You
17 can answer.
18     A.    Not often at all.
19     Q.    Was it on a case-by-case basis
20 or was it something more regular?
21     A.    It would be a case-by-case
22 basis.
23     Q.    And do you have any
24 recollection of a meeting with Detective
25 Agostini at all?

17

                    PARKER

1
2      A.    No.
3      Q.    Okay.  While you were at this
4  intelligence division, were you also
5  investigating narcotics cases?
6      A.    No.
7      Q.    Okay.  I am just trying to get
8  a feel for what you were doing.
9          As part of this hip-hop
10 intelligence division, were you investigating
11 crimes only related to hip-hop or were you
12 investigating other cases also?  And if you
13 were investigating other cases also, how
14 would that come about?
15          MS. FROMMER:  Objection.  You
16 need to break that down, because I
17 didn't understand what you were
18 asking.
19          MR. JOSEPH:  All right.
20     Q.    While you were in the
21 intelligence division, you told us you were
22 investigating hip-hop activities, so to
23 speak, correct?
24     A.    Correct.
25     Q.    Okay.  How would you come to

                            5 (Pages 14 to 17)

18

```
1              PARKER
2    investigate something other than a hip-hop
3    activity?
4           MS. FROMMER: Objection. You
5       can answer, if you can.
6       A.   If I was asked to do something
7    else, I would investigate it. If a CO, or
8    commanding officer, asked me to do something
9    else, I would.
10      Q.   And who was the CO? Did you
11   report to a specific CO or was it different
12   COs?
13      A.   Different.
14      Q.   Okay. Between 1998 and 2001,
15   were you actively investigating crimes that
16   occurred in the Bronx?
17          MS. FROMMER: Objection. You
18      can answer.
19      A.   I don't know about actively
20   investigating. I mean my job sends me all
21   around the five boroughs. So...
22      Q.   Did you ever know a gentlemen
23   named Albert Acosta?
24      A.   No.
25      Q.   Okay. Was he a hip-hop artist
```

19

```
1              PARKER
2    affiliated with hip-hop in any way?
3       A.   I don't know who he is.
4       Q.   Okay. Prior to February 12,
5    2001, did you ever know a gentleman named
6    Anthony Manganiello?
7       A.   No.
8       Q.   Did you know a gentlemen
9    Terrance Alston?
10      A.   Yes, I know a Terrance Alston.
11      Q.   How do you know Terrance
12   Alston?
13      A.   He was a confidential informant
14   of mine.
15      Q.   Okay. When did he become a
16   confidential informant of yours?
17      A.   I don't remember the year, but
18   he became a confidential informant of mine.
19   I don't remember the year.
20      Q.   Okay. Can you give me an
21   approximate?
22      A.   No.
23      Q.   How did Terrance Alston come to
24   become a confidential informant?
25      A.   He was incarcerated in a New
```

20

```
1              PARKER
2    York City correction division, correction
3    facility and he reached out to another
4    informant to talk to me.
5   *R  Q.   What informant did he reach out
6    to?
7   DI      MS. FROMMER: Objection. I am
8       going to instruct him not to answer.
9           MR. JOSEPH: Mark it for a
10      ruling.
11          MS. FROMMER: Okay.
12      Q.   What information were you given
13   by this other confidential informant
14   concerning Mr. Alston?
15          MS. FROMMER: Objection.
16      Without identifying the other
17      confidential informant, if you can,
18      give him the information, if you can.
19      A.   That he had information on a
20   crime.
21      Q.   Okay. Did he tell you what
22   crime?
23      A.   Mr. Alston did.
24      Q.   No.
25      A.   Who are you referring to now?
```

21

```
1              PARKER
2       Q.   The unnamed confidential
3    informant, did he tell you what crime Mr.
4    Alston had information on?
5       A.   No.
6       Q.   Okay. Do you know how this
7    other CI knew Mr. Alston?
8       A.   They were in the same cell
9    together.
10      Q.   At Rikers Island?
11      A.   Rikers.
12      Q.   Without identifying this CI,
13   this unnamed a CI, was he a member of any
14   criminal organization?
15          MS. FROMMER: Objection. You
16      can answer.
17      A.   Not that I know of.
18      Q.   Okay. Was he a member of the
19   Bloods?
20      A.   No.
21      Q.   Do you know if Mr. Alston was a
22   member of the Bloods?
23      A.   I believe he was a Blood.
24      Q.   What was the first thing you
25   did when you learned that this Mr. Alston
```

6 (Pages 18 to 21)

22

PARKER

1  might have information on a crime?
2  A.  Took down the information that
3  he had.
4  Q.  Okay. But my question is, did
5  you speak to him on the phone? Did you go to
6  Rikers Island?
7  A.  I went to Rikers.
8  Q.  Prior to going to Rikers
9  Island, did you do any investigating as to
10  why he was in Rikers Island?
11  A.  Yes, I ran his rap sheet.
12  Q.  Okay. And what happened to his
13  rap sheet after you ran it?
14  A.  It was given to the -- it was
15  placed in a folder for the informants and
16  given to the CO.
17  Q.  Okay. And what was on the rap
18  sheet?
19  A.  That he was arrested for
20  several crimes and he was incarcerated.
21  Q.  Was this sometime in -- was
22  this before or after he had been convicted of
23  these crimes?
24  MS. FROMMER: Objection.

23

PARKER

1  A.  Can you rephrase that question?
2  Q.  In other words, you said that
3  Mr. Alston was incarcerated at the point in
4  time when you met him, correct?
5  A.  Correct.
6  Q.  Okay. Had he already been
7  convicted or was he awaiting a trial?
8  A.  He was a pretrial detainee.
9  Q.  Pretrial detainee. At the time
10  that you met Mr. Alston, had he been
11  indicted?
12  A.  Not that I know of.
13  MS. FROMMER: Objection. You
14  can answer, if you can.
15  A.  Not that I know of.
16  Q.  Did you become aware of what
17  crimes he was being detained for?
18  A.  An assault.
19  Q.  Was it actually an attempted
20  murder?
21  A.  I don't remember that.
22  Q.  Okay.
23  MS. FROMMER: I just want to
24  clarify something on the record. You

24

PARKER

1  have been asking questions and I
2  believe Detective Parker has been
3  answering questions about the first
4  time when Mr. Alston was signed up,
5  when he first learned about Mr. Alston
6  to become a confidential informant.
7  THE WITNESS: Right.
8  Q.  Even if you can't us a date,
9  when you first met Mr. Alston, were you
10  already in this hip-hop intelligence unit?
11  A.  Yes.
12  MR. JOSEPH: Can I have this
13  marked as Plaintiff's Exhibit 30?
14  (Plaintiff's Exhibit 30,
15  indictment, marked for
16  identification.)
17  Q.  Sir, I will ask you to take a
18  look at what has been marked as Plaintiff's
19  Exhibit 30. Would you read through this and
20  let me know when you have had sufficient
21  opportunity.
22  MS. FROMMER: Just for the
23  record, this is a six-page document
24  that appears to have a stamp that says

25

PARKER

1  March 24, 1998, an indictment from the
2  Supreme Court State of New York,
3  County of Bronx.
4  A.  Okay.
5  Q.  Sir, does this document refresh
6  your recollection at all as to what charges
7  Mr. Alston was facing when you first met him?
8  MS. FROMMER: Why don't you ask
9  him if he has ever seen the document
10  before?
11  MR. JOSEPH: It is not a
12  required foundational question. I can
13  refresh his recollection. As they
14  said in my law school exam, I can
15  refresh it even with fettuccini.
16  MS. FROMMER: Okay. Well, I am
17  going to object to this line of
18  questioning. You haven't even asked
19  this witness if he has ever seen this
20  document. Now you are proceeding to
21  ask him questions about information on
22  a document that he may or may not have
23  ever seen.
24  Q.  I am asking, sir, does this

7 (Pages 22 to 25)

26

PARKER

1
2  refresh -- after looking at the document,
3  does this refresh your recollection as to
4  what charges, if any, Mr. Alston was facing
5  when you first met him?
6      A.    This does not, no.
7      Q.    Have you ever seen this
8  document before?
9      A.    No, I have not.
10     Q.    Okay. Other than running Mr.
11 Alston's rap sheet, did you do any
12 investigation into the crimes which he was
13 being charged with at the time?
14         MS. FROMMER: Objection. You
15 can answer.
16     A.    No.
17     Q.    Okay. Do you have any
18 recollection, one way or another, if you met
19 Mr. Alston after March 5, 1998?
20     A.    Yes. I was in the intelligence
21 division. Oh, no, sorry. Yeah, it would
22 have to be after 1998.
23     Q.    Okay. And what did Mr. Alston
24 say to you when you first met him?
25     A.    That he had information on a

27

PARKER

1
2  murder in the Bronx.
3      Q.    And when did you first meet
4  with him?
5      A.    When I went to Rikers Island.
6      Q.    And when was that?
7      A.    Before I retired.
8      Q.    Okay. Was that in the year
9  2000, the year 2001?
10         MS. FROMMER: I just want to
11 clarify.
12         Are you asking about the first
13         conversation that he ever had with
14         Terrance Alston?
15         MR. JOSEPH: Of course.
16         MS. FROOMER: The first time he
17         ever met him?
18         MR. JOSEPH: Correct.
19     Q.    What year was it when you first
20 met Terrance Alston?
21     A.    I don't remember that.
22     Q.    Do you recall what month or
23 what season it was?
24         MS. FROMMER: Objection. You
25         can answer.

28

PARKER

1
2      A.    No.
3      Q.    Did you take any written notes
4  concerning what Mr. Alston told you?
5      A.    I'm sure I did.
6      Q.    Okay. Where are those notes?
7      A.    I have been retired for six
8  years. I don't know.
9      Q.    What happened to the notes
10 after you took them?
11     A.    They were probably left in the
12 file somewhere.
13     Q.    Okay. What file were they left
14 in?
15     A.    Confidential informant file.
16     Q.    And what happens to the
17 confidential informant file?
18     A.    It gets filed with the
19 confidential informants.
20     Q.    Okay. So would it be fair to
21 say whatever Mr. Alston told you on that day
22 would still be sitting in the file somewhere
23 wherever the confidential informant files are
24 kept?
25         MS. FROMMER: Objection. You

29

PARKER

1
2  can answer.
3      A.    It could be. Or whatever he
4  told me, I gave it to someone else. So you
5  could check there also.
6      Q.    Okay. What did Mr. Alston tell
7  you?
8      A.    About a murder in the Bronx.
9      Q.    What did he say?
10     A.    He told me that he had
11 information about a murder involving a
12 security guard.
13         MS. FROMMER: This is the first
14         time you ever met Terrance Alston?
15         THE WITNESS: This is the first
16         time I ever met him.
17         MS. FROMMER: He is asking you
18         about information when you were first
19         learning that Terrance Alston was
20         becoming a CI.
21         THE WITNESS: Oh, I'm sorry.
22     A.    Rephrase the question
23         MS. FROMMER: We are going back
24         to when Terrance Alston was first
25         becoming a confidential informant,

8 (Pages 26 to 29)

30

```
 1         PARKER
 2    that conversation.
 3         THE WITNESS:  Right.
 4    A.    Refreshing my memory now, when
 5  I first met him, of course we spoke about
 6  other things.  But when I went to Rikers
 7  Island, he had more information to tell me.
 8  So I went to Rikers Island to see him.
 9    Q.    What did he tell you the first
10  time you spoke to him?
11    A.    That he had information.  He
12  talked about a bunch of things in the Bronx
13  and he knew about people that had guns,
14  people involved in gangs, people in the
15  record industry, things like that.
16    Q.    Okay.  How did he know about
17  people in the record industry?
18    A.    He knew people from his
19  neighborhood that became rappers.
20    Q.    And was one of them Baby Ace?
21    A.    I don't recall.
22    Q.    Okay.  Do you know of a young
23  rapper named Baby Ace from the Parkchester
24  section of the Bronx?
25    A.    No.
```

31

```
 1         PARKER
 2    Q.    What else?  What else?  You are
 3  giving me sort of generals.  What exactly did
 4  Terrance Alston tell you?
 5         MS. FROMMER:  Objection.  You
 6    can answer.
 7    A.    I am telling you what he told
 8  me.
 9    Q.    Okay.  Did he give you any more
10  specific information other than he knew about
11  guns and he knew about some rappers?
12    A.    No.
13    Q.    What if anything did he
14  indicate -- did he indicate to you that he
15  wanted something in exchange for this
16  information?
17         MS. FROMMER:  Objection.  You
18    can answer.
19    A.    He didn't say he wanted
20  anything in exchange.
21    Q.    Okay.  Do you have any
22  understanding of why Mr. Alston was
23  contacting you?
24         MS. FROMMER:  Objection.  Are
25    you asking for Terrance Alston's state
```

32

```
 1         PARKER
 2  of mind?
 3         You can answer, if you can.
 4         MR. JOSEPH:  I am asking him if
 5    Terrance Alston said to him why he was
 6    willfully providing this information.
 7         MS. FROMMER:  That is another
 8    question.
 9         You can answer.
10    A.    Because he spoke to another CI
11  who told him where to call.
12    Q.    Okay.  And other than what you
13  have just told me the first time you spoke
14  with Mr. Alston, was anything else said?
15    A.    No.
16    Q.    Was this before or after --
17  this first conversation, do you have any
18  recollection of when it took place?
19         MS. FROMMER:  Objection.  You
20    can answer again.
21    A.    I don't recall.
22    Q.    Okay.  How soon after the
23  telephone conversation did you go and see Mr.
24  Alston?
25    A.    You mean at Rikers Island?
```

33

```
 1         PARKER
 2    Q.    Correct.
 3    A.    As soon as he -- as soon as I
 4  got the phone call, I went out there to go
 5  see him.
 6    Q.    The same day, within a day?
 7         MS. FROMMER:  Objection.  You
 8    can answer.
 9    A.    I don't remember if it was the
10  same day.  I believe it was the same day.
11 *R   Q.    Okay.  By the way, the cell
12  mate who your confidential was his cell mate,
13  was he from the Parkchester section of the
14  Bronx?
15 DI        MS. FROMMER:  Objection  I am
16    instructing him not to answer.
17         MR. JOSEPH:  Mark that again
18    for a ruling.
19    Q.    By the way, without telling me
20  the identity of the confidential informant,
21  who I guess linked Mr. Alston and you up, did
22  you know this confidential informant outside
23  of your police work?
24         MS. FROMMER:  Objection.  You
25    can answer, if you can.
```

9 (Pages 30 to 33)

34

PARKER

2  A.  No.

3  Q.  Okay.  Have you ever been to a

4  party with that other confidential informant?

5      MS. FROMMER:  Objection.

6  Q.  Or at a club?

7      MS. FROMMER:  Objection.  You

8  can answer.

9  A.  No.

10  Q.  Okay.  Prior to getting this

11  phone call from Mr. Alston, had you ever

12  known anything about him?  In other words,

13  did you do any investigations into him?  Had

14  you ever heard of him prior to that first

15  phone call?

16      MS. FROMMER:  Objection.  You

17  can answer.

18  A.  No.

19  Q.  Okay.  Other than the charges

20  Mr. Alston was being charged with at the time

21  he called you, did you have any information

22  about prior charges on Mr. Alston?

23      MS. FROMMER:  Objection.  You

24  can answer.

25  A.  No.

35

PARKER

2  Q.  Okay.  Do you have a

3  recollection, as you sit here right now, as

4  to whether there were other convictions on

5  his rap sheet, aside from the criminal

6  charges he was facing, at the time that you

7  went to see him at Rikers Island?

8      MS. FROMMER:  Objection.  I

9      just want to clarify.  You are the

10     saying that the criminal charges that

11     were pending against him at the time

12     were on his rap sheet, and I don't

13     believe that is accurate.

14     You can answer the first part

15     of the question.

16  A.  I'm sorry.  Can you repeat the

17  question?

18  Q.  On the first day that you went

19  to see Mr. Alston, did his rap sheet indicate

20  he had any prior convictions?

21  A.  Yes.

22  Q.  Okay.  What had he been

23  convicted of?

24  A.  I don't remember.  I don't

25  recall.

36

PARKER

2  Q.  Do you have any recollection if

3  there was a robbery on there?

4  A.  I don't recall.

5  Q.  Or several?

6      MS. FROMMER:  Objection.  You

7  can answer.

8  Q.  Sir, when dealing with

9  confidential informants, is their prior

10  criminal background something you consider

11  when determining their believability?

12  A.  That varies.

13  Q.  Okay.  How so?

14  A.  I think you are asking me, if a

15  guy has a criminal charge, I am going to

16  believe him or not believe because he has

17  committed a crime before?  Is that what your

18  question is?

19  Q.  My question is, sir, in other

20  words, when you are working with CIs, do you

21  consider that fact that they have been

22  convicted of other crimes or they are

23  currently facing other criminal crimes when

24  you determine whether or not they are

25  believable?

37

PARKER

2      MS. FROMMER:  Objection.

3  Q.  Or trustworthy?

4      MS. FROMMER:  Objection.  You

5  can answer.

6  A.  There is a lot of

7  considerations.  I mean that could be one

8  factor.

9  Q.  Okay.  Is that one factor

10  which you consider when determining whether

11  or not you can believe what a CI is telling

12  you?

13  A.  I don't know.  That's a hard

14  question to answer.

15  Q.  What else was in the -- did you

16  have a CI file for Mr. Alston?

17  A.  Yes.

18  Q.  At that time you were in the

19  gang intelligence unit, what was the

20  procedure for a person to become a CI?

21      MS. FROMMER:  Objection.  You

22  can answer.

23  A.  There wasn't really a

24  determining procedure.

25  Q.  Okay.

10 (Pages 34 to 37)

38

PARKER

```
1          PARKER
2      A.   If he is giving you
3  information, you take down his information,
4  his pedigree information, take down what he
5  has to say to you and you try to verify it
6  some way, if you can.  But it doesn't work
7  that way with every CI, because every CI is
8  different.
9      Q.   Okay.  What did Mr. Alston say
10 to you the first time that you went to Rikers
11 Island?
12     A.   He told me that he had
13 information about a murder in the Bronx.
14         MS. FROMMER:  This is when?
15         THE WITNESS:  This is when I
16     went to Rikers Island.  That is what
17     he said.
18         MS. FROMMER:  Okay.
19     Q.   What did he say?  What
20 information did he say he had?
21     A.   He had information on a murder
22 about a security guard in the Parkchester
23 area of the Bronx.
24     Q.   Did you have this conversation
25 with him before he was convicted or after he
```

39

PARKER

```
1          PARKER
2  was convicted?
3      A.   I just said he was a pretrial
4  detainee.
5      Q.   Okay.  What specifically did he
6  say?
7          MS. FROMMER:  Objection.  You
8      can answer again.
9      Q.   I know he said he has
10 information.
11     A.   He has information about a
12 murder.
13     Q.   Right.
14     A.   He knew a guy who was involved
15 in a murder in the Parkchester part of the
16 Bronx.
17     Q.   Okay.  What did you say when he
18 told you that?
19     A.   Once he told me the
20 information, I had to verify it.  So I called
21 the 43 Precinct to see if in fact they had a
22 murder.  They said they did.
23     Q.   Okay.
24     A.   And once I spoke to a detective
25 there, the detectives came out to Rikers
```

40

PARKER

```
1          PARKER
2  Island.
3      Q.   Other than, quote unquote, he
4  had information, did he give anything more
5  specific?
6          MS. FROMMER:  Objection.  You
7      can answer.
8      A.   No.  I think he gave the
9  detective something more specific, because it
10 was their case.
11     Q.   Was Mr. Alston given anything
12 for providing this information?
13         MS. FROMMER:  Objection.  You
14     can answer.
15     A.   I don't know anything about
16 that.
17     Q.   Okay.  Do you know if he
18 received a reduction in charges because of
19 the information he provided?
20     A.   I don't know.
21     Q.   Did you ever give Terrance
22 Alston money?
23     A.   No.
24     Q.   Okay.  At some point did -- you
25 are sure about that?
```

41

PARKER

```
1          PARKER
2      A.   Pretty sure.
3      Q.   Did you ever work with Terrance
4  Alston after -- after that one meeting, did
5  you ever speak to Terrance Alston again?
6      A.   Yeah.
7      Q.   When did you speak with
8  Terrance Alston again?
9      A.   I don't recall.  Maybe a couple
10 of times of after that.
11     Q.   Can you tell me how soon after
12 the first meeting did those two meetings
13 occur?
14         MS. FROMMER:  Objection.
15     A.   You are confusing me.  Are you
16 talking about the first time I met him or are
17 you talking about the first time we had a
18 conversation or are you talking about the
19 first time that I met him at Rikers Island?
20     Q.   I am asking, after the first
21 time that you met him at Rikers Island, how
22 much time passed between that point in time
23 and the next time you spoke with him?
24     A.   Maybe a week.
```

11 (Pages 38 to 41)

42

PARKER

1
2    Q.    Okay. And how did that second
3    conversation come about?
4        A.    I don't recall.
5    Q.    Was it in person or over the
6    telephone?
7        A.    It could have been over the
8    telephone. You know, it could have been over
9    the telephone, because I get phone calls. So
10   I don't remember.
11   Q.    What did Mr. Alston say to you
12   and what did you say to him?
13       A.    I can't tell you. I don't
14   remember.
15   Q.    Okay. When was the next time
16   you met with Mr. Alston?
17       A.    Again, I don't remember after
18   that.
19   Q.    Did Mr. Alston ever give you
20   any more specific information other than he
21   knew about a murder in the Bronx?
22       MS. FROMMER: Regarding the
23       murder in the Bronx?
24       MR. JOSEPH: Correct.
25       MS. FROMMER: Okay, you can

43

PARKER

1
2    answer.
3        A.    To the best of my knowledge, I
4    don't remember.
5    Q.    Okay. Did Mr. Alston give you
6    information about any other crimes other than
7    this murder in the Bronx?
8        A.    I don't remember.
9    Q.    Was Mr. Alston -- do you know
10   if Mr. Alston was ultimately convicted of
11   just weapons possession?
12       MS. FROMMER: Objection. You
13       can answer.
14       A.    I don't know.
15   Q.    Do you have any idea of how or
16   why an attempted murder charge and an assault
17   and the first charge would get dismissed
18   after you meet with Mr. Alston?
19       MS. FROMMER: Objection. You
20       can answer.
21       A.    I don't know.
22   Q.    By the way, when you spoke to
23   Mr. Alston, did you give him what is commonly
24   known as a "Queen for the Day Agreement"?
25       MS. FROMMER: Objection. You

44

PARKER

1
2    can answer.
3        A.    I don't give out those
4    agreements.
5    Q.    Okay. Do you know what a
6    "Queen for the Day Agreement" is?
7        A.    I know what is, yes.
8    Q.    And just so we have it for the
9    record, what is a "Queen for the Day
10   Agreement"?
11       A.    It is when a defendant comes in
12   and he speaks in front of a district attorney
13   or a U.S. Attorney and they grant him some
14   immunity for what he is going to tell him for
15   crimes.
16   Q.    When you first met Mr. Alston
17   at Rikers Island, did you debrief him about
18   everything he knew?
19       A.    I believe I debriefed him about
20   the murder in the Bronx.
21   Q.    Did you debrief him about
22   anything else?
23       A.    I may have, but I don't
24   remember.
25   Q.    Okay. In debriefing him, did

45

PARKER

1
2    he admit to any involvement in the murder in
3    the Bronx?
4        A.    Not that I recall.
5    Q.    Had he admitted to any
6    involvement in the murder in the Bronx, would
7    you have placed him under arrest or charged
8    him?
9        MS. FROMMER: Objection. You
10       can answer.
11       A.    That wouldn't have been up to
12   me. It would have been up to the district
13   attorney.
14   Q.    Okay. When you first met him,
15   did he tell you that he agreed to do a hit
16   for hire on this particular security guard in
17   the Bronx?
18       A.    No.
19   Q.    Is that something that you
20   would recall if he told you that?
21       A.    It would probably stick out.
22   Q.    If a confidential informant had
23   admitted to agreeing to do a hit for hire,
24   would you have pressed charges?
25       MS. FROMMER: Objection. You

12 (Pages 42 to 45)

46

```
1              PARKER
2       can answer.
3       A.   It is not for me to press
4    charges. It is for the DA.
5       Q.   Okay. Would you have passed --
6    had a confidential informant told you that he
7    had agreed to do a hit for hire on a security
8    guard, would you have passed that information
9    along to the district attorney's office?
10          MS. FROMMER: Objection. You
11    can answer.
12      A.   Sure, I'm sure I would have
13   done that, sure.
14      Q.   Okay. Did you ever meet with
15   Mr. Alston any place other than Rikers
16   Island?
17      A.   I believe I went to the DA's
18   office one time with him.
19      Q.   Okay. Do you know if Mr.
20   Alston had given any information that turned
21   out to be false?
22          MS. FROMMER: About what?
23          MR. JOSEPH: About this murder.
24          MS. FROMMER: Okay. You can
25    answer.
```

47

```
1              PARKER
2       A.   I don't know.
3       Q.   By the way, did Mr. Alston ever
4    tell you that he knew somebody who sold a
5    person a gun that was involved in this murder
6    in the Bronx?
7       A.   I don't recall that.
8       Q.   Is that something that you
9    would recall?
10      A.   I don't recall it. So I
11   wouldn't recall it. If I said I didn't
12   recall, I didn't recall.
13      Q.   Okay. Was that something that
14   would kind of stick out in your mind?
15          MS. FROMMER: Objection. You
16   can answer.
17      A.   I can't say that, no.
18      Q.   Did you discuss either a
19   reduction in the charge or an early release
20   with Mr. Alston in exchange for the
21   information he was providing?
22          MS. FROMMER: Objection. You
23   can answer.
24      A.   No.
25      Q.   Sir, have you ever promised a
```

48

```
1              PARKER
2    confidential informant early release in
3    exchange for information?
4       A.   No.
5       Q.   Never?
6       A.   No.
7       Q.   Okay. Sir, have you ever given
8    money to a witness?
9           MS. FROMMER: Objection. You
10   can answer.
11      A.   A witness, yes.
12      Q.   Under what circumstances would
13   you give money to a witness?
14      A.   For food or living
15   arrangements.
16      Q.   Okay. And that would be a
17   witness who is identifying somebody, correct?
18          MS. FROMMER: Objection.
19      Q.   As a perpetrator?
20          MS. FROMMER: Objection. You
21   can answer.
22      A.   That could be a witness
23   involved in a case that may need things. You
24   know, it all depends, myself or the DA's
25   office.
```

49

```
1              PARKER
2       Q.   I'm sorry, I didn't hear that.
3       A.   I said it could be a witness
4    involved in a case that may need lodging or
5    may need food. If the DA's office determines
6    that they want to put this person up, you can
7    do it that way also.
8       Q.   Prior to a DA getting involved
9    in a case, have you ever given a witness
10   money?
11      A.   Yes.
12          MS. FROMMER: Objection. You
13   can answer.
14      A.   Yes.
15      Q.   Why would you give a witness
16   money?
17      A.   So they could make phone calls,
18   call me and get food.
19      Q.   Did you give any witnesses
20   money concerning the investigation into the
21   homicide of the Bronx Parkchester security
22   guard?
23      A.   No.
24      Q.   Okay. Do you know if Mr.
25   Alston ever referred to you as his meal
```

13 (Pages 46 to 49)

50

PARKER

1  ticket?
2  A.  No.
3  Q.  Was that a common thing you
4  did?
5      MS. FROMMER: Objection.
6  A.  What do you mean?
7  Q.  Was it common for you to give
8  money to witnesses in criminal
9  investigations?
10     MS. FROMMER: Objection. You
11  can answer.
12  A.  Not common.
13  Q.  Okay. Were you aware that Mr.
14  Alston was ultimately sentenced to four
15  years?
16  A.  I don't recall.
17  Q.  Did Mr. Alston ever tell you
18  about a gentleman named Johnnie Baker who
19  allegedly sold somebody a gun involved in a
20  murder?
21  A.  I don't recall.
22  Q.  If that information had been
23  provided to you, would you have attempted to
24  verify it?

51

PARKER

1  A.  If it was provided to me, yeah.
2  Q.  Okay. Was your CI file ever
3  given to the district attorney's office?
4  A.  That I can't say. I don't
5  remember.
6  Q.  Okay. Was it your custom and
7  practice to give the district attorney's
8  office a copy of the confidential informant
9  file if a confidential informant became a
10  witness?
11     MS. FROMMER: Objection. You
12  can answer.
13  A.  No.
14  Q.  Okay. And would it be fair to
15  say that, if the confidential informant's
16  file were never given to the district
17  attorney, it would never be given to the
18  defense counsel in a particular case,
19  correct?
20     MS. FROMMER: Objection. You
21  can answer, if you can.
22  A.  I can't.
23  Q.  All right. Did you ever give
24  the confidential informant file for Terrance

52

PARKER

1  Alston to anybody in the assistant district
2  attorney's office?
3      MS. FROMMER: Objection. you
4  can answer again.
5  A.  To the best of my knowledge,
6  no.
7  Q.  If Mr. Alston were provided a
8  deal for early release, would the parameters
9  of that deal be in the confidential informant
10  file?
11     MS. FROMMER: Objection. you
12  can answer.
13  A.  That would be up to the
14  district attorney's office.
15  Q.  Sir, did you ever get a -- did
16  you ever broker deals where felony charges
17  were dropped in exchange for testimony?
18     MS. FROMMER: Objection. You
19  can answer.
20  A.  I don't make deals.
21  Q.  Okay. Well, did you ever talk
22  an assistant district attorney into dropping
23  felony charges in exchange for criminal
24  testimony?

53

PARKER

1  A.  No.
2      MR. JOSEPH: Let's mark this.
3      MS. FROMMER: Just for the
4  record you are using an exhibit at the
5  deposition that has not been produced
6  to me in discovery.
7  RQ     So I am going to request an
8  entire copy of that be produced to me
9  in discovery, please.
10     MR. JOSEPH: I have no problem.
11  For the record, it is something used
12  only for impeachment and not
13  affirmatively, and under Rule 26 it
14  doesn't have to be. That being said,
15  I have no objection giving you a copy.
16     MS. FROMMER: Actually if you
17  are intending to enter something as an
18  exhibit, you have an obligation to
19  provide me with a copy.
20     MR. JOSEPH: Which I will.
21     MS. FROMMER: And whether or
22  not you have a copy of that, you are
23  under an obligation to give me a copy
24  if you have to go out and buy a copy

14 (Pages 50 to 53)

54

1           PARKER
2   on your own. That is your
3   responsibility, not mine.
4           MR. JOSEPH: I have no problem.
5           MS. FROMMER: I am just saying,
6   you are attempting to use
7   documentation in this deposition that
8   has not been provided to me during
9   discovery. I am just noting that.
10  Note my objection to any line of
11  questioning that has to do with an
12  exhibit that has never been provided
13  or identified in discovery.
14          MR. JOSEPH: For the record,
15  this is a document that is not used
16  affirmatively to establish our case.
17  It is used solely for impeachment,
18  which we don't have to produce under
19  Rule 26. That being said, we will be
20  more than happy to provide you with a
21  copy of it.
22          MS. FROMMER: Okay. But Rule
23  26 does not require -- actually
24  anything that you want to use in your
25  case has to be identified. You have

55

1           PARKER
2   never identified this.
3           MR. JOSEPH: Not for
4   impeachment, Counsel. Look at Rule
5   26.
6           MS. FROMMER: That is not
7   accurate.
8           MR. JOSEPH: We can deal with
9   it later. Let's just mark it.
10          MS. FROMMER: That's fine, but
11  under the Southern District of New
12  York you will never be able to
13  introduce evidence at trial that has
14  never been produced in discovery.
15          MR. JOSEPH: And we will be
16  more than happy to produce you a copy.
17          MS. FROMMER: Thank you.
18          MR. JOSEPH: Off the record.
19          (Discussion off the record.)
20          (Plaintiff's Exhibit 31, book,
21  marked for identification.)
22  Q.    Sir, I am going to show you
23  what has been marked as Exhibit 31 and ask
24  you if you recognize this document?
25  A.    Yes, I do.

56

1           PARKER
2   Q.    What is it?
3   A.    It is a soft cover copy of my
4   book.
5   Q.    And did you write this book?
6   A.    Yes.
7   Q.    Is everything in it true?
8   A.    Pretty much.
9   Q.    Okay. Aside from the names you
10  may have changed, and I believe you indicate
11  where you have changed names, is everything
12  in there true?
13  A.    Yes.
14  Q.    Okay. Could you turn to page
15  78.
16  A.    Okay.
17  Q.    Sir, on the bottom of page 78
18  you indicate that "nine times out of ten a DA
19  will agree to overlook a felony charge in
20  exchange for someone being a witness."
21          MS. FROMMER: I am going to
22  read it.
23          MR. JOSEPH: Okay.
24          MS. FROMMER: I am going to
25  object. I am going to ask you to show

57

1           PARKER
2   me where it says that on that page.
3   On page 78 your quote of "nine times
4   out of ten" does not appear anywhere
5   on that page. Therefore, I am going
6   to instruct --
7           MR. JOSEPH: Okay, I will read
8   it directly from the book.
9   Q.    Did you ever tell a witness,
10  "but if you talk, if you cooperate, I will
11  make a recommendation to the ADA that this
12  infraction that brought you in here be
13  overlooked. I wasn't bullshitting. Nine
14  times out of ten the DA goes for it"?
15  A.    Can I see that?
16  Q.    Yes, it is right over here.
17  A.    It does say that in my book,
18  yes.
19  Q.    So did you ever make a
20  recommendation to an ADA that felony charges
21  be dropped in exchange for somebody being a
22  witness?
23  A.    Are you talking about this
24  particular case or another case?
25  Q.    Ever, ever.

15 (Pages 54 to 57)

58

PARKER

1
2  A.  Yeah, of course.
3  Q.  Okay.  And is that something
4  you commonly did to get somebody, to get
5  people to be witnesses?
6      MS. FROMMER: Objection. You
7  can answer.
8  A.  Again, and I am going to say
9  this for the record, I don't make deals. The
10 DA's office does. I can recommend whatever I
11 want, but it is up to the DA to decide what
12 they want to do.
13 Q.  Okay.  During your time in the
14 intelligence unit, did you commonly tell a
15 confidential informant that you would
16 recommend that charges be dropped or
17 overlooked in exchange for testimony?
18     MS. FROMMER: Objection. You
19 can answer.
20 A.  Again, I don't tell -- I don't
21 make deals with people. The DA's office
22 does.
23 Q.  Listen to the question, sir.  I
24 haven't asked if you made a deal.
25     I am asking you, if during your

59

PARKER

1
2  time at the intelligence unit, if whether it
3  was something you normally did or part of
4  your practice to represent or tell a person
5  who had been arrested, that the charges would
6  be dismissed or overlooked if they cooperated
7  in a different case?
8      MS. FROMMER: Objection. That
9  is not your same question.
10 A.  Right.
11     MS. FROMMER: That is a
12 different question. Note my objection
13 on the record.
14 A.  I still don't understand your
15 question, because you are confusing me.
16 Q.  Okay.  At the time that you
17 were at the intelligence unit, did you
18 regularly tell people facing criminal charges
19 that you would recommend to the ADA that the
20 charges be overlooked or dismissed in
21 exchange for their providing testimony?
22     MS. FROMMER: Objection. You
23 can answer.
24 A.  I would probably say on a
25 case-by-case basis I suggested that they go

60

PARKER

1
2  speak to the DA and the DA would let them
3  know if they would do anything with the
4  charges that they are in for.
5  Q.  And is that something you did
6  on a regular basis while working confidential
7  informants?
8      MS. FROMMER: Objection.
9  Q.  During your time at the
10 intelligence unit?
11 A.  I wouldn't say regular basis.
12 I would say on a case-by-case basis.
13 Q.  What percentage of the
14 confidential informants with whom you were
15 working at intelligence unit did you make
16 such a recommendation to an ADA?
17     MS. FROMMER: Objection. You
18 can answer.
19 A.  I couldn't give you a
20 percentage, because there is really not a
21 percentage to give. It all depends on what
22 the confidential informant is giving you and
23 if the information is useful and the DA feels
24 it is useful, they will be the one to make
25 the deal with the defendant, not me.

61

PARKER

1
2  Q.  Okay, Would it be fair to say
3  that, if a CI gives you, quote unquote,
4  useful information, it is more than likely
5  that his case will ultimately be dismissed or
6  reduced?
7      MS. FROMMER: Objection. You
8  can answer.
9  A.  Again, I can't answer that
10 question totally. Again, how do you -- how
11 can I say that the information he is giving
12 me is useful. It is going to be up to the
13 district attorney to determine if it is
14 useful, not me.
15 Q.  Okay.  Sir, you made
16 recommendations to the assistant district
17 attorney, correct?
18     MS. FROMMER: Objection. In
19 what context?
20 A.  Right.
21 Q.  During your time at the
22 intelligence unit, did you make
23 recommendations to the ADA, that felony
24 charges be dismissed in exchange for witness
25 testimony?

16 (Pages 58 to 61)

62

PARKER

2    A.   No.
3    Q.   Okay.  What recommendations, if
4  any, did you make to the ADA concerning
5  overlooking criminal charges?
6         MS. FROMMER: Objection.  You
7  can answer.
8    A.   I can never make a
9  recommendation for a DA to overlook criminal
10  charges.  Everything is on a case-by-case
11  basis and it depends on the information that
12  the informant is providing, if the DA's
13  office feels it is useful and necessary, they
14  will make that determination.  It is not my
15  determination that I can make.
16    Q.   Okay.  Did you often promise
17  confidential informants that you are working
18  with that their cases might go away if they
19  provided useful information?
20         MS. FROMMER: Objection.  You
21  can answer.
22    A.   I can never make a promise to
23  anyone like that.
24    Q.   Did you ever suggest, make that
25  sort of a suggestion?

63

PARKER

2         MS. FROMMER: Objection.  You
3  can answer.
4    A.   Again, everything is on a
5  case-by-case basis.  I don't make those
6  decisions.  It is up to the ADA.
7    Q.   Sir, I didn't ask you who made
8  the decision.
9         I asked you if you ever
10  suggested to a person facing criminal charges
11  that his case might go away if he provided
12  witness information?
13         MS. FROMMER: Objection.  You
14  can answer.
15    A.   Not go away.
16    Q.   Okay.  You tell me, what
17  suggestions, if any, did you make to people
18  who are facing criminal charges in order to
19  get them to provide you information?
20         MS. FROMMER: Objection.  You
21  can answer.
22    A.   I suggest that you tell me the
23  truth, and whatever you tell me, I will bring
24  it to the DA and let the DA make a
25  determination.

64

PARKER

2    Q.   Okay.  A determination as to
3  what?
4    A.   What the DA's office is going
5  to do with his information or her
6  information.
7    Q.   And what if anything did you
8  suggest, did you normally suggest to the
9  person that they would get in response for
10  providing this information?
11         MS. FROMMER: Objection.
12    A.   There is nothing really to
13  suggest.  It is up to the district attorney's
14  office again.
15    Q.   Okay.  Well, what is up to the
16  district attorney's office?
17    A.   To determine whatever
18  information that the person is giving me is
19  useful information.
20    Q.   And if it is in fact useful
21  information, what did you suggest would be
22  the benefit to the person providing it, if
23  any?
24         MS. FROMMER: Objection.  You
25  can answer.

65

PARKER

2    A.   I can't make that suggestion.
3  That, again, comes from the DA's office.  I
4  don't have the power to make those
5  suggestions.
6    Q.   Okay.  Are you telling us that
7  you have never suggested to a criminal
8  defendant or someone facing criminal charges,
9  that your case would be overlooked?
10    A.   I never, ever said that to a
11  criminal defendant.
12    Q.   Okay.  Did you ever suggest to
13  Terrance Alston that his murder, attempted
14  murder and assault charge would go away in
15  exchange for information?
16    A.   No.
17    Q.   Did you have any role
18  whatsoever in assisting Mr. Alston in getting
19  early release?
20    A.   Yes.
21    Q.   Are you familiar with the
22  phrase "working off time"?
23    A.   Yes.
24    Q.   What does that phrase mean?
25    A.   It refers to an informant

17 (Pages 62 to 65)

66

PARKER

2 working off time, giving us information, but
3 again, that is determined by someone else,
4 not me.
5    Q.    Okay. What does working off
6 time mean?
7    A.    To go out, to do things
8 necessary for an informant that you need him
9 to do, make buys, give information, a
10 multitude of different things.
11    Q.    And what does that informant
12 get in return, when he is working off time?
13        MS. FROMMER: Objection. You
14    can answer.
15    A.    I think you just said that. He
16 is working off time. That is what that term
17 means.
18    Q.    Does it mean that he is getting
19 time off of his sentence?
20    A.    That is what it would suggest,
21 yeah.
22    Q.    Okay. Did any of your CIs
23 ever, quote unquote, work off time in
24 exchange for testimony?
25        MS. FROMMER: Objection. You

67

PARKER

2    can answer.
3    A.    To the best of my recollection,
4 I can't say I had a CI who was working off
5 time.
6    Q.    Do you know if Mr. Alston --
7 are you aware if Mr. Alston was released
8 early?
9    A.    I don't recall.
10    Q.    Okay. Sir, is it fair to say
11 that often a confidential informant will have
12 their own agenda?
13        MS. FROMMER: Objection. You
14    can answer, if you can.
15    A.    I mean that is with anyone.
16    Q.    Okay. Is a confidential
17 informant having their own agenda something
18 that you have to be aware of when dealing
19 with informants?
20        MS. FROMMER: Objection. You
21    can answer.
22    A.    A confidential informant is not
23 supposed to have his own agenda. He is
24 supposed to go by the rules that is governed
25 by yourself and by the DA's office.

68

PARKER

2    Q.    And what are those rules?
3    A.    To work within the guidelines.
For example, he has to report in to whoever
his handler is. He has to call in. He has
to keep in touch. And if he gets arrested or
anything happens, he has to notify you right
away.
9    Q.    And were you Mr. Alston's
10 handler?
11    A.    Not solely, no.
12    Q.    Who else was Mr. Alston's
13 handler?
14    A.    I couldn't tell you that.
15    Q.    Okay. Would there be a record
16 of that somewhere?
17    A.    Again, I couldn't tell you
18 that.
19    Q.    Sir, were you ever concerned,
20 that Mr. Alston was providing you false
21 information in exchange for getting out
22 early?
23        MS. FROMMER: Objection. You
24    can answer.
25    A.    No.

69

PARKER

2    Q.    Did you ever take any steps to
3 verify the information that Mr. Alston was
4 providing you?
5    A.    Yes.
6    Q.    Okay. And other than calling
7 your precinct and seeing that a murder did
8 happen, what if anything did you do?
9    A.    The detectives from the 43rd
10 Precinct came to Rikers Island, told me that
11 they wanted to interview him. So that led me
12 to believe that the information that he was
13 telling me was sort of accurate.
14    Q.    Sort of accurate?
15    A.    Yes, because they came all the
16 way to Rikers Island to interview him.
17    Q.    Okay. Were you present when
18 they interviewed him?
19    A.    No.
20    Q.    Okay. Was there any reason
21 that you weren't present when they
22 interviewed him?
23    A.    Because they might want to ask
24 him questions that they may not want me in
25 the room with him.

18 (Pages 66 to 69)

70

PARKER

2  Q.   And why would that be?
3  A.   Because they have the case. I
4  don't.
5  Q.   Now, sir, did you learn when
6  this murder -- how soon after the murder did
7  you get this phone call from Mr. Alston?
8     MS. FROMMER: Objection. You
9  can answer.
10  A.   That I don't recall.
11  Q.   Okay. Well, sir, did you learn
12  that Mr. Alston was in jail when the murder
13  occurred?
14  A.   Again, I don't know. I don't
15  remember.
16  Q.   Would you find it strange that
17  a confidential informant had information
18  concerning a murder that occurred while he
19  was in jail?
20     MS. FROMMER: Objection. You
21  can answer.
22  A.   Again, I don't recall that.
23  Q.   Okay. Sir, based on your
24  experience, is it good police practice to
25  charge someone with murder based solely on

71

PARKER

2  the word of a confidential informant?
3     MS. FROMMER: Objection. You
4  can answer.
5  A.   Based on my experience, there
6  are a lot of other factors that go into
7  making an arrest, not just from an informant,
8  but from eyewitnesses, evidence. And that
9  determination, again, is made by the district
10  attorney's office.
11  *R  Q.   No. My question to you was, is
12  it good police practice to arrest someone
13  based solely on the word of a confidential
14  informant?
15  DI     MS. FROMMER: I am going to
16     object and direct him not to answer
17     that, because you are making a
18     hypothetical. I am going to instruct
19     him not to answer that.
20     MR. JOSEPH: Mark it for a
21     ruling.
22     MS. FROMMER: Okay.
23  Q.   Sir, did you ever disregard
24  other evidence based solely on what a
25  confidential informant told you?

72

PARKER

2  DI     MS. FROMMER: Objection. I am
3     going to instruct him not to answer.
4     That is harassing.
5  Q.   Well, sir, did you ever say, if
6  you want to solve a homicide, you are going
7  to need informants, period. Quote "Fuck DNA
8  testing. Fuck all the flashy
9  divorced-from-reality high-tech cop shows you
10  see on TV. Informants are how most homicides
11  are solved," did you say that?
12  A.   Are you referring to my book?
13  Q.   I am asking you, did you say
14  that?
15  A.   I am asking what you are
16  referring to that I said that to?
17  Q.   Take a look at page 64.
18     MS. FROMMER: Off the record.
19     (Discussion off the record.)
20     MS. FROMMER: I am going to
21     ask, when you ask that question, that
22     you actually read the sentence before
23     it so it is in context of which it is
24     written in this book.
25     You can read it. I want you to

73

PARKER

2  read everything before and after that
3  so you can read the question.
4     THE WITNESS: You want me to
5  read it?
6     MS. FROMMER: You can read it
7  to yourself before you answer his
8  question.
9  A.   Okay.
10  Q.   Did you make that statement?
11  A.   Yes.
12  Q.   What do you mean by that?
13  A.   What I mean by that is, you
14  know, working in certain areas, you have to
15  talk to informants, because informants give
16  you information.
17     MS. FROMMER: Just for the
18  record, the thing you, quote unquote,
19  said is a statement is not a
20  statement. It was a piece of
21  literature in a book. It is not in
22  quotation marks. And according to
23  page 64, it was not a statement that
24  was ever made to anyone at any time.
25     MR. JOSEPH: Other than the

19 (Pages 70 to 73)

74

```
1              PARKER
2    general public.
3         MS. FROMMER: Well, it is a
4    statement. It is a summarization of a
5    thought in his head. So you calling
6    it -- whether he ever made that
7    statement, I object to that
8    characterization, as it is inaccurate.
9         Q.   Sir, are you indicating that
10   you disregarded other evidence and solely
11   relied upon the information provided by
12   confidential informants?
13        A.   I never disregard other
14   evidence, no.
15        Q.   Do you know a gentleman named
16   Mike Booth?
17        A.   No.
18        Q.   Do you know who he is?
19        A.   No.
20        Q.   Are you aware of a bookie named
21   Mike Booth who worked at the Hunts Point
22   Market?
23        A.   No.
24        Q.   Okay. Did you ever know
25   someone named Chris Tartone or know of
```

75

```
1              PARKER
2    someone named Chris Tartone?
3         A.   No.
4         Q.   Are you familiar with a
5    pizzeria on Metropolitan Avenue in the Bronx?
6         A.   There is a bunch of pizzerias
7    around there.
8         Q.   Okay. Well, specifically are
9    you familiar with a pizzeria on Metropolitan
10   Avenue right across from the Parkchester
11   complex?
12        A.   It doesn't ring a bell to me,
13   no.
14        Q.   Okay. Do you know someone
15   named Sal Miro?
16        A.   No.
17        Q.   What happened the second time
18   you met Mr. Alston?
19        A.   Are you referring to Rikers
20   Island again?
21        Q.   I don't know whether it was in
22   Rikers Island or somewhere else.
23             After the first meeting in
24   Rikers Island, which you told us about?
25        A.   Right.
```

76

```
1              PARKER
2         Q.   What happened the second time
3    that you met with Mr. Alston?
4         A.   I think the next time I met him
5    we were going to the DA's office.
6         Q.   Okay. And was he still in
7    Rikers Island at the point in time when you
8    met him on the second occasion?
9         A.   I don't recall.
10        Q.   Did you go to Rikers Island and
11   pick him up?
12        A.   Myself?
13        Q.   Correct.
14        A.   No.
15        Q.   Okay. Where did you meet Mr.
16   Alston?
17        A.   The DA's office.
18        Q.   Was he wearing any sort of
19   prison uniform?
20        A.   Again, I don't recall.
21        Q.   Okay. Do you have any
22   recollection of him being in handcuffs or
23   shackles?
24             MS. FROMMER: Objection. You
25   can answer.
```

77

```
1              PARKER
2         A.   I don't recall.
3         Q.   When the meeting with the DA's
4    office was over, did he walk out on his own?
5             MS. FROMMER: Objection. You
6    can answer.
7         A.   I don't recall.
8         Q.   Do you have any recollection of
9    him being escorted by anybody after the
10   meeting was over?
11            MS. FROMMER: Objection. You
12   can answer.
13        A.   Again, I don't recall.
14        Q.   Who else was present at the
15   meeting with the ADA?
16        A.   A detective from the 43rd, I
17   believe.
18        Q.   Was his name Agostini?
19        A.   I don't recall.
20        Q.   Okay. Was anyone else present?
21        A.   The DA.
22        Q.   Was that a Miss Sacca?
23        A.   I don't remember her name.
24        Q.   It was a female, correct?
25             MS. FROMMER: Objection. You
```

20 (Pages 74 to 77)

78

```
1            PARKER
2   can answer.
3       A.   To the best of my knowledge, I
4   don't recall.
5       Q.   Other than yourself, the ADA,
6   Mr. Alston and this detective from the 43rd
7   Precinct, was anyone else present?
8       A.   Again, I don't recall.
9       Q.   Okay. Tell me everything that
10  you recall being said at that second meeting.
11      A.   I don't recall.
12      Q.   Do you recall anything that was
13  said?
14      A.   No.
15      Q.   Was there a gentleman named
16  Mark Damon also present?
17      A.   I don't recall.
18      Q.   By the way, did Mr. Alston
19  testify before the grand jury concerning the
20  Bronx homicide of the security officer?
21          MS. FROMMER: Objection. You
22  can answer, if you can.
23      A.   I don't recall.
24      Q.   Okay. I will show you what has
25  been marked Exhibit 23, dated 12/20/07. I am
```

79

```
1            PARKER
2   going to ask you to read it to yourself.
3       A.   Okay.
4       Q.   After looking at Exhibit 23,
5   has your recollection been refreshed in any
6   way?
7       A.   Yes. It appears that I was at
8   this meeting.
9       Q.   Okay. Was this meeting the
10  second one you were describing or is this a
11  different meeting?
12      A.   I don't recall.
13      Q.   Okay. Do you have any
14  recollection, as you sit here right now, of
15  this meeting?
16      A.   Only that my name appears on
17  the report and that I was there.
18      Q.   Other than your name appearing
19  on the report, do you have any independent
20  recollection?
21      A.   No.
22      Q.   At the meeting with the DA, did
23  you take any handwritten notes?
24      A.   No.
25      Q.   After this second meeting with
```

80

```
1            PARKER
2   the ADA -- by the way, did you ever testify
3   in the grand jury concerning the Bronx
4   homicide of the security officer?
5       A.   Not that I recall.
6       Q.   Okay. Was it your custom and
7   practice to take notes at a meeting with an
8   ADA?
9           MS. FROMMER: Objection. You
10  can answer.
11      A.   In certain cases, yeah.
12      Q.   What would happen to those
13  notes typically?
14      A.   They would go in the DD5.
15      Q.   In the DD5?
16      A.   Yes.
17      Q.   Okay. Have you looked for any
18  DD5s concerning the investigation and
19  prosecution of Anthony Manganiello?
20      A.   No.
21      Q.   Do you know if you ever made a
22  DD5 concerning the arrest and prosecution of
23  Anthony Manganiello?
24      A.   No.
25      Q.   Can you tell me why you were
```

81

```
1            PARKER
2   present at the meeting with the ADA?
3       A.   At this particular meeting that
4   you are referring to?
5       Q.   On the second date, whether it
6   is the date reflected in the --
7       A.   Well, the reason I was there
8   was probably because of Terrance Alston.
9       Q.   Okay. What specifically about
10  Terrance Alston made you come to be present
11  at this meeting?
12      A.   I guess so he could be
13  comfortable with the people he was dealing
14  with.
15      Q.   Was Mr. Alston made any
16  promises at this meeting?
17          MS. FROMMER: Objection. You
18  can answer.
19      A.   I don't recall.
20      Q.   Was Mark Damon made any
21  promises at this meeting?
22          MS. FROMMER: Objection. You
23  can answer.
24      A.   I don't recall.
25      Q.   Do you have any recollection,
```

21 (Pages 78 to 81)

82

PARKER

1
2  as you sit here right now, whether Mr. Damon
3  was present at the second meeting you are
4  referring to?
5      A.  I have no recollection.
6      Q.  Okay.  Did you ever meet with
7  Mr. Damon outside of the district attorney's
8  office?
9      A.  To the best of my knowledge,
10  no.
11      Q.  Was Mr. Damon a confidential
12  informant?
13      A.  Again, to the best of my
14  knowledge, I don't know.
15      Q.  Aside from the second -- after
16  the second meeting, did you ever speak or
17  meet with Mr. Alston again?
18      A.  I don't recall.
19      Q.  As you sit right here right now, do
20  you have any recollection of any meetings
21  with Mr. Alston or conversations with Mr.
22  Alston after that day at the district
23  attorney's office?
24      MS. FROMMER:  Objection.  You
25      can answer.

83

PARKER

1
2      A.  I think I answered that.  I
3  told you that I spoke to him on the phone.
4      Q.  Okay.  You spoke to him on the
5  phone after the ADA's office?
6      A.  After the ADA's office.
7      Q.  And for what reason or reasons
8  did you speak to him on the phone?
9      A.  He called me to see how I was
10  doing, to see how he was doing.
11      Q.  When he called you, did he call
12  from jail or from someplace else?
13      A.  That I don't recall.
14      Q.  Do you know if Mr. Alston was
15  ever released?
16      A.  I don't know.
17      Q.  Did Mr. Alston participate in
18  any other cases as a confidential informant?
19      A.  To the best of my knowledge,
20  no.
21      Q.  By the way, did you ever say
22  you used unorthodox methods that sometimes
23  clashed with police tradition?
24      MS. FROMMER:  Objection.  You
25      can answer.

84

PARKER

1
2      A.  Again, are you referring to the
3  book?
4      Q.  Take a look at page 23.
5      A.  Okay.
6      MS. FROMMER:  Let me read it
7      first.
8      Can you repeat your question,
9      please?
10      MR. JOSEPH:  Okay.
11      Q.  Did you ever say that you had
12  unorthodox methods which sometimes clashed
13  with the powers that be and threatened police
14  tradition?
15      MS. FROMMER:  I object to your
16      quote.
17      You can read it.
18      A.  Yes, referring to hip-hop.
19      Q.  Okay.  What did you mean by
20  that?
21      A.  Well, in the hip-hop industry
22  there are gray areas.  The police department
23  tends to want to do things by the book, 1, 2,
24  3, 4, 5.  And sometimes, when you have these
25  gray areas, it is not so easy to do things 1,

85

PARKER

1
2  2, 3, 4, 5, by the numbers.
3      Q.  Okay.  What do you mean by
4  that?  What do you mean by a gray area?
5      A.  A gray area is a gray area.  I
6  mean something is black and white is black
7  and white.  Something is gray area means it
8  is not black and white.
9      It is not so simple to solve.
10  It is something that you need a little
11  finessing.  It is something you need to do a
12  little different to get the answers or things
13  that you want.
14      Q.  And what do you mean by
15  "finessing"?
16      A.  Just what I said, you know.
17  For example, you know, saying that someone
18  committed a crime is not so easy if there is
19  no witnesses.  So maybe there is a gray area.
20  Maybe something else happened, some other
21  mitigating circumstances that led someone to
22  say that or that crime to be committed.
23  There is a bunch of different
24  interpretations.  This is just an
25  interpretation.

22 (Pages 82 to 85)

86

```
 1          PARKER
 2    Q.   Thank you.  But what I want to
 3  ask you is what you meant by that?
 4    A.   I just told you.
 5    Q.   What do you mean by unorthodox
 6  methods?
 7         MS. FROMMER: Just for the
 8    record, he doesn't use the words
 9    "unorthodox methods" in his book.
10  DI       So I am going to object and
11    instruct him not to answer when you
12    completely misquoted the sentence that
13    you claim to be quoting.  If you would
14    like to rephrase it to accurately
15    reflect the quote, I will let him
16    answer, but I am not going to let him
17    answer a question that is misquoted.
18         MR. JOSEPH:  Let me see his
19    quote.
20    Q.   What did you mean by your
21  methods sometimes clashed with the powers
22  that be?
23         MS. FROMMER:  Objection.  You
24    can answer.
25    A.   Again, referring to the hip-hop
```

88

```
 1          PARKER
 2    A.   Yes.
 3    Q.   Okay.  And did you call it a
 4  flimsy excuse?
 5    A.   I don't know if I said flimsy
 6  excuse.
 7    Q.   Keep reading.
 8    A.   Flimsy assertion?
 9    Q.   "Flimsy assertion," what you
10  did mean by a flimsy assertion?
11    A.   It means that the judge in the
12  case felt, you know, it was just something
13  that he forgot or he couldn't find it.  It is
14  just a flimsy assertion.
15    Q.   In all of your years of being a
16  homicide detective, aside from this one
17  incident, did you ever hear of a homicide
18  detective losing an entire case file?
19    A.   It happens, yeah.
20    Q.   Okay.  And is that something
21  that you would consider a flimsy assertion?
22    A.   I mean it all depends.  It may
23  not have been his fault.  It might have been
24  a homicide that was an old homicide that
25  might have been put in storage and, you know,
```

87

```
 1          PARKER
 2  music industry.  Sometimes there are things
 3  that you have to do that might be different
 4  that the powers may not respect.  You know,
 5  you are talking to an individual involved in
 6  the hip-hop industry, you know, because of
 7  the influence of money and power and things,
 8  you know, that are involved with that
 9  industry.
10    Q.   By the way, did you ever
11  publicly criticize a detective for losing a
12  file?
13    A.   Did I ever publicly criticize,
14  I don't recall.
15    Q.   Take a look at page 61.
16         MS. FROMMER:  I will allow him
17    to answer the question subject to the
18    statement that he was discussing
19    members of the Los Angeles Police
20    Department.
21         MR. JOSEPH:  That's fine.
22         MS. FROMMER:  You can answer.
23    Q.   Did you ever criticize a Los
24  Angeles Police Department member for losing a
25  file?
```

89

```
 1          PARKER
 2  it got sent to certain different places and
 3  he couldn't find it.
 4    Q.   I am talking about an active
 5  homicide file.
 6    A.   Well, that is what I am saying,
 7  an active homicide file.  It could be an old
 8  file.  It could be something from years ago.
 9  Homicides are always active.  It could just
10  be something from years ago that they had to
11  make room to store it someplace else.
12    Q.   Did you ever hear of an active
13  homicide file in a case that was being
14  prosecuted being lost?
15    A.   To the best of my knowledge,
16  no.
17    Q.   Okay.  Is that something --
18  throughout the City of New York, based on
19  your experience as a homicide detective, are
20  there established procedures for maintaining
21  active homicide files?
22         MS. FROMMER:  Objection.  I am
23    going to instruct the witness, to the
24    best of his knowledge and his
25    experience, only in the commands he
```

23 (Pages 86 to 89)

90

```
1              PARKER
2        has worked on.
3   DI       I am going to instruct him not
4        to answer about police procedure
5        throughout the entire City of New York
6        on homicide cases, as he has no
7        personal knowledge of that. He is not
8        here as a 30(b)(6) witness.
9            So to the extent that you can
10       testify as to your knowledge you can,
11       and to your experience you can.
12       A.   To my personal experience, I
13       mean the folders sometimes they are
14       misplaced. They are put all over the place.
15       It all depends. Like I said, active
16       homicides can be anything from now to the
17       past. They are still active.
18       Q.   Were you aware, did you ever
19       become aware of the entire homicide file in
20       the case involving this particular
21       Parkchester security officer going missing?
22       A.   No, I didn't hear. I heard
23       nothing about that.
24       Q.   Okay. Did you ever touch that
25       file or have any -- did the homicide file for
```

91

```
1              PARKER
2        the security guard who was shot in the Bronx
3        ever come into your possession?
4        A.   No.
5        Q.   Would you find it unusual if a
6        case file for a homicide that was being
7        prosecuted went missing?
8            MS. FROMMER: Objection. You
9        can answer.
10       A.   I am sorry, again? Say it one
11       more time.
12       Q.   Okay. Sir, would you find it
13       unusual for a case file for a homicide that
14       is being actively prosecuted to just
15       disappear?
16           MS. FROMMER: Objection.
17       A.   Again, in the commands that I
18       have worked a lot of things happened. I have
19       seen cases come up missing before in the
20       commands that I have worked. So anything is
21       possible.
22       Q.   Tell me why. If it is
23       possible, can you tell me why you harshly
24       criticized the LAPD detective?
25           MS. FROMMER: In that
```

92

```
1              PARKER
2        particular case?
3            MR. JOSEPH: Correct.
4            MS. FROMMER: You can answer.
5        A.   In that particular case, I felt
6        it was a very high-profile murder case. And
7        because it was so high profile, you know, him
8        saying that he misplaced or didn't know where
9        the folder was to me bad police work.
10       Q.   Would you consider a security
11       officer being shot a high-profile police
12       matter?
13           MS. FROMMER: Objection. You
14       can answer.
15       A.   I mean I think every homicide
16       is high profile. It all depends. Some just
17       get more publicity than others.
18       Q.   Okay. On February 25, 2001
19       were you in Las Vegas working as a bodyguard
20       for Duane Johnson, also known as the Rock?
21       A.   Again, you are referring to the
22       book, what page?
23       Q.   235. I am just trying to get a
24       time frame.
25       A.   Okay.
```

93

```
1              PARKER
2            MS. FROMMER: What is the date
3        again, please?
4            MR. JOSEPH: February 25, 2001.
5        Q.   Just to refresh your
6        recollection, that was about the time that
7        there was a shooting at Hot 97 studio.
8            MS. FROMMER: You can answer,
9        if you can.
10       A.   When this shooting occurred, I
11       wasn't in New York, no.
12       Q.   My question is, on February 25,
13       2001 were you in Vegas working as a
14       bodyguard?
15       A.   I don't know if it was February
16       25th I was out there. I can't refer to the
17       date.
18       Q.   Okay. Well, on page 235 did
19       you put the date down as February 25th?
20       A.   Let's look. It doesn't refer
21       to a date. It just says the Hot 97 shooting
22       I was --
23           MS. FROMMER: So the answer to
24       his question is what, yes or no, that
25       on page 235 you specifically have the
```

24 (Pages 90 to 93)

94

PARKER

1 date February 25th?
2
3       THE WITNESS: No, I don't have
4 it.
5       MS. FROMMER: Thank you.
6    Q.   On any of the prior pages, do
7 you have a date February 25, 2001 as when the
8 shooting at Hot 97 occurred?
9    A.   I'm sorry, what pages?
10   Q.   Any of the pages preceding page
11 235.
12      MS. FROMMER: You want him to
13 read pages 1 through 235?
14      MR. JOSEPH: No, I don't.
15   A.   Why don't you just make it
16 clear?
17   Q.   On page 233 did you say on
18 February 25, 2001 is when the Hot 97 shooting
19 occurred?
20   A.   On February 1st --
21      MS. FROMMER: You can read the
22 whole quote.
23   A.   "On February 1, 2001 the rules
24 were broken. This particular Sunday
25 afternoon would see one of the most brutal

95

PARKER

1
2 public shootouts between rival rap crews in
3 rap history play out right on Hot 97's
4 doorstep."
5    Q.   Is it February 1st or February
6 25th?
7    A.   February 25th.
8    Q.   Okay. Because you said
9 February 1st.
10   A.   No, February 25th.
11   Q.   Okay. So at the time that that
12 occurred, on February 25th, were you in Las
13 Vegas?
14   A.   I don't recall.
15   Q.   Could you read pages 233
16 through 235 to see if it refreshes your
17 recollection.
18   A.   The question again?
19   Q.   On February 25, 2001 were you
20 in Las Vegas?
21   A.   Yes.
22   Q.   How long were you in Las Vegas
23 prior to February 25, 2001?
24   A.   I don't recall.
25   Q.   Okay. For example, did you

96

PARKER

1
2 leave immediately on February 25, 2001 once
3 you got a phone call informing you of the Hot
4 97 shooting?
5    A.   I don't believe leaving the day
6 of, no.
7    Q.   Okay. Prior to receiving the
8 phone call, how long had you been in Las
9 Vegas?
10   A.   Again, I don't recall. I don't
11 recall.
12   Q.   Was it more than a day?
13   A.   It could have been a week. I
14 don't recall.
15   Q.   Okay. Do you have any
16 recollection of how long? By the way, did
17 you ever work with Duane Johnson, also known
18 as the Rock, on any other occasions?
19   A.   Yes.
20   Q.   Was February 25, 2001 the first
21 time that you worked for Duane Johnson, also
22 known as the Rock?
23   A.   No.
24   Q.   Is this something you did on a
25 regular basis?

97

PARKER

1
2      MS. FROMMER: Objection. You
3 can answer.
4    A.   Yeah.
5    Q.   Okay. Do you have any
6 recollection why you were in Vegas on
7 February 25, 2001 acting as Mr. Johnson's
8 bodyguard? In other words, was there a
9 particular event that was happening out
10 there?
11      MS. FROMMER: Objection to the
12 characterization as "bodyguard."
13      You can answer.
14   A.   I believe we were there for
15 Summer Slam.
16   Q.   Okay. And how long did Summer
17 Slam last?
18   A.   Summer Slam is a day event.
19   Q.   One-day event?
20   A.   Yeah.
21   Q.   Do you recall, when you got the
22 phone call concerning the Hot 97 shooting on
23 February 25, 2001, had Summer Slam already
24 occurred or was it going to occur soon?
25      MS. FROMMER: Objection. You

25 (Pages 94 to 97)

98

```
1            PARKER
2    can answer.
3       A.   I don't remember if it was in
4    the process or whatever. I don't remember.
5       Q.   Okay. Do you have any records
6    that would indicate when you went out to
7    Vegas?
8       A.   No.
9       Q.   Do you have any pay slips or
10   billing invoices to Mr. Johnson that would
11   indicate when you traveled?
12      A.   No.
13      Q.   How did you get to -- who
14   booked your flight to Vegas?
15           MS. FROMMER: Objection. You
16   can answer.
17      A.   The travel agent for WWF --
18   WWE.
19      Q.   I'm sorry?
20      A.   WWE.
21      Q.   Were you there prior to Summer
22   Slam or did you show on the day of Summer
23   Slam or something else?
24           MS. FROMMER: Objection. You
25   can answer.
```

99

```
1            PARKER
2       A.   I don't recall.
3       Q.   Okay. Within the thirty days
4    prior to February 25, 2001, were you working
5    on any other bodyguard or security
6    assignments?
7            MS. FROMMER: Objection. You
8    can answer.
9       A.   Not that I recall.
10      Q.   Were you in any other states
11   other than New York and Vegas within the
12   thirty days prior to February 25, 2001?
13           MS. FROMMER: Objection. You
14   can answer.
15      A.   I can't recall.
16      Q.   Okay. By the way, did you ever
17   say the New York Police Department was
18   rampant with corruption driven by ambition
19   and stunted by stubborn egos?
20           MS. FROMMER: Objection. You
21   can answer
22      A.   Again, are you referring to the
23   book?
24      Q.   Page 9.
25           MS. FROMMER: Again, I am going
```

100

```
1            PARKER
2    to object to the complete misquote,
3    but you can answer, to the best of
4    what it reflects in your literature.
5       A.   It reflects the rap music
6    industry again.
7       Q.   Well, what did you mean by that
8    quote?
9       A.   It means that both cultures are
10   wracked with corruption and driven by
11   ambition.
12      Q.   And when you say the NYPD was
13   wracked with corruption, what do you mean?
14           MS. FROMMER: Objection. That
15           is not what he said. Stop
16           mischaracterizing his writing.
17   DI       I am going to instruct him not
18           to answer.
19      Q.   When you say wracked with
20   corruption, is that the correct term you
21   used, W-R-A-C-K-E-D?
22      A.   Yes.
23      Q.   Okay. Did you say the NYPD was
24   wracked with corruption?
25           MS. FROMMER: Stop
```

101

```
1            PARKER
2    mischaracterizing his testimony.
3       Q.   Is that what you said, yes or
4    no?
5       A.   I said both cultures.
6       Q.   Okay. And are you referring
7    also to the NYPD?
8            MS. FROMMER: Objection. You
9    can answer.
10      A.   Yes.
11      Q.   Okay. What did you mean by
12   that, specifically to the NYPD, not the other
13   culture?
14      A.   That sometimes we have flaws
15   and there is corruption.
16      Q.   And what do you mean by -- do
17   you also say that both cultures, including
18   the NYPD, were driven by ambition?
19           MS. FROMMER: Objection. You
20   can answer.
21      A.   I mean there is always
22   ambition. You have ambition, you know, to
23   rise to rank, and the music industry,
24   referring to the rap music industry, you have
25   ambition to be a top wrapper or top
```

26 (Pages 98 to 101)

102

PARKER

1 entertainer.
2     Q.   And the way to fulfill the
3 ambition within the NYPD was to close cases,
4 correct?
5 DI      MS. FROMMER: Objection. I am
6     instructing him not to answer.
7     Q.   Sir, in general, was closing
8 cases a way to advance in the NYPD?
9         MS. FROMMER: Objection. You
10     can answer, to the best of your
11     knowledge and personal experience
12     only.
13     A.   To the best of my knowledge,
14 that is not the sole part of advancing, no.
15     Q.   Okay. Is it a large part of
16 advancing?
17     A.   It plays a role.
18     Q.   And what do you mean by stunted
19 by stubborn egos?
20         MS. FROMMER: Objection. You
21     can answer.
22     A.   That we have egos.
23     Q.   But what do you mean by stunted
24 by stubborn egos?

103

PARKER

1     A.   It mean that in both cultures,
2 referring back to the rap music industry, we
3 have stunted, stubborn egos. You know,
4 sometimes we don't want to do certain things
5 or some things that we -- it is taken a lot
6 in different context. You know what I'm
7 saying. It is just a quote that I said about
8 egos.
9     Q.   Okay. This quote had to do
10 with the NYPD, correct?
11         MS. FROMMER: Objection. You
12     can answer.
13     A.   Yes.
14     Q.   In 2001 was it common for
15 police officers in the Bronx to look the
16 other way when other officers engaged in
17 misconduct?
18         MS. FROMMER: Objection. He
19     was not in the Bronx.
20 DI      I am going to instruct him not
21     to answer that.
22     Q.   In 2001 was it common for
23 detectives in the NYPD to look the other way
24 at other officer's misconduct?

104

PARKER

1         MS. FROMMER: Objection. You
2 can answer, if you can.
3     A.   I can't answer that.
4     Q.   Okay. Did you answer it on
5 page 5 of your book?
6     A.   Again, let me turn to page 5.
7         MS. FROMMER: You can answer,
8     if you can. He is asking you if you
9     say on page 5 that detectives look the
10     other way.
11     Q.   Sir, did you say the first rule
12 of law enforcement is the same as the code of
13 the street, keep your mouth shut?
14         MS. FROMMER: Objection.
15     A.   When talking to a journalist,
16 yeah.
17     Q.   Okay. Did you also say that --
18 you are lucky. I forgot about the page on
19 this one.
20 DI      MS. FROMMER: Then I am going
21     to instruct him not to answer if you
22     are going to ask him a general
23     statement about the comments in his
24     book.

105

PARKER

1     MR. JOSEPH: Well, actually
2 hold on.
3 *R  Q.   Sir, did you ever look the
4 other way while a fellow officer abused
5 cocaine --
6         MS. FROMMER: Objection.
7     Q.   -- and solicited prostitutes?
8 DI      MS. FROMMER: Objection. I am
9     going to instruct him not to answer
10     that.
11     MR. JOSEPH: Page 99.
12 DI      MS. FROMMER: I am going to
13     instruct him not to answer. I am
14     instructing him not to turn to the
15     page. You are asking him to implicate
16     himself in something that has the
17     appearance of impropriety, and I am
18     going to instruct him not to answer.
19     MR. JOSEPH: Mark it for a
20     ruling.
21     Q.   Sir, did you say on page 43
22 corruption was so rampant, you never knew if
23 cops were dirty or not?
24         MS. FROMMER: Then the answer

27 (Pages 102 to 105)

106

```
1           PARKER
2  to his question is it doesn't say that
3  on page 43.
4     A.   It doesn't say that.
5     Q.   Let me see.
6        MS. FROMMER: Off the record.
7        (Discussion off the record.)
8     Q.   Okay.  On Page 46, I apologize.
9  On page 46 did you say corruption was so
10 rampant, you never knew if cops were dirty or
11 not?
12       MS. FROMMER: Does it say that
13 on this page.
14       THE WITNESS: 46?
15       MS. FROMMER: So is the answer
16 no?
17       THE WITNESS: No, the answer is
18 no.
19       MS. FROMMER: Thank you.
20    Q.   Did you say you never know if
21 uniform cops were dirty cop or not on page 46
22 in your book?
23       MS. FROMMER: It is not the
24 question you asked, Counselor.  Again,
25 you continue to mischaracterize.
```

107

```
1           PARKER
2  DI      I am going to instruct him not
3         to answer a single question about the
4         book.  You have one more chance to get
5         the quotations right or I am going to
6         find it overly harassing.
7           Will you please explain the
8         context to the extent you need to.
9         You can answer.
10    A.   I'm sorry.  Can you rephrase
11 the question.
12    Q.   You want me to repeat it?
13    A.   Yes, please.
14       MR. JOSEPH: Would you read it
15 back.
16       (Record read.)
17    A.   I did say that, yes, in my
18 book.
19    Q.   Well, what did you mean by
20 that?
21    A.   Because I was an undercover cop
22 at the time, I didn't know if cops, you know,
23 knew people in the street that would give up
24 my identity, who I was.
25 *R   Q.   Okay.  Did you also say that
```

108

```
1           PARKER
2  there were things that you did as a cop that
3  you weren't proud of, page 208?
4        MS. FROMMER:  Again, you have
5  misquoted him.
6  DI      So I am going to instruct him
7         not to answer that.  That is the last
8         time I am going to allow this line of
9         questioning, because you have again
10        misquoted him.
11       MR. JOSEPH: Mark it for a
12 ruling.
13    Q.   Sir, did you say there were
14 things I did as Giuliani's hip-hop cop that I
15 wasn't proud of on page 20?
16       MS. FROMMER: Please finish the
17 quotation.  I am going to ask that the
18 entire statement be read into record.
19 So please read the entire statement
20 into the record from your book.
21       THE WITNESS: From the top?
22       MS. FROMMER: No, no, no.  From
23 the "there were."
24       THE WITNESS: "There were
25 things I did as Giuliani's hip-hop cop
```

109

```
1           PARKER
2  that I wasn't so proud of that made me
3  uncomfortable.  Still I had no choice
4  because it was my job."
5     Q.   What did you mean by that?
6     A.   This was referring to me doing
7  intelligence work on some of the people that
8  opposed Giuliani's methods, such as not
9  Minister Farakhan, but the disciple Mohammed
10 who had problems with Giuliani.
11    Q.   Okay.  And what specifically
12 did you do that you weren't proud of?
13    A.   I went to his house and sit on
14 his house and tail him, because he had a
15 verbal warring match with Giuliani, a verbal
16 war.
17    Q.   Anything else?
18    A.   That's it.
19    Q.   Is there anything that you
20 recall about Terrance Alston that you haven't
21 told us today?
22    A.   To the best of my knowledge,
23 no.
24    Q.   Is there anything else that you
25 recall or know about the prosecution of
```

28 (Pages 106 to 109)

110

PARKER

1  Anthony Manganiello that you haven't told us
2  here today?
3      MS. FROMMER: Objection. You
4      can answer.
5  A.    No.
6  Q.    Okay. Prior to coming here
7  today, did you speak with Detective Luis
8  Agostini?
9  A.    No.
10     MS. FROMMER: He already
11     answered three times that he doesn't
12     know who he is, Counselor.
13  Q.    Let me ask you generally.
14  Prior to coming here today, have you spoken
15  to any other defendant who is named in this
16  lawsuit?
17  A.    No.
18     MR. JOSEPH: That's all I have.
19     MS. FROMMER: I would like to
20     speak to you.
21     (Recess taken.)
22  EXAMINATION BY MS. FROMMER:
23  Q.    I have some follow-up
24  questions.

111

PARKER

1      Detective, did you have any
2  involvement at all in arresting Anthony
3  Manganiello?
4  A.    No.
5  Q.    Have you ever met Anthony
6  Manganiello?
7  A.    No.
8  Q.    Did you have any involvement in
9  investigating the homicide that occurred at
10  Parkchester?
11  A.    No.
12  Q.    Did you have any involvement in
13  prosecuting Anthony Manganiello for a
14  homicide?
15  A.    No.
16     MR. JOSEPH: Note an objection
17     to the last question.
18  Q.    Did you have any conversation
19  with the district attorney's office about its
20  prosecution of Anthony Manganiello?
21  A.    No.
22  Q.    Did you ever offer Terrance
23  Alston a deal or anything of value in
24  exchange for his information about the

112

PARKER

1  Parkchester homicide?
2  A.    No.
3  Q.    You testified earlier that
4  Terrance Alston gave you information about
5  gang members and hip-hop activity, correct?
6  A.    Correct.
7  Q.    That were unrelated to the
8  information he gave you about the Parkchester
9  homicide, correct?
10  A.    Correct.
11  Q.    Did you investigate the
12  information that he gave you about gang
13  activity and the hip-hop activity?
14  A.    Yes.
15  Q.    And when you investigated that
16  information, did you verify what Terrance
17  Alston told you was accurate?
18  A.    Yes.
19  Q.    Did you ever investigate any
20  information that Terrance Alston told you and
21  found that was inaccurate?
22  A.    No.
23  Q.    Did anyone from the district
24  attorney's office ever request Terrance

113

PARKER

1  Alston's confidential file from you?
2  A.    No.
3  Q.    Did you make a decision that
4  Terrance Alston would be a witness for the
5  prosecution against Anthony Manganiello?
6  A.    No.
7  Q.    Did you ever urge or encourage
8  the prosecution to use Terrance Alston as a
9  witness in the homicide investigation?
10  A.    No.
11  Q.    One last question, Detective.
12  Is it fair to say that some of the comments
13  in your book contain personal opinions?
14  A.    Yes.
15  Q.    Okay. Which can be subjective
16  in nature?
17     MR. JOSEPH: Objection.
18  A.    Yes.
19  Q.    Thank you. Is it fair to say
20  that some of the statements that were read or
21  picked out in your examination contain
22  statements that could be personal or
23  subjective in nature?
24     MR. JOSEPH: Objection.

29 (Pages 110 to 113)

118

```
1              PARKER
2         MR. JOSEPH: Okay.
3     Q.   What activity did he give you
4  about that Blood?
5         MS. FROMMER: He can answer
6     general activity, but nothing
7     specific.
8     A.   That he was involved in gang
9  activities.
10    Q.   Okay. Did he give you any
11 information on any specific crimes concerning
12 this Blood?
13    A.   Yes, he did.
14    Q.   What crimes did this Blood
15 allegedly commit?
16 DI       MS. FROMMER: Objection. I am
17    going to instruct him not to answer.
18    Q.   Do you have a recollection, as
19 you sit here right now, of what crime that
20 Blood actually committed?
21        MS. FROMMER: That is a
22    yes-or-no question. You can answer
23    only yes or no.
24    A.   I don't recall, no.
25    Q.   Okay, do you know, as you sit
```

119

```
1              PARKER
2  here right now, do you recall whether that
3  Blood was arrested and convicted?
4     A.   Not that I recall.
5     Q.   So how do you know that
6  information was accurate that Mr. Alston
7  provided you?
8         MS. FROMMER: Objection. You
9     can answer.
10    A.   Because speaking with other
11 detectives, I determined that this guy was a
12 Blood.
13    Q.   Okay. So the only verification
14 that you had concerning Mr. Alston's
15 statement was speaking with other detectives?
16        MS. FROMMER: Objection.
17    Q.   Correct?
18        MS. FROMMER: You can answer.
19    A.   Other cops, other detectives.
20    Q.   Is that a yes?
21    A.   Yes.
22    Q.   You said he also gave you some
23 information on hip-hop activity.
24        What information did he give
25 you?
```

120

```
1              PARKER
2  DI       MS. FROMMER: Objection. I am
3     going to instruct him not to answer.
4     Q.   What was the nature of the
5  information he gave you?
6  DI       MS. FROMMER: I am going to
7     instruct him not to answer. You can
8     answer only generally. This is all
9     protected by privilege. You can
10    answer generally.
11        MR. JOSEPH: It is actually
12    not.
13        MS. FROMMER: You can answer
14    generally, but I am instructing you
15    not to answer anything specific.
16    A.   About a music artist.
17    Q.   What did he tell you in general
18 about the music artist?
19        MS. FROMMER: Without giving
20    any identifying information or any
21    other specific information.
22    A.   Tied to gang activity.
23 *R  Q.   Okay. Did he give you anything
24 more specific other than this hip-hop artist
25 was tied to gang activity?
```

121

```
1              PARKER
2         MS. FROMMER: You are asking if
3     he said anything other than what I am
4     allowing him to testify to?
5         MR. JOSEPH: No. I am asking
6     if Mr. Alston's comments were more
7     specific than that or is it generally
8     he was tied to gang activities.
9         MS. FROMMER: Counsel, I
10    instructed him to couch his answer to
11    only give general information. You
12    are taking now my instruction and you
13    are deeming that to be his answer.
14        MR. JOSEPH: No, no.
15        MS. FROMMER: You are. I
16    instructed him to say something
17    general.
18        MR. JOSEPH: Mark it for a
19    ruling.
20        MS. FROMMER: My client
21    followed my instruction and now you
22    have mischaracterized his answer which
23    was based specifically on my
24    instruction which is protected by
25    privilege.
```

31 (Pages 118 to 121)

122

PARKER

1
2  DI    I am instructing him not to
3       answer, because you have my
4       instruction.
5       Q.   Did Mr. Alston provide you with
6  specific activity of criminal misconduct
7  concerning a hip-hop artist?
8       MS. FROMMER: You can answer.
9       A.   He did.
10      Q.   Okay. Was that hip-hop artist
11 ever arrested, charged or convicted?
12      A.   That I don't recall.
13      Q.   How do you know that the
14 information that he provided to you was
15 accurate?
16      MS. FROMMER: You can answer.
17      A.   Because I got that information
18 from someone else, that this guy was engaged
19 in some gang activity.
20      Q.   Was this "someone else" a
21 police officer?
22      A.   No.
23      Q.   Was this "someone else" another
24 confidential informant?
25      A.   No.

123

PARKER

1
2       Q.   Without telling me the person's
3  name, what was the relationship of this
4  particular person?
5       A.   It was a person in the music
6  industry.
7       Q.   Was this person within the
8  music industry facing any criminal charges at
9  the time?
10      A.   Not that I recall.
11      Q.   Did you give this person in the
12 music industry any money?
13      A.   No, no.
14      Q.   Was this hip-hop artist ever
15 convicted of any crime that in any way
16 relates to gang activity?
17      MS. FROMMER: Objection. You
18 can answer.
19      A.   No.
20      Q.   Okay. Sir, has Mr. Alston ever
21 provided you with any information that
22 actually resulted in a conviction?
23      MS. FROMMER: Objection. You
24 can answer, if you can.
25      A.   Not that I recall.

124

PARKER

1
2       MR. JOSEPH: I have nothing
3  further.
4       MS. FROMMER: One second,
5  please.
6       (Discussion off the record.)
7       MS. FROMMER: Yes, I have
8  nothing further. I will be looking
9  for my copy of the book in the mail.
10      MR. JOSEPH: Okay.
11      MS. FROMMER: As well the
12 deposition transcripts of the other
13 three.
14      MR. JOSEPH: Okay.
15      (Time noted: 3:08 p.m.)

125

ACKNOWLEDGMENT

1
2
3  STATE OF        )
4                  ) ss.:
5  COUNTY OF       )
6
7       I, DERRICK PARKER, hereby
8  certify that I have read the transcript of my
9  testimony taken under oath in my deposition;
10 that the transcript is a true, complete and
11 correct record of my testimony, and that the
12 answers on the record as given by me are true
13 and correct.
14
15      _____
16         DERRICK PARKER
17
18 Signed and subscribed to before
   me, this    day of       ,
19 2007.
20
21 _____
22 Notary Public, State of _____
23
24
25

32 (Pages 122 to 125)