EXHIBIT **7**

CITISTORAGE
6015415

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF BRONX : CRIMINAL TERM : PART  T-13

3  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

4  THE PEOPLE OF THE STATE OF NEW YORK,   :Ind. No.

5                      -against-              :2207/01

6  ANTHONY MANGANIELLO,                       :TRIAL

7                      Defendant(s). :

8  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9                          851 Grand Concourse
                           Bronx, New York    10451
10                         June 28th, 2004

11

12  B E F O R E :

13                  HONORABLE MARTIN MARCUS,
                            JUSTICE SUPREME COURT & jury.

14  A P P E A R A N C E S :

15                      ROBERT T. JOHNSON, ESQ.
                       District Attorney, Bronx County
16                     BY: CHRISTINE SCACCIA, ESQ.
                          SUZANNE MCELWREATH, ESQ.
17                     Assistant District Attorney

18

19  FOR THE DEFENDANT(S):

20                      MURRAY RICHMAN, ESQ.
                       RENEE HILL, ESQ.
21                     2027 Williamsbridge Road
                       Bronx, NY

22

23

24                          Lorraine L. Ramsey
                           Senior Court Reporter
25

Cobb - People - Direct      47

You said you got to work at about eight or so that day, your normal hours, correct?

A.    Uh-hum.

Q.    And that now you were saying as you were approaching,  you were approaching 1700, the building, from the street; what street were you walking on?

A.    Metropolitan Avenue.

Q.    Okay.  And now, the carriage rooms that are located in the basement of 1700, do they have any windows or other doors that face out onto Metropolitan Avenue?

A.    Several have, but the windows were facing out, one particular window facing out to Metropolitan Avenue.

Q.    And now, you're walking along.

Could you tell us what, if anything, you remember happening as you're now walking towards the basement of 1700?

A.    A few steps ahead of me was what they call a ramp to get into the building, but prior to that, there's one particular window I happen to hear.

Q.    What did you hear?

A.    Four shots.

Cobb - People - Direct    48

Q.    Now, the shots that you heard, did you have any idea where they appeared to be coming from?

A.    From one particular, only one particular window as I approached the ramp.

Q.    Other than hearing the shots, at that moment in time, did you see anything else around you on the street?

A.    No, ma'am.

Q.    And could you describe for the ladies and gentlemen of the jury what these shots sounded like to you?

A.    Well, I'm familiar, being that I was in the United States Marine Corps, with firearms and they sounded muffled to me, like they came from a 22 or a 25.

Q.    Why do you say 22 or 25, what makes you say that?

A.    The caliber, less power in the shell, less noise.  A higher caliber would make much more noise and coming in a, let's say empty basement, would make a much louder noise.

Anything below that would sound like a fire cracker.  But I can tell the difference.

Q.    Okay.  So now, after you hear these

Cobb - People - Direct        49

1  four shots, what do you do?

2        A.      What do I?

3        Q.      What do you do?

4        A.      I forgot it completely for the brief

5  moment.  I had made my turn to the small ramp to

6  gain entrance to the building.

7        Q.      And what happens?

8        A.      As I use my comp key or was about to

9  use my comp key, the door flies open.  I didn't

10 touch,  I didn't even get to physically touch the

11 door.  The door flew open.

12       Q.      What causes the door to fly open,

13 Mr. Cobb?

14       A.      Someone exiting it from the inside to

15 the outside.

16       Q.      Okay.  And this person who was exiting

17 it, had you ever seen this person before, ever?

18       A.      At that particular moment I saw him,

19 yes.

20       Q.      And did you recognize this person?

21       A.      Yes,  I did.

22       Q.      And who did you recognize the person

23 to be?

24               Who was it?

25       A.      Well, I don't know him but I found out

                        Cobb - People - Direct        50

1   later because he work in the place, I know him by

2   sight.

3        Q.    Okay.  And how did you recognize him

4   as working in your place?

5        A.    Because of the uniform he had.

6        Q.    This is an individual who you said you

7   had seen by sight?

8        A.    Yes, on the premises.

9        Q.    Did you see, when you saw this

10  individual, was he dressed in any uniform?

11       A.    Yes.

12       Q.    Mr. Cobb, I'm going to ask you to take

13  a look around the courtroom today and indicate for

14  us if you see the person you saw open the door on

15  February 12th, 2001 here in this courtroom?

16       A.    Yes, ma'am.

17       Q.    Where is he?

18       A.    Directly to my left.

19       Q.    Okay.

20            MR. RICHMAN:  Indicating the

21  defendant.

22       Q.    Now, when the defendant, Mr.

23  Manganiello opened the door, did you say something

24  to him, Mr. Cobb?

25       A.    Yes,  I did.

a/lr        P.O. NIEVES - PEOPLE - DIRECT

belong to a larger complex?

A.      Yes.

Q.      What complex does that building belong to?

A.      Parkchester Condominiums.

Q.      Could you tell the members of this jury, Officer Nieves, what it was that brought you and your partner over to 1700 Metropolitan Avenue that morning?

A.      We had a radio run of an officer shot.

Q.      Now, this radio run is that information you received over your police radio?

A.      Yes.

Q.      And when you're driving around in a police car on patrol?

Who is it that sends you to particular jobs?

A.      Central Dispatcher.

Q.      Now, the transmissions that you hear from Central Dispatcher, are they transmissions being given to you by police department personnel or are you actually hearing 911 calls?

A.      I'm sorry repeat the question.

Q.      When a person calls 911 to report an incident requesting police assistance, do you hear that call or do you just hear the information that Central gives you?

A.      Central gives us.

a/lr      P.O. NIEVES - PEOPLE - CROSS

A.      Correct.

Q.      You made no notes of the event itself,
correct?

A.      Correct.

Q.      All you did was make a single notation that
you arrived at the scene, correct?

A.      Correct.

Q.      And you never made a note, nor did you write
anything other than -- withdrawn.

You made no notes concerning the event as to
what you observed or what you heard; is that correct?

A.      Correct.

Q.      You testified that you were hearing a 1013
correct?

A.      Correct.

*      *      *      *      *

(Continued on next page...)

cpB        P.O. Nieves - People - Cross

        THE COURT:  You're saying there wasn't or it doesn't refresh your recollection?

        THE WITNESS:  Not to the exact wording of how the job came over.

    Q.    Do you recall whether or not now, after reviewing that document, whether or not it stated Parkchester Security officer?

        MS. SCACCIA:  Objection.

        MR. RICHMAN:  The broadcast I'm talking about.

        THE COURT:  Does this refresh your recollection?  Go ahead.

    Q.    Does this refresh your recollection as -- withdrawn.

        Does this document refresh your recollection?

        THE COURT:  I'm sorry, let's go back to the first question.  Do you recall whether or not --

    Q.    Do you recall whether or not the broadcast was indicated a Parkchester Security officer down or words to that effect?

    A.    I remember it saying either Parkchester Security or officer, unknown whether it was security or police officer.

179

cpB          P.O. Nieves - People - Cross

A.    Uh-hmm.  Yes.

MR. RICHMAN:  And may I just have a moment, Your Honor?

(Pause in the proceedings.)

Q.    You testified on direct examination, question of -- can we put this question to you?

MS. SCACCIA:  Can I have a page number?

MR. RICHMAN:  Bear with me.

Q.    Did you testify on a previous occasion in the Grand Jury?

THE COURT:  What page?

Q.    EP-111.  He said -- withdrawn.

EP-111 line 4.

"Question:  What happened to you when you go outside?

"Answer:  As I was walking out, I saw one of the Parkchester officers, which was Anthony Manganiello, coming in.  I figured they worked together.

"He said, 'I don't want to go in there.' And he said, 'That's my partner in there.'"

Do you remember that being your words?

A.    Yes.

Q.    "Question:"  123, line 7, you testified on direct examination by saying, "I want to go in there.

cpB          P.O. Nieves - People - Cross

That's my partner."

            Now it turns out in the Grand Jury you

testified, "I don't want to go in there.  That's my

partner," right?

            You also testified on direct examination

that, "You had no way of knowing that the person down

was an officer or a PSAA, Parkchester Special Police?"

            Your answer, "Yeah."

    A.    Right.

    Q.    Now, would it be fair to say that you never

wrote anything down about the events of that day,

correct?

    A.    Right.

    Q.    Even until today you never wrote it down?

    A.    Right.

    Q.    You testified one minute -- at one occasion

that the person said, "I don't want to go in there,"

correct?

    A.    Correct.

    Q.    You testify on another occasion that the

person said, "I do want to go in there?"

    A.    Right.

    Q.    You testify you didn't know that it was a

Parkchester person who was shot because you never

received the call over the radio, correct?

cpB          P.O. Nieves - People - Cross

THE COURT:  Sustained.

Q.    Now, how many transmissions came over the telephone, on the wires that day?

MS. SCACCIA:  Radio.

Q.    Radio, sorry.  Still ancient times.

A.    In that whole day?

Q.    No, that event that you recall.

A.    I can't recall.

Q.    Now, when you -- when for the first time did you tell a detective about what you allegedly observed?

A.    I believe it was March 1st.

Q.    And about three weeks later --

A.    Two-and-a-half, three.

Q.     -- right?

A.    Yes.

Q.    Not having written anything down, but that's what you recall, correct?

A.    Yes.

Q.    You didn't go back that afternoon to speak to a detective, right?

A.    Not that I recall, no.

Q.    You didn't speak to a detective that morning at the scene?

A.    No.

Q.    You didn't go back the following day, did

P.O. Perez - Peop. - Direct    210

1    A.    I recognize the white machine and,

2   that square, that's where Mr. Acosta was laying.

3    Q.    And now, from the point in time that

4   you receive the initial call to respond there

5   until you get there and walk into that room, do

6   you, yourself, Officer Perez, know whether the

7   person that they're calling for is an N.Y.P.D.

8   officer or a Parkchester security Officer?

9    A.    No, I just assumed it was P D.

10    Q.    At some point in time do you learn

11   that the individual who was on the ground, Mr.

12   Acosta, is an employee of Parkchester, a security

13   officer?

14    A.    Yes.

15    Q.    When did you learn that information?

16    A.    I learned it from my partner, Officer

17   Nieves.

18    Q.    And was that after your arrival at the

19   scene?

20    A.    Correct.

21        MS. SCACCIA:  If I may just have

22    one moment.

23        (Pause in proceedings.)

24        MS. SCACCIA:  I'm sorry, your

25    Honor, if I may just have one second.

Agostini - Peo - Direct          279

maintain custody and control of this box and these
reports that you have told us about?

A.    Yes.

          MR. RICHMAN:  Your Honor, I just
object to be the leading nature of the
questions.

          THE COURT:  Sustained as to the
last question.

Q.    Does there come a point in time,
detective, when you are no longer, you no longer
have knowledge as to the whereabouts of this box?

          MR. RICHMAN:  Objection, your
Honor, same objection.

          THE COURT:  Overruled.

A.    Yes.

Q.    When does that happen?

A.    It was February of 2003.

Q.    From that point on, from February
2003, when is the next time you try to locate the
box?

A.    March of 2004.

Q.    What did you do to try to locate the
box?

A.    I searched the file rooms, I searched
numerous rooms, I searched the basements, I

Agostini - Peo - Direct        280

1   searched the garage, I searched the room that it

2   was supposed to be in, and that turned into

3   another office.

4              I basically searched the whole

5   precinct.

6        Q.      And after your search, were you able

7   to find your box?

8        A.      No.

9        Q.      Of the items that you have spoken

10  about, while this box was in your possession did

11  you make duplicate copies of a number of the items

12  that were contained in this box?

13       A.      I made some copies, yes.

14       Q.      What items did you copy?

15       A.      I basically copied the DD-5's which

16  are the complaint follow ups.

17       Q.      And these are of the reports that were

18  generated by the detectives that you told us

19  about?

20       A.      Yes.

21       Q.      And as of today, do you still have

22  copies of those reports?

23       A.      Yes.

24       Q.      What about the handwritten notes that

25  you told us about?

Agostini - Peo - Direct          283

1   the room was totally changed.  They made it into

2   an auxiliary room.

3          Q.      Which means what, what is that?

4          A.      Auxiliary police room.

5                  MS. SCACCIA:  Your Honor, can we

6   step up for a moment, please?

7                  THE COURT:  Yes.

8                  (At this time and off the record

9   discussion is held at the bench among Court

10  and counsel.)

11                 THE COURT:  All right, ladies and

12  gentlemen, we're going to stop now for the

13  day.

14                 I remind you of your obligation as

15  jurors, to keep an open mind throughout the

16  trial; not to discuss the case among

17  yourselves or with anyone else during the

18  trial; not to permit anyone to discuss the

19  case in your presence; not to talk to the

20  attorneys, witnesses or defendant about

21  anything during the course of the trial; and

22  not to visit or view the place where the

23  crime charged was allegedly committed or any

24  other locations that have come up during the

25  trial.

288

a/lr   DET. AGOSTINI - PEOPLE - DIRECT

1    Q.    And can you tell the ladies and gentlemen of

2  the jury what pedigree information is?

3    A.    Pedigree information is basically your name,

4  date of birth, address and a phone number.

5              MR. RICHMAN: Your Honor, most

6         respectfully may we approach?

7              THE COURT: Yes.

8              (Whereupon, the following discussion

9         takes place at side-bar among the Court and

10        Counsel, outside the hearing of the defendant and

11        sworn jurors, off the record.)

12             MS. SCACCIA: May I have a read back.

13             (Whereupon, the Court Reporter reads

14        back the requested testimony.).

15   Q.    Now, Detective Agostini, you said at some

16 point that you learned Mr. Manganiello's full name to be

17 Anthony Manganiello, correct?

18   A.    Yes.

19   Q.    And did you have an opportunity to ask Mr.

20 Manganiello what his address was?

21   A.    Yes.

22   Q.    And could you tell the ladies and gentleman

23 of the jury, what, if anything, his response was when you

24 asked him that question?

25   A.    I don't know. I don't know.

a/lr   DET. AGOSTINI - PEOPLE - DIRECT

Q.      Did you have an opportunity to ask him Mr. -- ask Mr. Manganiello --

THE COURT:  I'm sorry. I don't know?

You don't know or I don't know that was his response?

THE WITNESS: His response was, "I don't know."

Q.      Now, did you have an occasion while you were present with Mr. Manganiello to ask him what, if any, phone contact information he had?

A.      Yes.

Q.      And what, if any, response did Mr. Manganiello give you when you asked him for his phone contact?

A.      It's unlisted.

Q.      At that point or shortly thereafter, detective, did you cease communicating with Mr. Manganiello?

A.      Yes.

MS. SCACCIA: Your Honor, I have no further questions of this witness.

THE COURT:  Mr. Richman.

MR. RICHMAN: Yes, Your Honor.

CROSS EXAMINATION

BY  MR. RICHMAN:

a/lr    DET. AGOSTINI - PEOPLE - CROSS

1    Q.    And wasn't this one of the reports you caused

2    to have turned over to the District Attorney's office?

3    A.    Uhm, I don't know if they have it or not.

4    Q.    Sir, you caused five folders to be turned

5    over to the District Attorney's office; is that correct?

6    A.    Yes.

7    Q.    Containing photocopies of DD-5s, right?

8    A.    Yes.

9    Q.    And you were the person in charge of this

10   investigation?

11   A.    Uh, not until 8, 8:30 that night.   Yes.

12   Q.    Not till 8:30 that night?

13   A.    That's correct.

14   Q.    But at 8:30 that night you became in charge

15   of that investigation?

16   A.    Yes, I did.

17   Q.    And you remained in charge of the

18   investigation for 3, 4 months at least?

19   A.    Yes.

20   Q.    And, in fact, the folder was in your charge

21   from that point forward?

22   A.    Yes.

23   Q.    And that folder was not just a little

24   folder, it was a box about this size, correct?

25   A.    Approximately, yes.

293

a/lr   DET. AGOSTINI - PEOPLE - CROSS

Q.    And that box was full of files, materials
for this case, right?

A.    It had my five folders, a book, a memo book,
and probably other papers.  Yes.

Q.    When you say other papers, what other papers
do you recall was in that box?

A.    It could be computer checks.

Q.    Computer checks?

A.    Yes.

Q.    How about a diagram of the crime scene
itself was that there?

A.    Uhm, I think we do have that.

Q.    You do?

A.    Yes.

Q.    Now, when you say we do have that, you have
it, correct?

A.    And I believe you do also.

Q.    And it was given in the box?

You didn't put it in the box, right?

A.    It was --

MS. SCACCIA: Objection.

Q.    Was it in the box?

THE COURT:  You can answer.

A.    Yes.

Q.    The original was in the box?

a/lr    DET. AGOSTINI - PEOPLE - CROSS

1    A.    Yes.

2    Q.    And you took notes, didn't you?

3    A.    Yes.

4    Q.    And, in fact, you know that it's customary

5    for a detective to take notes, correct?

6    A.    That's correct.

7    Q.    And you do -- in fact, you filled out more

8    than one spiral of notebooks of notes, do you recall?

9    A.    I don't recall if it's more than one.  I

10   don't --

11   Q.    But you interviewed people and you took

12   notes, right?

13   A.    Yes.

14   Q.    And that was in your box, too?

15   A.    Yes.

16   Q.    But you lost those notes?

17   A.    Yes.

18   Q.    Now, there was another detective involved in

19   this case.  A Detective Martinez, correct?

20   A.    Yes.

21   Q.    And you know for a fact that Detective

22   Martinez took notes?

23   A.    Do I know for a fact?  No, I didn't see him

24   taking notes.

25   Q.    Have you seen -- is it customary for a

A        Can I explain myself?

Q        No.  Please.  Did the police officer --
were you aware that police officers got there as
well?

A        I can't answer that.  I wasn't there.

Q        Okay.  You have a notation here that
says, "handled by P.D.," and does not P.D. mean
police department?

A        That's what Officer Manganiello relayed
to me.  That's why I put it down there.

Q        And do you know if officer -- was
Officer Acosta also sent to that?

A        Yes, sir.

Q        And did you know whether or not he ever
showed up?

A        He told me he was 84, which means he
was there at 1700.

Q        He was there at 1700?

A        He was ready.

Q        Where do you have that?

A        Not from the police radio.  From our
radio.

Q        And we are now talking now at 8:45 in
the morning?

A        Right.

THE COURT:  When you say ""he", you are talking about Officer Acosta?  That was the question?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

Q     And you made a notation of that somewhere?

MS. SCACIA:  Objection.

THE COURT:  Come up.

(Whereupon, an off-the-record discussion took place at the bench between the Court and counsel, out of the presence of the defendant.)

THE COURT:  The objection is overruled.

(Continued on the next page.)

MS. SCACCIA: Which?

MR. RICHMAN: Last conversation by Mr. Colon.

THE COURT: The last transmission on?

MS. SCACCIA: People's 3.

THE COURT: People's 3 or People's 6.

MR. RICHMAN: His call to 911.

THE COURT: People's 3.

(Whereupon, 911 tape is played in open court. Not transcribed for these purposes).

Q. Mr. Colon, you heard the time that call went out, correct?

A. Yes, sir.

Q. 10:22, did you hear that?

A. Yes.

Q. When did you learn that the person who was injured in the basement was one of your officers?

A. When the Sergeant Ohle called me stating that.

Q. And he called you?

A. Over the radio.

Q. Over the radio.

And that's -- a radio is open line to other officers, as well?

A. Yes. Yes.

d/lr    SPO COLON - PEOPLE - CROSS

Q.      So other officers who may have had their
radio would have been able to hear the same
communication?

A.      Yes, sir.

Q.      And when did Sergeant Ohle call you?  Call
that to you?

A.      Just before I made that call.

        I called -- made that call right away to
911.

Q.      And what other officers were there at the
time when Sergeant Ohle made that call to you?

            MS. SCACCIA: Objection.

            THE COURT: Where were?

Q.      At the scene, that you knew of?

        You said other officers were there?

A.      Later, later on I found out that Officer
Nieves was there.

Q.      But you said to the officer on at 10:22 that
other officers -- your other officers were present at the
scene, correct?

A.      Yeah, because Sergeant Ohle called me
stating that there was officers down (sic), so I called
911, and Officer Nieves was patrolling in his car.  He
was down there, too.

Q.      But did you know that he was there?

MS. SCACCIA: That's --

THE COURT: How old it.

MS. SCACCIA: That's Mr. Cobb. We need to go two conversations ahead.

THE COURT: It's earlier or later?

MS. SCACCIA: It's later. He has to fast forward from that.

THE COURT: Right.

(Whereupon, the 911 tape is being played in open court. Not transcribed for these purposes.)

CROSS EXAMINATION
BY MR. RICHMAN:

Q. Sir, did you hear yourself say you sent someone to a man in the basement and you believe he encountered someone else there?

A. Yes, sir.

Q. Now, you were explaining how the man -- the man in the basement got there injured, were you not, to the police officer?

MS. SCACCIA: Objection.

THE COURT: Sustained.

Q. You heard what you said, right?

A. Yes, sir.

Q. Who was the officer you sent to answer that

d/lr    SPO COLON - PEOPLE - CROSS

that that's because you assumed that the officer

who went there and encountered someone must be the

officer down, is that right? Is that what you

meant?

THE WITNESS: I was trying -- I thought

it if -- that if he was down, he must of -- must

have been foul play.

THE COURT:    Must?

THE WITNESS: Exactly.

THE COURT:    Okay when you referred to

that officer, when you -- who you sent to the

location and who you now believe was down because

he encountered someone, did you think it was some

officer in particular?

THE WITNESS: Well, I thought it was

Officer Acosta.

MR. RICHMAN: Nothing further.

REDIRECT EXAMINATION

BY MS. SCACCIA:

Q.    First of all, counsel asked you about summons

and how Parkchester Officers when you're issuing a

summons for garbage, correct?

A.    Correct.

Q.    You leave, depending on what type of

residence it is, you either leave a copy with the tenant

f/lr    PROCEEDINGS

wit, the securing of a conviction as against my

client by putting a gun in his hand when they know

that not to be the truth or should have known it

not to be the truth.

THE COURT: I don't understand what

you're saying.

MR. RICHMAN: Well, in view of Mr.

Damon's no longer a prosecution witness based upon

the falsity of the statement, I would like the

opportunity to potentially bring it to the Court's

or at least the jury's attention of just that, that

he was such a person and he -- the prosecution

through auspices in this particular case had

proffered him initially as a witness only later to

find out that he withdraw it knowing it to be

untrue.

MS. SCACCIA: If counsel can remember

back to this morning when we had this discussion at

the bench, I said I don't believe his recantation

and I don't know whether he was, in fact, lying

then or is lying now, but I know I have an

obligation and I'm not going to put a liar on the

stand because either way you cut it he's lying.

So I don't know where this whole

surprise and he didn't know that Booth and

cpE                    Booth - People - Cross

1          A.     Excuse me?

2                      MS. SCACCIA:   What does that mean?

3                      THE COURT:  Sustained.

4          Q.     Does anybody bother you in the 43rd

5    Precinct?

6          A.     Do they bother me?

7                      THE COURT:  Excuse me.  Sustained.

8          Q.     Have you ever been arrested in the 43rd

9    Precinct?

10                     MS. SCACCIA:  Objection.

11         A.     No.

12                     THE COURT:  Excuse me.  If there's an

13   objection, give me a chance to rule.

14                     MR. RICHMAN:  Sorry.

15                     THE COURT:  Sustained.

16         Q.     Do you stay in the vicinity of the 43rd

17   Precinct of Parkchester area?

18         A.     Yeah.

19         Q.     And that is the 43rd Precinct, if you know,

20   correct?

21         A.     I believe so, yes.

22         Q.     Have you ever been arrested?

23                     MS. SCACCIA:  Objection.

24                     THE COURT:  Sustained.

25         Q.     Have you ever been convicted of a crime?

619

cpE                  Booth - People - Redirect

1          A.      No.

2          Q.      When the police came to you, they came to

3    you in March of the year 2001, right?

4          A.      Yes.

5          Q.      And do you know Mr. Manganiello by name?

6          A.      No, just by short, fat guy.

7          Q.      Short, fat guy.

8                  But when you wrote out a statement, you

9    wrote a statement saying Manganiello came to you,

10   right?

11         A.      Yeah.

12         Q.      Who gave you the name Manganiello?

13         A.      Detectives.

14         Q.      The detectives.    Thank you.

15                 MS. SCACCIA:  Before I ask my next

16         question, I would like a ruling from Your Honor.

17                 THE COURT:  Come up.

18                 (Whereupon, a discussion was held off

19         the record between the Court and Counsel.)

20                 THE CLERK:  Come to order.  Remain

21         seated.

22   REDIRECT EXAMINATION

23   BY MS. SCACCIA:

24         Q.      Mr. Booth, when counsel was trying to ask

25   you about the 43rd Precinct and nobody bothering you --

cpE                    Booth - People - Redirect

1                    MR. RICHMAN:   Objection.

2         Q.      -- did the cops in this case give you a

3    free ride?

4                    THE COURT:   Sustained.   But go ahead

5         and ask your question.

6         Q.      Have you ever gotten any sort of benefit

7    from the police department regarding your side

8    businesses because you gave this statement against Mr.

9    Manganiello?

10        A.      No.

11        Q.      Have you received any benefit from giving

12   this statement to the police about Mr. Manganiello?

13        A.      No.

14        Q.      And you said that at some point, maybe some

15   of your side businesses were either running numbers or

16   loaning out money, right?

17        A.      Yeah.

18        Q.      If I can use two street terms to describe

19   those activities, perhaps maybe a little bookmaking and

20   perhaps a little loan sharking?

21        A.      No.

22        Q.      Not that severe?

23        A.      No.

24        Q.      However, when you were being asked about

25   nobody else bothering you in the neighborhood, did you

cpE                    Booth - People - Recross/Redirect

1      generally have problems with the civilian population

2      within Parkchester?

3          A.    Nobody.

4          Q.    Would it be reasonable, Mr. Booth, if

5      somebody thought that you were either into some things

6      such as running numbers or lending money that perhaps

7      you too --

8                    MR. RICHMAN:  Objection.

9          Q.    -- could assist them in obtaining an

10     illegal gun?

11                   THE COURT:  Sustained.  Don't answer

12         the question.

13                   MS. SCACCIA:  I have no further

14         questions.

15     RECROSS EXAMINATION

16     BY MR. RICHMAN:

17         Q.    But the detectives gave you the Manganiello

18     name, correct?

19         A.    Yes.

20     FURTHER REDIRECT EXAMINATION

21     BY MS. SCACCIA:

22         Q.    When you told the detectives who approached

23     you regarding where they could get a rod, what

24     description or identifying information did you give

25     them about the person?

cpE                    Booth - People - Recross

1          A.    A picture.  They showed me a picture.  They

2    showed me a book and there he was.

3                    MR. RICHMAN:  Objection.

4                    THE COURT:  Sustained.  Stricken.

5          Q.    Mr. Booth, the day that you had the

6    conversation about the rod with Mr. Manganiello --

7          A.    Uh-huh.

8          Q.    -- was that the first time you had ever

9    seen him?

10         A.    No, it wasn't the first time.

11         Q.    Did you continue to see him after you had

12    that conversation with him?

13         A.    Yeah.

14         Q.    And regardless of his first or last name,

15    when you saw -- that day when you had the conversation

16    about the rod, were you able to recognize him?

17         A.    Yeah.

18                    MS. SCACCIA:  I don't have any other

19         questions.

20    FURTHER RECROSS EXAMINATION

21    BY MR. RICHMAN:

22         Q.    By the way, you said you gave a written

23    statement, right?

24         A.    Excuse me.

25         Q.    You gave a written statement?

623

cpE                    Booth - People - Recross

1          A.     Yeah.

2          Q.     And this was your own handwriting, right?

3          A.     Yeah.

4          Q.     And you gave it to who, a Detective

5     Agostini, perhaps?

6          A.     There were two of them there.

7          Q.     Agostini and who else?

8          A.     I don't remember the name.

9          Q.     Who was the one who told you the name of

10    Manganiello?

11         A.     I don't believe -- I don't remember which

12    one.

13         Q.     Hmm?

14         A.     I don't remember which one.

15                MR. RICHMAN:  Thank you.

16                THE COURT:  Anything further?

17                MS. SCACCIA:  Just one more thing, Your

18    Honor.  And I have to find a piece of paper before

19    I can ask the question.

20                You know what, I have no other

21    questions.

22                THE COURT:  You're excused.  Thank you.

23                (Whereupon, the witness exits the

24    courtroom.)

25                THE COURT:  Can I see the attorneys,

671

Proceedings

brought down --

      MS. SCACCIA:  It's 15 pages.

      MR. RICHMAN:   -- 15 pages of documents concerning observations and notes from the Crime Scene person at the scene in the morning of February 12th.  This is the first we've had any knowledge whatsoever that this existed or that the Crime Scene was there.  And I believe the prosecution has indicated that's the same as to her.

      In addition thereto, as I walked into the courtroom this morning, 14 photographs showed up that were from Crime Scene that were just turned over to her.  In fact, she received it in the courtroom when they came up in that envelope and brought by hand of this crime scene itself.

      It is a very difficult way to try a case in this particular manner.  In fact, it's not only difficult, it's virtually impossible.

      You gear up to go one direction, you gear up, you get assumptions of certain facts then to see or attempt to have the prosecution deliver these items now.

      I have no intention of introducing these items in evidence.  I have no intention of

672

going any further.  I think it is wrong to even

have, but we have to inquire as to their

existence.

Again, I in no way fault the prosecutor

herself.  It is obviously something wrong with the

department that put this case together this way.

THE COURT:  You know, I have to agree

with something you said this morning, because I've

never seen anything like this before.  I've

certainly seen things not be disclosed earlier,

but in getting Crime Scene photographs the last

day of the trial is amazing.

MS. SCACCIA:  I would agree.

For the record, though, because none of

this is an ideal situation, I just want to list

what exactly was in the 15 pages, because 15 pages

sounds horrific.  And again, I'm not -- you know

what, there is no excuse for the way I got the

paperwork, the way I was able to turn the

paperwork over and I'm not doing it for that

purpose.  I'm doing it for the purpose of the

record.

In the 15 pages, the first page was a

fax cover sheet.

The second page was a body diagram of

675

cpB                         Proceedings

that are in evidence.

The eighth page is the handwritten version of the body sheet, which has two handwritten X's as opposed to two typewritten X's.

Sheets 9 and 10 are the detective's handwritten notes which list the victim's name, Mr. Manganiello's name.

It says, "Gunshot residue kit done at 12:25, 43rd precinct Squad room.'

It lists a narrative of or I should say a legend of the photos that were taken.

On page 10 it says that, "The navy jacket, navy shirt from the defendant were taken, the gunshot residue kit, a blood sample."

Again, all of which we had known about.

MR. RICHMAN:  Your Honor, one second. On 9, remember the big issue was whether or not my client gave his name and address.

His name and address is right here in handwriting at 12:25 with a precise time the officer was supposed to have asked him.  It s written at 227 Westchester Avenue, Mount Vernon, New York.  Social 110-153-4172.

THE COURT:  Whose handwriting?

MR. RICHMAN:  Officer's.

cpB

<div align="center">Proceedings</div>

676

MS. SCACCIA:  That is McMahon from Crime Scene's written notes.

MR. RICHMAN:  12:25, Your Honor, at the same time allegedly Officer Agostini is questioning him and he's not giving his name and address.

THE COURT:  Yeah.

MR. RICHMAN:  Only the fact that apparently he did give it and here it is.

MS. SCACCIA:  Or it was taken off some ID that he had on his person or his memo book.

The other items listed on page 10 are the two -- three shell casings, excuse me, that we had known about and are in evidence, the two deformed pieces of lead, a latex glove that was an EMS glove that's, I think, actually seen in one of the photographs turned over to counsel, and the victim's jacket was recovered.  Again, we know there was no hair or fiber recovered from either jacket.

Then she has a rough sketch of the room and she has a computer-generated sketch of the same place.

And the last page was the lab request for -- I'm sorry, pages 12 and 13 are her

761

lr/        MR. COLANGELO - DEFENDANT - DIRECT

Q.    I show you what has been marked as
Defendant's Exhibit "X" or part thereof.

Is this part of a report that you caused to
have sent to you?

A.    Yes, it is.

Q.    Now, in reviewing that report, could you
tell me us what that report encompasses?

A.    Well, the report is a document the -- the
results of an examination for gunshot.

Q.    Slow down, please. You're losing me. Let
me hear.

A.    The report documents the results conducted
by a private laboratory and it responds to the presence
of gunshot residue on a hand.

Q.    And could you tell us what makes up gunshot
residue?

A.    Well, gunshot residue is the result of a gun
being fired and the powder -- all the powder doesn't burn
it follows the bullet out of the barrel and the residue
is a part of the ammunition that makes the bullet move.

Q.    And what is that made up -- is it special
elements that make it a factor as to determine what
gunshot residue is?

A.    Yes, there's led, antimony, and barium.

Q.    Those are three elements that are present in

762

lr/        MR. COLANGELO - DEFENDANT - DIRECT

gunshot residue?

A.     That's true.

Q.     And would it be fair to say that in the
absence of those elements, there's not determinative
whether or not -- pardon me -- are they -- I'll withdraw
the question, make it easier.

Did they analyze his right hand?

A.     Yes, they did.

Q.     And were there any evidence of barium?

A.     Antimony and led.

Q.     Was there any evidence of barium, antimony
or led?

A.     No.

Q.     What do you, in your expert capacity, draw
the conclusion?

Was there any gunshot residue as a result of
that?

A.     There's no gunshot residue present.

Q.     There is no gunshot residue present on the
right hand, right?

A.     That's correct.

Q.     Now as a result did they also test the left
hand?

A.     Yes, they did but -- they had negative
results in the right hand, so they went to the left hand

763

lr/        MR. COLANGELO - DEFENDANT - DIRECT

and they came up with the same conclusion negative
results.

Q.    Now, when you mean negative results meaning
no evidence of gunshot residue?

A.    That's correct.

Q.    Now, there was evidence of other things were
there not?

A.    Well, the other elements that environmental
elements that can produce a positive reaction on
examination. Such as, well, it will be urine, fertilizer,
and also some metal from keys, can openers anything that
contains metal. Tools.

Q.    And it would even show that on the hand,
correct?

A.    Yes, they would.  They could cause a
positive reaction but it doesn't mean -- doesn't mean
that the hand fired the gun because --

THE COURT:  When you say a positive
reaction, positive for what?

A.    For the presence of -- I should say negative.
There was no evidence, negative.  It was a negative
result that there was no antimony, led or barium present
in the gunshot residue that whatever they recovered.

Q.    But they also mentioned for other things and
it would show up for a piece of metal, lighting a