EXHIBIT**23**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -X

ANTHONY MANGANIELLO,

     Plaintiff,

  -against-     Index No.

         07 CIV 3644(HB)

THE CITY OF NEW YORK, DET. LUIS AGOSTINI,
individually and as a New York City Police
Detective, SHAWN ABATE, individually and as
a New York City Police Detective, DEREK PARKER,
individually and as a New York City Police
Detective, LT. HENRY SCOTT, individually and as a
New York City Police Lieutenant, P.O. ALEX PEREZ,
individually and as a New York City Police
Officer, P.O. MIRIAN NIEVES, individually and as
a New York City Police Officer, MICHAEL PHIPPS,
individually and as a the Commanding Officer of
the 43rd Precinct, JOHN McGOVERN, individually
and as a New York City Police Detective Sergeant,
ROBERT MARTINEZ, individually and as a New York
City Police Detective, GERYL McCARTHY,
individually and as a New York City Police
Deputy Inspector,

      Defendants.

- - - - - - - - - - - - - - - - - - - -X

    December 19, 2007

    1:20 p.m.

   DEPOSITION of LIEUTENANT HARRY SCOTT




DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  919.679.6095

LIEUTENANT HARRY SCOTT

10

1 MR. JOSEPH: I'll adopt the
2 question; that's fine.
3 Q. Did you get the document from anyone
4 other than your attorney?
5 A. No.
6 Q. Okay. Are you presently employed by
7 the New York City Police Department?
8 A. I am not now.
9 Q. When did you cease to become
10 employed?
11 A. I retired in 2002.
12 Q. When did you begin your employment
13 with the New York City Police Department?
14 A. 1982, January.
15 Q. In 2002, what was your position with
16 the New York City Police Department?
17 A. I was with the Transit Police
18 Department at that time, and I was a patrolman.
19 Q. In 2002?
20 A. Oh, in 2002. I'm sorry. I was a
21 lieutenant squad commander in the Bronx County
22 with the NYPD.
23 Q. Were you a lieutenant commander of
24 the 43rd Precinct?

11

1 A. Yes.
2 Q. For how long had you been --
3 A. Oh, wait. Not in 2002, in 2001. In
4 2002, I was the CO of the 5-2 Squad.
5 Q. When did you become the lieutenant
6 commander of the 43rd Precinct?
7 A. Sometime in 2001. I don't remember
8 exactly when.
9 Q. Was it prior to February of 2001?
10 A. You know, I had three commands in
11 the Bronx and I remember during 9/11, I was in
12 the 5-2 but I went to the 4-3, because I had
13 uniforms there. I don't remember the exact date.
14 Q. On February 12th, 2001, what
15 precinct were you assigned to?
16 THE WITNESS: Is that --
17 Q. Let me rephrase the question.
18 A. Okay.
19 Q. Do you recall an incident -- do you
20 recall an investigation into the homicide of
21 Albert Acosta?
22 A. Yes.
23 Q. On the day of -- that that
24 investigation began, where were you assigned?

12

1 A. To the 4-3 Squad.
2 Q. And what was your position on that
3 date?
4 A. I was the commander of the 4-3
5 Squad.
6 Q. And what were your job
7 responsibilities as commander?
8 A. To supervise about 30 or 40
9 detectives and civilian employees, sergeants; to
10 review cases, case management, administrative
11 duties, equipment training, disciplinary action.
12 Represent the squad at community meetings,
13 Comstat meetings; network with various agencies.
14 Q. Now, what exactly did your
15 day-to-day duties entail regarding reviewing
16 cases?
17 A. You had in-baskets and out-baskets,
18 and you would look at a case folder. And there
19 were certain time periods where 5s had to be in.
20 You would review it for completeness. You would
21 recommend a case closing; you would recommend
22 that they reopen it. There's different kinds of
23 case closings, such as an arrest or an
24 exceptional clearance or various other closings.

13

1 Q. Now, you also mentioned case
2 management, what were your responsibilities with
3 regard to case management?
4 A. A detective has to -- there's a
5 sequence of 5s. They have to have like a 5 in
6 within the first day, then the first three days.
7 And you stay on top of them to make sure that
8 they take care of their time frame with their
9 paper.
10 Q. Okay. Now, when you say 5s, are you
11 referring to DD-5s ?
12 A. Yes. Yeah.
13 Q. Now, when you review these -- in
14 review of DD-5, do you also review any other
15 supporting paperwork upon which it's based?
16 MS. FROMMER: Objection. You can
17 answer.
18 Q. And I'm asking you back in February
19 2001.
20 A. Yeah, you may if someone -- if
21 there's, you know, vouchers, or maybe the
22 detective will clip his notes to it, various
23 other forms, unusuals; a 61 from another case
24 that's related that case from the same person or

4 (Pages 10 to 13)

LIEUTENANT HARRY SCOTT

14

1   defendant.

2     **Q. Was there a standard practice of how**

3   **the DD-5s were handled in terms of document**

4   **retention?**

5     MS. FROMMER: Objection. You can

6   answer.

7     A. Certainly.

8     **Q. What was that procedure?**

9     A. After the detective typed it, it

10   would stay in the folder, and the folder would

11   put in a in-bin in the supervisor's office. And

12   myself or the sergeant or another sergeant, a

13   supervisor, would review the case and sign the 5s

14   in it. We may recommend that he does other

15   things and put a note in there or see him or have

16   them come in and talk about the case. And when

17   it's completed, it gets broken down and the 5s go

18   to various locations in the department for

19   storage.

20     **Q. What about the handwritten notes**

21   **that you indicated would be attached to a DD-5?**

22     MS. FROMMER: Objection.

23     **Q. Where do they go, or where did they**

24   **go in 2001?**

15

1     A. That stays with the case folder.

2   That's Rosario material, so that would stay with

3   5s in the folder.

4     **Q. Okay. What's you understanding of**

5   **what Rosario material is?**

6     A. I guess any written material

7   pertaining to the case, relevant to the case.

8     **Q. And is that material that would, at**

9   **a later point, be turned over to a defense**

10   **attorney?**

11     A. Most of the time, it is, yeah.

12     **Q. Okay. And —**

13     A. If they request it.

14     **Q. Now, were there any procedures at**

15   **the 43rd Precinct for maintaining case files —**

16     MS. FROMMER: Objection. You can

17   answer.

18     **Q. — back in February of 2001?**

19     A. There's like a job-wide procedure

20   not only in the 4-3, it's throughout the job for

21   maintaining files and folders in cases.

22     **Q. What was the procedure?**

23     MS. FROMMER: Objection. You can

24   answer.

1     **Q. Strike that.**

2     **In February of 2001, what was the**

3   **procedure for maintaining a case folder in the**

4   **43rd Precinct?**

5     MS. FROMMER: Objection. You can

6   answer.

7     A. Okay. Well, homicide cases are a

8   little different than —

9     **Q. I'm gonna limit it to homicide.**

10     A. Okay.

11     **Q. I'm limiting my question to homicide**

12   **to make it easier for you.**

13     A. Most of them don't go into a file

14   folder with the other crimes. They stay in a

15   corrugated cardboard box marked with the victim's

16   name and date of incident, 61 number, and

17   usually, the detective's name. And the storage

18   room in the 4-3 was about the size of this room,

19   and it was packed with maybe 300 boxes —

20     **Q. Okay.**

21     A. — by year also.

22     **Q. Right. And is that where the case**

23   **folders were — back from — at your time at the**

24   **43rd Precinct, is that where the case folders**

17

1   were stored while they were still active?

2     A. Sometimes, sometimes they would be

3   in the supervisor's office. If it's active, the

4   Bronx District Attorney may request it. Homicide

5   task force, which is in another location, may

6   request it. The detective may hold onto it to do

7   further work on it. Other than that, it would go

8   into that storage area to be readily accessible

9   to other units like homicide task force or gang

10   units or, say, if the detective's not in, if they

11   got a lead on a case, someone else would be able

12   to obtain that folder.

13     **Q. Did you ever — was there ever a**

14   **situation where it would be acceptable to store a**

15   **homicide case folder in a locker room?**

16     MS. FROMMER: Objection. You can

17   answer.

18     A. In a locker room? The squads are so

19   cramped. A locker room. If it's squad equipment

20   locker room where other squad material is and

21   what not, due to space constraints, I'd say yes,

22   yeah.

23     **Q. If it's not a squad locker room, a**

24   **squad, equipment locker room.**

dalco
court reporting & legal video

18

1    A.  Okay.  Like a personal locker
2  room --
3    Q.  Correct.
4    A.  -- for the men which is in another
5  part of the building, I would say no.  No.
6    Q.  Was there any procedure that was to
7  be followed when a detective got transferred to
8  another precinct concerning what was going to --
9  what should happen to the case folders in his
10  possession?
11    MS. FROMMER: Objection.  You can
12  answer.
13    A.  Well, in his possession, upon him
14  leaving the squad for another location,
15  the case would be reassigned to someone else, and
16  not that they would physically take the case.
17  The case, like I said, would be in the storage
18  room or in the supervisor's room or the D.A.'s
19  Office or the Homicide Task Force Office.
20    Q.  Was it acceptable in your -- in your
21  -- based on your experience, was it acceptable
22  protocol for a detective, who was leaving the
23  43rd, to put a case folder in the locker room and
24  not advise any other detectives that's where it

19

1  was?
2    MS. FROMMER: Objection.  You can
3  answer.
4    A.  I don't see that happening, no.  No.
5    Q.  What do you mean by, you don't see
6  that happening?  I just want you to clarify your
7  answer.
8    A.  Well, because the -- before he
9  leaves the command, the case would be assigned to
10  another detective who was actively in the command
11  and, like I said, the case would, if not in the
12  supervisor's room, it would be in the case
13  storage area that we utilize; that you're
14  referring to as a locker room.
15    Q.  Now, at the point in time you left
16  the 43rd Precinct, was Lieutenant -- I'm sorry,
17  was Detective Agostini still assigned to the
18  43rd, or had he already been reassigned?
19    MS. FROMMER: Objection.
20    A.  I think he was still there when I
21  was transferred.
22    Q.  When was the last time you spoke
23  with Luis Agostini?
24    A.  Yesterday.

20

1    Q.  Okay.  And what did you speak to him
2  about yesterday?
3    A.  How he was, if he retired; if he
4  still cooked.  He's a chef.  If he spoke with
5  other detectives that him and I know in common;
6  how his wife was.  Basic stuff.
7    Q.  Anything else?
8    A.  If he was okay; how this case was,
9  you know.
10    Q.  Okay.  But -- and by the way, before
11  yesterday, when was the last time you spoke with
12  Detective Agostini?
13    A.  I think when I was first notified
14  that I was named in a, for lack of a better word,
15  the Manganiello case, that I was subpoenaed for
16  or depositioned for, I called the 4-3 and asked
17  to speak with him.
18    Q.  Okay.  Was that this Manganiello
19  case --
20    A.  No.  No.
21    Q.  -- or a different --
22    A.  It was a couple of years ago.  Three
23  years ago, maybe.
24    Q.  Now, what did you say to Mr.

21

1  Agostini concerning this case, if anything, and
2  what did he say to you?
3    A.  About this case?
4    Q.  About your appearance here today.
5    MS. FROMMER: Objection.  He didn't
6  testify he said --
7    MR. JOSEPH: Okay.  I'll rephrase
8  it.
9    Q.  Sir, did you in any way mention that
10  you were going to be giving a deposition today?
11    A.  To him, I did.  Yes.
12    Q.  And what did he -- what -- can you
13  tell me everything you said to him and everything
14  he said to you --
15    MS. FROMMER: Objection.
16    Q.  -- concerning your testimony today
17  or the Manganiello case?
18    MS. FROMMER: Objection.  I'm gonna
19  instruct him not to answer that to the
20  extent you're asking him if he told
21  Detective Agostini about conversations he
22  had with me.  That's privileged.
23    Q.  Apart from anything you may have
24  said concerning your conversations with your



LIEUTENANT HARRY SCOTT

26

1    A.   Well, I had to go downtown and do a
2    deposition, and then I was kind of notified that
3    I might have to go through another deposition, so
4    that's what we meant.
5    Q.   While you were lieutenant commander
6    of the 43rd, did you ever have any disciplinary
7    issues with Luis Agostini?
8    A.   No.
9    Q.   Do you ever have any disciplinary
10   issues with Shawn Abate?
11   A.   No.
12   Q.   On February 12th, 2001, did you
13   become involved in an investigation of a homicide
14   involving Albert Acosta?
15          MS. FROMMER: Objection. You can
16   answer.
17   A.   Is that the day of the homicide?
18   Q.   Correct.
19   A.   Is that the -- yes, I had a good
20   part of the investigation.
21   Q.   What was your responsibility during
22   that investigation?
23   A.   Well, I responded to the scene.
24   Q.   And by the way, when you responded

27

1    to the scene of the Acosta homicide, did you have
2    any documents with which you used to take notes?
3          MS. FROMMER: Objection. You can
4    answer.
5    A.   I usually carry a pad in case I do
6    have to take notes.
7    Q.   And did you ever take notes
8    concerning anything that happened at the scene of
9    Albert Acosta's murder?
10   A.   No.
11   Q.   Aside from the pad, did you have any
12   other documents such as a memo book?
13   A.   No, just a spiral pad. It's --
14          MS. FROMMER: It's okay.
15   Q.   Do you still have the pad that you
16   had on February 12, 2001?
17   A.   I doubt it, no.
18   Q.   Do you know what happened to that
19   pad that you had on February 12, 2001?
20   A.   No, I'm sure I used it up.
21   Q.   Okay. What happens to the pad after
22   -- what happened to the pad after it was used up?
23   A.   If it has relevant information
24   pertaining to a case, I would probably rip out a

28

1    few pages and give it to the detective that it --
2    the case that it pertains to. If it had personal
3    stuff in it, I would keep it or throw it away.
4    Q.   Okay. And after you gave it to the
5    detective who it was assigned to, was it your
6    expectation that that would be placed in a case
7    folder?
8          MS. FROMMER: Objection. You can
9    answer.
10   A.   Not just my expectation, it would be
11   departmental procedure that it would be put in
12   the folder.
13   Q.   Okay. Now, what did you do when you
14   arrived at the scene of where Acosta had been
15   murdered?
16   A.   Well, on the radio, I heard -- on
17   the police radio, I heard that there was a
18   dispute with a knife. And then shortly
19   thereafter, we heard -- I heard on the radio a
20   signal 10-13, which means that an officer is in
21   trouble. And I responded to the location with --
22   it was either Sergeant McGovern or Napolitano.
23   There may have been some other detectives in the
24   car. And I think that there was another car full

29

1    of detectives that responded there also. Several
2    uniformed officers --
3    Q.   Let me interrupt you for one second.
4    A.   Sure.
5    Q.   You say you heard a dispute on a
6    radio, was that a New York City Police Department
7    radio; was it a Parkchester transmission or
8    something else?
9          MS. FROMMER: Objection. You can
10   answer.
11   A.   It was an NYPD radio and sometimes
12   Parkchester would -- Parkchester security
13   personnel would utilize PD radios, our radios.
14   Q.   And when you first heard -- strike
15   that.
16          Did you respond to the dispute with
17   a knife?
18   A.   No.
19   Q.   Okay. Do you know if members of
20   your precinct did respond to a dispute with a
21   knife?
22          MS. FROMMER: Objection. The
23   precinct or the squad?
24          MR. JOSEPH: Precinct.



LIEUTENANT HARRY SCOTT

30

1    MS. FROMMER: You can answer.

2    A.   I don't have knowledge if uniformed

3    patrol responded to that incident.

4    Q.   Now, where were you when you

5    received a call of a 10-13?

6    MS. FROMMER: Objection.

7    A.   I was in my office.

8    MS. FROMMER: You can answer. You

9    can answer.

10   A.   I was in my office.

11   Q.   Now, when you say 10-13, did respond

12   -- did -- well, to the best your recollection,

13   what exactly came over the radio?

14   A.   I don't remember word for word, but

15   basically it was a report of a uniformed officer

16   in distress.

17   Q.   Was there an indication that it was

18   a Parkchester security officer or an SPO special

19   patrol officer?

20   A.   At first, no.

21   Q.   Okay. Was there a subsequent

22   response -- I'm sorry. Strike that.

23        Was there a subsequent transmission

24   indicating that it was a special patrol officer

31

1    from Parkchester that was down?

2    MS. FROMMER: Objection. You can

3    answer.

4    A.   It may have been after I was at the

5    scene or when other personnel first responded

6    there to the scene.

7    Q.   Okay. Can you give me an

8    approximation of how much time passed between the

9    first radio transmission of a 10-13 and the

10   transmission that it was a SPO or a special

11   officer down?

12   A.   I have no idea.

13   Q.   Okay. But do you have a memory of a

14   radio transmission stating that it's a

15   Parkchester security officer or a SPO that was in

16   trouble or down?

17   A.   Vaguely. Yes, I do.

18   Q.   Okay. And do you have a

19   recollection of where you were when you received

20   that transmission?

21   A.   I believe I was driving. I was

22   driving to the location, and as you're driving to

23   such an incident, you request updates from the

24   first officer at the scene.

32

1    Q.   Okay.

2    A.   Sometimes those 10-13 calls are

3    bogus, so we like to get an update as soon as

4    possible.

5    Q.   Okay. And let me ask you this:  As

6    soon as you heard the first 10-13, did you leave

7    immediately, leave the office immediately?

8    A.   Yes.

9    Q.   How much time -- how long does it

10   take to get from the 43rd Precinct to 1700

11   Metropolitan Oval or Avenue where Mr. Acosta was

12   ultimately found?

13   A.   It may have been under ten minutes.

14   Q.   Okay. So would it be fair to say

15   within ten minutes of the first transmission, the

16   second transmission indicating that there was an

17   SPO or a Parkchester security officer was made?

18   MS. FROMMER: Objection. You can

19   answer.

20   A.   It may be fair to say that, yeah.

21   Q.   Okay. And do you know whether the

22   Parkchester officers had access, or if they were

23   able to hear what was being broadcast on the NYPD

24   channels?

33

1    MS. FROMMER: Objection.

2    A.   If they have an NYPD radio, and if

3    they have the radio volume turned up, sure, they

4    could hear it. They can monitor it.

5    Q.   What happened -- I'm sorry. Strike

6    that.

7        When you responded to the scene, can

8    you tell me who else was present when you got

9    there?

10   A.   There was a whole bunch -- there was

11   numerous uniformed personnel, and myself, and

12   maybe six or eight detectives, and plainclothes

13   officers from various units.

14   Q.   What did you do when you arrived?

15   A.   I went over to a uniform, and I

16   asked them where the scene was. And I think

17   there was a uniform supervisor there that I

18   requested that the crime scene be expanded a bit.

19   Q.   What do you mean by that?

20   A.   Well, the original crime scene was

21   in a basement area like a rec room or some kind

22   of a storage room. And there was one doorway

23   out, which led to a walkway which led to the

24   street, so I had that whole area frozen, crime --

**dalco**
court reporting & legal video

LIEUTENANT HARRY SCOTT

34

1 you know, taped off to the -- from -- so the
2 public can't get into the crime scene.
3    **Q.  Okay.  And when you first walked**
4 **into the basement of 1700 Metropolitan Oval, how**
5 **far did you walk before you came to the room**
6 **where Mr. Acosta was?**
7      MS. FROMMER: Objection.
8    **Q.  How many feet; what distance, yards?**
9    A.  I really don't remember.
10    **Q.  Okay.  When you got to that room,**
11 **can you tell me how far into the room Mr. Acosta**
12 **was?**
13    A.  He was removed before I arrived at
14 the scene by ambulance.
15    **Q.  But was there a marking as to where**
16 **he was?**
17      MS. FROMMER: Objection.  You can
18      answer.
19    A.  I think there was some blood and
20 there was some shell casings and there was a
21 straight-back chair.  And his coat was on this
22 chair; his uniform security guard coat.
23    **Q.  What did you do next?**
24    A.  I looked around at the scene.  I

35

1 think there was a couple of .22 caliber shells on
2 the ground.  Spoke with one of the detectives to
3 make sure that Crime Scene was called.  I
4 probably had a department cellphone with me and I
5 called up the -- we call it the wheel.  It the
6 borough office where the chief of the Bronx
7 detectives is.  And I would updated them as to,
8 you know, whether the guy was likely to die;
9 where he went, what hospital.  And at the wheel,
10 at the borough office, they would make a log
11 notification of the incident.  As much
12 information as I can give them, they would write
13 in this book, and they would notify other units
14 to assist us.
15    **Q.  What did you do next?**
16    A.  I left the crime scene area and went
17 back into the street area.  And some ranking
18 members of the department arrived, and I told
19 them -- informed them as to what the scene was
20 with me.  And they asked what I needed and, I
21 think, I requested some people from Homicide Task
22 Force and, you know, various units to come and to
23 help us.
24

36

1    **Q.  Did Crime Scene arrive on the scene?**
2    A.  I think they came after I left.
3    **Q.  Okay.  When you say, some ranking**
4 **members arrived, who are you referring to?**
5    A.  Uniform Patrol Inspector Phipps and
6 Detective Borough Bronx Captain McCarthy.
7    **Q.  And what did you say to McCarthy,**
8 **and what did McCarthy say to you?**
9    A.  I don't remember the --
10      MS. FROMMER: Objection.  Sorry.
11    A.  I don't remember the exact
12 conversation, but it was relevant to, you know,
13 if the guy, the victim was likely -- where he was
14 brought, who I had, what we're doing, was Crime
15 Scene notified; stuff like that.
16    **Q.  Now, when you referred to who you**
17 **had, what does that mean?**
18    A.  Detectives I have.  Do I have enough
19 manpower to, you know, do I need anything.
20    **Q.  Okay.  And when you spoke with Mr.**
21 **Phipps, what was the substance of that**
22 **conversation?**
23    A.  Probably requested more uniformed
24 personnel to help us with the scene and the area

37

1 and, you know, a search for any more evidence or
2 property or people or witnesses and canvas and
3 try to get information.
4    **Q.  Did you speak with Detective**
5 **Agostini at the scene?**
6    A.  I'm sure I did, yeah.
7    **Q.  What did you say to Detective**
8 **Agostini, and what did he say to you?**
9      MS. FROMMER: Objection.
10    A.  I don't remember.
11    **Q.  Did you have a conversation with**
12 **Detective Abate at the scene?**
13    A.  I'm sure that I did, yes, and I
14 don't remember the details of that conversation
15 either.
16    **Q.  Do you remember the sum and**
17 **substance, not the exact details, of that**
18 **conversation?**
19    A.  Two detectives approached me, and
20 said that they had the victim's partner, and that
21 they would like to go to the squad or to the
22 precinct to speak with him.  And one of them, I
23 don't remember which one, stated that this guy
24 might be able to help with case.

38

1    Q.   Now, when you say "two detectives,"
2    who were those two detectives?
3    A.   I think -- like I said, I don't
4    remember exactly who it was. There may have been
5    about ten detectives there.
6    Q.   But do you have a recollection one
7    way or another whether it was Detective Agostini
8    or Detective Abate that you were speaking with --
9    MS. FROMMER: Objection.
10    Q.   -- concerning bringing the partner
11    back to the squad?
12    A.   No, that I do not.
13    Q.   Was it your understanding at this
14    point that that partner they were referring to
15    was a suspect?
16    A.   No. I did see Mr. Manganiello at
17    the scene. He looked a little pale. His uniform
18    was a little disheveled. He looked like he was
19    running. He was out of breath and sweaty.
20    And --
21    Q.   Sir, typically when a 10-13 comes
22    over a radio, it's expected that officers-on-foot
23    are going to run onto the scene; correct?
24    MS. FROMMER: Objection.

39

1    A.   I would imagine.
2    Q.   In fact, would it be unusual for an
3    officer not to run to a scene after there's a
4    call of an officer down?
5    MS. FROMMER: Objection.
6    A.   I don't know what his thoughts were,
7    or what other officers' thoughts are.
8    Q.   I'm not asking you what other
9    officers' thoughts are. I'm saying, in your
10    experience, would it be unusual for an officer
11    not to run to a scene when a call comes over for
12    an officer down?
13    MS. FROMMER: Objection.
14    A.   Yes, it would be unusual.
15    Q.   And by the way, the two detectives
16    you spoke to, did they convey any information to
17    you that would in any way indicate that Anthony
18    Manganiello was in any way connected to the
19    murder of Albert Acosta?
20    MS. FROMMER: Objection.
21    A.   Yes, one of the detectives looked at
22    me and kind of, not really winked, but kind of
23    looked at me like, opened his eyes very much and
24    then nodded towards Mr. Manganiello. And when I

40

1    looked at Mr. Manganiello, just his appearance,
2    he looked like he was in a scuffle. He also had
3    white, like, plaster or sheetrock material on the
4    sleeve of his jacket, on the shoulder of his
5    jacket.
6    Q.   Now, when you say -- which detective
7    was it that opened his eyes and sort of nodded to
8    Mr. Manganiello -- in Mr. Manganiello's
9    direction?
10    MS. FROMMER: Objection.
11    A.   That I do not remember.
12    Q.   Did you ask him why he was opening
13    his eyes and nodding towards Mr. Manganiello?
14    A.   Did I ask him, no.
15    Q.   What was your understanding as to
16    why this detective took this action?
17    MS. FROMMER: Objection.
18    A.   He was letting me know that Mr.
19    Manganiello might be able to shed some light on
20    this incident.
21    Q.   Now, aside from this detective
22    looking at you opening his eyes wide and nodding
23    in his direction, was there any actual evidence
24    in your -- that you had knowledge of at that

41

1    point that would in any way suggest that Mr.
2    Manganiello was involved in the death of Albert
3    Acosta?
4    MS. FROMMER: Objection. You can
5    answer.
6    A.   No.
7    Q.   Do you know why this detective was
8    opening his eyes wide and looking at Mr.
9    Manganiello?
10    MS. FROMMER: Objection. Asked and
11    answered. You can do it again.
12    THE WITNESS: Would you like me to
13    answer the --
14    MS. FROMMER: Yeah.
15    A.   I guess because of Mr. -- not I
16    guess, it was because of Mr. Manganiello's
17    appearance and, I guess, maybe his appearance.
18    Q.   And apart from his clothes being
19    generally disheveled and some kind of white thing
20    being on his uniform, what about -- was there
21    anything else about his appearance that made him
22    a suspect or a person of interest, so to speak?
23    MS. FROMMER: Objection.
24    A.   Well, I think I said that he was not



dalco
court reporting & legal video

11 (Pages 38 to 41)

LIEUTENANT HARRY SCOTT

40

rance,
to had
on the

etective
nodded to
s

pening
nganiello?

as to

light on

nd nodding
vidence
t that
41

t Mr.
f Albert

u can

e was
r.

ked and

me to

ance.
ng
white thing
t there
made him
eak?

ot

(to 41)

**42**

1 a suspect --
2   Q. Okay.
3   A. -- you threw that in there.
4   Q. I'll rephrase the question, sir.
5   A. Great.
6   Q. Now, let me clarify this. At the
7 point in time when the detectives opened their
8 eyes and nodded in his direction, was it your
9 understanding that they were indicating to you
10 that they believed that Mr. Manganiello was a
11 suspect?
12       MS. FROMMER: Objection.
13   A. No. Again, I clearly stated that
14 they said he may be of help.
15   Q. Okay. And what did you mean that --
16 what was your understanding of "he may be of
17 help"?
18   A. Well, since the both, him and --
19 since Mr. Manganiello and the victim were
20 partners that day, that he may be able to tell us
21 what happened to his partner.
22   Q. Were you aware that in Parkchester
23 security, the people that partner up don't
24 actually walk around and work together?

**43**

1       MS. FROMMER: Objection.
2   A. No, I was not aware of that.
3   Q. Okay. Did you ever speak to anybody
4 at Parkchester security to ascertain whether Mr.
5 Manganiello and Mr. Acosta were together at any
6 point that day?
7       MS. FROMMER: Objection.
8   A. No. Later in the day, when I was in the
9 squad room, several Parkchester security people
10 responded to the detective squad.
11   Q. Okay.
12   A. I believe that one of them was the
13 union delegate. And there were some people that
14 were concerned about Mr. Acosta, and there were
15 some security personnel that were concerned about
16 Mr. Manganiello. The exact content of the
17 conversation, I do not remember.
18   Q. Did you take any -- did you record
19 who was present at the detective squad? In other
20 words, was there any record kept of who showed up
21 from Parkchester?
22       MS. FROMMER: Objection. You can
23 answer.
24   A. If it relative to the case, I'm

**44**

1 -- the case detective would note that, if he
2 spoke with anyone.
3   Q. Okay. And would that -- what would
4 happen -- what procedure, if any, was there that
5 -- what would happen to his notes after he spoke
6 with them?
7       MS. FROMMER: Objection.
8   A. His notes would go with a 5 that he
9 would do pertaining to the relevant conversation.
10   Q. And what would happen to those DD-5s
11 after he prepared it?
12   A. They'd go into the case folder and
13 then the folder and other relevant material go in
14 the box that I mentioned earlier.
15   Q. By the way, do you know what
16 happened to the box in the Manganiello --
17 concerning the investigation of the death of
18 Albert Acosta?
19   A. Do I know what happened to the box?
20   Q. Yeah, do you know where it is now?
21   A. No.
22   Q. Did -- at any point, did you become
23 aware that it wasn't where it was supposed to be?
24       MS. FROMMER: Objection.

**45**

1   A. I heard that some things may have
2 been missing. I didn't know -- you're saying the
3 whole box was missing. It seems very unusual to
4 me.
5   Q. Okay. Who did you hear this from?
6   A. It may have been Agostini over three
7 years ago. It may have been another member of
8 the squad when I called there.
9   Q. What exactly, to the best of your
10 recollection, did Agostini say to you concerning
11 a document or a number of documents being
12 missing --
13       MS. FROMMER: Objection.
14   Q. -- concerning the prosecution of
15 Anthony Manganiello?
16       MS. FROMMER: Objection.
17   A. I do not. Like I said, it was a
18 couple of years ago, so I don't remember the
19 exact conversation. He said that he's missing 5s
20 or missing a folder. And I said, well, is it in
21 Bronx Homicide Task Force, is it in the D.A.'s
22 Office or, you know, where could it be?
23   Q. What was his response?
24   A. And he did not know. I think

12 (Pages 42 to 45)

LIEUTENANT HARRY SCOTT

46

1  Agostini transferred at a later date.
2      Q.   In your years as a — for how many
3  years were you a lieutenant commander; not just
4  at the 43rd, but in general?
5      A.   Six years.
6      Q.   In your six years as a lieutenant
7  commander, had you ever heard of a case folder
8  going missing on a homicide case apart from this
9  incident?
10      MS. FROMMER: Objection. You can
11  answer.
12      A.   I believe so and I, believe, that
13  they were usually turned up.
14      Q.   Do you know if the Anthony
15  Manganiello case folder ever turned up?
16      A.   No. I do not know.
17      Q.   Did you ask Mr. Agostini whether
18  this folder ever turned up?
19      MS. FROMMER: Objection.
20      A.   Other than the brief conversation I
21  had with Agostini yesterday, no. I didn't ask
22  him.
23      Q.   Well, what did you say to him
24  yesterday about the case folder, and what did he

47

1  say to you?
2      A.   We didn't discuss the case folder
3  yesterday.
4      Q.   Okay. Did you discuss any evidence
5  going missing yesterday?
6      A.   No.
7      Q.   I think you said earlier you found
8  it to be unusual. What did you mean by that?
9      MS. FROMMER: Objection. I think
10  you asked the question if -- it was a yes
11  or no question, and he answered that
12  question.
13      MR. JOSEPH: No, no. Not in response
14  to that question, in response to a
15  different question.
16      Q.   Did you — a few minutes ago, you
17  indicated that you found it unusual that certain
18  documents were missing. I'm just asking what did
19  you mean by that?
20      MS. FROMMER: Objection. You can
21  answer.
22      A.   Detective Agostini is very, very
23  meticulous with his case folders.
24      Q.   Okay.

4|

1      A.   And for such an important case, for
2  it to be missing or part of it to be missing, I
3  found that to be very unusual because, like I
4  said, Agostini is really very thorough with his
5  case folders.
6      Q.   Okay. Now, did he provide you with
7  an explanation as to what happened to this case
8  folder?
9      MS. FROMMER: Objection.
10      A.   No.
11      Q.   Did you ask?
12      A.   Other than saying maybe another unit
13  has it, I didn't know what -- where it could be
14  and neither did he.
15      Q.   By the way, is losing a case folder
16  something that a detective would normally be
17  disciplined for?
18      MS. FROMMER: Objection.
19      A.   I have not had that experience. I
20  don't know. I honestly don't know.
21      Q.   Let's take a step back to the point
22  in time when you were at the scene of Acosta's
23  murder and these unknown detectives opened their
24  eyes and nodded in Mr. Manganiello's direction.

49

1  What happened next?
2      MS. FROMMER: Objection. You
3  mischaracterized his testimony, but to the
4  extent you remember what your testimony
5  was, you can answer.
6      A.   Those two detectives, or detective
7  and sergeant maybe, went to a vehicle with Mr.
8  Manganiello and they left the scene.
9      Q.   Did you remain at the scene, or did
10  you leave the scene also?
11      A.   I remained at the scene.
12      Q.   While you were at the scene, did you
13  speak with any potential witnesses?
14      A.   Me personally, no. But while you're
15  at the scene, detectives do what's called a
16  canvas, and they actively seek people who have
17  information pertaining to the case.
18      Q.   And did any detectives report back
19  to you the results of this canvas while you were
20  there at the scene?
21      A.   Yes, I believe they said that they
22  had a Parkchester employee who had information
23  pertaining to the case.
24      Q.   Was anything else conveyed to you

13 (Pages 46 to 49)

dalco
court reporting & legal video

LIEUTENANT HARRY SCOTT

50

1 other than what you just said? In other words,
2 was there more -- were you given more details
3 about what this Parkchester employee said?
4     A.   It's been a while. It's been a
5 couple of years, so I think the person stated
6 that they heard some shots from the basement
7 area. I guess maybe the windows were open. I
8 don't know. And that they may have seen someone
9 leaving the basement area.
10     Q.   Did they indicate to you who that
11 someone was?
12     A.   Did the person or did the detectives
13 relay that to me?
14     Q.   Did the detectives relay to you
15 whether or not the Parkchester employee
16 identified who he saw leaving the scene?
17         MS. FROMMER:  Object to the form.
18     You can answer.
19     A.   I don't think so, no.
20     Q.   Now, by the way, which detective was
21 it that relayed that information to you
22 concerning the Parkchester employee?
23     A.   When I started to tell you that
24 information, I said it's been awhile. I don't

51

1 remember.
2     Q.   I'm taking your best recollection,
3 sir.
4     A.   I don't recall exactly who it was.
5 It was -- you have to understand, it was a very
6 chaotic scene.
7     Q.   Sir, I'm asking you just for your
8 best recollection. If you don't recall, you can
9 tell me you don't recall.
10     A.   I don't recall.
11     Q.   Okay. All right. For about
12 approximately how long did you remain at the
13 scene of Mr. Acosta's homicide?
14     A.   Under an hour.
15     Q.   Okay. Now, were you made aware --
16 strike that.
17         Did any detectives relay to you the
18 -- any information concerning what a Verizon
19 employee had said?
20         MS. FROMMER: Objection.
21     A.   They may have. I don't recall.
22     Q.   Okay. At the point in time when you
23 left the scene, was Anthony Manganiello a suspect
24 in the homicide of Albert Acosta?

52

1     A.   Mr. Manganiello was at the command,
2 and I was at the scene so --
3     Q.   Let me rephrase the question and
4 maybe make it easier for you. In your mind, at
5 the point in time when you left the scene, was
6 Anthony Manganiello a suspect in the homicide of
7 Albert Acosta?
8         MS. FROMMER: Objection. You can
9     answer.
10     A.   Okay. I would not say a suspect. I
11 would say a person who has or may have
12 information relating to what occurred, or maybe
13 he saw something that occurred.
14     Q.   Okay. Was Mr. -- at the point in
15 time Mr. Anthony Manganiello left the scene of
16 the Acosta homicide, was he going to the precinct
17 voluntarily or was he --
18     A.   Yes.
19     Q.   He was. Okay. At the point in time
20 you left the scene, were you aware of any
21 information that in any way connected Anthony
22 Manganiello to the homicide of Albert Acosta?
23         MS. FROMMER: Objection. You can
24     answer.

53

1     A.   Nothing. I may have called the
2 squad while I was in the field to ask if anything
3 happened or whatever, but I don't remember the
4 exact conversation, so I don't recall. No.
5     Q.   Okay. Let me see if maybe I can
6 make this a little simpler.
7     A.   Sure.
8     Q.   As you sit here right now, do you
9 have any recollection that at the point in time
10 that you left the scene of the Acosta murder of
11 any information that tied Anthony Manganiello to
12 the homicide of Albert Acosta?
13         MS. FROMMER: Objection. You can
14     answer.
15     A.   No.
16     Q.   Where did you go after you left the
17 scene of the Albert Acosta homicide?
18     A.   I went to the 4-3 detective squad,
19 my office.
20     Q.   Okay. And was Mr. -- was Anthony
21 Manganiello in the 4-3 squad?
22     A.   Yes, he was.
23     Q.   Was he under arrest when you
24 arrived?

**dalco**
court reporting & legal video

14 (Pages 50 to 53)

54

1 A. No.

2 Q. Was he free to leave?

3 A. If he chose to do so. I imagine he
4 was free to leave if he wasn't under arrest.

5 Q. Okay. Do you recall approximately
6 what time you arrived at the 4-3?

7 A. No.

8 Q. Where was Anthony Manganiello at the
9 point in time when you arrived?

10 A. He was sitting in a straight-back
11 chair in what we called our lunchroom, and there
12 may have been a detective in there with him. I
13 remember people going in and out.

14 Q. Okay.

15 MS. FROMMER: Just answer the
16 question. The question was where was
17 Anthony Manganiello, so you answered it.
18 Thank you.

19 A. In the lunch room.

20 Q. Okay. Do you recall who if anybody
21 was with him in the lunchroom at the point in
22 time when you arrived?

23 A. No.

24 Q. Okay. At the point in time when you

55

1 arrived, was any information conveyed to you
2 concerning Anthony Manganiello?

3 A. Yes.

4 MS. FROMMER: Objection.

5 Q. What information, if any, was
6 conveyed to you and by whom?

7 A. One of the detectives, it may have
8 been Agostini, said to me that Mr. Manganiello
9 was not feeling well, and that he would like to
10 go to the hospital or have an ambulance respond.
11 And I looked in the room at him and -- at Mr.
12 Manganiello, and he looked kind of pale. And I
13 grabbed a radio, and I requested that an
14 ambulance respond to the 4-3 squad.

15 Q. Okay. And was anything -- this
16 detective who may have been Agostini, say
17 anything else to you other than what you just
18 indicated to us?

19 A. I don't recall.

20 Q. Okay. By the way, were you aware
21 that -- strike that.

22 Had you received any information
23 that Anthony Manganiello either collapsed or
24 fainted upon learning that Mr. Acosta had been

56

1 shot --

2 MS. FROMMER: Objection.

3 Q. -- at the scene of the incident?

4 A. You just refreshed my memory about
5 that.

6 Q. Okay.

7 A. I remember him, as I stated earlier,
8 Mr. Manganiello looked pale and sweaty and
9 disheveled. I saw him, he didn't faint or hit
10 the floor or fall on the floor, but he did look
11 like was in distress.

12 Q. And one's partner being shot is
13 obviously a distressful event; correct?

14 MS. FROMMER: Objection.

15 A. If it was me, yes. Yeah.

16 Q. Okay. And so it would be nothing
17 unusual for a person whose partner had just been
18 shot to be in distress; would it?

19 MS. FROMMER: Objection.

20 A. I imagine so, yes.

21 Q. You imagine it would be unusual, or
22 you imagine it would not be unusual?

23 A. The question was again?

24 MR. JOSEPH: Read the question back.

57

1

2 (The requested testimony was
3 read back.)

4

5 A. The answer to that would be no.

6 Q. Okay.

7 MR. JOSEPH: Off the record.

8

9 (An off-the-record
10 discussion was held.)

11

12 BY MR. JOSEPH:

13 Q. So aside from -- was Mr. Manganiello
14 free to leave and go to the hospital at that
15 point?

16 A. Yes.

17 Q. Okay. Do you know -- well, did he
18 go to the -- did Mr. Anthony Manganiello leave
19 and go to the hospital?

20 A. Not at that time.

21 Q. Do you know why not?

22 A. Because an ambulance was responding
23 to the squad.

24 Q. Okay. And after the ambulance

15 (Pages 54 to 57)

LIEUTENANT HARRY SCOTT

58

1  responded to the squad, what happened?
2      A.  It was relayed to me that Mr.
3  Manganiello was fine.
4      Q.  By whom?
5      A.  By one of the EMS attendants.
6      Q.  Okay.
7      A.  Who it was, I do not remember.
8      Q.  Okay.  And by the way, when you saw
9  Mr. Manganiello sitting in the lunchroom, what if
10 anything was he wearing?
11     A.  He was wearing a coat; a blue,
12 nylon-type kind of Parkchester security coat.  I
13 think a blue, you know, a uniform shirt.  The
14 shirt was open and he had on a white undershirt
15 under that, and a belt with some keys on it.
16     Q.  Okay.  And at any point, was the
17 jacket taken from him?
18     A.  I don't -- yes, it was.  Yeah.
19     Q.  Can you tell me when it was taken
20 from him?
21     A.  No.
22     Q.  Can you tell me why the jacket was
23 taken from him?
24     A.  For tests to be done.

59

1      Q.  Okay.  And whose idea was it to take
2  the jacket?
3          MS. FROMMER:  Objection.
4      A.  I don't remember exactly.  It may
5  have been the detective.
6      Q.  Did you authorize -- strike that.
7          Before taking the jacket, did the
8  detectives ever come and talk to you about taking
9  the jacket and doing testing?
10     A.  They may have.  I don't recall.
11     Q.  Okay.  At any point, did the
12 detectives come and talk to you about doing
13 gunshot residue tests on Mr. Manganiello's hands?
14     A.  Yes.
15     Q.  And did you authorize that to be
16 done?
17     A.  I don't have to authorize it.  It's
18 part of the investigation if a person is willing
19 to do it, yeah.
20     Q.  Okay.  Was it your understanding
21 that Mr. Manganiello was willing to allow the
22 gunshot residue tests to be done on his hands?
23     A.  Yes.
24     Q.  Okay.  And can you tell me why this

60

1  detective wanted to take Mr. Manganiello's jacket
2  and do gunshot residue testing on his hands?
3          MS. FROMMER:  Objection.
4      A.  Could I tell you why, no.
5      Q.  Did he convey it to you?  Did he
6  tell you this is why I want to do the testing?
7      A.  I don't recall.
8      Q.  Okay.  What was the sum and
9  substance of the conversation concerning doing
10 testing for gunshot residue on Mr. Manganiello's
11 hands?
12     A.  I don't recall that either.
13     Q.  Okay.  At any point, did any
14 detective on -- strike that.
15         On February 12th, 2001, did your
16 view of Mr. Manganiello as of someone who had
17 information change?
18         MS. FROMMER:  Objection.
19     A.  I don't recall really.
20     Q.  Okay.  At any point on February
21 12th, 2001, did you learn of any evidence that in
22 any way suggested that Anthony Manganiello was
23 responsible for the death of Albert Acosta?
24         MS. FROMMER:  Objection.

61

1      A.  No.
2      Q.  Okay.  Do you know if Anthony
3  Manganiello, at any point, was arrested on
4  February 12th, 2001, for the murder of Albert
5  Acosta?
6      A.  No.
7      Q.  Is the arrest of a suspect in a
8  murder case by a detective something that in
9  February 2001 would have been reported to you?
10     A.  Yes.
11         MS. FROMMER:  Objection.
12     Q.  Was there any procedure in place in
13 February of 2001, more specifically February
14 12th, 2001, whereby you would review evidence
15 prior to an arrest being made in a homicide case?
16         MS. FROMMER:  Objection.
17     A.  Yes.
18     Q.  On February 12th, 2001, did you
19 ever review what evidence there was that Mr.
20 Anthony Manganiello had been responsible for the
21 death of Albert Acosta?
22     A.  No.
23     Q.  Did anybody in the 43rd Precinct of
24 a supervisory level review what evidence, if any,

16 (Pages 58 to 61)

LIEUTENANT HARRY SCOTT

62

1  existed to charge Anthony Manganiello with the
2  murder of Albert Acosta?
3      MS. FROMMER: Objection.
4      A.  To answer your question, I have to
5  explain that it's not just up to a detective or a
6  detective supervisor. It has to be, in the Bronx
7  County, it has to be accepted by the District
8  Attorney's Office.
9      Q.  Okay.
10     A.  They are the one's that can only
11 authorize an arrest for homicide.
12     Q.  Okay. Before we get to that point,
13 before a case is presented to an Assistant
14 District Attorney, is there a custom —
15 customarily a review done by someone other than
16 the detective who was working the case?
17     MS. FROMMER: Objection.
18     A.  For sure, yeah.
19     Q.  Okay. And can you tell me who, if
20 anyone, was responsible on February 12th, 2001,
21 to review whether there was sufficient evidence
22 to charge Anthony Manganiello with the murder or
23 Albert Acosta?
24     MS. FROMMER: Objection.

63

1      A.  It's a bit of a long question.
2      Q.  All right. On February 12th, 2001,
3  whose job was it to review whether there was
4  sufficient evidence to charge Anthony Manganiello
5  with the murder of Albert Acosta?
6      MS. FROMMER: Objection.
7      A.  The detective and the supervisor
8  that was there.
9      Q.  Okay. And what detective are you
10 referring to specifically?
11     A.  That would be the officer that
12 caught the case.
13     Q.  And what officer or detective caught
14 the Albert Acosta case?
15     A.  Luis Agostini, detective.
16     Q.  And who was the supervisor then?
17 Was there a particular supervisor that also
18 caught this case?
19     MS. FROMMER: Objection.
20     A.  No. No.
21     Q.  Okay. Was there a particular
22 supervisor that was responsible to review the
23 evidence on the Albert Acosta case to determine
24 whether there was sufficient evidence to charge

64

1  Anthony Manganiello with the murder of Albert
2  Acosta?
3      MS. FROMMER: Objection.
4      A.  No.
5      Q.  Okay. Do you know if any supervisor
6  ever on February 1st, 2001 — I'm sorry, February
7  12th, 2001 — let me strike that.
8      Do you know if on February 12th
9  2001, any supervisor reviewed the evidence
10 against Anthony Manganiello to determine if there
11 was sufficient evidence to charge him with the
12 murder of Albert Acosta?
13     MS. FROMMER: Objection. If you
14 know, you can answer.
15     A.  Yes, that would be something that I
16 would do, and then I would relay that information
17 to the Bronx District Attorney's office who says
18 whether there can be an arrest or not an arrest.
19     Q.  Okay. Now, did you review, on
20 February 12th, 2001, or the early morning hours
21 of February 13th, 2001, did you review the
22 evidence against Anthony Manganiello —
23     MS. FROMMER: Objection.
24     Q.  — concerning whether there was

65

1  sufficient evidence to charge him with the death
2  of Albert Acosta?
3      A.  I would say that I did review it and
4  relayed it to the District Attorney, and if there
5  wasn't enough evidence, then they would not
6  authorize an arrest.
7      Q.  Okay. Did you, prior to speaking
8  with a district attorney, make a determination
9  that there was sufficient evidence to charge
10 Anthony Manganiello with the homicide of Albert
11 Acosta?
12     MS. FROMMER: Objection.
13     A.  No.
14     Q.  At any point on February 12th, 2001,
15 or February 13th, 2001, did you present the case
16 against Anthony Manganiello to any district
17 attorney in the Bronx County?
18     MS. FROMMER: Objection.
19     A.  I relayed information to the
20 district attorney, yes, pertaining to the case.
21     Q.  Do you recall the name of the
22 district attorney?
23     A.  No, I do not.
24     Q.  Would the name Dondes, D-O-N-D-E-S,

17 (Pages 62 to 65)

dalco
court reporting & legal video

LIEUTENANT HARRY SCOTT

78

1 take Mr. Manganiello from the lunchroom area and
2 put him in the cell area?
3        MS. FROMMER: Objection.
4    A.  No.
5    Q.  Would a – do you know – strike
6 that.
7        Was there any particular person who
8 was authorized to make that decision at the 43rd
9 Department to bring a willing witness and place
10 him into a cell?
11       MS. FROMMER: Objection.
12   A.  No.
13   Q.  Okay.  Did Lieutenant Agostini have
14 that authority to place a witness into a cell?
15       MS. FROMMER: Objection.
16   A.  Detective Agostini.
17   Q.  Yes.
18   A.  You said Lieutenant Agostini.
19   Q.  Oh, I'm sorry.  Did Detective
20 Agostini have that authority –
21       MS. FROMMER: Objection.
22   Q.  – on his own?
23   A.  On his own and – no.
24   Q.  Okay.  Whose authority, if any, did

79

1 Detective Agostini need – sorry.  Strike that.
2        Whose permission, if any, did
3 Detective Agostini need to place Mr. Manganiello
4 in a cell from the lunch area?
5        MS. FROMMER: Objection.
6    A.  Well, if he was arresting him for
7 homicide, it would be the Bronx District
8 Attorneys' Office, the A.D.A. that responded.
9    Q.  Do you know if an A.D.A. ever
10 provided such authorization on February 12th or
11 February 13th of 2001, to Detective Agostini?
12       MS. FROMMER: Objection.
13   A.  No, I do not.
14   Q.  Had a district attorney provided
15 Detective Agostini with permission to place Mr.
16 Manganiello under arrest, is that something you
17 would have been made aware of?
18   A.  If I was in the immediate area, yes.
19   Q.  Were you in the immediate
20 area from the point in time Mr. Anthony
21 Manganiello was in the lunchroom until the point
22 in time he was placed in the cell?
23       MS. FROMMER: Objection.
24   A.  I really don't recall that.

80

1    Q.  When you saw Anthony Manganiello in
2 the cell, what if anything did you do?
3    A.  Nothing that I remember.
4    Q.  Did you ask anybody why he was in
5 the cell?
6    A.  I may have.  I don't remember.
7    Q.  Okay.  Do you recall having any
8 conversation at all with anybody about Anthony
9 Manganiello being in a cell?
10   A.  I may have had a conversation with
11 the district attorney later on in the day, and I
12 really don't remember the content of it.
13   Q.  Okay.  And let me take a step back.
14 At any point – strike that.
15       Did you permit Mario Manganiello to
16 speak with his brother?  Strike that.
17       Do you know if Mario Manganiello was
18 permitted to speak with his brother, Anthony
19 Manganiello?
20   A.  Yes, he was.
21   Q.  Okay.  And by the way, but prior to
22 his speaking – prior to Mario Manganiello
23 speaking with Anthony Manganiello, did Luis
24 Agostini convey any information to you that

81

1 Anthony Manganiello had provided to him?
2        MS. FROMMER: Objection.  You can
3 answer.
4    A.  I don't remember.
5    Q.  Okay.  What if anything happened
6 after Mario Manganiello spoke with Anthony
7 Manganiello?
8    A.  I remember asking Mr. -- his
9 brother, Mr. Mario Manganiello, I remember asking
10 him to leave the squad room.
11   Q.  And for what reason did you ask him
12 to leave the squad room?
13   A.  Because he was disruptive,
14 borderline discourteous, and he seemed very
15 agitated.
16   Q.  Okay.  Did he also indicate that he
17 was calling a lawyer for his brother?
18   A.  I remember him saying, oh, my God
19 and asking for a telephone.  And I showed him
20 where a telephone was outside of the squad room.
21   Q.  Okay.  And what did he way, oh, my
22 God, in response to?
23   A.  He asked me if his brother was being
24 arrested or if his brother was a suspect or if

**dalco**
court reporting&legal video

21 (Pages 78 to 81)

LIEUTENANT HARRY SCOTT

86

1 officers to believe that he was in some was
2 related -- in some was responsible for the death
3 of Albert Acosta?
4         MS. FROMMER: Objection.
5    A.   I can't say what they were thinking.
6 I have -- I don't know.
7    Q.   I'm not asking you what they were
8 thinking, I'm asking you what they -- what if
9 anything they said to you.
10        MS. FROMMER:  That was a prior
11 question.  To the extent someone asked
12 that to you, you can answer.
13   A.   If you could just ask that question
14 again --
15   Q.   Sure.
16   A.   -- because it was confusing.
17   Q.   Did any of the detectives in the
18 43rd squad say anything that led you to believe
19 that they believed Mr. Manganiello was involved
20 in the death of Anthony [sic] Acosta because he
21 had retained a lawyer?
22        MS. FROMMER: Objection.
23   A.   No, that wouldn't be -- no.
24   Q.   Okay.  And that would not be a valid

87

1 basis to make such an assumption; correct?
2         MS. FROMMER: Objection.
3    A.   I would guess so.
4    Q.   You may have misunderstood the
5 question.  Is it -- in your professional
6 judgment, is it a valid assumption to make that
7 because one retains an attorney, they must be
8 guilty of a crime?
9    A.   No.
10        MS. FROMMER: Objection.
11   Q.   Okay.  Would you permit the
12 detectives working under your supervision to make
13 such an assumption?
14        MS. FROMMER: Objection.
15   Q.   Strike that.
16        On February 12th, 2001, and/or
17 February 13th 2001, did you permit the detectives
18 working under your command to make that sort of
19 an assumption?
20        MS. FROMMER: Objection.
21   A.   I would not do that, no.
22   Q.   Okay.  Now, by the way, in February
23 of 2001, were you a smoker?
24   A.   Yes, I indulged in cigars.

88

1    Q.   Okay.  At any point on February
2 12th, 2001, did you smoke a cigar outside of the
3 43rd Precinct?
4    A.   Yes.
5    Q.   And while you were smoking a cigar,
6 did you see or speak with Mario Manganiello?
7    A.   I don't recall that.
8    Q.   Okay.  Do you have any recollection
9 of a conversation with Mario Manganiello, which
10 occurred outside of the 43rd Precinct while you
11 were smoking a cigar and he was smoking a
12 cigarette?
13   A.   No.
14        MS. FROMMER: Objection.
15   Q.   Okay.  Did you see -- do you have
16 any recollection of seeing Mario Manganiello
17 outside of the 43rd Precinct smoking a cigarette?
18        MS. FROMMER: Objection.
19   A.   No.
20   Q.   Okay.  At any point -- I'll strike
21 that.
22        At some point after you learned that
23 an attorney had been obtained, did Mr. Mario
24 Manganiello leave the squad room?

89

1    A.   I asked Mario Manganiello to leave
2 the squad room.
3    Q.   And did he comply?
4    A.   Yes.
5    Q.   Okay.  And was he -- by the way, was
6 he with an older gentleman that appeared to b
7 his father?
8         MS. FROMMER: Objection.
9    A.   I don't recall.
10   Q.   Okay.  And do you know if -- what if
11 anything -- did you see -- after Mr. Manganiell
12 left the squad room, did you see him again on
13 February 12, 2001?
14   A.   Yes, I did.
15   Q.   And how did you come to see him?
16        MS. FROMMER: Objection.  You can
17 answer.
18   A.   Well, me being in the squad room
19 when he walked in again, I saw him.
20   Q.   Okay.  Now, did he -- when did he
21 walk in again?
22   A.   I don't recall exactly.
23   Q.   Can you give me an approximate -- a
24 approximation of how much time passed --

23 (Pages 86 to 89

LIEUTENANT HARRY SCOTT

94

1    Q.   Okay.  Do you have any recollection
2  of speaking with Sergeant McGovern between the
3  point in time when Mr. Manganiello left the
4  precinct at your request and the point in time he
5  was brought back by a uniformed officer?
6        MS. FROMMER:  Objection.
7    A.   I don't recall.
8    Q.   Now, was Mario Manganiello placed
9  under arrest for possession of a handgun?
10   A.   I think he was being held for an
11 investigation.
12   Q.   Well, my question is:  Was he placed
13 under arrest?
14       MS. FROMMER:  Objection.
15   A.   You know, I honestly don't recall.
16   Q.   Okay.  Are you aware -- did you --
17 are you aware of whether New York State -- sorry.
18 Strike that.
19       Do you know a -- were you that Mr.
20 Manganiello was a sergeant in the Mount Vernon
21 Police Department?
22   A.   Sometime during the night, that was
23 bought to my attention.
24   Q.   Was it brought to your attention

95

1  before or after he was returned with a uniformed
2  police officer?
3        MS. FROMMER:  Objection.
4    A.   You know, I really don't remember.
5    Q.   Okay.  Are you aware of any law that
6  prohibits a sergeant, off duty, from carrying a
7  pistol?
8        MS. FROMMER:  Objection.  You can
9    answer.
10   A.   Carrying a pistol --
11   Q.   A firearm.
12       MS. FROMMER:  The question was
13   whether any off-duty sergeant is permitted
14   to carry a pistol, if you're aware of any
15   law that permits that.
16   A.   Well, if you're in New York City and
17 you're a New York City Police sergeant and you're
18 authorized to carry a firearm, you may carry a
19 firearm in New York City.
20   Q.   Okay.  And are you also authorized
21 to carry a firearm in New York State?
22   A.   If it's an authorized, registered
23 firearm, yeah.  I imagine you could, yes.
24   Q.   Okay.  And did you ever -- at any

1  point, did you ever have any indication that the
2  firearm which Mario Manganiello was carrying wi
3  not a registered authorized firearm?
4        MS. FROMMER:  Objection.
5    A.   I don't think Mr. Manganiello was
6  authorized to carry it in the confines of New
7  York City.
8    Q.   Okay.  Well, let mw ask you this:
9  Sir, was Mario Manganiello ever placed under
10 arrest for carrying a firearm?
11       MS. FROMMER:  Objection.  Are we
12   gonna litigate Mario, which can't be
13   litigated or --
14   A.   Like I said earlier --
15       MS. FROMMER:  Let me get my
16   objection on the record.
17       THE WITNESS:  Oh, I'm sorry.
18       MS. FROMMER:  Are we gonna litigate
19   Mario, which can't be litigated under law,
20   or are we gonna litigate Anthony?  Because
21   you can't litigate Mario.  I was gonna
22   make that on the record.
23       MR. JOSEPH:  Okay.
24       MS. FROMMER:  So I'm only gonna

1    permit about five more minutes of
2    questioning about Mario Manganiello to the
3    extent it is not related to Anthony.  And
4    then I'm going to instruct him not to
5    answer any more questions about that.  You
6    can re-ask the question.  You can answer.
7    Q.   Do you know what the question was?
8    A.   No.
9        MS. FROMMER:  Or you can have the
10   court reporter read back.
11   Q.   What was -- was Mario Manganiello
12 ever arrested for possessing a firearm?
13       MS. FROMMER:  Objection.
14   A.   Okay.  As I stated earlier, he was
15 brought in for investigation, and I don't recall
16 if he was arrested.
17   Q.   Do you know who authorized him to b
18 detained?
19       MS. FROMMER:  Objection.
20   A.   That may have been a patrol
21 supervisor at the scene of White Plains Road
22 where he had some incident there.
23   Q.   Was Geryl McCarthy at White Plains
24 Road?

25 (Pages 94 to 97

LIEUTENANT HARRY SCOTT

102

1  sitting in — who was serving a sentence in
2  Rikers Island?
3       MS. FROMMER: Objection.
4       A.  Sorry, I don't recall.
5       Q.  Okay.  Do you have any recollection
6  whatsoever concerning this so-called confidential
7  informant?
8       MS. FROMMER: Objection.
9       A.  I remember hearing about it, but I
10  really don't remember anything about it, no.
11      Q.  Did you ever inquire as to any
12  criminal activities which these confidential
13  informants may have been engaged in?
14      MS. FROMMER: Objection.
15      A.  If I have a dealing with a
16  confidential informant, it's required that you do
17  a background investigation and check on them,
18  yes.
19      Q.  Okay.  And is that something that
20  would also be kept as part of the case folder?
21      A.  Actually, that would be kept
22  separate into a -- the C.I.'s folder, which would
23  be locked in a, you know, a separate area.
24      Q.  Okay.  And who had access to the

103

1  C.I.'s folder in this case?
2       MS. FROMMER: Objection.
3       A.  I have no idea.
4       Q.  Okay.  Do you how this -- do you
5  have any recollection of what this -- how this
6  gentleman had become a confidential informant?
7       A.  No.
8       MS. FROMMER: Objection.
9       Q.  Okay.  Do you know who -- was the
10  confidential informant file kept at the 43rd
11  Precinct?
12      MS. FROMMER: Objection.
13      A.  If it was a 4-3 detective
14  confidential informant, they would have a file in
15  the 4-3 as directed by guidelines, but I don't
16  know -- I don't know whose C.I. it was.
17      Q.  Okay.  But what would be contained
18  in that file?
19      MS. FROMMER: Objection.
20      A.  Confidential information.
21      Q.  I'm not asking for the specific
22  confidential information, I'm asking what
23  categories of documents or what -- what would --
24  is there a form that this confidential

104

1  information was recorded on?
2       A.  Well, I don't think the information
3  they have would go into his file, the C.I.'s
4  file.  It would go into the case file if it was
5  information.
6       Q.  Okay.  And, but what was the purpose
7  of doing the background check on each
8  confidential informant?
9       MS. FROMMER: You're asking general
10  questions; right?  Because he said he had
11  no dealing with the confidential
12  informant.
13      MR. JOSEPH: No, no.  I'm talking
14  about the procedure.
15      Q.  Sir, did you testify that it was the
16  standard procedure or the required procedure to
17  do a background check on a confidential
18  informant?
19      MS. FROMMER: Objection.  That is
20  not was his testimony was.  His testimony
21  was if he dealt with a confidential
22  informant, it was something that he would
23  do.  That does not -- not testimony about
24  standard operating procedure.

105

1       MR. JOSEPH: I'll retract the
2  question.
3       MS. FROMMER: Okay.
4       Q.  Sir, was there a requirement in the
5  43rd Precinct that, when dealing with a
6  confidential informant, you had to do a
7  background check?
8       MS. FROMMER: Objection.
9       A.  I'm not so sure about that.  When I
10  was in narcotics investigations, we would do a
11  background check on the confidential informant
12  and kind of just see if they were credible.
13      Q.  Okay.  And what information were you
14  looking for to determine whether the confidential
15  informant was credible?
16      MS. FROMMER: You mean general
17  information?
18      MR. JOSEPH: Yeah.
19      MS. FROMMER: You can answer.
20      A.  Well, they may be giving you
21  information because they want to work off some
22  time on an ongoing pending charge or something.
23      Q.  Right.
24      A.  Or they may do it for a monetary or



27 (Pages 102 to 105)

106

1   who knows, revenge. I don't know.
2       Q.   And are these all factors that a
3   detective should consider when evaluating the
4   information provided by a confidential informant?
5       A.   Sure.
6       Q.   Okay. And is that the standard
7   practice and procedure at the 43rd Precinct —
8           MS. FROMMER: Objection.
9       Q.   — in February of 2001?
10          MS. FROMMER: Objection.
11      A.   To be honest, I don't know if the
12  4-3 had any C.I.'s, confidential informants, at
13  that time, so I don't know.
14      Q.   Well, at some point, did you become
15  aware that there had been information provided by
16  a so-called confidential informant in the case
17  against Anthony Manganiello?
18      A.   Yes.
19      Q.   And were you aware of whether —
20  strike that.
21          Do you know how this confidential
22  informant came to be in contact with the
23  detectives at the 43rd Precinct?
24          MS. FROMMER: Objection.

107

1       A.   I think you asked me that earlier,
2   but I think he was referred to them by someone
3   else. I don't recall who.
4       Q.   Okay. And would a background —
5   strike that.
6           Do you know if a background check
7   was performed on this particular individual, this
8   confidential informant?
9       A.   No, I don't.
10      Q.   Okay.
11      A.   I do not know.
12      Q.   Would you find — strike that.
13          Would you find it unusual if a
14  background check had not been performed on a
15  confidential informant providing information in a
16  murder case?
17          MS. FROMMER: Objection.
18      A.   Well, as I stated earlier, a handler
19  of a C.I., the person that the C.I. is registered
20  to, would do a background check on the person.
21      Q.   Okay.
22      A.   If the C.I. is relaying information
23  to a detective in another squad, I guess, maybe
24  it might be up to the detective's judgment if he

108

1   wants to do a background check on the C.I. or
2   not. He's not registered to that detective.
3       Q.   Okay. Now, what do you — when
4   you're saying "registered," what does that mean,
5   registered?
6       A.   There is a certain procedure that a
7   C.I. has to be registered. And also a C.I. has
8   to be interviewed by the detective that's going
9   to sign him up and a supervisor is involved. At
10  least, I know, in narcotics, we did it that way.
11      Q.   Okay. And is it ever permissible to
12  allow a confidential informant to commit crimes
13  without punishment in exchange for information?
14          MS. FROMMER: Objection.
15      A.   I think that's very ridiculous. And
16  no, I would say no.
17      Q.   Okay. Do you know if there was a
18  known loan shark acting as a confidential
19  informant in the prosecution of Anthony
20  Manganiello?
21          MS. FROMMER: Objection.
22      A.   No, I don't know.
23      Q.   Okay. Did you at any point become
24  aware that a confidential informant had admitted

109

1   to selling a firearm to Anthony Manganiello?
2       A.   I did hear that, yeah.
3       Q.   Okay. At any point, was that
4   confidential informant arrested for that crime?
5       A.   I don't know.
6       Q.   Did you — in your judgment, should
7   that confidential informant have been arrested
8   for selling a firearm?
9           MS. FROMMER: Objection.
10      A.   I guess that would be up to the
11  district attorney.
12      Q.   Okay. Do you know — strike that,
13  sir.
14          Is the sale of a firearm in 2001,
15  was that a felony?
16          MS. FROMMER: Objection.
17      A.   I would say so.
18      Q.   Okay. Now, at any point, were you
19  made aware that a confidential informant admitted
20  to conspiring to the murder of a Parkchester
21  security guard —
22          MS. FROMMER: Objection.
23      Q.   — in exchange for money?
24      A.   No, I don't recall that.

dalco
court reporting & legal video

LIEUTENANT HARRY SCOTT

110

1    Q.  Okay.  Had you been made aware of

2  that, would that confidential informant have been

3  arrested?

4        MS. FROMMER: Objection.

5    A.  It depends on the circumstances.  If

6  there was credibility to it, if it was

7  investigated, and it was found to be true, then

8  yeah, I guess, I would.  Yeah.

9    Q.  Do you know if a gentleman named

10  Terence Alton was ever arrested for conspiracy to

11  commit murder for hire?

12        MS. FROMMER: Objection.

13    A.  No, I don't know.

14    Q.  At any point, did you become aware

15  of a -- strike that.

16        Sir, would the fact that -- what

17  influence -- how can I phrase this for you?  Is

18  one of the factors in judging the credibility of

19  a confidential informant, whether he's given

20  false information in the past?

21        MS. FROMMER: Object to the form.

22  You can answer.

23    A.  Yeah, that would be -- yeah.

24    Q.  Okay.  Were you aware of whether or

111

1  not Terence Alston had provided false information

2  to Detective Agostini in -- concerning the

3  investigation of the death of Albert Acosta?

4        MS. FROMMER: Objection.

5    A.  I have absolutely no idea.

6    Q.  At any point, were you made aware

7  that a confidential informant named Terence

8  Alston told Detective Agostini and/or Detective

9  Parker that a friend of his had sold -- named

10  Johnnie Baker had sold a gun to Mr. Manganiello

11  and Mr. Baker later denied it?

12        MS. FROMMER: Objection.

13    A.  I don't recall such a -- hearing

14  such things.

15    Q.  Is that something that -- if that

16  were placed in a DD-5 and provided to you, is

17  something you would have read in 2001?

18        MS. FROMMER: Objection.  You can

19  answer.

20    A.  If it was in a case folder and it

21  was on a 5 and I saw it, I would have read it,

22  and I would have signed the 5, yeah.

23    Q.  Okay.  And what if anything would

24  you have done after you saw the DD-5 indicating

1  such a -- if that had transpired?

2        MS. FROMMER: Objection.

3    A.  Can you repeat the --

4    Q.  Sure.

5    A.  -- alleged offense or whatever you

6  were saying.

7        MR. JOSEPH: All right.  I'll tell

8  you what, let's have this marked,

9  two-paged document, marked.

10

11       (Plaintiff's Exhibit 9,

12       DD-5 REGARDING ALSTON, was

13       marked for identification.)

14

15       MS. FROMMER: Mr. Joseph handed th

16  witness the two-paged document to show it

17  to him, and I just want to put on the

18  record that I have seen this two-paged

19  document, but there are asterisks and

20  handwritten notes on the margins as well

21  as certain words have been circled on this

22  document.

23       MR. JOSEPH: Again, that how it came

24  to me and I have no --

1       MS. FROMMER: Okay.

2       MR. JOSEPH: Off the record.

3

4       (An off-the-record

5       discussion was held.)

6

7  BY MR. JOSEPH:

8    Q.  Now sir, I'll show you what's been

9  marked as Exhibit number 9.  Have you ever se

10  the document before?

11    A.  I don't recall it.

12    Q.  Now, part of the bottom is cut off,

13  but do you see anything indicating your signatu

14  on the bottom?

15    A.  Not really, no.

16    Q.  Okay.  Have you had time to review

17  the document?

18    A.  I just started to read it.

19    Q.  Okay.  Take a few minutes.

20    A.  Wow.

21    Q.  Sir, have you ever seen this DD-5

22  before?

23    A.  I don't recall it.

24    Q.  Okay.  Do you see anything on this

29 (Pages 110 to 113

**dalco**

court reporting & legal video

114

1  DD-5 that would indicate that you had signed it
2  or reviewed it?
3      A.   No.
4      Q.   Okay.  Now sir, in this DD-5,
5  apparently Mr. Alston is admitting to conspiracy
6  to commit murder; is that correct?
7          MS. FROMMER:  Objection.  If you're
8          asking him to give his opinion as to what
9          the legal crime is, I'm gonna instruct him
10         not to answer.  If you're asking him to
11         say that he's committed a legal crime.
12         He's not in the position to give that
13         testimony.  I'm gonna instruct him not to
14         answer.
15         MR. JOSEPH:  That's fine.
16     Q.   Sir, after reading what we have here
17  in Exhibit number 9, do you find this to be
18  sufficient to warrant an investigation into the
19  arrest of Terence Alston?
20         MS. FROMMER:  You can answer.
21     A.   You know, if depending upon the
22  detective, maybe he thought the guy was just full
23  of shit.
24     Q.   Okay.  And if the guy was full of

115

1  shit, should his -- any information he provides
2  be used in a murder investigation?
3          MS. FROMMER:  Objection.
4      A.   If he's full of shit, I would say
5  no.
6      Q.   Okay.  And did you ever have a
7  conversation with Detective Agostini to determine
8  whether or not Mr. Alston was full of shit?
9      A.   I don't recall such a conversation.
10     Q.   Sir, have you ever had a
11  conversation with any other detective in the 43rd
12  Precinct to determine whether or not Mr. Alston
13  was full of shit?
14     A.   You know, I don't know Mr. Alston,
15  and I don't recall having any conversations with
16  detectives about someone I don't know or
17  remember.
18     Q.   If Exhibit 9 were in the case file
19  for the homicide of Albert Acosta, would it be
20  unusual if you didn't see this?
21         MS. FROMMER:  Can you repeat that?
22         MR. JOSEPH:  Strike that.  I'll
23  rephrase it.  Sure.
24     Q.   If this was a document -- if Exhibit

116

1  9 is a document that was produced in the ordinary
2  course of the investigation into the homicide of
3  Albert Acosta, is this something that would have
4  been presented to you?
5      A.   For review, yes.  I would have -- if
6  it was in the case folder, I would have seen it.
7      Q.   And at any point -- after seeing
8  this, what action, if any, would you have taken?
9          MS. FROMMER:  Objection.
10     A.   Maybe I would have talked to
11  Bencenvingo.  I think I saw the name Parker here
12  from Intel, his C.I.  I would ask him, is your
13  C.I. credible.
14     Q.   Okay.
15     A.   I would speak to Robert Ramos who
16  did this 5.
17     Q.   Sir, did you ever speak to Ramos and
18  Bencenvingo or Parker?
19         MS. FROMMER:  Well, he testified
20         earlier that he didn't see the --
21         MR. JOSEPH:  I'm not asking him if
22         he ever did.
23         MS. FROMMER:  -- and the DD-5 and
24         his answer, that he just gave, was if he

117

1  had seen it --
2          MR. JOSEPH:  Right.
3          MS. FROMMER:  -- that is what he
4          would have done, so I think you're asking
5          a loaded question.  If you can properly
6          answer the question, you can tell him
7          that.
8      A.   Well, Ramos, I believe, was assigned
9  to the 4-3 so, yes, I talked with him.
10 Bencenvingo was assigned to the Ram unit, which
11 is next door to the squad, so yes, I've talked
12 with him also.  This guy Parker, I don't
13 remember.  And I guess that answers your
14 question.
15     Q.   Okay.  Was there anybody -- any
16  other supervisors who was supervising or
17  overseeing the investigation into the homicide of
18  Albert Acosta to whom a DD-5 such as Exhibit
19  number 9 would have been presented for review,
20  other than yourself?
21     A.   Sure.
22     Q.   Who?
23     A.   Lieutenant John McGovern, who at the
24  time, was a sergeant.

LIEUTENANT HARRY SCOTT

118

1    Q.   Okay.

2    I think Sergeant Chris Napolitano

3 was in the command at that time.  And if I was

4 not there, or if they were not there, it would be

5 a supervisor from another command in the

6 detective bureau.

7    Q.   Do you have – do you ever – do you

8 have a recollection of ever having a conversation

9 generally with either Sergeant McGovern, Ramos,

10 Agostini, Bencenvingo concerning whether a C.I.

11 on the Manganiello case was full of shit?

12    MS. FROMMER:  Objection.

13    A.   I recall having a conversation with

14 – it may have been Agostini, it may have been

15 Abate, about a C.I.'s involvement, but I think, I

16 think it was several months later, and I was in

17 the 5-2 squad at that time.

18    Q.   Okay.  You say several months later,

19 can you give me a ballpark approximation?

20    MS. FROMMER:  Objection.  I really

21 – no, I can't.

22    Q.   Okay.  Would that have been after

23 April of 2001?

24    A.   Yes, I think it would have been.

119

1    Q.   And can you tell what the sum and

2 substance, to the best of your recollection, was

3 concerning that conversation.

4    A.   Not really, no.  I don't really

5 recall it very good.

6    Q.   Okay.  If it had been Sergeant

7 McGovern or another supervisor who reviewed this

8 DD-5 that we have here as Exhibit number 9, what

9 is your expectation of what should have been done

10 here –

11    MS. FROMMER:  Objection.

12    Q.   – concerning the contents of this

13 DD-5?

14    A.   Well, I think I explained that

15 already.

16    Q.   Well, I think you told us – here's

17 what I'm getting at.  You told us what you would

18 do.  My question really is:  Is that what the

19 protocol was in February 2001 for other

20 supervisors, as well?

21    MS. FROMMER:  Objection.  You can

22 answer if you can.

23    A.   I guess it would depend on the

24 supervisor.

1    Q.   Okay.  Sir, was there any clear-cut

2 guidelines or policies or procedures as to what

3 to do when confronted with situations such as

4 see in Exhibit number 9?

5    MS. FROMMER:  Objection.

6    A.   Well, maybe you could refer, like

7 what do you – you know, in this 5, what is it

8 that's jumping out at you there?

9    Q.   Well, let me ask you this:  In

10 Exhibit number 9 assuming Mr. Alston is not f

11 of shit, what should have been done here –

12    MS. FROMMER:  Objection.

13    Q.   – if anything?

14    MS. FROMMER:  Objection.  Do you

15 understand the question?

16    THE WITNESS:  I think I do, but I

17 guess he just doesn't understand the

18 response.

19    Q.   Let me – I'll rephrase it then.

20 Sir, assuming Mr. Alston is not full of shit, if

21 a supervisor reads Exhibit number 9, should tha

22 supervisor commence some sort of criminal acti

23 against or commence some sort of criminal

24 investigation against Mr. Alston?

1    MS. FROMMER:  Objection.

2    A.   As I said earlier, you would ask

3 about his credibility.  You would refer with

4 Detective Parker.  You would speak with Ramos,

5 Bencenvingo, and anybody else involved that has

6 dealings with this person, Mr. Alston.  And mayb

7 you would have a different feeling then or maybe

8 you would not.

9    Q.   Let me ask you this:  Would there be

10 records kept if there were an investigation

11 speaking to Bencenvingo, Parker, and the othe

12 gentlemen you mentioned concerning this

13 particular C.I.?

14    MS. FROMMER:  Objection.

15    Q.   Would there be a record generated or

16 some kind of –

17    A.   I have no knowledge.

18    Q.   Okay.  Well, I'm saying is – I'm

19 not asking of your specific knowledge about

20 whether there exists a document concerning –

21    A.   You're asking me a hypothetical

22 question.

23    Q.   I'm asking you a procedural

24 question.

**dalco**
court reporting & legal video

31 (Pages 118 to 121)

LIEUTENANT HARRY SCOTT

122

1    MS. FROMMER: Objection.

2    Q.    Is there a procedure in place to

3    create and maintain a document after attempting

4    to verify the credibility of an informant?

5    MS. FROMMER: Objection.

6    A.    I guess depending upon the detective

7    or the supervisor involved; how thorough they

8    want to be. I guess they would.

9    Q.    Okay. And where would that document

10    have been kept --

11    MS. FROMMER: Objection.

12    Q.    -- assuming it was created?

13    A.    Maybe in the folder of the case that

14    it pertains to or maybe in the C.I.'s

15    registration folder. You know, I don't know. I

16    would -- I don't know. I guess it would be in

17    the handler's folder, the handler's command.

18    MR. JOSEPH: Okay. Let's have this

19    marked as --

20

21    (Plaintiff's Exhibit 10,

22    DD-5 REGARDING BAKER, was

23    marked for identification.)

24

123

1    Q.    For the record, I'm showing you a

2    one-paged document, Plaintiff's Exhibit 10, which

3    has a statement written on it, where is Baker's

4    statement, and certain portions are underlined.

5    Again, it came to me in this condition. Sir, I'm

6    gonna show you Exhibit number 10 and ask you:

7    Have you ever seen this document before? Take as

8    much time as you need to read it over.

9    A.    I can't tell you if saw this or not.

10    I don't recall it, and I don't see my signature

11    on it that I signed it.

12    Q.    Okay.

13    A.    I don't recall it.

14    Q.    Okay. Sir, at any point, did you

15    become aware that a C.I. who was working on the

16    investigation of the Acosta case provided a name

17    of somebody who he said sold the gun to Anthony

18    Manganiello and that later turned out to be

19    false?

20    MS. FROMMER: Objection.

21    A.    I don't recall it.

22    Q.    Okay. In such circumstances, what

23    effect if any would that have on the confidential

24    informant's credibility --

124

1    MS. FROMMER: Objection.

2    Q.    -- in your view?

3    A.    Do you mind rephrasing -- I mean,

4    just repeating the question.

5

6    (The requested testimony was

7    read back.)

8

9    A.    What would what affect?

10    Q.    Okay. Would the fact that a

11    confidential informant provided information that

12    turned out to be false, would that bear on

13    the confidential informant's credibility in your

14    eyes --

15    MS. FROMMER: Objection.

16    Q.    -- in your opinion --

17    MS. FROMMER: Objection.

18    Q.    -- or professional judgment?

19    A.    Well, he wouldn't be very credible.

20    Q.    Okay. And in your professional

21    judgment, should prosecution of a murder case go

22    forward based on a word of a confidential

23    informant who turned out not to be credible?

24    MS. FROMMER: Objection.

125

1    A.    I would say that that depends.

2    There might be other evidence.

3    Q.    Okay.

4    A.    Based solely on the confidential

5    informant's testimony, I would say not.

6    Q.    Okay. And sir, in August of 2001,

7    did you become aware that Anthony Manganiello had

8    become rearrested for the homicide of Albert

9    Acosta?

10    MS. FROMMER: In August of 2001?

11    Q.    I'm sorry, April.

12    MS. FROMMER: You can answer.

13    A.    I remember hearing that, yes.

14    Q.    Okay. Was role, if any, did you

15    play in making a determination as to whether

16    Anthony Manganiello should be arrested --

17    rearrested in April 2001?

18    MS. FROMMER: Objection.

19    A.    I don't recall that I had any, but

20    I don't remember. No.

21    Q.    Okay. As a part of a standard

22    practice, would the -- would Lieutenant Agostini

23    speak with you before he signed a felony complaint

24    charging someone with murder?

32 (Pages 122 to 125)

dalco
court reporting & legal video

LIEUTENANT HARRY SCOTT

126

1    MS. FROMMER: Objection.

2    A.  If I was in that day, I guess he

3  would --

4    Q.  Okay.

5    A.  -- and along with various district

6  attorneys and sergeant.

7    Q.  Now, between February 12th, 2001 --

8  strike that.

9    Between the time Albert Acosta was

10  murdered and the point in time that Anthony

11  Manganiello was rearrested some time in April of

12  2001, did you ever learn of any evidence that

13  established probable cause to believe that Mr.

14  Manganiello was responsible for the death of

15  Albert Acosta?

16    MS. FROMMER: Objection.

17    A.  I don't recall.

18    Q.  Okay.  Did -- how many supervisor --

19  well, let me strike that.

20    How was the case against Anthony

21  Manganiello staffed?  In other words, was there a

22  particular supervisor assigned to that case, or

23  were different supervisors assigned to that case?

24    MS. FROMMER: Objection. You can

127

1  answer.

2    A.  I would say there were probably

3  several.

4    Q.  Okay.  Can you tell me as you sit

5  here now who the -- what -- strike that.

6    Before a felony complaint could be

7  signed by a detective in the 43rd squad, did a

8  supervisor have to -- was there any procedure by

9  which a supervisor -- strike that.

10    Before a -- in February -- strike

11  that.

12    In April of 2001 before a detective

13  could sign a felony complaint charging an

14  individual with homicide, was there any

15  requirement that the case be reviewed by a

16  supervisor?

17    MS. FROMMER: Objection.

18    A.  A supervisor would sign the OLBS

19  arrest report after conferring with a district

20  attorney in Bronx County.

21    Q.  Okay.  Do you know who the

22  supervisor was that signed the OLBS report for

23  Anthony Manganiello's arrest?

24    A.  That I do not.

---

1    Q.  Okay.  Where would the OLBS repo

2  be kept or stored?

3    A.  That should definitely be in the

4  case folder.

5    Q.  Would a copy of it be --

6    A.  And if I'm not mistaken, maybe they

7  did a blap, you know, did it online also.

8    Q.  Okay.  In April of 2001, was that --

9  was an OLBS something that was electronica

10  stored on a computer?

11    A.  Not on the day that it is done, but

12  after that.  I don't recall what the time frame

13  may be.

14    MR. JOSEPH:  Let's go off the record

15  a second.

16

17    (An off-the-record

18    discussion was held.)

19

20  BY MR. JOSEPH:

21    Q.  Sir, what's the OLBS?

22    A.  It's the online booking sheet.

23    Q.  Okay.  Now, what responsibilities if

24  any does a supervisor have prior to signing a

1  OLBS in terms of reviewing the evidence?

2    A.  In a homicide case?

3    Q.  Correct.

4    A.  Oh, okay.  Well, after conferring

5  with the detective and thinking that you may have

6  probable cause, and then conferring with a

7  district attorney and getting a mission to

8  arrest.

9    Q.  Okay.  Now, you said "may have

10  probable cause," what do you mean by that?

11    A.  Evidence or a witness or -- evidence

12  or a witness.

13    Q.  And as far as -- at any point

14  between the date of Mr. Acosta's demise and the

15  date which Anthony Manganiello was arrested in

16  April 2001, did you ever come across any evidenc

17  or witness that directly tied Mr. Manganiello to

18  the murder on Albert Acosta?

19    MS. FROMMER: Objection.

20    A.  I will say that I don't remember

21  because I really don't remember.

22    Q.  By the way, on the OLBS or anywhere,

23  would there be some documentation of what

24  evidence supported that finding of probable



33 (Pages 126 to 129)

138

1  a statement as concerning the homicide
2  investigation?
3      A.  No.
4      Q.  And you testified that you did not
5  testify at the grand jury; is that correct?
6      A.  Correct, I did not.
7          MS. FROMMER:  Okay.  I have nothing
8  further.
9
10  FURTHER EXAMINATION BY
11  MR. JOSEPH:
12      Q.  Sir, on February 12th, 2001, did you
13  have a radio that — on which you can hear what
14  the Parkchester security was broadcasting?
15      A.  If they have a P.D. — if they have
16  one of our radios, yeah, I could monitor it.
17      Q.  Well, was there also a radio system
18  among the security officers at Parkchester?
19      A.  Yes.
20      Q.  Did you have one of those radios?
21      A.  No.
22      Q.  Did you have any ability to monitor
23  what those Parkchester security officers were
24  saying back and forth?

139

1          MS. FROMMER:  Objection.  You can
2  answer.
3      A.  No, not on their radio unless I had
4  one.
5      Q.  Do you known what information --
6  strike that.
7          Do you know who provided the
8  information to the District Attorney's Office
9  that led to an arrest warrant being issued for
10  Anthony Manganiello?
11      A.  Other than the case detective, no.
12      Q.  Whose -- was anybody responsible to
13  monitor what information the case detective was
14  giving to the District Attorney's Office?
15          MS. FROMMER:  Objection.
16      A.  If they're there physically, yes.
17  If they're not there, then no.
18      Q.  Do you come one way or another
19  whether Detective Agostini manufactured evidence?
20          MS. FROMMER:  Objection.  You can
21  answer.
22      A.  I would say no.
23      Q.  You don't know, or he didn't?
24      A.  I don't know, no.

140

1      Q.  Do you know whether Detective
2  Agostini used informants that were, in your
3  words, full of shit?
4          MS. FROMMER:  Objection.
5      A.  No, I do not know.
6      Q.  Okay.  Is that something that a
7  supervisor should know?
8          MS. FROMMER:  Objection.
9      A.  If the supervisor is there; if the
10  supervisor did a credibility check on the C.I., I
11  guess, he would know.
12      Q.  Do you know if any supervisor ever
13  did any credibility checks on any confidential
14  informants who provided information for the —
15  further into the prosecution of Anthony
16  Manganiello?
17          MS. FROMMER:  Objection.
18      A.  I don't know.
19      Q.  Okay.  By the way, did you ever
20  speak with any supervisors regarding the DD-5s
21  concerning Mr. Alston, Mr. Baker, Mr. Booth, or
22  Mr. Damon?
23          MS. FROMMER:  Objection.
24      A.  I don't recall.

141

1      Q.  And sir, as you sit here right now,
2  do you know whether the District Attorney's
3  Office was provided with fabricated evidence —
4          MS. FROMMER:  Objection.
5      Q.  — by Detective Agostini or
6  Detective Abate?
7          MS. FROMMER:  Objection.
8      A.  I wouldn't know.
9      Q.  As you sit here right now, do you
10  know if any of the — strike that.
11          As you sit here right now, do you
12  know whether Detective Agostini or Detective
13  Abate allowed confidential informants to commit
14  criminal acts in exchange for the information
15  they provided?
16          MS. FROMMER:  Objection.
17      A.  I would say no.
18      Q.  No, you don't know, or no, it didn't
19  happen?
20      A.  I don't know.
21      Q.  As you it here right now — strike
22  that.
23          Sir, as you sit here right now, do
24  you know whether Detective Agostini destroyed

LIEUTENANT HARRY SCOTT

142

1  evidence in this case?
2      MS. FROMMER: Objection. You can
3  answer.
4      A.  I do not know.
5      Q.  Did you believe Detective Agostini's
6  explanation for what happened to the case folder
7  concerning the disappearance of documents further
8  into the prosecution of Anthony Manganiello?
9      MS. FROMMER: Objection.
10     A.  I have no reason to not believe him.
11     Q.  Did the explanation provided to you
12  sound credible?
13     A.  Yes.
14     Q.  By the way, were you aware of any
15  remodeling that ever happened at the 43rd
16  Precinct?
17     MS. FROMMER: Objection.
18     A.  No, but then it could have happened
19  after I was gone.
20     MR. JOSEPH: All right. That's all
21  I have.
22
23
24     (Time noted: 3:30 p.m.)

I N D E X

EXAMINATION BY                    PAGE:L
MR. JOSEPH:              5:7

EXAMINATION BY
MS. FROMMER:           134:22

FURTHER EXAMINATION BY
MR. JOSEPH:            138:10

(Plaintiff's Exhibit 9,        112:11
DD-5 REGARDING ALSTON, was
marked for identification.)

(Plaintiff's Exhibit 10,       122:21
DD-5 REGARDING BAKER, was
marked for identification.)

143

1  STATE OF NEW YORK        )
2            ss:
3  COUNTY OF          )
4
5
6      I, LIEUTENANT HARRY SCOTT, hereby certify
7  that I have read the pages of the foregoing
8  testimony of this deposition and hereby certify
9  it to be a true and correct record.
10
11
12
13  _____
14      LIEUTENANT HARRY SCOTT
15
16
17
18
19  Sworn to before me this
20  ___day of_____, 2008.
21
22
23  _____
24     Notary Public

C E R T I F I C A T I O N

STATE OF NEW YORK      )
              ) ss.
COUNTY OF PUTNAM      )
      I, RAYMOND ROGENER, JR., Court
Reporter and Notary Public within and for the
County of Putnam, State of New York, do hereby
certify:
      That I reported the proceedings that
are hereinbefore set forth, and that such
transcript is a true and accurate record of said
proceedings.
      AND, I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.
      IN WITNESS WHEREOF, I have hereunto
set my hand.


      RAYMOND ROGENER, JR.
      Court Reporter

37 (Pages 142 to 145

dalco
court reporting & legal video