# EXHIBIT 24

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
ANTHONY MANGANIELLO,

                              Plaintiff,


         -against-


THE CITY OF NEW YORK, ET AL.,

                              Defendants.
------------------------------------------x

                              February 7, 2008
                              2:20 p.m.


         Deposition of JOHN MCGOVERN to Notice,
at the offices of CORPORATION COUNSEL, 100
Church Street, New York, New York 10007,
before Stephen Kleinman, a Notary Public
within and for the State of New York.
```

DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10601
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com



10

McGOVERN

1 lieutenant?
2    A. Internal affairs.
3    Q. From when to when were you an internal affairs lieutenant?
4    A. From July 10, 2003 to the present.
5    Q. Prior to July 10, 2003, what was your position?
6    A. Prior to that?
7    Q. Correct.
8    A. I was a platoon commander and special projects lieutenant in the 63rd Precinct.
9    Q. From when to when?
10    A. From August of '02, to July 10, '03.
11    Q. And prior to the 63rd, what was your assignment? Let me see if I can expedite this. At any point were you assigned to the 43rd Precinct?
12    A. Yes.
13    Q. From when to when?
14    A. I got there around, sometime around October of 1999.

11

McGOVERN

Q. Until?
A. And I left there sometime in June of 2001.
Q. Where did you go in June of 2001?
A. I was reassigned to the 44th detective squad.
Q. Okay. Is there any reason that you were reassigned?
   MS. FROMMER: Objection. You can answer.
A. Just the needs of the Department.
Q. From October of 1999 through June of 2001, what was your position at the 43rd Precinct?
A. I was a squad supervisor there.
Q. And what does a squad supervisor do?
A. Basically I would take care of most of the administrative tasks, I would assign cases, sign and assign them, maintain whatever databases needed to be maintained, review roll call and records and things of

12

McGOVERN

that nature.
Q. Okay. You mentioned "assign cases."
   What do you mean by "assign cases"?
A. Cases come up from, you know, when people make complaints, they have to be assigned to particular detectives. There is a running sheet.
Q. I think you also said that you sign cases.
   What do you mean by "sign cases"?
A. Sign, I would review for accuracy or completion. If there was any additional steps that needed to be conducted in the investigation, I would instruct detectives to do that.
Q. And by the way, between 1999 and when you left in 2001, was the 43rd Precinct ever renovated?
   MS. FROMMER: Objection. You can answer.
A. Not while I was there.

13

McGOVERN

Q. Do you know if it was ever renovated after you were there?
A. I have no idea.
Q. Do you know a Police Officer Ortiz who was assigned to the 43rd Precinct?
A. No.
Q. Do you know a Police Officer Rodriguez who was assigned to the 43rd Precinct?
A. No.
*R Q. By the way, did you ever receive any command level complaints which were sustained against Detective Agostini?
DI    MS. FROMMER: Objection. I am going to instruct you not to answer that.
   Detective Agostini has already been deposed and he has already stated what you are allowed to have, which is there are no substantiated Civilian --
   MR. JOSEPH: Well, that is what he says. I am asking this individual if out of his position he received any command level complaints which were

4 (Pages 10 to 13)

26

1  McGOVERN
2      MS. FROMMER: Objection.
3  A.  I don't recall that.
4  Q.  Do you have any other
5  recollection, as you sit here right now,
6  concerning what information, if any, was
7  provided by any witnesses on February 12,
8  2001?
9      MS. FROMMER: Objection. Other
10 than what he testified to?
11     MR. JOSEPH: Aside from what he
12 told us, do you have any recollection?
13     MS. FROMMER: You can answer.
14 Objection, for the record.
15 A.  No.
16 Q.  Okay. You mentioned the term
17 "someone of interest."
18     What does that term mean?
19 A.  The term?
20 Q.  Yes.
21 A.  It would mean someone that
22 would be a possible witness or a possible
23 subject in the investigation, someone that
24 could provide information or further leads
25 into solving that particular crime.

27

1  McGOVERN
2  Q.  Okay. Did anybody provide you
3  with information that Anthony Manganiello, a
4  person interest, was with two uniformed
5  police officers earlier that morning?
6      MS. FROMMER: Objection. You
7  can answer.
8  A.  No.
9  Q.  While you were at the scene on
10 February 12, 2001, who told you that Anthony
11 Manganiello was a person of interest?
12     MS. FROMMER: Objection. You
13 can answer.
14 A.  I don't remember.
15 Q.  While you were there at the
16 scene on February 12, 2001, did you speak
17 with a Detective Agostini?
18 A.  Did I speak to him?
19 Q.  Yes.
20 A.  Do I remember speaking to him?
21 Q.  Yes.
22 A.  No.
23 Q.  Do you have any recollection of
24 talking to a Detective Abate on February 12,
25 2001 at the scene of Mr. Acosta's homicide?

28

1  McGOVERN
2  A.  No.
3  Q.  What did you do? Approximately
4  what time did you leave the crime scene?
5  A.  I don't -- I don't know what
6  time I left.
7  Q.  Do you have a recollection for
8  how long you were at the crime scene?
9  A.  I was there for a little while.
10 Q.  What is "a little while"?
11 A.  I couldn't put a number on it
12 right now.
13 Q.  Okay. Could you put a
14 reasonable approximation on it?
15     MS. FROMMER: Objection.
16 A.  No.
17 Q.  At any point did you direct
18 anybody to bring Anthony Manganiello back to
19 the 43rd Precinct?
20     MS. FROMMER: Objection.
21 A.  I don't recall directing
22 anybody to do that.
23 Q.  Okay. At any point did you
24 authorize anybody to bring Anthony
25 Manganiello to the 43rd Precinct?

29

1  McGOVERN
2      MS. FROMMER: Objection. You
3  can answer
4  A.  Well, if I didn't direct
5  anyone, how would I authorize them? So that
6  would be a no.
7  Q.  Do you know if Mr. Manganiello
8  was brought back to the 43rd Precinct on
9  February 12, 2001?
10 A.  He was brought back to the
11 43rd.
12 Q.  And do you know why he was
13 brought back to the 43rd Precinct?
14 A.  He was being arrested for the
15 homicide.
16 Q.  At what point was he being
17 arrested?
18 A.  I don't know.
19 Q.  At the point in time when he
20 was being brought back to the 43rd Precinct
21 from the crime scene, was Anthony Manganiello
22 under arrest?
23     MS. FROMMER: Objection.
24 A.  I don't know. I wasn't
25 involved in that.

8 (Pages 26 to 29)

30

McGOVERN

1
2  Q. Can you tell me who was
3  involved in that?
4  A. It would have been the case
5  detective, Agostini.
6  Q. Okay. Do you know -- I think
7  you mentioned a few minutes ago that Anthony
8  Manganiello was being arrested for the
9  homicide of Albert Acosta.
10     What did you mean by that?
11     MS. FROMMER: Objection. You
12  can answer.
13  A. I mean he was arrested that
14  particular night, whatever it was. February
15  1?
16  Q. February 12, 2001?
17  A. February 12th. He was arrested
18  that night and he was subsequently released.
19  Q. Okay. Did you discuss with the
20  case -- did you have any discussion with the
21  case detective prior to Mr. Manganiello's
22  arrest about Mr. Manganiello being arrested?
23     MS. FROMMER: Objection. You
24  can answer.
25  A. I don't remember a discussion.

31

McGOVERN

1
2  All I remember is, when I got back to the
3  squad, he had already been in a cell and, you
4  know, they were processing an arrest and
5  speaking to the DA's office. At some point
6  the DA's office felt that there wasn't enough
7  to proceed with a case against him and he was
8  subsequently released. That is really all I
9  remember.
10  Q. Okay. Let's back up. I want
11  to take it step by step.
12     From the crime scene of the
13  homicide of Albert Acosta, did he go directly
14  to the 43rd Precinct?
15  A. I don't remember.
16  Q. Did you take any calls between
17  leaving the crime scene of the Albert Acosta
18  homicide and returning to the 43rd Precinct?
19     MS. FROMMER: Objection. You
20  can answer.
21  A. I don't remember.
22  Q. Okay. How long after Anthony
23  Manganiello left the crime scene did you
24  leave the crime scene, about?
25     MS. FROMMER: Objection. You

32

McGOVERN

1
2  can answer.
3  A. You must be under the
4  misimpression that I said that I saw him
5  leave the crime scene. I never said that.
6  Q. I didn't say you saw him. I
7  said do you have --
8  A. But that is what you are
9  inferring. What I told you before is what I
10  remember. I was at the crime scene. They
11  conduct an investigation there. Crime scene
12  did what they had to do. There was
13  interviews and canvases conducted.
14     I went back to the squad. I
15  recall him being in the cells. We felt there
16  was enough probable cause at that point,
17  based on interviews that were conducted, to
18  make an arrest. The DA's office declined to
19  prosecute, said there wasn't enough at this
20  point and he was subsequently released.
21     I don't remember anything else.
22  That is really -- I don't remember speaking
23  to anyone. I don't remember pretty much
24  anything else about it. So...
25  Q. Sir, was Mr. Manganiello in a

33

McGOVERN

1
2  cell at the point in time that you arrived
3  back at the 43rd Precinct?
4  A. I recall him being in a cell
5  when I got there.
6  Q. Okay. What I am trying to
7  figure out, sir, is how much time generally
8  passed between the time you left the crime
9  scene and when you returned to the 43rd
10  Precinct?
11     MS. FROMMER: Objection. You
12  can answer again.
13  A. I really don't know.
14  Q. Do you have any records which
15  would indicate when you returned to the 43rd
16  Precinct?
17  A. No.
18  Q. Did you note down the time in
19  your memo book when you left the crime scene?
20  A. No.
21  Q. Did you note down the time in
22  your memo book when you arrived back at the
23  43rd Precinct?
24  A. No.
25  Q. Who made the decision that

9 (Pages 30 to 33)

34

McGOVERN

1  McGOVERN
2  there was probable cause to arrest Anthony
3  Manganiello on February 12, 2001?
4       MS. FROMMER: Objection. You
5  can answer.
6   Q.   If you know?
7   A.   Do I know, it was a squad
8  commander there. So...
9   Q.   Okay. Can you tell me the
10 squad commander's name who made the decision
11 to arrest Mr. Manganiello?
12      MS. FROMMER: Objection. You
13 can answer.
14  A.   You know what, I don't know.
15  Q.   Was it Lieutenant Scott?
16  A.   Lieutenant Scott was the squad
17 commander.
18  Q.   Was lieutenant Scott the squad
19 commander on February 12, 2001?
20  A.   Yes.
21  Q.   Was it Lieutenant Scott's
22 decision whether or not there was probable
23 cause to arrest Anthony Manganiello on
24 February 12, 2001?
25      MS. FROMMER: Objection.

35

1  McGOVERN
2  Answer if you know.
3   A.   No, I don't know.
4   Q.   Was there a custom and practice
5  or procedure by which a squad commander would
6  make the decision as to whether or not there
7  was probable cause to arrest somebody in
8  February of 2001?
9       MS. FROMMER: Objection. You
10 can answer.
11  A.   Well, ultimately the squad
12 commander is in charge of the detective
13 squad. So any decisions would go through
14 him.
15  Q.   Okay. Does that mean that
16 Lieutenant Scott necessarily had to have been
17 involved in the decision to arrest Anthony
18 Manganiello?
19      MS. FROMMER: Objection. You
20 can answer.
21  A.   You would have to ask
22 Lieutenant Scott that.
23  Q.   Well, I am asking you based on
24 your knowledge of police procedure.
25 DI     MS. FROMMER: Well, I am going

36

1  McGOVERN
2  to instruct him not to answer what
3  someone else had on their mind or what
4  someone else did
5       MR. JOSEPH: That is not what I
6  asked him. I asked him, based on your
7  understanding of police procedure, was
8  the procedure such that Lieutenant
9  Scott would have had to have
10 authorized the arrest of Anthony
11 Manganiello?
12      MS. FROMMER: Objection. You
13 can answer.
14  A.   I don't think I can answer that
15 question.
16  Q.   Okay.
17  A.   I am not refusing to answer it.
18 I don't think I can give you an answer.
19  Q.   Okay. Well, let me ask you
20 this way.
21      Based on the police procedure
22 as it existed in February of 2001, was it
23 possible for an arrest in a homicide to have
24 been made on February 12, 2001 without
25 Lieutenant Scott's approval?

37

1  McGOVERN
2       MS. FROMMER: Objection. You
3  can answer.
4   Q.   Or authorization?
5       MS. FROMMER: Objection. You
6  can answer.
7   A.   Without Lieutenant Scott's
8  approval?
9   Q.   Yes.
10  A.   Yes.
11  Q.   Okay. And how would an arrest
12 for a homicide have been made without his
13 approval?
14  A.   Well, there would be other
15 covering supervisors. You know, we weren't
16 always working. There was other supervisors
17 working within the detective bureau. It
18 could be any various reasons why someone
19 would authorize the arrest.
20      It could come from the borough.
21 The captain could be there. It could be the
22 duty inspector. It could be any -- any
23 number of calls could be made on that. There
24 is no one right answer for that.
25  Q.   What evidence, if any, provided

10 (Pages 34 to 37)

38

```
 1          McGOVERN
 2  probable cause to believe that Anthony
 3  Manganiello was responsible for the homicide
 4  of Albert Acosta on February 12, 2001?
 5          MS. FROMMER: Objection. You
 6      can answer.
 7      A.  I think I have explained that
 8  to you.
 9      Q.  I am asking you specifically
10  what information provided probable cause?
11          MS. FROMMER: Object to the
12      extent that he has already discussed
13      the extent and full breath of his
14      knowledge. If you would like to ask
15      him that same question over and over
16      again, after three more times, I am
17      going to instruct him not to answer,
18      as it is harassing.
19          You can answer again,
20      Lieutenant.
21      A.  It is basically I kind of went
22  through it already. That's all I recall.
23          You know, there was a witness
24  developed that heard some shots. I believe
25  they said that there was a Parkchester
```

39

```
 1          McGOVERN
 2  security guard that walked out of the
 3  location, and then I came back to the station
 4  house and I remember him being in a cell.
 5      Q.  Okay. Did you review any of
 6  the witness statements by this individual who
 7  claims to have heard the shots?
 8          MS. FROMMER: At what point in
 9      time?
10          MR. JOSEPH: On February 12,
11      2001.
12          MS. FROMMER: You can answer.
13      A.  I don't recall.
14      Q.  Okay. As part of your practice
15  and procedure, would you have reviewed any
16  DD5s concerning what a witness would have
17  said on February 12, 2001 prior to an arrest
18  being made?
19          MS. FROMMER: Objection. The
20      question is ambiguous to me.
21          Are you asking whether he would
22      have reviewed it on February 12th or
23      whether the witness gave the statement
24      of February 12th, and then he would
25      have reviewed it? Because your
```

40

```
 1          McGOVERN
 2      question is vague.
 3  DI          I am going to instruct him not
 4      to answer the question, because I
 5      don't understand it.
 6      Q.  Well, sir, I believe you told
 7  us that your understanding was that a witness
 8  had given a statement that he saw a
 9  Parkchester security guard around a point in
10  time when there was shots being fired, right?
11      A.  Yes.
12      Q.  My question is, how did you
13  learn of that?
14      A.  Well, at the time I had shared
15  an office with the squad commander.
16      Q.  Was that Lieutenant Scott at
17  the time?
18      A.  Correct.
19      Q.  Okay.
20      A.  So whatever formation was
21  filtering in, you know, I was probably there.
22  So...
23      Q.  Did you review any of the DD5s
24  concerning the investigation at the crime
25  scene on February 12, 2001?
```

41

```
 1          McGOVERN
 2          MS. FROMMER: Again, your
 3      question is vague.
 4          Did he review DD5s at the crime
 5      scene?
 6          MR. JOSEPH: No.
 7      Q.  On February 12, 2001, did you
 8  review any DD5s that were created based upon
 9  information learned at the crime scene?
10          MS. FROMMER: You can answer
11      that.
12      A.  No.
13      Q.  At any point in time, did you
14  do anything to stop the arrest of Anthony
15  Manganiello?
16          MS. FROMMER: Objection.
17      A.  No.
18      Q.  On February 12, 2001, did you
19  do any review of evidence to determine
20  whether there was probable cause to arrest
21  Anthony Manganiello?
22          MS. FROMMER: Objection.
23      A.  I don't recall.
24      Q.  Okay. Did you create any notes
25  to any detectives on February 12, 2001
```

42

1    McGOVERN
2    concerning the arrest of Anthony Manganiello?
3    A.    I don't think I did, no.
4    Q.    At any point on February 12,
5    2001, did you learn that Mr. Manganiello had
6    requested an attorney?
7         MS. FROMMER: Objection.
8    Q.    Anthony Manganiello?
9         MS. FROMMER: I am going to
10   note my objection on the record, that
11   you have mischaracterized the evidence
12   as set forth in your own client's
13   deposition.
14        You can answer the question.
15   A.    I don't remember.
16   Q.    At any point did you have any
17   conversations with Lieutenant Scott
18   concerning Anthony Manganiello retaining a
19   lawyer?
20        MS. FROMMER: Objection. You
21   can answer.
22   A.    I don't remember.
23   Q.    On February 12, 2001, did you
24   see Mario Manganiello in the police station?
25        MS. FROMMER: Objection. You

43

1    McGOVERN
2    can answer.
3    A.    When?
4    Q.    On February 12, 2001, do you
5    have any knowledge at to whether Anthony
6    Manganiello's brother, Mario Manganiello,
7    came to the police station?
8    A.    Yes, I do recall his brother
9    coming in.
10   Q.    Okay. At the point in time
11   when his brother came there, was Mr. Anthony
12   Manganiello already in the cell?
13   A.    Yes.
14   Q.    Okay. At the point in time
15   when Mario Manganiello arrived at the 43rd
16   Precinct, was Anthony Manganiello already
17   under arrest?
18   A.    I believe so, yes.
19   Q.    Do you know whose decision it
20   was to place Anthony Manganiello under arrest
21   on February 12, 2001?
22        MS. FROMMER: Same objection.
23   You have answered the question four
24   times. You can answer it again,
25   Lieutenant.

44

1    McGOVERN
2    A.    I don't know.
3    Q.    And on February 12, 2001, did
4    you speak to Mario Manganiello?
5    A.    I don't recall.
6    Q.    Okay. At any point on February
7    12, 2001, did you become aware of Mario
8    Manganiello being stopped while driving a
9    vehicle after he left the 43rd Precinct?
10        MS. FROMMER: Objection.
11   Again, misstating the facts as set
12   forth.
13        You can answer, if you know.
14   A.    Which one is Mario?
15   Q.    Let me rephrase it. What did
16   you see when Mario Manganiello, Anthony
17   Manganiello's brother, appeared at the 43rd
18   Precinct?
19   A.    I just remember him coming in
20   with -- I believe he was with his father.
21   Q.    Okay. What do you recall
22   happening after he came in?
23   A.    I think he requested, he wanted
24   to see his brother. I think he briefly saw
25   him, and then we asked him to leave.

45

1    McGOVERN
2    Q.    And why did you ask him to
3    leave?
4    A.    I didn't think it was really
5    appropriate for him to be there at that point
6    after he saw him.
7    Q.    Why did you not think it was
8    appropriate?
9         MS. FROMMER: Objection. You
10   can answer.
11   A.    It wasn't really -- it is not
12   really common practice to have people in the
13   squad room at the cell area. The family
14   hanging around, it is just not conducive, you
15   know, safety reasons.
16   Q.    Okay. Did Mr. Mario
17   Manganiello leave after he was asked to
18   leave?
19   A.    Yes.
20   Q.    After Mr. Manganiello, Mario
21   Manganiello left, did you see him again on
22   February 12, 2001?
23   A.    I don't remember seeing him
24   again.
25   Q.    Okay. Do you have any

12 (Pages 42 to 45)

46

McGOVERN

1 knowledge of whether Mario Manganiello was
2 bought back to the 43rd Precinct after he
3 initially left?
4   A.   After he left?
5   Q.   Correct.
6   A.   I don't remember.
7   Q.   Okay. At any point did you
8 hear Lieutenant Scott give an order to bring
9 Mario Manganiello back?
10         MS. FROMMER: Objection.
11   A.   I don't know.
12   Q.   Did Detective Agostini or
13 Detective Abate ever discuss with you
14 anything about bringing Mario Manganiello
15 back to the 43rd Precinct after he had left?
16         MS. FROMMER: Objection.
17   A.   I don't remember any
18 conversation.
19   Q.   Sir, after February 12, 2001,
20 what involvement, if any, did you have in the
21 prosecution or arrest of Anthony Manganiello?
22         MS. FROMMER: Objection. You
23    can answer.
24   A.   I think it was sometime in

47

McGOVERN

1 April I was informed that the DA's office,
2 after reviewing the case with Detective
3 Agostini, had determined that there was
4 enough probable cause to make an arrest and
5 there was two locations to go to where he had
6 resided. I went to the location in
7 Yonkers -- in Mount Vernon with Detective
8 Abate to see if we could make an arrest.
9   Q.   Between February 13, 2001 and
10 this time in April, when you had gone to the
11 DA, after this meeting with Detective
12 Agostini, that the DA felt there was probable
13 cause, did you review any new information
14 that had come in concerning this case?
15         MS. FROMMER: Objection. You
16    can answer.
17   A.   Certainly it is possible that I
18 reviewed it, but I don't have any
19 recollection of reviewing it. The only thing
20 I really remember is going out there with
21 Detective Abate to that one location where we
22 eventually made an arrest.
23   Q.   Are you aware, on February 20,
24 2001, that Luis Agostini signed a felony

48

McGOVERN

1 complaint accusing plaintiff of murder in the
2 second degree, among other things?
3         MS. FROMMER: Objection.
4   A.   Was I aware of him signing a
5 complaint on that particular day?
6   Q.   Were you aware that Detective
7 Agostini has signed a felony complaint in
8 April of 2001 against Anthony Manganiello?
9   A.   Well...
10         MS. FROMMER: Answer if you
11    can, if you know.
12   A.   I am assuming he signed a
13 complaint. Mr. Manganiello was placed under
14 arrest and brought back to the 43rd Precinct
15 for processing. That would be Detective
16 Abate's job to go present that to the
17 district attorney and sign a complaint.
18   Q.   Detective Abate or Detective
19 Agostini?
20   A.   I mean Detective Agostini.
21   Q.   Did you speak with Detective
22 Agostini about what new information, if any,
23 had come in between February 12, 2001 and
24 this time in April when Mr. Manganiello was

49

McGOVERN

1 arrested?
2   A.   I don't recall.
3   Q.   Okay. Can you tell me what
4 information, if any, provided probable cause
5 for Anthony Manganiello's arrest on April 20,
6 2001 for the homicide of Albert Acosta?
7         MS. FROMMER: Objection. You
8    can answer.
9   A.   I don't recall.
10   Q.   Sir, did you take any steps to
11 verify whether there was information that
12 created probable cause to arrest Anthony
13 Manganiello prior to him being arrested in
14 April of 2001?
15         MS. FROMMER: Objection.
16   A.   The case was presented to the
17 district attorney. The district attorney
18 called and said there was probable cause to
19 make the arrest. We went out and made the
20 arrest.
21   Q.   Do you know what information or
22 evidence provided probable cause for the
23 arrest of Anthony Manganiello?
24         MS. FROMMER: Objection. You

13 (Pages 46 to 49)

50

```
 1              McGOVERN
 2   can answer again.
 3      A.   I don't recall.
 4      Q.   Sir, I will show you what has
 5   been previously marked as Exhibit 22 dated
 6   12/20/07. I am going to ask you to take a
 7   look at this document and tell me if you have
 8   ever seen that document before.
 9      A.   I don't recall seeing that
10   document.
11      Q.   Okay. Do you see part of a
12   signature on the bottom of it?
13      A.   I do.
14      Q.   Do you recognize whose
15   signature that is?
16      A.   It looks like Harry Scott's
17   signature.
18      Q.   Okay. Did Harry Scott ever
19   discuss with you the contents of what is
20   marked as Exhibit 22?
21      A.   I don't recall.
22      Q.   Okay. Sir, in February through
23   April of 2001, did you review all the DD5s
24   that were created by the detectives working
25   homicide cases?
```

51

```
 1              McGOVERN
 2           MS. FROMMER: Objection.
 3      A.   I think I told you earlier that
 4   I reviewed hundreds of DD5s while I was
 5   there. There was over 5,000 cases a year
 6   coming into that particular squad. For me to
 7   sit here and tell you what I reviewed, you
 8   know, it is not fair. It wouldn't be a fair
 9   statement of mine.
10      Q.   Okay.
11      A.   The only fair statement I could
12   make is that I did review hundreds of cases
13   while I was there. I talked about hundreds
14   of incidences and I handled probably over a
15   hundred homicides while I was assigned to the
16   Detective Bureau Bronx, not only this one.
17   Being this is seven years ago, you know, what
18   I am telling you is what I remember.
19      Q.   Sir, based on your experience,
20   is it proper police procedure not to arrest
21   somebody after they admit to agreeing to
22   murder somebody for hire?
23           MS. FROMMER: Objection.
24      A.   If they what?
25      Q.   If they have admitted to
```

52

```
 1              McGOVERN
 2   agreeing to murder somebody for money.
 3           MS. FROMMER: Objection. You
 4   can answer.
 5      A.   What do you want to know?
 6           MR. JOSEPH: Can you read back
 7   the question, please?
 8           (Record read.)
 9      A.   And you want me to answer what?
10      Q.   Whether it is proper police
11   procedure based your experience or not.
12           MS. FROMMER: Objection.
13      A.   I don't know if I can make an
14   honest answer on that one.
15      Q.   Why not?
16      A.   Without more facts.
17      Q.   Okay. If you would see what is
18   Exhibit 22, would it be proper not to arrest
19   Terrance Alston?
20           MS. FROMMER: Objection.
21      A.   Would it be proper not to
22   arrest Terrance Alston?
23      Q.   Right.
24      A.   I don't know.
25      Q.   Sir, if you had seen what is in
```

53

```
 1              McGOVERN
 2   Exhibit 22, would you have given this back to
 3   Detective Agostini with any notes?
 4           MS. FROMMER: Objection.
 5      A.   I really don't know.
 6      Q.   Sir, as a shift supervisor,
 7   that is what your title is, right?
 8           MS. FROMMER: Objection.
 9           MR. JOSEPH: I am not being
10   factitious.
11      Q.   Excuse me, squad supervisor. I
12   apologize.
13           Sir, as a squad supervisor in
14   2001, had you seen Exhibit 22, based on your
15   experience what would be the proper course of
16   police conduct?
17           MS. FROMMER: Objection.
18      A.   The proper procedure would be
19   to confer with the district attorney that
20   would be handling this and follow up with
21   them.
22      Q.   Okay.
23      A.   I believe in this case that was
24   what was done. The information provided to
25   them. The detective developed several other
```

14 (Pages 50 to 53)

## Page 54

McGOVERN

leads in investigative steps presented to them and they felt there was enough probable cause to make an arrest.

Q. My question is, can you tell me, was Terrance Alston ever investigated for the homicide of Albert Acosta?

MS. FROMMER: Objection. You can answer.

A. I don't know.

Q. Okay. What if anything would be the proper police based on a statement where someone is admitting to conspiring to commit murder for money?

MS. FROMMER: Objection.

A. Again, sir, that would be a conferral with the district attorney's office. Normally in these kind of high-profile cases or in the majority of the cases I deal with now, a district attorney is consulted with.

Q. Okay. Do you know if the district attorney was ever advised that Mr. Alston had provided false information?

MS. FROMMER: Objection.

## Page 55

McGOVERN

A. Again, I don't know.

Q. Sir, were you ever made aware that Mr. Alston had provided Detective Agostini with information that turned out to be false?

A. Was I ever provided with that?

Q. Right. Did Detective Agostini ever come to you --

A. No.

Q. -- and say this guy lied to me?

MS. FROMMER: Objection.

A. No.

Q. What if anything would you have done had Detective Agostini told you that Mr. Alston had lied to him about a gentleman selling a gun to Mr. Manganiello?

MS. FROMMER: Objection.

MR. JOSEPH: I am going to withdraw the question and re-ask it.

Q. Sir, what if anything would you have done had Detective Agostini told you that Mr. Alston had provided him with false information?

MS. FROMMER: Objection.

## Page 56

McGOVERN

A. I would have instructed him to contact the district attorney handling this particular case and instructed him to make a follow-up see how they wanted to proceed.

Q. Okay. Do you know if Detective Agostini ever told the district attorney that Mr. Alston had provided false information to them?

MS. FROMMER: Objection.

A. I don't know, because I think I left the squad about two months after that arrest. So my involvement after that was nil or zero.

Q. I am going to show you what has been marked as Exhibit 22 and I am going to ask you to also take a look at Plaintiff's Exhibit 10.

Did you ever see this document before?

A. I don't recall seeing that document.

Q. By looking at this document, is there any way you can tell which supervisor, if any, reviewed this document?

## Page 57

McGOVERN

MS. FROMMER: Objection. You can answer.

A. No.

Q. Sir, does Exhibit 10, does it is appear -- by looking at Exhibit 10 and Exhibit 22, does it appear that Mr. Alston had provided Detective Agostini with false information?

MS. FROMMER: Objection.

A. I don't know.

Q. Okay. Are there any police guidelines concerning using witnesses who provide false information in the investigation of a homicide?

MS. FROMMER: Objection.

A. Is there any guidelines?

Q. Correct.

A. I know of no guidelines.

Q. Okay. As a squad supervisor, was it ever proper police procedure to pay a witness?

MS. FROMMER: Objection.

A. Is it proper police procedure to pay a witness?

15 (Pages 54 to 57)

62

McGOVERN

2  A. No.
3  Q. Okay. Were you present when
4  Detective Agostini spoke with an assistant
5  district attorney?
6      MS. FROMMER: Objection.
7  A. I don't recall.
8  Q. By the way, did you ever speak
9  with Detective Agostini concerning any
10 information that a Mr. Booth had provided?
11     MS. FROMMER: Objection.
12 A. I don't recall.
13 Q. Okay. Were you ever made aware
14 that Detective Agostini found a knife and
15 illegal gambling slips on Mr. Booth?
16     MS. FROMMER: Objection.
17 A. I don't recall.
18 Q. Is it proper police procedure
19 to let someone walk out of a police
20 department with a knife?
21     MS. FROMMER: Objection.
22 Q. Based on your experience?
23 A. It depends on what kind of
24 knife.
25 Q. Is it also proper police

63

McGOVERN

2  procedure to not charge somebody after
3  finding gambling paraphernalia on them in
4  exchange for a statement?
5      MS. FROMMER: Objection.
6  A. I don't know.
7  Q. Okay. Do you know if Detective
8  Agostini found gambling material on a
9  gentleman named Mr. Booth and then did not
10 charge him or pass that information on to any
11 other departments?
12     MS. FROMMER: Objection.
13 A. I am not aware of that.
14 Q. Had you become aware of that,
15 what would you have done?
16     MS. FROMMER: Objection.
17 Q. As a squad supervisor, had you
18 been made aware that one of your detectives
19 found gambling material on an individual,
20 took a statement from that individual on a
21 homicide and then let him walk out the door
22 without charging him, --
23     MS. FROMMER: Objection.
24 Q. -- what would you have done?
25     MS. FROMMER: Objection.

64

McGOVERN

2  A. What would I have done?
3  Q. Correct.
4  A. Certainly in a homicide
5  investigation there is a lot of people
6  involved, the district attorney. Certainly I
7  don't know all the facts that you are
8  presenting at this point. Certainly again,
9  that is conferral with the district attorney,
10 a possible witness and see what they wanted
11 to do with the whole thing.
12 Q. Okay.
13 A. You know, as you know yourself,
14 sometimes the district attorney doesn't want
15 to prosecute some of these minor violations
16 or summonsable offenses, which a knife could
17 be raised to the level of not an arrest.
18 Gambling receipts, I don't really know what
19 you are talking about, how many. There is
20 certain limits on the amount.
21     So it would be unfair of me to
22 make a determination without having all the
23 facts in front of me and knowing a little
24 more.
25     Again, homicide investigation,

65

McGOVERN

2  district attorney, you are talking about a
3  knife. Certainly some people can be issued
4  criminal court summonses for knives,
5  depending on the size.
6      For you to sit here and tell
7  me, yeah, is everyone going to be charged
8  with a knife, it is a big maybe. As far as
9  your question with the gambling receipts,
10 well, certainly gambling receipts to any
11 extent, if you are talking about one gambling
12 receipt, I don't believe anyone in their
13 right mind is going to charge anyone with
14 that. If you are talking about 1,000
15 gambling receipts, well, then that is
16 probably a different story. But considering
17 you are giving me a blanket statement, I
18 really can't answer your question.
19 Q. How about a known bookie with
20 gambling slips stating a number of different
21 people with a number of different amounts
22 owed?
23     MS. FROMMER: Objection.
24     Assuming facts not in evidence.
25     You can answer, if you can.

17 (Pages 62 to 65)

66

1  McGOVERN
2      THE WITNESS: I don't know if I
3      really can answer that question.
4  Q. By the way, for the time that
5  you were at the 43rd Precinct, was there a
6  procedure for maintaining homicide case
7  files?
8      MS. FROMMER: Objection. You
9      can answer.
10 A. There was a designated file
11 cabinet for homicide files. Unless the
12 detective was working on them, then they
13 would maintain the file at their desk area or
14 whatever.
15 Q. Okay. Would it be unusual for
16 a homicide file not to be kept in the
17 designated case file?
18     MS. FROMMER: Objection. You
19     can answer.
20 A. I can only tell you what I know
21 while I was there. The files were maintained
22 in file cabinets. The homicide files were
23 maintained separately. Unless the detectives
24 were working on them, you know, they would
25 maintain them there. It is a detective's

67

1  McGOVERN
2  responsibility to maintain the files.
3  Q. You said "the homicide files
4  were maintained separately."
5      What do you mean by that?
6      MS. FROMMER: Objection.
7  A. Basically they wouldn't get
8  filed with all the other stuff that would
9  come in, the petit larcenies, the robberies.
10 Well, the robbery squad was across the way,
11 but grand larcenies, burglaries, they would
12 get filed by index number and 61. Except in
13 '02 that policy changed. They would be filed
14 by case number.
15 Q. And how would a homicide case
16 be filed in 2001?
17     MS. FROMMER: He just answered
18     that.
19     MR. JOSEPH: No. He said they
20     were done separately.
21 A. No, I didn't say that.
22     MS. FROMER: He just explained
23     it. I am going to ask the court
24     reporter to read that back to you,
25     because he just answered that. You

68

1  McGOVERN
2  have asked him the same question over
3  and over.
4  Q. Where exactly were homicide
5  files placed in 2001?
6      MS. FROMMER: If you would like
7      to refer to your earlier answer, you
8      may, because you have already answered
9      this question.
10 A. The homicide file cabinet,
11 there is other files. They are maintained
12 separately.
13 Q. How are they itemized, in other
14 words?
15     MS. FROMMER: Objection.
16 A. Homicides?
17 Q. Correct.
18 A. Would be by year.
19 Q. Okay. Would homicides remain
20 in that homicide file cabinet even after they
21 were closed by an arrest?
22     MS. FROMMER: Objection. You
23     can answer.
24 A. The files would be maintained
25 at the command, correct.

69

1  McGOVERN
2  Q. Would that be after they were
3  closed by arrest? In other words, what I am
4  asking, is there any different procedure for
5  a case that is active versus a case that was
6  closed by arrest?
7      MS. FROMMER: Objection
8  A. Is there anything different,
9  well, the case would be closed.
10 Q. Right.
11 A. So it would be different.
12 Q. Let me ask you this. Just so
13 we are clear, what is your understanding of
14 closed? When you say "closed," is it because
15 an arrest has been made, closed because of a
16 conviction or an acquittal or something else?
17     MS. FROMMER: Objection. You
18     can answer.
19 A. No. A case can be closed on
20 arrest. That would be one closing. It could
21 be closed exception of clearance positive.
22 That would be there is enough information to
23 close it with a positive clearance without an
24 arrest. It can be C4'd, leads exhausted; C3,
25 uncooperative complainant; C2 unable to ID.

18 (Pages 66 to 69)

70

McGOVERN

1  
2  There is several different closings. B7,
3  inaccurate facts, you know, there wasn't
4  enough to investigate it.
5       Q.   For a case that was closed by
6  an arrest, would that case be maintained, in
7  2001, in the same homicide folder that you
8  described earlier?
9           MS. FROMMER: Objection.
10      Q.   Or would it be placed someplace
11 else, is my question?
12      A.   No.
13          MS. FROMMER: Objection. You
14  can answer.
15      A.   Homicides all stay together.
16      Q.   Okay. By the way, was there a
17 procedure by which an entire homicide file
18 was given to a district attorney --
19          MS. FROMMER: Objection.
20      Q.   -- in 2001?
21          MS. FROMMER: Objection.
22      A.   Are you asking me if I am aware
23 of that?
24      Q.   I am asking you, as the squad
25 supervisor, did --

71

McGOVERN

1
2       A.   No. I told you, I left two
3  months after that arrest. So I didn't have
4  any involvement after that. I'm not sure
5  when the DA presented that case afterwards.
6  It could take several months to go see the
7  district attorney. Obviously there are
8  several hearings that would take place. In
9  my past experience, normally I don't know
10 what the arrangements were made. You would
11 have to ask Detective Agostini that.
12      Q.   Okay. My question to you is,
13 as a squad supervisor, what is your
14 understanding of the procedure by how the
15 portion or the entire homicide case file was
16 transferred or given to them? Were copies
17 made at the squad and then copies of those
18 documents given to the DA, was the DA given
19 the entire case file or something else?
20          MS. FROMMER: Objection.
21      A.   Again, I don't know. You would
22 have to ask Detective Agostini.
23      Q.   Okay. By the way, did you ever
24 speak to Detective Agostini about the Anthony
25 Manganiello case file going missing?

72

McGOVERN

1
2           MS. FROMMER: Objection.
3       A.   No.
4       Q.   Did you ever become aware that
5  the case file for the prosecution of Anthony
6  Manganiello had disappeared?
7           MS. FROMMER: Objection. He
8  can answer to the extent he has
9  independent personal knowledge of
10 that.
11      Q.   Aside from what your lawyer may
12 have told you?
13          MS. FROMMER: Objection to that
14  statement.
15          You can answer.
16      A.   I have no knowledge of that
17 case being missing.
18      Q.   Based on your experience as a
19 squad supervisor at the 43rd Precinct, was it
20 unusual for a homicide case to disappear?
21          MS. FROMMER: Objection.
22      A.   It is unusual for any case to
23 disappear.
24      Q.   And why is that?
25          MS. FROMMER: Objection.

73

McGOVERN

1
2       A.   Cases shouldn't disappear, you
3  know. That is why they have file cabinets.
4  They are supposed to complete their casework.
5  It gets filed. It is supposed to stay there.
6       Q.   Do you know of any legitimate
7  reason why case a case would not stay in the
8  cabinet, a homicide case specifically?
9           MS. FROMMER: Objection.
10      A.   The district attorney asks for
11 it for some reason and it gets sent out to
12 them. Somebody may have asked to review it
13 at a higher level in the police department.
14 They get transferred there. Those are the
15 only things that I can think of at this
16 point.
17      Q.   By the way, were there any
18 procedures for maintaining memo book entries
19 of the police officers at the 43rd Precinct
20 in effect from February of 2001 through the
21 time you were there?
22 DI        MS. FROMMER: I am going to
23          instruct him not to answer that.
24          Since he was not in charge of police
25          officers at the precinct. If you

19 (Pages 70 to 73)

74

1  McGOVERN
2  would like to rephrase that in terms
3  of only the officers that he
4  supervised, I will let him answer
5  that, but I am not going to let him
6  answer a question that is based on
7  information that he told you he does
8  not have. If you would like to
9  rephrase it, you can. If not, I am
10 going to instruct him not to answer
11 it.
12    Q.  Do you have any knowledge of
13 the procedures for the police officers at the
14 43rd Precinct and what they do with their
15 memo books?
16      MS. FROMMER: Objection. You
17 can answer.
18    A.  The police officers, no.
19    Q.  Was there any procedure for
20 what happened to a detective's memo book from
21 February 2001 through April 2001?
22      MS. FROMMER: Objection.
23    Q.  At the 43rd Precinct?
24    A.  They would have to maintain a
25 memo book for details and stuff like that.

75

1  McGOVERN
2    Q.  And was there any period of
3  time for which they were supposed to maintain
4  those memo books?
5      MS. FROMMER: Objection.
6    A.  Well, when I say maintain it,
7  you know, maintain a memo book so in case
8  they had to go into detail or document their
9  events.
10   Q.  My question, sir, did the
11 detectives maintain their own memo books or
12 were they placed in files somewhere for
13 safekeeping in the 43rd Precinct?
14     MS. FROMMER: Objection.
15   A.  Well, you are responsible for
16 your own memo book. No one else is
17 responsible.
18   Q.  By the way, would you consider
19 it proper police procedure to consider
20 somebody a suspect because they requested to
21 speak with a lawyer?
22     MS. FROMMER: Objection.
23 Again, I am going to say that you keep
24 misstating testimony given by the
25 plaintiff in this case, but you can

76

1  McGOVERN
2  answer.
3    A.  You got to run that one by me
4  again. I'm sorry.
5    Q.  Okay, let me ask it generally.
6  Sir, is it ever proper police procedure to
7  consider someone a suspect because their
8  right to counsel has been invoked?
9      MS. FROMMER: Objection.
10 Again, misstating facts not in
11 evidence by your own client.
12   A.  No.
13   Q.  Do you know if Detective
14 Agostini ever considered Anthony Manganiello
15 a suspect because an attorney was called on
16 his behalf?
17     MS. FROMMER: Objection. You
18 can answer.
19   A.  I don't know that, sir.
20   Q.  Okay. Did Lieutenant Scott
21 ever discuss that with you?
22   A.  No, sir.
23   Q.  What would you have said or
24 done had you been made aware of that
25 information?

77

1  McGOVERN
2      MS. FROMMER: Objection.
3    A.  What would I have said or done
4  if the guy asked for counsel?
5    Q.  No. If the detective had
6  considered him a suspect because counsel was
7  asked for.
8    A.  That is, you know, I don't know
9  how to answer that. It is, you know,
10 certainly everyone is entitled to their
11 counsel. That doesn't make them a suspect.
12     Do you know what I am saying?
13   Q.  I do.
14   A.  So that is my answer.
15   Q.  Okay.
16   A.  Certainly if that was presented
17 with me -- everyone is entitled to their
18 counsel regardless of who you are. You know,
19 the facts of the case will speak for
20 themselves.
21     You know what I mean?
22   Q.  Yes.
23   A.  No one is denied their right to
24 counsel or, you know, when I was there, as
25 far as I know.

20 (Pages 74 to 77)

78

McGOVERN

1 Q. Okay. Was anyone ever
considered a suspect because their right to
counsel had been invoked?
A. No, sir.
MS. FROMMER: Objection.
A. No, sir.
Q. By the way, on February 12,
2001, did you speak with anybody from the
Mount Vernon Police Department?
A. Did I speak with anyone?
Q. Correct.
A. I don't recall speaking with
anyone there.
Q. Do you know if any detectives
or police officers from the 43rd Precinct
went to the Mount Vernon Police Department?
A. I don't recall.
Q. At any point, sir, between
February 12, 2001 and the date in April when
Anthony Manganiello was arrested, did you do
anything to stop his prosecution?
MS. FROMMER: Objection.
Again, there had been no prosecution.
Go ahead, you can answer.

79

McGOVERN

A. No, sir.
MR. JOSEPH: That's all I have.
MS. FROMMER: I need to speak
to you outside for a second.
THE WITNESS: Sure.
(Recess taken.)
EXAMINATION BY MR. FROMMER:
Q. Lieutenant McGovern, between
February 12, 2001 and the date in April when
you took Anthony Manganiello into custody,
did you speak with anyone at the district
attorney's office about Mr. Manganiello?
A. No.
Q. Did you ever encourage the
district attorney's office to decide that Mr.
Manganiello should be arrested or prosecuted?
A. No.
Q. Did you ever testify before the
grand jury in this case?
A. No, I did not.
Q. Did you give any information to
the district attorney's office at all about
Anthony Manganiello?
A. No.

80

McGOVERN

Q. Did you ever provide any false
information to anyone to give to the district
attorney's office?
A. No.
MS. FROMMER: I have nothing
further.
FURTHER EXAMINATION BY MR. JOSEPH:
Q. Between February 12, 2001 and
the date that you arrested Anthony
Manganiello in April of 2001, did you ever
review any of the evidence to determine
whether there was probable cause to arrest
Anthony Manganiello?
MS. FROMMER: Objection. You
can answer.
A. Sir, like I said, I reviewed
several hundred records during that period of
time and after. I don't have any independent
recollection of any specific details except
what I have discussed here earlier today.
Q. Okay. Between February 12,
2001 and April of 2001, when you arrested
Anthony Manganiello, did you take any steps
to verify the credibility of any evidence

81

McGOVERN
that was presented to the grand jury?
MS. FROMMER: Objection.
Q. Presented to the district
attorneys's office. I apologize.
MS. FROMMER: Objection.
A. No.
MR. JOSEPH: That's all I have.
MS. FROMMER: We are done.
(Time noted: 3:33 p.m.)

21 (Pages 78 to 81)