EXHIBIT 25

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

ANTHONY MANGANIELLO,

            Plaintiff,

                  CASE No:

                  07-CV-3644

     -against-

THE CITY OF NEW YORK, et al.,

            Defendants.

- - - - - - - - - - - - - - - - - -X

           May 2, 2008

           2:12 p.m.

DEPOSITION of CHRISTINE SCACCIA, the

witness herein, taken pursuant to

Court Order, and held at the Offices

of New York Corporation Counsel, 100

Church Street, New York, New York,

before Mary T. Slavik, RPR, a

Certified Court Reporter and Notary

Public of the State of New York.

DALCO REPORTING, INC.170 Hamilton Avenue, White Plains, New York 10601
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com



CHRISTINE SCACCIA

14

1    Q.  At the point in time that a
2  decision was made not to take Anthony
3  Manganiello into custody because of further
4  investigative steps, what were the
5  investigative steps that were deemed
6  necessary to be taken?
7        MR. ZUCKERMAN: Object to form.
8    You can answer.
9    A.  One of those steps would have been
10  interviewing the witnesses ourselves. The
11  witnesses who were present on the scene the
12  day before. There were search warrants
13  that were being executed, and I believe
14  there was forensic testing that we wanted
15  to accomplish.
16    Q.  Let's start with the forensic
17  testing. What forensic testing did you
18  want to be accomplished, if any?
19        MR. ZUCKERMAN: Object to the
20    form.
21    A.  I believe that there was a
22  substance found on Mr. Manganiello's
23  uniform jacket that seemed to have been
24  consistent with the location of where

15

1  Officer Acosta was killed. That was
2  relayed to us by officers on the scene.
3  And I believe that Officer Acosta's
4  clothing had some of the same type dusty
5  white substance on it. So I know for sure,
6  off the top of my head, that was one of the
7  forensic questions that we had pending.
8    Q.  Was also the test concerning
9  gunshot residue of Mr. Manganiello's hands
10  and/or jacket one of the forensic tests you
11  were waiting to get back?
12    A.  I think the hand -- I know one was
13  done on his hand, but I don't know if the
14  results can be told immediately by the
15  person performing the test, but I know
16  those tests were performed. The jacket may
17  have been sent to the lab. I don't know if
18  you get an immediate response when you're
19  swabbing someone's hand.
20    Q.  When did you learn of the results
21  of the swabs of the hands, of
22  Mr. Manganiello's hands?
23    A.  It wasn't too long after the
24  incident, I don't remember a date.

16

1    Q.  Was it prior to April 20th of
2  2001?
3    A.  Prior to the grand jury proceeding
4  I would think so, yes.
5    Q.  And what were the results of the
6  swab to Mr. Anthony Manganiello's hand for
7  gunshot residue?
8    A.  To the best of my recollection it
9  was negative.
10    Q.  And do you recall a test for
11  gunshot residue to Anthony Manganiello's
12  jacket?
13    A.  I know one was done.
14    Q.  And to the best of your
15  recollection --
16        MR. ZUCKERMAN: Are you done with
17    your answer?
18    A.  I don't believe that the results
19  were positive on that either.
20    Q.  That's my next question.
21        MR. ZUCKERMAN: Just allow her to
22    finish.
23    Q.  To the best of your recollection,
24  what were the results of the gunshot

17

1  residue test to Anthony Manganiello's
2  jacket?
3    A.  I believe they were also negative.
4    Q.  What was the significance, if any,
5  of a negative gunshot residue test to
6  Mr. Manganiello's hand and jacket which was
7  taken on February 12, 2001 in a case
8  involving a shooting?
9        MR. ZUCKERMAN: I object to the
10    form. You can answer.
11    A.  Actually none because the test is
12  unreliable.
13    Q.  Okay. What search warrants were
14  you waiting for?
15    A.  I believe there was a search
16  warrant executed on Mr. Manganiello's
17  personal vehicle.
18    Q.  And did the results of that search
19  warrant provide any evidence which in any
20  way tied Anthony Manganiello to the
21  shooting of Albert Acosta?
22    A.  Directly, no.
23    Q.  How about indirectly?
24    A.  There were items that were

5 (Pages 14 to 17)

CHRISTINE SCACCIA

22

1 the DD5's, but the original handwritten
2 interview notes?
3    A.  They would have been part of the
4 original police file that was being
5 maintained by Detective Agostini.
6    Q.  Were you ever provided copies of
7 those original notes?
8        MR. ZUCKERMAN:  Sorry?
9    Q.  The original interview notes, were
10 you ever provided with copies of those?
11    A.  I do not know for sure whether I
12 had some of those notes that were
13 eventually turned over to the defense.
14    Q.  Do you have a recollection --
15 strike that.
16        Did Mr. Agostini ever provide you
17 with the entire case folder, the homicide
18 case folder for Mr. Acosta's death for
19 copying?
20        MR. ZUCKERMAN:  Object to form.
21    A.  There was a time that I had access
22 to the entire case folder, and that would
23 have been probably at the grand jury
24 stage. I did not maintain possession of

23

1 that folder between the grand jury and
2 trial, as you're probably aware.
3    Q.  What do you mean by "you had
4 access to the file"?
5        MR. ZUCKERMAN:  I object to form.
6        You can answer.
7    A.  I mean when a detective comes to
8 see you regarding a case they generally
9 bring their file with them.
10    Q.  And were you ever provided with
11 copies of the original handwritten notes
12 taken from the witnesses on the scene on
13 February 12th, 2001?
14        MR. ZUCKERMAN:  Object to form.
15    A.  As I stated, I believe at some
16 time I had some of them. There were others
17 that I did not have.
18    Q.  Did a number of these written
19 interview notes go missing?
20        MR. ZUCKERMAN:  Object to form.
21    A.  I believe what went missing was
22 the spiral notebook that Detective Agostini
23 would have maintained, among other things.
24    Q.  What other things to the best of

24

1 your recollection went missing?
2    A.  I remember it being described as a
3 box containing the notes, containing the
4 actual DD5's themselves which I had copied
5 and turned over to counsel, that's how we
6 have them for trial.
7        I believe that one of the things
8 that we were not able to secure in the end
9 was Mr. Manganiello's Parkchester security
10 memo book. I don't know if there were
11 miscellaneous items from Mr. Acosta in that
12 box as well. I want to say that maybe his
13 shield or hat were in that box, but I'm not
14 one hundred percent certain.
15    Q.  Now, can you tell me what -- would
16 it be fair to say that every handwritten
17 interview that you had you turned over to
18 defense counsel?
19    A.  Yes.
20    Q.  And if Mr. Manganiello's defense
21 counsel did not have a handwritten note of
22 a witness interview, would that mean you
23 were not provided with that note?
24        MR. ZUCKERMAN:  Object to form.

25

1    A.  Yes.
2    Q.  Was there ever a point in time
3 when Detective Agostini copied all of the
4 handwritten notes in the spiral notebook
5 and provided you a copy of it?
6        MR. ZUCKERMAN:  Object to form.
7    A.  Not that I can recall, no.
8    Q.  Did you ever ask him to do that?
9    A.  I think I asked him to do that
10 when we were preparing to go to trial,
11 which is how it became known that the box
12 that I was looking for was no longer where
13 it had been left.
14    Q.  And what -- how did you first --
15 how did you become aware that a box was
16 missing?
17    A.  When I --
18    Q.  Let me rephrase that.
19        How did you become aware that the
20 case, the homicide case file for Albert
21 Acosta was missing?
22        MR. ZUCKERMAN:  Object to form.
23    A.  Because we began preparing for
24 trial.

7 (Pages 22 to 25)

CHRISTINE SCACCIA

26

1    Q.  And as part of the trial, were
2  there -- were you obligated to provide
3  what's known as Rosario material to the
4  defense?
5    A.  Yes.
6      MR. ZUCKERMAN:  Object to the form
7  of the last question.  The answer
8  stands.
9    Q.  And was it your understanding that
10 the box which was lost contained what was
11 known as Rosario material?
12   A.  Yes, and I believe there was a
13 little hearing about what happened to the
14 box during the course of the trial or
15 during pretrial hearings.
16   Q.  What did you say to Detective
17 Agostini and what did he say to you when
18 you first learned that the box was missing?
19     MR. ZUCKERMAN:  Object to form.
20     You can answer.
21   A.  Again, doing this from memory I
22 seem to be under the impression today as I
23 sit here, that when the case was getting
24 ready for trial Detective Agostini was not

27

1  working at the 43rd Precinct anymore. 1
2  had called him and told him we were going
3  to court and he went back to the precinct
4  to try to get his paperwork and file to
5  bring down to the office, and that's when
6  we became aware that it was not in the spot
7  that he had left it.
8    Q.  Where did he tell you he left it?
9    A.  1 want to say that there is a room
10 in the 43rd Precinct squad room contained
11 within it, that was -- I don't know if they
12 were using it as a file room or -- it was a
13 room within a room, and I believe he said
14 he had left it in there on top of the file
15 cabinet in a clearly marked box.
16   Q.  Did he tell you that he left it in
17 the locker room?
18   A.  That might be what that room was.
19   Q.  Were you aware that the 43rd
20 Precinct had a storage room specifically
21 for homicide case files?
22   A.  I know that the 43rd Precinct had
23 case files in a number of places.
24   Q.  Now, did you receive all of the

28

1  DD5's in this case at one time or at
2  various times during the course of the
3  investigation?
4    A.  It would have to be at various
5  times while they became prepared.
6    Q.  Did Mr. Agostini, prior to the
7  file going missing, ever provide you with
8  the complete homicide case file for it to
9  be copied --
10     MR. ZUCKERMAN:  Object to form.
11   Q.  -- concerning Mr. Manganiello?
12   A.  No, I don't think for those
13 purposes. I had asked him to bring it down
14 prior to when it became an issue.
15   Q.  On February 12th or February 13th,
16 2001, did you agree with the assessment
17 that Mr. Manganiello should not be arrested
18 or charged for the homicide investigation
19 at that point?
20     MR. ZUCKERMAN:  Object to form.
21   A.  I guess the short answer would be,
22 I was comfortable with it and wanted more
23 investigative steps taken, yes.
24   Q.  On February 12th or February 13th,

29

1  2001, based on the information that you had
2  at that point, did you feel there was
3  probable cause to arrest, authorize an
4  arrest of Antbony Manganiello to be
5  prosecuted for the homicide of Albert
6  Acosta?
7      MR. ZUCKERMAN:  Object to form.
8    A.  I'm sorry, say it again.
9    Q.  On February 12th or February 13th
10 of 2001, when you first became aware of
11 this case --
12     MR. JOSEPH:  Read back my last
13 question.
14     (Requested question was read back
15 by the court reporter.)
16     MR. ZUCKERMAN:  Object to form.
17   Q.  On February 13th, 2001, did you
18 feel there was sufficient evidence to
19 authorize an arrest of Anthony Manganiello
20 for the homicide of Albert Acosta?
21     MR. ZUCKERMAN:  Object to form.
22   A.  I think there may have been
23 probable cause but because the case was a
24 circumstantial case, I think everyone was

8 (Pages 26 to 29)

CHRISTINE SCACCIA

30

1 more comfortable holding off on making an
2 arrest.
3     MR. ZUCKERMAN: Are you done with
4 your answer?
5     A. And that's why we decided to take
6 further investigative steps.
7     Q. Try and let her finish.
8     MR. JOSEPH: I thought she was.
9     Q. Was there any admission by
10 Mr. Manganiello that he was in any way
11 involved in the shooting of Albert Acosta?
12     MR. ZUCKERMAN: Object to form.
13     A. No, not that I can recall, no.
14     Q. Was there any civilian witness who
15 identified Anthony Manganiello as being
16 involved in the shooting death of Albert
17 Acosta?
18     MR. ZUCKERMAN: Object to form.
19     A. There were witnesses who
20 identified him and described his conduct
21 which supplied circumstantial evidence that
22 he was involved in the death of Albert
23 Acosta.
24     Q. And what witness was that or

31

1 witnesses was that?
2     A. There were officers that were
3 present on the scene after the discovery of
4 Officer Acosta. There was a maintenance
5 worker on the scene prior to the discovery
6 of Mr. Acosta. There was -- at what point
7 do you want me to stop because then other
8 people became known to the Police
9 Department?
10     Q. Well, I'm asking you about
11 February 12th, February 13th.
12     A. Then it would have been the
13 civilian that was present before and then
14 the officers present after.
15     Q. Now, by the civilian, are you
16 talking about Walter Cobb?
17     A. Yes, I am.
18     Q. Were you made aware on February
19 12th or February 13th, of any inconsistent
20 statements by Walter Cobb?
21     A. No.
22     Q. Were you ever made aware that
23 Walter Cobb said he heard the shots and he
24 thought they came from outside of the

32

1 building?
2     MR. ZUCKERMAN: Object to form.
3     A. I don't remember that.
4     Q. Let me ask you to take a look at
5 what has been marked previously as Exhibit
6 25 with a date of 12/20/07, and direct your
7 attention to paragraph two and I'll show
8 counsel first.
9     MR. ZUCKERMAN: Paragraph what?
10     MR. JOSEPH: Two on the bottom.
11     A. I've read it.
12     Q. Have you seen this prior to
13 today?
14     A. I would have, yes. I don't
15 remember the day I saw it, but this is the
16 police report in connection with the case.
17     Q. Did you see it prior to April 20th
18 of 2001?
19     A. Yes.
20     Q. Okay. Did you see it on or about
21 February 12th or February 13th of 2001?
22     A. If not then, shortly thereafter
23 probably.
24     Q. Did Officer Agostini provide you

33

1 with any information that caused you to
2 initiate a prosecution against Anthony
3 Manganiello?
4     MR. ZUCKERMAN: Object to form.
5     A. Did he provide me with any
6 information?
7     Q. Yes.
8     A. No, he provided us with witnesses
9 which resulted in the prosecution of
10 Mr. Manganiello.
11     Q. What witnesses were those?
12     A. Walter Cobb. There were, I
13 believe, two individuals that were brought
14 forth from a pizza store in a surrounding
15 area. I don't remember the names off the
16 top of my head, but I know one or both of
17 them testified.
18     Q. Would that be Tartone and Booth?
19     A. Yes.
20     Q. What other witnesses, if any, did
21 Mr. Agostini provide?
22     A. I think that was it. The other
23 witness came from another source within law
24 enforcement.

9 (Pages 30 to 33)

CHRISTINE SCACCIA

34

1  **Q. Would that be Derek Parker?**
2  A. That would be the person that
3  brought him forward, yes. The witness was
4  Terrance Alston.
5  **Q. And how did Mr. Parker bring**
6  **forward Terrance Alston?**
7  A. Detective Parker was Mr. Alston's
8  handler for lack of a better term.
9  Mr. Alston had been an informant of his in
10  the past. They had come into contact with
11  each other. I don't know if it was at
12  Rikers Island or just because Mr. Alston
13  reached out to Derek Parker. He relayed
14  information to Detective Parker and
15  Detective Parker notified the Bronx.
16  MR. ZUCKERMAN: The Bronx DA?
17  A. The Bronx DA, I'm sorry.
18  **Q. What makes you think that --**
19  **strike that.**
20  Can you tell me the source of your
21  belief that Mr. Alston had been an
22  informant for Mr. Parker in the past?
23  MR. ZUCKERMAN: Can you read that
24  back?

35

1  (Requested question was read back
2  by the court reporter.)
3  MR. ZUCKERMAN: Object to form.
4  If you understand you can answer.
5  A. That would have come from
6  Mr. Parker and/or Mr. Alston.
7  **Q. Were you aware that Derek Parker**
8  **testified in a deposition that this case**
9  **was his first dealing with Mr. Alston?**
10  A. Would I be surprised that he said
11  that?
12  **Q. Were you aware that he testified**
13  **in a deposition basically to the opposite**
14  **of what you just said?**
15  MR. ZUCKERMAN: Object to the
16  form.
17  A. No, I was not aware of that. But
18  I know Detective Parker is the one that
19  brought me Mr. Alston.
20  **Q. Did Mr. Robert Martinez or**
21  **Detective Martinez provide you with any**
22  **information that caused you to initiate a**
23  **prosecution against Anthony Manganiello?**
24  MR. ZUCKERMAN: Object to form.

36

1  A. Detective Martinez?
2  **Q. Correct.**
3  A. No, because as I sit here today I
4  can't even recall what his involvement in
5  this case was.
6  **Q. How about Lieutenant Scott, did**
7  **Lieutenant Scott provide you with any**
8  **information that caused you to initiate a**
9  **prosecution against Anthony Manganiello?**
10  A. No.
11  **Q. How about John McGovern or**
12  **Sergeant McGovern?**
13  A. No.
14  **Q. What information did Agostini**
15  **provide you with that caused you to**
16  **initiate a prosecution against Anthony**
17  **Manganiello?**
18  MR. ZUCKERMAN: Object to form.
19  A. Again, it wasn't Detective
20  Agostini providing information, it was
21  Detective Agostini providing witnesses who
22  had given statements regarding the events
23  that resulted in Mr. Acosta's death.
24  Detective Agostini was not either

37

1  a witness nor did he take any sort of
2  confession admission from Mr. Manganiello,
3  so, he could offer no insight to the manner
4  of Mr. Acosta's death.
5  **Q. Did Mr. Agostini tell you that**
6  **Anthony Manganiello was evasive while he**
7  **was being questioned?**
8  A. I remember he said that I think at
9  some point he refused to answer pedigree
10  information, and was either inconsistent or
11  evasive about what appeared to be a fresh
12  cut on one of his fingers.
13  **Q. And did that information cause or**
14  **did that information cause you in part to**
15  **initiate a prosecution against Anthony**
16  **Manganiello for the shooting of**
17  **Mr. Acosta?**
18  MR. ZUCKERMAN: Object to form.
19  A. No, actually despite that
20  information I believe -- that was -- that
21  all occurred on the day that he was
22  released.
23  **Q. When for the first time did you**
24  **meet with Alston?**

10 (Pages 34 to 37)

CHRISTINE SCACCIA

40

1    gun?

2                    MR. ZUCKERMAN:  Object to form.

3        A.    Yes, that is the name he used in

4    the initial report by Detective Agostini.

5        Q.    And when did you become aware of

6    that, was that before the case was

7    presented to the grand jury or afterwards?

8        A.    Did I become aware that the

9    individual -- he's saying an individual

10   sold Manganiello a gun or the kid's name is

11   not Jamel Baker or whatever he said

12   initially.

13       Q.    Let me ask you this.  Prior to

14   authorizing the arrest of Anthony

15   Manganiello, did you -- were you aware that

16   Terrance Alston had told lieutenant --

17   Detective Agostini that a gentleman named

18   Johnny Baker had sold Anthony Manganiello a

19   gun, when in fact, the gentleman named

20   Johnny Baker did not sell Anthony

21   Manganiello a gun?

22                   MR. ZUCKERMAN:  Object to form.

23       A.    I would say I was aware of the

24   contents of that report probably before the



CHRISTINE SCACCIA

42

1  information to the grand jury that anyone
2  sold Officer Manganiello a gun. Terrance
3  Alston was put into the grand jury for an
4  entirely different purpose.
5      Q.  Did you have any concerns about
6  Terrance Alston's credibility prior to
7  putting him in the grand jury?
8      A.  After interviewing him regarding
9  these subjects, no.
10     Q.  And did the fact that Terrance
11  Alston had lied to Detective Agostini cause
12  you any concern about his credibility?
13     A.  No.
14     Q.  Okay.  Did you ever question
15  Terrance Alston about his lie to Detective
16  Agostini about Johnny Baker selling Anthony
17  Manganiello a gun?
18     MR. ZUCKERMAN:  Object to form.
19     A.  Well, I mean at some point we did
20  have a conversation because then we found
21  out that individual's real name, and he
22  said that he did it because he was trying
23  to keep the kid out of trouble.
24     Q.  I'm sorry, can you repeat that?

43

1      A.  Terrance Alston gave the first
2  name that you say he gave to Detective
3  Agostini because he did not want to involve
4  that person or get that person in trouble.
5      Q.  So he decided to get an innocent
6  person in trouble instead of the gentleman
7  who he claims sold Anthony Manganiello the
8  gun; is that correct?
9      MR. ZUCKERMAN:  Object to the
10  form.
11     A.  Is that Mr. Manganiello's
12  position?
13     Q.  I'm asking you if that's your
14  understanding was --
15     A.  Not at all.
16     Q.  -- after speaking with Terrance
17  Alston?
18         Did you ever -- when did you
19  question Terrance Alston about this lie?
20     MR. ZUCKERMAN:  Object to form.
21         You want a date?
22     Q.  Correct.
23     A.  It was sometime between when I
24  became aware of it and when he was killed.

44

1      Q.  When did you become aware that
2  Terrance Alston had made a
3  misrepresentation to Detective Agostini
4  about selling -- a gentleman named Johnny
5  Baker selling Anthony Manganiello a gun?
6      MR. ZUCKERMAN:  Object to form.
7      A.  I don't recall.
8      Q.  Did you become aware that Terrance
9  Alston had lied prior to authorizing the
10  arrest of Anthony Manganiello?
11     MR. ZUCKERMAN:  Object to the
12  form.
13     A.  Though I cannot specify the date,
14  I would say that probably, yes.  Mr. Alston
15  was not alive too much longer after the
16  presentation.
17     Q.  On February 12th, 2001, was
18  Terrance Alston actually in Rikers Island?
19     A.  I believe he was incarcerated.
20     Q.  Did Detective Agostini ever raise
21  any concerns with you that Terrance Alston
22  was playing games to get out of jail, as he
23  put it?
24     MR. ZUCKERMAN:  Object to form.

45

1      A.  I don't remember if we ever had
2  that conversation or not.
3      Q.  Okay.  Did Lieutenant Scott ever
4  discuss the fact that Alston had lied to
5  you?
6      A.  I don't remember having any
7  discussions with Lieutenant Scott.
8      Q.  Do you recall having discussions
9  with a Detective Abbott concerning this
10  case?
11     A.  Detective Abbott was involved --
12  I'm trying to think what capacity he was
13  involved in.  I don't know if he was
14  Agostini's partner at the time or if he was
15  the detective from Bronx Homicide assigned
16  to this case.  I'm sure we had
17  conversations, I just don't recall.
18     Q.  Did you ever have any
19  conversations with Detective Abbott
20  concerning Mr. Alston?
21     MR. ZUCKERMAN:  Object to form.
22     A.  Not that I remember.
23     Q.  Did you ever have any
24  conversations with Mr. Parker about

12 (Pages 42 to 45)

CHRISTINE SCACCIA

46

1  Terrance Alston and/or the fact that he had
2  lied?
3     A.  I had conversations with Derek
4  Parker about Terrance Alston, but I don't
5  know if we had a conversation about him
6  lying.
7     Q.  Can you tell me the sum and
8  substance about the conversation you had
9  with Mr. Parker concerning Terrance
10 Alston?
11    A.  It was that he had knowledge of
12 Mr. Alston.  Mr. Alston brought to his
13 attention the incident between himself and
14 Mr. Manganiello, where Mr. Manganiello had
15 tried to hire him to kill another security
16 guard.  At some point, and I don't remember
17 if it was after my first meeting with
18 Mr. Alston or -- I don't remember at what
19 point, but at some point Mr. Alston tells
20 me that Mr. Manganiello had gone as far as
21 providing him with a key to the basement
22 area of Parkchester, which are not
23 accessible to tenants, and are only
24 possessed by employees.  And that that was

47

1  the key he was to use to go to this
2  location that the incident was supposed to
3  take place at.
4     And I think it was Detective
5  Parker who facilitated getting that key
6  from Mr. Alston's property and providing it
7  to the District Attorney's Office.
8     Q.  So you actually had a key?
9     A.  Yes.
10    Q.  Where is that key now?
11    A.  Somewhere in property.
12    Q.  Was that key ever provided to
13 Mr. Manganiello's criminal defense
14 attorney?
15    A.  No, because Mr. Alston was dead by
16 the time this case went to trial.
17    Q.  And where is that -- can you still
18 put your hands on that key?
19    A.  I have been trying to locate the
20 people, meaning the District Attorney's
21 Office folder, and the property that went
22 along with it.  Because of our own
23 sometimes inadequate filing system, I have
24 not been able to do that as of yet.

48

1     Q.  When was the last time you saw the
2  District Attorney's file concerning the
3  prosecution of Anthony Manganiello?
4     A.  Probably a few days after the
5  acquittal when I packed it up to be filed
6  away.
7     Q.  And is there a system in place to
8  preserve the files of prosecutions after
9  they have been closed?
10    MR. ZUCKERMAN:  Object to form.
11    A.  There are, and over the course of
12 the last several years the facilities in
13 which these files are stored have been
14 moved on a number of occasions.
15    MR. ZUCKERMAN:  Are you done with
16 your answer?
17    THE WITNESS:  Yes.
18    Q.  And is it your testimony that to
19 date you have been unable to locate the
20 prosecution file -- strike that.
21    Is it fair to say that up until
22 the present you have been unable to locate
23 the District Attorney's file concerning the
24 prosecution of Anthony Manganiello?

49

1     A.  Well, mind you, I really just
2  started looking for it now that this has
3  come up.
4     Q.  Is that a yes?
5     Is it fair to say that up until
6  today you have been unable to locate the
7  District Attorney's file for the
8  prosecution of Anthony Manganiello?
9     A.  Well, that is trying to make it
10 sound like the file has been lost for
11 years.  I mean the file could be exactly
12 where it's supposed to be.  I have not been
13 able to find the spot where it has been
14 moved to.
15    Q.  When did you start looking for
16 this file?
17    A.  Probably Tuesday evening.
18    Q.  Were you aware that several months
19 ago the file had been subpoenaed and
20 there's been no response to that subpoena?
21    A.  No, I wasn't.

22
23    (Scaccia Exhibit 1, GRAND JURY
24    MINUTES, was marked for

13 (Pages 46 to 49)

CHRISTINE SCACCIA

50

1    identification.)
2
3    Q.  Can you please take a look at
4    Exhibit Number 1.
5    A.  Okay.
6    Q.  Do you recognize this document?
7    A.  The grand jury minutes from the
8    case presentation.
9    Q.  Was it the grand jury minutes for
10   the case presentation concerning the case
11   against Anthony Manganiello?
12   A.  Yes.  The investigation into the
13   death of Albert Acosta.
14   Q.  Now, did Mr. Alston testify before
15   the grand jury that Mr. Manganiello
16   approached him in October of 2000
17   concerning killing -- murdering a security
18   guard for hire?
19   MR. ZUCKERMAN:  Just take your
20   time and review it.
21   A.  Did you say 2001?
22   Q.  October of 2000.
23   A.  Yes.
24   Q.  Let me show you what was

51

1    previously marked as Exhibit 9 dated
2    12/19/07.
3    MR. ZUCKERMAN:  It's Plaintiff's
4    Exhibit 9 at the 12/19/07 deposition?
5    MR. JOSEPH:  Yes.
6    MR. ZUCKERMAN:  So at least we
7    know what document we're talking
8    about.
9    A.  Okay.
10   Q.  Were you aware at the time
11   Terrance Alston testified before the grand
12   jury, were you aware that he had told
13   detectives that this conversation occurred
14   sometime in August of 2000?
15   A.  Yes.
16   Q.  Did you bring it to the grand
17   jury's attention that Mr. Alston had given
18   dates three months apart that this very
19   alleged conversation occurred?
20   A.  I was aware of this DD5.  Can I
21   just look at one thing?
22   Q.  Sure.  Take your time.
23   A.  I was aware that this DD5 existed
24   and DD5 said August of 2000.

52

1    Q.  Did you ever bring it to the grand
2    jury's attention that Mr. Alston had told
3    the detective that this alleged
4    conversation occurred three months earlier
5    in August of 2000?
6    A.  No.
7    Q.  Did you consider Mr. Alston's
8    grand jury testimony inconsistent with what
9    he told Detective Ramos on February 14,
10   2001?
11   A.  No.  Because that DD5 is basically
12   a sum and substance of the conversation
13   Detective Ramos had with Mr. Alston.  Prior
14   to Mr. Alston going into the grand jury, I
15   would have had a fairly extensive
16   conversation with him and went over things
17   in much more detail that wouldn't be
18   reflected in the DD5.  So, no, I didn't see
19   it as a problem.
20   Q.  Was Mr. Alston's grand jury
21   transcript ever provided to
22   Mr. Manganiello's defense lawyers?
23   A.  I don't recall if I just turned
24   over the entire set of grand jury minutes

53

1    or if I took Mr. Alston's testimony out
2    because he was obviously not going to be a
3    witness at trial.
4    Q.  At the point in time when
5    Mr. Alston came forward, had he been
6    indicted for attempted murder and robbery
7    in the first degree?
8    A.  He was in on something, but I
9    don't remember if it was a robbery or an
10   attempted murder.  I don't know what the
11   charge was.
12   Q.  Let me show you Exhibit 30 and ask
13   you if you recognize Exhibit 30.
14   A.  I recognize what Exhibit 30 is.
15   MR. ZUCKERMAN:  Exhibit 30 at a
16   deposition of 1/30/08.
17   Q.  I apologize.  I should have said
18   that.
19   A.  I recognize what this document is,
20   I don't have any recollection of reading
21   this in connection with my dealings with
22   Mr. Alston.
23   Q.  What do you recognize Exhibit 30
24   to be?

14 (Pages 50 to 53)

CHRISTINE SCACCIA

54

1  A.  It's an indictment, Bronx County
2  indictment against Mr. Alston for attempted
3  murder and unrelated charges.
4  Q.  At the point in time Mr. Alston
5  testified before the grand jury, were you
6  aware that he had been indicted for
7  attempted murder and robbery in the first
8  degree?
9      MR. ZUCKERMAN:  Objection, I think
10  she answered that.
11  Q.  I'm asking her what her awareness
12  is.
13  A.  Well, this is a 1998 indictment.
14  I can say that I was aware that Mr. Alston
15  was incarcerated, and I can say that I was
16  aware that he had a criminal record.  I
17  don't know if this is the indictment that
18  resulted in him still being at Rikers in
19  2001 when I met him.
20  Q.  Do you know if -- prior to
21  Mr. Alston testifying before a grand jury,
22  did you ever do what's called a credibility
23  check on him?
24  A.  I don't know what that is.

55

1  Q.  Did you ever look at Mr. Alston's
2  criminal record prior to allowing him or
3  putting him before the grand jury?
4  A.  I had I'm sure Mr. Alston's rap
5  sheet but that is not at all a credibility
6  check.
7  Q.  Did Detective Parker ever discuss
8  getting Mr. Alston released from custody
9  with you?
10      MR. ZUCKERMAN:  Object to form.
11  A.  I don't know if Detective Parker
12  -- there was a discussion between myself
13  and Detective Parker involving Mr. Alston
14  being out of custody.  Because once he was
15  released from custody he was -- he had to
16  check in and abide by certain rules, for
17  lack of a better word, that had been set up
18  for him.
19  Q.  When was it that Mr. Alston was
20  released from custody?
21  A.  I have absolutely no recollection
22  of that.
23  Q.  Was it prior to Anthony
24  Manganiello being arrested in April of

56

1  2001?
2  A.  I don't know.
3  Q.  Do you know whether, I'm sorry, do
4  you know whether Terrance Alston finished
5  and completed his sentence prior to him
6  getting out of jail?
7      MR. ZUCKERMAN:  Object to form.
8  A.  I would have to look at actual
9  court records, but I think that he had
10  ended up taking an open plea on a case.
11  Q.  And what does that mean?
12  A.  It meant that he was being
13  released and was going to get consideration
14  for his case, but that if he screwed up,
15  violated his cooperation agreement or
16  continued to get into trouble, that he
17  would just be sentenced on the case and
18  there would be no trial on it.  I think
19  that's what it is and that's my best
20  memory.  I would be able to tell you
21  looking at court records for sure.
22  Q.  When you say "consideration for
23  the case," what do you mean by that?
24  A.  He would get time off for

57

1  cooperating.
2  Q.  Okay.  And did he receive -- what
3  exactly was Mr. Alston -- strike that.
4      What was the nature of
5  Mr. Alston's cooperation for which he was
6  going to receive time off?
7  A.  Well, part of it was his
8  cooperation on this case.  Mr. Alston did
9  have other, what I perceived to be relevant
10  information, because he was -- he did have
11  a criminal history.  He was involved in
12  criminal activity and had knowledge of the
13  Blood's gangs and a number of things that
14  he would be considered available to
15  cooperate on.  But this is the only case
16  that I know of that he ever testified on.
17  Q.  And was the jury -- was the grand
18  jury ever made aware that Terrance Alston
19  was given time off in exchange for his
20  testimony?
21  A.  There was -- I don't know the
22  answer to that. There were motions about
23  that and I know that ultimately the motions
24  were denied, but I don't remember what or

15 (Pages 54 to 57)

CHRISTINE SCACCIA

58

1 where.
2     Q. I'll get to the motions in a
3 couple of seconds, I'm just asking you now
4 --
5     A. I don't know is my answer.
6     Q. And what consideration
7 specifically was Mr. Alston given in
8 consideration for his cooperation?
9     A. The only consideration that he was
10 able to get was that he had been released
11 from prison at some point, and he was at
12 liberty from whatever his release date was
13 until -- like July 5th of 2001 or July 1st
14 of 2001 when he was killed. So not much
15 consideration.
16     Q. Can you tell me how this agreement
17 came about? How did Mr. Alston become --
18 get released, so to speak, early?
19         MR. ZUCKERMAN: Object to form.
20     Q. I'll rephrase it. Can you tell me
21 who was involved in the decision to allow
22 Mr. Alston to be at liberty?
23         MR. ZUCKERMAN: Object to form.
24     A. Me.

59

1     Q. Was anyone else?
2     A. I'm sure his attorney at the time.
3     Q. Did you ever have discussions --
4 strike that.
5         How did it -- did Detective Parker
6 ever speak with you about Mr. Alston
7 getting time off like a proponent of
8 witness or for producing witnesses?
9         MR. ZUCKERMAN: Object to form.
10     A. Not that I remember.
11     Q. Did Detective Agostini ever speak
12 to you concerning Mr. Alston getting time
13 off in exchange for providing cooperation
14 in this case?
15     A. Are you asking are they talking to
16 me on his behalf like a proponent of
17 getting him time off? Because that I could
18 say no to.
19         There was discussion about him
20 getting out and me entering a plea
21 negotiation with the witness because it was
22 just part of the prosecution. But not them
23 asking me, can you get Terrance out?
24     Q. Well, what conversation did you

60

1 have, and we'll start with Mr. Parker.
2 What conversation did you have with
3 Mr. Parker concerning Terrance Alston being
4 at liberty?
5     A. At some point I probably informed
6 him that I was going to use him. I was
7 going to enter a cooperation agreement with
8 him and make a deal, and that once he was
9 out on the street, Detective Parker was, I
10 believe, his handler, his point person to
11 keep in contact with.
12         MR. ZUCKERMAN: I need to use the
13 men's room. Just a few minutes.
14
15         (Short recess was taken.)
16
17     Q. As part of this cooperation
18 agreement, was Mr. Alston released from
19 custody in exchange for his testimony
20 against Anthony Manganiello?
21         MR. ZUCKERMAN: Object to form.
22     A. That was one of the reasons behind
23 his release, yes.
24         MR. JOSEPH: Let's have this

61

1 marked as today's date Exhibit 2.
2
3         (Scaccia Exhibit 2, MOTION, was
4         marked for identification.)
5
6     Q. I'll show you what has been marked
7 as Exhibit Number 2 and ask you if you
8 recognize this document.
9     A. Okay.
10     Q. Do you recognize Exhibit Number 2?
11     A. It is a motion that was filed by
12 my, at the time, bureau chief, Mary
13 D'Andrea, in response to defendant's
14 omnibus motion.
15         MR. ZUCKERMAN: Did you identify
16 this?
17     A. He did.
18     Q. Now, directing your attention to
19 the last sentence, number three, did the
20 former bureau chief Ms. Andrea make a
21 representation to the Court that the
22 cooperation agreement was not to ensure
23 Mr. Alston's testimony in the Manganiello
24 case?

16 (Pages 58 to 61)

CHRISTINE SCACCIA

62

1    A.  Just so it's clear, D'Andrea is
2  the last name.  The agreement was not made
3  to ensure his testimony in this case but --
4    **Q.  For the record you're reading from**
5  **a document at this point?**
6    A.  Yes, that's what it says.  "The
7  agreement was not made to ensure his
8  testimony in this case."
9    **Q.  Was that document -- was**
10 **Ms. D'Andrea's representation to the Court**
11 **accurate?**
12   A.  Yes.
13     MR. ZUCKERMAN:  Object to the
14  form.
15   **Q.  Do you wish to revise your answer**
16 **after reading the document?**
17   A.  No.
18   **Q.  Was Mr. Alston released prior to**
19 **his testifying before the grand jury?**
20   A.  As I think I stated before, I
21  don't remember the date he was released.
22   **Q.  Do you have a recollection as to**
23 **whether it was after his grand jury**
24 **testimony that Mr. Alston was released?**

63

1    A.  I don't remember.
2    **Q.  Okay.  Was Mr. Alston provided**
3  **immunity in exchange for his testimony**
4  **against Anthony Manganiello?**
5      MR. ZUCKERMAN:  Object to form.
6    **Q.  Let me rephrase it.**
7      **Did Mr. Alston ever waive his**
8  **immunity testifying before the grand jury?**
9    A.  He did not go into the grand jury
10  under a waiver of immunity if that is what
11  you're asking.
12   **Q.  Is there any reason -- strike**
13 **that.**
14     **Did you have DD'5 in which**
15 **Mr. Alston agreed to commit a murder for**
16 **hire?**
17     MR. ZUCKERMAN:  Object to form.
18   A.  DD5's that indicated that
19  Mr. Alston said he was willing to commit a
20  murder for hire, but I don't think that it
21  ever reached the interaction where an
22  agreement as to who, when and how much was
23  ever made.
24   **Q.  Was Mr. Alston -- I believe you**

64

1  testified earlier, that Mr. Alston was
2  **provided a key, correct, for which to**
3  **utilize?**
4    A.  Yes.
5    **Q.  Would you consider taking a key an**
6  **act in furtherance of a conspiracy to**
7  **commit murder?**
8      MR. ZUCKERMAN:  Are you reading
9  something from a document?
10     MR. JOSEPH:  No.  I'm refreshing
11  my memory.
12     MR. ZUCKERMAN:  I object to form.
13   A.  I mean it would be considered an
14  act, but I don't think that that would
15  be -- I don't think it would rise to the
16  level of a conspiracy at that point.
17   **Q.  Would you consider Mr. Manganiello**
18 **asking or allegedly asking Terrance Alston**
19 **to commit a murder, and Mr. Alston agreeing**
20 **to do it for money to be a conspiracy?**
21     MR. ZUCKERMAN:  Object to form.
22   A.  I think that there would have to
23  be an act in furtherance of that conspiracy
24  before I can say yes.

65

1    **Q.  And would taking a master key to a**
2  **building where the murder was allegedly**
3  **going to occur be an act of furtherance?**
4    A.  From my understanding it was the
5  key to an area that was just not available
6  to the public.  I don't think a time and
7  place had been set for the murder.  It's
8  not like he gave him a key to apartment 5J,
9  which I'm completely making up, and said go
10  there on such and such a day and commit the
11  murder.
12   **Q.  Was Mr. Alston ever prosecuted for**
13 **agreeing to commit a murder for hire?**
14     MR. ZUCKERMAN:  In this case?
15   **Q.  Correct.**
16   A.  No.
17   **Q.  By the way, were you aware that**
18 **Detective Agostini said he had concerns**
19 **about Mr. Alston's credibility?**
20   A.  No, not that I can remember.
21   **Q.  Did Mr. Agostini ever voice**
22 **concerns to you concerning Mr. Alston's**
23 **credibility?**
24   A.  I don't remember, no.  I shouldn't

17 (Pages 62 to 65)

CHRISTINE SCACCIA

66

1 say, no, I don't remember is my answer.
2    Q. Were you ever made aware that
3 Mr. Alston didn't want witnesses that he
4 was producing interviewed outside of his
5 presence?
6        MR. ZUCKERMAN: Object to form.
7    Do you understand?
8    A. I understand it, I'm trying to
9 think. The only context that I can think
10 of that coming up with, was the kid who he
11 had told Detective Agostini about,
12 originally, and I don't remember the kid's
13 true name that's why I'm calling him the
14 kid. And I think it was only said in the
15 context of, he will be okay if he knows I'm
16 here, meaning like he's not going to get in
17 trouble, and this isn't just some lie that
18 the detectives are telling him. But I
19 don't remember him.
20        First of all, I would not allow a
21 witness to insist on being present for the
22 interview of another witness. It's not a
23 good practice.
24    Q. Was Terrance Alston ever present

67

1 for the interview of a witness whom he
2 produced?
3    A. He never produced anybody. I
4 don't know if he was there for an initial
5 introduction when that kid came in, I don't
6 remember.
7    Q. Now, did Terrance Alston ever say
8 he would produce a witness that sold a gun
9 to Anthony Manganiello in exchange for
10 being released from prison?
11    A. No, not produce.
12    Q. Well --
13    A. Give information about assisting
14 detectives in finding him, yes. Producing
15 as if he had control exclusively over this
16 person, no.
17    Q. Did Mr. Alston say that he would
18 provide detectives with a witness who would
19 say that he sold Anthony Manganiello a gun
20 if he was released?
21        MR. ZUCKERMAN: Object to form.
22    A. I don't remember the -- if he was
23 released conditions being placed on it.
24    Q. Did Mr. Alston subsequently come

68

1 up with a witness named Mark Damon who said
2 that he sold Anthony Manganiello a gun?
3    A. Mark Damon came up, yes.
4    Q. And did Mark Damon -- strike
5 that.
6        Did Terrance Alston produce Mark
7 Damon?
8        MR. ZUCKERMAN: Object to form.
9    Q. How did you come in contact with
10 Mark Damon?
11    A. I don't know if Mark Damon arrived
12 at my office on his own or with the police,
13 but eventually Mr. Alston did give the
14 police Mark Damon's contact information.
15    Q. Did Mr. Alston arrive at your
16 office with Mr. Damon?
17    A. I don't remember when that meeting
18 took place. I don't know if Mr. Alston was
19 in custody or out, and if he was in, the
20 answer would certainly be no, and if he was
21 out, I don't remember.
22    Q. Did you interview Mr. Damon in
23 Mr. Alston's presence?
24    A. I think that Mr. Alston may have

69

1 been present, like I said, for introduction
2 purposes. I do not remember conducting an
3 interview with them both there.
4        MR. JOSEPH: Let's have this
5    marked as 3.
6
7        (Scaccia Exhibit 3, DD5 DOCUMENT
8        was marked for identification.)
9
10    Q. I'll show counsel and I'll show
11 you what has been marked as Scaccia 3 with
12 today's date, May 2nd, 2008.
13        MR. ZUCKERMAN: Where is number 2
14    because we need copies of this?
15    Q. Have you seen this document
16 before?
17    A. At some point I have, yes.
18    Q. Is this DD5 document documenting a
19 meeting between you, Mr. Alston, Mr. Damon
20 and Mr. Agostini and Mr. Parker?
21    A. It is -- I'm sorry, say that
22 again. Is it a DD5 concerning a meeting
23 between myself, Agostini and Parker, is
24 that what you just said?

18 (Pages 66 to 69)

CHRISTINE SCACCIA

70

```
 1   Q. And Damon and Alston also.
 2       Read back the whole question.
 3
 4       (Requested question was read back
 5   by the court reporter.)
 6
 7   A. This does not refresh my
 8   recollection as to who was present during
 9   what portion of this meeting. At some
10   point all of the people named in this
11   report were present in my office. As I
12   said, I didn't think that -- Mr. Alston may
13   have been there for introduction purposes,
14   but I don't recall Mr. Alston being present
15   when I interviewed a witness in the case.
16   Q. If Mr. Alston was present on April
17   5th, 2001, does that mean Mr. Alston would
18   have been out of custody at this point?
19       MR. ZUCKERMAN: Object to form.
20   A. No.
21   Q. Directing your attention to number
22   2, does it say during the above interview
23   the following persons were present and is
24   Mr. Alston listed?
```

71

```
 1   A. It is but that's a report prepared
 2   by Detective Agostini. And, again, it's a
 3   summary of what took place that day, not a
 4   moment by moment account.
 5   Q. Were you ever aware -- did
 6   Mr. Agostini ever raise a concern to you
 7   that Mr. Alston did not want Mr. Damon to
 8   be interviewed outside of his presence?
 9   A. I don't remember that.
10   Q. By the way, were you aware of a
11   Verizon employee named Mr. Huello,
12   H-u-e-l-l-o?
13   A. Yes.
14   Q. When did you first become aware of
15   statements given by Mr. Huello?
16       MR. ZUCKERMAN: Object to form.
17   A. I would say whatever DD5
18   interviews were done with him during the
19   day of the incident came into my
20   possession, or I at least read them in the
21   immediate days following the incident.
22   Q. Was Mr. Huello ever presented to
23   the grand jury?
24   A. No, he was not.
```

72

```
 1   Q. And was there a reason he was not?
 2   A. No.
 3   Q. Did Mr. Huello provide a statement
 4   which contradicted what Mr. Cobb had said?
 5   A. I don't remember what Mr. Huello
 6   said. To tell you the truth, I remember
 7   where he was and what he was doing, but the
 8   context of what he said, I don't remember.
 9   Q. Do you have a recollection of him,
10   Mr. Huello, stating that he was across from
11   the room where Mr. Acosta was found at the
12   point in time when Mr. Cobb entered the
13   basement and he heard no shots and did not
14   see Mr. Manganiello?
15   A. He does say that and there was an
16   explanation behind it too, now that I
17   recall. He was saying that there was some
18   sort of noise factor going on and he was in
19   a room at one end of the basement. Again,
20   you're saying directly across from. I
21   don't know if it was directly across from.
22   And, yeah, he says he doesn't hear
23   anything.
24   Q. And did he also say he didn't see
```

73

```
 1   Mr. Manganiello at all at that point?
 2   A. He didn't see anyone. I think how
 3   he becomes aware of it is that he has
 4   interaction with Cobb in the basement, and
 5   when Mr. Cobb runs outside to make the
 6   phone call to the police, I think he sees
 7   the Verizon van pulling away or making a
 8   U-turn or something and flags him down.
 9   Q. By the way -- withdrawn.
10       When you presented the case to the
11   District Attorney, did Sergeant Ohle
12   testify?
13   A. You mean when I presented it to
14   the grand jury?
15   Q. Yes.
16   A. No, he did not testify to the
17   grand jury.
18   Q. Were you aware that Sergeant Ohle
19   gave a statement in which he says he
20   brought -- that one of his officers was
21   down over the Parkchester security radio
22   system?
23   A. I believe that was a point that
24   was litigated during the course of the
```

19 (Pages 70 to 73)

CHRISTINE SCACCIA

74

1  trial. I don't remember who called him at
2  trial, but I think he did testify
3  actually.
4      Q.  Was the grand jury ever made aware
5  that Mr. Ohle had broadcast the identity of
6  the Parkchester -- strike that. The victim
7  as a Parkchester security guard?
8      MR. ZUCKERMAN: I'm sorry. Can
9  you read that back, please?
10
11      (Requested question was read back
12  by the court reporter.)
13
14      MR. ZUCKERMAN: Object to form.
15  You can answer.
16      A.  The sergeant did not testify at
17  the grand jury, therefore, there was no way
18  of eliciting that information.
19      Q.  Was there any reason why he was
20  not called?
21      A.  There was no need to call him.
22      Q.  Now, did you elicit testimony from
23  an Officer Nieves that when Mr. Manganiello
24  arrived it was unknown that the victim was

75

1  a Parkchester security guard?
2      A.  If that's what Officer Nieves'
3  testimony states, that was according to
4  her.
5      Q.  Did you also elicit testimony from
6  Ms. Perez that it was not known that the
7  victim was a Parkchester security officer
8  at the point in time that Mr. Manganiello
9  arrived?
10      A.  Actually I think between Perez and
11  Nieves --
12      MR. ZUCKERMAN: Take your time and
13  review what you need to answer the
14  question.
15      MR. JOSEPH: Take your time and
16  I'll take a two minute break.
17
18      (Short recess was taken.)
19
20      A.  Both Officer Nieves and Officer
21  Perez state that they do not know when they
22  are responding to the location whether it
23  was a NYPD officer or Parkchester
24  security. But both say at some point that

76

1  while they're in the basement they realize
2  that it's Parkchester security. I think
3  one of the officers said that she
4  recognized him from seeing him around as a
5  Parkchester security officer.
6      Q.  And was that testimony elicited
7  for the purpose of inferring that Anthony
8  Manganiello had some guilty knowledge
9  because he allegedly made a statement to
10  Officer Perez that it was his partner
11  inside of the room?
12      MR. ZUCKERMAN: I object to the
13  form. You can answer if you can.
14      A.  That information was elicited
15  because of a variety of reasons. But the
16  short version is, yes, I do think that it
17  tended to inculpate him in the shooting of
18  Acosta.
19      Q.  Was the grand jury ever informed
20  that Sergeant Ohle had broadcast the
21  identity of the victim over the Parkchester
22  radio system prior to Mr. Manganiello's
23  arrival?
24      A.  Once again, Sergeant Ohle did not

77

1  testify, so that information did not come
2  out. And the fact that information about
3  it being Albert Acosta in the basement
4  being broadcast over the air would only be
5  relevant if it was broadcast before Anthony
6  Manganiello responded to that basement.
7      At some point Parkchester is well
8  aware that it is Acosta on the floor. So,
9  as I sit here today, I don't remember the
10  time sequence of those transmissions. I
11  only know what had taken place.
12      Q.  Let me see if I can clarify one
13  point of your answer. As you sit here
14  right now, do you recall whether Sergeant
15  Ohle had made the broadcast that it was one
16  of his officers or Albert Acosta prior to
17  Mr. Manganiello's arrival, do you have a
18  memory one way or another?
19      A.  I do not. I know that that
20  information went out. I cannot sit here
21  and tell you that it went out either before
22  or after, I don't have a recollection of
23  that.
24      Q.  How did you become aware of

20 (Pages 74 to 77)

CHRISTINE SCACCIA

78

1  Mr. Booth's existence?
2      A.  It was from a police source.  I
3  don't know how he was discovered.  I don't
4  know if he reached out for the officers or
5  if they had a tip or if it was done during
6  a canvass, I don't know.  Or if he, you
7  know, got in trouble and decided to give
8  information.
9          MR. JOSEPH:  Let's have this
10     marked as Exhibit 4.  For the record,
11     I'm marking a three-page document.
12
13         (Scaccia Exhibit 4, THREE-PAGE
14         DOCUMENT, was marked for
15         identification.)
16
17     Q.  I'll show you and your counsel
18  what has been marked as Exhibit 4 of
19  today's date.
20     A.  Okay.
21     Q.  Do you recognize Exhibit Number 4?
22     A.  I recognize it to be a DD5
23  prepared in conjunction with this case.
24     Q.  After reviewing Exhibit 4, does it

79

1  refresh your recollection as to how
2  Mr. Booth came to your attention?
3      A.  As I said, it's because the
4  detectives brought him to my attention.
5  How he came in contact with the detectives
6  still is not clear, because I don't know if
7  they had -- it says they met in front of
8  the pizza store.  I don't know if they were
9  there on a canvass, or if one of the
10 detectives knew him, or if he had called
11 the detectives.  I don't know the answer to
12 that.
13     Q.  Let me take one step back to
14 Mr. Alston.  Were you the Assistant
15 District Attorney in charge of prosecuting
16 Mr. Alston's case?
17     A.  When he incurred his cases, no.
18 After I entered an agreement with him,
19 yes.
20     Q.  And would it be fair to say that
21 you became the Assistant District Attorney
22 in charge of Mr. Alston, prosecuting
23 Mr. Alston's case as a result of his
24 testimony in Anthony Manganiello's case?

80

1      A.  Well, it's a result of him
2  cooperating.  One, I wanted to make the
3  deal, I took the case and made the deal.
4      Q.  And what was the deal exactly?
5      A.  I have no recollection.  I mean I
6  read response to motion papers that
7  indicated he pled guilty to four years and
8  was going to do that, and he was being
9  released for a period of time and going
10 back into custody.  But other than that,
11 refreshing my recollection, I don't know.
12     Q.  Now, were you ever made aware of
13 any criminal activity in which Mr. Booth
14 was engaged by the detectives?
15     A.  I think it was Mr. Manganiello's
16 attorney who told me that Mr. Booth was
17 engaged in criminal activity.
18     Q.  But did, for example, did
19 Mr. Agostini ever advise you that Mr. Booth
20 was a hookie?
21     A.  Again, I knew that information, I
22 don't know if the detective knew it as
23 well.  But I do remember Mr. Richmond, who
24 represented Mr. Manganiello at trial, I

81

1  think at one time represented Mr. Booth.
2      Q.  Just so I'm clear, I'm trying to
3  focus my questions on what the detectives
4  told you.
5      A.  I know that information, I don't
6  know from what source.  It could have been
7  from multiple sources that I knew that
8  information.
9      Q.  Did Detective Agostini ever advise
10 you that upon bringing Mr. Booth back to
11 the police station he searched Mr. Booth
12 and found a knife and gambling materials
13 which contained names and debts owed?
14     A.  I don't remember that information
15 being relayed.  I'm not saying it didn't
16 happen, I just have no recollection of it.
17     Q.  Okay.  Do you have any
18 recollection of the gambling paraphernalia
19 disappearing after Mr. Booth signed a
20 statement against Anthony Manganiello?
21         MR. ZUCKERMAN:  Object to form.
22     A.  Disappearing, no.  I had no -- I
23 have no recollection that Mr. Booth was in
24 custody, was about to be placed into

21 (Pages 78 to 81)

CHRISTINE SCACCIA

82

1  custody or any such thing. So, I don't.
2  **Q.  Did you ever have any knowledge**
3  **about Mr. Booth being threatened with**
4  **criminal charges unless he signed a**
5  **statement against Anthony Manganiello?**
6      MR. ZUCKERMAN:  Object to form.
7  **Q.  I'll rephrase it.**
8      **Do you have any knowledge of**
9  **Mr. Booth -- strike that.**
10     **Do you have any knowledge as to**
11 **whether Detective Agostini told Mr. Booth**
12 **that he would pass his name and gambling**
13 **paraphernalia found on Mr. Booth to**
14 **organized crime unless he signed a**
15 **statement against Anthony Manganiello?**
16     MR. ZUCKERMAN:  Object to form.
17 **Q.  My question is, were you ever**
18 **advised of that?**
19     MR. ZUCKERMAN:  Object to form.
20 A.  Actually, if Mr. Booth had such
21 items on him, I don't think that organized
22 crime figures would be surprised to know
23 that, since generally gambling is
24 associated with people in organized crime.

83

1  And, really, I don't ever remember hearing
2  from anyone that Mr. Booth was threatened
3  with prosecution for possessing gambling
4  slips, nor do I think that that would have
5  been enough of an incentive to sign a
6  statement in Bronx County.
7  **Q.  My question is, were you ever**
8  **informed --**
9  A.  No.
10 **Q.  Let me finish my question.**
11 A.  Sorry.
12 **Q.  Were you ever informed that**
13 **Detective Agostini threatened to pass**
14 **Mr. Booth's name and the materials found on**
15 **him to the organized crime division if he**
16 **did not sign a statement?**
17     MR. ZUCKERMAN:  Object to form.
18 A.  No.
19 **Q.  Did you ever learn that the**
20 **gambling paraphernalia which Mr. Agostini**
21 **found on Mr. Booth's person disappeared**
22 **after the statement was signed?**
23     MR. ZUCKERMAN:  Object to form.
24 A.  I never knew there was any, so,

84

1  no.
2  **Q.  Did you ever authorize Detective**
3  **Agostini to withhold evidence found on**
4  **Mr. Booth's person from any law enforcement**
5  **entities in exchange for his statement or**
6  **testimony against Anthony Manganiello?**
7      MR. ZUCKERMAN:  Object to form.
8  A.  No.
9  **Q.  Did the detectives ever tell you**
10 **that they gave Mr. Booth -- strike that.**
11     **Did Detective Agostini ever --**
12 **strike that.**
13     **Did Detective Agostini or**
14 **Detective Martinez ever advise you that**
15 **they gave Mr. Booth Mr. Manganiello's name?**
16     MR. ZUCKERMAN:  Object to form.
17 A.  That they gave him his name?  I'm
18 not sure what you mean by that, Counsel.
19 **Q.  Did Detective Agostini or**
20 **Detective Martinez ever advise you that**
21 **Mr. Booth did not know Mr. Manganiello's**
22 **name until the detectives provided him with**
23 **that name?**
24     MR. ZUCKERMAN:  Object to form.

85

1  A.  I don't know if Mr. Booth -- I
2  can't recall as I sit here whether
3  Mr. Booth said that he didn't know
4  Manganiello by name and only by sight, or
5  if he knew what his name was. So, I don't
6  know the answer to your question.
7  **Q.  Did you ever meet with Mr. Booth?**
8  A.  I believe Mr. Booth testified at
9  trial.
10 **Q.  Did you ever go over Mr. Booth's**
11 **statement with him prior to his testimony**
12 **at trial?**
13     MR. ZUCKERMAN:  Object to form.
14 A.  If he testified at trial I would
15 have gone over his statement with him
16 beforehand.
17 **Q.  Let's take a step back to**
18 **Mr. Damon.  What role, if any, did**
19 **Mr. Parker play in bringing Mr. Damon to**
20 **your attention?**
21 A.  I don't remember if he had any
22 role in it.
23 **Q.  What role, if any, did**
24 **Mr. Agostini play in bringing Mr. Damon to**

22 (Pages 82 to 85)

CHRISTINE SCACCIA

90

1    Q. And did you place any emphasis --
2  strike that.
3       What role, if any, did this
4  statement play in your decision to commence
5  the prosecution and continue it against
6  Mr. Manganiello?
7    A. Really this statement wouldn't
8  have factored that heavily into the
9  decision-making process. The prosecution
10  in this case was based upon, like I said,
11  the witnesses who were present at the scene
12  that day in conjunction with Mr. Alston.
13    Q. When you say "not factor heavily,"
14  did this statement play a factor, for you
15  at least, in linking how Mr. Agostini came
16  into contact with Mr. Tartone and in turn
17  Mr. Booth?
18    A. No. And this DD5 is labeled a
19  reinterview indicating that Mr. Miro had
20  spoken to somebody beforehand. I still
21  don't have -- I don't know how the police
22  got to the individuals in the pizza shop, I
23  don't know.
24    Q. Did this DD5, Exhibit Number 21,

91

1  play a role in your commencing the
2  prosecution or provide some link that you
3  believed established Mr. Manganiello was
4  involved in the shooting of Albert Acosta?
5       MR. ZUCKERMAN: Object to form.
6    Q. Let me rephrase it.
7       Did Exhibit 21 provide some link
8  that caused you to believe that Anthony
9  Manganiello was involved in the shooting of
10  Albert Acosta?
11       MR. ZUCKERMAN: Object to form.
12    A. No. Is it evidence I would have
13  liked to have used against
14  Mr. Manganiello? Yes. Does this evidence
15  prompt me to believe that there was enough
16  to arrest or charge Mr. Manganiello of this
17  homicide? Not based on this statement
18  alone.
19    Q. I'm not asking you if it's based
20  on this statement alone. I'm asking you if
21  this statement, in conjunction with the
22  other statements that you were provided
23  with, caused you to have some faith that
24  what you were being told by Mr. Tartone and

92

1  Mr. Booth was true?
2       MR. ZUCKERMAN: Object to form.
3    A. Yes, and that it's consistent with
4  what they're saying. But, again, it's not
5  something that was relied upon heavily I
6  would say.
7    Q. Were you ever made aware that
8  Mr. Miro stated he never said anything that
9  is contained in Exhibit 21?
10       MR. ZUCKERMAN: Object to form.
11    A. As I said before, I don't know if
12  Mr. Miro testified as a defense witness at
13  trial, and if he did, I'm sure that's what
14  he said. But as I sit here today, I don't
15  remember that.
16    Q. Do you have a memory one way or
17  another of being informed that Mr. Miro
18  never made any of the statements contained
19  in Exhibit 21 to Detective Agostini?
20    A. No.
21    Q. By the way, what happened to the
22  tests for the gunshot residue that were
23  performed on Mr. Manganiello's hands and
24  jacket?

93

1       What happened to the reports?
2       MR. ZUCKERMAN: Of the test
3  results?
4    Q. Correct.
5    A. Actually, those reports I think
6  were turned over to counsel.
7    Q. Were any of them ever missing,
8  were either of them missing?
9    A. I don't know if they were missing
10  and we were able to get other copies of
11  them from the labs, but there was -- that
12  information was definitely provided to
13  counsel. Everybody was well informed of
14  that.
15       The initial responses were
16  probably with the rest of the police
17  folder, but I think everybody had copies of
18  them in the end.
19    Q. Did you have any difficulty
20  getting any of the documents from the
21  Police Department in this case?
22       MR. ZUCKERMAN: Object to form.
23    Q. In the -- did you have any
24  difficulty receiving or getting a hold of

24 (Pages 90 to 93)

CHRISTINE SCACCIA

94

1  police documents say from the crime lab
2  concerning the prosecution of Anthony
3  Manganiello?
4      MR. ZUCKERMAN: Object to form.
5      A.  The difficulty in this was -- when
6  the case went to trial ultimately the
7  police reports that I was working from were
8  furnished back to me by the defense. So,
9  if I was calling a lab without a voucher or
10  a report in front of me that gave me a
11  number with which to give reference to,
12  yeah, they would have given me a hard
13  time. We can't find this or that. That
14  was one of the difficulties.
15     Q.  Were there any documents that were
16  not provided to defense counsel until the
17  last day of trial?
18     A.  I don't remember.
19     Q.  You can take a look at what I'll
20  represent is the trial testimony, page 671,
21  and see if this refreshes your
22  recollection.
23     A.  Okay. I read it.
24     Q.  Does this refresh your

95

1  recollection as to whether there were any
2  documents from the crime scene department
3  which were not provided to you or to the
4  defense counsel until the last day of
5  trial?
6      A.  Well, that would have been my
7  fault, that's when I obtained them. I
8  don't know in the grand scheme of what you
9  showed me if this was in fact the last day
10  of trial. Actually, it was the last day of
11  the People's case when everything would
12  have been -- my obligation is to turn stuff
13  over well in advance of trial.
14         However, the key moment in time is
15  when the People are about to rest if
16  something is not turned over. That's what
17  would spark adverse inferences. So this is
18  probably the maximum cut-off of that
19  happening to me.
20     Q.  My question really is, were there
21  any documents that you didn't have to turn
22  over to the defense until the last day of
23  the People's case?
24     A.  Yes, that would have been the

96

1  crime scene report and photos.
2      Q.  And is that unusual to not receive
3  these, these type of documents in a
4  homicide case, until the last day of the
5  People's case?
6      A.  Sir, trying to try a homicide case
7  without a police folder is a very unusual
8  circumstance. This is not ideal by
9  anybody's standard.
10         MR. JOSEPH: Can you mark this as
11  5.
12
13         (Scaccia Exhibit 5, HANDWRITTEN
14         NOTES, was marked for
15         identification.)
16
17     Q.  I'll show you what has been marked
18  as Exhibit 5, and ask you if you recognize
19  this document.
20     A.  It appears to be handwritten notes
21  of either a crime scene detective or ESU
22  detective who responded to the scene.
23     Q.  And when you say "responded to the
24  scene," are we talking about the Albert

97

1  Acosta homicide scene?
2      A.  Yes, I'm sorry.
3      Q.  And is this one of the documents
4  that you received on the last day of the
5  People's case?
6      A.  I mean --
7      Q.  If you can look at the fax track
8  it may refresh your recollection.
9      A.  It appears to match the
10  description of the type of documents that I
11  made a record about at trial. Without
12  seeing the rest of the typed crime scene
13  report and the photos, I don't know, but I
14  would say for all intents and purposes that
15  this is one of the documents.
16     Q.  And would -- does that document
17  contain any information which contradicted
18  any of Mr. Agostini's testimony about
19  Mr. Manganiello being evasive?
20         MR. ZUCKERMAN: Object to form.
21     A.  No.
22     Q.  Did Mr. Agostini testify that
23  Mr. Manganiello told him he didn't remember
24  what his address was?

25 (Pages 94 to 97)

CHRISTINE SCACCIA

98

1    MR. ZUCKERMAN: At the criminal
2    trial?
3    Q. At the criminal trial.
4    MR. ZUCKERMAN: If you remember.
5    A. At some point during the
6    interaction during the course of the day
7    when Mr. Manganiello is back at the
8    precinct, he was being -- I don't
9    necessarily want to say belligerent, but
10   uncooperative as far as giving over
11   information that would be considered
12   pedigree information.
13       At some point he does speak to
14   them and they had a conversation about, as
15   I said earlier, about the cut on his hand.
16   I think he said he was moving a treadmill
17   that morning and cut himself. So at some
18   point there is a dialogue that opens, but
19   originally he is like, my number is
20   unlisted, and I don't have to tell you my
21   name, sort of response.
22       So, no, this does not indicate
23   that he was -- it's not inconsistent with
24   Detective Agostini.

99

1    Q. Well, you were not present during
2    this conversation between Mr. Agostini and
3    Mr. Manganiello; correct?
4    A. No.
5    Q. So what you just testified to is
6    what Mr. Agostini told you, correct, or
7    testified in some form; correct?
8    A. Well, which is exactly what you
9    were asking me about whether this is
10   inconsistent with what Detective Agostini
11   was saying Mr. Manganiello is doing. No,
12   it's not.
13   Q. Was Exhibit 5 turned over to the
14   defense after Mr. Agostini had left the
15   stand?
16   A. Yes.
17   Q. At the criminal trial?
18   A. Yes, but Detective Agostini would
19   have been subject to recall at any time
20   defense wanted him.
21   Q. And does Exhibit 5 indicate that
22   approximately 12:25 p.m. on February 12,
23   2001, he provided detectives with his
24   address and Social Security number?

100

1    A. I don't know if the detective who
2    wrote that got that from Mr. Manganiello's
3    mouth or his identification in his wallet.
4    Q. Okay. Does Mr. Manganiello's
5    address and Social Security number appear
6    on Exhibit Number 5?
7    A. Yes, it does.
8
9       (Scaccia Exhibit 6, 911 TAPE, was
10      marked for identification.)
11
12   Q. Do you recognize the -- I'll show
13   you what has been marked as Exhibit Number
14   6. Do you recognize any of the writing on
15   the outside of the tape?
16   A. No.
17   Q. Can you put number six in and play
18   it and I'll ask you after you listen to it
19   if you recognize what this tape is.
20
21      (At this time a 911 tape was
22   played.)
23
24   Q. Ma'am, did you have an opportunity

101

1    to listen to what we have marked here as
2    Exhibit 6?
3    A. Yes.
4    Q. Do you recognize that?
5    A. Yes. Those are 911 transmissions
6    that were prepared in conjunction with this
7    case. The first, I think, two calls
8    pertain to a domestic incident not
9    involving the death of Albert Acosta, and
10   the other following ones were from
11   Mr. Cobb, the witness on this case, and one
12   of the Parkchester bosses I believe.
13   Q. And from where did you receive
14   this tape?
15   A. The Police Department.
16   Q. And was this something that you
17   understood to be made and kept in the
18   ordinary course of their business?
19   A. Yes.
20   Q. And, by the way, after listening
21   to the tape, did every single call that
22   reported the shooting identify the victim
23   as a Parkchester security officer?
24   MR. ZUCKERMAN: Object to form.

26 (Pages 98 to 101)

CHRISTINE SCACCIA

102

1    Q.  I'll rephrase it.
2        After listening to Exhibit 6, did
3    every call to 911 which reported the
4    shooting of the victim, identify him as a
5    Parkchester security officer?
6        MR. ZUCKERMAN: Object to form.
7    A.  Well, I believe Cobb says -- Colon
8    obviously says one of our men is down, but
9    he doesn't know what he is down from.  And
10   if memory serves me correctly, they were
11   trying to notify Acosta to respond to
12   Acosta's body not knowing he was down.
13       And Mr. Cobb says at one point,
14   it's a security officer and then he says, I
15   don't know if it's police or Parkchester, I
16   didn't go over to the body.  So to that
17   extent you're correct.
18   Q.  By the way, on this call did
19   Mr. Cobb ever indicate to the police that
20   he heard shots?
21   A.  Not in a direct response, but he
22   talks about hearing shots while he's
23   waiting on hold.
24   Q.  Did he ever say he saw a gentleman

103

1    walk out of the basement after he heard
2    shots, did he ever tell the police that in
3    the 911 tape?
4    A.  He was never asked that.  No, he
5    doesn't volunteer it.
6    Q.  At any point did you become aware
7    that -- strike.
8        At any point did you become aware
9    that Mr. Manganiello was with Police
10   Officer Rodriguez, Police Officer Ortiz and
11   Sergeant Rhodes while at 1700 Metropolitan
12   Avenue the morning prior to Mr. Acosta's
13   body being found?
14       MR. ZUCKERMAN: Object to form.
15   A.  If that's with regard to the
16   domestic call that's reflected on that,
17   that's very possible.  I don't remember if
18   it was Manganiello or Acosta that responded
19   to that call but they were there along with
20   NYPD.
21   Q.  Let me show you Exhibit 6 dated
22   12/19/07.
23   A.  Okay.
24   Q.  Have you ever seen Exhibit 6 prior

104

1    to today?
2    A.  Yes, during the preparation of
3    this trial.
4    Q.  Did you ever see Exhibit Number 6
5    prior to the point in time that the case
6    was presented to the grand jury against
7    Mr. Manganiello?
8    A.  Most probably, yes.
9    Q.  Do you have a recollection of
10   Mr. Manganiello being in the company of two
11   police officers at the point while he was
12   at 1700 Metropolitan Avenue?
13   A.  Earlier in the morning I have
14   reports of him being present at an
15   apartment within 1700 Metropolitan Avenue
16   in the company of police officers.
17   Q.  And do the reports also indicate
18   that Mr. Manganiello left with the police
19   officers?
20   A.  He left that apartment.  They
21   don't say where he goes.  They looked in
22   the apartment, everything seemed to have
23   calmed down and the Parkchester cop left is
24   all it says.  So where he went, I don't

105

1    know.
2    Q.  Is there an indication in the next
3    to last sentence that the Parkchester
4    police and NYPD police left at the same
5    time, left together?
6    A.  It says they all left and the
7    Parkchester cop left.  So, yes, I guess
8    they left at or about the same time.
9    Q.  In other words, was Officer
10   Rodriguez ever called to testify before the
11   grand jury?
12   A.  No.
13   Q.  Was Officer Rodriguez's full name
14   ever provided to the defense -- to
15   Mr. Manganiello's defense attorney?
16   A.  I have no idea.
17   Q.  Was there ever a request that
18   Officer Rodriguez testify before the trial,
19   during Mr. Manganiello's trial?
20   A.  For the defense?
21   Q.  Correct.
22   A.  If he wanted him to testify he
23   could have called him.
24   Q.  Did he ever ask that this officer

27 (Pages 102 to 105)

CHRISTINE SCACCIA

73

1    Mr. Manganiello at all at that point?

2        A.    He didn't see anyone.  I think how

3    he becomes aware of it is that he has

4    interaction with Cobb in the basement, and

5    when Mr. Cobb runs outside to make the

6    phone call to the police, I think he sees

7    the Verizon van pulling away or making a

8    U-turn or something and flags him down.

9        Q.    By the way -- withdrawn.

10            When you presented the case to the

11    District Attorney, did Sergeant Ohle

12    testify?

13        A.    You mean when I presented it to

14    the grand jury?

15        Q.    Yes.

16        A.    No, he did not testify to the

17    grand jury.

18        Q.    Were you aware that Sergeant Ohle

19    gave a statement in which he says he

20    brought -- that one of his officers was

21    down over the Parkchester security radio

22    system?

23        A.    I believe that was a point that

24    was litigated during the course of the

CHRISTINE SCACCIA

73

1    Mr. Manganiello at all at that point?

2        A.    He didn't see anyone.  I think how

3    he becomes aware of it is that he has

4    interaction with Cobb in the basement, and

5    when Mr. Cobb runs outside to make the

6    phone call to the police, I think he sees

7    the Verizon van pulling away or making a

8    U-turn or something and flags him down.

9        Q.    By the way -- withdrawn.

10            When you presented the case to the

11    District Attorney, did Sergeant Ohle

12    testify?

13        A.    You mean when I presented it to

14    the grand jury?

15        Q.    Yes.

16        A.    No, he did not testify to the

17    grand jury.

18        Q.    Were you aware that Sergeant Ohle

19    gave a statement in which he says he

20    brought -- that one of his officers was

21    down over the Parkchester security radio

22    system?

23        A.    I believe that was a point that

24    was litigated during the course of the