EXHIBIT**28**

CL1

PEOPLE OF THE STATE OF NEW YORK/BRONX COUNTY

VS

INV. INTO DEATH OF ALBERT ACOSTA,

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

PRESENTED BY:  A.D.A. SCACCIA/TD-B52

REPORTED BY:  CHERYL LAUREL

DATE: APRIL 16, 2001

PANEL & TERM: F PANEL & 5TH TERM

GRAND JURY #: 42,140

DOCKET #: IBNA

EXHIBIT
Scaccia 1
DATE 5/2/08 RPTR 925
DALCO REPORTING



CL2

1   MR. SCACCIA:  Good afternoon, ladies and

2   gentlemen, my name is Christine Scaccia.  I'm a

3   Senior Trial Assistant in Trial Division B-52.

4   This is the case, an investigation into the

5   death of Albert Acosta

6   I would now ask the Foreperson to determine

7   whether a quorum is present

8   THE FOREPERSON:   Let the record reflect that a

9   quorum is present.

10   MS. SCACCIA:  Ladies and gentlemen, before we

11   begin hearing evidence in this case I'm going to give

12   you a publicity charge.

13   You should not read, listen, or watch news

14   accounts about matters being presented to you.  In

15   the event that you have read or heard news accounts

16   about a case before evidence concerning that case

17   while it is pending before you, you must disregard

18   anything that you have read or heard, other than that

19   which is submitted to you as evidence.

20   If you have read or heard anything in the news

21   media about a case, you must not communicate that

22   information to your fellow Grand Jurors.  If, because

23   of something you have read or heard about a case, you

24   feel that you can no longer be impartial and cannot

25   reach a determination about a case solely on the



CL3

1    basis of the evidence and instructions presented, you

2    must tell the Foreperson and the Assistant District

3    Attorney.

4         Remember, that you should not discuss the case

5    being presented to you with anyone other than your

6    fellow Grand Jurors and the Assistant District

7    Attorney.  You may only form an opinion about a case

8    on the evidence presented, only after the case has

9    been submitted to you by the Assistant District

10   Attorney with specific legal instructions applicable

11   to the case before you.

12        At the end of the case the Assistant District

13   Attorney who presented it will give you charges for

14   your consideration.

15        If more than one defendant is presented you must

16   consider and vote the charges submitted to you as to

17   each defendant individually.  You may not necessarily

18   be re-read law on each charge.   Now if you do not

19   remember the law or if you are confused or have

20   questions please feel free to ask the Assistant

21   District Attorney presenting the case.

22        Now, given the nature of the date of

23   February 12th of the year 2001, at the location of

24   1700 Metropolitan Avenue here in Bronx County, and

25   the death of Albert Acosta.

CL4

1          Is there anyone who knows anything about this
2    case that would influence them in anyway?
3          Seeing no show of hands, the People are going to
4    begin their presentation of the evidence with the
5    calling of Mr. Terrence Alston.

CL5

1     .

2          TERRENCE ALSTON,   after having been duly sworn,

3     testified as follows:

4

5     EXAMINATION BY MS. SCACCIA:

6

7          Q.    Mr. Alston, you have to keep your voice up

8     nice and loud so everyone can hear you.

9          Please state your full name and the county you

10    live in?

11         A.    Terrence Alston, Bronx.

12         Q.    Mr. Alston, how old are you?

13         A.    Thirty-four.

14         Q.    Are you familiar with the location of

15    1700 Metropolitan Avenue here in Bronx County?

16         A.    Yes.

17         Q.    How is it that you are familiar with that

18    location, sir?

19         A.    I live in Parkchester, I live in the area.

20         Q.    How long have you lived in the area?

21         A.    Since '94.

22         Q.    I want to draw your attention now going

23    back to on or about October 1st, of the year 2000.

24    Were you living in Parkchester that day?

25         A.    Yes.

CL6

1          Q.    Can you please tell the Members of the

2     Grand Jury if anything unusual took place at about

3     that time?

4          A.    Yes.

5          Q.    What happened?

6          A.    A security officer approached me about

7     accepting a contract to kill another security

8     officer.

9          Q.    Now, where were you when this security

10    officer approached you?

11         A.    In front of my building, 1560 Unionport

12    Road.

13         Q.    Have you ever talked to this security

14    officer before?

15         A.    No.

16         Q.    When he approached you, did he call you by

17    name?

18         A.    Yes, he called me by my nickname, Murdock.

19         Q.    Now, when he first approached you, were you

20    alone or with other people?

21         A.    I was with my family.

22         Q.    Did you go somewhere to talk to him or did

23    he say this in front of your family?

24         A.    No, we went over to the other side and

25    talked.

CL7

1      Q.   Now, what exactly to the best of your

2  recollection did this security officer say to you and

3  what if anything did you say back to him?

4      A.   He asked me would I accept a contract to

5  kill another security officer.  I told him, yes.

6      Q.   Did he tell you why?

7      A.   He said it was over a little conflict, over

8  a girl.

9      Q.   Now, was there ever an arrangement made

10  about a price?

11      A.   No.

12      Q.   Was there any inquiry made about the price?

13      A.   I told him I'll get back to him about the

14  price.

15      Q.   Now, this security officer, did you ever

16  have any other conversations after that?

17      A.   Yes, a couple of days later.

18      Q.   Okay.  How did that happen?

19      A.   He approached me, he gave me a master key

20  to the building to get to the basement.  He showed me

21  where I was going to do it, and he also asked me if I

22  had a gun.  He told me he would give me a gun.  I

23  told him I had a gun already, I didn't need a gun.

24      Q.   Now, this master key, what is that master

25  key for?

CL8

1    A.    To get to the basements and the tunnels.

2    Q.    Now you are a tenant in Parkchester?

3    A.    Yes.

4    Q.    Do tenants have access to the basement or
5    tunnels?

6    A.    No.

7    Q.    This master key that he gave you, it would
8    allow you access to the basement and tunnels?

9    A.    Yes.

10    Q.    Did he tell you who the security officer
11    was that he wanted to kill?

12    A.    No.

13    Q.    Other than discussing that, did he tell you
14    when he wanted it to take place?

15    A.    No.

16    Q.    Did he discuss with you how it would take
17    place?

18    A.    Yes.

19    Q.    Could you tell the Members of the Grand
20    Jury, describe how it was going to take place?

21    A.    It was going to happen over in the 1700
22    area of the Parkchester basement.  He would lure him
23    down to the basement to where I would be at.

24    Q.    Now, on this second location, did he talk
25    to you about prices again?

CL9

1        A.   No.

2        Q.   Mr. Alston, did there come a time when you

3   actually carried out this contract for this security

4   officer?

5        A.   No.

6        Q.   Why is that, sir?

7        A.   I got incarcerated October 16th.

8        Q.   Of 2000?

9        A.   Yes.

10       Q.   During the date of February 12th of 2001,

11  were you still incarcerated?

12       A.   Yes.

13       Q.   The security officer who approached you on

14  those two occasions, Mr. Alston, do you know his name

15  to be Anthony Maganello?

16       A.   Yes.

17       MS. SCACCIA:   I have no further questions of

18  this witness.

19       Do the Members of the Grand Jury have any

20  questions?

21       Anyone else?

22       Q.   Mr. Alston, prior to you having this

23  conversation with the security officer by the name of

24  Anthony Maganello, had you ever seen him in the area

25  before?

CL10

1      A.    Yes.

2      Q.    When you were living in the area during the

3   time of October of the year 2000, were you hanging

4   out in a particular place?

5      A.    Yes.

6      Q.    Were you always there in the same area?

7      A.    Yes.

8      Q.    Had you ever seen him when you hung out in

9   the area in the past?

10      A.    Yes.

11      Q.    My Alston, when you were initially

12   approached by the security officer to do this

13   contract, were you physically incapacitated in any

14   way?

15      A.    I was shot up.  I was shot three times,

16   once in my head, one in the left arm and one in my

17   right leg.

18      Q.    How much before this conversation with the

19   security guard did this happen?

20      A.    Like right about two weeks after I came out

21   of the hospital.

22      Q.    When were you shot?

23      A.    I was shot August 22nd of 2000.

24      Q.    From the time that you got out of the

25   hospital until October when you had this conversation

CL11

1    were you immobilized, were you walking?

2         A.    No, I was in a wheelchair.

3         MS. SCACCIA:  Anyone else?

4         Seeing no show of hands, this witness is

5    excused.

6         Thank you.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CL12

1                        C E R T I F I C A T I O N

2

3

4              I, CHERYL LAUREL, a Grand Jury Reporter

5      within and for the State of New York, County of the

6      Bronx, do hereby certify:

7              That the within transcript is a true and

8      accurate record of the testimony given in the case of

9      the People of the State of New York versus

10     INV. INTO DEATH OF ALBERT ACOSTA in the F PANEL & 4TH

11     on APRIL 16, 2001.

12             IN WITNESS WHEREOF, I have hereunto set my

13     hand this 17TH day of APRIL, 2001.

14

15

16

17     _____

18                    CHERYL LAUREL

19

20

21

22

23

24

25

CL1

1         INVESTIGATION INTO DEATH OF ALBERT ACOSTA

2

3         A.D.A. SCACCIA/TD-B52         FROM: 4/16/2001

4

5         DATE: APRIL 18, 2001         F PANEL & 4TH TERM

6         REPORTER:  CHERYL LAUREL

7         GJ #: 42,140                 DOCKET: IBNA

8

9

10    *    *    *    *    *    *    *    *    *    *    *

11

12

13        MS. SCACCIA:  For the record, good afternoon,

14    ladies and gentlemen, my name is Christine Scaccia,

15    I'm an Assistant District Attorney in Trial Division

16    52.

17        This is a continuation of the investigation into

18    the death of Albert Acosta

19        I will now ask the Foreperson to determine

20    whether a quorum is present.

21        THE FOREPERSON:   Let the record reflect that a

22    quorum is present.

23        MS. SCACCIA:  The People now call Walter Cobb.

24

25

CL2

1       .

2           WALTER COBB,   after having been duly sworn,

3       testified as follows:

4

5       EXAMINATION BY MS. SCACCIA:

6

7           Q.   Mr. Cobb, could you state your full name

8       and county of residence for the Members of the Grand

9       Jury.

10          A.   Walter William Cobb, county of residence is

11      the Bronx.

12          Q.   Mr. Cobb, are you employed?

13          A.   Yes, ma'am.

14          Q.   For who do you work?

15          A.   Parkchester, Bronx, New York.

16          Q.   Okay.  What type of work do you do?

17          A.   Maintenance.

18          Q.   How long have you done that, sir?

19          A.   Eleven years now.

20          Q.   I want to direct your attention to

21      February 12th of 2001, specifically to the building

22      of 1700 Metropolitan Avenue here in Bronx county.

23      Were you present at that building on that day?

24          A.   Yes, ma'am, I was.

25          Q.   Now, is that the building that you're

CL3

1      normally assigned to Mr. Cobb?

2            A.    No, ma'am, I'm not.

3            Q.    How did you become assigned to that

4      building that day?

5            A.    I'm known as a miscellaneous person.    I

6      fill in for people that call in sick or out that day.

7      I was sent to that building.

8            Q.    Now, what time did you start work that day?

9            A.    8:00 in the morning.

10           Q.    Okay.    About what time did you get over

11     towards 1700 Metropolitan?

12           A.    About 10:00 a.m. or ten minutes after

13     10:00, 10:10.

14           Q.    When you approached that building how were

15     you going to go inside of that building, were you

16     going through the front door or were you using

17     another door?

18           A.    Well, the rear door is situated on the

19     avenue itself.    I approached the rear door.

20           Q.    Now, this rear door is that a doorway to

21     the public or do the tenants have access?

22           A.    Yes, ma'am.

23           Q.    How do you get into that door?

24           A.    Well, we use what we call a com key and

25     it's electronically controlled and you push the door

CL4

1    and it opens.

2         Q.    So it's a electronic lock?

3         A.    Yes, ma'am.

4         Q.    Do the tenants have such a electronic key?

5         A.    Yes, they do.

6         Q.    So tenants can go through the door?

7         A.    Yes, if you live in the building cause each

8    com key is assigned different codes for different

9    buildings.

10        Q.    Now, as you were approaching 1700

11   Metropolitan Avenue, did something unusual take

12   place?

13        A.    As I approached the rear exit which is on

14   the avenue itself I heard what appeared to be a

15   muzzle, four shots.

16        Q.    Four gunshots?

17        A.    At least four gunshots, at least four or

18   five steps before I hit the door, approach the door.

19        Q.    Now, these gunshots did they happen one

20   right after the other or was there a pause?

21        A.    Two first and then two after.  There was a

22   slight pause between the four.

23        Q.    Okay.  Now, as you approached the doorway

24   -- is there a time when you get right in front of the

25   door?

CL5

1     A.   I just dismissed it immediately from my

2  mind, almost immediately and I approached the door.

3     Q.   Okay.  What happened when you approached

4  the door?

5     A.   I was using my com key when the door flew

6  open.  I was trying to enter the building, the door,

7  someone from inside opened the door.

8     Q.   Now this door, how does it open, do you

9  push it in, how does it open?

10     A.   You push it in.

11     Q.   As soon as the door flew open from inside

12  did you see anyone on the other side of the door?

13     A.   Yes, I did.

14     Q.   Who was on the other side of that door?

15     A.   This man which I know is named

16  Maganello was stepping out.

17     Q.   Now, this man, Maganello, where do you know

18  him from?

19     A.   I don't know him personally, but I know

20  he's a security person on the Parkchester premises

21  itself.

22     Q.   Okay.  When he opened the door, did the two

23  of you have any sort of conversation?

24     A.   I said to him re-calling the four shots

25  which was four shots, I thought I heard four shots.

CL6

1    I did not get to open the door, he opened from the

2    inside he says to me, yes, I did two.  Then he

3    pointed over my left shoulder you go that way and

4    I'll go this way.

5         Q.   Meaning for you to go that way and he'll go

6    another way.

7         A.   I still had yet to enter the building.

8         Q.   Now, when he told you, you go this way and

9    I'll go that way, did you comply with his directions

10   or did you --

11        A.   I just ignored him and I entered the

12   building.  He bypassed me and went out.  I entered

13   the building through the door.

14        Q.   What portion of the building did you go in?

15        A.   Well, in Parkchester they are termed

16   terrace floors, because certain tenants live on those

17   floors.

18        Q.   Okay.  This is below the lobby level?

19        A.   Yes.

20        Q.   In this particular building are there

21   occupied apartments there, if you know?

22        A.   No, they are different apartments, but not

23   apartments per se.  It's a garbage room, compactor

24   room, carriage room where people store things.

25        Q.   When you went into the building after you

CL7

1    spoke to Officer Maganello, was there anybody else

2    down there that you encountered?

3        A.    Yes, I encountered -- on my left first

4    there was one door which is the pick-up station where

5    the garbage is, it was closed.

6        The second door was open and there was a

7    repairman, a telephone repair man from Verizon, he

8    was working at the wires, the telephone wires.

9        Q.    Did you speak with him?

10       A.    Briefly I stopped and said hello, hey guy

11   how are you.  Then he proceeded walking.  I proceeded

12   walking towards the back of the floor where the

13   compactors are.

14       Q.    The garbage compactors?

15       A.    Yes.

16       Q.    What were doing there?

17       A.    I was picking out the trash.  I was keeping

18   myself busy.  We started from the basement and I cut

19   a few bags to check down on the floors, and he called

20   me over.

21       Q.    Who called you over?

22       A.    The Verizon man, the telephone repairman.

23       Q.    When he called you over, what if anything

24   did he ask you?

25       A.    He wanted to know if the adjacent room, the

CL8

1    room opposite to where I was, if I had keys because

2    he wanted to see another outlet box for the telephone

3    line.

4           Q.    Okay.   The door he was pointing to, was it

5    locked?

6           A.    Yes.

7           Q.    Did you have keys for that door?

8           A.    I happen to be in that building for the

9    first time that day.   I was not assigned that day,

10   because the other fellow was away sick.   So, I said

11   let me try these keys, I'm new here today, sure

12   enough one of my keys opened the door.

13          Q.    When you opened the door to this room,

14   what's in the room?

15          A.    Well, in the room was total darkness.   I

16   did not think anything.   The Verizon guy turned on

17   the light, we both went in briefly, looked inside, no

18   box, we stepped away.   I went back to my room, he

19   went back to his.

20          Q.    You closed the door again or left it open?

21          A.    It was left open.

22          Q.    Was there anything to keep the door open?

23          A.    The door was -- I opened the door, he was

24   standing next to me.   In Parkchester in the basement

25   we usually keep, we have a cobblestone that we use to

CL9

1    prop the doors open.  I pushed one over and propped

2    it on the door.  I left him, he went to his

3    respective room.  I left the room.

4        Q.   After you left the room the initial time

5    that you put the cobblestone on the door, did there

6    come a time that day when you went back into that

7    room?

8        A.   I passed it about three times within the

9    next five or eight minutes.  I did not look,

10   something told me to look in.  I saw a bunch -- it

11   looked like a bundle of rags, a little further in

12   there was a stove.  At the foot of the stove there

13   was rags.

14       I took out my flashlight as I approached it, I

15   realized it was a body.  As my light came up on the

16   stove it was an officer's hat with a badge on the

17   visor, my light was shining off of it.  Then I heard

18   a radio.  I looked down and I went around I saw the

19   blood.  Then I realized I heard gurgling sounds.  I

20   said this guy is still alive.  I ran out that's when

21   I made my call.

22       Q.   Who did you call?

23       A.   I called first the Parkchester security

24   department, I couldn't get through.  So I said the

25   hell with that, and I called 911, thinking this man

CL10

1    was still alive to get an ambulance over.  I was not

2    thinking police, I was just thinking about getting an

3    ambulance here.  I got through to them quick.

4        Q.   Did you remain at the building until the

5    police and ambulance came?

6        A.   The police asked me where I was calling

7    from.  I told them Parkchester, 1700, I told them I'm

8    a maintenance man, I work there.  He said hang on the

9    line.  I stood on the line til they showed.

10       Q.   Was the phone man also there when the

11   police came?

12       A.   At that point I ran out, I didn't see him

13   if he was still in the opposite room.  But while I

14   was making the call I saw the van coming on the other

15   side of the lane.  I said, you remember when we

16   opened the door.  He said, yes.  I said there was a

17   body laying in there.  He stopped his van in the

18   middle of the street and ran back.  He ran back to

19   the van and he made a call also.

20       Q.   Okay.  When the police did finally arrive

21   were you still present, you spoke with them?

22       A.   Yes, I was still outside waiting for them.

23   I was still on the line, on the phone with them.

24       MS. SCACCIA:  Okay.  At this time I do not have

25   any further questions of this witness.

CL11

1    Do the Members of the Grand Jury have any

2    questions?

3    Actually, Mr. Cobb, I do have a few more

4    questions for you.

5    Q.    Were you there when the police arrived, did

6    there come a time when you saw Officer Maganello

7    return over there?

8    A.    Yes, I did.

9    Q.    Was the police with him at that point?

10   A.    No, the security of Parkchester started

11   showing up after the police, but then he dashed in

12   with all the police officers, the New York City

13   Police Department and he wrangled his way through

14   them.  Then he came back out which was less than a

15   minute, that's when they grabbed him.

16   Q.    The officer you said grabbed him, were they

17   males or females officer, if you remember?

18   A.    Male, mostly males, but there was two

19   females which was questioning him.

20   MS. SCACCIA:  Now, I'm going to ask that these

21   two photographs be deem marked for identification

22   purposes as People's 1 and 2.

23   Q.    Mr. Cobb, I'm going to ask you to take a

24   look the photographs that I deem marked Grand Jury

25   Exhibit number 1 for identification.   Do you

CL12

1     recognize the area shown in this photograph?

2         A.   Yes.

3         Q.   What is that picture of?

4         A.   Well, the building.  The lower half of the

5     building itself, the entrance to the -- the back

6     entrance to the building which happens to be on the

7     main thoroughfare.

8         Q.   Is that the entrance you described to us

9     you were attempting to enter while Officer Maganello

10    was walking out?

11         A.   Yes.

12         Q.   And, is that the way the building in that

13    area looked on the date that we have been speaking

14    about?

15         A.   Yes, I'll remember that building for the

16    rest of my life.

17         Q.   I want to ask you now to take a look at

18    that picture.

19         A.   This is the door I propped open and the

20    stove is back there.

21         Q.   Okay.  Is that the way you understand that

22    the person was lying on the ground, more or less?

23         A.   Except in front of the stove he was there

24    lying across the front of it.

25         MS. SCACCIA:  Based on your testimony I'm going

CL13

1    to ask that these two exhibits be moved into evidence

2    for Grand Jury purpose as People's 1 and 2.

3        I will pass them around to the Jury in a moment.

4        Q.    In this basement, Mr. Cobb, unless you had

5    a key to get in that basement from the outside can

6    you get in there without the key access?

7        A.    I assume you can, anything is possible with

8    some difficulty if you don't have keys.

9        Q.    By the way, the room that the victim was

10   lying in, does that room have any windows?

11       A.    Yes, there is a window directly in front of

12   where the stove is.

13       Q.    Again directly in front of the stove?

14       A.    Yes.

15       Q.    In this particular picture that we have in

16   evidence, now where the outside of the building is

17   shown, is that the same window?

18       A.    Yes, the window I heard the shots, the

19   sounds coming from, before I approached the door to

20   get into the building.

21       Q.    When you gave access to the Verizon man to

22   go into the room, did you have to physically unlock

23   the door with your key?

24       A.    Yes, I tried several keys before I opened

25   it.  I told him verbally, I'm going to try these

CL14

1    keys.  I'm going to try to see if one of these will

2    work and sure enough one of them opened the door.

3        MS. SCACCIA:  Seeing no show of hands, you can

4    step out.

5        (The photographs are being passed around to the

6    Grand Jury.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CL15

1                    C E R T I F I C A T I O N

2

3

4           I, CHERYL LAUREL, a Grand Jury Reporter

5    within and for the State of New York, County of the

6    Bronx, do hereby certify:

7           That the within transcript is a true and

8    accurate record of the testimony given in the case of

9    the People of the State of New York versus

10   INVESTIGATION INTO THE DEATH OF ALBERT ACOSTA in the

11   F PANEL & 4TH TERM on APRIL 18, 2001.

12          IN WITNESS WHEREOF, I have hereunto set my

13   hand this 19TH day of APRIL, 2001.

14

15

16

17   _____

18                    CHERYL LAUREL

19

20

21

22

23

24

25

```
                                                        TP1

1          PEOPLE VS ANTHONY MANGIELLO

2

3          A.D.A. SCACCIA/ 52    FROM:4/18/01

4          DATE: APRIL 23, 2001  F / 4

5          REPORTER:  THALIA PHARMAKIDES

6          GJ #:  42, 140      DOCKET:  IBNA

7

8

9      *     *     *     *     *     *     *     *     *     *     *

10

11

12        MS. SCACCIA: For the record, good afternoon,

13    ladies and gentlemen.  My name is Christine Scaccia,

14    I am an Assistant District Attorney in Trial Division

15    52.

16        This is a continuation of the case of the

17    investigation into the death of Albert Acosta.

18        I would now ask the Grand Jury Foreperson to

19    determine whether a quorum is present.

20            .

21        FOREPERSON:  Let the record reflect that a

22    quorum is present.

23

24        MS. SCACCIA: The People now call Officer Perez.

25
```

TP2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TP3

1          POLICE OFFICER PEREZ,  after having been duly

2     sworn, testified as follows:

3

4     EXAMINATION BY MS. SCACCIA:

5

6          Q.   Officer, could you please state your name,

7     shield and command for the Members of the Grand Jury.

8          A.    Police Officer Alex Perez, I work for the

9     43 Precinct, shield 13912.

10         Q.    Now, directing your attention to February

11    12th of this year.

12         Were you working as a member of the 43 Precinct

13    on that date?

14         A.    Yes.

15         Q.    And what tour were you working?

16         A.    Eight to four.

17         Q.    Eight in the morning?

18         A.    Seven-thirty in the morning until 3:40 in

19    the afternoon.

20         Q.    And were you working alone or with a

21    partner?

22         A.    Partner.

23         Q.    And who was your partner?

24         A.    Officer Nieves.

25         Q.    And were you in  uniform?

TP4

1      A.   Uniform.

2      Q.   And what was your assignment that date?

3      A.   Patrol in a radio car.

4      Q.   And I want to direct your attention more

5   specifically to 10:16 in the morning of February 12th

6   of this year.

7      Did you have occasion to receive a radio run?

8      A.   Yes.

9      Q.   And can you please tell the Grand Jury what

10  that radio run was about, and where you went after

11  hearing it?

12     A.   I received a call in the radio stating that

13  an officer had been shot.  At that point we received

14  another radio transmission that it was at 1700

15  Metropolitan, and it was an officer.  And at that

16  point we raced over to that location.

17     Q.   Upon your arrival at 1700 Metropolitan,

18  were you the first officers on the scene or were

19  there other  --

20     A.   There was two other cars there.

21     Q.   And in addition to police personnel, were

22  there any civilians present at the scene?

23     A.   Yes, Parkchester Maintenance.

24     Q.   Upon your arrival at the scene, officer,

25  where did you go?

TP5

1       A.    We all went into the corridor where the

2  basement was at.

3       Q.    Did you go into a lobby door or the main

4  entrance, or a side door?

5       A.    A back door, down the stairs and then into

6  the area into the room where the officer was shot.

7       Q.    And now what was downstairs in that

8  basement area?

9       A.    It's empty rooms in a basement.

10       Q.    And now before you got to 1700 you had

11  information that an officer had been shot.

12       Did you know whether it was a Parkchester

13  security officer or NYPD?

14       A.    We had no clue at that point.

15       Q.    During the time that you responded there,

16  and even when you got there, was the identity of the

17  person that was shot known?

18       A.    We didn't know who it was. We still assumed

19  it was a New York City Police Officer.

20       Q.    And now did there come a point in time

21  well --  withdrawn.

22       What did you -- you walked inside of that

23  basement area.  What happened?

24       A.    We get into the basement, confirmed that

25  the gentleman was shot in the back of the head.

TP6

1    We're searching to see if he has a weapon of his own.

2    We're trying to figure out who he is, who he works

3    for.

4         At that point my partner sees that he's

5    Parkchester Police.  While they're looking at him

6    looking in the area, I go into the other rooms, start

7    doing a canvass in the area seeing if there's any

8    weapons hidden, seeing if there's a person hanging

9    around.  And at that point I stepped out and I

10    started to question people outside.

11         Q.   And while you were outside speaking with

12    people, did you get to meet a person by the name of

13    Walter Cobb?

14         A.   Yes, I had a conversation with Mr. Cobb.

15         Q.   And now sometime after your conversation

16    with Mr. Cobb, does a security officer by the name of

17    Anthony Mangiello arrive on the scene?

18         A.   A gentleman does walk up at that point.  I

19    didn't know what his name was.

20         Q.   Do you know his name now to be Anthony

21    Mangiello?

22         A.   Yes.

23         Q.   When he comes on the scene, does he come

24    out of a vehicle or on foot?

25         A.   He comes out of the crowd.

TP7

1          Q.    And can you describe to the Ladies and

2     Gentlemen of the Grand Jury what his appearance was

3     and with -- his demeanor was when he gets there?

4          A.    Very disheveled.  Very pale, sweating.  At

5     one point we were going to call an ambulance for him.

6     He looked like he was ready to faint.  And he had

7     dust all over his uniform.

8          Q.    And now the dust, was it a particular

9     color?

10         A.    It was white, dusty.

11         Q.    And is his uniform a dark color?

12         A.    It's the same color, a dark blue.

13         Q.    And now did you -- when Officer Mangiello

14    comes there, do you have a conversation with him?

15         A.    No, I didn't speak to him.  My partner

16    ended up speaking to him.

17         Q.    Up to that point in time, have you ever

18    heard the name Albert Acosta being mentioned as the

19    person what was shot?

20         A.    No one mentioned anything about that.

21         Q.    And other than the involvement that you

22    told us about here today, did you have any other

23    involvement with this?

24         A.    No.

25

TP8

1      MS. SCACCIA: I have no further questions at this

2  time.

3      Do any Members of the Grand Jury have any

4  questions?

5      Seeing no show of hands, this witness is

6  excused.  And the People will now call Police Officer

7  Nieves.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TP9

1        POLICE OFFICER NIEVES,  after having been duly

2    sworn, testified as follows:

3

4    EXAMINATION BY MS. SCACCIA:

5

6        Q.   Good afternoon, officer.

7        Could you please state your name, shield number

8    and command for the Members of the Grand Jury.

9        A.   Police Officer Nieves, shield number 5089,

10   43rd Precinct.

11       Q.   Directing your attention to February 12th

12   of this year.

13       Were you working as a member of the 43rd

14   Precinct?

15       A.   Yes, I was.

16       Q.   And what hours did you work?

17       A.   Eight to four tour.

18       Q.   And did you work with a partner?

19       A.   Partner.

20       Q.   Who was your partner?

21       A.   Officer Perez.

22       Q.   And were you in uniform or plainclothes?

23       A.   Uniform.

24       Q.   And what was your assignment that day?

25       A.   Patrol in a marked police car.

TP10

1      Q.   And now, officer, I want to direct your

2  attention approximately to 10:16 a.m. on the date of

3  February 12th of this year.

4      Did you have occasion to respond over to 1700

5  Metropolitan Avenue?

6      A.   Yes.

7      Q.   Can you tell us what brought you to that

8  location?

9      A.   We had a radio run of a police officer

10 shot, 1013.

11     Q.   And now when you responded to that

12 location, officer, were you the first officers on the

13 scene?

14     A.   No.

15     Q.   Okay, were there other officers --

16 department personnel there?

17     A.   Yes.

18     Q.   And, okay, and once you arrived there, can

19 you tell us where you went?

20     A.   We went into the basement area of 1700

21 Metropolitan Avenue.

22     Q.   What, if any, observations did you make

23 when you went into there?

24     A.   We saw a male shot laying down on the

25 floor, face down in uniform.

TP11

1      Q.    And this person who was laying down on the
2  floor, did you recognize what service he belonged,
3  was it in NYPD or was it --
4      A.    Parkchester Security.
5      Q.    And did you recognize who this man was,
6  officer?
7      A.    I knew him from the area, yes.
8      Q.    And now who was down located in the room
9  where Officer Acosta was found by you and the other
10 officers?
11     A.    Say that again?
12     Q.    What was downstairs in that room where he
13 was?
14     A.    A stove and that's it.
15     Q.    And would you please, with respect to his
16 uniform, Parkchester Police officers wear a uniform?
17     A.    Yes.
18     Q.    Was his uniform fully on him intact, or
19 were there items of his uniform in other places?
20     A.    His memobook was on top of the stove and
21 his uniform jacket was in front of him as he laid on
22 the floor.
23     Q.    And what about a uniform hat, did you see
24 one?
25     A.    On the stove.

TP12

1      Q.    And now did you remain in the room where

2    Officer Acosta was, or did you go somewhere else?

3      A.    A few minutes.  And then I went outside.

4      Q.    What happened when you go outside?

5      A.    As I was walking out I saw one of the

6    Parkchester officers, which was Anthony Mangiello,

7    coming in.  I figured they work together.  He said I

8    don't want to go in there.  And he said that's my

9    partner in there.

10      Q.    And now when you encountered Officer

11    Mangiello downstairs in that hallway area, could you

12    please describe what his demeanor was like?

13      A.    He seemed in shock, sort of shaky, and

14    pale.

15      Q.    And now up to this point, you, yourself had

16    gone and seen Officer Acosta on the floor?

17      A.    Yes.

18      Q.    Was there any broadcasting of Officer

19    Acosta's identity while you were present on the

20    scene?

21      A.    Not that I had heard of.

22      Q.    Were other Parkchester officers present at

23    the scene of the  --

24      A.    Eventually.

25      Q.    Upon their arrival, to your knowledge, was

TP13

1    it known that Officer Acosta was the person inside

2    who had been shot?

3         A.    No.

4         Q.    When you saw Officer Mangiello entering

5    into the hallway area where the room where Officer

6    Acosta was located, did you make any note -- mental

7    note or otherwise, of the condition of his uniform or

8    did you notice anything unusual about it?

9         A.    I saw dust, the white dust.

10        Q.    And when you saw him, was he coming off of

11   the street or was he coming in from somewhere in the

12   building?

13        A.    From outside the street.

14

15        MS. SCACCIA: I have no further questions of this

16   witness.

17        Do any Members of the Grand Jury have any

18   questions?

19

20        Q.    Officer Nieves, when you arrived, you said

21   that other police personnel were on the scene?

22        A.    Yes.

23        Q.    Where were the other officers?

24        A.    All running in.  We were all running in at

25   the same time.

TP14

1          Q.    And as you stayed in the area, were

2     officers in and around the room where Officer Acosta

3     was?

4          A.    Yes.

5          Q.    When you saw Officer Acosta on the floor,

6     can you please tell us what the position of his body

7     was?  Was he face up?  Face down?

8          A.    He was lying face down, his face turned to

9     the left, and his jacket underneath him.

10         Q.    He was lying on his stomach but his face

11    was turned?

12         A.    Approximately on the side of his face.

13

14         MS. SCACCIA: Okay, seeing no show of hands, this

15    witness is also excused.

16         Thank you.

TP15

```
1              C E R T I F I C A T I O N

2

3

4           I, THALIA  PHARMAKIDES, a Grand Jury

5     Reporter within and for the State of New York,

6     County of the Bronx, do hereby certify:

7           That the within transcript is a true

8     and accurate record of the testimony given in the

9     case of the People of the State of New York

10    versus ANTHONY MANGIELLO  in the F / 4  on APRIL 23,

11    2001.

12          IN WITNESS WHEREOF, I have hereunto set my

13    hand this 26TH day of APRIL, 2001.

14

15

16

17              THALIA PHARMAKIDES

18              THALIA PHARMAKIDES

19

20

21

22

23

24

25
```

```
                                                        CL1
1        PEOPLE VS INVESTIGATION CASE

2

3        A.D.A. SCACCIA/TD50          FROM: 4/23/2001

4

5        DATE: APRIL 26, 2001       F PANEL & 4TH TERM

6        REPORTER:  CHERYL LAUREL

7        GJ #: 42,140               DOCKET: 2001BX024949

8

9

10   *    *    *    *    *    *    *    *    *    *    *

11

12

13       MS. SCACCIA:  For the record, good afternoon,

14   ladies and gentlemen, my name is Christine Scaccia,

15   I'm an Assistant District Attorney with Trial

16   Division 50

17       This is the case of the People of the State of

18   New York against Anthony Manganiello, also referred

19   to as an investigation into the death of

20   Albert Acosta

21       I would ask the Foreperson to determine whether

22   a quorum is present

23       THE FOREPERSON:   Let the record reflect that a

24   quorum is present.

25       MS. SCACCIA:  The People now call
```

CL2

1      Christopher Tartone.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CL3

1       CHRISTOPHER TARTONE,  after having been duly

2   sworn, testified as follows:

3

4   EXAMINATION BY MS. SCACCIA:

5

6       Q.   Mr. Tartone, can you please state your full

7   name and the county you live in.

8       A.   Christopher Tartone, the Bronx.

9       Q.   Okay.  Mr. Tartone, are you employed?

10      A.   Yes.

11      Q.   Where do you work?

12      A.   In the pizza shop.

13      Q.   Where is that pizza shop located?

14      A.   1665 Metropolitan Avenue.

15      Q.   Okay.  How long have you worked there, sir?

16      A.   About twelve years.

17      Q.   Okay.  Now, where is your pizza shop

18  located with respect to 1700 Metropolitan Avenue?

19      A.   Two hundred yards, across the street from

20  there, the opposite side.

21      Q.   Officer, during the course of the time you

22  worked in the pizza shop have you gotten to know any

23  of members of Parkchester either security or

24  maintenance?

25      A.   Yes.

CL4

1    Q.    What kind of contents did you get to know

2    them?

3    A.    Just them eating, coming to the

4    establishment.

5    Q.    During the course of your employment, did

6    you come to know a security officer by the name of

7    Anthony Manganiello?

8    A.    Yes.

9    Q.    Okay.  How did you meet him?

10    A.    Just coming in and eating.

11    Q.    How long ago would you say you met

12    Mr. Manganiello?

13    A.    Four years.

14    Q.    How often would you see Mr. Manganiello?

15    A.    Like once a month.

16    Q.    Okay.  I want to direct your attention now

17    to late January, early February of this year, did you

18    have an occasion to see Mr. Manganiello in your pizza

19    shop?

20    A.    Yes.

21    Q.    Okay.  And could you tell the Members of

22    the Grand Jury during what time span on those

23    occasions you saw him at the end of January, the

24    beginning of February, what if anything took place

25    that was unusual?

CL5

1  A. He sat down with his coworker, I overheard

2 him asking if he knew anybody selling a gun.

3  Q. When you say he, who are you talking about

4 Anthony Manganiello?

5  A. Yes.

6  Q. And the person that he was speaking to, was

7 this person a male or female?

8  A. A male.

9  Q. Okay.  Was he white, black, Hispanic, could

10 you tell?

11  A. Brown complexion, that's all I remember.

12  Q. You said he was with his coworker, was he

13 also a security guard or another sort of worker?

14  A. No, he was a porter.  He was in a green

15 uniform, but he wasn't in a security uniform, no.

16  Q. Did you see what the other man responded?

17  A. No, I really kept making my pizza.  I was

18 making a pie, I overheard, but I really can't tell

19 you what was said after that.

20  Q. Mr. Tartone, if you know in your encounters

21 with the Parkchester security, do Parkchester

22 security officers carry weapons?

23  A. No.

24  MS. SCACCIA:  I have no further questions.

25  Do the Members of the Grand Jury have any

CL6

1    questions?

2         Seeing no show hands, I will excuse the witness.

3         Thank you.

CL7

1          MS. SCACCIA:  For the record, good afternoon

2     ladies and gentlemen, my name is Christine Scaccia,

3     I'm an Assistant District Attorney in Trial Division

4     50.

5          This is a continuation of the case of the People

6     of the State of New York versus Anthony Manganiello,

7     also referred to as an investigation into the death

8     of Albert Acosta.

9          I would now ask the Foreperson to determine

10    whether a quorum is present.

11         THE FOREPERSON:    Let the record reflect that a

12    quorum is present.

13         MS. SCACCIA:  The People call Police Officer

14    Casiano.

15

16

17

18

19

20

21

22

23

24

25

CL8

1      .

2           POLICE OFFICER CASIANO,  after having been duly

3      sworn, testified as follows:

4

5      EXAMINATION BY MS. SCACCIA:

6

7           Q.   Officer, can you please state your name,

8      rank, shield number and command for the Members of

9      the Grand Jury.

10          A.   Police Officer Jose Casiano, shield number

11     14240, 43rd Precinct.

12          Q.   Officer, how long have you worked for the

13     43rd Precinct?

14          A.   I have worked there ten and a half years.

15          Q.   I want to direct your attention to

16     February 12th of this year.  Were you working as a

17     member of the 43rd Precinct on that date?

18          A.   Yes, I was.

19          Q.   What hours did you work?

20          A.   I did a 705 by 1540 hours.

21          Q.   Which is basically 8:00 to 4:00?

22          A.   Yes.

23          Q.   Did you work alone or with a partner?

24          A.   I was working with a partner.

25          Q.   Who was your partner?

CL9

1      A.    Police Officer Kalmanowicz.

2      Q.    Were you guys in uniform or plainclothes?

3      A.    Uniform.

4      Q.    What was your assignment that day?

5      A.    We were doing a patrol that day.

6      Q.    In a radio car or on foot?

7      A.    Radio car.

8      Q.    I want to direct your attention more

9  specifically to approximately 10:20 a.m., on that

10 day.

11      Did you have an occasion to respond to

12 1700 Metropolitan Avenue here in Bronx county.

13      A.    Yes, we did.

14      Q.    And, once you were there were you directed

15 into a particular portion of the building?

16      A.    Yes.

17      Q.    Where did you go?

18      A.    We went into the basement of that building.

19      Q.    What if anything did you see upon going

20 into the basement?

21      A.    I observed an individual on the ground.

22      Q.    Okay.  The individual's condition appeared

23 to be what?

24      A.    He appeared to be shot.

25      Q.    Was the individual on the ground able to

CL10

1    respond in anyway?

2         A.   No, ma'am.

3         Q.   Did there come a time when you learned the

4    identity of this individual who had apparently been

5    shot?

6         A.   Yes, ma'am.

7         Q.   Do you recall what his name was?

8         A.   Yes, Albert Acosta.

9         Q.   Now, Officer, did there come a time when

10   you took into possession, into your possession any of

11   Mr. Acosta's possession?

12        A.   Yes.

13        Q.   What did you take into custody from him?

14        A.   Well, I have to refresh my memory from my

15   memo book.

16        Q.   Sure.

17        A.   Yes, personal nature.

18        Q.   Did it consist of his clothing and

19   identification?

20        A.   Correct, clothing, jewelry and

21   identification card.

22        Q.   Now, was Mr. Acosta removed from the

23   basement of 1700 Metropolitan Avenue at any point?

24        A.   Yes, he was.

25        Q.   Do you know where he was taken?

CL11

1          A.    He was taken to Jacobi Hospital.

2          Q.    Did you go with him, officer, or did you

3    remain at the scene?

4          A.    I remained at the scene.

5          Q.    The property that you eventually took

6    custody from Mr. Acosta's person, what if anything

7    did you do with that property?

8          A.    I vouchered it.

9          MS. SCACCIA:  I have no further questions of

10   this witness.

11         Do the Members of the Grand Jury have any

12   questions?

13         Seeing no show of hands, this witness is

14   excused.

15         Thank you.

16

17

18

19

20

21

22

23

24

25

CL12

1      MS. SCACCIA:  The People are now calling

2  Detective Luis Agostini.

3          .

4      DETECTIVE LUIS AGOSTINI,  after having been duly

5  sworn, testified as follows:

6

7  EXAMINATION BY MS. SCACCIA:

8

9      Q.   Detective, can you please state your name,

10  rank, shield number and command for the Members of

11  the Grand Jury.

12      A.   Detective Luis Agostini, shield number

13  1230, 43rd Detective Squad.

14      Q.   Detective, how long have you been with the

15  43rd Detective Squad?

16      A.   For approximately four years.

17      Q.   Detective, I want to direct your attention

18  to February 12th of this year, were working as a

19  member of the 43rd Precinct Detective Squad?

20      A.   Yes.

21      Q.   And, did you have an occasion on that day

22  to become assigned to an investigation into the death

23  of Albert Acosta?

24      A.   Yes.

25      Q.   Now, I direct your attention to

CL13

1    approximately 10:30 a.m., on that day.  Did you have

2    an occasion to respond over to 1700 Metropolitan

3    Avenue here in Bronx county.

4         A.   Yes, I did.

5         Q.   And, when you got there was Mr. Acosta

6    present at the scene?

7         A.   No, he wasn't.

8         Q.   Who was present at the scene?

9         A.   Mainly the police.

10        Q.   Did there come a time when you saw

11   Mr. Acosta someplace?

12        A.   Yes.

13        Q.   Where did you see him?

14        A.   At Jacobi Hospital.

15        Q.   When you got to Jacobi Hospital, what

16   condition was he in at that point?

17        A.   At that time the doctors were working on

18   him.

19        Q.   Were you able to speak to Mr. Acosta in

20   anyway?

21        A.   No.

22        Q.   Detective, as a result of you becoming

23   assigned the investigation into this case, did there

24   come a time when you became aware of or in the

25   custody of any items of ballistic nature that was

CL14

1    recovered?

2         A.    Yes, I did.

3         Q.    Can you tell the Members of the Grand Jury

4    what if any items of a Ballistic nature was recovered

5    pursuant to that investigation?

6         A.    There was two, .22 caliber fragments that

7    was recovered from his head and two, .22 caliber

8    rounds on 1700 Metropolitan Avenue basement wall.

9         Q.    Okay.  And, other than the fragments and

10   bullets was there anything else of a Ballistic nature

11   recovered?

12        A.    Yes, there were four, .22 caliber shells

13   recovered.

14        Q.    Now, when you saw Mr. Acosta at Jacobi

15   Hospital you said doctors were still working on him,

16   he was alive?

17        A.    Yes.

18        Q.    Did there come a time when you were

19   notified of any change in his condition?

20        A.    Yes.

21        Q.    Was that in relation to the morning of

22   February 12th?

23        A.    That was approximately late at night, that

24   same day.

25        Q.    Okay.  And, what was the change in

CL15

1   Mr. Acosta's condition?

2          A.   That he had died.

3          Q.   After you learned of Mr. Acosta's death,

4   did there come a time when you again saw Mr. Acosta?

5          A.   Yes.

6          Q.   What was his condition at that time?

7          A.   He was dead.

8          Q.   Now, Detective Agostini, again as part of

9   the investigation and your duties in this case, did

10  there come a time, when you came in possession of

11  Mr. Acosta's clothing items from the medical

12  examiner's office?

13         A.   Yes, I did.

14         Q.   Okay.  And, was there a medical examiner's

15  case number assigned to Mr. Acosta's body and his

16  belongings?

17         A.   Yes.

18         Q.   Could you tell the Members of the Grand

19  Jury what the medical examiner's case number was?

20         A.   It was 595 of the year 2001.

21         Q.   Now, Detective, pursuant to this

22  investigation into this case, did there come a time,

23  when someone was placed into custody?

24         A.   Yes, there was.

25         Q.   Who was placed into custody?

CL16

1         A.    Anthony Manganiello.

2         Q.    Okay.   Now, Detective, working within the

3    confines of the 43rd Precinct is Parkchester within

4    the 43rd Precinct?

5         A.    Yes.

6         Q.    Have you had some dealings with the

7    security officers from Parkchester prior to becoming

8    involved in this case?

9         A.    Yes.

10        Q.    Could you tell the ladies and gentlemen of

11   the Grand Jury whether or not Parkchester Police

12   Officers or security officers authorized to carry

13   weapons while they are on duty?

14        A.    They are not.

15        Q.    Detective, you indicated that two bullet

16   fragments were removed from his head?

17        A.    Yes.

18        Q.    Pursuant to this investigation, Detective,

19   the two bullet wounds that Mr. Acosta suffered was on

20   his body?

21        A.    Yes.

22        Q.    Where were they?

23        A.    The two wounds were in back of the head.

24        MS. SCACCIA:   I have no further questions of

25   this witness.

CL17

1        Do the Members of the Grand Jury have any

2    questions?

3        Seeing no show of hands, this witness is

4    excused.

5        Thank you.

CL18

1          MS. SCACCIA:  I'm now holding in my hands a

2    one-page document which I'm going to have deem marked

3    for identification as People's number 3 for the Grand

4    Jury purposes.

5          Reading from the certification on the bottom.

6          I certify that I personally examined the body on

7    February 14, 2001, at the Office of the Chief Medical

8    Examiner's.

9          It has the signature of Yvonne Milewski.

10         I now ask what was previously deem marked into

11   evidence for Grand Jury purposes.

12         Reading in pertinent part:

13         Name of decease:  Albert Acosta.

14         Place of death, Bronx.

15         Date and hour of death:  February 12, 2001.

16         Death was caused by gunshot wound to the head

17   with perforation of skull and brain.

18         Injury date:  February 12, 2001.

19         Medical Examiner's case number assigned:

20   BX595 of the year 2001.

21         On the basis of examination and/or investigation

22   in my opinion, death occurred due to the causes and

23   manner as stated.

24         Certifier signature Dr. Yvonne Milewski, on

25   February 14, 2001.

CL19

1        Again Dr. Yvonne Milewski is the Deputy Chief

2   Medical Examiner in the Office of the Chief Medical

3   Examiner, City of New York, county of the Bronx.

4        That concludes the presentation of evidence to

5   the Grand Jury.

6        I would ask the Foreperson to instruct the jury

7   as to its voting requirements.

8        THE FOREPERSON:   Let the record reflect that a

9   quorum is present.

10        The panel is reminded that only those Grand

11   Jurors who have heard all of the evidence presented

12   in this case may vote, and an affirmative action or

13   decision requires the concurrence of at least twelve

14   Grand Jurors thereto.

15        May I have a show of hands of all of the Grand

16   Jurors who heard all of the evidence.

17        Let the record reflect that at least twelve of

18   the Grand Jurors present heard all of the evidence

19   given in the case.

20        MS. SCACCIA:   Ladies and gentlemen, I'm going to

21   remind you of the instruction I gave to you at the

22   beginning of the case regarding publicity.

23        I'm going to begin my legal instructions to you

24   by reading to you the circumstantial evidence charge

25   which applies to all of the charges I'm going to be

CL20

1    submitting to you today.

2        Evidence may be direct or circumstantial and I

3    will now explain the difference between these two

4    types of evidence.

5        Direct evidence is where a witness testifies to

6    what he saw, heard, smelled, tasted, or touched, in

7    other words, what he knows of his own knowledge.

8    Circumstantial evidence flows from direct evidence.

9    It is proof of a chain of circumstances from which

10   you may infer or conclude that a fact does exist.

11       When determining circumstantial evidence, you

12   may only draw an inference or conclusion from a fact

13   or facts proved by direct evidence.  Circumstantial

14   evidence is of no less value than direct evidence,

15   for in either case you must be convinced that there

16   is reasonable cause to believe the defendant

17   committed the crimes.

18       Let me give you one example.  Let us assume that

19   you entered this building earlier today, and it was a

20   clear day.  Let us also assume that this room has no

21   windows.  Now somebody walks into the room wearing a

22   wet raincoat and carrying a dripping umbrella.  Based

23   on our assumption, you cannot look out of the room to

24   see whether or not it is raining, and if you are

25   asked if it is raining, you cannot say that you know

CL21

1    it directly of your own observation.  But certainly

2    upon the combination of facts as given, even though

3    when you entered the building it was not raining

4    outside, it would be reasonable and logical for you

5    to conclude that it is raining now.

6        If inferences can be drawn from a fact directly

7    proved to you, one consistent with innocence and one

8    consistent with guilt, you must give the defendant

9    the benefit of the doubt.  An indictment may rest

10    upon circumstantial evidence alone, but for this

11    there must be compliance with certain well

12    established facts:

13        First, the collateral fact, such as the umbrella

14    dripping water and a man with a wet raincoat, must be

15    proved to your satisfaction by direct evidence;.

16        Second, the direct evidence proven must be

17    sufficient to give rise to an inference, such as it

18    is now raining outside, which is logical, clear, and

19    strong;.

20        Third, you must determine whether the total

21    effect of all the circumstances directly proved

22    persuades that you there is reasonable cause to

23    believe that all the elements of each crime submitted

24    actually exists.

25        I'm going to ask you to consider one count of

CL22

murder in the second degree under Penal Law section
125.25, sub 1, intentional murder.

A person is guilty of murder in the second
degree when:

1.  With intent to cause the death of another
person, he causes the death of such person or of a
third person.

A person acts intentionally with respect to a
result or to conduct described by a statute defining
an offense when his conscious objective is to cause
such result or to engage in such conduct.

I'm also going to ask you to consider one count
of murder in the second degree under depraved
indifference to human life, reading from Penal Law
section 125.25, subdivision 2.

A person is guilty of murder in the second
degree when:

2.  Under circumstances evincing a depraved
indifference to human life, he recklessly engages in
conduct which creates a grave risk of death to
another person, and thereby causes the death of
another person.

Recklessly, A person acts recklessly with
respect to a result or to a circumstance described by
a statute defining an offense when he is aware of an

CL23

1    consciously disregards a substantial and

2    unjustifiable risk that such result will occur or

3    that such circumstance exists. The risk must be of

4    such nature and degree that disregard thereof

5    constitutes a gross deviation from the standard of

6    conduct that a reasonable person would observe in the

7    situation.

8        I'm going to now ask you to consider one count

9    of manslaughter in the first degree under subdivision

10   1, manslaughter in the first degree.

11       A person is guilty of manslaughter in the first

12   degree according to Penal Law section 125.20,

13   subdivision 1, when:

14       1.  With intent to cause serious physical injury

15   to another person, he causes the death of such person

16   or of a third person.

17       I must define for you serious physical injury.

18       First of all physical injury means impairment of

19   physical condition or substantial pain.

20       Serious physical injury means physical injury

21   which creates a substantial risk of death, or which

22   causes death or serious and protracted disfigurement,

23   protracted impairment of health or protracted loss or

24   impairment of the function of any bodily organ.

25       Lastly, I'm asking you to consider one count of

CL24

1    criminal possession of a weapon in the second degree

2    under Penal Law section 265.03, subdivision 2.

3        A person is guilty of criminal possession of a

4    weapon in the second degree when, with intent to use

5    the same unlawfully against another:

6        2.  He possesses a loaded firearm.

7        Loaded firearm is defined in Penal Law section

8    265.00.

9        Loaded firearm means any firearm loaded with

10   ammunition or any firearm which is possessed by one

11   who, at the same time, possesses a quantity of

12   ammunition which may be used to discharge such

13   firearm.

14       Firearm of course means any pistol or revolver.

15       Does anyone have any questions on the charges,

16   that I have asked you to consider?

17       Let the record reflect that the Court

18   Stenographer and I are stepping outside the Grand

19   Jury Chambers in order for the jury to conduct its

20   deliberations.

21       Thank you.

22

23

24

25

CL25

1                    C E R T I F I C A T I O N

2

3

4           I, CHERYL LAUREL, a Grand Jury Reporter

5    within and for the State of New York, County of the

6    Bronx, do hereby certify:

7           That the within transcript is a true and

8    accurate record of the testimony given in the case of

9    the People of the State of New York versus

10   INVESTIGATION CASE in the F PANEL & 4TH TERM on

11   APRIL 26, 2001.

12          IN WITNESS WHEREOF, I have hereunto set my

13   hand this 27TH day of APRIL, 2001.

14

15

16

17           _____

18                    CHERYL LAUREL

19

20

21

22

23

24

25