# EXHIBIT 30

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ANTHONY MANGANIELLO,
                Plaintiff,

       -against-                    Index No.
                                    07 Civ. 3644(HB)

THE CITY OF NEW YORK, DET. LUIS AGOSTINI,
individually and as a New York City Police
Detective, SHAWN ABATE, individually and as a
New York City Police Detective, DEREK PARKER,
individually and as a New York City Police
Detective, LT. HENRY SCOTT, individually and as a
New York City Police Lieutenant, P.O. ALEX PEREZ,
individually and as a New York City Police
Officer, P.O. MIRIAN NIEVES, individually and as
a New York City Police Officer, MICHAEL PHIPPS,
individually and as a the Commanding Officer of
the 43rd Precinct, JOHN McGOVERN, individually
and as a New York City Police Detective Sergeant,
ROBERT MARTINEZ, individually and as a New York
City Police Detective, GERYL McCARTHY,
individually and as a New York City Police
Deputy Inspector,
                Defendants.
------------------------------x
                          December 19, 2007
                          10:17 a.m.


     DEPOSITION of DETECTIVE RICHARD MARTINEZ
```

DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10601
914.684.9009  Fax 914.684.6561  info@dalcoreporting.com  800.DAL.8779 

**Page 10**

Q. And what other — for how long as of February 2001 had you been a detective, third grade?

A. 19 -- let me see, I got promoted in January 1990 so that would be -- that's when I was promoted, and I was assigned to the precinct in '93, so that would be what, four -- I'm mean --

Q. Approximately, 12 to ten years?

A. Yeah. Yeah.

Q. What are the responsibilities of a third grade detective?

A. Just that you're assigned cases, interviews, investigate cases, make arrests if arrests warrant it. I guess that's it. You know, in --

Q. I believe you said a couple of seconds ago you make arrests if arrests warrant it. What do you mean by that?

A. Well, if you have probable cause on an arrest. If, you know, like say a dispute and battered wife, you got a complainant and they say, you know, I want him arrested, you know. There's an injury and through the investigation,

**Page 11**

you got a complainant, and you make your arrest if you have probable cause.

Q. And what's your understanding of the term, probable cause?

A. That you have, so to speak, you have probable cause. I mean, if you have a complainant on a case that is saying so-and-so did it, and they're still in -- like say, for instance, a dispute, in a marital dispute in a house and both parties are both there and, you know, the wife is battered up and he did it. And he's screaming and yelling and she wants to press charges. Plus, it's domestic violence laws, you have to make an arrest.

Q. How about in situations where you don't have a complainant saying that person did it; what is your understanding of probable cause in that circumstance?

A. Well, you have to investigate the case and make sure you that have enough evidence beyond your own -- beyond your reasonable doubt that you have, you know, enough to make an arrest. Sometimes you don't, you know, so, you know, sometimes it's -- you find out that a

**Page 12**

complainant is, you know, it's bogus, you know, he can do that too.

Q. Now, the standard you just -- or this definition you just discussed, is that something you were taught, something you learned on the job; how did you come up with that definition?

MS. FROMMER: Object to the form. You can answer.

THE WITNESS: Okay.

A. Well, I'm sure -- it's been a long time. I'm sure in the academy, they teach you the actual, legal term of probable cause, but in the course of your employment and work, you learn to interpret in different ways. I mean, the bottom line is you want to make sure that you have the right person. And that you have a valid case on a person. I mean, that's my own personal, the way I do it, in other words. But I don't remember -- if you're asking me what the actual definition is, I don't even remember.

Q. I'm just asking you your understanding.

A. My understanding is like beyond a

**Page 13**

doubt. If I have concrete proof around it, and then to me, I feel I have probable cause.

Q. Okay. And in the absence of concrete proof, it would be fair to say you do not have probable cause?

A. Correct.

MS. FROMMER: Objection.

THE WITNESS: Oh, I'm sorry.

MS. FROMMER: You can answer.

THE WITNESS: Yes.

Q. Okay. And was that a standard at the 43rd Precinct in February of 2001?

MS. FROMMER: Objection. You can answer if you know.

A. That's my standard.

Q. Okay.

A. I can't speak for anybody else.

Q. Do you know what other — do you know if other detectives in the 43rd Precinct followed a different standard than your standard?

MS. FROMMER: Objection.

A. I don't know.

Q. In February of 2001 at the 43rd Precinct, was there a procedure for supervision

DETECTIVE RICHARD MARTINEZ

### 14

1  of the detectives working cases?
2     A. Yes.
3     Q. What was that procedure?
4     A. Just that you had a sergeant, squad
5  sergeant, and he would basically make sure the
6  cases were done on a timely fashion. If
7  something was a bad thing like, say, a push and
8  robbery, elderly, or something like, you know,
9  something where it needs more attention, he would
10 say, well, if you need extra, additional help to
11 interview, canvas, what have you. And then he
12 would also want to get updates; what's happening
13 with the case. He would discuss it then, of
14 course, with the C.O., which would be either the
15 lieutenant or the captain. And it's like
16 anything else, when they go to their borough
17 meetings, they discuss cases, so it's the chain,
18 you know. In other words, the information goes
19 up the ladder, basically.
20    Q. Now, you just mentioned borough
21 meetings, what is a borough meeting?
22    A. Never went to one, but I guess it's
23 like Comstat, the old -- you know, where all the
24 big bosses go.

### 15

1     Q. So let me see if I can just clarify
2  this.
3     A. Yeah.
4     Q. Is that something that the
5  detectives would normally go to, or is that
6  something that only the higher-ups would go to?
7     A. The supervisors, higher-ups go to.
8     Q. Okay.
9        MS. FROMMER: Just let him finish.
10       THE WITNESS: Oh, I'm sorry. I'm
11 sorry.
12       MS. FROMMER: The court reporter can
13 only take down one person speaking at a
14 time.
15       THE WITNESS: Sorry about that.
16    Q. Now, was there any procedure at the
17 43rd Precinct in February 2001 for an arrest to
18 be authorized?
19       MS. FROMMER: Objection. You can
20 answer.
21    A. You would have to clarify what type
22 of an arrest.
23    Q. Okay. An arrest for a major case
24 based upon circumstantial evidence only.

### 16

1        MS. FROMMER: Objection.
2     A. Again, it would depend on what you
3  talk -- if it's a robbery, no. If it's a
4  stabbing, no. You know, an assault one, no.
5     Q. How about a homicide?
6     A. Homicide, yes.
7     Q. Okay. And what was the procedure
8  for homicides?
9     A. Whether they were circumstantial or
10 not or you have the, you know, so-called, classic
11 smoking gun; the guy's still holding the gun or
12 knife or whatever it be. You still had to confer
13 with a D.A. regardless of what any supervisor,
14 inspector, boss, anybody says. You had to --
15 that was protocol in the Bronx.
16    Q. Okay. And was the D.A.'s
17 permission, so to speak, required to make an
18 arrest on a homicide in the Bronx in February
19 2001?
20       MS. FROMMER: Objection. You can
21 answer.
22    A. I would believe so in this case,
23 because that's something I could say is written
24 in stone, pretty much.

### 17

1     Q. Okay. Prior to February 12th, 2001,
2  did you ever know Michael Booth?
3     A. No.
4     Q. Okay. Did you ever know of Michael
5  Booth at all in terms of any criminal
6  investigations?
7        MS. FROMMER: Objection. You can
8  answer.
9     A. No.
10    Q. Prior to February 12th, 2001, were
11 you ever provided with any information concerning
12 Michael Booth or criminal activity in which he
13 may have been involved?
14       MS. FROMMER: Objection.
15    A. No.
16    Q. Okay. Prior to February 12th, 2001,
17 from working at the 43rd Precinct or otherwise,
18 did you know Chris Tartone?
19    A. No.
20    Q. Were you familiar with a pizzeria
21 located close to the Parkchester Condominiums?
22       MS. FROMMER: Objection.
23    A. Well, that you'd have to -- if
24 you're saying prior to the incident or --

5 (Pages 14 to 17)

DETECTIVE RICHARD MARTINEZ

## 22

1 that Lieutenant Scott and/or McGovern were in a
2 supervisory position. What did you mean by that?
3   A.   Well, Sergeant McGovern was the
4 supervisor, immediate supervising sergeant, and
5 Lieutenant Scott was the C.O. of the command. He
6 was the boss of the precinct -- of the squad.
7   Q.   As far as you understood, what were
8 Sergeant McGovern's responsibilities in terms of
9 investigating homicides in February of 2001?
10      MS. FROMMER: Objection. You can
11   answer if you know.
12   A.   Yeah, that's -- I would think just
13 what a supervisory person is to do. To make sure
14 that, you know, the supervisor -- I mean, that
15 would be properly, you know, you'd have to ask
16 him.
17   Q.   Okay.
18   A.   I mean, I don't want to --
19   Q.   What's your understanding of what a
20 supervisor did at that time period in the 43rd
21 Precinct?
22   A.   Well, my experience is a supervisor
23 may delegate work to be done or if we're
24 shorthanded in a command, he may call the borough

## 23

1 and say I need people from another command to
2 help because we got to canvas or whatever. And
3 basically, whoever has the -- assigned the
4 homicide, usually reports back to him or make
5 sure -- they keep close communication meaning,
6 you know, with information that comes in and
7 stuff.
8   Q.   Okay. Would it be fair to say that
9 the supervisor, being Sergeant McGovern, would be
10 briefed or informed of the progress of any
11 homicide investigation --
12      MS. FROMMER: Objection.
13   Q.   -- in 2001?
14   A.   I would say. If he's working and is
15 involved in a case, you know, that -- if he's
16 working that time and gone out with it, yes.
17 Unless there's two sergeants working.
18   Q.   Right.
19   A.   Then it might be another sergeant
20 that goes.
21   Q.   Okay. Let me ask you: What was
22 your understanding of Lieutenant Scott's
23 responsibilities in the 43rd Precinct on February
24 of 2001?

## 24

1   A.   Just that he's overall in charge of
2 the command, the 43 Detective Bureau. And what
3 he -- you know, he's the boss -- he's big boss,
4 in other words.
5   Q.   Was Lieutenant Scott also briefed on
6 a regular basis concerning the investigations of
7 homicides in February of 2001 --
8      MS. FROMMER: Objection.
9   Q.   -- to the best of your knowledge?
10   A.   I could say -- I can answer for me,
11 for my homicides, yes. When he was working, I
12 always briefed him. I can't say what other
13 people do.
14   Q.   Now, on February 12th, 2001, how did
15 you actually -- well, strike that.
16      On February 12th, 2001, were you
17 working with a partner?
18   A.   No, we really don't have like
19 assigned partners like patrol.
20   Q.   Okay.
21   A.   Whoever's working that day -- you
22 might always go out one or two different people,
23 but it could shift around.
24   Q.   So on February 12th, 2001, how did

## 25

1 you become involved into the homicide of Albert
2 Acosta?
3   A.   Just that we had to go out. There
4 was a homicide in Parkchester, and we had to go
5 out and investigate.
6   Q.   Well, how were you -- my question
7 is: How were you notified? Was it radio
8 transmission; did someone say something to you --
9      MS. FROMMER: Objection.
10   Q.   -- to the best of your recollection?
11   A.   I don't recall with this particular
12 -- no, I don't.
13   Q.   Okay. What was the first thing you
14 did after being informed of the homicide
15 involving Albert Acosta?
16      MS. FROMMER: Objection. You can
17   answer.
18   A.   Just that we, you know, you grab a
19 pen, paper, and radio and, you know, you jump in
20 a car with somebody and you go.
21   Q.   Okay. Do you recall who you
22 reported to the -- did you -- let me strike that.
23      Sir, did you report to the scene of
24 where Albert Acosta's homicide occurred?

7 (Pages 22 to 25)

34

1  there a procedure in place at the 43rd? In other
2  words, was there a place where all the open case
3  files go --
4      MS. FROMMER: Objection.
5      Q.  -- in February 2001?
6      A.  They get sorted into where they --
7  if it's homicide, there's a file cabinets that
8  have -- they're all dated and stuff, and that's
9  where the folders go.
10     Q.  Okay. And what was the purpose of
11 keeping the files in that file cabinet?
12     MS. FROMMER: Objection.
13     A.  I guess so you could find it if you
14 need to pull it out if a supervisor needs -- if
15 you get -- if a supervisor needs -- get a phone
16 call from a borough and they -- somebody asks a
17 question, or they're talking about it and the
18 assigned detective isn't working, pull out the
19 folder, I want to, you know, just go over
20 something and check something out, and then they
21 know where it is.
22     Q.  And was it -- in February 2001, was
23 it the standard operating practice to put all the
24 handwritten notes into the case folder and then

35

1  put the case folder into that file cabinet you
2  told me about?
3      MS. FROMMER: Objection.
4      A.  There was no -- nothing -- no rules
5  of -- written rules. If that's me, again, I do
6  that. I put everything all in one folder.
7      Q.  Did the other members of your team
8  follow that same procedure --
9      MS. FROMMER: Objection.
10     Q.  -- in February 2001.
11     A.  I don't know.
12     Q.  Now, I'm not asking you so much
13 about if there was a written rule somewhere
14 saying this is how it had to be done, but was
15 there a common practice to safeguard the notes
16 from an investigation especially on a homicide
17 case?
18     MS. FROMMER: Objection.
19     A.  Well, again, it's -- I know what I
20 do.
21     Q.  Right.
22     A.  I can't speak for anybody else.
23     Q.  Okay. For how long after February
24 12th, 2001, did you continue to work at the 43rd

36

1  Precinct?
2      A.  Till October, I think, 2001.
3      Q.  Okay.
4      A.  Early October, I think, it was.
5      Q.  Now, was one of the purposes of
6  putting the case file and all the documents and
7  notes in that folder or the file cabinet you told
8  me about to preserve evidence for later use?
9      MS. FROMMER: Objection.
10     A.  Well, you keep everything in one,
11 big manila folder. It's like an attorney's
12 folder, you know, so everything is there.
13     Q.  Okay. And was it categorized -- was
14 there a method of filing whereby a file could be
15 found when it needed to be?
16     MS. FROMMER: Objection.
17     A.  Yes.
18     Q.  And what was that system or method
19 in 2001, February 2001?
20     A.  Well, that's -- and since I've been
21 there, it's always been done by years with
22 homicides. It just has years and dates and it's
23 in -- categorized in that order.
24     Q.  Okay. And for how long was that the

37

1  practice --
2      MS. FROMMER: Objection.
3      Q.  -- while you were at the precinct?
4      A.  When I got there and when I left.
5      Q.  When did you get there?
6      A.  In '93. I think summer, June '93.
7      Q.  Would it be unusual for a homicide
8  folder to be placed on a locker -- on top of a
9  locker in a locker room without the suspect's
10 name or the victim's name on it?
11     MS. FROMMER: Objection.
12     A.  Yeah, it would. It wouldn't happen.
13 I mean, I'd never seen something like that
14 happen.
15     Q.  Okay. Now, aside from when -- let
16 me take you back to February 12th, 2001. When
17 you're interviewing the witnesses, did you take
18 any -- did you make any records other than what
19 you took in your spiral notebook and the DD-5s?
20     A.  Meaning, did I write any records
21 or --
22     Q.  In other words, did you create any
23 other records or documents other than, for
24 example, what's in your spiral notebook or a

**42**

1    Q. What happened to the handwritten
2  notes concerning what Mr. Cobb said to you?
3       MS. FROMMER: Objection. You can
4  answer.
5    A. It's -- it goes from the pad and
6  when, like I said, when I'm done doing my DD-5s,
7  my typing, I give the 5s to him and the pad.
8    Q. To who?
9    A. Louie.
10   Q. Luis Agostini?
11   A. Detective Agostini, I'm sorry.
12   Q. Do you know what happened to those
13 notes you took from Mr. Cobb after they were
14 given to Luis Agostini?
15   A. No.
16   Q. Did anything about Mr. Cobb strike
17 you as strange when you were interviewing him?
18      MS. FROMMER: Objection.
19   A. Even now, I'm trying to remember. I
20 don't even remember him. But no, I would have --
21 no, nothing. I would have put something if I
22 think -- if I'd seen something in there that was
23 odd.
24   Q. Now, at approximately 10:10 -- I'm

**43**

1  sorry, did Mr. Cobb tell you at about 10:10 he
2  heard four gunshots?
3    A. Yes. Yes.
4    Q. Okay. An did he tell you that he
5  heard the gunshots from inside or outside of the
6  building?
7    A. He heard them that they were
8  muffled. He heard four shots that were muffled.
9  Yeah, just said that he heard four -- he walked
10 past the basement entrance according -- and what
11 I got here. And he heard four shots that were
12 muffled.
13   Q. At any point, did you speak with a
14 Sergeant Ole that day?
15   A. Oh, God. I don't remember, unless
16 there's something I could read or paperwork. I
17 really --
18   Q. Well, do you have any recollection
19 of Sergeant Ole telling you that Mr. Cobb
20 initially said the shots sounded like they came
21 from outside the building?
22      MS. FROMMER: Objection.
23   A. That I don't remember.
24   Q. But if that's what was said, would

**44**

1  that create a conflict in Mr. Cobb's story to
2  you?
3       MS. FROMMER: Objection.
4    A. I would have done a DD-5 with him.
5    Q. With who?
6    A. With Ole, you said Ole?
7    Q. Sergeant Ole, O-L-E.
8    A. I would have done a DD-5. You're
9  supposed to do DD-5s even if you speak to a cop.
10 I would have done a DD-5, because it's another
11 piece of information that goes in.
12   Q. Okay. Sir, according to what Mr.
13 Cobb said to you, apparently he heard gunshots.
14 And did he call the police after he heard the
15 gunshots?
16      MS. FROMMER: According to what Mr.
17   Cobb said to him?
18      MR. JOSEPH: Yeah.
19      MS. FROMMER: Okay.
20   A. No, if appears that he didn't call
21 the police.
22   Q. As a detective, did you find that
23 unusual that someone working there would hear
24 gunshots and not call the police?

**45**

1       MS. FROMMER: Objection.
2    A. Hold on a second. I'm just -- hold
3  that question.
4    Q. Sure.
5    A. It says here, at the end, he did
6  call 911. This is after he went and did some
7  work and then he went back and saw the Verizon
8  guy. And then they went into the room.
9    Q. So sir, did Mr. Cobb tell you that
10 he heard four shots, went in, did work, didn't
11 call the police, then apparently -- essentially
12 saw a body, then called the police.
13      MS. FROMMER: Objection.
14   Q. Is that an accurate description of
15 what he told you?
16   A. I guess it's a good assumption,
17 yeah.
18   Q. And as a detective, did you find
19 that unusual that someone would hear four
20 gunshots, go back to work, and not call the
21 police?
22   A. I hate to say this, and I don't mean
23 it cynical, but not in the Bronx.
24   Q. Okay. Why is that?

Page 46

1  A. I don't know.
2  Q. I mean, why do you —
3  A. Why is it odd that nobody calls 911
4  when they hear shots?
5  Q. Yeah.
6  A. I can't tell you. I'm not a -- I
7  know it could happen a lot of times.
8  Q. Okay.
9  A. And I don't mean to be cynical, but
10 it's --
11 Q. Did you ever review the 911 tape or
12 ever listen to the 911 tape of Mr. Cobb speaking?
13 A. No.
14 Q. Okay.
15     MR. JOSEPH: Now, let's have this
16 marked as Plaintiff's Exhibit number 2.
17
18     (Plaintiff's Exhibit 2,
19     DD-5 REGARDING GRIMES, was
20     marked for identification.)
21
22 Q. Sir, I'm gonna show you what's been
23 marked as Plaintiff's Exhibit number 2. Can you
24 tell me what that document is?

Page 47

1  A. It's a DD-5.
2  Q. Did you prepare this DD-5?
3  A. Yes.
4     MS. FROMMER: I probably received
5  this. I don't have an independent
6  recollection, but it also has a number 7
7  with a circle around it in the upper,
8  right corner and also has highlighting on
9  it.
10    MR. JOSEPH: And for the record,
11 that's how it came to me, and I don't
12 attach any significance to the number 7 or
13 the highlighting.
14 Q. Sir, did you speak to — does this
15 refresh your recollection as to whether you spoke
16 to a gentleman named John Grimes?
17 A. No, I'm trying to remember. I don't
18 -- outside of this, that's -- unless this is --
19 no. I know I spoke to guys that work there, but
20 I don't -- like I said, it doesn't bring anything
21 out outside of just reading.
22 Q. Let me ask you this: The building
23 where the homicide occurred — I'm sorry, strike
24 that.

Page 48

1     The building where Mr. Acosta's
2  homicide occurred, how many entrances into the
3  basement are there?
4  A. I know of -- definitely, I know of
5  one, and they're the steps. And then there's a
6  long hallway. And I remember the Verizon --
7  there was a --
8     MS. FROMMER: Just answer the
9  question.
10    THE WITNESS: Oh, I'm sorry. Yeah,
11 just --
12 A. I, yeah, I only know of one, to the
13 best of my knowledge.
14 Q. Let me make this kind of sound sort
15 of simple and try to get out of here. Aside from
16 the one basement entrance which you told just us
17 about, is there any other entrance or exit into
18 the basement aside from going to a different
19 floor?
20    MS. FROMMER: Objection. You can
21 answer.
22 A. It's not to my recollection. I
23 don't know.
24 Q. Okay.

Page 49

1  A. I don't know.
2  Q. Now, did Mr. Grimes tell you that he
3  had been right outside the basement door from 8
4  a.m. to 9:20?
5  A. Yes, between 8 and 9:20. Yes.
6  Q. And did he say anything about seeing
7  Anthony Manganiello?
8  A. Nothing here, no.
9  Q. Okay. Now, had he indicated to you
10 that he saw Anthony Manganiello outside the
11 basement door at that point, would you — is that
12 something you would have put into a report?
13 A. Yes.
14 Q. And is it fair to say the fact that
15 it's not mentioned in Exhibit number 2 means he
16 didn't say anything — Mr. Grimes did not say
17 anything about seeing Mr. Manganiello?
18 A. Correct.
19 Q. Now, by the way, did Mr. Grimes say
20 that he heard any gunshots?
21 A. No.
22 Q. Did Mr. Grimes say anything about
23 seeing Walter Cobb enter the building?
24 A. No. Walter Cobb wasn't the Verizon

50

1 guy; was he?
2   Q. No. We're representing Mr. Huell,
3 H-U-E-L-L, as the Verizon guy —
4   A. Oh, okay.
5   Q. — and Mr. Cobb is the person you
6 spoke with earlier.
7     MS. FROMMER: He's saying that, but
8   that doesn't mean —
9     THE WITNESS: Oh, I didn't know. I
10   didn't know because I just saw the Verizon
11   guy. I didn't know.
12   Q. Okay. Is it fair to say that Mr.
13 Grimes did not say anything to you about seeing
14 Walter Cobb enter the building?
15   A. Correct.
16   Q. And by the way, did you also take
17 handwritten notes from Mr. Grimes?
18   A. Yes.
19   Q. And what happened to those
20 handwritten notes?
21   A. They're in the same pad that I —
22 same spiral pad.
23   Q. And were the notes from Mr. Grimes
24 also given to Mr. Agostini?

51

1   A. Yes.
2   Q. And do you know what happened to
3 them after they were given to Mr. Agostini?
4   A. No.
5     MR. JOSEPH: Could I have this
6   marked as the next exhibit, 3? Call it
7   DD-5 regarding sketch.
8
9   (Plaintiff's Exhibit 3,
10   DD-5 REGARDING SKETCH, was
11   marked for identification.)
12
13   (Plaintiff's Exhibit 4,
14   DD-5 REGARDING HUELLO, was
15   marked for identification.)
16
17   Q. Sir, I'll show you first what's
18 marked as Exhibit number 4, a one-paged document
19 regarding Richard, H-U-E-L-L-O. Again, it has a
20 number 8, highlighting. I attach — it came to
21 me this way, and I attach no significance to
22 them.
23     MS. FROMMER: And I have seen this
24   document.

52

1     MR. JOSEPH: Okay.
2   Q. Sir, do you recognize what's been
3 marked as Plaintiff's Exhibit number 4?
4   A. Yes.
5   Q. And what do you recognize it to be?
6   A. It's a DD-5 that I have typed up.
7   Q. And is it a DD-5 that memorializes
8 your — an interview you conducted with Richard,
9 H-U-E-L-L-O?
10   A. It's — yeah. It's what he had told
11 me, yes.
12   Q. Okay. Now, did you also have
13 handwritten notes concerning what Mr. Huello told
14 you?
15   A. Yes.
16   Q. What happened to those notes?
17   A. They're in the same spiral.
18   Q. Okay. Did you also give those notes
19 to Mr. Agostini?
20   A. Yes.
21   Q. Do you know what happened to those
22 notes after Mr. Agostini took possession of them?
23   A. No.
24   Q. Now, did Mr. Huello tell you that he

53

1 was working in the basement when Mr. Cobb
2 arrived?
3   A. Just give me a second.
4   Q. Sure.
5   A. I want to read this. Okay.
6   Q. Did Mr. Huello tell you that he was
7 already working in the basement when Walter Cobb
8 arrived?
9   A. I believe, yeah. Hold on. Let me
10 see. Oh, yeah, here. I'm sorry. Repeat the
11 question again.
12     MR. JOSEPH: Could you read that back?
13
14   (The requested testimony was
15   read back.)
16
17   A. Yeah, he says he's seen the
18 maintenance guy walking by and parenthesized,
19 Walter Cobb.
20   Q. And did he tell you that he — did
21 he tell you one way or another whether he heard
22 shots fired?
23   A. He said he didn't hear shots.
24   Q. Okay. Now, did he indicate one way

54

1 or another -- did he mention -- strike that.
2     Did he mention to you that he had
3 seen Mr. Anthony Manganiello anywhere in the
4 basement?
5     MS. FROMMER: Objection.
6  A.  No.
7  Q.  Now, I'm gonna direct your attention
8 to Exhibit number 3. Can you tell me what
9 Exhibit number 3 is?
10 A.  It's a DD-5 that I typed up.
11 Q.  Okay. And for the record --
12 A.  Two page.
13 Q.  -- we have a two-paged document.
14 Did you also prepare a sketch on the second part
15 -- page of Exhibit number 3?
16 A.  Yes.
17     MS. FROMMER: Just for the record,
18     Exhibit number 3 is Bates-stamped 792 and
19     793 by my office; it was produced by me.
20 Q.  Now, I understand this is not to
21 scale, but does this diagram, which you created,
22 show were Mr. Acosta was found?
23 A.  Approximately, yes.
24 Q.  And it's marked victim; correct?

55

1  A.  Yes.
2  Q.  Okay. Does it also show where Mr.
3 Huello, the Verizon employee, was working?
4  A.  Yes, a little stick guy.
5  Q.  What's the approximate distance
6 between those two points --
7     MS. FROMMER: Objection.
8  Q.  -- to the best of your recollection?
9  A.  Oh, this is just the -- he was
10 working on boxes, phone boxes, right on that
11 wall.
12 Q.  Okay.
13 A.  So it's the width of the wall and it
14 would have to be at least half of the -- I
15 wouldn't even be -- of what the room is. That I
16 wouldn't be able --
17 Q.  Can you give me a reasonable
18 approximation?
19 A.  I couldn't. I really couldn't.
20 Q.  Would it be more than ten feet?
21 A.  Let's just say it's more than five
22 feet.
23 Q.  Okay. Is it somewhere between five
24 feet and 20 feet?

56

1     MS. FROMMER: Objection.
2  A.  I can't. I'm sorry, I can't.
3  Q.  What's the farthest distance that --
4 let me strike that.
5     How much distance -- about how big
6 was the room in which Mr. Acosta was found?
7  A.  Oh, God. I don't even remember. I
8 don't even know. It was a fairly, big room, but
9 it would be wrong for me to guess because I
10 didn't measure it, and I just know it was a large
11 room. And I don't want to, you know, give
12 inaccurate information. If I don't know it, I
13 don't want to guess.
14 Q.  Can you tell me about how many feet
15 into the room Mr. Acosta was found?
16 A.  Well, it wasn't in the immediate
17 doorway area. It was further back in the room,
18 but again, I don't know.
19 Q.  Okay. Would it be more than ten
20 feet back?
21 A.  I wish I could tell you. I really
22 don't know. I don't want to guess.
23 Q.  Okay. Was the distance close enough
24 though that if four gunshots had went off, Mr.

57

1 Huello would have heard them -- should have heard
2 them?
3     MS. FROMMER: Objection.
4  A.  Well, I -- me personally, I would
5 have thought it, which goes back to your earlier
6 question, would somebody hear gunshots, would
7 they call 911. Okay? So and I said not in the
8 Bronx. But that's, you know, but I have to go
9 with what he says. So he's telling me he didn't
10 hear the gunshots, so I have to go with what he
11 says.
12 Q.  Did this present any conflict to you
13 in Mr. Cobb's story?
14     MS. FROMMER: Objection.
15 A.  No, not to me, because at that time,
16 I'm just -- I'm gathering information.
17 Q.  Right.
18 A.  I'm not there to make an assessment
19 of the case.
20 Q.  But actually at some point, did you
21 make any assessments of the case --
22     MS. FROMMER: Objection.
23 Q.  -- after you gathered the
24 information?

15 (Pages 54 to 57)

DETECTIVE RICHARD MARTINEZ

### Page 82

1  A. No.
2  Q. Now, do these – now, did these
3  officers all convey to you that Anthony
4  Manganiello seemed to be of normal demeanor?
5  A. Just read from P.O. Ortiz stated is
6  that; that he's normal demeanor.
7  Q. Did Ortiz and Officers – strike
8  that.
9  Did Officers Ortiz and Rodriguez
10 indicate to you that or say to you – strike
11 that.
12 Did Police Officers Ortiz and
13 Rodriguez say to you that Mr. Anthony Manganiello
14 left at the same time they did?
15 A. Yes, they – yes.
16 Q. Okay. Did they – did Officers
17 Rodriguez and/or Ortiz say to you that they all
18 left together?
19 MS. FROMMER: Objection.
20 A. Yes, that's in sum and substance.
21 Yes.
22 Q. Okay. Now, aside from your DD-5,
23 did you also take handwritten notes of what
24 Police Officer Ortiz told you concerning Anthony

### Page 83

1  Manganiello's presence at Apartment 5E?
2  A. Yes.
3  Q. What happened to those notes?
4  A. They're in my spiral notebook.
5  Q. And was that also given to Detective
6  Agostini?
7  A. Yes.
8  Q. Do you have any knowledge of what
9  happened to those notes after Detective Agostini
10 took possession of them?
11 A. No.
12 Q. Did you take any handwritten notes
13 of what Police Officer Rodriguez told you?
14 A. Just -- best of the my recollection,
15 no. Just what is here on the DD-5.
16 Q. Well, my question is: Apart from
17 the DD-5, did you take notes concerning what
18 Police Officer Rodriguez told you in your spiral
19 notebook at the time that he was speaking?
20 Do you understand my question?
21 A. No.
22 Q. Okay.
23 MS. FROMMER: He just asked you if
24 you took notes about Ortiz --

### Page 84

1  THE WITNESS: Yes.
2  MS. FROMMER: -- and you said, yes,
3  it was in the spiral. He's asking you the
4  exact same question but about Rodriguez.
5  THE WITNESS: Oh, Rodriguez. Oh.
6  A. Oh, no. I got here is what P.O.
7  Ortiz had stated.
8  Q. But did you write down what
9  Rodriguez stated in your spiral notebook?
10 A. No.
11 Q. Do you write down anything Sergeant
12 Rose, Peter Rose, said in your spiral notebook?
13 A. No.
14 Q. By the way, were you speaking with a
15 Sergeant Peter Rose also at the same time you
16 were speaking with Ortiz and Rodriguez?
17 A. No.
18 Q. By the way, when you were – do you
19 – were you at any point on February 12th 2001,
20 were you working with Robert Nugent at all?
21 A. That I don't recall.
22 Q. Okay. Was anyone else present when
23 you were speaking with Police Officers Ortiz and
24 Rodriguez?

### Page 85

1  A. Again, that I don't recall.
2  Q. Did you ever discuss what Police
3  Officers Ortiz and Rodriguez told you concerning
4  Mr. Manganiello with Luis Agostini?
5  A. And that I don't – I don't – that
6  I don't recall.
7  Q. Did you ever --
8  A. To the best of my knowledge.
9  Q. Did you ever discuss what Police
10 Officers Ortiz and Rodriguez told you concerning
11 Mr. Manganiello's presence at Apartment 5E with
12 Detective Abate?
13 MS. FROMMER: Objection.
14 A. Best of my knowledge, no.
15 Q. On February 12th, 2001 – strike
16 that.
17 When you were speaking with Police
18 Officers Rodriguez and Ortiz, where were you
19 speaking with them?
20 A. I don't remember.
21 Q. Do you have any recollection of
22 whether it was at the precinct or on the scene?
23 A. No.
24 Q. Do you have any recollection of what

22 (Pages 82 to 85)