# EXHIBIT 31

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
ANTHONY MANGANIELLO,

                        Plaintiff,


        -against-


THE CITY OF NEW YORK, ET AL.,

                        Defendants.
------------------------------------------x

                        February 7, 2008
                        1:18 p.m.


        Deposition of GERYL MCCARTHY pursuant
to Notice, at the offices of CORPORATION
COUNSEL, 100 Church Street, New York, New York
10007, before Stephen Kleinman, a Notary
Public within and for the State of New York.
```



DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10601
914.684.9009  Fax 914.684.6561  info@dalcoreporting.com  800.DAL.8779
49 W 37th Street, New York, New York 10018  212.679.6095  dalcoreporting.com

Page 6

```
 1              McCARTHY
 2     Q.   Where were you stationed last
 3  prior to retirement?
 4     A.   Queens North Narcotics.
 5     Q    And for how long? From when to
 6  when were you at Queens North?
 7     A.   March of '01 to retirement.
 8     Q.   Okay. Is there any reason you
 9  were transferred to Queens North?
10     A.   It was a personal choice, just
11  a quality of life improvement.
12     Q.   And where were you prior to
13  Queens North?
14     A.   Detective Borough Bronx.
15     Q.   From when to when were you at
16  the Detective Borough in the Bronx?
17     A.   I was in the Bronx for
18  approximately two years before I transferred
19  out.
20     Q.   For the entire time were you at
21  a particular precinct?
22     A.   I was a captain for a period of
23  time and then I got promoted to deputy
24  inspector. So my assignments changed.
25     Q.   Okay. What precinct, if any,
```

Page 7

```
 1              McCARTHY
 2  were you assigned to as captain?
 3     A.   Well, physically worked out of
 4  the 48 Precinct. As a captain, I had the 41,
 5  43, 45 and 49 squads.
 6     Q.   Okay. Were you at all those
 7  squads at the same time or different times?
 8          MS. FROMMER: Objection to
 9     form.
10          You can answer.
11     A.   I worked out of the 48, however
12  I would supervise what was happening in those
13  squads randomly, you know.
14     Q.   Okay. From when to when did
15  you have supervisory duties for the 43rd
16  Precinct?
17          MS. FROMMER: Objection. You
18     can answer.
19     A.   When I was assigned to the
20  Bronx as a captain, that is where I was
21  assigned to, those commands.
22     Q.   From when to when were you
23  assigned in the Bronx as a captain to the
24  various commands, including the 43rd
25  Precinct?
```

Page 8

```
 1              McCARTHY
 2          MS. FROMMER: She already
 3     answered.
 4          You can answer again.
 5     A.   I have to think about that,
 6  because I have to go back in my mind.
 7     Q.   I am asking for approximate
 8  dates.
 9     A.   I got transferred to the Bronx
10  right after Abner Louima.
11          THE WITNESS: What year was
12     that?
13          MS. FROMMER: I can't answer
14     that.
15     A.   Right after the Abner Louima
16  case, I was assigned to the Bronx, from
17  Queens Detectives to the Bronx Detectives.
18     Q.   Did your transfer have anything
19  to do with the Abner Louima matter?
20     A.   No. I just think they wanted
21  more personnel in the Bronx.
22     Q.   Okay. Between say January of
23  2001 and April of 2001, were you a captain
24  assigned in part to the 43rd Precinct?
25     A.   Can you just repeat that again
```

Page 9

```
 1              McCARTHY
 2  just a little slower with the dates for me?
 3     Q.   From January of 2001 through
 4  April of 2001, were you a captain assigned to
 5  the 43rd Precinct?
 6     A.   No, I was not.
 7     Q.   Okay. From January of 2001
 8  through April of 2001, did you have any
 9  involvement at all at the 43rd Precinct?
10          MS. FROMMER: Objection. You
11     can answer.
12     A.   Yes.
13     Q.   What was the nature of your
14  improvement at the 43rd Precinct during those
15  dates?
16     A.   Well, during the dates January
17  '01 to probably 3/01, I was a deputy
18  inspector assigned to the Detective Borough
19  Bronx. I had occasion to visit the 43
20  regarding a homicide that occurred in
21  February of that year. From March to April
22  of that year I was assigned to Queens
23  Narcotics.
24     Q.   So is it fair to say that March
25  of 2001 you were transferred to Queens
```

3 (Pages 6 to 9)

6

1        McCARTHY
2   Q.   Where were you stationed last
3 prior to retirement?
4   A.   Queens North Narcotics.
5   Q   And for how long? From when to
6 when were you at Queens North?
7   A.   March of '01 to retirement.
8   Q.   Okay. Is there any reason you
9 were transferred to Queens North?
10  A.   It was a personal choice, just
11 a quality of life improvement.
12  Q.   And where were you prior to
13 Queens North?
14  A.   Detective Borough Bronx.
15  Q.   From when to when were you at
16 the Detective Borough in the Bronx?
17  A.   I was in the Bronx for
18 approximately two years before I transferred
19 out.
20  Q.   For the entire time were you at
21 a particular precinct?
22  A.   I was a captain for a period of
23 time and then I got promoted to deputy
24 inspector. So my assignments changed.
25  Q.   Okay. What precinct, if any,

7

1        McCARTHY
2 were you assigned to as captain?
3   A.   Well, physically worked out of
4 the 48 Precinct. As a captain, I had the 41,
5 43, 45 and 49 squads.
6   Q.   Okay. Were you at all those
7 squads at the same time or different times?
8        MS. FROMMER: Objection to
9   form.
10       You can answer.
11  A.   I worked out of the 48, however
12 I would supervise what was happening in those
13 squads randomly, you know.
14  Q.   Okay. From when to when did
15 you have supervisory duties for the 43rd
16 Precinct?
17       MS. FROMMER: Objection. You
18  can answer.
19  A.   When I was assigned to the
20 Bronx as a captain, that is where I was
21 assigned to, those commands.
22  Q.   From when to when were you
23 assigned in the Bronx as a captain to the
24 various commands, including the 43rd
25 Precinct?

8

1        McCARTHY
2        MS. FROMMER: She already
3   answered.
4        You can answer again.
5   A.   I have to think about that,
6 because I have to go back in my mind.
7   Q.   I am asking for approximate
8 dates.
9   A.   I got transferred to the Bronx
10 right after Abner Louima.
11       THE WITNESS: What year was
12  that?
13       MS. FROMMER: I can't answer
14  that.
15  A.   Right after the Abner Louima
16 case, I was assigned to the Bronx, from
17 Queens Detectives to the Bronx Detectives.
18  Q.   Did your transfer have anything
19 to do with the Abner Louima matter?
20  A.   No. I just think they wanted
21 more personnel in the Bronx.
22  Q.   Okay. Between say January of
23 2001 and April of 2001, were you a captain
24 assigned in part to the 43rd Precinct?
25  A.   Can you just repeat that again

9

1        McCARTHY
2 just a little slower with the dates for me?
3   Q.   From January of 2001 through
4 April of 2001, were you a captain assigned to
5 the 43rd Precinct?
6   A.   No, I was not.
7   Q.   Okay. From January of 2001
8 through April of 2001, did you have any
9 involvement at all at the 43rd Precinct?
10       MS. FROMMER: Objection. You
11  can answer.
12  A.   Yes.
13  Q.   What was the nature of your
14 improvement at the 43rd Precinct during those
15 dates?
16  A.   Well, during the dates January
17 '01 to probably 3/01, I was a deputy
18 inspector assigned to the Detective Borough
19 Bronx. I had occasion to visit the 43
20 regarding a homicide that occurred in
21 February of that year. From March to April
22 of that year I was assigned to Queens
23 Narcotics.
24  Q.   So is it fair to say that March
25 of 2001 you were transferred to Queens

3 (Pages 6 to 9)

10

1  McCARTHY
2  Narcotics?
3  A. Yes.
4  Q. Okay. Were you ever a captain
5  in the Bronx?
6  A. I was.
7  Q. And when did you become a
8  captain?
9      MS. FROMMER: Objection. You
10     can answer again.
11 A. I became a captain September of
12 1992.
13 Q. I believe you said you were a
14 deputy inspector from January of '01 to March
15 of '01; is that correct?
16 A. In the Bronx, I was an
17 inspector in the Bronx at that time.
18 Q. What were your duties as an
19 inspector?
20 A. I was the operations commander.
21 Q. What does that mean on a
22 day-to-day basis?
23 A. That means I had responsibility
24 for -- overall responsibilities related to
25 the Detective Borough, be it personnel

11

1  McCARTHY
2  assignments, promotions. Basically anything
3  that the chief thought warranted his
4  attention, he would send me out to look into
5  things.
6  Q. While you were a deputy
7  inspector, did you know a Police Officer
8  Ortiz at the 43rd Precinct?
9  A. No.
10 Q. While you were a deputy
11 inspector, did you know a Police Officer
12 Rodriguez at the 43rd Precinct?
13 A. No.
14 Q. Did you become involved in the
15 investigation of a homicide on February 12,
16 2001 --
17     MS. FROMMER: Objection. You
18     can answer.
19 Q. -- concerning Albert Acosta?
20     MS. FROMMER: You can answer.
21 A. I responded to the scene of
22 that homicide.
23 Q. Okay. Can you tell me
24 approximately what time you responded to the
25 scene?

12

1  McCARTHY
2  A. I don't recall.
3  Q. When you responded to the
4  scene, did you respond alone or with
5  somebody?
6  A. I don't recall.
7  Q. What information were you given
8  prior to responding to the scene?
9  A. I think the reason that I was
10 there was that the captain -- there was no
11 captains available. So I responded to the
12 scene just to ensure that proper
13 investigative steps were being taken. As far
14 as the time, I have no idea, and I usually
15 transport myself. So...
16 Q. Okay. When you say "proper
17 investigative steps," what do you mean by
18 that phrase?
19 A. Well, to ensure that crime
20 scene is doing what crime scene is supposed
21 to be doing, ensure that we are canvassing
22 for witnesses and retrieving any information
23 that we can get to further the investigation.
24 Q. When you say you responded to
25 the crime scene, what crime scene did you

13

1  McCARTHY
2  respond to on February 12, 2001?
3  A. I don't recall the address.
4  Q. Was it on Metropolitan
5  Avenue --
6  A. I don't recall.
7  Q. -- in the Bronx?
8  A. I don't recall.
9  Q. Was it to the scene where
10 Albert Acosta had been shot?
11 A. It was to a large apartment
12 at -- I don't remember the address, a large
13 apartment building. I believe the crime
14 scene was in the basement locker room.
15 Q. Okay. At the point in time you
16 arrived, was there any particular suspect?
17     MS. FROMMER: Objection. You
18     can answer.
19 A. I don't recall.
20 Q. When you arrived, had crime
21 scene already been at the location?
22 A. I don't recall that. I'm not
23 sure.
24 Q. For how long did you stay at
25 the crime scene?

4 (Pages 10 to 13)

14

McCARTHY

A. I stayed at the crime scene for a while and I know I responded back to the station house and I stayed there and I finished my tour out over there. So I was there for a couple of hours.

Q. Okay. Let's take it step by step.

How long were you actually at the crime scene?

A. Maybe a couple of hours.

Q. In the couple of hours that you were there, did the crime scene department ever show up?

A. Yes.

Q. Okay. And what did the crime scene do?

A. They take all their measurements and pictures and the diagrams, sketches.

Q. Is that all the information they had on February 12, 2001?

MS. FROMMER: Objection. You can answer, if you can.

A. Is that all the evidence they

15

McCARTHY

had, I don't know.

Q. No, that is not the question. The question is -- let me rephrase the question.

After crime scene did their measurements and took their pictures and did their diagrams, what happened with those measurements and diagrams after crime scene was complete?

MS. FROMMER: Objection. You can answer.

A. Well, I know crime scene, when they finish with all their work, whether it is fingerprints or whatever they are doing, they drop by sketches of the crime scene at the station house at their squad.

Q. And do you know who that was given to?

A. No.

Q. Do you know what was done with those sketches?

A. No.

Q. Okay. Did you ever learn what happened to those sketches?

16

McCARTHY

A. No.

Q. You said "proper investigative steps."

Did you speak to any witnesses at the crime scene?

A. No.

Q. Did you become aware of any information that any witnesses had provided?

MS. FROMMER: Objection. You can answer.

A. I don't recall.

Q. Okay. In the couple of hours in which you were at the crime scene on February 12, 2001, at any point did probable cause develop to arrest Anthony Manganiello?

MS. FROMMER: Objection. You can answer.

A. I don't believe that we -- I wasn't aware of any probable cause to arrest him at that time.

Q. Okay. Do you know if Anthony Manganiello was arrested on February 12, 2001?

A. No, I don't know.

17

McCARTHY

Q. As the deputy inspector or acting captain, so to speak, on a crime scene, is there any person there who had higher authority than you?

MS. FROMMER: Objection. You can answer.

A. No. I mean the only higher person would probably be the chief that I reported back to.

Q. And was the chief present at that point in time?

A. No, he was not.

Q. While at the crime scene, were you made aware of any inconsistencies of what any witnesses had said?

MS. FROMMER: Objection.

A. I don't recall.

Q. Okay. You mentioned that part of your responsibilities was making sure proper investigative steps were taken in retrieving information.

Can you tell me what you mean?

MS. FROMMER: Objection. You can answer.

5 (Pages 14 to 17)

                                    18
 1              McCARTHY
 2      A.   It means depending on the
 3   situation and what was involved, you know.
 4   You are scouring for witnesses obviously. We
 5   are looking for a suspect. We were
 6   interviewing, getting information, possibly
 7   looking for vehicles. There was a lot of
 8   things that could be going on and probably
 9   were going on in the case, crime scene doing
10   their thing, possibly involving TARU.
11      Q.   What is TARU?
12      A.   Technical Assistance Response
13   Unit.
14      Q.   Okay. By the way, based on
15   your experience, do proper investigation
16   steps require taking initial witness
17   statements, so to speak, at the crime scene?
18           MS. FROMMER: Objection. You
19       can answer, if you can.
20      A.   Absolutely, we should be taking
21   witness statements.
22      Q.   Okay. And is it proper police
23   procedure to allow the witnesses to write out
24   what happened in their own hand?
25           MS. FROMMER: Objection.

                                    19
 1              McCARTHY
 2      A.   Yes, yes.
 3      Q.   Why is that?
 4      A.   They can, or a detective. It
 5   depends. I mean if the person can't speak
 6   English or write English, then a detective is
 7   going to take down the statement. But if the
 8   person is capable of doing it themselves,
 9   they can do it and sign their own name.
10      Q.   And that is to ensure the
11   accuracy and reliability of what the person
12   has said?
13           MS. FROMMER: Objection. You
14       can answer.
15      A.   Absolutely.
16      Q.   Everything those witnesses say,
17   does that also become Rosario material later
18   on in the case?
19           MS. FROMMER: Objection.
20      A.   I believe it would be.
21      Q.   Do you know what Rosario
22   material is?
23      A.   Yes.
24      Q.   And what is your understanding
25   of what Rosario material is?

                                    20
 1              McCARTHY
 2      A.   Anything that is written
 3   regarding information from the case.
 4      Q.   In February of 2001, were there
 5   procedures in place at the 43rd Precinct to
 6   safeguard and maintain Rosario material?
 7           MS. FROMMER: Objection. You
 8       can answer.
 9      A.   Anything relevant to the case
10   should be probably kept with the detective
11   case notes or with the case notes and/or the
12   folder.
13      Q.   And in February of 2001, were
14   there procedures in place to safeguard a case
15   file?
16           MS. FROMMER: Objection. You
17       can answer, if you can.
18      Q.   In particular, a homicide case
19   file at the 43rd Precinct?
20           MS. FROMMER: Objection.
21      A.   Were there safeguards in place
22   to secure them?
23      Q.   Okay, let me rephrase the
24   question.
25      A.   I don't understand.

                                    21
 1              McCARTHY
 2      Q.   For the time that you were a
 3   deputy inspector governing or commanding the
 4   43rd Precinct, were there procedures in place
 5   to safeguard and maintain a homicide case
 6   folder?
 7           MS. FROMMER: Objection.
 8      Q.   At the 43rd Precinct?
 9           MS. FROMMER: Objection. She
10       was not the deputy inspector at the
11       43rd Precinct.
12           MR. JOSEPH: Okay.
13      A.   I was only assigned to the 43rd
14   Precinct as a captain, along with other
15   commands, as a captain. As a deputy
16   inspector in February of '01, I had no
17   responsibility as to what the 43 was doing
18   with their case folders.
19      Q.   Okay. Well, as a deputy
20   inspector on February 12, 2001, was it part
21   of your responsibility to make sure that the
22   Rosario material was properly maintained?
23           MS. FROMMER: Objection. You
24       can answer.
25      A.   I don't know. I don't

                              6 (Pages 18 to 21)

22

McCARTHY

1  understand how to answer that question.
2      MS. FROMMER: Then leave it at
3  that.
4      Q.   Okay. On February 12, 2001,
5  what responsibility, if any, did you have as
6  the deputy inspector at the crime scene to
7  make sure that the Rosario material was
8  properly maintained?
9      MS. FROMMER: Objection. You
10 can answer.
11     A.   I wasn't, at that time,
12 initially responding to a crime scene where
13 somebody had just basically become a victim
14 of homicide. I am not really -- it is not
15 the first thing in my thoughts, Rosario
16 material, secure it. We were securing a
17 crime scene. We were looking for witnesses.
18 We were looking for suspects. That was what
19 my responsibility was.
20     Q.   What responsibility, if any, as
21 a deputy inspector did you have on February
22 12, 2001 in responding to a homicide crime
23 scene to make sure evidence didn't get lost?
24     MS. FROMMER: Objection. You

23

McCARTHY

1  can answer.
2      A.   Certainly if I thought evidence
3  would have gotten lost, you know, that would
4  be one thing, but there was no reason for me
5  to think evidence would be getting lost. You
6  handle every case the way you handle a case.
7  You secure evidence. You voucher it. It
8  comes into police custody and it is
9  maintained like that.
10     Q.   You mentioned the word
11 "voucher."
12     What do you mean by "voucher
13 it"?
14     A.   The property voucher, I mean if
15 we are taking evidence in, we are going to be
16 putting it on a property voucher.
17     Q.   Okay. Back in February 2001,
18 were witness statements vouchered, given
19 property vouchers?
20     MS. FROMMER: Objection. You
21 can answer.
22     Q.   At the 43rd Precinct?
23     MS. FROMMER: Objection. You
24 can answer.

24

McCARTHY

1      A.   No. The witness statements
2  would be recorded on the DD5s, complaint
3  follow-ups.
4      Q.   And what about initial
5  handwritten reports made by the witnesses?
6      MS. FROMMER: Objection.
7      Q.   Would those be property
8  vouchered?
9      MS. FROMMER: Objection.
10     A.   No, they would not be.
11     Q.   What procedure, if any, was in
12 place in February of 2001 to preserve the
13 initial written witness statements?
14     MS. FROMMER: Objection. You
15 can answer, if you can.
16     A.   I would say that it would be
17 attached to the DD5. It should be attached
18 to whatever statement, saying that the
19 following is a statement by so and so, and it
20 would be attached.
21     Q.   After the statement was
22 attached to a DD5, what would happen to that
23 DD5 and statement?
24     MS. FROMMER: Objection. You

25

McCARTHY

1  can answer, if you can.
2      A.   It would be filed in the
3  homicide folder.
4      Q.   What procedure, if any, was in
5  place to preserve the homicide file in
6  February of 2001 at the 43rd Precinct?
7      MS. FROMMER: Objection. You
8  can answer.
9      A.   You would have to ask the 43
10 squad commander. I don't know. Every squad
11 commander has a little different system as to
12 where they keep their folders and stuff like
13 that. I imagine it would be in a cabinet,
14 but every single squad commander does a
15 different thing.
16     Q.   Would it be unusual for an
17 entire case file or a homicide case file to
18 go missing?
19     MS. FROMMER: Objection. You
20 can answer.
21     A.   I would think any time a case
22 file is missing, it is unusual.
23     Q.   Okay. Let's take a step back
24 to February 12, 2001.

7 (Pages 22 to 25)

26

1  McCARTHY
2  Q. At the point in time you
3  arrived at the crime scene, did you speak
4  with a Detective Agostini?
5  A. I don't recall.
6  Q. On February 12, 2001, when
7  arrived at the crime scene, at any point did
8  you speak with a Detective Abate?
9  A. I don't recall.
10 Q. Okay. Is there anything that
11 you recall about what happened at the crime
12 scene relative to the shooting of Albert
13 Acosta on February 12, 2001?
14    MS. FROMMER: Objection. You
15    can answer.
16 A. I don't recall that. I don't
17 want to commit on record of exactly to whom I
18 spoke, because I don't necessarily know
19 people's names nor do I know exactly what I
20 said to those people, if I said anything. So
21 I don't recall, I think, is a sufficient
22 response.
23 Q. My question is, do you have any
24 recollection, as you sit here right now, of
25 speaking to anybody on February 12, 2001 at

27

1  McCARTHY
2  the crime scene of Albert Acosta?
3     MS. FROMMER: Objection. You
4     can answer, if you can.
5  A. I am sure I spoke to people.
6  Q. And who do you recall speaking
7  to?
8  A. I don't know the names.
9  Q. Do you recall any descriptions
10 of whoever you spoke to on February 12, 2001
11 at the crime scene?
12    MS. FROMMER: Objection. You
13    can answer.
14 A. I do not recall. It is seven
15 years ago.
16 Q. Did you make any notes
17 concerning whatever you did at the crime
18 scene on February 12, 2001?
19    MS. FROMMER: Objection. You
20    can answer.
21 A. No, I did not.
22 Q. Did you speak with any officers
23 on February 12, 2001 at the crime scene
24 concerning what if anything they may have
25 learned from witnesses?

28

1  McCARTHY
2     MS. FROMMER: Objection.
3  A. I don't believe so.
4  Q. Okay. Well, what did you do on
5  February 12, 2001 at the crime scene of
6  Albert Acosta?
7  A. I think I reiterated that
8  already. I said that I responded, made sure
9  that proper investigative things were taking
10 place. Crime scene was doing what they were
11 supposed to do. Anything that we needed done
12 was being done. To whom I spoke, I can't
13 recall that.
14 Q. Okay. At any point did you
15 direct any officers to bring Anthony
16 Manganiello to the 43rd Precinct?
17    MS. FROMMER: Objection. You
18    can answer.
19    MR. JOSEPH: Let me rephrase
20    the question.
21 Q. On February 12, 2001, did you
22 direct any officers to transport Anthony
23 Manganiello from the crime scene to the 43rd
24 Precinct?
25    MS. FROMMER: Objection. You

29

1  McCARTHY
2     can answer.
3  A. I don't recall.
4  Q. Do you know if Anthony
5  Manganiello was transported from the crime
6  scene of Albert Acosta in the Bronx to the
7  43rd Precinct on February 12, 2001?
8  A. I don't recall.
9  Q. Okay. After leaving the crime
10 scene, where did you go?
11 A. I went back to the 43 squad.
12 Q. And what did you do when you
13 arrived at the 43rd squad?
14 A. I conferred with Lieutenant
15 Harry Scott. I believe at that time the
16 detectives were speaking with Anthony
17 Manganiello at that time.
18 Q. What did you say to Lieutenant
19 Scott and what did he say to you?
20    MS. FROMMER: Objection. You
21    can answer.
22 A. I don't recall.
23 Q. Do you know whose decision it
24 was to have the detectives speak with Anthony
25 Manganiello?

8 (Pages 26 to 29)

30

McCARTHY

1 MS. FROMMER: Objection. You
2 can answer.
3 A. I believe the detectives were
4 just following whatever investigative leads
5 they might have had in interviewing witnesses
6 and conducting an investigation.
7 Q. At the point in time that you
8 returned to the 43rd Precinct, was it your
9 understanding that Anthony Manganiello was a
10 witness?
11 MS. FROMMER: Objection. You
12 can answer.
13 A. I don't recall.
14 Q. Do you know what detectives
15 were speaking to Anthony Manganiello?
16 A. No, I do not.
17 Q. Okay. Do you know for what
18 reason they were speaking to Anthony
19 Manganiello?
20 A. Yes. I believe they were
21 trying to find out what had happened, trying
22 to get information.
23 Q. Did you speak to any of the
24 detectives who were speaking to Anthony

31

McCARTHY

Manganiello after they spoke to Anthony
Manganiello?
MS. FROMMER: Objection. Can
you repeat that?
Q. On February 12, 2001, did you
speak to any of the detectives who were
speaking with Anthony Manganiello after they
had finished speaking with Anthony
Manganiello?
A. I don't recall.
Q. By the way, on February 12,
2001, did the 43rd Precinct have the ability
to tape record an interview?
MS. FROMMER: Objection. You
can answer.
A. I would hate to make the
wrong -- I would hate to answer for them. I
don't know. I don't know if they have proper
equipment to do that.
Q. At any point did you have a
conversation with Lieutenant Harry Scott
concerning Anthony Manganiello on February
12, 2001?
A. Yes. That is the reason that I

32

McCARTHY

was in his squad room discussing the case
with him.
Q. Okay. To the best of your
recollection, what was the nature of the
discussion?
MS. FROMMER: Objection. You
can answer.
A. We were talking about things,
you know, possibly information from various
witnesses and the canvas, the results of the
canvas and the different things that we had
done. I don't remember what else.
Q. At the point in time that you
were speaking to Lieutenant Harry Scott, did
you have any information that in any way tied
Anthony Manganiello to the homicide of Albert
Acosta?
MS. FROMMER: Objection. You
can answer.
A. I don't recall.
Q. As you were sitting there
speaking with Lieutenant Harry Scott, was
there any information at all which provided
probable cause for the arrest of Anthony

33

McCARTHY

Manganiello in relation to the homicide of
Albert Acosta?
MS. FROMMER: Objection. You
can answer.
A. I don't believe, at the time I
was speaking with Harry Scott, that we had
probable cause to make an arrest at that
time.
Q. Okay. What did you do after
you spoke with Lieutenant Harry Scott?
A. After speaking with Harry Scott
for a period of time, I eventually left and
finished my tour, because I was there
probably the whole tour.
Q. You were at the 43rd Precinct
your entire tour?
A. Probably.
MS. FROMMER: Objection. You
can answer.
A. Yeah. I think I ended my -- I
think I signed out from there.
Q. Well, let me ask you this. At
any point on February 12, 2001, did you
contact anybody from the Mount Vernon Police

9 (Pages 30 to 33)

                                                                34
```
 1            McCARTHY
 2   Department?
 3      A.   Yes, I believe I did.
 4      Q.   And who did you contact?
 5      A.   I spoke with a captain up there
 6   that eventually came down and responded to
 7   the 43 squad room.
 8      Q.   Okay. Was that a Captain
 9   Kelly?
10      A.   It certainly could have been.
11   I don't remember his name.
12      Q.   Did you know any of the members
13   or the captains of the Mount Vernon Police
14   Department prior to that day?
15      A.   No.
16      Q.   Did you ever work at the Mount
17   Vernon Police Department?
18      A.   No.
19      Q.   Did any high-ranking officials
20   from the Mount Vernon Police Department ever
21   work at the 43rd Precinct?
22           MS. FROMMER: Objection.
23      A.   I would have no idea.
24      Q.   Did you ever work with any
25   members of the Mount Vernon Police Department
```
                                                                35
```
 1            McCARTHY
 2   at a point in time when they were employed by
 3   the New York City Police Department?
 4           MS. FROMMER: Objection. You
 5        can answer.
 6      A.   Can you repeat that? Because I
 7   got confused with that.
 8      Q.   Okay. Prior to February 12,
 9   2001, were you aware of any members or
10   ranking members of the Mount Vernon Police
11   Department which had previously worked for
12   the New York City Police Department?
13           MR. FROMMER: Asked an
14        answered.
15           You can answer again.
16           MR. JOSEPH: The answer was she
17        didn't understand the question. So I
18        repeated it.
19           MS. FROMMER: That is not the
20        question you asked. You repeated the
21        same question where she said she had
22        no idea.
23           You can answer the same
24        question again.
25      A.   I don't know if anybody from
```
                                                                36
```
 1            McCARTHY
 2   Mount Vernon ever worked in the 43. I have
 3   no idea.
 4      Q.   Okay. For what reason did you
 5   contact members of the Mount Vernon Police
 6   Department?
 7           MS. FROMMER: Objection. You
 8        can answer.
 9      A.   I believe a Mario Manganiello
10   had shown up at the station house with his
11   father and there was a just question as to
12   whether he was carrying an authorized weapon.
13   I believe that is why I reached out to the
14   Mount Vernon Police Department, to find out
15   if he was carrying an authorized weapon.
16      Q.   Okay. What did you learn?
17      A.   I believe that Mount Vernon
18   came down and said that they were going to do
19   their investigation.
20      Q.   When Mario Manganiello came,
21   what if anything did you see happen?
22           MS. FROMMER: Objection. You
23        can answer.
24      A.   I think he conferred with his
25   captain. I believe they checked whatever
```
                                                                37
```
 1            McCARTHY
 2   file they have on what kind weapons he has.
 3   I believe, in my recollection, that it was
 4   listed on his thing. I don't know whether he
 5   was supposed to be carrying it at the time,
 6   Mount Vernon was going to look into that, and
 7   I don't know what the outcome of that ever
 8   was.
 9      Q.   Well, let me ask you this. At
10   the point in time when Mario Manganiello
11   first entered the 43rd Precinct, what if
12   anything did you see happen?
13      A.   He stood there with his father
14   for a while and he kept trying to get the
15   attention of Lieutenant Scott and myself. He
16   was rather obnoxious in his behavior, and
17   that is basically what I remember of Mario
18   Manganiello.
19      Q.   Did Mario Manganiello ever ask
20   you why are you questioning his brother?
21           MS. FROMMER: Objection. You
22        can answer.
23      A.   I believe he is aware and he is
24   also in law enforcement and he knows that is
25   an investigative step that is a necessary
```

                                          10 (Pages 34 to 37)

38

```
 1              McCARTHY
 2  one. So I don't think that was an
 3  unreasonable thing to speak to his brother.
 4      Q.   The question is, did he ask you
 5  that?
 6      A.   Excuse me?
 7      Q.   My question is not what you
 8  think he may have thought.
 9           My question is, did Mario
10  Manganiello ask you why his brother was being
11  questioned?
12      A.   Oh, I don't recall if he asked
13  me that.
14      Q.   Okay. Did you speak to Mario
15  Manganiello?
16      A.   I believe I did.
17      Q.   And what did he say to you and
18  what you say to him?
19           MS. FROMMER: Objection.
20      A.   I don't recall.
21      Q.   At some point did Mario
22  Manganiello speak with his brother?
23      A.   I don't know.
24      Q.   Did you have a conversation
25  with Lieutenant Scott in which Lieutenant
```

39

```
 1              McCARTHY
 2  Scott advised that Anthony Manganiello had
 3  requested an attorney?
 4           MS. FROMMER: Objection.
 5      A.   I don't recall that.
 6      Q.   At some point did you become
 7  aware that Anthony Manganiello had requested
 8  an attorney?
 9           MS. FROMMER: Objection.
10      A.   I don't recall. I don't recall
11  that.
12           That is the same question you
13  asked me, correct?
14      Q.   No. At any point did anyone
15  tell you that Anthony Manganiello was, quote
16  unquote, lawyered up?
17           MS. FROMMER: Objection.
18      A.   No.
19      Q.   Do you know if Anthony
20  Manganiello became a suspect because he had
21  contacted an an attorney?
22           MS. FROMMER: Objection.
23      A.   I don't know.
24      Q.   Is it proper investigative
25  procedure to consider someone a suspect
```

40

```
 1              McCARTHY
 2  because they retain an attorney --
 3           MR. FROMMER: Objection.
 4      Q.   -- after being question?
 5           THE WITNESS: I can answer
 6  that?
 7           MS. FROMMER: You can answer.
 8      A.   No, that is not a reason to
 9  consider them a suspect.
10      Q.   Okay. Did you know a Detective
11  Luis Agostini?
12      A.   I probably know him to see him.
13  I don't remember what he looks like right
14  now.
15      Q.   Did any of the detectives or
16  Lieutenant Scott, on February 12, 2001,
17  advise you that they considered Anthony
18  Manganiello a suspect because he had gotten,
19  quote unquote, lawyered up?
20           MS. FROMMER: Objection.
21      Q.   Are you familiar with the term
22  "lawyered up"?
23      A.   Yes, I am.
24      Q.   What does it mean to you?
25      A.   That means you requested a
```

41

```
 1              McCARTHY
 2  lawyer.
 3      Q.   Okay. At some point did Mario
 4  Manganiello leave the station house?
 5      A.   Yes.
 6      Q.   Okay. Did Mario Manganiello
 7  return to the station house after he
 8  initially left?
 9      A.   I don't know.
10      Q.   At any point did you see Mr.
11  Manganiello enter with an attorney?
12           MS. FROMMER: Objection. You
13  can answer.
14      A.   Which Manganiello are you
15  talking about?
16      Q.   At any point on February 12,
17  2001, did you see Mario Manganiello enter the
18  station house with an attorney?
19      A.   No.
20      Q.   Okay. After Mario Manganiello
21  left, did you have any further dealings with
22  Mario Manganiello on February 12, 2001?
23      A.   No, I don't believe so.
24      Q.   On February 12, 2001, after
25  Mario Manganiello left the station house, did
```

11 (Pages 38 to 41)

                                                    58
```
 1            McCARTHY
 2    whether Mr. Manganiello was with two
 3    uniformed police officers on the morning that
 4    Albert Acosta had been shot?
 5           MS. FROMMER: Objection.
 6       A.   I don't know if that was done.
 7       Q.   Okay. Would that be part of
 8    good police procedure?
 9           MS. FROMMER: Objection.
10       A.   It certainly would be part of
11    it if it came up in the investigation at that
12    time, absolutely.
13       Q.   Would it also be part of the
14    standard practice to have those two officers
15    write in their own words what happened?
16           MS. FROMMER: Objection.
17       A.   Absolutely.
18       Q.   Do you know if Police Officers
19    Rodriguez or Ortiz ever wrote out what
20    happened?
21  DI       MS. FROMMER: Objection. She
22           answered that she doesn't know them.
23           So I am going to instruct her not to
24           answer this question, since she
25           already said she doesn't know Police
```

                                                    59
```
 1            McCARTHY
 2           Officer Ortiz or Police Officer
 3           Rodriguez. So I am going to instruct
 4           her not to answer a question that you
 5           assumed facts about people she doesn't
 6           know.
 7       Q.   On February 12, 2001, did you
 8    ever become aware that Mr. Manganiello was
 9    with two uniformed police officers from the
10    43rd Precinct on the morning that Mr. Acosta
11    was shot?
12           MS. FROMMER: Objection. She
13           already answered that. If you would
14           like to make her answer again, I just
15           ask that her answer be read back so
16           she doesn't have to answer the same
17           question again.
18       A.   Do you have any recollection of
19    that right now as you sit here?
20           MS. FROMMER: Objection. She
21           answered that already too.
22           You can answer again, Geryl.
23           THE WITNESS: Which am I
24           answering?
25           MS. FROMMER: Do you have any
```

                                                    60
```
 1            McCARTHY
 2    recollection?
 3       A.   No, I don't.
 4           MR. JOSEPH: That's all I have.
 5           MS. FROMMER: Can I take her
 6    outside for a second?
 7           (Recess taken.)
 8    EXAMINATION BY MS. FROMMER:
 9       Q.   I have a few questions. Miss
10    McCarthy, is it required for a witness to
11    write out a statement in his or her own hand?
12       A.   No, it is not required.
13       Q.   Is it proper police procedure
14    for a detective to write out a statement or
15    create a DD5 based on a witness' oral
16    statement?
17       A.   Yes.
18       Q.   Did you testify at the grand
19    jury regarding the homicide of Albert Acosta?
20       A.   No.
21       Q.   Did you speak with any
22    assistant district attorney regarding the
23    homicide of Albert Acosta?
24       A.   No.
25       Q.   Were you asked to speak with an
```

                                                    61
```
 1            McCARTHY
 2    assistant district attorney regarding the
 3    homicide investigation?
 4       A.   No.
 5       Q.   Did you have any personal
 6    involvement with the prosecution of Anthony
 7    Manganiello?
 8       A.   No.
 9       Q.   Did you have any personal
10    involvement in the actual investigation of
11    the homicide?
12       A.   No. That would be the
13    responsibility of the squad commander.
14       Q.   Did you personally speak to any
15    witnesses?
16       A.   No.
17       Q.   Did you personally gather any
18    evidence?
19       A.   No.
20       Q.   Did you make the decision to
21    have anyone arrested in this case?
22       A.   No.
23       Q.   Did you make the decision to
24    have anyone prosecuted in this case?
25       A.   No.
```