UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANTHONY MANGANIELLO,

PLAINTIFF

- Against-

THE CITY OF NEW YORK, et. al.,
DEFENDANTS
-----------------------------------------------------------------X


CIVIL ACTION No.:  07 CV 3644 (HB)


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**


Respectfully submitted,


Michael H. Joseph, Esq.
OSORIO & ASSOCIATES, LLC
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168
ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 1

DISCUSSION ...........................................................................................2

POINT I:    PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE ....................................2

A    All  Defendants Initiated And Continued The Prosecution And
      Aided And Abetted Those Who Did ................................................................2

B:    Plaintiff Can Rebut Any Presumption Of Probable Cause And
       Can Establish A Lack of Probable Cause  .......................................................8

C.    A Reasonable Jury Could Find That The Prosecution Was Started With Malice.............19

D.     It Is Undisputed That The Charges Were Terminated In Plaintiff's Favor.......................21

E.    It Is Also Undisputed That Plaintiff Was Incarcerated and Was Deprived
      of A  Liberty Interest ...............................................................................22

POINT II:    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.............22

 POINT III:    PLAINTIFF CAN ESTABLISH A POLICY,  PRACTICE
              AND PATTERN THAT CAUSED A  VIOLATION OF HIS RIGHTS .............24

CONCLUSION....................................................................................31

## PRELIMINARY STATEMENT

On April 12, 2001, Plaintiff was employed as a security guard for Parkchester Condominiums South. Plaintiff responded to a call that a fellow security officer had been shot. Shortly after arriving at the scene, he was arrested, then released because a lack of probable cause. In April, 2001, following an extensive fabrication of evidence by the defendant officers, plaintiff was arrested and charged with the murder of his coworker, Albert Acosta. Plaintiff was indicted by a grand jury based upon perjured testimony. On July 9, 2004, Plaintiff was found not guilty of all charges arising out of the homicide of Albert Acosta.

Plaintiff commenced the instant action on May 8, 2007, seeking damages for violations of his civil rights pursuant to 42 U.S.C. 1983, based upon the defendants' malicious prosecution. On April 22, 2008, the Honorable Martin Marcus unsealed the grand jury minutes from the grand jury which originally indicted plaintiff. Defendants' motion which seeks dismissal of Plaintiffs' complaint should be denied because there are genuine factual disputes that must be decided by a jury and Plaintiff can through admissible evidence establish a prima facie case of malicious prosecution and that a custom and practice was a cause of the malicious prosecution. Additionally, defendants' motion for summary judgment should be denied because defendants violated clearly established rights through unquestionably unlawful conduct, as such they are not entitled to qualified immunity.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to his Statement pursuant to Rule 56.1, the declaration of Michael Joseph, and exhibits attached thereto for a complete recitation of the facts.

## DISCUSSION

It is well-settled that resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court to determine on a summary judgment motion. U. S. v. Rem, 38 F.3d 634, 644 (2d Cir. 1994). At the summary judgment stage, a plaintiff is entitled to an assumption that the jury will believe him and the inferences to be drawn must be viewed in the light most favorable to the Plaintiff. Richardson v. City of New York, 2006 WL 2792768 E.D.N.Y. 2006);. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## POINT I:    PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE

To succeed on a claim for malicious prosecution, the plaintiff must show that a prosecution was initiated against him, that it was brought with malice and without probable cause to believe that it could succeed and that the prosecution terminated in favor of the Plaintiff. Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003). A summary judgment motion in a malicious prosecution case must be denied if the record reveals evidence from which a jury could find that officers prepared false reports and initiated a prosecution predicated on manufactured evidence. Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, (2d Cir 1997). For the reasons that follow, Plaintiff can establish a prima facie case of malicious prosecution.

> A.    All  Defendants Initiated And Continued The Prosecution And
>       Aided And Abetted Those Who Did

Defendants' contention that none of the defendants played any role in initiating  the prosecution is meritless because each defendant played a role in either initiating the baseless prosecution and/or continuing it. Here, Agostini commenced the prosecution by signing the felony complaint. A police officer's act of filing the charges is sufficient to establish the first

2

element. <u>Ricciuti v. New York City Transit Auth.,</u> 124 F.3d 123, 130 (2d Cir. 1997).

Additionally other witnesses may be considered complaining witness if they falsely gave the

prosecutor information which induced the prosecutor to act. <u>Mejia v. City of New York,</u> 119

F.Supp.2d 232 (E.D.N.Y. 2000). Persons who conspire with a complaining witness to

manufacture evidence that is likely to influence the prosecutor's decision to commence

proceedings and the jury's verdict are jointly liable for malicious prosecution. <u>Id.</u>  Likewise,

defendants that continue a prosecution, when the lack of probable cause becomes apparent are

also liable. <u>Pierce v. Gilchrist,</u> 359 F.3d 1279, 1295 (10th Cir. 2004). A jury could find that all of

the defendant officers played a role in initiating and continuing the prosecution by among other

things preparing false evidence and forwarding it to prosecutors, suborning perjury and

committing perjury. <u>See Ricciuti v. N.Y.C. Transit Authority,</u> 124 F.3d 123, 130 (2d Cir 1997).

   Here, the defendants initiated and continued the prosecution because they manufactured

evidence against Plaintiff, suborned perjurious testimony and provided perjurious testimony

which caused the District Attorney to institute the prosecution.  Martinez, Abate and Agostini

coerced Booth, a known loan shark and bookie with mafia ties, into signing a false statement that

Plaintiff was trying to purchase a gun from him. The defendants after finding a knife and

gambling slips (documenting names and debts) on Booth threatened to pass his name onto the

organized crime bureau unless he signed a statement. Not only did the defendants coerce Booth

into signing a false statement, detectives in the 43rd precinct looked the other way while Booth

continued his illegal gambling and loan sharking operations. Even more egregious, they

destroyed the gambling slips they found on Booth in exchange for his fabricated statement and

trial testimony. A jury could rationally find that Abate, Agostini and Martinez extorted Booth,

3

fabricated evidence and suborned perjury. Thus, Agostini and Martinez played a role in initiating the proceedings.

Agosinti also fabricated evidence to create a non-existent chain of events that lead the defendants to Booth. More specifically, Agostini attributed statements in a DD5 that Plaintiff told Sal Miro that Plaintiff owned a .22 caliber weapon, a conversation which Miro states never took place. Likewise, Agostini claims that Miro gave him Tartone's name, who in turn provided him with Booth's name. Agostini also created a DD5 which attributed false statements to officers Ortiz and Rodriguez. On the day of Acosta's murder, Plaintiff was with officers Rodriguez and Ortiz at a call between 8:45 a.m. and 9:10 a.m. and left 1700 Metropolitan Ave with them. The officers confirmed this information to Mr. Martinez on February 12, 2001. Agostini to undercut Plaintiff's alibi created a DD5 which falsely attributed statement to Ortiz and Rodriguez that Plaintiff left the building before them, thereby implying that Plaintiff had the opportunity to commit the murder, when in fact, he did not.

There is also more than sufficient evidence from which a jury could find that Agosinti and Parker suborned perjury by producing two witnesses, Alston and Damon whose veracity was extremely questionable. Alston, provided false statements and testimony that Plaintiff hired him to kill a security guard. Alston was actually in jail at the time of the murder and had been for four months. Agostini and Parker were also aware that Alston was lying because he intially told Agostini that Johnny Baker sold Plaintiff a .22 caliber gun, but when he was interviewed, Baker denied any knowledge of this. After this incident, Agostini admitted that he knew Alston was playing games to get out of jail, but he didn't care. Then Parker, Alston and Agostini produced Damon who lied and said that he sold Plaintiff a .22 caliber gun, the same caliber as the Acosta

4

murder weapon, a story which he subsequently recanted. Alston was let out of jail specifically in consideration for his testimony and "cooperation" in implicating Plaintiff.

A jury could rationally find that Parker and Agostini brokered a deal whereby Alston, who had been indicted for attempted murder and robbery, was released from jail in exchange for perjured testimony that falsely implicated Plaintiff. This inference is firmly supported by Parker's modus operandi in "finessing" evidence to get the answers he wants, and in brokering deals whereby felons are released from custody in exchange for testimony.

Judge Williams found that without Alston's testimony before the grand jury, there was no probable cause to charge Plaintiff with Acosta's murder. It was well known that Alston had lied about Baker selling Plaintiff a gun and the defendants continued to rely upon his false statements, even though they knew he had lied. Officers have a duty to assess the reliability of a witness and, if circumstances call into doubt the witness's veracity, to investigate the allegations and corroborate them. Jovanovic v. City of New York, 2006 U.S. Dist. LEXIS 59165. Here, not only did the detectives turn a blind eye to Alston's lies, they encouraged it by brokering a deal that rewarded his lies by providing him with his freedom. Thus, Agostini and Parker aided and abetted Alston's perjury. Agostini admitted that he knew Alston was "playing games" to get out of jail but didn't care and stated it wasn't his job to determine whether he was lying. The failure to make a further inquiry when a reasonable person would have done so is evidence of lack of probable cause. Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996). Agostini's attitude and willingness to ignore that a witness had blatantly lied is in stark contrast to his professional obligations as a detective and demonstrates a deliberate indifference to Plaintiff's constitutional rights. Further, as discussed in section B infra, Agositini manufactured DD5s and

5

committed perjury both at a pretrial hearing and at trial, thereby continuing the prosecution.

Nieves and Perez initiated and continued the prosecution by providing false evidence and false testimony before the grand jury and at trial. Nieves falsely testified that as Plaintiff entered the basement, he said the victim was his partner. Both Nieves and Perez testified that there was no radio transmission which identified the victim, when in fact every 911 call and radio transmission (both NYPD and Parkchester) identified the victim as a Parkchester security guard prior to Plaintiff's arrival. The false testimony implied that because Plaintiff made a statement indicating that he knew who the victim was prior to his entering the room, he was the murderer. Nieves and Perez by knowingly offering false testimony initiated and continued the prosecution. Further Agostini created a DD5 containing Nieves' false statements and provided it to the A.D.A., which in part caused the prosecutor to initiate charges, even though he knew that there was a radio transmission which identified the victim as a Parkchester officer. Defendants who conspire to procure groundless indictments and charges based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction can be held liable under section 1983. Anthony v. Baker,767 F.2d 657, 662 (10th Cir. 1985).

Scott, Abate, McCarthy and McGovern also played a role in initiating the prosecution because as discussed below, they authorized the actions of Abate, Agostini and Parker, actively encouraged same and bear supervisory responsibility for failing to prevent the abuse of Plaintiff's rights. It is not necessary that each defendant initiate the proceedings himself, rather liability for malicious prosecution attaches when a defendant influences a third party to initiate the proceedings. Bristow v. Clevenger, 80 F.Supp.2d 421, (M.D.Pa.,2000). Therefore, defendants'

6

claim that Scott, McCarthy and McGovern did not have any personal involvement in Plaintiff's prosecution is meritless.

Here, McGovern, Scott, Abate and Agostini originally targeted Plaintiff as a perpetrator even though there was no evidence which in any way connected Plaintiff to the shooting. Likewise, McCarthy failed to intervene in the targeting of Plaintiff and arrested Plaintiff's brother and father as retribution for calling Plaintiff a lawyer. Then the defendants made the decision to continue the prosecution through manufactured evidence as retribution for seeking legal representation. Scott, Abate and Agostini all made statements indicating that they believed Plaintiff was guilty because he was "lawyered up". This initial targeting of Plaintiff set in motion the remaining events. Likewise, Messrs. Scott and McGovern were the supervisors who were responsible to oversee the activities of Agostini authorized his actions. A police officer has an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other officers in their presence and the failure to do so renders them liable under § 1983. Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Here, the supervisors failed to stop the detectives from targeting the Plaintiff without probable cause, as retribution for seeking an attorney and they actually participated in the retribution. Further, even though they reviewed Agositni's DD5s, which contained glaring evidence of fabrication, including attributing conflicting statements to the officers who were with Plaintiff at 1700 Metropolitan Ave., they failed to intervene. Likewise, they either ignored or authorized the continued use of Alston, when they knew he had lied. A supervisor can be found grossly negligent in supervising subordinates who committed wrongful acts where the defendant supervisor normally checked reports but failed to remedy the wrong because a jury may infer that he was informed of the violation

7

through a report. Allen v. City of New York, 2007 WL 24796 (S.D.N.Y. 2007). Here, the jury could find that McGovern and Scott were notified of Agostini's wrongful conduct, but through gross negligence failed to correct it. Therefore all of the defendants played a role in initiating and continuing the prosecution and acted jointly to frame the Plaintiff.

B:    Plaintiff Can Rebut Any Presumption Of Probable Cause And<br>Can Establish A Lack of Probable Cause

There are material factual issues that prevent summary judgment on this issue. While defendants have offered self serving affidavits and testimony that they did nothing improper, the Plaintiff's proofs establishes that they engaged in serious misconduct to manufacture probable cause, when none in fact existed. Plaintiff can establish a lack of probable cause and rebut any presumption thereof, because the decision to prosecute and the grand jury indictment were obtained through bad faith, perjury and police misconduct. A Plaintiff can establish that there was a lack of probable cause where the decision to prosecute was secured by bad faith or perjury, and not through probable cause. Allen v. City of New York, 480 F.Supp.2d 689, 716 (S.D.N.Y. 2007). The presumption of probable cause created by a grand jury indictment may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence, that officers withheld evidence or other police conduct undertaken in bad faith. Savino v. City of New York, 331 F.3d 63 (2d Cir 2003). Evidence that an indictment was based on the defendants' misrepresentations constitutes evidence of fraud, suppression of evidence, and police misconduct sufficient to rebut the presumption of probable cause. Mejia,119 F.Supp.2d at 256. The chain of causation between a defendant's conduct is not broken by the exercise of independent judgment if the defendants misled or pressured the official who was supposed to exercise independent judgment. Townes v. City of New York, 176 F.3d 138, 147 (2 Cir.1999). The prosecutor's role in

8

a criminal prosecution will not shield a witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false. Webster v. City of New York, 333 F.Supp.2d 184 (S.D.N.Y. 2004); White v. Frank, 855 F.2d 956, 961 (2d Cir. 1988). The argument that officers were not liable for their conduct in initiating a prosecution because the prosecutor is the one who decides whether or not to prosecute the case was rejected in Borunda v. Richmond, 885 F.2d 1384 (9 Cir. 1988), because there was evidence that the defendants provided false evidence to the prosecutor. Likewise, a showing that the district attorney acted contrary to his independent judgment will rebut the presumption. Borunda, 885 F.2d at 1390.

Here defendants manufactured evidence, committed perjury, suborned perjury, and the Assistant District Attorney permitted officers and witnesses to commit perjury. Additionally, the Assistant District Attorney actively mislead the Court as to the deal reached between the People and Alston. Judge Williams held that but for Alston's testimony, there was no probable cause linking Plaintiff to the murder. Alston's testimony was a complete fabrication, and defendants knew he was an untruthful witness, as such, Plaintiff has rebutted any presumption of probable cause. A Plaintiff may overcome the presumption of probable cause from the issuance of an a true bill by demonstrating the true bill was based on perjured testimony. Lehman v. Kornblau, 134 F.Supp.2d 281 (E.D.N.Y. 2001).

Agostini and Parker knew that Alston was lying to get out of jail, nevertheless, they brokered a deal, whereby Alston was released from jail in exchange for perjurious testimony falsely implicating Plaintiff. Further, the grand jury was not advised that Alston had previously lied about the Plaintiff buying a gun from Johnny Baker. Succinctly stated, Parker and Agostini knew Alston was lying and not only did they fail to investigate and corroborate the statements of

9

a witness they knew to be unreliable, they aided and abetted his perjury. Officers evaluating a probable cause determination must sift through conflicting information and resolve discrepancies to find that probable cause does or does not exist. Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991). The fact that a witness provides the police with information of an alleged crime does not, without more, establish probable cause, rather, the officer has a duty to assess the reliability of the witness and, if circumstances call into doubt the witness's veracity, to investigate the allegations and corroborate them. Jovanovic v. City of New York, 2006 WL 2411541 (S.D.N.Y. 2006). Not only did defendants fail to corroborate Alston's statements, they intentionally encouraged him to lie.

Moreover, the Judge's findings that there were no irregularities in the proceedings are incorrect because the District Attorney's office actively misrepresented the nature of the deal with Alston and knowingly permitted police witnesses to offer false testimony. Here, the Court found that it appeared that there was a deal reached with Alston, which had not been made known to the grand jury and directed the People to identify if a deal existed and the nature of such deal. The District Attorney in an affirmation represented to the Court that Alston's release from jail was not to secure his testimony in this case, when in fact, Alston was let out of jail specifically in exchange for his testimony implicating the Plaintiff. The affirmation stated that Alston had agreed to work with Mr. Parker in the investigation of unrelated narcotics cases and that his release from custody was not to ensure his testimony in the instant case. This was a complete fabrication because Parker was not working on any narcotics cases and Alston was released in exchange for his testimony in this case. Thus, the prosecutor actively mislead the Court which oversaw the grand jury proceeding and violated well established duties of candor, as

10

such, any presumption of independent judgment is rebutted. Moreover, a prosecutory has a duty to disclose that they have made promises of benefit to a witness who is under separate indictment for unrelated crimes, which they failed to do here. See People v. Novoa, 70 N.Y.2d 490 (1987).

Further, Nieves and Perez knowingly testified falsely before the grand jury and during trial. More specifically, Nieves and Perez falsely testified that there was no broadcast that the victim was a Parkchester security guard, when the defendants and the prosecutor knew that the victim's identity was broadcast and known to everyone responding to the scene. A prosecutor has a duty to correct a witnesses testimony. People v. Novoa, 70 N.Y.2d 490 (1987).

Nieves also testified falsely that Plaintiff prior to entering the basement, stated to her that the victim was his partner, which implied that Plaintiff was the murderer. However, the fact that everyone knew it was Acosta because his designation was broadcast made Neives' testimony extremely misleading. Likewise, the prosecutor failed to correct Ms. Nieves' testimony, despite knowledge of its falsity.

Additionally, Mr. Cobb was permitted to testify that he heard shots and saw the Plaintiff exiting the basement, however, the grand jury was not informed that Cobb had given numerous inconsistent statements including that the shots came from outside (which would exonerate Plaintiff[1]) and that he initially failed to identify Plaintiff. Likewise Tartone falsely testified that he overheard Plaintiff asking if anyone was selling a gun. Here, the entire grand jury testimony which implicated Plaintiff was a fabrication.

There were also material omissions, because it was known that Acosta arrived at the

---

[1]If he was inside the building and shots came from outside, Plaintiff could not have fired them.

11

building at 8:45 am, and was not seen or heard from again, until he was found after being shot. Plaintiff at the time was with three police officers on a call and left the building with the officers. None of this evidence was presented to the grand jury, nor was the grand jury informed that the gun shot residue tests performed on Plaintiff's hands were negative.

Finally, it must be pointed out that defendants' motion papers misstates the law. Defendants contend, without any legal authority, that Plaintiff must establish that each defendant engaged in misconduct in the grand jury. This contention is incorrect as a matter of law. To establish a case of malicious prosecution, Plaintiff must prove that (1) defendants initiated a prosecution against plaintiff, (2) the matter terminated in plaintiffs' favor, (3) there was no probable cause for the criminal proceeding and (4) the proceeding was motivated by actual malice. Rodriguez v. City of New York, 2008 U.S. Dist. LEXIS 14718. While Plaintiff must rebut a presumption of probable cause, there is no requirement that plaintiff establish that each defendant committed perjury in the grand jury. Once the presumption of grand jury indictment is rebutted, each defendant who initiated the prosecution may be held liable so long as the other elements are satisfied.

Likewise, defendants' contention that Plaintiff's theory is merely that some arguably exculpatory evidence was withheld is incorrect. To the contrary, Plaintiff has established that the defendants deliberately misled the grand jury, testified falsely and the prosecutor failed to correct testimony that was known to be false which materially influenced the grand jury.

Plaintiff can also establish that a there was a lack of probable cause to charge him with Acosta's murder. When the probable cause determination depends upon disputed issues of fact, the issue of probable cause is for a jury to decide. Bullard v. City of New York, 240 F.Supp.2d

12

292 (S.D.N.Y. 2003). Significant issues of material fact, including questions of credibility

preclude the Court from determining that probable cause exists as a matter of law. Bristow v.

Clevenger, 80 F.Supp.2d 421, 434 (M.D.Pa. 2000). Probable cause is the knowledge of facts,

actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful

grounds for prosecuting a person in the manner complained of. Rounseville v. Zahl, 13 F.3d 625,

629 (2d Cir. 1994). For probable cause to be present, there must be more than rumor, suspicion,

or even a strong reason to suspect that the defendant committed the crime. U.S. v. Fisher, 702

F.2d 372, 374 (2d. Cir. 1983). Lack of probable cause means absence of reasonable grounds to

believe the defendant guilty, or at least to justify an honest and strong suspicion of his guilt.

Engleman v. Progressive Machinery Corp., 156 F.Supp. 46 (D.C.Mass. 1957).Where a

confidential informant provides false information and police officers fabricate evidence which is

provided to the District Attorney and results in an indictment and prosecution, there is sufficient

evidence of a lack of probable cause to overcome a summary judgment motion. See Richardson

v. City of New York, 2006 WL 2792768 (E.D.N.Y. 2006).

Here, it is undisputed that there was no direct evidence that in any way tied Plaintiff to the

shooting of Acosta. While defendants claim that witnesses identified Plaintiff from a photo array,

they fail to inform the Court that these identifications pertain to ancillary matters, not Plaintiff

committing the homicide. It is undisputed that there was no direct evidence which in any way

tied Plaintiff to the Acosta homicide.

When Mr. Acosta arrived at 1700 Metropolitan Ave., at 8:45 a.m., Plaintiff was already

in the company of police officers Rodriguez, Ortiz and Sgt. Rose. While there was a witness,

Mr. Cobb, who allegedly heard shots and then saw Plaintiff leave the building, there was more

13

than sufficient facts available to the defendants that Mr. Cobb's account was not credible. First, both officers Rodriguez and Acosta left the building with Mr. Manganiello and no one saw Plaintiff re-enter the building. Further, Cobb has given numerous inconsistent statements. To support a claim of the existence of probable cause, the information upon which the officers purport to rely must be "reasonably trustworthy information". Golino *v.* City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991). The Golino ruling demonstrates that officers evaluating a probable cause determination must sift through conflicting information and resolve discrepancies to find that probable cause does or does not exist. Golino, 950 F.2d at 871-872. The fact that a witness provides the police with information of an alleged crime does not, without more, establish probable cause. Id. Rather, the officer has a duty to assess the reliability of the witness and, if circumstances call into doubt the victim's veracity, to investigate the allegations and corroborate them. Jovanovic v. City of New York, 2006 WL 2411541 (S.D.N.Y.,2006). Bullard v. City of New York, No. 01 Civ. 11613, 2003 WL 168444, at *4 (S.D.N.Y. 2003) Probable cause is not established by witness testimony where the witness offers inconsistent accounts, which the defendants could have discovered with reasonable investigation. Jovanovic v. City of New York, 2006 WL 2411541(S.D.N.Y. 2006).

In his 911 call, Cobb did not state that he saw Mr. Manganiello leave the building. Also, Cobb told the first responder, Sgt. Ohle, that the shots sounded like they came from outside the building. If this is correct, then even if he did see Plaintiff leave the building, this would exculpate the Plaintiff because he was inside when the shots came from outside. Further, initially Cobb was not sure who he saw leave the building, but said it was Plaintiff after the Plaintiff was arrested. Thus, a reasonable jury could find that Cobb tried to help the police by finessing his

14

account to identify the person that the police targeted, namely Plaintiff. Further, Mr. Huello was directly across from the room where Acosta was found when Cobb entered the building and he says there were no shots fired and he did not see Plaintiff at all. Thus there were more than sufficient facts known to the defendants that Cobb was unreliable and they needed to corroborate his statement, which they failed to do. Additionally, the disappearance of all of the initial interview notes, which were in Agostini's possession are indicative that Cobb's testimony was materially undercut by his initial account and that of other witnesses. Nevertheless, A.D.A. Dondes determined on February 12, 2001 that Cobb's statement did not create probable cause to charge Plaintiff with Mr. Acosta's murder.

Judge Williams in reviewing the grand jury testimony correctly determined that Cobb's statement did not provide probable cause because Plaintiff's presence is not distinguishable from several other people who were also present in the basement when Cobb entered. In determining whether probable cause exists to believe that a particular person has committed a given crime, where the information possessed by the officers could have applied to any of a number of persons and did not reasonably single out from that group the person accused, there is no probable cause. U.S. v. Fisher, 702 F.2d 372, 374 (2d. Cir.1983). Further, the defendants knew that the gun shot residue tests showed that Plaintiff did not fire a gun that day.

Here, there are factual issues, because the evidence which the defendants claim provided probable cause are complete fabrications. A plaintiff can establish a lack of probable cause where detectives and confidential informants fabricate evidence and commit perjury to create probable cause. See Richardson v. City of New York, 2006 WL 2792768 (E.D.N.Y. 2006). Where the Plaintiff alleges that the statements and testimony of a confidential informant, upon whom the

15

prosecution was based were fabricated there is a factual dispute which prevents summary judgment. Stewart v. City of New York, 2008 WL 1699797 (S.D.N.Y. 2008). Competing affidavits from an exculpatory witness and Defendant, creates a factual issue that precludes granting summary judgment on the issue of probable cause. Boyd, 336 F.3d at 77.

Here, the statements of Booth and Tartone do not provide probable cause because they were fabrications. A jury could reasonably find that Abate, Martinez and Agostini knowingly extorted Booth into making the statement by threatening to pass his name onto organized crime if he did not sign the statement and by rewarding him for signing the statement by destroying evidence of illegal gambling activity and looking the other way while he operated his illegal businesses with impunity. Further, the fact that Agostini fabricated a statement by Sal Miro, to provide a seemingly legitimate investigation which lead to Booth, when in fact, none existed, could cause a jury to find that the statements of Booth and Tartone were fabricated and the testimony given by them perjury which was suborned by Abate, Agostini and Martinez. Likewise, the statements and testimony of Perez and Nieves were also perjury and fabrications. Evidence which is fabricated by the police does not create probable cause.

Nevertheless, the statements and testimony of Booth and Tartone, even if credited, does not create probable cause to believe Plaintiff was responsible for Acosta's demise. Here, both Booth and Tartone gave statements to the effect that Plaintiff was trying to purchase a gun. Plaintiff was a licensed park's police officer and was legally permitted to own and carry a gun. Moreover, there is no link that establishes that Plaintiff ever purchased a gun or used a gun against Mr. Acosta. Further, Judge Williams has already determined that the testimony of Tartone and Cobb do not establish probable cause to believe Plaintiff was Acosta's murderer.

16

Judge Williams found that the only testimony which linked Plaintiff to Acosta's murder was the testimony of Alston. Here, there is sufficient evidence from which a jury could find that Alston committed perjury and the defendants knowingly suborned and aided and abetted his perjury. Agostini knew that Alston was a criminal, a liar, had lied about the Plaintiff and in his own words was playing games to get out of jail. Nevertheless, a jury could find that Parker and Alston aided, abetted and encouraged Alston's perjury by brokering a deal whereby he was released from jail in exchange for lying to falsely implicate Plaintiff in Acosta's murder and in producing a witness (Damon) that also lied about selling Plaintiff a .22 caliber gun. Moreover, the defendants admitted that a confidential informant that provided false information should be dropped. Here, Alston lied about Johnny Baker selling him a gun, Agostini knew he lied, and rather than discontinuing this prosecution, he and Parker helped get Alston out of jail, so he could get a 17 year old kid to lie and falsely implicate the Plaintiff, then they helped secure a reward for him in terms of a reduced sentence and early release.

Agostini also created DD5s with false information, lied and provided extremely misleading testimony both at trial and during a pre-trial hearing. First Agostini created DD5s which falsely stated that Plaintiff was evasive in answering questions and then destroyed evidence which would have exposed his false statements including the online booking sheet. Agostini falsely testified at trial that when he interviewed Plaintiff on February 12, 2001, Plaintiff was evasive in answering questions and would not provide his pedigree information. However, records which Agostini did not provide to the prosecutor, which were discovered after Agostini testified showed that Plaintiff provided all of his pedigree information to Det. McMahon of the crime scene unit at 12:25 pm on February 12, 2001. These records, which

17

contradicted Agositni's testimony were among those claimed to be lost by Agosinti, but were received directly from the crime lab by the prosecutor.

Agostini also created a DD5 attributing statements to officer Ortiz and Rodriguez that was contradictory to their initial statements to Martinez. On the day of the shooting, the officers told Mr. Martinez that Plaintiff was with them at the call, seemed of normal demeanor and left the building with them. Colon's testimony firmly established that Acosta arrived at 1700 Metropolitan Ave., at 8:45 a.m. and was not seen or heard from again. As per the initial statement by Ortiz and Rodriguez, Plaintiff was with the officers when Acosta arrived at the building and he left with them twenty minutes later. However, several weeks after Martinez's interview, Agostini created a DD5 that attributed statements to Ortiz and Rodriguez that Plaintiff left the call before they did, which would create the opportunity for him to have committed the murder. This second DD5 was false and the original interview notes were also "lost".

In a pre-trial hearing Agostini testified that a note was found in Plaintiff's locker that said I feel like killing someone, when in fact the note said I pray I will never have to kill someone. Mr. Agostini also testified in a pre-trial hearing that Plaintiff's attorney, Richard Ross approached him and asked him if it was intentional. Mario Manganiello who was with Mr. Ross states that this statement never occurred.

Agostini testified that McGovern and Scott were aware of his action and they did not intercede. A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). Summary judgment must be denied where the evidence could allow a reasonable juror to conclude that officers cooperated with other officers in falsifying the

18

circumstances, although they knew there was no probable cause to justify the prosecution. Ricciuti, 124 F.3d 123 at 129.

Based upon the foregoing, there are numerous facts from which a jury could find that Agostini, Perez and Nieves lied, that Agostini fabricated evidence and destroyed exculpatory evidence, that Parker, Agostini, Abate and Martinez suborned perjury and that McGovern and Scott authorized their actions and failed to intervene to protect Plaintiff's rights. Thus there are facts from which a jury could infer a lack of probable cause.

C.    A Reasonable Jury Could Find That The Prosecution Was Started With Malice

There are adequate facts from which a jury could find that the defendants acted with malice. Malice means that the defendant commenced the proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served. Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir 1996). Malice may be proved by circumstantial evidence. Nardelli v. Stamberg, 44 N.Y.2d 500, 502 (1978). Once the Court finds an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well because a lack of probable cause generally creates an inference of malice. Boyd v. City of New York, 336 F.3d 72 (2d Cir 2003). As discussed above, there are numerous issues of facts which establish a lack of probable cause, therefore, Plaintiff has also established malice.

Likewise, there is evidence that the defendants acted out of anger. Evidence that a defendant acts out of anger is evidence of malice sufficient to survive a motion for summary judgment. Lowth, 82 F.3d at 573. It is settled that spite as a motive for prosecution, constitutes "malice". Cook v. Sheldon, 41 F.3d 73, 79 (1977). Malice may also be inferred from wanton,

19

reckless or grossly negligent disregard of the accused's rights, inconsistent with good faith. <u>Cox v. County of Suffolk,</u> 780 F.Supp. 103, 108 (E.D.N.Y. 1991).

      Here, the rash treatment of the Plaintiff by Agostini, Abate, Scott and McGovern certainly is indicative of a personal hostility. Here, Agostini and Abate in retaliation for Plaintiff's strong denial that he was involved in the murder, forcibly stripped him of his clothes and treated him like a suspect. Both Abate and Agostini admitted that they believed Plaintiff was a suspect because a lawyer was called for him. Likewise, Scott's statements to Plaintiff's brother, that this didn't have to go this way, you got your brother "Lawyered up" are indicative of a hostile motive. This statement combined with the concerted action of Plaintiff's brother and father being arrested and detained, even though they committed no crime or violation is further evidence that the actions against plaintiff were taken for retribution. Further after complaining about their treatment, Scott told Plaintiff's brother, "You got the lawyer". Additionally, when Agostini was told that there was insufficient evidence to charge plaintiff and the arrest had to be voided, he became incensed and physically and verbally abusive to Plaintiff, pushing him and saying "Get out of my fucking station house".

      Further, the events that followed including the detectives fabricating the statement of Sal Miro, extorting Booth into signing a false statement and providing false testimony and looking the other way while he operated his criminal business certainly evidences maliciousness. Knowingly filing a false report is strong evidence of malicious intent. <u>Allen v. City of New York,</u> 480 F.Supp.2d 689, 717 (S.D.N.Y. 2007). Also indicative of maliciousness is the use of a known liar, Alston, even after it was exposed that he lied about Plaintiff buying a gun. Even more egregious, Agostini and Parker got an indicted felon released from prison in exchange for

20

perjured testimony. Further, Agostini committed perjury on numerous occasions by testifying at a pre-trial hearing he found a note in Plaintiff's locker that said I feel like killing somebody, when in fact the note said that he prays he will never have to kill someone. Agostini also fabricated evidence (DD5s) and testified at trial that Plaintiff was evasive about providing his pedigree information, while simultaneously destroying and withholding evidence that showed that Plaintiff did give his pedigree information. Likewise, a jury could also find that Agostini intentionally destroyed exculpatory evidence including the original interview notes which contradicted Cobb's grand jury and trial testimony. Nieves and Perez lied about there not being a transmission of the victims identity when it was broadcast over the Parkchester radio and the NYPD radio. Also Nieves by falsely attributing statements to Plaintiff (that is my partner in there) when everyone knew who the victim was, further evidences malice because it shows an intent to unfairly taint the proceedings against Plaintiff. The conduct of the defendants from the outset of this matter evidences a wanton disregard of the rights of Plaintiff and his family. The fact that these defendants went to such great lengths to manufacture evidence and to testify falsely shows a deliberate intent to frame the Plaintiff, despite the complete lack of probable cause. From these facts and the utter lack of probable cause, along with defendants' attempts to manufacture it, a jury could reasonably find malice.

D. It Is Undisputed That The Charges Were Terminated In Plaintiff's Favor

It is undisputed that Plaintiff was found not guilty of all charges following a jury trial. As such, he has satisfied that last element.

21

E.    It Is Also Undisputed That Plaintiff Was Incarcerated and Was Deprived of A
Liberty Interest

As a result of the malicious prosecution, Plaintiff was incarcerated for ten days and lost

his police certification. Thus, Plaintiff has suffered a cognizable deprivation of a constitutionally

protected interest.

**POINT II: DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Plaintiff has alleged sufficient facts to establish that the defendants are not entitled to

qualified immunity.  When deciding the issue of qualified immunity, the Court must base its

decision on the facts that the plaintiff alleges are true. Escalera v. Lunn, 361 F.3d 737 (2d Cir.

2004).

The defendants are not entitled to qualified immunity because the right to be free from

prosecution in the absence of probable cause is a long established constitutional right and no

reasonable officer could conclude that defendants actions were lawful. Likewise, the right to not

be deprived of liberty based upon the fabrication of evidence by investigating officers was also a

well established right prior to February 12, 2001. Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir.

2000).

For a defendant to receive qualified immunity, it must be shown: (1) that the right alleged

to be violated was not clearly established when the violation occurred; or (2) if such right was

clearly established, that a reasonable person would not have known his acts violated it. Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1981). It is not required that the precise actions in question have

been found unlawful in a prior case, but rather that the unlawfulness of the acts must be apparent

from law which exists at the time of the acts.  Anderson v. Creighton, 483 U.S. 635,  640, 107

22

S.Ct. 3034, 3039 (1987). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." Id., 483 U.S. at 641, 107 S.Ct. at 3039. Freedom from malicious prosecution was a clearly established right prior to February, 2001. Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996); Bonide Products, Inc. v. Cahill, 223 F.3d 141, 145 (2d Cir. 2000). The right not to be deprived of liberty through the use of fabricated evidence was also clearly established prior to 2001. Zahrey, supra. Further no officer could reasonably believe that committing perjury, fabricating evidence, suborning perjury and destroying exculpatory evidence are lawful acts which would not infringe constitutional rights. As such defendants are not entitled to qualified immunity.

Moreover, the jurisprudence cited by defendants namely, Williams v. City of New York, 2003 WL 22434151 S.D.N.Y.,2003 and Provost v. City of Newburgh, 262 F.3d 146 (2d Cir.) 2001 are not applicable to this case. Williams involved a victim's identification of an attacker, where there was no reason to doubt the victim's veracity. Here, there was no victim identification. Unlike this case, in Williams, there was no dispute that the police did not fabricate evidence or commit perjury. In Provost, the Court expressly declined to consider the qualified immunity issue.

Further, the contention that Agostini merely conveyed information to the prosecutor, based upon a self serving affidavit is conflicted by his deposition testimony which evidences perjury and subornation of perjury. Likewise, there is substantial evidence that Parker and Agostini suborned perjury before the grand jury by brokering a deal with Alston. Further, the DD5s Agostini created were fabricated as such, he did much more than merely present evidence, he manufactured it. Likewise, there are material facts as to whether Nieves and Perez knowingly

23

gave perjured testimony before the grand jury and trial to falsely implicate Plaintiff. As discussed above, defendants' contention that Plaintiff must establish each defendant engaged in misconduct before the grand jury is meritless, so long as the other elements are met. As discussed above, Plaintiff can establish that all of the defendants actively engaged in misconduct and initiated and continued the prosecution. As such, there is no good faith basis to conclude that the defendants did not know their actions were unlawful.

### POINT III: PLAINTIFF CAN ESTABLISH A POLICY, PRACTICE AND PATTERN THAT CAUSED A VIOLATION OF HIS RIGHTS

Plaintiff can establish Monnell liability because the City's failure to train and supervise its detectives and officers constituted a deliberate indifference to the constitutional rights of the Plaintiff. Likewise, Plaintiff can establish that there was a practice and custom in effect of fabricating evidence and providing material benefit to criminals who were known to be unreliable which caused said criminals to provide perjury to implicate innocent citizens. The aforementioned caused the malicious prosecution complained of herein to occur.

To establish municipal liability, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy, however, this does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation. Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119 (2d Cir.1991). Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. Rookard v. Health and Hospitals Corp., 710 F.2d 41 (2d Cir. 1983). A policy maker is one who has a top level position and discretion in making the decision at issue. Id at 45. A plaintiff can establish a municipal custom, policy or practice by establishing that an

24

official who is a final policymaker directly committed or commanded the constitutional violation, or by showing that a policymaker indirectly caused the misconduct of a subordinate municipal employee. Perry v. Metropolitan Suburban Bus Authority, 390 F.Supp.2d 251 (E.D.N.Y. 2005). Defendants contention that Allen v. City of New York, 2007 WL 24796, S.D.N.Y.,2007, stands for the proposition that the Commissioner is the only policy maker is incorrect. Allen dealt with processing speed of arraignments, not criminal investigations. Further in Allen, the Court limited its holding to the factual record and arguments made therein.

  Here, McGovern and Scott were policy makers because for all practical purposes, they had the ultimate discretion to make the decisions concerning homicide investigations in the 43rd precinct detective squad and they were responsible for overseeing the activities of Agostini, Abate and Martinez. Likewise, McCarthy was a policy maker because she was an operational commander and the highest ranking officer associated with the investigation. McGovern was responsible for reviewing cases for accuracy, completion and making sure detectives did the follow steps needed to conduct an investigation. Lt. Scott was the commanding officer in overall charge of the 43rd detective bureau. An official has final authority if his decisions, at the time they are made, for practical reasons constitute the municipality's final decisions. Anthony v. City of New York, 339 F.3d 129 (2d Cir. 2003). The New York City Charter is divided into several sections which provide certain powers to the commissioner and certain powers to the department itself. See New York City Charter §§ 431-438. Section 435 of the Charter provides the Police Department with the power and duty to detect and arrest offenders. Likewise, the Administrative Code of the City of New York § 14-102 creates the position of Lieutenants and Sergeants. Section 14-103(c)  designates lieutenants as commanders of detective squads. Here, the

Administrative Code by creating these designations, when read with the charter providing the powers to the department is a delegation of authority, sufficient to make Lt. Scott, Sgt. McGovern and Inspector McCarthy policy makers. Thus, within the 43rd precinct, Lt. Scott was the commander.

Here, the supervisory personnel authorized and encouraged the unlawful and unconstitutional acts of their subordinates, as such, there is sufficient evidence of a policy. Where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts. Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980).The issue of authorization, approval or encouragement is generally one of fact, not law. Turpin, 619 F.2d at 201.

Here, Plaintiff was originally arrested on February 12, 2001, as were his father and brother without any probable cause. McGovern, McCarthy and Scott all knew there was no probable cause to arrest Plaintiff or his family, but they took no action to prevent it and in fact encouraged the behavior. Scott told Plaintiff's brother that it was retribution for getting his brother a lawyer. Likewise, McCarthy was at the scene of the arrest of Plaintiff's brother and father and directed officers to arrest them, for no reason. McCarthy, McGovern and Scott not only failed to reprimand Agostini, Martinez and Abate for falsely arresting Plaintiff and his family, they encouraged them to do so, thereby creating an atmosphere of disregard for civil liberties and the probable cause requirement. While police officers have an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers, (O'Neill, supra), Mr. Parker identified a custom at the N.Y.P.D. of tacitly

26

accepting and overlooking improprieties committed by officers. Mr. Parker stated in his book "Its funny how criminals and cops both share the same code: rats are looked down upon in both cultures, which shows how we're on both sides of the same coin".

Further, the lack of training was evident because Martinez couldn't recall what the definition of probable cause was. Likewise, Abate and Agostini felt that it was proper to target someone because they contacted a lawyer. Agostini was apparently permitted to disregard standard procedures for maintaining and storing a homicide case folder, which contained important evidence. Even though all of the supervisors testified that it was highly unusual for a high profile murder case file to disappear, Agostini was never disciplined. The only conclusions that can be drawn are that the supervisors permitted Agostini to intentionally destroyed the file because it contained evidence that exculpated Plaintiff or he was permitted to be so grossly negligent that no questions were asked when a complete file disappeared. Thus there was either authorization of the destruction of critical evidence or the reckless disregard for the obligation to disclose evidence, which is indicative of a seriously deficient lack of training and supervision.

Contrary to defendants' assertion, Plaintiff does not seek recovery for a single act, rather Plaintiff was aggrieved by a continuous pattern of unlawful and unconstitutional conduct. Plaintiff can establish the existence of a policy through the testimony of a nonpolicy decision maker. Greenfield v. City of New York, 2000 WL 124992 (S.D.N.Y.,2000). In Greenfield, the Court found that a police officer's testimony was sufficient to establish the existence of a police department policy and practice. Id. The wide spread proof of misconduct in this case, not only directed towards plaintiff, but also his family demonstrates a pattern and practice at the 43rd precinct and the N.Y.P.D. that permitted manufacture of evidence, commission of perjury,

27

subornation of perjury and targeting citizens without probable cause. The facts of this case support an inference that based upon the prolonged pattern of unconstitutional behavior, there was a custom in which fabricating evidence and suborning perjury to frame a citizen were tacitly permitted.

Here on February 12, 2001, defendants were told by the A.D.A. that there was no probable cause to charge Plaintiff, nevertheless, the supervisors permitted their subordinates to engage in numerous unconstitutional acts to manufacture probable cause. Two months passed between February 12, 2001 and Plaintiff's re-arrest in April, 2001, during which time the defendants engaged in an extensive course of conduct by committing several acts of evidence fabrication and manipulation designed to unfairly frame the Plaintiff.

Mr. Parker stated that the N.Y.P.D., was wracked with corruption and ambition and ambition meant getting ahead by closing cases. Here, Parker in a career spanning twenty years described how he routinely pressured criminals to implicate others in unrelated criminal activity in exchange for getting charges dropped, despite knowledge of their unreliability. Further, there is substantial evidence that informants were used instead and the place of actual evidence. As Mr. Parker stated, "if you want to solve a homicide, you're going to need informants. Period Fuck DNA evidence". (s.i.c). Mr. Parker further stated that finessing was necessary to get the answers you want. Mr. Parker's comments, when considered with the fact that there was no actual evidence against Plaintiff other than witnesses that were either threatened or released from jail in exchange for testimony is evidence of this custom. There is adequate evidence that the detectives were not properly trained in verifying and corroborating statements of "confidential informants". By offering criminals deals of reduced sentences or overlooking crimes in exchange for

28

statements which implicated others or by threatening them with criminal prosecutions if they did not provide statements implicating others, the defendants created a situation ripe for perjury and evidence fabrication.

Here, defendants knew that Alston lied to detectives about Plaintiff buying a gun from Mr. Baker and he was not charged with filing a false complaint, rather he was encouraged to keep making false statements which implicated the Plaintiff. Scott and McGovern were aware that Agostini and Parker were using Alston even though he lied. Lt. Scott claimed he was unaware that Alston claimed to have been hired by plaintiff to kill a security guard, even though the DD5 had his signature. When shown the DD5, his response was "WOW". Scott further testified that Alston should have been charged if there was some truth to his statement, but figured that Agostini thought the guy was "full of shit".  Notwithstanding the assessment, he allowed Agostini to commence a prosecution based upon the word of someone who was known to be dishonest. Here, there is abundant evidence that detectives regularly relied upon unreliable testimony without taking steps to verify the veracity of witnesses. More specifically Agostini testified that the did not care whether Alston was making up stories to get out of jail or that he had lied about Plaintiff. Martinez testified that it was not his job to assess the reliability of witnesses.  Agostini testified that the procedure was that an informant should be dropped if he gave bad information, however, Alston outright lied and the defendants continued to use him as a witness and got him out of jail to produce another witness who also lied (Damon). Likewise Scott and Mcgovern testified that there were no clear guidelines or procedures for dealing with informants who had lied.

Likewise, Martinez, Abate and Agostini threatened Booth to get him to sign a false

statement and destroyed gambling slips that were evidence of criminal activity. Scott claims to be unaware that Booth was threatened or that Alston was playing games to get out of jail. Even after Plaintiff's arrest and indictment, defendants Agostini, Perez and Nieves continued to commit perjury at hearings and ultimately at Plaintiff's trial in 2004.

There is more than adequate evidence of a practice of suborning perjury of "confidential informants" through use of questionable tactics including threats, giving them license to engage in criminal activities and overlooking past criminal acts in exchange for testimony implicating others. There is also sufficient evidence of a custom of initiating prosecutions based upon unreliable evidence and the fabrication and manipulation of evidence to close cases, all the while ignoring exculpatory evidence. Monnell authorizes liability against a municipal entity for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision making channels. Dykema v. Skoumal, 1999 WL 417360 (N.D.Ill.,1999). The inference that a policy existed may be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. Id.

A jury could find that Scott and McGovern ratified the actions of Agsotini in fabricating evidence, manipulating evidence, destroying evidence and in suborning perjury or at the very least, were grossly negligent in failing to stop him from doing so. Existence of a police policy or custom can be inferred from the omissions of a municipality's supervisory officials. Turpin v. Mailet, 619 F.2d 196 (2d Cir. 1980). Here, there is evidence that the supervisors both authorized Agostini's actions and/or turned a blind eye in failing to stop them. Scott, a supervisor authorized

retribution against Plaintiff and his family in exchange for Plaintiff seeking legal assistance. This evidence certainly raises issues of fact as to whether the supervisors authorized this behavior or whether the training and supervision of police personnel was so lax, to allow this rampant misconduct to occur. Either way, Plaintiff has adduced sufficient evidence of a custom and policy.

Plaintiff can establish a causal relationship between the custom and his deprivation of constitutional rights. The prosecution against Plaintiff went forward based upon the word of a bookie and loan shark, who was threatened with criminal prosecution then received a pass to conduct criminal activity and a known gang member, under indictment for attempted murder and robbery, who received a get out jail free card for falsely implicating plaintiff. Likewise, exculpatory evidence such as the negative gun shot residue test was ignored, exculpatory evidence such as the initial witness statements were destroyed. The fact that Plaintiff was with three police officers while at 1700 Metropolitan Ave., was ignored as was the fact that there was no actual evidence tying plaintiff to this crime. Further, the fact that defendants fabricated evidence because there was no actual evidence further evidences that this custom was present in Plaintiff's case. The pattern of relying exclusively on unreliable informants while ignoring actual evidence, evidences a serious inadequacy in training.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Defendants' motion be denied in its entirety.

31

Dated: White Plains, New York

      May 9, 2008                  Respectfully submitted,

                                    OSORIO & ASSOCIATES, LLC

                    BY:

                                    Michael H. Joseph, Esq. (MJ8838)

                                    184 Martine Avenue

                                    White Plains, New York 10601

                                    (914) 761-3168

32