UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

ANTHONY MANGANIELLO,                                CIVIL ACTION No.: 07 CV 3644
                                           Plaintiff,

                                                                             **PLAINTIFF'S STATEMENT OF**
        -vs-                                               **CONTESTED FACTS PURSUANT TO**
                                                                        **LOCAL RULE 56.1**

THE CITY OF NEW YORK, et al.
                                         Defendants,
--------------------------------------------------------X

        Pursuant to Local Rule 56.1 of the United State District Court for the Southern District of

New York, Plaintiff respectfully submits this statement of material facts which creates a genuine

issue to be tried.

        Plaintiff responds to defendants' Rule 56.1 statement as follows:

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Plaintiff had the same access to the basement as the rest of the general population since

        the doors inside the basement were left open and often the basement door was left open.

        (Defedants's Ex. C, p. 117).

5.      Admitted.

6.      Admitted.

7.      Defendants' exhibit D is partially illegible. Further it does not show what time a call

        came in, rather it shows that Central Dispatch at 10:15 a.m., made a dispatch, in part that

        a man was down, however much of the dispatch cannot be read, due to poor quality of the

document.

8.  Defendants' exhibit D actually shows that Plaintiff radioed for a personal break prior to any dispatch of a man down.

9.  Admitted.

10. While the central dispatcher did not identify the victim as a Parkchester security guard, both the dispatcher and Plaintiff testified that Sgt. Ohle, on an open Parkchester radio line, which all Parkchester Security officers could hear, broadcast that the victim was a Parkchester security guard and that the victim was Acosta. (Ex. 1, p 139, Ex. 7, p. 452, 453, 461).

11. Defendants' Exhibit E shows that Plaintiff did respond that he could not hear the transmission and asked that the message be relayed, due to problems with the radio.

12. Admitted.

13. Defendants' exhibit D does not establish that Central Dispatch attempted to call Plaintiff or Acosta, it merely shows that a broadcast was made, most of which is illegible.

14. Defendants' exhibit F has a notation PKC was shot, which is likely an abbreviation for Parkchester.  Ms. Nieves testified during trial that the broadcast did indicate that the victim may have been a parkchester officer. (Ex. 7, p. 174). Both Mr. Agostini and Lt. Scott admitted that the radio transmission stated that a Parkchester security guard was down. (Ex. 23, p. 31, 32, Ex. 3, p. 30).

15. Admitted.

16. Ms. Nieves admitted during trial  that the broadcast did indicate that the victim may have been a parkchester officer. (Ex. 7, p. 174).  Both Mr. Agostini and Lt. Scott testified that the radio transmission identified the victim as a Parkchester security guard. (Ex. 23, p. 31,

32, Ex. 3, p. 30).

17.    Admitted.

18.    Ms. Nieves admitted during trial that the broadcast did indicate that the victim may have

been a parkchester officer. (Ex. 7, p. 174). Ms. Perez has failed to appear for a deposition

and there is a motion to strike her answer pending before the Court. (Joseph Declaration).

19.    Admitted.

20.    Agostini made the decision to initiate the prosecution against Plaintiff by signing the

felony complaint and Mr. Agostini's supervisors Messrs. Scott and McGovern authorized

this decision. (Ex. 3, p. 202, Ex. 23, p. 14, 127, Ex. 3, p. 130- 133).  In order to receive an

arrest warrant, Mr. Agostini presented the falsified evidence provided by Mr. Cobb,

Booth, Tartone and Mr. Alston to a Judge. (Ex. 3, p. 203, Ex. 33).

21.    Admitted.

22.     Ms. Scaccia, the A.D.A. in charge of Mr. Manganiello's prosecution testified that she

was never given the entire homocide file and never copied it. (Ex. 3, p. 127, 129, Ex. 7, p.

292, Ex. 25, p. 25-28).  After the A.D.A. asked for the police file, which was last in Mr.

Agostini's possession, so that it could be turned over to Plaintiff's attorneys, it

disappeared.  (Ex. 25, p. 25-28, Ex. 7, p. 279, 280). As described more fully in Plaintiff's

contested facts ¶ 105-107,154-173, numerous documents were withheld from the A.D.A.,

many of which were favorable to the plaintiff and exculpatory. Plaintiff's contested facts

¶ 148-173 raise an inference that Agostini wilfully destroyed the homicide case file which

contained evidence that contradicted his testimony, as well as that of other witnesses who

implicated the plaintiff.

23.    Contrary to Mr. Agostini's testimony, Ms. Scaccia, the A.D.A. in charge of Mr.

Manganiello's prosecution testified that she was never given the entire homocide file and never copied it. (Ex. 3, p. 127, 129, Ex. 7, p. 292, Ex. 25, p. 25-28).After the A.D.A. asked for the police file, which was last in Mr. Agostini's possession, so that it could be turned over to Plaintiff's attorneys, it disappeared. (Ex. 25, p. 25-28, Ex. 7, p. 279, 280). As described more fully in Plaintiff's contested facts ¶105-108, 148-173, numerous documents were withheld from the A.D.A., many of which were favorable to the plaintiff and exculpatory. Plaintiff's contested facts ¶ 154-173 raise an inference that Agostini wilfully destroyed the homicide case file which contained evidence that contradicted his testimony, as well as that of other witnesses who implicated the plaintiff

24. The District Attorney, Ms. Scaccia admitted that every 911 transmission identified the victim as a Parkchester security guard and that Sgt Ohle (of Parkchester security) broadcast over the Parkchester radio that one of his officers was down. (Ex. 25, p. 73, 74, 101, 102).

25. Every call that came into 911, including the call from Mr. Colon identified the victim as a Parkchester security guard. (Ex. 25, p. 102). Mr. Colon also testified that Sgt. Ohle broadcast on an open Parkchester radio line which all security guards could hear that a Parkchester security guard was down and he understood from the transmission, that it was Acosta. (Ex. 7, p 452, 453, 461).

26. Every call that came into 911, including the call from Mr. Colon identified the victim as a Parkchester security guard. (Ex. 25, p. 102).

27. Admitted.

28. The District Attorney was not advised that Walter Cobb had given numerous inconsistent statements. (Ex. 25, p. 31, 32). Mr. Scott testified that when he was at the scene, it was

not known who Cobb saw leave the basement. (Ex. 23, p. 49, 50). Also Mr. Cobb told

first responder Sgt Ohle that the shots came from outside of the building, which would

exculpate Mr. Manganiello if he was inside the building. (Ex. 3, p. 231, 234).  Mr.

Cobb's statement that Plaintiff exited the basement was a fabrication. (Ex. 33).  A verizon

employee, Mr. Huello was directly across from where Mr. Acosta was found when Mr.

Cobb entered the basement and he did not see Anthony Manganiello or hear any shots.

(Ex. 3, p. 236-238). Additionally, Anthony Manganiello did not go into the basement at

all prior to receiving the call that Acosta was down. (Ex. 1, p. 143, 145, Ex. 33).

29.   Based upon the factual submissions identified  in #28, infra, which Plaintiff incorporates

herein, Cobb's testimony was a fabrication and Plaintiff was no where near the basement

until he received a call that Acosta was down. (Ex. 1, p. 143, 145, Ex. 33).

30.   The statements of Booth and Tartone were fabrications and Plaintiff never inquired about

purchasing a gun. (Ex. 33). Additionally, as shown in Plaintiff's contested facts   ¶ 237-

245, 251-255, which plaintiff incorporates herein Booth, a known criminal was

threatened into signing a statement and permitted to engage in criminal activity in

exchange for signing the statement.

31.   Plaintiff does not dispute that is what Booth's statement says, however, Booth's statement

was a fabrications and Plaintiff never inquired about purchasing a gun. (Ex. 33 ).

Additionally, as shown in Plaintiff's contested facts ¶ 237-245, 251-255, which plaintiff

incorporates herein, Booth, a known criminal was threatened into signing a statement and

permitted to engage in criminal activity in exchange for signing the statement.

32.   Booth also testified at trial that the conversation with Plaintiff occurred in March, 2001,

after Acosta's murder. (Defendants' Ex. K, p. 616).

33.    Admitted.

34.    Admitted, that Alston claimed to have information, but Plaintiff's contested facts ¶
181,195-199, 205, 206, 218- 211, which are incorporated by reference herein establish
that Alston was a known liar who was making up stories about Plaintiff to get out of jail.

35.    When Agostini and Parker told the District Attorney's office was that Alston knew
someone who sold Plaintiff a gun, they knew that Alston was lying and the District
Attorney was not advised that Alston had made inconsistent statements to Mr. Parker.
(Ex. 16, Ex. 3, p. 49, 50, 177 -179, Ex. 6, p. 51, 52).

36.    Mr. Damon was produced by Alston, after Alston had been caught lying that someone
named Johnny Baker sold Plaintiff a .22 caliber gun. (Ex. 16, Ex. 3, p.178-188). Mr.
Damon's statement that he sold a .22 caliber gun to a parkchester security guard was a lie
and Mr. Damon admitted he made it up because Alston was forcing him to say it. (Ex. 3,
p. 177 -179, 191- 193, Ex. 7, p. 508, Ex. 33).  When Mr. Damon was produced by Parker,
Agostini and Alston, the circumstances under which Damon was produced strongly
indicated that his statement was a fabrication and Agostini and Parker knew that Alston
was playing games to get out of jail.  (Ex. 16, Ex. 3, p. 150-153, 177 -179, 182, 188. Ex.
6, p. 65-67, 81, 83).

37.    The factual submissions in #36, infra, which Plaintiff incorporates herein also contradict
defendants uncontested fact #37.

38.    Agostini made the decision to initiate the prosecution against Plaintiff by signing the
felony complaint and Mr. Agostini's supervisors Messrs. Scott and McGovern authorized
this decision. (Ex. 3, p. 202, Ex. 23, p. 14, 127, Ex. 3, p. 130- 133). Likewise, based upon
the Plaintiff's contested facts ¶ 105-107, 148-150, 175-184, 190-192, 195-201, 205- 223,

231, 232, 241-246, 299-307, 322, 324, Agostini and other defendants including Abate,

Parker, Martinez and Perez by testifying falsely, fabricating evidence and other

misconduct initiated and continued the prosecution against Plaintiff. Plaintiff's proofs

contained in Plaintiff's contested facts ¶ 105, 106, 148, 150,175-181, 210-220, 222, 223,

231, 232, 241-246, 299-307 322, 324,  Infra, which are adopted by reference herein raise

an inference that the police misconduct precluded the District Attorney's office from

making any independent evaluation of the case. Additionally, the District Attorney's

independent judgment was compromised because the District Attorney actively mislead

the Court which supervised the Grand Jury as to the nature of a deal between the People

and Alston by misrepresenting that Alston was not given anything to secure his testimony

in this case, when in fact, he was let out of jail in exchange for implicating Plaintiff. (Ex.

4, Ex. 35, Ex. 25, P. 56, 57).

39.    The Felony Complaint bears Luis Agostini's signature. (Ex. 3, p. 202). Messrs. Scott and

McGovern authorized this decision, thereby causing the District Attorney to present the

case to the grand jury. (Ex. 3, p. 202, Ex. 23, p. 127). In order to receive an arrest warrant,

Mr. Agostini presented the falsified evidence provided by Mr. Cobb, Booth, Tartone and

Mr. Alston to a Judge. (Ex. 3, p. 203, Ex. 33).

40.    Based upon the Plaintiff's proofs contained in Plaintiff's contested facts ¶ 105-108,

119,120, 148, 150, 175-184, 195-201, 211- 223, 231, 232, 241-246, 322, 324,  Infra,

which are adopted by reference herein, Agostini fabricated evidence, committed perjury,

suborned perjury and destroyed evidence, as such had no reasonable belief that Plaintiff

committed any of the offenses alleged in the felony complaint.

41.    The District Attorney's decision to present the case was based upon the witnesses

provided by Agostini and Parker, who were lying about Plaintiff. (Ex. 25, p. 33, 34, 40 Ex. 33).

42.    Agostini made the decision to initiate the prosecution against Plaintiff by signing the felony complaint and Mr. Agostini's supervisors Messrs. Scott and McGovern authorized this decision, thereby causing the District Attorney to present the case to the grand jury. (Ex. 3, p. 202, Ex. 23, p. 127). In order to receive an arrest warrant, Mr. Agostini presented the falsified evidence provided by Mr. Cobb, Booth, Tartone and Mr. Alston to a Judge. (Ex. 3, p. 203, Ex. 33). Likewise, based upon the Plaintiff's contested facts ¶ 49,121-125, 132-134, 136-144, 157, 187, 174-184, 211-223, 299-307, other defendants including Abate, Scott, McGovern, Parker, Martinez and Perez by testifying falsely, fabricating evidence and other misconduct initiated and continued the prosecution against Plaintiff.

43.    Agostini made the decision to initiate the prosecution against Plaintiff by signing the felony complaint and Mr. Agostini's supervisors Messrs. Scott and McGovern authorized this decision.  (Ex. 3, p. 130- 133 202, Ex. 23, p. 14,127). Likewise, based upon the Plaintiff's contested facts ¶ 49, 91-93, 97, 98, 108, 157, 187, 174-184, 211-223, 231, 232, 299-307, other defendants including Abate, Parker, Martinez and Perez by testifying falsely, fabricating evidence and other misconduct initiated and continued the prosecution against Plaintiff.

44.    Exculpatory evidence which was in Agostini's possession disappeared, along with the entire homicide case file. (Ex. 25, p. 25-28, Ex. 7, p. 279, 280). Several pieces of evidence that were favorable to Plaintiff and undercut the defendants' assertions disappeared and were never provided to the Assistant District Attorney including an arrest

report which contradicted Agostini's testimony (and DD5s) that Plaintiff was evasive and didn't provide his pedigree information, the original interview of Mr. Cobb (which contradicted his grand jury and trial testimony), the original interview of Mr. Huello (which contradicted Mr. Cobb's testimony). (Ex. 3, p. 47, 48 Ex. 30, p. 42, 52-54). The district attorney was not made aware of any of the inconsistent statements. (Ex. 25, p. 31, 32). As described more fully in Plaintiff's contested facts ¶ 105-108 154-174, 231, 232, 261, numerous documents were withheld from the A.D.A., many of which were favorable to the plaintiff and exculpatory. Additionally, Agostini did not tell the District Attorney's office that Booth was threatened into making a statement and that incriminating evidence against him disappeared after he made the statement. (Ex. 25, p. 83, 84). Agostini never told the District Attorney's office that Alston was playing games to get out of jail. (Ex. 3, p. 49, 50, Ex. 25, p. 44, 45).

45.   Agostini never told the District Attorney's office that Alston was not credible and was playing games to get out of jail. (Ex. 3, p. 49, 50, Ex. 25, p. 44, 45).

46.   The background check on Mr. Alston disappeared along with the homicide case file. (Ex. 3, p. 152, 153, Ex. 6, p. 21).

47.   Admitted, however, the facts contained in Plaintiff's contested facts ¶175-184, 195-201, 205-211, 299-307, Infra, a raise an inference that Agostini suborned perjury of Alston and Nieves before the grand jury.

48.   Admitted, however, from the facts contained in Plaintiff's contested facts ¶175-184, 195-201, 205-211, 299-307 Infra, a raise an inference that Agostini suborned perjury of Alston and Nieves before the grand jury.

49.   Abate commenced the prosecution in part, by signing an affidavit in order to get a search

warrant for Plaintiff's car and that affidavit has disappeared. (Ex. 3, p. 97). Abate also

initiated the prosecution by targeting Plaintiff as the suspect without any probable cause

and by aiding Agostini or in failing to stop him from threatening Booth, thereby

suborning perjury. (Ex. 3 p. 60, 61, 96, Ex. 29, p. 72-74).

50.    The facts stated in paragraph #49, infra contradict paragraph 50 of the defendants' Rule

56.1 statement.

51.    Admitted.

52.    The facts contained in #43, 49, 53, 111, 116, 117, 121–128, 137-143, infra which are

adopted by reference herein, raise an inference that Abate engaged in other misconduct

which resulted in the prosecution being initiated against Plaintiff.

53.    Abate did not advise the District Attorney that Cobb had given numerous inconsistent

statements or that Booth was coerced into making the statements which he made. (Ex. 29,

p. 72-74, Ex. 25, p. 31, 32, 83, 84).

54.    Admitted, however, Martinez either assisted Agostini and Abate in coercing Booth or

failed to stop them from doing so. (Ex. 3, p. 221, 222, Ex. 8). Likewise, Martinez did not

tell the District Attorney that Booth was threatened and evidence against Booth was

destroyed in exchange for his statement. (Ex. 8, Ex. 25, p. 83, 84, Ex. 30, p. 17).

55.    The facts contained in Plaintiff's contested facts ¶ 174-181, 205-230, Infra, which are

adopted herein, raise an inference that Parker suborned perjury by brokering a deal

whereby Alston, whom it was known was lying about Plaintiff was released in exchange

for his perjured testimony and for producing Damon who also lied about Plaintiff.

56.    The facts established in #54, infra, which are adopted herein by reference contest

paragraph 56 of Defendants' Rule 56.1 statement.

57.   On April 5, 2001, Mr. Parker spoke with Ms. Scaccia, of the Assistant District
      Attorney's office concerning the prosecution of Plaintiff. (Ex. 3, p. 199, 200, Ex. 19). Ms.
      Scaccia testified that it was Parker, who brought Alston to her and that she had
      conversations with Parker regarding Alston getting out of jail. (Ex. 25, p. 34, 59).

58.   Admit that Parker did not testify before the grand jury, however, the facts contained in
      Plaintiff's contested facts ¶ 174-181, 205-230 Infra, which are adopted herein, raise an
      inference that Parker suborned perjury by brokering a deal to get Alston, a known liar, out
      of jail to falsely implicate Plaintiff and testify before the grand jury.

59.   The facts contained in Plaintiff's contested facts ¶ 174-181, 205-230 Infra, which are
      adopted herein, raise an inference that Parker suborned perjury by brokering a deal to get
      Alston, a known liar, out of jail to falsely implicate Plaintiff and testify before the grand
      jury.

60.   Admit that Scott did not testify before the grand jury, however, the facts contained in
      Plaintiff's contested facts ¶ 181, 189-195, 205-211 Infra, which are adopted herein, raise
      an inference that Scott knew Alston was a liar and failed to prevent or authorized
      Agostini actions in suborning Alston's perjury, coercing Booth and other misconduct
      more fully stated below.

61.   Scott did not tell the District Attorney's office that Booth was threatened, that Cobb gave
      inconsistent statements or that Alston was a known liar, who was playing games to get
      out of jail. (Ex. 23, p. 49, 50, Ex. 25 p. 25,31, 32. 44, 45).

62.   Admitted.

63.   Admitted.

64.   Admitted, however, Plaintiff's contested facts ¶187, 190-193 Infra, which are adopted

herein, raise an inference that McGovern authorized or failed to stop Agostini from
fabricating evidence and suborning perjury.

65.    Ms. McCarthy a deputy inspector assigned to the Bronx Detective Borough, was the
operations commander who responded to the scene of Acosta's homicide and was
responsible to ensure that proper investigative steps were being taken.(Ex. 31, p. 9, 10, p.
12).

66.    Admitted.

67.    Admitted

68.    Admit, that said witness made such statements, but said witness' statements were
fabrications. (Ex. 33).

69.    Admit, that said witness made such statements, but that said witness' statements were
fabrications. (Ex. 33).

70.    Admit, that said witness made such statements, but said witness' statements were
fabrications. (Ex. 33).

71.    Admit, however Plaintiff's contested facts ¶ 105, 106, 148, 150, 175-184, 195-201, 211-
223, 231, 232, 241-246, 322, 324 Infra, which are adopted herein and exhibit 33 establish
and raise inferences that said indictment was the result of perjury and fraud before the
grand jury.

72.    Admit that Judge Williams made such a ruling, however, Judge Williams was actively
misled as to the nature of a deal between the People and Alston. (Ex. 4, Ex. 35, Ex. 25, P.
56, 57). Additionally Judge Williams held that the evidence presented did not create
probable cause to believe Plaintiff was involved in Acosta's homicide, except for the
testimony of Alston. (Ex. 4). Mr. Alston's testimony was a complete fabrication. (Ex. 33).

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Plaintiff asserts that the evidence attached to the undersigned's declaration support the following statements and inferences, which raise material facts precluding summary judgment.

73.    On February 12, 2001, Plaintiff was assigned by Sgt. Ohle to patrol a quadrant with Albert Acosta. (Ex. 1, p. 107, 108, 111).

74.    Parkchester security guards, when partnered up, do not patrol together, rather they divide a quadrant (several buildings) into sectors and patrol separately. (Ex. 1, p. 61).

75.    Mr. Manganiello was assigned to the sector East Charlie David and Mr. Acosta was assigned to East Adam Boy. (Ex. 1, p. 111).

76.    While on patrol, the officer's designations are used and their names are not broadcast over the radio. (Ex. 1, p. 124).

77.    Following roll call, Plaintiff began his patrol and Mr. Acosta at 8:15 a.m. went to the roof of a building with S.P.O. David Brewer to eat breakfast. (Ex. 1, p. 119, Ex. 14).

78.    At approximately 8:40 a.m., Plaintiff was dispatched to a dispute in his quadrant at 1700 Metropolitan Ave., apartment 5E. (Ex. 1, p. 111, 123, 124). Plaintiff arrived at the apartment at approximately 8:45 a.m. (Ex. 1, p. 124, 125).

79.    Mr. Acosta was sent to backup Plaintiff on the call and notified the dispatcher that he was at 1700 Metropolitan at 8:45 a.m. (Ex.7, p. 442, 443, Ex. 14).

80.    Mr. Colon, Parkchester's dispatcher testified that he sent Acosta to a disturbance in the basement of 1700 Metropolitan and he must have encountered someone there. (Ex. 7, p. 459).

81.    While at apartment 5E, Plaintiff was accompanied by Sgt. Rose and officers Rodriguez and Ortiz of the 43rd precinct. (Ex. 1 p. 126, 129). Upon Plaintiff's arrival, it was determined that the call was a tenant dispute and after fifteen to twenty minutes of calming down the tenants, Mr. Manganiello left the building with officers Rodriguez and Ortiz at approximately 9:00 or 9:10 a.m., and continued on his patrol. (Ex. 1, p. 129-131).

82.    Neither Plaintiff or the officers saw Mr. Acosta during this call at 1700 Metropolitan Ave., Apartment 5E. (Ex. 1, p. 130).

83.    Mr. Agostini admitted that no witness ever saw Plaintiff re-enter the building after he left. (Ex. 3, p. 261).

84.    Mr. Grimes was outside of the basement door between 8:00 am and 9:20 am and didn't see Plaintiff at all. (Ex. 30, p. 49).

85.    At approximately 9:45, Mr. Manganiello was at 14 Metropolitan Ave and issued a summons for improper garbage disposal, which he put in his memo book because the summons had to be turned in to management, who would in turn send it to the tenant to avoid direct confrontations. (Ex. 1, p. 133, 134).

86.    Mr. Manganiello, radioed in that he was going for a coffee break and began walking towards a diner. (Ex. 1, p. 136, 137).

87.    A few minutes after Plaintiff radioed in for a coffee break, Sgt. Ohle broadcast over the radio "10-13, 10-13, officer down, East Adam Boy[1] in the basement, East Adam Boy Shot". (Ex. 1, p 139, Ex. 7, p. 452).

88.    Mr. Colon, Parkchester's dispatcher confirmed that Sgt. Ohle broadcast over the Parkchester radio that a parkchester security officer was down and he understood that it

---

[1]Mr. Acosta's designation.

was Acosta who was down. (Ex. 7, p. 452, 453, 461).

89.   Mr. Manganiello ran to the scene and along with several other security and police officers

enter the basement and saw Mr. Acosta laying on the floor. (Ex. 1, p. 143, 145).

90.   Ms. McCarthy a deputy inspector assigned to the Bronx Detective Borough was the

operations commander. (Ex. 31, p. 9, 10). Ms. McCarthy responded to the scene and was

responsible to ensure that proper investigative steps were being taken. (Ex. 31, p. 12).

91.   Shortly after exiting the basement, Mr. Manganiello was approached by two officers who

patted him down and brought him to the 43rd precinct. (Ex. 1, p. 151). Lt. Scott testified

that a detective approached him and told him they had the victim's partner and were

bringing him to the precinct. (Ex. 23, p. 37-40). Then the detective looked at Scott,

opened his eyes very wide and nodded towards Mr. Manganello indicating that

Manganiello knew what happened to his partner. (Ex. 23, p. 39, 40, 42).

92.   Lt. Scott admitted that there was no evidence that in any way suggested that Plaintiff was

involved in the shooting. (Ex. 23, p. 41-43).

93.   Lt. Scott testified that Manganiello was targeted because he appeared to have been

running, but that it would be unusual for an officer not to run after hearing an officer

down call. (Ex. 23, p. 38-41).

94.   Scott also testified that Manganiello looked like he was in distress but that it was

expected for a person to be in distress if their partner had just been shot. (Ex. 23, p. 56).

95.   Sgt. McGovern testified that Mr. Manganiello was brought back to the 43rd precinct

because he was being arrested for Acosta's murder. (Ex. 24, p. 29).

96.   Inspector McCarthy testified that while she was at the scene, there was no probable cause

to arrest Plaintiff. (Ex. 31,p. 16).

97.   Ms. McCarthy was the highest ranking officer at the scene. (Ex. 31, p. 17).  Sgt.
      McGovern testified that when he arrived at the 43rd precinct, Mr. Manganiello was
      already placed in a cell. (Ex. 24, p.28, 30).

98.   Sgt. McGovern has no recollection of doing anything to determine whether there was
      probable cause and he did nothing to stop the arrest. (Ex. 24, p. 41).

99.    En route to the precinct, Mr. Maganiello began having chest pain and asked to go to the
      hospital, however, the officers ignored his request. (Ex. 1, p. 153, 154).

100.  At the 43rd precinct, Detectives Agostini and Abate began to question Mr. Manganiello.
      (Ex. 1, p. 155).

101.  Mr. Agostini admitted that plaintiff's supervisor, Sgt. Ohle, told him that there were no
      problems between Anthony Manganiello and Albert Acosta. (Ex. 3, p. 52).

102.  Mr. Manganiello answered all of Mr. Agositini's questions and provided his pedigree
      information. (Ex. 1, p. 155).

103.   After answering the basic pedigree questions, Mr. Agostini asked Mr. Manganiello if he
      knew anyone who may have wanted to kill Acosta. (Ex. 1, p. 156).

104.  Mr. Manganiello advised Mr. Agositini that a group of blood gang members had thrown
      Mr. Acosta through a plate glass window and of another incident in which a couple of
      neighborhood thugs, had threatened to shoot Mr. Acosta. (Ex. 1, p. 157, 160, 243).

105.   Even though Plaintiff provided his pedigree information, on February 12, 2001, Mr.
      Agostini created a DD5, which stated that Plaintiff would not answer questions about
      whether anyone had a problem with Acosta, and that he did not know his address and
      refused to provide his telephone information. (Ex. 13).

106.  Mr. Agostini testified at the criminal trial that when he asked Mr. Manganiello his

address on February 12, 2001, he responded "I don't know. I don't know." and that his

phone number was unlisted. (Ex. 7, p. 288, 289).

107.    In his deposition, Mr. Agostini, admitted that Anthony Manganiello, did provide his

address on February 12, 2001 and said information was put in the arrest report, which was

lost. (Ex. 3, p. 47, 48).

108.    Crime Scene reports which documented that Anthony Manganiello gave his address, date

of birth and social security number to officer McMahon at 12:25 pm on February 12,

2001, were withheld from the A.D.A and Mr. Manganiello's defense lawyer by the police

department until after Agostini testified at trial. (Ex. 7, p. 675, 676, Ex. 26, Ex. 25, p. 96-

100).

109.    After advising Mr. Agostini of the prior incidents, Mr. Agostini asked Mr. Manganiello

"Did you kill Albert Acosta?". Mr. Manganiello responded "Are you fucking crazy. I had

nothing to do with it. I came in here to help you guys out. You're turning this–you're

pointing this investigation towards me?".(s.i.c.)  (Ex. 1, p. 163).

110.    After Plaintiff asked Mr. Agostini if he was crazy, Mr. Agostini got up and stared at him

like he was a perpetrator. (Ex. 1, p. 163).

111.    After the aforementioned conversation with Plaintiff, Agostini and Abate left the room

and returned with Mr. McGovern; then they stripped him of his clothes including his

jacket, belt, sweater, shirt, removed his watch and took everything out of his pockets

including his wallet, keys, memo book and phone. (Ex. ,1 p. 163, 164).

112.    Mr. Abate testified that he has no memory concerning the events concerning questioning

Plaintiff and removing his clothes. (Ex. 29,p. 26, 27).

113.    Mr. Manganiello asked Mr. Agostini if he could leave and Agostini smirked and had an

officer guard the door. (Ex. 1,p. 166).

114.    Inspector McCarthy testified that when the detectives were speaking with Plaintiff, there was no probable cause to arrest him. (Ex. 31,p . 29-33).

115.    Mario Manganiello, Plaintiff's brother, a Sargent in the Mount Vernon Police Department went to the 43rd precinct and saw that his brother looked disheveled, without a uniform, in an undershirt with electrodes[2] hooked up to his chest. (Ex. 2, p. 44).

116.    After learning that his brother's clothes were taken and his hands were swabbed (for gun shot residue), Mario Manganiello approached Lt. Scott and told him, that it was obvious they were treating his brother like a suspect and he was calling a lawyer. (Ex. 2, p. 51).

117.    Both Mr. Abate and Mr. Agositini testified that they became suspicious because a lawyer was called for Plaintiff. (Ex. 3, p. 53, Ex. 29, p. 50).

118.    After the attorney arrived, Mr. Scott told Mario Manganiello that Plaintiff would be held and processed. (Ex. 2, p. 69).

119.    Mr. Agostini testified in a pretrial hearing that he became suspicious because Plaintiff's attorney, Mr. Ross, after speaking with Plaintiff asked the defendants whether it was intentional. (Ex. 34, p. 339).

120.    Mario Manganiello was with Mr. Ross for the entire time he was at the 43rd statement and Mr. Ross never made any such statement. (Ex. 32).

121.    As Mario Manganiello was leaving the 43rd precinct on February 12, 2001, Lt. Scott approached him and said "This didn't have to go this way... you're a cop ...now you got your brother lawyered up... What's the first thing that comes to your mind when somebody lawyers up". (Ex. 2, p. 73, 74). Lt. Scott then said to Mario Manganiello we

---

[2]EMS treated him for shortness of breath at the precinct.

were trying to get some information about what happened, you would think your brother would want to cooperate, but instead, you get a lawyer, what are we supposed to think. (Ex. 2, p. 74).

122.    Mr. Agostini testified that being "lawyered up" means a defendant wants to speak with a lawyer and doesn't want to speak with the police. (Ex. 3, p. 57).

123.    Mr. Agostini testified that someone who gets lawyered up is guilty of something. (Ex. 3, p. 58).

124.    While Lt. Scott and Mr. Abate denied any recollection of the conversation, they admitted that it is improper to assume someone was guilty because they retained counsel, as did Mr. McGovern. (Ex. 23, p. 86-88, Ex. 24, p. 76, Ex. 29, p. 51, 52).

125.    Ms. McCarthy likewise testified that it is improper to consider someone a suspect because they request to speak with a lawyer. (Ex. 31, p. 40).

126.    Mr. Agostini admitted that on February 12, 2001, Plaintiff was arrested for murdering Mr. Acosta, even though there was no evidence or probable cause that connected Plaintiff to the shooting. (Ex. 3, p. 58-60, 64).

127.    Mr. Agostini testified that either Abate or his supervisor decided to arrest Plaintiff. (Ex. 3 p. 60, 61).

128.    Mr. Abate has no memory of evidence that tied Plaintiff to the Acosta shooting and testified that Plaintiff was not a suspect and he was not arrested on February 12, 2001. (Ex. 24, p. 29, Ex. 29, p. 19, 20, 24, 53, 54, 66, 67).

129.    Lt. Scott testified that only a District Attorney can authorize an arrest for a homicide and that the procedure required him and Agostini to review the evidence with an A.D.A. and get authorization prior to making an arrest. (Ex. 23, p. 62-65).

130. Mr. Martinez testified that to make an arrest, you have to have enough evidence beyond your own reasonable doubt. (Ex. 30 p. 11).

131. Mr. Martinez testified that he didn't remember what the definition of probable cause was. (Ex. 30 p. 12).

132. On February 12, 2001, Lt. Scott was aware that the A.D.A. did not authorize the arrest of Plaintiff, however, he recalls seeing Mr. Manganiello in a cell and did nothing about the fact that Plaintiff was in a cell. (Ex. 3, p. 66, 67, 78-80).

133. Mr. Agostini did not have the authority to make the decision to place Manganiello in a cell. (Ex. 23, p. 78).

134. Lt. Scott testified that at no point did he become aware of any evidence that tied Plaintiff to Mr. Acosta's shooting and was unaware if Mr. Manganiello was arrested on Feb. 12, 2001. (Ex. 23, p. 61, 62).

135. After Anthony Manganiello spoke with his attorney, he was placed in a cell. (Ex. 1, p. 175).

136. While in a cell, Mr. Manganiello asked the defendants for something to wear because it was cold in the cell and his clothes had been removed and the defendants laughed at him. (Ex. 1, p. 175, 176).

137. Plaintiff heard Mr. Agostini say to Sgt. McGovern, I want you guys to buy me some time and bring Mario and his father back to the station- take some uniformed cars with you when you pick them up. (Ex. 1, p. 176).

138. About ten minutes after Mario Manganiello and his father left the 43rd Precinct, they were pulled over by numerous police cars and officers approached them with their guns drawn. (Ex. 2, p. 83, 97, 98).

139.    Mario Manganiello who had not committed any traffic infractions, was aggressively

pulled out of the car, thrown against his vehicle and searched. (Ex. 2, p. 104, 118, 119).

140.    Detectives Agostini, Abate, Sgt. McGovern and Geryl McCarthy arrived at the scene.

(Ex. 2, p. 112, 120).

141.    Mr. Agostini denies that he or Abate were there and Abate has no recollection. (Ex. 3, p.

85-87, Ex. 29, p. 58).

142.    Mario Manganiello and his father were  brought back to the 43rd precinct against their

will, placed in a room and not allowed to leave or use a restroom for six hours. (Ex. 2, p.

130-133, 156, 162). When Mario Manganiello complained to Lt. Scott, he responded that

this could have gone a lot easier, you got the lawyer. (Ex. 2, p. 168)

143.    Lt. Scott testified that Mario Manganiello was "being held for an investigation". (Ex. 23,

p. 94).

144.    After being released, on February 12, 2001, Mario Manganiello returned to the 43rd

precinct to bring his brother some personal effects and Sgt. McGovern told Agostini to

escort him out and Agostini grabbed Mario Manganiello's arm and walked him out. (Ex.

2, p. 180).

145.    Mr. Agostini denies that he ever spoke with Mario Manganiello. (Ex. 3, p. 77).

146.    On February 12, 2001, A.D.A. Dondes told Mr. Abate and Mr. Agostini that there was

not enough evidence to arrest Anthony Manganielo and A.D.A. Dondes refused to

authorize the arrest.  (Ex. 3, p. 96).

147.    Mr. Agostini opened the holding cell and stated to Anthony Manganiello  "leave".  (Ex.

1,p. 179, 180 ). As Plaintiff was attempting to put on his shoes, Agostini started pushing

him and said "Get out of my fucking station house". (s.i.c.) (Ex. 1,p. 179, 180).

148.    On February 12, 2001, Mr. Martinez interviewed officers Ortiz and Rodriguez who

confirmed that Plaintiff was with them at apartment 5E and left the building with them.

(Ex. 21).  Both officers said there was nothing unusual about his demeanor. (Ex. 21).

149.    Two weeks after A.D.A. Dondes told Agostini there was no probable cause to charge

Plaintiff, Agostini created a DD5 which attributed statements to officers Ortiz and

Rodriguez that was materially different than what they told Mr. Rodriguez. Agostini's

DD5 stated that the officers said that Manganiello left the building before they did, and

they did not see him thereafter. (Ex. 22).

150.    The handwritten notes from Mr. Martinez's first interview of Ortiz and Rodriguez were

given to Agostini and they have also gone missing. (Ex 30, p. 82, 83).

151.    On February 12, or 13, 2001, Mr. Agostini took possession of the entire homicide

investigation file. (Ex. 3, p. 115).

152.    Agostini testified that after he took possession of the homicide case file, it disappeared.

(Ex. 7, p. 279, 280).

153.    While Mr. Agosinti testified that he provided the entire case file to the A.D.A. for

copying, he has no recollection of when this occurred and Ms. Scaccia, the A.D.A. in

charge of this case testified that she was never given the entire file and never copied it.

(Ex. 3, p. 127, 129, Ex. 7, p. 292, Ex. 25, p. 25-28).

154.    When Ms. Scaccia asked Agostini for the original interview notes so that they could be

turned over to defense counsel, that is when the case file disappeared. (Ex. 25, p. 25-28).

155.    Mr. Agostini testified that the homicide file contained five folders of DD5s, a memo

book and other papers including computer checks, a spiral notebook full of witness

interviews and Mr. Manganiello's memo book. (Ex. 7, p. 293-294).

156.    All of the interview notes from the original witness interviews were Rosario material that
was required to be turned over to Plaintiff's criminal defense attorney. (Ex. 31, p 19). The
interview notes of Agostini's interviews with P.O. Ortiz and Rodriguez and the tenants in
apartment 5E, which contain information that was not put into the DD5s are among the
documents that went missing. (Ex. 3, p. 262, Ex. 3, p. 24, 31-33).

157.    Mr. Abate signed an affidavit in order to get a search warrant for Plaintiff's car and that
affidavit has also disappeared. (Ex. 3, p. 97).

158.    Other detectives provided Mr. Agostini with hand written notes of what they had done as
part of the investigation and it was department procedure for those notes to be maintained
and kept in the case file. (Ex. 3, p. 117, Ex. 23, p. 28).

159.    Mr. Agostini was aware the file contained Rosario material which is evidence that is
required to be turned over to a criminal defendant. (Ex. 3, p. 126).

160.    Ms. Scaccia testified that Agositini never provided her with the Rosario materials. (Ex.
25, p. 26-28).

161.    Mr. Martinez testified that there were no rules for preserving Rosario material at the 43rd
precinct. (Ex. 30, p. 34, 35).

162.    On February 12, 2001, Mr. Manganiello carried a memo book, in which he recorded
where he went, what he did and the time of each event. (Ex 1, p. 67, 68).  Mr.
Manganiello kept strict track of where he was at any given time because the Sergeant
randomly inspected the memo book. (Ex. 1, p. 123).

163.    Mr. Agostini testified that the memo book was evidence, which according to the
procedures at the 43rd precinct should have been vouchered, however, it was never
vouchered and has gone missing. (Ex. 3, p. 69, 70).

164.    The 43rd precinct had a cabinet and a storage room where homicide case files were stored. (Ex. 3, p. 117, 118).  The procedure was that the case file had to be kept in the cabinet, unless the detective was working on it. (Ex. 24, p. 66).  The cases were categorized by year so that they could be retrieved when needed. (Ex. 30, p. 36).

165.    Mr. Scott confirmed that any written material which pertained to the case had to be preserved and later on turned over to defense counsel. (Ex. 23, p. 15).

166.    Mr. Scott confirmed that there was an indexing system at the 43rd precinct and a storage room where the homicide case folders were stored. (Ex. 23, p. 16).

167.    Mr. Scott testified that it was not acceptable protocol for a detective to leave a file in a personal locker room. (Ex. 23, p. 18, 19).

168.    Mr. Agostini did not put the case file into the filing cabinet and was unable to remember if the case file was ever put into the storage room. (Ex. 3, p. 119).  Mr. Agostini gave conflicting stories about where the file was when he last saw it.  Mr. Agostini testified that the last time he saw the file, it was in a locker room and also testified that it was under his desk the last time he saw it. (Ex. 3, p. 120, 122). Mr. Martinez when asked if files were kept in a locker room "It wouldn't happen, I mean I'd never seen something like that happen". (Ex. 30 p. 37).  He at one point blamed the disappearance of the file on a cleaning person taking it and at another time blamed the file's disappearance on renovations.  (Ex. 3 p. 122, Ex. 7, p. 283).

169.    Both Mr. McGovern and Lt. Scott testified that it is very unusual that an entire file for such an important case would go missing because Agostini is very meticulous with his case folders and that he had no memory of any renovations at the 43rd precinct. (Ex. 23, p. 45, 47, 48, 142, Ex. 24, p. 72, 73).

170.    Mr. McGovern testified "Cases shouldn't disappear..That is why they have file cabinets.

They are supposed to complete their case work. It gets filed. It is supposed to stay there."

(Ex. 24, p. 73).

171.    Inspector McCarthy testified that it would be very unusual for a case file to be missing.

(Ex. 31, p. 25). Mr. Agostini never provided Lt. Scott with an explanation of what

happened to the case folder. (Ex. 23, p. 48).

172.    Lt. Scott was unaware of whether a detective was subject to discipline for losing an

entire case file. (Ex. 23, p. 48).

173.    Ms. Scaccia testified in her recent deposition that the District Attorney's file for the

prosecution of Anthony Manganiello has also disappeared. (Ex. 25, p 47-49).

174.    On February 12, 2001, Mr. Abate contacted the intelligence department and they had no

information concerning Anthony Manganeillo. (Ex. 15 ).

175.    Four days after A.D.A. Dondes determined that there was not enough evidence to charge

Mr. Manganiello, Mr. Parker from intelligence came up with a "confidential informant"

named Terrance Alston, who was incarcerated in Rikers Island. (Ex. 16).

176.    Both Messrs. Parker and Agostini knew that Mr. Alston was a member of the bloods, a

street gang and his criminal history was in the homicide case file, which has disappeared.

(Ex. 3, p. 152, 153, Ex. 6, p. 21).

177.    When Mr. Parker produced Mr. Alston, he was under indictment for Attempted Murder,

Robbery in the first degree and weapons charges.  (Ex. 27).

178.    Mr. Alston was sent to prison four months prior to Mr. Acosta's murder. (Ex. 3, p. 167).

179.    When asked to explain how Alston had information on a murder that occurred four

months after he was sent to jail, Agostini admitted someone must have provided him with

the information. (Ex. 3, p. 168).

180.    Mr. Alston has given numerous contradictory statements to various detectives.  The first

time Mr. Parker met with Alston, he took notes of what Alston said concerning the

murder of Acosta, all of which have disappeared. (Ex. 6, p. 27, 28). The first time Alston

was interviewed by detectives from the 43rd precinct, he gave a statement that in August

of 2000, (six months prior to Acosta's shooting) a security guard asked him to kill a

fellow security guard, which differed from what he had initially told Mr. Parker, his

handler. (Ex. 6, p. 45, Ex. 18).

181.    The  inconsistent statements which Alston  made to Parker was never provided to the

A.D.A. (Ex. 6, p. 51, 52).

182.    Mr. Alston told Agostini that Plaintiff wanted Acosta killed "over a girl", but after

interviewing the women with whom Mr. Acosta had relationships, it turned out, none of

them had a relationship with Mr. Manganiello. (Ex. 3, p. 196).

183.    Mr. Alston had given contradictory dates when this alleged conversation with the Plaintiff

occurred to different detectives. (Ex. 3, p. 164, 165).

184.     Anthony Manganiello had never spoken with Terrance Alston and did not know who he

was, nor did he ever have a conversation with Terrance Alston in which he discussed

either buying a gun, killing a fellow security guard or purchasing a weapon, nor was he

involved with any of the same women as Mr. Acosta. (Ex.33, Ex. 3, p. 196).

185.     Lt. Scott was the Lt. Squad commander of the 43rd precinct and he was responsible for

supervising the detectives in his squad and was responsible for the investigation of the

homicides. (Ex. 23, p. 10-12, Ex. 31, p. 61).

186.     Mr. McGovern was the squad supervisor and his responsibilities included reviewing

cases for accuracy, completion and making sure detectives did the follow steps needed to conduct an investigation. (Ex. 24, p. 11, 12).

187.    It was standard procedure for either Lt. Scott and/or Sgt. McGovern to review all of the DD5s including the DD5s concerning Chris Tartone, Johnny Baker, Mark Damon and Terrance Alston. (Ex. 3, p. 130- 133,Ex. 23, p. 14).

188.    None of Mr. Agostini's supervisors ever spoke with him concerning whether Alston was credible. (Ex. 3, p. 132).

189.    Lt. Scott was the commanding officer and was in overall charge of the 43rd detective bureau. (Ex. 30 p. 23, 24).

190.    Lt. Scott was not aware that Alston had claimed that Plaintiff had agreed to pay him to kill another security guard, even though the DD5 which contains the statement was signed by Scott. (Ex. 23, p. 109, Ex. 24, p. 50). Lt. Scott testified that had he been aware of such a statement, the C.I. would have been arrested, if there was some truth to it. (Ex. 23, p. 110). Even though Alston agreed to kill someone for hire, Mr. Agostini testified that he did not charge Alston with criminal activity. (Ex. 3, p. 163, 164).

191.    When Mr. Scott was shown the DD5 with Alston's statement, Lt. Scott's response was "WOW". (Ex. 23, p. 113).

192.    When asked whether Alston should have been investigated, his response was "You know, if depending upon the detective, maybe he thought the guy was just full of shit".(s.i.c.) (Ex. 23,p. 114). If that was the case, Lt. Scott admitted that information provided by Alston should not have been used in a murder prosecution. (Ex. 23, p. 114, 115).

193.    Lt. Scott never spoke with Agostini or the A.D.A concerning Mr. Alston's credibility and admitted there were no clear guidelines on how to handle this type of situation. (Ex. 23, p.

115, 119-123, Ex. 25, p. 44, 45).

194.    Lt. Scott was unaware if any supervisor ever did a credibility check on Alston. (Ex. 23,

p. 140). Lt. Scott did not know whether Agostini provided the District Attorneys office

with fabricated evidence, or if Agostini permitted informants to commit criminal acts in

exchange for being a witness. (Ex. 23, p. 141).

195.    When Agostini met with Alston, he came up with a story that a friend of his Johnny

Baker sold Plaintiff a .22 caliber gun. (Ex. 16).

196.    Mr. Alston said nothing about Baker selling Plaintiff a gun the day prior when he spoke

with other detectives from the 43rd precinct. (Ex. 16).

197.    When Mr. Baker was interviewed, he said he never sold a gun to a Parkchester security

guard and knew nothing about this matter. (Ex. 3, p. 177 -179).

199.    Mr. Alston when asked about this, said to Agostini "Why did you question him, I told you

not to do that". (Ex. 3, p. 179).

200.    Mr. Agostini testified that Alston didn't want Agostini to interview any witnesses he

produced without him being present, however he never made the District Attorney aware

of that fact. (Ex. 3, p. 179, 180, Ex. 25, p. 72).

201.    Mr. Agosinti never asked Alston, why he wanted to be present and he claimed to be

unaware of whether Alston was suborning perjury. (Ex. 3, p. 181).

202.    Lt. Scott claimed to be unaware that Mr. Alston had lied to Agostini and testified that a

murder prosecution should not go forward based solely on the word of a Confidential

Informant that has lied. (Ex. 23, p. 110, 111, 124, 125). Mr. McGovern, who was also

supervising this investigation testified that Agostini did not inform him that Alston had

lied. (Ex. 24, p. 55, Ex. 3 117, 118).

203.  Mr. Agosinti testified that officers are supposed to do follow up investigations to see if confidential informants are providing reliable information and if an informant gives an officer bad information, he should be dropped. (Ex. 3, p. 15, 18).

204.   Lt. Scott testified that it was common for confidential informants to "work off time" or be paid.  (Ex. 23, p. 105, 106).

205.  Mr. Agostini admitted that Mr. Alston's credibility was undermined because he lied, hid things and was playing games because he wanted to get out of jail. (Ex. 3, p. 150, 152, 181, 182).

206.   Mr. Agostini did not make any record or advise the district attorney that he had concerns about Alston's credibility because he was playing games to get out of jail. (Ex. 3, p. 181, 182, Ex. 25, p. 44, 45, 65, 66).

207.  Ms. Scaccia, confirmed that a deal was reached with Alston and he was released from his incarceration in exchange for his testimony against Plaintiff. (Ex. 25, p. 60). When asked about the specifics of the deal Ms. Scaccia was unable to provide said information because the District Attorney's file has disappeared. (Ex. 25, p 47-49).

208.  Mr. Alston was let out of jail before Plaintiff was re-arrested and charged in April, 2001. (Ex. 3, p. 183).

209.  Although initially denying that Mr. Alston was provided anything in exchange for his testimony and statements, Mr. Agosinti, under further questioning admitted that Mr. Alston was let out of jail in exchange for the information he provided against Anthony Manganiello. (Ex. 3, p. 172, 173, 200, 201).

210.  Mr. Agostini testified that he did not care whether Mr. Alston was let out of jail in exchange for providing information and that it wasn't his responsibility to determine if

Mr. Alston was making up stories to get out of jail. (Ex. 3, p. 183, 184, 192).

211.    Agostini testified that Mr. Parker was the one that supervised Alston's activities. (Ex. 3, p. 184).

212.    Mr. Parker admitted that he had unorthodox methods which sometimes clashed with the powers that be and threatened police tradition. (Ex. 6, p. 84).

213.    In discussing his methodology, Mr. Parker stated sometimes crimes are not simple to solve and need a little finessing which is something you need to do a little different to get the answers you want. (Ex. 6, p. 85).

214.    Mr. Parker in his book also stated "if you want to solve a homicide, you're going to need informants. Period. Fuck DNA testing, fuck all the flashy, divorced from reality high tech cop shows you see on TV." s.i.c. (Ex. 5, p. 64).

215.    Parker also recognized that informants are not the most trustworthy people. (Ex. 5, p. 76).

216.    When asked if Mr. Alston was given anything in exchange for the information he was providing, Mr. Parker's response was " I don't know anything about that". (Ex. 6, p. 40).

217.    Ms. Scaccia was unable to remember Mr. Parker's involvement in the deal made with Alston, other than generally that there was a discussion with him. (Ex. 25, p. 59).

218.    Mr. Parker initially denied that he ever promised a confidential informant an early release in exchange for information or brokered deals whereby felony charges would be dropped in exchange for information. (Ex. 6, p. 47, 48, 52, 53).

219.    However, when confronted with a book in which he chronicled his police work, Mr. Parker admitted that he did in fact recommend to various District Attorneys that charges be dropped in exchange for a prisoner becoming a witness. (Ex. 6, p. 57, 58).

220.   In his book, Mr. Parker admitted that he customarily suggested to felons that the charges which brought them in would be overlooked if they cooperated. (Ex. 5, p. 57).

221.   Mr. Parker further said in his book "I wasn't bullshitting. Nine times out of ten the DA goes for it"(s.i.c) (Ex. 6, p. 57).

222.   Mr. Parker did admit that he has in the past paid money to witnesses. (Ex. 6, p 49). Mr. Parker was unable to recall whether Mr. Alston was "working off time" or if he was made any promises or released from prison in exchange for his testimony. (Ex. 6, p. 65-67, 81, 83).

223.   After Mr. Baker told Agostini that Alston was lying about him selling Anthony Manganiello a gun, Mr. Parker and Mr. Alston produced another witness named Mark Damon, who was 17 year old. (Ex. 3, p. 188).

224.   On April 5, 2001, when Damon met with the Ms. Scaccia, Agostini and Parker, Alson had already been let out of jail. (Ex. 3, p. 199, 200, Ex. 19).

225.   Ms. Scaccia admitted it was improper to interview a witness with Alston present, however, Agostini states that Damon was interviewed with Alston present. (Ex. 25, p. 66, Ex. 19).

226.   Mr. Damon falsely stated that he sold Plaintiff a .22 caliber gun. (Ex. 17, Ex. 33).

227.   Mr. Agostini did not ask Damon where he got the gun from because Alston did not want him to speak with Damon nor was Mr. Damon was ever asked to write out his own statement. (Ex. 3, p. 197, 199, 200).

228.   Mr. Agostini testified that Damon was Parker's responsibility. (Ex. 3, p. 197, 198).  Mr. Damon subsequently recanted his story and admitted that Alston was making him say it. (Ex. 3, p. 191, 192).

229.   Mr. Damon was never charged with sale of a firearm or perjury. (Ex. 3, p. 198).  During

Plaintiff's trial, the A.D.A. represented to the Court that Mr. Damon was a liar and she

could not put him on the stand. (Ex. 7, p. 508).

230.   Mr. Parker claims to have no memory of Mr. Damon. (Ex. 6, p. 78, 79, 82).

231.   Two weeks after being told there was not enough evidence to charge Anthony

Manganiello, Mr. Agostini created a DD5 which stated that Sal Miro said that Anthony

Manganiello told him he had a .22 caliber gun, that he carries it with him and that the

owner of the pizza place (Tartone) had additional information about Manganiello. (Ex.

10).

232.   Sal Miro swore that he never spoke with Mr. Manganiello directly and he never made

such a statement to any detective. (Ex. 11).

233.    If a witness had personal knowledge of a fact, Agostini would normally ask them to write

out a statement, however Sal Miro was never asked to write out his own statement. (Ex.

3, p. 138, 139).

234.    Ms. McCarthy stated that it was absolutely proper procedure to have witnesses write out

their own statements. (Ex. 31, p. 19).

235.    Ms. Scaccia admitted that the statement played a role in causing her to initiate the

prosecution against Plaintiff and explained how Agostini came into contact with Booth.

(Ex. 25, p. 91, 92).

236.   Agosinti claims that Tartone advised him that Manganiello asked Booth, a loan shark, for

an "illegal gun". (Ex. 3, p. 222, Ex. 12).

237.   Mr. Agostini and Mr. Martinez brought Mr. Booth to the 43rd precinct, and while they

claim that Booth came to the 43rd precinct voluntarily, Agostini admitted that he searched

Booth. (Ex. 3, p. 221, 222, Ex. 8).

238.    Mr. Martinez claims to have no knowledge of Booth even though Agostini claims that he

was with him when he interviewed Booth. (Ex. 30, p. 17, Ex. 8).

239.    Mr. Agostini knew that Booth was a neighborhood bookie with ties to organized crime

including an uncle that was "mobbed up" in Hunts Point, which is coincidentally where

Mr. Booth worked. (Ex. 3, p. 213- 216).

240.    Mr. Booth's criminal history was in the case file, which disappeared. (Ex. 3, p. 217, 218).

241.    Upon searching Booth, Mr. Agostini found a knife and betting slips, which were

evidence of criminal gambling activity. (Ex. 3, p. 222, 224).

242.    Mr. Agostini threatened to pass Booth's name onto the organized crime unit, but told

Booth that he would not be arrested if he told Agosintini what he wanted to know, and if

he didn't criminal charges would be pursued. (Ex. 3, p. 222- 226).

243.    Then Mr. Booth wrote out a statement in which he says Manganiello asked to purchase a

gun from him. (Ex. 8).

244.    After signing the statement for Mr. Agosinti, Mr. Booth was never arrested and there was

no investigation into his activities. (Ex. 2, p. 214, 215, 218, Ex. 3, p. 219).

245.    Even though possession of a knife is a crime, after Booth signed the statement, Agostini

gave him back the knife and the gambling paraphernalia disappeared. (Ex. 3, p. 223, 226).

While Mr. Abate also met with Booth, he has no memory of whether gambling slips or a

knife were found on his person or whether Booth was not charged with criminal activity

in exchange for implicating Plaintiff. (Ex. 29, p. 72-74).

246.    Plaintiff never asked Mr. Booth to sell him a gun and Mr. Booth's statement was a

fabrication. (Ex. 33).

247.    Mr. McGovern did not know whether it was proper procedure to not charge someone with a crime in exchange for giving a statement. (Ex. 24, p. 62, 63).

248.    Mr. McGovern testified that he was not aware that Mr. Agostini did not charge Booth, despite finding gambling contraband on his person in exchange for giving a statement against the Plaintiff. (Ex. 24, p. 63).

249.    Agostini and Martinez did not tell Ms. Scaccia, that they threatened Booth to get the statement or that the evidence they found on Booth disappeared after he signed the statement. (Ex. 25, p. 83, 84).

250.    Booth's statement played a causal role in causing the District Attorney to institute the criminal proceeding against Plaintiff. (Ex. 25, p. 33, 34, 40).

251.    Mr. Booth testified at trial that two  detectives gave him Plaintiff's name. (Ex. 7, p. 619-623).

252.    Mr. Agostini claimed to be unable to remember whether he provided Mr. Booth with Anthony Manganiello's name and could not recall anything else that he said to Booth. (Ex. 3, p. 221, 227, 228).

253.    Mr. Booth also testified that even though he "does numbers" and lends money, no one at the 43rd precinct bothers him. (Ex. 7, p. 618, 619).

254.    Agostini testified that Lt. Scott was informed that he found gambling materials on Booth and Scott approved of his not providing the gambling materials to the vice squad. (Ex. 3, p. 244, 245).

255.    However in his deposition, Lt. Scott testified it was improper to allow an informant to commit crimes without punishment in exchange for information. (Ex. 23, p. 108).

256.    On April 20, 2001, Luis Agostini signed a felony complaint charging Plaintiff with Mr.

Acosta's homicide and to do so, he needed a supervisor to authorize the arrest. (Ex. 3, p. 202, Ex. 23, p. 127).

257.    Ms. Scaccia testified that the witness statements provided by Agosinsi caused her to initiate the prosecution against the Plaintiff. (Ex. 25, p. 36).

258.    When Mr. Manganiello was arrested and charged with murder, Lt. Scott and Sgt. McGovern, Agostini's supervisors were not aware of any evidence that established probable cause to believe Mr. Manganiello was responsible Mr. Acostsa's death. (Ex. 23, p. 126, Ex. 24, p. 49, 50).

259.    Mr. McGovern never took any steps to verify that the information provided to the District Attorneys's office was credible. (Ex. 24, p. 80, 81).

260.    Prior to Mr. Manganiello being re-arrested in April, 2001, detective Agostini had the results of the gun shot residue tests performed on Plaintiff's hands, which were negative. (Ex. 3, p. 71, Ex. 7, 761-763, Ex. 25, p. 15-17).

261.    Even though Mr. Agostini prepared numerous papers in connection with the arrest of Plaintiff, all of those papers have gone missing. (Ex. 3, p. 202).

272.    In order to receive an arrest warrant, Mr. Agostini presented the evidence provided by Mr. Cobb, Booth, Tartone and Mr. Alston to a Judge. (Ex. 3, p. 203).

273.    However, he could not recall whether he advised the Judge that Alston had given false information. (Ex. 3, p. 209).

274.    The case against Mr. Manganiello was presented to the Grand Jury based upon the testimony of Walter Cobb, Terrance Alson, Alex Perez, Miriam Nieves, Chris Tartone, Jose Casiano, Luis Agostini, and the medical examiner's report was introduced.  (Ex. 28).

275.    The grand jury testimony was unsealed by Judge Marcus of the Bronx Supreme Court.

Joseph Declaration.

276. Before the grand jury, Mr. Alston falsely testified in pertinent part that on October 1, 2000, Mr. Manganiello approached him and asked him if he would accept a contract to kill another security officer because of a dispute with a girl. (Ex. 28, CL 5-9, Ex. 33).

277. Mr. Alston further falsely testified before the grand jury that he agreed to kill the security guard and said that Plaintiff would lure the security guard to the basement of 1700 Metropolitan Ave., where Alston would do the hit. (Ex. 28, CL 7-8, Ex. 33).

278. Plaintiff never approached Terrance Alston and never asked him to commit a murder. (Ex. 33).

279. Mr. Alston's grand jury testimony was a complete fabrication and Mr. Alston committed perjury before the grand jury. (Ex. 33).

280. The Grand Jury was not advised that Mr. Alston had lied about knowing someone who sold a gun to Plaintiff, nor were they advised that he was under indictment for Attempted Murder and Robbery and that he had been released from prison in exchange for his testimony. (Ex. 25, p. 40, 41).

281. The grand jury was not advised that Alston had previously said that this conversation occurred in August, not October. (Ex. 18, 25, p.50-52 ).

282. Alston had on yet another occasion stated the conversation occurred in September. (Ex. 18).

283. Mr. Cobb testified in pertinent part before the grand jury and at trial that on February 12, 2001, at approximately 10:00 a.m., he approached 1700 Metropolitan Ave., when he heard four gun shots, then the door opened and Plaintiff walked out. (Ex. 28, CL 2-5, Ex. 7, 47-50).

284.    Mr. Manganiello did not see Mr. Cobb at all prior to responding to the call that Acosta

was down. (Ex. 33). Mr. Cobb's testimony was not true. (Ex. 1, p. 142, Ex. 33) .

285.    Walter Cobb was an alcoholic with money problems and who had been caught stealing

supplies from Parkchester. (Ex. 1, p. 43, 44).

286.    In his 911 call to the police, after finding Acosta's body, Mr. Cobb did not tell the police

that he saw someone leave the building after hearing shots. (Ex. 25, p. 102, 103).

287.    Mr. Agostini was aware that Cobb had made inconsistent statements including telling the

first responder Sgt Ohle that it sounded like the shots came from outside of the building.

(Ex. 3, p. 231, 234).

288.    Lt. Scott testified that when he was at the scene, it was not known who Cobb saw leave

the basement. (Ex. 23, p. 49, 50).

289.    Mr. Martinez was the first detective to interview Cobb, and the notes from that interview

were given to Agostini and disappeared. (Ex. 30, p. 42).

290.    The District Attorney was not made aware of these inconsistent statements. (Ex. 25, p.

31, 32).

291.    Mr. Agostini was also aware that a verizon employee, Mr. Huello was directly across

from where Mr. Acosta was found when Mr. Cobb entered the basement and he did not

see Anthony Manganiello or hear any shots. (Ex. 3, p. 236-238).

292.    Mr. Martinez interviewed Mr. Huello and the notes from the interview were given to

Agostini and they too disappeared. (Ex. 30, p. 52, 53).

293.    Mr. Huello was working in the basement when Cobb first walked in and he did not hear

any shots, nor did he see Mr. Manganiello at all. (Ex. 30, p. 53, 54).

294.    Mr. Cobb gave completely contradictory stories to Detectives Agostini, Martinez and

officer Perez. (Ex. 2, p. 238-240, 255, 256).

295. When asked about the inconsistencies, Martinez responded that "I am not there to make an assessment of the case" (Ex. 30, p. 57).

296. The grand jury was never informed that Mr. Cobb had given directly contradictory statements and Mr. Huello was not called to testify before the grand jury. (Ex. 28, Ex. 25, p. 72).

297. Mr. Agostini never considered any of the information which indicated that Cobb's statements were not accurate including the statements of Richard Huello which directly contradicted what Cobb said. (Ex. 3, p. 210, 253).

298. The officers who accompanied Plaintiff to the call of the domestic disturbance and left the building with him were not presented to the Grand Jury. (Ex. 25, p. 104, 105).

299. Both officers Alex Perez and Miriam Nieves testified before the grand jury and at trial that they received a radio transmission that an officer had been shot but that the victim was not identified as a Parkchester officer prior to Plaintiff's arrival on the scene. (Ex. 28, TP 4- TP7, TP 12, 13, Ex. 7, p. 150, 210).

300. The grand jury was not informed that every 911 call that came into the N.Y.P.D. identified the victim as a parkchester security guard, Acosta's designation was broadcast over the parkchester radio by Sgt. Ohle, prior to Plaintiff's arrival. (Ex. 28, TP 12-14, Ex. 1, p. 139, 144, Ex. 7, p. 452, Ex. 25, p. 74, 101, 102).

301. During trial, Nieves admitted that the broadcast did indicate that the victim may have been a parkchester officer. (Ex. 7, p.174, 452, Ex. 25, p. 74).

302. Ms. Nieves testified that as she left the basement where Acosta was found, Plaintiff entered the hallway and said to her, "l don't want to go in there... that's my partner". (Ex.

28 TP 12- TP 14).

303.    During a pretrial hearing, Ms. Nieves testified that Plaintiff said to her, "I want to go in

there. That's my partner", which contradicted her grand jury testimony. (Ex. 7, p. 179,

180).

304.    Plaintiff did not make any statements to Ms. Nieves and never said to her that was his

partner in there. (Ex. 1, p.144, Ex. 33).

305.    The testimony of Ms. Nieves and Ms. Perez falsely implied that Plaintiff had guilty

knowledge because he could not have known Mr. Acosta's identity unless he was the

shooter. (Ex. 20).

306.    Ms. Nieves didn't tell any detectives on the scene about this conversation or make any

notes that the statement occurred, rather, the first record of this conversation occurring

was three weeks later in a DD5 prepared by Agostini. (Ex. 7, p. 170, 182, Ex. 20).

307.    Both Agostini and Lt. Scott knew that there was a radio transmission stating that a

Parkchester security guard was down. (Ex. 23, p. 31, 32, Ex. 3, p. 30).

308.    Chris Tartone, who works in a pizza shop, testified that while Plaintiff was eating pizza,

he overheard him asking a co-worker if he knew anyone who was selling a gun. (Ex. 28,

CL[3] 4,5).  Plaintiff never had any such conversation and Mr. Tartone's testimony was a

fabrication. (Ex. 33).

309.    The remaining witnesses testified that Acosta had died and that they vouchered evidence.

(Ex. 28, CL 8-15).

310.    Judge Williams reviewed the grand jury minutes and held that the evidence was purely

circumstantial, i.e., there is no testimony that anyone saw or heard the defendant shoot the

---

[3]From 4-26-01 testimony.

deceased, nor is there any link between the defendant and the murder weapon, nor did the defendant make any statements. (Ex. 4, p. 2).

311. Judge Williams found that the testimony concerning Mr. Manganiello's presence at the scene shortly after the fatal shots is not distinguishable from that of at least two other individuals who were also present. (Ex. 4, p. 2).

312. After summarizing the testimony of the police officers and two civilian witnesses, the Court found that "this evidence alone is insufficient to make out a prima facie case that this defendant ... killed Albert Acosta". (Ex. 4, p. 3).

313. The Court found that the only evidence that tended to connect Mr. Manganiello to the crime was the testimony of Mr. Alston concerning two statements made months prior that Mr. Manganiello wanted to kill another security guard. (Ex. 4, p. 3).

314. The Court found Mr. Alston's testimony to be the essential link to the circumstantial case. (Ex. 4, p. 3).

315. The Court determined that it appeared that a deal had been made with the witness concerning his testimony which was not disclosed to the grand jury. (Ex. 4, p. 3). The Court held that such an agreement would be crucially relevant to the Grand Jury's ability to judge the credibility of this witness and directed the A.D.A. to provide an affirmation identifying whether a deal had been made with the witness, which was not disclosed to the grand jury. (Ex. 4, p. 3).

316. In response to the Court's ruling, the District Attorney's office provided an affirmation which represented to the Court that the witness had agreed to work with Mr. Parker in the investigation of unrelated narcotics charges and was released from custody, but that Mr. Alston's release was not to ensure his testimony in the instant case. (Ex.5).

317.  However, Ms. Scaccia testified in her deposition that Mr. Alston was released from custody and would receive "time off" of his sentence in exchange for his testimony against the Plaintiff. (Ex. 25, P. 56, 57).

318.  In fact, Alston took an "open plea" which meant that the District Attorney had leverage to increase his sentence if he deviated from his "cooperation agreement". (Ex. 25, p. 56).

319.  Although, Ms. Scaccia, the prosecutor who prosecuted Plaintiff became the prosecutor responsible for prosecuting Alston, she has no recollection of the exact terms of the deal. (Ex. 25, p. 79, 80).

320.  Contrary to the District Attorney's affirmation, Detective Parker in his deposition testified that he was not working on any narcotics cases and his first contact with Mr. Alston was in reference to this case. (Ex. 6, p. 16-22, 29, 30, 38).

321.  Mr. Agostini confirmed that Alston was let out of prison in exchange for his statements against Plaintiff.  (Ex. 3, p. 172, 173, 200, 201).

322.  At a pre-trial hearing in the criminal matter, Agostini testified that a note was found in the Plaintiff's locker which said "I feel like killing somebody", when in fact the note said I pray everyday that I will never have to kill someone. (Ex.3, p. 105-107, Ex. 9).

323.  Mr. Agostini testified that he did not know if he ever provided the A.D.A., with a copy of the note. (Ex. 3, p. 104).

324.  Crime scene records were withheld from the District Attorney and Mr. Manganiello's lawyer until the end of the People's case at trial. (Ex. 7, p. 671, Ex. 25, 93-95).

325.  Judge Marcus commented that he had never seen anything like this before and he was amazed that Crime Scene photographs were being produced on the last day of the people's case, even though the prosecutor was obligated to disclose them well in advance

of trial. (Ex. 7, p. 672, Ex. 25, 93-95).

326.    Mr. Parker also testified that the NYPD was wracked with corruption and ambition in that

there was pressure to advance in rank and that a large part of rising in rank involves

closing cases. (Ex. 6, p. 99-102).

327.    Mr. Parker stated in his book "Its funny how criminals and cops both share the same

code: rats are looked down upon in both cultures, which shows how we're on both sides

of the same coin" (Ex. 5, p. 56).

328.    Plaintiff was acquitted of all charges following a jury trial. (Ex. 33).

329.     As a result of the prosecution, Mr. Manganiello spend ten days in jail and lost his police

certification. (Ex. 1, p. 220, 228).

Dated: White Plains, New York
          May 13, 2008
                                        Yours etc.,


                                        OSORIO & ASSOCIATES, LLC

                          BY:
                                        Michael H. Joseph, Esq. (MJ8838)
                                        184 Martine Avenue
                                        White Plains, New York 10601
                                        (914) 761-3168