# EXHIBIT BB

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

ANTHONY MANGANIELLO,

                    Plaintiff,

                              CASE No:

                              07-CV-3644

        -against-


THE CITY OF NEW YORK, et al.

                    Defendants.

- - - - - - - - - - - - - - - - - - - -X


                    May 2, 2008

                    2:12 p.m.


DEPOSITION of CHRISTINE SCACCIA, the

witness herein, taken pursuant to

Court Order, and held at the Offices

of New York Corporation Counsel, 100

Church Street, New York, New York,

before Mary T. Slavik, RPR, a

Certified Court Reporter and Notary

Public of the State of New York

CHRISTINE SCACCIA

2

A P P E A R A N C E S:


OSORIO & ASSOCIATES, LLC

    Attorneys for Plaintiff

    184 Martine Avenue

    White Plains, New York 10601

BY:  MICHAEL H. JOSEPH, ESQ.


NEW YORK CITY LAW DEPARTMENT

OFFICE OF THE CORPORATION COUNSEL

    Attorneys for Defendants

    100 Church Street, 4th Floor

    New York, New York 10007

BY:  MARK ZUCKERMAN, ESQ.

       and

    AMY N. OKEVEKE, ESQ.



CHRISTINE SCACCIA

3

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.



CHRISTINE SCACCIA

4

1

2              CHRISTINE SCACCIA,

3    having been first duly sworn by the Notary

4    Public, Mary T. Slavik, and stating her

5    address as 198 East 161st Street, Bronx,

6    New York 10451, was examined and testified

7    as follows:

8

9    EXAMINATION BY

10   MR. JOSEPH:

11       Q.    Ma'am, can we please have your

12   name and business address for the record?

13       A.    Christine Scaccia, S-c-a-c-c-i-a.

14   The address is 198 East 161st Street,

15   Bronx, New York 10451.

16       Q.    Between February of 2001 and July

17   of 2004, were you employed by the Bronx

18   County District Attorney's Office?

19       A.    Yes, I was.

20       Q.    And during that time period, what

21   was your position?

22       A.    I was over -- in July of 2001, I

23   went to the grand jury evaluations bureau

24   were I was serving as the deputy chief of



CHRISTINE SCACCIA

5

1  the bureau in homicide.

2      Q.   And what does the deputy chief for

3  the grand jury evaluations do?

4      A.   Well, we would authorize homicide

5  arrests based on any new homicides that

6  occurred within the county, and we also

7  supervise the presentation of homicide

8  presentations into a grand jury panel.

9      Q.   What procedure, if any, existed in

10  2001 for the authorization of a homicide

11  arrest?

12      A.   If there was a homicide that had

13  taken place we would, one, first of all, be

14  notified that someone had been killed.  If

15  there was a suspect who was either

16  identified or in custody once witnesses

17  were spoken to and interviewed, the

18  officers on the case would call the DA's

19  office to either further take statements if

20  the defendant was willing to or just

21  process the arrest.

22      Q.   And what steps, if any, had to be

23  done, taken, for a suspect to either be

24  placed in custody or remain in custody



CHRISTINE SCACCIA

6

1    between February of 2001 and May of 2001?

2              MR. ZUCKERMAN:  I just object to

3         form.  You can answer if you can.

4         A.    Okay.  Well, you would need a

5    combination of a number of things.  You

6    would have to be able to prove, one, that

7    the crime was committed.  You would have to

8    have a suspect either identified by

9    civilian witnesses or making incriminating

10   statements, implicating themselves.  You

11   have a combination of either one,

12   generally, you have probable cause to make

13   an arrest.

14        Q.    Now, aside from those two factors,

15   would it therefore be fair to say that

16   there would be no probable cause to make an

17   arrest?

18             MR. JOSEPH:  Object to the form.

19        A.    It would depend on what the

20   circumstances were, I mean obviously.

21             Does that mean I can answer?

22             MR. ZUCKERMAN:  Yes.

23        Q.    You can answer unless he tells you

24   not to.

CHRISTINE SCACCIA

7

1      A.   Okay.  If you had a statement
2   either by the suspect or an ID by an
3   eyewitness, or in some circumstances
4   circumstantial evidence would result in
5   probable cause to make an arrest.
6      Q.   And what role, if any, did you
7   play in terms of presentation of cases to
8   grand juries for homicide investigations
9   between February of 2001 and May of 2001?
10      A.   On occasion I was present with a
11   junior assistant watching them and
12   supervising them presenting cases, and on
13   occasion, I, myself, was assigned to
14   homicide investigations to put into the
15   grand jury.
16      Q.   Following the presentation to the
17   grand jury, what responsibility, if any,
18   did you have for the prosecution of the
19   case between that time period?
20          MR. ZUCKERMAN:  Talking about
21      Manganiello?
22          MR. JOSEPH:  I'm asking what her
23      general responsibilities were during
24      this time period.



CHRISTINE SCACCIA

1          MR. ZUCKERMAN:  Do you

2      understand?

3      A.    The way the office was structured

4      then, the homicides -- after going through

5      a grand jury phase -- if there was an

6      indictment would have been sent out to a

7      trial division.  So after the grand jury

8      paperwork was done, if the case was not

9      assigned to me, I would have no

10     involvement.

11     Q.    And for what reason or reasons

12     would a case be assigned to you?

13     A.    Staffing issues, high profile

14     cases, it would just depend.

15     Q.    Okay.  In 2001, did you become

16     involved in the prosecution of Anthony

17     Manganiello?

18     A.    Yes.

19     Q.    How?

20     A.    Once again, acting first in the

21     capacity as deputy chief and grand jury, I

22     was made aware of the case and then an

23     informant was brought to my attention.

24     Q.    When were you first made aware of



CHRISTINE SCACCIA

9

1    the case?

2              MR. ZUCKERMAN:  What day or when

3        in the process?

4        Q.   Approximately what day were you

5    made aware of the -- strike that.

6              At some point were you made aware

7    that Anthony Manganiello was a suspect in

8    the shooting of Albert Acosta?

9              MR. ZUCKERMAN:  Object to the

10       form.  You can answer.

11       A.   Yes.

12       Q.   Approximately when was the first

13   time you were made aware that Anthony

14   Manganiello was a suspect in the shooting

15   of Albert Acosta?

16             MR. ZUCKERMAN:  Object to the

17       form.  You can answer.

18       A.   Probably the day following the

19   incident.

20       Q.   Would that be approximately

21   February 13th, 2001?

22       A.   Yes.

23       Q.   And how did you become aware of

24   Anthony Manganiello?



CHRISTINE SCACCIA

10

1     A.   We have assistants who are on call

2     24 hours a day, or I should say 24 hours at

3     a time who are responsible for responding

4     to homicide scenes and taking any kind of

5     information down that's pertinent.  Either

6     just a body or if someone is arrested they

7     would process the case.  So that assistant

8     reports every morning, following the end of

9     their shift, what, if anything, took place

10    on the preceding shift.

11    Q.   Was it ADA Adondis who made a

12    report to you concerning Anthony

13    Manganiello?

14    A.   I believe he was the assistant on

15    duty.

16    Q.   And did you speak to ADA Adondis

17    or did you review paperwork or something

18    else?

19    A.   Probably a combination of both.

20    Q.   And on February 13th, 2001, did

21    you become aware that ADA Adondis had felt

22    that there was no probable cause to arrest

23    Anthony Manganiello for the shooting or

24    murder of Albert Acosta?



CHRISTINE SCACCIA

11

1          MR. ZUCKERMAN:  Object to the

2      form.

3      A.   I don't think ADA Adondis'

4  feelings had anything to do with it.  I

5  know there was a decision not to take

6  Mr. Manganiello into custody at that time.

7      Q.   And can you tell me who made that

8  decision?

9          MR. ZUCKERMAN:  Not to take him

10     into custody?

11     Q.   Correct.

12     A.   To tell you the truth I don't know

13  if it was a combination of the Police

14  Department, District Attorney's decision or

15  if it ultimately was with the District

16  Attorney's Office.

17     Q.   Okay.  Well, can you tell me who

18  was involved in the decision not to take

19  Anthony Manganiello into custody?

20          MR. ZUCKERMAN:  Just don't guess.

21     If you know, certainly tell him.

22     A.   I cannot give you a specific

23  individual's name.  What I can tell you is

24  the setup.  If Mr. Adondis was the



CHRISTINE SCACCIA

12

1    assistant on 24-hour beeper, above him is a

2    supervisor who wears the beeper for a week

3    and generally would make a call as to

4    whether or not to process an arrest.  Above

5    the supervisor is the chief of homicide, Ed

6    Taldy, and I was his deputy.  So, it was

7    either one or a combination of those

8    people.

9        Q.    Now, on February 12th of 2001 or

10   February 13th of 2001, did you become aware

11   of a decision not to take Anthony

12   Manganiello into custody?

13       A.    Yes, I know he wasn't arrested

14   that day.

15       Q.    And can you tell me why the

16   decision was made not to take him into

17   custody on February 12th or February 13th

18   of 2001?

19       A.    For further investigation.

20       Q.    Was there a determination that

21   there was insufficient probable cause to

22   arrest Anthony Manganiello on February 12th

23   and/or 13th for the homicide of Albert

24   Acosta?



CHRISTINE SCACCIA

13

1          MR. ZUCKERMAN:  Object to form.

2      A.   I don't know if that's exactly how

3    I would phrase it, but I believe that there

4    was more investigative steps that we wished

5    the Police Department to take before we

6    authorized the arrest.

7      Q.   And was there an arrest authorized

8    on February 12th or February 13th of 2001?

9      A.   No.

10     Q.   And for what reason was an arrest

11   not authorized?

12     A.   To take further investigative

13   steps.

14     Q.   Were you -- what further

15   investigative steps, if any, were deemed

16   appropriate or necessary --

17         MR. ZUCKERMAN:  Object to form.

18     Q.   -- to take Anthony Manganiello

19   into custody at some point in time

20   following February 13th, 2001?

21         MR. ZUCKERMAN:  I object to the

22     form.  You can answer.

23     A.   What steps - I want to be clear -

24   after that did we take?



CHRISTINE SCACCIA

14

1      Q.    At the point in time that a

2    decision was made not to take Anthony

3    Manganiello into custody because of further

4    investigative steps, what were the

5    investigative steps that were deemed

6    necessary to be taken?

7         MR. ZUCKERMAN:  Object to form.

8         You can answer.

9      A.    One of those steps would have been

10   interviewing the witnesses ourselves.  The

11   witnesses who were present on the scene the

12   day before.  There were search warrants

13   that were being executed, and I believe

14   there was forensic testing that we wanted

15   to accomplish.

16     Q.    Let's start with the forensic

17   testing.  What forensic testing did you

18   want to be accomplished, if any?

19         MR. ZUCKERMAN:  Object to the

20         form.

21     A.    I believe that there was a

22   substance found on Mr. Manganiello's

23   uniform jacket that seemed to have been

24   consistent with the location of where



CHRISTINE SCACCIA

15

1   Officer Acosta was killed.  That was

2   relayed to us by officers on the scene.

3   And I believe that Officer Acosta's

4   clothing had some of the same type dusty

5   white substance on it.  So I know for sure,

6   off the top of my head, that was one of the

7   forensic questions that we had pending.

8        Q.    Was also the test concerning

9   gunshot residue of Mr. Manganiello's hands

10  and/or jacket one of the forensic tests you

11  were waiting to get back?

12       A.    I think the hand -- I know one was

13  done on his hand, but I don't know if the

14  results can be told immediately by the

15  person performing the test, but I know

16  those tests were performed.  The jacket may

17  have been sent to the lab.  I don't know if

18  you get an immediate response when you're

19  swabbing someone's hand.

20       Q.    When did you learn of the results

21  of the swabs of the hands, of

22  Mr. Manganiello's hands?

23       A.    It wasn't too long after the

24  incident, I don't remember a date.



CHRISTINE SCACCIA

16

1      Q.    Was it prior to April 20th of

2  2001?

3      A.    Prior to the grand jury proceeding

4  I would think so, yes.

5      Q.    And what were the results of the

6  swab to Mr. Anthony Manganiello's hand for

7  gunshot residue?

8      A.    To the best of my recollection it

9  was negative.

10     Q.    And do you recall a test for

11  gunshot residue to Anthony Manganiello's

12  jacket?

13     A.    I know one was done.

14     Q.    And to the best of your

15  recollection --

16          MR. ZUCKERMAN:  Are you done with

17       your answer?

18     A.    I don't believe that the results

19  were positive on that either.

20     Q.    That's my next question.

21          MR. ZUCKERMAN:  Just allow her to

22       finish.

23     Q.    To the best of your recollection,

24  what were the results of the gunshot



CHRISTINE SCACCIA

17

1    residue test to Anthony Manganiello's

2    jacket?

3         A.    I believe they were also negative.

4         Q.    What was the significance, if any,

5    of a negative gunshot residue test to

6    Mr. Manganiello's hand and jacket which was

7    taken on February 12, 2001 in a case

8    involving a shooting?

9              MR. ZUCKERMAN:  I object to the

10        form.  You can answer.

11        A.    Actually none because the test is

12   unreliable.

13        Q.    Okay.  What search warrants were

14   you waiting for?

15        A.    I believe there was a search

16   warrant executed on Mr. Manganiello's

17   personal vehicle.

18        Q.    And did the results of that search

19   warrant provide any evidence which in any

20   way tied Anthony Manganiello to the

21   shooting of Albert Acosta?

22        A.    Directly, no.

23        Q.    How about indirectly?

24        A.    There were items that were



CHRISTINE SCACCIA

1    retrieved during the course of the search

2    warrant.  I believe there was an imitation

3    pistol, some handcuffs, some permits of

4    sorts.  There were unusual items recovered

5    from them but nothing criminally linking

6    him to Mr. Acosta's death.

7          Q.   Now, it is fair to say that

8    Mr. Acosta was not killed with an imitation

9    pistol; correct?

10         A.   No.

11         Q.   So, in what way, indirectly, would

12   an imitation pistol link Anthony

13   Manganiello to the shooting of Albert

14   Acosta, if any?

15              MR. ZUCKERMAN:  Object to form.

16         A.   If I recall, and you'll have to

17   forgive me if I'm mistaken because it's

18   been quite some time, I think within the

19   vehicle there was also some sort of

20   documentation indicating that

21   Mr. Manganiello owned pistols or used to go

22   to a pistol range.  And in his official

23   capacity as a Parkchester security officer,

24   he's not licensed to carry a gun.



CHRISTINE SCACCIA

19

1    Q.    Are you sure about that?

2         MR. ZUCKERMAN:    Sure about what?

3    Q.    That Mr. Manganiello was not

4    licensed to carry a firearm.

5    A.    As part of his job in Parkchester

6    he was not an armed security guard is what

7    I mean.    There was either a permit or some

8    sort of paperwork, I think, tending to

9    connect him to a firing range, I want to

10   say somewhere in the confines of

11   Westchester County, but as I said, this is

12   awhile ago.

13   Q.    Were you aware that Anthony

14   Manganiello was actually a State Park

15   Police Officer?

16   A.    Not that I recall as I sit here

17   today, no.

18   Q.    And if he was a State Park Police

19   Officer and had a valid license for a

20   pistol permit, in what way would that tie

21   him to the shooting of Albert Acosta?

22        MR. ZUCKERMAN:    Object to the

23   form.

24   A.    Well, it would certainly give him



CHRISTINE SCACCIA

20

1    the opportunity to possess a weapon such as

2    the one that Mr. Acosta was killed with.

3        Q.    In what way would that

4    differentiate Mr. Manganiello from any

5    other police officer that's licensed to

6    carry a weapon?

7            MR. ZUCKERMAN:   Object to form.

8        A.    That being the only factor it

9    wouldn't; taken in conjunction with

10   everything else we were finding out about

11   the case it would.

12       Q.    On February 12th and February

13   13th, 2001, did you come into possession of

14   any documents from the New York City Police

15   Department concerning Anthony Manganiello

16   and/or the investigation into the homicide

17   of Albert Acosta?

18           MR. ZUCKERMAN:   Object to the

19           form.

20       A.    At that point in time the only

21   thing I would have had access to were

22   possibly copies of any police vouchers that

23   were prepared in connection with the case;

24   a complaint report or a UF61, as the Police



CHRISTINE SCACCIA

21

1    Department form is called, and whatever

2    complaint follow-ups had been prepared at

3    that time.

4        Q.    Complaint follow-ups, are you

5    referring to forms known as DD5's?

6        A.    Yes.

7        Q.    At any point did you take

8    possession or see the original handwritten

9    notes of interviews with witnesses on the

10   scene in this case?

11       A.    At some point I did see them.

12       Q.    And when did you see them?

13       A.    It would have been early on in the

14   investigation.

15       Q.    And where were you when you saw

16   them?

17       A.    Physically or who did I work for?

18       Q.    Where were you physically when you

19   saw them?

20       A.    Somewhere in the confines of the

21   Bronx District Attorney's Office.

22       Q.    Did you -- strike that.

23           How did you come into possession

24   of these handwritten interview notes, not



CHRISTINE SCACCIA

1    the DD5's, but the original handwritten

2    interview notes?

3        A.    They would have been part of the

4    original police file that was being

5    maintained by Detective Agostini.

6        Q.    Were you ever provided copies of

7    those original notes?

8            MR. ZUCKERMAN:   Sorry?

9        Q.    The original interview notes, were

10    you ever provided with copies of those?

11        A.    I do not know for sure whether I

12    had some of those notes that were

13    eventually turned over to the defense.

14        Q.    Do you have a recollection --

15    strike that.

16            Did Mr. Agostini ever provide you

17    with the entire case folder, the homicide

18    case folder for Mr. Acosta's death for

19    copying?

20            MR. ZUCKERMAN:   Object to form.

21        A.    There was a time that I had access

22    to the entire case folder, and that would

23    have been probably at the grand jury

24    stage.  I did not maintain possession of

CHRISTINE SCACCIA

23

1    that folder between the grand jury and

2    trial, as you're probably aware.

3        Q.    What do you mean by "you had

4    access to the file"?

5            MR. ZUCKERMAN:  I object to form.

6            You can answer.

7        A.    I mean when a detective comes to

8    see you regarding a case they generally

9    bring their file with them.

10       Q.    And were you ever provided with

11   copies of the original handwritten notes

12   taken from the witnesses on the scene on

13   February 12th, 2001?

14           MR. ZUCKERMAN:  Object to form.

15       A.    As I stated, I believe at some

16   time I had some of them.  There were others

17   that I did not have.

18       Q.    Did a number of these written

19   interview notes go missing?

20           MR. ZUCKERMAN:  Object to form.

21       A.    I believe what went missing was

22   the spiral notebook that Detective Agostini

23   would have maintained, among other things.

24       Q.    What other things to the best of



CHRISTINE SCACCIA

24

1    your recollection went missing?

2        A.    I remember it being described as a

3    box containing the notes, containing the

4    actual DD5's themselves which I had copied

5    and turned over to counsel, that's how we

6    have them for trial.

7            I believe that one of the things

8    that we were not able to secure in the end

9    was Mr. Manganiello's Parkchester security

10   memo book.  I don't know if there were

11   miscellaneous items from Mr. Acosta in that

12   box as well.  I want to say that maybe his

13   shield or hat were in that box, but I'm not

14   one hundred percent certain.

15       Q.    Now, can you tell me what -- would

16   it be fair to say that every handwritten

17   interview that you had you turned over to

18   defense counsel?

19       A.    Yes.

20       Q.    And if Mr. Manganiello's defense

21   counsel did not have a handwritten note of

22   a witness interview, would that mean you

23   were not provided with that note?

24            MR. ZUCKERMAN:  Object to form.



CHRISTINE SCACCIA

1      A.   Yes.

2      Q.   Was there ever a point in time

3   when Detective Agostini copied all of the

4   handwritten notes in the spiral notebook

5   and provided you a copy of it?

6           MR. ZUCKERMAN:  Object to form.

7      A.   Not that I can recall, no.

8      Q.   Did you ever ask him to do that?

9      A.   I think I asked him to do that

10   when we were preparing to go to trial,

11   which is how it became known that the box

12   that I was looking for was no longer where

13   it had been left.

14      Q.   And what -- how did you first --

15   how did you become aware that a box was

16   missing?

17      A.   When I --

18      Q.   Let me rephrase that.

19           How did you become aware that the

20   case, the homicide case file for Albert

21   Acosta was missing?

22           MR. ZUCKERMAN:  Object to form.

23      A.   Because we began preparing for

24   trial.

CHRISTINE SCACCIA

26

1    Q.   And as part of the trial, were

2    there -- were you obligated to provide

3    what's known as Rosario material to the

4    defense?

5    A.   Yes.

6         MR. ZUCKERMAN:  Object to the form

7         of the last question.  The answer

8         stands.

9    Q.   And was it your understanding that

10   the box which was lost contained what was

11   known as Rosario material?

12   A.   Yes, and I believe there was a

13   little hearing about what happened to the

14   box during the course of the trial or

15   during pretrial hearings.

16   Q.   What did you say to Detective

17   Agostini and what did he say to you when

18   you first learned that the box was missing?

19        MR. ZUCKERMAN:   Object to form.

20        You can answer.

21   A.   Again, doing this from memory I

22   seem to be under the impression today as I

23   sit here, that when the case was getting

24   ready for trial Detective Agostini was not



CHRISTINE SCACCIA

27

1    working at the 43rd Precinct anymore. I

2    had called him and told him we were going

3    to court and he went back to the precinct

4    to try to get his paperwork and file to

5    bring down to the office, and that's when

6    we became aware that it was not in the spot

7    that he had left it.

8         Q.    Where did he tell you he left it?

9         A.    I want to say that there is a room

10   in the 43rd Precinct squad room contained

11   within it, that was -- I don't know if they

12   were using it as a file room or -- it was a

13   room within a room, and I believe he said

14   he had left it in there on top of the file

15   cabinet in a clearly marked box.

16        Q.    Did he tell you that he left it in

17   the locker room?

18        A.    That might be what that room was.

19        Q.    Were you aware that the 43rd

20   Precinct had a storage room specifically

21   for homicide case files?

22        A.    I know that the 43rd Precinct had

23   case files in a number of places.

24        Q.    Now, did you receive all of the



CHRISTINE SCACCIA

28

1    DD5's in this case at one time or at

2    various times during the course of the

3    investigation?

4         A.    It would have to be at various

5    times while they became prepared.

6         Q.    Did Mr. Agostini, prior to the

7    file going missing, ever provide you with

8    the complete homicide case file for it to

9    be copied --

10         MR. ZUCKERMAN:   Object to form.

11         Q.    -- concerning Mr. Manganiello?

12         A.    No, I don't think for those

13    purposes.   I had asked him to bring it down

14    prior to when it became an issue.

15         Q.    On February 12th or February 13th,

16    2001, did you agree with the assessment

17    that Mr. Manganiello should not be arrested

18    or charged for the homicide investigation

19    at that point?

20         MR. ZUCKERMAN:   Object to form.

21         A.    I guess the short answer would be,

22    I was comfortable with it and wanted more

23    investigative steps taken, yes.

24         Q.    On February 12th or February 13th,



CHRISTINE SCACCIA

29

1   2001, based on the information that you had

2   at that point, did you feel there was

3   probable cause to arrest, authorize an

4   arrest of Anthony Manganiello to be

5   prosecuted for the homicide of Albert

6   Acosta?

7            MR. ZUCKERMAN:  Object to form.

8       A.   I'm sorry, say it again.

9       Q.   On February 12th or February 13th

10  of 2001, when you first became aware of

11  this case --

12           MR. JOSEPH:  Read back my last

13       question.

14           (Requested question was read back

15       by the court reporter.)

16           MR. ZUCKERMAN:  Object to form.

17      Q.   On February 13th, 2001, did you

18  feel there was sufficient evidence to

19  authorize an arrest of Anthony Manganiello

20  for the homicide of Albert Acosta?

21           MR. ZUCKERMAN:  Object to form.

22      A.   I think there may have been

23  probable cause but because the case was a

24  circumstantial case, I think everyone was

CHRISTINE SCACCIA

30

1    more comfortable holding off on making an

2    arrest.

3            MR. ZUCKERMAN:  Are you done with

4        your answer?

5        A.    And that's why we decided to take

6    further investigative steps.

7        Q.    Try and let her finish.

8            MR. JOSEPH:  I thought she was.

9        Q.    Was there any admission by

10    Mr. Manganiello that he was in any way

11    involved in the shooting of Albert Acosta?

12            MR. ZUCKERMAN:  Object to form.

13        A.    No, not that I can recall, no.

14        Q.    Was there any civilian witness who

15    identified Anthony Manganiello as being

16    involved in the shooting death of Albert

17    Acosta?

18            MR. ZUCKERMAN:  Object to form.

19        A.    There were witnesses who

20    identified him and described his conduct

21    which supplied circumstantial evidence that

22    he was involved in the death of Albert

23    Acosta.

24        Q.    And what witness was that or



CHRISTINE SCACCIA

1   witnesses was that?

2       A.   There were officers that were

3   present on the scene after the discovery of

4   Officer Acosta.  There was a maintenance

5   worker on the scene prior to the discovery

6   of Mr. Acosta.  There was -- at what point

7   do you want me to stop because then other

8   people became known to the Police

9   Department?

10      Q.   Well, I'm asking you about

11  February 12th, February 13th.

12      A.   Then it would have been the

13  civilian that was present before and then

14  the officers present after.

15      Q.   Now, by the civilian, are you

16  talking about Walter Cobb?

17      A.   Yes, I am.

18      Q.   Were you made aware on February

19  12th or February 13th, of any inconsistent

20  statements by Walter Cobb?

21      A.   No.

22      Q.   Were you ever made aware that

23  Walter Cobb said he heard the shots and he

24  thought they came from outside of the



CHRISTINE SCACCIA

32

1    building?

2           MR. ZUCKERMAN:  Object to form.

3       A.   I don't remember that.

4       Q.   Let me ask you to take a look at

5    what has been marked previously as Exhibit

6    25 with a date of 12/20/07, and direct your

7    attention to paragraph two and I'll show

8    counsel first.

9           MR. ZUCKERMAN:  Paragraph what?

10          MR. JOSEPH:  Two on the bottom.

11      A.   I've read it.

12      Q.   Have you seen this prior to

13   today?

14      A.   I would have, yes.  I don't

15   remember the day I saw it, but this is the

16   police report in connection with the case.

17      Q.   Did you see it prior to April 20th

18   of 2001?

19      A.   Yes.

20      Q.   Okay.  Did you see it on or about

21   February 12th or February 13th of 2001?

22      A.   If not then, shortly thereafter

23   probably.

24      Q.   Did Officer Agostini provide you



CHRISTINE SCACCIA

33

1   with any information that caused you to

2   initiate a prosecution against Anthony

3   Manganiello?

4           MR. ZUCKERMAN:  Object to form.

5       A.   Did he provide me with any

6   information?

7       Q.   Yes.

8       A.   No, he provided us with witnesses

9   which resulted in the prosecution of

10  Mr. Manganiello.

11      Q.   What witnesses were those?

12      A.   Walter Cobb.  There were, I

13  believe, two individuals that were brought

14  forth from a pizza store in a surrounding

15  area.  I don't remember the names off the

16  top of my head, but I know one or both of

17  them testified.

18      Q.   Would that be Tartone and Booth?

19      A.   Yes.

20      Q.   What other witnesses, if any, did

21  Mr. Agostini provide?

22      A.   I think that was it.  The other

23  witness came from another source within law

24  enforcement.



CHRISTINE SCACCIA

34

1      Q.    Would that be Derek Parker?

2      A.    That would be the person that

3   brought him forward, yes.  The witness was

4   Terrance Alston.

5      Q.    And how did Mr. Parker bring

6   forward Terrance Alston?

7      A.    Detective Parker was Mr. Alston's

8   handler for lack of a better term.

9   Mr. Alston had been an informant of his in

10  the past.  They had come into contact with

11  each other.  I don't know if it was at

12  Rikers Island or just because Mr. Alston

13  reached out to Derek Parker.  He relayed

14  information to Detective Parker and

15  Detective Parker notified the Bronx.

16          MR. ZUCKERMAN:  The Bronx DA?

17     A.    The Bronx DA, I'm sorry.

18     Q.    What makes you think that --

19  strike that.

20          Can you tell me the source of your

21  belief that Mr. Alston had been an

22  informant for Mr. Parker in the past?

23          MR. ZUCKERMAN:  Can you read that

24     back?



CHRISTINE SCACCIA

1          (Requested question was read back

2      by the court reporter.)

3          MR. ZUCKERMAN:  Object to form.

4      If you understand you can answer.

5      A.   That would have come from

6  Mr. Parker and/or Mr. Alston.

7      Q.   Were you aware that Derek Parker

8  testified in a deposition that this case

9  was his first dealing with Mr. Alston?

10     A.   Would I be surprised that he said

11  that?

12     Q.   Were you aware that he testified

13  in a deposition basically to the opposite

14  of what you just said?

15          MR. ZUCKERMAN:  Object to the

16      form.

17     A.   No, I was not aware of that.  But

18  I know Detective Parker is the one that

19  brought me Mr. Alston.

20     Q.   Did Mr. Robert Martinez or

21  Detective Martinez provide you with any

22  information that caused you to initiate a

23  prosecution against Anthony Manganiello?

24          MR. ZUCKERMAN:  Object to form.

CHRISTINE SCACCIA

1     A.    Detective Martinez?

2     Q.    Correct.

3     A.    No, because as I sit here today I
4  can't even recall what his involvement in
5  this case was.

6     Q.    How about Lieutenant Scott, did
7  Lieutenant Scott provide you with any
8  information that caused you to initiate a
9  prosecution against Anthony Manganiello?

10    A.    No.

11    Q.    How about John McGovern or
12 Sergeant McGovern?

13    A.    No.

14    Q.    What information did Agostini
15 provide you with that caused you to
16 initiate a prosecution against Anthony
17 Manganiello?

18          MR. ZUCKERMAN:  Object to form.

19    A.    Again, it wasn't Detective
20 Agostini providing information, it was
21 Detective Agostini providing witnesses who
22 had given statements regarding the events
23 that resulted in Mr. Acosta's death.

24          Detective Agostini was not either



CHRISTINE SCACCIA

1    a witness nor did he take any sort of

2    confession admission from Mr. Manganiello,

3    so, he could offer no insight to the manner

4    of Mr. Acosta's death.

5        Q.    Did Mr. Agostini tell you that

6    Anthony Manganiello was evasive while he

7    was being questioned?

8        A.    I remember he said that I think at

9    some point he refused to answer pedigree

10   information, and was either inconsistent or

11   evasive about what appeared to be a fresh

12   cut on one of his fingers.

13       Q.    And did that information cause or

14   did that information cause you in part to

15   initiate a prosecution against Anthony

16   Manganiello for the shooting of

17   Mr. Acosta?

18           MR. ZUCKERMAN:   Object to form.

19       A.    No, actually despite that

20   information I believe -- that was -- that

21   all occurred on the day that he was

22   released.

23       Q.    When for the first time did you

24   meet with Alston?



CHRISTINE SCACCIA

38

1          MR. ZUCKERMAN:  Alston?

2     Q.    Terrance Alston.

3          MR. ZUCKERMAN:  You want a date

4     from her?

5     Q.    To the best of your recollection,

6     how soon after the shooting did you meet

7     with Terrance Alston or learn of Terrance

8     Alston's existence?

9          MR. ZUCKERMAN:  I object to the

10          form.  I mean, do you want a date,

11          where in the process, I mean?

12     Q.    Approximately, how many days

13     following the shooting of Albert Acosta,

14     did you become aware that Mr. Terrance

15     Alston may have had some information

16     pertinent or relative to the shooting of

17     Albert Acosta?

18     A.    I would put it in between -- we

19     went to the grand jury in April and this

20     happened in February.  I don't remember it

21     happening in the initial days following

22     Mr. Acosta's death, but I don't really have

23     a sense if it could have been as long as a

24     month or not, I don't remember, sorry.



CHRISTINE SCACCIA

39

1      Q.    Prior to -- strike that.

2            Did Terrance Alston testify before

3   the grand jury?

4      A.    Yes, he did.

5      Q.    And was that approximately April

6   2001?

7      A.    Yes.

8      Q.    Prior to him testifying, were you

9   ever made aware that Terrance Alston had

10  lied to Detective Agostini about a witness

11  named Johnny Baker selling Anthony

12  Manganiello a gun?

13     A.    I believe --

14           MR. ZUCKERMAN:  I object to form.

15     A.    I believe that the name that

16  Mr. Alston gave Detective Agostini was not

17  the individual's government or true name,

18  but there was -- that individual did exist.

19     Q.    Well, do you have a recollection

20  of Terrance Alston -- strike that.

21           Do you have a recollection of

22  learning that Terrance Alston told

23  Detective Agostini that a gentleman named

24  Johnny Baker sold Anthony Manganiello a



CHRISTINE SCACCIA

40

1    gun?

2            MR. ZUCKERMAN:  Object to form.

3        A.   Yes, that is the name he used in

4    the initial report by Detective Agostini.

5        Q.   And when did you become aware of

6    that, was that before the case was

7    presented to the grand jury or afterwards?

8        A.   Did I become aware that the

9    individual -- he's saying an individual

10   sold Manganiello a gun or the kid's name is

11   not Jamel Baker or whatever he said

12   initially.

13       Q.   Let me ask you this.  Prior to

14   authorizing the arrest of Anthony

15   Manganiello, did you -- were you aware that

16   Terrance Alston had told lieutenant --

17   Detective Agostini that a gentleman named

18   Johnny Baker had sold Anthony Manganiello a

19   gun, when in fact, the gentleman named

20   Johnny Baker did not sell Anthony

21   Manganiello a gun?

22           MR. ZUCKERMAN:  Object to form.

23       A.   I would say I was aware of the

24   contents of that report probably before the



CHRISTINE SCACCIA

41

1    grand jury.

2        Q.    And, by the way, did you ever

3    inform the grand jury or make it known to

4    the grand jury that Terrance Alston had

5    lied about a person selling Anthony

6    Manganiello a gun?

7            MR. ZUCKERMAN:  Object to form.

8        A.    Once again, I believe that

9    Terrance Alston did not give the person's

10   true name to the detective.  I do know that

11   that person existed.

12       Q.    Well, by not giving Detective

13   Agostini the, quote, unquote, "true name,"

14   would that be a lie?

15           MR. ZUCKERMAN:  Object to form.

16       A.    It is a lie.

17       Q.    Did you ever inform the grand jury

18   that Terrance Alston lied to Detective

19   Agostini?

20       A.    No.

21       Q.    Is there any reason you didn't

22   make the grand jury aware of that?

23       A.    That evidence was never put before

24   the grand jury.  I never tried to elicit



CHRISTINE SCACCIA

1    information to the grand jury that anyone

2    sold Officer Manganiello a gun.  Terrance

3    Alston was put into the grand jury for an

4    entirely different purpose.

5        Q.    Did you have any concerns about

6    Terrance Alston's credibility prior to

7    putting him in the grand jury?

8        A.    After interviewing him regarding

9    these subjects, no.

10       Q.    And did the fact that Terrance

11   Alston had lied to Detective Agostini cause

12   you any concern about his credibility?

13       A.    No.

14       Q.    Okay.  Did you ever question

15   Terrance Alston about his lie to Detective

16   Agostini about Johnny Baker selling Anthony

17   Manganiello a gun?

18           MR. ZUCKERMAN:  Object to form.

19       A.    Well, I mean at some point we did

20   have a conversation because then we found

21   out that individual's real name, and he

22   said that he did it because he was trying

23   to keep the kid out of trouble.

24       Q.    I'm sorry, can you repeat that?



CHRISTINE SCACCIA

43

1      A.    Terrance Alston gave the first

2 name that you say he gave to Detective

3 Agostini because he did not want to involve

4 that person or get that person in trouble.

5      Q.    So he decided to get an innocent

6 person in trouble instead of the gentleman

7 who he claims sold Anthony Manganiello the

8 gun; is that correct?

9           MR. ZUCKERMAN:  Object to the

10      form.

11      A.    Is that Mr. Manganiello's

12 position?

13      Q.    I'm asking you if that's what your

14 understanding was --

15      A.    Not at all.

16      Q.    -- after speaking with Terrance

17 Alston?

18           Did you ever -- when did you

19 question Terrance Alston about this lie?

20           MR. ZUCKERMAN:  Object to form.

21           You want a date?

22      Q.    Correct.

23      A.    It was sometime between when I

24 became aware of it and when he was killed.

CHRISTINE SCACCIA

44

1        Q.    When did you become aware that

2    Terrance Alston had made a

3    misrepresentation to Detective Agostini

4    about selling -- a gentleman named Johnny

5    Baker selling Anthony Manganiello a gun?

6            MR. ZUCKERMAN:  Object to form.

7        A.    I don't recall.

8        Q.    Did you become aware that Terrance

9    Alston had lied prior to authorizing the

10   arrest of Anthony Manganiello?

11           MR. ZUCKERMAN:  Object to the

12       form.

13       A.    Though I cannot specify the date,

14   I would say that probably, yes.  Mr. Alston

15   was not alive too much longer after the

16   presentation.

17       Q.    On February 12th, 2001, was

18   Terrance Alston actually in Rikers Island?

19       A.    I believe he was incarcerated.

20       Q.    Did Detective Agostini ever raise

21   any concerns with you that Terrance Alston

22   was playing games to get out of jail, as he

23   put it?

24           MR. ZUCKERMAN:  Object to form.



CHRISTINE SCACCIA

45

1      A.   I don't remember if we ever had

2  that conversation or not.

3      Q.   Okay.  Did Lieutenant Scott ever

4  discuss the fact that Alston had lied to

5  you?

6      A.   I don't remember having any

7  discussions with Lieutenant Scott.

8      Q.   Do you recall having discussions

9  with a Detective Abbott concerning this

10  case?

11      A.   Detective Abbott was involved --

12  I'm trying to think what capacity he was

13  involved in.  I don't know if he was

14  Agostini's partner at the time or if he was

15  the detective from Bronx Homicide assigned

16  to this case.  I'm sure we had

17  conversations, I just don't recall.

18      Q.   Did you ever have any

19  conversations with Detective Abbott

20  concerning Mr. Alston?

21          MR. ZUCKERMAN:  Object to form.

22      A.   Not that I remember.

23      Q.   Did you ever have any

24  conversations with Mr. Parker about



CHRISTINE SCACCIA

46

1     Terrance Alston and/or the fact that he had

2     lied?

3         A.    I had conversations with Derek

4     Parker about Terrance Alston, but I don't

5     know if we had a conversation about him

6     lying.

7         Q.    Can you tell me the sum and

8     substance about the conversation you had

9     with Mr. Parker concerning Terrance

10    Alston?

11        A.    It was that he had knowledge of

12    Mr. Alston.  Mr. Alston brought to his

13    attention the incident between himself and

14    Mr. Manganiello, where Mr. Manganiello had

15    tried to hire him to kill another security

16    guard.  At some point, and I don't remember

17    if it was after my first meeting with

18    Mr. Alston or -- I don't remember at what

19    point, but at some point Mr. Alston tells

20    me that Mr. Manganiello had gone as far as

21    providing him with a key to the basement

22    area of Parkchester, which are not

23    accessible to tenants, and are only

24    possessed by employees.  And that that was



CHRISTINE SCACCIA

47

1    the key he was to use to go to this

2    location that the incident was supposed to

3    take place at.

4              And I think it was Detective

5    Parker who facilitated getting that key

6    from Mr. Alston's property and providing it

7    to the District Attorney's Office.

8        Q.    So you actually had a key?

9        A.    Yes.

10       Q.    Where is that key now?

11       A.    Somewhere in property.

12       Q.    Was that key ever provided to

13   Mr. Manganiello's criminal defense

14   attorney?

15       A.    No, because Mr. Alston was dead by

16   the time this case went to trial.

17       Q.    And where is that -- can you still

18   put your hands on that key?

19       A.    I have been trying to locate the

20   people, meaning the District Attorney's

21   Office folder, and the property that went

22   along with it.  Because of our own

23   sometimes inadequate filing system, I have

24   not been able to do that as of yet.



CHRISTINE SCACCIA

48

1      Q.    When was the last time you saw the

2   District Attorney's file concerning the

3   prosecution of Anthony Manganiello?

4      A.    Probably a few days after the

5   acquittal when I packed it up to be filed

6   away.

7      Q.    And is there a system in place to

8   preserve the files of prosecutions after

9   they have been closed?

10         MR. ZUCKERMAN:  Object to form.

11     A.    There are, and over the course of

12   the last several years the facilities in

13   which these files are stored have been

14   moved on a number of occasions.

15         MR. ZUCKERMAN:  Are you done with

16      your answer?

17         THE WITNESS:  Yes.

18     Q.    And is it your testimony that to

19   date you have been unable to locate the

20   prosecution file -- strike that.

21         Is it fair to say that up until

22   the present you have been unable to locate

23   the District Attorney's file concerning the

24   prosecution of Anthony Manganiello?



CHRISTINE SCACCIA

49

1      A.   Well, mind you, I really just

2   started looking for it now that this has

3   come up.

4      Q.   Is that a yes?

5           Is it fair to say that up until

6   today you have been unable to locate the

7   District Attorney's file for the

8   prosecution of Anthony Manganiello?

9      A.   Well, that is trying to make it

10   sound like the file has been lost for

11   years.  I mean the file could be exactly

12   where it's supposed to be.  I have not been

13   able to find the spot where it has been

14   moved to.

15      Q.   When did you start looking for

16   this file?

17      A.   Probably Tuesday evening.

18      Q.   Were you aware that several months

19   ago the file had been subpoenaed and

20   there's been no response to that subpoena?

21      A.   No, I wasn't.

22

23           (Scaccia Exhibit 1, GRAND JURY

24           MINUTES, was marked for



CHRISTINE SCACCIA

50

1          identification.)

2

3          Q.    Can you please take a look at

4     Exhibit Number 1.

5          A.    Okay.

6          Q.    Do you recognize this document?

7          A.    The grand jury minutes from the

8     case presentation.

9          Q.    Was it the grand jury minutes for

10     the case presentation concerning the case

11     against Anthony Manganiello?

12          A.    Yes.  The investigation into the

13     death of Albert Acosta.

14          Q.    Now, did Mr. Alston testify before

15     the grand jury that Mr. Manganiello

16     approached him in October of 2000

17     concerning killing -- murdering a security

18     guard for hire?

19               MR. ZUCKERMAN:  Just take your

20          time and review it.

21          A.    Did you say 2001?

22          Q.    October of 2000.

23          A.    Yes.

24          Q.    Let me show you what was

