CHRISTINE SCACCIA

1    previously marked as Exhibit 9 dated

2    12/19/07.

3              MR. ZUCKERMAN:  It's Plaintiff's

4         Exhibit 9 at the 12/19/07 deposition?

5              MR. JOSEPH:  Yes.

6              MR. ZUCKERMAN:  So at least we

7         know what document we're talking

8         about.

9         A.   Okay.

10        Q.   Were you aware at the time

11   Terrance Alston testified before the grand

12   jury, were you aware that he had told

13   detectives that this conversation occurred

14   sometime in August of 2000?

15        A.   Yes.

16        Q.   Did you bring it to the grand

17   jury's attention that Mr. Alston had given

18   dates three months apart that this very

19   alleged conversation occurred?

20        A.   I was aware of this DD5.  Can I

21   just look at one thing?

22        Q.   Sure.  Take your time.

23        A.   I was aware that this DD5 existed

24   and DD5 said August of 2000.



CHRISTINE SCACCIA

52

1     Q.    Did you ever bring it to the grand

2     jury's attention that Mr. Alston had told

3     the detective that this alleged

4     conversation occurred three months earlier

5     in August of 2000?

6     A.    No.

7     Q.    Did you consider Mr. Alston's

8     grand jury testimony inconsistent with what

9     he told Detective Ramos on February 14,

10    2001?

11    A.    No.  Because that DD5 is basically

12    a sum and substance of the conversation

13    Detective Ramos had with Mr. Alston.  Prior

14    to Mr. Alston going into the grand jury, I

15    would have had a fairly extensive

16    conversation with him and went over things

17    in much more detail that wouldn't be

18    reflected in the DD5.  So, no, I didn't see

19    it as a problem.

20    Q.    Was Mr. Alston's grand jury

21    transcript ever provided to

22    Mr. Manganiello's defense lawyers?

23    A.    I don't recall if I just turned

24    over the entire set of grand jury minutes



CHRISTINE SCACCIA

53

1    or if I took Mr. Alston's testimony out

2    because he was obviously not going to be a

3    witness at trial.

4         Q.   At the point in time when

5    Mr. Alston came forward, had he been

6    indicted for attempted murder and robbery

7    in the first degree?

8         A.   He was in on something, but I

9    don't remember if it was a robbery or an

10   attempted murder.  I don't know what the

11   charge was.

12        Q.   Let me show you Exhibit 30 and ask

13   you if you recognize Exhibit 30.

14        A.   I recognize what Exhibit 30 is.

15             MR. ZUCKERMAN:  Exhibit 30 at a

16        deposition of 1/30/08.

17        Q.   I apologize.  I should have said

18   that.

19        A.   I recognize what this document is,

20   I don't have any recollection of reading

21   this in connection with my dealings with

22   Mr. Alston.

23        Q.   What do you recognize Exhibit 30

24   to be?

CHRISTINE SCACCIA

54

1      A.    It's an indictment, Bronx County

2   indictment against Mr. Alston for attempted

3   murder and unrelated charges.

4      Q.    At the point in time Mr. Alston

5   testified before the grand jury, were you

6   aware that he had been indicted for

7   attempted murder and robbery in the first

8   degree?

9           MR. ZUCKERMAN:   Objection, I think

10       she answered that.

11      Q.    I'm asking her what her awareness

12   is.

13      A.    Well, this is a 1998 indictment.

14   I can say that I was aware that Mr. Alston

15   was incarcerated, and I can say that I was

16   aware that he had a criminal record.  I

17   don't know if this is the indictment that

18   resulted in him still being at Rikers in

19   2001 when I met him.

20      Q.    Do you know if -- prior to

21   Mr. Alston testifying before a grand jury,

22   did you ever do what's called a credibility

23   check on him?

24      A.    I don't know what that is.



CHRISTINE SCACCIA

55

1    Q.    Did you ever look at Mr. Alston's

2    criminal record prior to allowing him or

3    putting him before the grand jury?

4    A.    I had I'm sure Mr. Alston's rap

5    sheet but that is not at all a credibility

6    check.

7    Q.    Did Detective Parker ever discuss

8    getting Mr. Alston released from custody

9    with you?

10    MR. ZUCKERMAN:    Object to form.

11    A.    I don't know if Detective Parker

12    -- there was a discussion between myself

13    and Detective Parker involving Mr. Alston

14    being out of custody.  Because once he was

15    released from custody he was -- he had to

16    check in and abide by certain rules, for

17    lack of a better word, that had been set up

18    for him.

19    Q.    When was it that Mr. Alston was

20    released from custody?

21    A.    I have absolutely no recollection

22    of that.

23    Q.    Was it prior to Anthony

24    Manganiello being arrested in April of



CHRISTINE SCACCIA

56

1    2001?

2       A.   I don't know.

3       Q.   Do you know whether, I'm sorry, do

4    you know whether Terrance Alston finished

5    and completed his sentence prior to him

6    getting out of jail?

7       MR. ZUCKERMAN:  Object to form.

8       A.   I would have to look at actual

9    court records, but I think that he had

10   ended up taking an open plea on a case.

11      Q.   And what does that mean?

12      A.   It meant that he was being

13   released and was going to get consideration

14   for his case, but that if he screwed up,

15   violated his cooperation agreement or

16   continued to get into trouble, that he

17   would just be sentenced on the case and

18   there would be no trial on it.  I think

19   that's what it is and that's my best

20   memory.  I would be able to tell you

21   looking at court records for sure.

22      Q.   When you say "consideration for

23   the case," what do you mean by that?

24      A.   He would get time off for

CHRISTINE SCACCIA

57

1    cooperating.

2        Q.    Okay.  And did he receive -- what

3    exactly was Mr. Alston -- strike that.

4            What was the nature of

5    Mr. Alston's cooperation for which he was

6    going to receive time off?

7        A.    Well, part of it was his

8    cooperation on this case.  Mr. Alston did

9    have other, what I perceived to be relevant

10   information, because he was -- he did have

11   a criminal history.  He was involved in

12   criminal activity and had knowledge of the

13   Blood's gangs and a number of things that

14   he would be considered available to

15   cooperate on.  But this is the only case

16   that I know of that he ever testified on.

17       Q.    And was the jury -- was the grand

18   jury ever made aware that Terrance Alston

19   was given time off in exchange for his

20   testimony?

21       A.    There was -- I don't know the

22   answer to that. There were motions about

23   that and I know that ultimately the motions

24   were denied, but I don't remember what or



CHRISTINE SCACCIA

58

1    where.

2        Q.    I'll get to the motions in a

3    couple of seconds, I'm just asking you now

4    --

5        A.    I don't know is my answer.

6        Q.    And what consideration

7    specifically was Mr. Alston given in

8    consideration for his cooperation?

9        A.    The only consideration that he was

10   able to get was that he had been released

11   from prison at some point, and he was at

12   liberty from whatever his release date was

13   until -- like July 5th of 2001 or July 1st

14   of 2001 when he was killed.  So not much

15   consideration.

16       Q.    Can you tell me how this agreement

17   came about?  How did Mr. Alston become --

18   get released, so to speak, early?

19            MR. ZUCKERMAN:  Object to form.

20       Q.    I'll rephrase it.  Can you tell me

21   who was involved in the decision to allow

22   Mr. Alston to be at liberty?

23            MR. ZUCKERMAN:  Object to form.

24       A.    Me.

CHRISTINE SCACCIA

59

1      Q.   Was anyone else?

2      A.   I'm sure his attorney at the time.

3      Q.   Did you ever have discussions --

4  strike that.

5           How did it -- did Detective Parker

6  ever speak with you about Mr. Alston

7  getting time off in exchange for being a

8  witness or for producing witnesses?

9           MR. ZUCKERMAN:  Object to form.

10     A.   Not that I remember.

11     Q.   Did Detective Agostini ever speak

12  to you concerning Mr. Alston getting time

13  off in exchange for providing cooperation

14  in this case?

15     A.   Are you asking are they talking to

16  me on his behalf like a proponent of

17  getting him time off?  Because that I could

18  say no to.

19           There was discussion about him

20  getting out and me entering a plea

21  negotiation with the witness because it was

22  just part of the prosecution.  But not them

23  asking me, can you get Terrance out?

24     Q.   Well, what conversation did you



CHRISTINE SCACCIA

1    have, and we'll start with Mr. Parker.

2    What conversation did you have with

3    Mr. Parker concerning Terrance Alston being

4    at liberty?

5        A.    At some point I probably informed

6    him that I was going to use him.  I was

7    going to enter a cooperation agreement with

8    him and make a deal, and that once he was

9    out on the street, Detective Parker was, I

10    believe, his handler, his point person to

11    keep in contact with.

12            MR. ZUCKERMAN:  I need to use the

13        men's room.  Just a few minutes.

14

15            (Short recess was taken.)

16

17        Q.    As part of this cooperation

18    agreement, was Mr. Alston released from

19    custody in exchange for his testimony

20    against Anthony Manganiello?

21            MR. ZUCKERMAN:  Object to form.

22        A.    That was one of the reasons behind

23    his release, yes.

24            MR. JOSEPH:  Let's have this

CHRISTINE SCACCIA

61

1    marked as today's date Exhibit 2.

2

3         (Scaccia Exhibit 2, MOTION, was

4         marked for identification.)

5

6    Q.   I'll show you what has been marked

7    as Exhibit Number 2 and ask you if you

8    recognize this document.

9    A.   Okay.

10    Q.   Do you recognize Exhibit Number 2?

11    A.   It is a motion that was filed by

12    my, at the time, bureau chief, Mary

13    D'Andrea, in response to defendant's

14    omnibus motion.

15         MR. ZUCKERMAN:  Did you identify

16         this?

17    A.   He did.

18    Q.   Now, directing your attention to

19    the last sentence, number three, did the

20    former bureau chief Ms. Andrea make a

21    representation to the Court that the

22    cooperation agreement was not to ensure

23    Mr. Alston's testimony in the Manganiello

24    case?

CHRISTINE SCACCIA

62

1      A.    Just so it's clear, D'Andrea is

2   the last name.  The agreement was not made

3   to ensure his testimony in this case but --

4      Q.    For the record you're reading from

5   a document at this point?

6      A.    Yes, that's what it says.  "The

7   agreement was not made to ensure his

8   testimony in this case."

9      Q.    Was that document -- was

10  Ms. D'Andrea's representation to the Court

11  accurate?

12     A.    Yes.

13        MR. ZUCKERMAN:  Object to the

14     form.

15     Q.    Do you wish to revise your answer

16  after reading the document?

17     A.    No.

18     Q.    Was Mr. Alston released prior to

19  his testifying before the grand jury?

20     A.    As I think I stated before, I

21  don't remember the date he was released.

22     Q.    Do you have a recollection as to

23  whether it was after his grand jury

24  testimony that Mr. Alston was released?



CHRISTINE SCACCIA

63

1      A.    I don't remember.

2      Q.    Okay.  Was Mr. Alston provided

3  immunity in exchange for his testimony

4  against Anthony Manganiello?

5           MR. ZUCKERMAN:   Object to form.

6      Q.    Let me rephrase it.

7           Did Mr. Alston ever waive his

8  immunity testifying before the grand jury?

9      A.    He did not go into the grand jury

10  under a waiver of immunity if that is what

11  you're asking.

12     Q.    Is there any reason -- strike

13  that.

14          Did you have DD'S in which

15  Mr. Alston agreed to commit a murder for

16  hire?

17          MR. ZUCKERMAN:   Object to form.

18     A.    We have DD5's that indicated that

19  Mr. Alston said he was willing to commit a

20  murder for hire, but I don't think that it

21  ever reached the interaction where an

22  agreement as to who, when and how much was

23  ever made.

24     Q.    Was Mr. Alston -- I believe you

CHRISTINE SCACCIA

64

1   testified earlier, that Mr. Alston was

2   provided a key, correct, for which to

3   utilize?

4       A.   Yes.

5       Q.   Would you consider taking a key an

6   act in furtherance of a conspiracy to

7   commit murder?

8           MR. ZUCKERMAN:  Are you reading

9       something from a document?

10          MR. JOSEPH:  No.  I'm refreshing

11      my memory.

12          MR. ZUCKERMAN:  I object to form.

13      A.   I mean it would be considered an

14  act, but I don't think that that would

15  be -- I don't think it would rise to the

16  level of a conspiracy at that point.

17      Q.   Would you consider Mr. Manganiello

18  asking or allegedly asking Terrance Alston

19  to commit a murder, and Mr. Alston agreeing

20  to do it for money to be a conspiracy?

21          MR. ZUCKERMAN:  Object to form.

22      A.   I think that there would have to

23  be an act in furtherance of that conspiracy

24  before I can say yes.



CHRISTINE SCACCIA

65

1      Q.    And would taking a master key to a

2    building where the murder was allegedly

3    going to occur be an act of furtherance?

4      A.    From my understanding it was the

5    key to an area that was just not available

6    to the public.  I don't think a time and

7    place had been set for the murder.  It's

8    not like he gave him a key to apartment 5J,

9    which I'm completely making up, and said go

10   there on such and such a day and commit the

11   murder.

12     Q.    Was Mr. Alston ever prosecuted for

13   agreeing to commit a murder for hire?

14          MR. ZUCKERMAN:  In this case?

15     Q.    Correct.

16     A.    No.

17     Q.    By the way, were you aware that

18   Detective Agostini said he had concerns

19   about Mr. Alston's credibility?

20     A.    No, not that I can remember.

21     Q.    Did Mr. Agostini ever voice

22   concerns to you concerning Mr. Alston's

23   credibility?

24     A.    I don't remember, no.  I shouldn't

CHRISTINE SCACCIA

66

1    say, no, I don't remember is my answer.

2         Q.    Were you ever made aware that

3    Mr. Alston didn't want witnesses that he

4    was producing interviewed outside of his

5    presence?

6              MR. ZUCKERMAN:    Object to form.

7              Do you understand?

8         A.    I understand it, I'm trying to

9    think.   The only context that I can think

10   of that coming up with, was the kid who he

11   had told Detective Agostini about,

12   originally, and I don't remember the kid's

13   true name that's why I'm calling him the

14   kid.    And I think it was only said in the

15   context of, he will be okay if he knows I'm

16   here, meaning like he's not going to get in

17   trouble, and this isn't just some lie that

18   the detectives are telling him.    But I

19   don't remember him.

20             First of all, I would not allow a

21   witness to insist on being present for the

22   interview of another witness.    It's not a

23   good practice.

24        Q.    Was Terrance Alston ever present

CHRISTINE SCACCIA

67

1    for the interview of a witness whom he

2    produced?

3        A.    He never produced anybody.  I

4    don't know if he was there for an initial

5    introduction when that kid came in, I don't

6    remember.

7        Q.    Now, did Terrance Alston ever say

8    he would produce a witness that sold a gun

9    to Anthony Manganiello in exchange for

10   being released from prison?

11       A.    No, not produce.

12       Q.    Well --

13       A.    Give information about assisting

14   detectives in finding him, yes.  Producing

15   as if he had control exclusively over this

16   person, no.

17       Q.    Did Mr. Alston say that he would

18   provide detectives with a witness who would

19   say that he sold Anthony Manganiello a gun

20   if he was released?

21            MR. ZUCKERMAN:  Object to form.

22       A.    I don't remember the -- if he was

23   released conditions being placed on it.

24       Q.    Did Mr. Alston subsequently come

CHRISTINE SCACCIA

68

1    up with a witness named Mark Damon who said

2    that he sold Anthony Manganiello a gun?

3         A.    Mark Damon came up, yes.

4         Q.    And did Mark Damon -- strike

5    that.

6               Did Terrance Alston produce Mark

7    Damon?

8               MR. ZUCKERMAN:   Object to form.

9         Q.    How did you come in contact with

10   Mark Damon?

11        A.    I don't know if Mark Damon arrived

12   at my office on his own or with the police,

13   but eventually Mr. Alston did give the

14   police Mark Damon's contact information.

15        Q.    Did Mr. Alston arrive at your

16   office with Mr. Damon?

17        A.    I don't remember when that meeting

18   took place.  I don't know if Mr. Alston was

19   in custody or out, and if he was in, the

20   answer would certainly be no, and if he was

21   out, I don't remember.

22        Q.    Did you interview Mr. Damon in

23   Mr. Alston's presence?

24        A.    I think that Mr. Alston may have

**CHRISTINE SCACCIA**

1    been present, like I said, for introduction

2    purposes.  I do not remember conducting an

3    interview with them both there.

4           MR. JOSEPH:  Let's have this

5       marked as 3.

6

7           (Scaccia Exhibit 3, DD5 DOCUMENT

8               was marked for identification.)

9

10          Q.   I'll show counsel and I'll show

11   you what has been marked as Scaccia 3 with

12   today's date, May 2nd, 2008.

13          MR. ZUCKERMAN:  Where is number 2

14      because we need copies of this?

15          Q.   Have you seen this document

16   before?

17          A.   At some point I have, yes.

18          Q.   Is this DD5 document documenting a

19   meeting between you, Mr. Alston, Mr. Damon

20   and Mr. Agostini and Mr. Parker?

21          A.   It is -- I'm sorry, say that

22   again.  Is it a DD5 concerning a meeting

23   between myself, Agostini and Parker, is

24   that what you just said?

CHRISTINE SCACCIA

70

1      Q.    And Damon and Alston also.

2            Read back the whole question.

3

4            (Requested question was read back

5      by the court reporter.)

6

7      A.    This does not refresh my

8   recollection as to who was present during

9   what portion of this meeting.  At some

10  point all of the people named in this

11  report were present in my office.  As I

12  said, I didn't think that -- Mr. Alston may

13  have been there for introduction purposes,

14  but I don't recall Mr. Alston being present

15  when I interviewed a witness in the case.

16     Q.    If Mr. Alston was present on April

17  5th, 2001, does that mean Mr. Alston would

18  have been out of custody at this point?

19           MR. ZUCKERMAN:  Object to form.

20     A.    No.

21     Q.    Directing your attention to number

22  2, does it say during the above interview

23  the following persons were present and is

24  Mr. Alston listed?



CHRISTINE SCACCIA

71

1        A.    It is but that's a report prepared

2    by Detective Agostini.  And, again, it's a

3    summary of what took place that day, not a

4    moment by moment account.

5        Q.    Were you ever aware -- did

6    Mr. Agostini ever raise a concern to you

7    that Mr. Alston did not want Mr. Damon to

8    be interviewed outside of his presence?

9        A.    I don't remember that.

10       Q.    By the way, were you aware of a

11   Verizon employee named Mr. Huello,

12   H-u-e-l-l-o?

13       A.    Yes.

14       Q.    When did you first become aware of

15   statements given by Mr. Huello?

16            MR. ZUCKERMAN:  Object to form.

17       A.    I would say whatever DD5

18   interviews were done with him during the

19   day of the incident came into my

20   possession, or I at least read them in the

21   immediate days following the incident.

22       Q.    Was Mr. Huello ever presented to

23   the grand jury?

24       A.    No, he was not.

CHRISTINE SCACCIA

72

1      Q.    And was there a reason he was not?

2      A.    No.

3      Q.    Did Mr. Huello provide a statement

4    which contradicted what Mr. Cobb had said?

5      A.    I don't remember what Mr. Huello

6    said.  To tell you the truth, I remember

7    where he was and what he was doing, but the

8    context of what he said, I don't remember.

9      Q.    Do you have a recollection of him,

10    Mr. Huello, stating that he was across from

11    the room where Mr. Acosta was found at the

12    point in time when Mr. Cobb entered the

13    basement and he heard no shots and did not

14    see Mr. Manganiello?

15      A.    He does say that and there was an

16    explanation behind it too, now that I

17    recall.  He was saying that there was some

18    sort of noise factor going on and he was in

19    a room at one end of the basement.  Again,

20    you're saying directly across from.  I

21    don't know if it was directly across from.

22    And, yeah, he says he doesn't hear

23    anything.

24      Q.    And did he also say he didn't see

CHRISTINE SCACCIA

1    Mr. Manganiello at all at that point?

2        A.    He didn't see anyone.  I think how

3    he becomes aware of it is that he has

4    interaction with Cobb in the basement, and

5    when Mr. Cobb runs outside to make the

6    phone call to the police, I think he sees

7    the Verizon van pulling away or making a

8    U-turn or something and flags him down.

9        Q.    By the way -- withdrawn.

10           When you presented the case to the

11   District Attorney, did Sergeant Ohle

12   testify?

13       A.    You mean when I presented it to

14   the grand jury?

15       Q.    Yes.

16       A.    No, he did not testify to the

17   grand jury.

18       Q.    Were you aware that Sergeant Ohle

19   gave a statement in which he says he

20   brought -- that one of his officers was

21   down over the Parkchester security radio

22   system?

23       A.    I believe that was a point that

24   was litigated during the course of the



CHRISTINE SCACCIA

1      trial.  I don't remember who called him at

2      trial, but I think he did testify

3      actually.

4          Q.    Was the grand jury ever made aware

5      that Mr. Ohle had broadcast the identity of

6      the Parkchester -- strike that.  The victim

7      as a Parkchester security guard?

8              MR. ZUCKERMAN:  I'm sorry.  Can

9          you read that back, please?

10

11             (Requested question was read back

12         by the court reporter.)

13

14             MR. ZUCKERMAN:  Object to form.

15             You can answer.

16         A.    The sergeant did not testify at

17     the grand jury, therefore, there was no way

18     of eliciting that information.

19         Q.    Was there any reason why he was

20     not called?

21         A.    There was no need to call him.

22         Q.    Now, did you elicit testimony from

23     an Officer Nieves that when Mr. Manganiello

24     arrived it was unknown that the victim was



CHRISTINE SCACCIA

75

1    a Parkchester security guard?

2        A.   If that's what Officer Nieves'

3    testimony states, that was according to

4    her.

5        Q.   Did you also elicit testimony from

6    Ms. Perez that it was not known that the

7    victim was a Parkchester security officer

8    at the point in time that Mr. Manganiello

9    arrived?

10       A.   Actually I think between Perez and

11   Nieves --

12           MR. ZUCKERMAN:  Take your time and

13       review what you need to answer the

14       question.

15           MR. JOSEPH:  Take your time and

16       I'll take a two minute break.

17

18           (Short recess was taken.)

19

20       A.   Both Officer Nieves and Officer

21   Perez state that they do not know when they

22   are responding to the location whether it

23   was a NYPD officer or Parkchester

24   security.  But both say at some point that

CHRISTINE SCACCIA

1    while they're in the basement they realize

2    that it's Parkchester security.  I think

3    one of the officers said that she

4    recognized him from seeing him around as a

5    Parkchester security officer.

6        Q.    And was that testimony elicited

7    for the purpose of inferring that Anthony

8    Manganiello had some guilty knowledge

9    because he allegedly made a statement to

10   Officer Perez that it was his partner

11   inside of the room?

12       MR. ZUCKERMAN:   I object to the

13       form.  You can answer if you can.

14       A.    That information was elicited

15   because of a variety of reasons.  But the

16   short version is, yes, I do think that it

17   tended to inculpate him in the shooting of

18   Acosta.

19       Q.    Was the grand jury ever informed

20   that Sergeant Ohle had broadcast the

21   identity of the victim over the Parkchester

22   radio system prior to Mr. Manganiello's

23   arrival?

24       A.    Once again, Sergeant Ohle did not

CHRISTINE SCACCIA

77

1    testify, so that information did not come

2    out.  And the fact that information about

3    it being Albert Acosta in the basement

4    being broadcast over the air would only be

5    relevant if it was broadcast before Anthony

6    Manganiello responded to that basement.

7            At some point Parkchester is well

8    aware that it is Acosta on the floor.  So,

9    as I sit here today, I don't remember the

10   time sequence of those transmissions.  I

11   only know what had taken place.

12       Q.  Let me see if I can clarify one

13   point of your answer.  As you sit here

14   right now, do you recall whether Sergeant

15   Ohle had made the broadcast that it was one

16   of his officers or Albert Acosta prior to

17   Mr. Manganiello's arrival, do you have a

18   memory one way or another?

19       A.   I do not.  I know that that

20   information went out.  I cannot sit here

21   and tell you that it went out either before

22   or after, I don't have a recollection of

23   that.

24       Q.  How did you become aware of



CHRISTINE SCACCIA

1    Mr. Booth's existence?

2        A.    It was from a police source.    I

3    don't know how he was discovered.    I don't

4    know if he reached out for the officers or

5    if they had a tip or if it was done during

6    a canvass, I don't know.    Or if he, you

7    know, got in trouble and decided to give

8    information.

9            MR. JOSEPH:    Let's have this

10           marked as Exhibit 4.    For the record,

11           I'm marking a three-page document.

12

13           (Scaccia Exhibit 4, THREE-PAGE

14           DOCUMENT, was marked for

15           identification.)

16

17       Q.    I'll show you and your counsel

18   what has been marked as Exhibit 4 of

19   today's date.

20       A.    Okay.

21       Q.    Do you recognize Exhibit Number 4?

22       A.    I recognize it to be a DD5

23   prepared in conjunction with this case.

24       Q.    After reviewing Exhibit 4, does it

CHRISTINE SCACCIA

79

1    refresh your recollection as to how

2    Mr. Booth came to your attention?

3        A.    As I said, it's because the

4    detectives brought him to my attention.

5    How he came in contact with the detectives

6    still is not clear, because I don't know if

7    they had -- it says they met in front of

8    the pizza store.  I don't know if they were

9    there on a canvass, or if one of the

10   detectives knew him, or if he had called

11   the detectives.  I don't know the answer to

12   that.

13       Q.    Let me take one step back to

14   Mr. Alston.  Were you the Assistant

15   District Attorney in charge of prosecuting

16   Mr. Alston's case?

17       A.    When he incurred his cases, no.

18   After I entered an agreement with him,

19   yes.

20       Q.    And would it be fair to say that

21   you became the Assistant District Attorney

22   in charge of Mr. Alston, prosecuting

23   Mr. Alston's case as a result of his

24   testimony in Anthony Manganiello's case?



CHRISTINE SCACCIA

80

1      A.    Well, it's a result of him

2   cooperating.  One, I wanted to make the

3   deal, I took the case and made the deal.

4      Q.    And what was the deal exactly?

5      A.    I have no recollection.  I mean I

6   read response to motion papers that

7   indicated he pled guilty to four years and

8   was going to do that, and he was being

9   released for a period of time and going

10  back into custody.  But other than that,

11  refreshing my recollection, I don't know.

12     Q.    Now, were you ever made aware of

13  any criminal activity in which Mr. Booth

14  was engaged by the detectives?

15     A.    I think it was Mr. Manganiello's

16  attorney who told me that Mr. Booth was

17  engaged in criminal activity.

18     Q.    But did, for example, did

19  Mr. Agostini ever advise you that Mr. Booth

20  was a bookie?

21     A.    Again, I knew that information, I

22  don't know if the detective knew it as

23  well.  But I do remember Mr. Richmond, who

24  represented Mr. Manganiello at trial, I

CHRISTINE SCACCIA

81

1    think at one time represented Mr. Booth.

2       Q.   Just so I'm clear, I'm trying to

3    focus my questions on what the detectives

4    told you.

5       A.   I know that information, I don't

6    know from what source.  It could have been

7    from multiple sources that I knew that

8    information.

9       Q.   Did Detective Agostini ever advise

10   you that upon bringing Mr. Booth back to

11   the police station he searched Mr. Booth

12   and found a knife and gambling materials

13   which contained names and debts owed?

14      A.   I don't remember that information

15   being relayed.  I'm not saying it didn't

16   happen, I just have no recollection of it.

17      Q.   Okay.  Do you have any

18   recollection of the gambling paraphernalia

19   disappearing after Mr. Booth signed a

20   statement against Anthony Manganiello?

21          MR. ZUCKERMAN:  Object to form.

22      A.   Disappearing, no.  I had no -- I

23   have no recollection that Mr. Booth was in

24   custody, was about to be placed into



CHRISTINE SCACCIA

82

1    custody or any such thing.  So, I don't.

2         Q.    Did you ever have any knowledge

3    about Mr. Booth being threatened with

4    criminal charges unless he signed a

5    statement against Anthony Manganiello?

6              MR. ZUCKERMAN:  Object to form.

7         Q.    I'll rephrase it.

8              Do you have any knowledge of

9    Mr. Booth -- strike that.

10             Do you have any knowledge as to

11   whether Detective Agostini told Mr. Booth

12   that he would pass his name and gambling

13   paraphernalia found on Mr. Booth to

14   organized crime unless he signed a

15   statement against Anthony Manganiello?

16             MR. ZUCKERMAN:  Object to form.

17        Q.    My question is, were you ever

18   advised of that?

19             MR. ZUCKERMAN:  Object to form.

20        A.    Actually, if Mr. Booth had such

21   items on him, I don't think that organized

22   crime figures would be surprised to know

23   that, since generally gambling is

24   associated with people in organized crime.

CHRISTINE SCACCIA

1   And, really, I don't ever remember hearing

2   from anyone that Mr. Booth was threatened

3   with prosecution for possessing gambling

4   slips, nor do I think that that would have

5   been enough of an incentive to sign a

6   statement in Bronx County.

7       Q.   My question is, were you ever

8   informed --

9       A.   No.

10      Q.   Let me finish my question.

11      A.   Sorry.

12      Q.   Were you ever informed that

13   Detective Agostini threatened to pass

14   Mr. Booth's name and the materials found on

15   him to the organized crime division if he

16   did not sign a statement?

17          MR. ZUCKERMAN:  Object to form.

18      A.   No.

19      Q.   Did you ever learn that the

20   gambling paraphernalia which Mr. Agostini

21   found on Mr. Booth's person disappeared

22   after the statement was signed?

23          MR. ZUCKERMAN:  Object to form.

24      A.   I never knew there was any, so,

CHRISTINE SCACCIA

1    no.

2        Q.    Did you ever authorize Detective

3    Agostini to withhold evidence found on

4    Mr. Booth's person from any law enforcement

5    entities in exchange for his statement or

6    testimony against Anthony Manganiello?

7            MR. ZUCKERMAN:   Object to form.

8        A.    No.

9        Q.    Did the detectives ever tell you

10   that they gave Mr. Booth -- strike that.

11           Did Detective Agostini ever --

12   strike that.

13           Did Detective Agostini or

14   Detective Martinez ever advise you that

15   they gave Mr. Booth Mr. Manganiello's name?

16           MR. ZUCKERMAN:   Object to form.

17       A.    That they gave him his name?  I'm

18   not sure what you mean by that, Counsel.

19       Q.    Did Detective Agostini or

20   Detective Martinez ever advise you that

21   Mr. Booth did not know Mr. Manganiello's

22   name until the detectives provided him with

23   that name?

24           MR. ZUCKERMAN:   Object to form.



CHRISTINE SCACCIA

1       A.   I don't know if Mr. Booth -- I

2   can't recall as I sit here whether

3   Mr. Booth said that he didn't know

4   Manganiello by name and only by sight, or

5   if he knew what his name was.  So, I don't

6   know the answer to your question.

7       Q.   Did you ever meet with Mr. Booth?

8       A.   I believe Mr. Booth testified at

9   trial.

10      Q.   Did you ever go over Mr. Booth's

11  statement with him prior to his testimony

12  at trial?

13          MR. ZUCKERMAN:  Object to form.

14      A.   If he testified at trial I would

15  have gone over his statement with him

16  beforehand.

17      Q.   Let's take a step back to

18  Mr. Damon.  What role, if any, did

19  Mr. Parker play in bringing Mr. Damon to

20  your attention?

21      A.   I don't remember if he had any

22  role in it.

23      Q.   What role, if any, did

24  Mr. Agostini play in bringing Mr. Damon to



CHRISTINE SCACCIA

1    your attention?

2        A.    Well, Agostini had --

3            MR. ZUCKERMAN:  Object to the form

4        of that question.

5        Q.    If any?

6        A.    Detective Agostini's role would

7    have been at some point Terrance Alston

8    relays information about this individual

9    with the gun, even though he was called

10   something different, Baker or something at

11   the time Detective Agostini first makes a

12   report of that information.

13           At some point I would think either

14   Detective Agostini, Detective Parker, and

15   Mr. Alston, in some combination, found out

16   that the Baker person was in fact Mark

17   Damon.  And I don't know who contacted him

18   to bring him in, but he was contacted.

19       Q.    Did Mr. Damon -- what, if

20   anything, did Mr. Damon say to you when you

21   met with him?

22           MR. ZUCKERMAN:  Object to form.

23       A.    I think I met with him on more

24   than one occasion.  I believe the first

CHRISTINE SCACCIA

87

1    meeting, although I do not have a

2    recollection of the exact contents of the

3    conversation, it was in sum and substance

4    about Manganiello, him giving Manganiello a

5    gun.

6            Sometime between that conversation

7    and him being called as a witness at trial,

8    he had in some fashion recanted his

9    statement.  And at that point that

10   information was turned over to

11   Mr. Manganiello's attorney, and I believe

12   Mr. Damon was available for

13   Mr. Manganiello's attorney to put on the

14   stand.  But, if I'm correct, we both

15   elected not to put Mr. Damon on the stand.

16       Q.   When you say Mr. Damon recanted,

17   what, if anything, did he say?

18       A.   It's hard for me to say

19   specifically what he said, but the one

20   thing I'm confident is, what he was telling

21   me before I put him on the stand before

22   trial was materially different from what he

23   said in the past.

24       Q.   Did you represent to the Court



CHRISTINE SCACCIA

88

1   that he was a liar and could not be put on

2   the stand?

3        MR. ZUCKERMAN:   Object to form.

4        A.   I made a representation to the

5   Court that the witness was now saying

6   something different than his original

7   statement, and I then turned him over to

8   the defense.

9        Q.   And by "different," did he

10  indicate to you that he had made up the

11  story about selling or providing

12  Mr. Manganiello with a gun?

13       A.   I don't remember what the

14  differences were, but it was significant

15  enough for me not to want to put him on the

16  stand because I was not about to suborn

17  perjury.  I don't know.

18            And I can tell you that from what

19  I remember about Mr. Damon, although it's

20  not very much, I have a distinct impression

21  with me still that he was significantly

22  younger than Mr. Alston.  That he was not

23  thrilled about having to be a witness.

24            And even as I sit here today, I

CHRISTINE SCACCIA

1    don't know if it was Mr. Damon's last

2    statement that was the truth, or

3    Mr. Damon's first statement that was the

4    truth.  But he could not be relied upon and

5    put on at trial.

6        Q.   Did you become aware of a

7    statement provided by a gentleman named Sal

8    Miro?

9        A.   I don't know if Mr. Miro was my

10   witness, not a witness, or defense witness

11   at trial.  I remember hearing the name.

12            Is he the other man in the pizza

13   store?

14       Q.   I'll show you what was marked

15   previously dated 12/20/07 as Exhibit Number

16   21.  I'll show it to your counsel and show

17   it to you.

18            MR. ZUCKERMAN:  You said Exhibit

19       21?

20       Q.   21.

21       A.   Okay.

22       Q.   Have you seen Exhibit 21 before?

23       A.   Yes, during the pendency of the

24   case.

CHRISTINE SCACCIA

1    Q.    And did you place any emphasis --

2    strike that.

3         What role, if any, did this

4    statement play in your decision to commence

5    the prosecution and continue it against

6    Mr. Manganiello?

7    A.    Really this statement wouldn't

8    have factored that heavily into the

9    decision-making process.  The prosecution

10   in this case was based upon, like I said,

11   the witnesses who were present at the scene

12   that day in conjunction with Mr. Alston.

13   Q.    When you say "not factor heavily,"

14   did this statement play a factor, for you

15   at least, in linking how Mr. Agostini came

16   into contact with Mr. Tartone and in turn

17   Mr. Booth?

18   A.    No.  And this DD5 is labeled a

19   reinterview indicating that Mr. Miro had

20   spoken to somebody beforehand.  I still

21   don't have -- I don't know how the police

22   got to the individuals in the pizza shop, I

23   don't know.

24   Q.    Did this DD5, Exhibit Number 21,

CHRISTINE SCACCIA

1    play a role in your commencing the

2    prosecution or provide some link that you

3    believed established Mr. Manganiello was

4    involved in the shooting of Albert Acosta?

5            MR. ZUCKERMAN:  Object to form.

6        Q.    Let me rephrase it.

7            Did Exhibit 21 provide some link

8    that caused you to believe that Anthony

9    Manganiello was involved in the shooting of

10   Albert Acosta?

11           MR. ZUCKERMAN:  Object to form.

12       A.    No.  Is it evidence I would have

13   liked to have used against

14   Mr. Manganiello?  Yes.  Does this evidence

15   prompt me to believe that there was enough

16   to arrest or charge Mr. Manganiello of this

17   homicide?  Not based on this statement

18   alone.

19       Q.    I'm not asking you if it's based

20   on this statement alone.  I'm asking you if

21   this statement, in conjunction with the

22   other statements that you were provided

23   with, caused you to have some faith that

24   what you were being told by Mr. Tartone and



CHRISTINE SCACCIA

92

1    Mr. Booth was true?

2         MR. ZUCKERMAN:  Object to form.

3    A.    Yes, and that it's consistent with

4    what they're saying.  But, again, it's not

5    something that was relied upon heavily I

6    would say.

7    Q.    Were you ever made aware that

8    Mr. Miro stated he never said anything that

9    is contained in Exhibit 21?

10        MR. ZUCKERMAN:  Object to form.

11   A.    As I said before, I don't know if

12   Mr. Miro testified as a defense witness at

13   trial, and if he did, I'm sure that's what

14   he said.  But as I sit here today, I don't

15   remember that.

16   Q.    Do you have a memory one way or

17   another of being informed that Mr. Miro

18   never made any of the statements contained

19   in Exhibit 21 to Detective Agostini?

20   A.    No.

21   Q.    By the way, what happened to the

22   tests for the gunshot residue that were

23   performed on Mr. Manganiello's hands and

24   jacket?



CHRISTINE SCACCIA

93

1        What happened to the reports?

2        MR. ZUCKERMAN:  Of the test

3    results?

4        Q.    Correct.

5        A.    Actually, those reports I think

6    were turned over to counsel.

7        Q.    Were any of them ever missing,

8    were either of them missing?

9        A.    I don't know if they were missing

10    and we were able to get other copies of

11    them from the labs, but there was -- that

12    information was definitely provided to

13    counsel.  Everybody was well informed of

14    that.

15        The initial responses were

16    probably with the rest of the police

17    folder, but I think everybody had copies of

18    them in the end.

19        Q.    Did you have any difficulty

20    getting any of the documents from the

21    Police Department in this case?

22        MR. ZUCKERMAN:  Object to form.

23        Q.    In the -- did you have any

24    difficulty receiving or getting a hold of



CHRISTINE SCACCIA

94

1    police documents say from the crime lab

2    concerning the prosecution of Anthony

3    Manganiello?

4         MR. ZUCKERMAN:  Object to form.

5         A.    The difficulty in this was -- when

6    the case went to trial ultimately the

7    police reports that I was working from were

8    furnished back to me by the defense.  So,

9    if I was calling a lab without a voucher or

10   a report in front of me that gave me a

11   number with which to give reference to,

12   yeah, they would have given me a hard

13   time.  We can't find this or that.  That

14   was one of the difficulties.

15        Q.    Were there any documents that were

16   not provided to defense counsel until the

17   last day of trial?

18        A.    I don't remember.

19        Q.    You can take a look at what I'll

20   represent is the trial testimony, page 671,

21   and see if this refreshes your

22   recollection.

23        A.    Okay.  I read it.

24        Q.    Does this refresh your



CHRISTINE SCACCIA

95

1    recollection as to whether there were any

2    documents from the crime scene department

3    which were not provided to you or to the

4    defense counsel until the last day of

5    trial?

6        A.    Well, that would have been my

7    fault, that's when I obtained them.    I

8    don't know in the grand scheme of what you

9    showed me if this was in fact the last day

10   of trial.    Actually, it was the last day of

11   the People's case when everything would

12   have been -- my obligation is to turn stuff

13   over well in advance of trial.

14            However, the key moment in time is

15   when the People are about to rest if

16   something is not turned over.    That's what

17   would spark adverse inferences.    So this is

18   probably the maximum cut-off of that

19   happening to me.

20       Q.    My question really is, were there

21   any documents that you didn't have to turn

22   over to the defense until the last day of

23   the People's case?

24       A.    Yes, that would have been the



CHRISTINE SCACCIA

1     crime scene report and photos.

2          Q.   And is that unusual to not receive

3     these, these type of documents in a

4     homicide case, until the last day of the

5     People's case?

6          A.   Sir, trying to try a homicide case

7     without a police folder is a very unusual

8     circumstance.  This is not ideal by

9     anybody's standard.

10          MR. JOSEPH:  Can you mark this as

11          5.

12

13          (Scaccia Exhibit 5, HANDWRITTEN

14          NOTES, was marked for

15          identification.)

16

17          Q.   I'll show you what has been marked

18     as Exhibit 5, and ask you if you recognize

19     this document.

20          A.   It appears to be handwritten notes

21     of either a crime scene detective or ESU

22     detective who responded to the scene.

23          Q.   And when you say "responded to the

24     scene," are we talking about the Albert



**CHRISTINE SCACCIA**

1    Acosta homicide scene?

2        A.    Yes, I'm sorry.

3        Q.    And is this one of the documents

4    that you received on the last day of the

5    People's case?

6        A.    I mean --

7        Q.    If you can look at the fax track

8    it may refresh your recollection.

9        A.    It appears to match the

10   description of the type of documents that I

11   made a record about at trial.  Without

12   seeing the rest of the typed crime scene

13   report and the photos, I don't know, but I

14   would say for all intents and purposes that

15   this is one of the documents.

16       Q.    And would -- does that document

17   contain any information which contradicted

18   any of Mr. Agostini's testimony about

19   Mr. Manganiello being evasive?

20           MR. ZUCKERMAN:  Object to form.

21       A.    No.

22       Q.    Did Mr. Agostini testify that

23   Mr. Manganiello told him he didn't remember

24   what his address was?



CHRISTINE SCACCIA

1            MR. ZUCKERMAN:  At the criminal

2       trial?

3       Q.   At the criminal trial.

4            MR. ZUCKERMAN:  If you remember.

5       A.   At some point during the

6   interaction during the course of the day

7   when Mr. Manganiello is back at the

8   precinct, he was being -- I don't

9   necessarily want to say belligerent, but

10  uncooperative as far as giving over

11  information that would be considered

12  pedigree information.

13           At some point he does speak to

14  them and they had a conversation about, as

15  I said earlier, about the cut on his hand.

16  I think he said he was moving a treadmill

17  that morning and cut himself.  So at some

18  point there is a dialogue that opens, but

19  originally he is like, my number is

20  unlisted, and I don't have to tell you my

21  name, sort of response.

22           So, no, this does not indicate

23  that he was -- it's not inconsistent with

24  Detective Agostini.

CHRISTINE SCACCIA

99

1      Q.    Well, you were not present during

2    this conversation between Mr. Agostini and

3    Mr. Manganiello; correct?

4      A.    No.

5      Q.    So what you just testified to is

6    what Mr. Agostini told you, correct, or

7    testified in some form; correct?

8      A.    Well, which is exactly what you

9    were asking me about whether this is

10   inconsistent with what Detective Agostini

11   was saying Mr. Manganiello is doing.  No,

12   it's not.

13     Q.    Was Exhibit 5 turned over to the

14   defense after Mr. Agostini had left the

15   stand?

16     A.    Yes.

17     Q.    At the criminal trial?

18     A.    Yes, but Detective Agostini would

19   have been subject to recall at any time

20   defense wanted him.

21     Q.    And does Exhibit 5 indicate that

22   approximately 12:25 p.m. on February 12,

23   2001, he provided detectives with his

24   address and Social Security number?



CHRISTINE SCACCIA

100

1    A.    I don't know if the detective who

2    wrote that got that from Mr. Manganiello's

3    mouth or his identification in his wallet.

4    Q.    Okay.  Does Mr. Manganiello's

5    address and Social Security number appear

6    on Exhibit Number 5?

7    A.    Yes, it does.

8

9         (Scaccia Exhibit 6, 911 TAPE, was

10        marked for identification.)

11

12   Q.    Do you recognize the -- I'll show

13   you what has been marked as Exhibit Number

14   6.  Do you recognize any of the writing on

15   the outside of the tape?

16   A.    No.

17   Q.    Can you put number six in and play

18   it and I'll ask you after you listen to it

19   if you recognize what this tape is.

20

21        (At this time a 911 tape was

22   played.)

23

24   Q.    Ma'am, did you have an opportunity



CHRISTINE SCACCIA

1    to listen to what we have marked here as

2    Exhibit 6?

3        A.    Yes.

4        Q.    Do you recognize that?

5        A.    Yes.   Those are 911 transmissions

6    that were prepared in conjunction with this

7    case.   The first, I think, two calls

8    pertain to a domestic incident not

9    involving the death of Albert Acosta, and

10   the other following ones were from

11   Mr. Cobb, the witness on this case, and one

12   of the Parkchester bosses I believe.

13       Q.    And from where did you receive

14   this tape?

15       A.    The Police Department.

16       Q.    And was this something that you

17   understood to be made and kept in the

18   ordinary course of their business?

19       A.    Yes.

20       Q.    And, by the way, after listening

21   to the tape, did every single call that

22   reported the shooting identify the victim

23   as a Parkchester security officer?

24            MR. ZUCKERMAN:   Object to form.



CHRISTINE SCACCIA

102

1      Q.    I'll rephrase it.

2            After listening to Exhibit 6, did

3      every call to 911 which reported the

4      shooting of the victim, identify him as a

5      Parkchester security officer?

6            MR. ZUCKERMAN:  Object to form.

7      A.    Well, I believe Cobb says -- Colon

8      obviously says one of our men is down, but

9      he doesn't know what he is down from.  And

10     if memory serves me correctly, they were

11     trying to notify Acosta to respond to

12     Acosta's body not knowing he was down.

13           And Mr. Cobb says at one point,

14     it's a security officer and then he says, I

15     don't know if it's police or Parkchester, I

16     didn't go over to the body.  So to that

17     extent you're correct.

18     Q.    By the way, on this call did

19     Mr. Cobb ever indicate to the police that

20     he heard shots?

21     A.    Not in a direct response, but he

22     talks about hearing shots while he's

23     waiting on hold.

24     Q.    Did he ever say he saw a gentleman



CHRISTINE SCACCIA

103

1    walk out of the basement after he heard

2    shots, did he ever tell the police that in

3    the 911 tape?

4        A.   He was never asked that.  No, he

5    doesn't volunteer it.

6        Q.   At any point did you become aware

7    that -- strike.

8            At any point did you become aware

9    that Mr. Manganiello was with Police

10   Officer Rodriguez, Police Officer Ortiz and

11   Sergeant Rhodes while at 1700 Metropolitan

12   Avenue the morning prior to Mr. Acosta's

13   body being found?

14           MR. ZUCKERMAN:  Object to form.

15       A.   If that's with regard to the

16   domestic call that's reflected on that,

17   that's very possible.  I don't remember if

18   it was Manganiello or Acosta that responded

19   to that call but they were there along with

20   NYPD.

21       Q.   Let me show you Exhibit 6 dated

22   12/19/07.

23       A.   Okay.

24       Q.   Have you ever seen Exhibit 6 prior

CHRISTINE SCACCIA

104

1      to today?

2          A.    Yes, during the preparation of

3      this trial.

4          Q.    Did you ever see Exhibit Number 6

5      prior to the point in time that the case

6      was presented to the grand jury against

7      Mr. Manganiello?

8          A.    Most probably, yes.

9          Q.    Do you have a recollection of

10     Mr. Manganiello being in the company of two

11     police officers at the point while he was

12     at 1700 Metropolitan Avenue?

13         A.    Earlier in the morning I have

14     reports of him being present at an

15     apartment within 1700 Metropolitan Avenue

16     in the company of police officers.

17         Q.    And do the reports also indicate

18     that Mr. Manganiello left with the police

19     officers?

20         A.    He left that apartment.  They

21     don't say where he goes.  They looked in

22     the apartment, everything seemed to have

23     calmed down and the Parkchester cop left is

24     all it says.  So where he went, I don't

CHRISTINE SCACCIA

105

1    know.

2        Q.    Is there an indication in the next

3    to last sentence that the Parkchester

4    police and NYPD police left at the same

5    time, left together?

6        A.    It says they all left and the

7    Parkchester cop left.  So, yes, I guess

8    they left at or about the same time.

9        Q.    In other words, was Officer

10   Rodriguez ever called to testify before the

11   grand jury?

12       A.    No.

13       Q.    Was Officer Rodriguez's full name

14   ever provided to the defense -- to

15   Mr. Manganiello's defense attorney?

16       A.    I have no idea.

17       Q.    Was there ever a request that

18   Officer Rodriguez testify before the trial,

19   during Mr. Manganiello's trial?

20       A.    For the defense?

21       Q.    Correct.

22       A.    If he wanted him to testify he

23   could have called him.

24       Q.    Did he ever ask that this officer

CHRISTINE SCACCIA

106

1    be produced at trial?

2        A.    I don't remember him asking me and

3    I don't know if he asked the Court to

4    subpoena him.

5        Q.    Did Mr. Ortiz ever testify at

6    trial, Officer Ortiz?

7        A.    I don't recall.

8        Q.    Did Officer Ortiz ever testify

9    before the grand jury?

10        A.    No.

11        Q.    Did Sergeant Ross ever testify

12    before the grand jury?

13        A.    No.

14            MR. JOSEPH:   I believe that is all

15        I have.

16            (Time noted: 4:13 p.m.)

17

18

19

20

21

22

23

24



**CHRISTINE SCACCIA**

107

1

2    STATE OF NEW YORK        )

3                                    SS:

4    COUNTY OF                    )

5

6

7                  I, CHRISTINE SCACCIA, hereby certify

8    that I have read the pages of the foregoing

9    testimony of this deposition and hereby certify

10   it to be a true and correct record.

11

12

13

14                  _____

15                  CHRISTINE SCACCIA

16

17

18

19

20   Sworn to before me this

21   ___day of_____, 2008.

22

23

24   _____

