UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANTHONY MANGANIELLO,

                             Plaintiff,          CIVIL ACTION No.:  07 CV 3644 (HB)

      - Against-

THE CITY OF NEW YORK, et. al.
                          DEFENDANTS
----------------------------------------------------------------X

## DECLARATION OF COUNSEL

Pursuant to 28 USC §1746, I hereby declare, under penalty of perjury under the laws of the United States of that the following is true and correct.

1.      My name is Michael H. Joseph.

2.      I am an attorney duly licensed to practice law in the State of New York, and before the United States District Court for the Southern District of New York.

3.      I represent the plaintiff in the above captioned matter, as such I am fully familiar with the facts and circumstances of this case.

4.      I offer this Declaration in support of Plaintiff's motion in limine.

5.      The statements of fact in the attached memorandum of law are based upon the exhibits attached hereto.

6.      I attach true copies of the following as exhibits hereto in support of Plaintiff's application:

      - The cited portions of Plaintiff's deposition are attached as Exhibit 1.

      - A DD5 concerning statements made by Sgt Ohle is attached as Exhibit 2.

      - The cited portions of defendant Agostini's deposition are attached as Exhibit 3.

7.      For the reasons more fully stated in the annexed Memorandum of Law, Plaintiff's motion should be granted.

Respectfully submitted,

OSORIO & ASSOCIATES, LLC

BY: _____

Michael H. Joseph, Esq.  (MJ8838)
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168

Dated: White Plains, New York
       May 31, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ANTHONY MANGANIELLO,

                    Plaintiff,        CIVIL ACTION No.: 07 CV 3644

    - Against-

THE CITY OF NEW YORK, et al.
                    Defendants,
---------------------------------------------------------X

## DECLARATION OF SERVICE

      Pursuant to 28 USC §1746, I hereby declare, under penalty of perjury under the laws of

the United States of that the following is true and correct.


      Deponent is not a party to the action, is over 18 years of age and resides at 184 Martine

Ave., White Plains, N.Y. 10601. That on the 31st day of May, 2008, deponent served the within:

Notice of Motion, Memorandum of Law, Declaration of Counsel with Exhibits   upon:

Corporation Counsel<br>
100 Church Street<br>
New York, NY 10007

at the last known address designated by them for that purpose by depositing a true copy of same

enclosed by federal express overnight service  in a postpaid properly addressed wrapper .

                         _____

                         Michael H. Joseph, Esq.

# EXHIBIT 1

72

A. MANGANIELLO

1      Q.    What did you think of him?

2      A.    I thought he was a good guy.

3      Q.    Did you consider him a friend?

4      A.    Yes.

5      Q.    Did you ever socialize with him outside of work?

6      A.    Sometimes.  We would go to a restaurant, there was

7   a restaurant on the corner.  During the end of tour, most of

8   the guys would go and get something to eat or drink.

9      Q.    At the end of tour?

10     A.    Yes.

11     Q.    What was the name of that restaurant?

12     A.    Give me a second here.  I can't remember the name.

13  It's right on the corner of Metropolitan Avenue.

14     Q.    Is it still there, if you know?

15     A.    I think it's still there.

16     Q.    Metropolitan Avenue and what was the corner cross

17  street?

18     A.    It's just before the L.  It might have been the Met

19  Oval Diner.

20     Q.    Met Oval Diner?

21     A.    It may have been that, the Met Oval Diner.

22     Q.    Did you ever go to his home?

23     A.    He did have a party when he had an apartment.  He

24  rented an apartment in Parkchester in the north, and he had

25  like a house party.

73

A. MANGANIELLO

```
1       Q.    That wasn't the area that he patrolled?

2       A.    No.

3       Q.    Were you allowed to live in the area that you

4   patrolled, do you know?

5       A.    I think there was several officers who lived.

6       Q.    Did you go to his house once for that party?

7       A.    Yeah, he had an open house party.  He invited us.

8   He was happy he got the apartment.

9       Q.    Did he ever go to your home?  Did you ever invite

10  him to your home?

11      A.    No.

12      Q.    Did you ever introduce Mr. Acosta to any members of

13  your family?

14      A.    No.

15      Q.    Do you recall that in November of 1995, there was a

16  charge against you for filing a false report?

17      A.    Can you refresh my memory on that?

18            MR. JOSEPH:  Over objection, you can answer.

19      Q.    Do you recall an incident where you claimed that

20  are you were late to work because there was an accident on

21  the highway?

22      A.    Yes, I believe there was.

23      Q.    Do you recall an investigation was conducted and

24  found out that there had not been an accident on that

25  highway?
```

74

A. MANGANIELLO

1                MR. JOSEPH:  Objection.  You can answer.

2        A.     There was an accident.  Highway One was on the

3    scene.  I took down the numbers of the car, and I believe I

4    also took down the license plate of the vehicle.

5        Q.     Do you remember that there was a claim that there

6    was no accident, and you falsely reported an accident?

7                MR. JOSEPH:  Objection.  You can answer.

8        A.     On My Way to work?

9        Q.     Yes?

10       A.     There was never a false report because an accident

11   did occur.

12       Q.     But do you remember that an investigation concluded

13   that falsely reported an accident?

14       A.     No, no.  I don't know if this is something else.

15       Q.     Were you aware of a harassment complaint made

16   against you by a fellow security officer in 1994?

17               MR. JOSEPH:  Objection.  You can answer.

18       A.     Who was that?

19       Q.     Do you remember a complaint being made by SP

20   Divila, D-I-V-I-L-A?

21       A.     Can you refresh my memory?

22               MS. FROMMER:  Why don't we have this marked as

23               Defendants' Exhibit A.

24               (Whereupon, the aforementioned one-page

25               Parkchester South complaint was marked as

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com
74

A. MANGANIELLO

1          Defendants' Exhibit A for identification as of this

2          date by the Reporter.)

3      Q.   Mr. Manganiello, I'm showing what's been marked as

4  Defendants' Exhibit A.  Take moment and read it (handing).

5      A.   (Reviewing document) Okay, I remember this

6  individual.

7      Q.   Prior to today, have you ever seen this document

8  before?

9      A.   Yes, I think I have.

10     Q.   When did you see it?

11     A.   I think when I first came home.

12     Q.   So you saw it in 1994?

13     A.   Right.

14     Q.   Were you interviewed by anyone?

15     A.   Yes.

16     Q.   Do you remember who?

17     A.   It may have been Chief Cowen or Deputy Bellamy or

18  both of them.

19     Q.   Were you ever disciplined as a result of this

20  complaint (indicating)?

21     A.   I don't remember if I was ever disciplined, but I

22  did explain to him that this individual was erratic, he was a

23  loose cannon, out of control and, in fact, shortly

24  afterwards, he was arrested in 52 Precinct for shooting

25  himself in the hand in his apartment and child endangerment

A. MANGANIELLO

1    because his kid was right beside him when this had happened.

2    He was trying to say that he was shot on the street.   I

3    recall Sergeant Johnson from Parkchester responded to take

4    all of Parkchester equipment away from him.

5         Q.    To your knowledge, you were not disciplined as a

6    result of that?

7         A.    I don't know if I was disciplined.   I know this was

8    what happened to him, and he was fired, he was terminated.

9         Q.    Do you recall a complaint made against you in 1996

10   by the driver of a My Way cab?

11              MR. JOSEPH:  Objection to the extent that

12              you're asking just about complaints being made.

13              You can answer.

14        A.    My Way cab?

15        Q.    There's a driver for My Way cab who made a

16   complaint against you.  Do you remember that?

17        A.    I believe so.

18        Q.    Do you remember the driver's name was Albert

19   Maynard?

20        A.    No.

21        Q.    Do you remember what Mr. Maynard claimed you did?

22        A.    No.

23              MS. FROMMER:  Can we mark this as Defendants'

24              Exhibit B?

25              MR. JOSEPH:  Note my ongoing objection to the

77

A. MANGANIELLO

```
 1              extent of any questions asked of what people

 2              claimed he did.

 3                   (Whereupon, the aforementioned two-page

 4              Parkchester South complaint was marked as

 5              Defendants' Exhibit B for identification as of this

 6              date by the Reporter.)

 7         Q.    Sir, I'm handing you what's been marked as

 8    Defendants' Exhibit B and ask you to take a look at that

 9    (handing).

10         A.    (Reviewing document) The delegations that --

11                   MR. JOSEPH:  There's no question.

12                   MS. FROMMER:  There's no question.

13         Q.    Have you ever seen this (indicating) before today?

14         A.    Yes.

15         Q.    Did you see it in 1996?

16         A.    Yes.

17         Q.    Do you know if there was an investigation of the

18    complaint that Mr. Maynard made?

19         A.    I don't know.

20         Q.    Were you aware that Security Officer Acosta claimed

21    to have witnessed your actions that Mr. Maynard claimed you

22    took?

23         A.    I don't know.

24                   MS. FROMMER:  Can we mark this Defendants'

25              Exhibit C?
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

77

78

A. MANGANIELLO

```
 1              (Whereupon, the aforementioned one-page
 2         Parkchester South complaint was marked as
 3         Defendants' Exhibit C for identification as of this
 4         date by the Reporter.)
 5      Q.   Sir, I'm going to hand you what's been marked as
 6  Defendants' Exhibit C, ask you to take a look at it, and then
 7  my question will be, have you ever seen this before today
 8  (handing)?
 9      A.   (Reviewing document) I've never seen this one.
10      Q.   You've never seen this before?
11      A.   No.
12      Q.   According to the document that you're looking at
13  Defendants' Exhibit C, did Officer Acosta state that he did
14  not want to work with you anymore?
15              MR. JOSEPH:  You're asking if that's what the
16         document says.
17              MS. FROMMER:  Yes.
18              MR. JOSEPH:  Objection.  You can answer.
19      Q.   Were you aware that Officer Acosta felt that way?
20      A.   In 1996?
21      Q.   Yes.
22      A.   No.
23      Q.   Did you have a meeting with Chief Cowen about
24  Mr. Maynard's allegations?
25      A.   I may have.
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

78

79

A. MANGANIELLO

1      Q.    Isn't it true that Mr. Cowen concluded that you

2   overreacted to this situation?

3              MR. JOSEPH:  Objection.  You can answer.

4      A.    I explained him --

5      Q.    Sir, I'm asking you for a yes or no answer.  Did

6   Chief Cowen conclude that you overreacted to this situation?

7      A.    I don't know.  I know what -- I know I explained to

8   him.

9              MS. FROMMER:  Can you mark this as Defendants'

10             Exhibit D, please?

11             (Whereupon, the aforementioned Parkchester

12             South memo dated 10/14/96 was marked as Defendants'

13             Exhibit D for identification as of this date by the

14             Reporter.)

15     Q.    I'm going to show you what's been marked as

16  Defendants' Exhibit D, read it, and my question will be have

17  you ever seen that before today (handing)?

18     A.    (Reviewing document) I don't believe I saw this

19  document.

20     Q.    Did you ever speak with Sergeant Pilios, about the

21  incident with the My Way cab in October of 1996?

22     A.    Yes, I did.

23     Q.    Do you remember telling Sergeant Pilios that you

24  would be more conscious and more conscientious of your job

25  duties?

A. MANGANIELLO

1        A.    I said several other things to him.

2        Q.    Do you recall stating to him that you would be more

3    conscientious in the performance of your duties?

4        A.    No, I don't remember that.

5              MS. FROMMER:  Can we mark this as E?

6              (Whereupon, the aforementioned letter dated

7              11/30/94 was marked as Defendants' Exhibit E for

8              identification as of this date by the Reporter.)

9        Q.    Sir, I'm going to hand you what's been mark as

10    Defendants' Exhibit E, read it and my question again is have

11    you ever seen this before today (handing)?

12        A.    (Reviewing document) I never brought my firearm to

13    work.  I just --

14              MR. JOSEPH:  Just she's --

15        A.    This document is issued to every employee at

16    Parkchester.

17        Q.    This document is dated November 30th, correct?

18        A.    Yes.

19        Q.    And it's to you, correct?

20        A.    Yes, it was issued to every employee at

21    Parkchester.

22        Q.    Is this document just informing you that you can't

23    bring your firearm to work or be brought onto Parkchester

24    property; is that correct?

25        A.    That's correct?

81

A. MANGANIELLO

1      Q.    It's informing you that if you do, you could be

2    terminated; is that correct?

3      A.    And I was never terminated because I never brought

4    a firearm to work.

5      Q.    I'm just asking you that's what the document says?

6      A.    That's what this document says.

7            Do you also have the 40 other documents with the

8    other officers' names on it?

9      Q.    Sir, I'm just asking --

10           MR. JOSEPH:  Jus answer the question.

11     Q.    -- according to this document (indicating), you

12   were informed that if you were to bring your firearm to

13   Parkchester property, you could be terminated?

14     A.    As well as every other employee.

15           MR. JOSEPH:  Just answer her questions.

16     Q.    Were you ever suspended from Parkchester?

17     A.    Yes, I was.

18     Q.    When was the first time you were suspended?

19     A.    I don't remember the date.

20     Q.    Were you suspended in early 1999, January of 1999?

21     A.    I'd have to see the document.

22     Q.    I'm asking you if you remember you were suspended

23   because there was a finding that you improperly parked your

24   vehicle?

25     A.    Where did I improperly parked my vehicle?

82

A. MANGANIELLO

```
1        Q.    I'm asking if you remember, sir.

2        A.    I need to refresh my memory.

3              MS. FROMMER:  Let me mark this as Defendants'

4        Exhibit F.

5              (Whereupon, the aforementioned two-page

6        disciplinary action report was marked as

7        Defendants' Exhibit F for identification as of this

8        date by the Reporter.)

9        Q.    I'm showing what's been marked as Defendants'

10   Exhibit F, and my question is have you ever seen that before

11   today?

12             MS. FROMMER:  Objection to the line of

13        questioning regarding this document (indicating).

14        You can answer it.

15       A.    (Reviewing document) I remember this document

16   Lieutenant Acosta.  Most of it is not true.  He's --

17             MR. JOSEPH:  Please --

18       A.    -- he's also arrested for hitting a police officer.

19             MS. FROMMER:  I'm going to move to strike that

20        as nonresponsive.

21       Q.    So you have seen this before today, correct?

22       A.    Yes.

23       Q.    According to this document (indicating), there were

24   two charges brought against you, correct?

25       A.    According to the document.
```

83

A. MANGANIELLO

1    Q.    The charges were disrespectful behavior towards a

2    supervisor and driving a personal vehicle while on duty,

3    correct?

4    A.    According to the document.

5    Q.    And according to the document there was a finding

6    that you were guilty of improperly parking your vehicle and

7    for acting with disrespect towards a lieutenant; is that

8    correct?

9    A.    That's not true.

10    Q.    That's not what the document says at the bottom of

11    the first page?

12         MR. JOSEPH:  She's asking you if that's what

13         the document says.

14    A.    That's what the document says.

15    Q.    And according to the document, you were suspended

16    for one day, correct?

17    A.    That's what the document says.

18         MR. JOSEPH:  Objection to the line of

19         questioning.

20    Q.    Do you recall being suspended for five days in

21    1993, in January of 1993?

22    A.    Can you refresh my memory?

23         MS. FROMMER:  Mark this as G.

24         (Whereupon, the aforementioned two-page

25         disciplinary action report was marked as

84

A. MANGANIELLO

```
 1              Defendants' Exhibit G for identification as of this

 2              date by the Reporter.)

 3                  MS. FROMMER:  For the record, all of these

 4              documents have been produced.  The bate stamp is in

 5              lower right corner.  The production copy,

 6              unfortunately, the Bates-stamp was cut off.  So I

 7              can't read the numbers, but there is my bate stamp

 8              on it.

 9      Q.     I'm going to show you what's been marked as

10      Defendants' G, and I ask you to read it, and the only

11      question I'm going to ask if whether you've seen it before

12      today (handing)?

13                  MR. JOSEPH:  Note my objection to the line of

14              questioning.  You can answer it.

15      A.     (Reviewing document) Yes, I've seen this.

16      Q.     Before today?

17      A.     Yes.

18      Q.     Did you see it in or around late 1992 or early

19      1993?

20      A.     Yes.

21      Q.     According to this document, you were charged with

22      insubordination and disrespect towards a supervisor slash

23      conduct unbecoming an officer; is that true?

24      A.     That's what the document says.

25      Q.     According to this document, you were found guilty
```

85

A. MANGANIELLO

1      of the charges; is that correct?

2          A.    That's what the document says.

3          Q.    According to the document, you were suspended for

4      five days, correct?

5          A.    That's what the document says.

6          Q.    Did there come a time when you had a dispute with

7      Albert Acosta in the locker room at Parkchester?

8          A.    It was a verbal disagreement.

9          Q.    When was that?

10         A.    I don't remember the date.

11         Q.    Tell me what happened.

12         A.    It was just a verbal disagreement over union

13     matters and nothing more.

14         Q.    What were the union matters?

15         A.    How the union was supposed to proceed with the

16     following of becoming contract negotiations.

17         Q.    Do you recall an incident in March of 1999

18     involving Officer Hicks in the locker room?

19         A.    In --

20              MR. JOSEPH:  Do you recall the incident?

21         A.    Yes.

22              MR. JOSEPH:  That's what she was asking you.

23         Q.    Do you recall whether that incident was physical?

24         A.    Yes.

25         Q.    You actually wrote a report on it; isn't that true?

86

A. MANGANIELLO

1        A.    Yes.

2        Q.    You claimed that Officer Acosta assaulted you as

3    well; isn't that true?

4        A.    Is that in the report?

5        Q.    I'm asking you if that's what you claimed, do you

6    recall?

7        A.    I don't recall if that's in the report.

8              MS. FROMMER:  Can you mark this as H.

9              (Whereupon, the aforementioned two-page

10             incident report was marked as Defendants' Exhibit H

11             for identification as of this date by the

12             Reporter.)

13       Q.    I'm going to show you what's been marked as

14   Defendants' Exhibit H and ask you to take a look at it

15   (handing)?

16       A.    (Reviewing document) Yes.

17       Q.    Did you write this document?

18       A.    Yes.

19       Q.    Is that your signature on Page 2?

20       A.    Yes.

21       Q.    In this document, you claimed that Officer Hicks

22   screamed, "You don't belong here" at you; isn't that correct?

23       A.    Yes.

24       Q.    And then you claimed that Officer Hicks punched you

25   with a closed fist in your jaw, correct?

A. MANGANIELLO

1          A.    Yes.

2          Q.    And then you claimed that Officer Acosta grabbed

3    you from behind in a bear hug, correct?

4          A.    He was breaking the fight up.

5          Q.    Where do you say in this document that Officer

6    Acosta was breaking the fight up?

7          A.    It's not written, but that's what he was doing.

8          Q.    Why didn't you write in the report that Officer

9    Acosta was breaking the fight up?

10         A.    I may have left it out.  It was an oversight on my

11   part, but that's what he was doing.

12         Q.    You thought he was grabbing you from behind in a

13   bear hug to break up the fight?

14         A.    Yes, he was breaking up the fight.  He was pulling

15   me back and someone else was pulling Hicks back.

16         Q.    Isn't it true that you claimed that after Acosta

17   grabbed you in a bear hug was when Officer Hicks punched you

18   several more times in the head?

19         A.    That wasn't Officer Acosta's fault.

20         Q.    Does it say anywhere in this document that it

21   wasn't Officer Acosta's fault?

22         A.    (Reviewing document) I don't say it was his fault.

23         Q.    Do you say anywhere in this report that you wrote

24   that Officer Acosta was trying to help you?

25         A.    No, and I don't say that he was trying to harm me.

88

A. MANGANIELLO

1      Q.    Isn't it true that you said that Officer Hicks and

2    Acosta had to be pulled off of you?

3      A.    (Reviewing document) Yes, that's in here.

4      Q.    Did you expect there to be an investigation, or did

5    you anticipate that there would be an investigation of this

6    incident by superiors?

7      A.    Yes.

8      Q.    Did you think that it would have been important for

9    an investigation to have write in this report that Officer

10   Acosta was not responsible for your injuries?

11              MR. JOSEPH:  Objection.  You can answer.

12     A.    I don't know if he was disciplined.

13              MR. JOSEPH:  Answer her question.

14     Q.    My question Mr. Manganiello is, did you think,

15   suspecting that there would be an investigation of this

16   incident, that it would be important to be in your detailed

17   report that Officer Acosta was not responsible for your

18   injuries?

19              MR. JOSEPH:  Objection to the question.  You

20              can answer.

21     A.    Yes, you're right but --

22     Q.    Just a yes or no.

23     A.    Please note, I was hit and I was bleeding at the

24   time.

25     Q.    Now you wrote this (indicating) on March 24th,

A. MANGANIELLO

1    correct?

2         A.    That's the date, yes.

3         Q.    And the incident happened two days before, correct?

4         A.    I don't know.

5         Q.    Well, didn't you write on 3/22, which was two days

6    before, right?

7         A.    Yes.

8         Q.    Were you still bleeding when you wrote the report

9    on March 24th?

10        A.    No, I was numb, and I had stitches on my jaw.

11        Q.    You had some details in here, correct?

12                   MR. JOSEPH:  Objection to the form of the

13                   question.  You can answer if understand what

14                   she's --

15                   MS. FROMMER:  I'll rephrase.

16        Q.    You put statements in quotation marks, correct?

17        A.    Yes.

18        Q.    And you identified the officers that were there,

19    correct?

20        A.    Yes.

21        Q.    And knowing there would be an investigation, didn't

22    you think it would be important to put in your detailed

23    report that Officer Acosta was trying to break up the fight?

24                   MR. JOSEPH:  Objection.  You can answer.

25        A.    In my mind, the aggressor in this report

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

90

A. MANGANIELLO

1    (indicating) was Eric Hicks.

2          Q.    But you didn't say that Officer Acosta was trying

3    to break up the fight; isn't that true.

4          A.    That was an oversight on my part.

5          Q.    Are you aware that Officer Acosta also submitted a

6    report about this incident?

7          A.    He may have.

8          Q.    Had you ever seen it before?

9          A.    No.

10                MS. FROMMER:  Let's mark this as Defendants'

11                Exhibit I.

12                    (Whereupon, the aforementioned one-page

13                incident report was marked as Defendants' Exhibit I

14                for identification as of this date by the

15                Reporter.)

16          Q.    I'm showing what's been marked as Defendants'

17    Exhibit I and ask you to take a look at it (handing).

18          A.    (Reviewing document)

19          Q.    Have you ever seen that before?

20          A.    I believe I have.

21          Q.    According to this, did you see it in or about

22    March of 1999?

23          A.    I believe I have.

24          Q.    According to this, Officer Acosta wrote that you

25    were the aggressor; isn't that true?

DIAMOND REPORTING  (718) 624-7200  info@diamondreporting.com

90

A. MANGANIELLO

```
1        A.    According to this report (indicating).

2        Q.    And according to this, Office Acosta wrote that you

3    wanted to fight with Officer Hicks, correct?

4        A.    Correct.

5              MR. JOSEPH:  I'm going to objection to the

6              line of questioning.

7              MS. FROMMER:  Can we mark this as J.

8              (Whereupon, the aforementioned one-page

9              disciplinary action report was marked as

10             Defendants' Exhibit J for identification as of this

11             date by the Reporter.)

12       Q.    I'm going to show you what's been marked as

13   Defendants' J (handing).  Have you ever seen that document

14   before today?

15       A.    (Reviewing document)

16             MR. JOSEPH:  Objection.  You can answer.

17       A.    Yes.

18       Q.    This is a disciplinary action report, correct?

19       A.    Correct.

20       Q.    It involves the locker room fight you had with

21   Officer Hicks, correct?

22       A.    Correct.

23       Q.    You had a hearing on March 25th, correct?

24       A.    Yes.

25       Q.    Did you make any statements as that hearing, verbal
```

A. MANGANIELLO

1     statements?

2          A.     I may have.

3          Q.     And according to this document, you claimed that

4     Officer Hicks punched you in the face and Officer Acosta held

5     you down while Officer Acosta continued to punch you in the

6     face; isn't that correct?

7                    MR. JOSEPH:   Objection.   You can answer.

8          A.     Would you repeat the question again?

9          Q.     Sure.

10                   According to this document, you claimed that

11     Officer Hicks punched you in the face, and then Officer

12     Acosta held you down while Officer Hicks continued to punch

13     you in the face; isn't that correct?

14         A.     It says I was held, not down, I was held by Officer

15     Acosta.

16         Q.     Does it say anywhere in this document (indicating)

17     that you believe that Officer Acosta was trying to break up

18     the fight?

19         A.     That's an oversight on my part.

20         Q.     Did you write this document?

21         A.     The findings.

22         Q.     Did you write this document?

23         A.     No.

24         Q.     Do you remember saying in the hearing that Officer

25     Acosta specifically was trying to break up the fight?

93

A. MANGANIELLO

1      A.    I may have said that, and in fact --

2      Q.    That's a yes or no question, sir.  Did you say it

3  in the hearing?

4      A.    That what?

5      Q.    That Officer Acosta tried to break up the fight?

6      A.    I may have said that, yes.

7      Q.    Is that anywhere in this document?

8            MR. JOSEPH:  Objection.

9      A.    No, it's not.

10      Q.    That was not a finding, was it?

11            MR. JOSEPH:  Objection.

12      A.    It's not in here (indicating).

13      Q.    And you were suspended for two days because of that

14  fight, correct?

15      A.    As well as, Hicks, yes.

16      Q.    Was Officer Acosta suspended?

17      A.    I don't know.

18      Q.    Did you ever discuss it with him?

19      A.    I may have.

20      Q.    To your knowledge, what was Officer Acosta's

21  relationship or friendship with Officer Hicks?

22      A.    He was his friend.

23      Q.    Did you ever discuss the locker room incident with

24  anyone at Parkchester?

25      A.    This incident here?

94

A. MANGANIELLO

1          MR. JOSEPH:  Objection to the question.  You

2          can answer.

3     A.   I don't remember.

4     Q.   Did you ever discuss it with Acosta?

5     A.   Yes, I spoke to him.  I said, "I know you were

6  trying to break up the fight, you know, I appreciate it," and

7  that was it.  That was over it.

8     Q.   You told him that you appreciated it?

9     A.   Yeah.

10    Q.   What did he say?

11    A.   He says, "Don't worry about it."

12    Q.   Were you aware that prior to that, Officer Acosta

13 thought you were a danger to him and to others?

14         MR. JOSEPH:  Objection.  At what point?  Are

15         we talking about concerning the same incident?

16    Q.   No, I'm just saying were you aware that prior to

17 March of 1999, Officer Acosta had told other people that he

18 believed you were a danger to him?

19         MR. JOSEPH:  Objection to the form.  You can

20         answer.

21    A.   You know what, if he thought that, I was never made

22 aware of that.

23    Q.   Did you socialize with Officer Acosta after the

24 March 1999 locker room incident?

25    A.   You have to understand, I was holding two jobs at

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

94

A. MANGANIELLO

1     the time.

2                    MR. JOSEPH:  Just answer the question.  Did

3                    you socialize with --

4     A.    I didn't socialize with anybody at the time.

5     Q.    Did you work with him after that?

6     A.    Yes.

7     Q.    How frequently?

8     A.    On rotation, but whoever was assigned to work with

9     somebody, that was it.

10    Q.    Did you ever have any other encounters with Albert

11    Acosta in front of other security officers or SPOs after

12    March of 1999?

13                   MR. JOSEPH:  Objection to form of the

14                   question.  What do you mean "encounters"?

15                   MS. FROMMER:  Interaction, physical

16                   interaction.

17    A.    You'd have to refresh my memory.

18    Q.    I'm asking you if you did.

19    A.    I don't know.  You'd have to refresh my memory.

20    That was a long time ago.

21    Q.    Did you have any other fights in the locker with

22    any other employees?

23    A.    I broke up a lot of fights in the locker room.

24    Q.    Who did you break up fights between?

25    A.    There was a fight between Officer Campbell and

96

A. MANGANIELLO

1    Officer Williams.

2        Q.    Did you report that?

3        A.    It was more of a verbal confrontation.  It never

4    came to blows.

5        Q.    Did you fill out a report?

6        A.    No, because the sergeant came in, and he's my

7    supervisor, and if anybody was to fill out a report, it was

8    his obligation and duty.

9        Q.    Did you witness Officer Acosta engaging in improper

10   behavior?

11       A.    Not that I recall.

12       Q.    Did you ever break up an argument that he was

13   involved in?

14       A.    You'd have the refresh my memory.

15       Q.    So you don't remember?

16       A.    I don't remember.

17              MS. FROMMER:  Can you mark this as K?

18       A.    Just back up a minute, did you say Officer Acosta

19   was involved in a fight with an officer or just in general.

20       Q.    I'm saying did you ever break up an argument in the

21   locker room between Officer Acosta and anyone?

22       A.    No, there was an argument with Officer Acosta when

23   he was off duty with two other individuals.

24       Q.    Did you break that up?

25       A.    Yes, everyone who was working at the scene

97

A. MANGANIELLO

1    responded, and we separated the individuals.

2         Q.    Did you ever write a report up?

3         A.    Yeah, everybody wrote a report.

4         Q.    Did Officer Acosta write up a report?

5         A.    Yes, everybody was ordered to write a to and from

6    and a report to Chief Cowen.

7         Q.    Did you ever see that report?

8                    MR. JOSEPH:  After he wrote it?

9                    MS. FROMMER:  Yes, after Acosta wrote it.

10        A.    No.

11        Q.    Did he ever tell you what he said?

12        A.    No.

13        Q.    Did you ever tell him what you said in your report?

14        A.    No.

15                   (Whereupon, the aforementioned one-page

16               corrective interview document was marked as

17               Defendants' Exhibit K for identification as of this

18               date by the Reporter.)

19        Q.    I'm showing what's been marked as Defendants'

20    Exhibit K and ask if you've ever seen this before (handing)?

21                   MR. JOSEPH:  Over objection, you can answer.

22        A.    (Reviewing document) Yes.

23        Q.    Did you see it on or about January 25th of 2001?

24        A.    Probably.

25        Q.    According to this, you were interviewed because you

A. MANGANIELLO

1    were driving with someone in your car that was not supposed

2    to be there; isn't that correct?

3         A.    It was January 25th.  It was very cold --

4         Q.    It's a yes or no question.

5              According to this document (indicating), you were

6    interviewed because you were driving with someone

7    unauthorized in your car; is that correct?

8         A.    No, I was just transporting officers to a call.

9              MR. JOSEPH:  Yes or no.

10        Q.    And you agreed with the statement, correct?  Did

11   you write in the statement "agreement"?

12        A.    No, that's the sergeant's opinion because it's the

13   same handwriting.

14        Q.    "Employee statement."  You're the employee,

15   correct?  See at the top (indicating), "employee name,

16   Anthony Manganiello," correct?

17        A.    Right.

18        Q.    And "employee statement or reaction, in agreement"?

19             MR. JOSEPH:  Did you write it?

20        A.    I didn't write it.

21        Q.    But were you in agreement that you were

22   transporting somebody in your car?

23        A.    Yeah, I explained to the sergeant.  I said, "I was

24   just transporting him to a call.  I was trying to help him

25   out.  It was cold.  I didn't have to respond to any call."

# EXHIBIT 2

COMPLAINT – FOLLOW UP
INFORMATIONAL
PD 313-081A (Rev. 4-69)-31

| | | | Crime | Pct. | OCCB No. | Complaint No. | Date of This Report | 14 |
|---|---|---|---|---|---|---|---|---|
| | | | HOMICIDE #2 | 043 | | 2412 | 2/12/01 | PERP 1 |

Report | Date Assigned 2/12 | Case No. 624 | Unit Reporting 43 PDS | | Follow-Up No. | PERP 2

's Name – Last, First, M.I.
Y FOR ACOSTA, ALBERT

Investigate:     HOMICIDE

Subject:        INTERVIEWED PARKCHESTER SUPERVISOR

On February 12, 2001, at approx. 1655 hrs., the u/s interviewed
Parkchester security supervisor Sgt. R. Ohle shield#4179 in the 43
Pct.. He stated he changed suspect to East quadrent from south due to
a law suit. He did not observe any problems between suspect and
victim.

The u/s has attached a copy of the roll call with this DD5.

Case active.

PLAINTIFF'S EXHIBIT

0807

# EXHIBIT 3

50

Agostini

2  A   Well, did he run today.
3  Q   What did he say?
4  A   I believe he said no.
5  Q   Do you have any reason to
6  believe he didn't run the day prior?
7  A   No.
8  Q   Did you ask him if he ran the
9  day prior?
10  A   No.
11  Q   Did you ask him if he walked on
12  the treadmill as opposed to running?
13  A   No.
14  Q   Did you ask him whether someone
15  else in his family used a treadmill?
16  A   No.
17  Q   Did you ask him who else he
18  lived with?
19  A   I don't remember that.
20  Q   Did you ask him if maybe he cut
21  his finger moving his girlfriend's
22  treadmill?
23      MS. FROMMER: Objection.
24  A   No, because I asked him how he
25  got that, and he told me how he got it.

51

Agostini

2  Q   Did you believe him?
3  A   Not -- yes, I guess I believed
4  him at the time.  Yes.
5  Q   Let me see if I understand the
6  process here.  You asked him what his name
7  is, and he told you, correct?
8  A   Yes.
9  Q   You asked him for his address,
10  and he says he doesn't remember, correct?
11  A   Yes.
12  Q   But his address wound up on an
13  arrest report prepared on February 12, 2001?
14      MS. FROMMER: Objection to that
15  question.
16  A   Okay, I believe he says "I don't
17  know" regarding to his address, not that I
18  don't remember.  And as far as the arrest
19  report, the address and everything else, if
20  it was there, this happened late that night,
21  not during the interview.
22  Q   So then after that, your next
23  question to him was what is your telephone
24  number?
25  A   Yes.

52

Agostini

2  Q   And he indicated that it was
3  unlisted, correct?
4  A   Correct.
5  Q   What was your next question to
6  Anthony Manganiello?
7  A   I don't remember what is the
8  next question.
9  Q   Do you remember any of the other
10  questions you asked him?
11  A   Did the victim have a problem
12  with anybody, or did he have a problem with
13  him?
14  Q   And what was his response?
15  A   I don't remember what his
16  response was.
17  Q   Did he tell you that he had a
18  problem with the victim?
19  A   No, he didn't say that.
20  Q   Was there anything that led you
21  to believe that Mr. Anthony Manganiello had
22  a problem with the victim on February 12,
23  2001?
24  A   No.
25      MS. FROMMER: Objection.

53

Agostini

2  Q   What other questions did you ask
3  him?
4  A   I think basically that's it.
5  Q   What happens after you asked him
6  those questions?
7  A   After I asked him those
8  questions, and I would say maybe 15 minutes
9  or whatever that he was there, Detective
10  Rubin Gonzalez comes in and says that
11  Anthony Manganiello's attorney called, and
12  asked us not to question him.
13  Q   What was your impression at that
14  point?
15  A   Then I was suspicious.
16  Q   Is it fair to say that the fact
17  that an attorney called made you suspicious?
18  A   The fact that he didn't answer
19  me, that he told me that he doesn't know
20  where he lives and his phone is unlisted, I
21  mean most people who we interview, I
22  interviewed a whole bunch of people, nobody
23  has ever told me that.  And the fact that he
24  told me that, and all of a sudden an
25  attorney calls, yes, it rose my suspicions.

14  (Pages 50 to 53)