UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                         :

**ANTHONY MANGANIELLO,**

                **Plaintiff,**

       - against -                                       **07 Civ. 3644 (HB)**

                                                       **OPINION & ORDER**

**THE CITY OF NEW YORK, DET. LUIS AGOSTINI, Individually and as a New York City Police Detective, SHAWN ABATE, individually and as a New York City Police Detective, DEREK PARKER, individually and as a New York City Police Detective, LT. HENRY SCOTT, individually and as a New York City Police Lieutenant, P.O. ALEX PEREZ, individually and as a New York City Police Officer, P.O. MIRIAN NIEVES, individually and as a New York City Police Officer, MICHAEL PHIPPS, individually and as a Commanding Officer of the 43rd Precinct, JOHN McGOVERN, individually and as a New York City Police Detective Sergeant, ROBERT MARTINEZ, individually and as a New York City Police Detective, GERYL McCARTHY, individually and as a New York City Police Deputy Inspector,**

                **Defendants.**

-----------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

       On April 17, 2008, defendants City of New York, retired Detective Luis Agostini, retired detective Shawn Abate, retired Detective Derek Parker, retired Lieutenant Harry Scott (sued herein as "Lt. Henry Scott"), retired Police Officer Alex Perez, retired Police Officer Miriam Nieves, Inspector Michael Phipps, Lieutenant John McGovern, retired Detective Richard Martinez (sued herein as "Robert Martinez") and retired Deputy Inspector Geryl McCarthy (collectively, "Defendants"), moved this Court for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, summary judgment is GRANTED in favor of defendants City of New York, Parker, Scott, Phipps, McGovern and McCarthy, and summary judgment is DENIED with respect to defendants Agostini, Abate, Perez, Nieves and Martinez.

1

# I. FACTUAL BACKGROUND

The following facts, *inter alia*, are not disputed. On the morning of February 12, 2001, Albert Acosta, a security guard for the Parkchester South Condominium Security Department ("Parkchester Security"), was found lying face down, dead, with a gunshot wound to his head in the basement of 1700 Metropolitan Avenue in the Parkchester South Condominium Complex. Plaintiff Anthony Manganiello ("Plaintiff"), also a Parkchester Security guard, was working in the vicinity of 1700 Metropolitan Avenue that day. Pl.'s & Defs.' Statements of Facts Pursuant to Local Rule 56.1 ("Statements") ¶¶ 1-3. At approximately 10:14 a.m. Parkchester Security received a telephone call from a person stating that there was a "man down" in the basement of 1700 Metropolitan Avenue. Frommer Decl. Ex. D. A minute later, the Parkchester Security central dispatcher transmitted this information over the Parkchester radio system. After hearing the broadcast, Plaintiff went to 1700 Metropolitan Avenue. Pl.'s & Defs.' Statements ¶¶ 9, 12. At some point, a call to 911 was made, and the NYPD central radio dispatcher broadcast over the NYPD radio system that there was a "10-13," or uniformed person in distress, at 1700 Metropolitan Avenue. *Id.* ¶¶ 14-15.

Defendants Police Officers Nieves and Perez, who were partners, responded to the scene. *Id.* ¶ 17. Several other members of the NYPD arrived at the scene, and detectives from the 43rd Precinct Detective Squad commenced an investigation. Later that day, Defendant Agostini was assigned as the case detective. *Id.* ¶ 19. The Bronx County District Attorney's ("DA's") Office was provided with information about the police investigation, including that Acosta had been shot and killed with a .22 caliber gun, *id.* ¶ 33, and that Plaintiff's hands had tested negative for gunshot residue, *id.* ¶ 27. The DA's Office was also made aware that Terrance Alston, a pretrial detainee housed in a correctional facility on Rikers Island, claimed to know someone who sold Plaintiff a .22 caliber gun. *Id.* ¶¶ 34-35.

The police investigation concluded on or about April 20, 2001, and that day Defendant Agostini signed a felony complaint for Plaintiff's arrest, an arrest warrant was obtained, and the DA's Office directed the 43rd Precinct Detective Squad to arrest Plaintiff. Defs.' Statement ¶ 20; Frommer Decl. Ex. V. Defendant Abate took Plaintiff into custody on April 20, 2001. Pl.'s & Defs.' Statements ¶ 21.

Defendants Agostini, Perez, Nieves and Abate testified before the Grand Jury. Joseph Decl. Ex. 28. Three civilian witnesses also testified before the Grand Jury. Walter Cobb testified that the Plaintiff was present at the scene of the crime immediately after the fatal shots

were fired. *Id.* ¶ 68. Christopher Tartone testified that Plaintiff was heard asking individuals if anyone was selling a gun. *Id.* ¶ 69. Alston testified that he heard Plaintiff say he intended to kill another security guard. *Id.* ¶ 70. The Grand Jury indicted Plaintiff on May 7, 2001, and charged him with two counts of Murder in the Second Degree and other related charges. Frommer Decl. Ex. X.

The criminal trial of *People v. Manganiello* commenced before Judge Martin Marcus and a jury in Bronx County Supreme Court on June 28, 2004. Plaintiff was acquitted.

## II. PROCEDURAL HISTORY

On May 8, 2007, Plaintiff filed a complaint against Defendants alleging malicious prosecution in violation of 42 U.S.C. § 1983. Defendants' motion for summary judgment was fully briefed on May 22, 2008, and this Court heard oral argument on May 28, 2008. Trial is scheduled to commence on June 16, 2008. Plaintiff's motion, filed April 10, 2008, for various orders pursuant to Fed. R. Civ. P. 37, remains open, and during oral argument the Court requested Defendants' counsel to submit a response.

## III. STANDARD OF REVIEW

A court will not grant a motion for summary judgment pursuant to Fed. R. Civ. P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. The Second Circuit has held that a "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). The nonmoving party may not overcome summary judgment by relying "merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e). Rather, the nonmoving party's "response must—by affidavits or as otherwise provided in [Fed. R. Civ. P. 56]—set out specific facts showing a genuine issue for trial." *Id.*

## IV. DISCUSSION

A. **Individual Defendants**

    1. *Summary Judgment Granted to Defendants Parker, Scott, Phipps, McGovern and McCarthy*

Under well-settled law in this Circuit, to succeed on a claim for malicious prosecution, a plaintiff must show that (1) a prosecution was initiated against him or her, (2) that it was brought with malice (3) and without probable cause to believe that it could succeed, and (4) that the prosecution terminated in favor of the accused plaintiff. *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). The fourth prong is not disputed, as Plaintiff was acquitted.

    a. **Parker**

Plaintiff bases his claim against Defendant Parker on Parker's alleged involvement with Alston, the witness who was a pretrial detainee at Riker's Island and who claimed to know someone who had sold a gun to Plaintiff. Parker, unlike other Defendants in this matter, did not work in the 43rd Precinct. Parker Dep. Tr. 9-11, Ex. 6 to Joseph Decl. Rather, he specialized in crimes involving the rap and hip-hop industries. *Id.* Alston was a confidential informant to Parker, and Parker was one of Alston's "handlers." *Id.* at 68; Scaccia Dep. Tr. 34-35, Ex. 25 to Joseph Decl. When Alston told him that he had information about a murder in the Bronx, Parker called the 43rd Precinct to refer them to Alston. Parker Dep. Tr. 39-40. Parker testified that he was not involved in the initial conversations between Agostini and Alston. *Id.* at 69. Indeed, there is no evidence that Parker had any conversations with Alston about the information that Alston claimed to know about the murder, or that Parker knew the content of the conversations between Alston and Agostini. The evidence submitted by Plaintiff shows only that Alston told *Agostini* that Johnny Baker had sold Plaintiff a gun, that *Agostini* then interviewed Johnny Baker, who denied the story, that Alston was angry at *Agostini* for having spoken with Johnny Baker without him present, and that *Agostini* continued to work with Alston after the incident. *See* Complaint Follow-up by Agostini regarding conversation with Alston, Ex. 16 to Joseph Decl.; Agostini Dep. Tr. 178-79, Ex. 3 to Joseph Decl.

The evidence demonstrates that Parker was later invited to a meeting between Alston, Agostini, Assistant District Attorney Christine Scaccia and Mark Damon, a 17-year-old who Alston had subsequently said sold a gun to Plaintiff. Parker Dep. Tr. 76-77. Parker testified that he had no recollection of Mark Damon being present at the meeting and he never met with him outside of that meeting. *Id.* at 82. He testified that he believed the reason he was invited was

because he was Alston's "handler" and Alston may have felt comfortable with him. *Id.* at 81.

Mark Damon later recanted his statement that he had sold Plaintiff a gun. By this time, Alston was no longer incarcerated. Plaintiff claims that Alston provided false testimony in exchange for his release from jail and that this is evidence of malicious prosecution by Agostini and Parker because they should have known, based on Alston's first lie with regard to Johnny Baker, that Alston's second statement, with regard to Mark Damon, was also false. However, there is no evidence that Parker had any knowledge of the first lie about Johnny Baker, or that he had any involvement at all with Alston in connection with Acosta's homicide investigation other than to refer Alston to the 43rd Precinct and to sit in on the meeting between Damon, Alston and the Assistant District Attorney. There is no evidence that Parker brokered any deal with Alston to get him out of jail early. Assistant District Attorney Scaccia testified that she told Parker that she would enter into a cooperation agreement with Alston and that once he was out of jail Parker was to be his handler, but that Parker never spoke with her on Alston's behalf to expedite his release. Scaccia Dep. Tr. 34-35, 59, Ex. 25 to Joseph Decl.

Finally, Plaintiff makes much to-do about a book authored by Parker in which Parker says that as a specialist in crimes in the hip-hop and rap industries, he often found unorthodox methods to be effective. In his deposition, he testified that this could mean "finessing" the witness. *See* Pl.'s Br. 4-5, 28. It would be a stretch of the imagination, without more, to extrapolate from these statements any significance or relationship to the criminal prosecution of Plaintiff. Even generally speaking, the statements do not reveal unethical or questionable conduct by Parker, but rather at most a somewhat maverick personality.

Plaintiff has not shown sufficient evidence that Parker initiated or continued the prosecution, or harbored any malice toward the prosecution of Plaintiff, or, even if he did participate in the prosecution of Plaintiff, that he had no probable cause to believe the proceeding would succeed, and therefore summary judgment is granted to Parker.

        **b.**    **Scott, Phipps, McGovern and McCarthy**

Upon a review of all of the parties' submissions and evidence, it is evident that Plaintiff does not allege facts sufficient to support a malicious prosecution claim against Defendants Scott, Phipps, McGovern and McCarthy, either. Pl.'s Br. 6. While Plaintiff claims that McGovern, Scott and McCarthy "actively" encouraged the actions of other Defendants, including Agostini, Plaintiff has produced no evidence to show any such encouragement. Plaintiff asserts that McGovern and Scott reviewed Agostini's Complaint Follow-up reports,

5

which allegedly attributed conflicting statements to officers who were with Plaintiff at 1700 Metropolitan Avenue, that they failed to "intervene" and that they either ignored or authorized the continued use of Alston, when they knew he had lied. *Id.* 7. However, none of the evidence submitted suggests that McGovern or Scott knew Alston had lied or that the Complaint Follow-up reports that they reviewed contained material conflicting statements.

Neither McGovern nor Scott testified before the Grand Jury. Moreover, merely having a supervisory position in the precinct is not sufficient to find that the supervisor initiated the prosecution. *See Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (requiring a showing that defendant played an "active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act"). Finally, with respect to Defendant Scott, Plaintiff alleges that at the time of his arrest in February 2001, Scott said he believes Plaintiff was guilty because he was "lawyered up." Pl.'s Opp. 7, 20. This fact, even if true, hardly creates a genuine issue of material fact as to the malicious prosecution claim against Scott in the absence of any real involvement by Scott in the investigation or prosecution of Plaintiff.

Similarly, although Plaintiff claims that Defendant McCarthy failed to intervene in the actions by other Defendants, including Agostini, there is no evidence in the record that McCarthy had any knowledge of any alleged wrongdoing by any other Defendants, even though he was the highest ranking officer associated with the investigation. He did not testify before the Grand Jury, nor did he or McGovern ever speak with anyone at the DA's Office regarding the prosecution of Plaintiff. Finally, with respect to Defendant Phipps, Plaintiff alleges no specific facts at all.

Therefore, Plaintiff has not shown a genuine issue of material fact as to his malicious prosecution claim against Defendants Scott, Phipps, McGovern and McCarthy and the undisputed facts are sufficient to warrant judgment as a matter of law.

### 2. *Summary Judgment Denied to Defendants Agostini, Abate, Perez, Nieves and Martinez*

#### a. **Assistant District Attorney Was Not Superseding Cause**

Defendants argue that the Assistant District Attorney's independent actions broke any causal connection between Defendants and the allegedly malicious prosecution and cite *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999), in which the Second Circuit addressed a § 1983 claim founded on an allegation of unreasonable search and seizure in violation of Fourth

Amendment rights. That case, however, is not analogous to the case at bar. First, the causes of action are different. Second, the Court in *Townes* found that the *trial court's* failure to suppress certain evidence constituted a superseding cause of the plaintiff's conviction and imprisonment and thus the police officers were not liable for malicious prosecution. Here, Defendants argue that the prosecutor was a superseding cause.

A case in the Eastern District, however, is apposite. *See Mejia v. City of New York*, 119 F. Supp. 2d 232 (E.D.N.Y. 2000). In that case, the court observed that witnesses may be considered complaining witnesses if they falsely gave the prosecutor information that induced the prosecutor to act.[1] *Id.* at 272. It was significant to the *Mejia* court that "[p]laintiffs' claim is *not* that [the defendants] simply went to prosecutors and related the facts as they honestly believed them to be and then let the prosecutor make his or her determination whether to commence proceedings." *Id.* (emphasis added). Instead, the plaintiff alleged that the defendants misrepresented to prosecutors the true circumstances leading to the arrest and, "thus, induced the prosecutor to commence proceedings based on manufactured evidence [and] further induced the prosecutor to continue the proceedings by giving testimony before the grand jury that was false and/or contained material omissions." *Id.* In *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997), the Second Circuit held that "initiation" of prosecution may include preparing false evidence, forwarding it to prosecutors, suborning perjury and committing perjury. That is precisely what Plaintiff alleges here with regard to Defendants Agostini, Abate, Perez, Nieves and Martinez. Therefore, the Assistant District Attorney's actions do not constitute an intervening cause that shields these Defendants from liability.

### b. Presumption Created by Grand Jury Indictment Is Rebutted

Defendants further argue that the Grand Jury indictment created a presumption of probable cause that cannot be rebutted. While the Grand Jury indictment did create a presumption of probable cause, this presumption may be rebutted by evidence demonstrating that the defendants engaged in fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. *See, e.g., Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). The *Savino* court held that the district court erred when it permitted the plaintiff to rebut the

---

[1] Although the *Mejia* court made this observation in the context of qualified immunity, not "initiation" of prosecution, qualified immunity and "initiation" of prosecution are conceptually intertwined. *Id.* ("Whether a witness is a complaining witness [for purposes of qualified immunity] is a fact-based question that coincides with the determination of whether the witness played such a role initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution.").

presumption of probable cause with mere "conjecture" and "surmise" that his indictment was procured as a result of conduct undertaken by the defendants in bad faith. *Id.* at 73. The *Mejia* court, on the other hand, found that the presumption of probable cause created by the grand jury indictment was rebutted where the plaintiff produced evidence of fraud, suppression of evidence and police misconduct. 119 F. Supp. 2d at 256. The court held that the plaintiff had rebutted the presumption to the extent that the indictment was based on alleged misrepresentations that the defendants—the City of New York, a U.S. Customs Service special agent, two police officers and a private corporation that acted under color of law and had state actor status—made about telephone calls between the plaintiff and the corporate defendant. Similarly, here, Plaintiff has produced evidence that the indictment depended upon the alleged misrepresentations made by at least some of the Defendants. *Id.*

  Here, Plaintiff has produced sufficient evidence to rebut the presumption created by a grand jury indictment. For example, Agostini's Complaint Follow-up report dated February 27, 2001, which states that Sal Miro told him that Plaintiff said he owned a .22 caliber gun and carried it on him sometimes, was directly contradicted by Sal Miro's declaration, dated February 29, 2008, that he never told any detective that he spoke with Plaintiff or that Plaintiff said he owned a .22 caliber gun. Assistant District Attorney Scaccia admitted that the initial statement *as provided by Agostini* played a role in her decision to initiate the prosecution against Plaintiff. Scaccia Dep. Tr. 91, Ex. 25 to Joseph Decl. Moreover, Agostini testified that if Booth had not told him anything about Plaintiff during their interview, Agostini would have made "inquiries" about the gambling slips that he found in Booth's pocket. Agostini did not "think" he made any inquiries, once Booth told Agostini what he wanted, *i.e.*, that Plaintiff had asked him if he had a "rod" (gun). Agostini Dep. Tr. 225–26, Ex. 3 to Joseph Decl. Martinez and Abate also met with Booth. Finally, as set forth above, Agostini continued working with Alston as an informant after it was clear that Alston had lied about Johnny Baker, and albeit Agostini admitted during a recent deposition that this had raised concerns for him about Alston's believability. *Id.* at 181. Agostini admitted that his conversation with Alston undermined Alston's credibility in his view but that he knew "he was playing games, because he was in jail and maybe he wanted to be out of jail before he gave me like the correct person who did it." *Id.* at 182.

  Agostini signed the felony complaint, dated April 20, 2001, in the Bronx Criminal Court, which reads in part: "Deponent [Agostini] states, based upon official investigation, [Plaintiff's] statements, and witnesses known to the Police Department, that, at the above time and place, the

Defendant did cause the death of Albert Acosta by shooting him with a loaded firearm." The complaint is signed only by Agostini. Frommer Decl. Ex. V. Agostini testified that he filled out "numerous paperwork" to obtain a warrant for Plaintiff's arrest, that to obtain the arrest warrant he "presented evidence," including witnesses Cobb, Alston, Booth and Cartone, to a judge, and that he "went to the DA's office, and *we* obtained an arrest from the judge." Agostini Dep. Tr. 203-05 (emphasis added). Moreover, Agostini testified that he gave his "whole file" to Assistant District Attorney Scaccia. Agostini Dep. Tr. 127-28, Ex. I to Frommer Decl. Scaccia testified that "[t]here was a time that I had access to the entire case folder, and that would have been probably at the grand jury stage. I did not maintain possession of that folder between the grand jury and the trial." Scaccia Dep. Tr. 22-24, Ex. 25 to Joseph Decl. "Having access" to the case file meant that "when a detective comes to see you regarding a case they generally bring their file with them." *Id.* at 23.

Further, it appears that Agostini may have provided false testimony during a pretrial hearing in the criminal matter in which he testified that a note found in Plaintiff's locker read, "I feel like killing somebody." In fact, the note said, "I pray every day that I will never have to kill someone." Joseph Decl. Ex. 3 at 105-07, Ex. 9. Agostini testified that he did not know if he ever provided the Assistant District Attorney with a copy of the note. Joseph Decl. Ex. 3 at 104. It also seems that Agostini may not have provided the Assistant District Attorney with everything he knew about the criminal investigation. For example, Assistant District Attorney Scaccia testified that Agostini never provided her with a copy of his handwritten interview notes, and the entire file, which was last in Agostini's possession, went missing before trial.[2] Scaccia Dep. Tr. 25, Ex. 25 to Joseph Decl. The cumulative effect of the evidence set forth above is sufficient to rebut the presumption of probable cause provided by a grand jury indictment.

        c. **Genuine Issues of Material Fact as to Agostini, Abate, Perez, Nieves and Martinez**

Plaintiff has demonstrated genuine issues of material fact as to these Defendants' liability for malicious prosecution. Agostini signed the felony complaint and provided the file to the Assistant District Attorney. Abate signed a search warrant for Plaintiff's car, according to Agostini—the search warrant itself has disappeared along with much of the file. Joseph Decl.

---

[2] During Plaintiff's criminal trial, Agostini testified that the box that contained materials relating to the homicide investigation went missing in February 2003. Joseph Decl. Ex. 7 at 279. In March of 2004 he "basically searched the whole precinct" for the box but could not find it. *Id.* at 279-80. Of the materials in the box, he had copied the DD-5s, or complaint follow-ups. *Id.* at 280.

Ex. 3 at 97. Abate, along with Martinez, were involved with the witness, Booth, and some evidence, as set forth above, shows that Booth's testimony may have been coerced. *See* Joseph Ex. 29 at 72-74, Ex. 8. Defendants Agostini, Abate, Nieves and Perez all testified before the Grand Jury. There is some evidence that Nieves and Perez misrepresented the facts during their testimony before the Grand Jury with respect to whether the Parkchester Security radio transmission identified the victim as a Parkchester Security guard and with respect to statements made by Plaintiff to Nieves.[3] *See* Joseph Decl. Ex. 28 at TP4-TP7, TP12, 13, Ex. 7 at 150, 210.

Drawing all reasonable inferences in Plaintiff's favor, a reasonable juror could find that the evidence reveals malicious prosecution by each of these Defendants. At this stage of the litigation, while more material issues of fact were presented, this is sufficient to deny the motion.

**B.     Absolute Immunity**

Defendants argue that Agostini, Perez and Nieves are entitled to absolute immunity for their testimony before the Grand Jury. The Supreme Court has held that a police officer has absolute immunity from liability under 42 U.S.C. § 1983 based on the substance of his trial testimony. *Briscoe v. LaHue*, 460 U.S. 325 (1983). The Second Circuit has held that police officers are entitled to the same protection for testimony that is provided to a grand juror. *White v. Frank*, 855 F.2d 956 (2d Cir. 1988). However, the Supreme Court has carved out "[a]n exception to this wall of immunity for trial and pretrial testimony [of] a 'complaining witness.'" *Malley v. Briggs*, 475 U.S. 335, 340 (1986). In *White*, the Second Circuit explained that "the common law made a subtle but crucial distinction between two categories of witnesses with respect to their immunity for false testimony. Those whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution—complaining witnesses—did not enjoy immunity." 855 F.2d at 958-59. To qualify as a complaining witness, and thereby be disqualified from absolute immunity, a witness must play a sufficient role in initiating the prosecution. *Id.* at 962. The Seventh Circuit has noted that "[o]f course, merely providing false testimony to a grand jury is not enough." *Cervantes v. Jones*, 188 F.3d 805, 810 (7th Cir. 1999) (citing *White*, 855 F.2d at 961). Rather, a complaining witness is one "who actively instigated or encouraged the prosecution of the plaintiff." *Cervantes*, 188 F.3d at 810.

Here, the gravamen of Plaintiff's lawsuit is that Defendants were "complaining

---

[3] It should be noted that Perez has not yet appeared for a deposition despite having been timely noticed. During oral argument, this Court instructed Defendants' attorney to make another effort to produce Perez for a deposition and instructed Defendants' attorney to respond to Plaintiff's Rule 37 motion, which request, *inter alia*, an order deeming Plaintiff's allegation as to Perez as established.

10

witnesses," *i.e.*, that they instigated or encouraged a malicious prosecution against him. As explained above, a reasonable juror could find that Defendants Agostini, Perez and Nieves instigated or encouraged Plaintiff's prosecution. Therefore, this Court declines to hold that these Defendants enjoy absolute immunity for their Grand Jury testimony.[4]

## C. Qualified Immunity

Defendants further argue that all of the individual Defendants are entitled to qualified immunity. Again, I will address the qualified immunity claim only for those Defendants for whom summary judgment is not granted: Agostini, Abate, Martinez, Perez and Nieves. The Supreme Court has recently held that "[i]n resolving questions of qualified immunity, courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quotation marks omitted). This inquiry "usually means adopting . . . the plaintiff's version of the facts." *Id.* at 1775. Here, as explained above, taken in the light most favorable to Plaintiff, the facts alleged, if true, would show that Defendants Agostini, Abate, Martinez, Perez and Nieves violated Plaintiff's constitutional rights to be free from malicious prosecution and not to be indicted without probable cause.

The "'next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* at 1774 (quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court in *Scott* never reached this question because it held that the facts alleged did not show a violation of a constitutional right. In *Saucier*, the Supreme Court explained that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202. Here, the right to be free from malicious prosecution in the absence of probable cause is a well-established constitutional right and was one at the time of the alleged prosecution. If Plaintiff's allegations, *e.g.*, that Defendants falsified evidence and suborned perjury, are true, then certainly it would be clear to a reasonable officer that this conduct was unlawful. The concern expressed by the Supreme Court in *Saucier*, that "reasonable mistakes can be made as to the legal constraints on particular police

---

[4] I need not decide whether the remaining Defendants, in whose favor summary judgment is granted, would be entitled to absolute immunity. *See Rolon v. Henneman*, 517 F.3d 140, 147 n.2 (2d Cir. 2008) (declining to decide whether defendant was a "complaining witness" or entitled to absolute immunity because Court already concluded that plaintiff had failed to state a legally cognizable claim against defendant).

conduct" and "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation," do not come into play here. *See id.* at 205. While an officer is entitled to the immunity defense "[i]f the officer's mistake as to what the law requires is reasonable," if Plaintiff's factual allegations concerning Defendants Agostini, Abate, Martinez, Nieves and Perez are true, there could be no such mistake. *See id.* That is, no reasonable police officer would mistake the law so as to include and permit fabrication of evidence, suborning of perjury and perjury.

The inquiry, however, necessarily encounters a lacuna at this point, as it is not clear at this stage in the litigation whether Plaintiff's allegations are, in fact, true: they rest on disputed facts. For example, if Defendant Agostini fabricated Complaint Follow-up reports, or Martinez, Abate and Agostini coerced Booth to give a false statement, or Perez and Nieves misrepresented to the Grand Jury their recollection of the radio transmissions and their interactions with Plaintiff, then this Court could reach a determination as to whether such conduct was clearly unlawful to a reasonable officer. Whether Defendants actually did these acts, and the nature of their conduct, are factual questions that must be answered by the jury. In *Saucier*, on the other hand, the conduct alleged, a "gratuitously violent shove" amounting to excessive force, did not require a factual finding by the Supreme Court, which held that the circumstances, based on facts that appear to have been undisputed, disclosed substantial grounds for the officer to have concluded he had legitimate justification to "shove" the plaintiff. *Id.* at 208. Here, the facts are bitterly contested.

Therefore, despite the Supreme Court's instruction that "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided, *id.* at 200, I must follow the lead of the court in a more recent case, *Zellner v. Summerlin*, 399 F.Supp.2d 154 (E.D.N.Y. 2005). As recounted by the Second Circuit, which reviewed the district court's post-jury-verdict judgment as a matter of law, the district court refused "[b]ecause of the factual issues" to determine qualified immunity before the jury could make its determination. *Zellner v. Summerlin*, 494 F.3d 344, 359 (2d Cir. 2007). The district court told the parties during trial that "the factual dispute has to be resolved before there can be a finding of whether or not there is qualified immunity." *Id.* at 360. The district court's approach was not criticized in the Court of Appeals' decision. I thus reserve judgment on the qualified immunity defense with regard to Defendants Agostini, Abate, Martinez, Nieves and

Perez until the jury determines the facts.[5]

**D.    Municipal Liability**

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978), the Supreme Court held that to hold a municipality liable as a "person" under the meaning of 42 U.S.C. § 1983, as Plaintiff seeks to do here, the plaintiff must show that a policy or custom of the municipality caused the deprivation of his federal constitutional rights.  "A municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691.  Here, Plaintiff has not demonstrated any genuine issue of material fact with respect to the existence of a policy or custom of malicious prosecution at the City of New York.  Plaintiff alleges that the City of New York

> had a custom, policy and practice of improper training, improper supervision, allowing and permitting constitutional violations, tacitly permitting the subordination of perjury, tacitly permitting the fabrication of evidence, tacitly permitting the destruction and withholding of exculpatory evidence and the commencing and continuation of criminal prosecutions without probable cause and of other improper police practices at the 43rd Precinct, which amounted to a deliberate indifference to plaintiff's rights.

Compl. ¶ 195.

However, the "mere assertion that a municipality has such a policy is insufficient to establish *Monell* liability," *Perez v. City of New York*, 97 Civ. 2915, 2002 U.S. Dist. LEXIS 4297, *4 (E.D.N.Y. Mar. 14, 2002), and in any case Plaintiff may not overcome summary judgment by relying "merely on allegations or denials in its own pleading," Fed. R. Civ. P. 56(e). Here, Plaintiff has not shown a set of facts, by affidavit, deposition or otherwise, that could lead a reasonable juror to conclude that *Monell* liability is appropriate for the City of New York.  The standard for liability based on a claim of failure to train is a high hurdle to overcome.  A plaintiff must establish through admissible evidence that "the failure to train amounts to deliberate indifference to the rights of those whom municipal employees will come into contact," and "only where a failure . . . reflects a deliberate or conscious choice by a municipality . . . can a city be liable for such failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

The Second Circuit has held that where an official has *final* authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41 (2d Cir. 1983).  Plaintiff thus argues that Defendants McGovern, Scott and McCarthy were final policy makers for the NYPD because

---

[5] I need not address whether the other individual defendants are entitled to qualified immunity, as summary judgment is granted in their favor.

McGovern and Scott "for all practical purposes" had the discretion to make the ultimate decisions concerning homicide investigations in the 43rd Precinct and because McCarthy was an operational commander and the highest ranking officer associated with the investigation. Pl.'s Br. 25. Even if these Defendants were policy makers, however, there is no indication that they had any knowledge of the alleged wrongdoing, as set forth above. *See Amnesty America v. Town of West Hartford*, 351 F.3d 113, 126 (2d Cir. 2004) (requiring plaintiff to show that a final policy-maker knew to a moral certainty that employees would confront a given situation and that the policy-maker had notice of a potentially serious problem of constitutional conduct such that the need for corrective action was obvious). Plaintiff has failed to make any such showing here. *See also Turpin v. Mailet*, 619 F.2d 196, 203 (2d Cir. 1980) (finding the standard is "undoubtedly difficult to meet" and was not met where the plaintiff claimed only that senior policy makers failed to take disciplinary action).

## V. CONCLUSION

For the reasons stated, Plaintiff has raised material issues with respect to the liability of Defendants Agostini, Abate, Martinez, Nieves and Perez. Accordingly, Defendants' motion for summary judgment with respect to these Defendants is DENIED. As explained above, Defendants' motion for summary judgment is hereby GRANTED in favor of Defendants City of New York, Parker, Scott, McCarthy, McGovern and Phipps. The balance of the Rule 37 motion is DENIED. What is sought there constitutes the proof at trial, stipulations and perhaps jury charges—possible fodder for motions in limine but not for the Court to decide at this time.

**IT IS SO ORDERED.**
New York, New York
June 10, 2008

_____
U.S.D.J.

14