1

86HMMANT

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ANTHONY MANGANIELLO,

4                  Plaintiff,

5              v.                              07 Civ. 3644 (HB)

6    LUIS AGOSTINI, individually
     and as a New York City Police
7    Detective; SHAWN ABATE,
     individually and as a New York
8    City Police Detective; ALEX
     PEREZ, individually and as a
9    New York City Police Officer;
     MIRIAM NIEVES, individually
10   and as New York City Police
     Officer; and ROBERT MARTINEZ,
11   individually and as a New York
     City Police Officer,
12
                  Defendants.
13
     ------------------------------x
14                                            New York, N.Y.
                                              June 17, 2008
15                                            9:35 a.m.

16   Before:

17                     HON. HAROLD BAER, JR.,

18                                            District Judge

19                          APPEARANCES

20   OSORIO & ASSOCIATES
          Attorneys for Plaintiff
21   BY:  MICHAEL JOSEPH

22   MICHAEL A. CARDOZO, Corporation Counsel
     for the City of New York
23        Attorney for Defendants
     BY:  MARK ZUCKERMAN
24        AMY OKEREKE

25

86HMMANT

1          (Case called)

2          MR. JOSEPH:  For the plaintiff, Michael Joseph, good

3    morning, your Honor.

4          THE COURT:  Good morning.

5          MR. ZUCKERMAN:  For defendants, Mark Zuckerman and Amy

6    Okereke.  Good morning, your Honor.

7          THE COURT:  I have read the motions in limine, and

8    while I want to hear something about them, I'm not going to

9    read them in most instances, anything but the result.  So that,

10   along with the exhibits, requires you to listen carefully.

11         I also have your voir dire and I think mine covers

12   most of your areas.  But two things you should know about the

13   way the voir dire works here.  Unlike many of my brethren, I

14   give you ten minutes, sometimes more, depending on what the

15   answers are, no more than 15, each of you, to bond with the

16   jury, should that be possible in that length of time.  But at

17   the same time what it does is, it limits somewhat my desire,

18   need, or feel about some of your questions because if I don't

19   cover them in mine, although I've adopted some of yours, if I

20   don't cover them and you think they are important, you can

21   cover them.

22         Let me go first to the exhibit summary.  Obviously,

23   any exhibit to which there is no objection there will be no

24   problem in having it admitted so I won't spend a lot of time

25   talking about those if there is no objection to them.

86HMMANT

1           In addition, however, with respect to those that were

2     objected to, they are overruled insofar as P-11, so long as

3     it's properly authenticated, P-13 is redacted, but as redacted

4     it's admitted once we understand who wrote it.  P-46.  I think

5     that does for the plaintiff what the Williams -- the original

6     decision would be, and I really don't want another judge's

7     decision here.  So I think P-46 will do it and her decision is

8     out.  P-49 through 54 and P-56 through 58, also P-30 is in.

9           And the following exhibits of the defendant will be

10    admitted and it's a significantly longer list, so sharpen your

11    pencil.  DE, DF, D-12, DJ-2, DM-2, DP-2, DQ-2, DT-2 through

12    DX-2, DF-3, DS-3, DZ-3, D-14, DO-4, DP-4, DX-4, DB-5 through

13    DE-5, DR-5 through DT-5, DW-5, DC-6, DE-6 through D-16, DK-6

14    through DX-6, DZ-6, DA-7 through DW-7, DB-8, DG-8, DJ-8, DP-8

15    through DR-8, and DU-8.

16           I should -- let me finish this first.

17           The following exhibits of the plaintiff will not be

18    admitted:  P-7, P-15, P-30, and P-34 other than to perhaps, if

19    the plaintiff chooses, to be used to refresh Rodriguez's

20    memory.  P-45, P-47, P-48, P-55, and P-59.

21           The following exhibits of the defendant are not

22    admitted:  DA, DJ except for if you know how to do it, to

23    refresh recollection or past recollection or use it for past

24    recollection recorded for which you might look at 803(5).  DW-8

25    through DZ-8, DA-9 through DH-9.

86HMMANT

 1          There are some that may be used.  Let me clarify the

 2    last statement.  DX-8, DC-9, D-9, and DE-9 may be used for

 3    impeachment and, obviously, there are impeachment

 4    opportunities.  I did not take an anatomy course on your

 5    lawsuit.  But those few problems that may arise in addition to

 6    what I've said, we will have to resolve at the time they come

 7    up.  But the large bulk of what we are doing here, that

 8    analysis should shorten it.  Don't get the impression that I

 9    expect you to introduce all of these because I certainly don't,

10    nor do I care if you think you should or have to or had planned

11    on it.  I'm not telling you not to.  I just want you to

12    understand that I've done a more complete job than I need you

13    to do in terms of what you're planning to provide.

14          I would like to go on.  I just want to underscore the

15    fact that all of the plaintiff's witnesses to whom the

16    defendants have not objected will, obviously -- will not

17    obviously -- will be permitted to testify and, in addition, the

18    following plaintiff's witnesses to whom the defendant have

19    objected will be permitted to testify:  Huello, Ohle, Colon,

20    Latif, Tinari, Richman, and Maria D'Andrea.

21          The following plaintiff's witnesses will not be

22    permitted to testify:  Mario Manganiello and Steven Colangelo.

23    I gather from my correspondence that we are not going to hear

24    from Mr. Miro, and I further understand that the plaintiff has

25    not objected to any of the defendant's ten witnesses, so they

86HMMANT

1    may all testify.  I have no reason not to permit them to

2    testify.

3                Moving right along to the motions in limine, there are

4    several exhibits that I was concerned about, but I think we

5    will go to the larger issues first.  The defendants' first

6    motion is to limit plaintiff's evidence to the issue of whether

7    there was fraud by defendants in connection with the evidence

8    presented to the grand jury by Christine Scaccia.  We will have

9    her in person.

10               You're not pronouncing the C or you're not pronouncing

11   the S?

12               MR. ZUCKERMAN:  Scaccia.  Almost S-K, but it's S-C.

13               THE COURT:  Scaccia.

14               MR. ZUCKERMAN:  Scaccia.

15               THE COURT:  This is like a tripartite motion in

16   limine.  As far as I'm concerned, Scaccia may testify.  But I'm

17   just sort of vacillating about whether I should read all of my

18   reasoning to you, but I think we will not get started if I do

19   that, so I'm just giving you the bottom line.

20               In the second portion of that first motion in limine

21   is Christine Scaccia presented seven witnesses to the grand

22   jury and the defendants Agostini, Perez, Nieves, Alston, Walter

23   Cobb, Christopher Tartone, and Police Officer Fasciano.

24               And the plaintiff has listed numerous witnesses in the

25   joint pretrial order who did not testify before the grand jury,

86HMMANT

1   including plaintiff's brother, Richard Huello, Sal Miro, Rolf

2   Ohle, Matias Colon, and Police Officer Eric Rodriguez and

3   Police Officer Jamie Ortiz.

4         The defendants argue that to the extent the witnesses

5   are asked questions unrelated to the allegations of fraud in

6   connection with the grand jury, they are irrelevant and barred

7   by Federal Rules of Evidence.   That, too, is denied, but,

8   obviously, you're welcome to make objections.

9         The only reason I spent all of this time doing this,

10  Anna more than I, is that so we can move this along, which I do

11  in every case.   Sometimes it works and sometimes it doesn't,

12  but at least in my experience we have not had any bench

13  conferences.   In other words, as you will hear me tell the

14  jury, you will get up, object, I rule, you go ahead.   We don't

15  discuss, certainly not in front of the jury.   In my experience,

16  we don't tell the jury to go in the back for 20 minutes while

17  we have a high-level policy discussion as to the admissibility

18  of an exhibit.   So those are the reasons why I do this, which

19  I'm soon coming to the conclusion is a lot more effort than it

20  deserves.

21        The defendants make additional submotions.   First,

22  defendants argue that questions which elicit evidence as to

23  whether additional testimony could have been presented to the

24  grand jury should not be allowed, as the ADA had discretion and

25  authority to decide, quote, what evidence to present to the

86HMMANT

 1    grand jury and is under no duty to present every item of

 2    arguably exculpatory evidence in seeking an indictment.

 3            In my view, evidence that the defendant failed to

 4    provide the ADA with all relevant information should be

 5    admitted, as this has nothing to do with her discretion.  After

 6    all, she could not exercise discretion over evidence of which

 7    she was unaware.

 8            Second, the defendants argue that the reasons why

 9    plaintiff was acquitted at the criminal trial are irrelevant

10    evidence on these areas and must be excluded.  Plaintiff

11    doesn't seem to respond very well to this, or at least I didn't

12    get it.  Maybe when we finish here if you have not fallen

13    asleep you will talk to me a little bit about that aspect of

14    these motions in limine.

15            Third, defendants argue that any mention of the city

16    as a prior defendant or responsible party not be allowed and I

17    gather the plaintiff has agreed that he's not about to mention

18    the city or any of the dismissed defendants.  But he reserves

19    the right to use depositions for impeachment purposes without

20    mentioning that they were deposed as defendants, and that

21    seemed perfectly reasonable to me.

22            The second full-blown is the motion to exclude

23    evidence of the so-called missing box as irrelevant to whether

24    there was fraud in connection with the grand jury proceeding

25    and that's denied.

86HMMANT

1          The third motion is -- these are all, as you may have

2   gathered, defendants' motions -- defendants' motion to exclude

3   evidence of treatment of plaintiff when he was initially

4   questioned on February 12, 2001 by NYPD detectives denied, but

5   there is, again, a submotion.  So they have a thought that

6   defendants argue that any testimony regarding how plaintiff's

7   brother and father were treated at the station house is not

8   relevant, and I'm granting that aspect since I believe it to be

9   both irrelevant and prejudicial and no testimony about how the

10  brother and father were treated will be permitted.

11          The defendants also argue that evidence of damage to

12  plaintiff's vehicle as a result of the search pursuant to a

13  valid warrant and the photographs are relevant because they

14  show the entire interior of the car was torn apart.  I think

15  the danger of prejudice here outweighs the probative value and

16  I'm granting the defendants' motion that no evidence of damage

17  to the plaintiff's vehicle will be admitted.

18          4.  Defendants' motion to exclude testimony by

19  plaintiff's brother, Mario, is granted in part and denied in

20  part.  Plaintiff's brother's testimony should be limited to how

21  he observed the defendants treating the plaintiff.  Plaintiff's

22  brother may not testify about how he himself was treated or how

23  his father was treated or how the car was treated.

24          5.  Defendants' motion to exclude evidence of

25  plaintiff's sister's and mother's presence when he was arrested

86HMMANT

1   is granted.

2           6.   Defendants' motion to exclude evidence by the

3   plaintiff that Parkchester's maintenance worker, Walter Cobb, I

4   had thought -- I haven't really dealt with you together, so I

5   don't know if this is just pie in the sky, but it seemed to me

6   that if you could work out a stipulation with respect to how

7   plaintiff's brother saw the plaintiff being treated, we could

8   avoid that testimony and it's a little less prejudicial that

9   way.  And if you can't do it, before you plan on bringing him

10  on the stand, I may very well try my hand.  So if I were you, I

11  would try and use your thinking before you take mine.

12          This motion number six to exclude the evidence by

13  plaintiff that Parkchester maintenance worker Walter Cobb is a

14  drunk, liar, and a thief can only be admitted to counter any

15  bolstering of Cobb's character by the defendants, but I am not

16  sure I fully understand what that may be.  So if you wish --

17  I'm not clear how that will work.

18          But if when we are finished with these you want to

19  argue that as well, or at least make sure you understand what

20  I'm saying, which is not always the case, I will be glad to

21  hear you.

22          7.   Defendants' motion to exclude the audiotape of

23  9/11 transmissions and the NYPD's Sprint Report, the

24  defendants' motion is granted as to the 9/11 audiotape.  It

25  will not be admitted and denied.  As to the Sprint Report it

86HMMANT

1    will be admitted.

2         8.    Defendants' motion to exclude comments and rulings

3    by -- I think we went through this -- acting Supreme Court

4    Justice Williams regarding whether the people could establish a

5    prima facie case for murder, the defendants' motion is granted.

6    I alluded to that, my thinking about that before in connection

7    with the exhibits.

8         Defendant's motion, 9, to exclude evidence of the

9    Bronx District Attorney's Office agreement with confidential

10   informant Alston, the defendants' motion in this regard is

11   denied.

12        10.    Defendants' motion to exclude evidence of why

13   Alston and Booth were not arrested and charged, it's granted as

14   to Alston and that testimony is excluded, and denied as to

15   Booth, and that evidence or testimony is admitted.

16        11.    While Miro's testimony -- obviously, we won't be

17   having a lot of that.

18        12.    The defendants' motion to exclude evidence of the

19   book Notorious Cop is granted.

20        The defendants' motion to exclude histories in prior

21   lawsuits against defendant officers is granted.

22        Defendants' motion to exclude testimony by plaintiff's

23   expert Colangelo is granted.

24        15.    Defendants' motion to bifurcate the issues of

25   liability and damages is denied.

86HMMANT

1        16.   Defendants' motion to exclude testimony and

2    evidence of plaintiff's experts, Latif and Tinari -- I don't

3    think they are both experts, but Dr. Latif and Dr. Tinari,

4    testimony and evidence relating to Latif's treatment of

5    plaintiff, including opinions and determinations she made as

6    part of the treatment, including that she believes the

7    prosecution caused plaintiff's mental illness, and that he will

8    likely not be working again, are admitted.   Testimony and

9    evidence of Tinari, plaintiff's economic expert, is also

10   admitted.

11       17.   Defendants' motion to exclude plaintiff's notice

12   to admit is granted.

13       Defendants' motion to exclude plaintiff's designation

14   of testimony during the criminal court trial, prior trial

15   testimony can be used only where a witness is unavailable or

16   for impeachment and to refresh recollection, and I agree with

17   plaintiff's view.

18       Finally, 19, defendants' motion to admit Parkchester

19   employment and disciplinary records relating to plaintiff -- I

20   did this when I went through the motion, but only Defendant's

21   Exhibit DR-8.

22       MR. ZUCKERMAN:   I'm sorry, your Honor.   I didn't hear

23   the exhibits.

24       THE COURT:   I said only Exhibit DR-8 is admitted.   No

25   other employment or disciplinary records.   I find most of what

1    you have or looked at is pretty old stuff, but that seems to be

2    something I really have an obligation to let the jury ponder.

3    I think those are all of the defendants' motions in limine.

4              As to the plaintiff's motion in limine, they seem to

5    preclude evidence and cross of any of plaintiff's

6    employment-related disciplinary matters.  All evidence is

7    excluded except Defendant's Exhibits R-8 and Defendant Exhibit

8    Z-7, both of which are admitted.  I don't think there is any

9    objection to Z-7, as a matter of fact.  I think while -- I

10   think that really -- I need to provide to you.

11             I think that's all I really need to provide to you.

12   Let me go back for a minute before I forget -- I have some

13   notes -- to the voir dire.  What I do as a general rule is I

14   have whoever the lead lawyer is, I ask him if he won't

15   introduce himself and the people at his table.  I don't do that

16   for you.  Other than that, you have no role at all, so to

17   speak.  In fact, it speeds things up a little bit.  Obviously,

18   if there is any reason why you don't want to introduce the

19   people at the table, then you tell me, although we have never

20   really had that happen before.

21             I think those are all my enlarged thoughts.  I've read

22   the semivituperative, but in my view, sound and fury signifying

23   nothing corresponded with respect to Miro.  I have no intention

24   of holding any hearing on the issue that plenty -- I think even

25   Mr. Joseph points out, but there are lots of other material

86HMMANT

1    issues of fact.  So it will have no effect ongoing forward or

2    on a motion for summary judgment.

3            MR. ZUCKERMAN:  Your Honor, defendants would just

4    reserve the rights in that regard with respect to a possible

5    jury instruction with respect --

6            THE COURT:  I should mention that.  While I have your

7    requests, they are not sacrosanct.  In other words, as we go

8    along, there may be other requests that you want, and sometimes

9    I even ask you if you would be good enough to provide a request

10   on a topic that has come up during the course of the trial.  So

11   you can always do that.  Unless there is a need to do or a

12   desire to do something else, I'm ready to call up the jury.

13           MR. ZUCKERMAN:  Your Honor, if I can just request one

14   clarification.  As I understand it, I think, if I understood

15   the exhibits, that defendants can admit -- one of those

16   exhibits is a Parkchester record dealing with a fight that

17   plaintiff got into with an Officer Hicks, and I think there is

18   another record with respect to Officer Acosta's statement that

19   he didn't want to work with the plaintiff anymore.  As I

20   understand it, I think those exhibits are out.  But am I

21   allowed to cross-examine the plaintiff with respect to those

22   areas?

23           THE COURT:  We talked about this and let me make

24   sure -- there are four exhibits that I think you're referring

25   to, and there are five years before the indictment concern, as

86HMMANT

1    you suggest, plaintiff and Acosta's relationship.  If I'm

2    right, X-8 is Acosta's 1996 statement that he didn't want to

3    work with the plaintiff because of his temper, and C-9 through

4    E-9 are March '99 statements by plaintiff and Acosta concerning

5    a fight between the plaintiff and a third officer in which

6    Acosta grabbed the plaintiff from behind.  Is that what you're

7    talking about?

8            MR. ZUCKERMAN:  Yes, your Honor, exactly.  And we

9    would like -- even if the exhibits can't come in, we would like

10   to cross-examine the plaintiff with respect to those incidents.

11   I think if the plaintiff is going to try to leave the jury with

12   the impression that he and Acosta had a good relationship --

13   and, of course, Acosta is dead.  He's not here.  He obviously

14   can't testify.  So defendants really need some way to address

15   that issue, especially if that testimony is elicited through

16   the plaintiff.

17           And if we can't use the exhibits, and apparently

18   that's what your Honor has ruled, then we should be allowed to

19   cross-examine the plaintiff on that point because we have no

20   other way to rebut the evidence of the plaintiff that it was a

21   good working relationship and a friendly and social

22   relationship between Acosta and plaintiff.

23           THE COURT:  Well, Mr. Joseph, do you have any

24   different thoughts about that?

25           MR. ZUCKERMAN:  Yes, Judge.  I think it is extremely

86HMMANT

1  prejudicial.  It has no relevance.  It is something that

2  happened in 1996 and 1999, has no relevance to something that

3  happened in 2001, especially given Mr. Acosta's tangential

4  involvement.

5      THE COURT:  The problem I anticipate that Mr.

6  Zuckerman is concerned about is that you will have him on the

7  stand saying, me and Acosta were big buddies.  So once that's

8  out there, if that's what you do, it's a little different than

9  the age problem, which is, if I mention it, is significant.

10 And the fact that it's five years old, it's significant.

11     MR. JOSEPH:  Judge, I don't anticipate having

12 Mr. Manganiello testify that him and Acosta were the best of

13 friends.  Since your Honor has allowed evidence of one dispute,

14 I may ask him about that one incident and what happened from

15 then until -- how the relationship was from that point in time

16 until February 12, 2001, but I don't think that opens the door

17 to anything prior.

18     THE COURT:  So why don't we wait and see, Mr.

19 Zuckerman.

20     MR. ZUCKERMAN:  Can I just say one more thing on this

21 issue, your Honor.  Let's say the plaintiff does nothing in

22 that regard.  He doesn't develop any testimony as to the

23 relationship with Acosta and plaintiff.  The absence of any

24 evidence or testimony in that regard could very well leave the

25 jury with the impression that they had a good relationship

86HMMANT

1   because it never came out during the trial that it was a bad

2   relationship.  That still leaves us behind the eight ball, if

3   you will, and we must have the opportunity -- motive is clearly

4   a big issue in that case.

5           THE COURT:  You can't impeach it if he doesn't bring

6   it up, if it's not on cross.  Impeachment denotes something

7   that came up on direct.

8           MR. ZUCKERMAN:  It would be impeachment from the

9   standpoint we wouldn't use the exhibits for impeachment, but

10  what I'm asking is can I ask questions about those incidents

11  and the effect of those incidents on the relationship?

12          THE COURT:  My ruling, so as not draw this out any

13  further, is, I'll have to decide after I hear the testimony.

14  You can't do it willy nilly because it's a piece of information

15  you think it might be niece for the jury to have.

16          MR. ZUCKERMAN:  Can we have the issue heard after the

17  plaintiff's testimony then?

18          THE COURT:  Yeah, right.  That's what I thought I

19  suggested.

20          MR. ZUCKERMAN:  Thank you, your Honor.

21          MR. JOSEPH:  Judge, while I'm standing, there was one

22  issue which I think the Court may have overlooked with respect

23  to Mr. Mario Manganiello's testimony.  Mr. Mario Manganiello

24  was present when an attorney left the interview room with the

25  plaintiff, and it was testified to by one of the defendants,

86HMMANT

1   Mr. Agostini at a pretrial hearing, that the attorney

2   approached him and said, was it intentional, meaning an

3   unintentional versus intentional discharge.  We planned to put

4   Mr. Mario Manganiello on the stand in part to show that that

5   was not true, that the attorney never made that statement.

6           Also, Judge, Mr. Mario -- Judge, you're saying, no, I

7   can't put him on?

8           THE COURT:  I'm saying, no, we can't hear that

9   testimony.

10          MR. JOSEPH:  Although it wasn't specifically addressed

11  with the Court, Judge, would the court allow him strictly as a

12  damage witness to testify how his brother was before and after

13  this incident?

14          THE COURT:  Let me review what I have here.  I have

15  grazed out -- I just don't want to go wondering along.  Let's

16  follow that through because there are similar incidents like

17  that.  Let's say that in fact he was bowed and bloodied, your

18  plaintiff.  Can't he testify to that?  Isn't there another way

19  to prove it rather than have a brother who is only going to be

20  thought by the jury to essentially echo what you want him to

21  echo?  After all, he is the closest relative than his mother

22  who was there and actually he, from what I can glean, was there

23  longer or sooner.  I'll tell you, if we could condense it into

24  a couple of questions and you show me those questions in

25  advance, I'll allow it.

86HMMANT

1          MR. JOSEPH:  Certainly, your Honor.

2          THE COURT:  You want to bring up the jury unless

3    anybody has anything else.

4          Let me go through this one more time just so nobody

5    has a problem with respect to the voir dire.  I do the voir

6    dire first and, as you know, there are three peremptories for

7    each of you and you will come to the side bar after you and I

8    have finished the voir dire, and we will, without letting the

9    jury move, we will right over here, if my interns don't block

10   the passage, decide who it is you're keeping both on a

11   peremptory basis and as a challenge for cause.

12         We will then come back and if we have eight jurors we

13   will stay with it.  If we don't, we will have to call in some

14   more people.  I doubt if he fills the box we will have to do

15   that, but certainly it can happen.  It happens all the time in

16   criminal cases.  That's really the skeleton of what transpires.

17         And then once we have selected the jury, I will

18   probably give Dennis five minutes to get their names and

19   addresses.  And if we still have some time before lunch I will

20   give the preliminary charge and then we will probably all go to

21   lunch.

22         I had another case I was about to try after this one,

23   but I now get the impression -- I only have this week and next.

24   After I saw your pretrial order I was concerned that the other

25   trial would not get finished and I didn't want the jury to sit

86HMMANT

1    during all of July while I was hopefully out of this
2    courthouse.  So I have done away with them.
3         However, I will tell the jury, I may as well tell you
4    in advance, that one day this week I am going to adjourn at 4
5    instead of 5:30 or 6, and one morning I am going -- I will have
6    to go to a doctor in Westchester.  I will be back for the
7    afternoon.  And the other nights, the other days I hope we will
8    be able to work from 9:30 to 5:30 minimally.  I hope that's
9    okay with everybody.  If there is a problem about it, you will
10   be sure not to be bashful.
11        One of the great advantages of not having this trial
12   yesterday is there were three, four or five criminal cases
13   which would have taken all our jurors.  And until they got rid
14   of the people they didn't think much of, we wouldn't have been
15   able to even start.  And when we did start there would be
16   people who had been excused for one reason or another.  So,
17   actually, this may save a little time, certainly not a whole
18   day but sometimes.  They are now on their way up.  So we ought
19   to be able to begin promptly.  I am going to look more judicial
20   by putting on the robe.
21        (A jury of eight was impanelled and sworn)
22        MR. ZUCKERMAN:  With respect to Defendant's Exhibit
23   R-8, which is the DD5 prepared by NYPD detectives concerning
24   the one altercation of the plaintiff with Mr. Acosta that your
25   Honor indicated would be allowed into evidence --

86HMMANT

1          THE COURT:  I'm not sure that's so, but I'll take your

2     word for it.

3          MR. ZUCKERMAN:  I thought that was our understanding.

4     That's why I'm raising it.  We would like to be able to discuss

5     that incident during openings since your Honor has allowed it

6     in.  I just want to make sure that that will be allowed.

7          THE COURT:  You want to find that?  Do you have a

8     copy?

9          THE LAW CLERK:  Yes.

10          THE COURT:  We will certainly give you the answer.

11          MR. ZUCKERMAN:  Thank you, your Honor.

12          (Jury present)

13          THE COURT:  It's in.

14          Ladies and gentlemen, I want to give you just a very

15     brief preliminary charge because I'm sure you're salivating,

16     and this will not take long.

17          Everybody is perfectly able, ready, and willing to go

18     forward on this case, I presume, because now it's going to be

19     over for people who have problems because we are going to let

20     the couple of jurors that we still have go to lunch.

21          Hearing nothing, I will take that as a yes, we have no

22     problem.

23          I think I told you once that the jurors are the

24     exclusive judges of the facts, and you may be sure you will

25     hear it again as well, but I just want you to realize that

86HMMANT

1  nobody can tell you what the facts are.  They are yours to

2  determine.

3          Secondly, I doubt that this case will generate any

4  media activity, but if it does you have to put it down or turn

5  it off because all we want from you is your attention with

6  respect to testimony and exhibits and any stipulations that may

7  be entered into because that's all the evidence includes.

8          Furthermore, on that score let me tell you a little

9  bit about the burden.  You may watch television and see a lot

10  of cases, basically criminal in nature, where the burden of

11  proof is proof beyond a reasonable doubt.  You have to put that

12  burden out of your mind.  It is not the burden in a civil case.

13  A civil case requires only a preponderance of the evidence.

14          So if you put the evidence of the plaintiff and the

15  defendant on a scale and the scale tipped however slightly in

16  the plaintiff's favor, that's enough for the plaintiff to have

17  sustained, carry, whatever, his burden of proof.  So don't

18  think in terms of beyond a reasonable doubt, even though that

19  may be all you're used to.

20          Let me tell you how the trial progresses in broad

21  stroke.  First of all, there will be opening statements.  The

22  plaintiff, as I've just told you, has the burden of proof, so

23  he will open first.  And the defendant will open, although he

24  probably doesn't have to, but I never have found that when you

25  give a lawyer a chance to talk he turns you down.  So the

86HMMANT

1    likelihood is that we will hear from both sides.

2           Thereafter, the plaintiff will put witnesses on to

3    testify and the defendant will have the opportunity to

4    cross-examine.  On occasion there is recross and redirect, but

5    not frequently in my experience.

6           At some juncture the plaintiff will rest.  That means

7    he is completed putting in the evidence that he feels he needs.

8    And the defendant, if it has a case to mount, will mount its

9    case, examine his witnesses on direct, and the plaintiff will

10   have the opportunity to cross-examine.

11          At some point both sides will rest and then they will

12   both come before you again in summation.  Keep in mind that

13   while you can ask, after you begin your deliberations for

14   virtually anything, it has to be evidentiary, so you can't ask

15   for the openings and you can't ask for the summation because

16   they are not evidence.  Nonetheless, obviously, if in fact the

17   arguments make sense to you, you are welcome and indeed that's

18   the purpose of summation, to take those arguments as your own.

19          There is also a difference that's worth understanding

20   between direct and circumstantial evidence.  There is an old

21   story that a lot of the judges who used to have me sitting in

22   one or another of these seats or tables would tell, so I've

23   remembered it for eons.  And it goes -- actually, I don't think

24   it's very good, but it will give you the idea.  If you got on

25   the subway on 86th Street and you took it down to 59th Street

86HMMANT

1    and you saw people getting on the train with umbrellas and

2    raincoats and there was water dripping off of the raincoats and

3    umbrellas and you went on down to 42nd Street and that there

4    was more of the same, that would be circumstantial evidence

5    that if you were on the sidewalk it would be raining.  So

6    circumstantial evidence is proof that you can use if in fact it

7    provides the inference that would be appropriate for you to

8    use.

9            I'll talk more about it, but direct evidence is

10   basically the kinds of things you have -- you're cognizant of

11   through a sense, through smell or hearing, and circumstantial

12   evidence is obviously a little different.  They are equally

13   valuable and equally usable.

14           As I mentioned before, one of your major tasks is

15   credibility.  You have got to be able -- and I will give you

16   some instructions about credibility, but when push comes to

17   shove, it's pretty much your decision with respect to the issue

18   of credibility and a very important decision and I will, as I

19   say, talk to you a little bit about that during the charge.

20   But I don't want you to think that you're supposed to -- when I

21   say that you really can only sort of soak up the evidence, that

22   doesn't mean that you leave your life experience at the door.

23   The reason we have juries and the reason we took the time to

24   find fair and impartial ones is so that they not only follow

25   the law and find the facts, but they also use their life

86HMMANT

1    experience in coming to the right decision or what they believe
2    is the right decision.
3         And that's pretty much where I think I can leave you
4    and ask you only to keep an open mind and not think that you
5    understand the nature or the result that you should arrive at
6    by hearing opening statements or hearing the first witness.
7    You have to keep an open mind throughout the entire trial and
8    through my charge on the law.
9         So with that thought, why don't we go to lunch. We
10   will see you at 2:15. Do not discuss the case amongst
11   yourselves or with anybody else, not that you have anything to
12   discuss, but indeed that will happen and I will say that
13   throughout the trial. So you may as well start now. Have a
14   good lunch.
15        (Jury not present)
16        THE COURT: We will see you as well at 2:15. I
17   thought that we had relieved juror no. 5, but I guess I was
18   wrong. Have a good lunch.
19        (Luncheon recess)
20
21
22
23
24
25

86HMMANT

1                    AFTERNOON SESSION

2                         2:20 p.m.

3          (Jury present)

4          THE COURT:  There is one short area that we meant to

5    mention before lunch, but I'll do that now and that is -- two

6    things.  The first is that you really are directed not to have

7    any conversations with the lawyers or witnesses or parties.  As

8    a regular course of business at the elevator you will find that

9    the lawyers, if they are smart, will let you go first and then

10   they will take the next elevator.  If they don't do that, my

11   preference is that you wait and go on the next elevator.

12          The other concern is that in the morning you may in

13   fact get here undoubtedly not all at the same time.  You can't

14   talk about this case at all.  You can't talk about it anywhere

15   else either, but in the jury room you certainly can't talk to

16   two or three of you when you are all not present.  The only

17   time you are to talk about the case is when I've charged and

18   the case is yours.

19          The other thought that I had is, I am anxious to move

20   cases along, which I think is actually part of my job

21   description.  And one way I do that is I have ruled on all of

22   the exhibits prior to us beginning today so that what might

23   otherwise be argument on exhibits that would take time away

24   from your listening to evidence has been obviated.

25          Basically, all the lawyers do when they have an

86HMMANT

 1    objection to testimony, which is obviously different than

 2    exhibits, is they simply stand up, state objection, and then

 3    one word, ground, like hearsay is a big thought here in

 4    America.  In any event, then they sit down and we keep going.

 5    I rarely, if ever, have bench conferences.

 6              The other side of that coin is that there are issues

 7    of law that are occasionally problems that arise occasionally

 8    and I have to deal with.  So when we have a recess I would

 9    appreciate it if you would move with a plumb, without falling

10    over the wires, into the jury room so I have as much time as I

11    can have with the lawyers.

12              I think that really takes care of my preliminary

13    concerns, although there will undoubtedly be more as we move

14    along.

15              I think now -- I should tell you that I will give

16    you -- I'm trying to see what the timetable -- do you have the

17    calendar that you were going to make every day and give me a

18    copy of?  Here it is.  I am going to give you off until noon

19    tomorrow and we will start at noon.  I don't know whether you

20    could eat beforehand or not.  If you decide to eat beforehand,

21    that's a wonderful thing, but I'm not requiring you.  We will

22    simply have about 20 minutes at 1:00.  You might want to bring

23    your peanut butter bags with you, whatever strikes your fancy,

24    and then we will start again at 20 after 1 and go on our

25    regular way.  So you have the morning off, which is the good

S6HMMANT

1   news.

2              Mr. Joseph, are you ready to open?

3              MR. JOSEPH:  Ready to open, your Honor.

4              THE COURT:  You're up.

5              MR. JOSEPH:  Your Honor, counsel, ladies and gentlemen

6   of the jury, February 12, 2001 should have been an ordinary day

7   in the life of Anthony Manganiello.  He woke up that morning

8   and went to work like he did every day for the last eight and a

9   half years prior.  At the time he was a security officer at the

10  Parkchester South condominiums in the Bronx.  He got a

11  full-time job there in Parkchester, and you are going to hear

12  at the time in 2001 he also worked as a part-time for the state

13  parks police.  He was also a police officer in addition to

14  being a security guard in the Parkchester section of the Bronx.

15             Now, on that date when he woke up he never would have

16  imagined that that would be the last date he would work.  He

17  never would have imagined that he would spend most of that day

18  in a jail cell for a crime he didn't commit.  He never imagined

19  that he would be accused of murder, that he would sit in limbo

20  for three years waiting for a trial date even though he was

21  found not guilty of all charges.  He suffered immense damages

22  to his personal life.

23             Mr. Manganiello arrived that day for work at a little

24  bit before 8 a.m. and he worked an 8 to 4 tour.  On that day he

25  was partnered up with Albert Acosta.  He didn't know he was

86HMMANT                          Opening - Mr. Joseph

1    going to be partnered up that day with Mr. Acosta until a

2    sergeant read off the two names during roll call.  Now, a

3    partner at Parkchester security is not like partners in the

4    police department who ride around and walk around together.  In

5    fact, it's the exact opposite.  The security guards there take

6    a quadrant which consists of several buildings and basically

7    gets divided in half and the two officers patrol separately so

8    they cover more grounds, and they are really not supposed to be

9    together unless they are on a call together.  Then they can be

10   together.  Otherwise, they walk around separately and do the

11   patrols on their own.

12          Shortly after roll call Mr. Acosta went to a roof of a

13   building and he had breakfast with another security guard.

14   Mr. Manganiello began his tour.  At approximately 8:40 in the

15   morning, Mr. Manganiello received a call to 1700 Metropolitan

16   Avenue at apartment 5E.  It was a dispute with knives.  He

17   responds.  When he gets there, the New York City Police

18   Department is already there.  There is already a Sergeant Rose,

19   and shortly after Mr. Manganiello arrives and responds, Police

20   Officer Ortiz and a Police Officer Rodriguez, who you'll meet,

21   arrive at the scene also.

22          And he stays there until about 9:05, give or take,

23   with these officers calming down the situation as well.  There

24   is no actual knives.  It's just a landlord/tenant dispute

25   between the people who live in the apartment.  And for about 20

1   minutes or so they calm down the situation and Mr. Manganiello

2   leaves with Officers Rodriguez and Ortiz.  He leaves the

3   building with them and he continues on his patrol.

4           He keeps walking around, and at one point he goes to a

5   building and he finds an improper garbage disposal.  So he

6   opens up the garbage and he sees who it is.  He sees a letter

7   from a tenant who put it there.  And he takes it, he puts it in

8   his memo book, and he writes out a summons for improper garbage

9   disposal.  And the protocol was, it gets handed in at the end

10  of the tour to avoid conflicts.

11          After he writes this summons, he radios in for a

12  break.  There is a diner right by where he is, where he goes to

13  get a cup of coffee.  As he's walking, a call comes in:

14  Officer down.  East Adam Boy down, East Adam Boy shot.  He gets

15  bits and pieces but he understands that East Adam Boy was the

16  designation assigned to Mr. Acosta.  You're going to hear --

17  during the radio or while these guys are working, they get

18  assigned designations, basically abbreviations, East Adam Boy,

19  East Charlie David.  And Mr. Manganiello was East Charlie

20  David.

21          So now he hears this, he hears officer down, officer

22  shot, one of our guys is down.  There is a lot of commotion on

23  the radio.  And he hears it's 1700 Metropolitan Avenue.  That's

24  his building.  That's the building where he was at with the

25  other police officers.  It's his responsibility to respond to

1    this building.

2         So he runs back, hearing one of his coworkers is down,

3    and he gets to the basement and there is other cars there.

4    There is other police officers there.  And he goes inside the

5    basement.  And it's somewhat a chaotic situation, as you can

6    imagine.  He goes into the basement, he goes into this little

7    room, and there is Mr. Acosta laying down, shot in the head,

8    and he sees this and it takes him aback a little bit.  But he

9    calls in also, along with other officers, for an ambulance and

10   he leans against the wall and he takes a minute to catch his

11   breath.

12        And the second he leaves that door, the second he

13   leaves the basement, all of a sudden, he's a suspect.  You're

14   going to hear that officers approached him.  You're also going

15   to hear that on the way into the basement he didn't say

16   anything to anybody.  That's important later.  You're going to

17   hear, the second he leaves the basement, officers approach him,

18   target him.

19        Now, obviously, he ran several blocks to 1700

20   Metropolitan Avenue, he was a little out of breath, and he had

21   just seen a coworker shot.  At this point he's not feeling so

22   great.  He's in a little bit of shock himself.  He's starting

23   to have chest palpations.  And the police officers ask him to

24   come to the 43rd Precinct, which he does.  But in route he

25   says, guys, I'm not feeling so good, can you take me to the

1    hospital?  And they ignore him.

2         You are going to hear when he gets to the 43rd, he

3    still has shortness of breath and paramedics are called, and

4    they actually confirm that he has shortness of breath.  But,

5    still, the defendants don't let him go to the hospital.

6         You are going to hear at some point defendant Luis

7    Agostini starts questioning him, and he starts asking basic

8    questions, his name, his address, which Mr. Manganiello

9    provides.  He asks him some questions, and he gives all the

10   information he knows.

11        Then out of the blue Mr. Agostini says, so did you

12   kill Albert Acosta?  And Mr. Manganiello at this point is taken

13   aback.  And he's offended.  He has a few choice words for

14   Mr. Agostini.

15        At that point Mr. Abate comes over and Mr. Agostini

16   and Abate start taking his clothes off.  You are going to hear

17   they take away his jacket, his keys, his belt, they take away

18   his memo book with the summons inside, and they also rip a

19   Band-Aid off of his finger.  And you are going to hear

20   Mr. Agostini gets very mad at this reaction.  Now, he's sitting

21   there in his undershirt and his pants for quite some while and

22   an attorney gets called on his behalf because of the way he's

23   being treated.  You are going to hear that the defendants were

24   not too happy about that.  In fact, that made him in part a

25   suspect in their eyes because an attorney had been called after

86HMMANT                    Opening - Mr. Joseph

1   this rash treatment of Mr. Manganiello.

2          You are going to hear some things after this point in

3   time that are very strange.  You are going to hear that there

4   was no probable cause at that point, on February 12, to charge

5   Mr. Manganiello, so he was released on the next day, on

6   February 13.  And then strange things start happening.  Several

7   of these officers, these defendants, Mr. Martinez, took witness

8   statements from a -- Mr. Abate, Shawn Abate, Rodriguez, even

9   Mr. Agostini, took witness statements from a lot of different

10  people on the scene.  All those witness statements have

11  disappeared.

12         You are going to hear not only that a few witness

13  statements disappeared, every piece of paper created at the

14  scene, handwritten note, disappeared.  You are going to hear

15  there is some pretty established procedures for storing these

16  files, and at some point this just shouldn't happen, but for

17  some unexplained reason it did in this case.  You are going to

18  hear the crime scene evidence, crime scene photos in this case,

19  all disappeared.  This becomes important.

20         You are going to hear from one of the people that

21  defendant Mr. Martinez interviews is a gentleman named Richard

22  Huello, who is a Verizon employee who happens to be working in

23  the basement of 1700 Metropolitan Avenue when Mr. Acosta is

24  found.  He gets there about 9:25 p.m.  He enters the building

25  and he hears a walkie-talkie, but the door is locked.  So he

1    keeps working and at some point you are going to hear that he

2    was working directly across from the room where Mr. Huello was

3    later found.  That's important.

4         You're going to hear he keeps working and at some

5    point a gentleman named Walter Cobb comes on the scene.  He

6    sees Mr. Cobb, he says hi, and they both keep working.  At some

7    point they get into the room, Mr. Cobb finds Mr. Acosta on the

8    ground, and it gets called into Parkchester.  It gets called

9    into the NYPD that a security guard was shot.

10        You are going to hear that Mr. Cobb said a lot of

11   different things to a lot of different people.  You are going

12   to hear that all Mr. Cobb's initial notes, along with the notes

13   that defendants took of Mr. Huello, disappeared.  You are going

14   to hear that one of the things that Mr. Cobb says is that he

15   heard shots outside the building and then came in and saw

16   Mr. Manganiello leaving the building.  That's one of the things

17   he said.

18        You are also going to hear that it looks like the

19   story didn't come up right away.  You're also going to hear at

20   one point he says he heard shots from someone else.  Mr. Cobb,

21   you are going to hear, has made a lot of different statements

22   about a lot of different things to a lot of detectives.  But

23   his initial statements have all disappeared.

24        You are also going to hear that Mr. Huello was

25   directly in the room when Mr. Cobb comes on the scene, and he

86HMMANT                    Opening - Mr. Joseph

 1   doesn't see Mr. Manganiello at all.  And he doesn't hear any

 2   shots and he's been in that room working since about 9:25 a.m.

 3          You are also going to hear that they interview another

 4   gentleman named John Grimes, who was an employee of

 5   Parkchester, and he was outside of the basement about 9:20 or

 6   so having a cup of coffee and he doesn't see Mr. Manganiello

 7   and he doesn't hear any shots.

 8          You are going to hear that Mr. Acosta was actually

 9   sent to apartment 5 as backup, but never arrived.  You are

10   going to hear that at some point, 8:45, it appears that Mr.

11   Acosta is on the scene there, while plaintiff was, with two

12   police officers.  Neither the police officers nor

13   Mr. Manganiello ever see Mr. Acosta.  After Mr. Manganiello

14   left, he left and he didn't come out to the building until he

15   received a radio call.

16          You are going to hear that on February 12, 2001, after

17   Anthony Manganiello is arrested, they obtained a search warrant

18   and they searched his car and they found zero evidence

19   connecting him with the murder of Acosta in any way.  You are

20   going to hear that they took gunshot swabs of his hands and his

21   clothing which had negative results.

22          After everything is reviewed, the arrest was actually

23   voided on February 12, 2001.  You are going to hear that

24   Mr. Agostini wasn't happy that he had to release plaintiff.

25   After the initial confrontation, he had an out for him and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86HMMANT                         Opening - Mr. Joseph

1    think that's what the evidence is going to show.

2         Mr. Manganiello was obviously shocked from this

3    experience.  He was suspended from his employment.  You are

4    going to hear that he can't try to live his normal life, until

5    April 20, 2001, at which point he's driving his car, he pulls

6    into a gas station and he's arrested out of the blue.  And he's

7    arrested for the murder of Albert Acosta.

8         You'll hear, as a result of that arrest, he was

9    formally charged, he's arraigned, he pleads not guilty, and

10   he's held in jail for ten days until the next court date.  At

11   the next court date he's finally released on bail for $100,000.

12   A family member has to put up his house for him to leave.

13        You are going to hear that things become even stranger

14   after his arraignment.  You are going to hear that the memo

15   book he had where he writes down the times of when he is, where

16   he is, the summons he wrote, they all disappear.  The only

17   thing that survived or seem to have not gotten lost are the

18   typewritten notes that some of the detectives made.  Remember I

19   told you they searched his car.  The affidavit for the search

20   warrant has also disappeared.

21        Another strange thing happens on February 12, 2001,

22   the date that Mr. Acosta was found, you are going to hear that

23   one of the defendants, Mr. Martinez, interviews Police Officers

24   Rodriguez and Ortiz, and they confirm that plaintiff was at the

25   home with them at 5E.  He seemed normal and he confirmed that

86HMMANT                        Opening - Mr. Joseph

he left the building with them, although those handwritten
notes had all disappeared.

That's important because Ortiz and Rodriguez on
February 12, 2001 told Mr. Martinez that the plaintiff left the
building of 5E with them.

You are also going to hear a couple of weeks later,
Mr. Luis Agostini, one of the defendants, creates a new DD5 or
typewritten report in which he attributes to Mr. Ortiz and
Rodriguez that are exactly the opposite of what they told
Mr. Martinez on February 12, 2001.  You are going to hear now
these statements are attributed to these officers that
Mr. Manganiello left the apartment or left the call before they
did, which now puts him alone in the building.

You are also going to hear that even though plaintiff
told these defendants everything he knew during the questioning
while they were questioning him, he was very honest, he gave
them everything.  You are going to hear that paperwork starts
appearing that says he was evasive in the questioning, that he
wouldn't give his name or address, that he wouldn't give his
phone number, and that he refused to answer those questions,
but all the handwritten notes from the interview disappeared.

You are also going to hear that a few days after
Mr. Agostini is told that he has to release plaintiff, a new
witness shows up, a witness who plaintiff has never met.  It's
not an ordinary citizen.  It's somebody staying at Rikers

86HMMANT                    Opening - Mr. Joseph

1    Island.

2         You are going to hear the name Terrence Alston

3    appears, and Terrence Alston, who is in Rikers Island on

4    February 12, 2001, and had been there for four months now, all

5    of a sudden, has personal knowledge about this murder that

6    occurred while he was in jail.  You are going to hear that he

7    comes forward and now he makes a lot of inconsistent

8    statements, but one of them is that several months prior,

9    Anthony Manganiello approached him and hired him to kill a

10   security guard.

11        Keep in mind, Anthony Manganiello has never met

12   Mr. Alston, never seen him, couldn't even pick him out of a

13   room.  Yet, the statement comes out.  And you are going to hear

14   that Terrence Alston -- there is a few things I want to tell

15   you about Terrence Alston.  One is that he was let out of jail

16   in exchange for his statement and testimony.  You are going to

17   hear that defendants, especially Mr. Agostini, knew that

18   Terrence Alston was a liar.  You are going to hear they knew he

19   lied because they admit that one of the things that Terrence

20   Alston has said is that a friend of his, Johnny Baker, sold a

21   gun to Anthony Manganiello, a gun of the same caliber used to

22   kill Albert Acosta, but then Mr. Agostini goes to Mr. Baker and

23   says, well, we heard this, we were told this.  He goes, it's a

24   lie.  I don't know what you're talking about.  And he believes

25   him.

86HMMANT                    Opening - Mr. Joseph

1          And then he confronts Mr. Alston.  Mr. Alston admits

2    he lied and made it up.  But yet they commence a murder

3    prosecution based on Mr. Alston's testimony.  And Mr. Alston,

4    he didn't really know this.  Mr. Alston is permitted to testify

5    before a grand jury and none of this was real until much, much

6    later.

7          You are going to hear also, Mr. Agostini admits he has

8    doubts about Terrence Alston's credibility and he felt that he

9    was playing games to get out of jail, but, yet, he got out of

10   jail in exchange for his testimony.

11         You are also going to hear that the gentleman, Johnny

12   Baker, who said that he himself picked the gun, he also wrote

13   out his own statement, and that statement disappeared.

14         Now, this is real important because Mr. Alston, one,

15   at the time the defendants commenced this prosecution for

16   murder, they know Mr. Alston lied, they know he lied to falsely

17   implicate plaintiff, and they know he even lied and falsely

18   implicated Johnny Baker in connection with criminal activity.

19   Yet, after Mr. Baker says, no, I don't know anything about it,

20   what happens?  Mr. Alston gets out of jail and he produces a

21   17-year-old kid named Mark Damon, who now says he sold the .22

22   caliber gun to Anthony Manganiello.

23         You are also going to hear that a district attorney

24   offered a sworn statement to the judge that oversaw the grand

25   jury in which he said that Mr. Alston was not given any

86HMMANT                    Opening - Mr. Joseph

1    consideration for this case in terms of his sentence when the

2    truth came out is, the only thing -- only case Mr. Alston ever

3    testified in was against Anthony Manganiello and that's why he

4    was let out of jail.

5           Ladies and gentlemen, I think the evidence is going to

6    show that Mr. Alston was let out of jail for falsely

7    implicating plaintiff for giving false testimony before a grand

8    jury, that plaintiff hired him to kill another security guard.

9    And Alston's testimony, I think when you review it, is the only

10   thing that really linked plaintiff to this crime.  It was a

11   lie.  The defendants knew it was a lie.

12          You're also going to hear, a few weeks later a

13   gentleman named Mr. Booth comes into the picture.  Now,

14   defendants Luis Agostini, Shawn Abate, and Martinez go pick up

15   Mr. Booth.  Mr. Booth is known to be involved in various

16   criminal things, some of which are loansharking and bookmaking

17   and gambling.  They bring him in to the 43rd Precinct and they

18   say it's voluntary but you are going that they search him.

19   When they searched Mr. Booth, they find gambling materials,

20   names, numbers, addresses of people that are owed money, and

21   they also find a knife.

22          And at first Mr. Booth doesn't want to cooperate, but

23   then you are going to hear that Mr. Agostini tells him, we

24   heard Anthony Manganiello tried to buy a gun from you.  And the

25   first thing -- he doesn't want to cooperate, but then

86HMMANT                    Opening - Mr. Joseph

1    Mr. Agostini suggests, well, maybe your name will get passed on

2    to the organized crime division.  Then all of a sudden

3    Mr. Booth remembers that Anthony Manganiello in fact came up to

4    him and tried to buy a gun.

5         You are going to hear that after Mr. Booth signs a

6    statement implicating Anthony Manganiello, saying he tried

7    buying a gun from him, the gambling materials disappeared.

8    They give him back the knife and he walks out of the police

9    station.

10        You are also going to hear that Anthony Manganiello

11   never tried to buy a gun from anybody, let alone Mr. Booth.  By

12   the way, the district attorney was never told how this

13   statement from Mr. Booth was obtained.  He never created any

14   paperwork about how they obtained this statement from Mr. Booth

15   because if they created paperwork, Mr. Manganiello's criminal

16   defense lawyers would have had access to them.  As a result,

17   they didn't know about this.

18        You are also going to hear that defendants Miriam

19   Nieves and Alex Perez, who are also police officers, testified

20   falsely before the grand jury, at pretrial hearings, and at

21   trial against Anthony Manganiello.  You are going to hear that

22   these defendants said there was never a broadcast before

23   plaintiff arrived on the scene that identified the victim as a

24   Parkchester security guard.

25        But then Miriam Nieves testifies on all three

86HMMANT                    Opening - Mr. Joseph

1    occasions before the grand jury, before the pretrial hearings,

2    and at trial that in fact Anthony Manganiello, at a point in

3    time when he couldn't have known who Albert Acosta was, said to

4    her, as he was entering the basement on February 12, 2001,

5    that's my partner there.  You are going to hear she said

6    different things at different times concerning the statement,

7    but the fact is, there was a broadcast.  I don't think it's

8    disputed from Sergeant Ohle at Parkchester that identified the

9    victim as one of our guys, one of our men is down.  So

10   everybody knew who was down.

11        And you are also going to hear some other witnesses

12   who will confirm that there was in fact a broadcast or at least

13   an ambiguity that it was highway police or a Parkchester

14   security guard that was down.

15        You are going to hear that she offered this testimony

16   to implicate the plaintiff in this crime.  You are also going

17   to hear that she didn't say it on February 20, 2001, she didn't

18   say it on February 13, she didn't say it on February 14.  The

19   first written record when this appears is two and a half weeks

20   later, after she speaks with defendant Agostini.

21        You are also going to hear defendants' Agostini and

22   Abate made several misrepresentations during the course of the

23   pretrial hearings and trial.  You are going to hear at one

24   point or another both of them testified that the plaintiff was

25   evasive and wouldn't answer questions.  But all the interview

86HMMANT                    Opening - Mr. Joseph

 1   notes from that interview disappeared.

 2          And you are going to hear it's not true.  The

 3   plaintiff, Anthony Manganiello, will tell you he answered all

 4   their questions and, all of a sudden, these guys are saying he

 5   didn't.  It painted him in a negative light in the criminal

 6   proceeding.

 7          You are also going to hear at one point the defendant,

 8   Luis Agostini, testified at a pretrial hearing that a note was

 9   found in plaintiff's locker that said, I feel like killing

10   someone.  That's pretty damning, right.  But fortunately the

11   note actually said, I pray every day I will never have to kill

12   anyone.  At the time Mr. Manganiello was also a Bronx police

13   officer.

14          I think when you also take a close look at the

15   evidence you are going to hear, you are going to see that there

16   are numerous, numerous, numerous inconsistencies among what the

17   defendants say happens and why Mr. Manganiello was charged with

18   murder.

19          The other things will come out during the course of

20   the trial, but at this point I think you have a sense about

21   what this case is about.  And I hope, after you have heard all

22   of this evidence, I am confident you will agree that when you

23   look at the evidence that wasn't fabricated, there was no

24   probable cause to charge Anthony Manganiello with the murder of

25   Albert Acosta.

86HMMANT                        Opening - Mr. Joseph

1          I think you'll also agree that the only evidence that

2     really connected him to this crime was fabricated.  I think

3     you'll also find, when you hear the evidence, that the grand

4     jury indictment in this case was based on fraud and perjury.

5          I think you'll also agree at the end of the case that

6     these defendants, each one of them, fabricated evidence, made

7     false representations, committed perjury, and it commenced and

8     continued through these actions, a criminal prosecution for

9     murder against Anthony Manganiello that is baseless.  And they

10    all played a role, which you'll hear.  I think when you hear

11    all the evidence, you are also going to agree that this

12    prosecution was started maliciously.

13          You are also going to hear that Anthony Manganiello

14    went to trial after three years and he was found not guilty,

15    not guilty.  But you are going to hear that the stress from

16    this experience affected him dramatically.  You are going to

17    hear that for three years his life was on hold until he waited

18    to see if he would be falsely committed of the crime, the

19    murder that he didn't commit.

20          You are going to hear he suffered severe anxiety, post

21    traumatic stress disorder.  You are going to hear that he

22    developed depression, he developed a fear of leaving the house

23    based on the experience that he went through.  And as a result

24    of the stress that was placed on him, his career was ruined, he

25    will never be the same.

86HMMANT                    Opening - Mr. Joseph

1          You will also hear that at the time he was making good

2    money.  He had a good career and that was all taken from him.

3    Even though he was found not guilty, he will never come out of

4    it.

5          He had a girlfriend, which that relationship

6    deteriorated.  You will hear that his personal health and his

7    personal emotional health deteriorated.  You will hear that the

8    people he worked with for years turned their back on him when

9    he was accused.  You are also going to hear that he had to

10   spend over a $100,000 in lawyers' fees defending himself of

11   these charges.

12         After you have heard all of the evidence I am going to

13   ask you for a verdict that vindicates Anthony Manganiello, that

14   says he was maliciously prosecuted, and there is no probable

15   cause, and I am going to ask you to make an award that

16   compensates him for everything that he's lost, that truly

17   compensates him for his loss.  Thank you.

18         THE COURT:  Mr. Zuckerman, do you care to open?

19         MR. ZUCKERMAN:  Ms. Okereke will do the defendants'

20   opening, your Honor.

21         THE COURT:  Very well.

22         MS. OKEREKE:  Your Honor, ladies and gentlemen of the

23   jury, my name is Amy Okereke and I along with my cocounsel,

24   Mark Zuckerman, represent the defendants, Luis Agostini, Shawn

25   Abate, Richard Martinez, Miriam Nieves, and Alex Perez, all

86HMMANT                    Opening - Ms. Okereke

1    retired members of the New York City Police Department.  At the

2    time of events concerning this case Luis Agostini, Shawn Abate,

3    and Richard Martinez held the rank of detective, and Miriam

4    Nieves and Alex Perez held the rank the police officer.  I will

5    refer to them using these titles.

6         On the morning of February 12, 2001, Albert Acosta, a

7    security guard with the Parkchester housing complex, was shot

8    in the back of the head and died later that day.  The police

9    learned of that shooting and they began an investigation.  And

10   this investigation ended when the Bronx County district

11   attorney's Office decided to prosecute the plaintiff, Anthony

12   Manganiello, for the homicide of Albert Acosta.

13        Now, this case is about Anthony Manganiello's criminal

14   prosecution and specifically about what occurred when the

15   district attorney presented the case before the grand jury in

16   April of 2001.  Plaintiff will want you to believe that

17   defendants committed some wrongdoing or some misconduct during

18   the grand jury hearing.  But the evidence will show that each

19   of the defendants performed their duties carefully, properly,

20   and honestly.  You will hear that police have a clear and

21   distinct role in an investigation.  Their role is to collect

22   information and to give this information to the district

23   attorney who then decides to prosecute, not the police.

24        During this trial you are going to hear what in fact

25   each of the defendants did after they learned of the shooting.

1    You will hear that on February 12, 2001, Officers Miriam Nieves

2    and Alex Perez, who were on patrol together, responded to the

3    shooting, which occurred on 1700 Metropolitan Avenue in the

4    Bronx.   1700 Metropolitan Avenue is one of the many buildings

5    comprising the condominium complex known as Parkchester.

6          Officer Nieves will tell you that when she arrived at

7    Parkchester she went inside the basement of 1700 Metropolitan

8    Avenue and she saw a man wearing a uniform lying on his stomach

9    shot in the back of the head.  Officer Nieves will tell you

10   that after she saw the victim she walked out of the room and

11   saw Anthony Manganiello, and there were three things that

12   Officer Nieves remembers about this encounter, three things.

13         She remembers Mr. Manganiello looked sweaty and

14   disheveled, Mr. Manganiello had a white powder on his jacket,

15   the same powder that officers found in the room where the

16   victim was discovered.  And Mr. Manganiello said to her, that's

17   my partner in there.  And then Officer Nieves wondered, how did

18   he know that that was his partner in there?  Because she didn't

19   know who the victim was until she walked into the basement.

20         Then Officer Nieves will tell you that after just 35

21   minutes on the scene, she left.  And what you just heard,

22   Officer Nieves told the detective, she told the district

23   attorney, and she later testified the same information to the

24   grand jury, and that was her sole involvement in this case.

25         Officer Perez will tell you that he also saw

86HMMANT                    Opening - Ms. Okereke

1   Mr. Manganiello at the scene and that Mr. Manganiello was

2   sweaty and disheveled and that he had white powder on his

3   uniform.  And Officer Perez will tell you that when he arrived

4   at 1700 Metropolitan Avenue, he didn't know who the victim of

5   the crime was either, and that he, like Officer Nieves, left

6   the scene after about half an hour, and that is Officer Perez's

7   sole role in this case.  He reported these facts to the

8   detective handling the case, to the Bronx County District

9   Attorney's office and to the grand jury.

10          Then you'll hear from Detective Luis Agostini, who at

11   the time of the incident had been with the NYPD for

12   approximately 17 years.  Detective Agostini was the lead case

13   detective in this investigation.  He will explain to you that

14   as the lead detective in a homicide investigation, it is not

15   only his duty to look for witnesses and gather information, but

16   also to work with other detectives involved in the

17   investigation and to follow up with leads.

18          Detective Agostini will tell you that many detectives

19   participated in the investigation, an investigation that lasted

20   over two months and culminated when the Bronx County District

21   Attorney's office determined that Mr. Manganiello would be

22   prosecuted for the murder of Albert Acosta.

23          You'll hear from Detective Agostini that during this

24   two-month investigation he learned that prior to the homicide

25   the plaintiff had been asking people to purchase a .22 caliber

86HMMANT                    Opening - Ms. Okereke

1    gun, the same type of gun used to commit the murder, that the

2    plaintiff solicited someone to commit the murder of the

3    Parkchester security guard, and you will also hear that

4    Mr. Manganiello was involved in a shoving match with the victim

5    prior to the homicide.

6           You will learn that Detective Agostini and Detective

7    Abate also conducted an interview of the plaintiff, who, again,

8    at the time was a Parkchester security guard and who worked

9    with the victim and was a potential important witness with

10   information.  But you will hear that plaintiff was anything but

11   helpful during his interview with Detective Agostini and

12   Detective Abate.

13          When Detective Agostini completed his investigation,

14   he will tell you that he gave the entire case file, including

15   the detective interview notes, the activity reports, and all of

16   the other information gathered, to the Bronx County District

17   Attorney's office.  You will, however, learn that two years,

18   two years after the plaintiff was arrested, two years after the

19   plaintiff was indicted for murder by a grand jury and two years

20   after Detective Agostini was no longer assigned to the 43rd

21   Precinct, that the case file could not be located.

22          You will also hear during this trial from the veteran

23   detectives Richard Martinez and Shawn Abate, both at the 43rd

24   Precinct and both involved in the homicide investigation.

25   Detective Martinez will tell you that they were also involved

1    in this case.  They will tell you that they interviewed police

2    officers, they interviewed Parkchester security guards, and

3    they interviewed people at the crime scene.

4          And one of these individuals that was interviewed was

5    a man named Walter Cobb, a Parkchester maintenance employee.

6    Mr. Cobb told Detective Martinez that minutes after hearing

7    gunshots coming from the basement of 1700 Metropolitan Avenue,

8    he saw the basement door fly open, Mr. Manganiello step out,

9    and Mr. Manganiello walk away.

10         Now, the plaintiff will attempt to discredit the

11   defendants by attempting to point out discrepancies in what --

12   the detectives' paperwork and in their memories, in the

13   detectives' memories.

14         But, ladies and gentlemen, this homicide occurred

15   seven and a half years ago and since February 12, 2001, these

16   officers have collectively been involved in many

17   investigations.  They have spoken to many witnesses and they

18   have listened to hundreds of radio calls.  So it shouldn't

19   concern you that their memories have faded.

20         Finally, ladies and gentlemen, you will hear from

21   Assistant District Attorney Christine Scaccia.  Christine

22   Scaccia was the prosecutor in plaintiff's criminal trial.  You

23   will learn that Christine Scaccia independently reviewed the

24   evidence, independently spoke with witnesses, and independently

25   made the decision to present the plaintiff's case to a grand

1    jury and that it was the Bronx County District Attorney's

2    Office that assessed the evidence and determined to prosecute

3    Mr. Manganiello.

4          Assistant District Attorney Scaccia will tell you that

5    Detective Agostini, Detective Abate, Detective Martinez and

6    Officers Perez and Nieves played no role, had no say, and had

7    no input in her decision to prosecute or her decision to

8    present plaintiff's case to a grand jury.

9          She will tell you that after she presented the

10   information to the grand jury, the plaintiff was indicted.

11   That means that the grand jury found there was sufficient

12   evidence for her to continue with the case.

13         Now, you will also hear that the plaintiff was

14   ultimately acquitted at trial.  Christine Scaccia, however, the

15   Assistant District Attorney, will tell you that an acquittal at

16   trial does not change the fact that she believes that there was

17   sufficient cause to present the case to the grand jury.

18         That, ladies and gentlemen, is what this case is about

19   and what the evidence will show, that Detectives Agostini,

20   Abate, Martinez, and Officers Perez and Nieves did nothing

21   wrong, that they performed their duties in connection with this

22   investigation, played no part in the decision to prosecute the

23   plaintiff, and that no misconduct occurred during the grand

24   jury proceeding in this case.

25         I would also like you to keep in mind that it's

86HMMANT                    Opening - Ms. Okereke

1    plaintiff's burden to prove or to show you otherwise with

2    actual evidence.  We are competent that after you have heard

3    the evidence your verdict will be for the defendants.

4            Thank you.

5            THE COURT:  You may call your first witness.

6            MR. JOSEPH:  May it please the Court, plaintiff calls

7    Anthony Manganiello.

8    ANTHONY MANGANIELLO,

9        the plaintiff, called as a witness, in his own behalf,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. JOSEPH:

13   Q.  Mr. Manganiello, what is your date of birth?

14   A.  May 30, 1962.

15   Q.  How old are you presently?

16   A.  I'm 46 years old.

17   Q.  Can you tell us a little bit about your employment history?

18   A.  Yes.  In my last year of high school I had to drop out and

19   start working because my father got sick.  I started working

20   for security, and I got a few jobs with the Gleason Security

21   Company, New York Athletic Club, and Genovese Drug Store, until

22   I finally got hired in 1992 as a full-time officer for the

23   Parkchester South Condominiums.

24   Q.  While you were working at Parkchester South Condominiums

25   did you have any other jobs?

86HMMANT                           Manganiello - direct

1    A.  Yes, I did.  In 1995, I was hired as a part-time police

2    officer in Pawling, New York.

3    Q.  What happened to that employment?

4    A.  I was able to maintain both employments, Parkchester full

5    time, and I had a part-time job at Pawling, New York.

6    Q.  And did the part-time at Pawling stop at some point?

7    A.  Yes, it did.  In 1997, the department disbanded, and I

8    applied to the state park police.

9    Q.  Did you begin employment with the state park police at that

10   time?

11   A.  Yes, I did.  In 1998, I started for the state park police.

12   Q.  When you started at Parkchester, what was your rank?

13   A.  Security officer.

14   Q.  Did that change?

15   A.  Yes, it did.

16   Q.  How did it change?

17   A.  I obtained the position.  I was certified as a special

18   patrolman a few years later.

19   Q.  What is the difference between a security officer and a

20   special patrolman?

21   A.  As a special patrolman you are required to take extra

22   courses in the penal law.  They give you a background

23   investigation at 1 Police Plaza, and once you've been accepted,

24   approved, they certify you as special patrol officers and you

25   have arrest powers and increase in pay.

86HMMANT                        Manganiello - direct

1           MR. JOSEPH:  Your Honor, I would ask at this point to

2    admit Plaintiff's 51 into evidence.

3           THE COURT:  I assume we went through all of this.

4    It's nice to see Mr. Zuckerman is studying it anyway.  It's

5    marked 51, and it's in evidence without objection.

6           (Plaintiff's Exhibit 51 received in evidence)

7           MR. JOSEPH:  Judge, may I present it to the witness?

8           THE COURT:  You may.

9    Q.  Sir, do you recognize Exhibit 51?

10   A.  Yes, I do.

11   Q.  What do you recognize it to be?

12   A.  It's an application for special patrolman status that has

13   been approved.

14   Q.  Was that the order of special patrolman status that was

15   approved?

16   A.  Yes, sir.

17   Q.  Pursuant to your job with the park police in Pawling, were

18   you authorized and required to carry a weapon, a firearm?

19   A.  Yes, I was.

20   Q.  Sir, can you tell us, in your last year or so of working at

21   Parkchester, what was your pay?

22   A.  My pay was about 35,000 annually with annuities and

23   overtime benefits.

24   Q.  How about the state park police?

25   A.  State park police, I made roughly around $10,000 a year.

1          MR. JOSEPH:  Your Honor, I would also ask to introduce

2    Exhibit 49.

3          MR. ZUCKERMAN:  Your Honor, we have objected

4    previously, but I take it they have been overruled.

5          THE COURT:  You are absolutely right.

6          (Plaintiff's Exhibit 49 received in evidence)

7          MR. JOSEPH:  Your Honor, may I approach the witness?

8          THE COURT:  You may.

9          Do you want my list so we don't spend more time?  Do

10   you have a copy, Anna.

11         THE LAW CLERK:  I can get it to you.

12         THE COURT:  We will get it to you as soon as we can.

13   I will be glad to tell you when one is not admitted or I didn't

14   admit it.

15   Q.  I show you what's been marked as Exhibit 49.  Are these

16   your tax returns?

17   A.  Yes, sir.

18   Q.  And when did your employment with Parkchester end?

19   A.  On February 12, 2001.

20   Q.  I'd like to draw your attention, if I can, to February 12,

21   2001.  Were you working on that day?

22   A.  Yes, I was.

23   Q.  What time did you arrive at work?

24   A.  I arrived for work around 7:30, quarter to 8.

25   Q.  What happened when you arrived?

86HMMANT                          Manganiello - direct

1    A.  I proceeded to 63 Met Oval.  That's our base.

2    Q.  What happened when you arrived?

3    A.  When I arrived, I scanned my hand on the machine.

4    Q.  At some point do you appear for roll call?

5    A.  I proceeded to my locker to change into my uniform, and

6    then I waited to get the keys and radios from the desk

7    sergeant.

8    Q.  What happens next?

9    A.  Shortly afterwards, afterwards, we wait and we proceed with

10   roll call.

11   Q.  At roll call are you assigned designations?

12   A.  Yes, I am.

13   Q.  Can you explain to the jury what designations are?

14   A.  A designation is a post in an area that a sergeant assigns

15   you to work.  For example, Parkchester has approximately 177

16   buildings.  They divide that into three sections.  They call it

17   the east section, east quadrant; the south section, south

18   quadrant; and the west section, the west quadrant, for example,

19   and then they will further subdivide that in half.  Let's say

20   there are two officers, and they are assigned to work in the

21   east.  One will work one-half of the east, east 12 or East Adam

22   Boy, and the other officer worked the other side, East Charlie

23   David or east 34.

24   Q.  What was your designation that day?

25   A.  My designation was East Charlie David.

86HMMANT                          Manganiello - direct

1   Q.  With whom were you partnered?

2   A.  Albert Acosta.

3   Q.  What was Mr. Acosta's designation?

4   A.  He was East Adam Boy.

5   Q.  Now, prior to receiving your assignments at roll call, do

6   you know who you are going to be partnered up with?

7   A.  No.

8   Q.  Sir, can you explain, when you say at Parkchester you began

9   a patrol, what is a patrol?

10  A.  They expect us to check every building that is on our post.

11  Q.  While working at Parkchester, did security officers who

12  were partnered up walk around together?

13  A.  No.  The protocol, their protocol is that we are to remain

14  separated so we could cover more area.

15  Q.  And what happened after roll call?

16  A.  After roll call I proceeded to my post, East Charlie David.

17  Q.  At approximately 8:45 a.m., did you receive a call?

18  A.  Yes, I did.

19            MR. ZUCKERMAN:  Object, leading, your Honor.

20            THE COURT:  I think that's admissible.  You should

21  understand, because you certainly don't want to leave here

22  without your license to practice law, when you're examining on

23  direct leading questions are not allowed.  A leading question

24  is when you essentially ask a question that puts the answer in

25  the mouth of the witness so all he has to say is yes or no.

86HMMANT                    Manganiello - direct

1    The reverse is true on cross-examination where better

2    cross-examinations come from essentially only leading

3    questions.  If you ask how, what, when, where, or why

4    questions, you will avoid the problem, although this problem

5    didn't arise to the degree that I would sustain the objection.

6    Just a thought for the future.

7         MR. JOSEPH:  Yes, sir.

8    Q.  What was the nature of the call?

9    A.  The nature, Sergeant Ohle gave the nature of the call,

10   dispute with knives.

11   Q.  What did you do next after receiving the call?

12   A.  I proceeded to that location.

13   Q.  And what was the location?

14   A.  1700 Metropolitan Avenue, apartment 5 Eddie.

15   Q.  When you say 5 Eddie, what do you mean?

16   A.  5E.

17   Q.  What happens when you arrive at apartment 5E?

18   A.  When I arrived I noticed a police car in front of the

19   building, so I assumed there was a police officer upstairs.  I

20   proceeded upstairs, I knocked on the door, and I found Sergeant

21   Rose from the 43rd Precinct speaking with the tenants in the

22   apartment.

23   Q.  What, if anything, happened at that time?

24   A.  Well, I stood back because he was the superior officer, and

25   I was taking notes at the time.

86HMMANT                         Manganiello - direct

1    Q.   When you say you were taking notes, what were you taking

2    notes in?

3    A.   I was taking detailed information of who the tenants were,

4    what the dispute was about, and what Sergeant Rose was relaying

5    to the tenants.

6    Q.   What were you taking these notes in?

7    A.   In my memo book.

8    Q.   Can you give us a brief description of what a memo book is?

9    A.   A memo book is just looseleaf papers, and we are going to

10   write everything that occurs from the start until the end of

11   the tour in that book.   During the course of the tour the

12   supervisor will sign it maybe two or three times.

13   Q.   What happened, if anything, as you were writing these

14   notes?

15   A.   As I was writing these notes, two other officers from the

16   43rd Precinct arrived in the apartment.

17   Q.   Do you recall who they were?

18   A.   Yes.   Police Officer Ortiz and Police Officer Rodriguez.

19   Q.   Did any other Parkchester police officers arrive at 5E?

20   A.   No.

21   Q.   Did you write down in your memo book what time you left?

22   A.   We left -- yes.

23   Q.   As you sit here right now do you have a recollection of

24   what time you left?

25   A.   We left around 9, 9:10.

86HMMANT                    Manganiello - direct

1   Q.  When you left the building at 1700 Metropolitan Avenue, who

2   were you with?

3   A.  I was with Police Officer Ortiz and Police Officer

4   Rodriguez.

5   Q.  Did you exit the building with Police Officer Ortiz and

6   Rodriguez?

7   A.  Yes.

8           MR. ZUCKERMAN:  Object.  Leading.

9           THE COURT:  I'll allow it.

10  Q.  What, if anything, did you do after you left 1700

11  Metropolitan Avenue?

12  A.  After we exited the building and we left together, I

13  proceeded up Metropolitan Avenue to do various building checks.

14  Q.  At some point did you issue a summons?

15  A.  Yes.

16          MR. ZUCKERMAN:  Object, leading, your Honor.

17          THE COURT:  Why don't we just do more of what you had

18  begun to do, such as what happened next.

19  Q.  Sir, what happened after you left 1700 Metropolitan Avenue?

20  A.  I proceeded up Metropolitan Avenue to do various building

21  checks.

22  Q.  And what buildings did you check?

23  A.  They would have been in my book.  I wrote it down in my

24  book.

25  Q.  As you sit here now, do you have a memory of any buildings

86HMMANT                          Manganiello - direct

1   that you checked?

2   A.   I do remember 14 Metropolitan Oval.

3   Q.   What, if anything, happened at 14 Metropolitan Oval?

4   A.   I did a vertical and I wrote a summons for improper garbage

5   disposal.

6   Q.   What is a vertical?

7   A.   A vertical is when you go to the top of a building, roof

8   landing and you go -- and you go down the stairs floor by floor

9   to check if there are any vagrants or if there are any

10  hazardous conditions in the building.

11            THE COURT:  What does four by four mean?

12            THE WITNESS:  Four by four?

13            THE COURT:  Is that what you said?

14            MR. JOSEPH:  I think he said floor by floor.

15            THE WITNESS:  Floor by floor.

16  Q.   What, if anything, happened at 14 Metropolitan Avenue?

17  A.   I came across an open garbage bag that had a letter on top.

18  Q.   What did you do?

19  A.   I saw the letter, I got the name, and I took it to

20  confirm -- I took the letter, I got the name to confirm that it

21  was with the garbage and I took that, I attached it to a

22  summons and to a report, I folded it, and I put it in my memo

23  book.

24  Q.   Why did you take the letter?

25  A.   It was evidence that improper garbage disposal was left by

1   that certain tenant.

2   Q.  What information, if any, was contained on the piece of

3   paper?

4   A.  It was the full name and the address and apartment number

5   of the tenant.

6   Q.  What, if anything, did you do next?

7   A.  I put it in my memo book.

8   Q.  Why did you do that?

9   A.  I put it in my memo book because the procedure is, at the

10  end of the tour, we all line up and we hand in our radios, keys

11  and whatever reports to the desk sergeant.

12  Q.  Why?

13  A.  That's the procedure.

14  Q.  What happens after 14 Metropolitan Avenue?

15  A.  After 14 Metropolitan Avenue, I left the building and I

16  called for a 10-8, which is a personal break.  I was going on a

17  coffee break.

18  Q.  Where were you going?

19  A.  I was going to go across the street to the Met Oval Diner.

20  Q.  Did you get to the Met Oval Diner?

21  A.  No.

22  Q.  Why not?

23  A.  I hadn't reached it.  There was a call over the air from a

24  Sergeant Ohle.

25  Q.  What was the nature of the call?

86HMMANT                    Manganiello - direct

1    A.  He came over the radio and stated 1013 East Adam Boy, East

2    Adam Boy down in the basement shot.

3    Q.  What is 1013?

4    A.  It means officer down.

5    Q.  When you heard East Adam Boy, what, if anything, did that

6    mean to you?

7    A.  I knew who it was because at roll call they gave us our

8    designations.  As part of the procedure when you fill out the

9    memo book you are supposed to write who your partner is.  So I

10   had written East Adam Boy and the name Acosta, so I knew what

11   it was.

12   Q.  What did you do at that point?

13   A.  I proceeded to run down top speed Metropolitan Avenue, and

14   the message came a little garbled.  I got most of it.  I just

15   asked him to 10-5, which means to repeat the message.

16   Q.  What happened when you got to 1700 Metropolitan Avenue?

17   A.  I saw numerous police cars in front of the building along

18   with Parkchester security.

19   Q.  And what sector was 1700 Metropolitan Avenue?

20   A.  It was my sector, East Charlie David.

21   Q.  What, if anything, happened when you arrived at the scene?

22   A.  When I arrived at the scene I entered the building, went to

23   the basement, I saw police officers, and I saw more police

24   officers in the storage room area.

25   Q.  At this point did you see a Mary Nieves?

86HMMANT                        Manganiello - direct

1   A.  No.

2   Q.  Did you speak at any point while entering the basement to

3   Mary Nieves?

4   A.  No.

5   Q.  At any point when you entered the basement, was there any

6   white powder on your jacket?

7   A.  No.

8   Q.  What happens when you enter the basement?

9   A.  I enter the basement and off to the storage room there is

10  more security and police officers, and I see a person lying

11  down on the ground.  I go over to that person.

12  Q.  What happens next?

13  A.  I go over to the person and I look at the face and see that

14  it's Albert Acosta.

15  Q.  What happens next?

16  A.  Albert Acosta, he's bleeding from the head, I'm in shock of

17  what I'm looking at, and I'm frustrated at that point that

18  there is not an ambulance there, so I yell over the radio, I

19  want an ambulance to respond.

20  Q.  How are you feeling at that point?

21  A.  I'm sorry?

22  Q.  What is your physical condition at that point?

23  A.  I'm in a state of shock, I'm feeling faint, I lean to the

24  wall to kind of balance myself.

25  Q.  What, if anything, happens when you lean on the wall?

86HMMANT                          Manganiello - direct

1    A.   When I leaned against the wall I got some powder on my

2    jacket.

3    Q.   What happened next?

4    A.   Afterwards, the officers on the scene, I was there about a

5    minute or two, they were instructing me not to step on the

6    shell casings that were on the floor.

7    Q.   What, if anything, did you do at that point?

8    A.   I exited because crime scene started coming in and they

9    wanted to seal the area off.  I exited the storage room area

10   and I leaned up against the corridor wall.

11   Q.   What did you do then?

12   A.   I pull myself together a little bit, and then I exit the

13   building and I'm walking towards the sidewalk.

14   Q.   What happens now?

15   A.   As I'm leaving the building, Miriam, Police Officer Miriam

16   Nieves, stops, grabs my hands and starts smelling my hands, and

17   I said to her, what are you doing.

18   Q.   How did she respond?

19   A.   She didn't respond.

20   Q.   Between the time that you left 1700 Metropolitan Avenue and

21   being at 5E, at the point in time that you received the call of

22   the 1013, had you been back to 1700 Metropolitan Avenue at all?

23   A.   No.

24   Q.   What happened after Ms. Nieves smelled your hands?

25   A.   She smelled my hands.  I asked her, why are you doing this?

1    What are you doing?  She didn't answer.  I proceeded on and I

2    was met by two other officers from the 43rd Precinct on the

3    sidewalk.

4    Q.   What happened then?

5    A.   They asked me if I wanted to come to thc station to help

6    with the investigation.

7    Q.   How do you respond?

8    A.   I said yes.

9    Q.   What happens next?

10   A.   I get into the car and before I get into the car they pat

11   me down, which was strange.  They pat me down and they brought

12   me to the back of the car.

13   Q.   What, if anything, happens on the way to the precinct?

14   A.   Like I said, I was having palpitations from running down

15   the street and from what I saw.  I had to get checked out first

16   before I go to the 43rd Precinct.

17   Q.   How did the officers respond?

18   A.   They didn't respond at all.

19   Q.   What, if anything, happens when you arrived at the 43rd

20   Precinct?

21   A.   When I arrived at the 43rd Precinct they took me to see

22   Detective Agostini.

23   Q.   And what happens when you meet Detective Agostini?

24   A.   Detective Agostini introduces himself, and they bring me

25   into the interrogation room.

1  Q.  And what happens next?

2  A.  Well, he sits me down and he's asking me general

3  information.

4  Q.  Did you provide him general information?

5  A.  Yes.

6  Q.  What does he ask you and how do you respond?

7  A.  He asked me for my name.  I told him my name was Anthony

8  Manganiello.  He asked me where I lived, I gave him my address.

9  He asked me for my phone number, which I also gave him.

10  Q.  What, if anything, was Mr. Agostini doing while you were

11  giving this information?

12  A.  He was writing this information down in his memo book.

13  Q.  What happens next?

14  A.  EMS responded and they put sensors on my chest to check me

15  out.

16  Q.  What happens now?

17  A.  I ask if I can go and get checked out.  They said no, you

18  stay here.

19  Q.  Who said no, you stay there?

20  A.  Detective Agostini.

21  Q.  What happens next?

22  A.  Detective Agostini proceeds to ask me more questions.

23  Q.  What questions does he ask you?

24  A.  He asks me, do you know of anyone that Acosta had any

25  problems with.

86HMMANT                          Manganiello - direct

1    Q.   How did you respond?

2            MR. ZUCKERMAN:  Objection, hearsay.

3            THE COURT:  I'll allow it.  Could you either identify

4    or have each of the defendants when he mentions them stand up

5    so that we all know who we are talking about?

6            MR. JOSEPH:  Certainly.

7            THE COURT:  Let's do it now.

8    Q.   Sir, can you point out Detective Agostini for the jury?

9    A.   Yes, sir.  He's the detective seated at the far end with

10   the red tie.

11   Q.   Do you see Detective Abate?

12   A.   Yes, sir.

13   Q.   Can you point him out for the jury, please?

14   A.   He's seated -- there is another detective between him and

15   Detective Agostini.  He has the goatee.

16   Q.   You see Mr. Martinez?

17   A.   Yes.  Detective Martinez is right in the middle.

18   Q.   Can you also see Police Officer Perez?

19   A.   Yes, sir.

20   Q.   Can you point out Police Officer Perez?

21   A.   Police Officer Perez is behind the detective.

22   Q.   Who is standing up?  Do you also see Miriam Nieves?

23   A.   Yes.  She is wearing a white shirt in the back.

24   Q.   What information, if any, do you provide to Mr. Agostini

25   after he -- do you know of anybody who has a problem with Mr.

86HMMANT                        Manganiello - direct

1   Acosta?

2   A.  What came to mind was what Albert had told me in the past,

3   that some time ago he was thrown through a plate glass window

4   in front of 1514 Metropolitan Avenue by Blood gang members.

5   Q.  Did you tell him anything else?

6   A.  Yes.  There was also an incident where he was involved in a

7   dispute with some local thugs, and they were arguing with each

8   other and they were threatening to shoot him, and I remember

9   this because it happened between tours.  I worked the 8 to 4

10  tour.  It happened in between tours.  They called everybody to

11  respond from the 8 to 4 tour to the location, as well as the 4

12  to 12 officers who were getting dressed in the locker room.

13  Q.  What, if anything, was Mr. Agostini doing when you provided

14  this information?

15  A.  He was writing all this information down.

16  Q.  And what happens next?

17  A.  What happens next, out of the blue, he asked me if I killed

18  Albert Acosta.

19  Q.  How did you respond?

20  A.  I was taken aback.  I was taken aback.  And I said, are you

21  fucking crazy?  I said I had nothing to do with this.  After he

22  hears this, he stands up, pissed off and he's looking at me

23  like a piece of garbage and he calls in Detective Abate and

24  Detective Sergeant McGovern.  They all come in and they start

25  stripping me of my clothes.

86HMMANT                          Manganiello - direct

1    Q.   What do you mean by that?

2    A.   I had my jacket on, they took my jacket off, I had my

3    shirt, they took my shirt off, my belt, keys.  I was left in a

4    tank top and pants.

5    Q.   What, if anything, did you say to them?

6    A.   I said, what are you guys doing?  What are you doing here?

7    Q.   How did they respond?

8    A.   They were laughing.  They were just stripping me of my

9    clothes.

10   Q.   What happens next?

11   A.   What happens next, a few other police officers come in and

12   they swab my hands and they are taking pictures, photographs of

13   my hands.

14   Q.   Was anything removed from your hands?

15   A.   Yes.  I had a Band-Aid on my hand and Detective Agostini

16   came and ripped it off my finger and he said, you won't be

17   needing this.

18   Q.   Is that what he said to you?

19   A.   Yes.

20   Q.   At some point is an attorney called for you?

21   A.   Yes.

22   Q.   Do you meet with an attorney at the precinct?

23   A.   Yes.

24   Q.   After you meet with an attorney, are you placed in a cell?

25   A.   Yes, I am.

86HMMANT                         Manganiello - direct

1    Q.  Can you describe the cell?

2    A.  They place me into a holding cell on the same floor, which

3    was cold.  Like I said, I was still in my pants and T-shirt.

4    And I had asked Detective Agostini to get some clothes for me,

5    something to keep me warm.

6    Q.  How did he respond?

7    A.  He laughed at me and said yeah, right, and he walked away.

8    Q.  Did you ever get any clothes?

9    A.  Not from him.

10   Q.  At that point how did you feel?

11   A.  I was in a shock.  I couldn't believe this was happening to

12   me.  I went that morning to work, everybody was happy, and

13   then, all of a sudden, I find myself in this position.  I went

14   there to help them out and they turned everything against me

15   for no reason.

16   Q.  How long were you in that cell?

17   A.  I was in that cell until 5 a.m. the next morning.

18   Q.  What happens at 5 a.m. at the next morning?

19   A.  5 a.m., Detective Agostini opens the cell block.

20   Q.  What, if anything, does Mr. Agostini say to you?

21   A.  He just says leave.

22   Q.  What happens next?

23   A.  I asked him about -- I asked him about my car keys.

24   Q.  How does he respond?

25   A.  No, you don't get that.

86HMMANT                    Manganiello - direct

1   Q.  What happens next?

2   A.  As I'm going out I had the shoe laces there, I'm trying to

3   put the shoe laces on, and he goes, no, no, no, you don't put

4   the fucking shoe laces on at my station house.  He said, get

5   out of my fucking station house now, and he's shoving me while

6   he's saying this.

7   Q.  What else does he say?

8   A.  I get to the staircase and I'm just grabbing on to make

9   sure that they don't throw me off the staircase.

10  Q.  Where did you go after this?

11  A.  I was not able to place a call from inside the police

12  station.  I went to the street and I found a public phone, and

13  I placed a call.

14  Q.  Where did you go?

15  A.  I called a cab company to take me to my parents' house.

16  Q.  How were you feeling that morning?

17  A.  I was feeling exhausted, I was feeling humiliated, scared,

18  unbelievable, unbelievable that something like this could

19  happen.  It was unreal.  It was a nightmare.

20  Q.  At that point did you develop any physical symptoms?

21  A.  Yes, I did.

22  Q.  Can you tell the jury what you developed?

23  A.  I was nauseous, I was very dizzy, I wasn't able to sleep.

24  I had a constant fear that these cops would come out of

25  anywhere and just pick me up for no reason.  I didn't go out

1  much.  I stayed inside the house most of the time.  I had major

2  depression.  I felt sick down to the pit of my stomach.  Most

3  of all, I couldn't believe -- every time I thought about it, I

4  couldn't believe what I was going through.  I said, if this

5  could happen to me, this could happen to anybody.  It was

6  unbelievable.  It was a nightmare.

7  Q.  Were you able to go back to work?

8  A.  No, I wasn't.

9  Q.  Why is that?

10  A.  I called the deputy and he informed me because there was an

11  ongoing investigation that they were not able to bring me back

12  to work.

13        MR. JOSEPH:  Your Honor, I would offer Plaintiff's

14  Exhibit 50 in evidence.

15        MR. ZUCKERMAN:  We previously objected, your Honor.

16        THE COURT:  I don't believe it was successful.

17        MR. ZUCKERMAN:  The objection?

18        THE COURT:  No.  It's admitted.

19        (Plaintiff's Exhibit 50 received in evidence)

20        THE COURT:  It's a letter dated 3/22/01.

21  Q.  I'll show you what's been marked as Exhibit No. 50.  Do you

22  recognize that?

23  A.  Yes, sir.

24  Q.  What do you recognize it to be?

25  A.  It's a letter from Parkchester South Condominium stating

1    that they officially suspended me from my job as of February

2    12, 2001.

3    Q.    How did you feel when you received this?

4    A.    I was in a state of shock.  I said, what's going to happen

5    to me, where will I go.

6    Q.    Sir, what was your next contact with the defendants?

7    A.    My next contact was on April 20, 2001.

8    Q.    What was the nature of the contact?

9    A.    I pulled into a gas station to fill up because my father

10   had suffered a stroke.

11           MR. ZUCKERMAN:  Objection, your Honor.

12           THE COURT:  Sustained.

13   Q.    Just what happened?

14           MR. ZUCKERMAN:  Move to strike.

15           THE COURT:  Excuse me?

16           MR. ZUCKERMAN:  We move to strike that part of the

17   answer.

18           THE COURT:  Stricken.

19   Q.    What was the contact that you had with the defendants?

20   A.    As soon as I was filling up the gas, I saw two officers

21   running out of nowhere towards me with guns pointed.

22   Q.    Did you know they were officers at the time?

23   A.    No, I didn't know they were officers.  I thought I was

24   going to be carjacked at the time.  When they got closer, the

25   officers, they announced themselves as police officers, and

1   they threw me up against the car and they handcuffed me and

2   they threw me to the back of the car.

3   Q.   Where did they take you?

4   A.   They took me to the 43rd Precinct.

5   Q.   What happens when you arrived at the 43rd Precinct?

6   A.   They took me to Detective Agostini.

7   Q.   What happened when you saw Mr. Agostini?

8   A.   Detective Agostini saw me and he laughed and he said to the

9   other detectives, Abate and McGovern, did he resist?  Detective

10  Abate said, no, he's all yours, now we got him good.

11  Q.   And what happened next?

12  A.   They strip-searched me and they put me in the cell.

13  Q.   What, if anything, was happening while they were

14  strip-searching you?

15  A.   They were laughing behind my back.

16  Q.   What happened after you were placed in the cell?

17  A.   After I was placed in the cell, I waited some time and I

18  was taken to central booking.

19  Q.   Can you describe the experience at central booking.  What

20  happened there?

21  A.   When I got to central booking they placed me in a large

22  cell, large cell, maybe 30 or 40 people were there.  And I

23  noticed that most of the people were still -- they were

24  uncuffed.  They were walking around the cell cursing, half of

25  them drunk, pushing into each other, and I noticed I was still

86HMMANT                          Manganiello - direct

1    the only one left cuffed in that cell.

2            MR. ZUCKERMAN:  Your Honor, I object to this line of

3    questioning.

4            THE COURT:  You want to say objection, right?

5            MR. ZUCKERMAN:  Objection, your Honor.

6            THE COURT:  Sustained.  Keep your eye on the ball even

7    if these lawyers seem to have trouble doing that.  This is a

8    malicious prosecution case, in essence.  I read you what those

9    elements are.  I will read them to you again before the end of

10   the day.  This doesn't fit.

11   Q.  Sir, were you brought before a judge?

12   A.  I'm sorry?

13   Q.  Were you brought before a Judge?

14   A.  Yes.

15           MR. ZUCKERMAN:  Objection, your Honor.

16           THE COURT:  I don't know where he's going.  Overruled.

17   Q.  How much time did you spend in central booking before

18   seeing the Judge?

19   A.  I was there all night.

20   Q.  How did you plead when you saw the judge?

21   A.  Not guilty.

22   Q.  Were you released on bail?

23   A.  No.

24   Q.  What, if anything, happened to you after seeing the judge?

25   A.  They remanded me, they put me back in jail.

86HMMANT                          Manganiello - direct

1    Q.   When was the next time you saw the judge?

2              MR. ZUCKERMAN:   Objection, your Honor.

3              THE COURT:   I think this has to do possibly with what

4    these policemen were responsible for or not responsible for,

5    had a role in and didn't have a role in and therefore, in my

6    view, admissible.

7    Q.   When did you see the judge next?

8    A.   I saw the judge approximately ten days later.

9    Q.   After the ten days, where were you?

10   A.   I was at Rikers Island and Queen West.

11   Q.   Can you give us a brief description of your emotional state

12   during that time?

13   A.   Sure.  First off, I was scared that somebody might

14   recognize me either from the state court police or Parkchester

15   law enforcement, and I was scared they would jump me for that

16   reason.

17             MR. ZUCKERMAN:   Objection, your Honor.

18             THE COURT:   I'll sustain the objection.

19             MR. ZUCKERMAN:   Move to strike.

20             THE COURT:   I am not sure I see that connection.

21             Did you ever see any of these defendants while you

22   were there?

23             THE WITNESS:   I'm sorry, sir?

24             THE COURT:   Did you ever see any of the defendants

25   while you were in Rikers Island?

86HMMANT                          Manganiello - direct

1           THE WITNESS:  No, sir.

2           THE COURT:  Let's move on.  I think we have your

3    point.

4    Q.  After ten days in jail were you released?

5    A.  Yes.

6    Q.  How was it that you were released?

7    A.  My sister put up her house in order to make bail.

8    Q.  How much was bail?

9    A.  Bail was $100,000.

10          MR. JOSEPH:  Your Honor, at this point I would offer

11   Exhibit 22 into evidence.

12          THE COURT:  When you went to the hearing before the

13   judge and bail was set, did you see or hear anything from any

14   of these defendants?

15          THE WITNESS:  I don't believe so.

16   Q.  Sir, let me take a step back.  The first time you were in

17   court, was there any mention of what evidence, if any, was

18   against you?

19   A.  They had mentioned they had scientific evidence against me.

20   Q.  Anything else?

21   A.  They had scientific evidence and they mentioned they had

22   powder on the jacket.  They had mentioned something about

23   gunshot residue.

24          MR. ZUCKERMAN:  Your Honor, I object.  There has got

25   to be some foundation for it, who said it, when.

86HMMANT                          Manganiello - direct

1          THE COURT:  I think we know when and we can find out

2     essentially.

3     A.   ADA Agostini.

4          MR. JOSEPH:  At this point I would offer Plaintiff's

5     22 into evidence.

6          THE COURT:  Very well.  22 is admitted without

7     objection.

8          (Plaintiff's Exhibit 22 received in evidence)

9          MR. JOSEPH:  Judge, may I show it to the witness?

10         THE COURT:  Sure.  The only time you have to worry

11    about approaching the witness is if you think he is going to be

12    recalcitrant like you couldn't handle him.  It doesn't appear

13    to me that you're in that kind of position with your own

14    witness.

15         MR. JOSEPH:  Thank you, your Honor.

16    Q.   Sir, do you recognize what Exhibit No. 22 is?

17    A.   Yes, sir.

18    Q.   Have you seen it before?

19    A.   Yes, sir.

20    Q.   When did you see it?

21    A.   During pretrial hearings.

22    Q.   What, if anything, is Exhibit 22?

23    A.   It's an interview that the police had with Terrence Alston,

24    an inmate at Rikers Island.

25    Q.   When did you see this for the first time?

86HMMANT                          Manganiello - direct

1   A.   During pretrial hearings when discovery information was
2   coming in.
3   Q.   By the way, can you tell us who prepared Exhibit No. 22?
4   A.   It says here Detective Luis Agostini.
5   Q.   Prior to February 12, 2001, had you ever met Terrence
6   Alston?
7   A.   No.
8   Q.   Did you ever speak to him?
9   A.   No.
10  Q.   Did you ever ask him to kill another security guard?
11  A.   No.   I don't know who this guy is.
12  Q.   Could you pick him out of a lineup if you had to?
13  A.   No.
14  Q.   Is there anything that's not true in Exhibit 22?
15  A.   Everything is not true.
16  Q.   Did you ever buy a .22 caliber weapon from anybody?
17  A.   No.
18  Q.   How did you feel when you saw this document?
19  A.   It was a shock.   I couldn't believe what I was seeing.   I
20  was seeing lies were being put together against me and I
21  couldn't understand why.
22        MR. JOSEPH:   Your Honor, at this point I would also
23  offer Exhibit No. 1 into evidence.
24        THE COURT:   Any objection?  No objection.
25        MR. ZUCKERMAN:   No objection, your Honor.

86HMMANT                    Manganiello - direct

1              (Plaintiff's Exhibit 1 received in evidence)

2    Q.  Sir, do you recognize Exhibit No. 1?

3              THE COURT:  I should tell you, ladies and gentlemen,

4    that on occasion some prosecutors and some defense attorneys or

5    plaintiff and defendant lawyers provide copies of exhibits to

6    the jury.  But when you retire to deliberate in this case you

7    may ask for any of them and they will be brought to you, just

8    in case these lawyers don't have that idea.

9    Q.  Sir, is Exhibit No. 1 prepared by Detective Martinez?

10   A.  Detective Martinez, yes.

11   Q.  Sir, on February 12, 2001, did you see Walter Cobb at all?

12   A.  No, I didn't.

13   Q.  Prior to responding to the call of Mr. Acosta being down,

14   were you in the basement of 1700 Metropolitan Avenue at all?

15   A.  No.

16             MR. ZUCKERMAN:  Objection, leading, your Honor.

17             MR. JOSEPH:  Withdrawn.

18             THE COURT:  Little late, but better late than never.

19   Q.  Sir, is there anything that's not true in Exhibit No. 1?

20   A.  Yes.

21   Q.  Can you tell us what's not true?

22   A.  When he says that he saw me leave the building.

23             THE COURT:  It's in evidence.  Maybe you better read

24   it.  You and Zuckerman have lived with this matter for a few

25   weeks, months, years.  These people, including yours truly,

86HMMANT                          Manganiello - direct

1   have not.  So it's sort of like little tiny pieces that you're

2   throwing out to this jury who really have to have a better

3   understanding if they are going to be a deliberating jury that

4   is worth their salt, which I know they are.

5   Q.  Can you read No. 1 on Exhibit 1?

6   A.  Yes.  It says, he stated he recognized the Parkchester

7   officer Manganiello from working at the park, knows him by face

8   and maybe for around a year.  He stated that he positively

9   recognized Officer Manganiello as the Parkchester officer that

10  exited the basement of 1700 Metropolitan Avenue after he heard

11  gunshots.

12  Q.  Prior to responding to the call, were you ever at the

13  basement of 1700 on February 12, 2001?

14  A.  No.

15  Q.  Is Mr. Cobb's statement true?

16  A.  No.

17           THE COURT:  This is on what the police file in the

18  regular course of business called a DD5.  You will be hearing

19  at least a lot about DD5s throughout this lawsuit.

20  Q.  Sir, let's go back to Exhibit 22 for a second.  Can you

21  read to the jury what, if anything, is contained in Exhibit No.

22  22?

23  A.  Which one is that?

24  Q.  It has a 22 on it, sir.

25  A.  Yes.  The interview with Terrence Alston.

1  Q.  Can you please read it for us?

2  A.  Yes.  It says that on February 15, 2001, at 1725 hours,

3  Detective Palacio, Sergeant Martinez, and the undersigned,

4  which is Luis Agostini, visited Rikers Island intelligence

5  section and interviewed prisoner Terrence Alston.

6  Q.  What statements, if any, are attributed to Mr. Alston?

7           MR. ZUCKERMAN:  Object to the form.

8           THE COURT:  Why don't you read it all so we all know

9  what they are.

10  Q.  Please read the whole document.

11  A.  Okay.  Fine.  He stated the following:  He was approached

12  last year, September 2000, by a male white, heavyset, who works

13  as a Parkchester security officer to do him a favor.  The favor

14  was to kill another security officer for him.  Terrence also

15  knew -- when Terrence, also known as Murdock, asked why, he

16  stated, over a girl.  Terrence asked how much and did not give

17  a price.  Terrence stated that the Parkchester officer asked

18  him, do you need a gun, and Terrence stated, no.  I have one.

19  Terrence stated that when the hit was going to go down, the

20  security officer will point out the other Parkchester security

21  officer you wanted to kill.  Terrence stated he met twice with

22  the security officer and spoke about the hit on the Parkchester

23  security officer.

24           Terrence, a/k/a Murdock, then stated, his boy, Johnny,

25  who had been talking, sold a .22 caliber to a male white

1    security officer for $75.  Terrence is trying to convince John,

2    who was dating his daughter, to give this information to the

3    police.  Terrence states, Johnny is scared he will get

4    arrested.

5           The undersigned showed Terrence Alston a photo book

6    consisting of a male white, and he ID'd Anthony Manganiello as

7    a security officer who asked him to kill another security

8    officer.  Terrence states he had been -- he had seen the person

9    he picked out various times around the neighborhood.  That's

10   it.

11   Q.  Are the contents of that document true or untrue?

12   A.  Untrue.

13          MR. JOSEPH:  At this point, your Honor, I would also

14   offer Exhibit 41, which consists of a DD5 and two statements,

15   into evidence.

16          (Plaintiff's Exhibit 41 received in evidence)

17   Q.  Sir, do you recognize Exhibit 41?

18   A.  Yes, sir.

19   Q.  What is Exhibit 41?

20   A.  It's an interview with Michael Booth.

21   Q.  And have you seen this before?

22   A.  Yes, I have.

23   Q.  When did you see it?

24   A.  I saw it during the pretrial hearing.

25   Q.  Can you tell me who prepared it?

86HMMANT                    Manganiello - direct

1        MR. ZUCKERMAN:  Objection, foundation, your Honor.

2    Withdrawn.

3    A.   Detective Luis Agostini.

4    Q.   Can you read for us what the document says?

5    A.   It says:  On March 1, 2001, at approximately 1110 hours,

6    Detective Martinez and the undersigned, Luis Agostini, picked

7    up Michael Booth in front of Pizza Place, 1665 Metropolitan

8    Avenue and drove him to the 43rd Precinct:  Michael Booth,

9    residing at -- it's blacked out -- made the following

10   statements.

11        He stated:  Officer Manganiello approached him one

12   time when he was sitting in his truck by the bed next to Macy's

13   and asked him if he had arrived.  Michael told him it's a big

14   rap for a small price if he sold him one.  Michael had seen

15   Manganiello numerous times around the neighborhood and

16   pizzeria.

17   Q.   Sir, are the statements in there true or untrue?

18   A.   Untrue.

19   Q.   Did you have any such conversation about Michael Booth?

20   A.   Everything is a lie in there.

21        THE COURT:  The answer to the question, I gather, is,

22   no, you haven't had any conversations with Michael Booth, is

23   that true?

24        THE WITNESS:  That's true, your Honor.

25   Q.   Let me show you what's also -- also offer Exhibit 10 into

86HMMANT                          Manganiello - direct

1     evidence, Judge.

2              THE COURT:  There is no objection.  It will be

3     admitted.

4              (Plaintiff's Exhibit 10 received in evidence)

5     Q.  Sir, I'll show you what's been marked as Exhibit 10.  Have

6     you seen this before?

7     A.  Yes, sir.

8     Q.  What, if anything, is Exhibit 10?

9     A.  Exhibit 10 is an interview that Detective Luis Agostini had

10    with Johnny Baker.

11    Q.  What, if anything, does this document say?

12    A.  It says that:  On February 17, 2001, at 1330 hours, the

13    undersigned interviewed Johnny Baker at the 43rd Precinct.

14    Johnny came to the precinct on his own with his sister.  Johnny

15    states he has no knowledge of selling a firearm to a security

16    guard.  He states he was supposed to meet with an officer named

17    Derrick Parker of the gang intelligence unit to talk about drug

18    locations.  He states the officer wanted also guns, but he told

19    him, I only know about drugs.  Johnny Baker wrote a statement

20    on his behalf, it says see attached.  That's it.

21             MR. JOSEPH:  Your Honor, at this point I would also

22    introduce Exhibit 23.

23             THE COURT:  No objection, it will be admitted.

24             (Plaintiff's Exhibit 23 received in evidence)

25    Q.  Sir, I'm showing you what's been marked Exhibit 23.  Do you

86HMMANT                        Manganiello - direct

1    recognize this?

2    A.   Yes.

3    Q.   When did you see this?

4    A.   During pretrial hearings.

5    Q.   What is Exhibit 23?

6    A.   It's an interview with Mark Damon.

7    Q.   Who is present for this interview?

8    A.   Detective Parker, ADA Scaccia, Terrence Alston, and the

9    name printed on the report is Luis Agostini.

10   Q.   What, if anything, does Exhibit 41 say?

11   A.   It says that on April 5, the undersigned was present at the

12   ADA's office, Christine Scaccia, and Mark A. Damon, 17 years

13   old, residing at 1491 Metropolitan Avenue, was interviewed.

14           Mark stated, with permission from a/k/a Murdock, he

15   sold a .22 caliber auto handgun to a security guard back on

16   January 2001.  He sold it for $75.  He stated the guard was a

17   male white, Italian, heavyset, with a thick mustache.  During

18   the above interview the following persons were present,

19   Detective Derrick Parker, ADA Scaccia, Terrence Alston, and the

20   undersigned, Luis Agostini.

21   Q.   Had you ever met Mark Damon in person?

22   A.   No.

23   Q.   In January of 2001, did you buy a .22 caliber handgun?

24   A.   No.

25   Q.   Have you ever seen Mark Damon?

1    A.   No.

2    Q.   Are the statements contained in Exhibit 41 true or untrue?

3    A.   Complete lie.

4         THE COURT:  These are all statements in DD5s by police

5    detectives?

6         THE WITNESS:  Yes, your Honor.

7         MR. JOSEPH:  At this point, Judge, I would seek to

8    introduce Exhibit 39 into evidence.

9         (Plaintiff's Exhibit 39 received in evidence)

10   Q.   I show you what's been marked Exhibit 39.  Do you recognize

11   this document?

12   A.   Yes, I do.

13   Q.   What do you recognize it to be?

14   A.   It's an interview with Police Officer Nieves.

15   Q.   Who prepared it?

16   A.   Detective Luis Agostini.

17   Q.   When was it prepared?

18   A.   It was prepared on March 1, 2001.

19   Q.   What, if anything, does this document state?

20   A.   It states that she observed SPO Acosta laying on the floor

21   with his face towards the left side and that she observed his

22   memo book and hat on the stove.  She states Acosta's jacket was

23   off.  She states she was present when Manganiello came to the

24   scene and stated he wanted to see his partner.  PO Nieves

25   stated, how did he know it was his partner when he never

86HMMANT                          Manganiello - direct

1   entered the room.  She states, Manganiello did enter the room

2   and minutes later I saw Acosta laying on the floor.

3   Q.  Sir, on February 12, 2001, did you say anything to Officer

4   Nieves when you entered the room?

5   A.  No.

6   Q.  Is her statements contained in Exhibit 39 true or untrue

7   concerning your statement?

8   A.  It's not true.

9         MR. JOSEPH:  I am going to ask at this point, Judge,

10  to move Exhibit 38 into evidence.

11        MR. ZUCKERMAN:  No objection, your Honor.

12  Q.  I am going to show you what's been marked Exhibit 38.

13        THE COURT:  38 is admitted without objection.

14        (Plaintiff's Exhibit 38 received in evidence)

15  Q.  Sir, do you recognize Exhibit 38?

16  A.  Yes, sir.

17  Q.  Have you had an opportunity to look through it prior to

18  today?

19  A.  Yes, sir.

20  Q.  What are they?

21  A.  These are the grand jury minutes.

22  Q.  And did Terrence Alston testify before the grand jury?

23  A.  Yes.

24  Q.  And what, if anything, did Mr. Alston say, if anything,

25  that was not true?

86HMMANT                      Manganiello - direct

1    A.   Everything that Terrence Alston said about me was not true.

2    Q.   Can you read to us what he said about you?

3              MR. ZUCKERMAN:   Objection, your Honor.   Either the

4    whole thing should be read --

5              THE COURT:   This is sort of an awkward way to do this.

6    You have to think of a better way.   It can get in.   We are not

7    going to listen to snippets.

8    Q.   Sir, can you summarize what portions of the --

9              THE COURT:   I don't want him to summarize.   If there

10   are specific portions, maybe you can bracket them and if they

11   make some sense we will let him read it or you can read it.   I

12   don't care who reads it.

13             MR. JOSEPH:   For the record, I'll begin reading on

14   CL-6 -- CL-5, line 22:

15   "Q.   I want to draw your attention now going back to on or

16   before October 1, 2000.   Were you living in Parkchester that

17   day?

18   "A.   Yes.

19   "Q.   Can you tell the members of the grand jury if anything

20   unusual took place at and about that time?

21   "A.   Yes.

22   "Q.   What happened?

23   "A.   The security officer approached me about accepting a

24   contract to kill another security officer.

25   "Q.   Now, where were you when this security officer approached

86HMMANT                    Manganiello - direct

1    you?

2    "A.   In front of my building, 1560 Union Port Road."

3              Sir, was that testimony true or untrue?

4    A.   Untrue.

5              THE COURT:   Whose testimony is this?

6              MR. JOSEPH:   Terrence Alston, your Honor.

7              Turning to Terrence Alston, continuing on page CL-6,

8    line 16:

9    "Q.   When he approached you, did he call you by name?

10   "A.   Yes.   He called me by my nickname, Murdock.

11   "Q.   Now, when he first approached you, were you alone or with

12   other people?

13   "A.   I was with my family.

14   "Q.   Did you go somewhere to talk to him or did he say this in

15   front of your family?

16   "A.   No.   We went over to the other side and talked."

17             Continuing on page CL-7:

18   "Q.   What exactly, to the best of your recollection, did this

19   security officer say to you and what, if anything, did you say

20   back to him?

21   "A.   He asked me would I accept a contract to kill another

22   security guard.   I told him yes.

23   "Q.   Did he tell you why?

24   "A.   He said it was over a conflict over a girl."

25             Sir, was that true or untrue?

86HMMANT                    Manganiello - direct

1   A.   Untrue.

2   Q.   I am now turning to grand jury testimony, Exhibit 38, of

3   Walter Cobb starting at page CL-2, line 20:

4   "Q.   And I want to direct your attention --

5          MR. ZUCKERMAN:   Your Honor, if I can just have a

6   moment to find it, please.

7          MR. JOSEPH:   Sure.

8          THE COURT:   Sure.

9          MR. ZUCKERMAN:   I've got it, your Honor.

10  Q.   "QUESTION:   I want to direct your attention to February 12,

11  2001, specifically to the building of 1700 Metropolitan Avenue

12  here in Bronx County.  Were you present at that building on

13  that day?

14  "A.   Yes, ma'am, I was.

15  "Q.   That was the building that you're normally assigned to?

16  "A.   No, ma'am, I'm not.

17  "Q.   How did you become assigned to this building that day?

18  "A.   I'm known as a miscellaneous person.  I fill in for people

19  that call in sick or out that day.  I was sent to that

20  building."

21          Skipping down to line 10, about what time --

22          MR. ZUCKERMAN:   Your Honor, I object.

23          MR. JOSEPH:   I'll read the whole thing, Judge.

24  "Q.   Now, what time did you start work that day?

25  "A.   8 in the morning.

1    "Q.   Okay.   About what time did you get over towards 1700

2    Metropolitan Avenue -- 1700 Metropolitan, it says.

3    "A.   About 10 a.m. or 10 minutes after 10, 10:10.

4    "Q.   When you approached that building, how were you going to

5    go inside that building?  Were you going through the front door

6    or using another door?

7    "A.   Well, the rear door is situated on the avenue itself.   I

8    approached the rear door.

9    "Q.   Now, this rear door, is that a doorway to the public or do

10   tenants have access?

11   "A.   Yes, ma'am.

12   "Q.   How do you get into that door?

13   "A.   Well, we use what we call a comp key, electronically

14   controlled, and you push the door and it opens.

15   "Q.   So it's electronic lock?

16   "A.   Yes, ma'am.

17   ."Q.   Do the tenants have an electronic key?

18   "A.   Yes, they do.

19   "Q.   So tenants can go through the door?

20   "A.   Yes, if you live in the building, because each comp key is

21   assigned different codes for different buildings.

22   "Q.   Now, as you were approaching 1700 Metropolitan Avenue, did

23   something unusual take place?

24   "A.   As I approached the rear exit, which is on the avenue

25   itself, I heard what appeared to be a muzzle, four shots.

86HMMANT                    Manganiello - direct

1   "Q.   Four gunshots?

2   "A.   At least four gunshots, at least four or five steps before

3   I hit the door, approached the door.

4   "Q.   Now, these gunshots, did they happen one right after the

5   other or was there a pause?

6   "A.   Two first, then two after.  There was a slight pause

7   between the four.

8   "Q.   Okay.  Now, as you approached the doorway, is there a time

9   when you get right in front of the door?

10   "A.   I just dismissed it immediately from my mind, almost

11   immediately, and I approached the door.

12   "Q.   What happened when you approached the door?

13   "A.   I was using my comp key when the door flew open, I was

14   trying to enter the building, the door, someone from inside

15   opened the door.

16   "Q.   Now, this door, how does it open?  Do you push it in?  How

17   does it open?

18   "A.   You push it in.

19   "Q.   As soon as the door opened from inside, did you see

20   anybody on the other side of the door?

21   "A.   Yes, I did.

22   "Q.   Who was on the other side of that door?

23   "A.   This man which I know is named Manganiello was stepping

24   out."

25        Sir, were you there on February 12, 2001, after --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   when Mr. Cobb was present?

2   A.  After Mr. Cobb was present?

3   Q.  Let me rephrase it.  Sir, is Mr. Cobb telling the truth or

4   telling a lie in these grand jury minutes?

5           MR. ZUCKERMAN:  Object to form.

6           THE COURT:  Yes or no question.  I'll allow it.

7   A.  No.

8   Q.  What, if anything, is Mr. Cobb saying that's not true?

9   A.  He's saying that he saw me.  I never saw Mr. Cobb that day.

10  Q.  Let's turn to the grand jury testimony of Officer Perez

11  starting at TP-4:  Question starting --

12          MR. ZUCKERMAN:  I just object that he's reading it

13  piecemeal again.

14          THE COURT:  I'm not clear why we have to continue to

15  do this, actually.  I think there is a better way to do it.

16          Why don't we take a ten-minute recess.

17          (Jury not present)

18          THE COURT:  Mr. Zuckerman, before we get to your

19  objection, while I'm watching here, I see one or more of your

20  clients smirking and smiling at this testimony.  I would

21  appreciate it if you would instruct them that that's not the

22  way it's supposed to work here; and if I continue to see it,

23  some action will be taken by me against them and they won't be

24  smiling.

25          MR. ZUCKERMAN:  Understood, your Honor.

86HMMANT                          Manganiello - direct

1          THE COURT:  What's the concern here, aside from mine

2   which is that this is getting dull?  How much more of this is

3   there?  Maybe that's a better way.

4          MR. JOSEPH:  Two witnesses with a couple of phrases.

5   I'd be happy to read what's relevant, except that counsel

6   objects to reading it piecemeal.

7          THE COURT:  The problem is, there is no story.  He's

8   helping you.  You should be wanting to tell some sort of a

9   story.  As far as I'm concerned, if there are only two more and

10  there are only a couple of lines, I really don't care, but I

11  really am not clear that it's accomplishing your mission which

12  I think I understand, although sometimes it's a little hazy.

13         Mr. Zuckerman, what's your problem?

14         MR. ZUCKERMAN:  My only problem is, as long as during

15  our case we are allowed to read the complete grand jury

16  testimonies of each witness so the jury can hear the whole

17  testimony together and at once, that's fine.

18         THE COURT:  That problem only elongates this trial,

19  which I'm really not anxious to do, but you certainly are

20  welcome from the standpoint of completeness to read the

21  transcript, but, obviously, there should be a way that you work

22  together -- I realize that's an oxymoron -- so that you don't

23  reread what he has read.

24         MR. ZUCKERMAN:  Your Honor, if I can, unfortunately --

25  first of all, the grand jury testimony is not long.  For each

86HMMANT                    Manganiello - direct

 1   witness we are only dealing with between five and ten pages

 2   generally.  We are not talking about pages and pages of

 3   testimony.  But from our standpoint, the testimony of these

 4   witnesses at the grand jury only really makes complete sense to

 5   read those five or ten pages at once.  To the extent that

 6   counsel is not doing it and your Honor allows us, all we ask is

 7   that during our case we get to make a full and complete

 8   presentation so the jury can understand what went on here.

 9        THE COURT:  You're welcome to do it, but I really

10   don't need it twice.

11        Is there some magic, Mr. Joseph, in the snippets that

12   you're reading?  Those are the lines that you think are

13   pivotal.

14        MR. JOSEPH:  Judge, these are the relevant pieces of

15   evidence that we feel the grand jury indictment was based on

16   and there is really -- although it's not terribly exciting, and

17   I'm the first to concede that, there is really no other way

18   that I can think of to get across to the jury that this

19   testimony was untrue other than ask my client was this said and

20   was it untrue.

21        THE COURT:  At least we ought to have some foundation

22   about what grand jury minutes are and that they are under oath

23   and when they took place.  The whole thing seems so fragmented

24   to me.  That's why.  I'm not suggesting that either of you are

25   wrong in terms of the way you want to do it, and I don't really

86HMMANT                     Manganiello - direct

1   care as long as it's admissible.

2           As I indicated earlier on, I want the jury to have a

3   vague idea of what the overall operation here is.  And the more

4   little fragments you introduce, the less likely they are to get

5   it.  But if there is only a little more left, we will do it and

6   then we will be listening to more of it when Mr. Zuckerman has

7   his turn, I suppose.

8           MR. ZUCKERMAN:  We are not going to do it with this

9   witness, but we have other witnesses, the ADA, the witnesses

10  who testified, and they will be the ones --

11          THE COURT:  Indeed, by the same token, the witnesses

12  will be on the stand, but whoever can read it more

13  mellifluously, I would prefer to have him or her do the

14  reading.  I don't really need -- everybody knows that is the

15  testimony of the witness, but I don't think he means he has to

16  read it.  Sometimes it's effective.  It wasn't effective here.

17          Five minutes, everybody.

18          MR. ZUCKERMAN:  Your Honor, may I raise one more

19  issue?

20          THE COURT:  Yes.

21          MR. ZUCKERMAN:  Thank you, your Honor.

22          Mr. Manganiello testified that he was in shock when he

23  saw Mr. Acosta lying down mortally wounded and he said that he

24  was very concerned, that he wanted an ambulance.  That gave the

25  impression to the jury that he was concerned, that he cared,

1   that he had a relationship with Mr. Acosta.  I would like some

2   leeway on cross-examination --

3           THE COURT:  Forget about it.  You got more leeway than

4   I think I would give you in the first place by letting you

5   admit that one document.

6           MR. ZUCKERMAN:  Mr. Manganiello also admitted during

7   his deposition as to an oral argument that he had with

8   Mr. Acosta.  I at least should be allowed to get into that as

9   well.

10          THE COURT:  Same ruling.

11          MR. ZUCKERMAN:  I'm sorry?

12          THE COURT:  No.

13          MR. ZUCKERMAN:  Thank you, your Honor.

14          (Recess)

15          (Jury present)

16          THE COURT:  I gather somebody asked if they could take

17  notes.  What happens is, I don't want only one person to take

18  notes.  I'm not forcing everybody to write in their pad, but

19  indeed everybody is going to have the same opportunity so you

20  don't get back during deliberations and one juror says, well, I

21  know the answer to this, I have it right here in my little book

22  and nobody else knows what's happening.  So they usually take

23  that juror's word for it, which would probably be okay, but not

24  the best way.

25          We are probably going to go until -- I have another

86HMMANT                        Manganiello - direct

1   matter at 6, so as close as we can get to 6 we are going to

2   sit.

3           Go right ahead.

4           MR. JOSEPH:  For the record, I'm reading from the

5   grand jury minutes of Chris Tartone beginning on page CL-4,

6   line 21.

7           THE COURT:  What's the exhibit number?

8           MR. JOSEPH:  Exhibit 38, Judge.

9           THE COURT:  Page?

10          MR. JOSEPH:  CL-4.

11          THE COURT:  Go right ahead.

12          MR. JOSEPH:  Thank you, Judge.

13  Q.  "QUESTION:  Okay.  And can you tell the members of the jury

14  during the time span on those occasions that you saw him at the

15  end of January, the beginning of February, what, if anything,

16  took place that was unusual?

17  "A.  He sat down with his coworkers, I overheard him asking if

18  he knew anybody selling a gun.

19  "Q.  When you say he, who are you talking about, Anthony

20  Manganiello?

21  "A.  Yes."

22          Sir, is Mr. Tartone's testimony in this matter true or

23  untrue?

24  A.  Untrue.

25  Q.  Did you ever ask anybody in the pizzeria if they were

86HMMANT                         Manganiello - direct

1    selling a gun?

2    A.  No.

3         THE COURT:  You understand, ladies and gentlemen, that

4    this is the grand jury proceeding in the criminal case several

5    years back and that, in fact, as all grand jury testimony is,

6    it's under oath and that's part of why we can read it now to

7    you.

8         Go ahead.

9         MR. JOSEPH:  Judge, turning to the grand jury

10   testimony of Alex Perez, beginning on page TP-5, line 10:

11   "Q.  And now, before you got to 1700, you had information that

12   an officer had been shot.  Did you know whether it was a

13   Parkchester security officer or NYPD?

14   "A.  We had no clue at that point."

15        Mr. Manganiello, was there a transmission prior to

16   your arrival identifying the victim?

17   A.  Yes.

18        THE COURT:  Who is this testimony of?

19        MR. JOSEPH:  Alex Perez.

20        Judge, I'm now turning to the testimony of Miriam

21   Nieves beginning on page TP-12, line 1:

22   "Q.  And, now, did you remain in the room where Officer Acosta

23   was or did you go someplace else?

24   "A.  A few minutes, and then I went outside.

25   "Q.  What happens -- what happened when you got outside?