86HMMANT                        Manganiello - direct

1    "A.  As I was walking out I saw one of the Parkchester

2    officers, which was Anthony Manganiello, coming in.  I figured

3    they worked together and he said, I don't want to go in there

4    and then -- and he said, that's my partner in there."

5              Mr. Manganiello, did you ever make that statement to

6    Ms. Nieves?

7    A.  No.  That's not true.

8              MR. JOSEPH:  Judge, coming down to the bottom of the

9    same page, line 25:

10   "Q.  Upon their arrival, to your knowledge, was it known that

11   Officer Acosta was the person inside who had been shot?

12   "A.  No."

13   Q.  Sir, was there a broadcast identifying Officer Acosta as

14   the victim prior to your arrival?

15   A.  Yes.  Sergeant Ohle, he put the broadcast over the air.

16   He's from Parkchester.

17   Q.  Sir, were you present at any pretrial hearings?

18   A.  Yes.

19   Q.  Were you present at a pretrial hearing on June 18, 2004, in

20   which Miriam Nieves gave testimony under oath?

21             MR. ZUCKERMAN:  Objection, your Honor.

22             THE COURT:  He can answer yes or no.

23   A.  Yes.

24   Q.  As you sit here now, do you have any recollection of

25   Ms. Nieves making any statements that were not true?

86HMMANT                          Manganiello - direct

1          THE COURT:  Sustained.

2    Q.  Sir, were you present on June 21, 2004 at a pretrial

3    hearing in which Shawn Abate testified?

4    A.  Yes.

5    Q.  What testimony, if any, do you recall Mr. Abate giving?

6          MR. ZUCKERMAN:  Objection.

7          THE COURT:  Sustained.  It's the same question.  If

8    you have something, we will be glad to hear it, but I don't

9    need it third hand.

10          MR. JOSEPH:  Judge, at this point I am going to read

11   from the hearing.

12          I have a copy for the Court.

13          THE COURT:  If you have one, I'll be certainly glad to

14   take it.

15          MR. JOSEPH:  For the record, Judge, I'm reading from a

16   pretrial hearing in the matter of the People of the State of

17   New York against Anthony Manganiello on June 21, 2004,

18   beginning at page 373.

19          MR. ZUCKERMAN:  Objection, your Honor.

20          MR. JOSEPH:  Beginning on line 14, for the record,

21   this is the testimony of Shawn Abate.

22          THE COURT:  It's going to have some relevance, right?

23          MR. JOSEPH:  Yes, your Honor.

24          MR. ZUCKERMAN:  Objection.  Your Honor, there was an

25   objection before trial as to this testimony and there was a

86HMMANT                          Manganiello - direct

1    ruling.

2              THE COURT:  The number is 185.  What's the number -- I

3    hope you can read my rulings here.  They are not really tricky.

4    What's the number of this exhibit?

5              MR. JOSEPH:  It's not an exhibit.  It's a hearing

6    transcript.

7              THE COURT:  It doesn't have a number?

8              MR. JOSEPH:  No, your Honor.

9              THE COURT:  You can be sure that that puts us in a

10   more complicated position.  But if it's testimony that was --

11   why do you suppose, Mr. Zuckerman, that it was ruled upon,

12   which I have no recollection of doing?

13             MR. ZUCKERMAN:  Because Mr. Joseph designated portions

14   of criminal proceedings that he wished to essentially have read

15   into evidence.  And although he's not reading them into

16   evidence, he's having another witness read them into evidence.

17   He's not using them for impeachment or to refresh or anything

18   like that that's allowable under the rules.

19             MR. JOSEPH:  It's not for the truth of matter

20   asserted, but just the fact that it was said.

21             THE COURT:  As far as I'm concerned, if indeed there

22   was a ruling, which I take Mr. Zuckerman's word for, we are not

23   going to reopen it now and read another 200 pages to see if I

24   believe it.

25   Q.  Mr. Manganiello, did you go to trial on your criminal case?

86HMMANT                          Manganiello - direct

1    A.   Yes.

2    Q.   Were you tried for the homicide of Albert Acosta?

3    A.   Yes.

4    Q.   What was the result?

5    A.   Not guilty.

6    Q.   How much time passed between the time you were charged and

7    the trial itself?

8              MR. ZUCKERMAN:  Objection, your Honor.  Withdrawn.

9              THE COURT:  Mr. Zuckerman, my recollection is that

10   that was a motion in limine that you had made -- isn't that

11   right -- with respect to this hearing that we are talking

12   about?

13             MR. ZUCKERMAN:  Well, the reasons -- that was the

14   motion in limine.

15             THE COURT:  Close enough to being right.  Okay.  Go

16   ahead.

17             Where are you, Mr. Joseph?

18             MR. JOSEPH:  I'm asking how much time passed between

19   the point in time he was charged --

20             THE COURT:  Mr. Zuckerman withdrew his objection.  You

21   can tell us.

22   A.   Approximately three years.

23   Q.   And did you seek medical treatment during those three

24   years?

25             MR. ZUCKERMAN:  Objection, your Honor.

86HMMANT                          Manganiello - direct

1          THE COURT:   Overruled.

2    A.   Yes, I did.

3    Q.   Why did you seek medical treatment?

4    A.   I sought medical treatment because I was having panic

5    attacks, I was feeling depressed, I wasn't able to leave the

6    house, I was feeling nauseous, and I needed some help.

7    Q.   When you say panic attacks, can you describe what you mean?

8    A.   They are for like heart attacks.  There was tightness in

9    the chest, I was sweating profusely, I would fall to the

10   ground, and I didn't know what it was.

11   Q.   How often did you have these during that three-year time

12   period between the time you were charged and the time of your

13   trial?

14   A.   It happened a few times a week.

15   Q.   And what doctor did you see?

16   A.   I saw Dr. Rehana Latif.

17   Q.   What, if anything, did Dr. Latif do for you?

18          THE COURT:   We are going to have her here in the

19   flesh?

20          MR. JOSEPH:   We will, Judge.

21          THE COURT:   That's enough.

22          MR. JOSEPH:   Okay, Judge.  Very good.

23   Q.   Sir, did you ever have any mental health issues or

24   depression or anxiety prior to February 12, 2001?

25   A.   No.

1   Q.  Sir, after your acquittal were you able to return to work?

2   A.  No, I wasn't.

3   Q.  And why not?

4   A.  I had a police certification which had expired.  I was no

5   longer active.  I worked very hard to get that police

6   certification.  I went to the academy.  After that length of

7   time, the certification had expired.  I was no longer able to

8   get it back because of my age.  There was an age limit on when

9   you would go to the police academy.

10          MR. ZUCKERMAN:  Objection, your Honor.  The answer

11  wasn't responsive to the question.  Move to strike.

12          THE COURT:  I'll leave it, but certainly not

13  responsive.  Just listen to the questions.

14  A.  Yes, sir.

15  Q.  Were there any physical reasons why you were unable to go

16  back to work?

17  A.  Physical reason.  I had major depression, I was still

18  having panic attacks, I suffered from dizziness, and I had a

19  fear of leaving the house.  I stayed in the home most of the

20  time.

21          MR. JOSEPH:  Your Honor, at this point I'd like to

22  introduce Exhibits 52, 53, and 54.

23          MR. ZUCKERMAN:  Over our prior objection, your Honor.

24          THE COURT:  Very well.  They will all be admitted over

25  the objection of the defendant.

86HMMANT                    Manganiello - direct

1              (Plaintiff's Exhibits 52, 53, and 54 received in

2       evidence)

3       Q.  Mr. Manganiello, I will show you what Exhibit 52 is.  Can

4       you tell us if you recognize it?

5       A.  Yes, sir.

6       Q.  What is 52?

7       A.  52 is a letter from the director of human services at

8       Parkchester South Condominiums.

9       Q.  What, if anything, does this letter inform you?

10      A.  It indicates that because of the seriousness of the charge,

11      they will discontinue my employment at Parkchester South

12      Condominiums.

13      Q.  How about Exhibit 53, do you recognize that?

14      A.  Yes, sir.

15      Q.  What do you recognize it to be?

16      A.  This is a letter from the City of New York, a special

17      patrol division.  They state that they -- because of the

18      circumstances surrounding the incident, they would revoke my

19      special patrolman status.

20      Q.  When was that?

21      A.  This is dated May 23, 2001.

22      Q.  How about Exhibit 54?

23      A.  Yes.

24      Q.  What do you recognize it to be?

25      A.  This is a letter from the City of New York, Police Plaza.

86HMMANT                          Manganiello - direct

1     It's a notice of revocation of my special patrolman license.

2     Q.   What is it dated?

3     A.   It's dated October 9, 2001.

4     Q.   Sir, following your trial were you able to resume work?

5     A.   No, sir.

6     Q.   What, if anything, kept you from working?

7     A.   What kept me from working were many things.  Like I said, I

8     lost all my certifications, everything I worked for, so hard

9     for, the police certification, the police officer

10    certification.  I lost all based on lies that were created by

11    the police and convicted criminals.

12          MR. ZUCKERMAN:  Objection, your Honor.  Nonresponsive.

13          THE COURT:  But it's interesting.  I'll allow it.

14    Q.   What other reasons were there that you were unable to work?

15    A.   I had suffered such -- getting to a point that I became so

16    depressed during that whole period of time, I was always under

17    a suspicion until I went to trial.  I didn't go to trial until

18    three years -- approximately three years later, and it was

19    always that suspicion over me, hanging over me, until I finally

20    went to trial and had everything cleared up.  But that period

21    of time I was very depressed, I was seeing Dr. Latif on a

22    regular basis.  I wasn't able to leave the house.  I was

23    feeling nauseous most of the time.

24          THE COURT:  I think we got the drift.

25          THE WITNESS:  Yes, sir.

86HMMANT                      Manganiello - direct

1   Q.  What physical problems, if any, do you continue to have?

2   A.  I continue to have the panic attacks.  I get them

3   frequently.

4   Q.  How frequently?

5   A.  I still get them frequently, maybe once or two times a

6   week.  I still don't leave the house much, unless to visit my

7   parents or family.  I have this dizziness.  Just recently I

8   fell, I broke my elbow, I fractured my elbow, which I'm taking

9   Percocet for.

10          MR. ZUCKERMAN:  Objection, your Honor, move to strike.

11  Q.  Sir, what physical problems do you have as a result -- you

12  feel as a result of your prosecution?

13  A.  I lost everything.  I lost my friends, I lost my personal

14  relationship, I lost my friendships.  I don't socialize.  I

15  have no desire to socialize.  I have no desire to go out or

16  leave the apartment.  That's just the way it is.

17  Q.  What effect, if any, has this prosecution had on your life?

18          THE COURT:  I think we have that pretty much detailed.

19  Do you have something specific that you missed?

20  Q.  Sir, were you involved in any relationships, personal

21  relationships?

22  A.  Yes, I was.

23  Q.  What happened?

24  A.  I had a relationship.  Hopefully, we got married later on,

25  but that fell through.

86HMMANT                          Manganiello - direct

1   Q.  Sir, did you have to expend any money for your criminal

2   defense?

3   A.  Yes, I did.

4   Q.  And how much did you have to pay?

5   A.  Most of my life savings.  I paid $110,000.

6       MR. JOSEPH:  That's all I have, your Honor.  Thank

7   you.

8       THE COURT:  Cross.

9       MR. ZUCKERMAN:  Yes, your Honor.

10  CROSS-EXAMINATION

11  BY MR. ZUCKERMAN:

12  Q.  Good afternoon, Mr. Manganiello.

13  A.  Good afternoon.

14  Q.  On February 12, 2001, you were a Parkchester special patrol

15  officer, correct?

16  A.  Correct.

17  Q.  And it is true, isn't it, that you were not permitted to

18  carry a gun as a Parkchester special patrol officer while on

19  duty, correct?

20      MR. JOSEPH:  Objection.  Assumes facts not in

21  evidence.

22      THE COURT:  I'll allow it.  Overruled.

23  A.  Correct.

24  Q.  If you did carry a gun while on duty, you would be

25  terminated, correct?

86HMMANT                          Manganiello - cross

1    A.   Correct.

2    Q.   Prior to February 12, 2001, you had possessed various guns

3    before, correct?

4          MR. JOSEPH:   Objection to form.  At Parkchester or

5    somewhere else?

6          THE COURT:   I don't know what that means either.

7    Various guns, big guns, little guns, lots of guns?

8    Q.   You owned certain guns before February 12, 2001, correct?

9    A.   I had pistol permits, yes.

10   Q.   And you had owned various guns, correct?

11   A.   Yes.

12   Q.   In fact, sir, you had extensive experience with guns before

13   February 12, 2001, correct?

14   A.   Yes.

15   Q.   You had fired guns from time to time with different caliber

16   pistols, correct?

17   A.   Yes.

18   Q.   You even had a .38 caliber Smith & Wesson stored in your

19   apartment prior to February 12, 2001, correct?

20   A.   Yes.

21   Q.   And this gun was for your personal use as opposed to your

22   professional use, correct?

23   A.   Yes.  They were on my permits.

24   Q.   And you had been trained to fire a gun in order to obtain

25   the pistol permit you just mentioned, correct?

86HMMANT                    Manganiello - cross

1   A.  Correct.

2   Q.  And you were trained to fire a gun on a firing range,

3   correct?

4   A.  Correct.

5   Q.  And as a parks police officer that you told the jury about

6   earlier, you were allowed to carry a gun, correct?

7   A.  On duty, correct.

8   Q.  While on duty, correct?

9   A.  Correct.

10  Q.  And you in fact did carry a gun while on duty with that

11  position, correct?

12  A.  Correct.

13  Q.  And that the position you mentioned with the Pawling Police

14  Department you carried a .22 caliber gun, correct?

15  A.  Not correct.

16  Q.  A model .22 gun?

17  A.  It was a .40 caliber pistol.  I believe it was model 23.

18  Q.  But you never carried a gun while on duty at Parkchester,

19  correct?

20  A.  Correct.

21  Q.  Because you knew that if you did carry a gun and you were

22  caught you would be terminated, correct?

23  A.  Correct.

24          MR. JOSEPH:  Objection.  Is there some relevance to

25  this?

86HMMANT                          Manganiello - cross

1              THE COURT:  Where are we going?

2              MR. ZUCKERMAN:  Your Honor, it goes to opportunity.

3              THE COURT:  We already have that now.

4              MR. ZUCKERMAN:  Thank you, your Honor.

5    Q.  Now, there did come a time that you applied for a position

6    with the NYPD, correct?

7    A.  Yes.

8    Q.  And your application wasn't accepted, correct?

9    A.  Yes.

10   Q.  So on February 12, 2001, you were working as a Parkchester

11   special patrol officer, correct?

12   A.  Yes.

13   Q.  But you don't even know what day of the week February 12,

14   2001 was, correct?

15              MR. JOSEPH:  Objection, relevance.

16              THE COURT:  Do you?

17              MR. ZUCKERMAN:  I wasn't present.  The witness --

18              THE COURT:  The answer is no?

19              THE WITNESS:  No.

20              THE COURT:  Mr. Zuckerman's answer is no.

21   Q.  Sir, you don't know what day of the week February 12, 2001

22   was, correct?

23              MR. JOSEPH:  Objection.  Asked and answered.

24   A.  No, sir.

25   Q.  On February 12, 2001, you wore your standard blue uniform,

86HMMANT                    Manganiello - cross

1   correct?

2   A.   Yes.

3   Q.   For Parkchester?

4   A.   Yes.

5   Q.   As part of that uniform you wore a jacket, correct?

6   A.   Correct.

7   Q.   And you would agree with me it wouldn't have been very

8   difficult to keep a gun beneath that jacket, correct?

9   A.   I disagree with you.

10            MR. JOSEPH:  Objection.

11            THE COURT:  Sustained.  When I sustain an objection,

12   try not to answer.  Otherwise, I don't have anything to do

13   here.

14            THE WITNESS:  Sorry.

15   Q.   Parkchester is divided into north and south quadrants,

16   correct?

17   A.   Not correct.

18   Q.   There is a south quadrant of Parkchester?

19   A.   Parkchester South Condominium is divided into three

20   sections, the north, the south, and the west.  There are three

21   sections, three quadrants.

22   Q.   And your patrol duties were limited to those three

23   quadrants, correct?

24   A.   Correct.

25   Q.   So within the south quadrant Parkchester is divided into

86HMMANT                          Manganiello - cross

1    east, west, and south, correct?

2    A.   That's correct.

3    Q.   On February 12, 2001, you were assigned to what was known

4    as the Charlie David post within the east quadrant of

5    Parkchester, correct?

6    A.   Yes.

7    Q.   And you were the only special patrol officer who was

8    assigned to that post on February 12, 2001, correct?

9    A.   No.

10   Q.   There was another officer assigned to East Charlie David?

11   A.   Yes, correct.   I was the only one.

12   Q.   And you had probably patrolled the east quadrant hundreds

13   of times while you were employed at Parkchester, correct?

14   A.   Correct.

15   Q.   Now, on February 12, 2001, you were assigned to the 8 a.m.

16   to 4 p.m. shift, correct?

17   A.   Yes.

18   Q.   And the 8 to 4 shift was your regular shift at that time,

19   correct?

20   A.   Yes.

21   Q.   And you traveled to work by car on February 12, 2001,

22   correct?

23   A.   Yes.

24   Q.   That day you received your assignment at 63 Metropolitan

25   Oval, correct?

86HMMANT                    Manganiello - cross

1    A.   Yes.

2    Q.   And 63 Metropolitan Oval was within the Parkchester

3    complex, correct?

4    A.   Correct.

5    Q.   And that's where your locker room was, correct?

6    A.   Yes.

7    Q.   And that day you received your assignment by approximately

8    8 a.m., correct?

9    A.   About five, ten minutes later.

10   Q.   So by 8:10 that morning you had received your assignment,

11   correct?

12   A.   Correct.

13   Q.   By 8:15 that morning you had started your patrol duties,

14   correct?

15   A.   I proceeded to my post, correct.

16   Q.   And you had started your patrol duties, correct?

17   A.   Yes.

18   Q.   And you were familiar with another Parkchester special

19   patrol officer by the name of Albert Acosta, correct?

20   A.   Yes.

21   Q.   In fact, sir, you had a shoving match with him that was

22   observed by other special patrol officers, correct?

23         MR. JOSEPH:   Objection.

24         THE COURT:   One of these we allowed in, not a lot of

25   them.  This is your choice.

86HMMANT                         Manganiello - cross

1              MR. ZUCKERMAN:  That's the one, your Honor.

2    A.  Not correct.

3    Q.  Not correct.

4              That never happened?

5    A.  No, sir.

6    Q.  Back to February 12, 2001, Officer Acosta was assigned to

7    what was known as the Adam Boy post within the east quadrant of

8    Parkchester, correct?

9    A.  Correct.

10   Q.  So you and Officer Acosta were the only security officers

11   assigned to the east quadrant of Parkchester on February 12,

12   2001, correct?

13   A.  Correct.

14   Q.  Just the two of you, correct?

15   A.  Correct.

16             MR. JOSEPH:  Objection.  Asked and answered.

17             THE COURT:  I'll allow it.

18   Q.  Now, Officer Acosta and yourself were not regularly

19   assigned to the same quadrant, correct?

20   A.  Not true.

21   Q.  It is true, isn't it, sir, that you did not regularly

22   patrol the same quadrant with Officer Acosta, correct?

23   A.  There were random -- they picked the post randomly and who

24   you worked with was also chosen randomly.  No one had any say

25   in the matter.

86HMMANT                         Manganiello - cross

1   Q.  So Officer Acosta was not a regular patrol partner of

2   yours, right?

3   A.  I wouldn't say that, no.

4   Q.  Well, you patrolled with Officer Acosta infrequently,

5   correct?

6   A.  I wouldn't say that, no.

7         THE COURT:  How long was it since your last tour with

8   him?

9         THE WITNESS:  We patrolled numerous times.

10        THE COURT:  Last time before this one.

11        MR. JOSEPH:  Judge, I can't hear him.  Can he speak

12  into the mic.

13        THE WITNESS:  We patrolled numerous times.  The

14  selection of the partners was all done randomly.

15        THE COURT:  How long a time was there between the time

16  of your partnership with him on the day of his murder and the

17  previous time?

18        THE WITNESS:  That I don't remember.

19  Q.  You don't remember that, sir, do you?

20  A.  I don't remember.

21  Q.  Now, the officers assigned to the same quadrant don't

22  normally do their patrol together, correct?

23  A.  Correct.

24  Q.  Except if you were doing what was known as a vertical?

25  A.  Not true.

86HMMANT                     Manganiello - cross

1  Q.  And you were allowed to patrol with your partner if you

2  were doing a vertical, correct?

3  A.  Not true.

4  Q.  And your superiors at Parkchester didn't want you to patrol

5  together with the other officer assigned to the same quadrant

6  because you could cover more ground if you were separated,

7  correct?

8  A.  Exactly.

9  Q.  On February 12, 2001, you were carrying a Parkchester radio

10  walkie-talkie, correct?

11  A.  Correct.

12  Q.  And the Parkchester radio walkie-talkie was part of your

13  standard equipment that you carried with you each day, correct?

14  A.  Correct.

15  Q.  And the Parkchester radio walkie-talkie did not allow you

16  to communicate with the NYPD or hear NYPD transmissions,

17  correct?

18  A.  Yes.

19  Q.  But the Parkchester radio walkie-talkie did allow you to

20  communicate with the Parkchester dispatcher, correct?

21  A.  Yes.

22  Q.  And the dispatcher is in the office known as central,

23  correct?

24  A.  Correct.

25  Q.  And the dispatcher generally stayed in the office while

86HMMANT                    Manganiello - cross

1  he's performing his duties, correct?

2  A.  Yes.

3  Q.  The dispatcher didn't generally patrol on foot or by

4  vehicle, correct?

5  A.  Correct.

6  Q.  And the dispatcher on February 12, 2001 was a man by the

7  name of Matias Colon, correct?

8  A.  Yes.

9  Q.  And Mr. Colon was a Parkchester special patrol officer just

10  like you, correct?

11  A.  Yes.

12  Q.  And Mr. Colon was a person who you did get along with at

13  Parkchester, correct?

14         MR. JOSEPH:  Objection.

15         THE COURT:  Sustained.  I think probably you can

16  rephrase it so it will be agreeable.

17  Q.  You did have a good working relationship with Mr. Colon

18  while you were at Parkchester, correct?

19  A.  Yes.

20  Q.  You were friendly with Mr. Colon?

21         MR. JOSEPH:  Objection.

22         THE COURT:  I'll allow it.  You can answer.

23  A.  We were coworkers.

24  Q.  Were you friendly?

25  A.  We were coworkers.

86HMMANT                        Manganiello - cross

1              MR. ZUCKERMAN:  I would ask that the witness be

2     directed to answer my question.

3              THE COURT:  Can you do a little better than coworkers?

4              THE WITNESS:  We didn't socialize.  We spoke at work.

5     That was it.  We were coworkers.

6     Q.  And you could hear transmissions on the Parkchester radio

7     walkie-talkie that you carried from other Parkchester security

8     officers, correct?

9     A.  Yes.

10    Q.  And you knew that your transmissions over the Parkchester

11    radio walkie-talkie were normally recorded, correct?

12    A.  Yes.

13    Q.  By the way, porters, such as Walter Cobb, don't have

14    Parkchester radio walkie-talkies, correct?

15    A.  I believe they are on a different frequency.

16    Q.  So the porters couldn't hear what you were saying, correct?

17    A.  I don't believe so, correct.

18    Q.  Or any other Parkchester security officer, correct?

19    A.  I believe they are on a different frequency.

20    Q.  Now, 1700 Metropolitan Avenue is part of the post known as

21    Charlie David within the east quadrant, correct?

22    A.  Yes.

23    Q.  And that was a post to which you were assigned on February

24    12, 2001, correct?

25    A.  Yes.

86HMMANT                          Manganiello - cross

1    Q.  On February 12, 2001, you knew the Parkchester complex very

2    well, didn't you?

3    A.  I knew the complex very well, yes.

4    Q.  That was because you had patrolled there for some eight and

5    a half years, correct?

6    A.  Correct.

7    Q.  And you knew the apartment building located at 1700

8    Metropolitan Avenue very well, too, correct?

9    A.  Yes.

10   Q.  Because you had patrolled and had been responsible for

11   securing 1700 Metropolitan Avenue for eight and a half years,

12   correct?

13   A.  Yes.

14   Q.  That's how you knew it well, correct?

15   A.  With all of the other buildings in the complex, yes.

16   Q.  So on February 12, 2001, having been assigned to post

17   Charlie David, you had responsibility for securing 1600

18   Metropolitan Avenue, correct?

19   A.  No.  What you're saying -- what you're implicating is I had

20   to secure that one building.  I had approximately 22 to 23

21   buildings that I was responsible for in that location, not just

22   that one building.

23   Q.  Fair enough.  But that one building was one of the

24   buildings you had responsibility to secure that day, correct?

25   A.  Correct.

86HMMANT                          Manganiello - cross

1    Q.  And 1700 Metropolitan Avenue is where Officer Acosta's

2    mortally-wounded body was found that morning, correct?

3    A.  Correct.

4    Q.  And 1700 Metropolitan Avenue is a seven-story apartment

5    building within Parkchester, correct?

6    A.  It's been a long time.  It's either a seven or eight-story

7    building.  I am not sure.

8    Q.  And there is a basement in that building, correct?

9    A.  Yes.

10   Q.  And there are two entrances from the street to 1700

11   Metropolitan Avenue, correct?

12   A.  I believe there may be three entrances.

13   Q.  There are two entrances from street level, correct?

14   A.  I mean there.  There may be three entrances all together.

15   Q.  But two of them are from street level?

16   A.  I believe all three may be from the street level.

17   Q.  And that includes a front door that leads to the lobby,

18   correct?

19   A.  Yes.

20   Q.  As well as a door that leads from the street to the

21   basement, correct?

22   A.  Yes.

23   Q.  And both of those entrance doors, the front lobby door and

24   the basement door would ordinarily be locked, correct?

25   A.  Yes.

1    Q.  And each day you worked on patrol as a Parkchester security

2    officer you would be issued a set of keys that allowed you to

3    get into buildings that you were to patrol, correct?

4    A.  Yes.

5    Q.  Now, the basement of 1700 Metropolitan Avenue, there were

6    five interior doors, correct?

7    A.  The basement -- quite honestly, I don't recall at this date

8    how many interior doors there were.

9    Q.  There was a compactor room, correct?

10   A.  Yes?

11   Q.  There was a room where there is certain telephone equipment

12   and maintenance equipment?

13   A.  Correct.

14   Q.  There were two terrace apartments, correct?

15   A.  I don't know if there were two or three.

16   Q.  Two or three apartments down there, correct?

17   A.  Okay, yes.

18   Q.  And you knew that those two terrace apartments were vacant

19   on February 12, 2001, correct?

20        MR. JOSEPH:  Objection, relevance.

21        THE COURT:  I don't know what the relevance is, but

22   I'll allow it for a minute to simply see where you're headed,

23   if anywhere.

24   Q.  And you knew those two terrace apartments were vacant on

25   February 12, 2001, correct?

86HMMANT                        Manganiello - cross

1    A.   No, I didn't know.

2    Q.   You didn't know that.

3         Do you remember being deposed in this matter, sir?

4    A.   Yes.

5    Q.   And you were asked a series of questions and you gave a

6    series of answers?

7    A.   Yes.

8    Q.   Page 115, line 2.  Let me go back.  Page 114, line 24:

9    "Q.   Can you get into the basement from inside the building, or

10   the basement you have to walk outside the building and to go a

11   different entrance?

12   "A.   Let me think -- there's."

13        Then the answer continues:  "I remember that there was

14   an entrance.  1700 connects with 1690 Metropolitan Avenue.  I

15   believe if you go into 1690, to the basement, you can walk

16   through across the basement and go into the basement of 1700.

17   Now, there is a side entrance at 1700 Metropolitan Avenue and

18   the front entrance is located on Purdy Street, and there are

19   terrace-level apartments.  I believe they were vacant at the

20   time."

21        Do you remember being asked those questions and giving

22   that testimony?

23   A.   I believe so.

24   Q.   Then there was what was known as the carriage room,

25   correct?

86HMMANT                    Manganiello - cross

1   A.   Yes.

2   Q.   And the carriage room ordinarily was to be kept locked,

3   correct?

4   A.   Correct.

5   Q.   There was a Parkchester employee that was a section

6   manager, correct?

7   A.   Parkchester --

8   Q.   Was there a section manager in Parkchester?

9   A.   Yes.   There was a section manager in east quadrant or east

10  section.

11  Q.   And he or she would have had a key to the carriage room?

12  A.   I believe so.

13  Q.   And porters would have keys to the carriage room, correct?

14  A.   Yes.

15  Q.   And Parkchester security guards such as yourself had the

16  key to the carriage room?

17           MR. JOSEPH:   Objection.   Are we going anywhere with

18  this?

19           THE COURT:   Where are you going?   We now understand --

20           MR. ZUCKERMAN:   It's evidence that connects the

21  plaintiff to the homicide.

22           MR. JOSEPH:   How?   I don't see that.

23           THE COURT:   I think you had it.   Now you've got all

24  the keys there are, so let's move along.

25  Q.   And the door to the carriage room would be kept locked; the

86HMMANT                          Manganiello - cross

1    carriage door would be kept locked ordinarily?

2    A.   They should be, yes.

3    Q.   When you started your tour of duty on February 12, 2001,

4    you were given a radio walkie-talkie and keys, correct?

5    A.   Yes.

6    Q.   And those keys gave you access to the buildings and

7    basement of the buildings in the south quadrant of Parkchester,

8    correct?

9            MR. JOSEPH:   Objection.   I think we are going over the

10   same place we were just --

11           THE COURT:   I'll allow it, but indeed I have heard it

12   before.

13   A.   Did you say south quadrant?

14   Q.   The east quadrant.

15   A.   East quadrant yes.

16   Q.   On February 12, 2001, you had the keys to all the inner

17   doors in the basement of 1700 Metropolitan Avenue, correct?

18   A.   Basement.   Most of the keys, yes.

19   Q.   Most of the keys you had?

20   A.   We don't have keys to apartments or vacant apartments.

21   Q.   But other than the vacant terrace apartments, you had keys

22   to the remainder of the doors and the basement of 1700 and

23   Metropolitan Avenue, correct?

24   A.   Yes.

25   Q.   Now, you testified that you were dispatched to an incident

86HMMANT                    Manganiello - cross

1   on the fifth floor on 1700 Metropolitan Avenue at approximately

2   8:40 a.m. that morning, correct?

3   A.   Correct.

4   Q.   And you had received a direction to report to that location

5   by virtue of your radio walkie-talkie from Sergeant Rolf Ohle,

6   correct?

7   A.   Yes.

8   Q.   And Sergeant Ohle transmitted that there was a dispute on

9   the fifth floor of 1700 Metropolitan Avenue involving knives,

10  correct?

11  A.   A dispute with knives, yes, in apartment 5E.

12  Q.   So the radio transmissions were working properly at 8:45

13  that morning, correct?

14  A.   We did -- I heard that transmission, but they were having

15  problems with radio transmission, as Sergeant Ohle testified

16  to.

17  Q.   The radio was working --

18  A.   Not just for that day.  For months we had problems with

19  transmissions.

20  Q.   That morning --

21  A.   I heard that transmission.

22  Q.   At 8:45, you heard the transmission from Sergeant Ohle,

23  correct?

24  A.   8:40, yes, sir.

25  Q.   Did NYPD police officers, as you also testified to, also

1  respond to the scene of the accident?

2  A.  Right.  When I got to the location, I saw a sector car out

3  front and I saw Sergeant Rose in apartment 5E.

4  Q.  And Sergeant Rose was the first NYPD officer who responded

5  to the scene of the incident, correct?

6  A.  Correct.

7  Q.  Then two other NYPD officers responded, correct?

8  A.  Correct.

9  Q.  And those were Officers Rodriguez and Ortiz?

10  A.  Yes.

11  Q.  And you learned their names from their nameplates on their

12  shields, correct?

13  A.  Yes.

14  Q.  And you had interacted with members of the NYPD prior to

15  February 12, 2001 in performing your duties at Parkchester,

16  correct?

17  A.  Yes.

18  Q.  From your experience as a Parkchester security officer, it

19  was standard Parkchester practice to send backup for you at an

20  incident where there are knives involved, correct?

21  A.  Not if city police is on the scene.

22  Q.  But you don't make that decision, correct?

23  A.  No.  They tell us if city police is on the scene you can

24  proceed to the call; if not, wait for supervisor or for backup.

25  Q.  You didn't make the decision that morning whether to send

86HMMANT                    Manganiello - cross

1    Parkchester backup to the fifth floor of 1700 Metropolitan

2    Avenue regarding the incident with knives, correct?

3    A.   No.  Because city police was on the scene, so I proceeded

4    upstairs.

5              MR. ZUCKERMAN:  Your Honor, I would ask that he answer

6    my question.

7              THE COURT:  Just try to answer the question.

8    A.   I didn't understand the question.  Can you please repeat

9    it.

10             THE COURT:  If you don't understand it, ask him to

11   repeat it and clarify it.

12             THE WITNESS:  Yes, sir.

13   Q.   You didn't make the decision that morning whether or not to

14   send backup to the incident involving knives at 1700

15   Metropolitan Avenue, correct?

16   A.   To send backup, no.

17   Q.   Someone else would have made that decision, correct?

18   A.   I would have made the decision if the city police wasn't

19   there, but city police was on the scene, so it didn't require

20   for a backup because they were already present.

21   Q.   Well, the dispatcher would be the person -- the dispatcher

22   in central would be the person to send backup or decide not to

23   send backup, correct?

24   A.   Not true.

25   Q.   Not true.

86HMMANT                    Manganiello - cross

1          And if backup was going to be sent that morning, the

2     backup would have been the other officer assigned to the east

3     quadrant, Officer Acosta, correct?

4     A.   As I said, if city police was not on the scene I would have

5     had requested backup, but I had my discretion because city

6     police was on the scene and there was no need for backup.

7     Q.   So you never heard over the Parkchester radio walkie-talkie

8     that Officer Acosta was dispatched to back you up in that

9     incident, correct?

10    A.   No, sir.

11    Q.   You didn't hear that, correct?

12    A.   I didn't hear that, no, sir.

13    Q.   Nor did you hear that Officer Acosta had indeed arrived at

14    1700 Metropolitan Avenue, correct?

15    A.   I didn't hear that, no.

16    Q.   You didn't hear that either, correct?

17    A.   Correct.

18    Q.   You were present at this incident for approximately 15 to

19    20 minutes, correct?

20    A.   Correct.

21    Q.   And as it turned out there were no knives, correct?

22    A.   No, there wasn't a dispute with knives.

23    Q.   So if you arrived at 8:40 a.m. to the incident that you

24    thought that there would be knives at, you had left by 9 a.m.,

25    correct?

1   A.   9, 9:10.

2   Q.   By 9:10 you had left the incident that you had been

3   dispatched to, correct?

4   A.   After we settled the tenants down, we calmed them down and

5   we referred them to tenant landlord court, we all left

6   together.

7   Q.   My question is, according to your testimony, by 9:10 a.m.,

8   you had left the scene of the accident?

9   A.   By 9:10 a.m., we left.

10  Q.   You left?

11  A.   We left together.

12  Q.   I'm asking about you, sir.  You had left, correct?

13  A.   No, I did not leave.  You're asking me if I left by myself?

14  Q.   I did not ask you that.  When you left the scene of the

15  incident, you left the scene of the incident at 9:10 a.m.,

16  correct?

17  A.   We all left, Police Officer Ortiz, Rodriguez, and myself

18  left the scene of the incident.

19  Q.   At some point after 10:15 a.m. you come running back to

20  1700 Metropolitan Avenue because you had learned that there was

21  an officer down, correct?

22  A.   I received a radio transmission, correct.

23  Q.   Now, between 9:10 a.m. and 10:15 a.m., you had transmitted

24  to --

25  A.   Repeat that question.

86HMMANT                          Manganiello - cross

1    Q.  Between 9:10 a.m. and 10:15 a.m., you transmitted by virtue

2    of your radio walkie-talkie to the central dispatcher twice,

3    correct?

4    A.  Correct.

5    Q.  Actually, sir, the first time -- actually, you telephoned

6    central that you had written a summons for an improper garbage

7    disposal by the tenant in apartment 6G in a building located at

8    14 Metropolitan Oval, correct?

9    A.  Not correct.

10   Q.  Not correct.  You didn't telephone the dispatcher?

11   A.  No.  I radioed the dispatcher.

12   Q.  You radioed the dispatcher; you didn't telephone the radio

13   dispatcher.  You're positive of that?

14   A.  Positive.

15   Q.  And this transmission which you say was by radio was placed

16   at 9:40 a.m., correct?

17   A.  No.

18   Q.  Not correct?

19   A.  No.  I arrived at 14 Metropolitan Oval at approximately

20   9:45 a.m.

21   Q.  And you did telephone central from time to time, correct?

22   A.  No.

23   Q.  Never telephoned central?

24   A.  On occasion from a landline inside the section office.

25   Q.  And Sergeant Ohle would be patrolling in the field,

1   correct?

2   A.  Correct.

3   Q.  Sergeant Ohle didn't have access to your telephone calls,

4   correct?

5           MR. JOSEPH:  Objection.  It assumes there was a

6   telephone call.

7           THE COURT:  I'll allow it.  That's his problem or

8   yours on redirect.

9   Q.  Sergeant Ohle could only hear your transmissions that you

10  made over your radio, correct?

11  A.  Correct.

12  Q.  Now, when you wrote this summons that you discussed during

13  your direct testimony, you didn't encounter anyone while you

14  wrote that summons, correct?

15  A.  Correct.

16  Q.  And you certainly didn't encounter any Parkchester security

17  personnel, correct?

18  A.  Correct.

19  Q.  Then you radioed for a personal break to the west quadrant,

20  correct?

21  A.  Correct.

22  Q.  And you were allowed --

23  A.  I'm sorry.  It was either to the west or the south where

24  the Metropolitan Oval Diner was.

25  Q.  Sir, my question was, did you radio for a personal break to

86HMMANT                    Manganiello - cross

1   the west quadrant?

2   A.  It may have been the south or the west.  I am not sure.

3              THE COURT:  How much longer do you have with this

4   witness?

5              MR. ZUCKERMAN:  About half an hour.

6   Q.  You were allowed two personal breaks a day, correct?

7   A.  Correct.

8   Q.  They were to last no more than ten minutes, correct?

9   A.  Correct.

10  Q.  You wanted this break to get some coffee, correct?

11  A.  Yes.

12  Q.  There was coffee available to you in the east quadrant,

13  correct?

14  A.  Correct.

15  Q.  So you didn't need to leave your quadrant that you were

16  assigned to to get coffee, correct?

17  A.  Not correct.  I could have coffee in the diner as opposed

18  to a bodega.

19  Q.  If you wanted coffee you could have gotten coffee within

20  the east quadrant?

21  A.  Not good-tasting coffee.

22  Q.  You could have gotten coffee within the east quadrant,

23  correct?

24  A.  Yes.

25  Q.  And not left your post?

1    A.   I'm not abandoning my post when I go for a 10-8.   I'm

2    receiving authorization from a supervisor for that ten minutes.

3    Q.   In fact, Sergeant Ohle approved your personal break,

4    correct?

5    A.   Correct.

6    Q.   And this approval came over the radio walkie-talkie,

7    correct?

8    A.   Correct.

9    Q.   So, again, the radio walkie-talkie was working when

10   Sergeant Ohle gave you permission to take this personal break,

11   correct?

12   A.   Correct.

13   Q.   On this personal break that you took to get coffee, you

14   didn't encounter anyone, did you?

15   A.   No.

16   Q.   You didn't encounter any Parkchester security personnel,

17   correct?

18   A.   Correct.

19   Q.   Just before you requested the personal break outside of the

20   quadrant to which you were assigned, you heard the dispatcher,

21   Officer Colon, try to raid radio you, correct?

22   A.   I am not sure I heard Sergeant Ohle.   After he approved the

23   break he -- after he approved my break, personal, he tried to

24   radio me.

25   Q.   So you didn't hear the dispatcher, Officer Colon, try to

86HMMANT                          Manganiello - cross

1    radio you, correct?

2    A.   Correct, I didn't hear him.

3    Q.   You didn't hear that, correct?

4    A.   Correct.

5    Q.   And because you didn't hear him you didn't radio back that

6    you couldn't hear his transmissions, correct?

7              MR. JOSEPH:   Objection.

8    Q.   You never radioed to Officer Colon, the dispatcher, that

9    you couldn't hear his transmissions at or about 10:15 a.m. that

10   morning, correct?

11   A.   I couldn't call in what I couldn't hear.

12   Q.   I'm sorry?

13   A.   I couldn't call in what I didn't hear.

14   Q.   My question to you is, you didn't send any transmissions to

15   Officer Colon in central that you couldn't hear his

16   transmissions, correct?

17             MR. JOSEPH:   Objection.   At what point?

18   Q.   At 10:15 a.m. that morning, correct?

19             MR. JOSEPH:   I have an objection at this point.   This

20   assumes this is before Sergeant Ohle gave him permission for

21   the break.   That's my objection.

22             THE COURT:   Overruled.

23   A.   Okay.   I reached dispatcher Colon when I gave my

24   disposition of 14 Metropolitan Oval, and he gave me -- he

25   assigned me a job number, I believe.

1    Q.  Sir, if you would answer my question.  My question is, did

2    you transmit at or about 10:15 a.m. that morning that you

3    couldn't hear the dispatcher, Officer Colon's transmissions?

4    It's a simple yes or no question.

5    A.  It's not.  You're assuming that I had never contacted

6    Officer Colon.  I gave him a disposition at 14 Metropolitan

7    Oval that I wrote an in-house summons and I requested a job

8    number for it, so that part I got through.  If he had called me

9    back, I don't know.  I didn't hear it.

10   Q.  Once you heard Sergeant Ohle's transmission over the radio,

11   you ran as fast as you could to 1700 Metropolitan Avenue,

12   correct?

13   A.  Yes, I did.  And I asked, I said 10-5 --

14          MR. ZUCKERMAN:  Your Honor, it's a yes or no question.

15          THE COURT:  See if you can't answer yes or no.

16   A.  Yes.  I ran as fast as I could.

17   Q.  And you got there within five minutes, correct?

18   A.  Correct.

19   Q.  And when you got there it was a chaotic situation, correct?

20   A.  Yes.

21   Q.  And you did see Officer Nieves just outside the basement

22   door, correct?

23   A.  I don't remember if I saw her there.

24   Q.  Again, you remember being deposed in this matter, correct?

25   A.  Yes.

86HMMANT                    Manganiello - cross

1    Q.  Page 144, line 15.  Withdrawn.

2         You knew Officer Nieves because at one time she had

3    been a Parkchester security officer, correct?

4    A.  Yes.

5    Q.  Although she left Parkchester before you started to work

6    there, correct?

7    A.  I am not sure the exact date, but she left shortly

8    afterwards, yes.

9         THE COURT:  Shortly after you came?

10        THE WITNESS:  Yes, sir.

11   Q.  And when you arrived at the scene it was chaotic, correct?

12   A.  Correct.

13   Q.  And you wanted to get into the basement of 1700

14   Metropolitan Avenue, correct?

15   A.  Yes.

16   Q.  To see your partner, correct?

17   A.  I knew they gave the designation East Adam Boy down, and

18   that would have meant Acosta.

19   Q.  You wanted to get into the basement of 1700 Metropolitan

20   Avenue to see your partner, correct?

21        MR. JOSEPH:  Objection.

22        THE COURT:  Overruled.

23   A.  I wanted to get in to see what was going on.

24   Q.  And you kept saying, that's my partner, that's my partner,

25   correct?

86HMMANT                      Manganiello - cross

1    A.   False.

2    Q.   Now, you were able to get into the basement, correct?

3    A.   Correct.

4    Q.   And you ran into the carriage room where Officer Acosta was

5    lying, correct?

6    A.   Yes.

7    Q.   When you got into the basement you said, Al, hang in there,

8    hang in there, correct?

9    A.   Yes.

10   Q.   And you started to yell over the radio for an ambulance,

11   correct?

12   A.   Yes.

13   Q.   And you couldn't believe what you were looking at, correct?

14   A.   Yes.  I was frustrated that an ambulance hadn't arrived on

15   the scene yet.

16   Q.   And you wanted Officer Acosta's body out of that room where

17   the police officers were, correct?

18           MR. JOSEPH:   Objection to form.

19           THE COURT:   Sustained.

20   Q.   Then you leaned against the wall outside of the corridor of

21   the basement and bent over because you were out of breath from

22   running and seeing what you saw, correct?

23   A.   I was dizzy, so I leaned momentarily against the wall in

24   the carriage room.  Then I also leaned outside the wall in the

25   corridor.  I leaned up against the wall in the corridor.

86HMMANT                    Manganiello - cross

1    Q.  Now, you read through Walter Cobb's grand jury testimony,

2    correct?

3    A.  Yes.

4    Q.  And you're aware that Walter Cobb was a porter at

5    Parkchester, correct?

6    A.  Yes.

7    Q.  So you knew him, correct?

8    A.  I knew him as a porter, yes.

9    Q.  You knew who he was before February 12, 2001?

10   A.  Yes.

11   Q.  And you're aware that Walter Cobb testified that in the

12   vicinity of 10 a.m. that he saw you leaving the basement door

13   of 1700 Metropolitan Avenue, correct?

14              MR. JOSEPH:  Objection.

15              THE COURT:  If that's his recollection.  Otherwise,

16   you can refresh his recollection if he chooses.

17   A.  Yes.

18   Q.  But it's your testimony that you had never saw Walter Cobb

19   that morning, correct?

20   A.  I never saw Walter Cobb that day.

21   Q.  After leaving the basement area you agreed to go with the

22   police to the 43rd Precinct station house, correct?

23   A.  Yes.

24   Q.  And you had been there before on another matter, correct?

25   A.  Different Parkchester related matters, correct.

86HMMANT                    Manganiello - cross

1   Q.  When you went to the 43rd Precinct on February 12, 2001,

2   you were not under arrest, correct?

3   A.  Well, there was some something strange that took place

4   before I got in.  I was patted down.  So quite honestly, I

5   didn't know what was going on.

6   Q.  You weren't under arrest, correct?

7           MR. JOSEPH:  Objection.

8           THE COURT:  He said he didn't know what was going on.

9   I guess he didn't know if he was under arrest because he had

10  been patted down.

11  Q.  And you were interviewed by Detective Agostini and Abate at

12  the 43rd Precinct station house, correct?

13  A.  Correct.

14  Q.  So you did know who Detective Abate was when you were

15  arrested two months later, correct?

16  A.  Not at first, no.

17          THE COURT:  43rd Precinct encompass all of this

18  project, development?

19          THE WITNESS:  Yes.

20  Q.  Now, when you were taken to the 43rd Precinct you weren't

21  handcuffed, were you?

22  A.  No.

23  Q.  When you got there, actually, you were interviewed in the

24  lunchroom of the 43rd Precinct, correct?

25  A.  I thought it was an interrogation room or interview room.

86HMMANT                    Manganiello - cross

1   I didn't know it was a lunch room.

2   Q.  And you were not handcuffed while you were interviewed,

3   correct?

4   A.  Correct.

5   Q.  And there came a time that the New York City emergency

6   services unit came in response to your request for medical

7   attention, correct?

8   A.  Yes.

9   Q.  And they examined you, correct?

10  A.  Yes.

11  Q.  And then they left, correct?

12  A.  They left, yes.

13  Q.  And at some point when you were interviewed by the

14  detectives you said you wanted to go to the hospital where

15  Officer Acosta was so you could just hold his hand or

16  something, correct?

17          MR. JOSEPH:  Objection.

18          THE COURT:  Overruled.

19  A.  Yes.

20  Q.  When you were interviewed by Detective Agostini and Abate

21  you had a Band-Aid on one of your fingers, correct?

22  A.  Yes.

23  Q.  And you told them that the Band-Aid was necessary for an

24  injury suffered moving a treadmill that morning in your

25  residence, correct?

86HMMANT                    Manganiello - cross

1   A.  Yes.

2   Q.  Even though you didn't run on a treadmill that day,

3   correct?

4           THE COURT:  Please, Mr. Zuckerman.  We don't care if

5   he ran on the treadmill that morning or not.

6   Q.  Sir, you knew that Terrence Alston lived in Parkchester,

7   correct?

8   A.  No.

9   Q.  You didn't know that?

10  A.  No.

11  Q.  There was a pizza parlor at 1665 Metropolitan Avenue that

12  you ate at from time to time, correct?

13  A.  That -- I'm sorry?

14  Q.  There was a pizza parlor at 1665 Metropolitan Avenue that

15  you ate at from time to time, correct?

16  A.  Yes.

17  Q.  While you worked at Parkchester you ate there approximately

18  two case a week, correct?

19  A.  Once or two days a week.

20  Q.  And the pizza parlor is part of Parkchester condominiums,

21  correct?

22  A.  Yes.

23  Q.  When you would go there you would go with other Parkchester

24  security officers, correct?

25  A.  If they had the same meal period I did we would go

86HMMANT                    Manganiello - cross

1    together.

2    Q.  And you knew the owner of that pizza parlor as Chris,

3    correct, his name was Chris?

4    A.  I knew the owner.  I didn't know him by name.

5    Q.  You did know the owner, correct?

6    A.  I knew the person who served the pizza.

7    Q.  And you mentioned that there were certain certifications

8    you lost, correct?

9    A.  Correct.

10   Q.  You can regain those certifications, correct?

11   A.  Not the police certification, no.

12   Q.  Not the police certification.

13        How about the security guard certification?

14   A.  I am not sure I can regain that.

15   Q.  Have you made any efforts to regain your certification as a

16   security officer?

17   A.  Made one attempt after the completion of my trial, and I

18   received no response from them.

19   Q.  And you didn't do anything to follow up on that, correct?

20   A.  No, sir.

21   Q.  And you haven't applied for any positions, any employment

22   positions over the last two years, correct?

23   A.  The last two years, no, sir.

24   Q.  Not one position, correct?

25   A.  Correct.

86HMMANT                          Manganiello - cross

1   Q.   And you said you were seeing Dr. Latif, correct?

2   A.   Correct.

3   Q.   And you missed many appointments with Dr. Latif, correct?

4   A.   I missed a few because of injuries that I had.

5   Q.   You missed appointments?

6   A.   Either, like I said, I have a broken elbow right now or if

7   I had the flu, I would miss the appointments.

8   Q.   You have seen her rather infrequently over the last two

9   years, correct?

10  A.   She told me she kept me on maintenance schedule, she told

11  me.

12  Q.   You've seen her rather infrequently over the last two

13  years, correct?

14            MR. JOSEPH:   Objection.

15            THE COURT:   Sustained.  I don't know what that means.

16            MR. ZUCKERMAN:   Nothing further, your Honor.

17            THE COURT:   Any brief redirect?

18            MR. JOSEPH:   Very brief, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. JOSEPH:

21  Q.   Sir, after you were charged with the murder, did you turn

22  in all of the guns that were registered to you?

23  A.   Yes.

24  Q.   And who did you turn them into?

25  A.   I turned all into Westchester County Police Department.

86HMMANT                    A. Manganiello - redirect

1   Q.  While you were with Pawling and the state parks, were you

2   required to carry a firearm?

3   A.  Yes.

4   Q.  Part of your employment?

5   A.  Yes.

6   Q.  Sir, you were asked some questions about the doors in

7   Parkchester basements.  Are they ever left ajar?

8   A.  Yes, they are.

9   Q.  How frequently?

10  A.  When I --

11          MR. ZUCKERMAN:  Objection, your Honor.

12          THE COURT:  If he says how frequently as opposed to

13  giving us the right answer, assuming it has any relevance

14  whatsoever.

15  A.  Most of the time the parties would leave them ajar so they

16  could go in and out with the trash.  I keep telling them, you

17  got to keep them closed so vagrants and other people don't get

18  into the building.

19  Q.  During your patrols, did you ever find vagrants in the

20  basements of the buildings?

21  A.  Many times.

22  Q.  Would that include the various rooms inside the basements?

23  A.  Yes.

24  Q.  By the way, did Mr. Acosta have a key to the basement to

25  1700 Metropolitan Avenue?

1    A.   Yes.

2    Q.   Did he have a key to all the inner rooms?

3    A.   We all had the same keys.

4    Q.   Did all the tenants that lived in the building, did they

5    all have access to 1700 Metropolitan Avenue?

6    A.   Yes.

7    Q.   Approximately how many apartments were on a floor in 1700

8    Metropolitan Avenue?

9    A.   I believe there may have been six apartments per floor.

10   Q.   Approximately seven to eight stories high?

11   A.   Seven or eight-floor building.

12   Q.   Sir, after the summons you wrote out and the letter in the

13   envelope, after the defendants took it, Mr. Agostini took it

14   from you, did you ever see it again?

15   A.   No.

16   Q.   Why were you moving the treadmill on the morning of

17   February 12, 2001?

18   A.   I was moving the treadmill -- I have a small studio

19   apartment and I exercised on it the night before and I didn't

20   raise it, so I went to go raise it.  That's when I hurt myself.

21          MR. JOSEPH:  Nothing further.

22          MR. ZUCKERMAN:  One question.

23          THE COURT:  Shoot.

24   RECROSS EXAMINATION

25   BY MR. ZUCKERMAN:

86HMMANT                    A. Manganiello - recross

1    Q.  You said, sir, in your direct testimony that you didn't

2    recognize the officers who arrested you in April of 2001,

3    correct?

4            MR. JOSEPH:  Objection.  Outside the scope of my

5    redirect.

6            THE COURT:  Absolutely.  Sustained.

7            You're excused.  Thank you.

8            (Witness excused)

9            THE COURT:  What's next?

10           MR. JOSEPH:  We would call Police Officer Eric

11   Rodriguez.

12           THE COURT:  One of the reasons that recross and

13   redirect is fairly brief is because each succeeding examination

14   has to be within the scope of the previous exam.  You can't ask

15   new questions that haven't been brought up, which is what Mr.

16   Zuckerman's effort was.

17    ERIC RODRIGUEZ,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. JOSEPH:

22   Q.  Sir, on February 12, 2001, were you employed as a police

23   officer?

24   A.  Yes, sir.

25   Q.  And to what precinct, if any, were you assigned?

86HMMANT                        Rodriguez - direct

1   A.  At that time, to the 43rd Precinct in the Bronx.

2   Q.  And on February 12, 2001, did you respond to a call at 1700

3   Metropolitan Avenue, apartment 5E?

4   A.  I don't remember.

5           MR. JOSEPH:  Your Honor, I'd like to show the witness

6   Exhibit 34 to refresh his recollection.

7           THE COURT:  You can try.

8   Q.  Sir, I am going to show you what's been marked as trial

9   Exhibit 34 and I am going to ask you if this refreshes your

10  recollection?

11  A.  That's a copy of my memo book entry.

12          THE COURT:  All he's asking you is whether it

13  refreshes your recollection.

14          THE WITNESS:  No.

15  Q.  As you sit here right now do you have any recollection of

16  the events on February 12, 2001?

17  A.  No.

18  Q.  Sir, did you create Exhibit 34?

19  A.  Yes.

20  Q.  And did you create Exhibit 34 on February 12, 2001?

21  A.  Yes.

22  Q.  And did you write down the events at a point in time on

23  February 12, 2001 while they were still fresh in your mind?

24  A.  Yes.

25  Q.  And did you write down the events in your memo book on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86HMMANT                        Rodriguez - direct

1  February 12, 2001 about the same time they occurred or shortly

2  thereafter?

3  A.  Yes.

4           MR. JOSEPH:  Your Honor, I would offer Exhibit 34 as a

5  recorded recollection.

6           THE COURT:  Let me see it.  Do you have any objection,

7  Mr. Zuckerman?

8           MS. OKEREKE:  No objection, your Honor.

9           THE COURT:  I hope it helps you.  As long as there is

10  no objection to 35, it will be admitted without objection.

11           MR. JOSEPH:  34, Judge.

12           THE COURT:  34.  Sorry.

13           (Plaintiff's Exhibit 34 received in evidence)

14  Q.  Sir, Exhibit 34, can you read your own handwriting?

15  A.  Yes.

16  Q.  Does it reflect that you arrived at a call at 1700

17  Metropolitan Avenue, apartment 5E?

18           MS. OKEREKE:  Objection, your Honor.  It's a leading

19  question.

20           THE COURT:  Why don't you read it.

21  Q.  Read for us what, if anything, did your memo book say

22  concerning a call at 1700 Metropolitan Avenue?

23           THE WITNESS:  Read it?

24           THE COURT:  Yeah, sure.

25  A.  8:35, we responded to a 52 at 1700 Metropolitan Avenue,

86HMMANT                          Rodriguez - direct

1    apartment 5E, as in Eddie.

2    Q.   What's a 52?

3    A.   It's a dispute.

4    Q.   What time did you leave the dispute?

5    A.   9:04 in the morning.

6    Q.   What?

7    A.   9:04.

8    Q.   9:04?

9    A.   Yes.

10   Q.   Do you have any other notes concerning that call?

11   A.   That call, no.

12          MR. JOSEPH:   Nothing further, your Honor.

13          THE COURT:   Anything from the defense?

14          MS. OKEREKE:   No, your Honor.

15          THE COURT:   You're excused.   Thank you very much.

16          (Witness excused)

17          THE COURT:   What's next?

18          MR. JOSEPH:   Judge, I think our next witness will be

19   somewhat lengthy.   I don't know if you want to start now.

20          THE COURT:   I have half an hour before I can do

21   anything else, so I'm glad to, and we coerced the jury by

22   giving them a half a day off tomorrow.

23          MR. JOSEPH:   Very good, Judge.   At this point we would

24   call Luis Agostini to the stand.

25    LUIS AGOSTINI,

86HMMANT                          Rodriguez - direct

1              called as a witness by the Plaintiff,

2              having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. JOSEPH:

5    Q.  Sir, on February 12, 2001, were you employed by the New

6    York City Police Department?

7    A.  Yes.

8    Q.  At the time were you a detective assigned to the 43rd

9    Precinct?

10   A.  Yes.

11   Q.  And on February 12, 2001, did you become involved in the

12   investigation into the homicide of Albert Acosta?

13   A.  Yes.

14   Q.  While so doing, did you do that in your capacity as a New

15   York City detective of the police department?

16   A.  Yes.

17   Q.  On that date were you partnered up with Shawn Abate?

18          MS. OKEREKE:  Objection, your Honor.  These are

19   leading questions.

20          MR. JOSEPH:  Judge, this is an adverse party.

21          THE COURT:  I hope we get more leading questions so we

22   can get to the substance, if there is any.  Overruled.

23   A.  I was partnered with my partner, which was Detective

24   Ramirez.  Later on I helped Shawn Abate in the investigation.

25   Q.  On February 12, 2001, who was initially in charge of the

86HMMANT                          Agostini - direct

1   investigation?

2   A.   Detective Abate.

3   Q.   Sir, did you respond to a radio transmission at 1700

4   Metropolitan Avenue?

5   A.   Yes.

6   Q.   Sir, between the hours of 10:20 and 10:24 a.m., was there a

7   radio transmission that identified the victim as a Parkchester

8   security officer?

9   A.   I don't know the times that it came up, the transmission.

10  Q.   Sir, prior to your arriving on the scene, was there a radio

11  transmission that identified the victim as a Parkchester

12  security officer?

13  A.   The only thing I remember --

14          MS. OKEREKE:   Objection, your Honor.  I have to object

15  to the leading form of the questions.

16          THE COURT:   He really is not Mr. Joseph's favorite

17  friend, so indeed there is a little more scope with respect to

18  leading than there might be if he was, for instance, his

19  client, so I'm overruling the objection.

20  A.   Yes.   The only thing I remember was that it's supposed to

21  be someone in uniform down.

22  Q.   Sir, do you have any recollection, as you sit here right

23  now, as to whether there was a call identifying the victim as a

24  Parkchester security officer?

25  A.   No, I do not recollect.

1          MR. JOSEPH:  Your Honor, at this point, I would offer

2     Exhibit 11 into evidence.

3          THE COURT:  I allow this over the objection of the

4     defendants, which is a relevance objection, amongst other

5     things, so I should hope there is some relevance to your

6     inquiry.

7          (Plaintiff's Exhibit 11 received in evidence)

8     Q.  Sir, I am going to show you what's been marked as Exhibit

9     No. 11.  And does Exhibit No. 11 refresh your recollection as

10    to whether there was in fact a call that came over the NYPD

11    radio identifying the victim as a Parkchester security officer?

12         THE COURT:  Mr. Agostini, it really doesn't matter if

13    it's read there.  The concept behind refreshing his

14    recollection is whether or not it turns on a little light in

15    your head so that you remember it independently.

16         THE WITNESS:  No, I do not.  I do not remember

17    independently.

18    Q.  Sir, by looking at Exhibit No. 11, do you agree there was a

19    transmission over the NYPD system stating that a Parkchester

20    security guard had been shot?

21    A.  Well, it says, a security guard shot.  It doesn't say

22    Parkchester.

23         MS. OKEREKE:  Objection.

24         THE COURT:  If you see your lawyer getting up, then,

25    so I earn my keep, you got to wait until I rule on the

86HMMANT                      Agostini - direct

1    objection.  Anyway, it's too late now, but go ahead, Mr.

2    Joseph.

3    Q.  Sir, was there a radio transmission that said security

4    officer was shot?

5              THE COURT:  That you recall.

6              MS. OKEREKE:  Objection, your Honor.

7    A.  By memory, no.

8              THE COURT:  You want to show him something, or does he

9    have it in front of him.

10   Q.  Sir, could you read what Exhibit 11 says?

11             THE COURT:  It's only coming in for refreshing his

12   recollection.  You can use a milking stool to refresh

13   recollection.  It doesn't come into evidence.

14             MR. JOSEPH:  Very well, your Honor.

15   Q.  Sir, on February 12, 2001, did you have a Parkchester radio

16   that you could hear the transmissions from Parkchester security

17   officers?

18   A.  No, sir.

19   Q.  I'm sorry?

20   A.  No, sir.

21             THE COURT:  That doesn't mean, Mr. Joseph, that you

22   can't authenticate it through Nieves or Perez, but I don't

23   think with him you can authenticate it.

24   Q.  Sir, did you give testimony under oath at a deposition?

25   A.  Yes.

86HMMANT                          Agostini - direct

1   Q.  And were you asked these questions and did you give this

2   answer, page 30?

3           THE COURT:  I hope you would give us the page, not

4   that I have it.

5           MR. JOSEPH:  I have a copy for your Honor.

6           THE COURT:  That's all right.  I will take your word

7   for it, and we have Mr. Zuckerman watching over your shoulder.

8   Q.  Page 30, line 5:

9   "Q.  By the way, sir, do you have any access to the radio

10  transmissions from the Parkchester security?

11  "A.  Yes."

12          MS. OKEREKE:  Objection, your Honor.  Mr. Joseph is

13  reading testimony and there has been no impeachment here.

14          MR. JOSEPH:  He just said no.

15          THE COURT:  I don't have a problem with what he's

16  doing and I consider, as I already told you, that maybe he's

17  leading but perhaps this fellow is hostile and I'll allow it.

18  I don't know how to make it clear, but I'll do it again.

19          MS. OKEREKE:  That is clear, your Honor.  I believe,

20  Mr. Joseph is mischaracterizing what Mr. Agostini just said.

21  He said he did not know or have a Parkchester radio, not that

22  he did not have access to it, which is what Mr. Joseph asked.

23          THE COURT:  Let's clarify it so we all know.

24  Q.  On the morning of February 12, 2001, did you have access to

25  a Parkchester radio?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86HMMANT                          Agostini - direct

1    A.   No.

2    Q.   No access whatsoever?

3    A.   I never -- I don't think I never had a radio of

4    Parkchester.

5    Q.   And you had no access to the radio transmissions from

6    Parkchester, correct?

7    A.   For that date, no.

8    Q.   And sir, let me ask you, on page 30 of your deposition,

9    line 5, were you asked this question and did you give this

10   answer:

11   "Q.   By the way, sir, do you have any access to the radio

12   transmissions from the Parkchester security?

13   "A.   Yes."

14   A.   What I was thinking that you were telling me is, like this

15   radio call here, do I have access to what they say as maybe to

16   this in paper, but I never -- I never had a Parkchester radio.

17   Q.   Sir, did you give -- were you asked that question and did

18   you give that answer?

19   A.   Yes, I did.

20   Q.   Sir, is it true that the first calls that came into the

21   NYPD identified the victim as a Parkchester security guard?

22   A.   In NYPD, no.

23   Q.   The NYPD?

24   A.   Sir, the only thing I remember was that it was a person in

25   uniform down.

86HMMANT                    Agostini - direct

1        THE COURT:  You mean it could have been another
2    policeman?
3        THE WITNESS:  It could have been a policeman, it could
4    be a security guard, it could be anybody in uniform.  It could
5    be a porter, I guess.
6    Q.  Sir, did you speak with Miriam Nieves on February 12, 2001?
7    A.  I don't remember the date.  You have to show me something.
8    I know I spoke to her, but I don't know what date it was.
9    Q.  On the same date the homicide occurred, did you speak with
10   Miriam Nieves that afternoon, at 1640 p.m.?
11   A.  I am not sure, sir.
12   Q.  Did you speak with any of the police officers from the
13   scene, who were present at the scene on February 12, 2001, on
14   February 12, 2001?
15   A.  Yes.
16   Q.  And did you take handwritten notes of what they said?
17   A.  No, sir.  I don't have to.
18   Q.  You didn't take handwritten notes --
19   A.  No, sir.  I don't have to take handwritten notes from
20   detectives when they could do the report themselves.
21   Q.  Sir, let me show you what's been marked as Exhibit 39.  Did
22   you create this document?
23        THE COURT:  39 is in without objection.
24        MR. JOSEPH:  Correct, your Honor.
25        (Plaintiff's Exhibit 39 received in evidence)

86HMMANT                    Agostini - direct

1   A.  Yes.

2   Q.  And this is a statement by Miriam Nieves, correct?

3   A.  Yes.

4   Q.  And the statement says that Ms. Nieves had a conversation

5   with Anthony Manganiello on February 12, 2001, right?

6   A.  Yes.

7   Q.  And it says that Mr. Manganiello said to her, as he was

8   entering the basement, that's my partner in there, right?

9   A.  Yes.

10  Q.  And Exhibit 39 questions how he could know this because

11  there was no transmission, right?

12  A.  It doesn't say about transmission.  It just says he never

13  entered the room.

14  Q.  Is there an indication on Exhibit 39 that Mr. Manganiello

15  never entered the room where Mr. Acosta was found?

16  A.  It states here when he said that, that's my partner, that's

17  my partner, that he hasn't entered the room yet.

18  Q.  Sir, Ms. Nieves didn't tell you that on February 12, 2001,

19  did she?

20  A.  I don't think I spoke to her.  I don't believe I spoke to

21  her on February 12.

22  Q.  Sir, you had possession of the case file from February 12,

23  2001 on you, correct?

24  A.  Starting with the case, the case was Detective Abate's case

25  on February 12.  It became my case later on that night.

86HMMANT                          Agostini - direct

1   Q.  On the evening of February 12, 2001, you took possession of

2   the homicide case folder, correct?

3   A.  Yes, that's correct.

4        THE COURT:  How does that happen?  How does it get

5   changed like that?

6        THE WITNESS:  Well, sir, when it came over it was

7   uniform, somebody in uniform down.  And when a person is shot,

8   we have a list in the detective squad where a detective is

9   up -- he's going to catch the next case we are shooting and

10  then there is another list where it's a homicide.  At this

11  point the victim wasn't dead.  He didn't die until later on

12  that night.  So when it became a homicide then it became my

13  case.

14  Q.  Sir, on the evening of February 12, 2001, you took

15  possession of this case folder, correct?

16  A.  Yes.

17  Q.  On February 12, 2001, there wasn't a single piece of paper

18  in that case file in which Ms. Nieves said that attributed a

19  statement to Anthony Manganiello, correct?

20        MS. OKEREKE:  Objection, your Honor.

21        THE COURT:  You can go through it.  If he has it all,

22  he can tell us.  Whether there is or there isn't, I don't find

23  anything wrong with that.  He was there.  He knows what the

24  case file has.  If he doesn't know if the case file had it, he

25  can say so.

1              THE WITNESS:  Sir, what happens with the case folder.

2    everyone who does work, detectives who does work on the case,

3    they give you what they call DD5s, what you put the information

4    in.  They could give you the DD5 that day or they could give

5    you the DD5 the next day.  I couldn't tell you whether that was

6    there that day or the next day.

7    Q.  Sir, your DD5, Exhibit 39, is dated March 1, 2001, correct?

8    A.  That's correct.

9    Q.  And there is not a single DD5 that was ever created prior

10   to March 1, 2001 that in any way attributes this statement

11   Ms. Nieves heard to Anthony Manganiello, is there?

12             MS. OKEREKE:  Objection, your Honor.

13             THE COURT:  Overruled.

14   A.  Sir, I don't know if she told someone else --

15             THE COURT:  Can't you give us a yes or no answer.

16   A.  Say it again.  I'm sorry.

17   Q.  Prior to March 1, 2001, was there ever a DD5 that

18   identified that Ms. Nieves heard this statement from Anthony

19   Manganiello?

20   A.  No.

21   Q.  And the first time this statement comes about is two and a

22   half weeks after Ms. Nieves speaks with you, correct?

23   A.  That's correct.

24   Q.  Sir, on February 12, 2001, did you respond to the scene of

25   1700 Metropolitan Avenue?

86HMMANT                     Agostini - direct

1    A.  Yes, I did.

2    Q.  And at the point in time when you did, were there any

3    suspects?

4    A.  No.

5    Q.  And within a few minutes of arriving at the scene, did you

6    go to the hospital?

7    A.  Yes.

8    Q.  And after you returned to the scene from the hospital, was

9    Anthony -- strike that.

10            After the hospital did you return to the scene?

11   A.  Yes.

12   Q.  When I say scene, I mean 1700 Metropolitan Avenue, right?

13   A.  That's correct, yes.

14   Q.  And at the time you came back to the scene was Anthony

15   Manganiello a suspect?

16   A.  No.

17   Q.  Sir, did you go to apartment 5E at 1700 Metropolitan

18   Avenue?

19   A.  Yes.

20   Q.  And did you go there to verify that plaintiff was at a

21   call?

22   A.  No, sir.

23   Q.  Sir, you testified at trial, right?

24   A.  Yes.

25   Q.  At the trial of Mr. Manganiello you raised your hand, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86HMMANT                          Agostini - direct

1   swore to tell the truth?

2   A.  Yes.

3   Q.  Sir, at the time -- on page 269 of the trial transcript --

4          MR. JOSEPH:  Your Honor, I have a copy for your Honor

5   if you'd like.

6          THE COURT:  I have one or I have enough.

7   Q.  Sir, beginning at line 23 --

8          MR. ZUCKERMAN:  Your Honor, one second, please.

9          MR. JOSEPH:  Sure.

10         THE COURT:  I guess I only have the hearing that we

11  talked about.  If you have an easily accessible copy, I'll be

12  happy to follow along.  Go ahead.  What page --

13         MR. JOSEPH:  On page 269 at line 23.

14         THE COURT:  Okay.

15  Q.  "QUESTION:  Now, Detective Agostini, did you go to

16  apartment 5E of 1700 Metropolitan Avenue that day to verify

17  that Officer Manganiello had responded to a call there at 8:30

18  that morning, yes or no?

19  "A.  Yes."

20  A.  Yes.

21  Q.  Did you give that testimony?

22  A.  Yes, I did, but it wasn't -- if I could clear this out, it

23  wasn't like his name.  I went there to see if Parkchester --

24  because it was Parkchester.  Parkchester responded to a call at

25  5E.  That's why I went there.  I didn't even know who Anthony

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86HMMANT                         Agostini - direct

1    Manganiello was when I responded to 5E.

2    Q.   Sir, were you asked if you went there specifically to

3    verify whether Mr. Manganiello was there and did you say yes?

4    A.   I meant Parkchester, Parkchester security.

5    Q.   Are you sure about that, sir?

6    A.   Yes.

7    Q.   Sir, let me ask you, a couple of pages later, on 290, did

8    you also testify, beginning at page 16:

9            "And you went to apartment 5E, it was to verify the

10   fact that Mr. Manganiello was indeed there at 8:30 when he was

11   assigned to go there.

12           "It was verified now.  It was verified at the time.

13   "Q.  Well, you went there for that purpose, right?

14   "A.  I went there because my supervisor told me to go there.

15   There was a call earlier that morning that the New York City

16   Police Department and Parkchester also went."

17   A.   Yes, sir.  I gave that testimony only because at trial I

18   knew it was Anthony Manganiello who responded to that job, but

19   at the day that I went I didn't know Anthony Manganiello.  I

20   just went there to verify if a Parkchester security person went

21   to that job.  The only reason I said his name and I said yes is

22   because I already knew who responded to the job.

23   Q.   Sir, when you went to that apartment you interviewed the

24   tenants, correct?

25   A.   Yes.

86HMMANT                        Agostini - direct

1    Q.  And you took handwritten notes, correct?

2    A.  Yes.

3    Q.  And what did you do with those handwritten notes?

4    A.  I have like a little spiral notebook, I keep it with me.

5    Q.  What happened to that spiral notebook, sir?

6    A.  It was lost.

7    Q.  Lost?

8    A.  Yes.

9    Q.  Sir, did you put the spiral notebook into the homicide case

10   file?

11   A.  It was a box, yes.

12   Q.  And, sir, the tenants at apartment 5E would be able to

13   verify who was there at the call, correct?

14   A.  I don't understand that.

15   Q.  Were the tenants able to say how many police officers

16   responded on February 12, 2001?

17   A.  I am not sure.  I can't recall.

18   Q.  Sir, did the tenants happen to mention or identify or

19   describe a Parkchester security officer who responded to that

20   call?

21              MS. OKEREKE:  Objection, your Honor.

22              THE COURT:  I am not sure I get it, but I'll allow it.

23   You can answer the question.

24   A.  You have to show me something.  I can't remember whether

25   they said a Parkchester security person was there.

86HMMANT                           Agostini - direct

1   Q.  Sir, whatever information they would have given you, you

2   would have written it down in that spiral notebook, correct?

3   A.  Correct.

4   Q.  And that spiral notebook went missing, correct?

5   A.  Correct.

6   Q.  And it went missing when Mr. Manganiello's criminal defense

7   lawyers asked for it, correct?

8   A.  When his criminal lawyers asked for it, no.  When ADA

9   Scaccia asked me about the case, I was looking for the case and

10  it was gone.

11  Q.  And Ms. Scaccia asked you for the case so she could provide

12  copies to Mr. Manganiello's criminal defense lawyer, correct?

13          MS. OKEREKE:  Objection, your Honor.

14          THE COURT:  He may not know that.  Sustained.  She

15  asked, and he didn't have it.

16  Q.  Sir, those handwritten notes from apartment 5E, they never

17  made it to the district attorney, did they?

18  A.  My whole case folder, the whole box, made it to the

19  district attorney's office.

20  Q.  You're sure about that?

21  A.  Yes.

22  Q.  It's your sworn testimony here that you provided those

23  spiral notebooks to the district attorney's office?

24          MS. OKEREKE:  Objection, your Honor.  I would like to

25  know which sworn testimony the plaintiff is referring to.

86HMMANT                          Agostini - direct

1          MR. JOSEPH:  The one he just gave.

2          THE COURT:  The testimony at the trial I assume he's

3     talking about.

4          MR. JOSEPH:  I'm talking about the testimony he gave

5     five seconds ago here.

6          THE COURT:  This trial?

7          MR. JOSEPH:  Yes.

8     Q.  Sir, on June 18, 2004, did you testify at a pretrial

9     hearing?

10    A.  I don't remember the date.

11    Q.  Did you testify at a pretrial hearing in the Bronx Supreme

12    Court before Judge Marcus?

13    A.  I don't remember the judge.

14    Q.  Do you have a recollection of giving testimony?

15    A.  Yes.

16         THE COURT:  This is a time four years ago?

17         MR. JOSEPH:  Yes, sir.

18    Q.  Were you asked this question and did you give this answer

19    on page 24, beginning On line 2:

20    "Q.  Do you recall whether you ever turned over any handwritten

21    notes from your spiral to the district attorney's office?

22    "A.  I don't think so."

23    A.  Well, sir, my spiral notebook, every evidence that I

24    gathered on that case, including the spiral notebook, okay,

25    it's with the box.  Everything is kept together.  That way, one

86HMMANT                          Agostini - direct

1    thing won't get lost, either this here, and then the other

2    thing gets lost.  Everything stays in one box, everything that

3    has to do with the case.

4    Q.  So everything got lost?

5    A.  Everything got lost, yes.

6    Q.  Sir, didn't you testify at the pretrial hearing that you

7    didn't give the spiral notebook to the district attorney's

8    office?

9    A.  I said I didn't think so.

10   Q.  Now you have a recollection of doing it, correct?

11   A.  I know that every evidence that you gather from a homicide,

12   everything, including the spiral notebook, including that,

13   everything stays with one case, stays in there.

14   Q.  Sir, on June 18, 2004, almost exactly three years ago, was

15   it your testimony --

16        THE COURT:  Or four.

17        MR. JOSEPH:  My math is a little bit off.

18   Q.  Almost four years ago didn't you testify that you didn't

19   think you gave the spiral notebook to the district attorney's

20   office?

21        MS. OKEREKE:  Objection, your Honor.  It's been asked

22   and answered.

23        THE COURT:  Overruled.  It's like cross.  I give a

24   great deal of latitude, as you will undoubtedly want on cross.

25   Overruled.

1     You can answer the question, if there is a question

2   pending.  I am not sure there is.

3   Q.  Sir, almost four years ago didn't you testify that you

4   didn't think that you did provide the spiral notebook to the

5   district attorney's office?

6   A.  That's what I said, yes.

7   Q.  And today you're saying something different, correct?

8   A.  Because the case -- everything stays the same in the same

9   box.

10          THE COURT:  Detective, is there any doubt in your mind

11   that within the last ten minutes you changed from having given

12   it to her to not having given it to her?

13          THE WITNESS:  Sir, giving it to her, I don't know.  It

14   was all in one box.  The whole evidence was in one box.

15          THE COURT:  All we are talking about is this spiral

16   notebook.  You're essentially, I guess -- your memo book?

17          THE WITNESS:  It's not a memo book.  It's separate.

18          THE COURT:  Indeed, as I understand the past ten

19   minutes of testimony, you said that you had given it to her and

20   then at some earlier time, in answer to Mr. Joseph's question

21   or reading to you your testimony, you said no.

22          THE WITNESS:  I don't know how to answer this.

23          THE COURT:  You don't have to answer it.  Just tell me

24   if I'm wrong.  Because the jury and I both know very much less

25   about this case than you do.

86HMMANT                              Agostini - direct

1          THE WITNESS:  I testified that I didn't think so.

2     It's out of memory when they asked me that.  But like I know in

3     other cases that I have, everything stays in one box,

4     everything stays with the case.  Do I know that I gave her the

5     spiral notebook?  I didn't give her the spiral notebook.  I

6     gave her the box.

7     Q.  Sir, were the contents of the spiral notebook ever seen

8     again after they came into your possession?

9     A.  After what date?

10    Q.  Sir, did the district attorney ever have the spiral

11    notebook in her file?

12    A.  Sir, I can only say that I gave her the box with all

13    evidence in it and I believe the spiral notebook was there.

14    Q.  Sir, on February 12, 2001, when you went to interview the

15    tenants of apartment 5E, did you think it was important to

16    verify what times the Parkchester security officer was there?

17    A.  I might have, but I can't recall right now.

18    Q.  And if you did, that information would be in the spiral

19    notebook, right?

20    A.  Yes.

21    Q.  That spiral notebook is gone?

22    A.  Yes.

23    Q.  And you knew that spiral notebook was evidence, right?

24    A.  Yes.

25    Q.  And knew it was evidence that had to be preserved, correct?

86HMMANT                        Agostini - direct

1    A.   That's correct.

2    Q.   Now, sir, I am going to show you what's been marked --

3              MR. JOSEPH:   Your Honor, 1 am going to ask to move

4    Exhibit 12 into evidence.   There is no objection.

5              (Plaintiff's Exhibit 12 received in evidence)

6    Q.   Sir, I'll show you what's been marked Exhibit 12.   Do you

7    recognize this, correct?

8    A.   Yes.

9    Q.   It's a document you created, right?

10   A.   Yes.

11   Q.   And it's a typewritten version, typewritten DD5, correct?

12   A.   Yes.

13   Q.   And, sir, this DD5 concerns your interview in the

14   apartments of the 5E?

15   A.   Correct.

16   Q.   There is no mention in there at all of Anthony Manganiello,

17   correct?

18   A.   That's correct.

19   Q.   You don't put into your DD5 what time he arrived?

20   A.   Who arrived?

21   Q.   Anthony Manganiello arrived at apartment 5E.   Is there any

22   indication as to that --

23   A.   I didn't know Anthony Manganiello at the time I did this

24   interview.

25   Q.   Is there any indication as to what time the Parkchester

86HMMANT                         Agostini - direct

1    officer who responded to the call at 5E arrived?

2    A.   No.

3    Q.   Is there any indication as to what time the Parkchester

4    security officer who arrived at apartment 5E left?

5    A.   No.

6    Q.   And this DD5 survived, correct?

7    A.   Yes.

8    Q.   But your original handwritten notes from this interview did

9    not, correct?

10   A.   That's correct.

11           MR. JOSEPH:   Your Honor, we move Plaintiff's Exhibit 6

12   into evidence, I believe on consent.

13   Q.   Sir, I'll show you Exhibit No. 6.   You recognize this

14   document, correct?

15           THE COURT:   Without objection, 6 will be admitted.

16           (Plaintiff's Exhibit 6 received in evidence)

17   A.   I'm reading it right now.

18   Q.   Sir, you've seen this document before?

19   A.   I have seen this document before, yes.

20   Q.   This is one of the documents that was created as part of

21   the investigation into the homicide of Albert Acosta, correct?

22   A.   Yes.

23   Q.   And this was created by Detective Martinez, right?

24   A.   Yes.

25   Q.   And according to this document, on February 12, 2001,

86HMMANT                        Agostini - direct

1    Detective Martinez interviewed Officer Ortiz and Officer

2    Rodriguez, correct?

3    A.  That's correct.

4    Q.  And they indicate that Officer Manganiello did in fact

5    respond to that call, correct, at apartment 5E?

6    A.  That's correct.

7    Q.  And they also indicate that Officer Manganiello seemed of

8    normal demeanor, correct?

9    A.  Yes.

10   Q.  And they also said that when they completed, the officers

11   left and the Parkchester police security officer left, correct?

12          THE COURT:  When you reach a convenient pause, this is

13   the time you ought to tell me about it.

14          MR. JOSEPH:  Judge, I will.  I have a couple more

15   minutes and it will be a good pause point.

16   Q.  Is that correct, sir?

17   A.  It states that when they were completed they all left and

18   the Parkchester cop left.

19   Q.  Sir, doesn't that document in fact indicate to you that

20   Mr. Manganiello left at the same time as officers Ortiz and

21   Rodriguez.

22   A.  It doesn't say the same time.  The document doesn't say the

23   same time.

24   Q.  Sir, did you ever give testimony that your understanding

25   was that based on this document they left -- Mr. Manganiello

1   and Officers Rodriguez and Ortiz left at the same time?

2   A.   I don't know whether I gave testimony to that.  I can't

3   recall if I gave testimony that they left at the same time.

4   Q.   Sir, let me see if I can refresh your memory here.  At page

5   256, beginning on line 10, sir, I am going to show you what was

6   marked as Plaintiff's Exhibit 6.  Do you recognize that

7   document?  For the record, that's also marked as Plaintiff's

8   Exhibit 6, correct?

9   A.   Yes.

10  Q.   Have you seen it before, and you answered yes, right?  And

11  coming down to 257, line 5:  "By the way, on February 12, 2001,

12  did these officers indicate -- by officers, I mean police

13  Officers Rodriguez and Ortiz -- indicate that they were with

14  Mr. Manganiello at a call at apartment 5E at 1700 Metropolitan

15  Avenue"?

16  "A.   According to this document, yes.

17  "Q.   Does that indicate that Mr. Manganiello left with the two

18  police officers at the same time?

19  "A.   Yes."

20       Did you give that testimony, sir?

21  A.   Well, sir, I can't remember whether I gave that testimony

22  or not.

23       THE COURT:  You don't know if you gave that testimony?

24  We will be glad to show it to you.

25  A.   You're asking me four years later.

86HMMANT                        Agostini - direct

1          THE COURT:  We are asking you if when you see it in

2     black and white it was taken in error or whether indeed you

3     believe that it was indeed what you testified to.

4     Q.  Sir, did I accurately read your testimony from your

5     deposition?

6     A.  I can't see where it's at.

7     Q.  Page 257.

8     A.  I can't find it.  Yes, I see it.

9     Q.  Did you give that testimony?

10    A.  Sir, you asked me today.

11         THE COURT:  Yes or no question.

12    A.  No.

13         THE COURT:  You didn't give that testimony?

14         THE WITNESS:  Yes.  According here, it says, yes, that

15    I gave the testimony.  You're asking me today whether I

16    remember.  No, I don't remember.

17         THE COURT:  No, he's not asking you today.  He's

18    showing it to you and asking you if he read it properly to you

19    because that's what you had said at the time.

20         THE WITNESS:  Yes.

21         THE COURT:  I think this is a good time for us to

22    adjourn.

23         Why don't I give you an extra hour and have you come

24    by at 1, having eaten whatever you choose to eat for lunch.

25    1:00 we'll start tomorrow afternoon.

1          Have a good evening.  Do not discuss the case amongst

2   yourselves or with anybody else.

3          (Adjourned to Wednesday, June 18, 2008, at 1:00 p.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

ANTHONY MANGANIELLO

Direct By Mr. Joseph . . . . . . . . . . . .     51

Cross By Mr. Zuckerman . . . . . . . . . .     110

Redirect By Mr. Joseph . . . . . . . . . .    146

Recross By Mr. Zuckerman . . . . . . . . .    148

ERIC RODRIGUEZ

Direct By Mr. Joseph . . . . . . . . . . .    149

LUIS AGOSTINI

Direct By Mr. Joseph . . . . . . . . . . .    153

```
 1                          PLAINTIFF EXHIBITS

 2      Exhibit No.                                           Received

 3        51      . . . . . . . . . . . . . . . .      53

 4        49      . . . . . . . . . . . . . . . .      54

 5        50      . . . . . . . . . . . . . . . .      72

 6        22      . . . . . . . . . . . . . . . .      78

 7        1       . . . . . . . . . . . . . . . .      80

 8        41      . . . . . . . . . . . . . . . .      83

 9        10      . . . . . . . . . . . . . . . .      85

10        23      . . . . . . . . . . . . . . . .      85

11        39      . . . . . . . . . . . . . . . .      87

12        38      . . . . . . . . . . . . . . . .      88

13      52, 53, and 54  . . . . . . . . . . .     107

14        34      . . . . . . . . . . . . . . . .     151

15        11      . . . . . . . . . . . . . . . .     155

16        39      . . . . . . . . . . . . . . . .     159

17        12      . . . . . . . . . . . . . . . .     172

18        6       . . . . . . . . . . . . . .        173

19

20

21

22

23

24

25
```

86IMMANT

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ANTHONY MANGANIELLO,

4              Plaintiff,

5         v.                          07 Civ. 3644 (HB)

6    LUIS AGOSTINI, individually
     and as a New York City Police
7    Detective; SHAWN ABATE,
     individually and as a New York
8    City Police Detective; ALEX
     PEREZ, individually and as a
9    New York City Police Officer;
     MIRIAM NIEVES, individually
10   and as New York City Police
     Officer; and ROBERT MARTINEZ,
11   individually and as a New York
     City Police Officer,
12
              Defendants.
13
     ------------------------------x
14                                   New York, N.Y.
                                     June 18, 2008
15                                   1:00 p.m.

16   Before:

17             HON. HAROLD BAER, JR.,

18                              District Judge

19                   APPEARANCES

20   OSORIO & ASSOCIATES
          Attorneys for Plaintiff
21   BY:  MICHAEL JOSEPH

22   MICHAEL A. CARDOZO, Corporation Counsel
     for the City of New York
23        Attorney for Defendants
     BY:  MARK ZUCKERMAN
24        AMY OKEREKE

25

86IMMANT

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Mr. Zuckerman, I hear you want a minute.

4          MR. ZUCKERMAN:  A minute should be all it takes.  One

5     of the witnesses that plaintiff has subpoenaed and your Honor

6     is familiar with is ADA Christine Scaccia.  She is, as you

7     know, an assistant district attorney.

8          THE COURT:  I had trouble with her before and now we

9     are going to have more?

10         MR. ZUCKERMAN:  The challenge is that she is trying a

11    homicide case in the Bronx.

12         THE COURT:  All I can suggest to you is that -- is she

13    your witness or Mr. Joseph's witness?

14         MR. JOSEPH:  She is my witness, your Honor.  I

15    subpoenaed her.

16         MR. ZUCKERMAN:  Can I make a suggestion?

17         THE COURT:  Anything you think you can do that would

18    be helpful.

19         MR. ZUCKERMAN:  I believe -- it's been suggested to me

20    by Ms. Scaccia, it does seem to make some sense.  If your Honor

21    could confer with the judge who is presiding over the criminal

22    trial and set a time when she can come here and testify, I

23    think that would be very helpful.

24         THE COURT:  I guess I can do that.  I am not sure why,

25    if she is your witness, Michael Cardoza can't do that just as

86IMMANT

1   well.

2           MR. ZUCKERMAN:  We don't represent her.

3           THE COURT:  I don't either.

4           MR. ZUCKERMAN:  I know, your Honor.

5           THE COURT:  That's good.  That's a step in the right

6   direction.  Who is it, the judge?

7           MR. ZUCKERMAN:  The judge?  It's actually Judge

8   Marcus, who coincidentally was presiding over the criminal

9   trial of Mr. Manganiello.

10          THE COURT:  Maybe he would like to come, too.

11          MR. JOSEPH:  Your Honor, it's actually the same

12   defense attorney was involved in the same trial.

13          THE COURT:  I'll be glad if you give me his telephone

14   number to call him right now before we start or after court,

15   although I doubt he sits as long as I do.

16          MR. ZUCKERMAN:  I don't have the phone number with me,

17   so I would have to get that to your Honor as quickly as we

18   possibly can.

19          THE COURT:  If you can do it while we are working and

20   we can call him at recess and see what happens if we get him.

21          MR. JOSEPH:  Judge, if I were allowed to have some

22   internet access, I believe I could provide it quite quickly.  I

23   could log in remotely.  I would need permission to do it.

24          THE COURT:  I think we can find it quickly enough.  If

25   you can't do it very quickly, I can do it in my chambers.

86IMMANT

 1    What's his first name, Marcus?

 2         MR. JOSEPH:  Judge Marcus.  Martin Marcus of the Bronx

 3    Supreme Court.

 4         MR. ZUCKERMAN:  Actually, your Honor, one thing I

 5    should say, Judge Marcus, it's my understanding he's in Albany

 6    today and so we would have to place the call tomorrow.  That's

 7    my understanding.

 8         THE COURT:  When do you think you are going to call

 9    her?

10         MR. ZUCKERMAN:  The plaintiffs subpoenaed her and it

11    was my understanding that they wanted her toward the end of

12    their case.

13         THE COURT:  I hope tomorrow will be toward the end of

14    their case.  But whether it is or not, let's get it resolved.

15    As far as I'm concerned, I think we ought to call him and at

16    least leave a message.  Why don't we try to get it.  You give

17    me the number when we have it.

18         MR. JOSEPH:  Judge, the Court directed me to provide a

19    list of questions which we'd like to ask the brother, Mario

20    Manganiello.  I do have that here and I would like to hand it

21    up and get a ruling from your Honor.  I've provided counsel

22    with a copy.

23         THE COURT:  I think the first question is all right.

24    I am not sure I understand the relevance of the second

25    question.  I understand.

86IMMANT

1          MR. JOSEPH:  What are you referring to, your Honor?

2          THE COURT:  Bring them in and -- where is your client?

3          MR. JOSEPH:  He's not here, Judge.  He should be here.

4    He's not.  I expect him to be here.

5          THE COURT:  What can we do about that?

6          MR. JOSEPH:  I think we should proceed in his absence.

7          THE COURT:  What do you mean, he's absent?

8          MR. JOSEPH:  Judge, I believe he will be here.  I

9    spoke with him yesterday.  He was going to be here.  He's no

10   longer on the stand.  I believe the Court can proceed in his

11   absence.

12         THE COURT:  Did you finish your direct?

13         MR. JOSEPH:  He was off the stand yesterday, Judge.

14         THE COURT:  I didn't think so.

15         MR. JOSEPH:  I thought he was.

16         THE COURT:  Did you have that view, Mr. Zuckerman?  I

17   guess that's right.

18         MR. ZUCKERMAN:  The plaintiff is off the stand.

19         THE COURT:  I guess he doesn't really have to be here.

20         You can bring them in.

21         (Jury present)

22         THE COURT:  Good afternoon, everybody.  I trust you

23   had something to eat and we are ready to roll.

24         Mr. Joseph, you're still on direct.

25         MR. JOSEPH:  Yes, your Honor.

86IMMANT

1          THE COURT:  You're still under oath.

2          THE WITNESS:  Yes, sir.

3     LUIS AGOSTINI, resumed.

4   DIRECT EXAMINATION (cont'd)

5   BY MR. JOSEPH:

6   Q.  Mr. Agostini, on February 12, 2001, were you partnered up

7   with Shawn Abate?

8   A.  I was partnered with my partner, Detective Ramirez.  I

9   helped Detective Abate later on with the case.

10  Q.  Were you partnered up with Detective Abate?

11  A.  He was part of my team, yes.

12          MR. JOSEPH:  Sir, at this point I would ask to move

13  Plaintiff's Exhibit 25 into evidence.

14          THE COURT:  I don't think there is any objection, so

15  it will be admitted.

16          (Plaintiff's Exhibit 25 received in evidence)

17  Q.  Sir, I am going to show you what's been marked as

18  Plaintiff's Exhibit No. 25.  Do you recognize this document?

19  A.  It's a DD5 stating an interview with Sergeant Ohle,

20  Parkchester security.

21  Q.  Sir, was this DD5 in your possession when you took over the

22  case file?

23  A.  Looking at a DD5 I don't remember this DD5, but if it's a

24  DD5 that it's in my case, yes.

25  Q.  Sir, according to this DD5, which we have as Exhibit 25,

86IMMANT                    Agostini - direct

1    does Sergeant Ohle indicate that on February 12, 2001, he

2    placed a radio dispatch over the Parkchester security radio

3    system indicating one of his officers was down?

4    A.   I have to read it.  Can I read it?

5    Q.   Go ahead, please.

6    A.   He said that he called for an ambulance.  Would you like me

7    to read the whole thing?

8    Q.   Sir, I'm asking, does he or does he not say -- strike that.

9              Does he not say, Sergeant Ohle then observed SP Nieves

10   responding and directed him via radio to go pick up part 1

11   Chief Ballamy and informed officers responding one of his guys

12   was shot, and we need a bus.

13             Does he or does he not say that?  Second line from the

14   bottom, sir.

15   A.   That is correct, sir.

16   Q.   Sir, you had this document in your possession when you took

17   over the case file, correct?

18   A.   Like I told you, I can't remember this certain DD5.  If it

19   was in my possession and it was there, then it was there.  But

20   looking at it, I can't remember.

21   Q.   This statement was taken on February 12, 2001, the same day

22   Mr. Acosta was shot, correct?

23   A.   That's correct.

24   Q.   And a bus is a term for ambulance, correct?

25   A.   That's correct.

86IMMANT                    Agostini - direct

1   Q.  And, sir, two and a half weeks later you created Exhibit

2   No. 39, correct?

3   A.  That's correct.

4   Q.  And in this document you attribute a statement to Miriam

5   Nieves, correct?

6   A.  Yes.

7   Q.  And it says, how can Mr. Manganiello know it was his

8   partner when he didn't go into the room, correct?

9   A.  That's what she stated.

10  Q.  And that's a document you created, correct?

11  A.  Yes.

12  Q.  And did you ever indicate anywhere that this may be

13  incorrect because you knew Sergeant Ohle had made a

14  transmission?

15          MS. OKEREKE:  Objection, your Honor.

16          THE COURT:  Let me look at it.  Overruled.  You can

17  answer.

18  A.  I can only write and I can only document what the person

19  tells me and that's what I do.  I document what the person

20  tells me.

21  Q.  By the way, Exhibit 39 is one of the DD5s you provided to

22  the district attorney's office, correct?

23  A.  I believe so.

24  Q.  And, sir, anywhere when you did it, did you ever tell the

25  DD5 or create some other DD5 that there may be -- this may not

86IMMANT                          Agostini - direct

1   be correct?

2   A.  No, sir.  I only document what the person tells me.

3   Q.  Sir, I believe when we left yesterday we were discussing

4   Exhibit No. 6.  I'll show you Exhibit No. 6, sir.

5           Sir, according to Exhibit No. 6, Mr. Martinez recorded

6   on February 12, 2001 that the Police Officers Rodriguez and

7   Ortiz and Mr. Manganiello left the building at 1700

8   Metropolitan Avenue together, correct?

9   A.  Yes.

10  Q.  And, sir, I am going to show you what's been marked as

11  Exhibit No. 12.  It's already in evidence.  And, sir, you

12  created Exhibit No. 12, correct?

13  A.  Yes, that's correct.

14  Q.  And when did you create that document?

15  A.  On February 12, 2001.

16  Q.  That's when you wrote the document, sir?

17  A.  When I wrote it, yes.

18          MR. JOSEPH:  Your Honor, at this point, I would ask to

19  move Exhibit 29 into evidence.  I don't believe there is any

20  objection.

21          THE COURT:  No objection.  It will be admitted without

22  objection.

23          (Plaintiff's Exhibit 29 received in evidence)

24  Q.  Sir, I show you what's been marked as Exhibit 29 in

25  evidence.  And you created this document, correct?

86IMMANT                        Agostini - direct

1    A.   I created it, that's correct.

2    Q.   And when did you create it?

3    A.   March 1, 2001.

4    Q.   Is that approximately two and a half weeks after February

5    12, 2001?

6    A.   Approximately.

7    Q.   And is that approximately two and a half weeks after

8    Detective Martinez interviewed Police Officers Rodriguez and

9    Ortiz?

10   A.   Yes.

11   Q.   And two and a half weeks after Detective Martinez

12   interviews Police Officers Ortiz and Rodriguez, do you create a

13   DD5 which states that the Parkchester police officer,

14   Mr. Manganiello, left the call at apartment 5E before Officers

15   Rodriguez and Ortiz?

16   A.   Well, it says, PO Rodriguez then gave back the job at

17   approximately 094 hours, which is 9:04 in the morning, and did

18   not see SPO Manganiello when he left the building.

19   Q.   According to the DD5 that you created two and a half weeks

20   after Mr. Martinez interviews these officers, Mr. Manganiello

21   is alone in the building of 1700 Metropolitan Avenue, correct?

22   A.   I don't know if he's alone in the building or not.

23   Q.   Sir, you created this DD5, right?

24   A.   Yes.

25   Q.   And it states here that no one saw him leave the building

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                        Agostini - direct

1    or leave the call, right?

2    A.   It states that PO Rodriguez didn't see him leaving the

3    building.

4    Q.   And that's in stark contrast to the DD5 created by

5    Mr. Martinez two weeks earlier, correct?

6    A.   That's correct.

7    Q.   Sir, I am going to show you --

8         MR. JOSEPH:   I am going to ask at this point to

9    introduce Exhibit 40.   I don't believe there is any objection

10   to it.

11        THE COURT:   No objection.   It will be admitted without

12   objection.

13        (Plaintiff's Exhibit 40 received in evidence)

14   Q.   Sir, according to Exhibit 40 -- strike that.

15        Sir, you recognize Exhibit 40, correct?

16   A.   I don't recognize this DD5 also.

17   Q.   Have you seen this before also?

18   A.   Probably.

19   Q.   In this DD5 does Sergeant Rose identify Anthony Manganiello

20   as the Parkchester security officer who responded to the call

21   at apartment 5E at 1700 Metropolitan Avenue on the morning of

22   February 12, 2001?

23   A.   I have to read it.   Is that okay?

24   Q.   Go ahead.

25   A.   It says first that Parkchester security responded.   And

86IMMANT                    Agostini - direct

1   once Sergeant Rose saw the security officer at the 43 squad

2   office, that's when he identified him as Anthony Manganiello.

3   Q.  He identified him as the officer who responded earlier that

4   morning, correct?

5   A.  Yes, that's correct.

6   Q.  When you spoke with Police Officer Rodriguez on March 1,

7   2001, did you take handwritten notes of what he said?

8   A.  Sir, I can't remember that day.  I can't remember whether I

9   took the notes or not.

10  Q.  Sir, let me see if I can refresh your recollection.  You

11  gave a deposition on December 20, 2007, correct?

12  A.  I don't remember that day.

13  Q.  You don't recall giving a deposition --

14  A.  I remember giving a deposition.  I don't remember if it's

15  that day.

16  Q.  Was it approximately seven months ago?

17  A.  I don't know, sir.

18  Q.  Do you recall the deposition was approximately seven months

19  ago?

20  A.  Something like that.

21  Q.  Seven months ago were you asked these questions and did you

22  give these answers, beginning on page 262?

23          THE COURT:  I trust the city has no question about the

24  detective's date for his deposition, right?

25          MS. OKEREKE:  No, your Honor.

86IMMANT                    Agostini - direct

1   Q.  And beginning on line 20:

2   "Q.  By the way, what date did you interview Officers Ortiz and

3   Rodriguez?

4   "A.  On this one it was March 1, 2001.

5   "Q.  And did you take any handwritten notes about what they

6   said?

7   "A.  I probably did."

8   Q.  Were you asked those questions and did you give those

9   answers?

10  A.  I probably did, yes, I gave the answer.

11  Q.  Sir, what happened to those notes?

12  A.  Those notes were lost.

13          THE COURT:  There is a lot of story here about lost

14  notes and the inability to have them to defense counsel, which

15  is usually what defense counsel wants.  Does this happen often?

16          THE WITNESS:  No, sir.  But at the time that it

17  happened to me, I was speaking to another detective who had a

18  hit and run case that was going to court, and he said that his

19  files are missing also.

20          THE COURT:  Is this the first time that your file was

21  missing?

22          THE WITNESS:  First time, yes, sir.

23          THE COURT:  How long are you a detective?

24          THE WITNESS:  Since 1992.

25          THE COURT:  How long were you on the police force?

86IMMANT                          Agostini - direct

1          THE WITNESS:  From what date to what date?

2          THE COURT:  When did you first become a policeman?

3          THE WITNESS:  1987.

4          THE COURT:  So over now over 20 years ago?

5          THE WITNESS:  Yes.

6  Q.  Sir, on February 12, 2001, who, if anyone, told you to go

7  to apartment 5E?

8  A.  I don't specifically know who told me, but I was there to

9  interview the people at 5E.

10  Q.  And were you asked to go there by the lead investigator at

11  the time?

12  A.  I don't know who told me.  I can't remember who told me,

13  but we were supposed to go to 5E and interview the occupants.

14  Q.  By the way, for how long were you the lead detective on the

15  Albert Acosta homicide file?

16  A.  I was the lead detective on the homicide after, I believe,

17  the victim died, which was, I believe, after 8 p.m. that day.

18  Q.  On February 12, 2001?

19  A.  Yes, that's correct.

20  Q.  You would have been the lead investigator from February 12,

21  2001, through the trial in June or July of 2004, correct?

22  A.  Correct.

23  Q.  And, sir, in those three years or so that passed did you

24  ever speak to Richard Huello, the Verizon employee who was in

25  the basement on February 12, 2001?

86IMMANT                       Agostini - direct

1    A.  No, sir.

2    Q.  Sir, after leaving apartment 5E, did you return to the 43rd

3    Precinct?

4    A.  Yes.

5    Q.  And was Anthony Manganiello at the 43rd Precinct when you

6    arrived?

7    A.  No, sir.

8    Q.  At what point did Mr. Manganiello arrive at the 43rd

9    Precinct?

10   A.  I believe I was already in the 43.  I don't know what I was

11   doing.  I was just in the 43 squad.  That's our room.  And

12   later on, I would say in the afternoon, is when the plaintiff

13   came in with EMS.

14   Q.  EMS brought him --

15   A.  EMS was present.

16   Q.  Who brought Mr. Manganiello to the precinct?

17   A.  I don't know who brought him in.

18   Q.  Sir, did you know seven months ago who brought him in?

19   A.  I know who transported him to the 43rd Precinct, but I

20   didn't know at the time when he came in who brought him in.

21   Q.  Sir, did uniformed patrol officers bring Anthony

22   Manganiello to the 43rd Precinct?

23   A.  Yes.

24   Q.  Did he appear there voluntarily?

25   A.  Yes.

86IMMANT                      Agostini - direct

1   Q.  And is it your testimony, sir, that he was not brought back

2   to the 43rd Precinct because he was being arrested?

3   A.  That's correct.

4   Q.  By the way, in route to the 43rd Precinct, was

5   Mr. Manganiello suffering from shortness of breath?

6   A.  That's what the officer stated in the interview on the DD5,

7   yes.

8   Q.  And you believed the officers, correct?

9   A.  Yes.

10  Q.  Did Mr. Manganiello ask to go to the hospital?

11  A.  Did he ask me?  No.

12  Q.  Did he ask the patrol?

13  A.  You have to show me something.

14          MR. JOSEPH:  At this point, I would ask to move

15  Exhibit 19 into evidence.  I don't believe there is an

16  objection.

17          THE COURT:  What's the number?

18          MR. JOSEPH:  19.

19          THE COURT:  No objection.  It will be admitted without

20  objection.

21          (Plaintiff's Exhibit 19 received in evidence)

22  Q.  I will ask you to take a look at Exhibit 19.  This is a

23  document that you created, correct?

24  A.  Yes, that's correct.

25  Q.  And in this DD5 that you created do you say that Anthony

1   Manganiello began suffering shortness of breath and asked to be

2   taken to the hospital?

3   A.   In this document it doesn't say anything about shortness of

4   breath.   It just says they stated Anthony Manganiello asked to

5   be taken to the hospital.

6   Q.   Did he ask to be taken to the hospital?

7   A.   That's what they had stated, yes.

8   Q.   And if he wasn't under arrest, is there any reason why he

9   wouldn't have been taken to the hospital?

10  A.   You are asking me.   You have to ask the officers.

11  Q.   Do you know any reason why --

12  A.   I don't know the reason.

13  Q.   Sir, did Mr. Manganiello ever ask you to be taken to the

14  hospital?

15  A.   Yes.   You have to refresh my memory on that.

16  Q.   As you sit here now, do you have a memory of whether

17  Anthony Manganiello on February 12, 2001 asked you -- asked for

18  permission to go to the hospital?

19  A.   You have to refresh my memory.

20  Q.   You have no memory one way or the other?

21  A.   No.

22        MR. JOSEPH:   Your Honor, at this point I would ask to

23  move into evidence Exhibit 14.

24        THE COURT:   There is no objection to Exhibit 14.   It

25  will be admitted.

86IMMANT                    Agostini - direct

1          (Plaintiff's Exhibit 14 received in evidence)

2    Q.  Let me show you Exhibit No. 14.  Sir, did you create

3    Exhibit No. 14?

4    A.  Yes.

5    Q.  In Exhibit No. 14, did Mr. Anthony Manganiello ask you to

6    go to the hospital?

7    A.  That's not correct.

8    Q.  Did he state he wanted to go to the hospital?

9    A.  He told EMS he wanted to go to the hospital.  He never told

10   me.

11   Q.  How did you learn he wanted to go to the hospital?

12   A.  When I interviewed EMS.

13   Q.  And is there any reason why EMS was not allowed to bring --

14   strike that.

15          Did EMS bring Mr. Anthony Manganiello to the hospital?

16   A.  I don't know, sir.  I don't believe so.

17   Q.  Is there any reason why -- did EMS tell you he was, in

18   fact, suffering from shortness of breath?

19   A.  Yes.

20   Q.  He said he wants to go to the hospital, correct?

21   A.  He told them that, yes.

22   Q.  And that information was conveyed to you, correct?

23   A.  Yes.

24   Q.  And why wasn't he allowed to go to the hospital?

25          MS. OKEREKE:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                          Agostini - direct

1        THE COURT:  I think he said he doesn't know, but if

2   you want to pursue it, you can try.  I don't think it will make

3   or break this lawsuit.

4        MR. JOSEPH:  Judge, I'll withdraw the question.

5   Q.  Now, at some point do you begin to question Anthony

6   Manganiello?

7   A.  Question or interviewing him, yes.

8   Q.  Did you interview him?

9   A.  Yes.

10  Q.  When you began interviewing him was Anthony Manganiello a

11  suspect?

12  A.  No, sir.

13  Q.  Now, sir, as you were interviewing Anthony Manganiello, did

14  you take any handwritten notes of what was being said?

15  A.  Oh, yes.

16  Q.  By the way, what happened to those handwritten notes?

17  A.  They are missing.

18        THE COURT:  Are they any different than the DD5s or

19  other items that are missing?

20        THE WITNESS:  The whole DD5 and everything that was in

21  evidence for this case was in a certain box, and that certain

22  box is missing.

23        THE COURT:  I think I understand that.  All I'm really

24  asking -- I guess you answered it -- is that everything from

25  this case is missing.

86IMMANT                              Agostini - direct

1              THE WITNESS:  The reason we have DD5s is when I gave

2     it to the district attorney's office they made copies of the

3     DD5s.

4              THE COURT:  And where are they?

5              THE WITNESS:  That's what we are using now.

6              THE COURT:  What was missing essentially from the box

7     which was also missing was original --

8              THE WITNESS:  Original DD5s, that's correct, sir.

9              THE COURT:  What about the notes?

10             THE WITNESS:  Everything was in the box.

11    Q.  Sir, is it fair to say that just about everything except

12    for the DD5s, a couple of vouchers were missing?

13    A.  I can't tell you.

14             THE COURT:  That was what was in the box.

15             THE WITNESS:  Right.  I don't know if someone made

16    copies of DD5s or not.

17             THE COURT:  You know you have a DD5 in front of you --

18             THE WITNESS:  I'm talking about vouchers or DD5s, or

19    whatever.

20             THE COURT:  Or the notes that might be somewhat

21    different than the DD5s, they were also in the box.

22             THE WITNESS:  Yes, sir.

23    Q.  Sir, I am going --

24             MR. JOSEPH:  At this point I would ask to move into

25    evidence Exhibit 33.

86IMMANT                         Agostini - direct

1              THE COURT:  No objection.

2              (Plaintiff's Exhibit 33 received in evidence)

3   Q.  Sir, I show you what's been marked as Exhibit 33.  Do you

4   recognize this document?

5   A.  Yes, I do.

6   Q.  This is a DD5 that you created?

7   A.  Yes.

8   Q.  By the way, in this DD5 do you say that Anthony Manganiello

9   was evasive to questioning?

10  A.  What do you mean?

11  Q.  Did you or did you not say in this DD5 in front of you that

12  Mr. Manganiello was evasive to questioning?

13  A.  I didn't say that, that he was evasive.

14             THE COURT:  I think that's better English.

15             THE WITNESS:  Yes.

16             MR. JOSEPH:  I'm sorry.  I didn't hear that, the

17  witness' comment.

18             THE COURT:  The witness said he was evasive and I said

19  that's better English than the language you read or what your

20  question was.  It was nothing significant.

21             MR. JOSEPH:  Very good, Judge.

22  Q.  Well you asked Mr. Manganiello questions, correct?

23  A.  Yes.

24  Q.  And yet one of the questions you asked him was when was the

25  first time you saw Albert Acosta on the morning of February 12,