86IMMANT                        Agostini - direct

1    2001, right?

2    A.   Yes.

3    Q.   You said you saw him at roll call, right?

4    A.   Yes.

5    Q.   You also asked him when was the next time you saw him,

6    right?

7    A.   Yes.

8    Q.   And he says the next time he was lying on the floor of the

9    basement of 1700 Metropolitan Avenue, right?

10   A.   No, I didn't ask him -- it's not in the DD5 when is the

11   next time I saw him.

12   Q.   Sir, doesn't the DD5 state, he states then the next time he

13   saw Albert Acosta is when he was lying on the floor at 1700

14   Metropolitan Avenue in the basement.  Is that in your DD5?

15   A.   You want to show me that.

16   Q.   Sir, you see a little star under No. 1, a little star.

17   A.   Okay.

18   Q.   Do you see the second sentence, he then states?

19   A.   Yes, I see that.

20   Q.   Did I read it correctly?

21   A.   Yes.

22   Q.   This is something you prepared, correct?

23   A.   Yes.

24   Q.   And you asked Mr. Manganiello where he was at the point in

25   time when the call came in, correct?

86IMMANT                        Agostini - direct

1    A.  Yes.

2    Q.  You said he was on a personal by the oval, right?

3    A.  Yes.

4    Q.  By the way, sir, you also stated in here that you asked him

5    for his address, and he said he didn't know, correct?

6    A.  That's correct.

7    Q.  You also say in here that you asked him for his phone

8    number and he replied that it was unlisted, correct?

9    A.  Correct.

10   Q.  The original handwritten notes from that interview have

11   disappeared?

12   A.  That's correct.

13   Q.  And all we have left is this DD5?

14   A.  Yes.

15   Q.  And you never gave those handwritten notes to the district

16   attorney's office, did you?

17   A.  Like I said once before, I gave the whole box, everything

18   that had to do with the case, I gave the whole box to the

19   district attorney.

20   Q.  Sir, did you ever offer testimony to the exact opposite

21   four years ago?

22   A.  Excuse me?

23   Q.  Did you offer the exact opposite testimony four years ago?

24   A.  Yes.  You told me yesterday.

25           THE COURT:  I am not quite sure, not that again it's

86IMMANT                        Agostini - direct

1    terribly important, but when the plaintiff here told you that

2    his phone number was unlisted.  That doesn't mean he doesn't

3    have one, right?

4              THE WITNESS:  Right.

5              THE COURT:  But you didn't pursue that issue and ask

6    him what it was, regardless of whether it was unlisted?

7              THE WITNESS:  Sir, these questions, when he first came

8    in --

9              THE COURT:  Just yes or no.

10             THE WITNESS:  No, I didn't pursue it.

11   Q.  Sir, did you also testify at trial that you asked Anthony

12   Manganiello what his address was -- strike that.

13             Sir, did you also testify at the criminal trial of

14   Anthony -- People of State of New York against Anthony

15   Manganiello in June of 2004 that you asked him what his address

16   was, and he said, I don't know, I don't know?

17   A.  He said I don't know.

18   Q.  Is that the testimony you offered at trial?

19   A.  Yes.  I don't know.  That's what you're saying.

20   Q.  Sir, let me show you your trial testimony, page 288.  Sir,

21   I'll direct your attention to lines 19 through 25.  Do you in

22   fact state when asked -- when Mr. Manganiello was asked what

23   his address was, he said I don't know?

24   A.  That's correct.

25   Q.  And did you also testify at trial -- by the way, I'll

86IMMANT                        Agostini - direct

1    direct your attention to page 289, the following page, lines 8

2    through 15.  Did you also testify that on February 12, 2001,

3    you asked him for his phone number and he said it's unlisted?

4    A.   That's correct.

5    Q.   By the way, on February 12 -- when this conversation

6    occurred, was Mr. Abate in a room with you?

7    A.   Yes.

8    Q.   On February 12, did you fill out an arrest report?

9    A.   Yes.

10   Q.   On the arrest report it has a section for address, correct?

11   A.   Yes.

12   Q.   And on February 12, 2001, did you put Mr. Manganiello's

13   address on that arrest report?

14   A.   Yes.

15   Q.   And Mr. Manganiello gave you his address?

16   A.   That night, yes.

17   Q.   And that arrest report has gone missing, too, correct?

18   A.   That's correct.

19   Q.   So that arrest report was never given to the district

20   attorney's office, right?

21   A.   Sir, everything in the box, like I said, was given to the

22   district attorney's office.  Everything -- I can't say

23   specifically what was in it, but everything was given to the

24   district attorney's office.

25           THE COURT:  In the regular course of business, would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                          Agostini - direct

1   the arrest report be part of what was in the file?

2        THE WITNESS:  Yes.

3        THE COURT:  So it would likely be in the box?

4        THE WITNESS:  It would likely be in the box.

5   Q.  Sir, were people from the crime scene division called to

6   the 43rd Precinct?

7   A.  I know some people came in.  I don't know what unit they

8   were in, but they did come into the 43rd Precinct, yes.

9   Q.  And did Mr. Manganiello provide these people with his

10  pedigree information?

11  A.  I wasn't there when that happened.

12  Q.  Sir, on February 12, 2001, you're aware of statements made

13  by Walter Cobb, correct?

14  A.  Give the date again.

15  Q.  The date of the incident.

16  A.  No, sir.

17        THE COURT:  All of what Mr. Joseph is doing, just to

18  continue your legal education, is called prior inconsistent

19  statements; that is, statements that were given at an early

20  earlier time which differ than the statements that are given on

21  the witness stand.  It's really an issue of credibility.

22  Remember I spoke to you at some length about credibility.  If

23  you find it is sufficiently significant and material so that it

24  impeaches his credibility, then you can conclude that he was

25  not testifying credibly.  On the other hand, you have no

86IMMANT                         Agostini - direct

1    obligation to find that it was that way, or that it was

2    material.  I will talk to you more about it, but I just want

3    you to understand the concept.

4            MR. JOSEPH:   Thank you, your Honor.

5    Q.  Sir, on February 12, 2001, were you aware of information

6    provided by Walter Cobb?

7    A.  I don't believe so, sir, no.

8    Q.  Sir, did you ever say you were?

9    A.  That I were what?

10   Q.  Did you ever say that you were aware of the statements made

11   by Walter Cobb on February 12, 2001?

12   A.  Yes.  Maybe after February 12, not on February 12.

13   Q.  Sir, while you were interviewing Mr. Manganiello an

14   attorney called, correct?

15   A.  Yes.

16   Q.  And he said -- sir, let me ask you this.  Did you testify

17   at a hearing on June 21, 2004?

18   A.  I believe it was that day.  I don't remember the date.

19   Q.  Sir, on page 332, beginning on line 2 were you asked these

20   questions and did you give this answer:

21   "Q.  Detective, prior -- up until the time you just described

22   for us, up until you get the phone call now from the attorney,

23   is there any one thing that happens which now turns

24   Mr. Manganiello, in your eyes, from a witness to a suspect?

25   "A.  Yes.

86IMMANT                       Agostini - direct

1    "Q.   What?

2    "A.   After hearing from other detectives, Detective Abate, that

3    we have a witness who was at the time, we call him the porter,

4    that saw her, heard the shots, went to the location.  And when

5    he opened the door, Anthony Manganiello was there.  He asked

6    Anthony Manganiello, did you hear the shots and he said yeah, I

7    heard it, you run this way, I'll go this way.

8    "Q.   And by this porter, do you now know this porter's name to

9    be Mr. Walter Cobb?

10   "A.   Yes."

11   A.   Now that you refreshed my memory, yes.

12   Q.   On February 12, 2001, you were aware of statements that had

13   been made by Walter Cobb?

14   A.   Sir, you asked me now.  Whatever you said right there,

15   that's fine.  But you are asking me now, and I'm telling you, I

16   don't know and I don't think so.  As I apparently testified to,

17   yes, but you're asking me today.  I can't remember.

18        THE COURT:  You're clear that your memory was better

19   then than it is now.

20        THE WITNESS:  Yes, sir.

21   Q.   And four years ago, you testified that on February 12,

22   2001, you were aware of what information Walter Cobb had

23   provided?

24   A.   You're asking me today?

25   Q.   I'm asking if you testified under oath four years ago that

86IMMANT                           Agostini - direct

1    you were aware that -- of statements given by Walter Cobb on

2    the day of Mr. Acosta's murder.

3    A.   Yes.

4    Q.   Sir, was a gunshot residue test performed on

5    Mr. Manganiello's hands and clothing?

6    A.   I believe so.

7    Q.   What happened to the results of that test?

8    A.   I believe the results came, and I don't know who received

9    it.  Either I received it or the ADA received it.  I asked her

10   basically --

11        MR. JOSEPH:   Judge, I'm just -- not what the results

12   were.

13   A.   Do you want me to say what happened to her.

14   Q.   Were those results in the case file that was lost?

15   A.   Yes.

16   Q.   By the way, was Mr. Manganiello wearing a jacket when you

17   were interviewing him?

18   A.   I remember when he came into the precinct he was wearing a

19   jacket, yes.

20   Q.   And was the jacket taken from him?

21   A.   I don't know.

22   Q.   Sir, I will ask you to review page 335 of your hearing

23   testimony.  I am going to ask you whether this refreshes your

24   recollection as to whether Mr. Manganiello's jacket was taken

25   from him.

86IMMANT                       Agostini - direct

1          THE COURT:  It's a two-part question.  The first part

2    of the question is whether it does or does not refresh your

3    recollection.

4          THE WITNESS:  No, sir.

5          THE COURT:  That's the end of that.  What's next?

6    Q.  Sir, did you voucher Mr. Manganiello's jacket?

7    A.  Sir, I don't know if I did or not.  I am not sure.  I can't

8    remember.

9          THE COURT:  In case you were worried where any of the

10   parties were, you know that in a civil case they don't have to

11   be here every minute of the time.

12   Q.  Sir, let me ask you, did you testify four years ago at the

13   hearing on page 335 line 2:

14   "Q.  At that point in time does something else of an

15   evidentiary nature come into your possession from

16   Mr. Manganiello?

17   "A.  To me?

18   "Q.  Well, to you and the detectives working on the case.

19   "A.  Yes.

20   "Q.  What?

21   "A.  It was a jacket.

22   "Q.  Whose jacket was it and where was it?

23   "A.  It was the defendants's jacket.

24   "Q.  And was it on his person?  Was it in a room?  Where was

25   it?

86IMMANT                    Agostini - direct

1   "A.   It was on his person."
2           Did you give that testimony?
3   A.   Sir, I don't remember.  I don't remember saying that.
4   Q.   By the way, was Mr. Manganiello's memo book taken from him?
5   A.   Yes.
6   Q.   And in the memo book he wrote down times where he was --
7   strike that.   In the memo book he recorded where he was and at
8   what time he was there, correct?
9   A.   I don't remember what is the content inside a memo book.
10          THE COURT:   You know it wasn't in the box?
11          THE WITNESS:   It was in the box also.
12          THE COURT:   Do we have it or don't we have it?
13          THE WITNESS:   No, we don't have it.
14  Q.   Sir, is it fair to say that the memo book has gone missing,
15  too?
16  A.   Yes.
17  Q.   And the memo book was a piece of evidence?
18  A.   Yes.
19  Q.   Was there a procedure at the 43rd Precinct by which a piece
20  of evidence could be vouchered?
21  A.   Yes.
22  Q.   And you've used that procedure on many, many occasions to
23  secure evidence, correct?
24  A.   That's correct.
25  Q.   And on this particular occasion, Mr. Manganiello's memo

86IMMANT                          Agostini - direct

1  book was never vouchered, was it?

2  A.  It was never vouchered.

3  Q.  According to your testimony, you had possession of the memo

4  book for approximately two years, correct?

5  A.  Three years, I believe.

6  Q.  And in that three years you never vouchered

7  Mr. Manganiello's memo book, correct?

8  A.  That's correct.

9  Q.  And it went missing when the ADA requested that she be

10  provided with it, correct?

11  A.  That's correct.

12  Q.  Sir, did you take the memo book from Anthony Manganiello?

13  A.  I don't remember if I took it or someone else did.  I don't

14  remember that.

15  Q.  Was it taken because you and the other detectives working

16  on the case wanted to see where he was on February 12, 2001,

17  correct?

18         MS. OKEREKE:  Objection, your Honor.

19         THE COURT:  I think that's perfectly reasonable.

20  That's certainly what I would want to know.  Overruled.

21  A.  He just wanted to see probably what's in the contents

22  inside the memo book.

23         THE COURT:  Amongst those contents I would assume he

24  wanted to see where he was on the day of the murder.

25         THE WITNESS:  Probably, sir, but I can't remember

86IMMANT                              Agostini - direct

1    that.

2    Q.   Sir, that memo book disappeared, correct?

3    A.   Yes.

4    Q.   And everything that was inside of the memo book

5    disappeared, too, correct?

6    A.   That's correct.

7    Q.   Sir, when was it that this memo book disappeared?

8    A.   The whole box disappeared some time -- this is an

9    approximate -- either January of 2003, and that's an

10   approximate.  It's not -- to January, I would say, or February

11   of 2004.

12   Q.   When was the last time you saw the memo book?

13   A.   The memo book.  I don't know when I saw the memo book.  I

14   know when I saw the box, but I don't know when I saw the memo

15   book.

16   Q.   Would it have been some time in 2003, 2004?

17   A.   I can't tell you, sir.

18   Q.   Did you ever give testimony that the last time you saw the

19   memo book was 2001?

20   A.   Maybe I did.  I can't remember that.

21   Q.   At your deposition seven months ago on page 116 were you

22   asked this question and did you give this answer:

23   "Q.   When was the last time you saw the memo book?

24   "A.   Some time that year.

25   "Q.   In 2001?

86IMMANT                    Agostini - direct

1    "A.  Yes."

2    A.  Okay.

3    Q.  According to your testimony, the memo book went missing

4    long before the file did?

5    A.  No, sir.  The memo book was with the file.

6    Q.  You say the last time you saw the file was in 2003 or 2004,

7    correct?

8    A.  It's a box, yes.

9    Q.  But in your deposition seven months ago you told us the

10   last time you saw the memo book was in 2001, isn't that true?

11   A.  That's what I testified, yes.

12           THE COURT:  What's true today?

13           THE WITNESS:  Sir, I can't remember when the last time

14   I saw the memo book.  He's asking me today when was the last

15   time I saw it, and I can't remember the last time I saw the

16   memo book.

17           THE COURT:  Wasn't the memo book in the box?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  When is the last time you say today you

20   say you saw the box?

21           THE WITNESS:  The last time I saw the box was

22   January -- approximately, I would say, either January of

23   2003 --

24   Q.  Sir on February 12, 2001, did a lawyer call on

25   Mr. Manganiello's behalf?

86IMMANT                    Agostini - direct

1    A.  February 12, yes.

2    Q.  And did you consider Mr. Manganiello a suspect because a

3    lawyer called for him?

4    A.  In my thoughts I thought there was something suspicious

5    about it, but I didn't consider him a suspect because it wasn't

6    my case.

7    Q.  Sir, did you become suspicious because a lawyer was called?

8    A.  Yes, sir.

9    Q.  Sir, did the fact that a lawyer called on Mr. Manganiello's

10   behalf make him a suspect in your eyes?

11   A.  It wasn't my case, so he's not a suspect.  I didn't

12   consider him a suspect because it wasn't my case, but I had

13   suspicion of it because the lawyer called.

14   Q.  Sir, did you give testimony at a pretrial hearing on June

15   21, 2004?

16   A.  I don't know.

17   Q.  Sir, let me ask you, were you asked this question on page

18   352, line 6:

19   "Q.  Now when this lawyer called and said, stop questioning,

20   did that make him more of a suspect in your eyes?

21   "A.  In my eyes, yes."

22   A.  Right, in my eyes, but it wasn't my case.

23   Q.  Did you give that testimony, sir?

24   A.  If it's there, yes.

25           THE COURT:  Do you want to see any it?  Do you have

86IMMANT                        Agostini - direct

1    any question about it?

2              THE WITNESS:  Sir, I don't remember saying that.

3              THE COURT:  That's a good reason to look at it and see

4    if that makes you feel more secure or refreshes recollection or

5    both.

6    A.  I don't remember giving it.  I don't remember it.

7    Q.  Sir, do you have any dispute that that's what you said four

8    years ago?

9    A.  Sir, I don't know.

10   Q.  And when this case became yours on February 12, 2001 some

11   time in the evening, you considered Mr. Manganiello a suspect

12   because a lawyer had called for him, correct?

13   A.  Not only because the lawyer called, no.

14   Q.  Was the fact that a lawyer called for Anthony Manganiello

15   one of the reasons you considered him a suspect when you

16   inherited this case on February 12, 2001?

17   A.  There was other things, sir.

18   Q.  Was that one of the reasons, sir?

19   A.  It could be one of the reasons, yes.

20   Q.  Could be?

21   A.  Could be.

22             THE COURT:  You sort of said it was one of the reasons

23   in that transcript, unless you're now telling us you didn't say

24   that.

25             THE WITNESS:  He's saying before then when the lawyer

86IMMANT                    Agostini - direct

1    called.  When the lawyer called -- when the lawyer called, it

2    was 12 in the afternoon.  It wasn't my case.

3    Q.  It became your case at some point after 12 in the

4    afternoon, right?

5    A.  After, late at night.

6    Q.  Late at night, when the case became yours, in your eyes,

7    Mr. Manganiello was still a suspect because a lawyer had called

8    for him, correct?

9    A.  Not only because the lawyer called, no.

10   Q.  Sir, was that one of the reasons you considered him a

11   suspect, because a lawyer called on his behalf?

12   A.  It was probably one of the reasons, but it's not the only

13   reason.

14   Q.  Sir, isn't it true that you considered Mr. Manganiello

15   guilty because a lawyer called for him?

16   A.  No, sir.

17   Q.  Do you recall your deposition seven months ago?  Let me

18   just direct your attention to page 58, lines 3 through 7.  Did

19   you, in fact, say you considered him guilty of something

20   because a lawyer called?

21   A.  I can't find --

22   Q.  58, line 3, sir.

23   A.  It says I won't say guilty.  It says, I don't know.  Guilty

24   of something.

25   Q.  Is it true, sir, you considered him guilty of something

86IMMANT                         Agostini - direct

1   because a lawyer called?

2   A.  Guilty of something.  That's what it says here.

3   Q.  Those were your words, right?

4   A.  That's what it says here, yes, my words.

5   Q.  By the way, did you do a background check on

6   Mr. Manganiello?

7   A.  I don't remember whether I did.

8   Q.  Sir, at the point in time when the lawyer called, you

9   stopped questioning Mr. Manganiello, correct?

10  A.  Yes.

11  Q.  And at that point in time when the lawyer called, was there

12  any evidence that you were aware of that in any way connected

13  Anthony Manganiello to the murder of Albert Acosta?

14  A.  At the time when the lawyer called?

15  Q.  Yes.

16  A.  I didn't have him as a suspect.  I thought I was

17  interviewing someone that had information on the shooting

18  itself.  That's what I thought.  He was never considered a

19  suspect when his lawyer called.

20  Q.  That wasn't the question, sir.  Sir, the question is, at

21  the point in time when the lawyer called, were you aware of any

22  information that in any way tied Anthony Manganiello to the

23  murder of Albert Acosta?

24  A.  No.

25  Q.  And at that point you were aware of whatever Walter Cobb

86IMMANT                         Agostini - direct

1    had said, correct?

2    A.   No, sir.

3    Q.   Did you testify four years ago you were?

4    A.   At the time of his interview, no, I wasn't aware of Walter

5    Cobb.

6    Q.   At the time the lawyer called were you aware of Walter

7    Cobb?

8    A.   I am not sure.

9    Q.   On February 12, 2001, you were aware of what Walter Cobb

10   said, correct?

11   A.   I don't remember that.

12   Q.   Did you ever testify that you were?

13   A.   I could have, but I don't remember.

14   Q.   Sir, let me ask you, is it your testimony that when the

15   lawyer called you didn't know about Walter Cobb?

16   A.   That's correct.

17   Q.   Sir, didn't you admit a few minutes ago at the time the

18   lawyer called you were aware of what Mr. Walter Cobb said?

19           MS. OKEREKE:   Objection, your Honor.  These questions

20   have been asked and answered.

21           MR. JOSEPH:   I'll move on.

22           THE COURT:   Are you finished or close to finished?

23           MR. JOSEPH:   No, your Honor.  I have a good deal more.

24   Q.   Sir, at any point on February 12, 2001, did you have

25   probable cause to arrest Anthony Manganiello for the crime of

86IMMANT                        Agostini - direct

1    murder?

2    A.  Did I have probable cause, no, sir.

3    Q.  But you arrested him anyway, right?

4    A.  I didn't arrest him.

5              MS. OKEREKE:  Objection, your Honor.

6              THE COURT:  Overruled.  What did he do?

7              THE WITNESS:  Sir, some time during the day he was put

8    in a cell, but it wasn't my case yet.  It didn't become my case

9    until that night.  That night he was already in the cell.  So I

10   had to arrest him and void the arrest.

11             THE COURT:  You had to arrest him --

12             THE WITNESS:  He was in the cell already.  I had to

13   like process it as a voided arrest.

14   Q.  Sir, when he was put in the cell, what time was he put in

15   the cell?

16   A.  Sir, I don't know.  I didn't put him in the cell.

17   Q.  Were you there when it happened?

18   A.  I was in a squad office, but I didn't see anyone putting

19   him in the cell.

20   Q.  The cell itself is in the squad office, right?

21   A.  That's correct.

22   Q.  As you walking down doing work, you could see the cell?

23   A.  Yes.

24   Q.  You saw Anthony Manganiello sitting in the cell?

25   A.  At one point, yes.

86IMMANT                          Agostini - direct

1   Q.  When you saw him on February 12, 2001, sitting in a cell,

2   you knew there was no probable cause to arrest him, right?

3   A.  Sir, it wasn't my case.

4   Q.  Is that a yes or no, sir?

5   A.  It wasn't my case.  If it was my case, I could tell you

6   whether it was probable cause or not.

7   Q.  At that point in time it was still Mr. Abate's case?

8   A.  Yes.

9   Q.  So it means it was Mr. Abate's decision to arrest Anthony

10  Manganiello at the point in time there was still no probable

11  cause?

12              MS. OKEREKE:  Objection, your Honor.

13              THE COURT:  Overruled.

14  A.  I wouldn't know if it was his decision.  I don't know if it

15  was his decision or a superior's decision.  I don't know.

16  Q.  Sir, isn't it true that the lead detective is the one that

17  would make the decision?

18  A.  Either the lead decision or his supervisor.  The lead

19  detective just can't do whatever he wants.  He has supervisors.

20              THE COURT:  For every arrest they go to a supervisor

21  and they don't exercise their own independent judgment to make

22  any arrests?

23              THE WITNESS:  Detectives make arrests, but a

24  supervisor has to sign off on it.

25              THE COURT:  But in the regular course -- go ahead.

86IMMANT                          Agostini - direct

1    Let's keep moving here.

2              MR. JOSEPH:  Certainly, your Honor.

3    Q.  Sir, what time was Anthony Manganiello released?

4    A.  I don't know what time.  I know it was at night.

5    Q.  Was it the following morning?

6    A.  I don't know, sir.

7    Q.  Sir, wasn't it approximately 5:00 the following morning?

8    A.  I wouldn't know.

9              MR. JOSEPH:  Your Honor, at this point I would ask to

10   introduce Exhibit 61.  I don't believe there is an objection.

11             (Plaintiff's Exhibit 61 received in evidence)

12             THE COURT:  By the next morning it was your case,

13   right?

14             THE WITNESS:  By that night, sir.

15             THE COURT:  When you got out at 5:00 in the morning,

16   it was your case, but you had nothing to do with his release?

17             THE WITNESS:  No.  I released him, yes.  But I don't

18   know what time it was.  I know it's nighttime, but I don't know

19   what time it was.

20             THE COURT:  61 will be admitted without objection.

21             (Plaintiff's Exhibit 61 received in evidence)

22   Q.  Sir, I am going to show you what's been marked as Exhibit

23   61.  You created this, correct?

24   A.  Yes.

25   Q.  And according to Exhibit 61, on February 12, 2001, the

86IMMANT                        Agostini - direct

1    district attorney did not authorize the arrest of Anthony

2    Manganiello, correct?

3    A.   That's correct.

4    Q.   And you knew that by 10:00, correct?

5    A.   I don't know what time did I know it by.  I know that I

6    called.  I had called him and spoke to him.  I don't know what

7    time if you're looking time wise.

8    Q.   Why don't you look at the document.  Does it say on there

9    at 10 something p.m. you were told there was no probable cause

10   to hold Anthony Manganiello?

11   A.   You want to show me where it says 10 something p.m.?

12   Q.   Doesn't it say 2200 hours, sir?

13   A.   2025 is 8:25.

14   Q.   At 8:25 were you told there was no probable cause to hold

15   Anthony Manganiello by a district attorney?

16   A.   No, sir.  At 8:25 all I did is I wrote down that the person

17   died at 8:25.

18   Q.   But on the same DD5, which you document your activities at

19   8 something at night, you say, do you not, that there was --

20   defendant was arrested, then released, ADA Dondes, did not

21   authorize arrest?

22   A.   It doesn't say that it was at 2025.  But at 2025 the person

23   died.

24   Q.   On this same document, No. 2, it says ADA Dondes doesn't

25   authorize arrest?

86IMMANT                    Agostini - direct

1    A.  That's correct.

2    Q.  No. 1 says 2025 hours, right?

3    A.  Yes.

4    Q.  And this is the same DD5, correct?

5    A.  That's correct.

6    Q.  Sir, you didn't release Anthony Manganiello until the

7    following morning, isn't that correct?

8    A.  Sir, it was nighttime.  I don't know what time it was when

9    I released him, but it was night.

10   Q.  Sir, was a warrant to search Anthony Manganiello's car

11   obtained on February 12, 2001?

12   A.  Yes.

13   Q.  And did Mr. Shawn Abate convey information to the Assistant

14   District Attorney, ADA Dondes, in order to get the search

15   warrant?

16           MS. OKEREKE:  Objection, your Honor.

17           THE COURT:  If you know, you can answer.

18           MR. JOSEPH:  I'll rephrase it, Judge.

19   Q.  Sir, were you present with Shawn Abate during the course of

20   the day on February 12, 2001?

21   A.  Yes.

22   Q.  And were you present when he went and spoke with ADA

23   Dondes?

24   A.  That's correct, yes.

25   Q.  And one of the things Shawn Abate did on February 12, 2001

86IMMANT                          Agostini - direct

1   was provide Mr. Dondes with information to obtain a search

2   warrant for Anthony Manganiello's car?

3          MS. OKEREKE:  Objection, your Honor.

4          THE COURT:  If you know, you can answer.  If you don't

5   know --

6   A.  I don't remember, sir.

7   Q.  Did you remember seven months ago?

8   A.  Sir, I don't remember if he told any information to the --

9   I don't know if I was present, if I stepped out of the room.  I

10  don't know.

11  Q.  Well, sir, I'll tell you, what.  On page 94 of your

12  deposition, beginning on line 3, were you asked these questions

13  and did you give these answers:

14  "Q.  At some point did you speak with an Assistant district

15  attorney named Dondes?

16  "A.  Yes.

17  "Q.  Was that on February 12, 2001?

18  "A.  Yes.

19  "Q.  For what reason did you speak to ADA Dondes?

20  "A.  It was Shawn Abate that was speaking with him.  Shawn

21  Abate, I believe, was trying to obtain a search warrant for

22  Mr. Manganiello's vehicle."

23         were you asked those questions seven months ago and

24  did you give those answers under oath?

25  A.  Yes.

86IMMANT                    Agostini - direct

1   Q.   February 12, 2001, you and Mr. Abate went to the ADA's

2   office together, correct?

3   A.   Yes.

4   Q.   And there is a procedure for obtaining a search warrant,

5   correct?

6   A.   Yes.

7   Q.   And that procedure is the officer has to sign an affidavit,

8   correct?

9   A.   Yes.

10  Q.   And in the affidavit the officer has to state what facts he

11  knows about that provides probable cause to support a search,

12  correct?

13  A.   That's correct.

14  Q.   On February 12, 2001, you weren't aware of any facts that

15  establish probable cause to believe that Anthony Manganiello

16  had shot and killed Albert Acosta, isn't that correct?

17          MS. OKEREKE:   Objection, your Honor.   Asked and

18  answered several times.

19          THE COURT:   Overruled.

20          THE WITNESS:   Do I answer?

21          THE COURT:   Please.

22  A.   I didn't obtain the search warrant.

23  Q.   That wasn't the question.

24  A.   What was the question?

25  Q.   The question was, did you have any information that would

86IMMANT                          Agostini - direct

1    support probable cause on February 12, 2001 to believe that

2    Anthony Manganiello shot and killed Albert Acosta?

3    A.   I wasn't the one obtaining the search warrant.  You have to

4    ask the detective who was obtaining the search warrant whether

5    he had it or not.  I was not obtaining the search warrant.

6    Q.   By the way, the affidavit for the search warrant, that's

7    one of the documents that was put into the case file?

8    A.   That is correct.

9    Q.   And that affidavit disappeared?

10   A.   Yes.

11   Q.   We will never know what it said.

12   A.   I guess not.  I don't have it.

13   Q.   And it was never provided.

14            I'll withdraw the question.

15            By the way, was the application for the search warrant

16   granted?

17   A.   Yes.

18   Q.   Was a search conducted of Anthony Manganiello's car on

19   February 12, 2001?

20   A.   Yes.

21   Q.   And would it be fair to say it was a thorough search?

22   A.   I didn't search the car, sir.

23   Q.   Were you present when it was done?

24   A.   Yes.

25   Q.   From your observations as a detective on the job for 19

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                        Agostini - direct

1    years at the time, was it?

2    A.  No, sir.

3    Q.  Fourteen years?

4    A.  Yes.

5    Q.  As a detective on the job for 14 years, was it your

6    observations that the search of Anthony Manganiello's car was a

7    thorough one?

8    A.  I would say so, yes.

9    Q.  In fact, the car was actually x-rayed, wasn't it?

10   A.  At one point, yes.

11   Q.  And was there any --

12        MS. OKEREKE:  Objection.

13        THE COURT:  To the x-rays?

14        MS. OKEREKE:  There was a motion in limine regarding

15   this issue, your Honor.

16        MR. JOSEPH:  I'm not introducing those documents,

17   Judge.  I'm just asking what was done.

18        THE COURT:  That's what I thought.

19   Q.  Sir, as a result of this thorough search, was there any

20   weapons or evidence found in Mr. Manganiello's vehicle that in

21   any way tied him to the shooting of Albert Acosta?

22   A.  Any weapons or anything?

23   Q.  Was there any evidence which tied Anthony Manganiello to

24   the shooting of Albert Acosta?

25   A.  No, sir.

86IMMANT                          Agostini - direct

1   Q.  Sir, the point in time that the search warrant was

2   obtained, statements given by Mr. Huello were already in police

3   custody, correct?

4   A.  Can you rephrase that, please?

5   Q.  Sure.

6           MR. JOSEPH:  At this point, I would offer Exhibit 28

7   in evidence.

8           THE COURT:  Admitted without objection.

9           (Plaintiff's Exhibit 28 received in evidence)

10          MR. JOSEPH:  Judge, I also offer Exhibit 4 in

11  evidence.

12          THE COURT:  That, too, is admitted without objection.

13          (Plaintiff's Exhibit 4 received in evidence)

14  Q.  Sir, I show you what's been marked as Exhibit 4.  Is this

15  one of the documents that you had as part of your

16  investigation?

17  A.  Yes.

18  Q.  And according to this document, this is a DD5 created which

19  contains the statements of a Richard Huello, correct?

20  A.  That's correct.

21  Q.  And Huello arrived, according to Exhibit No. 4, Mr. Huello

22  arrived at 1700 Metropolitan Avenue at approximately 9:25 in

23  the morning, correct?

24  A.  I just have to read it.  Is that okay?

25  Q.  Sure.

86IMMANT                      Agostini - direct

1    A.   I just don't see the time.   You said 9:25 in this document?

2    Q.   Sir, does it say he arrives at 1700 Metropolitan Avenue?

3    A.   Yes.

4    Q.   And according to Exhibit No. 8, an SPO Nieves provides

5    Mr. Huello with a key at approximately 9:25 in the morning,

6    correct?

7    A.   Well, it states at 9:25 he was directed by a lieutenant to

8    take the key over to 1700 Metropolitan Oval.   At that time he

9    was directed.

10   Q.   By car, 1700 Metropolitan Oval is not very far from where

11   the central office is, right?

12   A.   Sir, I don't know.

13   Q.   Sir, does it indicate at approximately 9:25 Mr. Huello is

14   at 1700 Metropolitan Avenue?   Reading these two documents

15   together, is it fair to say that Mr. Huello was at 1700

16   Metropolitan Avenue at approximately 9:25 a.m.?

17   A.   That's not what my conclusion is.

18   Q.   Sir, when Mr. Huello is let into the basement does he hear

19   a walkie-talkie?

20   A.   Yes, he does.

21   Q.   And he bangs on the door, correct?

22   A.   Correct.

23   Q.   And there is no response, correct?

24   A.   Correct.

25   Q.   And he's at the basement of 1700 Metropolitan Avenue

86IMMANT                        Agostini - direct

1   continuously until Mr. Cobb arrives, correct?

2   A.   Correct.

3   Q.   And Mr. Huello doesn't hear any shots, does he?

4          MS. OKEREKE:   Objection, your Honor.

5   Q.   According to the statement.

6   A.   Can I just read this, please?

7   Q.   Yes, of course.

8          THE COURT:   Do you have a ground for that objection?

9          MS. OKEREKE:   I believe Mr. Joseph clarified his

10  question.

11  A.   It states here -- you said he remained.  It states here he

12  left and went to the main office after he spoke to the

13  maintenance worker.

14  Q.   And the maintenance worker was Mr. Cobb, correct?

15  A.   I don't know.  It says maintenance worker.  It doesn't say

16  Mr. Cobb in there.  Later on here it says maintenance guy

17  walking by, Walter Cobb.

18  Q.   Is it fair to say that based upon Exhibit No. 4, Mr. Huello

19  was in the basement of 1700 Metropolitan Avenue before Mr. Cobb

20  comes on the scene?

21  A.   Before?

22  Q.   Correct.

23  A.   That's what it states, yes.

24  Q.   And this is a document that you had in your investigation

25  file, correct?

86IMMANT                    Agostini - direct

1    A.  Yes.

2    Q.  And, sir, according to Mr. Huello, he didn't hear any shots

3    after he arrived, did he?

4    A.  That's what it states here, yes.

5    Q.  And he didn't see Anthony Manganiello in the basement at

6    all, did he?

7    A.  It doesn't state that he saw him, no.

8    Q.  And he was working directly across from where Mr. Acosta

9    was found, correct?

10   A.  I don't remember the room that he was working in.

11   Q.  Sir, do you consider there to be a conflict between what

12   Mr. Cobb says on one hand and what Mr. Huello says on the

13   other?

14   A.  No.

15        MR. JOSEPH:  Your Honor, I wanted to move Exhibit 5

16   into evidence.  I don't believe there is an objection.

17        THE COURT:  No objection, it will be admitted.

18        (Plaintiff's Exhibit 5 received in evidence)

19   Q.  Sir, I'll show you what's been marked as Exhibit No. 5.

20   Sir, you've seen this document before today, correct?

21   A.  Yes.

22   Q.  And this is a DD5 prepared by Detective Martinez, correct?

23   A.  That's correct.

24   Q.  And this is a document you had as part of your

25   investigation file, yes?

86IMMANT                    Agostini - direct

1   A.   Yes.

2   Q.   And this represents a statement that Mr. Martinez took from

3   Officer Alex Perez, correct?

4   A.   That's correct.

5   Q.   By the way, when was the statement taken?

6   A.   February 12.

7   Q.   Same day as the Acosta murder?

8   A.   Yes.

9   Q.   And did Officer Perez -- strike that.

10              Officer Perez relates at the bottom of the document

11   what, if anything, Mr. Cobb told him, correct?

12   A.   Hold on.  Let me read it.  Mr. Cobb told him?  Okay.  That

13   Cobb heard the shots.

14   Q.   And there is no mention of Mr. Cobb seeing Anthony

15   Manganiello at the scene, is there?

16   A.   There is nothing written here.

17   Q.   And there were also handwritten notes taken of that

18   conversation, yes?

19   A.   You'll have to ask the person who took it.

20   Q.   If the person who took it did in fact take it, he would

21   have given it to you in the ordinary course of business to be

22   put into the case file, correct?

23   A.   Correct.

24   Q.   Those notes, if they existed, were lost, correct?

25   A.   That's correct.

86IMMANT                          Agostini - direct

1          MR. JOSEPH:  I am going to ask to move Exhibits 26 and

2     27 into evidence.  I don't believe there is an objection.  On

3     consent, 26 and 27 in evidence.

4          THE COURT:  No objection, they will be admitted.

5          (Plaintiff's Exhibits 26 and 27 received in evidence)

6     Q.  Sir, I'll show you what has been marked as Exhibit 26.  Do

7     you recognize this?

8     A.  This is the first one you gave me, correct, 26?

9     Q.  It has 26 on it.

10    A.  Yes.

11    Q.  This is a document you created, correct?

12    A.  That's correct.

13    Q.  And when did you create this document?

14    A.  On February 24, 2001.

15    Q.  Approximately two weeks after the incident, correct?

16    A.  Correct.

17    Q.  After you interviewed Mohammed Riaz, correct?

18    A.  Yes.

19    Q.  Did Mr. Riaz tell you he picked up a Hispanic male and he

20    overheard the male talking on the cell phone that he saw a

21    security officer get shot?

22    A.  Correct.

23    Q.  This is before Anthony Manganiello was rearrested on April

24    20, 2001?

25    A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                          Agostini - direct

1   Q.  Sir, I am going to draw your attention now to Exhibit 27.

2   Do you recognize Exhibit 27, correct?

3   A.  Yes, that's correct.

4   Q.  It's a document you prepared?

5   A.  Yes, sir.

6   Q.  And you found the individual who had been in Mr. Riaz's

7   cab, yes?

8   A.  Yes.

9   Q.  His name was Alfred Vasquez, right?

10  A.  Yes.

11  Q.  And you spoke to Mr. Vasquez once, yes?

12  A.  Yes.

13  Q.  He said a couple of days after the incident he took a cab

14  and he spoke to somebody on the cell phone and he said he

15  imagined himself being there, correct?

16  A.  That's correct.

17  Q.  And he said he imagined himself being present when the

18  security officer was shot?

19  A.  When the person was shot.  I don't believe he said

20  security.

21  Q.  Sir, don't you write down --

22  A.  I said security officer, yes.

23  Q.  After this interview did you do any follow-up investigation

24  on Alfred Vasquez?

25  A.  Sir, I interviewed him and he said no, that he was only

86IMMANT                    Agostini - direct

1    lying about it.

2    Q.  And you bought that, you believed that?

3    A.  Yes, sir.

4    Q.  And you didn't do any other follow-up investigation into

5    Alfred Vasquez at all, correct?

6    A.  Not that I remember, sir.

7    Q.  Did you find Mr. Vasquez's story suspicious at all?

8    A.  Suspicious, no.  He just said he was talking to someone

9    over the phone, and he wanted to like, I guess -- I don't know,

10   make himself big that he sold this, he sold that.  When I asked

11   him did he see whoever shot the Parkchester security, he said

12   no.  I just makes thing up.  I was just on the phone talking to

13   someone.

14   Q.  Did you ever check Mr. Vasquez's fingerprints to see if

15   they matched any other fingerprints found on the crime scene on

16   February 12, 2001?

17   A.  Sir, I don't remember.

18   Q.  Anywhere in your DD5 does it indicate that that happened?

19   A.  No.

20   Q.  And if you do that, would you have made a DD5 about it?

21   A.  If I did that, of course, yes.

22   Q.  And there is no DD5?

23   A.  No DD5.

24   Q.  Sir, we have been talking about this case file.  When you

25   took possession of the case file was it your responsibility to

86IMMANT                          Agostini - direct

1   maintain all the reports and evidence during the investigation

2   and secure it for trial?

3   A.  Yes.

4   Q.  And one of the purposes of securing this evidence is to

5   guarantee a fair trial, correct?

6   A.  Yes.

7   Q.  And one of the reasons that you have to keep the materials

8   is so that someone accused of a crime can properly

9   cross-examine the witnesses, correct?

10  A.  I will say it's correct.  It's basically for trial.  That's

11  what the case is for, so when it goes to trial.

12  Q.  One of the reasons you secure the evidence is so that the

13  accused, the person who is accused of the crime has the ability

14  to cross-examine the people who are giving testimony against

15  him, correct?

16          MS. OKEREKE:  Objection, your Honor.

17          THE COURT:  If you don't know the answer, you can say

18  so, but it does seem that somebody like yourself might well

19  know the answer to that inquiry.

20  A.  Well, sir, I keep the case for myself, so when it goes to

21  trial so I'll be prepared.

22          THE COURT:  But you're aware of the law, right, that

23  indeed you have to turn over --

24          THE WITNESS:  Everything, sir, that's correct.

25          THE COURT:  I don't know about everything, but

86IMMANT                    Agostini - direct

1    certainly everything exculpatory.

2    Q.  Sir, did you testify in 2004, four years before the trial,

3    at the time -- let me ask you, sir, you received training at

4    the police academy as to why you have to secure handwritten

5    notes, correct?

6    A.  Sir, it was 20 years ago.  I don't remember.  It was more

7    than 20 years.

8    Q.  As of February 12, 2001, you had been a detective for 14

9    years, correct?

10   A.  I was a detective for 14 -- no.  I was on the job for 14

11   years.

12   Q.  You were on the job for 14 years.  And during those 14

13   years you continuously did police work?

14   A.  That's right.

15   Q.  Sir, were you asked this question and did you give this

16   answer at trial four years ago, page 300:

17   "Q.  To preserve the ability to have a person cross-examined is

18   one of the reasons why could have those notes, right?

19   "A.  Yes."

20          Did you give that testimony --

21   A.  I don't know, sir.  If it's there, I gave it.

22   Q.  Let me show you page 300.  Beginning on line 23, going on

23   to the next page, did you give that testimony four years ago?

24   A.  It states here, but I don't remember it.

25          THE COURT:  But you're not disputing -- didn't you

86IMMANT                    Agostini - direct

1    have a chance to look at it after it was transcribed?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Mr. Joseph, this is not going to go on

4    forever.

5              MR. JOSEPH:  I will expedite this, Judge.

6    Q.  Sir, were there also crime scene photographs that were

7    taken of the crime scene itself?

8    A.  There were photographs, yes.

9    Q.  Were those photographs also lost?

10   A.  Yes.

11   Q.  And those photographs were also evidence, correct?

12   A.  Yes.

13   Q.  By the way, the box that was lost, it was approximately 13

14   inches long and eight inches wide, correct?

15   A.  I don't know the size.

16   Q.  Sir, if I just direct your attention to your hearing

17   testimony, page 40, I am going to ask if that refreshes your

18   recollection.

19              Sir, after reviewing your hearing transcripts, do you

20   have a recollection of whether or not the box is approximately

21   13 inches long by eight inches wide?

22   A.  Even if you're telling me now, I don't know whether that

23   was the size or not.  I never measured it.

24   Q.  Did you say that's what the size was four years ago?

25   A.  It says approximately.

86IMMANT                          Agostini - direct

1   Q.  And the box was full of information, correct?

2   A.  Yes.

3   Q.  And it also included photographs taken of Anthony

4   Manganiello on February 12, 2001, right?

5   A.  Yes.

6   Q.  And those photographs were intended to document his

7   physical condition, right?

8   A.  I don't know if it was intended to do that.

9   Q.  But those photographs were lost, right?

10  A.  Correct.

11  Q.  By the way, you also had blood test results from a Band-Aid

12  that was removed from Anthony Manganiello's hand, correct?

13  A.  I wasn't there when that happened, but there was a

14  Band-Aid, I believe, vouchered.

15  Q.  But the results of tests run on that Band-Aid were also in

16  that box, correct?

17  A.  I don't know and I don't remember whether they were in the

18  box or not.

19  Q.  Sir, where was this box the last time you saw it?

20  A.  The last time I saw it was on top of, I believe, a locker

21  room, a locker in the detective's locker room on the second

22  floor.

23  Q.  Did you ever give a different statement under oath?

24  A.  Well, sir, at one point I said it was on my desk one time,

25  but the last time that I saw it, the last time that I believe

86IMMANT                        Agostini - direct

1    that I saw it was on top of the locker the last time.

2    Q.  Sir, didn't you ever say that the last time you saw it was

3    underneath your desk?

4    A.  At one point I had it underneath my desk.  I know the last

5    time I saw it was on top of the locker in the detective's

6    locker room.

7    Q.  Did you ever attribute its disappearance to a cleaning

8    lady?

9    A.  I don't know who cleaned that out.  They cleaned the whole

10   room.  I don't know who cleaned the whole room out.

11   Q.  Did you ever attribute the disappearance of your file from

12   underneath your desk to a person cleaning the squad unit?

13   A.  I don't know, sir.

14   Q.  Sir, at your deposition seven months ago on page 122 did we

15   ask this question and did you give this answer:

16   "Q.  When was the last time you had possession of the file?

17   "A.  The last time I saw it, it was underneath my desk.  Then I

18   came one day and the squad was like clean.  It was totally

19   cleaned and I said, what happened to all the boxes?  Somebody

20   cleaned up, they moved it next door."

21   A.  That's correct.

22   Q.  And it was your testimony that someone else moved the box?

23   A.  That's correct.

24   Q.  Did you ever testify that you put it on top of the locker?

25   A.  No, I never put it on top of the locker.  Let me rephrase

86IMMANT                          Agostini - direct

1   that.  One time I had the box, of course. and I was checking

2   through the box, and then I had to put the box right back on

3   top of the locker.  When I first saw the box, the box was on

4   top of the locker already.

5   Q.  Sir, did you put the box on top of the locker?

6   A.  At what point, sir?

7        MS. OKEREKE:  Objection, your Honor.  These questions

8   have been asked and answered.

9        THE COURT:  Sustained.

10  Q.  Sir, at trial did you give this testimony, page 281, line

11  24:

12  "Q.  And why was it that you placed this box on top of these

13  lockers?

14  "A.  Because the original room that it was in, they were

15  cleaning it out and they were putting boxes all over the place,

16  so I decided to take this box and put it in a safe place."

17  A.  That's correct.

18  Q.  By the way, sir, during your time at the 43rd Precinct,

19  there was a storage room, correct, where the cases were stored

20  and indexed by year?

21  A.  I don't know if it was indexed or not.  I don't remember if

22  it was indexed.  I know they had cabinets, but I don't know

23  whether they were indexed.

24  Q.  Sir, this case file was never put in the cabinet, was it?

25  A.  No, never.

86IMMANT                          Agostini - direct

1   Q.  That was a safe place to keep the files, correct?

2   A.  But it never fit, no.  It never fit in the cabinet.  It was

3   just too big of a box.

4   Q.  Sir, while you were at the 43rd Precinct there was also a

5   large storage room where the boxes were stored and indexed by

6   year, correct?

7   A.  Sir, I don't know.

8   Q.  Sir, did you testify seven months ago on page 118, line 14:

9   "Q.  Was there also a storage room at the 43rd Precinct at the

10  time you were there whereby boxes related to the homicide

11  investigations were stored by year?

12  "A.  By year.  There is a storage room that is stored by year,

13  yes."

14  A.  That's what I said.

15  Q.  You didn't put this box in that storage room either, right?

16  A.  No.  It was there originally, and then they started

17  cleaning that room out.  That's why my box was there

18  originally, in that room, and then they started cleaning

19  everything out from the squad room, and then they started

20  moving it all over the place.  That's where it was originally.

21  Q.  Sir, you never put the victim's name on the box, right?

22  A.  I had my name on the box.

23  Q.  Not the victim's name?

24  A.  I believe I had my name and I put homicide number, whatever

25  number it was.

86IMMANT                          Agostini - direct

1   Q.  But you didn't put Mr. Manganiello's name on it, right?

2   A.  Sir, I don't remember putting his name.

3   Q.  So you didn't put the victim's name or the accused's name

4   on this file, right, just your name?

5   A.  On the box, I mean?

6   Q.  Sir, isn't it also true that you didn't put -- you didn't

7   place the homicide file in the wrong box either, did you?

8           MS. OKEREKE:  Objection, your Honor.

9           THE COURT:  Sustained.

10  Q.  Sir, a day or two after you spoke with ADA Dondes and you

11  learned you had to release Anthony Manganiello, did you come in

12  contact with Terrence Alston?

13  A.  At one point I got in contact with Terrence Alston, yes.

14  Q.  When you came into contact with Terrence Alston, was he

15  member of any criminal organization?

16  A.  Yes.

17  Q.  What organization?

18  A.  The Bloods.

19  Q.  And you knew that when you came in contact with Mr. Alston,

20  correct?

21  A.  Yes.

22  Q.  Where is it you met Mr. Alston?

23  A.  In Rikers Island.

24  Q.  Was Mr. Alston in fact in Rikers Island on February 12,

25  2001?

86IMMANT                          Agostini - direct

1    A.  He probably was.  I don't know.

2    Q.  Sir, isn't it true that Mr. Alston had been in prison for

3    four years before Albert Acosta was murdered?

4    A.  I believe so, sir, yes.

5    Q.  And isn't it unusual for a Bloods member to cooperate with

6    the police --

7              MS. OKEREKE:  Objection, your Honor.

8    Q.  -- based on your experience as a detective?

9    A.  Well, sir.

10             THE COURT:  I'll let him answer.

11   A.  Some gang members do cooperate because some members, they

12   do cooperate, and some of them either do it for reasons, like

13   for time, or they do it for money.

14   Q.  Well, sir, did you ever testify that Mr. Alston is a gang

15   member and they are not going to provide information to the

16   police, they don't even like the police?  Did you ever use

17   those words?

18   A.  No, sir.

19   Q.  Let me show you your deposition, page 171.  Directing your

20   attention to lines 15 through 19, were these your words?

21   A.  15 to 19.  Which page?

22   Q.  171.

23   A.  That's 15?

24   Q.  Line 15 through 19.  Did you use the words that I just

25   uttered?

86IMMANT                          Agostini - direct

1    A.   It says maybe.

2    Q.   I'm sorry?

3    A.   I don't know which one you're talking about.

4    Q.   Sir, did you ever say that Mr. Alston -- on page 151, lines

5    15 through 19, did you say that Mr. Alston is a Blood, he is

6    not going to provide information to the police, Blood gang

7    members do not like the police?

8    A.   Sir, I don't remember that statement.

9    Q.   Did you make it?

10   A.   I don't remember.

11   Q.   Sir, did you find it unusual that a Blood gang member who

12   has been in jail for four months now has information about a

13   murder that has occurred while he's been in jail?

14            MS. OKEREKE:   Objection, your Honor.

15            THE COURT:   Overruled.

16   A.   Did he have some information.   Some people receive that

17   information in jail.

18   Q.   Sir, the only way he could have received information while

19   he was in jail is if someone gave it to him, correct?

20            MS. OKEREKE:   Objection, your Honor, speculation.

21            THE COURT:   Overruled.

22   A.   I would say so, yes.

23   Q.   After your met Mr. Alston did you do a background check on

24   him?

25   A.   Sir, I don't have the documents to say that I did or I

86IMMANT                    Agostini - direct

1    didn't.  I'm probably assuming I did, but I don't have the

2    document for that.

3    Q.  If you did a background check that would have been in the

4    file, correct?

5    A.  Yes.

6    Q.  And isn't it a fact that the background check which you

7    performed on Mr. Alston disappeared?

8    A.  If I did one, yes.

9    Q.  And, sir, the background check would contain all of

10   Mr. Alston's criminal history, correct?

11   A.  That would contain that, yes.

12   Q.  By the way, did you ever ask Mr. Alston to write out his

13   own statements about what, if anything, he knew about this

14   Acosta homicide?

15   A.  You have to show me, sir.

16   Q.  Did you ever ask Terrence Alston to write out his own

17   statement?

18   A.  I don't remember.

19   Q.  By the way, did Terrence Alston ever lie to you?

20   A.  Yes.

21   Q.  And that was before Anthony Manganiello was arrested,

22   rearrested, on April 20, 2001?

23   A.  That's correct.

24   Q.  And that's before Anthony Manganiello was charged with

25   murder, correct?

86IMMANT                    Agostini - direct

1    A.   Rephrase the question.

2    Q.   Did Terrence Alston provide you with false information that

3    implicated Anthony Manganiello before he was charged with

4    murder in April 2001?

5    A.   He did provide us with some bad information.  But some of

6    the information was good.

7    Q.   Sir, prior to Mr. Manganiello being charged with murder,

8    you knew that Alston had provided you false information,

9    correct?

10   A.   Yes.

11   Q.   Sir, as a result of that false information, did you have

12   doubts as to whether Terrence Alston was believable?

13   A.   Was he believable or -- I didn't know whether he was

14   believable or not believable.

15   Q.   You didn't know?

16   A.   No.

17   Q.   In your own mind, before you accused Anthony Manganiello of

18   murder -- let me withdraw that.

19              Sir, did you sign a felony complaint?  Sir, did you

20   sign a felony complaint charging Anthony Manganiello with the

21   crime of murder arising out of the death of Albert Acosta?

22   A.   Yes.

23              MS. OKEREKE:  Objection, your Honor.

24              THE COURT:  Overruled.

25   Q.   Before you signed that felony complaint did you have doubts

86IMMANT                    Agostini - direct

1   as to the believability of Terrence Alston?

2   A.  No, sir.

3   Q.  You didn't?

4   A.  No, sir.

5   Q.  Sir, let me ask you, seven months ago in your deposition

6   were you asked this question and did you give this answer, on

7   page 151, line 16:

8   "Q.  Did that raise any suspicion on your part whether

9   Mr. Alston was believable?

10  "A.  Like I said, I had my differences with him, okay.  You

11  know, he has somebody, I'm trying to look for this body, and he

12  says, I'll give it to you in four weeks or whatever.  I had my

13  doubts with him, yes."

14  A.  That was for that part.  For the part before, he was

15  arrested for murder.  There was a different part to that, so I

16  need to be specific.

17  Q.  Well, sir, did the fact that Terrence Alston provided you

18  with false information cause you to have doubts as to whether

19  he was believable before you signed a felony complaint charging

20  Anthony Manganiello with murder?

21  A.  He gave me false information at once, but then he gave me

22  the right information for the second time.

23  Q.  We will get to that in a couple of seconds, sir.

24          Isn't it true that if you get bad information from an

25  informant you're supposed to drop him?

86IMMANT                          Agostini - direct

1    A.  Sir, I don't have --

2              MS. OKEREKE:  Objection, your Honor.

3              THE COURT:  It's interesting, isn't it.  I don't know

4    the answer.  Is there an operating procedure --

5              THE WITNESS:  Sir, he wasn't my informant.

6              THE COURT:  Just for academic purposes.

7              THE WITNESS:  Most informants, you don't drop them the

8    first time they give you bad information.  If they keep doing

9    it and they keep doing it, then you drop them.

10             THE COURT:  Then you make your own decision.

11             THE WITNESS:  You make your own decision whether he's

12   worth it or not worth it.

13   Q.  Did you ever testify differently?

14   A.  I don't know.

15   Q.  Sir, in your deposition seven months ago on page 17,

16   beginning on line 23 were you asked these questions and did you

17   give these answers:

18   "Q.  In your experience, sir, working with confidential

19   informants, was there any procedure by which you put up a red

20   flag, so to speak, if it turned out that a confidential

21   informant had given you false information?

22   "A.  Basically, if he gives you once or twice bad information,

23   what your supervisor would say is drop him, you just drop him,

24   that's it.  He won't be your confidential informant anymore."

25             You were also asked this question on page 18.  Did you

86IMMANT                    Agostini - direct

1    make those statements, sir?

2    A.   That's correct.

3    Q.   And on page 18 were you also asked this question:  Was that

4    a procedure -- page 18, line 18:

5    "Q.   Was that a procedure that you would follow in the event

6    that a confidential informant gave you false information?

7    "A.   Yes."

8    A.   Yes.

9    Q.   Mr. Alston gave you false information, correct?

10   A.   But he wasn't my confidential informer.

11   Q.   Did you continue to rely on what Mr. Alston was saying to

12   commence prosecution against Anthony Manganiello?

13            MS. OKEREKE:   Objection, your Honor.

14            THE COURT:   I think we have your drift, Mr. Joseph.

15   We will sustain the objection.

16   Q.   Sir, did Mr. Alston tell you that a friend of his named

17   Johnny Baker sold plaintiff a .22 caliber gun?

18   A.   No.  He told me a Johnny sold.  He never said Johnny Baker.

19   Q.   Sir, did Mr. Alston tell you that a friend of his named

20   Johnny sold Anthony Manganiello a .22 caliber gun?

21   A.   Yes.

22   Q.   And that's the same caliber of gun that was used to kill

23   Albert Acosta, correct?

24   A.   That's correct.

25   Q.   And you found this person who was named Johnny, right?

86IMMANT                    Agostini - direct

1   A.  I found the Johnny, yes.

2   Q.  And Johnny told you it was a lie, right?

3   A.  I remember -- I remember the results that it was a lie, but

4   I don't remember the actual conversation with this Johnny

5   Baker.  I really don't.

6   Q.  And you believed Johnny Baker when he told you that Alston

7   was lying, correct?

8   A.  I believe that it was a lie, yes.

9   Q.  And he had no reason not to believe Johnny Baker, right?

10  A.  I don't remember this Johnny Baker, but I know I

11  interviewed a Johnny and I believed it to be a lie, yes.

12  Q.  And what Mr. Alston had done at that point is he had

13  falsely accused Anthony Manganiello of purchasing the same

14  caliber of gun used in the Acosta shooting months before the

15  shooting occurred, correct?

16  A.  No, that's not what he was saying.  That's not what he was

17  implicating, no.

18  Q.  Sir, the statement that Anthony Manganiello bought a gun

19  from Johnny Baker months before the Acosta shooting was false,

20  right?

21  A.  Correct.

22  Q.  So he lied about Anthony Manganiello buying a gun of the

23  same caliber prior to the shooting occurring, correct?

24          MS. OKEREKE:  Objection, your Honor.

25          THE COURT:  Overruled.

86IMMANT                    Agostini - direct

1    A.   No.   He lied about Johnny Baker selling the gun to Anthony
2    Manganiello.
3    Q.   By the way, owning a gun at that point in time, in 2001, it
4    was a felony, right?
5    A.   That's correct.
6    Q.   What Mr. Alston had done, in effect, was to falsely accuse
7    Johnny Baker of a felony?
8              MS. OKEREKE:   Objection, your Honor.
9              THE COURT:   Overruled.   You can answer.
10   A.   Sir, I don't know.   There is no complaint.
11   Q.   And from the information you had, Mr. Baker was innocent,
12   correct?
13   A.   I believe this person Johnny was telling me the truth that
14   he didn't sell the gun.
15   Q.   And you confronted Alston about him lying, correct?
16   A.   That's correct.
17   Q.   And isn't it true that Mr. Alston did not want you to
18   interview witnesses that he was bringing forward without him
19   being present?
20   A.   That's correct.
21   Q.   And did it ever raise a suspicion in your mind that
22   Mr. Alston was trying to influence witness testimony or witness
23   statements?
24   A.   No, sir.   I think he was trying to negotiate that he wanted
25   to get out of jail before he would tell me the right person who

86IMMANT                        Agostini - direct

1  he knows sold the gun.  He was trying to negotiate.  He wanted

2  to get out.

3  Q.  Sir, isn't it also true that you didn't create any

4  paperwork that documented that Terrence Alston didn't want you

5  interviewing witnesses without him being present?

6  A.  That's correct.

7  Q.  If such a paper had been created, that would have

8  undermined Terrence Alston's credibility, right?

9  A.  No, sir.

10         MS. OKEREKE:  Objection.

11         MR. JOSEPH:  Judge, is there a ruling?

12         THE COURT:  I didn't hear an objection.  Was there an

13  objection?

14         MS. OKEREKE:  Yes, your Honor.

15         THE COURT:  The grounds were?

16         MS. OKEREKE:  The form of the question, your Honor.

17         THE COURT:  Overruled.  Anyhow, he answered.

18         MR. JOSEPH:  I didn't hear an answer, Judge.

19         THE COURT:  He said no, sir.

20  A.  It's regarding if I did paperwork on the conversation.  Is

21  that the question?

22  Q.  No, sir, not the question.  The question was, if you

23  created paperwork that showed that Mr. Alston had to be present

24  before he would let you interview a witness that he produced,

25  wouldn't that tend to undermine his believability?

86IMMANT                          Agostini - direct

1    A.  But I did create paperwork, I believe, didn't I?

2    Q.  Sir, didn't you tell us a few minutes ago that you never

3    created any paperwork that documented Mr. Alston wanted to be

4    present when you were interviewing witnesses that he produced?

5    A.  I never did paperwork for that conversation.

6    Q.  And if you never did paperwork for that conversation --

7    strike that.

8          By the way, did you ever tell the assistant district

9    attorney involved in this case that Mr. Alston had to be

10   present when he produced a witness?

11   A.  Sir, I don't remember whether I told them that.  I do

12   remember that I kept them abreast of everything in this

13   investigation, even the conversations I had with Terrence

14   Alston.

15          THE COURT:  Do you know what Alston was in Rikers for?

16          THE WITNESS:  I don't know what he was in there for.

17   Q.  Sir, isn't it also true that Mr. Alston would find you

18   another witness, but it would take him four weeks?

19   A.  No, sir, he didn't say that.

20   Q.  Sir, on page 151 of your deposition, line 16:

21   "Q.  Did that raise any suspicions on your part whether

22   Mr. Alston was believable?

23   "A.  Like I said, I had my differences with him, okay.  He has

24   this body and I'm trying to look for this body and he says, I

25   will give it to you in four weeks or whatever.  I had my doubts

86IMMANT                        Agostini - direct

1  with him, yes."

2            Isn't that what you testified to, sir?

3  A.  Sir, what I'm telling you is, he told me that he has the

4  person who sold the gun and when I get out I will give you the

5  person.  That's what he was saying, not that he was going to

6  find a witness like from the street to do it.  He says, I have

7  the person, but I'll give it to you when I get out.

8  Q.  Sir, isn't that, in fact, what he did, he found a person

9  from the street?

10  A.  I don't know.

11  Q.  Sir, Mr. Alston was let out of jail in exchange for his

12  cooperation in this matter, right?

13  A.  I don't know, sir.

14  Q.  You don't?

15  A.  No.

16  Q.  Sir, beginning on your deposition, on page 182, line 16,

17  were you asked these questions and did you give these answer --

18  QUESTION-- strike that.

19            Wasn't it true that in your opinion at the time,

20  Mr. Alston was playing games to get out of jail?

21  A.  I wouldn't say playing games.  I know that he was probably

22  trying to negotiate.  I know if I was in jail I would

23  negotiate, too.  I wouldn't give you a witness if I'm still in

24  jail.

25  Q.  Sir, did you ever use the words that Mr. Alston was playing

86IMMANT                    Agostini - direct

1    games?

2    A.  Sir, I don't remember using those words.

3    Q.  Sir, let me ask you these questions.  Seven months ago at

4    your deposition on page 182, line 5:

5    "Q.  Whatever was said in the conversation between you and

6    Mr. Alston, did that, in your view, tend to undermine

7    Mr. Alston's credibility?

8    "A.  Somewhat, but I know he was playing games because he was

9    in jail and maybe he wanted to be out of jail before he gave me

10   like the correct person who did it, so he was playing games.

11   To me, he was playing games."

12            Did you give that testimony?

13   A.  Sir, if that's what's there, yes.  You're asking me today.

14   I don't remember giving that testimony.

15   Q.  By playing games, he means he will provide information if

16   you get him out of jail, right?

17   A.  To me, he wanted to get out of jail first, and then he was

18   going to give us the person who stole the gun.

19   Q.  But he couldn't give you the name of someone who stole the

20   gun until he was let out of jail?

21   A.  That his reasoning, yes.

22   Q.  One of the names of the persons he did give you while he

23   was in jail turned out to be a lie?

24   A.  That is correct.

25   Q.  By the way, did you create any written record that Terrence

1    Alston was playing games to get out of jail?

2    A.   Not that I remember, no.

3    Q.   Was that ever put in any of your DD5s?

4    A.   Sir, not that I remember, no.

5    Q.   If it had been put in your DD5s, you know it would had to

6    have been turned over to Mr. Manganiello's criminal defense

7    lawyers, right?

8    A.   The only thing I could think of was the so-called interview

9    with Johnny that stated he's not the person.  That would

10   contradict what Terrence Alston was telling me.  That does

11   contradict.  There was paperwork that was contradicting

12   Terrence Alston.

13   Q.   By the way, Johnny Baker wrote out his own witness

14   statement, right?

15   A.   Like I told you, I don't remember the actual interview, but

16   I know I spoke to a Johnny, but I don't remember this Johnny

17   Baker.

18   Q.   Sir, let me ask you this.

19           MR. JOSEPH:  I ask to move Exhibit 10 into evidence.

20           Judge, I ask to move Exhibit 24 into evidence.  I

21   don't think there is an objection.

22           (Plaintiff's Exhibit 24 received in evidence)

23   Q.   Sir, I am going to show you Exhibit 24.  Do you recognize

24   this?

25   A.   Yes, sir.

86IMMANT                    Agostini - direct

1    Q.   That's a felony complaint, right?

2    A.   That's correct.

3    Q.   That's a felony complaint you signed, correct?

4    A.   Correct.

5    Q.   Felony complaint you signed accusing Anthony Manganiello of

6    murder arising out of the death of Albert Acosta, correct?

7    A.   Correct.

8          MR. JOSEPH:   Your Honor, I offer a copy of Exhibit 10

9    that's premarked into evidence.

10         (Plaintiff's Exhibit 10 received in evidence)

11   Q.   Sir, Exhibit 10 you created, correct?

12   A.   Yes, sir, I created it.

13   Q.   And according to Exhibit 10, Johnny Baker wrote out his own

14   handwritten statement?

15   A.   According to the statement, yes.

16   Q.   Did that statement disappear?

17   A.   Yes.

18   Q.   Sir, did you ever tell the district attorney that

19   Mr. Alston was playing games to get out of jail?

20         MS. OKEREKE:   Objection, your Honor.

21         THE COURT:   Sustained.

22   Q.   Sir, in fact, was Mr. Alston let out of jail before Anthony

23   Manganiello was rearrested in April 2001?

24   A.   I believe he was out of jail.

25   Q.   And he was let out of jail for his cooperation, correct?

86IMMANT                        Agostini - direct

1    A.  Well, sir, I had nothing to do with letting him out of

2    jail.

3    Q.  I'm asking what your knowledge is, sir.

4    A.  I have none.

5    Q.  Sir, after Mr. Alston was let out of jail another gentleman

6    comes into the picture named Mark Damon, is that correct?

7    A.  That's correct.

8    Q.  Mark Damon was 17 years old, correct?

9    A.  You have to show me the DD5.

10   Q.  And, sir, after Johnny Baker told you he didn't sell

11   Anthony Manganiello a .22 caliber gun, now, all of a sudden,

12   Terrence Alston produces Mark Damon, correct?

13   A.  That's correct.

14   Q.  Mark Damon says he sold Anthony Manganiello a .22 caliber

15   gun months before the Acosta murder, correct?

16   A.  He didn't mention Anthony Manganiello.  He didn't mention

17   his name.

18   Q.  He mentioned he sold a .22 caliber gun to a white male

19   Italian security guard, right?

20   A.  I have to look at the DD5 before I could answer that.

21           THE COURT:  When you find a good time to pause, we

22   will take a recess.

23           MR. JOSEPH:  I have a copy right here.  I will use the

24   copy which is also marked.  I offer Exhibit 23 in evidence.

25           (Plaintiff's Exhibit 23 received in evidence)

86IMMANT                        Agostini - direct

1    Q.   Sir, I show I Exhibit 23.  You recognize Exhibit 23?

2    A.   Yes, I do.

3    Q.   What do you recognize it to be?

4    A.   It's the interview with Mark Damon.

5    Q.   That's an interview you did, right?

6    A.   It was the interview that I attended, yes.

7    Q.   By the way, who else attended this interview?

8    A.   It was Detective Derrick Parker, ADA Scaccia, and also, not

9    necessarily in the interview, but present was Terrence Alston.

10   Q.   Terrence Alston was there when Mark Damon was interviewed,

11   is that right?

12   A.   No, not while he was interviewed, no, sir.

13   Q.   Terrence Alston appeared at the district attorney's office

14   with Mark Damon, correct?

15   A.   Yes.  They appeared at the district attorney's office.

16   Q.   At this point in time Terrence Alston is out of jail?

17   A.   He's out of jail, yes.

18   Q.   By the way, looking at Exhibit 23, does that refresh your

19   recollection as to how old Mr. Damon was at the time?

20   A.   Yes.  17.

21   Q.   Were his parents there?

22   A.   No, sir.

23   Q.   Mr. Alston was quite a bit older than Mr. Damon, correct?

24   A.   I don't know -- yeah, he was older.

25        MS. OKEREKE:   Objection, your Honor.

86IMMANT                         Agostini - direct

1           THE COURT:  Sustained.

2    Q.  Sir, Mr. Damon now accused Anthony Manganiello of

3    purchasing a .22 caliber gun, correct?

4           MS. OKEREKE:  Objection, your Honor.

5           THE COURT:  Sustained.

6    Q.  Sir, did Mr. Damon ever admit that he lied?

7    A.  Yes.

8    Q.  And did Mr. Damon ever admit to you why he lied?

9    A.  He didn't admit to me why he lied.  I believe the district

10   attorney's office was interviewing him and I was present.

11   Q.  In your presence did he ever say why he lied?

12   A.  Yes.

13   Q.  Why did he lie?

14   A.  I don't remember exactly, so I am not going to guess at

15   what he said.  I just don't remember what he said.

16   Q.  Sir, did you remember seven months ago?

17   A.  I don't know.  I don't remember.

18   Q.  Sir, let me ask you.  Page 193 of your deposition, line 20:

19   "Q.  Did he recant in your presence?

20   "A.  I recanted to them first and then I sat down with the

21   investigator, and he said that Murdock, whatever, Alston, made

22   him say it."

23   A.  That's probably correct.

24   Q.  By the way, when you interviewed Mark Damon -- strike that.

25           The interview that's reflected in Exhibit 23, did you

86IMMANT                    Agostini - direct

1    ever ask Mark Damon where he got the gun from?

2    A.  I wasn't conducting the interview.

3    Q.  In fact, sir, you didn't speak to Mark Damon at all?

4    A.  That's correct.

5    Q.  That's because Mr. Alston didn't want you to speak to him?

6    A.  I wasn't doing the interview.  I wasn't conducting the

7    interview.  I was just there listening.

8         THE COURT:  Did you hear my earlier comment, Mr.

9    Joseph?

10        MR. JOSEPH:  No, I did not, your Honor.

11        THE COURT:  Whenever you're at a resting place, we

12   will take a recess.

13        MR. JOSEPH:  I have one more question and we can take

14   a recess.  I didn't hear that.  I apologize to the Court.

15        THE COURT:  That's all right.

16   Q.  Sir, did you ever give testimony that you did not talk to

17   Mr. Damon?

18   A.  I don't know, sir.  I don't remember talking to him or

19   giving testimony that I had spoken to him or not spoken to him.

20   Q.  Sir, on page 197 of your deposition were you asked the

21   following questions and did you give the following answers,

22   starting on line 21:

23   "Q.  By the way, did you ask Mr. Damon, the 17-year-old kid,

24   how he came in possession of a firearm?

25   "A.  Sir, I didn't talk to him."

86IMMANT                          Agostini - direct

1            Were you asked that question and did you give that

2       answer?

3       A.   Yes, I gave that answer.

4       Q.   Sir, continuing on page 198:

5       "Q.   You were there in the DA's office?

6       "A.   Yes.  And I didn't talk to him, you know, what this guy --

7       this Alston guy didn't want me to talk to him, so it was like

8       ADA, Derrick Parker, and the kid, and I didn't ask him any

9       questions.  I just listened."

10           Did you give that testimony?

11      A.   Yes.

12      Q.   Sir, you were the lead investigator on this case, not

13      Terrence Alston?

14           MS. OKEREKE:   Objection, your Honor.

15           THE COURT:   Sustained.

16           MR. JOSEPH:   This is an appropriate resting point.

17           THE COURT:   Ladies and gentlemen, we will take a

18      ten-minute recess and we will come back at or about 3:30.

19           (Jury not present)

20           THE COURT:   Mr. Joseph, you have 15 minutes for this

21      witness.  You should use it any way you want, and here is what

22      I think you can ask the brother.  Actually, I would have

23      preferred the stipulation I originally thought we might put

24      together, but my guess is you never even bothered to talk to

25      Corp. Counsel.  So I have written out the way in which you can

86IMMANT                              Agostini - direct

1    get the answer because you're leading him into it.  It's

2    exactly what he said in some former document or what he said.

3              MR. JOSEPH:  Very well, your Honor.

4              MR. ZUCKERMAN:  Can I see what he has.

5              (Recess)

6              (Jury present)

7              THE COURT:  This direct, by the way, is going to be

8    over in 15 minutes in case you thought it might never end.

9              MR. JOSEPH:  May I proceed, your Honor?

10             THE COURT:  You may.

11   BY MR. JOSEPH:

12   Q.  Sir, did Terrence Alston ever tell you that a security

13   guard hired him to kill another security guard?

14   A.  Hired him?

15   Q.  Correct.

16   A.  There were talks of killing another security guard, yes,

17   but as far as the hiring part, no.

18   Q.  Did Mr. Alston ever say to you that a Parkchester security

19   guard wanted him to commit a murder?

20   A.  Yes.

21   Q.  Sir, did you testify at your deposition seven months ago on

22   page 212, line 6:

23   "Q.  Now, did you testify a couple of seconds ago that

24   Mr. Alston never said to you that a Parkchester security guard

25   wanted to hire him to commit a murder?

86IMMANT                          Agostini - direct

1    "A.  He never said that to me.

2    "Q.  He never did?

3    "A.  No."

4         Did you give that testimony.

5    A.  That was --

6         THE COURT:  It's a yes or no question.

7    A.  Do I remember the testimony, no, I don't remember the

8    testimony.

9    Q.  Did you give that testimony?

10   A.  I don't remember the testimony.

11        THE COURT:  You want to look at it to see if that

12   helps you?

13        THE WITNESS:  Yes, sir.

14   Q.  212.

15        THE COURT:  I don't think anybody is arguing about the

16   veracity of the deposition language, but you're welcome to tell

17   us you never said that.

18        THE WITNESS:  Sure.

19        THE COURT:  Just a couple of lines, Mr. Agostini.

20   A.  Sir, that's what it says here, but I don't remember this.

21   Q.  Sir, did you also create Exhibit No. 22, which is right in

22   front of you, next to those cups?

23   A.  Yes.

24   Q.  Sir, did you testify at a pretrial hearing on June 18, 2004

25   and did you give the following -- did you ever testify that you

86IMMANT                          Agostini - direct

1    found a note in plaintiff's locker?

2    A.  I know I found a note, but I am not sure why I don't

3    remember where I found it at.

4              THE COURT:  You found it in his locker, you just said?

5              THE WITNESS:  No, sir.  I said I know I found a note.

6              THE COURT:  You don't know where.

7              THE WITNESS:  I don't know where, whether it was the

8    locker or somewhere else.

9    Q.  But it was a note that you attributed to the plaintiff

10   having?

11   A.  Yes.

12   Q.  Did you testify at a pretrial hearing on June 18, 2004 that

13   the note said, I feel like killing somebody?

14   A.  Yes.

15             MR. JOSEPH:  Your Honor, at this point I would ask to

16   move into evidence Exhibit 16.

17             THE COURT:  Very well.  With no objection, it will be.

18             (Plaintiff's Exhibit 16 received in evidence)

19   Q.  Exhibit 16 is the note, is it not?

20   A.  Yes, sir.

21   Q.  And it doesn't say I feel like killing somebody?

22   A.  No, sir.

23   Q.  In fact it says:  I pray every day I will never have to

24   kill somebody, correct?

25   A.  Kill someone.

86IMMANT                    Agostini - direct

1    Q.  I pray every day that I will never have to kill someone.

2    That's what the note says?

3    A.  Yes.

4    Q.  Did you ever correct the testimony that you gave to the

5    court in June 2004?

6    A.  Sir, when I gave my testimony I didn't have this piece of

7    paper in front of me.  I basically testified out of memory.

8    Just like you, you messed up, when you said something else.

9    Q.  Sir, you were present when an attorney named Richard Ross

10   appeared for Anthony Manganiello at the 43rd Precinct on

11   February 12, 2001, correct?

12   A.  Correct.

13   Q.  And did you testify at a pretrial hearing that Mr. Ross

14   exited the interview room and said to you, quote unquote, was

15   it intentional?

16   A.  He didn't say it to me.  I was present -- I believe it was

17   me and someone else.

18   Q.  Did you testify that Mr. Ross made that statement when he

19   left the interview room?

20   A.  The statement was it intentional, yes, that's correct.

21   Q.  You gave that testimony under oath, right?

22   A.  I don't know whether I gave that testimony.

23   Q.  Sir, did you give that testimony on June 21, 2004?

24   A.  Sir, I don't know.

25          THE COURT:  I'll take judicial notice that he did.

86IMMANT                        Agostini - direct

1    And the Corporation Counsel, I assume, will join me, if he has

2    that power.

3    Q.  Sir, a couple of weeks after you found out that Mr. Alston

4    lied about Mr. Baker, you met with a gentleman named Michael

5    Booth, right?

6    A.  Yes.

7    Q.  And Richard Martinez was with you?

8    A.  I believe so, yes.

9    Q.  You saw him in front of a pizzeria, correct?

10   A.  He came inside the pizzeria.

11   Q.  You saw him around a pizzeria, right?

12   A.  Yes.

13   Q.  And you had some information that Mr. Booth was engaged in

14   criminal activity, correct?

15   A.  I don't know.  I don't know how to answer criminal

16   activity.

17   Q.  Did you have any information that he was in any way

18   affiliated with organized crime?

19   A.  That he was -- if I could see the DD5.  Can I see the DD5?

20   Q.  I'll show you what's been marked in evidence as Exhibit 41.

21   By the way, sir, you created this document, right, the first

22   page of it, it's a three-page document?

23   A.  This is not the DD5 I'm looking for.

24   Q.  Is that the DD5 for Mr. Booth?

25   A.  No.  For Chris Tartone.  I'm looking for just to let you

86IMMANT                          Agostini - direct

1    know whether -- whether he's affiliated with organized crime.

2    Q.  Sir, do you have any recollection of whether Mr. Booth was

3    a bookie?

4    A.  I don't know whether they said a bookie or the neighborhood

5    loan shark or something like that, but it wasn't -- I don't

6    believe it was a bookie, no.

7    Q.  It was one of the two?

8    A.  It was something like that.  I have to look at the DD5.

9    Q.  Both of those activities are illegal, right?

10   A.  Yes.

11   Q.  And after you met with Mr. Booth you did a background

12   check, right?

13         MS. OKEREKE:  Objection, your Honor.  I believe there

14   was a motion in limine regarding this issue.

15         THE COURT:  I don't want to go any further.  I assume

16   you listened to what we read out to you in the motions in

17   limine, right?

18         MR. JOSEPH:  Judge, I don't believe this was precluded

19   in any motions in limine.

20         THE COURT:  This seems to me this was part of one.  I

21   don't want to go any further, in any event.

22   Q.  Sir, let me ask you this.  Did you search Mr. Booth when he

23   arrived at the proceeding sing?

24   A.  He arrived at the precinct.

25         MS. OKEREKE:  Your Honor, this is along the same vain

86IMMANT                          Agostini - direct

1    of questions.

2            MR. JOSEPH:  Judge, I believe the Court -- I believe

3    this is what the Court allowed me to ask, specifically this one

4    individual, but not others.

5            MS. OKEREKE:  No, your Honor.  I believe that's not

6    what the Court ruled.

7            THE COURT:  You remember the number?

8            MR. ZUCKERMAN:  Point number 10, your Honor, in

9    defendants' motion in limine.

10           MR. JOSEPH:  Which I believe --

11           THE COURT:  Actually, the way it worked out is, the

12   motion was granted as to Alston and that means it was excluded

13   and denied as to Booth, which meant it was admitted.  So it was

14   defendants' motion to exclude evidence with respect to both of

15   them.  So it would seem to me that although if you go down and

16   see what the rationale was, in terms of Alston and what he told

17   the defendant --

18           MS. OKEREKE:  Your Honor, I apologize.  May the

19   parties have a side bar?

20           THE COURT:  No.  We are certainly not going to do

21   that.  I thought I made that clear at the outset.

22           MR. JOSEPH:  Judge, my notes reflect that it was

23   denied as to Booth.

24           THE COURT:  I think that's true.

25           MR. JOSEPH:  That would mean I'm allowed to ask these

86IMMANT                        Agostini - direct

1    questions that I'm asking.

2            THE COURT:   It seems that way to me.   I'll allow it.

3            MR. JOSEPH:   Can I have the last question read?

4            I'll withdraw it.

5    Q.   Sir, when Mr. Booth arrived at the police station at the

6    43rd Precinct, you and Detective Martinez brought him back to

7    the police station, correct?

8    A.   That's correct.

9    Q.   At some point you searched Mr. Booth, correct?

10   A.   At some point, yes.

11   Q.   And Mr. Booth was reluctant to talk to you, was he not?

12   A.   Yes.

13   Q.   When you searched him you found betting slips in his

14   pocket, correct?

15   A.   I don't know if they were betting slips.

16   Q.   Did you find slips with a bunch of names and amounts,

17   numerical numbers?

18   A.   There were names, yes, names and numbers.

19   Q.   Sir, did you consider that to be evidence of criminal

20   activity?

21   A.   Well, sir, I have never seen a betting slip before.

22   Q.   Really.   Did you also find a knife on him?

23   A.   Yes.

24   Q.   Sir, were you asked these questions and did you give these

25   answers at your deposition seven months ago, page 222, line 18:

86IMMANT                        Agostini - direct

1     "Q.  Did you tell him that you would pass his name onto

2     organized crime?

3     "A.  Yes, I would, yes, I did."

4          21:  "Why did you say that?

5     "A.  Because he had these betting slips in the back of his

6     pocket."

7          Is that your testimony, sir.

8     A.  That's the testimony, yes, but I didn't know whether they

9     were betting slips or not.  They were names and numbers.  I

10    have never seen a betting slip before.

11    Q.  Seven months ago you knew they were betting slips, right?

12    A.  I didn't know they were betting slips.

13         MS. OKEREKE:  Objection, your Honor.

14         THE COURT:  Let me clarify how you may have

15    misunderstood the ruling with respect to the motion in limine,

16    but the bottom line is that the evidence with respect to Booth

17    and the fact that he had not been arrested was something I

18    found to be relevant, and I can tell you why, but in fact

19    that's partially the way I came out with respect to this and

20    differently with respect to Alston.  But I could give you the

21    decision since I wrote something on every one of your 19

22    motions.

23         Go ahead.

24    Q.  And, sir, did you say to Booth after you threatened to pass

25    his name onto organized crime, I have some information from

86IMMANT                     Agostini - direct

1    somebody that a Parkchester security officer approached you

2    with purchasing a gun?

3    A.  I said that before searching.

4            MS. OKEREKE:  Your Honor, defendants note for the

5    record their objection to this line of questioning.

6            THE COURT:  You only have about five more minutes.

7    Q.  Sir, you said that, right?  Then you searched him, correct?

8    A.  Right.

9    Q.  Then you found betting slips and a knife, right?

10   A.  I saw names and numbers and he had a knife on him.

11   Q.  That's when you threatened to pass his name onto organized

12   crime?

13           MS. OKEREKE:  Objection.

14           THE COURT:  Overruled.

15   A.  There were no threats.  I told him that I was going --

16           THE COURT:  I really only want the information with

17   respect to the arrest.  I really don't want the gory details.

18   Q.  Sir, Mr. Booth then signed a statement implicating Anthony

19   Manganiello, correct?

20   A.  Yes.

21   Q.  And he signed a statement which is in Exhibit 41 which says

22   that Anthony Manganiello approached him to buy a gun, right?

23   A.  He said a rod.

24   Q.  You understood a rod to mean a gun?

25   A.  Yes.

86IMMANT                    Agostini - direct

1    Q.  After he signed that statement, he gave Mr. Booth back the

2    knife?

3    A.  Correct.

4    Q.  And he walked out of the station house?

5    A.  Yes.

6    Q.  And the gambling slips disappeared, right?

7    A.  They were with my box.

8    Q.  In the box that disappeared, right?

9    A.  That's correct.

10   Q.  And the gambling slips disappeared with the box, yes?

11           MS. OKEREKE:  Objection, your Honor.

12           THE COURT:  Overruled.

13   A.  I don't know if they are gambling slips.  They are a slip.

14   The names of the numbers with the slip, they disappeared.

15   Q.  Mr. Booth was never charged -- strike that.

16           After he signed this statement you never passed

17   Mr. Booth's name onto organized crime, right?

18   A.  I don't believe I did.

19   Q.  And Mr. Booth was never arrested after he signed that

20   statement, right?

21           MS. OKEREKE:  Objection, again, to this line of

22   questioning, your Honor.

23           THE COURT:  Overruled.  You have an objection to the

24   line.  You don't have to stand up and give him less time every

25   few minutes while he asks questions, which he has a few minutes

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                          Agostini - direct

1   left to do.

2           MS. OKEREKE:  Thank you, your Honor.

3           THE COURT:  You're very welcome.

4   Q.  Sir, isn't it true that Mr. Booth was never arrested after

5   he signed that statement implicating Anthony Manganiello?

6   A.  He was never arrested.

7   Q.  And those gambling slips never made their way to the

8   assistant district attorney's office, did they?

9   A.  The slips were in the box.

10  Q.  And, sir, to get an arrest warrant you went before a judge,

11  yes?

12  A.  Yes.

13  Q.  And you told the judge what evidence you had, right, what

14  statements you had from what witnesses, correct?

15  A.  I don't remember the conversation I had with the judge.

16  Q.  But you had to go before a judge and give information to

17  get an arrest warrant?

18  A.  That's correct.

19  Q.  Did you tell that judge that you threatened to pass Michael

20  Booth's name onto organized crime?

21  A.  I just told you I don't remember what I told the judge.

22  Q.  But did you tell the judge that Alston had lied to you?

23  A.  I don't remember what I told the judge.

24  Q.  Did you ever tell the judge that Mr. Booth was never

25  arrested even though you found criminal evidence on him?

86IMMANT                    Agostini - direct

1    A.  I never -- I don't remember the conversation I had with the

2    judge.

3            MR. JOSEPH:  Judge, I believe that's all I have.

4    Thank you, your Honor.

5            THE COURT:  Do you have any cross?

6            MS. OKEREKE:  Yes, your Honor.

7            THE COURT:  While you're getting warmed up, let me

8    just reread to you what this case is about because sometimes I

9    seem to lose track myself.  This isn't all that you'll hear but

10   it gives you some feeling.

11           That the plaintiff to prevail on a claim of malicious

12   prosecution must establish four elements:  First, the plaintiff

13   must prove that the defendant initiated a criminal proceeding;

14   second, the proceeding must have been terminated favorably to

15   the plaintiff; third, the plaintiff must prove that there was

16   no probable cause for the criminal charge; and, finally, the

17   defendant must have acted maliciously.

18           I think if you keep your eye on those four balls and

19   the lawyers as well, we will all do swimmingly.  That concerns

20   not only direct but cross-examination.

21           MS. OKEREKE:  If I may proceed, your Honor.

22           THE COURT:  You may.

23           (Continued on next page)

24

25

86IMMANT                     Agostini - direct

1    CROSS-EXAMINATION

2    BY MS. OKEREKE:

3    Q.  Now, Detective Agostini, there has been discussion of a

4    case file.  At any point after the plaintiff was arrested did

5    you provide the district attorney with the case file regarding

6    the Albert Acosta investigation?

7    A.  The case file was in a box.  The whole box I provided them.

8    Q.  And at what point did you give the district attorney this

9    case file or this box?

10   A.  I believe it was after the arrest.

11   Q.  Were all the documents relating to the investigation in the

12   case file in this box at the time you gave the file to the

13   district attorney?

14   A.  Yes.

15   Q.  Was it your belief that everything you had regarding the

16   investigation was in the file at the time you gave it to the

17   DA?

18            MR. JOSEPH:  Objection, leading.

19            THE COURT:  Sustained.

20   Q.  What was in the box at the time that you gave the file to

21   the district attorney?

22   A.  Basically, everything that I did in the investigation of

23   the homicide was in that box.

24   Q.  Did the DA return the file to you?

25   A.  Yes.

86IMMANT                    Agostini - cross

1    Q.  And when did the DA return the file to you?

2    A.  I'm not sure.  Could have been two or three weeks later.

3    I'm not sure of the time after I dropped it off.

4    Q.  What did you do with the file after the district attorney

5    returned it to you?

6    A.  I brought it back to the 43 squad.

7    Q.  And at some point were you reassigned to another precinct?

8    A.  Yes.

9    Q.  And when was that?

10   A.  February of 2003, until February of 2004, I was transferred

11   to the deputy commissioner's office.

12   Q.  And at the time that you were reassigned, was the Albert

13   Acosta case still assigned to you?

14   A.  Rephrase it, please.

15   Q.  At the time that you were reassigned to another precinct,

16   were you still handling the homicide investigation?

17   A.  I was still handling, yes.  It's my case.

18   Q.  Were you responsible for tracking the whereabouts of where

19   the case file was in the 43rd Precinct?

20   A.  No, ma'am.

21   Q.  Did there come a time when you later attempted to find the

22   case file?

23   A.  Yes, ma'am.

24   Q.  When was this?

25   A.  This was after I had a conversation with ADA Scaccia, and

86IMMANT                    Agostini - cross

1    she said that the case was going to trial, I believe she said

2    something like in June.  And at that point I started looking

3    for the case.

4    Q.  Again, you were looking for the case because the trial was

5    coming up?

6    A.  Yes.

7    Q.  Did anyone else try to find the case file?

8    A.  Yes.

9    Q.  And who else tried to find the case file?

10   A.  I believe ADA Scaccia came herself to the precinct and

11   looked for the file.

12   Q.  And how long did you look for the file?

13   A.  I looked for the file for like three or four days.

14   Q.  How long did ADA Scaccia look for the file?

15   A.  I am not sure.  You have to ask her.

16   Q.  But she did attempt to try and obtain --

17   A.  I believe she did.  She told me that, yes.

18   Q.  Were you eventually able to find this case file?

19   A.  No.

20   Q.  And why is that?

21   A.  They had moved it.

22   Q.  Who had moved it?

23   A.  I don't know.  I don't know who moved it.

24   Q.  Were you given any indication or any reason by any

25   individual at the 43rd Precinct why the case file may not have

86IMMANT                          Agostini - cross

 1   been --

 2            MR. JOSEPH:  Objection, hearsay.

 3            THE COURT:  If you know what transpired.  You've

 4   already testified that they were renovating the area.  I

 5   suppose that's fair.

 6            THE WITNESS:  Yes.  The room where the box was on top

 7   of a locker used to be a detective locker room.  When I was

 8   transferred and came back, it was an auxiliary room.  They

 9   totally changed the whole room.

10   Q.  At the time that you were assigned to the 43rd Precinct,

11   approximately how many boxes were kept in this locker room?

12   A.  There were various boxes.

13   Q.  And how many boxes total would you estimate were held at

14   the 43rd Precinct?

15   A.  At that room, you mean?

16   Q.  In the 43rd Precinct.

17   A.  A whole bunch of boxes.

18            THE COURT:  What are these boxes, are they just

19   cardboard boxes that you get out of the supermarket?

20            THE WITNESS:  It's like those boxes that they keep

21   cases in.

22            THE COURT:  I can't see them, but I presume the jury

23   can figure it out.

24            THE WITNESS:  Just like a cardboard box like this, and

25   you keep documents in them.  There was, I would say, hundreds

86IMMANT                    Agostini - cross

1   of boxes that I looked through in the 43rd Precinct for this

2   case.

3   Q.   Hundreds of boxes when you were attempting to find the case

4   file for this case?

5   A.   Yes.

6   Q.   Now, during your time -- as you previously testified you've

7   been with the New York City Police Department for over 20

8   years -- how many investigations have you been involved with

9   during your time with NYPD?

10          MR. JOSEPH:   Objection, relevance.

11          THE COURT:   I'll allow it.

12  A.   I would say thousands.

13  Q.   Do you remember every single detail of every investigation?

14  A.   No, ma'am.

15          THE COURT:   Do you remember never having lost a box?

16          THE WITNESS:   Right.   That was the only time I lost a

17  case file like that.

18  Q.   And, again, why don't you remember every detail of every

19  investigation that you handled?

20          MR. JOSEPH:   Objection.   Form.

21          THE COURT:   I'll allow it.

22  A.   It's just too much detail, too much investigation.   You

23  interview numerous witnesses, numerous victims.   It's just --

24  it's a lot of investigation.

25  Q.   Well, in addition to interviewing witnesses and the things

86IMMANT                    Agostini - cross

1   you've just stated, what were your general duties and

2   responsibilities as a detective with the 43rd Precinct?

3   A.  Our duties was to catch -- catch, meaning we receive

4   complaints from people which were open, meaning could be

5   domestic violence, shootings; not robberies, but homicides,

6   domestic disputes.

7   Q.  And at some point on February 12, 2001, was the

8   investigation -- you previously testified that the

9   investigation of Albert Acosta was reassigned to you as lead

10  case detective, is that correct?

11  A.  That's correct.

12  Q.  Please explain for us what are the duties of a lead case

13  detective in a homicide investigation.

14  A.  Basically, the lead detective is in charge of the

15  investigation and if he wants certain things done, he ought to

16  ask people.  He doesn't do everything.  He ought to ask people

17  either to canvass, meaning interview people in this building,

18  or do something else, go to the hospital, or anything like

19  that.  But the lead detective is in charge of the

20  investigation.

21  Q.  And, again, in charge, if you could just explain.

22  A.  In charge meaning he's basically directing the

23  investigation.

24  Q.  Now, during of course of an investigation you've testified

25  that you and other detectives create what's called DD5s?

86IMMANT                    Agostini - cross

1    A.  Yes.

2    Q.  And so we understand more, could you just please explain

3    exactly what a DD5 is?

4    A.  A DD5 is a follow-up, and basically it's a form where

5    basically we use it to interview people.  If anyone needs to be

6    interviewed we put it on a DD5.

7    Q.  Do you also carry a spiral notebook with you during an

8    investigation?

9    A.  Yes.

10   Q.  And why do you carry a spiral notebook?

11   A.  Because we basically interview a person, we put it on a

12   spiral notebook, the information they give us, and from the

13   spiral notebook it goes onto a DD5.

14   Q.  Is there any difference between what is in your notes, your

15   handwritten notes, and what would be in a DD5?

16   A.  I would say it's the same thing.

17   Q.  And the DD5s for this case, were they provided to the

18   district attorney's office prior to the grand jury?

19   A.  Yes.

20   Q.  Now, Detective Agostini, I'd like to specifically talk to

21   you about this investigation and some of the events that

22   occurred.  Approximately how many members of the 43rd Precinct

23   were involved in this investigation?

24   A.  Like the whole squad.  I can't -- more than, I would say,

25   15 people.

1    Q.  More than 15 people?

2    A.  I would say, yes.

3    Q.  Were there also other individuals not working with the 43rd

4    Precinct that were involved in the case?

5    A.  There were people from the crime scene and other units.

6    Q.  When adding people with the crime scene, people from other

7    units and people from the 43rd Precinct, would you say that

8    more than 20 individuals participated in this investigation?

9    A.  I would say more than 20.  It was an approximate.

10   Q.  Definitely more than 20, you're saying?

11   A.  I'm not sure more than 20.  I'm saying it was an

12   approximate.

13   Q.  Many individuals, though?

14   A.  Yes.

15   Q.  I am going to show you or enter into evidence what's been

16   marked as Defendants' Exhibit W.

17         (Defendants' Exhibit W received in evidence)

18   Q.  Detective Agostini, who prepared Defendants' Exhibit W?

19   A.  I did.

20   Q.  And if you could please tell us -- or when was this

21   document prepared?

22   A.  February 12, 2001.

23   Q.  What does this document indicate had occurred as a part of

24   your investigation?

25         THE COURT:  You're putting it in evidence, right?

86IMMANT                        Agostini - cross

1          MS. OKEREKE:  Yes, your Honor.

2          THE COURT:  Maybe you can read it.

3   Q.  Please do.

4   A.  It says:  Subject, responding to Jacobi Hospital.  On

5   February 12, 2001, at approximately 1100 hours, Detective

6   Ramirez and the undersigned, which is me, responded to Jacobi

7   Hospital in regards to this case.  The undersigned spoke with

8   PO Gebbia and PO Mauro of the 43rd Precinct and they gave me

9   the following pedigree on the victim:  Albert Acosta, date of

10  birth, his address, telephone number.  The other side conferred

11  with Dr. Touger, who stated victim was shot once in the back of

12  the head, which is so far, and is likely to die.

13  Q.  In summary, this DD5 represents a response that you made to

14  Jacobi Hospital in the morning of the homicide?

15  A.  Yes.

16  Q.  Why was that done?  Why was that action taken?

17  A.  Basically, if you wanted to get on a DD5, which is on

18  record what the victim's status is and whether the doctor is

19  saying about what's wrong with the victim.

20  Q.  Was this action then, your response to Jacobi, taken in

21  furtherance of your conducting an investigation in this case?

22  A.  Can you rephrase it, please?

23  Q.  And this was done in furtherance of your investigation?

24  A.  Yes.

25  Q.  Was this DD5 a part of your case file?

86IMMANT                    Agostini - cross

1    A.   Yes.

2    Q.   And was this DD5 given to the DA before she presented her

3    case to the grand jury?

4    A.   Yes.

5         MS. OKEREKE:   Now entering into evidence Defendants'

6    Exhibit U-3.

7         (Defendants' Exhibit U-3 received in evidence)

8    Q.   Detective Agostini, who prepared this document?

9    A.   Shawn Abate.

10   Q.   When was this document created?

11   A.   February 12, 2001.

12   Q.   And what does this document indicate?

13   A.   Basically, a notification to gang intel.

14   Q.   Why was this done on the day of the homicide?

15   A.   Why was it done?

16   Q.   Yeah.  Why would this sort of action be taken?

17   A.   I don't know.  I didn't prepare this.

18   Q.   But would this action or this event be taken in the course

19   of an investigation?

20   A.   Yes.

21   Q.   Was this DD5 a part of your case file?

22   A.   Yes.

23   Q.   And was this DD5 given to the district attorney before she

24   presented her case to the grand jury?

25   A.   Yes.

1          MS. OKEREKE:  Your Honor, I'm now introducing into

2    evidence what's been marked as Defendant's V-3.

3          (Defendants' Exhibit V-3 received in evidence)

4    Q.  Detective Agostini, who prepared this document?

5    A.  Shawn Abate.

6    Q.  When was this document created?

7    A.  February 12, 2001.

8    Q.  And what does this document indicate had occurred on

9    February 12, 2001?

10   A.  Basically, it says notification to the video unit.

11   Q.  And what is a notification to the video unit?  What is your

12   understanding of what that is?

13         THE COURT:  It speaks for itself.  It's in evidence.

14         MS. OKEREKE:  I do agree.

15   Q.  Detective Agostini --

16         THE COURT:  That's comforting.

17   Q.  Did Detective Abate tape these events in connection with

18   the investigation?

19   A.  Yes.

20   Q.  Was this DD5 a part of your case file?

21   A.  Yes.

22   Q.  And was this DD5 given to the district attorney before she

23   presented her case to the grand jury?

24   A.  Yes.

25         MS. OKEREKE:  Now I'm introducing into evidence what's

1    been marked as Defendants' Exhibit S.

2            (Defendants' Exhibit S received in evidence)

3    Q.  Detective Agostini, who prepared this document?

4    A.  I did.

5    Q.  When was this document created?

6    A.  February 12, 2001.

7    Q.  What does this document indicate?

8    A.  An interview with resident at 1700 Metropolitan Avenue,

9    apartment 5E.

10   Q.  And why were the residents of apartment 5E being

11   interviewed on the day of the homicide?

12   A.  Because I believe that morning there was a radio call of a

13   dispute.

14   Q.  Was this event done in connection with the investigation?

15   A.  Yes.

16   Q.  Was this DD5 a part of your case file?

17   A.  Yes.

18   Q.  And was this DD5 given to the district attorney before she

19   presented her case to the grand jury?

20   A.  Yes.

21           MS. OKEREKE:  I'm now entering into evidence what's

22   been marked as Defendants' Exhibit A-2.

23           (Defendants' Exhibit A-2 received in evidence)

24           THE COURT:  I don't think there was any objection, so

25   it will be admitted without objection.

86IMMANT                    Agostini - cross

1   Q.  Who prepared this document, Detective Agostini?

2   A.  I did.

3   Q.  When was this document created?

4   A.  February 12, 2001.

5   Q.  Could you please read for the jury Defendants' Exhibit A-2.

6   A.  Yes.  It's conferred with EMS.  On February 12, 2001, at

7   approximately 1205 hundred hours, the other side conferred with

8   EMS number 1370 Marquez who stated Anthony Manganiello, date of

9   birth, is suffering from short of breath and wants to go to the

10  hospital.

11  Q.  Why would you confer with EMS?

12  A.  Basically, they came in.

13  Q.  Do you confer with every party that has information

14  regarding an investigation?

15  A.  Most of the time, yes.

16  Q.  And in this case that DD5 represents that you conferred

17  with EMS, correct?

18  A.  That's correct.

19  Q.  Was this DD5 a part of your case file?

20  A.  Yes.

21  Q.  And was this DD5 presented to the DA before she presented

22  her case at the grand jury?

23  A.  Yes.

24       MS. OKEREKE:  Defendants now enter into evidence

25  what's been marked as Defendants' Exhibit T, T as in Tom.

1          THE COURT:  I assume you know -- if not, the plaintiff

2     would object -- that there was no objection or I ruled that it

3     was admissible.

4          MS. OKEREKE:  That's correct, your Honor.

5          (Defendants' Exhibit T received in evidence)

6          THE COURT:  What are we looking at?

7          MS. OKEREKE:  Defendants' Exhibit T.

8     Q.  Who prepared this document or this DD5?

9     A.  I did.

10    Q.  When was this document created?

11    A.  February 12, 2001.

12    Q.  What does this document indicate?

13    A.  Interview with Anthony Manganiello.

14    Q.  Let's talk a little bit more about that interview.  Where

15    in the 43rd Precinct -- you previously testified that this

16    interview was conducted in a lunchroom?

17    A.  It was our 43 squad lunchroom.

18    Q.  Why would an interview be conducted in a lunchroom?

19    A.  When we have witnesses -- I wouldn't say witnesses, meaning

20    our own.  When cops come or anybody that we don't think to us

21    is a witness, because we take witnesses sometimes, there is an

22    interrogation room.  When cops come or we have to interview

23    somebody, we will bring them into our lunchroom.

24    Q.  So in this situation the plaintiff was not taken into the

25    interrogation room, correct?

86IMMANT                    Agostini - cross

1   A.  Correct.

2         MR. JOSEPH:  Objection, leading.

3   Q.  How long did this interview last?

4   A.  The interview lasted, I am going to say, 10 to 15 minutes.

5   Q.  When did the interview end?

6   A.  When detective Rubin Gonzalez came in and said that the

7   lawyer called and to have him stop questioning.

8   Q.  Now, you testified earlier that you felt it was suspicious

9   that a lawyer appeared?

10  A.  Yes.

11  Q.  Why is that?

12  A.  Because when Anthony Manganiello first came in, my

13  impression was -- he was out of breath and everything -- my

14  impression was he must have ran after someone or he has some

15  type of information that he's going to give us.  Maybe he saw

16  what happened.  That's why he was out of breath.  So we brought

17  him in.

18  Q.  Because he was a witness?

19  A.  Correct.

20  Q.  If you could talk further about why you found it

21  suspicious.  Please continue.

22  A.  When we first came in, I had the name and the date of birth

23  from EMS, so now when he sits down, basically, when we do an

24  interview we ask the person's name, address, telephone number

25  only because if we need to contact them again or call them we

1    don't have to go to their house or anything like that.

2    Q.   And do you do with every witness --

3    A.   We do with most of them, yes.  We start off that way, that

4    way we don't forget; in case the interview is over, we forget

5    to ask them about the address.  That's how we start an

6    interview.  And when I started the interview and I asked him

7    what's your address, he says, I don't know.  And I'm going like

8    this, what?  And I says, you have a phone?  And he goes, it's

9    unlisted.  Obviously, he wasn't going to tell me anything.

10   That's when I asked him when was the first and last time you

11   saw Acosta.  And he said in roll call.  And I asked, did you

12   have any problems with him or anyone else has any problem with

13   Acosta?  But he didn't answer.

14   Q.   What, if anything, was your impression to those responses?

15   A.   My impression was that if it was me, I put myself in that

16   position and it was my partner, I think I would cooperate with

17   the cops.  I don't think you could shut me up if I had some

18   information.  And if I didn't have information, I would tell

19   you, no, I just got there at the scene and this is what

20   happened, but I didn't get anything from him.

21   Q.   At some point again, you testified earlier that you were

22   notified that the plaintiff's lawyer had requested that the

23   questioning be stopped, is that correct?

24   A.   That's correct.

25   Q.   And you also testified earlier that you felt that this was

1    suspicious?

2    A.   Right after the lawyer called, yes.

3    Q.   Why did you find that suspicious?

4    A.   Like I said, if I was in that position I would give as much

5    information, if I knew something.  If I didn't know I would

6    cooperate.  Why a lawyer all of a sudden calls.  Either you

7    have information or you don't have information.  Why now a

8    lawyer calls and says stop questioning.  I didn't understand

9    that.

10           MS. OKEREKE:  Defendant's introduce into evidence

11   what's been marked as Defendants' Exhibit U.

12           (Defendants' Exhibit U received in evidence)

13   Q.   I would like to ask you some more questions about the some

14   of the events that were conducted in the investigation,

15   Detective Agostini.

16           Who prepared this DD5?

17   A.   I did.

18   Q.   When was this document prepared?

19   A.   February 12, 2001.

20   Q.   And what event does this document memorialize that was

21   conducted by police officers in this investigation?

22   A.   It's basically the conferral with ADA Dondes.

23   Q.   Why was ADA Dondes conferred?

24   A.   Basically, if someone is shot and likely to die or someone

25   was shot and killed, you have to notify the DA's office.

86IMMANT                    Agostini - cross

1  Q.  Is this a regular event that would be conducted in the

2  course of a homicide investigation?

3  A.  Or a shooting, yes.

4  Q.  Was this DD5 a part of your case file?

5  A.  Yes.

6  Q.  And was this DD5 given to the district attorney before she

7  presented her case to the grand jury?

8  A.  Yes.

9        MS. OKEREKE:  Defendants enter into evidence what's

10  been marked as Exhibit Z.

11        (Defendants' Exhibit Z received in evidence)

12  Q.  Who prepared this DD5, Detective Agostini?

13  A.  I did.

14  Q.  When was this document created?

15  A.  February 12, 2001.

16  Q.  What does this document memorialize.  What event in the

17  investigation does this document memorialize?

18  A.  It was the interview with officers who transported Anthony

19  Manganiello.

20  Q.  And why was this interview conducted?

21  A.  Basically, you do interview maybe just in case someone has

22  something to say.  Someone might say something in a car.  I

23  wasn't present.  Or you want to know if there is anything

24  unusual that happened during the ride or what happened when you

25  picked them up.

86IMMANT                    Agostini - cross

1    Q.  Was this DD5 created as a normal part of your duties in

2    this investigation?

3            MR. JOSEPH:  Objection.  Leading.

4            THE COURT:  I'll allow it.

5    A.  Yes.

6    Q.  Was this DD5 a part of your case file?

7    A.  Yes.

8    Q.  And was this DD5 given to the district attorney before she

9    presented her case to the grand jury?

10   A.  Yes.

11           MS. OKEREKE:  Defendants introduce Exhibit R,

12   Defendants' Exhibit R into evidence.

13           (Defendants' Exhibit R received in evidence)

14   Q.  Who prepared this DD5?

15   A.  I did.

16   Q.  When was this document created?

17   A.  February 12, 2001.

18   Q.  And what event in the investigation does this DD5

19   memorialize?

20   A.  Interview with Parkchester supervisor.

21   Q.  This Parkchester security supervisor, why were they

22   interviewed?

23   A.  Basically, it had to do with Parkchester security, so we

24   interviewed their supervisors.

25   Q.  Did you interview several individuals at Parkchester?

86IMMANT                          Agostini - cross

1    A.  Certain individuals, yes.

2    Q.  I'm sorry.  Did you interview several individuals at

3    Parkchester?

4    A.  Many people in Parkchester, yes.

5    Q.  Approximately how many?

6    A.  Well, it was two detectives.  I know we interviewed the

7    whole Parkchester security, I believe, in one day.  I don't

8    know.  It has to be more than 20, more than 25 maybe.

9    Q.  Each of these interviews were conducted as a part of the

10   investigation, is that correct?

11   A.  Yes.

12   Q.  Was this DD5 a part of your case file?

13   A.  Yes.

14   Q.  And was this DD5 the information in that DD5 given to the

15   district attorney before she presented her case to the grand

16   jury?

17   A.  Yes.

18        THE COURT:  Ms. Okereke, the problem I have is he has

19   already indicated on direct, unless you want to argue with it,

20   that all of the DD5s were shown or received by the ADA prior to

21   the box having disappeared.  We really can save some time,

22   unless you disagree with that analysis.

23        MS. OKEREKE:  Your Honor, what is at issue in this

24   case is the information that was collected --

25        THE COURT:  When I talk you don't talk because he can

86IMMANT                          Agostini - cross

1   only get one person and I assure you if he has to choose, he

2   will choose me.

3            MS. OKEREKE:  That is true.

4            THE COURT:  What I'm saying is, I don't mind about the

5   input or the meat, whatever, but I don't think that line is

6   necessary since we already know that before it disappeared he

7   had turned over the DD5.

8            Is that true?

9            THE WITNESS:  Yes.

10           MS. OKEREKE:  Defendants will continue with the

11  explanation of the DD5s, though.

12           THE COURT:  I have no problem.

13           MS. OKEREKE:  I will refrain from the line that each

14  of the DD5s are provided to the DA prior to her presentation of

15  the case to the grand jury.

16           Defendants now introduce what's been marked as

17  Defendants' Exhibit V.

18           (Defendants'' Exhibit V received in evidence)

19  Q.  Who prepared this DD5?

20  A.  I did.

21  Q.  When was this document created?

22  A.  February 12, 2001.

23  Q.  What does this document indicate, if you could please tell

24  the jury?

25  A.  Basically, it's -- I observed the inventory of Anthony

86IMMANT                          Agostini - cross

1    Manganiello's locker and it was done under the direction of

2    their supervisors.

3    Q.   Why was this event done or why was this action take?

4    A.   Basically, we were looking to see if the weapon used in the

5    homicide was in the locker room.

6    Q.   Is this a normal activity that you would conduct in the

7    course of a homicide investigation?

8    A.   During the homicide investigation we do search locations

9    with warrants.   We do look for weapons, yes.

10   Q.   Again, this DD5 is part of your case file?

11   A.   Yes.

12             MS. OKEREKE:   Defendants now introduce into evidence

13   what's been marked as Defendants' Exhibit Y.

14             (Defendants' Exhibit Y received in evidence)

15   Q.   Detective Agostini, does Defendants' Exhibit Y represent

16   yet another action that was taken in the course of this

17   investigation?

18   A.   Yes.

19   Q.   And who prepared Defendants' Exhibit --

20   A.   I did.

21   Q.   When was this document created?

22   A.   February 12, 2001.

23   Q.   And what does this document indicate that -- what event

24   does it indicate was taken in the course of this investigation?

25   A.   This document indicates that the person who was shot was

1    still alive, so the investigation went from assault 1 and it

2    was reclassified to murder.

3    Q.  And at this time it was reclassified to you, isn't that

4    correct?

5    A.  Yes.

6          MS. OKEREKE:  Defendants introduce into evidence

7    what's been marked as Defendants' Exhibit S-4.

8          (Defendants' Exhibit S-4 received in evidence)

9    Q.  Who prepared Defendants' Exhibit S-4?

10    A.  I can't make out the name.  It's partially blocked in the

11    bottom.  It looks like C-a-b-a-s-s-a.

12    Q.  Would this document have been created by one of the

13    detectives?

14    A.  Yes.

15    Q.  Who was a part of the investigation?

16    A.  Yes.

17    Q.  When was this document created?

18    A.  On February 12, 2001.

19    Q.  And what investigative action does this document or this

20    DD5 memorialize?

21    A.  It basically says canvass of Yonkers pistol range.

22    Q.  Do you know why a canvass was done of the Yonkers pistol

23    range?

24    A.  No, ma'am.

25    Q.  Was this action or this event done in the course or in

86IMMANT                        Agostini - cross

1    furtherance of the investigation?

2    A.  Yes.

3    Q.  Again, this DD5 was a part of your case file, correct?

4    A.  Yes.

5            MS. OKEREKE:  Defendants introduce into evidence

6    what's been marked as Defendants' Exhibit T-4.

7            (Defendants' Exhibit T-4 received in evidence)

8    Q.  Detective Agostini, let's stick with S-4 for a moment.  I'd

9    like for you to read that DD5 for the jury.

10   A.  Sure.  On February 12, 2001, at approximately 2000 hours,

11   the undersigned, which is Cabassa, along with Detective Peters,

12   did canvass Yonkers Coin Park Pistol Range.  The undersigned

13   did interview the range officer, Robert Cabassa, who did a

14   computer check into the membership of the range and found that

15   Anthony Manganiello is not and never was a member of the Coin

16   Park Yonkers Pistol Range.  The undersigned also reviewed the

17   nonmembership sign-in sheets dating back to June of 2000, and

18   also found that Anthony Manganiello was not -- has not used the

19   range during that period.

20   Q.  And this was a piece of information that was obtained on

21   February 12, 2001, correct?

22   A.  Yes.

23           MS. OKEREKE:  Now defendants enter into evidence

24   what's been marked as Exhibit T-4.

25   Q.  Who prepared this DD5?