1    A.  Victor Cabassa.

2    Q.  When was the DD5 -- what date is that DD5 dated?  When does

3    it appear to have been created?

4    A.  I believe it was February 12, 2001.

5    Q.  Again, the day of the homicide?

6    A.  Yes.

7    Q.  What does this document indicate or what event does it

8    memorialize in the course of the investigation?

9    A.  It basically says canvass of 1545 White Plains Road.

10   Q.  And Detective Agostini, are you able to tell from that DD5

11   how many places or how many individuals where canvassing was

12   done at 1545 White Plains Road?

13   A.  Hold on for a second.  Approximately 15 apartments they

14   went to interview.

15   Q.  Fifteen apartments appear on that one DD5 alone, isn't that

16   correct?

17   A.  Yes.

18   Q.  If you could explain -- I believe you may have done this --

19   what exactly is canvassing?

20   A.  Basically, if a shooting happens at a certain location you

21   want to canvass that building or the buildings next to it

22   because someone might have seen something.

23   Q.  The homicide occurred at 1700 Metropolitan Avenue, correct?

24   A.  Yes.

25   Q.  That canvass, however, indicates that the canvass was done

1   at 1545 White Plains Road?

2   A.   That's correct.

3   Q.   Why would a canvass be done all the way over at another

4   section of the Bronx?

5   A.   Ma'am, I couldn't tell you.

6   Q.   But, again, could this be to canvass other areas?

7   A.   It could be.

8   Q.   And was this DD5 a part of your case file?

9   A.   Yes.

10          MS. OKEREKE:   Now entering into evidence what's been

11   marked as Defendant's U-4.

12          (Defendants' Exhibit U-4 received in evidence)

13          MR. JOSEPH:   Over objection, your Honor, for the

14   record.

15          THE COURT:   Why?  Do you have a ground.

16          MR. JOSEPH:   I do, Judge.  This indicates quote

17   unquote what a police dog did, and it runs afoul of Federal

18   Rule of Evidence 702.

19          THE COURT:   It is getting far afield, I think, Ms.

20   Okereke, to what we are doing here, but I'll allow this one.

21          MS. OKEREKE:   Thank you, your Honor.

22   Q.   Who prepared this DD5?

23   A.   Detective Mallon.

24   Q.   When was this document created?

25   A.   February 12, 2001.

86IMMANT                      Agostini - cross

1    Q.  And what does this document indicate?

2    A.  It says subject, ATF canine.

3    Q.  If you could please read that DD5 to the jury.

4    A.  It says:  Monday, February 12, 2001, at approximately 2115

5    hours, Detective Clovis and I were present with PO William H.

6    Brush, III of North Andover Police Department, Andover,

7    Massachusetts and his canine Iris who was brought to a Nissan

8    Maxima, New York, registration -- I won't say the number --

9    which was marked on White Plains Road in front of 1540.  At

10   this time the handler calibrated Iris.  Shortly after Iris was

11   brought to the subject vehicle, Iris hit on the driver's door

12   handle, the trunk and the right rear wheel well.  P.O. Brush

13   further informed me that he is a sworn North Andover police

14   officer, shield No. 36, and was trained by ATF.  The ATF, who

15   also provided Iris, who is two and a half years old --

16            THE COURT:  That's enough.  I'm sustaining the

17   objection and striking the testimony.  Do you have something

18   else?

19            MS. OKEREKE:  The entire DD5?

20            THE COURT:  The entire testimony, not the DD5.

21            MS. OKEREKE:  Defendants will not move onto the next

22   DD5.  Your Honor I will first introduce what has been marked as

23   V-4.

24            (Defendants' Exhibit V-4 received in evidence)

25   Q.  Who prepared this document?

86IMMANT                      Agostini - cross

1    A.  Detective Mallon.

2    Q.  When was this document created?

3    A.  February 12, 2001.

4    Q.  Again, the date of the homicide, correct?

5    A.  Yes.

6    Q.  What does this DD5 indicate?

7    A.  A canvass of 1590 Metropolitan Avenue.

8    Q.  How many buildings, if you're able to ascertain from the

9    document, how many buildings does that DD5 reflect were

10   canvassed at 1590 Metropolitan Avenue?

11   A.  I would say more than 15 apartments.

12        MS. OKEREKE:  Defendants now introduce into evidence

13   what's been marked as Exhibit W-4.

14        (Defendants' Exhibit W-4 received in evidence)

15   Q.  Who prepared this document?

16   A.  I can't read the name.

17   Q.  Was this document prepared by a detective that was a part

18   of the investigation?

19   A.  I can't see the name, so I can't say.

20   Q.  Does this document memorialize an event that occurred

21   pursuant to the investigation into Albert Acosta's homicide?

22   A.  Yes.

23   Q.  What does this document indicate?

24   A.  It says response to Mt. Vernon shooting range.

25   Q.  Why was there a response to Mt. Vernon shooting range?

86IMMANT                          Agostini - cross

1          THE COURT:  If you know.

2    A.  I don't know.  I just have to read it.

3    Q.  Actually, if you could please read the document for the

4    jury.

5    A.  On February 12, 2001, at approximately 2000 hours, I, along

6    with Detective Carini of the 40th Precinct Detective Unit, did

7    respond to Mt. Vernon, New York shooting range (magnum range)

8    located at 172-174 Gramatan Avenue in Mt. Vernon.  An attempt

9    was made to obtain any information available at the range on

10   one Anthony Manganiello.  The range was closed and we were

11   unsuccessful in gaining entry.  In view of the above-listed

12   information, it is recommended that this case be active.

13   Q.  Was this document a part of your case file?

14   A.  Yes.

15          THE COURT:  Why would this totally negative

16   essentially useless DD5 have a conclusion that suggests that

17   the case be active?

18          THE WITNESS:  Any time a homicide or any case, any

19   crime that is not closed with an arrest, it remains active.

20          THE COURT:  And they add that to the line, sort of a

21   tag line.

22          THE WITNESS:  That it's active, that it's not a closed

23   case.

24   Q.  And each of the DD5s that are created in the investigation

25   are created while an investigation is active, isn't that

1    correct?

2    A.   Yes.

3          MS. OKEREKE:   Your Honor, defendants introduce

4    Defendants' Exhibits B-5, C-5, and actually, additionally, D-5.

5          (Defendants' Exhibits B-5, C-5, and D-5 received in

6    evidence)

7    Q.   Detective Agostini, do each of the DD5s that you have

8    before you memorialize investigative actions that were

9    conducted in connection with the investigation?

10   A.   Yes.

11   Q.   When were those documents prepared?

12   A.   They were all prepared on February 12, 2001.

13   Q.   What investigative action do those DD5s indicate occurred

14   on February 12, 2001, the day of the homicide?

15   A.   One of them is a canvass of 1585 Odell Avenue, the other

16   one is a canvass of 1595 Odell Avenue, and the other one is a

17   canvass of 1680 Metropolitan Avenue.

18   Q.   Approximately, if you can, briefly, let us know how many

19   total apartments and buildings were canvassed or represent --

20   those DD5s represent were canvassed?

21   A.   They went to at least more than ten apartments on each

22   building.

23   Q.   Why do officers canvass apartments, several apartments?

24   A.   Basically, you do can canvasses just to see if you find a

25   witness to the case.

86IMMANT                          Agostini - cross

1    Q.  These were conducted on February 12, 2001?

2    A.  Yes.

3                THE COURT:  Are we finished with this line of

4    questioning?  Because I am.

5                MS. OKEREKE:  Again, your Honor --

6                THE COURT:  We are not asking you for your response.

7                MS. OKEREKE:  No.

8                THE COURT:  We are going to move along to something

9    else.

10                MS. OKEREKE:  There are additional DD5s --

11                THE COURT:  There may well be, but they are not coming

12    in now, and maybe never.

13                MS. OKEREKE:  Thank you, your Honor.  Defendants

14    will --

15                THE COURT:  You don't have to thank me.  I'm just

16    doing my job, trying my best.

17    Q.  Detective Agostini, during the course of your investigation

18    did you speak with the district attorney's office?

19    A.  Yes.

20    Q.  And approximately how often would you speak with the

21    district attorney's office in the course of this investigation?

22    A.  I will say at least once a week.

23    Q.  And why did you conduct these conversations or have these

24    conversations?

25    A.  Basically, if I find something new in the case, I would

86IMMANT                          Agostini - cross

1    relay it to the ADA to see where we could go from there.

2    Q.  Would the ADA give you any directions?  What was the ADA's

3    responses to these conversations?

4    A.  I don't remember at this point what was the ADA's response.

5    Q.  Were there typical things that you were ever directed to

6    do, or were you ever directed to take any activities by the

7    ADA?

8    A.  I don't remember.

9    Q.  But these discussions did occur --

10   A.  At least once a week I will tell her any updates on the

11   case, if we had any.

12   Q.  And did each of these conversations occur prior to the date

13   that the grand jury presented her case -- prior to the date

14   that the district attorney presented her case to the grand

15   jury?

16   A.  Yes.

17   Q.  I'd like to continue to discuss more about some of your

18   activities.  Did you conduct an interview with a confidential

19   informant named Terrence Alston on February 15, 2001?

20   A.  Yes.

21   Q.  Please explain for us -- I know you've testified previously

22   about Terrence Alston, but who is Terrence Alston?

23   A.  Terrence Alston -- at first, when you say confidential

24   informant, I didn't know he was a confidential informant.  I

25   knew him as Terrence Alston.  He had information he stated

86IMMANT                    Agostini - cross

1   about a security officer asking him to kill another security

2   officer.

3   Q.   Did you independently learn about Mr. Alston?

4           MR. JOSEPH:   Objection.  I am not sure what that

5   means.

6   Q.   How did you learn about Terrence Alston?

7   A.   There was a DD5 from a Detective Ramos who had made a DD5

8   saying I don't know, I have to look at it.  I don't know

9   whether he interviewed Alston or was it by phone, and that

10  someone in jail by the name of Terrence Alston had information

11  on this case.

12          MS. OKEREKE:   Your Honor, defendants introduce into

13  evidence what's been marked as Defendants' Exhibit F-8.

14          (Defendants' Exhibit F-8 received in evidence)

15  Q.   Who prepared this document?

16  A.   Detective Ramos.

17  Q.   When was this DD5 created?

18  A.   February 12, 2001.

19  Q.   What does this DD5 indicate, if you can actually please

20  read the DD5 for the jury.

21  A.   Interview of Terrence Alston.

22          On February 14, 2001, at approximately 1610 hours, the

23  undersigned received a phone call from Detective Parker of

24  intel who stated that he has a CI at Rikers Island who has

25  information regarding the homicide at Parkchester.

1          On February 14, 2001, at approximately 1720 hours,

2     Detective Bencenvingo and the undersigned were present at

3     Rikers Island gang intel building.  The undersigned took a

4     verbal and written statement from Terrence Alston as follows:

5          I, Terrence Alston, make the following statement:  In

6     late August of 2000, a uniformed security guard from

7     Parkchester approached me and asked if I could do him a favor.

8     I asked him, what is the favor?  He told me that he wanted

9     another security guard killed.  I asked him why he wanted him

10    killed, and he said he wanted him killed because he was fucking

11    with a girl.  He then asked me if I needed a gun, and I told

12    him I have one already.  He asked, what is the price, and I

13    told him that I did not know right now, I'll get back to you.

14         Two days later I saw him in front of 1560 Union Port

15    Road.  We talked about setting it up in a building in the

16    daytime.  He stated that he will call for assistance and when

17    the guy showed up I will be waiting for him.  I told him that I

18    will get back to him.  He told me that when it was time he will

19    show me the guy.  He also gave me a master key to the building

20    in Parkchester.  I went to court in October and pleaded out to

21    an attempted possession of a weapon and got remanded.  The

22    reason I did not do the hit because I was healing from being

23    shot up on August 22, 2000.

24    Q.  Did Detective Ramos, who conducted that interview, did he

25    give you this DD5 during your investigation?

86IMMANT                    Agostini - cross

1   A.  I don't know.  Maybe he gave it to me personally, but I

2   received the DD5, yes.

3   Q.  It was a part of your case file?

4   A.  Yes.

5   Q.  And it was a part of the information given to the DA?

6   A.  Yes.

7   Q.  Did you subsequently then or you testified you conducted

8   another interview with Mr. Alston, is that correct?

9   A.  That's correct.

10  Q.  What information did you obtain during this investigation

11  or during this interview?

12  A.  Basically, the sum and substance, the same information that

13  he gave Ramos.

14  Q.  Did Mr. Alston give you any information concerning how he

15  knew the plaintiff?

16  A.  He said he seen him in Parkchester.

17  Q.  Did you have any independent information about Mr. Alston?

18  A.  Independent information meaning?

19  Q.  Did you know where Mr. Alston lived?

20  A.  Yes.  I believe his family lives in Parkchester.

21  Q.  Parkchester, again, is the same area where the homicide

22  occurred?

23  A.  The same complex.

24  Q.  Did you believe Mr. Alston when he gave you this

25  information?

86IMMANT                    Agostini - cross

1    A.   I don't know whether to believe him or not believe him, but

2    I have to check out the information he gave me.

3    Q.   Why did you have to check out the information he gave you?

4    A.   Basically, to see if it's true or not.

5    Q.   Did you find Mr. Alston credible?

6    A.   Not that I find him credible.  I was just listening to the

7    information he was giving me.  I don't know Terrence Alston to

8    find him credible.

9    Q.   With respect to credibility decisions, is it a case

10   detective's role to make determinations as to the credibility

11   of evidence?

12   A.   Once you investigate it, yes.

13   Q.   Is it the role of the case detective to classify

14   information as credible or incredible, to classify them into

15   those categories prior to giving this information to the

16   district attorney's office?

17   A.   I just give them what they say.  I don't say whether they

18   are credible or noncredible.  I give them the information, what

19   it is, and they determine themselves whether they find it

20   credible or not credible.

21   Q.   Is that your understanding of what your duties are as a

22   detective?

23   A.   That's my understanding, yes.

24   Q.   Did you show Mr. Alston a photography book with several

25   pictures, including one of the plaintiff, during your interview

86IMMANT                    Agostini - cross

1  with them?

2  A.  Yes.

3  Q.  Was Mr. Alston able to identify the plaintiff?

4  A.  Yes.

5  Q.  Did the fact that Mr. Alston was able to identify the

6  plaintiff affect your assessment of him in any way?

7  A.  Mainly, it showed me that he knew the person.

8  Q.  Did you speak with the district attorney's office regarding

9  your interview with Mr. Alston?

10  A.  Yes.

11  Q.  And do you recall when you spoke to the DA's office about

12  this?

13  A.  No.  I know any time I do anything I need updates, I will

14  keep her informed.

15  Q.  So you gave the full details of your interview with Mr.

16  Alston to the district attorney?

17  A.  Yes.

18  Q.  Did you conduct a further investigation into any of the

19  information which Mr. Alston provided you?

20  A.  Yes.

21  Q.  And what further investigation did you conduct?

22  A.  I basically found out who this Johnny person was.

23  Q.  You previously testified about this Johnny.  What, if

24  anything -- did you eventually find -- you did find this

25  Johnny.  You testified to that, correct?

86IMMANT                        Agostini - cross

1    A.   That's correct.

2    Q.   What did this Johnny say to you?

3    A.   Like I said, I don't remember this Johnny Baker, the actual

4    conversation.  I just found out that it wasn't him.  I remember

5    that it wasn't him, but I don't remember the actual

6    conversation.

7    Q.   Did this information that you found out affect your

8    assessment of Terrence Alston, who provided this information to

9    you?

10   A.   In some way, yes.

11   Q.   And how so?

12   A.   Meaning, you know, he gave me the wrong person and now I am

13   going to talk to him about it.

14   Q.   And what happened when you talked to him about it?

15   A.   It was over the phone and he told me, I told you not to

16   look for the person, basically not to look for the person.  And

17   I said, well, I basically found him, interviewed him, and he's

18   not the guy.  And he stated, I'm not going to give you the guy

19   until I get out.

20   Q.   Why do you think Mr. Alston didn't tell you the full truth

21   regarding his knowledge about the plaintiff and Albert Acosta's

22   murder?

23            MR. JOSEPH:  Objection.  Calls for speculation.

24            THE COURT:  Sustained.

25   Q.   Does the fact that Mr. Alston was not completely truthful

86IMMANT                    Agostini - cross

1    with you affect your opinion about the other information he

2    provided you?

3    A.   No.

4    Q.   Why is that?

5    A.   Because the other information -- he pointed out the guy, he

6    gave me the information.  The only thing I was thinking about

7    is, he gave me the wrong guy just so he could get out.

8    Q.   What do you mean by get out?

9    A.   Meaning maybe he could get out of jail and he could supply

10   the right guy.  He was basically negotiating.

11           THE COURT:  Is it your decision whether he gets out of

12   jail or not?

13           THE WITNESS:  No, sir.

14           THE COURT:  Where did you have to go to make that

15   happen?

16           THE WITNESS:  I kept information and I spoke to the

17   DA's office of what's happening and I told the DA, I checked

18   this guy out and he wasn't it.  This guy says he knows who it

19   is, he just wants to get out, and I just relay her the

20   information, but I had nothing to do with him getting out of

21   jail.

22   Q.   Let me ask you further about this getting out and what your

23   role is in someone getting out.  As a detective investigating a

24   homicide, do you have any control as to the deals or anything

25   that is made with a witness?

86IMMANT                    Agostini - cross

1    A.  No.

2    Q.  Do you have any role in that?

3    A.  No.

4    Q.  What information, if any -- did Mr. Alston subsequently

5    provide you with this correct information?

6    A.  He provided the DA's office with the right information.

7    Q.  What was that right information?

8    A.  I believe that was Damon.

9    Q.  And you previously testified that you were present during

10   the interview of Mr. Damon?

11   A.  Yes.

12   Q.  What did you learn from Mr. Damon?

13   A.  Basically, that he stated that he sold the gun to a white

14   male, heavy set, Italian.

15   Q.  And the district attorney was present during this meeting,

16   correct?

17   A.  Yes.

18   Q.  At some point did you interview an individual named or

19   Parkchester security official named SPO Anthony Langhorn?

20   A.  Yes.

21   Q.  Who is SPO Langhorn?

22   A.  I guess he's a Parkchester security person.

23   Q.  What were the circumstances of your encounter with him?

24   A.  I am not sure.  It was basically an interview.

25   Q.  And what information did SPO Langhorn provide you with?

86IMMANT                    Agostini - cross

1    A.   I need to see the document.

2    Q.   We will come back to that in a moment.

3         Did you at some point interview an individual named

4    Sal Miro in connection with Albert Acosta's murder?

5    A.   Yes.

6    Q.   Who is Mr. Miro?

7    A.   He's a witness that we interviewed who lives in Parkchester

8    and stated basically that his friend from the pizzeria, I

9    believe it's Chris Tartone, had told him that Anthony

10   Manganiello was in the pizza shop at one time asking for a gun.

11   Q.   And did you eventually conduct an interview with this Chris

12   Tartone?

13   A.   Yes.

14   Q.   And please tell us again, what did Mr. Tartone tell you

15   during this interview?

16   A.   Like I say, I need to see the document.

17        MS. OKEREKE:   Defendants introduce into evidence

18   what's been marked as Defendants' Exhibit L-3.

19        (Defendants' Exhibit L-3 received in evidence)

20   Q.   Who prepared this DD5, Detective Agostini?

21   A.   I did.

22   Q.   And when was this DD5 created?

23   A.   February 27, 2001.

24   Q.   What does this DD5 indicate?

25   A.   It's an interview with Chris Tartone.

86IMMANT                    Agostini - cross

1    Q.  Can you please read that DD5 for the jury.

2    A.  Yes.  On February 27, 2001, at approximately 2205 hours,

3    Detective DeLeo and the undersigned interviewed Chris Tartone.

4    It has his date of birth and where he lives.  He stated Officer

5    Manganiello came to his pizza shop, it's called pizza place,

6    and he was asking people if they were selling a gun.  Chris

7    stated Officer Manganiello had a gun book in his hand.  Chris

8    states a friend of his named Mike Booth told him that the

9    Officer Manganiello asked him if he was selling an illegal gun.

10   Mike then told him that he could get in a lot of trouble and

11   could get 20 to 25 years.

12          Chris states Officer Manganiello comes to the pizza

13   shop maybe once a month.  Chris states Mike Booth drives a

14   white truck with tinted windows and also is the neighborhood

15   loan shark.  Chris states he will be in on Thursday at around

16   12 noon.  Chris Tartone wrote a statement in the above

17   incident.  The undersigned showed Chris Tartone the photo book

18   consisting of white males, and he picked out Anthony

19   Manganiello as the person who went to his pizza shop and asked

20   for a gun.

21   Q.  Again, that DD5 indicates that Mr. Booth was shown a photo

22   book, correct?

23   A.  That's correct.

24   Q.  Approximately how many photos were in the book that

25   Mr. Tartone viewed?

86IMMANT                    Agostini - cross

1    A.  I can only approximate.  The whole book.  It could be more

2    than -- I don't know.  It's an approximate.  Thirty photos, I

3    would say.  More than 30 in the whole book.

4    Q.  Thirty photos in the whole book?

5    A.  Yes.  I would approximate.

6    Q.  And was Mr. Booth able to identify the plaintiff in that

7    book?

8    A.  Yes.

9    Q.  Did this affect your perception of Mr. Booth's credibility?

10   A.  It wasn't Mr. Booth --

11   Q.  Excuse me.  Mr. Tartone.

12   A.  Then I knew who he was talking about since he picked them

13   out of a book.

14   Q.  Did you speak with the district attorney about your

15   conversation with Mr. Tartone?

16   A.  Yes.

17   Q.  When did you speak with the DA about this?

18   A.  During the -- I have no specific date.  Every time I

19   learned something, either the next day or whatever, I'll give

20   her a call and update her on the case.

21   Q.  Did you then provide the full information regarding this

22   interview with the district attorney?

23   A.  Yes.

24   Q.  Did you conduct an investigation into the information or

25   any of the information received from Mr. Tartone?

86IMMANT                          Agostini - cross

1    A.  Yes.

2    Q.  And what were the results of this version?

3    A.  I believe it was one of the days, I believe it was a

4    Thursday, whatever, Chris Tartone calls me up and says that,

5    listen, Mike Booth is here.  So I don't know -- I believe it

6    was me and Detective Martinez who went to the pizza shop, I

7    entered the pizza shop, and he said he just stepped out, he

8    will be right back.  And when Mike Booth was coming around and

9    entered the pizza shop, he said that's him.

10   Q.  Why did you choose to conduct this interview with

11   Mr. Booth?

12   A.  Basically, to get his information to see if this person

13   asked him for a gun.

14   Q.  What, in fact, did Mr. Booth tell you during the interview?

15   A.  That Anthony Manganiello, while he was -- while Mr. Booth

16   was sitting in his car by Macy's, Anthony Manganiello

17   approached him and asked him basically sum and substance, can

18   you get me a ride, or something like that.  And he says, are

19   you crazy.  I've been here 20 to 25 years.

20   Q.  Did you also show Mr. Booth a photo book containing

21   approximately 30 photographs?

22   A.  Yes.

23   Q.  Was Mr. Booth able to identify the plaintiff?

24   A.  Yes.

25   Q.  Did this in any way affect your perception of Mr. Booth and

86IMMANT                          Agostini - cross

1   the information he had?

2   A.   No.

3   Q.   Did you speak with the district attorney about your

4   conversation with Mr. Booth?

5   A.   Yes.

6   Q.   And what did you tell the district attorney?

7   A.   Basically, the sum and substance of the interview.

8   Q.   In addition to these interviews that you conducted of these

9   activities, please explain for the jury some of the other

10  activities that you conducted as a part of this investigation.

11  A.   I can't even remember, it was so much.  I can't remember.

12  Q.   Did you yourself conduct canvassing?

13  A.   I did canvassing, I did interviewing of Parkchester police

14  officers.  I really can't remember what else.

15  Q.   And why did you conduct these actions?

16  A.   Basically, if you get any information on what happened on

17  this homicide.

18  Q.   Is this a part of your duty as a detective?

19  A.   Yes.

20  Q.   Did you testify before the grand jury in this matter?

21  A.   Yes.

22  Q.   And when you testified before the grand jury did you tell

23  the grand jury the truth?

24  A.   Yes.

25            MS. OKEREKE:   Your Honor, defendants introduce into

86IMMANT                    Agostini - cross

1   evidence portions of Defendants' Exhibit C.

2           (Defendants' Exhibit C received in evidence)

3           THE COURT:  Are those the minutes?

4           MR. JOSEPH:  I believe they are already in evidence as

5   Exhibit 38.

6           MS. OKEREKE:  They are.  Plaintiff's Exhibit 38.

7   Q.  What is it that is Defendants' Exhibit C and Plaintiff's

8   Exhibit 38 that you are being shown?

9   A.  It's grand jury minutes.

10  Q.  And during the grand jury did you give or did you answer

11  questions?

12  A.  Yes.

13  Q.  Detective Agostini, I now ask if you could read your grand

14  jury testimony.

15          THE COURT:  The whole testimony.  How many pages?

16          MS. OKEREKE:  It's a very few pages.  It's four pages

17  there.

18          THE COURT:  It seems to me if it's in evidence, the

19  jury can ask for it and they will get it.  We really would like

20  to move along.

21          MS. OKEREKE:  Your Honor, the grand jury testimony,

22  what was presented at the grand jury is crucial and defendants

23  would like that read into evidence and read into the record.

24          THE COURT:  Did you get my drift?  Did you understand

25  what I was saying?

1          MS. OKEREKE:  Yes, your Honor.

2          THE COURT:  If you have a few lines, you can read

3     them.  If you don't and you have four pages, the jury will have

4     the opportunity to study them at length.

5          MS. OKEREKE:  Yes, your Honor.  I will choose a few

6     portions of the transcript.

7     Q.  Detective Agostini, if you could please read for the jury

8     the first page of your transcript, the grand jury testimony.

9     A.  First page?

10    Q.  Yes.

11    A.  Ms. Scaccia, the people are now calling Detective Luis

12    Agostini.

13          Detective Luis Agostini, after having been duly sworn,

14    testified as follows:  Examination by Ms. Scaccia.

15    "Q.  Detective, can you please state your name, rank, and

16    shield number for the members of the grand jury?

17    "A.  Detective Luis Agostini, shield No. 1230, 43 detective

18    squad.

19    "Q.  Detective, how long have you been with the 43 detective

20    squad?

21    "A.  For approximately four years.

22    "Q.  Detective, I want to direct your attention to February 12

23    of this year.  Were you working as a member of the 43rd

24    Precinct detective squad?

25    "A.  Yes.

86IMMANT                    Agostini - cross

1    "Q.  And did you have an occasion on that day to become

2    assigned to an investigation into the death of Albert Acosta?

3    "A.  Yes.  Now I direct your attention --"

4    Q.  When you testified during the grand jury did you testify

5    generally to your duties as a case detective?

6    A.  Yes.

7    Q.  Again, did you tell the truth during that grand jury

8    hearing?

9    A.  Yes.

10   Q.  Have you testified in other matters related to

11   Mr. Manganiello?

12   A.  Yes.

13   Q.  In what capacity?

14   A.  I believe -- I am not sure if it was a hearing or trial.

15   Q.  So you've given quite a bit of testimony in this matter

16   over the last seven years?

17   A.  Yes.

18         MR. JOSEPH:  Objection, leading.

19   Q.  Did you tell the truth?

20         THE COURT:  Overruled.

21   Q.  Did you tell the truth to the best of your memory when you

22   gave testimony during the pretrial hearing?

23   A.  Yes.

24   Q.  Which occurred --

25         MR. JOSEPH:  Judge.  Doesn't the jury decide?

86IMMANT                    Agostini - cross

1          THE COURT:  I'll allow it.  Are we close to the end

2   here?

3          MS. OKEREKE:  Yes.  Just approximately five to six

4   more questions, your Honor.

5          THE COURT:  I'll allow it.  Almost anything.

6   Q.  To repeat the question, did you tell the truth to the best

7   of your memory when you gave testimony during the pretrial

8   hearing which, again, occurred three years after the homicide?

9   A.  Yes.

10  Q.  Did you tell the truth to the best of your memory when you

11  gave testimony during the criminal court trial which, again,

12  occurred almost three years after the homicide?

13  A.  Yes.

14  Q.  And did you tell the truth to the best of your memory when

15  you gave testimony during your deposition which occurred almost

16  seven years after the homicide?

17  A.  Yes.

18  Q.  Again, how many investigations have you been involved with

19  during your time with NYPD?

20         MR. JOSEPH:  Objection.  Asked and answered.

21         THE COURT:  It was on your examination.  She gets her

22  own opportunity.

23  Q.  How many investigations was that, Detective Agostini?

24  A.  It's over a thousand.

25  Q.  Mr. Agostini, did you know Anthony Manganiello before your

86IMMANT                          Agostini - cross

1    involvement with the Acosta or the investigation into the

2    murder of Albert Acosta?

3    A.   No.

4    Q.   Did you ever urge the assistant district attorney to

5    present this case to a grand jury?

6            MR. JOSEPH:   Objection.

7            THE COURT:   Sustained.   You're over your limit.

8            MS. OKEREKE:   Two more questions, your Honor.

9    Q.   Did you ever persuade the assistant district attorney to

10   prosecute Anthony Manganiello?

11           MR. JOSEPH:   Objection.

12           THE COURT:   Sustained.

13           MS. OKEREKE:   Finally, your Honor, defendants would

14   just enter into evidence the remaining DD5s which have yet to

15   be entered into evidence, which I can read if your Honor

16   requires.

17           THE COURT:   We will just get a list later.

18           MR. JOSEPH:   For the record, Judge, we stated the

19   objections that were previously stated.

20           MS. OKEREKE:   Defendants have no more questions.

21           THE COURT:   Any redirect?

22           MR. JOSEPH:   Yes, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. JOSEPH:

25   Q.   Sir, according to Exhibit F-8, Mr. Alston told you that

86IMMANT                    Agostini - redirect

1   this conversation with Mr. Manganiello occurred in August of

2   2000, correct?

3   A.   It happened in September of 2000.

4   Q.   There is one DD5 Mr. Alston says September of 2005?

5   A.   2000.

6   Q.   2000, you're correct.  And in one DD5 Mr. Alston says this

7   conversation occurred in August 2000, right?

8   A.   I have to look.

9   Q.   Look at Exhibit 22 and you look at F-8 together.

10  A.   Yes.

11  Q.   He is giving different dates for this conversation

12  occurring, is that correct?

13  A.   That's correct.

14  Q.   Also, sir, you tried to verify whether Mr. Manganiello was

15  in fact involved with any woman that Mr -- strike that.

16          Sir, you tried to verify whether Mr. Manganiello and

17  Mr. Acosta were involved with any of the same women, correct?

18  A.   Yes.

19  Q.   That turned out to be false?

20  A.   Yes.

21  Q.   You interviewed Ms. Acosta's girlfriend?

22  A.   Yes.

23  Q.   Did she indicate to you that there was no romantic

24  involvement between herself and Mr. Manganiello?

25  A.   That's correct, there was no romantic --

86IMMANT                    Agostini - redirect

1   Q.  The information that Mr. Alston gave you was incorrect,
2   correct?
3   A.  Sir, that was February.  I don't know what happened back in
4   September.
5   Q.  Sir, did this girlfriend ever indicate to you that she had
6   ever been involved romantically with Mr. Manganiello?
7   A.  That's correct.
8   Q.  Sir, Mr. Alston was never able to produce a key he says the
9   plaintiff gave him, right?
10  A.  I believe he gave that to Ramos.  Detective Ramos did that
11  DD5 on the key.  He never indicated anything to me about a key.
12  Q.  Sir, is it not true that Mr. Alston never produced a key,
13  right?
14  A.  That's correct.
15  Q.  We are clear, he never produced a key that Anthony
16  Manganiello gave him?
17  A.  Not that he told me.
18  Q.  You were the only detective on this case, right?
19  A.  Yes.
20  Q.  If there was a key produced, you would know about it?
21  A.  If he would tell me, yes, if he would tell me.
22  Q.  The fact is, sir, you have no knowledge of Mr. Alston ever
23  producing such a key, right?
24  A.  That's correct.
25  Q.  Also, sir, you testified about some photo books which

86IMMANT                          Agostini - redirect

1    Mr. Booth and Mr. Alston picked Anthony Manganiello out of.

2    What happened to those photo books?

3    A.   They were with the case file.

4    Q.   They disappeared, too?

5    A.   Yes.

6    Q.   Now, you said that Alston gave you the right person who was

7    Johnny Damon, right?

8    A.   Correct.

9    Q.   I'm sorry.  Mark Damon.

10   A.   You say he gave me.  He gave the DA's office the right

11   person.

12   Q.   You say that Mr. Damon was the right person, correct?

13   A.   Yes.

14   Q.   Mr. Damon was also lying, right?

15   A.   Yes.

16   Q.   And Mr. Alston was forcing this right person to lie, right?

17           MS. OKEREKE:   Objection, your Honor.

18           THE COURT:   Maybe you can rephrase it.

19           MR. JOSEPH:   I will.

20   Q.   Sir, wasn't the information that you had that Mr. Alston

21   was forcing Mr. Damon to lie to falsely implicate Anthony

22   Manganiello?

23           MS. OKEREKE:   Objection, your Honor.

24           THE COURT:   I'll allow it.

25   A.   I don't know what you mean by forcing.  I know in sum and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    substance he told him to lie for.  I don't know if force is the
2    right word.
3    Q.  He asked Damon to lie about Anthony Manganiello, correct?
4    A.  Correct.
5    Q.  Sir, was it fair to say that you conveyed the information
6    that Alston gave you to the DA, correct?
7    A.  Which information?
8    Q.  All of the information -- did you convey all of the
9    information which Mr. Alston gave you to the ADA?
10   A.  With the information he gave me I gave it to the ADA's
11   office.
12   Q.  And you also told the ADA that he wants to get out of jail
13   to get me another witness, correct?
14   A.  I let her know that, yes.
15   Q.  And without you, Mr. Alston never would have gotten out of
16   jail, correct?
17            MS. OKEREKE:  Objection, your Honor.
18            THE COURT:  If he knows, he can answer.
19            MS. OKEREKE:  Speculation.
20   A.  No, sir, I had nothing to do with him getting out of jail.
21   Q.  Mr. Tartone and Mr. Booth were friends, correct?
22   A.  That's where Mr. Tartone say.
23   Q.  Sir, if we direct your attention to L-3, did Mr. Tartone
24   say this loan shark would be at his business on Thursday,
25   right?

86IMMANT                    Agostini - redirect

1    A.   That's correct.

2    Q.   So this loan shark came to his business on somewhat of a

3    regular occurrence, correct?

4    A.   I don't know if he's a regular.   It doesn't say that he

5    comes there regular.

6    Q.   But Mr. Tartone knew when this guy would be at his

7    business, correct?

8    A.   That day, yes.

9    Q.   That's because Mr. Tartone was in fact involved in

10   Mr. Booth's loan sharking operations, correct?

11            MS. OKEREKE:   Objection, your Honor.

12            THE COURT:   If you know the answer --

13   A.   I do not know anything about Mr. Tartone and any loan

14   sharking operation.

15   Q.   Sir, is it also true that Mr. Alston never told you that he

16   was hired or he was asked to kill another security officer?

17            MS. OKEREKE:   Objection, your Honor.

18            THE COURT:   Overruled.

19   A.   Say it again, please.

20   Q.   Sure.   Sir, the first time you met Mr. Alston, did

21   Mr. Alston tell you that he was approached by a Parkchester

22   security guard for a gun that he wanted to kill another

23   security guard?

24            MS. OKEREKE:   Objection, your Honor.   Again, these

25   questions have been asked.

86IMMANT                         Agostini - redirect

1          THE COURT:  Not only that, but I think this portion of

2     the defendants' motion in limine was granted.  I think we are

3     finished with Mr. Alston.

4          MR. JOSEPH:  That is fine, Judge.  That's all I have,

5     your Honor.  Thank you.

6          THE COURT:  Any other recross?

7          MS. OKEREKE:  No, your Honor.

8          THE COURT:  You're excused.  Thank you very much.

9          (Witness excused)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86IMMANT                          Agostini - redirect

1            THE COURT:  Who is next?

2            MR. JOSEPH:   Judge, we call Shawn Abate.

3      SHAWN ABATE,

4          called as a witness by the Plaintiff,

5          having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MR. JOSEPH:

8   Q.  Mr. Abate, on February 12, 2001, were you employed by the

9   City of New York?

10  A.  Yes, I was.

11  Q.  And were you employed as a detective with the New York City

12  Police Department?

13  A.  Yes, I was.

14  Q.  On February 12, 2001, did you become involved in the

15  investigation into the shooting of Albert Acosta?

16  A.  Yes.

17  Q.  And do the detectives involved in an investigation of a

18  shooting work as a team?

19  A.  Yes.

20  Q.  And was Luis Agostini part of your team on that date?

21  A.  Yes, he was.

22  Q.  Sir, on February 12, 2001, did you respond to 1700

23  Metropolitan Avenue?

24  A.  Yes, I did.

25  Q.  And did you respond with Mr. Agostini?

86IMMANT                     Abate - direct

1   A.   I believe I responded with Detective Martinez.

2   Q.   Sir, when you responded was there a radio transmission that

3   identified the victim as a security officer?

4   A.   I'm sorry, sir.  Could you say that again?

5   Q.   Sure.  Was there a transmission that identified the victim

6   as a Parkchester security officer?

7   A.   I don't remember any transmission, sir.

8   Q.   Sir, I show you what's been marked in evidence as Exhibit

9   11.  I will ask you if this jogs your memory.

10  A.   This is a Sprint report.

11  Q.   Sir, what is a Sprint report?

12  A.   It's a paper copy of radio transmissions from 9/11.

13  Q.   And are they also a paper copy of radio transmissions that

14  are placed from central dispatch to the officers?

15  A.   Yes, sir.

16  Q.   And does that document reflect the radio transmissions that

17  were placed over the air on February 12, 2001 to the responding

18  officers?

19  A.   This is to the sector car, to the uniform car.

20  Q.   It's something -- sir, on February 12, 2001, could you hear

21  what was being relayed to the sector cars?

22  A.   I don't remember hearing that, sir, no.

23        THE COURT:  That's not the question.

24  A.   Repeat the question, please.

25  Q.   Sir, did you have a NYPD radio on February 12, 2004?

86IMMANT                        Abate - direct

1   A.  Yes, I did.

2   Q.  And was it on the same frequency as the sector cars?

3   A.  Yes.

4   Q.  And did you have the capacity and ability to hear what was

5   being relayed to the sector cars on February 12, 2001?

6   A.  I don't know if I understand that question, sir.

7            THE COURT:  Could you have heard it if you were

8   listening?

9            THE WITNESS:  Yes.

10  Q.  Sir, what, if anything, according to Exhibit 11, was put

11  over the radio to the sector cars concerning the call at 1700

12  Metropolitan Avenue?

13           MS. OKEREKE:  Objection, your Honor.

14           THE COURT:  Overruled.

15  A.  Repeat that question, please.

16           THE COURT:  Or rephrase it.

17  Q.  Sir, what, if anything, does Exhibit 11 show was broadcast

18  from central dispatch over the radio to the sector cars

19  concerning 1700 Metropolitan Avenue?

20           MS. OKEREKE:  Objection, your Honor.

21           THE COURT:  It is over the objection of the defendant.

22  You wanted to read it.  I suppose you could read it if that

23  would make you feel better.

24           MS. OKEREKE:  No foundation --

25           THE COURT:  Enough foundation for me.

86IMMANT                            Abate - direct

1    Q.  What information was relayed, sir?

2    A.  You want me to read from the Sprint report?

3    Q.  Correct.

4    A.  1034 shots/IN, unknown condition.  1700 Metropolitan Oval.

5         Would you like me to continue?

6    Q.  Please.

7    A.  At 0829 it says, yelling at location, double ASTS,

8    718-824-5521, 1700 Metropolitan Avenue, floor 5, apartment 5E,

9    Bronx operator 2363C69; 1019, previous incident code 1010, H1.

10   It says, 1020, security guard shot in head.

11   Q.  Can you repeat that one sentence?

12   A.  1020, SEC guard shot in the head.

13   Q.  Is that what was placed over the radios from central to the

14   sector cars?

15         MS. OKEREKE:  Objection, your Honor.

16         THE COURT:  Overruled.

17   A.  According to this Sprint report, yes.

18   Q.  Sir, did you testify at a hearing on June 21, 2004?

19   A.  I don't remember, sir.

20   Q.  Sir, let me ask you, on page 366, line 14, were you asked

21   these questions and did you give these answers:

22   "Q.  When you leave your precinct to go there, do you have any

23   idea whether this man is a civilian, officer, an NYPD officer?

24   Do you know any of that?

25   "A.  We did not know at the time, no, ma'am."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                        Abate - direct

1            Did you give that testimony?

2    A.  I'd like to see it, please.

3    Q.  Sure.

4    A.  What line was that, sir?

5    Q.  Page 366, lines 14 through 17.

6    A.  That was the question and my answer, yes, sir.

7    Q.  Sir, on February 12, 2001, when you arrived at the scene,

8    were you what's known as the lead detective?

9    A.  At that time, yes, sir.

10   Q.  What's a lead detective?

11   A.  I was assigned the case because it was a nonfatal shooting

12   at the time.

13   Q.  What responsibilities, if any, did you have at the time?

14   A.  I basically ran the investigation at the crime scene.

15   Q.  When you got to the scene were there Parkchester officers

16   already on site?

17   A.  I believe so, yes, sir.

18   Q.  And, sir, did you have a spiral notebook that you used to

19   take notes?

20   A.  Yes, sir.

21   Q.  And did you do a canvass?

22   A.  I did a canvass as well, yes.

23   Q.  And did you take down notes of who you interviewed and what

24   was said in the spiral notebook?

25   A.  Yes.

86IMMANT                    Abate - direct

1   Q.  And did you give that spiral notebook to Mr. Agostini?

2   A.  Once the case was reassigned to him, yes, sir.

3   Q.  And after you gave it to Mr. Agostini, did you ever see it

4   again?

5   A.  No, sir.

6   Q.  Do you know what happened to that spiral notebook?

7   A.  Do I know what happened to it, no, sir.

8   Q.  And did you ever learn that the spiral notebook went

9   missing?

10  A.  Yes, sir.

11  Q.  Do you have any explanation for why your notes went

12  missing?

13  A.  No, sir.

14  Q.  Did you ever give the Assistant district attorney hard

15  copies of your handwritten notes -- did you ever give the

16  Assistant district attorney copies of the handwritten notes

17  which you took before the memo book went missing?

18  A.  I don't remember giving the district attorney my copies,

19  no, sir.

20          THE COURT:  Did you give anybody copies?

21          THE WITNESS:  When the case was reassigned to

22  Detective Agostini, the notes went with the case.

23          THE COURT:  The spiral notebook?

24          THE WITNESS:  Not the entire notebook.  As I took

25  notes I would rip them out and they would go to the case file.

86IMMANT                        Abate - direct

1          THE COURT:  You never made a copy?

2          THE WITNESS:  No, sir.

3   Q.  Sir, while you were on the scene at 1700 Metropolitan

4   Avenue, did you ever interview a Richard Huello, a Verizon

5   employee?

6   A.  I don't believe I did, no.

7   Q.  Sir, you gave a deposition approximately two months ago,

8   right?

9   A.  I believe I did, yes, sir.

10  Q.  And, sir, were you asked these questions in your deposition

11  and did you give these answers, page 15:

12  "Q.  What information, if any, did you learn at the scene as a

13  result of the canvass?

14  "A.  I don't remember.

15  "Q.  Did you speak with a Verizon employee named Richard

16  Huello?

17  "A.  Yes, I did."

18          I'll show it to you, if you'd like, sir.

19  A.  Thank you.  Yes, I gave that answer to that question.

20  Q.  Two months ago you spoke with Richard Huello.  Two months

21  ago you had a memory of speaking to Richard Huello, is that

22  correct?

23  A.  I was present for that interview, yes, sir.

24  Q.  And today do you have a recollection of speaking with

25  Mr. Huello?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                    Abate - direct

1   A.  I was present for the interview with Mr. Huello, I believe,

2   yes.

3   Q.  Was Mr. Huello working close to where Mr. Acosta was found?

4   A.  Yes.

5   Q.  And, sir, did you speak with any officers to verify whether

6   plaintiff was on call at 1700 Metropolitan Avenue on the

7   morning of February 12, 2001 at apartment 5E?

8   A.  I don't remember that, sir.

9           MR. JOSEPH:  I would like to introduce Exhibit 17.  I

10  believe there is no objection to move 17 into evidence, if it

11  please the Court.

12          (Plaintiff's Exhibit 17 received in evidence)

13  Q.  I am going to show you what's been marked as Exhibit 17.

14  Do you recognize this?

15  A.  Yes, I do.

16  Q.  And is this a document that you created?

17  A.  Yes, it is.

18  Q.  When did you create this document?

19  A.  On February 12, 2001.

20  Q.  Sir, is this a request for information to the intelligence

21  department?

22  A.  To the gang intelligence, yes.

23  Q.  By the way, is there a Detective Parker who was assigned to

24  that, to intelligence?

25  A.  I'm sorry, sir?

86IMMANT                        Abate - direct

1    Q.  Are you aware of a Detective Parker who is assigned to the

2    intelligence unit?

3    A.  I don't remember that, sir.

4    Q.  Sir, on February 12, 2001, I see here a note saying

5    negative results, Anthony Manganiello, is that correct?

6    A.  That is correct.

7    Q.  What is the significance of that?

8    A.  That means that Anthony Manganiello was not listed in their

9    computer program as a gang member.

10   Q.  It also means that the intelligence division on February

11   12, 2001 had no information whatsoever concerning Anthony

12   Manganiello, correct?

13   A.  Regarding gangs, yes, sir.

14   Q.  The same is true with Albert Acosta, correct?

15   A.  That is correct.

16   Q.  Sir, on February 12, 2001, while you were at the scene, was

17   Anthony Manganiello a suspect for the shooting of Albert

18   Acosta?

19   A.  While at the scene, no, sir.

20   Q.  Sir, did you direct any officers to bring Anthony

21   Manganiello back from the scene to the 43rd Precinct?

22   A.  I don't remember that, sir.

23   Q.  By the way, when you left the scene, at the point in time

24   when you left the scene of 1700 Metropolitan Avenue on February

25   12, 2001, what information, if any, was known that tied Anthony

1   Manganiello to the shooting of Albert Acosta?

2   A.   I don't remember, sir.

3   Q.   Did you see Anthony Manganiello at the precinct?

4   A.   On February 12, yes, sir.

5   Q.   And how did he get there?

6   A.   I believe uniformed patrol brought him in.

7   Q.   When you brought Anthony Manganiello into an interview

8   room, was he a suspect?

9   A.   When I got to the precinct, Mr. Manganiello was already in

10  our lunchroom area.

11  Q.   At the point in time you arrive at the lunchroom area, was

12  Anthony Manganiello a suspect for the shooting of Albert

13  Acosta?

14  A.   No, sir.

15  Q.   By the way, on the way back from the precinct -- strike

16  that.

17         In route from the scene of the Acosta shooting to the

18  precinct, did you learn what information, if any, Walter Cobb

19  had provided?

20  A.   I don't remember that, sir.

21  Q.   Now, sir, at the point in time that you arrived at the

22  precinct, isn't it true you were not aware of any evidence

23  which in any way connected Anthony Manganiello to the shooting

24  of Albert Acosta?

25  A.   That's correct.

86IMMANT                          Abate - direct

1    Q.  And at that point in time when you arrived is it true that

2    you already knew what information, if any, Walter Cobb had

3    provided?

4    A.  I don't remember that, sir.

5    Q.  Sir, let me ask you to take a look at your hearing

6    testimony from four years ago, June 21, 2004, page 376.  I'll

7    direct your attention to line 20.  I am going to ask you if

8    this refreshes your recollection.

9    A.  I don't remember giving the answer, but it is in the

10   minutes here, sir.

11   Q.  I'll tell you what, sir.  Since you have it in front of

12   you, can you read page 376, line 20 to 25?

13   A.  20 to 25?

14   Q.  Yes.

15   A.  "QUESTION:  Prior to speaking to Mr. Manganiello were

16   you -- you knew who Mr. Cobb was?

17   "A.  Yes.

18   "Q.  And were you briefed as to what information Mr. Cobb had

19   given the other detectives?

20   "A.  Yes, ma'am."

21   Q.  Those were your words, right, four years ago?

22   A.  Yes, sir.

23   Q.  So at the point in time you speak with Anthony Manganiello

24   you know what Walter Cobb has to say, correct?

25   A.  According to my testimony at this date, yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86IMMANT                        Abate - direct

1   Q.  And you also considered at that point in time that whatever

2   Walter Cobb had to say didn't connect Anthony Manganiello to

3   the shooting of Albert Acosta, isn't that correct?

4   A.  I'm sorry, sir.  Could you say that again?

5   Q.  Sure.  Sir, isn't it true that on February 12, 2001, it was

6   your opinion that whatever information Walter Cobb had provided

7   did not connect Anthony Manganiello to the shooting of Albert

8   Acosta?

9           MS. OKEREKE:  Objection, your Honor.

10          THE COURT:  I'll allow it.  You can answer.

11  A.  I don't remember that, sir.

12  Q.  Sir, did you testify that on page 372 of the hearing

13  testimony, line 20 that at the point in time you arrived at the

14  precinct there was no reason to believe that plaintiff was in

15  any way involved in the shooting of Albert Acosta?

16  A.  What line was that, sir?

17  Q.  372, line 20.

18  A.  Again, your question is?

19  Q.  Did you state that the point in time that you arrived at

20  the precinct on February 12, 2001, there was no reason to

21  believe that plaintiff was in any way involved in the murder of

22  Acosta?  Didn't you say that under oath four years ago?

23  A.  Yes, sir.

24  Q.  And, sir, on February 12, 2001, did you speak with Anthony

25  Manganiello at the precinct?

86IMMANT                          Abate - direct

1  A.  Yes, we did.

2  Q.  And was Mr. Agostini with you during this interview?

3  A.  Yes, he was.

4  Q.  Anyone else with you?

5  A.  I don't believe so, sir.

6  Q.  When you spoke with Anthony Manganiello, was he under

7  arrest?

8  A.  No, he wasn't.

9  Q.  Was Anthony Manganiello arrested at any point on February

10 12, 2001?

11 A.  He was placed in a cell and a voided arrest was done.

12 Q.  Was he arrested?

13 A.  Not by me.

14 Q.  By who?

15 A.  I don't know.

16 Q.  Sir, you were the lead investigator on this file, up until

17 the time that Detective Agostini took it over?

18 A.  That is correct.

19 Q.  Was he placed in the cell while you were lead investigator?

20 A.  Not by me, no, sir.

21 Q.  By who?

22 A.  I don't know if he was placed in a cell.

23 Q.  You don't know if he was placed in a cell?

24 A.  What time frame are you talking about, sir?

25 Q.  On February 12, 2001, at any point was Anthony Manganiello

86IMMANT                        Abate - direct

1    placed in a cell?

2    A.  Yes.

3    Q.  At the point in time when he was placed in the cell was he

4    under arrest?

5    A.  I'm sorry.  Was he --

6    Q.  Was he under arrest when he was placed in a cell?

7    A.  I can't answer that, sir.  I did not put him in a cell.  I

8    did not arrest him when I was the lead investigator.

9             THE COURT:  It's a little different question.  You

10   want to try your hand again.

11            MR. JOSEPH:  Yes, your Honor.

12   Q.  Sir, was Mr. Manganiello arrested while you were still the

13   lead investigator, or when Mr. Agostini became the lead

14   investigator?

15   A.  I can speak -- I can speak only when I was the lead

16   investigator.  He was not arrested when I was the lead

17   investigator.

18   Q.  Was he at any time placed in a cell when you were the lead

19   investigator?

20   A.  No.

21   Q.  Was Anthony Manganiello placed in a cell after Mr. Agostini

22   became the lead investigator on February 12, 2001?

23   A.  I had seen him in the cell on February 12, 2001, yes.

24   Q.  At the point in time when you saw him in the cell, who was

25   the lead investigator --

86IMMANT                        Abate - direct

1            MS. OKEREKE:  Objection, your Honor.

2    Q.  -- on February 12, 2001?

3            THE COURT:  If he knows, he can answer.

4    A.  It was Detective Agostini.

5    Q.  Does that mean it was Detective Agostini's decision to put

6    Anthony Manganiello in the cell on February 12, 2001?

7            MS. OKEREKE:  Objection, your Honor.

8            THE COURT:  Overruled.

9    A.  I didn't hear that fully.

10   Q.  Does that mean that it was Detective Agostini's decision to

11   put Anthony Manganiello in the cell on February 12, 2001?

12   A.  No.

13   Q.  Sir, did you testify at a pretrial hearing on June of 2004

14   that you asked Anthony Manganiello where he lived and he

15   responded he doesn't remember?

16   A.  I'd have to see some documentation, sir.

17   Q.  Do you still have the hearing transcript in front of you?

18   A.  Yes, sir.

19   Q.  Can you turn to page 373.

20   A.  What line, sir?

21   Q.  14 to 17.

22   A.  373, 14 --

23   Q.  373, line 14 to 17.

24   A.  Okay.

25   Q.  Did you testify that Anthony Manganiello was evasive to

86IMMANT                          Abate - direct

1   questioning on February 12, 2001?

2   A.   Yes, I testified to that.

3   Q.   Did you also testify that you asked him where he lived and

4   he said he didn't remember, is that correct?

5   A.   What line is that on, sir?

6   Q.   Take a look between page 373 and 374.  Did you give that

7   testimony?

8   A.   Your question, sir?

9   Q.   Sir, at the pretrial hearing, did you testify that Anthony

10  Manganiello was asked his address and responded I don't know?

11  A.   Can you tell me what line that's on, regarding his address?

12  Q.   Did you testify at the pretrial hearing on page 374 between

13  line 12 and 19 that when asked what his phone number was, he

14  said it's unlisted?

15  A.   That is correct.

16  Q.   Sir, when you questioned Anthony Manganiello, did you take

17  any handwritten notes of what he said?

18  A.   I don't believe I did, sir, no.

19  Q.   And you told the assistant district attorney about this

20  conversation you had with Anthony Manganiello, correct?

21  A.   I don't remember if I told the district attorney.

22  Q.   Sir, did you consider Anthony Manganiello a suspect because

23  he was evasive to your questioning?

24  A.   No, sir.

25  Q.   You didn't.  Sir, can you turn to page 377.  And between

86IMMANT                    Abate - direct

1   lines 20 to line 17 on the following page, did you testify that

2   you considered him a suspect because he was evasive to your

3   questioning?

4   A.  What it states is that my suspicion had raised a bit.  It

5   doesn't say anything about him being a suspect.

6   Q.  Did you testify at the trial hearing that your suspicion

7   about Anthony Manganiello's involvement in the Acosta murder

8   was raised because he was evasive in questioning?  Is that

9   fair?

10  A.  Not only because he was evasive to the simple questions we

11  were asking him.

12  Q.  Was that one of the factors?

13  A.  That was one of the factors, certainly.

14  Q.  Sir, did you take possession of Anthony Manganiello's memo

15  book?

16  A.  I did, yes, sir.

17  Q.  Well, sir, did you ever deny under oath taking possession

18  of the memo book?

19  A.  I don't remember that, sir.

20  Q.  How about at your deposition about two months ago.  I'll

21  refer you to page 26, lines 24 to line 1 on the following page.

22  Read that for me, sir.

23  A.  You said read it?

24  Q.  Yes.

25  A.  Question:  Sir, do you recognize what has been marked as

86IMMANT                        Abate - direct

1   Exhibit 1?

2   Q.  Reading page 26, line 24.

3   A.  That's what I'm reading.  26, line 24?

4   Q.  I'll find it, sir.  Page 26, line 24.  Can you read that

5   for us, please?

6   A.  "QUESTION:  Did you keep Mr. Manganiello -- take possession

7   of Mr. Manganiello's memo book?"

8   Q.  And the answer was?

9   A.  I didn't.

10  Q.  And did you give that testimony under oath?

11  A.  Yes, I did.

12  Q.  That was two months ago, right?

13  A.  That was correct before I had a chance --

14          THE COURT:  That's when it was, two months ago?

15          THE WITNESS:  It was two months ago, yes.

16  Q.  You were given a copy of this deposition to review, is that

17  correct?

18  A.  Correct.

19  Q.  There was something called an errata sheet that you --

20          MS. OKEREKE:  Objection.

21          THE COURT:  Overruled.

22  Q.  You were given an errata sheet to make changes if anything

23  in your testimony was inaccurate?

24  A.  I don't remember that.

25  Q.  Did you also make a copy of Anthony Manganiello's memo

86IMMANT                          Abate - direct

1  | book?

2  | A.  I would need some documentation for that, sir.

3  | Q.  How about page 530 of your trial testimony, line 3.

4  |        THE COURT:  What's the page?

5  |        MR. JOSEPH:   530, your Honor, line 3.

6  | Q.  Sir, did you make copies of Mr. Manganiello's memo book?

7  | A.  According to my testimony, yes, sir.

8  | Q.  What happened to those copies?

9  | A.  They were with the case file.

10 | Q.  Did they go missing also?

11 | A.  Yes, sir.

12 | Q.  Now, on February 12, 2001, did crime scene come and take

13 | pictures of Anthony Manganiello?

14 | A.  I would need some documentation for that, sir.

15 | Q.  Why don't you take a look at page 530, lines 16 through 22.

16 | A.  What line, sir?

17 | Q.  16 through 22.

18 | A.  Pictures were taken by crime scene, too.

19 | Q.  Those picture were lost, too, right?

20 | A.  I believe so.

21 | Q.  Did you take possession of Anthony Manganiello's jacket?

22 | A.  His jacket was taken off him, yes, sir.

23 | Q.  It was taken off of his physical person?

24 | A.  I asked him to remove and he removed it, gave it to me.

25 | Q.  Sir, did you ever testify that you came into possession of

86IMMANT                        Abate - direct

1   this jacket differently?

2   A.   I don't know, sir.

3   Q.   Why don't you take a look at your deposition, page 25, line

4   24.

5   A.   Page 25, is it?

6   Q.   Correct.

7   A.   Line 24?

8   Q.   Correct.   Sir, did you testify that Mr. Manganiello was on

9   a chair outside of the interview room and that's where you got

10  it?

11  A.   That's what my deposition says, yes, sir.

12            THE COURT:   You keep saying that's what it says here.

13  Do you have any question that you gave that testimony?

14            THE WITNESS:   This was prior to me being able to view

15  any paperwork from seven years ago.

16            THE COURT:   All I'm talking about is the under oath

17  statements in the deposition or the trial and you keep on

18  saying, being equivocal about it, as maybe you didn't say it.

19  We are not saying you didn't get more information later.   I

20  just want to be sure that's what you actually said.

21            THE WITNESS:   That's what my testimony states.

22            THE COURT:   You don't have any doubt that you

23  testified to that?

24            THE WITNESS:   There is no doubt in that, sir.

25  Q.   Mr. Manganiello had a Band-Aid on his fingers, correct, on

86IMMANT                        Abate - direct

 1   February 12, 2001?

 2   A.   I believe so, yes.

 3   Q.   Did you order that Band-Aid to be tested?

 4   A.   I don't remember if I ordered that, sir.

 5   Q.   If you take a look at your deposition, page 30, does that

 6   refresh your recollection, lines 1 through 14?

 7   A.   That's what I said in my deposition, yes, sir.

 8   Q.   That was two months ago, right?

 9   A.   That was about two months ago.

10   Q.   By the way, was plaintiff's shirt removed from him on

11   February 12, 2001, while he was in this interview room?

12   A.   I believe it was given to us, yes.

13   Q.   And it was taken off of his body, correct?

14   A.   I believe he took it off his body, yes, sir.

15   Q.   Sir, on February 12, 2001, did you receive a call from a

16   lawyer on Mr. Manganiello's behalf?

17   A.   I didn't receive a call, no, sir.

18   Q.   Sir, was there information related to you that an attorney

19   had called on behalf of Mr. Manganiello?

20   A.   I knew of the call, yes, sir.

21   Q.   And at that point did you become suspicious?

22   A.   Suspicious of what, sir?

23   Q.   Sir, did you become suspicious because a lawyer called on

24   behalf of Anthony Manganiello?

25   A.   It raised my suspicion a little bit.

86IMMANT                    Abate - direct

1   Q.   May I have your deposition, sir?

2   A.   Yes.

3   Q.   Sir, it concerned you, did it not, that an attorney showed

4   up, right?

5   A.   I wouldn't say it concerned me, no, sir.

6   Q.   You wouldn't.  Did you say it two months ago?

7   A.   I'd have to see it, sir.

8   Q.   Sir, were you asked this question and did you give this

9   answer, on page 50, line 7:

10  "Q.   Did the fact that a lawyer appeared raise your suspicion

11  that Mr. Manganiello was somehow involved in the shooting of

12  Mr. Acosta?

13  "A.   It concerned me."

14  A.   Yes, I gave that answer.

15  Q.   Sir, did the attorney say anything when he left the

16  interview room after speaking with Anthony Manganiello?

17  A.   I don't remember that, sir.

18  Q.   And, sir, when the attorney left the interview room, you

19  were in the vicinity, correct?

20  A.   I believe I was, yes.

21  Q.   And you were in close proximity to Detective Agostini,

22  correct?

23  A.   That I don't remember, sir.

24  Q.   But you didn't hear a lawyer ask was it intentional, right?

25  A.   I don't remember that, sir.

86IMMANT                        Abate - direct

1    Q.  Sir, at a point in time when the attorney arrived was there

2    any probable cause to believe that Anthony Manganiello was

3    involved in Mr. Acosta's shooting?

4    A.  I don't determine if there is probable cause, sir.

5            MS. OKEREKE:  Objection.

6            THE COURT:  Overruled.

7    Q.  Sir, did you state a couple of weeks ago that you didn't

8    remember whether there was probable cause?

9    A.  I'd have to see that, sir.

10   Q.  Why don't you take a look at page 53, line 8.

11   A.  What line, sir?

12   Q.  Line 8.

13   A.  Your question, sir?

14   Q.  Sir, did you say two weeks ago you didn't recall -- two

15   months ago that you didn't recall whether there was probable

16   cause to believe Anthony Manganiello was involved in a shooting

17   of Albert Acosta at the point in time when a lawyer showed up?

18   A.  I said I don't remember if there was probable cause at the

19   time.

20   Q.  And, sir, on February 12, 2001, did you apply for a search

21   warrant for Anthony Manganiello's vehicle?

22   A.  Yes, I did.

23   Q.  What was the procedure for obtaining a search warrant at

24   the time?

25   A.  The procedure was, I had called the district attorney, had

86IMMANT                          Abate - direct

1   given him the facts that we had had, some facts that we had

2   from the case, and then the DA would determine if there was

3   probable cause enough to go in front of a judge.  We went in

4   front of the judge, she explained what she had and what she

5   thought probable cause was, and the judge signed the warrant.

6   Q.   What facts did you convey to the district attorney?

7   A.   I don't know what facts I gave her, sir.

8   Q.   Did you sign an affidavit?

9   A.   I signed the affidavit, yes, sir.

10  Q.   What facts, if any, were contained in an affidavit?

11  A.   I don't remember that, sir.

12  Q.   And that affidavit disappeared, correct?

13  A.   It was with the case file, yes, sir.

14  Q.   Sir, did you actually speak to the judge when you applied

15  for the search warrant?

16  A.   We did go in front of the judge, yes, sir.

17  Q.   You made statements as to what facts supply probable cause

18  to get a warrant, correct?

19  A.   The district attorney is the one who speaks to the judge

20  regarding probable cause or not.

21  Q.   Sir, don't you also make some statements in front of the

22  judge, typically?

23  A.   I don't believe I made any statements, no, sir.

24  Q.   But, sir, on February 12, 2001, as a result of whatever

25  paperwork that you signed, which we don't have, the judge

86IMMANT                        Abate - direct

1    issued a warrant for the search of Anthony Manganiello's

2    vehicle, correct?

3              MS. OKEREKE:  Objection, your Honor.

4    Mischaracterizing the testimony.

5              THE COURT:  How is that?

6              MS. OKEREKE:  The witness already testified that he

7    alone did not speak with the judge and he did not make the

8    determination for probable cause.

9              THE COURT:  That's a mischaracterization?

10             MS. OKEREKE:  That's correct.

11             THE COURT:  Maybe in your book.  Anyhow, maybe you can

12   rephrase it, although it's perfectly reasonable.

13   Q.  Sir, based upon the affidavit which you gave the judge, did

14   the judge issue a warrant for the search of Anthony

15   Manganiello's car?

16   A.  Based on my information I gave to the district attorney and

17   the information the district attorney related to the judge, the

18   judge signed and certified for the vehicle.

19             THE COURT:  Did she have more than what you gave her?

20             THE WITNESS:  I don't know that, sir.

21             THE COURT:  How would she achieve that?

22             THE WITNESS:  More information?

23             THE COURT:  Than what you gave her in her affidavit.

24             THE WITNESS:  I don't know.

25             THE COURT:  Where do you guess it would have come from

86IMMANT                        Abate - direct

1    other than the detectives on the case?

2              THE WITNESS:  I think nowhere.

3              THE COURT:  Me, too.

4    Q.  Sir, as a result of the search of the vehicle was there any

5    evidence found that tied plaintiff to the shooting of Albert

6    Acosta?

7    A.  No, sir.

8    Q.  On February 12, 2001, at any point during that day was

9    there any evidence or facts made known to you that in any way

10   tied Anthony Manganiello to the shooting of Albert Acosta?

11   A.  On the 12th, no, sir.

12             THE COURT:  Are we coming to the conclusion of this

13   soon?

14             MR. JOSEPH:  We are, your Honor.

15   Q.  Sir, did you meet with Michael Booth?

16   A.  On what date, sir?

17   Q.  Ever.

18   A.  I believe I met with Mr. Booth before on the street.

19   Q.  Did you meet with -- did you meet with Mr. Booth at the

20   43rd Precinct?

21   A.  I don't remember that, sir.

22   Q.  Sir, do you still have your deposition in front of you?

23   A.  I do, sir.

24   Q.  Can you turn to page 72, line 19 to 24.  Were you with

25   Detective Agostini when he interviewed Michael Booth at the

86IMMANT                       Abate - direct

1    43rd Precinct?

2    A.   It doesn't say anything that I was with him at the 43rd

3    Precinct.

4    Q.   Were you with Luis Agostini when Michael Booth was

5    interviewed?

6    A.   It just states that we met with him.  It doesn't say

7    anything about interviewing him.  I met with him with Detective

8    Agostini.

9    Q.   Is meeting somehow different than interviewing him?

10   A.   Sure.

11   Q.   What took place at this meeting, sir?

12   A.   I'm sorry?

13   Q.   What took place at this meeting?

14   A.   I don't remember that, sir.

15   Q.   When was this meeting?

16   A.   I don't remember that either.

17   Q.   Was this meeting in relation to the case against Anthony

18   Manganiello?

19   A.   I believe so, yes, sir.

20   Q.   And were you aware that Mr. Booth was involved in

21   bookmaking and gambling when you met with him?

22   A.   That was a rumor I heard.

23   Q.   It was information you had, correct?

24   A.   It was a rumor that I heard.  I didn't have any information

25   on that.

86IMMANT                        Abate - direct

1    Q.  Was Mr. Booth searched in your presence?

2    A.  Searched in my presence?  I don't remember that, sir.

3    Q.  Do you have any recollection of Mr. Agostini finding

4    gambling slips on Mr. Booth?

5    A.  I'm sorry, sir.  I didn't hear that.

6    Q.  Do you have any recollection of Mr. Agostini as a result of

7    a search finding evidence of illegal activities on Mr. Booth's

8    person?

9    A.  I don't remember that.

10   Q.  Were you present when Mr. Booth was asked to write out a

11   statement?

12   A.  I don't believe so.

13   Q.  Sir, as part your investigation of this case did you learn

14   that Anthony Manganiello was a parks officer in Westchester?

15   A.  Yes, sir.

16   Q.  You also learned through part of your investigation that he

17   was licensed and authorized and in fact required to carry guns

18   as part of his job, correct?

19   A.  I knew he had a pistol permit for that job, yes, sir.

20   Q.  Usually, the job of a police officer requires one to carry

21   a gun, correct?

22   A.  That's fair to say.

23   Q.  And, sir, isn't it also true that all of the guns that

24   plaintiff owned were turned into the police department after

25   this case began?

86IMMANT                        Abate - direct

1    A.  I don't remember that, sir.

2    Q.  Did you testify to that at trial?

3    A.  I'd have to see some documentation, sir.

4    Q.  Would you turn to page 533.

5    A.  In the trial book?

6    Q.  Yes.  Line 8?

7    A.  I'm sorry.  What line, line 8?

8    Q.  Correct.  8 through 16, specifically.

9    A.  I stated in my testimony, that, yes, they were turned in.

10   Q.  Sir, in April of 2001, did you rearrest Anthony

11   Manganiello?

12   A.  That was the first time I arrested him.

13   Q.  In April 2001, did you arrest Anthony Manganiello because

14   you had a search warrant?

15   A.  I had a search warrant, no, sir.

16   Q.  An arrest warrant.

17   A.  We had authorization from the Bronx DA's office.

18   Q.  Sir, April 2001 did you have a warrant for Anthony

19   Manganiello's arrest?

20   A.  We had authorization from the Bronx DA's office.

21   Q.  Did you have an arrest warrant, yes or no?

22   A.  In my mind, yes, we did.

23   Q.  And, sir, who supplied the information to get that arrest

24   warrant?

25   A.  I believe it was Luis Agostini.

86IMMANT                          Abate - direct

1   Q.  Did you supply some of the information to get the arrest

2   warrant?

3   A.  I'm sorry, sir?

4   Q.  Did you supply some of the information to obtain that

5   arrest warrant?

6   A.  I don't remember if I did.

7           THE COURT:  I don't think it's been established that

8   there actually was an arrest warrant myself.

9   Q.  Did you testify that in your deposition on page 77 that you

10  did have an arrest warrant?

11  A.  What line, sir?

12  Q.  Line 25.

13  A.  Yes, I did.

14  Q.  Was that true?

15  A.  We had authorization to arrest Mr. Manganiello from the

16  Bronx DA's office.

17  Q.  Did you have an arrest warrant for Anthony Manganiello's

18  arrest in April of 2001?

19          MS. OKEREKE:  Objection, your Honor.

20          THE WITNESS:  I don't understand what he's asking.

21          THE COURT:  Overruled.

22  A.  I don't understand what you're asking.

23  Q.  Do you know what an arrest warrant is?

24  A.  Yes, I do.

25  Q.  Did you have one for Anthony Manganiello in April of 2001?

86IMMANT                          Abate - direct

1           THE WITNESS:  Can I explain that, Judge?

2           THE COURT:  All he's asking you is whether you had a

3    piece of paper.

4    A.   No, I didn't have a piece of paper.

5    Q.   You did not have an arrest warrant?

6    A.   I did not have a piece of paper.

7           THE COURT:  Move on.

8    Q.   Did you know whether a piece of paper had had been issued

9    by a judge for Anthony Manganiello's arrest?

10   A.   I didn't know that, sir.

11          MR. JOSEPH:  Nothing further, your Honor.

12          THE COURT:  Any brief cross?

13          MS. OKEREKE:  Yes, your Honor.  I don't know how brief

14   it is.

15          THE COURT:  I'll help.

16   CROSS-EXAMINATION

17   BY MS. OKEREKE:

18   Q.   Mr. Abate, how long were you employed by NYPD?

19   A.   Twenty years.

20   Q.   And for those 20 years, how long were you a detective?

21   A.   Eleven years.

22   Q.   What were your main duties and responsibilities in the 11

23   years that you were a detective?

24   A.   I was in Bronx narcotics, we investigated all narcotics.

25   From narcotics I went into organized crime, investigation

86IMMANT                        Abate - cross

1    division.  And from the organized crime investigation division

2    I went into the detective bureau.

3    Q.  At some point you were assigned to the 43rd Precinct, as

4    you testified, is that correct?

5    A.  That's correct.

6    Q.  What were your duties at the 43rd Precinct?

7    A.  When I first got there I was assigned to the robbery unit.

8    I was there for about five or six months.  From the robbery

9    unit I went into the regular squad where we investigated all

10   crimes from harassment to murder, excluding sex crimes and

11   robberies.

12   Q.  You testified that at some point you became aware of the

13   shooting that occurred at 1700 Metropolitan Avenue on February

14   12?

15   A.  That's correct.

16   Q.  Just to clarify, how exactly did you learn of that

17   shooting?

18   A.  I don't remember if we got requested via the radio or we

19   got notified from the desk sergeant where a lot of times we got

20   notified where we got called up by the squad and we were needed

21   to respond to a certain location.

22   Q.  If you were notified by the desk sergeant, would you have

23   received that information from a radio call?

24   A.  Not necessarily.

25   Q.  On February 12, 2001 -- first off, you were shown a copy of

86IMMANT                          Abate - cross

1   a Sprint report, is that correct?

2   A.   Yes, ma'am.

3   Q.   How often do you come across Sprint reports in your time as

4   a detective?

5   A.   Just about every major crime we pull in.

6   Q.   Are you trained in interpreting Sprint reports?

7   A.   I'm not trained in it, no, ma'am.

8              THE COURT:   I think this is a good place for us to

9   have a rest.  Let's adjourn now and we will see you tomorrow

10  morning at 9:30.  Please be on time because we can't start

11  unless you're all here.  Have a good evening and do not discuss

12  the case amongst yourselves or with anybody else.

13             (Jury not present)

14             THE COURT:   See you tomorrow.

15             (Adjourned to Thursday, June 18, 2008, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2     Examination of:                                Page

3     LUIS AGOSTINI

4     Direct By Mr. Joseph . . . . . . . . . . .      185

5     Cross By Ms. Okereke . . . . . . . . . .        277

6     Redirect By Mr. Joseph . . . . . . . . . .      326

7     SHAWN ABATE

8     Direct By Mr. Joseph . . . . . . . . . . .      333

9     Cross By Ms. Okereke . . . . . . . . . .        363

10                          PLAINTIFF EXHIBITS

11    Exhibit No.                                   Received

12       25    . . . . . . . . . . . . . . . . . .   185

13       29    . . . . . . . . . . . . . . . . . .   188

14       40    . . . . . . . . . . . . . . . . . .   190

15       19    . . . . . . . . . . . . . . . . . .   195

16       14    . . . . . . . . . . . . . . . . . .   197

17       33    . . . . . . . . . . . . . . . . . .   200

18       61    . . . . . . . . . . . . . . . . . .   221

19       61    . . . . . . . . . . . . . . . . . .   221

20       28    . . . . . . . . . . . . . . . . . .   228

21       4     . . . . . . . . . . . . . . . . . .   228

22       5     . . . . . . . . . . . . . . . . . .   231

23       26 and 27 . . . . . . . . . . . . . . .     233

24       24    . . . . . . . . . . . . . . . . . .   257

25       10    . . . . . . . . . . . . . . . . . .   258

1    23    . . . . . . . . . . . . . . . . .    259

2    16    . . . . . . . . . . . . . . . . .    266

3    17    . . . . . . . . . . . . . . . . .    340

4                    DEFENDANT EXHIBITS

5    Exhibit No.                              Received

6    W     . . . . . . . . . . . . . . . . .    284

7    U-3   . . . . . . . . . . . . . . . . .    286

8    V-3   . . . . . . . . . . . . . . . . .    287

9    S     . . . . . . . . . . . . . . . . .    288

10   A-2   . . . . . . . . . . . . . . . . .    288

11   T     . . . . . . . . . . . . . . . . .    290

12   U     . . . . . . . . . . . . . . . . .    293

13   Z     . . . . . . . . . . . . . . . . .    294

14   R     . . . . . . . . . . . . . . . . .    295

15   V     . . . . . . . . . . . . . . . . .    297

16   Y     . . . . . . . . . . . . . . . . .    298

17   S-4   . . . . . . . . . . . . . . . . .    299

18   T-4   . . . . . . . . . . . . . . . . .    300

19   U-4   . . . . . . . . . . . . . . . . .    302

20   V-4   . . . . . . . . . . . . . . . . .    303

21   W-4   . . . . . . . . . . . . . . . . .    304

22   B-5, C-5, and D-5   . . . . . . . . . .    306

23   F-8   . . . . . . . . . . . . . . . . .    309

24   L-3   . . . . . . . . . . . . . . . . .    317

25   C     . . . . . . . . . . . . . . . . .    322

86GMMANT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ANTHONY MANGANIELLO,

4            Plaintiff,

5            v.               07 Civ. 3644 (HB)

6   LUIS AGOSTINI, individually
    and as a New York City Police
7   Detective; SHAWN ABATE,
    individually and as a New York
8   City Police Detective; ALEX
    PEREZ, individually and as a
9   New York City Police Officer;
    MIRIAM NIEVES, individually
10  and as New York City Police
    Officer; and ROBERT MARTINEZ,
11  individually and as a New York
    City Police Officer,

12

            Defendants.
13

    ------------------------------x
14                     New York, N.Y.
                        June 19, 2008
15                     9:30 a.m.

16  Before:

17               HON. HAROLD BAER, JR.,

18                         District Judge

19                 APPEARANCES

20  OSORIO & ASSOCIATES
        Attorneys for Plaintiff
21  BY:  MICHAEL JOSEPH

22  MICHAEL A. CARDOZO, Corporation Counsel
    for the City of New York
23        Attorney for Defendants
    BY:  MARK ZUCKERMAN
24       AMY OKEREKE

25

86JMMANT

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  I had a chat with Justice Marcus, who just

4     apparently got confirmed.  I am not sure what he got confirmed

5     for.  Is he a court of claims?  That's what he was in Albany

6     for.

7          He will tell Scaccia to be here at 10 in the morning

8     and asked me to ask both of you to confirm that date just so

9     that the rapid heartbeat of his trial don't confuse everything.

10          MR. ZUCKERMAN:  Your Honor, is that tomorrow?

11          THE COURT:  Tomorrow, Friday.  We will interrupt and

12    indeed if there are other witnesses, just for the future

13    opportunities you may have to try cases in front of me, I'm

14    really quite flexible in terms of taking witnesses out of turn,

15    especially when they are on trial somewhere else.

16          Bring them in.

17          MR. JOSEPH:  Judge, may we have one housekeeping

18    clarification?

19          THE COURT:  Not yet.  Maybe at the recess.

20          MR. JOSEPH:  Very well, Judge.

21          THE COURT:  Why isn't the witness in the box?  Where

22    is he?

23          (Jury present)

24          THE COURT:  I understand one of you has an opportunity

25    to watch a child be justly rewarded this afternoon for one or

86JMMANT

1    another things.  So we will adjourn no later than 4:45 and

2    probably -- we will see.  It just depends on where we are.  We

3    are going to work all day tomorrow.  I hope we will be moving

4    to the last vestiges of this trial by the time the weekend is

5    upon us, but I'm glad to see you all here and relatively on

6    time, more or less.

7            You're up.

8            You're still under oath, Detective.  Do people still

9    call you detective like they call me judge even when I'm not

10   here, so to speak?

11           THE WITNESS:  Sometimes, yes.

12    SHAWN ABATE, resumed.

13   CROSS-EXAMINATION (cont'd)

14   BY MS. OKEREKE:

15   Q.  Detective Abate, how long were you employed by the New York

16   City Police Department?

17   A.  Twenty years.

18   Q.  Did you retire from the New York City Police Department?

19   A.  Yes, I did.

20   Q.  What was your rank at the time you retired?

21   A.  My rank was detective, second grade.

22           THE COURT:  Is that higher than first grade or lower?

23           THE WITNESS:  One below first.

24   Q.  Can you briefly tell us what your assignments were during

25   your tenure with NYPD?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JMMANT                         Abate - cross

1   A.   I went to the academy.  After the academy I went into NSU8.

2            THE COURT:  I think we did this all yesterday.  I'm

3   glad you know where we ended.  That's encouraging.  Whether we

4   need to have his résumé a second time is probably not my view.

5   Q.   How long were you a detective with NYPD?

6   A.   Eleven years.

7   Q.   And as of February 12, 2001, what precinct were you

8   assigned to?

9   A.   The 43rd Precinct.

10  Q.   And were you a detective at that time?

11  A.   Yes, I was.

12  Q.   What specifically were your duties as a homicide detective

13  with the 43rd Precinct?

14  A.   On that date?

15  Q.   That's correct.

16  A.   I was in the detective squad and my assignments were to

17  investigate all open complaints ranging from homicide to

18  harassment, excluding robberies and sex crimes.

19  Q.   And you previously testified that you responded to the

20  homicide on February 12, 2001, the homicide of Albert Acosta,

21  correct?

22  A.   Yes, ma'am.

23  Q.   If you could just clarify for us, how did you learn of the

24  homicide?  How were you notified about it?

25  A.   Well, the squad was notified of a nonfatal shooting at the

86JMMANT                           Abate - cross

1    time.  It wasn't a homicide at our inception.

2    Q.  Did you receive a radio call for this or did you receive

3    other notification?

4    A.  I don't remember how we were notified.

5    Q.  And you also previously testified that you at one point

6    were the case leader or the case detective?

7    A.  That's correct.

8    Q.  For the homicide.

9         At what point was the case, if you recall, transferred

10   or reassigned to another detective?

11   A.  Once the victim was deceased.

12   Q.  Do you recall what time it is that you learned of that?

13   A.  I believe it was somewhere around 8:00 on the 12th.

14   Q.  If you could please tell us, what were some of the

15   investigative actions that you took in furtherance of the

16   investigation into Albert Acosta's homicide?

17   A.  When I first arrived on the scene?

18   Q.  Yes.

19   A.  When I first arrived on the scene, I had spoken to some of

20   the first responders that were there.  They gave me a brief

21   synopsis of what had happened.  One of the officers had brought

22   me into the basement of 1700 Metropolitan Avenue where the

23   crime occurred.  This was like a basement area of the building.

24   Once I went into the basement then I set up a preliminary crime

25   scene.

86JMMANT                          Abate - cross

1    Q.   I'll stop you there.  What do you mean by setting up a

2    crime scene?  What does that mean?

3    A.   That means we basically tape off with the yellow tape that

4    says police, don't cross so people don't contaminate the crime

5    scene.

6    Q.   Why do you do that?

7    A.   One, so they don't contaminate the crime scene.  This way

8    we can assess the whole situation, look for evidence and things

9    like that.

10   Q.   And is this one of your duties then as a case detective?

11   A.   Yes, ma'am.

12   Q.   What did you do after you taped off the crime scene?

13   A.   After I taped off the crime scene, we had started a canvass

14   of the building, of Parkchester, actually.

15   Q.   Do you recall what specific canvassing you conducted?

16   A.   I don't remember which apartments I canvassed, but it was

17   within that building.

18   Q.   What did you do after you canvassed?

19   A.   After I canvassed, I came back, obviously, to the crime

20   scene, and shortly after that I responded back to the precinct.

21   Q.   What, if anything, did you do when you arrived back at the

22   precinct?

23   A.   When I got back to the precinct I did some brief computer

24   checks.  And when I got back there, Mr. Manganiello was there

25   already, and I had entered into the room where he was and I did

86JMMANT                        Abate - cross

1    a brief interview.

2    Q.  And with respect to the computer checks that you conducted,

3    explain for us what type of computer checks you conducted and

4    why you would conduct those.

5    A.  Well, the reason why we do computer checks is, one, it's

6    part of our duties as a detective.  And some of the few checks

7    we do, we do checks on the building to see how many complaints

8    there had been at the building or any radio runs.  We had a

9    victim's name at the time and we attempt to do a full check on

10   the victim as well.  Any vehicles that were within the crime

11   scene we do what's called a vehicle canvass.  We write down the

12   license plates and then we run them to get the registered owner

13   and where they lived to see if possibly they are in the area,

14   we can speak to them, see if they heard or saw anything.  If

15   they are not in the area, then we want to determine why they

16   were there, why that car was in the area.

17   Q.  And is this normally done with every car that is in a crime

18   scene?

19   A.  That's part of a vehicle canvass, yes.  We literally go up

20   and down a crime scene and jot down all the license plates.

21   Q.  When you first arrived at the 43rd Precinct, did you know

22   if the victim of the crime was still alive?

23   A.  At that time I believed he was still alive, yes, ma'am.

24   Q.  Did you know if the victim -- did you at some point observe

25   the victim while you were at the scene of 1700 Metropolitan

86JMMANT                          Abate - cross

1    Avenue?

2    A.  No, ma'am.  The victim was already removed to the hospital

3    when I got there.

4    Q.  By the time you arrived the victim was gone?

5    A.  Yes, ma'am.

6    Q.  You mentioned your interview with the plaintiff.  Tell us

7    in your own words what your observations were during that

8    interview.

9              THE COURT:  This is the famous lunchroom interview?

10             THE WITNESS:  Yes, sir.

11   A.  When I got into the interview room, Mr. Manganiello was

12   already there with Detective Agostini.  And my observations of

13   Mr. Manganiello, he was still fully dressed in his uniform, and

14   appeared somewhat disheveled, shirt a little bit out of his

15   pants, hair kind of messed up, sweating.

16   Q.  Do you know why Mr. Manganiello was being interviewed?

17   A.  He was brought there because he was a Parkchester employee

18   as well and knew he was basically in that same quadrant where

19   the radio run was.

20   Q.  Again, tell us more about this interview.  What, if

21   anything, did you -- observations did you make?

22   A.  We started asking him simple questions.  Normally, at the

23   beginning of any interview, we start with simple pedigree

24   information, name, address, phone number, so we have that later

25   on.

1    Q.  Are these questions that you would ask of any witness?

2    A.  Absolutely.

3    Q.  Please continue.

4    A.  So we started, again, to ask his name, how to spell his

5    name.  He did give us how to spell his name.  When we asked him

6    about his address, basically, he wouldn't give it to us or

7    couldn't remember, phone number, stated it was unlisted.

8            THE COURT:  Haven't we heard all of this before?

9            MS. OKEREKE:  I'd like the jury to hear it from

10   Detective Abate, a full detail of all of the observations and

11   all of the events and all of the action that he took in the

12   course of this investigation.

13           THE COURT:  You have 15 minutes to do it in.

14   Q.  Please continue, Detective.

15   A.  Basically, once he wasn't -- he didn't give us his address

16   or stated his phone number was unlisted, that's what I remember

17   of it.

18   Q.  Did you notice anything on plaintiff's clothing?

19   A.  Yes, ma'am.

20   Q.  What did you notice?

21   A.  On the outside of his duty jacket, which is his outer

22   garment that he wears, there was some white stain on his

23   sleeve, I believe it was.

24           THE COURT:  Did you ever find out what that was?

25           THE WITNESS:  Did I ever find out what it was?  No, I

86JMMANT                          Abate - cross

1    did not find out what it was.

2            THE COURT:  So to this day you don't know what that

3    white powder was?

4            THE WITNESS:  I don't know what it is right now, no.

5    Q.  Were any tests conducted on that white powder?

6    A.  Yes, ma'am.

7    Q.  What, if any, tests or what test was conducted?

8    A.  They were testing to see if the material on his jacket was

9    similar to the dust we had found in the room where Mr. Acosta

10   was found.  The walls were basically crumbling in there and

11   there was like a plaster dust.

12   Q.  The same white dust you testified appeared on the

13   plaintiff's jacket?

14   A.  Yes, ma'am.

15   Q.  Did you take any notes during your interview of the

16   plaintiff?

17   A.  No, ma'am.

18   Q.  Why is that?

19   A.  I don't normally have to take notes.  This was a simple

20   interview that we were doing and I didn't feel I needed to take

21   notes.  Plus, it was so short I didn't need to take notes.

22   Q.  Did you take any notes of the conversations or of the

23   investigative activities that you conducted during the course

24   of the investigation?

25   A.  Yes, ma'am.

86JMMANT                          Abate - cross

1    Q.  Where did you put these notes?

2    A.  It was with the case file.

3    Q.  Did you have occasion to use a spiral notebook during your

4    time canvassing or other investigative activities?

5    A.  Yes.

6    Q.  What is the purpose of a spiral notebook?

7    A.  The spiral notebook is just a note pad that we carry to

8    every crime scene, and any investigative steps that I take I

9    put into the spiral notebook.  At a later time, when I can sit

10   down and type it onto our official document, a DD5, is

11   basically memorialized from what I wrote.

12   Q.  Is there any difference between what is in your notes and

13   what you would put in a DD5?

14   A.  No, ma'am.

15   Q.  What's in the spiral notes and what's in the DD5 are the

16   exact same things?

17           MR. JOSEPH:  Objection, leading.  Withdrawn.

18   A.  Yes, ma'am.

19   Q.  What did you do with your DD5s after you transcribe them?

20   A.  They were placed into the case file.

21   Q.  Approximately how long after you would take a notation in

22   your spiral notebook would you type up a DD5?

23   A.  That's different every time, depending on how busy we are.

24   It could be the same day, it could be that night.

25   Q.  But it was your practice again to create DD5s?

86JMMANT                    Abate - cross

1              MR. JOSEPH:  Objection, leading.

2              THE COURT:  I'll allow it.  We are going to move along

3       here very quickly.

4       A.  Yes, it was my practice.

5       Q.  After you were present during plaintiff's interview what,

6       if any, other actions did you take in the course of the

7       investigation into Albert Acosta's homicide?

8       A.  I had arrested Mr. Manganiello.

9       Q.  Who authorized this arrest?

10      A.  The Bronx DA's office.

11      Q.  And you conducted your arrest pursuant to this

12      authorization?

13      A.  Yes, ma'am.

14      Q.  How did you receive authorization from the Bronx County

15      DA's office?

16      A.  I was notified through my supervisor that the Bronx DA's

17      office had given us authorization to place Mr. Manganiello

18      under arrest.

19      Q.  When was the arrest or when did the arrest occur?

20      A.  I believe it was in April of 2001.

21      Q.  Two months after the homicide, is that correct?

22      A.  That's correct.

23      Q.  Were any other officers or police personnel with you when

24      you apprehended the plaintiff?

25      A.  Yes, ma'am.

86JMMANT                        Abate - cross

1    Q.   Who was with you?

2    A.   In my car was my supervisor, Sergeant John McGovern, and

3    there was another location within the vicinity of the house

4    that we were surveilling, and Detective Agostini was in that

5    car, and I don't remember who his partner was that day.

6    Q.   And with respect to receiving authorization for an arrest

7    or making an arrest, do detectives have the authorization to

8    make an arrest without independent authorization?

9              MR. JOSEPH:   Objection to form.

10             THE COURT:   I don't understand the question.

11   Q.   Do police detectives have independent authority to

12   effectuate an arrest?

13             MR. JOSEPH:   Same objection.

14             THE COURT:   I think that's more of a legal inquiry.

15   And the way you phrased it, any citizen has a right to make an

16   arrest, depending on what the action was.

17   Q.   In a homicide case can you, without the authority of the

18   Bronx County District Attorney's Office, effectuate an arrest?

19   A.   No, ma'am.

20   Q.   What happened when you arrested the plaintiff?

21   A.   Well, myself and Sergeant McGovern were watching one of the

22   locations that we knew Mr. Manganiello had frequented.  At some

23   point he came out or I should say some people came out of a

24   house that we were watching, got into a car, I believe it was a

25   van, backed out of the driveway, and we started to follow the

86JMMANT                        Abate - cross

1    vehicle because I didn't know who was in the car.  The car

2    pulled into a gas station, pulled up to the pumps.

3    Mr. Manganiello exited the car, I believe he was driving.

4          At that point my car -- I put my car basically on the

5    other side of the pumps where his car was, got out, and I

6    identified myself, I called him by his first name because I

7    knew he was -- I assumed he knew who I was as well -- I

8    identified myself as a detective, told him he was being

9    arrested.  I attempted to handcuff him.  He resisted a little

10   bit.  I said, this will be a lot easier -- I don't want to do

11   this in front of your family.  He placed his hands behind his

12   back, and I placed him in the car and transported him back to

13   the 43rd Precinct.

14   Q.  You just said that you believed that the plaintiff

15   recognized you also.  Why is that?

16   A.  Because he had seen me prior, the day of the homicide.

17   Q.  Did you at any point use your weapon or draw your gun

18   during this arrest?

19   A.  I did not draw my gun.  I tactically approached the

20   vehicle.  I did have my hand on my gun, yes, I did.

21   Q.  Was Sergeant McGovern's gun drawn?

22   A.  No, ma'am.

23   Q.  Again, it was just you and Sergeant McGovern who

24   effectuated the arrest?

25   A.  That's correct.

86JMMANT                    Abate - cross

1    Q.  Other than what you've previously testified to, did you

2    conduct any other activities concerning the investigation?

3    A.  No, ma'am.

4    Q.  Did you testify before the grand jury in this matter?

5    A.  I don't believe I testified in the grand jury, no, ma'am.

6    Q.  Did you give all of the information that you received

7    concerning this investigation and your activities to the case

8    leader?

9    A.  Yes, ma'am.

10   Q.  And who was the case leader, again?

11   A.  For the homicide, it was Detective Luis Agostini.

12            MS. OKEREKE:  Thank you.

13            THE COURT:  Any redirect?

14            MR. JOSEPH:  Very briefly, Judge.

15   REDIRECT EXAMINATION

16   BY MR. JOSEPH:

17   Q.  Sir, I think you said you spoke to some of the first

18   responders when you arrived on the scene.  Was one of those

19   first responders a Sergeant Ohle from Parkchester security?

20   A.  I don't believe I spoke to Sergeant Ohle, but I don't have

21   documentation.

22   Q.  I think during cross-examination you described

23   Mr. Manganiello's appearance on February 12, 2001 as sweaty and

24   a little bit disheveled?

25   A.  That's correct, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JMMANT                          Abate - redirect

1    Q.   That would be conducive for someone who had just ran

2    several blocks, correct?

3    A.   I can't say that.

4    Q.   After someone has been running for several blocks it would

5    be expected that he would be a little sweaty, right?

6              MS. OKEREKE:   Objection.

7              THE COURT:   Sustained.

8    Q.   Sir, as an officer, when a call of a 1013 or officer down

9    comes over a radio, it is expected that every officer in the

10   vicinity is supposed to arrive at that location, correct?

11   A.   To respond to the scene, yes.

12   Q.   And they are supposed to respond as quickly as possible

13   with all deliberate speed?

14             MS. OKEREKE:   Objection.

15             THE COURT:   I'll allow it.  I am not clear why.

16   A.   Officers respond as quickly as they can get there.

17   Q.   Sir, if Mr. Manganiello was in the room where Mr. Acosta

18   was shot after receiving a call that Mr. Acosta had been shot,

19   that would explain why he had some powder on his jacket,

20   correct?

21             MS. OKEREKE:   Objection, your Honor.

22             THE COURT:   Overruled.  I wouldn't phrase it like

23   that, but if you can answer, why don't you do that.

24   A.   Could you ask that again, please.

25   Q.   Would it be unusual for Mr. Manganiello to have some powder

1    on his sleeve similar to that found in the area where

2    Mr. Acosta was shot if he was in fact in the room after he

3    received the call?

4              MS. OKEREKE:  Same objection, your Honor.

5              THE COURT:  Overruled.

6    A.  If he was in the room, yes, he could get powder on the

7    sleeve.

8    Q.  Sir, I think you said you didn't take notes during your

9    interview of Mr. Manganiello, is that correct?

10   A.  That is correct.

11   Q.  Sir, wouldn't you want to take down -- strike that.

12             As part of your normal course of business as to the

13   detective, don't you write down people's pedigree information

14   for later use in case you have to call them or contact them?

15   A.  Yes, sir.

16   Q.  Did you write down Anthony Manganiello's name?

17   A.  I did not write down his name, no.

18   Q.  Did anybody write down his name?

19   A.  I don't know.  I didn't.

20   Q.  Sir, did you take any handwritten notes that he was

21   evasive?

22   A.  I don't believe I took any handwritten notes at all for

23   that.

24   Q.  When you print a DD5 it's basically a sum and substance,

25   correct?

1    A.   That's fair, sure.

2    Q.   And sum and substance is not an exact translation of what's

3    contained in an original interview note, correct?

4    A.   Sometimes, that's correct.

5    Q.   And so, for example, there could be information contained

6    in a handwritten interview note that's not put into a DD5,

7    correct?

8    A.   I would never say that, no.

9    Q.   Sir, things could be in an original handwritten interview

10   note that may be phrased differently in a DD5, correct?

11   A.   No, I wouldn't say that either.

12   Q.   But there is a reason you're supposed to keep the original

13   handwritten interview notes, correct?

14   A.   Sure.

15   Q.   And that's because those are the most accurate record of

16   what happened at the point in time that you're recording the

17   events, correct?

18          MS. OKEREKE:  Objection, your Honor.

19          THE COURT:  Overruled.

20   A.   No.  Because I mean sometimes -- when we write notes, a lot

21   of times they are quick notes that we are writing, especially

22   for a case where we were canvassing within Parkchester, which

23   was so large, you know.  You couldn't write everything down.

24   You were just getting the sum and substance of what these

25   people were saying.

86JMMANT                        Abate - redirect

1    Q.  By the way, as a result of your canvass, your extensive

2    canvasses, did any witness say they saw Anthony Manganiello

3    shoot Albert Acosta?

4    A.  My canvass, no.

5    Q.  Sir, to obtain authorization from the Bronx district

6    attorney, somebody had to provide that district attorney with

7    information that would establish probable cause, correct?

8            MS. OKEREKE:  Objection, your Honor.

9            THE COURT:  Overruled.

10   A.  Could you ask that again, please?

11   Q.  Sure.  Isn't it true to obtain authorization to effectuate

12   an arrest for a homicide from the Bronx District Attorney's

13   Office, somebody would have to provide them with information

14   that would establish probable cause for the arrest?

15           MS. OKEREKE:  Objection, your Honor.

16           THE COURT:  Overruled.

17   A.  Somebody would contact the district attorney and the

18   district attorney would filter through the information and

19   determine if there was enough probable cause and, if so, they

20   would give us authorization.

21   Q.  In this case, who provided the district attorney with the

22   information that led to the authorization for Anthony

23   Manganiello's arrest?

24   A.  I believe it was Detective Agostini.

25   Q.  Did you provide some of that information, too?

1   A.  Did I physically speak to the attorney?

2   Q.  Did you create any documents that were given to the

3   district attorney which they relied upon to issue authorization

4   for the arrest?

5           MS. OKEREKE:  Objection.

6           THE COURT:  Sustained.

7   Q.  Now, you talked about a location Mr. Manganiello

8   frequented.  It was a family member's house, correct?

9           MS. OKEREKE:  Objection.

10  A.  Yes.

11          THE COURT:  I don't think her inquiry really went to

12  whose house.

13          MR. JOSEPH:  I just want to establish, Judge, it

14  wasn't a bar or something of ill repute.

15          MS. OKEREKE:  Objection, your Honor.

16  A.  It was a house.

17          MR. JOSEPH:  That's all I have.

18          THE COURT:  You're excused.

19          (Witness excused)

20          THE COURT:  What's next?

21          MR. JOSEPH:  At this point, plaintiff would call Mario

22  Manganiello.  He is outside.  I'll get him.

23          MR. ZUCKERMAN:  Your Honor, note our objection to this

24  witness.

25   MARIO MANGANIELLO,

86JMMANT                        Abate - redirect

1              called as a witness by the Plaintiff,

2         having been duly sworn, testified as follows:

3              THE COURT:  I had hoped you could reach a stipulation,

4    but my guess is you never tried, so I essentially did one for

5    you and that will be the topic that he stays with and goes no

6    further.  But you have an objection?

7              MR. ZUCKERMAN:  We object to this witness testifying.

8    We believe --

9              THE COURT:  I told you you have an objection.  If I

10   want you to talk more, I'll tell you.  Otherwise -- I thought

11   we did this at the outset.  You say objection and you can or

12   cannot, if you choose, give me a one-word ground.  Do you

13   remember that conversation?

14             MR. ZUCKERMAN:  Yes, your Honor.

15             THE COURT:  Good.

16             MR. JOSEPH:  May I inquire, your Honor?

17             THE COURT:  You may.

18   DIRECT EXAMINATION

19   BY MR. JOSEPH:

20   Q.  Sir, do you know Anthony Manganiello?

21   A.  Yes, sir.

22   Q.  How do you know him?

23   A.  He's my brother.

24   Q.  I am going to draw your attention to February 12, 2001.  Do

25   you recall that date?

86JMMANT                      M. Manganiello - direct

1    A.   Yes, I do.

2    Q.   On that date did you go to the 43rd Precinct?

3    A.   Yes.

4    Q.   About what time did you arrive?

5    A.   Somewhere between 11:30 in the morning and noon.

6    Q.   Sir, what observations, if any, did you make of your

7    brother when you arrived?

8    A.   Well, when I first saw him he was sitting in an

9    interrogation room where he had no uniform shirt on, and he had

10   electrocardiogram electrodes attached to his chest.  He

11   appeared to be very disheveled and pale.

12   Q.   Sir, at this point did you call a lawyer for your brother?

13   A.   Yes, I did.

14   Q.   What was this lawyer's name?

15   A.   Mr. Richard Ross.

16   Q.   Did Mr. Richard Ross come to the 43rd Precinct?

17   A.   Yes, he did.

18   Q.   Did you ever hear Mr. Ross say to Mr. Agostini, was it

19   intentional?

20   A.   No, at all.

21   Q.   Sir, what difference, if any, do you notice in your

22   brother's personality compared to before this prosecution?

23            MR. ZUCKERMAN:  Objection, your Honor.

24            THE COURT:  I'll allow it.

25   A.   Prior to this happening to him, he was a very lively,

1   vivacious individual, very caring, very warm, participated

2   socially among family gatherings with friends and with groups.

3   He was working, he was happy to be employed and settling into a

4   career that he enjoyed.  He took a lot of pride in his work,

5   and he was a very happy --

6           THE COURT:  I think we got your drift.  He's not like

7   that anymore?

8           THE WITNESS:  No, at all.  He's merely a shell of the

9   person that I once knew at one time.  He is very depressed.  He

10  spends a lot of time at his apartment home alone.  He doesn't

11  very much get involved in any social functions or gathering.

12  He doesn't participate in anything.  He feels very much like he

13  lost his ability to be productive in society again.

14          MR. ZUCKERMAN:  Your Honor, I object.

15          THE COURT:  Overruled.

16          And this change came about directly following the

17  incident that we are talking about here, the arrest and the

18  following trial?

19          THE WITNESS:  Yes, sir, your Honor, without a doubt.

20          MR. JOSEPH:  Nothing further, your Honor.

21          THE COURT:  Any cross?

22          MR. ZUCKERMAN:  Briefly, your Honor.

23  CROSS-EXAMINATION

24  BY MR. ZUCKERMAN:

25  Q.  Mr. Manganiello, on February 12, 2001, you received a call

86JMMANT                          M. Manganiello - cross

1    that your brother was at the 43rd Precinct, correct?

2    A.  Yes, sir.

3    Q.  And you went to the 43rd Precinct to find out why your

4    brother was there, correct?

5    A.  Say it again, please.

6    Q.  You went to the 43rd Precinct to find out why your brother

7    was there, correct?

8    A.  Yes.

9              MR. ZUCKERMAN:  That's all, your Honor.

10             MR. JOSEPH:  Nothing further, your Honor.

11             THE COURT:  You're excused.  Thank you very much.

12             THE WITNESS:  Thank you, your Honor.

13             (Witness excused)

14             THE COURT:  What's next?

15             MR. JOSEPH:  Your Honor, at this point, we would call

16   Richard Martinez.

17             Your Honor, may Mr. Manganiello remain in the

18   courtroom?

19             THE COURT:  Absolutely.

20    RICHARD E. MARTINEZ,

21        called as a witness by the Plaintiff,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. JOSEPH:

25   Q.  Sir, on February 12, 2001, were you a detective assigned to

86JMMANT                          Martinez - direct

1    the 43rd Precinct?

2    A.   Yes.

3    Q.   Can you tell us from when to when were you assigned to the

4    43rd Precinct?

5    A.   I was assigned, I believe it was in June of 1993, and then

6    around October of 2001, I was temporarily reassigned to an

7    anthrax response unit down by the World Trade Center.

8    Q.   Sir, on February 12, 2001, did you become involved into the

9    investigation of the death of Albert Acosta?

10   A.   Yes.

11   Q.   And did you respond to the scene at 1700 Metropolitan

12   Avenue in the Bronx, New York?

13   A.   Yes, I did.

14   Q.   And did you interview a gentleman named Walter Cobb?

15   A.   Yes, I did.

16   Q.   And did you create a DD5 which we have in evidence as

17   Exhibit 1.  Did you create that document, sir?

18   A.   Yes, I did.

19   Q.   And that document was created when you got back to the

20   station house, correct?

21   A.   Correct, sir.

22   Q.   And when you met with Mr. Cobb did you take interviews,

23   handwritten notes of what he said?

24   A.   Mr. Cobb, yes.

25   Q.   And what happened to those notes?

86JMMANT                     Martinez - direct

1   A.   When I got back to the precinct I took those notes and

2   typed word for word from my notes onto the DD5 here to this

3   copy.

4   Q.   Sir, isn't it true that the DD5 is a paraphrase -- isn't it

5   true your DD5 is a paraphrase, not a word-for-word translation,

6   transcription?

7   A.   My notes are sum and substance.  When you take the notes to

8   memorialize them to a legal document, the way I do it, it's

9   exactly the way I write my notes.  My notes might have been sum

10  and substance, some might be quotes, depending what the person

11  has told me.  Whatever I wrote on the notes I type on the

12  report outside, correcting my bad spellings sometimes.

13  Q.   Sir, isn't it true that in your DD5, if you're doing it

14  word for word, you'll put down quotations; otherwise, it's just

15  your own paraphrasing?

16  A.   I'll put down a quotation if the person says something

17  like, I did X, Y, and Z, and they are really adamant about it,

18  then I'll put a quotation.  But as they're talking, you try to

19  write as quick as someone is talking and sometimes you have to

20  back them up, and basically you get their whole story in sum

21  and substance, and then that gets typed onto the DD5.

22  Q.   You gave a deposition, correct, sir?

23  A.   Yes, sir.

24  Q.   Were you asked this question and did you give these answers

25  at page 32, line 22:

86JMMANT                          Martinez - direct

1    "Q.  Now are the DD5s word for word of what's in your spiral

2    notebook or are they paraphrased?

3    "A.  If I paraphrase I usually put, that's me, I put sum and

4    substance.

5    "Q.  Okay.

6    "A.  If it's a quote, if somebody says yes, I did it, you know,

7    quote, I'll put a quote.  That's how I do it."

8    A.  May I see, please?

9    Q.  Sure.

10   A.  Thank you.

11        MR. ZUCKERMAN:  Your Honor, there is no inconsistency.

12   Objection.

13        THE COURT:  Isn't that a question for the jury?  You

14   want to be both the judge and the jury and the defense

15   attorney?  I explained that to them in some detail yesterday.

16   I assume you were here.

17        Go ahead.

18   Q.  Line 22, sir, page 32.

19   A.  Thank you.  What I'm saying is --

20   Q.  Sir, did you give that testimony, yes or no?

21   A.  Yes, I did.

22   Q.  Sir, isn't it true that you don't have a memory of what

23   Mr. Cobb actually said, correct, apart from what's in the DD5?

24   A.  Correct, sir.

25        THE COURT:  Are most memo book entries amongst your

86JMMANT                        Martinez - direct

1    squad pretty much the same, as you say yours are, that they do

2    virtually word for word what the interviewee says?

3          THE WITNESS:  With me, your Honor, like if I'm

4    interviewing you and talk to you, I'll write as quickly as I

5    can.  I don't tape it, so that's why I say I paraphrase

6    sometimes in sum and substance.  But if you actually are sure

7    on something and it's a fact that you're telling me something

8    like this happened this way, I'll quote it.

9          When I put it on to the DD5 I put sum and substance on

10   the DD5 because that's how I took my notes in sum and substance

11   and that's why I put it on the DD5 in sum and substance,

12   meaning this is what he had -- the person had told me.  And

13   then if there is a quote in there I would quote it, just like I

14   had it in the notes.  Otherwise, it would be how I heard it

15   when the person explained to me and I wrote it down.

16         THE COURT:  The DD5 is a narrative, right, while your

17   memo book is just notes that you made?  Look at this one.  This

18   is not yours.  That's Mr. Abate.  That's a memo book entry

19   denominated Exhibit 13 that I just happened to come across.

20   Isn't that a memo book entry, or not?  I don't want to not know

21   what I'm talking about all of the time.

22         MR. ZUCKERMAN:  Your Honor, I would object.

23         THE COURT:  Overruled.  The likelihood is when I ask a

24   question you're welcome to object, but you can rest assure that

25   it will likely be overruled.

1              MR. ZUCKERMAN:  Yes, your Honor.

2              THE WITNESS:  What the memo book --

3              THE COURT:  What is that?

4              THE WITNESS:  I would just look at this as being

5    notes.  If I can explain.

6              THE COURT:  Yes.

7              THE WITNESS:  The memo book, you do have memo books,

8    like a patrol officer has a memo book and carries it with them

9    on patrol.  That is my own personal experience, you don't have

10   that, you don't write your notes like if you go out on a case,

11   whatever it may be.  That memo book basically tells you when

12   you reported to work, if you went downtown to court.  It's just

13   your generalization.  That's a memo book of your accounts of

14   when you started work, when you left work.

15             When you go out on a case, we usually take maybe a

16   spiral notebook, and you write it from there on a spiral

17   notebook.  But it's not called -- we call it a spiral.  It's

18   not called an actual memo book.  Memo book is like a little

19   blue packet book that most cops have.

20             THE COURT:  What is that, if you can tell?

21             THE WITNESS:  To me it wouldn't be a copy of a memo

22   book, but you'd have to ask Detective Abate.  The memo books

23   are like, to describe it, it's about maybe three, four inches

24   wide, and maybe about six, seven inches, and it's like a flip

25   pad.  That would be an official PD memo book.

86JMMANT                          Martinez - direct

1              THE COURT:  When you were talking about legal

2     document, you were talking about a DD5?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  I am not sure I got the answer, but I'll

5     take it.

6     Q.  Sir, if I understand your testimony correctly, when you

7     interview a witness are you saying you don't take down word for

8     word what the witness says?

9     A.  You try to, but it's like if I'm talking to somebody --

10    when you interview somebody, you don't record it, you don't

11    take it with a portable recorder or anything.  Sometimes they

12    talk fast, sometimes they are hard to understand.  You try to

13    get their whole story.  You try to back them up if you miss

14    something, or you do it in your best ability to get their full

15    statement.  And I can only talk for myself, I read -- a lot of

16    times I'll go back and I'll read my notes back to that witness.

17    This is what you told me, and they will -- yeah, or they may

18    say no, the color was this color not that color, or you forgot

19    to put the color down, and I'll correct my notes.

20    Q.  Sir, isn't it true that those handwritten notes in the

21    spiral notebook, to the best of your ability, you take them

22    word for word documenting what the witness said on the scene?

23             MR. ZUCKERMAN:  Objection, your Honor.  Asked and

24    answered and argumentative.

25             THE COURT:  Sustained.

S6JMMANT                     Martinez - direct

1   Q.  Sir, in February 2001, was it your protocol to take what a

2   witness says down word for word in your notebook?

3          MR. ZUCKERMAN:  Same objection, your Honor.

4          THE COURT:  Sustained.

5   Q.  Sir, on February 12, 2001, did you give all of your

6   handwritten notes of witness statements to Detective Agostini?

7   A.  Yes.  After I was done typing my work, my DD5s, yes.

8   Q.  What you do is you attach the notes to a DD5, correct?

9   A.  Yes, sir.

10  Q.  And that way you have a complete record, so to speak, your

11  summary and the original notes?

12  A.  Correct, sir.

13  Q.  That's for evidentiary purposes, correct?

14         MR. ZUCKERMAN:  Objection, your Honor.

15         THE COURT:  Overruled.

16  A.  Yes.

17  Q.  By the way, did you ever see those notes after you gave

18  them to Mr. Agostini?

19  A.  No.

20         THE COURT:  Let me ask you something else.  In terms

21  of the preparation for this lawsuit, did you review your DD5s?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  And what else did you look at?

24         THE WITNESS:  Just my deposition transcript.  That's

25  it.

86JMMANT                           Martinez - direct

1          THE COURT:  And do you know whether or not all of the

2     defendants did the same thing, or you don't know?

3          THE WITNESS:  I don't know.

4     Q.  Sir, during the time you were at the 43rd Precinct, was

5     there a procedure for storing homicide case files?

6     A.  Yes.

7     Q.  What was the procedure?

8     A.  Well, if it's an active current case that you're actively

9     working on and the detective is coming in like day after day,

10    not off for a couple of days, usually you keep it on your desk

11    because you've got to refer to it because you're actively

12    working on it.  Or it may be in the supervisor's office because

13    they want to review the case folder.  If it's going to be

14    neither, it gets filed, there is a file room, file cabinet, and

15    it gets filed there.

16    Q.  Sir, what was the purpose of keeping the case files in the

17    file room?

18    A.  Just so it can be easily accessed and you know where it is

19    to get it if it's needed for court or somebody needs to look at

20    it or whatever it may be.

21    Q.  And, sir, are they organized and filed by year and date?

22    A.  Yes.  It's done by date and I believe it might be done in

23    numeral order of the homicide number, like 2001, one of 2,000,

24    two of 2,000, and so on.

25    Q.  Is it done that way so the files don't get lost?

1  A.  Yes.  And you can easily access it.  You can locate it if

2  you're looking for a particular one.

3  Q.  Has that been your experience for the entire time you've

4  been at the 43rd Precinct?

5  A.  Yes.

6  Q.  Sir, in your experience, would it have been unusual for a

7  detective to put a file on top of a locker?

8          MR. ZUCKERMAN:  Objection, your Honor.

9          THE COURT:  Overruled.

10 A.  I've never experienced anything like that, so I don't -- I

11 can say where I put mine.  They are either with me, on my desk

12 or supervisor's room or I dump them in the file cabinet.

13 Q.  In your time at the 43rd you never heard of a detective

14 putting a case file on top of a locker?

15         MR. ZUCKERMAN:  Objection, your Honor.

16         THE COURT:  Overruled.

17 A.  No, sir.

18 Q.  Sir, have you ever heard of somebody putting a case file on

19 top of a locker without a suspect or victim's name on it?

20         MR. ZUCKERMAN:  Objection, your Honor.

21         THE COURT:  Same ruling.

22 A.  Well, on case folders you usually don't put -- I'm trying

23 to think.  Case folder usually has the complaint number.  It

24 may not have the subject's name on it, if that's the first half

25 of your question.  Can you repeat --