1    Q.   How about victim's name?

2    A.   I put the victim names on mine.  Again, I can't say what

3    everybody else does.

4    Q.   In your experience, sir, does every case file have some

5    identifying characteristic on it other than, for example, the

6    detective's name who is working on it?

7              MR. ZUCKERMAN:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.   Again, I could say what I do.

10             THE COURT:  Only tell us what you do.  If you don't

11   know what other people do, we don't want you to guess.

12   Q.   Sir, when you spoke with Walter Cobb on February 12,

13   2001 -- I'll direct your attention to Exhibit 1 -- did he tell

14   you he heard four gunshots, correct?

15   A.   Yes, sir.

16   Q.   And he said he heard two gunshots and then two more,

17   correct?

18   A.   Yes, sir.

19   Q.   And you also spoke with an Officer Alex Perez that same

20   day, correct?

21   A.   Yes, sir.

22   Q.   Did Alex Perez ever advise you that Mr. Cobb only told him

23   he only heard one gunshot?

24   A.   Not to my knowledge.  I'd have to see the DD5 if you have

25   that, please.

86JMMANT                        Martinez - direct

1          THE COURT:  Ladies and gentlemen, I don't want you to

2   get the wrong idea when I talked about review.  Any good lawyer

3   makes sure all his witnesses review all the evidence before

4   they testify so that in fact they know what it is they are

5   going to be asked questions about.  That's just common sense,

6   but I want to be sure you didn't think there was anything wrong

7   with it.

8   Q.  Sir, I'll show you what's been marked as Exhibit 5 in

9   evidence.  Sir, did you create this document?

10  A.  Yes, sir.

11  Q.  And when did you create it?

12  A.  I would say some time after 8 p.m. on the 12th.

13  Q.  February 12, 2001?

14  A.  Correct.

15  Q.  And is this document a conversation you had with Officer

16  Alex Perez?

17  A.  Yes, sir.

18  Q.  By the way, Officer Alex Perez spoke with Walter Cobb

19  before you did, correct?

20          MR. ZUCKERMAN:  Objection, your Honor.

21          THE COURT:  If you know.

22  A.  I don't know.

23  Q.  Maybe if you could review your own DD5, Exhibit 1, it might

24  refresh your recollection.  I'll withdraw the question.

25  Withdrawn.

1           Sir, according to Alex Perez, isn't it true that

2    Mr. Cobb didn't initially say anything about Anthony

3    Manganiello coming out of the basement?

4    A.  I'm sorry.  I was reading it when you were talking.  Can

5    you repeat it.

6    Q.  According to what you documented in Exhibit 5 -- according

7    to Exhibit 5, Alex Perez -- strike that.

8           According to Exhibit 5, isn't it true that Walter Cobb

9    did not say anything to Officer Alex Perez about Anthony

10   Manganiello coming out of the basement doors after he heard

11   shots?

12          MR. ZUCKERMAN:  Objection to form, your Honor.

13          THE COURT:  Overruled.  If you understand the

14   question, you can answer it.  If you don't, he will rephrase.

15   A.  According to this, no, there is nothing about any

16   conversation.

17   Q.  Well, does Exhibit 5 document that Officer Alex Perez did

18   in fact have a conversation with Walter Cobb?

19   A.  Yes.  I apologize.  I'm looking at the bottom line here.

20   Q.  Isn't it true that Mr. Cobb didn't say anything to Officer

21   Perez about Mr. Manganiello coming out of a basement door,

22   according to Exhibit 5?

23          MR. ZUCKERMAN:  Objection, your Honor.

24          THE COURT:  Take your time.  Overruled.

25   A.  According to this, no.

86JMMANT                      Martinez - direct

1    Q.  But in your document, document you created, Exhibit 1, it

2    says that Walter Cobb did in fact see Anthony Manganiello

3    coming out of the basement door after he heard shots, correct?

4    A.  Correct.

5    Q.  By the way, did you take handwritten notes of what Officer

6    Perez told you?

7    A.  Yes.

8    Q.  What happened to those notes?

9    A.  I took those notes, transferred them exactly onto the DD5s

10   that I typed, then attached that to the DD5, and it goes to the

11   case detective.

12   Q.  And after you gave it to the case detective did you ever

13   see those notes again?

14   A.  No, sir.

15   Q.  Would you agree those notes were evidence?

16          MR. ZUCKERMAN:  Objection, your Honor.

17          MR. JOSEPH:  I'll rephrase it.

18   Q.  Sir, were the handwritten notes that you took evidence?

19          MR. ZUCKERMAN:  Objection, your Honor.

20          THE COURT:  I think everybody understands what

21   evidence means.  Maybe you should rephrase the question.

22   Q.  Sir, did you view the handwritten notes that you took from

23   Officer Perez as a record of what occurred?

24          MR. ZUCKERMAN:  Objection, your Honor.

25          THE COURT:  Overruled.

86JMMANT                      Martinez - direct

1    A.   Yes.

2    Q.   In your view, was that something that should have been

3    maintained and preserved for later use?

4            MR. ZUCKERMAN:   Objection, your Honor.

5            THE COURT:   Overruled.

6    A.   Yes.

7    Q.   Now, sir, did you also interview a gentleman named Richard

8    Huello, a Verizon employee?

9    A.   Yes.

10   Q.   Did Mr. Huello tell you that he was already in the basement

11   working when Mr. Cobb arrived on the scene?

12   A.   If I could review the DD5 to be sure, please.

13   Q.   Sure.

14           Sir, I'll show you what's been marked in evidence as

15   Exhibit 4.

16   A.   Thank you.

17   Q.   Is this the DD5 that you created?

18   A.   Yes, sir.

19   Q.   And is this a DD5 in which you documented a conversation

20   with Richard Huello on February 12, 2001?

21   A.   Yes, sir.

22   Q.   And did Mr. Huello on February 12, 2001 tell you he was

23   already in the basement of 1700 Metropolitan Avenue when

24   Mr. Cobb arrives on the scene?

25   A.   Yes, sir.

86JMMANT                           Martinez - direct

1    Q.   And does Mr. Huello say that he at any point saw

2    Mr. Manganiello?

3    A.   No, sir.

4    Q.   Did Mr. Huello say he heard shots at about the time that

5    Mr. Cobb entered the basement?

6    A.   No, sir.

7    Q.   In fact, he says he didn't hear any shots, correct?

8    A.   Correct, sir.

9              MR. JOSEPH:   Judge, I ask to move into evidence

10   Exhibit 3, a two-page document, on consent.

11             MR. ZUCKERMAN:   No objection, your Honor.

12             THE COURT:   Very well.   If there is no objection, it

13   will be admitted before I even find it.   I indeed found it.   It

14   will be admitted without objection.

15             (Plaintiff's Exhibit 3 received in evidence)

16   Q.   Sir, I show you what's been marked as Exhibit 3.   Do you

17   recognize this?

18   A.   Thank you.   Yes, sir.

19   Q.   And this is a two-page document, correct?

20   A.   Yes, sir.

21   Q.   And this is a document that you created, yes?

22   A.   Yes.

23   Q.   And on the second page of the document did you create a

24   sketch?

25   A.   I'm sorry?

86JMMANT                          Martinez - direct

1    Q.  Create a sketch.

2    A.  Yes.

3    Q.  And it was a sketch of the area of the basement?

4    A.  Yes.

5            MR. JOSEPH:  Judge, with the Court's permission, for

6    demonstrative purposes, I have a blowup of Exhibit 3 --

7            THE COURT:  You better show it to your adversary

8    without the jury to see if it's agreeable to him.

9            MR. ZUCKERMAN:  Our only objection is he says it's a

10   blowup.  We haven't seen it before.

11           THE COURT:  You want some time to examine it?

12           MR. ZUCKERMAN:  No objection.

13           THE COURT:  Is there a number or a letter?

14           MR. JOSEPH:  Judge, I'll mark it Exhibit 3-A.

15           THE COURT:  3-A is admitted without objection.

16           (Plaintiff's Exhibit 3-A received in evidence)

17   Q.  Sir, can you see this from where you are?

18           THE COURT:  Why don't you bring it over here in the

19   corner and maybe we can all see it -- that will be pleasant --

20   so I'm not too far away.  He can step down if you want him

21   to --

22           THE WITNESS:  I would rather have the jury see it.

23           THE COURT:  Me, too.

24           MR. JOSEPH:  Maybe I can have him step down and I can

25   do it in the middle of the courtroom if that's acceptable.

1          THE COURT:  Whatever you want to do.

2          MR. JOSEPH:  I'll do it right here and I'll ask the

3   witness to step down.

4   Q.   Is this a copy of the sketch that you drew?

5   A.   Yes.

6   Q.   It's fair to say it's not exactly to scale, correct?

7   A.   Correct.

8   Q.   The victim was found in this area, correct?

9   A.   In that general area, yes.

10  Q.   And Mr. Huello was in the room directly across, correct?

11  A.   Yes.

12         THE COURT:  Why don't you put an X next to where the

13  victim was found so we can look at it further and understand

14  what he's doing.

15         MR. JOSEPH:  Judge, this is a stick figure here.

16  Q.   Is this stick figure where the victim was found?

17  A.   Yes.

18  Q.   Is there another stick figure next to the words Verizon

19  employee?

20  A.   Yes.

21  Q.   Is that the general area where Mr. Huello was working?

22  A.   Right on this wall there is phone boxes, like the big

23  rectangle ones against the wall.  He was working on that.

24  Q.   Sir, the victim was found basically in a room directly

25  across from where Mr. Huello was working, correct?

86JMMANT                         Martinez - direct

1    A.  Yes.  In the other room across the hall, yes.

2    Q.  Sir, in this proximity if there were gunshots would you

3    expect Mr. Huello to have heard them?

4              MR. ZUCKERMAN:  Objection, your Honor.

5              MR. JOSEPH:  I'll withdraw the question.

6              THE COURT:  Good.

7              MR. JOSEPH:  That's all I have with this.  Thank you,

8    Judge.

9    Q.  Sir, based upon the interview you conducted with Mr. Huello

10   and Mr. Cobb, did you feel that there was an inconsistency in

11   what Mr. Cobb was telling you?

12             MR. ZUCKERMAN:  Objection, your Honor.

13             THE COURT:  You can rephrase it so we have a little

14   more pointedness.

15             THE DEPUTY CLERK:  I think we have got a witness

16   walking in.

17             MR. ZUCKERMAN:  It's Mr. Colon.

18   Q.  Sir, in Exhibit No. 4, did Mr. Huello tell you that when he

19   arrived on the scene that morning he heard a walkie-talkie in

20   the basement, correct?

21   A.  Yes.

22   Q.  And did he also tell you that he banged on a door but no

23   one responded?

24   A.  Yes.

25   Q.  Sir, is one of your responsibilities as a detective to make

1    an assessment of the information which you're being provided?

2    A.   If it is my case, regardless of what it is, it's my

3    assessment to gather all the information.  If I'm assisting

4    someone on a case, it's not my -- again, the way I feel, it's

5    not up to me to make an assessment because there might be other

6    factors involved, that I haven't talked to somebody, I haven't

7    seen something, that may give reason for different stories.  I

8    can only speak for myself.

9    Q.   Sir, in your view, what responsibilities, if any, does the

10   lead investigator have to make an assessment of the information

11   to which he's being provided?

12   A.   Well, as a lead investigator you gather all the

13   information.  Like I often say, it's like a funnel.  The wide

14   part of the funnel is where everything gets dumped in, all the

15   information.  The small part is like where it all comes to the

16   lead investigator.  He goes through or she goes through the

17   evidence and makes a decision whether to reinterview, whether

18   not to reinterview, to present to a DA, supervisor looks at it,

19   also concurs or disagrees, and it's decided then.

20            As far as assisting on a case, I don't know all the

21   factors involved.  I'm assisting, so I'm a gatherer basically.

22   I'm getting as much information as I can, trying to document

23   it, and then I give it to the lead investigator.

24   Q.   By the way, sir, did you speak with Mr. Abate concerning

25   what Mr. Huello and what Mr. Cobb had told you prior to

86JMMANT                          Martinez - direct

1   returning to the 43rd Precinct?

2   A.  Not to my recollection, no.

3   Q.  By the way, sir, was Mr. Abate on the scene when you were

4   on the scene?

5   A.  I believe so, yes.

6   Q.  And did you have conversations with him?

7   A.  Not that I remember.  If I may, a lot of times when you go

8   on the scene you may not stay together.  You split up to

9   maximize what you could try and accomplish with being

10  shorthanded.

11  Q.  Sir, let me show you this.

12          MR. JOSEPH:  I'll move into evidence, at this point,

13  Judge, what's also been marked in evidence as Exhibit 2.

14          THE COURT:  2 will be admitted without objection.

15          (Plaintiff's Exhibit 2 received in evidence)

16  Q.  Sir, is this a document that you created?

17  A.  Thank you.  Yes.  I'm sorry.

18  Q.  And in this document there is a gentleman named Mr. Grimes

19  who had -- what, if anything, is shown in that exhibit, sir?

20  A.  It's a complaint follow-up DD5 that I typed up regarding an

21  interview I had with John Grimes.

22  Q.  What information, if any, did Mr. Grimes provide you?

23  A.  It's a short paragraph.  Shall I read it?

24          THE COURT:  Whatever you choose.

25  A.  You want me to read it, sir?

1    Q.   Whatever you choose.

2    A.   I arrived, meaning Mr. Grimes, at work at 8 a.m., and about

3    9:30 a.m. I went outside to get coffee.  I was standing in

4    front of the basement doorway.  I didn't notice anything

5    unusual at all and all the doors were closed.  I saw the

6    Verizon guy standing out front, and he asked me if I had a key

7    to the doors, which I didn't.  I told him to go to the security

8    office.  And I saw that he left in that direction, and I

9    proceeded to get coffee and returned to my work area.

10   Q.   Sir, you read 9:30 --

11   A.   Did I say 9:30?  I apologize.

12   Q.   It was actually --

13   A.   9:20 a.m.

14   Q.   9:20 a.m.  Mr. Grimes arrives.

15        If Mr. Grimes had mentioned anything about seeing

16   Anthony Manganiello in the area, would you have put that in the

17   DD5?

18   A.   Yes.

19   Q.   But there is no mention of it, correct?

20   A.   If he mentioned anybody, anything else, I would have put it

21   in.

22   Q.   And did you also take handwritten notes of what Mr. Grimes

23   said?

24   A.   Yes.

25   Q.   Were those handwritten notes turned over to Mr. Agostini?

1    A.   After I typed -- copied those handwritten notes onto the

2    DD5, yes, everything was handed over.

3    Q.   Have you seen those handwritten notes afterwards?

4    A.   No, sir.

5    Q.   Sir, I'll show you what's been marked as Exhibit 6 in

6    evidence.  Sir, I am going to show you what's been marked as

7    Exhibit 6.

8    A.   Thank you.

9    Q.   Did you prepare that document, sir?

10   A.   Yes.

11   Q.   Did you prepare it on February 12, 2001?

12   A.   Yes.

13   Q.   And does it document an interview which you conducted with

14   Police Officers Ortiz and Rodriguez?

15   A.   Yes.

16   Q.   Did Officers Ortiz and Rodriguez confirm that Anthony

17   Manganiello on the morning of February 12, 2001 was with them

18   at a call at apartment 5E at 1700 Metropolitan Avenue?

19   A.   Yes.

20   Q.   Did these officers also tell you that Anthony Manganiello

21   seemed to be of normal demeanor?

22   A.   Yes.

23   Q.   And did the officers also tell you that Mr. Manganiello

24   left the building with them?

25   A.   Yes.

86JMMANT                              Martinez - direct

1    Q.   And did you also take handwritten notes on what these

2    officers told you?

3    A.   Yes.

4    Q.   And what did you do with the handwritten notes afterwards?

5    A.   Again, when I sit down to do my DD5s, copy the notes onto

6    that, attach it, and it's given to the case officer, case

7    detective.

8    Q.   And after you gave it to the case detective, did you ever

9    see those notes again?

10   A.   No.

11   Q.   By the way, I'll show you Exhibit 29 in evidence.

12   A.   Thank you.

13   Q.   Sir, take a minute to review it, let me know when you're

14   done.

15   A.   Okay.

16   Q.   Now, sir, does this DD5, which Mr. Agostini prepared about

17   two weeks after your interview, attribute statements to

18   Officers Rodriguez and Ortiz that are different than what they

19   told you?

20            MR. ZUCKERMAN:   Objection, your Honor.

21            THE COURT:   You want to read them and then we will

22   know -- maybe if we read his, we will see what the differences

23   are.

24            MR. JOSEPH:   Let me rephrase the question.

25   Q.   What differences, if any, are there in the DD5 you created

1    concerning your interview of Officers Rodriguez and Ortiz and

2    the DD5 that Mr. Agostini prepared?

3               MR. ZUCKERMAN:  Objection, your Honor.

4               THE COURT:  Why don't you first ask him whether there

5    are differences.

6    Q.   Are there any differences between the two DD5s?

7    A.   If you can give me one minute.

8    Q.   Sure.

9    A.   Thank you.  Okay, sir, I'm ready.

10   Q.   Are there any differences?

11   A.   It has Mr. Manganiello left once they were all at the scene

12   first.

13   Q.   That's Mr. Agostini's DD5, correct?

14   A.   Yes.

15   Q.   And your DD5 says what?

16   A.   They all left and the Parkchester cop left.

17   Q.   Together?

18   A.   Yes.

19   Q.   Sir, did you ever interview or meet with Michael Booth in

20   relation to the homicide investigation of Albert Acosta?

21   A.   Not to my recollection, no.

22   Q.   You're sure about that?

23   A.   If there is paperwork.  I don't remember.  No.  I'm trying

24   to -- I don't -- unless there is paperwork, I don't remember.

25               THE COURT:  You don't remember unless he can refresh

1    your recollection is what you mean?

2              THE WITNESS:  Yes, sir.

3    Q.  Sir, let me show you what's been marked as Exhibit 41 in

4    evidence.  For the record, this is a three-page document.  Why

5    don't you read this over and tell me if this refreshes your

6    recollection as to whether you met with a gentleman named

7    Michael Booth?

8    A.  I don't remember.  And being honestly, counselor, when I

9    was reviewing my notes -- and I do not mean to be disrespectful

10   when you talk about the pizza place.  Snippets come to your

11   mind.  And for some reason, I don't know why, and it's no

12   disrespect to the Court or to the jury, I just remember going

13   there and getting an Italian ice.  I don't remember going

14   there -- you try to rattle your brain.  You are going through

15   all your notes and old paperwork.  That's all I remember on it.

16   Q.  Let me ask you this.  On the second and third page of that

17   document, is your signature there?

18   A.  Yes.

19   Q.  And are you witnessing a statement given by Michael Booth?

20   A.  Yes.

21   Q.  By the way, there are two separate statements given by

22   Michael Booth, correct?

23   A.  Yes.

24   Q.  And they are 10 minutes apart?

25   A.  I'm looking at the times.  12:10.  Sure.  About that.  It

86JMMANT                    Martinez - direct

1   looks like it.  Four minutes.

2   Q.  And your signature appears on both of those documents,

3   correct?

4   A.  Yes.

5   Q.  Sir, is one of them your handwriting?

6   A.  No.  It's just my signature.

7   Q.  Is it your testimony that your handwriting doesn't appear

8   on either of the written statement portions of those documents?

9   A.  Absolutely not.

10  Q.  Sir, on one of these documents Mr. Booth misspells

11  Mr. Manganiello's name, right?  He spells it as Manganillo?

12  A.  I see that.

13  Q.  On the other one he spells it correctly, is that correct?

14          THE COURT:  He had four minutes to think about it.

15  A.  I wouldn't even know -- if you asked me now how to spell

16  his name, I'm assuming -- I don't even know how to spell his

17  name.

18  Q.  On the day this statement was given did someone provide

19  Mr. Booth with the correct spelling of Mr. Manganiello's name?

20          MR. ZUCKERMAN:  Objection, your Honor.

21          THE COURT:  If he knows, he can answer.

22  A.  I don't know.  I wouldn't even know how to spell his name.

23  Now I'm looking at it, I'm assuming that this one is probably

24  right, pronunciation.

25  Q.  Sir, at the point in time when you met with Mr. Booth, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JMMANT                        Martinez - direct

1   had documents that had Anthony Manganiello's name on it,

2   correct?

3   A.  I didn't, sir, no.

4   Q.  Sir, didn't you in fact create documents that had

5   Mr. Manganiello's name on it?  Take a look at Exhibit 1.

6   A.  Yes.

7   Q.  So you did in fact know how to spell Mr. Manganiello's name

8   at some point during your investigation, correct?

9   A.  That's how I spelled it, yes, when I typed the DD5, yes.

10  Q.  And who provided Mr. Booth, if anybody, with how to

11  correctly spell Mr. Manganiello's name?

12  A.  It wasn't me.  Like I said, I wish I could remember.

13  Honest to God, I don't recall this.

14  Q.  And who else was present during this meeting?

15  A.  I would think Detective Agostini.

16  Q.  Sir, in one of the statements does Mr. Booth write out,

17  Manganiello came to me about one month ago for a rod.  I said

18  that I did not fool -- and he spells it f-u-l-l -- with that

19  stuff.  Is that what's written there?

20          THE COURT:  On the later one.

21  A.  On the later one.  I'm sorry.  I'm just reading -- repeat

22  the question, please.

23  Q.  Sir, on one of the statements does Mr. Booth say,

24  Manganiello came to me about one month ago for a rod.  I said

25  that I did not fool with that stuff and he spelled fool

86JMMANT                         Martinez - direct

1    f-u-l-l, correct?

2    A.  Yes.

3    Q.  And he also spelled stuff s-t-u-f?

4    A.  Yes.

5    Q.  But on the other statements there is no spelling errors?

6    A.  Correct.

7    Q.  On one of the statements he spells gun g-u-n-n, right?

8    A.  Yes.

9    Q.  But on the other statement gun is spelled correctly?

10   A.  Correct.

11   Q.  So, sir, was anybody helping Mr. Booth with his statement?

12   A.  Like I said, I don't -- I wish I could help you with this.

13   I don't remember.  It comes to a complete blank.  I don't want

14   to assume, your Honor, because --

15            THE COURT:  Are could you look at the earlier one for

16   me, Detective?  The earlier one is dated 12/06.  Do you have

17   that one in front of you?  There are only two.  You can look at

18   mine.  We have to move this along.

19            THE WITNESS:  I'm sorry, your Honor.

20            THE COURT:  You see that?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Do you see little initials next to some of

23   the sentences or the language?

24            THE WITNESS:  Like me, m-e?

25            THE COURT:  I don't know what it is.  I'm only showing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    it to you in case it makes it easier for you to remember what

2    was happening and who was it happening to.  I gather --

3              THE WITNESS:  I don't.  I really wish I did.

4    Q.  Sir, by looking at these documents, it appears that one was

5    given at 12:00, correct, and another was given at 12:10 p.m.,

6    both on March 1, 2001, yes?

7    A.  Correct.

8    Q.  And, sir, the one that actually appears to be spelled right

9    precedes or occurred earlier than the one with all the spelling

10   errors, correct?

11   A.  Correct.

12   Q.  Sir, as you sit here right now, do you have a memory of

13   Mr. Booth being searched at the precinct?

14   A.  No.  Like I said, I wish I did.

15   Q.  Do you have a memory of Mr. Booth initially saying he

16   doesn't know anything about Anthony Manganiello?

17   A.  No, sir.

18   Q.  Do you have a memory of Detective Agostini finding a knife

19   on Mr. Booth's person?

20   A.  No.

21   Q.  Do you have a memory of Mr. Agostini finding any gambling

22   slips or other criminal evidence on Mr. Booth's person?

23   A.  No.

24   Q.  Do you have a memory of Mr. Agostini telling Mr. Booth that

25   if he doesn't sign a statement his name will get passed on to

86JMMANT                          Martinez - direct

1    the organized crime division?

2    A.  No.

3    Q.  Sir, in your experience, is it ever good police practice to

4    threaten a witness to get a statement?

5              MR. ZUCKERMAN:  Objection, your Honor.

6              THE COURT:  Sustained.  I will, again, take judicial

7    notice.  That would not be good police practice.

8    Q.  By the way, after Mr. Booth gave this statement was he ever

9    arrested or investigated, to your knowledge?

10   A.  Not to my knowledge.

11   Q.  Sir, did Mr. Agostini give Mr. Booth Mr. Manganiello's

12   name?

13   A.  Excuse me?

14   Q.  Did Mr. Agostini provide Mr. Booth with Mr. Manganiello's

15   name.

16             THE COURT:  If you know.

17   A.  I don't know.

18   Q.  Sir, you were there, yes?

19   A.  I am going by my signature so I must have been, but I can't

20   go by my memory.  That is my signature.

21             MR. JOSEPH:  Your Honor, at this point I would ask to

22   move into evidence, I believe on consent, Exhibit 22.

23             THE COURT:  Very well.  22 is admitted without

24   objection.

25             (Plaintiff's Exhibit 22 received in evidence)

86JMMANT                          Martinez - direct

1              THE COURT:  It's fair to say, Mr. Martinez, or

2    Detective Martinez, that you reviewed these notes, and neither

3    at the time of your reviewing the DD5 nor today have you any

4    recollection of a meeting with Mr. Booth, albeit your signature

5    is on the DD5?

6              THE WITNESS:  No, sir, no.

7              THE COURT:  Just so the record is clear, my DD5s on

8    whatever we are looking at, 27, has 12:06 and 12:10 as the two

9    times they were made.  There is some confusion, I thought, in

10   this exhibit.

11             MR. JOSEPH:  Judge, I wasn't able to tell if it was a

12   zero or six.

13             THE COURT:  Now we know.

14             MR. JOSEPH:  Your Honor, at this point I would ask to

15   move Exhibit 8 into evidence, I believe on consent.

16             (Plaintiff's Exhibit 8 received in evidence)

17   Q.  Sir, I'll show you what's been marked as Exhibit 8 in

18   evidence.

19   A.  Thank you.

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  What do you recognize it to be?

23   A.  It's a DD5, complaint follow-up report, for a request for a

24   microscopic analysis on a recovered .22 handgun.

25   Q.  This is a document that you prepared?

86JMMANT                          Martinez - direct

1    A.   Yes.

2    Q.   When did you prepare it?

3    A.   On March 8, 2001.

4    Q.   That's less than a month after Mr. Acosta was shot,

5    correct?

6    A.   Yes.

7    Q.   Sir, can you tell me, when you say recovery, does that

8    indicate a .22 caliber gun was recovered during the arrest?

9    A.   Yes.

10   Q.   And who was arrested?

11   A.   A Cynthia Taylor.

12   Q.   Where was Ms. Taylor arrested?

13   A.   1641 Metropolitan Avenue.

14   Q.   That's in the Parkchester condominium complex, correct?

15   A.   Correct.

16   Q.   And a .22 caliber gun is the same caliber of gun used to

17   kill Albert Acosta, correct?

18   A.   To the best of my knowledge, yes.

19   Q.   Did you ever see the microscopic analysis come back from

20   that report?

21   A.   No.

22   Q.   Do you know if the microscopic analysis from that .22

23   caliber gun which was recovered in Parkchester was ever

24   received?

25             MR. ZUCKERMAN:  Objection, your Honor.

1           THE COURT:  Overruled.

2           MR. JOSEPH:  I'll withdraw it and rephrase it.

3           THE COURT:  I'll sustain the objection.

4           The question is simply, do you know if it ever came

5    back to your squad?

6           THE WITNESS:  No, I don't.

7    Q.  If it did come back to the squad, those results would have

8    been put in the homicide file, correct?

9           MR. ZUCKERMAN:  Objection, your Honor.

10          THE COURT:  Sustained.

11   Q.  Where would the results have been put if they did come back

12   to the squad?

13          MR. ZUCKERMAN:  Objection, your Honor.

14          THE COURT:  Overruled.

15   A.  It goes back to the case detective.

16          MR. JOSEPH:  Thank you.  Nothing further.

17          THE COURT:  Any cross?

18          MR. ZUCKERMAN:  Yes, your Honor.

19   CROSS-EXAMINATION

20   BY MR. ZUCKERMAN:

21   Q.  Detective Martinez, what was the highest rank you achieved

22   while with the NYPD?

23   A.  Detective third grade.

24   Q.  How long were you with the NYPD?

25   A.  Twenty years.

86JMMANT                     Martinez - cross

1   Q.  How long were you a detective?

2   A.  About 12 years.

3   Q.  Are you now retired?

4        THE COURT:  Excuse me just a moment.  Just for my own

5   information, do you all, whether you're first, second, or third

6   grade, appear on the roster to catch homicide cases?

7        THE WITNESS:  Yes, sir.

8        THE COURT:  And in regular order, so it's not like

9   random, but everybody knows their niche?

10       THE WITNESS:  Yeah.  We have what's like a batting

11  order, and you have a list of names and it's separate from the

12  regular cases that come up each day.  If I caught one last, I

13  was the last one in, you're next under the list.  And the next

14  homicide that comes up --

15       THE COURT:  You go to the bottom?

16       THE WITNESS:  After you catch, you're back on the

17  bottom of the list.

18       THE COURT:  Thank you.

19       THE WITNESS:  You're welcome.

20  Q.  Approximately how many cases did you handle while you were

21  a detective at the 43rd Precinct?

22  A.  I'd say anywhere from around 2500 cases, which range from

23  harassments to homicides.

24  Q.  In February of 2001, approximately how many investigations

25  were you involved with?

1   A.  Well, I'd say easily over 2,000 because I wasn't there much

2   longer after that date.

3           THE COURT:  When he says involved in, I don't know

4   what he means.  What do you think he means?

5           THE WITNESS:  Cases that were assigned to me.

6           THE COURT:  That may or may not have been concluded?

7           THE WITNESS:  Meaning any case, whether it be an

8   assault, harassment, or burglary.

9           THE COURT:  What I didn't understand is whether there

10  were still 2,000 open cases --

11          THE WITNESS:  No.  I left clean.

12  Q.  How many active cases were you involved with in February of

13  2001, approximately?

14  A.  Active cases, I may have had two or three homicides that

15  were still open and it might have been about 20 somewhat cases

16  that you're working on at the same time that were open.  I was

17  getting about 25 cases on average a month assigned to me.

18  Q.  When you interviewed a witness did you determine whether

19  the witness was telling the truth?

20          MR. JOSEPH:  Objection.

21          THE COURT:  Sustained.

22  Q.  Did you make credibility assessments when you interviewed a

23  witness?

24  A.  I just -- if there is anything peculiar or anything I'll

25  put it down on a statement, on my assessment.  But if there is

86JMMANT                          Martinez - cross

1   nothing that strikes me odd, I will just put down what the
2   witness had told me.
3   Q.   Is there an NYPD document called a DD5?
4   A.   Yes.
5   Q.   Can you tell the jury what that is?
6   A.   That's a complaint follow-up report.  That's what we have
7   been going -- most of the testimony is on, and it basically is
8   anything that you do in pertaining to any type of case gets
9   typed onto that report and it goes with that case, that
10  particular case.
11  Q.   Could you tell the jury how you prepare one?
12  A.   From my notes that I've taken, whatever it may be, I take
13  each incident, each -- if it's an interview, it's looking at a
14  scene, whatever it may be, computer check, I'll take that
15  particular note and copy it onto the DD5, attach the note to
16  the DD5, and that goes with the case.
17  Q.   On February 12, 2001, did there come a time that you
18  responded to the scene of a shooting in the Bronx?
19  A.   Yes.
20  Q.   And how were you notified of that shooting?
21  A.   That, I don't recall.  I really don't.  I just know we
22  went, we had to go, but I don't know how we were notified or I
23  was notified.
24  Q.   Were you ever lead detective with respect to the Acosta
25  homicide?

86JMMANT                          Martinez - cross

1   A.  No.

2   Q.  How did you get to the scene of the homicide?

3   A.  By car, but I don't know with who.

4   Q.  What did you observe when you got there?

5   A.  Just that there was uniform there, there was people milling

6   around, hanging around and watching, civilians.  There was

7   people there, uniform and nonuniform.

8   Q.  Did you then go into the basement?

9   A.  Yes.

10  Q.  Was the victim still at the scene when you got there?

11  A.  I don't remember that he was there.  I don't think he was

12  there, no.

13  Q.  Prior to the incident on February 12, 2001, did you know

14  the plaintiff, Anthony Manganiello?

15  A.  No, I did not.

16  Q.  Did you encounter the plaintiff at the scene of the

17  homicide?

18  A.  No, I did not.

19  Q.  Did you conduct investigatory work in connection with the

20  Acosta homicide?

21  A.  Yes.

22  Q.  And did you conduct certain witness interviews?

23  A.  Yes.

24  Q.  I'm showing you Plaintiff's Exhibit 3.

25  A.  Thank you.

86JMMANT                          Martinez - cross

1    Q.   Could you tell the jury what Plaintiff's Exhibit 3 is?

2    A.   It's a copy of the DD5 that I prepared regarding an

3    interview of Walter Cobb.

4    Q.   And did you interview Walter Cobb?

5    A.   Yes.

6    Q.   When did you interview him?

7    A.   Approximately 11:15 a.m.

8    Q.   On February 12, 2001?

9    A.   Yes.

10   Q.   And you interviewed him at the scene of the homicide?

11   A.   Yes, I would believe so.

12   Q.   Could you read that DD5 to the jury, please.

13   A.   Both paragraphs?

14   Q.   Please.

15   A.   Paragraph 1:  On February 12, 2001, at approximately 1115

16   hours, which is 11:15 a.m., the undersigned spoke to Walter

17   Cobb regarding what he had seen in relation to the above

18   incident.  He stated the following in sum and substance:  The

19   witness stated that he was working at Parkchester for around a

20   year.  Furthermore, he stated that he recognized this

21   Parkchester officer, Manganiello, from working at Parkchester,

22   and he knows him -- it's probably a typo -- be by face, and

23   then for around a year.  He stated that he positively

24   recognizes Officer Manganiello as a Parkchester officer that

25   exited the basement at 1700 Metropolitan Avenue after he heard

86JMMANT                          Martinez - cross

1   the gunshots.

2   Q.  Is there a second page to that DD5, sir?

3   A.  Yeah, I believe so, yes.  Should I continue?

4   Q.  Please.

5   A.  Paragraph 2:  Walter Cobb said it was around 10:10 or so,

6   he was walking to the basement entrance and he was next to the

7   basement window while on the sidewalk when he heard four shots

8   that were muffled.  There were two and then two more.  He then

9   approached the basement door when it burst open and Parkchester

10  officer came rushing out.  It was Manganiello who he saw.

11      I said to him, and it's quote -- this would be Walter

12  Cobb's quote -- I just heard four shots and he said, so did I.

13  He was excited looking.  I'm sorry with my reading.  He was

14  excited looking.  He said to me, you go that way, pointing up

15  to Metropolitan Avenue towards the circle, and he took off in a

16  hurry.  I saw him go up street towards the circle.  I saw the

17  door was closing.  I did not have the key, so I grabbed it to

18  go inside and do my work.  I started working on the compactor

19  at the end of the hallway.

20      As I walked into the basement, I saw a telephone guy

21  in the other open storage room on the left side.  I proceeded

22  to the compactor and started to work when the Verizon guy came

23  to me regarding a locked storage room that he needed to get

24  inside.  I opened the door and we both looked inside and we

25  didn't see any telephone equipment, so we left the room.  I

86JMMANT                          Martinez - cross

1   left the door open.  I went on doing my work.

2              I then decided to take a look inside the room.  It was

3   about a minute or two later.  I saw what looked like a stack of

4   clothing.  The room was dark, so I was using my flashlight and

5   took a closer look.  I saw a guy lying face down, there is this

6   center hole punch where I believe it says with a uniform on.

7   It might be W/A.  His hat and radio was on the stove in the

8   room.  And I looked close and I saw a gunshot wound to the back

9   of his head.  I ran out and got the telephone guy (Verizon) and

10  we went back inside the room with him.  We then left the room,

11  came outside, I called security office and there was no answer.

12  I then called 911.

13  Q.   Showing you Plaintiff's Exhibit 13 in evidence --

14             THE COURT:   There will be no objection.

15             MR. ZUCKERMAN:   It's already in, your Honor.

16             THE COURT:   Can I see that, your 13?

17             THE WITNESS:   Yes.

18             MR. JOSEPH:   Judge, I don't believe 13 was in

19  evidence.

20             MR. ZUCKERMAN:   I'm sorry.  Exhibit 5, your Honor.

21  Plaintiff's Exhibit 5.

22             THE COURT:   5 is in, but I'm not at all so clear about

23  13.  I am not sure what this is.

24             Go ahead.

25  Q.   Could you tell the jury what Plaintiff's Exhibit 5 is?

1    A.   It's a complaint follow-up report that I prepared and it's

2    an interview of PO Perez from the 43rd Precinct.

3    Q.   Did you interview Officer Perez on February 12, 2001?

4    A.   Yes.

5    Q.   Where did you interview him?

6    A.   I believe it was at the 43 station house later in that day.

7    Q.   Could you read the DD5 to the jury, please?

8    A.   Paragraph 1, on February 12, 2001, at approximately 2000

9    hours, which is 8 p.m., the undersigned spoke to PO Perez

10   regarding what she had seen at 1700 Metropolitan Avenue.  She

11   said in sub and substance, I was at the scene when I noticed

12   the Parkchester cop emerging from the crowd.  He was all messy

13   looking with white-like powder on his jacket sleeve.  He was

14   red-faced and breathing heavy and had sweat on his face.  I

15   then saw other officers taking him to a car.  We first

16   responded to the scene on a 1013 call to 1700 Metropolitan

17   Avenue.  We went inside the basement and saw the guy that was

18   shot.  We did a small canvass and spoke to the maintenance guy,

19   Cobb, who heard the shots.

20   Q.   Showing you Plaintiff's Exhibit 4 in evidence.

21   A.   Thank you.

22   Q.   Could you tell the jury what Plaintiff's Exhibit 4 is?

23   A.   It's a complaint follow-up report, DD5.  They an interview

24   with Richard Huello.

25   Q.   And who is Mr. Huello?

1  A.  He is the Verizon worker.

2  Q.  And from your interview with Mr. Huello did you understand

3  that Mr. Huello was in another room from where the body was

4  found?

5  A.  Yes.

6  Q.  And under DD5 is anything reflected about Mr. Huello

7  wearing a telephone earpiece?

8  A.  Yes.

9  Q.  Could you tell the jury what's reflected on the DD5 about

10  the telephone earpiece?

11  A.  Give me just one second.  In paragraph 2, about midway, he

12  says:  He let me into the telephone room and left, which I

13  believe he means for the security -- I'll just read it.  He let

14  me into the telephone room and he left.  And then it goes on:

15  I went back to work and using the telephone earpiece I didn't

16  hear any shots.  I then saw the maintenance guy walking by, in

17  parenthesis, Walter Cobb.

18  Q.  So he's wearing a telephone earpiece, correct?

19  A.  Yes.

20  Q.  Showing you Plaintiff's Exhibit 22 in evidence, could you

21  identify Plaintiff's Exhibit 22 in evidence for the jury?

22  A.  It's a complaint follow-up report, DD5, dated February 15,

23  2001, prepared by Detective Agostini.

24  Q.  Now, there is a reference to a Sergeant Martinez on that

25  interview?

1   A.   Correct.

2   Q.   And it indicates that a Sergeant Martinez attended that

3   interview?

4   A.   Correct.

5   Q.   Were you Sergeant Martinez?

6   A.   No.   There is an Edward Martinez that was at the precinct.

7   Q.   So that wasn't you who attended that interview, correct?

8   A.   No, not at all.

9            THE COURT:  Is that it?

10           MR. ZUCKERMAN:  Very close, your Honor, very close.

11           THE COURT:  Going back to the telephone earpiece, just

12   to fill up the time, you don't know whether or not that makes

13   you hear better or more or less?  You're not a telephone --

14           THE WITNESS:  I don't know.

15   Q.   Sir, did you ever testify before the grand jury in this

16   matter?

17   A.   No, sir.

18   Q.   Did you ever meet with the DA on this case?

19   A.   No.

20   Q.   Did you ever urge or pressure the DA to prosecute this

21   matter?

22           MR. JOSEPH:  Objection.

23           THE COURT:  Sustained.

24           MR. ZUCKERMAN:  May I have one minute to confer?

25           THE COURT:  Sure.

86JMMANT                          Martinez - cross

1    Q.  Sir, you never spoke to the DA about this case, correct?

2    A.  Correct.

3            MR. ZUCKERMAN:  I have nothing further, your Honor.

4            THE COURT:  Any redirect?

5            MR. JOSEPH:  Very brief, Judge.

6            THE COURT:  Very, very briefly.

7    REDIRECT EXAMINATION

8    BY MR. JOSEPH:

9    Q.  Sir, I am going to hand you back these exhibits for the

10   sake of brevity.

11   A.  Thank you.

12   Q.  Sir, on Exhibit No. 1, is the statement that you recorded

13   for Mr. Cobb quote unquote in sub and substance?

14           MR. ZUCKERMAN:  Objection, your Honor.

15   Q.  Does it say on Exhibit 1 --

16           THE COURT:  I thought we had it already.

17           MR. JOSEPH:  I'll move on.

18   Q.  Sir, according to Mr. Cobb's statement that he gives you on

19   Exhibit 1 he hears gunshots, correct?

20   A.  I'm just getting -- give me a minute.  I'm just trying to

21   find Exhibit 1 here.

22           THE COURT:  You don't have Exhibit 1?

23           THE WITNESS:  I'm double checking, your Honor.

24           MR. JOSEPH:  Maybe I can find it faster, Judge.  It

25   appears the witness does not --

86JMMANT                    Martinez - redirect

1  Q.  Sir, according to your statement, though, does Mr. Cobb

2  hear gunshots, from your recollection?

3  A.  Yes.

4  Q.  And after he heard gunshots did he call the police?

5  A.  On his statement, yes, they left and he said he called the

6  police, 911.

7  Q.  He called 911 immediately after hearing the gunshots?

8  A.  No.

9  Q.  In fact, he hears the gunshots and he just goes back to

10  work, correct?

11  A.  Yes.  He was going back to the compactor and then he called

12  later.

13          THE COURT:  He went back to the compactor?

14          THE WITNESS:  To continue his work.

15  Q.  Sir, you were also asked about Exhibit 5.  Do you have

16  Exhibit 5 in front of you?

17  A.  Yes, sir.

18  Q.  Now, according to Exhibit 5, Officer Perez told you that

19  Cobb said he heard shots, that Mr. Cobb heard shots, correct?

20  A.  Correct, sir.

21  Q.  But Mr. Cobb said nothing about seeing anybody leave the

22  basement after he heard the shots, correct?

23          MR. ZUCKERMAN:  Objection, your Honor.

24          THE COURT:  Overruled.

25  A.  No, not on this statement here.

86JMMANT                          Martinez - redirect

1    Q.  Sir, on Exhibit 4 you were asked some questions about an

2    earpiece.  Does Exhibit 4 indicate that Mr. Huello had an

3    earpiece in only one ear?

4    A.  It just has an earpiece.

5    Q.  One earpiece, correct?

6    A.  That's how I would interpret my own typing, yes.

7    Q.  Fair enough.

8            And sir, was Mr. Huello able to see Walter Cobb as he

9    walked by?

10            MR. ZUCKERMAN:  Objection, your Honor.

11            MR. JOSEPH:  According to his statement.

12            MR. ZUCKERMAN:  Objection, your Honor.

13            THE COURT:  Overruled.  If you can tell.  I don't know

14   how you would be able to tell.  If you can tell, you can

15   answer.

16   A.  From his statement he says he went -- I then saw the

17   maintenance guy walking by.

18   Q.  And was he able to hear the maintenance guy say hello to

19   him?

20            MR. ZUCKERMAN:  Objection.

21            THE COURT:  Overruled.

22   A.  Well, there is a hallway as you walk by, as you looked at

23   that sketch, and he would -- Mr. Huello would be working -- if

24   he was in that room, the telephone room, he would be to the

25   right of the door.  I think I had on the sketch which way the

86JMMANT                          Martinez - redirect

1   doors open.  If you happen to look or you happen to be standing

2   right in front of the door, you coul see someone walking by,

3   yes.

4   Q.  My question is, even though he was wearing a earpiece, was

5   he able to hear Walter Cobb say hello to him?

6              MR. ZUCKERMAN:  Objection.

7              THE COURT:  Overruled.

8   Q.  Look at the statement, sir.

9   A.  I'm just saying, it would be better if you could get him in

10  here to answer that because I didn't know if he had it in the

11  whole time or he took it off.

12             THE COURT:  It's a question of whether you know of

13  your own knowledge or you have it somewhere in front of you

14  that refreshes your recollection.  It's not a guessing game.

15  A.  Just that -- just what I wrote down.  He saw the

16  maintenance guy walking by and he said hello and they both

17  continued working.

18  Q.  That means Mr. Cobb said hello to Mr. Huello, correct?

19  A.  Correct.

20  Q.  Sir, based on your experience as a police officer and

21  detective, did you expect that the statements of Mr. Booth

22  which you signed would have been passed on to the district

23  attorney's office, Exhibit 41?

24  A.  Yes.

25  Q.  And that would be in furtherance of a criminal prosecution,

439

1    correct?

2           MR. ZUCKERMAN:  Objection, your Honor.

3           THE COURT:  Sustained.

4           MR. JOSEPH:  Nothing further.

5           THE COURT:  You're excused.

6           (Witness excused)

7           THE COURT:  What's next?

8           MR. JOSEPH:  If it would please the Court, we will

9    call Matias Colon.

10          MR. ZUCKERMAN:  Your Honor, with respect to Mr. Colon,

11   there is an issue that defendants really raise with the Court

12   before Colon testifies.

13          THE COURT:  Why don't we have a recess and we can

14   resolve it and everybody will be happy.  We will take ten

15   minutes.

16          (Jury not present)

17          THE COURT:  Yes, Mr. Zuckerman.  What's on your mind

18   with Mr. Colon?

19          MR. ZUCKERMAN:  Mr. Colon was subpoenaed for this

20   trial by plaintiff and plaintiff's counsel.

21          THE COURT:  He was what?

22          MR. ZUCKERMAN:  Mr. Colon was subpoenaed to appear.

23   And subsequent to his being subpoenaed we had the opportunity

24   and did interview Mr. Colon.  When we interviewed Mr. Colon he

25   recalled an incident involving Mr. Manganiello where three

86JMMANT

 1    weeks before the homicide Mr. Manganiello and Mr. Colon were in

 2    a basement in one of the buildings in Parkchester and Mr. Colon

 3    said that Mr. Manganiello pulled out a .22 caliber pistol and

 4    fired it at the ceiling.

 5         So as your Honor will recall, Mr. Manganiello

 6    testified during his examination that he never carried a gun

 7    while on patrol at Parkchester, that he never fired a gun while

 8    at Parkchester, that he never purchased a .22 caliber pistol,

 9    and we wanted to bring this important testimony to your Honor's

10    attention because we didn't want just do it without bringing it

11    to your attention, and we believe it's absolutely relevant and

12    important and it's a witness that the plaintiff has subpoenaed

13    here to the trial, and he has important information that bears

14    on the issues in this case.  We would request that information

15    be allowed to be elicited during Mr. Colon's testimony.

16         MR. JOSEPH:  Judge, this is a complete surprise.

17    There has never been a single DD5 which indicates this.  I

18    don't know where this is coming from.  It is not anywhere in

19    any Parkchester record.  Frankly, I don't even know how this

20    could occur.  He's a dispatcher.  This smells and wreaks of

21    fraud.

22         MR. ZUCKERMAN:  He's a dispatcher on the day of the

23    incident.  That's not his only position.  He's an officer, an

24    SPO, just like Mr. Manganiello, and he had patrol duties on

25    other days.  The testimony is not that Mr. Manganiello fired a

86JMMANT

1    .22 caliber pistol in the basement at the building in

2    Parkchester on the day of the incident.

3           The purported testimony would be three weeks before

4    the incident they were in a basement, Mr. Colon and

5    Mr. Manganiello, and that Mr. Manganiello pulled out a .22

6    caliber pistol and fired it at the ceiling.  That would be his

7    purported testimony based upon my interview with Mr. Colon just

8    last week.

9           THE COURT:  Why don't you bring him in and talk to

10   him.

11          MR. ZUCKERMAN:  Thank you.

12          THE COURT:  How long ago was it that you talked to

13   Mr. Colon last?

14          MR. JOSEPH:  Judge, I've never spoken with Mr. Colon

15   concerning the substance of his testimony.  I'm just looking at

16   his trial testimony.  This wasn't mentioned in his trial

17   testimony at all.

18          THE COURT:  Did you talk to him to prepare for his

19   testimony here today?

20          MR. JOSEPH:  No, not at all.  I issued an subpoena

21   based on what he testified to at trial and this wasn't in it.

22   And now, all of a sudden, he speaks with the defense lawyers

23   and he comes up with a story.  We didn't speak to him.  The

24   only thing we spoke to him about was scheduling.

25          THE COURT:  Here he is.  Let's see what he says to me.

86JMMANT

```
 1   MATIAS COLON, sworn.

 2          THE COURT:  We have just heard about some new

 3   testimony that you're prepared to give us.  It has to do with

 4   an event that happened three weeks prior to the homicide.  Will

 5   you review that with me.

 6          MR. COLON:  Yes.

 7          THE COURT:  This is a good time?

 8          MR. COLON:  Sure.

 9          THE COURT:  I'm listening.

10          MR. COLON:  You refresh my memory and relate what was

11   it about.

12          THE COURT:  If I understand the Corporation Counsel

13   correctly and the plaintiff's attorney, while you never

14   testified to anything like this before, you did in fact testify

15   to a gunshot being fired three weeks before the homicide.

16          MR. ZUCKERMAN:  Your Honor, he has never testified to

17   it.  He relayed that to me in an interview.

18          MR. COLON:  I don't remember the date, but it happened

19   before the events that took place in February 12, 2001.  In

20   regards to the defendant, while we were patrolling in the south

21   section area, he invited me to show me a gun.

22          THE COURT:  The plaintiff you're talking about?

23          MR. COLON:  Yes.

24          THE COURT:  What's his name?

25          MR. COLON:  Officer Manganiello.
```

86JMMANT

1          THE COURT:  Go ahead.

2          MR. COLON:  So we went to the basement.  I followed

3     him to the basement.  It was in the East Avenue in the south

4     section of Parkchester.  We went to one of the rooms in the

5     basement and he pulled out a .22.

6          THE COURT:  How did you know?

7          MR. COLON:  It was small.  I didn't take it in my

8     hands and look at it, but it was a small revolver.  And he

9     fired against the wall and, you know, I said, what are you

10    crazy?  What if it ricochets and hits me.  He laughed.  But

11    going back, it was in the wintertime, maybe two, three weeks

12    before the incident that happened on the 12th.  He put his gun

13    back into his jacket, and we left.

14         THE COURT:  Mr. Joseph, you want to ask him any

15    questions?

16         MR. JOSEPH:  Sir, did you ever tell any police officer

17    this happened?

18         MR. COLON:  I was never asked.

19         MR. JOSEPH:  But you were interviewed by police

20    officers, correct?

21         MR. COLON:  No, not really.

22         MR. JOSEPH:  You were never interviewed by police

23    officers?

24         MR. COLON:  I testify in court during the trial.

25    That's it.

86JMMANT

1          MR. JOSEPH:  By the way, did you tell the Court this

2     when you testified at trial?

3          MR. COLON:  No.  Because I wasn't asked.

4          MR. JOSEPH:  And if you had this information did you

5     tell the district attorney that you knew about this?

6          MR. COLON:  If I would have been asked.

7          MR. JOSEPH:  Sir, your job was a dispatcher, correct?

8          MR. COLON:  On the 12th, February 12?

9          MR. JOSEPH:  Yes.

10          MR. COLON:  2001, yes.

11          MR. JOSEPH:  For how long were you a dispatcher?

12          MR. COLON:  Just that one day.  I was not assigned

13     permanently to that post.  They had regular dispatchers.  I was

14     just taking -- I was assigned that day because the female that

15     was dispatching was off.

16          MR. JOSEPH:  How often did you patrol Mr. Manganiello?

17          MR. COLON:  Several times.

18          MR. JOSEPH:  The officers -- that means as an officer,

19     Parkchester officer, it was your duty to report crimes,

20     correct?

21          MR. COLON:  Correct.

22          MR. JOSEPH:  And did you ever report Mr. Manganiello

23     firing a gun in a dispatch to anybody?

24          MR. COLON:  I didn't consider myself a snitch.  I

25     wasn't going accuse anybody, fellow officers, so I kept it to

86JMMANT

1    myself.

2         MR. JOSEPH:  But you didn't make any report of this,

3    correct?

4         MR. COLON:  No.

5         MR. JOSEPH:  And you actually testified in the

6    criminal trial, yes?

7         MR. COLON:  Yes.

8         MR. JOSEPH:  And why didn't you tell the court there

9    this?

10        MR. ZUCKERMAN:  Objection, your Honor.

11        THE COURT:  Overruled.  We are just trying -- just

12   relax, Mr. Zuckerman.  If you want him to testify, relax.  If

13   you don't, then you should keep objecting.

14        MR. ZUCKERMAN:  I apologize, your Honor.

15        MR. COLON:  What was the question?

16        MR. JOSEPH:  Why didn't you tell the Court in 2004

17   that this event --

18        MR. COLON:  2001.

19        MR. JOSEPH:  You testified in court in 2004, right?

20        MR. COLON:  Oh, yes, that's right.

21        MR. JOSEPH:  And in 2004, why didn't you tell the

22   court that this happened?

23        MR. COLON:  Like I said, I didn't want to add anything

24   unless I'm asked on my own.

25        MR. JOSEPH:  How did it come about that you told Mr.

86JMMANT

1    Zuckerman this story?

2         MR. COLON:  Because he interviewed me about different

3    things and then I remembered that.

4         MR. JOSEPH:  What, if anything, did Mr. Zuckerman say

5    to cause you to remember this?

6         MR. COLON:  What was that?

7         MR. JOSEPH:  What, if anything, did Mr. Zuckerman say

8    that caused you to remember this?

9         MR. COLON:  Going through the details of things that

10   happened over that period, that year.

11        MR. JOSEPH:  But you never told this to any police

12   officer, correct?

13        MR. COLON:  No.  Because I was never interviewed by a

14   police officer.

15        THE COURT:  Do you know any of the defendants here,

16   police officers?

17        THE WITNESS:  I was ordered to testify the day of the

18   trial, but I was never interviewed.

19        THE COURT:  You don't know any of them from any other

20   occasions?

21        THE WITNESS:  No, sir.

22        MR. JOSEPH:  Sir, were you given any money when you

23   met with Mr. Zuckerman?

24        MR. COLON:  No.

25        MR. JOSEPH:  Were you given anything else?

86JMMANT

1          MR. COLON:  No.

2          MR. JOSEPH:  Did Mr. Zuckerman in any way suggest that

3     you make a statement?

4          MR. ZUCKERMAN:  I'm sorry.  I didn't hear the

5     question.

6          MR. COLON:  No.  I didn't even know how to say that.

7          MR. JOSEPH:  You didn't know what?

8          MR. COLON:  I didn't even know that I had to testify

9     to that.  I just found out now.

10         MR. JOSEPH:  Sir, are you familiar with guns?

11         MR. COLON:  Yes.  I used to be a police officer.

12         MR. JOSEPH:  When were you a police officer?

13         MR. COLON:  From 1964 to 1972.

14         THE COURT:  Had you did you come to leave the

15    department?

16         THE WITNESS:  I got sick.  I got West Nile virus.  I

17    was lucky to survive.

18         MR. ZUCKERMAN:  Your Honor, I am not sure I heard

19    that, but I understand Mr. Colon's background.  He was a police

20    officer in Puerto Rico?

21         THE WITNESS:  Yes, sir.

22         MR. JOSEPH:  Judge, I believe that's all the questions

23    I have.

24         I do have an application, though.

25         THE COURT:  Mr. Zuckerman, do you have anything you

86JMMANT

1    want to ask him?

2              MR. ZUCKERMAN:  No, I don't, your Honor.

3              THE COURT:  You're excused.

4              (Witness excused)

5              THE COURT:  Sit in the witness room where you came

6    from, and we will call you momentarily.

7              Yes, Mr. Joseph, what's your application?

8              MR. JOSEPH:  Your Honor, my application is to preclude

9    any of this testimony from being offered.  I think the Court

10   has previously determined that any character evidence of

11   plaintiff while at Parkchester would be precluded.  I think the

12   defendant certainly had a good-faith obligation to bring this

13   to the Court's attention prior to today and they failed to do

14   so.

15             Further, this wreaks of perjury.  The man was in fact

16   interviewed by -- I'm looking for the DD5 now.  He was in fact

17   interviewed by police officers.  He never said it.  He didn't

18   say it to the district attorney.  He didn't say it at trial.

19             Now, seven years after the fact he has a conversation

20   with the defense lawyers and the story emerges.  It's entirely

21   prejudicial.  He was not identified for this purpose as having

22   any relevant information prior to today and this is literally

23   popping up mid-trial.  It's entirely prejudicial.  This is

24   trial by ambush, it's unfair surprise, and the Court -- the

25   defendants put in numerous motions, motions in limine

86JMMANT

1    concerning character evidence.  This was never raised and now

2    all of a sudden it's being raised at the time, and we

3    subpoenaed him to testify strictly as the operator to offer

4    testimony that he gave at trial.  This is so far afield from

5    anything this witness has ever said in the past, it's

6    tantamount to perjury.

7        THE COURT:  First of all, in terms of the exclusions,

8    they are based primarily on the length of time between this

9    alleged homicide and the event.  This happened to have occurred

10   three weeks before.  That really would not have been excluded.

11       Second of all, if in fact you want to have a

12   deposition, we are going to adjourn early today, we will be

13   sure he's available for you to have a deposition at 5:00 right

14   here in the courthouse, or wherever else you choose to have

15   one.

16       But going to the core of the topic, if you're calling

17   him, it seems to me that there is every reason in the world why

18   there should have been, in my view, more preparation by the

19   Corp. Counsel, but in this instance enough for this witness

20   preparation, and I think it does go to credibility and my view

21   is that it goes pretty directly since the testimony was from

22   your client pretty much what Mr. Zuckerman has said it was.

23       I am not clear what it really does in terms of the

24   four or five elements of malicious prosecution, but I'm

25   prepared to give you the afternoon or evening with him and have

1     him come by first thing in the morning if that makes you feel

2     more comfortable, or if you think you'll find out some reason

3     why I shouldn't allow him during that period of time, assuming

4     we have another witness.

5          MR. JOSEPH:  I would like the opportunity to take his

6     deposition, Judge.  Further, I would also move to preclude

7     based on relevance.  He says that the police never knew about

8     it.  This is a malicious prosecution case based upon --

9          THE COURT:  If we are going to give you the time, you

10    can also write me a letter as well as I'm sure Corp. Counsel

11    can on the grounds we should exclude it.  We don't have to do

12    both.  We will take five minutes and Corp. Counsel, who now

13    seems to know him better, and the two of you can go in and tell

14    him that the judge has directed him to be available at 4:30 for

15    a deposition.

16         MR. JOSEPH:  Judge, I guess we need a court reporter.

17         THE COURT:  I don't know.  We will try and work it out

18    so we don't waste anybody's time or money.  Both of you better

19    find somebody to call the assistant district attorney to tell

20    her she knows to be here at 10:00 in the morning.

21         MR. ZUCKERMAN:  I will call her, your Honor.

22         (Recess)

23         (Jury present)

24         THE COURT:  Do you have another witness?  Who is it?

25         MR. JOSEPH:  Harry Scott, your Honor.

86JMMANT

1    HARRY SCOTT,

2        called as a witness by the Plaintiff,

3        having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. JOSEPH:

6    Q.  Good morning, Mr. Scott.

7    A.  Good morning, sir.

8    Q.  Sir, on February 12, 2001, were you employed by the City of

9    New York?

10   A.  Yes, I was.

11   Q.  In what position.

12   A.  I was a lieutenant with the New York City Police

13   Department.

14   Q.  Sir, from when to when were you assigned to the 43rd

15   Precinct?

16   A.  Roughly, the year 2001.

17   Q.  From 2001 until when?

18   A.  Until the end of 2001.

19   Q.  And, sir, while you were at the 43rd Precinct, were there

20   any procedures in place for maintaining case files,

21   specifically homicide case files?

22   A.  Yes, there was.

23   Q.  What were the procedures?

24   A.  To the best of my recollection, when a detective had a

25   homicide case file, they would work on it during the day, and

1   at the end of their tour they would put it in a file folder in

2   a storage room, or they would put it on the supervisor's desk

3   for review.

4   Q.   Sir, what procedure, if any, was there for maintaining the

5   handwritten interview notes that detectives took?

6   A.   The interview notes would be attached to the case file with

7   a DD5 that was done pertaining to the notes.

8   Q.   And were there any methods to make sure those notes didn't

9   get lost?

10  A.   Well, they would be secured in the case folder with a metal

11  clip.

12  Q.   Are you familiar with the term Rosario material?

13  A.   Yes, I am.

14  Q.   Can you tell us what that is?

15          MS. OKEREKE:  Objection, your Honor.

16          THE COURT:  I'll allow it.  It's hardly important, but

17  go ahead.  It may be important.  It may be worthwhile having

18  jury to understand, adding to their legal education.  It's the

19  name of the case, for your information, and you are going to

20  tell us what that case says, which came into being a rule.

21  A.   Rosario material would be any written documents pertaining

22  to a specific case.

23  Q.   Is that something that has to be turned over to the defense

24  lawyer for a criminal defendant?

25          MS. OKEREKE:  Again, your Honor, defendants object to

86JMMANT                         Scott - direct

1    this line of questioning.  It is completely out of the scope of

2    what this case is about and a malicious prosecution claim, your

3    Honor.

4                THE COURT:  I hope you remember that tomorrow morning.

5                I'll allow this.  You can answer or move on.  Do

6    whatever you choose.

7    Q.  Sir, can you answer that?

8    A.  Any written material would be available for the defense

9    that I'm aware of.

10   Q.  Sir, would it be acceptable procedure for a detective who

11   is reassigned to put a case folder in a locker room and not

12   advise other detectives that it's there?

13   A.  No.

14   Q.  Have you ever heard of an entire -- for how many years were

15   you with the police force?

16   A.  Almost 21.

17   Q.  Have you ever heard of a case file disappearing?

18   A.  Not really.

19   Q.  Sir, from your experience would it be unusual for an entire

20   case file to disappear?

21   A.  Yes.

22   Q.  And, sir, while you were at the 43rd, did you supervise

23   Detective Agostini?

24   A.  Yes, I did.

25   Q.  What, if anything, can you tell us about his ability to

86JMMANT                          Scott - direct

1    maintain notes and evidence?

2    A.  Having supervised many detectives, I thought that Detective

3    Agostini was excellent in his administrative duties.

4    Q.  And would it be unusual for a detective with these

5    excellent skills to lose a file?

6    A.  I think it would be unusual.

7    Q.  Sir, I am going to direct your attention to February 12,

8    2001.  Did you respond to 1700 Metropolitan Avenue in response

9    to a call?

10   A.  Yes, I did.

11   Q.  Sir, while you were in route did there come a call over the

12   radio that identified the victim as a Parkchester security

13   officer or SPO?

14   A.  I believe there was such a radio transmission.

15   Q.  And did you receive that transmission before you arrived on

16   the scene?

17   A.  I believe that I did.

18   Q.  Sir, while you were on the scene were you approached by any

19   detectives?

20   A.  I was approached by several, yes.

21   Q.  And were you approached by detectives regarding a possible

22   suspect?

23   A.  No.  No.

24   Q.  Did the detectives indicate that they believed that Anthony

25   Manganiello may have been involved in the homicide?

1              THE COURT:  When?

2              MR. JOSEPH:  On the scene on February 12, 2001.

3    A.  If I could just clarify, you're asking me what the

4    detectives were thinking?

5    Q.  What information did they convey to you?  Let me rephrase

6    it to make it simpler.

7              Sir, at some point did you learn from some detectives

8    that Mr. Manganiello was going to be brought to the 43rd

9    Precinct?

10   A.  Yes I did.

11   Q.  How you did you learn that?

12   A.  I was approached by a detective who relayed that there was

13   a person of interest made a gesture towards the plaintiff that

14   this was the deceased partner and that he may have some

15   relevant information pertaining to the case.

16   Q.  What was the gesture he made?

17   A.  After speaking to me he kind of made a facial gesture like

18   nodding towards your plaintiff.

19   Q.  Kind of opening his eyes and winking a little bit?

20   A.  No winking.  Maybe raised his eyebrows to make sure that I

21   was acknowledging that he wanted to leave the area.

22   Q.  And, sir, you understood that he was suggesting to you that

23   Mr. Manganiello was somehow involved in the homicide, correct?

24   A.  I don't know what you mean by involved, but he was a person

25   who may provide information on it, yes.

1   Q.  Sir, while you were at the scene on February 12, 2001, did

2   you receive reports of information that detectives learned

3   while doing a canvass?

4   A.  I may have, yes.

5   Q.  And were you made aware of a witness, a porter named Walter

6   Cobb?

7   A.  I remember the porter part.  I don't remember the name,

8   sir.

9   Q.  Sir, was it conveyed to you that while you were at the

10  scene on February 12, 2001 that the porter saw anybody leave

11  the basement?

12  A.  I vaguely remember that, yes.

13  Q.  Sir, was he able -- at the time was the porter able to

14  identify anybody?

15  A.  I don't know.

16  Q.  Sir, isn't it true that the detectives did not convey to

17  you that they knew who, if anybody, Mr. Cobb saw leaving the

18  basement?

19  A.  That I don't remember either, sir.

20  Q.  Sir, at the point in time when you left the scene was there

21  any information that in any way tied Anthony Manganiello to the

22  shooting of Albert Acosta?

23  A.  Not that I'm aware of, no.

24  Q.  Sir, on February 12, 2001, did you become aware of any

25  evidence that suggested in any way that plaintiff was involved

86JMMANT                          Scott - direct

1    in the death of Albert Acosta?

2    A.    No.

3    Q.    Sir, for how long were you Mr. Agostini's supervisor?

4    A.    Under a year.

5    Q.    During the time you were his supervisor did he ever report

6    to you that a confidential informant named Terrence Alston

7    provided him with false information?

8    A.    I don't remember that, no.

9    Q.    Sir, when plaintiff was rearrested in April 2001, did you

10   ever learn of any evidence that created probable cause to link

11   Anthony Manganiello to the death of Albert Acosta?

12   A.    I don't remember that either, sir.

13           MR. JOSEPH:  That's all I have.

14           THE COURT:  Any cross?

15           MS. OKEREKE:  Yes, your Honor.

16   CROSS-EXAMINATION

17   BY MS. OKEREKE:

18   Q.    Mr. Scott, when did you leave the 43rd Precinct?

19   A.    I believe it was before September 2001.

20   Q.    Did you have any ideas as to whether there was any

21   renovation work at the 43rd Precinct?

22   A.    No.

23           THE COURT:  When you left?  I assume that's the end of

24   the sentence, that she had completed the sentence.

25           THE WITNESS:  No.  I found out afterwards there was,

86JMMANT                        Scott - cross

1    but not before I was there.

2    Q.  What did you find out happened?

3           MR. JOSEPH:  Objection.  Unless he has personal

4    knowledge.

5           THE COURT:  It's my fault.  When you left the precinct

6    there had been no renovation done, to your knowledge?

7           THE WITNESS:  When I left the precinct.

8           THE COURT:  Yes.  I assume that corresponds pretty

9    much to when you got out or left the department.

10          THE WITNESS:  I had one more assignment after leaving

11   the 43.  I heard that there was renovation --

12          THE COURT:  We don't want you to tell us what you

13   heard.  That's his objection.  I gather the answer is, when you

14   left in September you were not aware of any renovation?

15          THE WITNESS:  Correct.

16          THE COURT:  We move on after that major point.

17   Q.  Now, as a lieutenant commander with the NYPD, what

18   obligation, if any, in your opinion, what obligation, if any,

19   does a detective have to track or keep track of the case file

20   after that detective leaves a precinct?

21   A.  He has no obligation.

22   Q.  And what obligation, if any, does a detective have to keep

23   track of the case file if they are no longer assigned to a

24   case?

25   A.  They don't have.

86JMMANT                         Scott - cross

1   Q.  Now, did you review the DD5s or any of the DD5s related to

2   this case?

3   A.  Yes, I did.

4   Q.  I am showing you what's been marked as Defendants' R-8.

5           MR. JOSEPH:  This is over objection, your Honor.

6           THE COURT:  Can we identify it.

7           MS. OKEREKE:  It's Defendants' Exhibit R-8.

8           THE COURT:  Maybe you will give it to me can I see it.

9   I'll admit it over the objection.

10          (Defendants' Exhibit R-8 received in evidence)

11  Q.  Lieutenant Scott, who prepared that DD5?

12  A.  It looks like a Detective Al Palacios, assigned to Bronx

13  homicide task force.

14  Q.  When was that document created or prepared?

15  A.  Date of this report is 2/26/01.

16  Q.  February 16, 2001?

17  A.  Yes, ma'am.

18  Q.  Was this DD5 created in connection with the Albert Acosta

19  homicide?

20  A.  Yes.

21  Q.  If you could please read for the jury, what does that DD5

22  indicate?

23  A.  It is an interview of Parkchester security personnel.

24  Q.  Could you please read for the jury paragraph 7 on the

25  second page of that DD5?

86JMMANT                          Scott - cross

1    A.  Harry Plaza has SPO status, has been a security officer in

2    Parkchester for the last five years, works midnights, 12 to 8.

3    He was off duty on Monday.  He has worked with Acosta for two

4    years on the 4 to 12 shift and also worked with Manganiello for

5    eight months before he went to days.  He has heard Manganiello

6    mention that he has a carry permit.  He also knows that

7    Manganiello had an incident with Officer Hicks and the

8    supervisors were aware and they received some type of

9    disciplinary action.  But there was another inside the locker

10   room with Manganiello and Acosta after the Hicks incident that

11   we broke up and no supervisor was notified.  It was a shoving

12   match and we had to pull them apart.

13   Q.  And would this DD5 be a part of the case file?

14   A.  Yes, it would be.

15   Q.  What happens to DD5s after a detective finishes his

16   investigation?

17   A.  What he does is he breaks them down and there are several

18   copies, and he perforates the top and he puts it into a case

19   folder with a metal clip.

20   Q.  And would this information then be given to the district

21   attorney's office?

22   A.  Yes, it would, at some time.

23          MS. OKEREKE:  Thank you.  Defendants have no more

24   questions.

25          THE COURT:  Redirect?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JMMANT                          Scott - cross

1              MR. JOSEPH:  Brief.

2    REDIRECT EXAMINATION

3    BY MR. JOSEPH:

4    Q.  Sir, is there a procedure for what happens to a case file

5    that a detective is working on when he leaves a precinct?

6    A.  Yes.  He would submit it in a basket in the supervisor's

7    room for a review, or if there was nothing to review he would

8    put it in the appropriate file area.

9    Q.  Regardless, when a detective leaves the precinct, was there

10   a procedure to maintain the case file so that it didn't get

11   lost?

12   A.  When he leaves the precinct to go to another assignment or

13   when he leaves the precinct for the day?

14   Q.  Another assignment.

15   A.  He puts the case file in a file folder area, a filing

16   cabinet or in a supervisor's basket, and the supervisor would

17   reassign the case.

18   Q.  As you sit here right now, did you know whether that

19   occurred in this case?

20   A.  No, I don't.

21   Q.  Would it be the responsibility of the detective who is

22   leaving the precinct to take steps to secure the case file

23   prior to leaving?

24   A.  Other than filing it where I told you they do --

25   Q.  That's what I'm asking.  Is it the responsibility of the

86JMMANT                       Scott - redirect

1   detective who is filing -- who has the file to appropriately

2   file it before he leaves the precinct?

3   A.  I would say so, yes.

4   Q.  Sir, you were asked about this DD5 concerning Mr. Plaza.

5   Is there any indication on the DD5 when this occurred?

6   A.  There should be, yes.

7   Q.  Does it say?

8   A.  On the 16th.

9   Q.  Does the DD5 say when this shoving match allegedly

10  occurred?

11  A.  It says that there was another shoving match after the

12  Hicks incident.

13  Q.  Sir, is there a date when this occurred?

14  A.  No.

15  Q.  So this could have happened a year before Mr. Acosta was

16  shot?

17          MS. OKEREKE:  Objection.

18          THE COURT:  When did the Hicks episode occur?

19          MR. JOSEPH:  Do you want a representation?

20          THE COURT:  Maybe he knows it from reading it.  All I

21  want to be clear about is, the reason we are letting any of

22  this in, really, is on a little flimsy basis, it seems to me.

23  But if it's far away from the time of the incident in question,

24  then it really ought not be given any weight by the jury.  So

25  the only reason that he's asking these questions is because he

86JMMANT                          Scott - redirect

1   can't tell when it happened, and if it was long ago it should

2   be given less weight.  I think they have the picture, unless

3   you can do better.  You're welcome to do better.

4           MR. JOSEPH:  Judge, we have spoken to counsel.  We can

5   stipulate that the Hicks event occurred in 1999.

6           THE COURT:  This was before that.

7   Q.  Is that correct, sir?

8           THE COURT:  That's what it says.

9   A.  Yes.

10          MS. OKEREKE:  I believe it indicates it occurred

11  after.

12          THE COURT:  Whatever it says, Lieutenant, I am not

13  trying to put the words after in your mouth.  Was it after or

14  was it before the Hicks incident?

15          THE WITNESS:  It was after the Hicks incident,

16  according to the DD5.

17  Q.  And according to the DD5, it occurred some time in relation

18  to the Hicks incident, correct?

19  A.  It doesn't really specify.

20          THE COURT:  Don't guess.

21  Q.  As far as we know, this alleged incident happened two years

22  before Acosta was shot?

23          MS. OKEREKE:  Objection.

24          THE COURT:  Sustained.

25  Q.  By the way, sir, did Mr. Plaza testify before a grand jury?

86JMMANT                          Scott - redirect

1    A.  I have no knowledge of that.

2    Q.  Did Mr. Plaza testify before trial, at Mr. Manganiello's

3    trial?

4    A.  Again, I have no knowledge of that.

5              MR. JOSEPH:  Thank you.

6              THE COURT:  Anything?  You're excused.  Thank you very

7    much.

8              (Witness excused)

9              THE COURT:  What's next?

10             MR. JOSEPH:  Judge, plaintiff would call John

11   McGovern.

12    JOHN P. MCGOVERN,

13        called as a witness by the Plaintiff,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. JOSEPH:

17   Q.  Sir, on February 12, 2001, were you employed by the City of

18   New York?

19   A.  Yes.

20   Q.  What was your position?

21   A.  I was a sergeant.

22   Q.  In February of 2001, where were you assigned?

23   A.  The 43rd Precinct detective squad.

24   Q.  From when to when were you there?

25   A.  Somewhere between 1999, the end of '99 to some time around

1    2001.

2    Q.  And, sir, were you in what's known as a supervisory

3    position at the time?

4    A.  Yes.

5    Q.  And did you become involved in the investigation into the

6    death of Albert Acosta?

7    A.  Yes.

8    Q.  And on February 12, 2001, did you respond to the scene of

9    1700 Metropolitan Avenue?

10    A.  Yes.

11    Q.  And did you become aware that Mr. Manganiello was being

12    brought to the 43rd Precinct from the scene?

13    A.  Yes.

14    Q.  Sir, why was he being brought from the scene to the 43rd

15    Precinct?

16    A.  There was a witness that had been interviewed that had

17    heard at least one shot and had saw Mr. Manganiello leave the

18    basement area.

19    Q.  Sir, was he being arrested at the time?

20    A.  Was he being arrested at the time?

21    Q.  Correct.

22    A.  Well, he was being brought into custody for questioning.

23    Q.  Was Mr. Manganiello being brought back from the scene

24    because he was being arrested for the death of Albert Acosta?

25    A.  Certainly, Mr. Manganiello was arrested that particular

1  night.

2  Q.  My question to you is, on February 12, 2001, at the point

3  in time that Anthony Manganiello was being brought back to the

4  43rd Precinct, was he being arrested?

5  A.  Yes.

6        THE COURT:  Did anybody read him his Miranda rights?

7        THE WITNESS:  Sir, I wasn't present when

8  Mr. Manganiello was taken into custody.  I was covering the

9  crime scene, so I'm not aware of that.

10  Q.  And he was taken into custody at the scene, correct?

11  A.  I don't recall.

12  Q.  Sir, let me show you your deposition, page 32, line 25 and

13  just ask you if this refreshes your recollection, line 25 to

14  the next page.

15  A.  That's correct.  You asked me a question about was

16  Mr. Manganiello in the cell at the point in time you arrived

17  back at the 43rd Precinct, and that's correct.  When I got back

18  to the 43rd Precinct, he was in the cell.  So at that point if

19  he's in the cell he is in custody and he's under arrest.

20  Q.  Sir, while you were at the 43rd Precinct, was there a

21  procedure for maintaining case files?

22  A.  Procedure for maintaining case files?

23  Q.  Specifically homicide files.

24  A.  Homicide files were maintained separately from the other

25  files or the other cases that were coming in.

1    Q.   How were they maintained?

2    A.   They had a separate homicide case file in the precinct.

3    Q.   And were these cases itemized?  Were they categorized in

4    some way?

5    A.   In general, the cases were at some point categorized as

6    different crimes, and the numbers that would come in.

7    Q.   So would the case files be marked in some way to identify

8    them?

9    A.   Yeah.  They would normally be homicide No. 1 of the year,

10   No. 2, No. 3, No. 4, No. 5, No. 50.

11   Q.   Sir, what was the procedure, if any, for maintaining a case

12   file after it was -- an arrest was made?

13   A.   The case would be closed to an arrest, A1, or A2, or A3,

14   depending how many people.  That would be the closing code.

15   They would be required to do a DD5.  And the case would be

16   closed.  The case would then be filed until the district

17   attorney would need the case.

18   Q.   Sir, based on your experience, is it unusual for an entire

19   case folder to disappear?

20   A.   It would be unusual, yes.

21   Q.   Sir, while you were at the 43rd Precinct, was it proper

22   police procedure to consider someone a suspect because a lawyer

23   had been called for them?

24   A.   No.

25            MR. JOSEPH:   That's all I have.  Thank you.

86JMMANT                         McGovern - direct

1          THE COURT:  Anything from the defense?

2          MS. OKEREKE:  Yes, briefly, your Honor.

3    CROSS-EXAMINATION

4    BY MS. OKEREKE:

5    Q.   Mr. McGovern, do you currently work for the New York City

6    Police Department?

7    A.   Yes, I do.

8    Q.   What is your current rank with NYPD?

9    A.   Lieutenant commander detective.

10   Q.   How long have you been a lieutenant commander detective?

11   A.   Since June of 2007.

12   Q.   What do you do as a lieutenant commander detective?

13   A.   I'm currently the commanding officer of the police

14   impersonation investigations unit out of internal affairs or

15   group 51.

16   Q.   And what do you do in that position?

17   A.   Basically, I run a group.  I have about, including myself,

18   18 people, and I oversee home invasion robbery investigations

19   as well as solicitations throughout the city that come in

20   through the internal affairs bureau, as well as any other

21   crimes that may occur that the chief of internal affairs deems

22   should come to my group.

23   Q.   How long have you worked with NYPD?

24   A.   This coming July 15 will give me 22 years of service.

25   Q.   And of those 22 years, how many years did you serve in a

1    supervisory role?

2    A.  I became a supervisor back in February of 1998.

3    Q.  So approximately over a decade?

4    A.  Yes.

5    Q.  And were you also serving in a supervisory role in February

6    2001?

7    A.  Yes, I was.

8    Q.  What were your duties in connection or in your supervisory

9    capacity in connection with the Albert Acosta homicide?

10   A.  Basically, I had been working that particular day or tour,

11   and my primary responsibility on that particular day was I

12   supervised the crime scene, which people would come and several

13   things that had to be completed there, and basically when that

14   was all completed I headed back to the precinct.

15   Q.  Did you have any other activities that you conducted in the

16   course of this investigation?

17   A.  At this point all I remember is I did supervise the crime

18   scene, which took a decent amount of time to complete.  I

19   supervised that.  There were certainly some other things going

20   on, but I wasn't privy to that, being at the crime scene, to

21   make sure that the canvasses were completed, that the crime

22   scene was taken care of by the crime scene unit.  And then,

23   like I said, once that was all wrapped up, I headed back to the

24   precinct.  As I testified earlier, that's when I saw

25   Mr. Manganiello in the cell.

1          I also had an involvement later on in the case where I

2    was involved in the arrest of Mr. Manganiello.

3    Q.  And during the arrest were any guns drawn on the plaintiff?

4    A.  I don't really recall any guns being drawn.  I do remember

5    we stopped them in a gas station.  We asked them to step out of

6    the car and he was placed under arrest.

7    Q.  Was this what you would consider a normal arrest then?

8    A.  Yeah.  There was nothing unusual about that arrest.

9    Q.  In the course of the Albert Acosta investigation did you

10   review or have any occasion to review any DD5s?

11   A.  I reviewed a lot of DD5s and I'm sure I reviewed some of

12   the DD5s.  I don't have any independent recollection of that.

13   Again, about 5,000 cases a year came in there and I was one of

14   the supervisors there, and I did review a lot of cases.

15   Q.  And the case detectives or individuals assigned to lead or

16   head a case, do you know approximately how many cases the case

17   detectives handle on a regular basis?

18   A.  Per year, when I was assigned to the Bronx detectives,

19   catching detectives were probably handling anywhere from 3 to

20   400 cases a year.

21          THE COURT:  One of the witnesses suggested that he

22   handled between 20 to 25 at a time.  Does that sound

23   reasonable?

24          THE WITNESS:  That certainly does sound reasonable,

25   your Honor.

1   Q.   In handling those 20 to 25 cases at a time and the 3 to 400

2   cases in a year, what sort of activities or what are the duties

3   of a case detective in handling those matters?

4   A.   The detective would be required to be assigned a case and

5   would be required to investigate, interview the complainants,

6   follow up on any leads that came out of the case.  And if there

7   was enough information to go forward with an arrest, an arrest

8   would be made.  Unfortunately, on all cases arrests aren't made

9   and some cases go unsolved.  So really their responsibility is

10  to investigate the case, interview people, and see if they

11  could develop leads.

12  Q.   Did detectives work together in the course of conducting an

13  investigation?

14  A.   Certainly, they would go out in the field with other

15  detectives, yes.

16  Q.   And at any given time, what is the maximum number of

17  detectives that could be working on a given matter at a time?

18  A.   A minimum would be two.  On a high end you could have

19  several, into the twenties, depending on the seriousness of the

20  case.  There could be a quite a number of detectives that come

21  out, depending if it's a homicide, a shooting.  There are

22  several things that need to be completed.  People need to

23  respond to hospitals, canvasses of areas.  Some areas are quite

24  large and that would require more detectives to canvass larger

25  areas with bigger buildings.

1        So you could have quite a number of detectives working

2   on any particular case at one time.  On some of the lower end

3   cases it would be probably two detectives and it could expand.

4   It would only be one catching detective.  On the bigger cases

5   one catching detective and all the information would be fed

6   into him and he would be required to maintain the case.

7   Q.  After that case detective finishes with an investigation,

8   what are his duties with respect to his case file?

9   A.  The case file would then -- it would be filed, it would be

10  closed and signed off on, and it would be maintained at the

11  command.

12  Q.  Is that case file at some point given to a district

13  attorney?

14  A.  On occasion if there is an arrest associated with the case,

15  the case would or could be given to the district attorney at

16  some point, yes.

17  Q.  So in the case of a homicide arrest, the case file would be

18  given to the district attorney's office?

19        MR. JOSEPH:  Objection, leading.

20  A.  Absolutely.  If the district attorney wanted to review the

21  case file and needed it for further trial preparations or court

22  proceedings, absolutely.

23        MS. OKEREKE:  Thank you.

24        THE COURT:  Anything from anybody?

25        You're excused.  Thank you very much.

473

1              (Witness excused)

2              THE COURT:  Ladies and gentlemen, I have another

3      matter.  Why don't we adjourn now for lunch and come back at

4      1:30.  See you then.

5              Have a good lunch.  Remember my concern about not

6      speaking amongst yourselves about this case or to anybody else.

7      See you at 1:30.

8              (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86JMMANT                          McGovern - cross

1                          AFTERNOON SESSION

2                              1:40 p.m.

3              (Jury present)

4              THE COURT:  Does the plaintiff have a witness?

5              MR. JOSEPH:  Your Honor, plaintiff calls Derrick

6     Parker.

7       DERRICK J. PARKER,

8          called as a witness by the Plaintiff,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MR. JOSEPH:

12    Q.  Sir, on February 12, 2001, were you employed by the City of

13    New York?

14    A.  Yes.

15    Q.  What capacity?

16    A.  I was the detective assigned to the intelligence division.

17    Q.  And, sir, did you come in contact with an informant named

18    Terrence Alston?

19    A.  Yes.

20    Q.  When you first met Mr. Alston were you already in the

21    intelligence division?

22    A.  Yes.

23    Q.  From when to when were you in the intelligence division?

24    A.  From 1999 until 2001.

25    Q.  And while you were in the intelligence division were you

86JMMANT                    Parker - direct

1    investigating any narcotics cases?

2    A.   To the best of my knowledge, no.

3    Q.   How did Mr. Alston become a confidential informant?

4    A.   I met him through another informant.

5    Q.   Was that informant in Rikers Island?

6    A.   Yes.

7    Q.   Was Mr. Alston a member of any criminal organizations?

8    A.   He had affiliation with the Bloods.

9    Q.   Was he a member of the Bloods?

10   A.   I believe he was, yes.

11   Q.   After coming in contact with Mr. Alston did you meet with

12   him at Rikers Island?

13   A.   Yes.

14   Q.   Was that in February 2001?

15   A.   Yes.

16   Q.   At that point in time had Mr. Alston been in Rikers Island

17   for several months?

18   A.   He had been in Rikers Island for I don't know how long.

19   Q.   The first time you met Mr. Alston did he tell you he had

20   some information about a murder of a security guard in the

21   Bronx?

22   A.   Yes.

23   Q.   And did you discuss what information he had?

24   A.   Yes.

25   Q.   At any point did Terrence Alston ever tell you that he

86JMMANT                         Parker - direct

1   agreed to kill a Parkchester security guard for money?

2   A.  No.

3   Q.  And if he said that, is that the sort of thing that you

4   would recall?

5   A.  Yes, I would have remembered that.

6   Q.  But Terrence Alston never said that to you, correct?

7   A.  Correct.

8   Q.  And did Terrence Alston ever tell you that he knew someone

9   who sold a gun to the person involved in the murder of the

10  Parkchester security guard?

11  A.  I believe that came up later, yes.

12  Q.  I'm asking you, when you met with Terrence Alston did he

13  tell you that?

14  A.  No.

15  Q.  And that came up after Mr. Alston had spoken with

16  detectives from the 43rd Precinct, correct?

17  A.  Correct.

18  Q.  By the way, the first time the story about Mr. Alston

19  agreed to commit a murder for money came up after Mr. Alston

20  had met with detectives from the 43rd Precinct, correct?

21          MR. ZUCKERMAN:  Objection.

22          MR. JOSEPH:  I'll withdraw the question.

23  Q.  Sir, was Mr. Alston given anything in consideration for

24  providing information?

25          THE COURT:  That you know of.

86JMMANT                          Parker - direct

1    Q.  That you know of.

2    A.  That I don't know.

3            THE COURT:  Nothing by you?

4            THE WITNESS:  Nothing by me.

5            MR. JOSEPH:  I have nothing further.

6            THE COURT:  Anything from the defendant?

7            MR. ZUCKERMAN:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. ZUCKERMAN:

10   Q.  Detective Parker, you're retired, is that correct?

11   A.  Yes.

12   Q.  And you were formerly employed by the NYPD, correct?

13   A.  Yes.

14   Q.  When did you retire?

15   A.  January of 2002.

16   Q.  And how long had you been an active member of the NYPD?

17   A.  Twenty years.

18   Q.  And you were a detective?

19   A.  Yes, I was.

20   Q.  How many years were you a detective for?

21   A.  Thirteen or 14.

22   Q.  Were you ever in the 43rd detective squad?

23   A.  No.

24   Q.  Did you ever have occasion to work with anyone in the 43rd

25   detective squad?

86JMMANT                          Parker - cross

1   A.  No.

2   Q.  Do you know defendant Agostini?

3   A.  No.

4   Q.  Do you know defendant Abate?

5   A.  No.

6   Q.  Do you know defendant Martinez?

7   A.  No.

8   Q.  Do you know defendant Nieves?

9   A.  No.

10  Q.  Do you know defendant Perez?

11  A.  No.

12  Q.  Did you have experience during your career with persons

13  known as confidential informants?

14  A.  Yes.

15  Q.  Tell the jury what a confidential informant is.

16  A.  A confidential informant is someone who comes into contact

17  with the police in some way where he or she may be involved in

18  a criminal organization or might be involved with someone who

19  is on the street who has information about crimes that were

20  committed by someone.  They want to provide information or they

21  usually give it to either -- a member of the police department.

22  Q.  So some confidential informants have engaged in criminal

23  activities, correct?

24  A.  Correct.

25  Q.  How did you come to work with confidential informants?

86JMMANT                    Parker - cross

1    A.   I started working with confidential informants when I was

2    assigned to the narcotics division.

3    Q.   Did you find confidential informants helpful in your work

4    as a detective?

5              MR. JOSEPH:   Objection, relevance.

6              THE COURT:   Sustained.

7    Q.   Did you find that confidential informants gave you valuable

8    information from time to time?

9              MR. JOSEPH:   Objection.  Relevance to this case.

10             THE COURT:   I'll sustain the objection.  Keeping an

11   eye on relevant evidence, it's not any easier for me than it is

12   for you, which is why I keep reading you the elements.  They

13   are mostly for my benefit or somewhat for my benefit, too.

14   Q.   Did you have authority to enter into any type of agreements

15   with confidential informants?

16             MR. JOSEPH:   Objection.

17             THE COURT:   Overruled.  It's a yes or no question.

18   A.   No.

19             THE COURT:   Good.  Maybe we can move along.

20   Q.   Did there come a time that you came in contact with a

21   person by the name of Terrence Alston?

22   A.   Yes.

23   Q.   When was that?

24   A.   February of 2001.

25   Q.   How did that occur?

86JMMANT                     Parker - cross

1    A.  I spoke with another informant who is in Rikers Island who

2    informed me that Mr. Alston had some information about a

3    homicide.

4    Q.  Did you then go to Rikers Island to meet with Mr. Alston?

5    A.  Yes, I did.

6    Q.  Before going to Rikers Island to meet with Mr. Alston did

7    you contact anyone at the 43rd detective squad?

8    A.  Not before, no.

9    Q.  Did you have any knowledge of the murder of Albert Acosta

10   before going out to meet with Mr. Alston at Rikers Island?

11   A.  No.

12   Q.  Did you go to Rikers Island to meet with Mr. Alston by

13   yourself or with someone?

14   A.  With someone.

15   Q.  Where did you meet Mr. Alston once you got there?

16   A.  At the correctional gang intel trailer.

17   Q.  Did you meet with him alone?

18   A.  No.

19   Q.  Who did you meet him with?

20   A.  My partner, Detective Bryant, was with me.

21   Q.  How long did you meet with him for?

22   A.  I think I was with him up until about an hour.

23   Q.  What did he tell you?

24   A.  He told me he had information concerning a homicide that

25   happened in the Parkchester section of the Bronx.

86JMMANT                         Parker - cross

1    Q.  What did you do with that information at that time?

2    A.  I called the 43rd detective squad and asked them if in fact

3    they did have a homicide.

4    Q.  What did they tell you?

5    A.  They told me that they did, and they asked me where I was

6    and that they would come out to Rikers Island.

7    Q.  Did they send detectives to Rikers Island immediately?

8             MR. JOSEPH:  Objection.  If he knows.

9             THE COURT:  If he knows.

10   A.  Yes.

11   Q.  Did they do that?

12   A.  Yes.

13   Q.  Did you wait for them to get there?

14   A.  Yes.

15   Q.  When they arrived what happened?

16   A.  I introduced them to Terrence Alston, and I let them

17   interview him in the room.

18   Q.  Were you present for that interview?

19   A.  No.

20   Q.  Did you wait outside while that happened?

21   A.  Yes.

22   Q.  Did you enter into any agreements with Mr. Alston?

23   A.  No.

24   Q.  Did you subsequently have any further contacts with

25   Mr. Alston?

1   A.  Yes.

2   Q.  Can you tell the jury what contacts you had?

3   A.  I saw him later on at the district attorney's office in the

4   Bronx.

5           THE COURT:  How did that come about?

6           THE WITNESS:  I was asked to come down to the DA's

7   office.

8           THE COURT:  By who?

9           THE WITNESS:  I think it was the ADA.

10  Q.  Could you tell the jury about that meeting?

11  A.  I went down to the DA's office because I was the person

12  that was handling Mr. Alston as an informant, so he wanted me

13  there to be comfortable to speak with the district attorney.

14  Q.  And what was the purpose of that meeting, as far as you

15  know?

16  A.  I believe it was some information pertaining to the

17  homicide with another individual.

18          THE COURT:  Who else was there?

19          THE WITNESS:  The ADA, there was an individual there

20  that had some information, and a detective from the 43rd.

21          THE COURT:  Alston was the individual that had some

22  information?

23          THE WITNESS:  Alston was there and there was another

24  individual.

25  Q.  Do you know who the individual was who had information?

86JMMANT                    Parker - cross

1    A.  I don't remember his name offhand.  I think his first name

2    was Mark.

3    Q.  Did you know what information that person had to provide?

4    A.  I believe it was information about a gun.

5    Q.  Do you know anything further about that information?

6    A.  I don't recall.

7         THE COURT:  Who was the direct from the 43rd?  Do you

8    remember?

9         THE WITNESS:  I don't remember, your Honor.

10         THE COURT:  You see him in the courtroom there on the

11    right-hand side at that second table?

12         THE WITNESS:  I remember one of the individuals.  I

13    don't know if he was the detective at the time.

14    Q.  Were you present for the interview that the ADA conducted?

15    A.  I was there, but I don't think I was there the entire time.

16    Q.  So you were not in the interview room the entire time, is

17    that correct?

18    A.  That's correct.

19    Q.  Do you know if Mr. Alston was in the interview room the

20    entire time?

21    A.  That I don't recall.

22    Q.  Do you know if he was in the interview room at all?

23    A.  Yes, I believe he was there.

24    Q.  But you don't know for how long, though, correct?

25    A.  Correct.

86JMMANT                    Parker - cross

1    Q.  Did you ever come to learn what information Mr. Alston had

2    provided concerning the homicide in the Bronx?

3             MR. JOSEPH:  Objection.  At what point.

4    A.  I don't recall.

5    Q.  Other than what you've testified to?

6             THE COURT:  Overruled.

7    Q.  Other than what you've testified to here today, did you

8    ever work with the 43rd detective squad in investigating the

9    homicide in the Bronx as you've discussed?

10   A.  No.

11            MR. ZUCKERMAN:  Nothing further, your Honor.

12            THE COURT:  Any redirect?

13   REDIRECT EXAMINATION

14   BY MR. JOSEPH:

15   Q.  Sir, you spoke with Mr. Alston for an hour at that first

16   meeting, correct?

17   A.  Correct.

18   Q.  In that whole hour he didn't mention anything about a

19   security guard hiring him to do a professional hit, correct?

20   A.  No, he did not.

21            MR. JOSEPH:  Nothing further.

22            THE COURT:  You're excused.  Thank you very much.

23            (Witness excused)

24            MR. JOSEPH:  Your Honor, I call Miriam Nieves.

25   MIRIAM NIEVES,

86JMMANT                    Parker - redirect

1              called as a witness by the Plaintiff,

2              having been duly sworn, testified as follows:

3       DIRECT EXAMINATION

4       BY MR. JOSEPH:

5       Q.   On February 12, 2001, were you employed by the City of New

6       York?

7       A.   Yes.

8       Q.   Were you a police officer assigned to the 43rd Precinct?

9       A.   Yes, I was.

10      Q.   Were you partnered with Officer Alex Perez?

11      A.   Yes.

12      Q.   Did you see Officer Perez in the courtroom?

13      A.   Yes.

14      Q.   Can you describe him, please?

15      A.   He's in the back, far right.

16      Q.   His hand in front of his face?

17              MR. ZUCKERMAN:   Objection.

18      A.   Yes.

19      Q.   Prior to working at the police department did you also work

20      at a Parkchester security guard?

21      A.   Yes.

22      Q.   Isn't it true that Parkchester security guards don't patrol

23      the areas together, they walk around separately?

24      A.   Sometimes.

25      Q.   I'll come back to that.

86JMMANT                         Nieves - direct

1           Now, on February 12, 2001, did you respond to a call

2    at 1700 Metropolitan Avenue?

3    A.   Yes.

4    Q.   And on that call was there any indication that the victim

5    may have been a Parkchester security guard?

6    A.   I don't recall that.

7    Q.   Let me see if I can jog your memory.

8           Let me show you page 174 of the trial transcript, line

9    20 through 25.  Does that refresh your recollection as to

10   whether the radio transmission indicated the possibility that

11   the victim may have been a Parkchester security officer?

12   A.   It states here, I said, I remember it saying either

13   Parkchester security or officer, unknown whether it was

14   security or police officer.

15   Q.   And that's testimony you gave under oath, correct?

16   A.   Yes.

17   Q.   By the way, it's testimony that you gave on

18   cross-examination during trial, correct?

19   A.   I don't know when I gave this testimony.

20   Q.   But according to your testimony, ma'am, there was some

21   mention on the radio call that the victim may have been a

22   Parkchester security guard, is that correct?

23   A.   According to my testimony, yes.

24           THE COURT:  Is that wrong?

25           THE WITNESS:  I don't recall it, your Honor.

1          THE COURT:  You don't doubt that's what you said.

2          THE WITNESS:  If it's here, I have to have said it.

3          THE COURT:  We are having a little trouble getting

4     that answer from some of your colleagues.  That's why I was

5     asking you.

6     Q.  Ma'am, did you testify before the grand jury that indicted

7     Anthony Manganiello?

8     A.  Yes.

9     Q.  I'll draw your attention to Exhibit 38.  Please turn to the

10    page TP-12.  You see your testimony there, ma'am?  Are you able

11    to find TP-12?

12    A.  I find it.  It doesn't say it's my testimony.  It starts on

13    TP-9.

14    Q.  Does your testimony continue on TP-12?

15    A.  Yes.

16    Q.  I want to direct your attention to TP-12.  Did you give

17    testimony before the grand jury that you encountered Anthony

18    Manganiello in the basement of 1700 Metropolitan Avenue?

19    A.  Yes.

20    Q.  And did you give testimony that at the point in time you

21    saw Anthony Manganiello he was coming into the basement?

22    A.  Yes.

23    Q.  Did you give testimony that between line 4 and 9 that

24    Anthony Manganiello made a remark to you in the basement of

25    1700 Metropolitan Avenue?

1    A.   Yes.

2    Q.   And what statement did you testify that Mr. Manganiello

3    made to you?

4    A.   He said something about going into the room, that was his

5    partner in there.

6    Q.   Did you, in fact, testify that he said, I don't want to go

7    in there, that's my partner?  Were those your words, ma'am?

8    A.   I'm reading it.  He said I don't want to go in there.  He

9    said that's my partner in there.

10   Q.   That was the testimony you gave before the grand jury?

11   A.   Yes.

12   Q.   I am also going to direct your attention to page -- same

13   page, lines 18 through 21.  Did you also testify before the

14   grand jury that there was no broadcast of the -- that the

15   victim was a security officer?

16   A.   Not that I heard.

17   Q.   Is that what your testimony was?

18   A.   Not that I heard of.  That's my testimony.

19   Q.   Did you also testify, line 22, beginning on line 22 that it

20   was unknown that the victim was a Parkchester security officer

21   when other officers arrived?

22   A.   Say that again.  What line?

23   Q.   Beginning on line 22, continuing to the following page,

24   line 3.

25   A.   What was your question?

36JMMANT                          Nieves - direct

1    Q.  Well, did you testify that when other Parkchester officers

2    arrived it was unknown that the victim was a Parkchester

3    security officer?

4              MS. OKEREKE:  Objection, your Honor.

5              THE COURT:  She has read it all.  She can answer.

6    I'll allow it.  Overruled.

7    A.  If it was known?

8    Q.  Correct.

9    A.  No.

10   Q.  That's the testimony you gave, correct, it was not known?

11   A.  It was not known.

12   Q.  But at that point in time you had already heard a radio

13   transmission indicating that the victim may have been a

14   Parkchester security officer?

15             MS. OKEREKE:  Objection, your Honor.

16             THE COURT:  Overruled.

17   Q.  Isn't that correct?

18   A.  Might be.

19   Q.  Ma'am, did you ever mention that to the grand jury?

20             MS. OKEREKE:  Objection, your Honor.

21   A.  Not that I remember.

22             THE COURT:  When you see your lawyer stand up -- maybe

23   she doesn't stand well.  Wait until I rule before you answer.

24   Q.  Ma'am, did you give this testimony to imply that

25   Mr. Manganiello had knowledge of the victim's identity prior to

86JMMANT                          Nieves - direct

1  going into the room?

2              MS. OKEREKE:  Objection, your Honor.

3              THE COURT:  Overruled.

4  Q.  For what reason did you give that testimony?

5  A.  Which testimony?  Repeat it, please.

6  Q.  The testimony you gave before the grand jury.  When you

7  told the grand jury that there was no radio transmission that

8  you heard, which identified the victim as a Parkchester

9  security officer and then testified that Mr. Manganiello in the

10 basement of 1700 Metropolitan Avenue told you that there was a

11 partner in the room before he entered the room, what, if

12 anything, were you trying to convey to the jury?

13             MS. OKEREKE:  Objection, your Honor.

14             THE COURT:  I don't understand what you're objecting

15 to.  The element here that is most disturbing to, I believe,

16 all of us is that we have to show -- indeed the plaintiff has

17 to show that a defendant or more than one acted maliciously, if

18 indeed this woman testified to the effect that -- differently

19 than she had heard only a few minutes before, that seems to me

20 to go to that element.

21             MS. OKEREKE:  Your Honor, to the extent that plaintiff

22 is mischaracterizing the testimony that she actually gave --

23             THE COURT:  I think it's right in front of her, ma'am.

24 If indeed he is mischaracterizing it, A, she can look, she

25 seems to know how to read; and, B, you can correct it.  It is

1    no grounds for me to sustain your objection.

2              MS. OKEREKE:  Very well, your Honor.

3    Q.   Ma'am, were you trying to convey to the grand jury that

4    Mr. Manganiello had some sort of guilty knowledge?

5    A.   No.

6    Q.   Ma'am, did you ever give testimony that you found this

7    statement odd?

8    A.   Which statement?

9    Q.   The statement which you claim Mr. Manganiello made to you.

10   A.   Yes.

11   Q.   For what reason did you find it odd?

12   A.   At the time I was not aware that there was a broadcast of

13   who it was in the room.

14   Q.   Did you make any efforts to find out before you testified

15   before the grand jury?

16   A.   No.

17   Q.   And, ma'am, were you trying to imply that Mr. Manganiello

18   could not have known who was in the room unless he was the

19   murderer?

20             MS. OKEREKE:  Objection, your Honor.

21             THE COURT:  Overruled.

22   A.   I found it odd when he said he knew who was in the room.  I

23   wasn't implying that he was in or he wasn't.  Just struck me as

24   odd that he knew who was in the room.

25   Q.   Why would you find it odd?

1    A.  To my knowledge, at that point, no one knew who was in that

2    room.

3    Q.  In fact, ma'am, there had been a broadcast only a few

4    minutes earlier that would have identified the victim as a

5    Parkchester security officer, correct?

6    A.  Not that I remember.

7    Q.  Ma'am, if in fact there was such a broadcast over the

8    Parkchester radio that identified the victim as a Parkchester

9    security officer, it wouldn't be weird or odd that

10   Mr. Manganiello would know who was in the room, would it?

11          MS. OKEREKE:  Objection.

12          THE COURT:  I'll sustain that objection.

13          MR. JOSEPH:  I'll move on.

14   Q.  By the way, ma'am, when you worked at Parkchester did you

15   know Rolf Ohle?

16   A.  Yes.

17   Q.  Was he in the basement when you arrived?

18   A.  I don't remember.

19   Q.  But you knew who he was, correct?

20   A.  Yes.

21   Q.  You knew him to be a sergeant for the Parkchester security

22   force?

23   A.  Yes.

24   Q.  Was he making broadcasts over the radio as you were walking

25   into the room?

86JMMANT                          Nieves - direct

1    A.  I don't remember him there.

2            THE COURT:  You worked at Parkchester before you

3    joined the police department, is that right?

4            THE WITNESS:  Yes.

5            THE COURT:  What were the years that you worked at

6    Parkchester?

7            THE WITNESS:  I believe it was '90 to '92, year and a

8    half.

9            THE COURT:  When did you join the police department?

10           THE WITNESS:  '92.

11   Q.  Did you also testify that you saw dust on Mr. Manganiello's

12   uniform before he entered the room on page TP-12, lines 4

13   through 9?

14   A.  Where does it say --

15   Q.  TP-12, lines 4 through 9.

16   A.  You're asking about something on his jacket.  I don't see

17   it here.

18   Q.  Can I have it back for a second.

19           THE COURT:  Did you read your grand jury testimony

20   before you came here today?

21           THE WITNESS:  Some time ago.

22           THE COURT:  How long ago?

23           THE WITNESS:  Maybe a week ago.

24           THE COURT:  But you looked at it all?

25           THE WITNESS:  Yes, read through it.

86JMMANT                          Nieves - direct

1          THE COURT:  Did he review it with the Corp. Counsel at

2     all, with your lawyer?

3          THE WITNESS:  Yes.

4     Q.  Page TP-13, lines 4 through 9 were you asked this question

5     and did you give this answer:

6     "Q.  When you saw Officer Manganiello entering into the hallway

7     area where the room where Officer Acosta was located, did you

8     make any note, mental note or otherwise, of the condition of

9     his uniform, or did you notice anything unusual about it?

10    "A.  I saw dust, the white dust."

11    Q.  Were you asked that question and did you give that answer?

12    A.  I believe so.

13    Q.  And you also testified at trial, at Mr. Manganiello's

14    criminal trial, correct?

15    A.  Yes.

16    Q.  That was on June 29, 2004, right?

17    A.  I don't remember the date, but yes.

18    Q.  On direct examination -- ma'am, why don't you turn to page

19    150.  Do you have that in front of you?  On lines 5 to 10 did

20    you testify that the radio transmission which you received said

21    officer shot?

22    A.  Which line?

23    Q.  Page 150, lines 5 through 10.

24    A.  Radio run of an officer shot.

25    Q.  On your direct examination did you give any indication as

1   to the possibility that it might have been a Parkchester

2   security officer on the radio run?

3          MR. JOSEPH:  I'll rephrase the question.

4   Q.  Ma'am, on that direct testimony, on page 150, did you give

5   any indication to the jury that the radio transmission may have

6   also said possible Parkchester security authority?

7          MS. OKEREKE:  Objection, your Honor.

8          THE COURT:  Overruled.

9   A.  I remember it as radio run, officer shot.

10  Q.  That's not my question, ma'am.  My question is, did you at

11  any point on page 150 during your --

12         THE COURT:  Did you talk to these people -- we will

13  talk to you after the jury goes away.

14         MR. JOSEPH:  I'm sorry, your Honor?

15         THE COURT:  I'm not talking to you.

16  Q.  Ma'am, on your direct examination on page 150, when you

17  were asked what the radio run said, did you give any indication

18  that it may have identified the victim as a Parkchester

19  security officer?

20  A.  No.

21  Q.  And you knew this was a murder trial, correct?

22  A.  Yes.

23  Q.  And the consequences for a criminal defendant in a murder

24  trial can be quite severe, correct?

25  A.  Yes.

86JMMANT                    Nieves - direct

1    Q.  And you know it was important to make full and accurate

2    disclosure of what you knew, correct?

3              MS. OKEREKE:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Ma'am, I am going to show you what's been marked into

6    evidence as Exhibit 11.  Wasn't the radio transmission --

7    didn't it, in fact, say possible Parkchester security shot at

8    location?  Wasn't that the exact transmission that was

9    broadcast over the radio?

10   A.  Yes.

11   Q.  Now, ma'am, when you arrived at the scene at 1700

12   Metropolitan Avenue, did you and your partner, Officer Perez,

13   walk into the basement together?

14   A.  I believe we did.

15   Q.  And where was Officer Perez when you claim you had this

16   conversation with Mr. Manganiello?

17   A.  Officer Perez had walked out in front of me.  I was behind

18   her, behind Officer Perez.

19   Q.  Behind her?

20   A.  Behind Officer Perez.

21   Q.  But you were behind officer Alex Perez?

22   A.  Yes.

23   Q.  How far behind Officer Perez were you?

24   A.  I can't say.  I know she walked out first.  I'm sorry.

25   Officer Perez walked out first.

86JMMANT                    Nieves - direct

1   Q.  Ma'am, isn't it in fact true that you didn't see Anthony

2   Manganiello -- strike that.

3           Ma'am, isn't it in fact true that at the point in time

4   that Anthony Manganiello arrives on the scene you're already

5   outside of the basement of 1700 Metropolitan Avenue?

6   A.  Negative.

7   Q.  And is it your testimony that you and Officer Perez are not

8   together when you first see Anthony Manganiello?

9   A.  Right.

10  Q.  And at trial did you also testify on page 157, line 15 that

11  you had a conversation with Anthony Manganiello?

12  A.  State that question between.

13  Q.  Let me make it easier.  Why don't you give me the

14  transcript.  Ma'am, on page 159, line 4, did you testify to a

15  statement that Anthony Manganiello made to you or allegedly --

16  that you claim he made to you in the basement?

17          THE COURT:  You got to speak up.  I don't think the

18  jury can hear you if you don't use the microphone.

19          MR. JOSEPH:  I'll repeat it.

20  Q.  Ma'am, on page 159, line 4, do you testify that Anthony

21  Manganiello made a statement to you?

22  A.  Yes.

23  Q.  What statement, if any, do you say he made to you?

24  A.  He said something in regards to going into the room, that

25  that was his partner.

86JMMANT                          Nieves - direct

1    Q.  Ma'am, after you saw Mr. Manganiello in the basement, he

2    walked past you, correct?

3    A.  After we spoke he stood there in the hallway.  I walked

4    past him.

5    Q.  But he was walking into the direction of where Mr. Acosta's

6    body was, correct?

7    A.  Officer Acosta's body was in the room.  We were still in

8    the hallway outside the room.

9    Q.  But after you passed Mr. Manganiello, he keeps walking

10   towards that room, correct?

11   A.  I don't think he did.

12   Q.  Ma'am, did you ever testify to the exact opposite?

13   A.  Show me where.

14   Q.  In a pretrial hearing on page 109.

15   A.  109?

16   Q.  Right.  Lines 9 through 17, pretrial hearing.  That's

17   trial, ma'am.

18   A.  Line 9?

19   Q.  Correct, through 17.

20   A.  It states here --

21         THE COURT:  It's a yes or no question.

22   A.  Repeat the question.

23   Q.  Did you or did you not testify that after Mr. Manganiello

24   made the statement, he walked past you towards the room where

25   Acosta was found?

86JMMANT                          Nieves - direct

1   A.  Yes.

2   Q.  And that was four years ago, correct?

3   A.  Four years ago, yes.

4   Q.  That was under oath?

5   A.  Yes.

6   Q.  You said the exact opposite of what you said here today

7   just a few minutes ago, correct?

8           MS. OKEREKE:  Objection.

9           THE COURT:  Overruled.

10  Q.  Is that correct, ma'am?

11  A.  Yes.

12  Q.  By the way, in that same pretrial hearing did you also

13  offer testimony that Mr. Manganiello said he wanted to go into

14  the room, his partner was in there, page 108?

15  A.  What line?

16  Q.  11 through 15.

17  A.  Yes.

18  Q.  But you told the grand jury that he said that he didn't

19  want to go in there, correct?

20  A.  Correct.

21  Q.  Did you also testify at that same hearing that you didn't

22  know -- strike that.

23          Ma'am, when you saw the uniform, the Parkchester

24  uniform on Mr. Acosta, did you recognize it?

25  A.  I don't remember.

86JMMANT                          Nieves - direct

1          THE COURT:  Was it a uniform like you had worn?

2          THE WITNESS:  It's the same uniform as PD.

3   Q.  They have patches on it?

4   A.  They have patches.

5   Q.  You saw a patch on Mr. Acosta's uniform, correct?

6   A.  Yes.

7   Q.  You knew it was a Parkchester security officer at the point

8   in time you got into the room, right?

9   A.  I can't recall.  His arms were underneath him.  I don't

10  remember seeing the patches.

11  Q.  Did you tell Officer Perez that it was a Parkchester

12  security officer?

13  A.  I don't remember.

14  Q.  By the way, did you also testify at that hearing that none

15  of the radio transmissions identified the victim as a

16  Parkchester security officer, on page 109?

17          THE COURT:  You better give her the line.

18          MR. JOSEPH:  Line 4 through 8.

19  A.  Your question again?  I'm sorry.

20  Q.  On page 109, lines 4 through 8, did you testify that none

21  of the radio transmissions identified the victim as a

22  Parkchester security guard?

23  A.  Yes.

24  Q.  And, turn to page 134.

25  A.  134?