86JMMANT                          Nieves - direct

Q.  134.  Between lines 13 through 20 did you testify that you

found Mr. Manganiello's statement odd because how did he know

it was his partner if he didn't go into the room.  Did you give

that testimony?

A.  Yes.

Q.  By the way, did you ever make any notes on the day in

question, on February 12, 2001, that Mr. Manganiello made this

odd comment?

A.  No.

Q.  And you're taught to take notes at the police academy?

A.  Yes.

Q.  Especially when witnesses make statements that you find

odd, correct?

A.  Yes.

Q.  And how long were you a police officer as of February 12,

2001?

A.  Approximately eight and a half years.

Q.  And after eight and a half years of being a police officer

did you make any notes about when this odd statement was made

by a suspect in the murder charge, suspect following a murder?

        MS. OKEREKE:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  Did you make any notes at all that Mr. Manganiello made

this comment?

A.  No.

86JMMANT                        Nieves - direct

1    Q.   And were you interviewed on February 12, 2001 by

2    detectives?

3    A.   I can't remember.

4    Q.   Well, at specifically 1640 p.m. on February 12, 2001,

5    weren't you and your partner brought up to the detective squad?

6    A.   I don't remember.

7    Q.   Ma'am, in fact, the first written record that was ever

8    created of the statement was two and a half weeks after it

9    occurred, correct?

10   A.   I don't remember.

11           MR. JOSEPH:   That's all I have.

12           THE COURT:   Any cross?

13           MS. OKEREKE:   Yes, your Honor.

14   CROSS-EXAMINATION

15   BY MS. OKEREKE:

16   Q.   Officer Nieves, are you currently retired from the New York

17   City Police Department?

18   A.   Yes.

19   Q.   And how long did you or were you employed with NYPD?

20   A.   Approximately 14 years.

21   Q.   Fourteen years.  In the course of your 14 years with NYPD,

22   how many radio calls did you receive?

23   A.   Thousands.

24   Q.   Do you remember the content of every single radio call that

25   you have received over the last 14 years while you were

86JMMANT                         Nieves - cross

1     employed with the New York City Police Department?

2     A.   No.

3     Q.   Why don't you remember those?

4                MR. JOSEPH:   Objection.

5                THE COURT:   I'll allow it.   I am not sure if thousands

6     are helpful.   You have a reason that you can give us?

7                THE WITNESS:   It's too many to remember.

8     Q.   In what year did you retire from NYPD?

9     A.   2006.

10               THE COURT:   How long were you with the 43rd after this

11    incident?

12               THE WITNESS:   After that incident, about three more

13    years.

14    Q.   Officer Nieves, this incident occurred in 2001?

15    A.   Yes.

16    Q.   Since 2001, how many proceedings have you testified in

17    regarding Anthony Manganiello?

18    A.   Three, I think.

19    Q.   And was one of those the criminal court trial?

20    A.   Yes.

21    Q.   And approximately how many years did you testify in the

22    criminal court trial?

23               THE COURT:   How many years?

24    Q.   Approximately how many years ago did you testify at the

25    criminal court trial?

1              THE COURT:  There was no ago in your earlier question.

2    Q.  Approximately how many years ago did you testify at the

3    criminal court trial?

4    A.  About four.

5    Q.  Four years ago.  And did you testify truthfully to your

6    memory at the time --

7              MR. JOSEPH:  Objection.

8    Q.  -- when you gave testimony during the criminal court trial?

9              THE COURT:  Overruled.  The jury will be the final

10   judge and arbiter of that issue.

11   A.  Yes.

12   Q.  And did you also testify during a pretrial hearing?

13   A.  Yes.

14   Q.  And how long ago was the pretrial hearing?

15   A.  About four years as well.

16   Q.  Did you testify truthfully to the best of your memory at

17   the pretrial hearing?

18              MR. JOSEPH:  Same objection.

19              THE COURT:  Same ruling.

20   A.  Yes.

21   Q.  And I believe you said you testified one more time with

22   regard to the Manganiello case.  When was that?

23   A.  I don't recall.  I think the same year.

24   Q.  Did you have your deposition taken in this matter?

25   A.  Yes.

86JMMANT                          Nieves - cross

1    Q.  When was your deposition taken?  Was that in 2008?

2    A.  Yeah.  It was a few months ago.

3    Q.  That would be then seven years after you received the radio

4    call?

5    A.  Yes.

6    Q.  And did you testify truthfully to the best of your memory

7    at the time you gave your deposition?

8    A.  Yes.

9    Q.  And did you testify during the grand jury?

10   A.  Yes.

11   Q.  And how many years ago, if you recall, was the grand jury

12   hearing?

13   A.  I believe it was that year, 2001.

14   Q.  So that would be approximately seven years ago?

15   A.  Seven years ago.

16   Q.  Did you testify truthfully to the best of your memory when

17   you gave testimony during the grand jury hearing?

18   A.  Yes.

19   Q.  Now, I am going to show you what has been marked as

20   Plaintiff's Exhibit 11.  I don't know if you have a copy of it

21   still up there.

22   A.  Yeah, I believe so.

23   Q.  I believe you testified that this document is what's

24   referred to as a Sprint report?

25   A.  Yes.

86JMMANT                          Nieves - cross

1    Q.   Do you have any expertise in interpreting Sprint reports?

2    A.   No.

3    Q.   On the day of the incident did you see the Sprint report?

4    A.   I don't remember.

5    Q.   Would you contemporaneously -- or at the same time that a

6    radio call is made, do you view a Sprint report?

7    A.   No.

8    Q.   Now, let's talk about February 12, 2001.

9            THE COURT:   I am not sure I understand that.  Just for

10   my information, the question was, were you contemporaneously --

11           MS. OKEREKE:   I'll repeat the question.

12   Q.   Would you view a Sprint report at the same time that you

13   hear a call?

14   A.   No.

15   Q.   Thank you, Officer Nieves.

16           Now, back to February 12, 2001, you've already

17   previously testified that you were with your partner, Alex

18   Perez?

19   A.   Yes.

20   Q.   And at some point you received a radio transmission

21   requesting police assistance at 1700 Metropolitan Avenue?

22   A.   Yes.

23   Q.   Now, please tell the jury what do you recall was the

24   substance of that radio transmission?

25   A.   1013, officer down.

86JMMANT                          Nieves - cross

1    Q.  Did you hear any radio transmission which identified the

2    identity of the officer?

3    A.  No.

4    Q.  Did you have access to Parkchester radios in your squad

5    car?

6    A.  No.

7    Q.  Would you then be able to hear what was being broadcast

8    over Parkchester radios?

9    A.  No.

10   Q.  Did you have any knowledge of what was being broadcast over

11   Parkchester radios?

12   A.  No.

13   Q.  Officer Nieves, I am showing you -- I don't know if you

14   still have your trial testimony over there.

15   A.  It's pretrial.

16   Q.  I'll bring this to you in just a moment.

17        Now, Officer Nieves, I refer your attention to page

18   159, line 20.  If you could please read for us the question and

19   the answer that you gave during your criminal court trial.

20   A.  "QUESTION:  While you were present in the room did you come

21   to find out before entering -- before encountering

22   Mr. Manganiello the identity of the individual in the room?

23   "A.  No."

24   Q.  Thank you.

25        Officer Nieves, when you arrived at 1700 Metropolitan

1   Avenue, did you know the identity of the victim at that point?

2   A.   No.

3   Q.   When you entered the basement of 1700 Metropolitan Avenue,

4   did you know the identity of the victim?

5   A.   No.

6   Q.   When did you learn the identity of the victim?

7   A.   I don't remember.

8   Q.   Did you learn the identity of the victim prior to seeing

9   Anthony Manganiello?

10  A.   No.

11  Q.   Now, you mentioned you previously worked at Parkchester,

12  correct?

13  A.   Yes.

14  Q.   Did you know Anthony Manganiello at all?

15  A.   Not personally.

16  Q.   What years did you work at Parkchester?  I believe you've

17  told the judge between '90 to '92?

18  A.   '90 to '92.

19  Q.   Did you at any point work with Anthony Manganiello?

20  A.   I don't remember.

21  Q.   Was he working at Parkchester in the same years that you

22  worked at Parkchester?

23  A.   I don't think so.

24  Q.   I'd like to go to the statement that you've previously

25  testified to, the that's my partner in there.  What, if

86JMMANT                          Nieves - cross

1    anything, went through your mind when Anthony Manganiello said

2    that to you?

3    A.   I just found it odd.

4    Q.   I know you've somewhat discussed this, but please explain

5    for us, what in particular was odd about that comment?

6    A.   Up until that point I didn't think anybody knew who was in

7    the room.

8    Q.   And why in particular did you remember that statement?

9    A.   Because he stated it was his partner in there, so somehow

10   he knew who was in there.

11   Q.   Did you make any other observations or any observations of

12   the plaintiff when you spoke to him?

13   A.   He had a white powdery substance on his left arm.

14   Q.   Did you notice anything about his physical appearance?

15   A.   He was -- he seemed disheveled, pale, nervous, sweaty.

16   Q.   What, if anything, did you do after you spoke with Anthony

17   Manganiello on February 12, 2001?

18   A.   I walked out.

19   Q.   Did you speak with anyone else at the scene?

20   A.   I spoke with my partner.

21   Q.   What did you tell your partner?

22   A.   I told my partner, this guy knows -- something to the

23   effect of, this guy knew who was in the room.  How did he know.

24   Q.   Did you tell anyone else or did you speak with anyone else

25   on February 12 regarding the conversation that you had with

86JMMANT                          Nieves - cross

1    Anthony Manganiello?

2    A.   I can't remember.

3    Q.   What did you do after you left the scene?

4    A.   Went back on patrol.

5    Q.   Officer Nieves, approximately how long were you at 1700

6    Metropolitan Avenue on the day of the homicide?

7    A.   Fifteen, 20 minutes.

8    Q.   Fifteen to 20 minutes?

9    A.   Something like that.

10   Q.   Other than the 15 to 20 minutes and the grand jury

11   testimony or the other testimony that you've testified that

12   you've given in conjunction with this case and speaking with

13   detectives, did you have any other involvement in the homicide

14   investigation of Albert Acosta?

15   A.   No.

16   Q.   You've also testified that you said at one point that the

17   plaintiff stated, I want to go in the room and during some

18   other testimony you stated the plaintiff said I don't want to

19   go in the room, is that correct?

20   A.   Yes.

21   Q.   However, have you ever given inconsistent testimony with

22   the fact that the plaintiff said that's my partner in there?

23   A.   I don't think I have.

24   Q.   Again, why has that statement stuck in your mind?

25            THE COURT:   Sustained.

86JMMANT                          Nieves - cross

1   Q.  Did you speak with the district attorney at any point with

2   regards to this case?

3   A.  Scaccia?

4   Q.  That's correct.

5   A.  Yes.

6   Q.  And did you tell the district attorney the truth when you

7   spoke to her?

8   A.  Yes.

9   Q.  Did you tell the grand jury the truth when you spoke to

10  them?

11  A.  Yes.

12  Q.  Did you ever ask the prosecutor whether she was going to

13  prosecute Anthony Manganiello?

14  A.  No.

15          MS. OKEREKE:  No more questions, your Honor.

16          THE COURT:  Any redirect?

17          MR. JOSEPH:  Yes, your Honor.

18  REDIRECT EXAMINATION

19  BY MR. JOSEPH:

20  Q.  Ma'am, you could have told the grand jury that you didn't

21  recall what the call said when it came over the radio, right?

22  A.  Yes.

23  Q.  But that's not what you testified to, was it?

24          MS. OKEREKE:  Objection.

25          THE COURT:  Overruled.

86JMMANT                      Nieves - redirect

1    A.  No.

2    Q.  You could have testified at the hearing that she didn't

3    have a memory of what the call said when it came over the

4    radio --

5           THE COURT:  We do have enough of this.  We know what

6    she said and we know what she didn't say and we know what she

7    contradicted.  Anything else?

8           MR. JOSEPH:  Yes, your Honor.

9    Q.  Did you ever tell the district attorney that the call in

10   fact came over and may have identified the victim as a

11   Parkchester security officer?

12   A.  No.

13   Q.  And you spoke with Ms. Scaccia in preparation for giving

14   your grand jury testimony, yes?

15          MS. OKEREKE:  Objection, your Honor.

16   Q.  Did you speak with Ms. Scaccia in preparing to give your

17   grand jury testimony?

18   A.  I believe so.

19   Q.  Did you speak with Ms. Scaccia in preparing to give your

20   trial testimony?

21   A.  I believe so.

22   Q.  And at no time did you ever tell Ms. Scaccia that the call

23   which came over the radio may have indicated that the victim

24   was a Parkchester security officer?

25          MS. OKEREKE:  Objection, your Honor.

```
 1              THE COURT:  Overruled.

 2   A.  I guess not.

 3              THE COURT:  You can answer.

 4   Q.  Ma'am, in 2001, did you have the ability to review a Sprint

 5   report if you chose to?

 6              MS. OKEREKE:  Objection, your Honor.

 7              THE COURT:  Sustained.

 8   Q.  Ma'am, I believe you testified that Mr. Manganiello's

 9   appearance was that he was disheveled, pale, nervous, and

10   sweaty looking, right?

11   A.  Yes.

12   Q.  And those characteristics are consistent with running,

13   correct?

14              MS. OKEREKE:  Objection, your Honor.

15              THE COURT:  She is a police woman, or she was.  She

16   probably knows many people who run.  She finds that they have

17   been running and probably can tell us whether they look sweaty

18   or they don't, or whether she doesn't know.  She is very, very

19   intelligent.

20   Q.  Do people tend to be sweaty after they run?

21   A.  Yes.

22   Q.  Are people sometimes pale after they run?

23   A.  I don't know.

24   Q.  Ma'am, would it be unusual after hearing that an officer

25   was shot to be nervous?
```

86JMMANT                        Nieves - redirect

1           MS. OKEREKE:  Objection, your Honor.

2           THE COURT:  Sustained.

3           MR. JOSEPH:  Nothing further.

4           THE COURT:  You're excused.  Thank you very much.

5           (Witness excused)

6           THE COURT:  What's next, Mr. Joseph.

7           MR. JOSEPH:  At this point, Judge, I call Officer

8    Perez.

9     ALEX PEREZ,

10          called as a witness by the Plaintiff,

11          having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. JOSEPH:

14   Q.  Officer Perez, on February 12, 2001, were you employed by

15   the City of New York as a police officer?

16   A.  Yes, sir.

17   Q.  And were you assigned to the 43rd Precinct?

18   A.  Yes, I was.

19   Q.  And were you partnered with Miriam Nieves?

20   A.  Yes, I was.

21   Q.  Did you respond to the scene at 1700 Metropolitan Avenue?

22   A.  Yes, I did.

23   Q.  And at the point in time when you responded did you see a

24   Sergeant Ohle from Parkchester there?

25   A.  When we first arrived, no.

86JMMANT                           Perez - direct

1    Q.   After you arrived did you go into the basement?

2    A.   Yes, we did.

3    Q.   Had you seen Sergeant Ohle in the basement?

4    A.   No, I did not.

5            THE COURT:   We are going to adjourn a little early

6    this afternoon, so we should get a recess.   This is a good time

7    for it before we get into the substance.

8            (Recess).

9    Q.   Officer Perez.

10   A.   Yes, sir.

11   Q.   I am not sure if I got it clear.   When you arrived on the

12   scene at 1700 Metropolitan Avenue, was Sergeant Ohle present?

13   A.   I don't remember him being present when I first arrived.

14   Q.   Well, did you have a better memory two weeks ago?

15   A.   Two weeks ago?

16   Q.   Yes.

17   A.   What does that mean?

18   Q.   Two weeks ago didn't you give a deposition?

19   A.   Yes, I did give a deposition.

20   Q.   Two weeks ago did you remember Sergeant Ohle being present

21   when you first arrived on the scene?

22   A.   I don't think I remembered him being there when we first

23   arrived on the scene.   I remember saying he was there, but I

24   don't remember seeing him when we first arrived.

25   Q.   Take a look at page 14.

86JMMANT                        Perez - direct

1          THE COURT:  Did you look at this testimony --

2          THE WITNESS:  This one I didn't look at.  Everything

3     else I did.

4     Q.  Can you read for us what the question and answer is

5     beginning on page 14, line 19.  Can you read it for us aloud,

6     Officer?

7     A.  It says here -- page 14, line 19.  Line 19 says:

8     "Q.  Okay.  And were there any Parkchester security personnel

9     present when you arrived at the basement on February 12, 2001?

10    "A.  There was a sergeant there."

11    Q.  What's the next question?

12    A.  Was there a Sergeant Ohle?  Yes.

13    Q.  Did you have a deterioration of memory in the last two

14    weeks?

15         MR. ZUCKERMAN:  Objection, your Honor.

16         THE COURT:  I can't even concede what objection would

17    be appropriate at that moment, but don't try and help me.

18    Overruled.

19    A.  No, sir, I do not have a deterioration of memory.

20    Q.  Officer, when you arrived on the scene, was Sergeant Ohle

21    making transmissions into his radio?

22    A.  That I don't remember.

23    Q.  Did you remember two weeks ago?

24    A.  Okay.  I don't remember saying that two weeks ago as well,

25    sir.

86JMMANT                           Perez - direct

1    Q.  Why don't you take a look at page 15.

2    A.  Okay.

3    Q.  Line 11.

4    A.  Okay:

5    "Q.  Do you have any recollection of hearing Sergeant Ohle

6    making any transmissions over on his radio?

7    "A.  I remember him using his radio, but your question was, do

8    I remember him using his radio when I first arrived on the

9    scene, and that I do not remember."

10   Q.  At some point, Officer Perez, do you have a recollection of

11   Sergeant Ohle speaking into his radio?

12   A.  Yes, I do.

13   Q.  And as you sit here right now, do you remember what, if

14   anything, Sergeant Ohle said?

15   A.  I don't.

16   Q.  So it is possible Sergeant Ohle was putting transmissions

17   over his radio while you were standing right there saying one

18   of our men is down, get an ambulance?

19            MR. ZUCKERMAN:  Objection.

20            THE COURT:  Anything is possible, so I'll sustain it.

21            You didn't hear him saying that, I'm sure?

22            THE WITNESS:  No, sir.

23   Q.  By the way, when you first arrived was your partner with

24   you?

25   A.  Yes, she was.

86JMMANT                        Perez - direct

1    Q.   And she was present when you saw Sergeant Ohle, correct?

2    A.   I believe so, sir.

3    Q.   Did you give grand jury testimony, Officer Perez?

4    A.   Yes, I did, sir.

5    Q.   I am going to turn your attention to page TP-4.

6           MR. JOSEPH:  For the record, I'm looking at Exhibit

7    38.

8           MR. ZUCKERMAN:   Okay.

9    Q.   Did you testify that the radio transmission to which you

10   responded on February 12, 2001 did not identify the victim as a

11   Parkchester police officer or Parkchester security guard?

12   A.   What was the question, sir?. Repeat that again.

13   Q.   Did you testify that the radio transmission which you

14   received did not identify the victim as a Parkchester security

15   officer?

16   A.   Yes, I did not -- when we received radio call, I do not

17   remember it saying it was a Parkchester personnel that had

18   gotten shot.

19   Q.   That was what your testimony was before the grand jury

20   seven years ago?

21   A.   That's still my testimony.

22   Q.   That was within two months of the events occurring that you

23   gave that testimony?

24   A.   Correct.

25   Q.   Now, after you arrived did you perform a canvass?

86JMMANT                          Perez - direct

1    A.   Yes, I did, sir.

2    Q.   After canvassing the basement did you find any witnesses or

3    evidence in the basement?

4    A.   In the basement, no, sir.

5    Q.   And did you find anything that in any way tied Anthony

6    Manganiello to the shooting of Albert Acosta in the basement?

7    A.   In the basement, no, sir.

8    Q.   After you do your canvass, do you go outside?

9    A.   Yes, I do.

10   Q.   At that point do you encounter a Walter Cobb?

11   A.   Yes, I do.

12   Q.   By the way, did Walter Cobb tell you he heard one gunshot?

13   A.   I don't remember how many gunshots he said that he heard.

14   I just remember him saying that he heard a gunshot.

15   Q.   Do you remember two weeks ago?

16   A.   I said I heard him say that he heard a gunshot.

17   Q.   A single gunshot?

18   A.   Could be single.  It was a gunshot.

19              THE COURT:  It was -- a gunshot is likely more than

20   one?

21              THE WITNESS:  Depends on how somebody interprets that.

22              THE COURT:  How do you interpret to make it several?

23              THE WITNESS:  It's upon somebody's interpretation.  He

24   told me a gunshot.  I am not going to make an assumption on

25   that.

86JMMANT                          Perez - direct

1          THE COURT:  I think you would be hard pressed.

2    Q.  Did Mr. Cobb tell you that it sounded like the gunshot came

3    from inside the building?

4    A.  Yes, sir.

5    Q.  By the way, what, if anything, did Mr. Cobb tell you he was

6    doing when he heard this gunshot?

7    A.  He was just working.

8    Q.  He said he was cleaning up outside, correct?

9    A.  I don't remember him saying he was cleaning up outside.  I

10   remember him saying he was working.

11   Q.  Did you remember two weeks ago?

12   A.  Yes.

13   Q.  Can you take a look at page 25 of your deposition?

14   A.  Yes, sir.  Okay.  What line, sir?

15   Q.  6 through 10.

16   A.  Okay:

17   "Q.  Okay.  And did Mr. Cobb indicate to you where outside he

18   was when he heard the shot?

19   "A.  I am pretty sure he said he was by the window.

20   "Q.  Did he indicate to you with any specificity -- strike

21   that.

22          Did Mr. Cobb indicate to you with any specificity as

23   to where he heard the shot come from?

24   "A.  No.

25   "Q.  Okay.  Did Mr. Cobb say anything concerning anything

1   unusual happening --"

2   Q.  On page 25, Officer Perez.

3   A.  25.

4   Q.  Why don't you read page -- start on page 24, line 15 to

5   page 25, line 4.

6   A.  Okay.

7           THE COURT:  Can't he read it to himself and then give

8   you the answer?

9           MR. JOSEPH:  Certainly, your Honor.

10  Q.  Officer Perez, did you testify two weeks ago that Mr. Cobb

11  told you he was cleaning up outside?

12  A.  I wrote -- I believe he said he was cleaning up outside, I

13  believe it was.  I didn't say for sure.  I said I believed he

14  was.

15  Q.  Two weeks ago you had the belief that Mr. Cobb was cleaning

16  up outside when he heard the shot?

17  A.  I had the belief that he was.

18  Q.  Did Mr. Cobb tell you about five minutes had passed between

19  the time he heard gunshots and the time he saw Anthony

20  Manganiello?

21  A.  What was that, sir.

22  Q.  Did Mr. Cobb tell you how much time passed between the time

23  he heard a gunshot and the time he says he saw Anthony

24  Manganiello?

25  A.  I don't believe he told me a time of when he saw him.

86JMMANT                        Perez - direct

1    Maybe it was a little bit after.  I am not sure.

2    Q.  Wasn't it five minutes?

3    A.  It could have been.

4    Q.  Did you tell me it was five minutes two weeks ago?

5    A.  I might have.

6    Q.  Would you take a look at page 26 of your deposition, line

7    19 through 24.

8           THE COURT:  Read them to yourself and answer the

9    question yes or no.  Of course, you may not remember the

10   question.

11   A.  I put a short period of time afterwards, perhaps five

12   minutes.

13   Q.  Five minutes?

14   A.  I said a short period of time after.

15   Q.  And you also said five minutes, yes or no?

16   A.  Yes, sir.

17   Q.  Is that under oath two weeks ago, yes?

18   A.  Of course, I did.

19          MR. ZUCKERMAN:  Objection, your Honor.

20          THE COURT:  Overruled.

21   A.  Yes, I did.

22   Q.  By the way, when Mr. Manganiello showed up did he identify

23   Anthony Manganiello?

24   A.  Yes, he did.

25   Q.  Did he use his name?

86JMMANT                              Perez - direct

1    A.   Yes, he did.

2    Q.   So you knew Anthony Manganiello's name when he first

3    arrived on the scene, is that correct?

4    A.   From Mr. Cobb, yes, I did.

5    Q.   Did you ever testify that you didn't know Anthony

6    Manganiello's name at the point in time that he arrived on the

7    scene?

8                MR. ZUCKERMAN:   Objection.

9                THE COURT:   Overruled.

10   A.   Wait.   Repeat that.

11               THE COURT:   I overruled the objection.

12   A.   Repeat that again.

13   Q.   Did you ever testify that you did not know Anthony

14   Manganiello's name when he first arrived on the scene?

15   A.   No, I didn't when he first arrived on the scene, I did not

16   know his name.   It was not until Mr. Cobb had informed me that

17   it was Mr. Manganiello that I knew his name.

18   Q.   Cobb points them out and he uses his name, Manganiello,

19   right?

20   A.   Correct.

21   Q.   But didn't you testify that when you first saw him you

22   didn't know his name?

23   A.   I can't recall that, sir.

24   Q.   Why don't you take a look at your grand jury testimony on

25   page TP-6.

524

1     THE COURT:  Before Cobb told you, you didn't know his

2  name, right?

3     THE WITNESS:  No, I didn't know his name.

4  A.  Okay, sir.

5  Q.  Lines 15 through 20, didn't you testify you didn't know

6  Anthony Manganiello's name, even after speaking with Mr. Cobb?

7     MR. ZUCKERMAN:  Can he read this grand jury testimony,

8  your Honor?

9     THE COURT:  Somebody better.

10     THE WITNESS:  Do you want me to read this out loud,

11  your Honor?

12     THE COURT:  If you have the lines --

13     THE WITNESS:  It basically says the same thing that I

14  said right now.

15     THE COURT:  That will be fine.  Let's move on.

16  Q.  Isn't it true that you got Anthony Manganiello's name not

17  from Mr. Cobb, but from Mr. Cowan?

18  A.  I don't know who that is.

19  Q.  Sir, let me just ask you, were you asked these questions at

20  a hearing four years ago and did you give these answers?

21     MR. ZUCKERMAN:  What page?

22     MR. JOSEPH:  Page 206.

23     MR. ZUCKERMAN:  Of what?

24     MR. JOSEPH:  Hearing testimony.

25     MR. ZUCKERMAN:  One second.

86JMMANT                          Perez - direct

1          MR. JOSEPH:  I am going to come back to that in about
2      a second.
3      Q.  On February 12, 2001, did you speak to Anthony Manganiello?
4      A.  I might have said something to him very briefly.
5      Q.  Do you have a recollection of saying something to him?
6      A.  I asked him if he was all right.
7      Q.  Now, at a pretrial hearing four years ago were you asked
8      these questions and did you give these answers, page 206, line
9      20:
10     "Q.  And at no time did you speak to Mr. Manganiello, correct?
11     "A.  No, sir.
12     "Q.  And you didn't even know Mr. Manganiello by name, did you?
13     "A.  No, sir.
14     "Q.  How his name appears in your book on another page" --
15     withdrawn.
16          Continuing on page 207, line 12:
17     "Q.  Who gave it to you?"
18          MR. ZUCKERMAN:  Your Honor, he skipped a line.
19          THE COURT:  He said he skipped a line.  We assume that
20     it was out of context or unimportant.  You want to read it?
21          MR. ZUCKERMAN:  Yes.
22          THE COURT:  Go for it.
23          MR. ZUCKERMAN:
24     "A.  That was a name that was given to me at the scene."
25          MR. JOSEPH:  I skipped a question, your Honor, because

1    your Honor had ruled something inadmissible.

2              THE COURT:  But that wasn't it.

3              MR. JOSEPH:  The question which I responded involved

4    that.  That's why it was skipped.

5    Q.  On line 14:

6    "Q.  Mr. Cowan gave you the name?

7    "A.  Correct."

8              Did you give that testimony four years ago?

9    A.  Right now I don't recall who that person is, to tell you

10   the truth.

11   Q.  Let me show you your hearing transcript on page 207.  Did

12   you give that testimony?

13   A.  Yes, sir.

14   Q.  So four years ago it wasn't Mr. Cobb that gave you Anthony

15   Manganiello's name; it was another gentleman named Mr. Cowan,

16   correct?

17   A.  I honestly don't remember who this person is.

18   Q.  By the way, you spoke with a detective on the morning of

19   February 12, 2001, correct?

20   A.  Did I speak to a detective that morning?

21   Q.  Yes.

22   A.  I might have.  There were so many people at the scene.

23   Q.  In fact, you didn't say anything about Walter Cobb

24   identifying Anthony Manganiello as a person leaving the scene

25   of the basement on the morning of February 12, 2001, did you?

86JMMANT                        Perez - direct

1    A.  At that point, no, I didn't say anything to them.  I

2    allowed Mr. Cobb to say it to them himself.

3    Q.  Isn't it also true that on February 12, 2001, you met with

4    detectives at 1640 hours?

5    A.  Yes, sir.

6    Q.  And your partner, Miriam Nieves, was with you at that point

7    in time, correct?

8    A.  I don't remember if she was with me at that time.

9    Q.  Do you remember two weeks ago?

10   A.  If she was with me while I was giving testimony to the

11   detectives?

12   Q.  Let me ask you this.  At about the same time, on February

13   12, 2001, at 1640 p.m., was Miriam Nieves, your partner, also

14   interviewed by detectives?

15   A.  I don't believe she was.

16   Q.  Why don't you take a look at page 53 of your deposition.

17   A.  What page?

18   Q.  Page 53, lines 5 through 8.

19            THE COURT:  Mr. Perez, it's only three lines.

20            THE WITNESS:  Sorry, sir.  I have to find the page.

21            THE COURT:  The page is 53.

22   A.  Yes, I said she was present there.

23   Q.  And Miriam Nieves was also interviewed by detectives at

24   1640 on February 12, 2001, yes?

25   A.  I said that I was interviewed, but I never said that she

86JMMANT                           Perez - direct

1   was interviewed.

2              THE COURT:  I thought that's what you said --

3              THE WITNESS:  I said that she was present in that

4   testimony.  I said she was present.  I didn't say she was

5   interviewed.

6   Q.  By the way, when you were interviewed did the detectives

7   take handwritten notes?

8   A.  I don't remember that, sir.

9   Q.  Why don't you turn to your hearing testimony, page 204, and

10  see if that refreshes your recollection.  The hearings, not the

11  deposition.

12  A.  What line, sir?

13  Q.  Page 204, line 21 through page 205, line 8.

14  A.  I don't see it saying anything about handwritten notes,

15  though.

16  Q.  Does it say detectives were taking notes while they were

17  interviewing you?

18  A.  I still don't see anything about anything being

19  handwritten.

20             THE COURT:  I think you'll settle for taking notes.

21             THE WITNESS:  I don't even see that in here.

22             THE COURT:  I'm just trying to move us along just a

23  little bit.

24  Q.  How about 205, sir, line 6:

25  "Q.  Do you remember the officer taking notes?

529

1    "A.  I believe so."

2    A.  Okay.

3    Q.  Did you give that testimony?

4    A.  I guess I did.

5    Q.  Officer, when you first saw Anthony Manganiello, where were

6    you?

7    A.  I was outside.

8    Q.  And where was Ms. Nieves?

9    A.  I don't remember.

10   Q.  Did you remember two weeks ago?

11   A.  What line, what page?

12   Q.  Page 33, line 1 through line 7.

13   A.  33?

14   Q.  Line 1 through line 7.

15   A.  It says here did I see Miriam Nieves when I was speaking to

16   Mr. Cobb.  No, not yet.

17   Q.  And if we continue:

18   "Q.  Where did you see Officer Nieves?

19   "A.  She was coming out of the doorway."

20        Correct?

21   A.  Yes.  But you asked me --

22   Q.  Read the next line.  Officer, doesn't it say here on page

23   33, line 1, at the point in time when Officer Manganiello came

24   onto the scene?  Yes.

25   "Q.  Where did you see Officer Nieves?

86JMMANT                          Perez - direct

1    "A.   She was coming out of the doorway."

2    A.   Okay.

3    Q.   Isn't that what you said two weeks ago?

4    A.   Yes, sir.

5    Q.   In fact, when you first see Anthony Manganiello, Ms. Nieves

6    is already outside the basement, correct?

7    A.   Yes, sir.

8    Q.   So it would have been impossible for Ms. Nieves to have a

9    conversation with Anthony Manganiello in the basement?

10            MR. ZUCKERMAN:   Objection.

11            THE COURT:   You can answer it, if you can.

12   A.   Miriam may have gone back into the basement.   I know that I

13   did not.

14   Q.   At the point in time when you see Anthony Manganiello she

15   is already out of the basement, right?

16            MR. ZUCKERMAN:   Objection, your Honor.

17            THE COURT:   Overruled.

18   A.   Yes.

19   Q.   In fact, you and Ms. Nieves are approximately ten feet from

20   the basement door, yes?

21   A.   I guess you could say ten feet.

22   Q.   When you made some comment to Anthony Manganiello,

23   Ms. Nieves was right next to you, right?

24   A.   I don't believe she was right next to me.

25   Q.   She was close to you, close by you?

86JMMANT                          Perez - direct

1    A.    Correct.

2    Q.    And Officer Perez, at the grand jury did you testify that

3    Anthony Manganiello had plaster on his uniform?

4    A.    Yes, I did.

5    Q.    And did you also testify at a hearing that Anthony

6    Manganiello never entered the basement?

7    A.    I never saw him enter the basement.

8    Q.    Why don't you take a look at page 215 of the hearing, the

9    red one.

10   A.    Page 215?

11   Q.    Page 215, line 6 through 9.

12   A.    I wrote no, he did not.  That's what I said, no, he did

13   not.  Did he enter the building?

14   "Q.    Yes.

15   "A.    No, he did not."

16   Q.    So you testified at a pretrial hearing that Anthony

17   Manganiello did not enter the basement of 1700 Metropolitan

18   Avenue?

19   A.    Like I said, I don't remember him ever entering the

20   basement when I was on the scene.

21   Q.    Officer, did you also testify at trial?

22   A.    Did I testify at trial?  Yes, I did.

23   Q.    And did you testify that there was no call that came over

24   the radio indicating the victim may have been a Parkchester

25   security guard.

86JMMANT                            Perez - direct

1          MR. ZUCKERMAN:  Objection.  Page and line.

2          THE COURT:  You can ask him and see.  There is some

3   time he might have a recollection independently.

4          MR. ZUCKERMAN:  But he asked him what he testified to.

5          THE COURT:  And that's conceivable, too.

6   Q.  Do you have a recollection of testifying to that?

7   A.  Do I have a what?

8   Q.  Do you recall giving that testimony?

9   A.  I still state that I never -- I don't remember ever stating

10  that it was a Parkchester officer that was shot over the air.

11  Q.  And you testified -- you gave that same testimony at trial,

12  right?

13  A.  Yes, I did.

14          MR. JOSEPH:  Nothing further.

15          THE COURT:  Any cross?

16  CROSS-EXAMINATION

17  BY MR. ZUCKERMAN:

18  Q.  Good afternoon, Officer Perez.

19  A.  Good afternoon, sir.

20  Q.  You're no longer with the NYPD, is that correct?

21  A.  No, sir.

22  Q.  How long were you with the NYPD?

23  A.  Thirteen years.

24  Q.  When did you leave the department?

25  A.  '06 of March, approximately.

86JMMANT                              Perez - cross

1                THE COURT:  After 13 years, is that what you said?

2                THE WITNESS:  Yes, sir.

3                THE COURT:  What are you doing now?

4                THE WITNESS:  I work for a cable company.  I'm a cable

5      technician.

6      Q.  What was your position with the NYPD on February 12, 2001?

7      A.  I was a police officer.

8      Q.  What precinct were you assigned to?

9      A.  The 43.

10     Q.  Generally, what were your duties?

11     A.  Basically, it was to patrol different sectors within the

12     43rd Precinct.

13     Q.  Were you working on February 12, 2001?

14     A.  Yes, I was.

15     Q.  Did you have a partner that day?

16     A.  Yes, I did.

17     Q.  Who was that?

18     A.  Miriam Nieves.

19     Q.  Was Officer Nieves your regular partner at that time?

20     A.  Yes.

21     Q.  What was your tour of duty on February 12, 2001?

22     A.  7 to 3.

23     Q.  What was your assignment that day?

24     A.  I forgot what sector we were patrolling, but we were

25     working patrol that day.

86JMMANT                          Perez - cross

1    Q.  Were you and Officer Nieves in a patrol car?

2    A.  Yes, we were.

3    Q.  When you were on patrol with Officer Nieves, which one of

4    you usually drove?

5    A.  I did.

6    Q.  Did there come a time on February 12, 2001 that you

7    responded to an incident at 1700 Metropolitan Avenue?

8    A.  Yes, we did.

9    Q.  Where were you when you received that call?

10   A.  We were in the patrol car.

11   Q.  Did there come a time that you arrived at 1700 Metropolitan

12   Avenue?

13   A.  Yes, sir.

14   Q.  How long did it take you to get there?

15   A.  A little less than five minutes.

16   Q.  Before you arrived did you have an understanding that there

17   was a shooting?

18   A.  Yes, we did.

19   Q.  Did you have an understanding of who the victim was?

20   A.  No, we did not.

21   Q.  Did you know his identity?

22   A.  No, we did not.

23   Q.  Did you know whether the victim was a Parkchester officer?

24   A.  No, sir.

25   Q.  Did the radio call, as best you can recall, give you that

86JMMANT                        Perez - cross

1    information?

2    A.  No, it did not, sir.

3             THE COURT:  Do you have access to the Sprint system?

4             THE WITNESS:  No.  We were never trained on the Sprint

5    system, so we never used that.

6    Q.  When you arrived what did you observe?

7    A.  I remember walking through the door, hearing voices to the

8    right, going into a room to the right, and there was a body on

9    the floor face down.  I remember seeing a jacket on a white

10   appliance, and I remember just seeing a body in dressed blues.

11   Q.  Were there other NYPD officers in that room?

12   A.  Yes, there were.

13   Q.  Did you talk to any of them?

14   A.  I might have.

15   Q.  Could you just briefly describe the nature of the building

16   that you went into?  Was it an apartment building?

17   A.  Yes.  It's a residential apartment building.

18   Q.  Highrise?

19   A.  Yeah.  Say maybe approximately 13 flights, stories, maybe

20   less.

21   Q.  What entry did you use when you entered the building?

22   A.  Went through the rear door.

23   Q.  How was the lighting in the room that you entered into when

24   you saw the body?

25   A.  It was dark.  I remember it being dark.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86JMMANT                              Perez - cross

1    Q.   Could you be more specific as to where the victim was

2    lying?

3    A.   He was close to the back, back of the room, towards the

4    center of the floor.

5    Q.   And what position was the body in?

6    A.   He was face down.

7    Q.   Could you tell at that point in time whether the victim was

8    an NYPD or Parkchester officer?

9    A.   No, I could not.

10   Q.   Why not?

11   A.   For one thing, his jacket wasn't on, his uniform was dark

12   blue like ours.  I didn't see any patches or any insignia

13   stating who he was or where he was from.

14   Q.   Was an ambulance called?

15   A.   An ambulance is always called to any kind of 1013.

16           THE COURT:  You didn't do that; somebody else did?

17           THE WITNESS:  I didn't do that.  911 does that --

18           THE COURT:  Someone has to call 911.

19           THE WITNESS:  Usually, 911 makes the call.  Once we

20   got the call over 911, 911 automatically calls an ambulance.

21           THE COURT:  But you don't know who called 911?

22           THE WITNESS:  No, sir.

23   Q.   Did you conduct certain canvasses?

24   A.   Yes.

25   Q.   Can you tell the jury what canvasses you conducted?

1    A.  I basically walked around the inside of the basement.  I

2    went from room to room, and I basically was looking to see if

3    there was any suspects in the area or if there was any weapons

4    to be found.

5    Q.  And what did you find?

6    A.  Negative results.

7    Q.  Did there come a time that you went back outside the

8    building?

9    A.  Yes, I did.

10   Q.  What exit did you use?

11   A.  I used the same rear entrance as where we came in.

12   Q.  Could you approximate for the jury how long you were inside

13   the building?

14   A.  Maybe ten minutes.

15   Q.  I'm sorry?

16   A.  Maybe approximately ten minutes inside.

17   Q.  When you went back outside did you talk to anyone?

18   A.  Yes, I did.

19   Q.  Was that Mr. Cobb?

20   A.  Yes, I did.

21   Q.  Can you tell the jury what Mr. Cobb told you, as best as

22   you can recall?

23   A.  Basically, Mr. Cobb told me that he had heard a shot, and

24   he had seen a Parkchester officer exit the building.  He told

25   me that it was an Officer Manganiello that he had seen, and

86JMMANT                          Perez - cross

1    that's it.  That's all he said to me.  Then at that point that

2    was when the officer walked through the crowd and he pointed

3    him out to me.

4    Q.  Showing you Plaintiff's Exhibit No. 5 in evidence, were you

5    interviewed by a detective later that day?

6    A.  Yes, sir.

7    Q.  Could you read the contents of the DD5, please to the jury?

8    A.  It says here:  On 2/12/01, at approximately 2000 hours, the

9    UC spoke to PO Perez regarding what he had seen at 1700

10   Metropolitan Avenue.  He stated in sum and substance, I was at

11   the scene when I noticed a Parkchester cop emerging from the

12   crowd.  He was all messy looking with white plaster, like

13   powder on his jacket sleeve.  He was red faced, breathing

14   heavy, and he had sweat on his face.  I then saw other officers

15   taking him to a car.  We first responded to the scene on a 1013

16   call to 1700 Metropolitan Avenue.  We went inside the basement

17   and saw the guy was shot.  We did a small canvass, spoke to the

18   maintenance guy, Cobb, who heard the spots.

19   Q.  Could you just tell the jury what 2000 hours stands for?

20   A.  That's 8 p.m.

21   Q.  After talking to Mr. Cobb did you see the plaintiff,

22   Anthony Manganiello, that morning?

23   A.  Yes, I did.

24   Q.  Where did you see him?

25   A.  He came out of the crowd.

86JMMANT                          Perez - cross

1   Q.  Can you describe his appearance as you saw him that

2   morning?

3   A.  It's like the DD5 said, he was sweaty, he was out of

4   breath, he was pale looking.  He didn't look well.  His jacket

5   was full of white powder.

6   Q.  Did you speak with him?

7   A.  I pretty much remember asking him if he was all right.

8   Q.  Could you tell the jury how long you were on the scene of

9   the incident that morning?

10  A.  Not more than half an hour.

11  Q.  Sir, Officer Perez, did you write a memo book entry

12  concerning this incident?

13  A.  Yes, I did.

14         MR. JOSEPH:  Objection, Judge.  I believe the Court

15  has made a ruling --

16         THE COURT:  Sustained.

17  Q.  Do you remember what time you arrived that morning at 1700

18  Metropolitan Avenue?

19  A.  Around 10:15 in the morning, approximately.

20  Q.  What did you do after leaving the scene?

21  A.  We went back on patrol.

22  Q.  When you met with the detective on February 12, 2001, did

23  you tell him the truth?

24  A.  Yes, I did.

25  Q.  Did there come a time that you testified before the grand

1    jury?

2    A.  Yes, I did.

3    Q.  Do you remember approximately when that was?

4    A.  No, sir, I do not.

5    Q.  Officer Perez, I show you the minutes of your grand jury

6    testimony and I would ask that you read the grand jury minutes

7    to this jury.

8              THE COURT:  No way.  Put another question.

9              MR. ZUCKERMAN:  Your Honor, I believe that Defendant's

10   Exhibit E was allowed into evidence.  That's --

11             THE COURT:  You can allow that into evidence.  You

12   just aren't going to read it.

13             MR. ZUCKERMAN:  E is the memo book entries, not the

14   grand jury minutes.

15             THE COURT:  Let's deal with one at a time.  The grand

16   jury minutes, which I just looked at, he is not reading those

17   five, six pages to the jury, but it does have -- I think it has

18   an exhibit number or letter, and they certainly can be looked

19   at and asked for and read by the jury when they deliberate.  As

20   to the memo book entry, let me see that.  We will decide again

21   if we didn't decide once.

22             MR. ZUCKERMAN:  It says the following exhibit.

23             THE COURT:  Even if I did decide once, I'll look at

24   it.  What's the designation?

25             MR. ZUCKERMAN:  Defendant's Exhibit E.

86JMMANT                        Perez - cross

1          THE COURT:  Seems true to me.  I don't see it on mine

2    or yours, although I think yours is just a copy of mine.  So

3    it's in.

4          (Defendant's Exhibit E received in evidence)

5          MR. ZUCKERMAN:  For the record, we object to not being

6    allowed to read the grand jury minutes with respect to Officer

7    Perez to the jury.  Note for the record, please.

8          THE COURT:  Should I take it down in longhand?

9    Q.  Showing you Defendant's Exhibit E, Officer Perez, can you

10   identify Defendant's Exhibit E?

11   A.  Yes, sir.  It's my memo book.

12   Q.  From what day?

13   A.  From February 12, '01.

14   Q.  2001?

15   A.  Yes.

16         MR. ZUCKERMAN:  At this time I move Defendant's

17   Exhibit E into evidence.

18         THE COURT:  I agreed that it would be admitted over

19   objection by the plaintiff.

20   Q.  Mr. Perez, can you read your memo book entry starting

21   February 12, 2001 to the jury.

22   A.  Yes, sir.  I wrote 1015, 1013.  1013 means an emergency for

23   a police officer.  And then I wrote 1700 Metro, which is

24   Metropolitan, and I wrote, Parkchester police shot.

25   Q.  And the time that you put in your memo book entry, is that

86JMMANT                        Perez - cross

1     the time you arrived?

2     A.   No, sir.  I didn't write anything when I arrived on the

3     scene.

4     Q.   You wrote the memo book entry later, correct?

5     A.   When I least the scene.

6     Q.   But the time, the 10:15, was that the time that you arrived

7     at 1700 Metropolitan Avenue?

8     A.   Yes, sir, approximation, yes.

9     Q.   Were you interviewed by the assistant district attorney

10    before you gave grand jury testimony?

11    A.   Yes, sir, I was.

12    Q.   I take it you gave testimony to the grand jury, correct?

13    A.   Yes, sir.

14    Q.   And did there come a time that you later testified at a

15    hearing before the criminal trial involving this matter?

16    A.   Yes, sir.

17    Q.   And then you testified at the criminal trial itself?

18    A.   Yes, sir.

19    Q.   How long ago was that?

20    A.   Four years ago, approximately.  Maybe more.

21          THE COURT:  Don't we all know.  Isn't it a given.

22    Let's not waste time.  That's a little silly to say now.

23    Q.   Sir, does your memo book indicate what time you left the

24    scene of the incident at 1700 Metropolitan Avenue on February

25    12, 2001?

86JMMANT                    Perez - cross

1   A.  No, sir.  I picked up another call at 10:54, so I must have

2   left around that time.

3           THE COURT:  You were the driver; she was the recorder?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Who picks up the calls?

6           THE WITNESS:  Usually, the recorder.  But we take

7   turns.

8           MR. ZUCKERMAN:  Nothing further of this witness, your

9   Honor.

10          MR. JOSEPH:  Very brief.

11  REDIRECT EXAMINATION

12  BY MR. JOSEPH:

13  Q.  Officer, in route to 1700 Metropolitan Avenue, you and

14  Ms. Nieves were in the same car, correct?

15  A.  Correct.

16  Q.  And I believe you testified when Mr. Zuckerman was asking

17  you questions that you spoke with Anthony Manganiello?

18  A.  Yes, sir.

19  Q.  Did you say the exact opposite in your grand jury testimony

20  seven years ago?

21  A.  I may have, sir.

22  Q.  Take a look at page TP-7.

23  A.  It says here I did not speak to him.  My partner ended up

24  speaking to him.

25  Q.  You testified seven years ago that you did not speak to

86JMMANT                         Perez - redirect

1    Anthony Manganiello, but you testified a few minutes ago that

2    you did?

3    A.   Yes, sir.  I didn't hold a conversation with him.  My

4    partner did.  I just asked him if he was all right.  I didn't

5    have a conversation with him.

6    Q.   Seven years ago didn't you say you didn't speak to him at

7    all?

8              MR. ZUCKERMAN:  Object, your Honor.  Argumentative.

9              THE COURT:  Sustained.

10   Q.   Let me direct your attention to Exhibit 5.  Do you still

11   have this in front of you?

12   A.   Exhibit what, sir?

13   Q.   5.

14   A.   That's my DD5?  Yes, we have got that.

15   Q.   And when you spoke to the detectives you told them the

16   truth, correct?

17   A.   Yes, sir, I did.

18   Q.   And you told them everything you knew so that they would

19   have all the information they needed for the investigation,

20   correct?

21   A.   Yes, sir.

22   Q.   And in that DD5 there is no mention at all of Mr. Cobb

23   identifying Anthony Manganiello, is there?

24   A.   Unfortunately, no, there is not.

25   Q.   Would it be your expectation that had you made such a

1    statement the detectives would have put it in the DD5?

2            MR. ZUCKERMAN:  Objection.

3            THE COURT:  I'll allow it.

4    A.  Yes, sir.  It was a very hectic day, though.  Things

5    happen.

6            MR. JOSEPH:  Nothing further.

7            MR. ZUCKERMAN:  One question, your Honor, if I may.

8            THE COURT:  Sure.

9    RECROSS EXAMINATION

10   BY MR. ZUCKERMAN:

11   Q.  Officer Perez, after speaking with Mr. Cobb did you then

12   send Mr. Cobb to the detectives to be interviewed?

13   A.  Yes, I did, sir.

14           MR. ZUCKERMAN:  Thank you.

15           THE COURT:  You're excused.

16           THE WITNESS:  Thank you, your Honor.

17           (Witness excused)

18           MR. JOSEPH:  I believe those are the witnesses we have

19   for today, your Honor.

20           THE COURT:  What do you plan on doing for the next

21   hour?

22           MR. JOSEPH:  Judge, the only remaining witnesses we

23   spoke about earlier today.  Our next witness, we had a

24   conversation earlier today --

25           THE COURT:  I understand that.  But I didn't

86JMMANT

1    understand that you were going to run out of witnesses.

2            Does the defense have any witnesses?

3            MR. ZUCKERMAN:  All the witnesses have been called.

4    It's the plaintiff's case.

5            THE COURT:  I know whose case it is, Mr. Zuckerman.

6    Do you have a witness in the witness room that you are going to

7    call on your case?

8            MR. ZUCKERMAN:  No, we don't.

9            THE COURT:  Simple question and a simple answer.

10            I don't know.  Usually, in my courtroom, Mr. Joseph,

11    when you rest -- when you stop, you rest.  You have now

12    stopped.

13            MR. JOSEPH:  Judge, my next witness would be the ADAs

14    and I think we informed the Court as to a situation that arose

15    with the ADAs which the Court is aware of.  Our other two

16    witnesses are experts, Judge, who had to be rescheduled due to

17    the shifting court date.  The only date they had available to

18    get there would be Monday morning.  Aside from the district

19    attorneys, we are out of fact witnesses.

20            THE COURT:  You have only three witnesses in total for

21    tomorrow?

22            MR. JOSEPH:  I believe I'm only going to have two,

23    actually, Judge.

24            THE COURT:  What about you, Mr. Zuckerman?

25            MR. ZUCKERMAN:  I was under the impression that

86JMMANT

```
 1    plaintiff was going to call Mr. Colon as a third witness.

 2              THE COURT:  We keep on telling these witnesses to

 3    please answer the question.  Could you answer.  How many

 4    witnesses do you plan to call tomorrow?

 5              Why don't we let you go.  You need not be part of

 6    this.

 7              Have a really nice evening.  We will see you at 9:30

 8    tomorrow morning.  Do not discuss the case among yourselves or

 9    with anybody else.

10              (Jury not present)

11              THE COURT:  Mr. Zuckerman, this is a really simple

12    question.

13              MR. ZUCKERMAN:  Yes, your Honor.

14              THE COURT:  Maybe I'll make two separate questions.

15    First question, how many witnesses do you have in total that

16    you're planning to call on your case?

17              MR. ZUCKERMAN:  As of this point --

18              THE COURT:  At this moment in time.

19              MR. ZUCKERMAN:  As of this point in time the only

20    witnesses that we would call, if the plaintiff doesn't call

21    them, would be ADA Scaccia and Matias Colon.

22              THE COURT:  That, I assume, means, you correct me if

23    I'm wrong, that we should be able to finish the case some time

24    during the day tomorrow.  Is that your view, Mr. Joseph?

25              MR. JOSEPH:  It is not.  I believe we can finish the
```

86JMMANT

1    liability portion of the case, and I would respectfully,

2    Judge -- given what I now know about Colon, I believe him to be

3    likely to commit, so I do not feel I can put him on the stand.

4            THE COURT:  You're going to have a deposition, right?

5            MR. JOSEPH:  I will, Judge.  Based upon what I've

6    heard him say this morning and the information that my client

7    conveyed to me, I believe that he will commit perjury.

8    Therefore, I do not believe I can ethically put him on the

9    stand.  I did not know that he was going to commit perjury.  At

10   the point in time when I had planned to call him earlier today,

11   I had no indication that he would offer this kind of testimony.

12           THE COURT:  The perjury concept is a problem for the

13   people who call him.

14           MR. JOSEPH:  That's why I'm withdrawing him as a

15   witness at this point because I do not want to put a witness on

16   the stand who may commit perjury.

17           THE COURT:  Other than your two expert witnesses, you

18   have no other damage testimony either, right?

19           MR. JOSEPH:  That's correct.  I have two expert

20   witnesses and I would ask for the Court's indulgence because

21   both of the witnesses had to be -- Dr. Latif was rescheduled

22   twice because we first moved the court date from Monday to

23   Tuesday.  We originally had planned for her to come on Tuesday,

24   and it would make no sense to put her on first.  We then

25   rescheduled her for Wednesday morning, Judge, and Wednesday

86JMMANT

morning the Court had an appointment.  I would, therefore,

respectfully request the Court's indulgence to allow us to put

her on Monday morning.  She had cancelled her office hours

twice already --

THE COURT:  Tomorrow morning or not at all.  You

should be having her here now.

Who else do you have as an expert?

MR. JOSEPH:  Dr. Tinari.

THE COURT:  And he's available tomorrow?

MR. JOSEPH:  I would have to make a phone call, Judge,

although I did not feel it would be -- the foundation for his

testimony is necessary through Dr. Latif.

THE COURT:  All I can tell you is that tomorrow is

when I think every witness that either of you plan on calling

ought to be here and ready to go.  That's the way it ought to

work.  If it doesn't work that way, we will have to take it

into consideration as to whether there is going to be any more

testimony.

MR. JOSEPH:  In that event, I do know that Dr. Latif

is out of town, actually out of the state, if not the country

at the moment and supposed to be coming back Sunday night.  I

would respectfully at that point request to be able to read

portions of her deposition testimony.

THE COURT:  Absolutely.  If you can't find her and she

is out of town and unavailable, you're welcome to read it.

S6JMMANT

1          MR. ZUCKERMAN:   Your Honor, we have the right to

2     cross-examine her.

3          THE COURT:   You weren't there at the deposition?

4          MR. ZUCKERMAN:   Number one, I wasn't personally there

5     at the deposition.

6          THE COURT:   But a representative of your office was

7     there in your place.

8          MR. ZUCKERMAN:   There was a representative, but the

9     deposition is taken for pretrial purposes of an expert.   It's

10    not taken for cross-examination at a trial or in lieu of

11    cross-examination opportunity at a trial.   I have never heard

12    of a situation where a plaintiff's expert isn't going to appear

13    for a trial and then you submit her deposition testimony.   It's

14    absolutely unfair.   It's prejudicial.   We have the right to

15    cross-examine the witness live at trial.

16         THE COURT:   The federal rules don't echo your

17    sentiments, but I understand --

18         MR. ZUCKERMAN:   Your Honor, if I can, I'm sorry.   She

19    is also not unavailable under the rules.

20         THE COURT:   If she is out of the country, she is

21    unavailable under the rules.

22         MR. ZUCKERMAN:   She is not as an expert witness.

23         THE COURT:   There may be special differences about

24    expert witnesses.   The problem is, you do have a right to

25    cross-examine and I do not particularly like reading from

86JMMANT

1    depositions, as you may have gathered.

2              I think probably we are in a lot of trouble, Mr.

3    Joseph, mostly you.

4              MR. JOSEPH:  Judge, with all due respect, she is not

5    an expert under the rules.  She is a doctor, a treating

6    physician who -- she is a factual witness.

7              THE COURT:  We have determined she is not an expert,

8    that's true.  It doesn't mean that they shouldn't have a chance

9    to examine her live if, in fact, we can work it out.

10             MR. JOSEPH:  Judge, if we can work it out --

11             THE COURT:  Tell me what it is that you're planning to

12   do for a full day.

13             MR. JOSEPH:  Judge, we plan to put the two district

14   attorneys on, and then we would respectfully, if Mr. Zuckerman

15   has witnesses, he can put them on, and I would respectfully

16   request a continuance until Monday morning.

17             THE COURT:  How much do you expect we are going to get

18   done tomorrow?

19             MR. JOSEPH:  Probably, morning session.

20             THE COURT:  Did you get the feeling you were going to

21   do this in pieces more so than my pieces?  My pieces we can do

22   in pieces.  Your pieces we can't do in pieces.

23             MR. JOSEPH:  Most respectfully, Judge, we did have the

24   doctor lined up, and this difficulty was caused in part by cf

25   this shift in the court date.  I would most respectfully

86JMMANT

1    request the Court's indulgence in either allowing us to read

2    the deposition into the record, which the rules I do believe

3    allow, or calling her first thing Monday morning.

4            THE COURT:  Who do we have that is here and alive and

5    well for tomorrow?

6            MR. JOSEPH:  Hopefully, the district attorneys.

7            THE COURT:  If she is not coming until 10 we could

8    have let the jurors -- it's helpful if in the future you let

9    the judge know before the end of the day that you don't have

10   any more witnesses and, more importantly, it's good if you let

11   the judge know that you have all your witnesses.  That's the

12   way it ought to work.  Certainly the city is in the same

13   position.

14           What do you have for us tomorrow, Mr. Zuckerman?

15           MR. ZUCKERMAN:  Well, now that Mr. Joseph has said

16   that he's not going to call Mr. Colon --

17           THE COURT:  You're calling him.

18           MR. ZUCKERMAN:  We would call Mr. Colon.  But with

19   respect to ADA D'Andrea, plaintiff is calling her.  We wouldn't

20   call her if he doesn't.  With respect to ADA Scaccia, the

21   plaintiff has indicated that he is going to call her; and if he

22   doesn't, we would.

23           THE COURT:  She will be here, but I don't about the

24   other ADA.  I hope you know something about her because she --

25   D'Andrea.

86JMMANT

1          MR. ZUCKERMAN:  I am in contact with her.  I left a

2     message last night and asked her to be available for tomorrow,

3     and it's my understanding that she is available for tomorrow.

4     I have no reason to believe she is not.

5          THE COURT:  And you have no expert?

6          MR. ZUCKERMAN:  We don't have any experts.

7          THE COURT:  It doesn't make any difference to me.  I

8     think it's a disservice to the jury who have -- many of whom

9     are coming from as far as that lady who has a problem this

10    afternoon in Peekskill.  I think it really is incredible that

11    both of you are in a position that has provided them with time

12    to come and go and nothing to do.

13         MR. ZUCKERMAN:  Your Honor, with all due respect, I

14    don't see how that can be blamed on the defendants.

15         THE COURT:  I don't have any idea how long his

16    witnesses would take.  Certainly, he's the major culprit.  He

17    is the guy that had some witnesses.  If he was finished, it

18    would have been your turn.  Obviously, they would have been

19    finished tomorrow.  How long?  Let's assume an expert took an

20    hour or two hours.  He would still be finished.

21         MR. ZUCKERMAN:  Right.  All I'm saying is, it's the

22    plaintiff's case.  The plaintiff -- other than what I've just

23    learned about the plaintiff not calling Mr. Colon, all these

24    witnesses have been subpoenaed to trial by the plaintiff.  So

25    how the defendants can be the cause of this problem --

86JMMANT

1    THE COURT:  I don't understand.  Who cares who they

2    were subpoenaed by.  Apparently, there are witnesses that the

3    defense has planned to call.  They have a witness list in their

4    pretrial order.

5         All I am suggesting to you is, if we had finished

6    today and you had nobody around for tomorrow or if we hadn't

7    finished today but indeed we had plenty of time tomorrow, it

8    would be unfortunate if your witnesses weren't available.  If

9    you decide not to call your witnesses, you should also make

10   sure that we understand that.  This is not rocket science that

11   we are talking about.

12        There is really no sense in us pursuing this.  The

13   jury will have forfeited -- you will have forfeited at least

14   half a day, as I understand it, of their free time by bringing

15   them in tomorrow morning.  We could have gotten the whole case

16   in on Monday.

17        MR. JOSEPH:  Judge, if the district attorney is

18   available, I'm certainly happy to have tomorrow off and finish

19   the examination on Monday.

20        THE COURT:  How will they know that?  Am I going to

21   call all of them?  They are gone, Peekskill.

22        I guess one thing we could do tomorrow, as a matter of

23   fact, now that I think about it, won't help the jury, we can

24   have a charging conference after you're finished with all of

25   your witnesses.  The fact that you have some more experts

86JMMANT

1    really won't make a lot of difference.

2            If you have any additional charges or requests, please

3    be sure they are here within the next couple of hours.

4            We will see you tomorrow morning.

5            MR. ZUCKERMAN:  At 10 a.m., your Honor?

6            THE COURT:  Did we say 10 a.m. to the jury?  10 a.m.

7            (Adjourned to Friday, June 20, 2008, at 10:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                         Page

 3    SHAWN ABATE

 4    Cross By Ms. Okereke . . . . . . . . . . .   370

 5    Redirect By Mr. Joseph . . . . . . . . . .   382

 6    MARIO MANGANIELLO

 7    Direct By Mr. Joseph . . . . . . . . . . .   388

 8    Cross By Mr. Zuckerman . . . . . . . . . .   390

 9    RICHARD E. MARTINEZ

10    Direct By Mr. Joseph . . . . . . . . . . .   391

11    Cross By Mr. Zuckerman . . . . . . . . . .   424

12    Redirect By Mr. Joseph . . . . . . . . . .   435

13    HARRY SCOTT

14    Direct By Mr. Joseph . . . . . . . . . . .   451

15    Cross By Ms. Okereke . . . . . . . . . . .   457

16    Redirect By Mr. Joseph . . . . . . . . . .   461

17    JOHN P. MCGOVERN

18    Direct By Mr. Joseph . . . . . . . . . . .   464

19    Cross By Ms. Okereke . . . . . . . . . . .   468

20    DERRICK J. PARKER

21    Direct By Mr. Joseph . . . . . . . . . . .   474

22    Cross By Mr. Zuckerman . . . . . . . . . .   477

23    Redirect By Mr. Joseph . . . . . . . . . .   484

24    MIRIAM NIEVES

25    Direct By Mr. Joseph . . . . . . . . . . .   485
```

```
1    Cross By Ms. Okereke . . . . . . . . . . .   502

2    Redirect By Mr. Joseph . . . . . . . . . .   511

3    ALEX PEREZ

4    Direct By Mr. Joseph . . . . . . . . . . .   514

5    Cross By Mr. Zuckerman . . . . . . . . . .   532

6    Redirect By Mr. Joseph . . . . . . . . . .   543

7    Recross By Mr. Zuckerman . . . . . . . . .   545

8                     PLAINTIFF EXHIBITS

9    Exhibit No.                            Received

10   3    . . . . . . . . . . . . . . . . .   406

11   3-A  . . . . . . . . . . . . . . . . .   407

12   2    . . . . . . . . . . . . . . . . .   411

13   22   . . . . . . . . . . . . . . . . .   421

14   8    . . . . . . . . . . . . . . . . .   422

15                    DEFENDANT EXHIBITS

16   Exhibit No.                            Received

17   R-8  . . . . . . . . . . . . . . . . .   459

18   E    . . . . . . . . . . . . . . . . .   541

19

20

21

22

23

24

25
```

86KMMANT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANTHONY MANGANIELLO,

 4              Plaintiff,

 5         v.                            07 Civ. 3644 (HB)

 6   LUIS AGOSTINI, individually
     and as a New York City Police
 7   Detective; SHAWN ABATE,
     individually and as a New York
 8   City Police Detective; ALEX
     PEREZ, individually and as a
 9   New York City Police Officer;
     MIRIAM NIEVES, individually
10   and as New York City Police
     Officer; and ROBERT MARTINEZ,
11   individually and as a New York
     City Police Officer,
12
                Defendants.
13
     ------------------------------x
14                                       New York, N.Y.
                                         June 20, 2008
15                                       9:25 a.m.

16   Before:

17                   HON. HAROLD BAER, JR.,

18                                       District Judge

19                        APPEARANCES

20   OSORIO & ASSOCIATES
          Attorneys for Plaintiff
21   BY:  MICHAEL JOSEPH

22   MICHAEL A. CARDOZO, Corporation Counsel
     for the City of New York
23        Attorney for Defendants
     BY:  MARK ZUCKERMAN
24        AMY OKEREKE
          FRANCES SANDS
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT

1          (Trial resumed)

2          (In chambers)

3          MR. JOSEPH:  Judge, one housekeeping matter.  We will

4    have an application to preclude Mr. Colon's testimony based on

5    yesterday's deposition.  I don't know if the Court would like

6    me to discuss it now.  I would like to bring it to the Court's

7    attention.

8          THE COURT:  You can tell me anything.

9          MR. JOSEPH:  Judge, we would move to preclude his

10   testimony on the basis at the deposition yesterday Mr. Colon

11   testified he could not state with any certainty that the gun he

12   alleges he saw -- yesterday Mr. Colon testified at a

13   deposition, and he stated that he could not state with any

14   certainty that the gun was a .22 caliber gun as opposed to a

15   .25 or a .32 or some other caliber gun.  Based on that, I

16   believe that renders his testimony to be speculative and

17   extremely prejudicial.

18         THE COURT:  Take me back a little.  Tell me why you

19   were calling him in the first place.

20         MR. JOSEPH:  I was calling him strictly for the call

21   that he dispatched and that he received to establish that he

22   received a call that Mr. Acosta was at the building at a

23   certain time.  That was it.

24         THE COURT:  Well, my view -- I don't know what the

25   deposition elicited.

86KMMANT

1          MR. JOSEPH:  I have marked the page I'm referring to.
2    It's page 37.
3          THE COURT:  I don't have a doubt about your telling
4    me.  It looked like a .22, it looked to me.
5          MR. JOSEPH:  If you look at 23:  Do you know for
6    certainty -- line 23 on page 37:  "Do you know for certainty
7    whether the gun was a .22 caliber or a .25 caliber?
8    "A.  No."
9          On the next page it says:  "Is it fair to say that you
10   can't say with any certainty that it was a .22 caliber gun?
11   "A.  No.  I didn't look at the caliber.  I didn't look at it
12   that close.  I pulled it away real quick when I yelled at him."
13         If they are offering this testimony specifically to
14   either impeach or show that Mr. Manganiello had a .22 caliber
15   gun, this has no relevance to that because it's pure
16   speculation.
17         THE COURT:  What it does have, which is the only thing
18   that gives me any pause, is that there is testimony in the
19   trial from your client to the effect that he never had a gun
20   while he worked there and indeed he wasn't supposed to have a
21   gun.  And I think probably I wrote out a couple questions which
22   I think are as neutral as possible that I think I would allow.
23   It's really a discretionary issue with the Court.
24         So let me just see if what I wrote shocks your
25   conscience.  But I agree that it's terribly prejudicial and my

86KMMANT

```
 1    concern is whether or not to let -- or was whether or not to
 2    let it in at all.  So the way I came out was that both on
 3    direct and cross the substance -- this is obviously the
 4    plaintiff's but the defendant will be guided by the same
 5    concerns, and there are a variety of cases in the Second
 6    Circuit which I'll be glad to cite for you if you are unclear
 7    as to whether or not the discretion is almost entirely up to
 8    me, but you can just take the cites.  930 F.2d 185.  You don't
 9    have to do that 185 another Second Circuit case, 237 625;
10    another Second Circuit, 159 F.3d 49; another was -- must be
11    published somewhere, but I don't see it.  I guess it may not be
12    a circuit decision.  In any event, there are four or five.
13    They all come out the same way.
14            So what I did is, I agreed with you that this was very
15    prejudicial and the issue was whether there was anything that
16    should creep in.  And the direct examination is to be limited
17    and, obviously, cross will have to take its lead from direct.
18    And the questions are -- I'll give you this, but they are in
19    substance:  To your knowledge, did Mr. Manganiello ever have a
20    gun with him at work in Parkchester?  Two, if yes, did
21    Mr. Manganiello show you the gun?  Three, to your knowledge,
22    how many times did Mr. Manganiello have a gun with him at work?
23            That's it, folks.  It has nothing to do with firing
24    the gun, it has nothing to do with the recklessness that that
25    would obviously show and inflame the jury.
```

86KMMANT

```
 1              Are we ready now to go to the charges?
 2         MR. JOSEPH:  Yes, Judge.
 3         THE COURT:  I have a copy for each of you.  What I've
 4    done is, I've taken most of your charges -- I have reviewed now
 5    all of the ones I just got, but I've taken your charges and
 6    essentially, and in some places I guess Anna has actually put
 7    in where in your charges the language appears.  But for the
 8    most part, I think probably you have to take my word.
 9              Let's go through the boilerplate first, which I don't
10    think can take us a long time.  There is more of mine than
11    there is of yours, but these boilerplate charges are mostly in
12    your -- it's worth looking at carefully because they are
13    essentially just pumped out so there may be some differences in
14    your fact pattern that you would like to change.
15         THE COURT:  I am through the burden of proof.  Does
16    anybody have a problem on the first five instructions?
17         MR. JOSEPH:  Plaintiff does not.
18         THE COURT:  I am going to pass out the direct and
19    cross and redirect with respect to the area in which we have
20    some understandable concern and which I read in large measure.
21         MR. JOSEPH:  Judge, we do intend to ask Mr. Colon or
22    confirm with Mr. Colon that that it was a quote unquote
23    revolver that he saw?  It doesn't open it up to the caliber,
24    but the fact that it was a revolver.
25         THE COURT:  Some of your substantive charges are in my
```

86KMMANT

1    boilerplate, credibility charge, which is No. 7, so please read

2    it carefully in case you think I left out something that is

3    vital to your interests.

4         MR. JOSEPH:  Judge, one thing which I didn't see which

5    we did request is the missing evidence charge.

6         THE COURT:  It's there.  I don't think it's in the

7    boilerplate.  When we get into the substantive charges --

8         THE LAW CLERK:  It's in part 2.

9         THE COURT:  I have reviewed all of these.  If you have

10   a problem, you ought to let me know.  They seem to be

11   applicable to your case, as indeed they should be, but

12   sometimes it talked about he when it should say she and

13   vice-versa.

14        Are we finished with boilerplate?

15        MR. JOSEPH:  Yes, Judge.

16        THE COURT:  So we move right into the substantive

17   charges.  I gather neither of you have any problems with the

18   first 22 pages.

19        MR. JOSEPH:  No, your Honor, the plaintiff does not.

20        MS. OKEREKE:  No, your Honor.

21        THE COURT:  What I've done, not that it makes any

22   difference to you, is, I've gone through your charges and where

23   I don't have the substance, at least, I usually have a

24   question.  So when we get to the what corresponds with the

25   defendants' charge on page 6 of their charge, which is the

86KMMANT

1    first element, commencement or continuation of a criminal

2    prosecution, just so we don't go ahead of one another.  Our

3    collective view is that this really is no longer the law and

4    that our language is different because of the difference in the

5    plaintiffs in that case.  And if you look at mine we don't have

6    to discuss yours.  I just want to be sure you see mine, and if

7    you have a problem with my language, let me know.

8            MS. OKEREKE:  This is specifically with the initiation

9    point you were just talking about, correct?

10           THE COURT:  The first element.

11           MS. OKEREKE:  Even prior to getting to the first

12   element, there is an issue on page 25.

13           THE COURT:  I'm glad to do it at your speed.

14           MS. OKEREKE:  Page 25, defendants, where it says one

15   or more of the defendants for each of the elements.

16           THE COURT:  You must consider each defendant

17   separately and then further down.

18           MS. OKEREKE:  Further down:  In order to succeed on

19   his claim the plaintiff is required to prove five elements.  We

20   would prefer that it says each of the defendants versus one or

21   more of the defendants.

22           MR. ZUCKERMAN:  Or by the defendants.

23           MS. OKEREKE:  Or by the defendants.

24           MR. ZUCKERMAN:  By the defendant.

25           MS. OKEREKE:  Exactly, by the defendant.  I believe

86KMMANT

1   this language gives the implication that finding liability on

2   behalf of one individual would then make all individuals

3   liable.

4         THE COURT:  But I said you have to look at each

5   defendant separately.

6         MS. OKEREKE:  I think it's confusing and I think

7   simply by changing the language to each or by defendant, making

8   it singular, it would clear up any potential confusion which

9   may be there.

10        THE COURT:  Do you have any problem about that change

11  from one or more to each?

12        MR. JOSEPH:  No, your Honor.  The only problem I would

13  have, though, is actually -- I think the each language may

14  suggest to them that they would have to find all to find any

15  one.

16        MR. ZUCKERMAN:  How about just by the defendant?

17        THE COURT:  You are considering.  How about that?

18        MS. OKEREKE:  I think that's good.  The defendant you

19  are considering.

20        MR. ZUCKERMAN:  That's fine.

21        MS. OKEREKE:  And that same language is in every

22  single element, or at least where it's applicable.  It's also

23  in the fourth element.

24        THE COURT:  Let's move into the Post-it department.

25        MR. JOSEPH:  Judge, a little further on, I think it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT

1    typographical.

2             MS. OKEREKE:  I think we should go page by page.

3             THE COURT:  Where?

4             MR. JOSEPH:  I found something on 30.  I think it's

5    just typographical.

6             MS. OKEREKE:  I'm still on 27.

7             THE COURT:  Let's go in order.  What's on 27?

8             MS. OKEREKE:  27, specifically, where the charge

9    mentions defendant Agostini.

10            THE COURT:  Defendant Agostini.

11            MS. OKEREKE:  I don't like that.

12            THE COURT:  Just an example --

13            MS. OKEREKE:  I think it's --

14            THE COURT:  There were very few -- there are very few

15   things that cops do in terms of legal filing.  This is the only

16   one I could find.  I don't even know if it's in evidence.

17            MR. JOSEPH:  It is, Judge.

18            MS. OKEREKE:  I agree exactly.  I think that's for the

19   jury --

20            THE COURT:  I'm not telling them they have to agree to

21   it.

22            MS. OKEREKE:  Just putting defendants' Agostini name

23   right in the charge of this element I believe gives an unfair

24   implication and inference that he may have committed some

25   wrongdoing.  It's overly prejudicial.

86KMMANT

1    MR. JOSEPH:  Judge, I think some sort of charge like

2    this is necessary because to the extent that the defendants

3    have tried to mislead the jury through Mr. Agostini's

4    testimony, it's the district attorney who commences charges,

5    not Agostini.

6    THE COURT:  We have taken care of that pretty

7    completely, as the law has.

8    MR. JOSEPH:  I think they tried to mislead the jury

9    throughout this case by trying to put the onus on the district

10   attorney, who happens to be immune, to fall on her sword to

11   protect the defendants.

12   MS. OKEREKE:  What, in fact, the jury heard, and I

13   think your Honor said yesterday, it's for the jury to decide

14   and if they are not charged on anything regarding the district

15   attorney, they won't consider that.  But putting defendant

16   Agostini right in the charge is overly prejudicial.

17   THE COURT:  How about by a defendant without his name?

18   MS. OKEREKE:  Signing the felony complaint by a

19   defendant.  It's the example in and of itself.

20   THE COURT:  Give me an example.

21   MS. OKEREKE:  I don't think any example -- filing

22   criminal charges against the plaintiff.

23   THE COURT:  We all know what the other ones are,

24   giving advice, we know what that means, encouraging, we know

25   what that means, encouraging the authorities to act, we know

86KMMANT

1    what that means.

2            MR. ZUCKERMAN:  That's what the jury has to decide,

3    your Honor.

4            MS. OKEREKE:  Exactly.

5            THE COURT:  They can't decide it if they don't know

6    what we are talking about.  If you were to poll that jury, how

7    many do you think even know what a filing of a criminal

8    complaint is or means in connection with a prosecution?  Very

9    few, if any.  I'm never sure myself when I get those complaints

10   what are they for or why do we need them, except I know over

11   the years we do need them.

12           MS. OKEREKE:  The issue is more of the information

13   which was in that complaint and to the extent that defendant

14   Agostini may have prepared the complaint.  There are more

15   issues with merely filing the complaint.  In this situation,

16   defendant Agostini did not even prepare the criminal court

17   complaint.

18           MR. JOSEPH:  There is no testimony to that.

19           MS. OKEREKE:  There will be testimony today from the

20   district attorney, so I think that should be --

21           THE COURT:  I'm putting a Post-it in.  I'm not buying

22   your position.

23           MS. OKEREKE:  The defendants object for the record.

24           THE COURT:  You don't have to look for anybody for

25   authority to object.

86KMMANT

1          MS. OKEREKE:  We are a team here.  We work together.

2          THE COURT:  Did you take a vote, we work together.

3          MS. SANDS:  I know I haven't participated in the

4     trial.  I'm Frances Sands.  I'm Corp. Counsel.  Can I add

5     something to that?

6          THE COURT:  Sure.

7          MS. SANDS:  The fact that the officer signed the

8     criminal complaint, the issue is what the criminal court --

9     what it contains.  If the jury believes there was some

10    falsehood in the complaint itself, that's something.  The DA

11    prepares the complaint, the officer signs it.  If there was

12    some incorrect information in the complaint, well that goes to

13    the perjury of fraud and wrongdoing.  I don't think we need to

14    emphasize the signing of the complaint because it's confusing

15    in that the officer does not prepare -- he doesn't prepare

16    what's in the complaint.  He attests to the complaint.

17         MS. OKEREKE:  If we would like to clarify in there,

18    for example, preparing a false information in any felony court

19    complaint and then signing what the officer believes to be

20    false information, I think that clarifies for the jury then.

21    But merely putting -- signing the felony complaint --

22         THE COURT:  Three against one here, Mr. Joseph.  I

23    understand you are the one.  It's your turn.

24         MR. JOSEPH:  I am, Judge.  I'm Nemo.

25         Judge, here is the problem.  They are misstating the

86KMMANT

1    elements of the law.  The element of the law is to commence a

2    criminal proceeding.  It doesn't say lie to commence it.  It

3    says commence a criminal proceeding.  The falsehood goes to the

4    next element, which is probable cause.  Now, what does a

5    defendant do to commence a criminal proceeding?  He signs a

6    felony complaint.  I think the evidence on this point is,

7    unless something mind boggling happens today, is so strong that

8    the Court -- I intend to ask the Court to issue judgment as a

9    matter of law at the end of the defendants' case because it's

10   unrefuted, it's undisputed.  Even if I give my secretary

11   information and she types it up and I sign it, my secretary

12   isn't the person providing the falsehood or commencing the

13   action; I am.

14        MS. OKEREKE:  I don't know if that's clear, your

15   Honor.  I don't believe that's true.

16        MR. ZUCKERMAN:  Your Honor, under Roman, just signing

17   a criminal complaint is not an initiation.  Roman cautions that

18   the defendant has to do more than that.  They have to importune

19   the authorities, they have to encourage the authorities.

20        THE COURT:  The prefatory language is an active role,

21   so it modifies that.

22        MR. ZUCKERMAN:  But then it goes back and says signing

23   the criminal complaint is an act of initiation.  The actual

24   signing of a criminal complaint is not, under the law,

25   initiation.  There has to be more and that's what Roman talks

86KMMANT

1    about.  It has to be active encouragement advising what you

2    have at the beginning of that paragraph.  It has to be

3    something more than just signing a criminal complaint, and

4    Roman couldn't be more clear on that point.

5            THE COURT:  We are going to keep that open.  Let's

6    move along.

7            MS. OKEREKE:  I do have citations to Roman right here.

8            MR. JOSEPH:  Resudia clearly states that the signing

9    of a criminal complaint is an initiation.

10           MS. SANDS:  It just creates --

11           THE COURT:  It's over now, guys.

12           MS. SANDS:  Its contents are incorrect.

13           THE COURT:  We have a Post-it.  That's all I can do

14    for the moment, unless Anna has a point.

15           THE LAW CLERK:  We can discuss later.  I can pull

16    cases, too, if you'd like.

17           THE COURT:  Probable cause is really taken from what

18    you've done and, as you can see, we have bold type showing

19    where in your material the language comes from.

20           MS. OKEREKE:  With the probable cause portion, your

21    Honor, the criminal court complaint is in evidence.

22           MR. JOSEPH:  Yes.  Exhibit 24.

23           MS. OKEREKE:  I know plaintiff has inserted in here

24    the actual charges -- are these the exact charges that are on

25    the criminal court complaint?  Because I don't know if that's

86KMMANT

1    been established.

2              THE COURT:  I thought this was from McKinney's as to

3    what these charges are.

4              THE LAW CLERK:  They are a combination of the

5    plaintiff's, and I checked it against the New York Penal Code

6    and a made a couple of modifications.

7              MR. JOSEPH:  I copied and pasted on from the Westlaw.

8    The felony complaint has the penal law sections on it and these

9    are the corresponding language to the penal law sections.

10             MS. OKEREKE:  I don't believe, your Honor, there has

11   been any evidence solicited as to what plaintiff was actually

12   charged with.

13             MR. JOSEPH:  It's on the felony complaint.  It's the

14   penal law.

15             THE COURT:  I think that's what these are.  That's

16   exactly --

17             MS. OKEREKE:  These specific charges.

18             THE COURT:  These specific charges.  Murder 2,

19   manslaughter, to some extent, and the weapon charge.

20             MR. JOSEPH:  Frankly, it's also in the grand jury

21   transcripts which Ms. Scaccia advised the grand jury of what

22   the law is and what the charges they were considering.

23             MS. OKEREKE:  However, what charges Ms. Scaccia

24   presented to the grand jury, it doesn't necessarily mean it

25   wasn't malicious prosecution -- excuse me, cause to prosecute

86KMMANT

1   the plaintiff on other charges.

2        THE COURT:  All we are doing is parroting what's in

3   the indictment.

4        MS. OKEREKE:  Again, the indictment is not in and of

5   itself alone, as I said, what Ms. Scaccia could have proceeded

6   with in the prosecution.  Like assuming she presented -- she

7   could have presented ten charges in front of the grand jury.

8   She, however, only presented two charges.  It does not -- or

9   three.  It does not mean that she did not have cause to

10  continue with a prosecution for something.

11       MR. JOSEPH:  What does that have to do with this

12  charge?

13       MS. OKEREKE:  With this specific charge -- that's just

14  touching the -- the plaintiff said they are in the grand jury

15  indictment, but specifically though, there is no evidence, I

16  don't believe that's been solicited yet with the specific

17  charges that the Court proceeded with or the DA proceeded with.

18       MR. JOSEPH:  They are on the felony complaint.  This

19  is the action that Agostini commenced.  He signed the felony

20  complaint formally accusing the plaintiff of these charges.  I

21  don't see where you're coming from on this argument or what

22  bearing it has on anything.

23       THE COURT:  Can we move along.  We can think more

24  about it, and I'll even put a Post-it in it so I think more

25  about it.

86KMMANT

1          MS. OKEREKE:  I appreciate the Post-it.

2          THE COURT:  I think it's sort of not even worth your

3     time, to say nothing of mine.

4          MR. ZUCKERMAN:  Your Honor, on page 30, the

5     presumption -- the indictment, there is a section in the

6     proposed instruction that says:  Defendants did not make a

7     complete and full statement of facts either to the grand jury

8     or the district attorney.

9          With respect to the grand jury, that's terribly

10    misleading because an officer or any other witness, for that

11    matter, when they go before the grand jury, they don't

12    determine the questions that they are going to be asked.  The

13    questions that they are asked are by the district attorney.

14    The district attorney, it's undisputed, determines the

15    questions that are asked and, of course, the answers are just

16    responsive to those questions.  So to give an instruction that

17    they haven't made a full statement to the grand jury when all

18    they do is answer questions is terribly misleading.

19          MR. JOSEPH:  Judge, on that point, the grand jury

20    proceeding is different than a criminal proceeding where they

21    just respond to questions.  I believe there is a standard

22    question, having been in a grand jury room or two, that is

23    there anything else that the witness would like to add.  So

24    they have an open opportunity to make a full and complete

25    statement.

86KMMANT

1          MR. ZUCKERMAN:  With all due respect, I haven't seen

2     out of these grand jury minutes.  Let's, if we can, focus on

3     this case.  There is nothing in these grand jury minutes asking

4     these defendants to add something or make an additional

5     statement as to something else.

6          THE COURT:  Do you see the cite at the bottom, Mr.

7     Zuckerman?  This is a direct quote from the Second Circuit case

8     which you might really take home and put under your pillow for

9     the weekend.  It comes right from the mouth of my leadership.

10          MR. ZUCKERMAN:  Your Honor, with all due respect, I've

11     read Rothstein, and I do not --

12          THE COURT:  You want to see it?

13          MR. ZUCKERMAN:  Yes.

14          THE COURT:  You believe it's not there.  Let's see if

15     I have Rothstein.

16          THE LAW CLERK:  I have it on my desk.

17          THE COURT:  I'll do it, but it's wasting my time.

18          MR. JOSEPH:  Judge, I think there is a typographical

19     thing on this where it says:  Either the grand jury or the

20     district attorney that misrepresented -- it should say, that

21     they represented and falsified.

22          THE COURT:  What line?

23          MR. JOSEPH:  Sixth line.  It says that misrepresented.

24          THE COURT:  You're suggesting --

25          MR. JOSEPH:  That they misrepresented.

86KMMANT

1          THE COURT:   -- taking that out.

2          MR. JOSEPH:   No, not taking it out.

3          THE COURT:   Misrepresented or falsified evidence or --

4          MS. OKEREKE:   I don't think there is a typo at all,

5     that they misrepresented.

6          MR. JOSEPH:   It should say --

7          MS. OKEREKE:   I believe that applies to the --

8          MR. JOSEPH:   It's not incredibly important, Judge.   In

9     other words, the plaintiff may overcome this representation by

10    showing that one or more of the defendants did not make a

11    complete and full statement of facts either to the grand jury

12    or to the district attorney that misrepresented or falsified

13    evidence or that they.   I think that there should be a they

14    there.   It's just grammatical.

15         MS. OKEREKE:   I thought it more modified the full

16    statement of facts.

17         THE LAW CLERK:   It was a typo.

18         THE COURT:   Are you ready to listen to page 30 of my

19    charges?

20         MR. ZUCKERMAN:   Yes, I am, your Honor.

21         THE COURT:   Or are you ready to concede?

22         MR. ZUCKERMAN:   I'm not ready to concede it.

23         THE COURT:   The presumption may be overcome only by

24    evidence establishing that the police witnesses have not made a

25    complete and full statement of fact, either to the grand jury

86KMMANT

1    or to the district attorney.

2         MR. ZUCKERMAN:  Your Honor, I would respectfully

3    submit that when --

4         THE COURT:  You're not arguing with that language?

5         MR. ZUCKERMAN:  I'm not arguing with the language, but

6    in the context --

7         THE COURT:  Just like some of your witnesses with

8    their deposition testimony, you're buying that I read okay.

9         MR. ZUCKERMAN:  I'm absolutely buying that.  Rothstein

10   says what you said.  But the reality of this case and a grand

11   jury proceeding is that officers and other witnesses are asked

12   certain questions.  So when that language from Rothstein is

13   placed in context of what actually occurs in a grand jury

14   proceeding, if an officer is asked a question, if he's asked a

15   certain question and he doesn't give perhaps a complete

16   response, then Rothstein may kick in, the portion that you just

17   read.  But to have an instruction that essentially gives the

18   idea that he has to volunteer something when he's not even

19   asked a question is absolutely contrary to the intent in the

20   language that's contained in Rothstein.

21        THE COURT:  I'm not reading anymore.  But if you go

22   on, you will see it's quite like our case on the same page, 373

23   F.3d 275, page 9, and the cite is right in the book as well.

24        We are moving right along here.

25        MR. ZUCKERMAN:  Note our objection.

86KMMANT

1          MS. OKEREKE:  Also, your Honor, the presumption of

2     probable cause created by a grand jury means that if a jury

3     finds there was no misconduct, of course, as the law says, the

4     jury does not even have to consider the elements of probable

5     cause or of malicious prosecution.

6          Putting the section with regard to the presumption in

7     the same portion as the probable cause element of malicious

8     prosecution implies that rebutting the presumption of probable

9     cause is the same thing as finding that there is no probable

10    cause.  I think it's very confusing putting the two of them in

11    the same category.

12         THE COURT:  And your suggestion?

13         MS. OKEREKE:  That the jury should first be instructed

14    that if they find that no misconduct occurred during the grand

15    jury proceeding, that -- if they find misconduct, if plaintiff

16    proves that there is misconduct, only then may they consider

17    the elements of malicious prosecution.  There are two separate

18    concepts that have been merged into one point here.

19         THE COURT:  How can they know what went on and how can

20    they make that determination?

21         MS. OKEREKE:  That's what plaintiff must prove and

22    that's what Rothstein says.

23         THE COURT:  What would you do if you were the

24    defendant?  What would you put in the grand jury or show as way

25    of evidence that avoided that problem?

86KMMANT

1      MS. OKEREKE:  I'm sorry.  I am not sure if I

2  understand.

3      THE COURT:  What would happen in the grand jury to

4  avoid your problem?  What would have it show?  What would have

5  to happen?

6      MS. OKEREKE:  What would plaintiff have to show

7  happened?

8      THE COURT:  Yes.

9      MS. OKEREKE:  Misconduct, some sort of fraud

10  misconduct, and that is exactly what Rothstein says and I will

11  get a quote.

12      THE COURT:  Unfortunately, if you read Rothstein and

13  you read what I read, the presumption may be overcome only by

14  evidence establishing that the police witnesses have not made a

15  complete and full statement of fact.  That's not supposed to be

16  told to the grand jury, either to the grand jury or to the

17  district attorney.  You want to look at the language?

18      MS. OKEREKE:  I'm confused.  It's during the grand

19  jury proceeding or that as it affects the district attorney's

20  presentation of her case to the grand jury.

21      THE COURT:  You have an objection.  Let's go on to 21.

22  I think this is the one you were looking for.

23      MR. JOSEPH:  Yes.  21 is satisfactory to plaintiff.

24      MR. ZUCKERMAN:  Your Honor, unrelated --

25      MS. OKEREKE:  You take this.

86KMMANT

1          MR. ZUCKERMAN:  Unrelated to this, just, I believe ADA

2     Scaccia is 10:00 and she is downstairs.

3          THE COURT:  And, therefore --

4          MR. ZUCKERMAN:  I'm just -- I'm not saying therefore.

5     I'm just concerned -- I don't know what her schedule is.  No

6     therefores.

7          THE COURT:  Thank you for letting me know.

8          MR. JOSEPH:  Judge, on a related note, we were able to

9     get our economist for today.

10         THE COURT:  Great.

11         MR. JOSEPH:  We can move this along a little better.

12         THE COURT:  21 gives the plaintiff no pause or you

13    haven't read it?

14         MR. JOSEPH:  I'm still looking through it.

15         MS. SANDS:  Defendants object to 21.

16         MR. JOSEPH:  21 I have no problems.

17         MR. ZUCKERMAN:  Your Honor, with respect to failure to

18    produce evidence --

19         MS. SANDS:  Your Honor, the instruction doesn't even

20    indicate that -- the testimony that's come out thus far in the

21    trial is that the officer, Detective Agostini, provided the

22    district attorney with everything he had gathered in the course

23    of this investigation prior to her presentation to the grand

24    jury.  That's the issue here, whether the district attorney had

25    everything in her possession at the time she presented the case

86KMMANT

1    to the grand jury.  This has no limitation.  This could create

2    an inference that at any time during the pretrial hearings or

3    the criminal trial.  It's a really narrow issue.

4            THE COURT:  I don't think I even know your name.

5            MS. SANDS:  I did introduce myself, your Honor.

6    Frances Sands.

7            THE COURT:  I think that maybe we better wait to hear

8    the district attorney's evidence before we finalize this

9    charge.  Let's move on.

10           MS. OKEREKE:  Your Honor, I'm sorry.  Just for the

11   record, I would like to revisit the probable cause portion of

12   No. 19, Rothstein at page 283.  Rothstein was required to rebut

13   that presumption -- again, the presumption created the

14   indictment by proving fraud, perjury, suppression of evidence,

15   or other misconduct in the grand jury.  That's in the grand

16   jury itself.  And the charge we have here is misleading because

17   it does not show that what is in the grand jury is what

18   mattered.  And that, again, is page 283 of Rothstein.

19           MR. JOSEPH:  Judge, we also look at Resudia and

20   Rothstein.  I think it's pretty clear that it doesn't mean that

21   the defendants have to actually, quote unquote, commit

22   misconduct in the grand jury.  If they suborn perjury, that

23   occurs in the grand jury, but they physically threaten the

24   witness outside the jury room, that does count, that's in.

25           MS. OKEREKE:  That does count also.  I'm inclined to

86KMMANT

1   agree with that.  What matters is what occurred at that

2   proceeding, not before -- not the complete statement of facts

3   they gave to the district attorney, but what occurred during

4   that proceeding.

5         MR. JOSEPH:  Under Rothstein, if they make an

6   incomplete statement of facts to the district attorney which

7   causes her to go forward and present an incomplete case to the

8   grand jury, how is that --

9         MS. OKEREKE:  That is in the malice portion.  That

10  would show that they had other reasons other than to show the

11  ends of justice in pursuing the prosecution.  However, in the

12  probable cause portion, it's in the grand jury.  What matters

13  is what happened during that proceeding.

14        THE COURT:  You have a thought?

15        MS. OKEREKE:  That's what page 283 says.

16        THE LAW CLERK:  May I?  Am I permitted to speak?

17        THE COURT:  I give you permission.

18        THE LAW CLERK:  My thought is that when I read

19  Rothstein I also found an evident contradiction in the Second

20  Circuit's language because when the Second Circuit sets up the

21  general rule, at the beginning of its presumption section, it

22  clearly states that the presumption may be overcome by evidence

23  establishing that the police witnesses have not made -- we have

24  already read that -- have not made a complete and full

25  statement of facts either to the grand jury or to the district

86KMMANT

1     attorney.

2             Later on in the case, where the Second Circuit is

3     speaking about the particular facts at issue there, they state

4     that the plaintiff Rothstein was required to rebut the

5     presumption by proving misconduct in the grand jury and there

6     are two points there.

7             One is that Rothstein in this case was not a police

8     officer.  So there is a distinction, I think, between a

9     defendant who is a nonpolice officer who couldn't possibly --

10    who didn't have the role and the function of providing

11    information to the DA to begin with.

12            And then, secondly, you could also read grand jury --

13    proving misconduct in the grand jury broadly to include also

14    the provision as is alleged in this case of fraudulent evidence

15    to the district attorney which then affects the presentation to

16    the grand jury.  I think there are two distinctions.  One is a

17    factual distinction made on the facts of this particular case,

18    especially in light of Second Circuit's general provision

19    previously, and then the other interpretation of presentation

20    to the grand jury.

21            MS. OKEREKE:  I definitely understand that point and

22    appreciate it.  However, there are -- and maybe during a break

23    I'll find the several cases.  There are several cases in which

24    where there is a grand jury indictment, the plaintiff was not

25    able to proceed with a malicious prosecution claim before he

86KMMANT

1   first unsealed the minutes of the grand jury to see what was

2   presented there, and that line of cases would imply that what

3   matters in the grand jury is what is at issue.  In those cases

4   there were defense police officers, several cases.

5          THE COURT:  I don't share that view.  In fact, having

6   spent a long time in the grand jury, I can't even conceive of

7   how it could happen that way, certainly not with nonpolicemen,

8   even with them.  Anyhow, you have an objection.

9          We will go on to 21 or 31.

10         MS. OKEREKE:  I think it would be a clear

11  contradiction of all the other cases where an unsealing of the

12  grand jury minutes is required first to even proceed.

13         MR. JOSEPH:  What happened here?

14         MS. OKEREKE:  We can continue.

15         MR. JOSEPH:  What's the issue?

16         THE COURT:  Proximate cause give you any pause?

17         MR. JOSEPH:  No, your Honor.

18         THE COURT:  The damage charges are pretty pro forma.

19  I'm glad to let you look at them, but I don't want to keep the

20  district attorney.

21         There is some language we are going to add to the 23rd

22  instruction, underscore something you have all mentioned in

23  your proposed charges which is that we are talking about only

24  one recovery.  We don't multiply by three or four or five.

25         MR. JOSEPH:  I think with punitives, Judge, I think

86KMMANT

1    you do, when punitives are assessed against each defendant for

2    their own wrongful conduct.

3            THE COURT:  I thought it would probably be better or a

4    little more appropriate if we did it with respect to the

5    general damage charge and compensatory damages because that's

6    really what they are looking at most.  If they get the punitive

7    damages, they would have already resolved and created the

8    error.  That gives me some pause.  So this is a way to avoid

9    that.

10           MS. SANDS:  Your Honor, instruction 23, the first

11   sentence where it says, if you find that plaintiff has proven

12   all of the elements, can we just insert the number, if you find

13   that plaintiff has proven all of the five elements?

14           MR. JOSEPH:  Judge, some of the elements the Court is

15   instructing them are already met.  I think that's one

16   contradictory --

17           THE COURT:  I don't mind putting in the five elements.

18   You know you have three or four and then five when you get to

19   malicious prosecution.  It's somewhat confusing.  But if I put

20   in a malicious prosecution, it really won't be complete

21   because, obviously, it won't talk about the 1983 requirements.

22           I am going down.  I'm really worried about the ADA.

23   Let's go, guys.  If you have any other problems that I don't

24   have, would you just write me a letter.

25           MS. SANDS:  Your Honor, may I just ask how the Court

86KMMANT

1   is going to handle the qualified immunity?

2           THE COURT:  Mr. Zuckerman is concerned about his

3   witness.  I don't have to go there at all.

4           MR. ZUCKERMAN:  I just don't know what was -- I know

5   you talked to Judge Marcus.  I don't know if she has to be back

6   for something.

7           THE COURT:  We didn't interrogate him.  I just said we

8   need her for a witness, and he said, have her Friday morning,

9   and I said fine.

10          But in terms of the damages, you look troubled.  Is

11  there a problem in terms of any other concerns --

12          MR. ZUCKERMAN:  The qualified immunity we haven't

13  addressed there.

14          THE COURT:  There isn't any charge on qualified

15  immunity.

16          MR. ZUCKERMAN:  How would that be handled?

17          THE COURT:  It will be handled, and I hope you did it,

18  in your jury verdict and they will find the facts and I'll make

19  the decision.  That's the way the recent 2007 case reads in the

20  Second Circuit.

21          MS. SANDS:  We inadvertently didn't --

22          THE COURT:  Read that case.

23          MS. SANDS:  No.  We didn't inadvertently didn't

24  include the qualified immunity component to our verdict sheet

25  and would just like to do that --

86KMMANT

1          THE COURT:  I haven't even looked at them, so you

2     haven't lost anything.

3          MS. SANDS:  Thank you.

4          THE COURT:  Is everybody happy?  And if not, you can

5     write.  The bell didn't ring.  It's just that I think we ought

6     to do what we can do.  Also, regardless of the assistant

7     district attorney, which I must tell you doesn't scare me, the

8     problem that does scare me is that the jury has really been

9     waiting, and maybe they have some orange juice, but I don't

10    like to keep them waiting, as you may have gleaned from my

11    concerns yesterday.

12          I am going to assume but for anything you write me on

13    the damage area that you have no other problems and I'll look

14    at all of your concerns over the weekend.

15          MS. SANDS:  Our objections, we made them.  When your

16    Honor provides us with the other portions that we discussed,

17    whether or not your Honor was going to revise those portions --

18          THE COURT:  Before we charge you'll get a full final

19    copy.

20          MR. ZUCKERMAN:  Thank you.

21          (In open court)

22          THE COURT:  There should be a witness in the box.

23    That saves us about 30 seconds.  Who is next on your list?

24          MR. JOSEPH:  Your Honor, I'd like to call Frank

25    Tinari.

86KMMANT

1      MR. ZUCKERMAN:  Your Honor, this was the time for the

2  district attorney to testify.  We agreed that the district

3  attorney was going to testify at 10.  She is here.

4      THE COURT:  I told her to be here at 10.  I didn't

5  tell anybody when they are going to testify, but I'm glad to

6  take her out of turn if she is in a hurry.  My understanding

7  from Judge Marcus was that she was off today because there was

8  a Muslim defendant who didn't want to work on Friday and she

9  was free.  Where is she?  Is that true?

10      MS. SCACCIA:  That is true.  As long as I can take

11  care of this today, I will wait until the Court calls me.

12      THE COURT:  Mr. Zuckerman has a special love and

13  affection for you, so we want to protect your interests at all

14  costs.  If it doesn't matter to you, we will do it in Mr.

15  Joseph's timetable since it's his case.

16      MS. SCACCIA:  As long as I can return to trial on

17  Monday, that is fine, Judge.

18      THE COURT:  We will get to you before lunch.

19      MS. SCACCIA:  Thank you.

20      THE COURT:  She is a fact witness.  We better get rid

21  of her before we start with your expert.

22      (Jury present)

23      THE COURT:  You may call your next witness.

24      MR. JOSEPH:  Your Honor, may it please the Court, the

25  plaintiff calls Frank Tinari.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT

1    FRANK D. TINARI,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. JOSEPH:

6    Q.   Dr. Tinari, can you give us the benefit of your educational

7    background?

8    A.   Yes.  My doctorate is in the field of economics.  I went to

9    Fordham College in New York, and I received my college degree

10   in economics in 1964.  I then went on to study at the Fordham

11   University Graduate School of Arts and Sciences.  I received my

12   master's degree in economics in 1966, and then continued for my

13   doctorate or Ph.D.  That was interrupted by about two years of

14   service in the U.S. Army, but when I returned in the 1970s, I

15   completed my doctorate in economics.

16        THE COURT:  I think we misunderstood one another.  If

17   this witness is going to be a long witness, I think --

18        MR. JOSEPH:  He won't, Judge.

19        THE COURT:  Ten, 15, 20 minutes?

20        MR. JOSEPH:  Probably less than that.

21        THE COURT:  Then it's perfectly all right to do it

22   this way.  I just thought -- go ahead.

23        Good morning, everybody.  It's nice to see you.  I

24   hope you were entertained at least with some vittles.  We are

25   sorry we are a little late, but we are going to catch up.

86KMMANT                          Tinari - direct

1   Q.  Doctor, can you very briefly give us the benefit of your

2   educational experience?

3   A.  Basically, I've been an economist all my professional

4   career.  I've worn two hats.

5        One as a professor of economics over in Seton Hall

6   University in South Orange, New Jersey.  I taught there for 31

7   years on the full-time faculty.  I'm now professor emeritus,

8   meaning retired for about five years.

9        The second hat that I've worn as an economist has been

10  as a consultant and writer and speaker.  I have a company

11  called the Tinari Economics Group.  I have offices in Manhattan

12  as well as in New Jersey, and we do mostly litigated related

13  work, people are suing one another, they need us to write

14  reports about the value of the loss, and periodically I come to

15  court, such as today, to testify regarding my findings.

16  Q.  Have your opinions been accepted by courts?

17       MR. ZUCKERMAN:  Objection, your Honor.

18       THE COURT:  I'll allow it.

19  A.  Yes, they have.

20       MR. JOSEPH:  I ask at this point that the witness be

21  allowed to offer opinions, your Honor.

22       THE COURT:  Indeed.  He is qualified, in my view.

23  Q.  Doctor, were you retained by us to perform an analysis of

24  Mr. Manganiello's economic loss resulting from his prosecution?

25  A.  Yes, I was.

86KMMANT                    Tinari - direct

1    Q.  What, if anything, did you do?

2    A.  Well, I requested information from the attorney.  I sent

3    them my fact-finding questionnaire, which indicates the name of

4    the person, date of birth, their job, et cetera, and I received

5    that back.  I also received various other documents,

6    information about Mr. Manganiello's earnings history, his union

7    wage contract, and one or two doctors' reports.  But pretty

8    much I had a good background and I gathered all that

9    information before I wrote my report.

10   Q.  What information, if any, did you find relevant to form an

11   opinion?

12   A.  Well, I needed to know his date of birth, which was 1962,

13   May 30 of 1962.  The incident occurred in February of 2001.  He

14   was 38.7 years of age.  I looked up his life expectancy, and I

15   looked up his statistical retirement based on available

16   statistics that is commonly generally used.  I have him

17   projected to retire at 61.6 years of age, and his retirement --

18   his life expectancy would take him to 78.2 years of age in the

19   year 2040.

20            I also looked at his earnings.  He had two basic

21   positions.  One was with Parkchester as a special police or

22   patrol officer, and he also had a part-time job working for the

23   State of New York parks police.  I looked at all of that, his

24   federal tax returns, his W2s, and I developed a base earnings

25   for him and projected, assuming this incident never occurred,

86KMMANT                        Tinari - direct

1    what would he have earned year by year as a measure of his

2    losses.

3    Q.  Sir, were you able to come to any opinions within a

4    reasonable degree of certainty as to what Mr. Manganiello's

5    pecuniary loss was as a result of his prosecution?

6    A.  I believe I have, yes.

7            MR. JOSEPH:  Judge, at this point, I would ask to move

8    into evidence Exhibits 57-A, B, and C.  I believe they are in

9    over objection.

10           MR. ZUCKERMAN:  No objection, your Honor.

11           THE COURT:  Noted.

12           (Plaintiff's Exhibits 57-A, B, and C received in

13   evidence)

14           THE COURT:  I believe I admitted it over your

15   objection at the outset of the case, is that right?

16           MR. JOSEPH:  Yes, Judge.

17   Q.  Dr. Tinari, do you recognize what Exhibits 57-A, B, and C

18   are?

19           THE COURT:  I should tell the jury what this is about.

20   As you will hear, hopefully Monday, in my charge, we charge

21   both -- there are two pieces to every case or just about every

22   case, liability and damages.  We charge you on both because we

23   don't want you wondering back and forth into the courtroom once

24   you start your deliberations.

25           And similarly with respect to testimony, we take all

1    the testimony, this is testimony devoted to damages, and there

2    was some testimony yesterday which was devoted to damages which

3    may or may not spring readily to mind, but it will all become

4    clear.  It does not mean that you have to reach the issue of

5    damages.  It just means you don't have to come in and look at

6    me again.  You get all of the charges on the damages as well as

7    liability, and you get all the testimony and this is some of

8    the testimony.  Go head.

9    Q.   Doctor, do you recognize what's been put in evidence as

10   57-A, B, and C?

11   A.   Yes, I do.

12   Q.   What are they?

13   A.   These are charts taken from the report that I wrote, and

14   they specify the earnings that Mr. Manganiello would have

15   earned in what I call the past years and the remaining future

16   years until his retirement, and then it has a summary chart.

17   Q.   Doctor, can you please tell us what your opinions are as to

18   Mr. Manganiello's pecuniary loss which was caused by the

19   prosecution?

20        MR. ZUCKERMAN:  Objection, your Honor.

21        THE COURT:  Did you explain to us what you think the

22   cause was for this loss?

23        THE WITNESS:  Your Honor, I don't get involved in the

24   causation, but I think you're asking should I explain some of

25   the calculations before I came to my conclusion.

86KMMANT                        Tinari - direct

1          THE COURT:  True.

2          THE WITNESS:  I would agree with that.

3    Q.  Doctor, can you provide us with your opinions?

4    A.  Yes.  Let me just explain that in order to calculate a loss

5    I had to do a couple of things.

6          One, of course, I mentioned, to establish a base

7    earnings, what was he earning in the year before the incident,

8    and I used that as a starting point.

9          The second thing I did was to make some adjustments to

10   his gross earnings.  I had to subtract some things and I had to

11   add some things.  So it would be useful if I spent a moment

12   just explaining that to arrive at what I call a net loss.

13         The first thing I did was I applied a work life

14   adjustment.  Now, work life tells us statistically how many

15   months and years a person will work until their retirement.

16   Usually, it's not every month or every year.  There are reasons

17   why people might not be in the work force up until their

18   retirement date.  They may take time out either voluntarily or

19   involuntarily and, as a result, economists make that

20   adjustment.  We remove from the projection of loss that period

21   of time where a person would not have been in the work force

22   and not have been earning anything.

23         So I made a reduction of about 8 and a half percent

24   statistically based on males like Mr. Manganiello.  The next

25   adjustment I made, another subtraction, was to reduce the

1    projected losses by 3 percent a year for the probability of

2    future unemployment or temporary layoffs that a worker might

3    experience.  We don't have a crystal ball, we don't know for

4    sure, so what we do is we use average statistics, and I removed

5    another 3 percent for the probability of unemployment.

6            Another adjustment I made was for his job maintenance

7    expenses.  When people go out to work and they are earning

8    money, they usually have to spend some money to make the money,

9    whether it's transportation or clothing or whatever.  So if a

10   person says he can no longer work really didn't make all the

11   money because they would have spent some money on

12   transportation and so forth.  So we removed that as part of our

13   calculation of loss, and I removed 11 percent additionally for

14   his job maintenance expenses.

15           And, finally, the last adjustment I made was to add

16   something, and I'm adding the value of his fringe benefits, the

17   things that you don't receive in cash but still have value,

18   still have benefit.  And in this case I added for fringe

19   benefits his union benefits.  Let me just identify what they

20   are.  If I may refer to my report for a moment.  He had various

21   insurance.  He had health insurance, life insurance, he had an

22   annuity plan, a dental and optical vision coverage as well.

23           So what we have here -- and that applies to the

24   Parkchester patrol officer's job.  For his part-time job with

25   the state police, because it's part-time, I didn't give any

596

1    value to any fringe benefits.  Usually, you don't get fringe

2    benefits on a part-time job.  And so including all of those I

3    was able to calculate that his loss at the Parkchester job,

4    after making the subtractions and the additions, was 5.6

5    percent more than his gross earnings.  He'd lose some money,

6    but he gained some in fringe benefits.  The net result was

7    about 5.6 percent additional to each dollar of earnings.  And

8    for the New York State job his earnings were about 79 percent

9    of the gross, primarily because there are no fringe benefits to

10   add back in, so we just had to subtract.

11         Having said that, I was able then to make a projection

12   of his earnings.  I used 2 and a half percent for his

13   Parkchester job.  2 and a half percent per year would be the

14   increase, the annual increase in his earnings based on his

15   union contract.  And for the New York State job I used 3.2

16   percent increase per year and that's based -- there was no

17   union contract, but that's based on the average increase of

18   wages in the New York area from 2001 to 2008.

19         I think I have laid all of the foundation for the

20   first chart, which I can show, if you'd like, to the jury.

21   Q.   Please, Doctor.  Can you step down and explain your

22   calculations and projections.

23   A.   I wonder if I could put it up on the easel and bring the

24   easel over.

25         THE WITNESS:  Your Honor, should we move it closer to

1    the jury so they can see it?

2            THE COURT:  You can do whatever you want, until I get

3    upset.

4    A.   What we have in this chart is the Parkchester job and the

5    New York State job, part-time job.  In the first column we have

6    the years 2001 up to the present time, 2008.  And in the second

7    column we have the portion of the year that we are analyzing.

8            So in 2001, we are analyzing the rest of the year

9    after the incident, which is 89 percent of the year, and then

10   we come through 2008, I have 42 percent of the year, meaning up

11   to the end of last month, the end of May.  Everything else will

12   be looked at as the future.

13           The next column, No. 3, shows the earnings of

14   Parkchester increasing at 2 and a half percent per year, which

15   is based on the union contract.  So you see, for example, in

16   the year 2002, earnings are projected to be $38,138, and they

17   increase up to the present time of about $44,228.

18           In the next column, No. 4, we add in the 5.6 percent

19   for all of the adjustments we make to come up with a series of

20   numbers in column No. 4 which we are calling the adjusted or

21   net earnings.

22           And then in column No. 5 we do the same thing with the

23   New York State part-time job, we have got about a little over

24   $10,200 being earned in the second job per year, and that is

25   going up, as I indicated a moment ago, at 3.2 percent average

1    wage increase.

2              And then in column No. 6 we are doing, again, the

3    adjusted figure, which is 79 percent after we take away all

4    those adjustments I mentioned before.

5              So to get the total loss, we are going to take the net

6    Parkchester job earnings plus, in column No. 6, the net

7    earnings at the New York State part-time job to come up with

8    the total in column No. 7.  And that's the method I used to

9    develop the loss for each year.  And the total, we have over

10   $377,000 from the year 2001 to about the present time in 2008

11   as the net loss of earnings from both jobs.

12   Q.  Doctor, did you also do a projection for the future

13   pecuniary loss that Mr. Manganiello is likely to suffer?

14   A.  I did the future projected earnings until his retirement

15   and I'll bring that chart over.  There is one additional

16   calculation that's needed for future years, and that

17   calculation is called present value.

18   Q.  Doctor, so the record is clear, we are looking at Exhibit

19   57-B now, correct, trial Exhibit 57-B?

20   A.  That's correct.  Right there.

21   Q.  Please continue.

22   A.  The present value is needed because we are projecting

23   losses in the future, but we want to know what are those future

24   values worth in today's money because we are sitting here

25   trying to make a decision in the year 2008.

1            So to calculate present value we assume that monies

2    can earn interest, whether it's a CD or a bank deposit,

3    whatever it is, and, therefore, if you had $100 today and you

4    earned 5 percent interest, next year you'd have $105.  So if we

5    have to figure out next year someone lost $105, what is it

6    worth today?  The answer is, it's only worth $100 today because

7    they could earn interest.  So we do that for each year in order

8    to express the current or present value of those future

9    projected losses.

10           In this chart we begin in 2008 and we have 58 percent

11   of the remainder of this year, and we continue until the year

12   2023.  At the end of that year we have retirement at

13   approximately age 61 and a half years of age is the statistical

14   retirement that I used.

15           As a result, we are able then to project the net

16   earnings in Parkchester, and you'll notice it continues to

17   increase at 2 and a half percent per year, and we also have the

18   net earnings in the New York State job, that's being projected

19   at 3.9 percent per year.

20           The reason I select that rate of increase is that that

21   is the best estimate economists now have for the likely trend

22   of wages for the foreseeable future.  It is somewhat higher

23   than past years because a lot of baby bocmers will be retiring,

24   the labor force will be tightening, the projections or wages

25   will be increasing at a little higher rate than before.  As a

1    result, I'm able to combine the Parkchester and New York jobs

2    to arrive at the total annual loss, and then I convert those to

3    present value.

4          I'll give you just one example in this chart, take the

5    year 2015.  For that year I projected the total loss to be

6    75,694.  We want to know, what is that worth in today's money?

7    If we go over to the last column, we see that it's only worth

8    $53,794, monies that could be saved and earned interest to

9    reach the $75,000 loss.

10         And when we combine those we obtain a total of little

11   over 829,000 as the present value of the future remaining years

12   of lost earnings to Mr. Manganiello.

13   Q.   Doctor, did you prepare any other calculations?

14   A.   Just one other summary chart combining the two, if I may.

15   Q.   Please, for the record, we are looking at Exhibit No. 57-C.

16   A.   That is correct, 57-C is correct.

17   Q.   Can you give us the benefit of your calculations or

18   projections on 57-C?

19   A.   This, basically, as small as it is for the jury, this

20   basically takes the present value of the past year's loss of

21   $377,000, and combines that with the present value of the

22   future loss, $829,000, for a total of a little over $1.2

23   million of lost earnings from the two employments.

24   Q.   Doctor, does that represent your opinion within a

25   reasonable degree of economic certainty as to what