86KMMANT                          Tinari - direct

1   Mr. Manganiello's pecuniary loss is today?

2   A.  Yes, it is.

3         MR. JOSEPH:  Thank you, Judge.  I have no further

4   questions.

5         THE COURT:  Any cross?

6         MR. ZUCKERMAN:  Thank you, your Honor.

7   CROSS-EXAMINATION

8   BY MR. ZUCKERMAN:

9   Q.  Good morning, Dr. Tinari.

10  A.  Good morning.

11  Q.  Dr. Tinari, you have received a fee for your services in

12  this matter, correct?

13  A.  Yes.  I've been paid for both my report and for my time

14  coming to court.

15  Q.  Including the time that is spent giving testimony today,

16  correct?

17  A.  Yes.

18  Q.  And including your testimony that you've given here today,

19  what's your total fee in this matter?

20  A.  It would be, I think, about 3,000 for the report and 2500

21  for half a day of court.  It's about 5500.

22  Q.  At the present time the only position that you hold is the

23  president and founder of Tinari Economics Group, is that

24  correct?

25  A.  That is correct.

86KMMANT                           Tinari - cross

1    Q.  Virtually, all the work that you do as president and

2    founder of the Tinari Economics Group is to prepare reports and

3    testify on behalf of clients during litigation matters,

4    correct?

5    A.  That's over 90 percent of our work, that is correct.

6    Q.  In fact, in your qualifications profile it says that you've

7    given testimony in some 600 matters?

8    A.  It is probably higher by now.  It is probably closer to 700

9    trials and depositions.

10   Q.  In virtually all the matters which you've given testimony

11   you've testified on behalf of plaintiffs in litigation,

12   correct?

13   A.  For trial purposes, that's correct.

14   Q.  Most of those matters, in fact, have been personal injury

15   matters, correct?

16   A.  A little over half, yes.

17   Q.  Now, for purposes of your opinions in this case, you have

18   assumed that Mr. Manganiello will never work again, correct?

19   A.  That's correct.

20   Q.  And that he can never work again, correct?

21   A.  That's correct.

22   Q.  And the sole basis for that assumption as set forth in the

23   report that you prepared is a single statement from a

24   psychiatrist by the name of Dr. Latif, correct?

25   A.  Yes.

86KMMANT                    Tinari - cross

1    Q.  One single statement, correct?

2    A.  That's a medical opinion, yes.

3            THE COURT:  What's a medical opinion?

4            THE WITNESS:  The opinion offered by Dr. Latif that I

5    relied upon.

6    Q.  You never interviewed Dr. Latif, did you?

7    A.  No.

8    Q.  Never attempted to find out what her opinions were,

9    correct?

10   A.  No.

11           MR. JOSEPH:  Objection.  He just said he read them.

12           THE COURT:  I gather she wrote a report.  You read the

13   report, right?

14           THE WITNESS:  I did, your Honor.

15           THE COURT:  Isn't that where she would put her

16   opinions?

17           THE WITNESS:  Yes.

18           THE COURT:  You did in fact read her opinions?

19           THE WITNESS:  I did read it, yes.

20   Q.  Do you have a report from Dr. Latif?

21   A.  Yes.

22   Q.  And with respect to Dr. Latif's conclusion, all that's set

23   forth in your report in this matter is that Anthony had not

24   been able to motivate or initiate enough strength to pursue

25   livelihood or a gainful career.  These symptoms developed

86KMMANT                    Tinari - cross

1   causally as a result of the emotional trauma he experienced,

2   correct?

3   A.   Correct.

4   Q.   That's all you have in your report about what Dr. Latif

5   said, correct?

6   A.   That's correct.

7   Q.   And you also assume in reaching your conclusions in this

8   matter that Mr. Manganiello would have been continuously

9   employed until the year 2023, correct?

10  A.   Not continuously employed.  He would be employed 91 and a

11  half percent of the time because I did remove periods of no

12  work life.

13  Q.   So between now and the year 2023 you assume that he would

14  have been employed for 91 and a half percent of that time,

15  correct?

16  A.   That is correct.

17  Q.   Now, you never did any investigation -- did you ever talk

18  to Mr. Manganiello?

19  A.   No.

20  Q.   Never interviewed him?

21  A.   No.

22  Q.   You never interviewed any of his former employers, did you?

23  A.   No.

24  Q.   Never called Parkchester security?

25  A.   No.

1    Q.   Never called the state parks police, did you?

2    A.   I did not.

3    Q.   You never called anyone at Parkchester to ascertain what

4    Mr. Manganiello's job performance was at Parkchester, correct?

5                    MR. JOSEPH:  Objection.

6                    THE COURT:  Sustained.  Is what you did here different

7    than what you do in the other hundreds of reports that you've

8    made?

9                    THE WITNESS:  No, your Honor.

10   Q.   You never reviewed Mr. Manganiello's performance

11   evaluations have you?

12                   MR. JOSEPH:  Objection.

13                   THE COURT:  Sustained.

14   Q.   And you are aware that Mr. Manganiello testified during

15   this trial, correct?

16   A.   I was told today he has already testified.

17   Q.   As far as you know, Mr. Manganiello is fully ambulatory?

18   A.   I assume so.  He can get up from the chair, sure.

19   Q.   Any reason why he can't work?

20                   MR. JOSEPH:  Objection.  He's not a vocational expert.

21                   THE COURT:  I'll let him answer the question.  I am

22   not clear what this expert needs to have decided or found about

23   his ambulatory ability, but here we are.  It's just a

24   statistical analysis that you did.

25                   THE WITNESS:  It's going to the question of whether I

1    offset his future earnings by his ability to earn, and I didn't

2    do that.

3    Q.   Do you know whether Mr. Manganiello made any efforts to

4    reenter the job force?

5    A.   I'm not aware of any.

6    Q.   You're not aware of any that he's made, correct?

7    A.   That's correct.

8    Q.   And your opinion is based on the assumption that

9    Mr. Manganiello's employment would have continued with the

10   Parkchester security and the state parks police?

11   A.   I did assume that, right.

12   Q.   Through the years 2023, is that right?

13   A.   Yes.

14   Q.   91 percent of the time, correct?

15   A.   That's correct.

16   Q.   And you have no knowledge as to the facts underlying the

17   criminal prosecution, correct?

18   A.   No, I have no idea about that.

19            MR. ZUCKERMAN:  No further questions, your Honor.

20            THE COURT:  Anything, Mr. Joseph?

21            MR. JOSEPH:  Two questions.

22   REDIRECT EXAMINATION

23   BY MR. JOSEPH:

24   Q.   Do you commonly rely upon medical opinions of disability to

25   perform a projection?

86KMMANT                         Tinari - redirect

1          MR. ZUCKERMAN:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.  Yes, I do.

4    Q.  And, sir, you testified that he could work 61 years was the

5    average.  Do people work longer than 61 years?

6    A.  That's possible, certainly, sure.

7    Q.  Would it be fair to say this is a conservative estimate?

8          MR. ZUCKERMAN:  Objection, your Honor.

9          THE COURT:  Sustained.

10   Q.  Sir, in the field of economics, is past earning capacity

11   considered -- in the field of economics, why do you look at

12   past earning capacity?

13   A.  Well, we look at his past track record of earnings to see

14   if he had a job and how much he was earning.  And if he did,

15   that establishes a baseline for us to go forward.

16   Q.  And if you're working somewhere else in a similar capacity,

17   is it fair to say he could earn a similar wage?

18         MR. ZUCKERMAN:  Objection, your Honor.

19         THE COURT:  I'll sustain the objection.

20         MR. JOSEPH:  Nothing further, your Honor.

21         THE COURT:  You're excused.  Thank you.

22         (Witness excused)

23         THE COURT:  What's next?

24         MR. JOSEPH:  Ms. Scaccia, your Honor.

25   CHRISTINE SCACCIA,

86KMMANT                    Tinari - redirect

1              called as a witness by the Plaintiff,

2              having been duly sworn, testified as follows:

3     DIRECT EXAMINATION

4     BY MR. JOSEPH:

5     Q.   Ms. Scaccia, between the calendar years 2001 and 2004,

6     where were you employed?

7     A.   The Bronx district attorney's Office.

8     Q.   In what capacity?

9     A.   Assistant district attorney.

10    Q.   And did you become involved in the prosecution of the case

11    of the People of the State of New York v. Anthony Manganiello?

12    A.   Yes, I did.

13    Q.   And when did you first become aware that Anthony

14    Manganiello was a suspect in a shooting of Albert Acosta?

15    A.   Probably, the day after the incident took place.

16    Q.   On the date of the incident was an Assistant district

17    attorney Dondes handling this matter?

18    A.   He was the assistant on homicide duty, yes.

19    Q.   On February 12 or February 13 of 2001, did the Bronx

20    District Attorney's Office authorize an arrest of Anthony

21    Manganiello?

22    A.   Not at that time.  We deferred.

23    Q.   Ma'am, did you become aware of the results of any gunshot

24    residue testing performed on Anthony Manganiello's hands and

25    clothing on February 12, 2001?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT                        Scaccia - direct

1    A.   I don't know that I became aware of the results that day,

2    but at some time afterwards I did, yes.

3    Q.   The question is, did you become aware of the results that

4    were performed on that day?

5    A.   Yes.

6    Q.   And what were the results?

7    A.   They were negative.

8    Q.   Ma'am, there has been some testimony in this case

9    concerning the homicide case file.  Did you ever have

10   possession of the homicide case file?

11   A.   Yes, I did.

12   Q.   Ma'am, did you ever represent to the court that you didn't?

13   A.   No.

14   Q.   Let me show you --

15       THE COURT:  Not this court.

16   Q.   Not this court.  The Bronx Supreme Court.

17   A.   At some point I no longer had possession of it, correct.

18       THE COURT:  I don't think that was his question.

19       MR. JOSEPH:  It wasn't.

20   Q.   Ma'am, did you tell Judge Marcus of the Bronx Supreme Court

21   that you never had possession of the file?

22   A.   Not in that context, no.

23   Q.   Ma'am, I am going to ask you to take a look at page 7 --

24       MR. ZUCKERMAN:  One second, your Honor.

25   Q.   -- of the hearing proceedings from the pretrial hearing on

86KMMANT                        Scaccia - direct

1    June 18, 2004?

2    A.   Okay.

3    Q.   Ma'am, could you please read lines 8 to 10.

4           THE COURT:   The way this is supposed to be done, since

5    each of you have had your own way about it and nobody has

6    objected and I haven't said something, indeed, she should read

7    it to yourself and then you should ask her a question or you

8    can read the passage and ask her if she made that answer to

9    that question.

10   Q.   Ma'am, please read the passage.

11   A.   I'm sorry.  Lines 8 through 10, you said?

12   Q.   Correct.

13          THE COURT:   What's the page number?

14          THE WITNESS:   7, your Honor.

15   Q.   Have you had sufficient time to read the passage?

16   A.   Yes, I have.

17   Q.   Did you in fact represent in open court to Judge Marcus in

18   June of 2004 that you never had possession of the homicide case

19   file?

20   A.   In the context that I was speaking, yes, I did.

21   Q.   And you had a duty of candor and truthfulness to the court,

22   correct?

23   A.   I'm an officer of the court, yes.

24   Q.   In June of 2004, is it true that you never had physical

25   possession of the homicide case file?

86KMMANT                           Scaccia - direct

1    A.  Again --

2              THE WITNESS:  Your Honor, may I explain?

3              THE COURT:  Sure.

4    A.  At points during my involvement in the investigation I had

5    access to the homicide case file.  I did not retain possession

6    of the police department homicide case file.  So, no, I never

7    had full and complete possession as if I kept the folder, but I

8    had access to the folder during points of the pendency of the

9    case.

10   Q.  Ma'am, access means it was generally available somewhere,

11   right?

12             MR. ZUCKERMAN:  Objection.

13             THE COURT:  This is like cross.  It's a perfectly

14   appropriate question and a follow-up and another follow-up is

15   also appropriate.  Go ahead.

16   A.  No.  At points the file was with the detective in my

17   office.

18   Q.  By the way, ma'am, you're a district attorney, correct?

19   A.  Correct.

20   Q.  And possession means having it physically either on your

21   person or in close proximity, correct?

22   A.  At the time you possess it, yes.

23   Q.  And did you tell Judge Marcus in June of 2004 that you

24   never had possession of that file?

25   A.  Yes.  Because I never maintained possession of that file.

86KMMANT                           Scaccia - direct

1    Q.  Ma'am, did you use the word maintain on page 7 of the

2    hearing transcript?

3    A.  No, counselor, I didn't.

4    Q.  You told Judge Marcus as an officer of the court in open

5    court four years ago, I never had possession of the file,

6    correct?

7    A.  That's correct.

8         THE COURT:  There has been a lot of talk about a box

9    that went missing which you may or may not know about.  Is the

10   folder and the box the same item, if you know.

11        THE WITNESS:  I do know, and, yes.  What happens is,

12   when an investigation is started by the police department, they

13   create paperwork.  It is up to the case officer to maintain the

14   paperwork, to fill out the paperwork, to collect the paperwork.

15        And during the course of this investigation, the

16   officers who worked on the case prepared paperwork, it became

17   part of the case folder, and there were other items and

18   handwritten notes and it got too big for a folder, so the

19   folder now became a box.  And in this box was the police

20   department paperwork, notes, and some other items, all of which

21   were present in the beginning and throughout the grand jury

22   stages of this case, and at some point between then and the

23   trial that box became misplaced.

24   Q.  By the way, ma'am, that's not the only box that became

25   misplaced, is it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT                          Scaccia - direct

1    A.   With regards to this case?

2    Q.   Yes.   Where is the district attorney's file for the

3    prosecution of Anthony Manganiello presently?

4              MR. ZUCKERMAN:   Objection, your Honor.

5              THE COURT:   I am not sure I understand.   But if you

6    can answer, you're welcome to answer.   I am not sure I

7    understand the question.

8    A.   The district attorney's office didn't have a box, but we

9    had a file that after the case was ended I sent to archives.

10   Q.   Have you made efforts to look for that box since then?

11   A.   I believe my office has made efforts, but I'm not aware of

12   what their findings or direct efforts have been.

13   Q.   You made no efforts to look for the box?

14   A.   I looked in my office.   I don't have it and it's not a box.

15   It's a folder.

16   Q.   Did you make efforts to look for the folder?

17   A.   Yes.

18   Q.   Have you been able to find that folder?

19   A.   It's not in my office.   I sent it to archives, sir.

20             THE COURT:   Now I'm a little confused.   The folder

21   which grew too big for a folder and became a box, you had

22   access to from time to time.   And when the case was over you

23   sent it to archives, is that right?

24             THE WITNESS:   Two different things, your Honor.   The

25   police department paperwork was what was maintained by the

86KMMANT                        Scaccia - direct

1   detectives that became a box and kept at the precinct until

2   last we saw it.  And then the DA's office has their own folder

3   which would include our paperwork, minutes, copies of reports.

4              THE COURT:  Indictment and things like that?

5              THE WITNESS:  Correct.

6   Q.  Ma'am, did you not attempt to look for this box, even in

7   archives?

8   A.  I have made requests of my office to ask where the folder

9   has been and to order it from archives.  I have not followed up

10  on that myself, counselor.

11  Q.  That's been since May of this year, May 2 of this year?

12  A.  Probably when we were contacted about me appearing, yes.

13  Q.  By the way, ma'am, did Detective Agostini ever provide you

14  with all of that handwritten interview and investigative notes

15  from the file, not the DD5s, but the handwritten investigative

16  notes?

17  A.  When you say provide me, counselor, I have seen them and I

18  have seen them in his possession while we were presenting the

19  case.  Did I make copies of them and, therefore, preserve them

20  on my own, no, but, yes, he did provide me with them at one

21  point.

22  Q.  Did he give you copies for you to maintain as part of your

23  file?

24  A.  No.

25  Q.  Ma'am, what obligations, if any, does a district attorney

615

1    have to provide copies of handwritten statements and

2    investigative notes to a person who is accused of a crime?

3              MR. ZUCKERMAN:  Objection, your Honor.

4              THE COURT:  If she is knows, it is interesting, we

5    will be glad to listen.  Overruled.

6    A.  As a district attorney I have an obligation to provide any

7    and all paperwork that's created as part of any investigation.

8    Most importantly, statements made by witnesses, handwritten

9    notes taken or made by witnesses, because at some point in time

10   when a prosecution or a case would go to trial, obviously, the

11   accused has a right to confront witnesses with what they have

12   said on prior occasions.  Those are reports, they are

13   handwritten notes, they are scientific labs, there are minutes

14   from other proceedings.

15             And what happens is, we would make copies and turn

16   them over to the defense in a case.  In this case police

17   reports were made copies of, and I did turn them over to

18   defense.  Between the time that was turned over and the time

19   the case went to trial, we lost the police file.  It could not

20   be found within the precinct.  So when the case actually went

21   to trial, I had to try the case based on the copies of the

22   reports I had originally provided to defense counsel.

23   Q.  Did you ever provide the handwritten notes, the

24   investigative notes, the statements, the crime lab reports to

25   Mr. Manganiello's defense lawyer?

1    A.  Mr. Manganiello's defense attorney was provided with

2    everything that I had originally provided.  I turned over --

3    Q.  That wasn't the question, ma'am.

4         MR. JOSEPH:  Judge, she is giving me an evasive

5    answer.  I would like a clear answer to my question.

6         THE COURT:  The problem is, it's fairly clear from the

7    testimony here that there were handwritten notes, perhaps memo

8    book entries and perhaps other spiral notebook entries that

9    apparently never appeared or indeed never were given to the

10   defense attorney because you didn't have them.  That's what

11   he's asking about.  Do you have a recollection of that

12   happening?

13        THE WITNESS:  Yes.  There were notes that were not

14   turned over because by the time I went to turn them over the

15   file had been lost and, therefore, I could not turn them over.

16   Q.  After you asked Mr. Agostini to provide you with copies so

17   you could provide them to Mr. Manganiello's defense lawyers,

18   correct?

19   A.  I'm sorry.  Repeat that, sir.

20   Q.  At the point in time these notes disappeared you had asked

21   Mr. Agostini to provide you with copies so that you could in

22   turn provide them to Mr. Manganiello's criminal defense lawyer,

23   correct?

24   A.  No.  At some point I had asked Detective Agostini to bring

25   the folder down to me so I could make copies and it was at that

1    point that we became aware that we could not find the folder.

2    Q.   When was that?

3    A.   I don't have any recollection of that date, sir.

4          THE COURT:  Before the trial?

5          THE WITNESS:  It was before the trial because that's

6    what I'm obligated to do before the trial.

7    Q.   Is there any reason why these typewritten DD5s were

8    preserved and turned over but all the handwritten notes weren't

9    given to the defense lawyer at the same time?

10   A.   It's a matter of, quite frankly, convenience.  The stuff

11   that was prepared and ready to be easily copied and turned over

12   to defense was turned over first.  And well before we got to

13   the trial we tried to make attempts to turn over the remainder

14   of the file, but at that point the file had become lost.

15   Q.   Ma'am, the case against Anthony Manganiello was pending for

16   three years before it went to trial, correct?

17   A.   That is about the average time of pendency for a murder

18   case in the Bronx, sir, yes.

19   Q.   Is that a yes to my question?

20   A.   Yes it is.

21   Q.   And in the three years or three plus years, between the

22   time this matter was commenced, the criminal matter was

23   commenced and the time of trial, the handwritten investigative

24   notes were never provided to Mr. Manganiello's criminal

25   attorney, isn't that right?

86KMMANT                        Scaccia - direct

1    A.   Yes.

2    Q.   Ma'am, did you present a case to the grand jury of the

3    State of New York, Bronx County, against Anthony Manganiello?

4    A.   Yes, I did.

5    Q.   Can you explain to the jury what role, if any, the grand

6    jury proceeding has in -- let me rephrase that.

7              Ma'am, can a murder prosecution go forward in a local

8    court?

9    A.   When someone is arrested on the charge for murder, that is

10   actually the highest felony you can be charged with.  When

11   someone is taken into custody, the district attorney's office

12   has approximately 120 hours to put evidence before a grand jury

13   panel to offer the accused an opportunity to call witnesses or

14   testify, and then in the end be prepared to vote charges.

15             So a grand jury panel is a body of 16 to 23 people

16   from Bronx County who listen to the evidence and then in the

17   end are asked to decide if there is reasonable cause to believe

18   that the suspect of that investigation committed the crimes

19   charged.  So that's what a grand jury is.

20   Q.   And does a grand jury indictment provide jurisdiction to

21   the county level criminal court?

22   A.   It's the county level Supreme Court.

23   Q.   County level Supreme Court?

24   A.   Yes.

25   Q.   Is it fair to say without a grand jury indictment there is

1   no jurisdiction in county level Supreme Criminal Court for a

2   felony?

3                   MR. ZUCKERMAN:  Objection, your Honor.

4                   THE COURT:  I am not sure I care about that.  I'll

5   sustain the objection.

6                   When does the criminal complaint get filed?

7                   THE WITNESS:  The criminal complaint is an affidavit

8   by the arresting officer or the victim in a case which is filed

9   upon the arrest of an individual, and that is what starts the

10  criminal process.

11  Q.  And is that criminal process started in a local criminal

12  court?

13                  MR. ZUCKERMAN:  Objection.

14                  THE COURT:  Overruled.

15  A.  Yes.

16  Q.  And does the grand jury in an indictment in effect remove

17  the case from a local criminal court and bring it to the county

18  Supreme Court?

19                  MR. ZUCKERMAN:  Objection, your Honor.

20                  THE COURT:  That's sort of interesting to know that,

21  so I'll let you answer it.

22  A.  What happens when the criminal court complaint is filed,

23  the person is brought before a judge for the first time.  At

24  that point in time the accused is arraigned.  The judge would

25  ask them or inform them of the charges and ask them if they

86KMMANT                        Scaccia - direct

1    plead guilty or not guilty, ask them if they wanted to testify

2    at a grand jury proceeding, and the person would, most

3    importantly, be assigned an attorney or have an attorney hired

4    to represent them.

5            Once that is invoked and the person is arraigned, that

6    is now what triggers the now 120 hours to go before a grand

7    jury and seek an indictment.  The criminal court maintains

8    control of that case until an indictment is voted, and then

9    when it comes time if a person is indicted to be arraigned on

10   the indictment, that's when it moves to a Supreme Court level.

11   Q.  And isn't it true that without an indictment the Supreme

12   Court does not have jurisdiction on a felony complaint?

13           MR. ZUCKERMAN:  Objection.

14           THE COURT:  I am not sure -- we will listen to you.

15   A.  I am not sure that that's correct either.

16           THE COURT:  I'll sustain the objection.

17   Q.  Did a gentleman named Harry Plaza ever testify before the

18   grand jury?

19   A.  Harry --

20   Q.  Plaza.

21   A.  No.

22   Q.  Do you have any memory of a Harry Plaza as you sit here

23   right now?

24   A.  No, I don't.

25   Q.  Did a Harry Plaza testify at trial?

1   A.  Not that I recall.

2   Q.  If Mr. Plaza had information that you considered relevant

3   on whether or not Mr. Manganiello committed a crime, would you

4   have presented him to the grand jury or called him as a trial

5   witness?

6           MR. ZUCKERMAN:  Objection.

7           THE COURT:  Overruled.

8   A.  I'm a little uncertain how to answer that question because

9   I'm not sure who this individual is and what they would have to

10  say, but, obviously, if somebody has relevant information I'm

11  at least going to listen to them and consider whether or not I

12  am going to present them at trials.

13  Q.  As you sit here right now, do you have a recollection of

14  ever meeting with a Harry Plaza?

15  A.  No.

16  Q.  Did you base your decision to present a case to the grand

17  jury on the witnesses which Mr. Agostini provided you?

18  A.  I based my decision to put this case into the grand jury

19  based on my interview of the witnesses I was provided with.

20  Q.  And the witnesses were provided to you by Mr. Agostini,

21  correct?

22  A.  Well, when you say provided, the witnesses came to light

23  because of the police investigation.  So we were supplied names

24  and addresses and sum and substance of what individuals said

25  based on police reports.  So in that respect, yes, Detective

1  Agostini brought them to me.

2  Q.  Did Mr. Agostini ever make you aware that Walter Cobb had

3  made inconsistent statements on February 12, 2001?

4  A.  I was informed on either written or oral form about all of

5  Mr. Cobb's statements before I myself interviewed him and put

6  him before the grand jury and called him at trial.

7  Q.  Ma'am, did you give a different answer approximately a

8  month ago, month and a half ago?

9  A.  Sir, I don't know exactly what that means.  If you have

10  somewhere that you'd like me to look, I'd be happy to do so.

11  Q.  Let me ask you this, ma'am.  Were you made aware, on

12  February 12 or 13, when you took over the file, of any

13  inconsistent statements made by Mr. Cobb?

14  A.  Counsel, I don't have an independent recollection of that.

15  I know I reviewed reports concerning Mr. Cobb and that I

16  interviewed Mr. Cobb.  But as I sit here today I don't

17  remember.

18  Q.  Ma'am, let me ask you this.  About a month or so ago did we

19  ask this question and did you give this answer on page 31 of

20  your deposition, line 18:

21  "Q.  Were you made aware" --

22          THE COURT:  Do you remember having given a deposition?

23          THE WITNESS:  Yes, I do, sir.

24  Q.  "Were you made aware on February 12 or 13 of any

25  inconsistent statements by Walter Cobb?

623

1    "A.  No."

2    A.  Okay.

3    Q.  Were you asked those questions and did you give that

4    answer?

5    A.  I'm sure I did, counselor.  You're reading it.

6              THE COURT:  If you sat through trial, you wouldn't be

7    sure.

8    Q.  Were you ever made aware that Mr. Cobb initially said he

9    heard shots that sounded like they came from outside the

10   building?

11   A.  I don't recall that, no.  I recall Mr. Cobb saying he was

12   outside the building when he heard shots.

13   Q.  And by the way, did you review your deposition testimony

14   before coming here today?

15   A.  A while back, yes, I did.

16   Q.  When was that?

17   A.  Probably, last Friday.  I think, last Friday.

18   Q.  And were you ever made aware that Mr. Cobb initially told

19   Alex Perez he only heard one shot?

20   A.  I don't recall that.

21   Q.  That would be different than what he testified to before

22   the grand jury, correct?

23             MR. ZUCKERMAN:  Objection.

24   Q.  If you need to refresh your recollection, I can show you

25   the minutes.

86KMMANT                        Scaccia - direct

1           THE COURT:  Overruled.

2    A.   Show me the minutes as to what?

3    Q.   Mr. Cobb's testimony before the grand jury.

4    A.   I recalled Mr. Cobb's testimony before the grand jury.

5    Q.   Did he say he heard more than one shot?

6    A.   Yes, he did.

7    Q.   By the way, did Mr. Cobb testify before the grand jury

8    that immediately after hearing the shots he saw plaintiff

9    coming out of the basement of 1700 Metropolitan Avenue?

10   A.   He testified -- my concern is your use of the term

11   immediately.

12   Q.   Within a couple of seconds?

13   A.   Yes.

14   Q.   Did Alex Perez ever tell you that Mr. Cobb initially told

15   him that he saw Mr. Manganiello five minutes after hearing the

16   shots?

17   A.   As I sit here today, I don't recall that, but all of those

18   witnesses were part of the same presentation, part of the same

19   trial.

20   Q.   And did Mr. Huello testify before the grand jury?

21   A.   No.

22   Q.   Was there an inconsistency between what Mr. Huello said

23   what happened and what Mr. Cobb said happened?

24   A.   As I sit here today, I don't know, but that's not out of

25   the ordinary, counselor.

86KMMANT                    Scaccia - direct

1    Q.  But Mr. Cobb testified before the grand jury, correct?

2    A.  Yes.

3    Q.  Mr. Huello did not, correct?

4    A.  Yes.

5    Q.  By the say, did a Sergeant Ohle testify before the grand

6    jury?

7    A.  No, he did not.

8    Q.  Were you aware at the time that Mr. Ohle had made a

9    broadcast over the Parkchester radio that one of his men was

10   down?

11   A.  I know that Sergeant Ohle made that broadcast, but when

12   that broadcast was made is, to my understanding, not immediate.

13   Q.  Isn't it true that he made that broadcast before plaintiff

14   arrived on the scene?

15   A.  It may have been.  I don't recall the exact timing of it,

16   but it was not immediately known who the victim of this

17   homicide was.

18   Q.  But it was known within a very short period of time after

19   Ohle responds that the victim is a Parkchester security

20   officer, correct?

21   A.  It's known relatively quickly.  You have officers

22   responding, you have a person on the ground suffering from

23   gunshot wounds who is in full uniform, so, yes, that

24   information is disseminated fairly quickly.

25   Q.  In fact, isn't it true that Sergeant Ohle put a call over

1    the Parkchester radio on an open line that it was one of his

2    men was down before Anthony Manganiello ever arrived on the

3    scene?

4    A.   Again, that information was disseminated, but I also know

5    that they -- Parkchester security was trying to send the

6    deceased to his own body.  So when it initially came over,

7    there was an officer down, but they were trying to send Officer

8    Acosta, not realizing it was Officer Acosta that was down.  So

9    there was information being disseminated and it was happening

10   quickly, as you can imagine.  But when that came, as I sit here

11   today, exactly in relation to when he got to the scene, I don't

12   know.

13   Q.   Let me show you this, Exhibit 25 in evidence.

14        MR. ZUCKERMAN:   One second, please.

15   Q.   Isn't this one of the DD5s you had in your possession?

16        MR. ZUCKERMAN:   One second.

17   Q.   Isn't Exhibit 25 one of the DD5s you had in your

18   possession?

19   A.   This is a DD5 pertaining to this case.  If I just may -- I

20   am sure I had it in my possession.  I would just like to read

21   what it says if you don't ask me a question about it.

22        Go ahead, sir.

23   Q.   Doesn't this contain a statement made by Sergeant Ohle on

24   the day of Albert Acosta's murder?

25   A.   Yes.

86KMMANT                               Scaccia - direct

1    Q.  Doesn't it say that he put down over the radio, one of my

2    men is down, before Anthony Manganiello ever arrived on the

3    scene?

4    A.  One of his men were down, yes.

5    Q.  That would mean anybody listening to that would know that a

6    Parkchester security officer was down, right?

7              MR. ZUCKERMAN:  Objection.

8              THE COURT:  Sustained.

9    Q.  Did you ever bring that fact to light before the grand

10   jury?

11             MR. ZUCKERMAN:  Objection.

12             THE COURT:  Sustained.

13   Q.  Was the grand jury ever informed that Sergeant Ohle had put

14   a transmission over the Parkchester radio identifying the

15   victim as a Parkchester security officer?

16             MR. ZUCKERMAN:  Objection.

17             THE COURT:  You can tell us if you recall.  I don't

18   find it terribly upsetting.

19   A.  I know it didn't come out through Sergeant Ohle making a

20   statement.  If it came out peripherally, I don't remember, by

21   someone saying the Parkchester officer was down.  I don't

22   recall.  It came out specifically.  I know Sergeant Ohle didn't

23   testify.  I can tell you that.

24   Q.  And let me show you Exhibit No. 11, ma'am.  Wasn't it also

25   true that there was a radio broadcast from central NYPD to the

86KMMANT                          Scaccia - direct

1    cars that a possible security was shot at the location?

2              MR. ZUCKERMAN:  Your Honor, I object.

3              THE COURT:  I'll allow it.

4    A.  You've handed me what I recognize to be what's called a

5    Sprint report, which is when radio broadcasts are made by

6    police officers or people call 911, it ends up in the

7    typewritten printout.  And I believe this is an NYPD Sprint

8    report and, yes, it does indicate that a possible Parkchester

9    officer is down, but I don't believe that Parkchester security

10   is on NYPD frequency.

11   Q.  Isn't it also true that NYPD officers, such as defendant

12   Miriam Nieves and Alex Perez, are on an NYPD frequency?

13   A.  I would imagine that's why they went to the location,

14   because there was somebody shot there.

15   Q.  What they heard was it was a possible Parkchester security

16   officer that was shot?

17             MR. ZUCKERMAN:  Objection, your Honor.

18             THE COURT:  I'll allow it.

19   A.  Yes.

20   Q.  Now, did you elicit testimony before the grand jury that

21   was from Ms. Nieves that was -- that there was no transmission

22   identifying the victim as a Parkchester security officer?

23   A.  I don't understand your question.

24   Q.  Did Ms. Nieves testify before the grand jury that there was

25   no transmission identifying their victim as a Parkchester

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT                          Scaccia - direct

1    security officer?  Let me show you the testimony, if you'd

2    like, to refresh your recollection.

3    A.  No.  I would like the Court's permission to explain because

4    I don't believe I can answer that with a yes or no.

5              THE COURT:  You have a choice.  You can rephrase the

6    question so maybe she can answer it, or we are going to let her

7    go on?

8              MR. JOSEPH:  I'll rephrase the question.

9    Q.  Ma'am, did Ms. Nieves testify that prior to her arriving on

10   the scene there was no radio transmission that identified the

11   victim as a Parkchester security officer?

12   A.  I believe Officer Nieves' testimony was that prior to going

13   in there and making personal observations that it was unclear

14   who the victim was.  I don't believe there was any testimony

15   indicating there was never a transmission.  It was based on

16   what the officer knew when the officer entered the location.

17   Q.  Ma'am, let me ask you this.  Did you testify about a month

18   and a half ago, on page 75, line 22 of your deposition:

19   "Q.  Now, did you elicit testimony from an Officer Nieves that

20   when Mr. Manganiello arrived it was unknown that the victim was

21   a Parkchester security guard?

22   "A.  If that's what Officer Nieves' testimony states, that was

23   according to her."

24              Correct?  That was the answer to the question,

25   correct?

1    A.  Yes.  That's not what you were just asking me about.

2    Q.  Ma'am, did you ever inform the grand jury or bring it to

3    their attention that in fact a radio transmission over the NYPD

4    radio did identify the victim as a Parkchester security

5    officer?

6    A.  No.

7    Q.  Let me ask you, isn't it true that both Officers Nieves and

8    Perez testified before the grand jury that at the point in time

9    when they respond to the location they don't know whether it's

10   an NYPD officer or Parkchester security before the grand jury?

11   A.  Yes.

12   Q.  At no point did you ever inform the grand jury that there

13   was in fact a radio transmission identifying the victim as a

14   Parkchester security guard?

15           MR. ZUCKERMAN:  Objection, your Honor.

16           THE COURT:  Overruled.

17   A.  First of all, according to the transmission that you showed

18   me, it's possible.  There is no affirmative unequivocal

19   statement that there is a Parkchester security officer down.

20   They know that they have a uniformed individual laying on the

21   ground in the basement in Parkchester.  That is what is known.

22   That is the way things are phrased, possible male shot,

23   possible male DOA, that's the way it comes over.  It was a

24   possibility.  What the officers knew in their heads when they

25   responded there, only they can answer.

86KMMANT                          Scaccia - direct

1    Q.  Isn't it true that the only information they had was that

2    it was a possible Parkchester security officer?

3    A.  I don't even know if that information got out before they

4    arrived at the scene.  At some point that information is

5    disseminated.  They were responding to a male shot in the

6    basement.

7    Q.  Ma'am, isn't it also true that they testified not that

8    there was a possibility that the victim was a Parkchester

9    security guard, but there was no transmission which identified

10   the victim as a Parkchester security guard?

11   A.  Sir, there could have been a hundred transmissions.  If

12   they didn't hear it, it couldn't have affected them.

13   Q.  You knew they had radios, right?

14   A.  Yes, police officers carry radios, yes.

15   Q.  Isn't it also true, ma'am, that you elicited testimony from

16   Mr. Nieves concerning a statement that Mr. Manganiello made?

17   A.  Yes.

18   Q.  What is the purpose of that statement?

19            MR. ZUCKERMAN:  Objection, your Honor.

20            THE COURT:  Sustained.

21   Q.  Was the purpose of the statement which Ms. Nieves testified

22   to to establish that Mr. Manganiello had some knowledge he

23   couldn't have otherwise had unless he was involved in the

24   homicide?

25            MR. ZUCKERMAN:  Objection.

1          THE COURT:  If you understand, you can answer it.

2     A.   Okay.  Let me put it this way, counselor.  The statement

3     that Mr. Manganiello made to the officer was one in a series of

4     the circumstances that I feel is relevant to this

5     investigation.

6     Q.   Now, even if he did make that statement, had there been a

7     broadcast that the victim was a Parkchester security guard over

8     the Parkchester radio, that statement would no longer have any

9     relevance, would it?

10    A.   No, that's not true.

11    Q.   Ma'am, on the morning of February 12, 2001, were you aware

12    that Mr. Manganiello was in the company of two to three police

13    officers while he was at 1700 Metropolitan Avenue?

14    A.   I'm sorry.  Say that question again, please.

15    Q.   Sure.  On the morning of February 12, 2001, were you aware

16    that Mr. Manganiello was in the company of Police Officers

17    Ortiz and Rodriguez while he was at the call at 1700

18    Metropolitan Avenue, apartment 5E?

19    A.   That was earlier in the morning.

20    Q.   That's what I was asking.

21    A.   You asked me that morning.  I wanted to be clear.  My

22    understanding was earlier that morning he responded to some

23    kind of domestic dispute at another location and that job had

24    come to an end.

25    Q.   He was at that call from approximately 8:40 a.m. until

1    about 9:05 a.m., correct?

2    A.  I don't remember the exact time, sir, but I know it was

3    preceding the incident that brings us here today.

4    Q.  You said it was preceding the incident.  Were you there?

5    A.  No, but --

6    Q.  Do you have any personal knowledge of what time Albert

7    Acosta was actually shot?

8    A.  Counsel, you just asked me if I was aware of where he was,

9    and I am answering you no.  I wasn't there when you asked me

10   either.  I was saying this based on the people that I

11   interviewed.

12   Q.  And one of those people was Mr. Richard Huello, correct?

13   A.  At some point I did speak with Mr. Richard Huello.

14   Q.  And Mr. Huello says he gets to the basement at about 9:20

15   or so, correct?

16   A.  I don't recall the times as I sit here today.

17   Q.  Do you have a memory of Mr. Huello saying that when he

18   arrives at 1700 Metropolitan Avenue he hears a Parkchester

19   radio, knocks on the door and gets no response?  Do you have a

20   memory of that?

21   A.  No.

22   Q.  By the way, did Police Officers Ortiz or Rodriguez ever

23   testify before the grand jury?

24   A.  No.

25   Q.  Did Mr. Manganiello's criminal defense attorney ask you to

86KMMANT                          Scaccia - direct

1    produce them for trial during the criminal trial?

2    A.   I don't have a recollection, but if he asked me to I would

3    have been obligated to do so, sir.

4    Q.   Let me show you page 690 of the trial transcript --

5              MR. ZUCKERMAN:   Note my objection, your Honor.

6              THE COURT:   I'll allow it.

7    Q.   -- to refresh your recollection.   Page 690 and 691.   Why

8    don't you read it to yourself, ma'am.

9              THE COURT:   It's a yes or no question.   Either it

10   refreshes your recollection or it doesn't.

11   A.   It refreshes my recollection as to what?

12   Q.   Whether or not Mr. Manganiello's criminal defense attorney

13   asked you to have Officers Rodriguez or Ortiz appear at trial.

14   A.   He asked for my assistance, yes.

15   Q.   And did you represent to the Court that you could not find

16   Officer Rodriguez?

17             MR. ZUCKERMAN:   Objection, your Honor.

18             THE COURT:   I'll allow it.   You can answer.

19   A.   Did I represent to the Court that I what?

20   Q.   Was unable to locate or identify Officer Rodriguez.

21   A.   What I indicated to the Court was after counsel made the

22   request of me, which we do as a courtesy to try to move things

23   along, is bring police officers in since we have more access to

24   them, is that I made attempts and that there was only one

25   Rodriguez that I could find and I didn't know if that was him.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Were you aware that Eric Rodriguez testified in this trial

2    on Monday?

3    A.  This trial, I have no idea.

4           MR. ZUCKERMAN:  Objection.

5           THE COURT:  Overruled.

6    Q.  Ma'am, did you base in part your decision to present the

7    case to the grand jury against Anthony Manganiello on the

8    statements made to you by Michael Booth?

9    A.  Michael Booth was not involved in the grand jury

10   presentation, no.

11   Q.  Did you base your decision in part to continue a

12   prosecution against Anthony Manganiello for murder based in

13   part on what Mr. Booth told you?

14   A.  No.

15   Q.  Did you feel that Mr. Booth had relevant information that

16   was passed on to you by Mr. Agostini?

17   A.  I believe Mr. Booth testified at the trial.  So at some

18   point I put him on as a witness, but not at the grand jury

19   stage.

20   Q.  I didn't ask the grand jury stage.  I meant in general in

21   the prosecution did you base your decision to continue the

22   prosecution in part on what Mr. Michael Booth had told you?

23          MR. ZUCKERMAN:  Objection.

24          THE COURT:  Overruled.

25   A.  Every witness is a part of the case.  But is Michael Booth

86KMMANT                          Scaccia - direct

1   the reason that I prosecuted Mr. Manganiello for homicide, no.

2   Q.  Was he one of the reasons you prosecuted Mr. Manganiello?

3   A.  As I said, every witness is a reason to go forward in some

4   capacity, however great or small.

5   Q.  Did Detective Agostini ever tell you that Mr. Booth was a

6   loan shark for a bookie?

7   A.  I believe the information about Mr. Booth's criminal

8   activity came to me from Mr. Manganiello's attorney, who also

9   represented him.

10  Q.  Is that a no?

11  A.  Meaning Mr. Booth.

12  Q.  Is that a no?

13  A.  I don't remember who it came from, sir.  I was made aware

14  of it.

15  Q.  Were you made aware of it by Detective Agostini?

16  A.  If he had a criminal past?

17  Q.  If he was actively working as a bookie or a loan shark.

18  A.  I don't remember.

19  Q.  Did Mr. Agostini ever tell you that he searched Mr. Booth,

20  found a knife, and gambling materials with names and amounts

21  owed?

22  A.  I don't recall that.

23  Q.  Did Mr. Agostini ever tell you that Mr. Booth was at first

24  reluctant to talk to him at all?

25  A.  That would not surprise me at all, but I don't recall that

86KMMANT                        Scaccia - direct

1   either.  Witnesses are usually reluctant.

2   Q.  Especially those engaged in criminal activity, correct?

3            MR. ZUCKERMAN:  Objection, your Honor.

4            THE COURT:  Sustained.

5   Q.  Were you ever informed that either Detective Agostini --

6   that he told Mr. Booth that he was going to pass his name onto

7   organized crime?

8   A.  I would assume if Mr. Booth was working as a bookie, he was

9   in contact with organized crime himself.

10  Q.  Well, did Mr. Agostini ever tell you that he told Mr. Booth

11  that he would pass his name onto the department in the NYPD

12  that investigates organized crime?

13  A.  No.

14  Q.  Did Mr. Agostini ever tell you that the gambling materials

15  he found on Mr. Booth's person disappeared after he signed a

16  statement?

17           MR. ZUCKERMAN:  Objection, your Honor.

18  A.  I'm sorry.  Repeat that.

19           THE COURT:  I am going to sustain the objection.

20  Q.  Immediately prior to a witness giving a statement, evidence

21  of a crime was found on him, is that something a defense

22  attorney has a right to know about?

23           MR. ZUCKERMAN:  Objection, your Honor.

24           THE COURT:  Sustained.

25  Q.  Are you familiar with what's commonly known as a Brady

86KMMANT                              Scaccia - direct

1    obligation?

2              MR. ZUCKERMAN:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.  Yes, I am, counselor.

5    Q.  What is a Brady obligation?

6    A.  As an assistant district attorney we have an obligation to

7    turn over information to defense counsel as soon as it becomes

8    known to us.  Obviously, we have to turn over the information

9    we are using to inculpate their clients.  But when there is

10   information that comes to our attention that tends to exculpate

11   their clients, meaning their clients did not do what they are

12   being accused of, we have an obligation to turn that over.

13   Q.  Does that obligation also include evidence that undermines

14   the credibility of prosecution witnesses?

15             MR. ZUCKERMAN:  Objection, your Honor.

16             THE COURT:  Sustained.

17   Q.  Did you ever authorize Detective Agostini or any other

18   detective to withhold criminal charges against Mr. Booth in

19   exchange for a statement implicating the plaintiff?

20             MR. ZUCKERMAN:  Objection.

21             THE COURT:  I'll allow her to answer it.

22   A.  Absolutely not.

23   Q.  Did Mr. Booth testify at trial?

24   A.  I believe he did.

25   Q.  And did Mr. Cobb testify at trial?

86KMMANT                          Scaccia - direct

1    A.   Mr. Cobb?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And was Anthony Manganiello found not guilty of all

5    charges?

6    A.   Yes.

7    Q.   What charges was he tried on?

8    A.   I know murder in the second degree was the top count

9    submitted to the jury.  I believe there would have been a

10   manslaughter charge and perhaps criminal possession of a

11   weapon.  That's my best recollection as I sit here now.

12   Q.   By the way, was Mr. Booth ever charged with any criminal

13   activity after he testified against Mr. Manganiello?

14             MR. ZUCKERMAN:  Objection, your Honor.

15             MR. JOSEPH:  To your knowledge.

16   A.   I have no idea.

17   Q.   And was Terrence Alston another person who testified before

18   the grand jury?

19   A.   Yes, he was.

20   Q.   And did he give testimony to the grand jury that Anthony

21   Manganiello had asked him to kill a fellow security guard?

22   A.   Yes, he did.

23   Q.   Were you aware that he never made that statement to his

24   handler, Derrick Parker?

25   A.   Counselor, the only way I found out about Mr. Alston was

86KMMANT                          Scaccia - direct

1    through law enforcement, so at some point Mr. Alston said that

2    to somebody before it was brought to my attention.

3    Q.   That wasn't my question, ma'am.  My question was, were you

4    aware that when Terrence Alston first spoke with his handler,

5    Derrick Parker, he didn't say that Anthony Manganiello tried to

6    hire him to kill another security guard?

7    A.   I don't know that.

8    Q.   Are you aware that Mr. Parker testified to that effect here

9    yesterday?

10              MR. ZUCKERMAN:  Objection, your Honor.

11              THE COURT:  Sustained.

12   Q.   By the way, ma'am, did you ever become aware that Terrence

13   Alston had lied to Detective Agostini?

14   A.   I would ask you to be more specific about what you're

15   saying he lied about.

16   Q.   Is it a difficult question?

17              THE COURT:  She would like you to be more specific.

18   Can you be more specific, Mr. Joseph, or not?

19              MR. JOSEPH:  Certainly, your Honor.

20   Q.   Did Mr. Agostini ever tell you that Terrence Alston ever

21   lied about a person named Johnny Baker selling him a .22

22   caliber gun?

23   A.   Mr. Alston did not lie about the existence of that person.

24   Mr. Alston did not tell the detective the person's true name

25   because he did not want to get that person involved, so he told

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86KMMANT                          Scaccia - direct

1    him something else originally or he said Johnny Baker -- let me

2    just do it again.

3            Mr. Alston told Detective Agostini about the existence

4    of this other individual.  When he first tells Detective

5    Agostini about this other individual, he doesn't give Detective

6    Agostini that person's true name because he didn't want that

7    person to become involved.  At some point later in the

8    investigation we realized that Johnny Baker isn't really called

9    Johnny Baker, his name was something else, but there was in

10   fact that person that existed.

11   Q.  And that person who existed also admitted to lying,

12   correct?

13   A.  Again, when you say lying, give me -- you're talking about

14   in general or you're talking about a specific incident?  I

15   don't know that you can deem a lawyer across the board.

16   Q.  Did that person, a Mark Damon, who you say is the real

17   person, ever recant the statement that he sold Anthony

18   Manganiello a .22 caliber gun?

19   A.  By the time Mark Damon --

20   Q.  It's a yes or no question, ma'am.

21   A.  Just before trial, yes, that's what he said.

22   Q.  By the way, was there any witness or any name that Terrence

23   Alston ever gave you who didn't recant the story?

24           MR. ZUCKERMAN:  Objection, your Honor.

25           THE COURT:  Overruled.

86KMMANT                         Scaccia - direct

1    A.   Counsel --

2    Q.   Was there ever a real person?

3              MR. ZUCKERMAN:  She was trying to answer.

4              THE COURT:  She was, so we will let her.

5              MR. JOSEPH:  Very well, your Honor.

6    A.   You're making it sound like there was 30 people that

7    Terrence Alston named.  Terrence Alston spoke about one other

8    individual.  And by the time this case went to trial, Terrence

9    Alston was dead and the kid, Mark Damon, if that's his full

10   name, recanted his story, to the point I was not comfortable

11   putting him on the stand.

12   Q.   Did you represent to the Court that Mr. Damon was a lawyer

13   and if you put him on the stand you were concerned about the

14   possibility of suborning perjury?

15             MR. ZUCKERMAN:  Objection, your Honor.

16             THE COURT:  Sustained.

17   Q.   Ma'am, isn't it true that Terrence Alston never provided a

18   witness who said that Anthony -- he sold Anthony Manganiello a

19   gun and did not recant his story?

20             MR. ZUCKERMAN:  Objection, your Honor.

21             THE COURT:  You can answer it.  Go right ahead.  If

22   you can't, you can't.

23             THE WITNESS:  Your Honor, he's making it sound like

24   there is more than one individual, and there is not.

25             THE COURT:  On the basis of the one individual, I

86KMM4NT                          Scaccia - direct

1    gather --

2            THE WITNESS:  The one person he provided his name

3    with, by the time the case went to trial, that kid was

4    recanting his story, meaning he was backing off his story in

5    one respect to the other, to the degree I don't know.  But I

6    have an obligation to put people on the stand who have reason

7    to believe are telling me the truth, and at that point in time

8    it was my professional and ethical decision not to put this kid

9    on the stand because I didn't know what was the truth from him

10   anymore.

11   Q.  Ma'am, when Terrence Alston provided the name of Johnny

12   Baker, that was a lie, was it not?

13           MR. ZUCKERMAN:  Objection.

14           THE COURT:  Overruled.

15   A.  The name Johnny Baker was a lie, yes.

16   Q.  Did you present a witness to the grand jury with knowledge

17   that he had lied?

18           THE COURT:  She isn't on trial here, Mr. Joseph.

19           MR. JOSEPH:  Judge, I think we have to establish

20   certain things as part of your charge --

21           THE WITNESS:  Can I explain again?

22           THE COURT:  Sure.

23   A.  Mr. Terrence Alston was a criminal.  Sad to say, he has now

24   passed on.  He was a criminal.  He was engaged in criminal

25   activity and he testified before a grand jury in the Bronx

86KMMANT                          Scaccia - direct

1   County that he was approached by Mr. Manganiello to kill

2   another security guard.  Mr. Alston did not -- he did lie about

3   Johnny Baker being Johnny Baker as opposed to Mark Damon, but

4   Mr. Alston did that to protect the kid's identity and not get

5   him involved in a police investigation.  Mr. Alston, to my

6   knowledge, back then and as I sit here before you today, did

7   not lie about anything material having to do with this homicide

8   investigation.

9   Q.  Would you consider someone selling --

10  A.  I don't even believe I asked him about Johnny Baker's name

11  in the grand jury, so that would not be a lie in front of the

12  grand jury.

13  Q.  Would you consider a statement that somebody sold somebody

14  a gun of the same caliber weapon used in a murder to be

15  relevant --

16          MR. ZUCKERMAN:  Objection, your Honor.

17  Q.  -- or material?

18          THE COURT:  Overruled.

19  A.  At some point the information is relevant and material, but

20  Mr. Alston was put before the grand jury because Mr. Alston had

21  to say that Mr. Manganiello tried to hire him to kill another

22  Parkchester security guard, that Mr. Manganiello provided him

23  with keys to a basement area that tenants who lived in

24  Parkchester would not have access to in order that Mr. Alston,

25  at the time and date to be set at some other occasion, would be

86KMMANT                      Scaccia - direct

1    able to gain access into the basement when Mr. Manganiello

2    would lure the victim.  And I believe the address that

3    Mr. Alston testified that this was going to happen at some

4    future date was 1700 Metropolitan Avenue.

5    Q.   That was after you spoke with detectives from the 43rd

6    Precinct, including Detective Agostini, correct?

7    A.   Mr. Alston reached out to law enforcement.  Law enforcement

8    did not go --

9    Q.   Please answer the question yes or no.

10   A.   Was the testimony after he spoke to officers, absolutely.

11   Q.   Did Detective Agostini ever raise any concerns with you

12   about Mr. Alston's credibility?

13   A.   Detective Agostini and I spoke about Mr. Alston, about

14   Mr. Alston's criminal past, which would not only have to be

15   brought before a trial jury at some point, but should give

16   everybody cause to sit back and evaluate the witness' testimony

17   to see if what you're being told can be relied upon.  To that

18   extent, Detective Agostini and I I'm sure discussed Mr. Alston

19   and whatever his testimony would have been.

20   Q.   Was the grand jury ever given that opportunity?

21           MR. ZUCKERMAN:  Objection.

22           MR. JOSEPH:  I'll rephrase.

23   Q.   Was the grand jury ever informed that Terrence Alston had

24   lied?

25           MR. ZUCKERMAN:  Objection.

86KMMANT                        Scaccia - direct

1          THE COURT:  Overruled.

2     A.  Counselor, I think I've answered that.

3     Q.  Was the grand jury ever told that Terrence Alston lied

4     about Johnny Baker selling plaintiff a .22 caliber gun?

5     A.  Johnny Baker was not part of the grand jury presentation,

6     as far as I can remember, and every witness who was put before

7     a grand jury, police, assistant district attorneys, civilian,

8     if you wanted to ask every single person at some point in their

9     lives, they have lied.

10    Q.  Did the grand jury know that Mr. Alston had lied about

11    selling this plaintiff a gun of the same caliber used to kill

12    the victim, yes or no?

13    A.  I don't think that information about the gun being sold was

14    put before the grand jury as I sit here today.  If it was,

15    counsel, please show me because I don't remember that.

16         THE COURT:  I think he's asking, did you tell the

17    grand jury that?

18         THE WITNESS:  Did I tell the grand jury about somebody

19    lying about a name, about evidence that wasn't put before them?

20    No, I did not.

21    Q.  In fact, in the lying, Mr. Alston was falsely implicating

22    Johnny Baker in criminal activity, correct?

23         MR. ZUCKERMAN:  Objection.

24         THE COURT:  Sustained.

25    Q.  Ma'am, on the date of this murder Terrence Alston was

1    actually in jail, correct?

2    A.   Correct.

3    Q.   And he had been there for some time, isn't that correct?

4    A.   Yes, it is.

5    Q.   Did Mr. Agostini ever raise any concerns with you that

6    Terrence Alston was playing games to get out of jail?

7    A.   I don't recall that offhand, no.  Again, it's not uncommon

8    that someone who is in jail wants to get out of jail.

9    Q.   Did he ever raise any concerns with you that Mr. Alston was

10   making up stories that weren't true to get out of jail?

11   A.   No, counsel.  My decision to put Mr. Alston in the grand

12   jury was my decision.  It had nothing to do with Detective

13   Agostini or what he thought about Mr. Alston or anything else.

14   It is the DA's call as to who to put before a grand jury, when,

15   and why.

16   Q.   Can you give me a straight answer, ma'am?

17           MR. ZUCKERMAN:  Objection.

18   A.   If you ask me a pointed question, counselor, I will.

19   Q.   Yes or no, did Detective Agostini ever express any concerns

20   to you that Mr. Alston was making up stories to get out of

21   jail?

22   A.   I don't recall that conversation, no.

23   Q.   Was Mr. Alston in fact released from jail in exchange for

24   his testimony against the plaintiff?

25   A.   Yes, he was.

1    Q.  And that was before Anthony Manganiello was arrested in

2    April of 2001, correct?

3    A.  I don't remember what day Mr. Alston testified in respect

4    to when Mr. Manganiello was arrested, but it had to be close in

5    time because once Mr. Manganiello was placed into custody my

6    time obligations would have begun running.

7    Q.  And isn't it also true that Mr. Alston didn't testify in

8    any other cases except for Anthony Manganiello's?

9    A.  Mr. Alston only testified at the grand jury stage of

10   Mr. Manganiello's case because he was dead by the time the

11   trial took place.

12   Q.  But he did not testify against any other criminal

13   defendants, isn't that right?

14        THE COURT:  To your knowledge.

15   A.  To my knowledge, no.

16   Q.  Ma'am, after Mr. Alston agreed to testify before the grand

17   jury, did you take over the prosecution of Mr. Alston's

18   criminal matters?

19        MR. ZUCKERMAN:  Objection, your Honor.

20        THE COURT:  Sustained.

21   Q.  Were you ever made aware by Mr. Agostini that Mr. Alston

22   did not want witnesses whom he was producing interviewed

23   outside of his presence?

24   A.  I don't know what witnesses Mr. Alston was producing other

25   than Mr. Damon, who Mr. Alston asked to be present while he

1    introduced Mr. Damon to myself and the detective; and then once

2    the introduction was made, Mr. Alston was no longer part of any

3    interview that I conducted with my witness.

4    Q.  Were you ever informed by Mr. Agostini that Mr. Alston had

5    gotten mad at him --

6    A.  Had what?

7    Q.  Were you ever made aware by Mr. Agostini that Terrence

8    Alston got mad at him for interviewing Johnny Baker?

9    A.  I don't think Detective Agostini would care if Mr. Alston

10   was mad at him.

11            MR. ZUCKERMAN:  Objection, your Honor.

12            THE COURT:  Sustained.

13   Q.  By the way, ma'am, were there any documents that were not

14   provided to you until the last day of the People's case during

15   Anthony Manganiello's criminal trial?

16            MR. ZUCKERMAN:  Objection, your Honor.

17            THE COURT:  I'll sustain the objection.

18   Q.  I show you what's been marked for identification as Exhibit

19   13.

20            THE COURT:  How much more of this, Mr. Joseph?

21            MR. JOSEPH:  Hopefully, about 60 seconds.

22   Q.  Do you recognize that document, ma'am?

23   A.  This appears to be handwritten notes by the crime scene

24   detective in the case whose name I don't know as I sit here.

25   Q.  And when did you see that document for the first time?

86KMMANT                              Scaccia - direct

1                MR. ZUCKERMAN:  Objection, your Honor.

2                THE COURT:  It's 13.

3                MR. JOSEPH:  13 is in.

4                THE COURT:  If it was redacted it may be in, but only

5      if it was redacted, and then I thought I would admit it,

6      assuming the detective would testify, which she has.

7                THE WITNESS:  You want to see it?

8                THE COURT:  No.  I've seen it.  Thanks.  Doesn't look

9      redacted.

10               MR. JOSEPH:  I am not sure what your Honor wanted

11     redacted.

12               THE COURT:  I am not sure either because I don't want

13     to start looking at it to tell.  I thought we went over it

14     before.  And the ruling was, if Agostini testifies and it was

15     redacted it was in, but let's hear the question.

16     Q.  Without telling us what the contents of that document are,

17     can you tell me when you saw that document for the first time?

18     A.  I have no idea.

19     Q.  If it helps you remember, take a look at page, deposition,

20     page 95.

21     A.  I don't have my deposition.

22     Q.  I am going to hand it to you now.  95, line 20.

23               For the record, what you have in front of you is

24     Exhibit 13, was also marked as Exhibit 5 of the deposition.

25     I'll show you that as well.  If you could read to yourself that

86KMMANT                        Scaccia - direct

1    portion of your testimony.

2    A.   I'm sorry, counsel, line 20?

3    Q.   Page 95, line 20 through page 96, line 1.

4    A.   Okay.  Go ahead.

5    Q.   Has your recollection been refreshed as to when you saw it

6    for the first time?

7              MR. ZUCKERMAN:  Your Honor, I object.

8              THE COURT:  Overruled.  It's a yes or no question.

9    A.   Actually, no.

10             MR. JOSEPH:  In that case, I have no further

11   questions.

12             THE COURT:  Any cross?

13             MR. ZUCKERMAN:  Yes, your Honor.  If we are going to

14   take a morning break, would this be a good opportunity to take

15   that?

16             THE COURT:  Yes, I suppose that's fine.  Why don't we

17   take ten minutes, ladies and gentlemen, and we will see you at

18   10 after 12.

19             (Recess)

20             THE COURT:  As I told the lawyers and the parties, the

21   young men and women who are here are all summer associates in a

22   large New York law firm who frequently are taken to a courtroom

23   to see what it looks like and what's going on and that's why

24   they are here.  Go right ahead.

25             MR. ZUCKERMAN:  Thank you, your Honor.

86KMMANT                          Scaccia - direct

1    CROSS-EXAMINATION

2    BY MR. ZUCKERMAN:

3    Q.  ADA Scaccia, what's your present position?

4    A.  I'm currently director of gang prosecutions for the Bronx

5    District Attorney's Office.

6    Q.  How long have you been a prosecutor with the Bronx District

7    Attorney's Office?

8    A.  August 26 it will be 17 years.

9            THE COURT:  You must have come as a baby.

10           THE WITNESS:  Thank you.

11   Q.  Approximately how many homicide cases have you presented to

12   grand juries?

13   A.  I would say in the hundreds.

14   Q.  Did there come a time that you presented this matter to a

15   grand jury?

16   A.  Yes, I did.

17   Q.  What witnesses did you present to the grand jury?

18   A.  I believe I called Mr. Terrence Alston, Walter Cobb, Chris

19   Tartone, Detective Agostini, Police Officer Perez, Police

20   Officer Nieves, and I believe there was one other officer by

21   the name of Casciano.

22   Q.  Seven witnesses all together?

23   A.  That sounds about right.

24   Q.  Just very briefly, with respect to each of those witnesses,

25   with respect to Mr. Cobb, could you just summarize what they

1   testified to, very briefly?

2   A.  Mr. Cobb testified that he was a maintenance worker at the

3   location, that he was walking to the building of, I believe the

4   address is 1700 Metropolitan Avenue.  He was coming along the

5   side of the building when he had heard two shots and then a

6   pause and then two shots.  And as he proceeded to this -- it's

7   not really a basement door, but you have to go down about three

8   or four stairs to enter into the basement area of the location.

9           As he was going in there to swipe that door to open

10  it, Mr. Manganiello came from within the basement, pulling the

11  door open and coming out, Mr. Cobb said to him, did you hear

12  that?  And he, being Mr. Manganiello, responds, yeah, you go

13  this way and I'll go that way.  As I sit here today I don't

14  remember which way Mr. Cobb says he pointed, but that

15  Mr. Manganiello goes off in a direction and that Mr. Cobb goes

16  into the basement to go to the garbage room or the incinerator

17  to go about his duties.  He testified about a telephone Verizon

18  man being down in the basement and asking about access to a

19  room.  And he -- you want me to stop?

20  Q.  Finish your answer.

21  A.  Mr. Cobb testifies about walking back and forth doing

22  various things.  And he notices at some point what I believe he

23  calls the carriage room, inside of the carriage room.  He says

24  he sees what appears to be, at first, rags on the ground.  As

25  he approaches, he realizes that it's not rags.  It's in fact

1    who he later learned to be Mr. Acosta lying on the ground.  He

2    can hear gurgling and he sees blood coming from his head.  He

3    runs outside and tells the Verizon guy:  Hey, in that door we

4    opened there is a body in there, and he begins notifying the

5    police, he calls the police, and he remains on the scene until

6    the police get there, essentially.

7    Q.  And you testified on Mr. Joseph's examination as to what

8    Mr. Alston testified to, is that correct?

9    A.  Yes.

10   Q.  Anything that you would add to that?

11   A.  Not that I can recall offhand, no.

12   Q.  How about Mr. Tartone, what did he testify to?

13   A.  That he was either an owner or an employee of a nearby

14   pizza shop, that he had seen Mr. Manganiello in there over a

15   period of time.  He would see him like once a month or whatever

16   when he came in to eat.  And on one particular date, I don't

17   know how long before the homicide it was, but some time prior

18   to the homicide, not too long before, he had overheard

19   Mr. Manganiello speaking to an unknown male asking him if he

20   knew where he could get a gun, meaning where Mr. Manganiello

21   could get a gun.

22   Q.  Just one question about Mr. Alston.  When you spoke to

23   Mr. Alston, did he describe Mr. Manganiello's appearance?

24   A.  On the day that he spoke to him, yes, he gave a physical

25   description of him.

86KMMANT                          Scaccia - cross

1    Q.  You said you presented Detective Agostini to the grand

2    jury, is that correct?

3    A.  Yes.

4    Q.  Could you just briefly summarize Mr. Agostini's grand jury

5    testimony, briefly?

6    A.  Detective Agostini testified -- the main purpose of

7    Detective Agostini's testimony was he did what is called the

8    body identification, meaning every time you present a case to

9    the grand jury you have to be able to show that the person who

10   was either observed dead or injured at a scene was in fact the

11   same person who was later brought to the morgue and had an

12   autopsy performed on them.

13          So Detective Agostini saw Mr. Acosta, I believe, if

14   not at the scene, definitely at the hospital before he expired,

15   and then was able to say, after going and seeing his remains at

16   the medical examiner's office, that they were in fact one in

17   the same person.

18   Q.  And you presented Officer Nieves to the grand jury,

19   correct?

20   A.  Yes.

21   Q.  Just, again, briefly, very briefly summarize Officer

22   Nieves' testimony.

23   A.  I believe Officer Nieves said --

24          THE COURT:  It doesn't matter.  We have had her

25   testimony.  Is there anything special you have in mind so we

86KMMANT                        Scaccia - cross

1    shouldn't have to go through each testimony?

2           MR. ZUCKERMAN:  No, your Honor.

3    Q.  Other than the persons that you presented to the grand

4    jury, did you interview other witnesses?

5    A.  Yes.

6    Q.  Do you have discretion in determining who to present to a

7    grand jury?  Do you have discretion in deciding what witnesses

8    to present to a grand jury?

9    A.  I have discretion in deciding what witnesses the People

10   will call if a defense attorney or a defendant wishes to

11   testify before the grand jury, they are absolutely afforded

12   that right.  If they have witnesses they want to present to a

13   grand jury, it's my obligation to ask a grand jury panel if

14   they wish to hear from those witnesses.

15   Q.  Did that ever happen in the Manganiello case?

16          MR. JOSEPH:  Objection.

17          THE COURT:  You can answer yes or no.

18   A.  No.

19          THE COURT:  Doesn't happen in the federal court, by

20   the way, just giving you another term with a legal connection.

21   It's really something that the state provides that the federal

22   grand jury laws do not.

23   Q.  Did there come a time that the grand jury voted to indict

24   Mr. Manganiello?

25   A.  Yes.

86KMMANT                          Scaccia - cross

1    Q.  Mr. Manganiello was acquitted of the charges against him,

2    correct?

3    A.  At trial, yes, he was.

4    Q.  Despite the acquittal, do you believe that there was

5    reasonable cause to have prosecuted Mr. Manganiello?

6            MR. JOSEPH:  Objection.  It's for the jury to

7    determine.

8            THE COURT:  I'll sustain the objection.  The grand

9    jury voted for the indictment.

10   Q.  Did Detective Agostini in any way pressure you to bring

11   this prosecution against Mr. Manganiello?

12   A.  No.

13   Q.  How about Detective Martinez?

14   A.  No.

15   Q.  How about Detective Abate?

16   A.  No.

17   Q.  How about Officer Nieves?

18   A.  No.

19   Q.  How about Officer Perez?

20   A.  No.  Officers have very little, if anything, to do with

21   what gets presented to a grand jury other than asking them to

22   testify in it.  It's not their decision.

23   Q.  Whose decision was it to prosecute Mr. Manganiello?

24   A.  The office of the Bronx district attorney.

25           MR. ZUCKERMAN:  Nothing further, your Honor.

86KMMANT                    Scaccia - cross

1              THE COURT:  Anything, Mr. Joseph?

2              MR. JOSEPH:  Yes, your Honor.

3    REDIRECT EXAMINATION

4    BY MR. JOSEPH:

5    Q.  I believe you just testified it was the decision of the

6    Bronx district attorney to prosecute Mr. Manganiello, correct?

7    A.  The Bronx District Attorney's Office, yes.

8    Q.  On the felony complaint is there a signature of a Bronx

9    district attorney?  Let me show you Exhibit 24.

10   A.  You don't have to show me.  Assistant district attorneys do

11   not swear out felony complaints, sir.

12   Q.  And Mr. Agostini swore out the federal complaint in this

13   case, correct?

14   A.  That has nothing to do --

15             THE COURT:  Come on.  Let's not make this any longer.

16   Just answer the question so we --

17   A.  Detective Agostini swore out the complaint.  If that's his

18   signature that's on it, then he is the one, yes.

19   Q.  Isn't it true that a defendant, criminal defendant, is not

20   present while the actual grand jury proceedings are going on

21   unless he's testifying?

22   A.  Correct.  If he exercises his right to testify, he's in

23   there talking to the grand jurors.

24   Q.  Otherwise, he has no right to be there, correct?

25   A.  Correct.

86KMMANT                              Scaccia - redirect

1   Q.  A criminal defendant is not told in advance what witnesses,

2   if any, will be presented to a grand jury, correct?

3              MR. ZUCKERMAN:  Objection.

4              THE COURT:  Sustained.

5   Q.  And during the grand jury proceedings isn't it also true

6   that a criminal defendant or his lawyer doesn't have the right

7   to ask any questions of any witnesses?

8              MR. ZUCKERMAN:  Objection.

9              THE COURT:  Sustained.

10  Q.  By the way, was this grand jury ever informed that

11  Mr. Alston was let out of jail in exchange for his testimony?

12             MR. ZUCKERMAN:  Objection.

13             THE COURT:  I'll allow that likelihood that the answer

14  is sort of clear.

15  A.  No.

16  Q.  And when Mr. Alston gave Mr. Manganiello's physical -- at

17  the point in time when Mr. Alston gave a physical description

18  of Anthony Manganiello, was that after he had met with

19  Detective Agostini?

20             THE COURT:  If you know.

21  A.  I don't know.

22             MR. JOSEPH:  Nothing further.

23             THE COURT:  You're excused.

24             MR. ZUCKERMAN:  One question, your Honor.

25  RECROSS EXAMINATION

86KMMANT                         Scaccia - recross

1    BY MR. ZUCKERMAN:

2    Q.  With respect to the felony complaint, who drafts the felony

3    complaint?

4    A.  Whatever assistant is working in the complaint room.

5    Q.  Someone from the district attorney's office?

6    A.  Yes.

7               MR. ZUCKERMAN:  Thank you.  No further questions.

8               THE COURT:  Basically, however, they do it in

9    conjunction with the detective who is going to sign it, I

10   trust?

11              THE WITNESS:  Yes.  The detective would bring an

12   arrest to the district attorney's office and then the district

13   attorney's office prepares the paperwork that would now

14   initiate legal action.

15              THE COURT:  And the complaint would be discussed with

16   the detectives so that the complainant would know what to put

17   in it?

18              THE WITNESS:  Yes.

19              THE COURT:  You're excused.

20              MR. ZUCKERMAN:  One second, your Honor.  One question,

21   your Honor.

22              THE COURT:  You had one question?

23              MR. ZUCKERMAN:  One more, if I can.

24   RECROSS EXAMINATION

25   BY MR. ZUCKERMAN:

86KMMANT                    Scaccia - recross

1   Q.  Did the presiding judge in the criminal proceedings know

2   about the agreement between the district attorney and

3   Mr. Alston?

4   A.  I believe that all of the judges involved in the pendency

5   of the case knew about that.

6              THE COURT:  That's it.  Thanks.  Bye.

7              (Witness excused)

8              THE COURT:  What's next, Mr. Joseph?

9              MR. JOSEPH:  May it please the Court, the plaintiff

10  calls Mary D'Andrea.

11             THE COURT:  This is sort of a kaleidoscope in terms of

12  how long this is going to go on.  But if I'm right as to what I

13  think this kaleidoscope shows, there are two more witnesses for

14  the plaintiff and there is only maybe one or two witnesses or

15  maybe none for the defense, so we are moving closer and closer

16  to the end of this saga.

17  MARY D'ANDREA,

18       called as a witness by the Plaintiff,

19       having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. JOSEPH:

22  Q.  Ma'am, are you currently employed?

23  A.  I'm sorry?

24  Q.  Are you currently employed?

25  A.  Yes.

86KMMANT                    D'Andrea - direct

1    Q.   Where?

2    A.   Bronx District Attorney's Office.

3    Q.   Were you so employed in 2001?

4    A.   Yes.

5          THE COURT:  Were you an assistant district attorney?

6          THE WITNESS:  Yes, your Honor.

7    Q.   Let me jump to the chase here, ma'am.  I'll show you --

8          MR. JOSEPH:  Judge, I ask to introduce what's been

9    marked as Exhibit 46.

10         MR. ZUCKERMAN:  Your Honor, we object to the so-called

11   supplemental affirmation being introduced into evidence.

12         THE COURT:  I think it's in over your objection.

13         MR. ZUCKERMAN:  Note our objection for the record.

14         (Plaintiff's Exhibit 46 received in evidence)

15   Q.   Ma'am, I am going to show you --

16         THE COURT:  That doesn't mean that I find it

17   particularly relevant, just not enough for me to deny its

18   admission at this juncture.  So tread lightly.

19         MR. JOSEPH:  Very well, your Honor.  I will be brief,

20   I believe.

21   Q.   Ma'am, I am going to show you what's been marked as Exhibit

22   46.  Do you recognize this document?

23   A.   Yes.

24   Q.   What do you recognize it to be?

25   A.   It's a supplemental affirmation, a motion that I wrote -- I

1    don't see a date on it.

2    Q.  Was it an affirmation that you offered to the Court during

3    the prosecution of Anthony Manganiello?

4    A.  Yes.

5    Q.  And did the Court direct the district attorney's office to

6    identify what deal, if any, had been made with Terrence Alston?

7           MR. ZUCKERMAN:  Objection.

8    A.  I don't recall.

9           THE COURT:  I overrule the objection.  I thought we

10   are going to put it in.

11          MR. JOSEPH:  It's in.  I'm just giving the jury some

12   context of how the document came about.

13          THE COURT:  Let's hope you get it soon.

14   Q.  Take a look at the first page, second paragraph, ma'am.

15   A.  Yes.

16   Q.  Did the Court, the Bronx Supreme Court, direct the district

17   attorney's office to provide an affirmation identifying what

18   deal, if any, had been made with Terrence Alston?

19          MR. ZUCKERMAN:  Objection, your Honor.

20          THE COURT:  Overruled.  It's a yes or no question.

21   A.  Yes.

22   Q.  And, ma'am, did you sign the exhibit that you have in front

23   of you?

24   A.  Yes.

25   Q.  And did you represent to the Court that the deal was not

86KMMANT                          D'Andrea - direct

1    made to secure Terrence Alston's testimony against Anthony

2    Manganiello?

3                MR. ZUCKERMAN:  Objection, your Honor.

4                THE COURT:  Overruled.

5    A.   I don't understand the question.

6    Q.   Let me make it very simple.  Ma'am, can I see the document

7    for a second, please.

8                Ma'am, could you just read for us the last sentence on

9    paragraph No. 3 of your affirmation?

10   A.   The agreement was not made to ensure his testimony in this

11   case but rather to set up parameters regarding his parole and

12   activities with law enforcement.

13   Q.   And did you also represent to the Court that Mr. Alston was

14   working on unrelated drug cases with Detective Derrick Parker?

15               MR. ZUCKERMAN:  Objection, your Honor.

16               THE COURT:  Overruled.

17   A.   Yes.

18   Q.   Did you ever speak with Detective Derrick Parker prior to

19   making this representation?

20   A.   No.

21   Q.   Were you aware that Mr. Parker was not working on any drug

22   cases at all during the relevant time period?

23               MR. ZUCKERMAN:  Objection, your Honor.

24               THE COURT:  Sustained.  If she hadn't talked to him,

25   how would she know what he was working on.

86KMMANT                          D'Andrea - direct

1          MR. JOSEPH:  Very well, your Honor.

2     Q.  Did you also represent that Mr. Alston, on page 2, the

3     fourth paragraph, second sentence, that Mr. Alston's testimony

4     was not in any way a condition precedent to any deal made in

5     this case?

6     A.  Yes.

7          MR. ZUCKERMAN:  Objection, your Honor.

8          THE COURT:  Overruled.

9     Q.  Ma'am, were you ever made aware that Terrence Alston was

10    let out of jail specifically in exchange for his testimony

11    against Anthony Manganiello?

12         MR. ZUCKERMAN:  Objection.

13         THE COURT:  Sustained.

14         MR. JOSEPH:  Nothing further.

15         THE COURT:  Anything, Mr. Zuckerman?

16         MR. ZUCKERMAN:  No questions, your Honor.

17         THE COURT:  You're excused.  Thank you very much.

18         (Witness excused)

19         THE COURT:  What's next?

20         MR. JOSEPH:  I believe our sole remaining witness is

21    Dr. Latif, who we have scheduled for Monday morning.  We

22    respectfully, unless the defendant has a witness, respectfully

23    request a continuance until Monday morning.

24         THE COURT:  Let's go.  We will keep your case open.

25    We will go on to the defendants' case.

86KMMANT

```
 1              MR. ZUCKERMAN:  Your Honor, the only witness for the

 2    defendants would be Matias Colon, and Mr. Colon had a doctor's

 3    appointment for today.  He will be here Monday morning as well.

 4              THE COURT:  My hope is that testimony will conclude

 5    before noon on Monday and that we will have summations and

 6    charge on Monday and probably that will work.  If not, we

 7    certainly will have the conclusion of the testimony plus the

 8    summations.

 9              In any event, the case should be yours late Monday or

10    first thing Tuesday morning.

11              Have a good weekend.  Do not discuss the case among

12    yourselves and we will see you Monday morning at 9:30.  Have a

13    good weekend.

14              (Jury not present)

15              THE COURT:  Let me talk for a moment about summations.

16    In this case the plaintiff has the burden of proof.  He will go

17    last and the defendant will sum up first.

18              How much time do you choose to use for that purpose at

19    this juncture, Mr. Zuckerman and company?

20              MR. ZUCKERMAN:  I'm sorry.  Is there a time limit?

21              THE COURT:  There will be if you ask for too much.

22              MR. ZUCKERMAN:  I would say one hour.

23              THE COURT:  Mr. Joseph?

24              MR. JOSEPH:  Approximately the same, Judge.  I speak

25    fast.  I think I probably can get through it sooner.
```

86KMMANT

1        THE COURT:  If you do less, that's a wonderful thing.

2   However, you will know it if you go over it.

3        As I think I told you, the last aspect of the charges

4   that we went through today, that is, the damage aspect, we

5   didn't really conclude, so if there are any changes or

6   additions that you think ought to be included, please write me,

7   preferably before Monday morning, since you now have the

8   afternoon to play, because I really would like to be able to

9   have the charge.  If your witnesses only take an hour or two in

10  the morning, we should be able to have summations at or about

11  lunchtime and sum up and charge in the late afternoon.

12        MR. ZUCKERMAN:  Your Honor, with respect to damages,

13  there is one jury instruction that we had proposed that I

14  didn't see in there.  That deals with mitigation for failure of

15  plaintiff to mitigate damages.  I didn't see that instruction

16  in the copy that your Honor provided to us this morning, and

17  that's certainly one that, given the plaintiff's testimony,

18  that he didn't look for a job for two years, would clearly be

19  appropriate, and we would request that the mitigation of

20  damages jury instruction be provided to the jury if it's not

21  already contained in the proposed jury charge.

22        THE COURT:  I don't think it's there.  But in that

23  area, as far as I'm concerned, you're welcome to submit

24  anything you'd like.

25        MR. ZUCKERMAN:  We did with our proposed jury

86KMMANT

1    instructions.

2            THE COURT:  What I will do is bring it again to my

3    attention.  I have no idea what Dr. Latif will testify.  She

4    may say he can't work again, in which case it would probably be

5    unlikely that he would be able to mitigate.  You'd like the

6    charge anyway.

7            MR. ZUCKERMAN:  Right.  We are still entitled to argue

8    to the jury that he could work and that he hasn't looked for

9    work.

10            THE COURT:  Do you have some testimony to that effect?

11    I have no idea what Dr. Latif is going to say.  Do you have any

12    testimony that says he could say work other than Mr.

13    Zuckerman's hope or view, or whatever you call it?

14            MR. ZUCKERMAN:  I think it's a reasonable inference

15    based upon -- let's put it this way.  So far during this trial

16    there has been no testimony, no competent testimony that he

17    can't work.  He said he can't work.

18            THE COURT:  That's why I thought between his testimony

19    and the psychiatrist, we may be able to come to rapproche ment,

20    but you don't get it automatically.  The fact that you've

21    included it is helpful, but doesn't mean very much.

22            MR. JOSEPH:  Defendants have not exchanged any

23    vocational expert reports or even so-called independent

24    treating medical examination that that differs in any way from

25    Dr. Latif's conclusion.  As such, there is no evidence upon

86KMMANT

1    which they could base that requested charge. That's

2    plaintiff's position.

3          MR. ZUCKERMAN: Just because Dr. Latif says something

4    doesn't mean it's true. We are entitled to cross-examine and

5    present --

6          THE COURT: You're going to be able to do all of that.

7    And if you succeed, again, I don't know what she is going to

8    say, Mr. Zuckerman. If it turns out that in fact there is an

9    area where mitigation seems appropriate, we will use your

10    charge.

11          MR. ZUCKERMAN: Thank you, your Honor.

12          THE COURT: Have a good weekend, everybody.

13          MR. ZUCKERMAN: Your Honor, 10:00 on Monday, 9:30 on

14    Monday?

15          THE COURT: Yes, 9:30.

16          (Adjourned to Monday, June 23, 2008, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                Page

FRANK D. TINARI

Direct By Mr. Joseph . . . . . . . . . . .   589

Cross By Mr. Zuckerman . . . . . . . . . .   601

Redirect By Mr. Joseph . . . . . . . . . .   606

CHRISTINE SCACCIA

Direct By Mr. Joseph . . . . . . . . . . .   608

Cross By Mr. Zuckerman . . . . . . . . . .   652

Redirect By Mr. Joseph . . . . . . . . . .   658

Recross By Mr. Zuckerman . . . . . . . . .   660

Recross By Mr. Zuckerman . . . . . . . . .   660

MARY D'ANDREA

Direct By Mr. Joseph . . . . . . . . . . .   661

PLAINTIFF EXHIBITS

Exhibit No.                              Received

57-A, B, and C . . . . . . . . . . .   592

46      . . . . . . . . . . . . . . .   662

86NMMANT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANTHONY MANGANIELLO,

 4                 Plaintiff,

 5            v.                            07 Civ. 3644 (HB)

 6   LUIS AGOSTINI, individually
     and as a New York City Police
 7   Detective; SHAWN ABATE,
     individually and as a New York
 8   City Police Detective; ALEX
     PEREZ, individually and as a
 9   New York City Police Officer;
     MIRIAM NIEVES, individually
10   and as New York City Police
     Officer; and ROBERT MARTINEZ,
11   individually and as a New York
     City Police Officer,
12
                  Defendants.
13
     ------------------------------x
14                                         New York, N.Y.
                                           June 23, 2008
15                                         9:30 a.m.

16   Before:

17                    HON. HAROLD BAER, JR.,

18                                         District Judge

19                           APPEARANCES

20   OSORIO & ASSOCIATES
          Attorneys for Plaintiff
21   BY:  MICHAEL JOSEPH

22   MICHAEL A. CARDOZO, Corporation Counsel
     for the City of New York
23        Attorney for Defendants
     BY:  MARK ZUCKERMAN
24        AMY OKEREKE

25
```

86NMMANT

1     (Trial resumed)

2     (Jury not present)

3        THE COURT:  Good morning, everybody.  I gather the

4  plaintiff wants a word before the jury comes in.

5        MR. JOSEPH:  Judge, it's very minor.  I just noticed

6  in some of the doctor's medical records and the chart that she

7  makes a reference to things she spoke about with plaintiff

8  concerning the brother's arrest, my client's brother's arrest.

9  My suggestion how to handle it, we will put the documents and

10  we will redact it prior to being published to the jury.  I want

11  to make the Court aware of that.

12        THE COURT:  Does that give you any pause?

13        MR. ZUCKERMAN:  I'm sorry, your Honor.

14        THE COURT:  Say it again.

15        MR. JOSEPH:  Judge, my suggestion is that since the

16  doctor is about to testify, I've instructed her, as per the

17  Court's ruling, not to mention that plaintiff's brother or

18  family members were arrested.  And we will put our references

19  in her notes.  My suggestion is that we put the notes in and

20  then redact them prior to them being published to the jury.  I

21  will work with counsel to make any redactions he feels are

22  appropriate.

23        MR. ZUCKERMAN:  That's okay, your Honor.  Also, there

24  are documents there relating to an application for Medicare or

25  Medicaid by the plaintiff.  I think that's irrelevant, too, and

86NMMANT

1   shouldn't be published to the jury.  His application for

2   Medicare has nothing to do with what we are trying here, and I

3   would request those be redacted as well.

4           MR. JOSEPH:  Judge, I agree with counsel.  I have no

5   problem redacting any portion or a reference to Medicaid

6   although though since the documents do express some of the

7   doctor's opinions I think the documents themselves, which

8   express her opinions, can be put in and we can certainly redact

9   social security, Medicare, whatever, any portion of the

10  documents that makes reference to those entities.

11          THE COURT:  That sounds fine to me.  We certainly want

12  it to be relevant.  I'll be glad to monitor the redactions.

13          MR. JOSEPH:  Yes, your Honor.

14          THE COURT:  You want to produce her?

15          MR. JOSEPH:  She is right here.

16          THE COURT:  Or him.

17          I gather that you have no witnesses, the defendants,

18  is that true?

19          MR. ZUCKERMAN:  Your Honor, that's correct.

20          THE COURT:  We are ready when you're ready.

21          (Jury present)

22  REHANA LATIF,

23      called as a witness by the Plaintiff,

24      having been duly sworn, testified as follows:

25          THE COURT:  Ladies and gentlemen, I hope you all had a

86NHMANT

1    good weekend.  I think even better news, I think, is that this

2    will be the last witness for either side so that while we give

3    the parties a little minute or two to regain their composure,

4    we will then go right into summations.  It just depends on how

5    long this witness takes before we take a short adjournment and

6    start summations.  Go ahead.

7                 MR. JOSEPH:  Thank you, your Honor.

8    DIRECT EXAMINATION

9    BY MR. JOSEPH:

10   Q.  Doctor, could you give us the benefit of your educational

11   experience?

12   A.  I'm a medical graduate from Pakistan.  I came to the United

13   States and I did my national medical boards.  And I did my

14   residency in New York, first, at Stony Brook Hospital in

15   medicine, surgery, and then I did my psychiatry residency at

16   Harlem Hospital and Creedmor Psychiatric Center.

17   Q.  Doctor, are you currently licensed to practice medicine in

18   the State of New York?

19   A.  Yes, I am.

20   Q.  And for how long have you been licensed?

21   A.  Fifteen, 16 years.

22   Q.  And do you limit your practice to any specialty?

23   A.  Yes.  I'm a psychiatrist.

24   Q.  Doctor, is Anthony Manganiello a patient of yours?

25   A.  Yes.

86NMMANT                     Latif - direct

1  Q.  And did you see him for the first time on February 15,

2  2001?

3  A.  Yes.

4  Q.  And what were your observations at that point in time?

5  A.  When he came to my office, he was very shaky, he was very

6  sweating, trembling, was not able to give me a coherent history

7  when I asked him why he was there.  He just said something

8  terrible has happened, I can't talk about it.  I can't talk

9  about it.

10  Q.  And what symptoms, if any, did he present with?

11  A.  He was presenting with -- he told me that he has poor

12  sleep, poor memory, poor concentration, he's unable to cross

13  streets, he's very afraid of coming out of his house, and this

14  was associated with chest pain, palpitations, numbness feelings

15  of hands and arms.

16  Q.  What is the significance of palpitations and numbness in

17  the arms?

18  A.  These symptoms are usually anxiety symptoms.  And when

19  anxiety symptoms present with palpitations, shortness of

20  breath, chest pain and fear of something bad is going to happen

21  means that they are experiencing panic attacks, and that's what

22  I felt that he was experiencing.

23  Q.  Doctor, at that point did you come to the opinion as to the

24  severity of his medical condition?

25  A.  Moderate to severe symptoms.

86NMMANT                         Latif - direct

1    Q.   What does that mean?

2    A.   It means on a scale from zero to ten when we say ten was

3    the worst, he was at least seven and a half to eight.

4    Q.   At that point did you come to a functional diagnosis?

5    A.   Yes.  He was experiencing symptoms of depression, as well

6    as symptoms of anxiety disorder.

7    Q.   Can you tell us what those conditions -- can you give us a

8    brief description of what those conditions are?

9    A.   Those conditions are medical conditions that are created by

10   severe stress or chemical imbalance created by severe stress.

11   And he was presenting with these symptoms prior -- as soon as

12   he came to see me, prior to coming to see me.

13   Q.   What is anxiety disorder?  What is an anxiety disorder?

14   A.   Anxiety disorder that presents with tremblingness,

15   sweatiness, chest pains, and palpitations.

16   Q.   How about major depression?

17   A.   Major depression is loss of concentration, loss of memory,

18   poor memory, poor energy level, fear of death or constant

19   thoughts of death, or lack of energy, basically.

20   Q.   Doctor, what, if anything, did you do to treat

21   Mr. Manganiello's symptoms or condition?

22   A.   He was severely anxious, so I had to give him something

23   right away, which was a benzodiazepine.  The medication that I

24   gave him was Klonopin to immediately relieve these symptoms

25   because these symptoms can be very distressing that can cause a

86NMMANT                    Latif - direct

1    person to not be able to function at all in any capacity.

2    Q.  Doctor, have you continuously treated Mr. Manganiello from

3    February 15, 2001 through the present?

4    A.  Yes, I have been treating him.

5         MR. JOSEPH:  At this point, Judge, I would like to

6    move into evidence Exhibit 56.

7         MR. ZUCKERMAN:  Your Honor, over our prior objection

8    and subject to the redactions we discussed.

9         THE COURT:  Very well.

10        (Plaintiff's Exhibit 56 received in evidence)

11   Q.  Doctor, I show you what's been marked as Exhibit 56 in

12   evidence, a copy of your chart.

13        Doctor, could you turn to your 7/13/01 note.

14        THE COURT:  While she is waiting, just, again, to

15   finish up your legal education, there is a distinction which is

16   worth understanding between the economist who was an expert who

17   did not have a hands-on role with respect to the plaintiff and

18   his injuries.  We are simply giving you his opinion based on

19   his expertise as an economist.

20        And this doctor, who was a treating doctor, who in

21   fact is testifying now actually from the records that she

22   amassed while she was treating the plaintiff, it carries with

23   it some differences, but I will charge you as to those

24   differences.  But keep in mind that there is -- I suppose the

25   big difference has to do with the expert because people

1   sometimes think the expert's word is gospel.  The expert's word

2   is not gospel, but I will charge you on that issue and really

3   has nothing to do with this doctor's testimony as the treating

4   doctor, so we don't have to belabor it.

5   Q.  Ma'am, what complaints, if any, did Mr. Manganiello present

6   with on 7/13/01?

7   A.  He was anxious, he was resistant to taking medications

8   because the medications I am starting him on were

9   antidepressant and antianxiety medication.  Those medications

10  have side effects, which is sexual side effects which he was

11  experiencing at the time, and he didn't like taking it, so he

12  had stopped it.

13  Q.  What conditions, though, did he present with or what

14  symptoms?

15  A.  I am not sure of your question.

16  Q.  On 7/13/01, what symptoms had Mr. Manganiello presented

17  with --

18           THE COURT:  Because he stopped taking the drugs or

19  just generally?

20  A.  He was resistant to taking the medication because he was

21  experiencing the side effects.  And I added another medication

22  to relieve those symptoms, Serzone, which usually improves the

23  sexual dysfunction.  And he still continued feeling the same

24  way as he was with the medication, and I understood that he was

25  gaining weight and he was having other problems, so I

1    encouraged him to continue taking medication because without it

2    he was completely nonfunctional.

3    Q.    Doctor, I want to direct your attention to the October 1,

4    2001 visit.  At that point did Mr. Manganiello discuss what, if

5    anything, had brought him to see you or what stress he was

6    undergoing?

7    A.    On October 1, he told me that he was having difficulties

8    because at that time he felt comfortable talking about the

9    incidents.  Initially, all these times since he came to see me

10   he hadn't spoken anything about what happened.  Despite my

11   questioning, he would always not want to talk about it.  So on

12   October 1 was the first time he told me that he was falsely

13   accused of killing someone.

14   Q.    Doctor, from February 12, 2001 through the present, are

15   there any symptoms that Mr. Manganiello has continued to

16   present with?

17   A.    He has shown very slight improvement with medications,

18   despite the fact that I tried several different kinds of

19   medications to improve his energy level, to improve his

20   motivation, to improve his concentration.  And it appears that

21   he remains, you know, very limited occupationally, physically,

22   psychologically because he has experienced, you know -- later

23   on he had mentioned at some point that he has lost his

24   girlfriend because of these reasons.  He was not able to have a

25   consistent relationship with the woman.

86NMMANT                          Latif - direct

1            MR. ZUCKERMAN:  Your Honor, I move to strike the

2    portions of the response that are nonresponsive.

3            THE COURT:  Stricken.

4    Q.  You mentioned psychological limitations.  What

5    psychological limitations, if any, has Mr. Manganiello

6    experienced?

7    A.  When we say psychological limitations, the functioning of

8    the person on day-to-day level emotionally as well as

9    cognitively.  Emotionally means that their mood is okay, they

10   are feeling up to getting up, going to work.  And cognitive

11   means being able to pay attention to their work and be able to

12   concentrate and be able to have the energy level to be able to

13   function in day-to-day life.  Both of these functions were

14   affected enough to not be able to carry on any kind of work.

15   He remained mostly at home, not did much during that period of

16   time.

17   Q.  Doctor, during this period of time did Mr. Manganiello

18   describe any nightmares?

19   A.  He mentioned that he was experiencing and reliving the

20   whole traumatic event the way the police sirens affected him.

21   He says that he still feels shaky when he hears the siren,

22   still feels afraid of the handcuffing, also, the incidents when

23   he was taken to be in jail --

24            MR. ZUCKERMAN:  Objection, your Honor.

25            THE COURT:  I'll sustain the objection.  Are you

86NMMANT                        Latif - direct

1    reading from your notes or are you just telling us your best

2    recollection of what transpired?

3                    THE WITNESS:  My best recollection.

4                    THE COURT:  Let's go on to something else.

5    Q.  Doctor, what is Mr. Manganiello's present condition?

6    A.  Mr. Manganiello has remained limited in his functioning

7    occupationally, physically, psychologically.

8    Q.  Doctor, at this point, do you have a final diagnosis of

9    Mr. Manganiello's condition?

10   A.  He suffers from major depression, he suffers from

11   posttraumatic stress disorder, and associated with these

12   symptoms are anxiety symptoms.

13   Q.  What is posttraumatic stress disorder?

14   A.  Posttraumatic stress disorder is when a person experiencing

15   severe stress or trauma and they do not want to mostly talk

16   about that trauma, they do not want -- they have recollections

17   of those traumas over and over and it ruminates on these

18   recollections.  They have nightmares, they have flashbacks, and

19   that is severe enough to incapacitate them to not be able to

20   function normally.

21   Q.  Doctor, do you have an opinion within a reasonable degree

22   of certainty as to whether there is a causal relationship

23   between the prosecution for murder and the diagnosis which you

24   made?

25                    MR. ZUCKERMAN:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86NMMANT                           Latif - direct

1          THE COURT:  Overruled.

2     A.  Yes, absolutely, because he denied any prior history of

3     having any psychological or any psychiatric problems.  He had

4     never seen a psychiatrist before.  And I can say for sure that

5     these were the incidents that has caused him to become totally

6     incapacitated.

7     Q.  Doctor, do you have an opinion within a reasonable degree

8     of certainty whether his medical condition is causing him to be

9     disabled?

10          MR. ZUCKERMAN:  Objection, your Honor.

11    A.  Yes.

12          THE COURT:  Overruled.

13    A.  This is a medical condition that is created by that severe

14    stress.

15    Q.  And do you have an opinion as to whether that medical

16    condition is causing Mr. Manganiello to be disabled?

17          MR. ZUCKERMAN:  Objection, your Honor.

18          THE COURT:  Overruled.

19    A.  Yes.  It is the medical condition that is created by the

20    severe stress.

21    Q.  And, Doctor, do you have an opinion within a reasonable

22    degree of medical certainty as to whether Mr. Manganiello's

23    medical condition is permanent?

24          MR. ZUCKERMAN:  Objection, your Honor.

25          THE COURT:  Overruled.

86NMMANT                          Latif - direct

1    A.    Yes.

2    Q.    Doctor, why do you feel it's permanent?

3    A.    Because of my experience for seven years with this patient,

4    I have noticed that not much has changed, even though he is

5    receiving medication, he is receiving some supportive type of

6    therapy, but nothing much has changed.  He constantly ruminates

7    about what his life and career would be like if this has not

8    happened.  He had wanted to join --

9          MR. ZUCKERMAN:  Objection, your Honor.

10         THE COURT:  This is all what she gained from her

11   sessions with plaintiff.  She is a treating doctor and relating

12   to us her opinion during the course of that treatment and what

13   it portends.  I can't imagine a better treating doctor type of

14   testimony, and I certainly don't understand any of your last

15   ten objections, but it's of no moment since I'm the judge.

16         Go ahead.

17   A.    He was constantly concerned about his future, he was

18   constantly concerned about his career.  He felt that his life

19   is completely ruined by this incident because now he has a

20   record that nobody will accept him.  He worked as a security

21   guard.  Now he cannot pursue that career because he has a

22   record.  Although he is cleared, but now he has gotten older,

23   he has gained tremendous weight, he has gained -- he has not

24   gained any motivation to improve all this because of this

25   chemical balance that is created as a result of this whole

86NMMANT                    Latif - direct

1    incident.  It has affected him tremendously.

2    Q.  Doctor, what, if anything, about Mr. Manganiello's medical

3    condition is preventing him from being able to, for example,

4    return to security work?

5    A.  He is experiencing posttraumatic stress symptoms which

6    means that he does not want to go to the same environment, he

7    cannot be surrounded by sirens of police.  Security guard means

8    he will have to call police and he will have to constantly be

9    in association with the same environment.  He will not be able

10   to pursue that as a career because he is going to be

11   traumatized again.  He will just not function.

12   Q.  Doctor, what, if anything, is preventing Mr. Manganiello

13   from pursuing other lines of work?

14   A.  The effect that is created by this trauma which has

15   affected his cognitive functioning, which is his concentration,

16   his attention, his level of understanding, lack of energy, I

17   think will prevent him to pursue any career.  During my time

18   that I've seen him during this whole period of time I have

19   encouraged him several times to pursue other careers, and he

20   always was not able to give me any reason for me to pursue it

21   enough to be able to do it because I just never saw him

22   motivated enough.  He seems to be completely, completely not

23   recognizing that his life has become stagnant.  He just

24   presents as a very limited person to me now, at this stage of

25   his life.

86NMMANT                         Latif - direct

1    Q.   Doctor, do you have a prognosis?

2    A.   The prognosis is anywhere from poor to fair, which means

3    very limited functioning.

4            MR. JOSEPH:   That's all I have.   Thank you, Doctor.

5            THE COURT:   Any cross?

6            MR. ZUCKERMAN:   Yes, your Honor.

7    CROSS-EXAMINATION

8    BY MR. ZUCKERMAN:

9    Q.   Good morning, Dr. Latif.

10   A.   Good morning.

11   Q.   Mr. Manganiello first came to see you on or about February

12   15 of 2001, correct?

13   A.   Correct.

14   Q.   And since February 2001, you've seen him off and on, is

15   that correct?

16   A.   Yes.

17   Q.   And during your treatment of Mr. Manganiello you never

18   consulted with his primary care physician, correct?

19   A.   I have obtained some of his, I think, medical records, but

20   not really directly in consultation, no.

21           MR. ZUCKERMAN:   Your Honor, I would ask that the

22   witness be directed to answer the question that I asked.

23           MR. JOSEPH:   I believe she did.

24   A.   No.

25   Q.   The answer is no?

86NMMANT                          Latif - cross

1   A.   No.

2   Q.   Now, when Mr. Manganiello first came to see you he told you

3   that he had been a security officer in a Bronx housing complex,

4   correct?

5   A.   Yes.

6   Q.   And during your treatment of Mr. Manganiello he didn't

7   discuss his relationship with any of his coworkers at that

8   Bronx housing complex, correct?

9           MR. JOSEPH:   Objection.

10          THE COURT:   Overruled.

11  A.   No.

12  Q.   In fact, when he first came to see you he kept saying, I

13  can't talk about it, meaning he couldn't talk about the reason

14  that brought him to you in the first place, correct?

15  A.   Correct.

16  Q.   And this went on for a few months, correct?

17  A.   Yes.

18  Q.   Then after a few months he told you he was accused of

19  killing someone, correct?

20  A.   Yes.

21          THE COURT:   I think she had said originally falsely

22  accused.

23          THE WITNESS:   Falsely accused.

24  Q.   And he told you that the person he was accused of killing

25  was a person he did not even know, correct?

86NMMANT                              Latif - cross

1              MR. JOSEPH:  Objection.

2              THE COURT:  I don't remember that testimony, but you

3       can answer it if that's what you said and I missed it, which is

4       conceivable.

5       A.   I don't recall that he said that.  I'm sorry.

6       Q.   Do you remember your deposition being taken in connection

7       with this matter?

8       A.   Yes.

9       Q.   Page 46, line 13.  Page 46 of your deposition.  Do you have

10      a copy of your deposition transcript there?

11      A.   No, I don't.

12      Q.   At page 46, line 13, you were asked the following questions

13      and you gave the following answers:

14      "Q.  Do you know who Mr. Manganiello is accused of killing?

15      "A.  He has told me the name of the person, but I don't

16      remember."

17             MR. JOSEPH:  Objection.  That's a completely different

18      question than counsel asked.

19             MR. ZUCKERMAN:  I'm just reading the questions.

20             THE COURT:  First of all, the way he is supposed to

21      present it to you is, did you give these answers to these

22      questions.  He neglected that predicate.  But then he has gone

23      on to read the questions and the answers and then he will ask

24      you if you remember having given these answers to these

25      questions.  Why don't we start again.

86NMMANT                          Latif - cross

1          MR. ZUCKERMAN:  Sure.

2          THE COURT:  Hopefully, contextually.

3          MR. ZUCKERMAN:  Page 46, line 13:

4    "Q.  Do you know who Mr. Manganiello is accused of killing?

5    "A.  He has told me the name of the person, but I don't

6    remember.

7    "Q.  Do you know what that person's relationship, if any, was

8    to Mr. Manganiello?  Did he tell you what the relationship was,

9    whether he was a colleague or a neighbor or stranger or

10   something to that effect?

11   "A.  As far as I know, he himself did not know who that person

12   was.  As far as I recall, he said, I don't know who that person

13   is, what they are accusing me of.

14   "Q.  He didn't know who the victim was?

15   "A.  No, he did not know him, as far as I remember.  He did not

16   know him or, yes, he did not know that person."

17          Do you remember being asked those questions and giving

18   those answers at your deposition?

19   A.  Yes.

20   Q.  Mr. Manganiello never gave you the identity of the murder

21   victim, correct?

22   A.  No.

23   Q.  But he did tell you that someone was trying to frame him,

24   correct?

25   A.  Someone was trying to frame him.

86NMMANT                          Latif - cross

1          THE COURT:  If you don't remember, you don't remember.

2     A.  No, I don't remember.

3     Q.  And he told you that he didn't carry guns, correct?

4          MR. JOSEPH:  Objection.  Unless this has some

5     relevance, Judge.

6          THE COURT:  I don't know what the relevance is, but

7     she doesn't remember.

8     A.  I don't remember that he said that -- he had that

9     discussion or not.

10    Q.  On page 54 of your deposition do you remember being asked

11    these questions and giving these answers, page 54, line 17:

12    "Q.  Do you know whether or not Anthony Manganiello owned a

13    gun?

14    "A.  I don't know whether he owned or not.  I don't know when

15    owns a gun or not".

16         MR. JOSEPH:  Objection.  That's exactly what he said.

17         THE COURT:  We have got these eight people who have

18    been sitting here day in and day out.  They are going to be

19    able to handle whether there is an inconsistent statement and

20    will it matter and what weight to give it.  That's a major

21    concern which they will hear about shortly.

22         MR. JOSEPH:  Very well, your Honor.

23         THE COURT:  And have heard about already.

24    Q.  As Mr. Manganiello's treating psychiatrist, you believed

25    everything Mr. Manganiello told you, correct?

86NMMANT                        Latif - cross

1    A.    Absolutely.

2    Q.    So you took his word for everything that he told you,

3    correct?

4    A.    Absolutely.

5    Q.    And you can't make a determination about whether he's

6    telling you the truth or whether he's lying, correct?

7              MR. JOSEPH:    Objection.

8              THE COURT:    That's interesting.  Is that really so?

9    Any patient that comes to you and gives you a story that you

10   find unbelievable, you believe anyway?

11             THE WITNESS:    I have to believe what the person is

12   telling me.  Then I make my judgment whether that coincides

13   with the behavior and with their history or not.  But I have to

14   believe that they are telling the truth.  I cannot be making

15   judgments that, oh, this person is malingering or making an

16   excuse.

17   Q.    During certain sessions that Mr. Manganiello had with you

18   Mr. Manganiello complained of having nightmares and flashbacks

19   of the event, correct?

20   A.    Yes.

21   Q.    And during the time that Mr. Manganiello has been in

22   treatment with you he has never been suicidal, correct?

23   A.    No.

24   Q.    No, he hasn't, correct?

25   A.    No.

86NMMANT                          Latif - cross

1   Q.  And when he first came to see you he told you that he was

2   afraid to leave his house, correct?

3   A.  Yes.

4   Q.  But at some point he was able to leave his house and take

5   care of some minor chores, correct?

6   A.  Yes, after medications.

7   Q.  And during the time that Mr. Manganiello has been your

8   patient he has missed many of his scheduled appointments,

9   correct?

10  A.  Yes.  He forgot most of the time.

11  Q.  In fact, he has appointments for months at a time, correct?

12  A.  Correct.

13  Q.  In fact, Mr. Manganiello told you that he just forgot his

14  appointments, correct?

15  A.  Yes.

16  Q.  And you referred Mr. Manganiello to a therapist but he

17  didn't go, correct?

18  A.  Correct.

19  Q.  And at the time you started seeing Mr. Manganiello he was

20  36 years old, correct?

21  A.  Correct.

22  Q.  And since you've been treating him Mr. Manganiello hasn't

23  been motivated to do anything with his life, correct?

24  A.  He has not been able to do much.

25  Q.  He hasn't been motivated to do anything?

86NMMANT                         Latif - cross

1    A.   He has not been motivated.

2    Q.   And he's not interested in pursuing a career or any

3    employment, correct?

4    A.   Correct.

5    Q.   Nor is he motivated to go and learn any new skills,

6    correct?

7    A.   Correct.

8    Q.   And even after his acquittal he hasn't been motivated to do

9    anything with his life, correct?

10   A.   Correct.

11   Q.   Now, when Mr. Manganiello finally told you that he was

12   accused of murdering someone he told you that the district

13   attorney knew he was innocent but continued to pursue the case,

14   correct?

15   A.   Correct.

16   Q.   And after he was acquitted he discussed with you his

17   frustration that the police that arrested him would suffer no

18   consequences, correct?

19   A.   Correct.

20   Q.   And the fact that he didn't want to take medication that

21   impeded sexual functions reflected that he was actually

22   engaging in sexual relations, correct?

23             THE COURT:   I don't think she was there.

24   A.   Well, when a patient tells me a side effect that is clearly

25   related to the medication, I have to take that into

86NMMANT                    Latif - cross

1   consideration.  I don't really go and check whether they are

2   really inhibited from having sex because of medication or they

3   are not emotionally not ready to do it.  I can't say that.  But

4   if they tell me, then I assume that is a side effect of the

5   medication.

6   Q.  His complaint reflects that he was actually engaging in

7   sexual relations, correct?

8          MR. JOSEPH:  Objection.

9   A.  All I know is, he was in a relationship and sexual

10  impediment was an issue.

11         MR. ZUCKERMAN:  No further questions.

12         MR. JOSEPH:  Two brief questions.

13  REDIRECT EXAMINATION

14  BY MR. JOSEPH:

15  Q.  Doctor, was missing appointments a symptoms of

16  Mr. Manganiello's medical condition?

17  A.  Absolutely.  I said earlier, he was affected cognitively,

18  which means attention, concentration, memory, and forgetfulness

19  is a part of that cognitive dysfunction.  He displayed that and

20  his physical condition was also impeded because he had no

21  energy level.  His energy level always is very low.

22         MR. JOSEPH:  Thank you, Doctor, no further questions.

23         THE COURT:  You're excused.  Thank you very much.

24         (Witness excused)

25         THE COURT:  Mr. Joseph, anything further?

86NMMANT

1              MR. JOSEPH:  Judge, we would like to move Exhibit 36

2    into evidence.  I believe there is no objection to it.

3              THE COURT:  Any objection?

4              MR. ZUCKERMAN:  Can I see what 36 is.

5              THE COURT:  Me, too.  I don't have my list in front of

6    me.

7              MR. ZUCKERMAN:  No objection.

8              (Plaintiff's Exhibit 36 received in evidence)

9              MR. JOSEPH:  For the record, defense counsel and I

10   entered a stipulation regarding the amount of legal bills paid

11   by Anthony Manganiello.  It's been stipulated among myself and

12   Mr. Zuckerman that Anthony Manganiello paid Murray Richman

13   $85,000 for his legal representation and he paid Richard Ross

14   $25,000 for his legal representation in this matter.

15             With that, Judge, plaintiff rests.

16             THE COURT:  Does the defense have a case it chooses to

17   mount?

18             MR. ZUCKERMAN:  Defendants have motions.

19             THE COURT:  As you might say, can you try to be

20   responsive to the question?

21             MR. ZUCKERMAN:  Defendants rest as well.

22             THE COURT:  What generally happens at this juncture is

23   that you listen to motions from one side or the other side or

24   both, and my policy is that I assume and put on the record, as

25   I am now, that each side has made any motions that they could

86NMMANT

1    make and that I have reserved decision on those motions.  As a

2    consequence of that ruling, we can move along.

3          Why don't you take a ten-minute recess and we will

4    then have summations.  Each summation has been represented as

5    only an hour or less.  So let us hope that continues to be the

6    case.

7          (Jury not present)

8          THE COURT:  We have made some changes in the charge

9    and we will give you each a copy of the charge and a copy of

10   the verdict sheet that we are planning to use.  And I will mark

11   as court exhibits your proposed verdict sheets and all of your

12   requests and any of your errors are presumed errors.  As a

13   consequence, you are protected in terms of anything you may

14   have objected to.  And at the end of my charge, when I ask you

15   to come up for any additions or corrections, please do not go

16   through the objections that have been marked as court exhibits.

17   Got it?

18         MR. JOSEPH:  Yes, your Honor.

19         THE COURT:  Did we keep the changes in italics?  You

20   should easily find what changes we did make.  We agreed with

21   the defendant on occasion and there were no objections -- ten

22   minutes, everybody.

23         (Recess)

24         (Jury present)

25         MR. ZUCKERMAN:  Your Honor, if we could just preserve

1    a few moments after the summation to discuss the jury charge.

2                THE COURT:  No.  You're up.

3                MR. ZUCKERMAN:  Thank you.

4                THE COURT:  If we don't have the charge before lunch

5    you're welcome to talk to me about it, but assuming we have

6    time to go right into at least the boilerplate, I don't think

7    we will be talking any more about this.  It seems to me I have

8    given you every possible opportunity.

9                MR. ZUCKERMAN:  Good morning, ladies and gentlemen of

10   the jury.  On behalf of Detective Shawn Abate, Detective

11   Richard Martinez, Detective Luis Agostini, Officer Alex Perez,

12   and Police Officer Miriam Nieves, I want to thank you for

13   taking the time out of your busy lives to hear this case over

14   the last week.

15               On February 12, 2001, Albert Acosta's mortally wounded

16   body was found in the room of 1700 Metropolitan Avenue, which

17   is located in the Bronx.  Officer Nieves and Officer Perez,

18   both experienced police officers, responded to an NYPD radio

19   call and went to the scene of the shooting.  They were among

20   the first responders to the incident.

21               Officers Nieves and Perez went into the basement and

22   saw Albert Acosta's body lying face down in a darkened room.

23   Officer Perez proceeded to canvass the basement area to

24   determine if any weapons or suspects could be found.  Officer

25   Perez then went back outside, using the same door to the

86NMMANT                    Summation - Mr. Zuckerman

1    basement from which he had entered a short time earlier.

2            Once he went back outside, Officer Perez ran into a

3    park porter by the name of Walter Cobb.  Mr. Cobb told Officer

4    Perez that he was working outside of the basement of 1700

5    Metropolitan Avenue that morning when he heard gunshots coming

6    from inside the building.  Mr. Cobb also told Officer Perez

7    that just after hearing the gunshots the basement door flew

8    open and Mr. Manganiello came running outside.

9            As Mr. Cobb and Officer Perez were talking, Mr. Cobb

10   saw Mr. Manganiello for a second time that morning, this time

11   emerging out of a crowd that had formed outside the scene of

12   the incident.  Mr. Cobb pointed out Mr. Manganiello to Officer

13   Perez as the person that he had seen leaving the basement just

14   after the shots were fired some time earlier that morning.

15   Officer Perez testified that he observed Mr. Manganiello and

16   that he appeared disheveled with dust similar to what was found

17   in the basement area of 1700 Metropolitan Avenue on his

18   uniform.  Officer Perez then gave Mr. Cobb to the NYPD

19   detectives that had arrived on the scene so that Mr. Cobb could

20   be interviewed.

21           Officer Nieves testified that as she was leaving the

22   basement area Mr. Manganiello was yelling, that's my partner,

23   that's my partner in there.  She thought that was odd because

24   at the time the identity of the victim was unknown to her.

25           The undisputed evidence during this trial was that the

86NMMANT                          Summation - Mr. Zuckerman

1    NYPD and Parkchester radios were on different frequencies.  The

2    situation was so chaotic that the Parkchester dispatcher was

3    even attempting to send Officer Acosta to respond to his own

4    fallen body.

5          Officers Perez and Nieves left the scene of the

6    shooting after about half an hour and resumed their normal and

7    regular patrol duties.

8          Veteran Detective Shawn Abate was one of the

9    detectives from the 43rd Precinct who responded to the scene of

10   the shooting.  Detective Abate was lead detective in this

11   matter for all of eight hours while Albert Acosta was still

12   alive.  Detective Abate secured the crime scene, canvassed the

13   area, and knocked on doors of persons living near the scene of

14   the shooting.  He then returned to the 43rd Precinct and was

15   present for an interview of Anthony Manganiello which I will

16   discuss in just a moment.  Detective Abate requested routine

17   laboratory tests on Mr. Manganiello's jacket and laboratory

18   analysis of a bullet found at the scene of the homicide.

19         As you heard during this trial, Mr. Manganiello was

20   interviewed by Detective Agostini and Detective Abate at the

21   43rd Precinct on February 12, 2001.  Mr. Manganiello was

22   interviewed because he was working the same tour as Albert

23   Acosta and the detectives thought he might have some

24   information about the shooting.

25         What occurred during that interview was recorded on a

86NMMANT                          Summation - Mr. Zuckerman

1    DD5 that was prepared by Detective Agostini.  This DD5 is in

2    evidence, actually twice, as Plaintiff's Exhibit 33 and

3    Defendants' Exhibit T.  I'd like to read from the DD5 what was

4    recorded about the interview with Anthony Manganiello.  He,

5    Mr. Manganiello, attended roll call and saw Albert Acosta.  He

6    then states the next time he saw Albert Acosta is when he was

7    laying on the floor at 1700 Metropolitan Avenue in the

8    basement.  The undersigned asked him where he was when the call

9    came in, and he stated, by the oval taking a personal.  The

10   undersigned, meaning Detective Agostini, asked him if he had

11   any problems with Albert Acosta or if anyone he knows has any

12   problems with him, and Anthony Manganiello would not answer.

13        The undersigned observed Anthony's right index finger

14   with a Band-Aid and asked him, how did he get his finger cut?

15   He stated, lifting up his treadmill.  The undersigned asked him

16   if he ran today, and he stated no.  The undersigned asked him

17   for his address, and he did not know.  The undersigned, again,

18   Detective Agostini, asked him for his phone number and he

19   replied, it is unlisted.  The interview stopped when his

20   lawyer, Mr. Manganiello's lawyer, Richard A. Ross, notified the

21   43rd Precinct not to have his client questioned.  So the

22   interview is recorded on the DD5 that's in evidence as

23   Defendant's Exhibit T.

24        Later on the day of February 12, 2001, Albert Acosta

25   died.  Within the 43rd Precinct it was Detective Agostini's

86NMMANT                    Summation - Mr. Zuckerman

1    turn to be assigned to the next homicide.  For that reason

2    Detective Agostini became the lead detective with respect to

3    the Acosta homicide, replacing Detective Abate.  Detective

4    Agostini began an exhaustive and complete investigation into

5    the Acosta homicide.  What Detective Agostini and the more than

6    20 other detectives that worked on this matter did were

7    recorded on DD5s.  Ladies and gentlemen of the jury, in this

8    set of exhibits are all the DD5s that are in evidence.  Ladies

9    and gentlemen of the jury, you will have the opportunity to

10   review each and every DD5 in evidence prepared concerning this

11   case when you deliberate.

12          What you will see is that NYPD detectives canvassed

13   the neighborhood, they interviewed Parkchester security

14   officers, they interviewed Parkchester maintenance workers,

15   they rang door bells to see if any people had any information

16   that would be helpful to them.  They performed vehicle

17   canvasses, they followed every conceivable lead that they had.

18   When you deliberate I invite you to review all of the DD5s that

19   are in evidence concerning this case because they show how

20   exhaustive the investigation into this homicide was.

21          On February 12, 2001, Detective Richard Martinez

22   interviewed Walter Cobb.  A DD5 was prepared by Detective

23   Martinez of his interview of Walter Cobb and this DD5 is in

24   evidence twice as well, Plaintiff's Exhibit 1 and Defendant's

25   Exhibit Q, page 2 of Defendant's Exhibit Q.