1           I'd like to read what the DD5 says about the interview

2   that Detective Martinez took with Walter Cobb.  On February 12,

3   2001, at approximately 11:15 hours, the undersigned, Detective

4   Martinez, spoke to Walter Cobb regarding what he had seen in

5   relation to the above incident.  He stated the following in sum

6   and substance:  The witness stated that he has been working in

7   Parkchester for around a year.  Furthermore, he stated that he

8   recognized the Parkchester officer, Manganiello, from working

9   at Parkchester, and knows him by face and name for around a

10  year.  He stated that he positively recognized Officer

11  Manganiello as the Parkchester officer that exited the basement

12  at 1700 Metropolitan Avenue after he heard the gunshots.

13          Paragraph 2:  Walter Cobb stated it was around 10:10

14  or so, he was walking to the basement entrance and he was next

15  to the basement window while on the sidewalk when he heard four

16  shots that were muffled.  There was two and then two more.  He

17  then approached the basement door when it first opened and a

18  Parkchester officer came rushing out.  It was Manganiello who

19  he saw.  I said to him, I had just heard four shots and he

20  said, so did I.  He was excited looking.  He took off in a

21  hurry.  I saw him go up the street towards the circle.  I saw

22  the door was closing and did not have the key, so I grabbed it

23  to go inside to do my work.  I started working on the compactor

24  at the end of the hallway.  As I walked into the basement to

25  the compactor and was starting to work when a Verizon guy came

86NMMANT                          Summation - Mr. Zuckerman

1    to me regarding a locked storage room that he needed to get

2    inside.  I opened the door and we both looked inside.  We

3    didn't see any telephone equipment, so we left the room, but I

4    left the door open.

5            I went on doing my work, then I decided to take a look

6    inside this room.  It was about a minute or two later, I saw

7    what looked like a stack of clothing.  The room was dark.  So I

8    was using my flashlight and took a closer look.  I saw the guy

9    lying face down with a uniform on.  His hat and radio was on a

10   stove in the room.  I looked close and saw a gunshot wound in

11   the back of his head.  I ran out and got the telephone guy, the

12   Verizon worker, and we went back inside the room with them.  We

13   then left the room and came outside.  I called the security

14   office and there was no answer.  I then called 911.  That's the

15   DD5 of Detective Richard Martinez's interview with Walter Cobb,

16   same day that Albert Acosta was murdered.

17           You also heard that Detective Martinez interviewed

18   Richard Huello that day.  Richard Huello is the Verizon worker.

19   Mr. Huello is a Verizon worker who was working in another room

20   in the basement of 1700 Metropolitan Avenue with a telephone

21   earpiece in his ear.  A DD5 was prepared by Detective Martinez

22   of his interview of Mr. Huello.  This DD5 is in evidence twice

23   as well, as Plaintiff's Exhibit 4 and Defendant's Exhibit K.

24           Later on February 12, 2001, Detective Martinez

25   interviewed Officer Perez at the 43rd Precinct.  A DD5 was also

1   prepared by Detective Martinez of that interview as well.  It

2   is in evidence twice also as Plaintiff's Exhibit 5 and

3   Defendant's Exhibit Q, page 1.  I'd like to read paragraph 2

4   from the interview that Detective Martinez conducted with

5   Officer Perez.  Paragraph 2:  I was at the scene when I noticed

6   the Parkchester cop emerging from the crowd.  He was all messy

7   looking with white plaster-like powder on his jacket sleeve.

8   He was red-faced and breathing heavy and had sweat on his face.

9   I then saw other officers take him to a car.  We first

10  responded to the scene on a 1013 call to 1700 Metropolitan

11  Avenue.  We went inside the basement and saw the guy that was

12  shot.  We did a small canvass and spoke to the maintenance guy,

13  Cobb, who heard the shots.

14          The investigation then continued.  On February 16,

15  2001, Detective Linda Palacio interviewed a Parkchester

16  security officer named Harry Plaza.  She prepared the DD5s of

17  that interview and her interview with Harry Plaza is contained

18  on the second page of Defendant's Exhibit R-8.  And I would

19  like to read to you, ladies and gentlemen of the jury, the

20  portion of Defendant's Exhibit R-8, the DD5, that contains the

21  interview by Detective Palacio with Harry Plaza.  Harry Plaza

22  has SPO status, has been a security officer in Parkchester for

23  the last five years, works midnight, 12 to 8.  He was off duty

24  on Monday.  He has worked eight months before he went to days.

25  I'm sorry.  He has worked with Acosta for two years on the 4 to

1    12 shift and also worked with Manganiello for eight months

2    before he went to days.

3         He has heard Manganiello mention that he has a carry

4    permit.  He also knows that Manganiello had an incident with

5    Officer Hicks and the supervisors were aware and they received

6    some type of disciplinary action, but there was another inside

7    the locker room with Manganiello and Acosta after the Hicks

8    incident that we broke up and no supervisor was notified.  It

9    was a shoving match and we had to pull them apart.  That's

10   Defendant's Exhibit R-8 in evidence, one of the DD5s that you

11   can review when you deliberate.

12        On February 17, 2001, Detective Agostini interviewed a

13   Parkchester security officer by the name of Anthony Langhorn.

14   Detective Agostini prepared a DD5 of that interview.  It is in

15   evidence as Defendant's Exhibit P-2 and I would like to read to

16   you a portion of that interview.  He, SPO, special patrol

17   officer, special Parkchester patrol officer Anthony Langhorn

18   stated both Albert and Anthony were hotheads.  He is a good

19   friend of Anthony Manganiello and he told me that he had a

20   pistol license and he gave Anthony his nine millimeter to hold.

21   The undersigned advised him to go to Yonkers PD and attempt to

22   recover his gun.  The undersigned spoke about Anthony

23   Manganiello's injury and his finger due to him lifting his

24   treadmill and Langhorn stated he does not have a treadmill.

25        He also stated that one time Anthony Manganiello told

1  him he was driving home one time and someone cut him off.  He

2  then told Langhorn he pulled along side the vehicle and pointed

3  his gun to the driver.  That DD5, Defendant's Exhibit P-2, is

4  in evidence and I would ask, ladies and gentlemen of the jury,

5  that you please review it during your deliberations.

6         On February 12, 2001, a Detective Dowd of the 43rd

7  Precinct interviewed a Parkchester construction worker named

8  Sal Miro.  Detective Dowd prepared a DD5 of that interview.

9  That DD5 is in evidence as Defendant's Exhibit Z-7.

10        MR. JOSEPH:  Judge, I don't believe this is in

11 evidence, looking at my notes.

12        THE COURT:  If it's not in evidence, then it won't go

13 to the jury.  I kept a record for a while, but I don't know

14 that I have that number on it at all.  Do either of you, Dennis

15 or Anna, have a record of it?

16        THE DEPUTY CLERK:  Which one is it?  What number?

17        MR. JOSEPH:  Z-7.

18        MR. ZUCKERMAN:  We moved all of the DD5s into

19 evidence.

20        THE COURT:  They don't all go into evidence.  They

21 only go in evidence if they use them.  Otherwise, they are just

22 in your book.  I have a Z, no Z-7.

23        MR. JOSEPH:  Judge, I don't think P-2 is in evidence

24 either.

25        MR. ZUCKERMAN:  They were admitted into evidence, your

86NMMANT                              Summation - Mr. Zuckerman

1    Honor.

2              THE COURT:  An individual piece of paper is shown to a

3    witness and identified before it goes in.  The fact that you

4    provided me with a book with 5,000 pages does not mean they are

5    all in evidence.  You understand that.

6              MS. OKEREKE:  Respectfully, your Honor, during

7    Detective --

8              THE COURT:  We don't need both of you.

9              MR. ZUCKERMAN:  -- Detective Agostini's testimony we

10   moved the remainder of the DD5s into evidence and they were

11   admitted.

12             MR. JOSEPH:  No, they were not, Judge.

13             THE COURT:  My view is, I don't remember that

14   happening, so we won't talk about that particular DD5.

15             MR. JOSEPH:  Judge, I am going to ask for a corrected

16   charge on P-2.  It is absolutely improper just what happened.

17             MS. OKEREKE:  Your Honor, at the very end of Detective

18   Agostini's defendants' examination of him, defendants went DD5

19   by DD5 and your Honor requested that instead of defendants

20   exhaustively going into each DD5 that all of the DD5s be

21   entered into evidence and the jury would have another

22   opportunity to view them.

23             MR. JOSEPH:  Absolutely not, Judge.

24             THE COURT:  Look at the transcript.  It's not a big

25   deal.

86NMMANT                          Summation - Mr. Zuckerman

1          MR. JOSEPH:  Judge, what the defense is doing right

2     now is highly improper.

3          MR. ZUCKERMAN:  Detective Dowd interviewed Sal Miro.

4          MR. JOSEPH:  Judge, this shouldn't be up there.  This

5     isn't in evidence.

6          THE COURT:  We are assuming it's not evidence.  And if

7     something changes that decision, you will be the first to know,

8     and we can talk to the jury about it at the end of summations

9     and then we will have plenty of time.  But at the moment, since

10    only you and your colleague recall that they went into

11    evidence, we are not letting them in now.

12         MR. ZUCKERMAN:  Detective Agostini interviewed Sal

13    Miro.  Sal Miro --

14         THE COURT:  Did you show these to your adversary,

15    these charts, before you started to put them up on the wall?

16         MR. ZUCKERMAN:  They are DD5s that were in evidence.

17         THE COURT:  But the fact is, that's no longer

18    apparently agreed to.

19         MR. ZUCKERMAN:  They are just blowups of DD5s --

20         MR. JOSEPH:  Whatever he put in evidence in front of

21    the jury is in evidence, but he's pulling out things that he

22    didn't put in evidence.

23         MR. ZUCKERMAN:  They are in evidence.

24         THE COURT:  What I'm talking about is a little

25    different.  I prefer, if in fact you ever come by again, that

86NMMANT                        Summation - Mr. Zuckerman

1    before you put charts up -- let's keep going.

2            MR. ZUCKERMAN:   Detective Agostini interviewed a

3    Parkchester construction worker named Sal Miro.   Sal Miro then

4    sent Detective Agostini to the pizzeria, the pizzeria that

5    plaintiff Anthony Manganiello admitted that he ate at once or

6    twice a week.   Detective Agostini interviewed Chris Tartone,

7    the owner of the pizzeria, and Mr. Tartone in his interview

8    with Detective Agostini told Detective Agostini that a friend

9    of his named Michael Booth -- that he overheard a friend of his

10   by the name of Michael Booth that Mr. Manganiello asked him if

11   he was selling an illegal gun.

12           And then Detective Agostini interviewed Mr. Booth.

13   The interviews that Detective Agostini had with Chris Tartone

14   and Michael Booth are in evidence.   I'd like to read portions

15   of the interview that Detective Agostini conducted with Chris

16   Tartone.   Officer Manganiello came to his pizza shop, Pizza

17   Place, and was asking people if they were selling the gun.

18   Chris stated Officer Manganiello came to this pizza shop and

19   was asking people if they would sell him a gun.   Chris stated

20   Officer Manganiello had a gun book in hand.   Chris states a

21   friend of his named Michael Booth told him that Officer

22   Manganiello asked him if he was selling an illegal gun.   Mike

23   then told him he could get in a lot of trouble and could get 20

24   to 25 years.

25           Chris states Officer Manganiello comes to his pizza

86NMMANT                    Summation - Mr. Zuckerman

1   shop maybe once a month.  Chris states Michael Booth drives a

2   white truck with tinted windows, and he is also the

3   neighborhood loan shark.  Chris states that he will be in on

4   Thursday at around 12 noon.

5           Chris Tartone wrote a statement on the above incident.

6   The undersigned showed Chris Tartone a photo book consisting of

7   white males and he picked out Anthony Manganiello as the person

8   who went to this pizza shop and asked for a gun.  This DD5 is

9   in evidence.  It's the DD5 of an interview that Detective

10  Agostini conducted with Chris Tartone, the owner of the pizza

11  shop, that Mr. Manganiello testified on his examination that he

12  ate at once or twice a week.

13          So as you can see, Chris Tartone led Detective

14  Agostini to Michael Booth.  Michael Booth was then interviewed

15  by Detective Agostini and that DD5 is in evidence as

16  Defendant's Exhibit O-3.  I'd like to read a portion of that

17  DD5.

18          He, Michael Booth, stated Officer Manganiello

19  approached him one time when he was sitting in his truck by the

20  bank next to Macy's and asked him if he had arrived.  Michael

21  told him it's a big rap for a small price if he sold him one.

22  Michael has seen Manganiello numerous times around the

23  neighborhood and pizzeria.  That DD5 is in evidence as

24  Defendant's Exhibit O-3.

25          Also in evidence as Defendant's Exhibit N-3 is a DD5

86NMMANT                    Summation - Mr. Zuckerman

1    in which Detective Agostini had Michael Booth view a photo book

2    and it states on March 1, 2001, at approximately 1405 hours,

3    Michael J. Booth viewed a box of photos consisting of white

4    males and he picked out Anthony Manganiello as the person

5    looking for a ride.  That's Defendant's Exhibit N-3 and it's in

6    evidence.

7         You heard testimony from retired detective, NYPD

8    Detective Derrick Parker.  Detective Parker never worked in the

9    43rd detective squad.  Rather, at the time of the Acosta

10   homicide he was working in the NYPD intelligence unit.

11        On February 14, 2001, Detective Parker received a

12   phone call from a confidential informant that Detective Parker

13   was working with.  He was in jail at Rikers Island.  The

14   confidential informant that Detective Parker was working with

15   told him that another inmate named Terrence Alston, who lived

16   in Parkchester, had information about a homicide in the Bronx.

17   Detective Parker went to Rikers Island and met with Terrence

18   Alston.  Mr. Alston told Detective Parker that he had

19   information concerning the shooting death of a security guard

20   in the Bronx.

21        Detective Parker testified that he immediately called

22   the 43rd Precinct and confirmed that the 43rd detective squad

23   was indeed investigating such a homicide.  The 43rd detective

24   squad immediately sent two detectives, Detective Ramos and

25   Detective Bencenvingo, to Rikers Island to meet with

1    Mr. Alston.  Detective Ramos prepared a DD5 of his interview

2    with Mr. Alston, and I would like to read to you the statement

3    that Mr. Alston gave to Detective Ramos.  That is in evidence

4    as Defendant's Exhibit F-8; again, Mr. Alston's statement.

5         I, Terrence Alston, make the following statement.  In

6    late August 2000, a uniformed security guard from Parkchester

7    approached me and asked if I could do him a favor.  I asked

8    him:  What is the favor.  He told me he wanted another security

9    guard killed.  I asked him why he wanted him called and he said

10   he wanted him killed because he was expletive in with a girl.

11   He then asked me if I needed a gun and I told him I have one

12   already.  He asked me, what is the price?  I told him I did not

13   know right now.  I'll get back to you.  Two days later I saw

14   him in front of 1560 Union Port Road.  We talked about setting

15   it up in the building in the daytime.

16        He stated that he would call for assistance and when

17   the guy showed up I would be waiting for him.  I told him that

18   I would get back to him.  I told him that when it was time he

19   would show me the guy.  He also gave me a master key to the

20   buildings in Parkchester.

21        I went to court in October and pled out to attempted

22   possession of a weapon and got remanded.  The reason I did not

23   do the hit was because I was healing from being shot up on

24   August 22, 2000.  This is DD5, interview conducted by Detective

25   Ramos and Detective Bencenvingo of Terrence Alston on February

1    14, 2001.

2              On February 15, 2001, one day later, Detective

3    Agostini, along with a Sergeant Martinez, not to be confused

4    with Detective Martinez, and Detective Palacio, went to Rikers

5    Island and reinterviewed Terrence Alston.  Detective Agostini

6    prepared a DD5 of that interview.  It is in evidence as

7    Defendant's Exhibit F-2.  I'd like to read to you a portion of

8    that DD5.  He stated the following, being Mr. Alston:

9              He, Mr. Alston, was approached last year, September

10   2000, by a male white heavyset who works as a Parkchester

11   security officer to do him a favor.  The favor was to kill

12   another security officer for him.  When Terrence, also known as

13   Murdock, asked why, he stated, over a girl.  Terrence asked,

14   how much, and he did not give a price.  Terrence stated, the

15   Parkchester officer asked him, do you need a gun, and Terrence

16   stated, no.  I have one.

17             Terrence stated, when the hit was going to go down,

18   the security officer will point out the other Parkchester

19   security officer he wanted killed.  Terrence stated he met

20   twice with the security officer and spoke about the hit on the

21   other Parkchester security officer.  Terrence Alston, a/k/a

22   Murdock, then stated, Johnny, who he had been talking to, sold

23   a .22 caliber gun to a white male security officer for $75.

24   Terrence is trying to convince Johnny, who was dating his

25   daughter, to give this information to the police.  Terrence

1    states, Johnny is scared he will be arrested.

2            Detective Agostini testified that he showed Mr. Alston

3    a photo book and that Mr. Alston identified Mr. Manganiello as

4    a person who had approached him.  That DD5 is in evidence as

5    Defendant's Exhibit F-2.

6            The Acosta homicide investigation lasted approximately

7    two months before ADA Christine Scaccia, a Bronx Assistant

8    District Attorney with 17 years' experience and who was

9    prosecuted over a 100 homicides, presented the case to the

10   grand jury.  During that time Detective Agostini and ADA

11   Scaccia were in frequent contact and Detective Agostini

12   provided ADA Scaccia with all the information that he received

13   during the course of the investigation.

14           ADA Scaccia determined, based upon the independent

15   interviews of witnesses that she conducted, that there was

16   sufficient cause to proceed with the prosecution of

17   Mr. Manganiello, and she authorized Mr. Manganiello's arrest.

18           You heard from ADA Scaccia that the Bronx District

19   Attorney's Office decides whether to prosecute a criminal

20   defendant, not NYPD police officers or detectives.  You also

21   heard from ADA Scaccia that none of the defendants asked,

22   suggested, or pressured her to prosecute Mr. Manganiello.

23   You've heard her testify that police officers don't determine

24   what evidence she presents to a grand jury.  Additionally,

25   police officers don't sit in the grand jury as evidence is

86NMMANT                        Summation - Mr. Zuckerman

1    presented by the Assistant District Attorney.

2            Then you heard that ADA Scaccia presented this case to

3    the grand jury.  You also heard that ADA Scaccia had her 120

4    hours after Mr. Manganiello's arrest to present her case to the

5    grand jury.  ADA Scaccia testified that between 16 to 23 people

6    living in Bronx County hear the evidence as grand jurors and

7    determine if there is reasonable cause to determine if the

8    suspect has committed the crimes he is charged with.  ADA

9    Scaccia testified that she has broad discretion as to the

10   witnesses she presents to the grand jury.

11           She testified that in this case she independently

12   interviewed all of the witnesses as she presented to the grand

13   jury.  ADA Scaccia also testified that she had access to the

14   entire contents of Detective Agostini's case file for her use

15   in the grand jury, even though portions of that case file later

16   went missing, after the grand jury indicted him.  ADA Scaccia

17   also testified that Mr. Manganiello had the opportunity to

18   present witnesses to the grand jury if he desired, and that he

19   declined to do so.

20           There was seven witnesses that ADA Scaccia presented

21   to the grand jury, three of them were civilians:  Walter Cobb,

22   Chris Tartone, and Terrence Alston.  Four NYPD officers

23   testified, Officer Nieves, Officer Perez, Detective Agostini,

24   and Officer Casciano.  The grand jury minutes are in evidence

25   as Plaintiff's Exhibit 38, and I would encourage you to read

1    them as you deliberate.

2              I would like to read just a portion of Walter Cobb's

3    grand jury minutes, Walter Cobb's testimony to the grand jury:

4    Question by Ms. Scaccia:  Now, as you were approaching 1700

5    Metropolitan Avenue, did something unusual take place?

6    "A.  As I approached the rear exit, which is on the avenue

7    itself, I heard what appeared to be a muzzle, or gunshots.

8    "Q.  Four gunshots?

9    "A.  At least four gunshots, at least to four or five steps

10   until I hit the door, approached the door.

11   "Q.  These gunshots, did they happen one right after the other

12   or was there a pause?

13   "A.  Two first and then two after.  There was a slight pause

14   between the four.

15   "Q.  Okay.  Now, as you approached the doorway is there a time

16   when you get right in front of the door?

17   "A.  I just dismissed it immediately from my mind, almost

18   immediately I approached the door.

19   "Q.  Okay.  What happened when you approached the door?

20   "A.  I was using my comp key when the door flew open.  I was

21   trying to enter the building, the door, someone from inside the

22   door.

23   "Q.  Now, this door, how does it open, do you push it in?  How

24   does it open?

25   "A.  You push it in.

1    "Q.  As soon as the door flew open from inside did you see

2    anyone on the other side of the door?

3    "A.  Yes, I did.

4    "Q.  Who was on the other side of that door?

5    "A.  This man which I know is named Manganiello was stepping

6    out."

7            That's a portion of what Walter Cobb testified to the

8    grand jury.

9            Mr. Alston, who died between the time of the grand

10   jury proceedings and the criminal trial, also testified before

11   the grand jury, and I would just like to read a small portion

12   of Terrence Alston's grand jury testimony as well.

13   Ms. Scaccia's question:  Can you please tell the members of the

14   grand jury if anything unusual took place at about that time?

15   "A.  Yes.

16   "Q.  What happened?

17   "A.  A security officer approached me about accepting a

18   contract to kill another security officer.

19   "Q.  Now, where were you when the security officer approached

20   you?

21   "A.  In front of my building, 1560 Union Port Road.

22   "Q.  Have you talked to the security officer before?

23   "A.  No.

24   "Q.  When he approached you, did he call you by his name?

25   "A.  Yes.  He called me by my nickname, Murdock."

1           Another portion of Terrence Alston's grand jury

2    testimony:

3    "Q.  Now, what exactly, to the best of your recollection, did

4    the security officer say to you and what, if anything, did you

5    say back to him?

6    "A.  He asked me if I would accept a contract to kill another

7    security officer.  I told him yes.

8    "Q.  Did he tell you why?

9    "A.  He said it was over a little conflict, over a girl."

10          One more portion of Terrence Alston's grand jury

11   testimony:

12   "Q.  Now this security officer, did he have any other

13   conversations after that?

14   "A.  Yes, a couple of days later.

15   "Q.  Okay.  How did that happen?

16   "A.  He approached me, he gave me a master key to the building

17   to get to the basement, he showed me where I was going to do

18   it, and he also asked me if I had a gun.  He told me he would

19   give me a gun.  I told him I had a gun already, I wouldn't need

20   a gun."

21          That's portions of Terrence Alston's grand jury

22   testimony as part of Plaintiff's Exhibit 38, the entire grand

23   jury minutes that, ladies and gentlemen of the jury, you will

24   have for your review when you deliberate in this case.

25          Mr. Tartone also testified before the grand jury.  I

1   would encourage you to read Mr. Tartone's entire testimony, but

2   in sum and substance Mr. Tartone testified that Mr. Manganiello

3   came to his pizzeria to eat from time to time and that on one

4   occasion he overheard Mr. Manganiello asking someone if he

5   could purchase a gun.

6        Officers Nieves and Perez also testified before the

7   grand jury.  I refer you to their testimonies which are

8   contained as part of the grand jury minutes in Plaintiff's

9   Exhibit 38, the grand jury minutes in evidence.

10        Detective Agostini also testified before the grand

11   jury.  The grand jury minutes reflect that the only thing that

12   Detective Agostini testified to was that the body of the victim

13   was indeed that of Albert Acosta.  Mr. Manganiello presented no

14   evidence to the grand jury.  The grand jury voted to indict

15   Mr. Manganiello for murder, manslaughter, and unlawful

16   possession of a gun after hearing the evidence.

17        In an attempt to persuade you into believing that the

18   grand jury indictment was obtained improperly, plaintiff has

19   attempted to distort the facts and discredit the defendants.

20   Plaintiff has attacked the officers with various testimonies

21   that they have given during the last seven plus years.

22        You heard Officer Nieves testify that the grand jury

23   proceedings were over seven years ago.  She testified at a

24   criminal pretrial hearing some four years ago.  She testified

25   as to Mr. Manganiello's criminal trial that also took place

86NMMANT                        Summation - Mr. Zuckerman

1    four years ago.  She testified at a deposition in this case

2    earlier this year.  Finally, she testified before you at this

3    trial.  And in each of these proceedings she testified as to

4    the 30 minutes out of her long career that she spent in the

5    NYPD.

6            Similarly, Officer Perez, Detective Abate, and

7    Detective Agostini testified up to five times in this matter

8    over the last seven plus years in the various proceedings that

9    Officer Nieves testified at.  With respect to Detectives Abate,

10   Agostini, and Martinez, this case was just one of hundreds or

11   thousands of cases that they were responsible for during their

12   long careers as NYPD detectives.

13           Ladies and gentlemen of the jury, can a person

14   reasonably be expected to remember everything about an event

15   that took place over seven years ago, even an important event,

16   or even three or four years after the event?  Or would a person

17   remember what was important about the event in question, which

18   is what I submit to you that Officers Nieves and Perez,

19   Detectives Abate, Martinez, and Agostini have done in this

20   case.

21           Plaintiff has also tried to make you believe that

22   Detective Agostini purposely lost the box containing the case

23   file.  However, you've heard from Detective Agostini that well

24   after the grand jury proceedings he was transferred from the

25   43rd Precinct to another unit of the NYPD at a different

1    location.  Some years after the grand jury indictment ADA

2    Scaccia asked Detective Agostini for the box containing the

3    case file because the criminal trial was coming up.  Detective

4    Agostini told you that he went back to the 43rd Precinct to

5    look for the files.  What he found was that the room where he

6    had left it had been renovated and completely changed.  Despite

7    Detective Agostini's best efforts, the box containing his case

8    file simply cannot be located.

9            You've also heard a lot of testimony concerning

10   Terrence Alston.  There is no dispute that Terrence Alston had

11   a criminal background.  But what we would ask you to focus on

12   is that he had material information about the Acosta homicide.

13   He lived in Parkchester, he was able to describe

14   Mr. Manganiello's physical appearance, he identified Mr. Alston

15   from a photo book, explained how Mr. Manganiello approached him

16   and asked him if he would kill a Parkchester security guard,

17   explained that Mr. Manganiello had given him a set of keys to

18   portions of the basement area that other persons did not have.

19           He gave all of this information to ADA Scaccia and a

20   cooperation agreement was entered into between the Bronx

21   District Attorney's Office and Mr. Alston.  The judges involved

22   in the criminal proceedings were fully aware of the agreement

23   that the Bronx District Attorney's Office made with Mr. Alston.

24           You've also heard considerable testimony about persons

25   named Johnny Baker and Mark Damon.  However, the information

86NMMANT                    Summation - Mr. Zuckerman

1     that Mr. Damon provided to Ms. Scaccia, namely

2     Mr. Manganiello's purchase of a .22 caliber gun, was never even

3     presented to the grand jury. It, therefore, played absolutely

4     no really in the grand jury's decision to indict

5     Mr. Manganiello. I submit, therefore, that this issue is

6     nothing but a red herring.

7            During this trial plaintiff has also placed a lot of

8     emphasis on this Sprint report which he claims evidences that

9     Officer Nieves and Perez heard over their radios the identity

10    of the victim on their way to the scene of the incident.

11    However, there is no dispute that Parkchester and NYPD radios

12    are on a different frequency. There is also no question that

13    things were chaotic and there was a lot going on. In fact, you

14    have heard that there were many Parkchester radio transmissions

15    that morning. Simply, Officers Nieves and Perez have testified

16    truthfully to what they heard and what they saw that day.

17    There was nothing to contradict their testimonies.

18            Now, Anthony Manganiello testified during this trial

19    that at least nine different people lied. He testified that

20    Walter Cobb lied. He testified that Chris Tartone lied. He

21    testified that Michael Booth lied. He testified that Terrence

22    Alston lied. He testified that Detective Agostini lied. He

23    testified that Detective Abate lied. He testified that

24    Detective Martinez lied. He testified that Officer Nieves

25    lied. And, finally, he testified that Officer Perez lied. But

86NMMANT                    Summation - Mr. Zuckerman

1    there was no lying here.  Defendants conducted their duties

2    honestly, properly, and professionally.  There was no reason

3    for defendants to lie.  There was no motive for defendants to

4    lie.

5            Ladies and gentlemen of the jury, plaintiff would have

6    you believe that he was framed, but that just did not happen.

7    Therefore, your verdict should be for the defendants.

8            Thank you very much.

9            THE COURT:  Mr. Joseph, you're up.

10           MR. JOSEPH:  Thank you, Judge.

11           Good morning, ladies and gentlemen.  On behalf of my

12   client I would also like to thank you for fulfilling your civic

13   responsibilities and serving as jurors in this case.  I know

14   you have taken some time away from your personal lives, and we

15   do appreciate it.  We couldn't do this without you.

16           When we speak about this process it's often said,

17   above all, let the system be fair.  If the process is fair, the

18   result will be just.  But I think when you look at the big

19   picture and you recall all of the pieces of the evidence that

20   you have heard throughout the course of this trial, I think the

21   only conclusion that you can really draw is, the system was not

22   fair to Anthony Manganiello.  The process was anything but

23   fair.  In fact, I think the only conclusion you can really draw

24   is that Anthony Manganiello played into a stacked deck from day

25   one.

86NMMANT                       Summation - Mr. Joseph

1           Ladies and gentlemen, I think it's appropriate that we
2    are a week or so away from the 4th of July when hearing this
3    case, a week or so away from our country's birthday.  You got
4    to remember, our country arose out of a yearning to be free
5    from government oppression, bad things by government actors.  I
6    think this case makes us think about in some ways what the
7    Constitution is really about.  Unfortunately, the one thing --
8    the sad truth of the matter is, the Constitution is guaranteed
9    to mean nothing unless the police obey them.
10          So the question becomes, who holds the police
11   accountable for their actions?  My question to you, ladies and
12   gentlemen, if not you, then who?
13          We are here to ask you today to hold each and every
14   one of these defendants responsible for the constitutional
15   violations they committed against Anthony Manganiello.  And
16   you're here because this system wasn't fair, because he played
17   into a stacked deck.  Because it was a manipulation of the
18   system, Anthony Manganiello spent ten days in jail, ten days
19   away from his family, ten days away from his life, in jail.  He
20   was deprived of a liberty interest.  Ladies and gentlemen, what
21   greater constitutional right do we have than our own liberty.
22          Now, you're going to listen to the judge's charge on
23   constitutional rights.  I submit to you I believe you're going
24   to hear that loss of deprivation is sufficient for a
25   constitutional right.

1          And, also, ladies and gentlemen, while -- because the
2     system was unfair, Mr. Manganiello has waited over seven years
3     to receive the justice that he's entitled to and that I hope
4     you agree he's entitled to.

5          You've heard a lot of talk about elements, elements we
6     haven't established for a malicious prosecution here.  One, the
7     prosecution terminated in the plaintiff's favor while he was
8     acquitted.  He was found not guilty, not guilty.  That's a
9     termination in his favor of this criminal proceeding.

10         You also heard about an initiation.  Well, how did
11    this criminal case come about?  How did it start?  Well, it's
12    Exhibit No. 24 and it's -- Defendant Agostini signed a felony
13    complaint.

14         I know the defendants have spent a lot of time talking
15    to you about the district attorney's role, the grand jury's
16    role, but when you look at Exhibit 24, it's in evidence, you're
17    going to see -- I'm sorry I don't have blowups for you.  It's
18    Detective Luis Agostini is who started this criminal
19    prosecution, not the district attorney's office, Luis Agostini
20    swore that Anthony Manganiello did cause the death of a person,
21    namely, Albert Acosta.  This is in evidence.  It's not the
22    district attorney's signature.  It's Detective Luis Agostini's.

23         You also heard, I think, throughout the course of the
24    trial, the defendants here have sort of tried to pass the buck
25    onto the DA.  The district attorney is an advocate.  They are

1    not out there investigating crimes.  They are only going

2    forward based upon what information they are given.  If they

3    are given lies, no knowing that they are lies, they go forward

4    with the lies.  It's junk in, junk out.  It's the defendants'

5    responsibility not -- to pass on truthfully credible

6    information and make it known to the district attorney when

7    they know someone is lying.  That's their obligation.

8           You heard also, since we are talking about initiation,

9    that an officer has to go before a judge and give them certain

10   information to be able to get authorization or a warrant.  Did

11   any of these witnesses tell a judge that Mr. Alston lied to

12   them?  Did any of these witnesses tell them that Mr. Alston was

13   getting out of jail in exchange for his testimony?  Did any of

14   these witnesses tell them that they threatened Booth into

15   signing a statement?  That information was not put forward to

16   the district attorney or the judge.

17          In fact, not only did the grand jury not know that

18   Mr. Alston was getting a deal, the evidence is clear,

19   unrefuted, that the district attorney's office actively misled

20   the judge overseeing that proceeding.  If you look at -- it's

21   in evidence -- Exhibit 46, this is a sworn affirmation, an

22   affidavit by the district attorney in the case --

23          MR. ZUCKERMAN:  Objection, your Honor.

24          MR. JOSEPH:  It's in evidence, Judge.

25          THE COURT:  The object of these summations, Mr.

1    Zuckerman, unless there is a tragic mistake, is it is the only

2    time that either side has for a narrative so as to be able to

3    give the jury an overview.  So I look at objections extremely

4    carefully and generally ignore them so that they can have the

5    advantage of that narrative.  If you think this is critical,

6    I'll be glad to listen.

7          MR. ZUCKERMAN:  Yes, your Honor.  He's talking about

8    what the DA -- an agreement that the DA entered into with

9    Mr. Alston.  We are not litigating the DA's role in this.

10         THE COURT:  But it all comes from whatever your client

11   gave her.

12         MR. ZUCKERMAN:  This is an agreement that the DA

13   entered into, the DA and Mr. Alston.

14         THE COURT:  Is it in evidence, Mr. Zuckerman?

15         MR. ZUCKERMAN:  Yes, it is in evidence.

16         THE COURT:  Unlike, by the way, all I can find on P-2

17   and Z-7, but I hope you will convince me to the contrary.

18         Go ahead, Mr. Joseph.

19         MR. JOSEPH:  This is in evidence.  You can look at it.

20   It says, specifically, the Court directed the people, the

21   district attorney's office, to provide additional information

22   before it makes its determination regarding the defendants'

23   motion to inspect and dismiss the indictment.

24         Specifically, the Court wanted to know whether an

25   agreement had been reached between the people and a civilian

727

1    witness who provided a direct nexus between the crime and the

2    defendant.  This is Alston.

3            What did she say?  Exhibit No. 1.  He agreed to work

4    with Detective Parker in the investigation of unrelated

5    narcotics cases.  You heard Detective Parker.  Didn't he tell

6    you he wasn't working on any narcotics cases?  Also, the

7    agreement -- No. 3, the agreement was not made to ensure his

8    testimony in this case.

9            Well, what did Ms. Scaccia testify to?  That this

10   witness was let out of jail specifically in exchange for

11   testimony against this plaintiff.  How can you have any

12   confidence in what the district attorney did or this grand jury

13   indictment when there has been active misrepresentation.  It's

14   clear as day.

15           Also, remember these defendants didn't tell the judge

16   that Mr. Huello and Mr. Cobb had inconsistent statements, one

17   contradicted the other.  They both couldn't possibly be true.

18   Instead, what he did is he concentrated on what Cobb said and

19   ignored what Huello said.

20           Ladies and gentlemen, Detective Agostini initiated

21   this prosecution, I don't think there is any question about it.

22   And the other defendants played a distinct role that also

23   caused this prosecution to go forward.

24           You heard that Mr. Abate was the lead detective when

25   this case -- when this case first was reported.  And even

1    though he couldn't really get a straight answer from either

2    Abate or Agostini on who actually arrested plaintiff, remember

3    that?  One says, oh, it happened after my tour, and then Abate

4    said, it happened after I came on, when I got the case, and

5    then Agostini said, no, no, it only came on after me.  They

6    both pointed the finger at each other.  Neither one of them

7    will give a straight answer.

8        But we did get a straight answer from Lieutenant

9    McGovern, who has no reason to want to help us.  He's a police

10   officer, he was their supervisor, and what he did he tell you?

11   He told you that plaintiff was arrested or taken into custody

12   at the scene.  It was Detective Abate's decision to target this

13   plaintiff.

14       Also, you heard that Detective Abate filled out

15   paperwork for a search warrant to get a search warrant on

16   Anthony Manganiello's car, a search warrant, by the way, which

17   was negative for any evidence that he was in any way involved

18   in this crime.  That also is part of commencing this

19   proceeding.  And what's interesting is, remember I asked

20   Detective Abate.  I said, sir, on February 12, 2001, what

21   evidence was there?  What evidence did you have that tied

22   Anthony Manganiello to this crime?

23   "A.  No."

24       You need probable cause to get a search warrant.  Did

25   he tell the judge that there was no evidence tying Anthony

1    Manganiello to the crime?  Odds are unlikely.  No judge in his

2    right mind would issue a warrant if he sees there is no

3    evidence, and we don't know what he said.  Why?  Search warrant

4    applications and affidavits disappeared, so we will never know.

5    Isn't that convenient?  I submit to you, ladies and gentlemen,

6    these acts by Mr. Abate also initiated this proceeding and

7    caused it to go forward.

8         You also heard about what a grand jury is.  A grand

9    jury is a body of people who are supposed to look at the

10   evidence and determine whether there is some reasonable cause.

11   Ladies and gentlemen, I submit to you that Officers Nieves and

12   Perez both gave false testimony, knowingly gave false testimony

13   before this grand jury.  That played a role in causing this

14   prosecution to go forward.

15        I think there is no doubt that he lied.  You see, you

16   heard -- I am not going to go through their testimony again.

17   It's been read over and over and over again.  You know what

18   they said.  They both say, there was no transmission which in

19   any way identified the security officer as a victim.  Well,

20   that's a little misleading, wasn't it?  You heard Lieutenant

21   Scott, who has no reason to want to help us.  He said there

22   was, in fact, a transmission identifying him as a Parkchester

23   security guard.

24        Also, Ms. Nieves, on cross-examination both and at

25   trial and here, finally admitted, he may have said Parkchester

1    security guard.  That wasn't her testimony before this grand

2    jury.  Her testimony was pretty clear.  There was no

3    transmission.  He made this statement to me, he couldn't have

4    known it, he had to be the shooter.  That was certainly

5    misleading.

6            If you look at Exhibit No. 11, which is also in

7    evidence -- and remember, this is a document the defendants --

8    not the defendants, but the police department created.  I

9    didn't create this document.  This is a record, not from me,

10   but an independent record.  What does it say?  Possible

11   Parkchester security guard shot at location, last line.

12   Ms. Nieves testified and Parker testified -- Perez testified,

13   there was no transmission which in any way identified this

14   victim as a Parkchester security guard.  What does Exhibit 11

15   say?  Possible Parkchester security guard shot at location.

16           Ladies and gentlemen, I said we were going to come

17   back to what they actually said, but misleading the grand jury

18   and providing false testimony before a grand jury causes a

19   prosecution to go forward.  That's part of initiation and we

20   satisfied this element.  You've also heard that she put words

21   in Anthony Manganiello's mouth that he never made.  He told you

22   he was there.  He said it was a lie, that she never made that

23   statement to her.

24           Do you know what's interesting?  When she said this

25   statement occurred, it's in the basement, right?  Well, didn't

86NMMANT                    Summation - Mr. Joseph

1    her own partner, Officer Perez, tell you when Manganiello comes

2    on the scene she is already outside the basement.  According to

3    her own partner, this statement couldn't have happened,

4    couldn't have happened.  Even her own partner doesn't back her

5    up on this one.

6         This was -- doesn't matter what evidence you hear

7    before the grand jury.  If it's a lie and the defendants are

8    knowingly putting forth lies, it doesn't create probable cause.

9    And if they misrepresented, mislead the grand jury, there is no

10   presumption that there is probable cause.  Junk in, junk out.

11        You also heard about Mr. Martinez, and we know he

12   fabricated some evidence to the grand jury.  You remember

13   Booth's statement.  You remember the statement of Mr. Booth.

14   You remember Mr. Booth?  Mr. Agostini told you that at first he

15   doesn't know anything about this.  We bring him in, we search

16   him, we find in his deposition he knew there were gambling

17   slips, but now he doesn't know what gambling slips are.

18        Then, all of a sudden after they find a knife, after

19   they find evidence of the criminal activity, the guy signs a

20   statement against Anthony Manganiello, which he didn't know

21   about before, and he walked out of the precinct.  No charges.

22   They even give him back the knife.  These false statements

23   against Anthony Manganiello were forwarded to the district

24   attorney.

25        Mr. Booth testified at trial.  This also caused this

1   prosecution to go forward.  Isn't it convenient that

2   Mr. Martinez now has no memory of these events at all?  He has

3   no memory.  He has developed amnesia.  Isn't that also

4   convenient?  But what's not convenient is his signature is on

5   these documents.

6          It's Exhibit 41 in evidence.  Martinez and Martinez.

7   And these are the two statements.  Remember?  They are written

8   ten minutes apart.  The one that's dated earlier by

9   Mr. Martinez has Mr. Manganiello's correct name, correct

10  spelling of his name.  It has no spelling errors, it's written

11  out perfectly.  But the one which they admit -- which they say

12  came later, it's Minganiello, spells the gun G-u-n-n, and there

13  is all sorts of spelling errors, grammatical reports in this

14  one.  Ladies and gentlemen, I suggest to you, Mr. Martinez

15  helped him write the statement, and he knew it was not true at

16  the time that he did it.  He forwarded this to the district

17  attorney and that in part caused this prosecution to go

18  forward.

19         When we talk about this, I think it's reprehensible.

20  They gave this guy, who they know is a bookie, they know he's a

21  loan shark, they gave him a free pass.  You heard in his

22  statement against plaintiff, he is never arrested, never

23  investigated.  He's out there running a criminal enterprise,

24  criminal business.  We have cops fabricating evidence, forcing

25  criminals to lie about other cops.  It's outrageous what

86NMMANT                        Summation - Mr. Joseph

1    happened here.  This was no good-faith investigation.

2              I also have to talk to you about probable cause and

3    malice.  I think when you take a real close look at this

4    evidence, there is really no probable cause at all to believe

5    Anthony Manganiello shot and killed Albert Acosta.

6              Well, remember I asked Mr. Abate and Mr. Agostini,

7    sir, what evidence on February 12, 2001 connected him to this

8    crime?  Both their answers was none.  Remember that?  On

9    February 12, 2001, they were aware of whatever it was that

10   Mr. Cobb had to say, that did not connect Anthony Manganiello

11   to the crime of this murder on February 12, 2001.

12             The question becomes, how did it later connect it to

13   this crime?  What happened in between?  Well, it's also

14   undisputed, when we talk about malice, they arrested Anthony

15   Manganiello even though they had no probable cause.  A district

16   attorney told him they had no probable cause, the DD5 in

17   evidence.  And what happens, even though they can't hold him

18   that night, he has to sit in jail until 5:00 the next morning.

19   Doesn't that show some malice, some anger, some resentment?

20             Look at the evidence.  Let's see.  No witness saw

21   Anthony Manganiello kill Albert Acosta.  Nobody saw anybody

22   kill Acosta.  There was no weapon which tied Manganiello to

23   this crime.  There was no gunshot residue.  There was a

24   negative gunshot residue test within hours performed on his

25   hands and clothing.  They searched his car.  They even X-rayed

1   it.  Negative results.

2           What was it that tied Anthony Manganiello to this

3   crime on February 12, 2001?  The answer is nothing.

4           In fact, when you take a closer look at the evidence,

5   you heard that Anthony Manganiello was with two police officers

6   on the morning of February 12, 2001.  Could you ask for a

7   better alibi than being with two police officers?  You heard

8   from Mr. Rodriguez's -- Officer Rodriguez's memo book.  He

9   doesn't remember the incident, but he writes down he was at the

10  call from, I think it was 8:35 to 9:04.

11          And what does he say?  Exhibit No. 6.  On February 12,

12  2001, what does he say?  Officer Rodriguez and Officer Ortiz,

13  assigned to the 43rd, responded to a dispute with a knife.

14  They responded.  Sergeant Rose of the 43rd was there, no knife

15  involved.  Things calmed down.  Officer Manganiello responded,

16  seems normal.

17          When they complete it, they all left and the

18  Parkchester cop left.  Only one Parkchester cop showed up this

19  to this call.  Anthony Manganiello left 1700 Metropolitan

20  Avenue with two police officers.  They know this.  This is not

21  something we are pulling out of thin air.  These are records

22  and notes from their own file.

23          But then you also are going to hear -- you heard

24  Mr. Manganiello kept a memo book where he wrote down times and

25  places and where he was.  And you also heard that he issued a

86NMMANT                      Summation - Mr. Joseph

1    summons shortly after he left the building.  You heard not only

2    did he issue a summons, he saw some garbage, he went through

3    the garbage and took out evidence, a letter addressed to

4    somebody to document whose garbage it was and he put it in his

5    memo book.

6         And what happened?  After he gets to the 43rd, these

7    papers and his memo book are never seen again.  The evidence

8    that would establish where Anthony Manganiello was goes

9    missing.  Is that a coincidence?  Is it a coincidence that

10   every piece of written material, handwritten material, except

11   for Mr. Booth's statement apparently, have gone missing.

12        You heard what Lieutenant Scott and Mr. McGovern

13   testified to.  They have very strict procedures at the 43rd

14   Precinct concerning what happens to case files.  They are

15   indexed by year, they are put in a cabinet or storage room.

16   And whenever a detective leaves the 43rd Precinct, it's his

17   responsibility to make sure it's put in the location where it's

18   supposed to be so it could be found later.  This is the only

19   case file that's ever disappeared in Detective Agostini's

20   career.

21        Is it a coincidence that this evidence, this memo

22   book, which has -- which documents where he was disappeared?

23   Think about it also that they have a vouchering system.  Was

24   this memo book ever vouchered in the three years between

25   Anthony Manganiello was arrested and the time it went to trial?

1    Why wasn't this evidence vouchered?  Because they didn't want

2    it to come to light.  That's why.  Because if this came to

3    light, it contradicted what they were saying.  That's why.

4          Is it also a coincidence that every handwritten note

5    that Mr. Agostini created when he interviewed the tenants of

6    apartment 5E disappeared?  And the notes he did create say

7    nothing about him being at 5E.  Is that a coincidence?  And

8    take a look at Exhibit 36.  We didn't talk about it much, but

9    it didn't have any -- what does it say?  It's a DD5 by David

10   Brewer.  It says that on or about -- he went to his post to

11   have breakfast -- he went to have breakfast with Albert Acosta

12   at 8:15 a.m.  They bought breakfast, went to the roof at 1522

13   Union Port Road to east breakfast.

14          The first thing Mr. Acosta does when he goes on tour,

15   he goes and gets breakfast and he goes up to the roof to eat

16   with an Officer Brewer.  And then a job came over for 1700

17   Metropolitan Avenue, apartment 5E, and Acosta was assigned to

18   backup.  But we know from Exhibit 6, Acosta never made it

19   there.  At the point in time Acosta arrives, Anthony

20   Manganiello was already with two uniformed police officers.

21   God knows what happened to Mr. Acosta in the basement.  But you

22   know that Anthony Manganiello wasn't there.

23          Remember the DD5 from Sergeant Rose, and even Exhibit

24   6.  They say only one Parkchester cop made it to the call and

25   it was Anthony Manganiello.  Somewhere in route to that call

1   something happened to Mr. Acosta, and Mr. Manganiello was

2   already with two cops.

3           We also have Exhibit No. 2, which is Mr. Grimes'

4   statement which says, outside the basement door, about 9:20 or

5   so, he's drinking a cup of coffee and you know what, he hears

6   no shots.  You also had a DD5 which is in evidence as Exhibit 4

7   that Mr. Huello arrived some time around 9:20 and when he gets

8   inside the basement he hears a radio inside the basement.  He

9   bangs on the door and there is no response.  Whatever happens

10  to Mr. Acosta happened to him before Mr. Huello came on the

11  scene.  That's the simple answer.

12          And he's also on the scene at 9:20 something.  When

13  Mr. Cobb says he comes onto the scene at 10 something, hears

14  shots, we know it's not true because Mr. Huello was there at

15  9:20 working in the room.  And we have a diagram which is in

16  evidence.  This is Mr. Martinez's drawings.  Look where the

17  victim is, look where Mr. Huello is.  I submit to you, ladies

18  and gentlemen, if there were gunshots, Mr. Huello would have

19  heard them.  But there is no gunshots after 9:20.  What do we

20  know?  We know Mr. Cobb is either fudging his story a little to

21  help the police, or he's crazy, one of the two.

22          I think when you look at this evidence, ladies and

23  gentlemen, only, the only conclusion that you can really draw

24  is that Anthony Manganiello was with two police officers when

25  this incident happened.  Remember, Ms. Scaccia told you that

1    Mr. Manganiello requested at trial that these officers testify

2    and they couldn't find them.  You heard from Officer Rodriguez

3    here.

4          Also, if you look at Exhibit 4, not only does

5    Mr. Huello say he doesn't hear shots, he says he doesn't see

6    Anthony Manganiello at all the entire time he's in the

7    basement.  He sees Cobb come in and he can hear him say hello.

8    I submit to you, if you can hear someone say hello, you can

9    hear four gunshots if they go off.  But Mr. Huello doesn't hear

10   that.

11         We talked a lot -- they put up Mr. Cobb's grand jury

12   and some of Mr. Cobb's DD5.  Here is what they didn't tell you.

13   You remember when Mr. Scott testified.  He said while he was at

14   the scene, nobody knew who it was that Mr. Cobb saw in the

15   building.  On February 12, 2001, nobody knows who Mr. Cobb sees

16   in the building.  But later on that day we have typed DD5s

17   saying it was Anthony Manganiello.  And also all the initial

18   interview notes of Mr. Cobb, they just seemed to have sprout

19   legs and walked out of the police station.  Is that also

20   coincidental?

21         And you heard an ADA testify that a criminal defendant

22   has a right to confront the people who are testifying against

23   him.  He has an absolute right to have every statement they

24   made so he can present it to them and cross-examine them.  Did

25   Mr. Manganiello have that right?  Did he have that opportunity?

1    Even though he did, he was still found not guilty.

2           Also, ladies and gentlemen, take a look at Exhibit No.

3    5.  I believe the defendants made a big blowup of it.  It's

4    Officer Perez's statement.  Officer Perez has been on the job

5    for a long time, right.  And she knows to give a full complete

6    statement.  Mr. Martinez knows it's important to document what

7    happens.

8           Exhibit No. 5.  This is what -- on February 12, 2001,

9    at 2000 hours, which is about 8:00 at night, Mr. Martinez

10   speaks with Officer Perez, and what happens?  This is all it

11   says:  We did a small canvass, spoke to the maintenance guy,

12   Cobb, who heard shots.  Nothing about Anthony Manganiello being

13   there at all.

14          On February 12, 2001, there is no mention of Anthony

15   Manganiello being there by Mr. Cobb, according to Officer

16   Perez.  Isn't this a little suspicious, that all these DD5s now

17   pop up and this grand jury testimony has all these details

18   about Anthony Manganiello coming and blasting out of the

19   basement when the fact of the matter is, it wasn't said on

20   February 12, 2001.

21          Isn't it kind of an important fact to leave out?

22   Isn't it also a coincidence that whatever notes these

23   detectives took of Officer Perez's statement that he made later

24   have disappeared?

25          Remember, Officer Perez told you that Ms. Nieves was

1    also there on February 12, 2001 being interviewed.  Does

2    Ms. Nieves say anything on February 12, 2001 about plaintiff

3    saying, hey, that's my partner in there?  No, she doesn't, does

4    she.  Is there a single DD5 anywhere that documents that

5    conversation on February 12, 2001?  Doesn't say it on February

6    12, doesn't say it on February 13, 14, 15, 16, 17, 18, 19, 20,

7    up until March 1.

8          Who does she speak with on March 1?  Lo and behold,

9    Detective Agostini.  That's when the statements of his end.

10   Not a single handwritten note, not a single DD5 for two and a

11   half weeks.  Remember, by this time, Mr. Agostini was already

12   told that he couldn't prosecute Anthony Manganiello.

13         I suggest when you take a close look at the evidence

14   here, what it suggests to you, the only conclusion you can

15   really draw, is that evidence didn't lead to a suspect.  They

16   picked the suspect and massaged the evidence towards that

17   particular suspect.  I think when you take a close look as we

18   go through this evidence you're going to hear over and over,

19   they are trying to put square pegs into round holes.  It

20   doesn't fit now, it didn't if it then, and Anthony Manganiello

21   should never have been charged with murder.  There is simply no

22   evidence that he was any way involved in this particular crime.

23         We have what Mr. Cobb has to say and so did these

24   defendants and presumably so did the district attorney on

25   February 12, 2001.  But you know what, on February 12, 2001,

86NMMANT                        Summation - Mr. Joseph

1    the ADA says we don't have probable cause.  So whatever Cobb

2    says really, it doesn't create probable cause.

3           And when we go through the evidence, I think you can

4    draw the conclusion that every contact these defendants had,

5    especially Abate and Agostini, with Anthony Manganiello,

6    evidence is malice.  He knew there was no evidence.  They

7    arrest him on February 12, 2001, even though he can't get a

8    clear answer on who actually did it.

9           And if you look at the way this investigation

10   proceeded, I suggest to you whoever had the bad luck to be

11   signed up or partnered up with Albert Acosta, God rest his

12   soul, may his soul rest in peace, would have been the suspect

13   that day, whether it was Anthony Manganiello or any other

14   security guard.  But they didn't look at the evidence.  They

15   just picked out the partner and massaged the evidence to the

16   conclusion they wanted to draw.

17          You heard when Mr. Agostini was told that he couldn't

18   prosecute or arrest Anthony Manganiello on February 12, 2001,

19   he got upset.  He got very angry.  He got angry when plaintiff

20   told him -- he interviews the plaintiff.  Plaintiff is

21   cooperating.  He tells you, I told them name, I told them my

22   address, I told them my phone number, I told them about other

23   people who had problems with Mr. Acosta.  But those handwritten

24   notes, again, just disappeared.  Isn't that coincidence?

25          But we know that Mr. Agostini fills out an arrest

1    report, and where does he get the information from for address,

2    phone number, pedigree?  From Anthony Manganiello.  Is it

3    really believable that Anthony Manganiello doesn't give him his

4    address, but then it winds up on the arrest report, same day,

5    and the arrest report again just disappears.  Does that --

6    you're all intelligent people.  Does it strike you as

7    believable, the story that these people are offering you.  Does

8    it gibe with your common sense.  I suggest, ladies and

9    gentlemen, it doesn't.

10            And then they have to come up with something, so what

11   do they say?  They say that Anthony Manganiello is evasive.

12   You heard Anthony tell you, and he testified at trial, was this

13   credibility impeached at all?  Was he caught lying at all?  I

14   suggest to you he testified to you in a straightforward and

15   forthright manner as to what happened that day.  When you

16   compare that with the defendants, who have been in caught lie

17   after lie after lie, the story keeps shifting.  Every point in

18   time he testified, the story comes out differently.  The only

19   thing that's been consistent with these defendants' stories is

20   that it's consistently inconsistent.

21            Ladies and gentlemen, when Mr. Agostini created that

22   DD5, which defendants blew up and put up in front of you, if

23   that's untrue, he forwards it to the district attorney's office

24   as part of initiating the prosecution.  That's part of malice,

25   misrepresenting what happened and giving it to a prosecutor.

1    It's outrageous.

2            You heard that when -- Anthony Manganiello is in an

3    interview room and he's helping.  He's saying yes, there was an

4    event, there was an event where some Blood gang members --

5    remember, Terrence Alston is also a Blood gang member -- threw

6    Mr. Acosta through a plate glass window.  There is also another

7    incident where some local thugs had threatened to shoot him.

8    Did they investigate either of these incidents?  They don't, do

9    they.  Do little bells go off when Terrence Alston, who happens

10   to be a Blood gang member, comes forward and says, yeah, I know

11   something about this, the shooting, and Terrence Alston happens

12   to be in jail and has been there for many, many months.  And

13   Anthony Manganiello says, yeah, some Blood gang members threw

14   Albert Acosta through a glass plate window.  Shouldn't little

15   bells go off?  Is this really a thorough and good-faith

16   investigation that the defendants would have you believe they

17   conducted?

18           Anyway, going back to the interview, Mr. Manganiello

19   said they are interviewing him -- and, remember, this gentleman

20   is still in a state of shock.  He has just seen a coworker shot

21   a few minutes earlier.  He is actually having shortness of

22   breath.  They don't let him go to the hospital.  He was at that

23   call.  This just as easily could have been him.  Then they flat

24   out accuse him of shooting the guy?  And he says, what, are you

25   fucking crazy?  I had nothing to do with this.

86NMMANT                        Summation - Mr. Joseph

1        Then what happens.  Then they get mad, very mad.  They

2    start ripping his clothes off, ripping his clothes off, taking

3    his memo book, taking his keys, ripping a Band-Aid off his

4    hand.  I think, ladies and gentlemen, when you look at that,

5    that is evidence of malice.  Whatever happened in that room

6    infuriated Mr. Agostini and Mr. Abate.  That's when these

7    events started to occur.  You hear that when Mr. Agostini is

8    told that he can't charge Anthony Manganiello, what happens?

9    Opens the cell door, after holding him for several hours, and

10   says leave.  And as he's trying to put on his shoes, he starts

11   pushing him and says, get out of my fucking station house.  Is

12   that professional?  Is that what a police officer should do?

13        Ladies and gentlemen, if you're not free from this

14   kind of kind of harassment in a police station, where are you

15   free from it?  A police station is supposed to be a place of

16   safety.  Yet, we have two detectives pushing someone out the

17   door and cursing at him.  Doesn't this show a little bit of

18   their state of mind?  Remember, they both testified at trial.

19   Did either one of them deny it happened?  They didn't, do they?

20        Then what happened?  Anthony Manganiello's brother,

21   Mario Manganiello, comes, gets a phone call from somebody,

22   appears at the station, and sees his brother sitting there in a

23   chair, in a T-shirt with electrodes hooked to his chest.  Of

24   course, he calls a lawyer.  Who wouldn't if a family member is

25   sitting there in that condition.  Isn't that what's going

86NMMANT                          Summation - Mr. Joseph

1    through his mind, seeing his brother in this condition?

2            You hear Mr. Ross shows up and now the defendants, all

3    of a sudden, they are even more suspicious because he gets a

4    lawyer to stop their abuse.  This wasn't a prosecution based on

5    evidence.  There was no evidence.  There was supposition.  They

6    determined that they got angry with this particular plaintiff

7    because they didn't like how he responded to that question, and

8    he gets a lawyer.  Now, all of a sudden, they assume he's

9    guilty and they are going to do whatever they have to do to get

10   him.  That's what happened here.  I don't think there is any

11   doubt about that.

12           You heard when Anthony Manganiello was placed in the

13   cell, he doesn't have any clothes because they took his clothes

14   from him.  He says, can I have something to wear?  They laugh

15   at him.  Yeah, right, we'll give you something to wear.  Isn't

16   that evidence of malice, isn't that evidence of dislike or

17   anger toward somebody?

18           What do we know?  We know on February 12, 2001, there

19   was no evidence whatsoever that connected Anthony Manganiello

20   to this crime.  We know that Abate and Agostini don't like

21   Anthony Manganiello, and they seem to have an agenda.  They

22   tried to stick him any way they could and that's been shown

23   during the course of Anthony Manganiello's testimony.

24           Then, February 12, 2001 passes, he's released, and

25   then things start to get very strange.  Take a look at Exhibit

1    29, which Mr. Agostini created.  On February 12, 2001, Luis

2    Agostini interviews Officers Ortiz and Rodriguez.  And what

3    does he say?  They did not see SPO Manganiello leave the

4    building.  Well, can't be further from the truth from what

5    Mr. Martinez says happened on February 12, 2001.  If you

6    compare Exhibit 29 and Exhibit 26, they both can't be true.

7            Why, on February 12, 2001, did these two officers,

8    Ortiz and Rodriguez, say that Anthony Manganiello left the

9    building with him?  Why, two and a half weeks later, after

10    Mr. Agostini is told he doesn't have probable cause to charge

11    Anthony, does this particular document surface, which is 180

12    degrees from what these officers said on the day in question.

13            Why?  Because now this document puts Anthony

14    Manganiello on his own in the building at 1700 Metropolitan

15    Avenue at about the time you know that Albert Acosta was killed

16    when, in fact, he was with Ortiz and Rodriguez.  There is no

17    good-faith explanation for this.  There really isn't.  This was

18    forwarded to a prosecutor for one particular reason, to get

19    Anthony Manganiello, even though they knew he was innocent.

20            Defense counsel would have you believe that they did

21    this complete and thorough investigation, hundreds of people

22    canvassed.  Well, do any of these canvasses lead to anything

23    that tied Anthony Manganiello to the crime?  No, it didn't.

24    Well, what happened?  We heard about this DD5, that there is a

25    Cynthia Taylor arrested a couple of weeks after the murder in

86NMMANT                          Summation - Mr. Joseph

1    Parkchester with a .22 caliber gun, same caliber murder weapon

2    as was used to kill Albert Acosta.  Where are the ballistics,

3    where are the lab results of this .22 caliber gun?  Missing.

4    The .22 caliber gun, same caliber, same complex, within a

5    couple of weeks, and they don't even look into it.  Is this a

6    thorough and good-faith investigation, or did they already have

7    their suspect, so they ignored everything else.

8          You also heard that they found somebody, this guy is

9    talking in a cab -- it's in the DD5s, also -- that says on a

10   cell phone he was there when a security officer got shot, he

11   was there.  But then they bring him in, he gives them some

12   story, he just made it up, and they let him go without doing

13   any further investigation.  They didn't look at this guy's

14   fingerprints.  They didn't look at anything.  They accepted his

15   story and let him walk out of the door.  Why?  Because they

16   already had their suspect.

17         This wasn't a thorough, good-faith investigation.

18   They focused on Mr. Manganiello and ignored everything else.

19   They ignored exculpatory evidence, they didn't make material

20   statements of fact.  They fabricated evidence to get this guy,

21   and they ignored evidence showing that other people were likely

22   responsible for this crime, including the Blood gang members

23   whose threw this guy through a plate glass window, including

24   Ms. Taylor, who possesses a .22 caliber gun in the same complex

25   wherever the murder happened, less than a month after the fact.

1    They ignore the guy who says that I was there, but then changes

2    his story when they speak to him.  Doesn't this sound a little

3    strange to you, that these leads would be ignored?  Did they

4    exhaust every potential lead, like defendants would have you

5    believe?  I suggest, ladies and gentlemen, they did not, they

6    absolutely did not.

7          You know, another thing, remember how Mr. Agostini

8    keeps telling you, I gave my whole file, I gave them everything

9    they wanted, wow.  Four years ago he said the exact opposite in

10   his hearing testimony.  You remember that?  He only gave the

11   DD5 vouchers, nothing else.

12         What do you do with a defendant that says one thing

13   four years ago and then tells you, 180 degrees, the exact

14   opposite here at trial.  Is that believable to you?

15         Is it believable when he says he gave that district

16   attorney his entire file, every piece of paper in it to be

17   copied, but Ms. Scaccia, four years ago, at a hearing, likewise

18   represented to the Court and told the judge, I never had

19   possession of it.  I never, never had possession of it.  Is

20   that consistent?  I suggest to you, ladies and gentlemen, it

21   isn't.

22         You are also going to see in evidence Exhibit No. 17,

23   which is dated -- which is the request for -- request to

24   intelligence, which is Mr. Parker's division, and it comes up

25   with a date or two of February 12, 2001 and negative results

86NMMANT                    Summation - Mr. Joseph

1    when it comes back, but a day or two later, that's when

2    Mr. Alston comes up.

3              And Agostini knows he's a liar.  There is no question

4    about that at this point, is there?  He knows he's making up

5    stories to get out of jail and he doesn't care what he has to

6    say, so long as he gets Anthony Manganiello.  You heard

7    Mr. Parker, who is his handler.  Mr. Parker spoke with him,

8    with Mr. Alston, for an hour, spoke with him for an hour about

9    what information he had.  And at no time during this hour did

10   he mention that Anthony Manganiello tried to hide the killing

11   of another security guard.  Do you find that a little strange?

12   His own handler he doesn't tell.  But the story emerges after

13   he speaks with detectives from the 43rd Precinct.

14             What's even more unusual, remember I asked Detective

15   Agostini, did Mr. Alston ever tell you another security guard

16   hired me -- did Mr. Alston tell you that Anthony Manganiello

17   tried to hire him to kill another security guard?  He says no,

18   he never made that statement to me.  It's in his testimony.

19   You can look at it.  But what's interesting is, if you look at

20   his DD5, which is also in evidence, that's exactly what's in

21   the statement that Mr. Agostini signs.  Alston doesn't tell him

22   this, but it is in the DD5 that Agostini signs.

23             What happened here?  And defendants can put any

24   exhibit up on the board they like.  If it's a lie, it's not

25   true and they know it's not true, it doesn't create probable

1      cause to believe that Anthony Manganiello killed anybody.

2             Remember, Mr. Alston is in jail on February 12, 2001.

3      He's been there for quite a long time.  How is it that he knows

4      anything about a murder in Parkchester that occurs while he's

5      in jail, unless somebody is feeding him information?  Remember,

6      Mr. Alston is a Blood gang member, a gang member.  You heard

7      Mr. Agostini tell you that Blood gang members don't like the

8      police, they don't cooperate with the police.  How is it that

9      this gentleman, all of a sudden, is coming forward, testifying

10     against not a criminal, but a cop, a security guard.  Shouldn't

11     a little bell be going off here?

12            Remember, Mr. Agostini told you that Mr. Johnny Baker

13     sold him a gun, sold Anthony Manganiello a gun, a .22 caliber,

14     same weapon used in this murder.  But then Mr. Agostini

15     interviews Mr. Baker and what happens?  Johnny states, Exhibit

16     No. 10, he has no knowledge of selling a firearm to a security

17     guard.  Johnny Baker's name comes from Detective Agostini and

18     Mr. Baker says, I know nothing about it.  Even more

19     importantly, Mr. Baker, Johnny Baker wrote out a statement on

20     his behalf, see attached.  Statement disappeared.  Is that also

21     coincidence?

22            Now, remember, Mr. Agostini told you that he believed

23     Johnny Baker.  He thought he was telling the truth.  He was

24     credible.  What does that mean?  That means that Terrence

25     Alston tried to implicate two people for crimes he knew he

86NMMANT                    Summation - Mr. Joseph

1    didn't commit.  He tried to implicate Johnny Baker for selling

2    a gun, and he knew at this point that he lied about that.  He

3    tried to falsely implicate plaintiff for buying a gun of the

4    exact same caliber.  And what happens, he knows now it's a lie

5    and this is long before this information is passed through the

6    DA, long before Mr. Alston testifies before the grand jury.

7           You heard Mr. Agostini tell you that if a confidential

8    informant lies or gives bad information, you're supposed to

9    drop him, no questions asked.  Did they drop him?  In fact,

10   they say, no.  They come up with a story, that was just the

11   wrong guy.  It was a lie.  It was a lie.  This case went

12   forward against Anthony Manganiello based on lies and they knew

13   it.

14          Not only did he lie, he says, oh, now he's going to

15   get me the real guy, this other guy, Mark Damon, who is 17

16   years old.  But wait.  Get me out of jail first, and they do.

17   Get me out of jail and in four weeks I'll get you another

18   witness.

19          Then what happens?  Some time later he gets out of

20   jail.  Mark Damon, 17 years old, shows up and says the exact

21   same story as Johnny Baker.  And even more suspicious,

22   Mr. Alston doesn't want Agostini speaking to witnesses he

23   produces.  Don't you find that odd?  Don't you find it odd that

24   now, all of a sudden, Mr. Agostini, who is his lead

25   investigator, goes to the DA's office, this witness comes out

1    of nowhere, out of the woodwork, and he doesn't ask him any

2    questions?  Why?  Because Terrence Alston doesn't want him to.

3              Ladies and gentlemen, doesn't this smell dirty?

4    Doesn't this appear that Terrence Alston is supporting perjury

5    to get out of jail?  Is there any doubt that that is the only

6    conclusion you could draw here?  But they don't care.  They let

7    it go forward.  They present this evidence to the DA, they put

8    him into this grand jury room, even though he's lying.  Doesn't

9    matter what testimony they put up on this board.  Terrence

10   Alston said, they know it's a lie.  That's what's important

11   here.  And how heinous is it?

12             He said that Johnny Baker -- that Anthony Manganiello

13   wanted this guy dead because he was messing with a girl.  Well,

14   they interviewed Mr. Acosta's girlfriend, and she says, there

15   is no problem here, I don't know what you're talking about.

16   Shouldn't be bells going off?  This guy is not telling us the

17   truth.

18             Yet, what do they do?  They reward him.  He doesn't

19   just let him -- Agostini doesn't just let Alston sit in jail.

20   He brings him to the DA to say this guy has got good

21   information.  He vouches for him.  They give him a deal, let

22   him walk right out of a jail cell in exchange for falsely

23   implicating Anthony Manganiello.  You have cops making deals

24   with criminals to falsely implicate other cops.  That's

25   malicious prosecution.

1      What is also important here is that Mr. Agostini, he

2  doesn't make a record of what happened here.  He doesn't make a

3  record that Mr. Alston said, hey, don't interview my witnesses.

4  He doesn't make any written records saying that Mr. Alston was

5  playing games to get out of jail.  Why?  Because

6  Mr. Manganiello's defense lawyers would get it if he did.  So

7  he makes no written record and no disclosure about it.

8      Remember the DA said, did Mr. Agostini tell you that

9  Mr. Alston was playing games to get out of jail?  No, I don't

10  remember that.  Did he tell you that he didn't want witnesses

11  he was producing interviewed?  He didn't tell the DA that

12  either.  Ladies and gentlemen, I submit to you that on some

13  very, very important facts concerning Mr. Alston, Agostini left

14  the district attorney in the dark.  He did not make a full and

15  complete disclosure like he should have.

16      Even worse, Alston was fed details about a homicide

17  that he couldn't possibly know.  If you look at his initial

18  statement, he's got some sort of general information.  Then if

19  you look at his grand jury testimony, he's giving the address

20  of 1700.  What happened between that first interview and the

21  grand jury testimony?  He was fed information that he couldn't

22  have otherwise known.  It's outrageous.

23      Now, defendants want you to believe that these people,

24  these citizens of Bronx County looked independently at this

25  evidence and decided that there was probable cause because they

1    voted to indict.  Well, do you have any faith or confidence in

2    a grand jury indictment when it's been based on nothing but

3    lies?

4         If you look at the grand jury minutes, like I'm sure

5    you will, you'll see that Alston is the only person who really

6    connects Anthony Manganiello to this murder.  You will see that

7    Nieves and Perez also marginally try to connect him, although

8    all these three are lies.

9         Even Chris Tartone who, incidentally, seems to be some

10   kind of business associate of Booth's, how is it that Tartone

11   knows that he's going to be at that pizzeria on Thursday at a

12   specific time unless he's involved with these operations.

13        You heard Anthony Manganiello say, I never -- I don't

14   know these people.  How is it -- imagine what it's like being a

15   criminal defendant and, all of a sudden, people you have never

16   spoken to, heard of, are coming forward with these stories

17   implicating you falsely of murder.  It's unbelievable.  He

18   doesn't know Mark Damon.  He couldn't pick Mark Damon out of a

19   room.  He doesn't know Terrence Alston.  He couldn't pick

20   Terrence Alston out of a room.  Tartone is also -- same thing

21   with Booth.  He never spoke to Booth or asked him for a gun.

22   It's outrageous.  Even with Tartone, he didn't make the

23   statement in the pizzeria.  Even if he did, Mr. Manganiello is

24   a cop, he's allowed to carry guns, he's required to carry guns.

25        If he's looking through a gun book and talking about

1   buying a gun, how do we know it's not for his occupation?

2   That's like accusing a chef of a stabbing after he talks about

3   buying a carving knife.  It's ridiculous.

4          Even the district attorney, you see in her affidavit,

5   she misrepresented to this court.  Hello, what deal was made

6   with Alston?  Is there any doubt that based -- you have

7   Ms. Scaccia telling you, he was let out because he was

8   testifying against plaintiff.  But then you have this exhibit

9   by Ms. D'Andrea, no, it has no relationship, it has nothing to

10  do with this case, unrelated narcotics.

11         The story is the complete opposite.  How can you have

12  anything at all that this grand jury indictment was really

13  based on probable cause?  The answer is, you can't.  The answer

14  is, there was no probable cause.  If there was probable cause

15  in this case, why did defendants go to such lengths to

16  manipulate the evidence?  Why did they go so far to try and

17  create probable cause?

18         You heard Mr. Agostini testify at trial and he says --

19  it's in the testimony -- he testified at a pretrial hearing.

20  He found a note in Anthony Manganiello's locker that says, I

21  feel like killing somebody.  Pretty damning, right?  Until you

22  actually look at the note, which is in evidence as Exhibit 16.

23  Here it is.  Plaintiff's Exhibit 16.  This is the note that

24  Detective Agostini testified to at trial without actually

25  producing.  What does it say?  Does it say, I feel like killing

86NMMANT                        Summation - Mr. Joseph

1    somebody?   I pray every day that I will never have to kill

2    somebody.   Couldn't be further from the truth what this

3    defendant testified to at a pretrial hearing.

4            You also heard that Mr. Agostini testified at a

5    pretrial hearing that Richard Ross, who is now deceased, came

6    out of the interview room with -- after speaking to Anthony,

7    and says -- goes up to him and says, was it intentional,

8    meaning intentional discharge?   The only problem was, it didn't

9    happen, it never happened.

10            You heard Mario Manganiello, plaintiff's brother,

11    testify that he was there when Mr. Ross came out of that

12    interview room.   You know what, he didn't make that statement.

13    And remember, Mario Manganiello's testimony was not impeached

14    in any way.   There was no showing that he was being untruthful

15    in any way, shape, or form.   Remember, also, that even if

16    Mr. Abate -- was there any statement made by this attorney

17    after he came out of the interview room?   Not that I remember.

18    Even Mr. Agostini's own partner, Mr. Abate, doesn't back him up

19    on the story.

20            Then what's interesting is shortly after they find out

21    that Agostini is lying, that's when Mr. Booth comes into the

22    picture.   We can take a look at Exhibit No. 41.   Again, even

23    though Mr. Martinez had no memory of this event whatsoever,

24    it's right here.   Remember Mr. Agostini told you that at first

25    he doesn't know anything.   Then Agostini says, I heard you --

86NMMANT                          Summation - Mr. Joseph

1    someone approached you, a guy named Anthony Manganiello

2    approached you about buying a gun.  No, I don't know anything.

3    Let me search you.  They find this criminal activity evidence.

4    They say, well, you don't know anything?  You know what, maybe

5    this stuff will find its way into the organized crime division.

6    He doesn't deny he said that.

7         Then, all of a sudden, what happens is, the statement

8    emerges, which Mr. Martinez signs as a witness.  Isn't it

9    coincidental that Mr. Martinez, a level guy, can't remember

10   anything about this meeting, can't remember anything.  Sir, was

11   Mr. Booth threatened?  I don't know.  I don't remember.

12        THE COURT:  You have five minutes.

13        MR. JOSEPH:  Ladies and gentlemen, when you look at

14   this testimony, none of this stuff makes sense.  The only --

15   you have cops hiring or engaging with criminals to fabricate

16   evidence against other cops.  When you look at this -- when you

17   look at the real evidence, there was no probable cause to

18   suspect Anthony Manganiello was in any way involved in the

19   shooting of Albert Acosta.  If there was, why did they have to

20   manufacture it?

21        You heard about this guy Langhorn, this guy Plaza,

22   they just throw in some documents.  Neither one of these guys

23   testified before the grand jury.  Neither one of these guys

24   testified at trial.  If these statements were accurate, don't

25   you think a district attorney would have presented that

86NMMANT                        Summation - Mr. Joseph

1    evidence?  But she didn't.

2            Also, you're going to hear that this prosecution

3    damaged Anthony Manganiello tremendously.  You're going to hear

4    that he was thrown in jail for ten days.  What's it like for a

5    cop being in Rikers Island?  It's like being a sitting duck in

6    a shark tank.  I will submit to you, those were ten of the

7    longest days in Mr. Manganiello's life.

8            You heard Dr. Latif testify that Mr. Manganiello is

9    severely damaged because of what happened to him.  Can you

10   imagine the stress of sitting through three years waiting to

11   see if you're going to spend the rest of your life in jail for

12   a crime you didn't commit?  What does that do to somebody?

13   Something like this, where evidence has been made up against

14   you by the people who are supposed to be guardians of our

15   community and guardians of our safety, how do you have faith in

16   life again?  How do you have faith in anything again?

17           You heard that his career is destroyed, ladies and

18   gentlemen.  Even though he was found not guilty, he's got a

19   record.  Who is going to hire him at this point to do any kind

20   of security even if he could physically do the work?  Even if

21   he looks for other work, how does he explain how he's been out

22   of work for so long?  And what happens when they ask him, where

23   did you used to work?  Oh, Parkchester.  And then they call

24   Parkchester and what do they say?  Oh, he stopped working here

25   because he was accused of killing somebody.  Who is going to

759

1    hire him?

2            I submit to you, ladies and gentlemen, he's in his

3    forties now, he has lost the prime earning years of his life,

4    he's lost the best years of his life.  You heard the economist

5    testify that he did a calculation, and I submit to you the very

6    conservative calculations that he lost approximately $1.3

7    million for not being able to work from the damage caused by

8    this prosecution.  I ask you to award that money back to him.

9    Mr. Manganiello didn't ask for this, he did nothing to deserve

10   this, and he deserves this day to get justice.

11           You also heard that he spent $110,000 in lawyers fees

12   defending him against these baseless charges.  I am going to

13   ask you to give him that, too.

14           You heard from Dr. Latif that he has severe

15   depression, anxiety, and posttraumatic stress disorder.  Did

16   the defendants call any doctor to rebut that?  Did they call

17   any doctor in here to say he doesn't have these serious

18   conditions and it's not affecting him.  They didn't, did they?

19           Ladies and gentlemen, it's a horrible, horrible thing

20   to live every day in fear, to have weekly panic attacks where

21   you feel like you're having a heart attack.  What does that do

22   to somebody?  How do you go along in life after that when

23   something like this happens to you?

24           You heard Dr. Latif tell you that he's dependent on

25   medication and he's barely even functional with medication.

1   When you go through something like this, it just doesn't go

2   away, even if you're found not guilty.  The stress of what you

3   lived through remains with you for the rest of your life.

4        Murder is a heinous, heinous crime.  It's the one

5   crime you can't undo.  And when someone is accused of murder,

6   it sticks with them, it's a cloud over their head, it's a mark

7   on them for life.  And Mr. Manganiello did nothing to deserve

8   it.

9        I ask you to compensate him fairly for the ten days he

10  spent in jail and would recommend to you, ladies and gentlemen,

11  $15,000 per day for that day.  For the last seven years he has

12  had 2,555 days which he has lived with this problem, 2,555

13  sleepless nights, 2,555 days of living in fear.  I recommend to

14  you, ladies and gentlemen, it's worth $750,000.

15       It also appears -- it's permanent.  He's going to have

16  this crime for the rest of his life.  He's a young man.  What's

17  it like, living without hope?  What's it like, living with

18  nothing to look forward to?  What's it like, constantly

19  thinking about this event over and over and over again in your

20  mind?  They didn't put him in jail.  They made him a prisoner

21  in his own mental world and in his own apartment, which he's

22  afraid to leave.  How traumatized does somebody have to be to

23  be afraid and nervous about leaving their own apartment?

24       You heard Mario Manganiello tell you that he's not the

25  same man I once knew.  He's a shell of the man that I once

1    knew.

2          I am going to ask you, ladies and gentlemen, to

3    compensate him and compensate him for everything these

4    defendants have taken from him.  Remember, you only get one

5    shot to compensate him now, through the course of all the pain

6    and suffering and the problems he's going to have throughout

7    the course of his life.

8          I am also going to ask you to make an award of

9    punitive damages.  As you sit here as a jury, ladies and

10   gentlemen, you're not only a jury, you're the conscience of our

11   community.  These defendants violated public trust, they abused

12   their power, and I am going to ask you to use your verdict, if

13   you award punitive damages, you are going to tell them they

14   maliciously prosecuted Anthony Manganiello and what they did

15   was wrong.  They crossed lines that should not be crossed.

16   They trampled on civil rights as if they don't even exist.  I

17   am going to ask you to do justice.

18         So when you think about this case, and you will, when

19   you are at the grocery store, hardware store or whatever, that

20   you took this one opportunity to do justice and make sure the

21   system is fair and give Anthony Manganiello the justice he's

22   waiting for for seven years.  Thank you.

23         THE COURT:  Ladies and gentlemen, you've now heard the

24   summations.  Rather than begin the charge now, which will take

25   hopefully less than an hour, why don't we go to lunch and we

86NMMANT

1  will see you at 1:30, and then we will charge the jury and

2  you'll have the case by 2:30 or before.

3           Have a good lunch.  The case is not yours yet.  Please

4  do not discuss the case amongst yourselves or with anybody

5  else.

6           (Jury not present)

7           THE COURT:  We will see you at 1:30.

8           MS. OKEREKE:  Your Honor, the parties are moving -- we

9  have some motions we would like to discuss before the Court.  I

10 don't know if we do it now.

11          THE COURT:  I don't know what kinds of motions you're

12 talking about.

13          MS. OKEREKE:  Defendants would like to make a Rule 50

14 motion on the record.

15          THE COURT:  I told you we are going to reserve

16 decision on any and all motions and we are assuming that you

17 made them.  I don't know how I can make that clearer.

18          MS. OKEREKE:  The motions have not been made yet, your

19 Honor.

20          THE COURT:  I am assuming that the motions were made.

21          MS. OKEREKE:  No, your Honor, they were not made.

22          THE COURT:  Anything else?  See you at 1:30.

23          (Luncheon recess)

24

25

86NMMANT

AFTERNOON SESSION

1:30 p.m.

THE COURT:  I just want to clarify or not really clarify but maybe not keep it as foggy as it was.  The DD5s that I presume you were interested in, which were P-2 and Z-7, I think what happened -- I just haven't had time to really read the transcript in detail.  I think what happened is that those were declared admissible on my list of all the evidence that was provided so that I could rule on them, but, as I told you at the outset, I am not anxious having thousands of pieces of paper before the jury.  So the way I limit it, even though I spend the time to go through all of them, is to make sure that I only admit those that actually go to the jury, not whether or not they are admissible; only those that a witness looks at or talks about or identifies.  So far as I am concerned, neither P-2 nor Z-7 pass that test.

On the other hand, from what I can glean from the transcript hurriedly is there was some conversation about putting all of them in, all of the DD5s into evidence.  I think they were all marked admissible by me because they are all business records.  I am not sure that I actually ruled on that issue, but I'm fairly sure that there was no objection.

So in an abundance of caution, unless Mr. Joseph has a different recollection, I'm prepared, if the jury asks, to let the jury see all of the DD5s, although I'll look at the

86NMMANT

1    transcript more carefully.

2         Mr. Joseph, do you have any problem or thought about

3    that arrangement?

4         MR. JOSEPH:  I do, your Honor.  I believe that at one

5    point the defendants said, Judge, we would like to move the

6    rest of the DD5s into evidence and your Honor said no.  They

7    indicated that they wanted specific DD5s put in and these two

8    documents were not put in.  I think at this point it would be

9    error, with all due respect to the Court, to allow a jury to

10   see a document which was not actually in evidence.

11        THE COURT:  I am not sure I understand what you're

12   saying.  In other words, if it happened the way I said it

13   happened, there was no objection from you about letting in the

14   balance of the DD5s.

15        MR. JOSEPH:  There was, Judge, and I believe your

16   Honor did sustain the objection.  I believe it was the redirect

17   of -- I'm trying to remember who it was.  I believe it was

18   Agostini.  I believe your Honor said denied because at one

19   point the defendants had introduced basically irrelevant DD5

20   after irrelevant concerning canvasses, and the Court -- and

21   they wanted to just introduce in a blanket matter 300 or so

22   DD5s and I believe the Court said denied.  There was no attempt

23   by defendants to introduce the exhibits which they argued to

24   before the jury.

25        And frankly, Judge, I would actually request a

1    curative instruction that they are not to consider the

2    evidence, the documents which are not in evidence.

3            THE COURT:  I don't think there is any question about

4    not considering documents that aren't in evidence, especially

5    since I won't be giving them if they want to look at them.  But

6    the transcript that reads like this.  Ms. Okereke says:

7    Finally, your Honor, defendants would just enter into evidence

8    the remaining DD5s which have yet to be entered into evidence

9    which I can read if your Honor requires.  And I said, we will

10   just get a list later, which I didn't get, but that's neither

11   here nor there.  You said:  For the record, Judge, we stated

12   the objections that were previously stated.  I assume that

13   meant to the ones that I either admitted or didn't admit at the

14   beginning of the trial?

15           MR. JOSEPH:  That's correct, Judge.  We were

16   maintaining all our objections.

17           THE COURT:  I don't think it had anything to do with

18   the DD5s.  All of them in the first instance were business

19   records, and I didn't have any problem and some of them were

20   clearly irrelevant, but they weren't sufficiently -- I didn't

21   think anybody would ask for them or examine about them if they

22   were fully or totally irrelevant.  So then Ms. Okereke said,

23   defendants have no more questions, and you went onto redirect.

24           I'm not sure that I can characterize your position

25   anything different than mine; that is, I let in when it was

86NMMANT

```
 1    sought to let in with a list that I've yet to get of the DD5s
 2    that I had held admissible, even though my rule is that I only
 3    take and put into before the jury the DD5 or anything else that
 4    is actually identified by a witness rather than getting a whole
 5    stack of stuff that the jury probably doesn't even want.  I am
 6    not sure how you come out, but if I understand you, there isn't
 7    a lot of difference in this transcript.
 8              MR. JOSEPH:  What I'm saying, Judge, anything that was
 9    not specifically moved into evidence should not be in evidence.
10    I think we crafted our closing arguments to respond to what's
11    actually in evidence.  After your Honor denied the blanket
12    attempt to move things in evidence, defendants moved selected
13    pieces of evidence into evidence or selected DD5s into
14    evidence.  My position is, those are all that's in evidence.
15              Anything that may have been on the sideline that they
16    didn't put in or directly move into evidence which is relevant,
17    they can't now, after we have rested, after they have rested,
18    they had the opportunity at any point on their case which they
19    didn't call any witnesses, to say, Judge, we also want to put
20    in the following exhibits, A, B, whatever, and make sure they
21    are in evidence.  They didn't do it.  They have closed, they
22    have rested, their case is closed.  I don't think it's proper
23    now to pick and choose from a list of DD5s that should go
24    before the jury when there has been no testimony about them --
25              THE COURT:  I think you're right.  My mistake.  If you
```

86NMMANT

1    read this language, it's hard to see -- I never agreed to let

2    it in.  All I said is, we will just get a list later.  It sort

3    of leads me to the view that I was leaning towards letting them

4    all in, since I held them all admissible.  I agree with you as

5    a general course of business I never let in anything that

6    somebody hasn't at least touched.

7         MR. JOSEPH:  Judge, frankly, upon defendants' case,

8    when they started their case, they should have said, Judge, we

9    would now move into evidence the following exhibits, or at

10   least give your Honor a list of exhibits that would be in

11   evidence, but they didn't do that.  They rested.

12        MR. ZUCKERMAN:  Judge, it was our assumption that they

13   were in evidence at that time.  We moved the remainder of the

14   DD5s into evidence and they were in.  That's the way we

15   proceeded.  And we should be allowed even to discuss those DD5s

16   that Mr. Joseph objected to to the jury, reopen our closing for

17   five minutes to address those.

18        THE COURT:  You got a choice, either you can forget

19   reopening your summation or you can forget about letting them

20   in for the jury to see.

21        MR. ZUCKERMAN:  I guess under those circumstances we

22   have made our objection and we will choose to have the ones --

23   all the DD5s into evidence and present them to the jury.

24        THE COURT:  I think we can assume that that was my

25   fault, but it's now resolved for better or for worse.  I don't

1    think, frankly, that it's terribly -- the other DD5s are

2    significant.  That's why I admitted them.  But, obviously, if

3    you're trying a case you take out the ones you want and those

4    are the ones that were taken out by both sides and those are

5    the ones that the witnesses touched.  I am going to leave it at

6    that and I think probably we can charge the jury if you can

7    bring them in, unless you have anything else.

8              MR. JOSEPH:  Just note our objection for the record.

9              MS. OKEREKE:  Your Honor, defendants did want to note

10   a few objections to the amended court's charge to the jury.

11             THE COURT:  I think your time to do that is when I

12   call you up to the side bar, which is after the charge, not

13   before the charge.

14             MS. OKEREKE:  Okay, your Honor.

15             However, just one more matter for the record.

16   Although the Court again respectfully has assumed that

17   defendants' motions will be made at some point, defendants did

18   want to put on the record that we did intend today to make

19   motions pursuant to Rule 50 and Rule 59, and, again, we put

20   that on the record so it is clear in the event the defendants

21   did need to pursue notice at a later time.

22             MR. JOSEPH:  Plaintiff also intended to make some more

23   motions.

24             THE COURT:  It's so clear what I do as a regular

25   course of business.  It is easier to let her talk than for me

86NMMANT

1    to start ruling one way or another when in fact I've made twice

2    the announcement that I make in every case.  But it's fine.

3    Certainly she has the right to make her objection usually once,

4    but here we do it two or three times.

5         (Jury present)

6         THE COURT:  Ladies and gentlemen, we are now at the

7    last aspect of any trial, which is the charge.  The charge is

8    divided into three parts.  Some of it will sound quite familiar

9    to you because indeed I mentioned it at the outset when I gave

10   you a preliminary charge.  So the only difference is that now I

11   read it, so I don't make any mistakes or fewer mistakes, and

12   it's worthwhile doing for emphasis in any event.

13        Now that the evidence in the case has been presented

14   and the attorneys for the parties have concluded their closing

15   arguments, it is my responsibility to instruct you as to the

16   law that governs this case.  You must pay close attention and I

17   will be as clear as possible.  My instructions will be in three

18   parts.

19        First, I will give you instructions regarding the

20   general rules that define and govern the duties of a jury in a

21   civil case; second, I will instruct you as to the legal

22   elements of the causes of action alleged by the plaintiff; and,

23   third, I will give you instructions regarding the general rules

24   governing your deliberations as jurors.

25        It is your responsibility and duty to find the facts

1    from all the evidence in this case.  You are the sole judges of

2    the facts, not counsel and not I.  I want to impress upon you,

3    again, the importance of that role.  It is for you and you

4    alone to pass upon the weight of the evidence, to resolve such

5    conflicts as may have appeared in the evidence, and to draw

6    such inferences as you deem to be reasonable and warranted from

7    the evidence or the lack of evidence.  With respect to any

8    questions concerning the facts it is your recollection of the

9    evidence and yours alone that controls.

10            You are to conduct your deliberations as jurors in an

11    atmosphere of complete fairness and impartiality, without bias

12    for or against the plaintiff or the defendants.  This case

13    should be considered and decided by you as an action between

14    parties of equal standing in the community.  No party is

15    entitled to sympathy or favor.

16            It would be improper for you to consider any personal

17    feelings you may have about one of the parties or their race,

18    religion, national origin, sex, or age.  It would be equally

19    improper for you to allow any feeling you might have about the

20    nature of the claim influence you in any way.

21            The parties in this case are entitled to a trial free

22    from prejudice.  You must reach your verdict through a fair and

23    impartial consideration of the evidence.

24            You have now heard all of the evidence in the case.

25    Keep in mind that while it is your duty to accept the law from

86NMMANT                    Charge

me, you must apply the facts as you determine them.  Once
again, you are the exclusive judges of the facts.

You should not single out any instruction as alone
stating the law by which this case should be judged, but you
should consider my instructions as a whole when you retire to
deliberate.

Finally, on this issue, you should not, any of you, be
concerned about the wisdom of any rule that I state.
Regardless of any opinion that you may have as to what the law
may be, or ought to be, it would violate your sworn or affirmed
duty to base a verdict upon any other view of the law than that
which I give you.  Neither you nor I have the right to follow
our predilections about what the law should be.  We must both
follow the law as it is and as I charge it to you.

Remember, again, you are the sole and exclusive judges
of the facts.  You pass upon the weight of the evidence, you
determine the credibility of the witnesses, you resolve
conflicts as there may be in the testimony, and you draw
whatever reasonable inferences you decide to draw from the
facts as you have determined them.

I shall later discuss with you how to think about the
credibility, or believability, of the witnesses.

In determining the facts, you must rely upon your own
recollections of the evidence.  Anything that counsel may have
said while questioning witnesses or during argument is not to

86NMMANT                    Charge

be substituted for your own recollection or evaluation of the

evidence.  With respect to a fact matter, nothing I may have

said during the trial, or may say during these instructions,

should be taken in substitution for your own independent

recollection.

        Because you are the sole and exclusive judges of the

facts, I do not mean to indicate any opinion as to the facts or

what your verdict should be.  Indeed, I have no power to tell

you what your verdict should be.  If I allude to a fact and

should your recollection differ from mine, it is your

recollection that governs.

        During the trial, I have been called upon to make

rulings on various questions.  Those rulings are not evidence

and need not be considered by you.  Procedural matters are

matters of law and, although you may have been curious about

them, you should not consider them.

        The rulings I have made during the trial are not any

indication of my views of what your decision should be.

        I also ask you to draw no inference from the fact that

upon occasion I may have asked questions of certain witnesses.

Such questions were only intended for clarification or to

expedite matters and certainly were not intended to suggest any

opinion on my part as to the verdict you should render or

whether any of the witnesses may have been more credible than

any other of the witnesses.

86NMMANT                              Charge

1          Your job is to consider only the evidence and find

2     facts from what you consider to be the believable evidence, and

3     apply the law as I will later give it to you.  Your verdict

4     will be determined by the conclusions you reach, no matter whom

5     the verdict helps or hurts.  Sympathy and speculation should

6     play no part in your decision.

7          Although there are five defendants in this case, it

8     does not follow from that fact alone that if one defendant is

9     liable, any of the other defendants is liable.  Each defendant

10    is entitled to a fair consideration of the evidence relating to

11    that defendant and of that defendant's own defense, and is not

12    to be prejudiced by any finding you may make for or against any

13    other defendant.  Unless otherwise stated, all instructions I

14    give you that govern this case are to each defendant separately

15    and you have an obligation to consider them.

16         The burden of proof in this case is on the plaintiff

17    to prove each essential element of his claim by a preponderance

18    of the evidence.  You are most likely familiar with the

19    standard beyond a reasonable doubt, which is the burden of

20    proof in a criminal case.  That standard does not apply to a

21    civil case such as this, and you should therefore put it far

22    from your mind.

23         To establish a preponderance of the evidence means to

24    prove that something is more likely so than not so.  A

25    preponderance of the evidence means the greater weight of the

1    evidence.  It refers to the quality and persuasiveness of the

2    evidence, not to the number of witnesses or documents.  If you

3    find that the credible evidence on an issue is evenly divided

4    between the parties, that is, equally probable that one side is

5    right as it is that the other side is right, then you must

6    decide that issue against the party having this burden of

7    proof.  That is because the party who has to shoulder the

8    burden of proof must prove more than simple equality of

9    evidence.  The party must prove its claim by a preponderance of

10   the evidence.  On the other hand, the party that has to

11   shoulder the burden of proof need prove no more than a

12   preponderance.  So long as you find that the scales tip,

13   however slightly, in favor of the plaintiff, that what the

14   plaintiff claims is more likely true than not true, then that

15   party's claim will have been proved by a preponderance of the

16   evidence.

17          In determining whether any fact has been proved by a

18   preponderance of the evidence in the case, you may consider the

19   testimony of all the witnesses, regardless of who may have

20   called them, and all the exhibits received in evidence,

21   regardless of who may have introduced them.

22          On that issue, the evidence upon which you are to

23   decide what the facts are in this case comes either from:

24          1.  Sworn testimony of witnesses, including deposition

25   testimony, both on direct and cross and regardless of who

1     called the witness; or from

2             2.   Exhibits that the Court received in evidence;

3             3.   Stipulations.  A stipulation of fact, if there is

4     any, is an agreement among the parties that a certain fact is

5     true.  You must regard such agreed fact as true.

6             What is not evidence.  Certain things are not evidence

7     and are to be disregarded in deciding what the facts are.

8             1.   Arguments or statements by lawyers, including

9     openings and summations;

10            2.   Objections to questions;

11            3.   Testimony that has been excluded or stricken, or

12    that you have been instructed to disregard;

13            4.   Anything you may have seen or heard outside the

14    courtroom is not evidence.

15            Credibility.  You have had an opportunity to observe

16    all of the witnesses.  It is now your job to decide how

17    believable each witness was in his or her testimony.  You are

18    the sole judges of the credibility of each witness and of the

19    importance of his or her testimony.

20            It must be clear to you by now that you are being

21    called upon to resolve various factual issues, in the face of

22    the different pictures painted by the plaintiff, and the

23    defense which cannot be reconciled without your help.  You will

24    now have to decide where the truth lies, and a vital part of

25    your decision will involve making judgments about the testimony

86NMMANT                          Charge

1    of the witnesses you have listened to and observed.  In making

2    those judgments, you should carefully scrutinize all of the

3    testimony of each witness, the circumstances under which each

4    witness testified, and any other matter in evidence which may

5    help you to decide which witnesses were telling the truth and

6    which witnesses were not, and the importance of each witness'

7    testimony.

8         It is your determination as to a witness' credibility

9    that counts.  Nonetheless, the law has provided some

10   guidelines.  For instance, you should consider the witness'

11   demeanor.  Was the witness candid, frank, and forthright?  Or

12   did the witness seem as if he or she was hiding something,

13   being evasive or suspect in some way?  How did the way the

14   witness testified on direct examination compare with how the

15   witness testified on cross-examination?  Was the witness

16   consistent in his or her testimony or did he or she contradict

17   himself?  Did the witness appear to know what he or she was

18   talking about and did the witness strike you as someone who was

19   trying to report his or her knowledge accurately?

20        Your decision whether or not to believe a witness may

21   also depend on whether, or the extent to which, the witness'

22   testimony is corroborated or supported by other evidence in the

23   case.

24        Even if the witness was still partial, you should

25   consider whether the witness had an opportunity to observe the

86NMMANT                    Charge

1     facts he or she testified about.  Ask yourselves whether the

2     witness' recollection of the facts stands up in light of all

3     the other evidence.

4          In other words, what you must try to do in deciding

5     credibility is to size a person up in light of his demeanor,

6     the explanations given, and in light of all the other evidence

7     in the case, or the lack of evidence, just as you would in any

8     important matter where you were trying to decide if a person is

9     truthful, straightforward, and accurate.  In deciding the

10    question of credibility, remember that you should use your

11    common sense, your good judgment, and your life experience.

12         Inconsistencies or discrepancies in the testimony of a

13    witness, or between the testimony of different witnesses, may

14    or may not cause you to discredit such testimony.  Two or more

15    persons witnessing an incident or a transaction may see or hear

16    it differently.  In weighing the effect of a discrepancy,

17    always consider whether it pertains to a matter of importance

18    or an unimportant detail, and whether the discrepancy results

19    from innocent error or intentional falsehood.

20         If a person is shown to have knowingly testified

21    falsely concerning any important or material matter, you have a

22    right to distrust the testimony of such an individual

23    concerning other matters.  You may reject all of the testimony

24    of that witness or give it such weight or credibility as you

25    may think it deserves.

86NMMANT                         Charge

1          A witness may be inaccurate, contradictory, or even

2     untruthful in some respects and yet may be entirely credible in

3     the essence of his or her testimony.  It is for you to say

4     whether his or her testimony in this trial is truthful in whole

5     or in part, and to give it such weight as you believe it

6     deserves.

7          In evaluating the credibility of the witnesses, you

8     may take into account any evidence that the witness who

9     testified may benefit in some way from the outcome of this

10    case.  Such an interest in the outcome may sway the witness to

11    testify in a way that advances his or her own interests.

12    Therefore, if you find that any witness whose testimony you are

13    considering may have an interest in the outcome of this trial,

14    then you should bear that factor in mind when evaluating the

15    credibility of his or her testimony.

16         This is not to suggest that every witness who has an

17    interest in the outcome of a case will testify falsely, or

18    conversely, that witnesses with no apparent interest in the

19    case will always tell you the truth.  It is for you to decide

20    to what extent, if at all, the witness' interest has affected

21    or colored his or her testimony.

22         Expert witnesses.  You have also heard testimony from

23    an expert witness, Dr. Frank Tinari.  An expert witness is an

24    expert who has special training or experience in a given field

25    and is permitted to express opinions based on observed or

86NMMANT                    Charge

1    assumed facts to aid you in deciding the issues in the case.

2            The opinions stated by the expert were based on

3    particular facts, as the expert obtained knowledge of them and

4    testified to them before you, or as the attorneys who

5    questioned the expert asked the expert to assume certain facts.

6    Keep in mind, like any other witness, you may reject the

7    expert's opinion if you find the facts to be different from

8    those which form the basis of his opinion.  His opinion is not

9    gospel.  You may also reject an opinion if, after careful

10   consideration of all the evidence in the case, expert and

11   otherwise, you disagree with that opinion.  In other words, you

12   are not required to accept an expert's opinion to the exclusion

13   of the facts and circumstances disclosed by other testimony.

14   Such an opinion is subject to the same rules concerning

15   reliability as the testimony of any other witness.  It is given

16   to assist you in reaching a proper conclusion.  It is entitled

17   to such weight as you find the expert's qualification in the

18   field warrant and must be considered by you, but is not

19   controlling upon your judgment.

20           Keep in mind that the testimony of the expert,

21   Dr. Tinari, is relevant only to damages, and you should

22   consider it only if you find one or more of the defendants to

23   be liable for the malicious prosecution.

24           You have heard the testimony of current and former

25   police officers and detectives.  The fact that a witness may be

86NMMANT                         Charge

1    employed or formerly employed as a law enforcement official

2    does not mean that the witness' testimony is necessarily

3    deserving of more or less consideration or greater or lesser

4    weight than that of an ordinary witness.

5            It is your decision, after reviewing all the evidence,

6    whether to accept the testimony of any law enforcement witness

7    and to give to that testimony whatever weight, if any, you find

8    it deserves.

9            Direct and circumstantial evidence.  We spoke about

10   this as well in the preliminary charge and may spare you the

11   subway story, but I think it's worthwhile in going over the

12   concept.

13           In making your determination, you may consider

14   evidence which is either direct or circumstantial.

15           Direct evidence is that which a witness testifies that

16   the witness has perceived.  Direct evidence may also be in the

17   form of an exhibit admitted into evidence.

18           Circumstantial evidence is proof of a chain of facts

19   and circumstances from which other inferences may be drawn.

20   You are allowed to make reasonable inferences from particular

21   facts that are established by direct evidence.  This is called

22   circumstantial evidence.

23           The law does not distinguish between direct and

24   circumstantial evidence.  You may give equal weight to both.

25   The question in the case is whether, based upon all the

1    evidence, both direct and circumstantial, the party with the

2    burden of proof has proved its case by a preponderance of the

3    evidence.

4            As you can see from the subway story where the people

5    who get on and the next stop come in with raincoats and

6    dripping umbrellas, as you can see, the matter of drawing

7    inferences from facts in evidence is not a matter of guesswork

8    or speculation.  An inference is a logical, factual conclusion

9    which you might reasonably draw from other facts that have been

10   proved.  You are permitted to draw inferences, but are not

11   required to do so, from either direct or circumstantial

12   evidence.  In drawing inferences you should exercise your

13   common sense.

14           Many material facts, such as state of mind, are rarely

15   susceptible of proof by direct evidence.  Usually, such facts

16   are established by circumstantial evidence.  Circumstantial

17   evidence is of no less value than direct evidence for in either

18   case you must be convinced that the party with the burden of

19   proof proved its case by a preponderance of the evidence.

20           There are times when different inferences may be drawn

21   from facts, whether they are proved by direct or circumstantial

22   evidence.  The plaintiff may ask you to draw one set of

23   inferences.  The defendant may ask you to draw another.  It is

24   for you, and you alone, to decide what inferences you will

25   draw.

86NMMANT                    Charge

1        A witness may be discredited or impeached by

2   contradictory evidence from other witnesses, or by evidence

3   that at a prior time the witness had said or done something, or

4   failed to say or do something which is inconsistent with the

5   witness' present testimony.

6        You are not to consider evidence of a prior

7   inconsistent statement as affirmative evidence in determining

8   the acts complained of.  Evidence of a prior inconsistent

9   statement was placed before you for the more limited purpose of

10   helping you decide whether to believe the trial testimony of

11   the witness who contradicted a prior statement.  If you believe

12   any witness has been impeached and thus discredited, it is your

13   exclusive province to give the testimony of that witness such

14   credibility, if any, as you may think it deserves.

15        The law does not require anybody to call as witnesses

16   all persons who may have been present at any time or place

17   involved in the case, or who may appear to have some knowledge

18   of the matters in issue at this trial.  Nor does the law

19   require any party to produce as exhibits all papers and things

20   mentioned in this case.  Keep in mind, too, that with respect

21   to witnesses they are equally available to both sides.  Put

22   another way, either side was able to subpoena and call any

23   witness it chose to call.

24        If you find that a party could have produced documents

25   or other evidence in this lawsuit, and that such evidence was

1    at one time within that party's control or in his or her

2    custody, and that this evidence would have been relevant in

3    deciding facts in dispute in this lawsuit, you are permitted,

4    but not required, to infer that the evidence, if produced,

5    would have been unfavorable to that party.

6              In deciding whether to draw this inference, you should

7    consider whether the evidence that was not produced would

8    merely have duplicated other evidence already introduced.  You

9    may also consider whether the party has offered a reason for

10   not producing this evidence, and whether that reason was

11   explained to your satisfaction.

12             Let us move on to part 2.  I will now instruct you on

13   the law applicable to this case.  The other thoughts which we

14   frequently call boilerplate are applicable to just about every

15   civil case and, for the most part, criminal cases as well.  But

16   now we are going to talk about the law applicable to this case.

17             The plaintiff in this case is Anthony Manganiello.

18   The plaintiff contends that the defendants -- I've listed them

19   in alphabetical order -- Shawn Abate, Luis Agostini, Richard

20   Martinez, Miriam Nieves, and Alex Perez, are liable for

21   malicious prosecution against the plaintiff in violation of his

22   constitutional rights.

23             The plaintiff is seeking damages under Section 1983 of

24   Title 42 of the United States Code, and that section reads in

25   relevant part as follows:

1    Every person who, under color of any statute,

2    ordinance, custom or usage of state subjects any citizen of the

3    United States to the deprivation of any rights, privileges, or

4    immunities secured by the Constitution and laws shall be liable

5    to the party injured in an action at law.

6    To establish a claim under Section 1983, the plaintiff

7    must prove, by a preponderance of the credibility evidence,

8    each and every one of the following three elements:

9    First:  That the conduct complained of was committed

10   by a person acting under color of state law;

11   Second:  That the person's conduct deprived the

12   plaintiff of rights, privileges, or immunities secured by the

13   Constitution and laws of the United States; and

14   Third:  That the defendants' conduct was the proximate

15   or legal cause of injury and the resulting damage sustained by

16   the plaintiff.

17   Let me now explain each of these elements to you.

18   The first element of the plaintiff's claim is that the

19   defendants acted under color of state law.  In this case, it is

20   not disputed that all five defendants were employees of the New

21   York City Police Department at all the relevant times and as a

22   consequence of this employment were acting under color of state

23   law.  In other words, the first element is satisfied and you

24   need not deliberate with respect to it.

25   The second element of the plaintiff's Section 1983

86NMMANT                    Charge

1    claim is that he was deprived of a federal constitutional right

2    by the defendant or the defendant under whom you are

3    considering at the moment.  You are required to determine

4    whether or not there was a deprivation of a citizen's rights

5    under the Fourth Amendment of the United States Constitution,

6    which that amendment, as you may know, guards against

7    unreasonable searches and seizures.  If you find that the

8    defendant whom you are considering is liable for malicious

9    prosecution, this is a deprivation of the plaintiff's rights

10   under the Fourth Amendment and satisfies the second element of

11   Section 1983.

12         In order to succeed on his claim, the plaintiff is

13   required to prove by a preponderance of the evidence five

14   elements; that is, the malicious prosecution aspect includes

15   five elements:

16         First, the commencement or the continuance of a

17   criminal proceeding by the defendant whom you are considering

18   against the plaintiff;

19         Second, the termination of the criminal proceeding in

20   favor of the plaintiff;

21         Third, the absence of probable cause for the

22   proceeding;

23         Fourth, malice on the part of the defendant whom you

24   are considering; and

25         Fifth, that the plaintiff was deprived of his liberty

86NMMANT                    Charge

1   at some time after his arraignment and before the criminal

2   proceeding was terminated in his favor.

3           I instruct you that the second element has been met

4   because the parties have agreed that the criminal proceeding

5   terminated in the plaintiff's favor; that is, the plaintiff was

6   acquitted of crimes for which he was charged.

7           I instruct you that the fifth element has been met

8   because it is clear on this record that the plaintiff was

9   deprived of his liberty after his arraignment; that is, he was

10  incarcerated for some period of time before he was released on

11  bail.

12          It is for you, the jury, to determine whether the

13  plaintiff has satisfied, by a preponderance of the evidence,

14  credible evidence, the first, third, and fourth elements of his

15  malicious prosecution claim, whether the defendant whom you are

16  considering commenced or continued a criminal proceeding

17  against the plaintiff, whether there was probable cause to

18  commence or continue the proceeding, and whether there was

19  malice on the part of the defendant whom is under

20  consideration.

21          Now, let me explain each of these three remaining

22  elements.

23          With respect to whether the defendant commenced or

24  continued a criminal proceeding against the plaintiff, the

25  plaintiff must prove that the defendant you are considering

86NMMANT                        Charge

1    played an active role in the prosecution.  This would include

2    giving advice, encouraging the authorities to act, filing

3    criminal charges against the plaintiff, being instrumental in

4    bringing about the criminal charges, and providing false

5    information to the prosecutors.

6         Probable cause.  The next element that you must decide

7    is whether there was probable cause to commence, for instance,

8    by an indictment or continue, for instance, by a trial the

9    criminal proceedings.  Probable cause depends upon whether a

10   reasonably prudent person, based upon all the facts and

11   circumstances known to him when the prosecution was commenced

12   or continued, would have believed that the plaintiff was guilty

13   of the crime with which he was charged.  In the plaintiff's

14   criminal case he was charged with murder in the second degree,

15   manslaughter in the first degree, and criminal possession of a

16   weapon in the second degree.

17        The New York penal law states in pertinent part that a

18   person is guilty of murder in the second degree when with

19   intent to cause the death of another, he causes the death of

20   such person.

21        The New York penal law states in pertinent part that a

22   person is guilty of manslaughter in the first degree when with

23   intent to cause serious bodily harm to another person, he

24   causes the death of such person, or with intent to cause the

25   death of another person, he causes the death of such person

86NMMANT                          Charge

1    while under the influence of extreme emotional disturbance.

2              The New York penal law states in pertinent part that a

3    person is guilty of criminal possession of a weapon in the

4    second degree when with intent to use the weapon unlawfully

5    against another, such person possesses a loaded firearm.

6              The fact that the plaintiff was ultimately acquitted

7    of these charges against him is not evidence that the

8    defendants lacked probable cause when the prosecution was

9    commenced or continued.

10             You must determine whether or not there was probable

11   cause to commence, in this instance, by an indictment, or

12   continue, for instance by a trial, criminal proceedings.

13             The grand jury's indictment of Mr. Manganiello creates

14   a rebuttable presumption of probable cause.  The plaintiff may

15   overcome this presumption by showing by a preponderance of the

16   evidence that the defendant whom you are considering did not

17   make a complete and full statement of facts either to the grand

18   jury or to the district attorney, that he or she misrepresented

19   or falsified evidence, or that he or she withheld evidence or

20   otherwise acted in bad faith, and that this action or omission

21   by the defendant had an impact on the grand jury's decision to

22   indict Mr. Manganiello.  Put another way, to rebut the

23   presumption of probable cause created by the grand jury

24   indictment, the plaintiff must establish by a preponderance of

25   the evidence that the grand jury's indictment was the result of

fraud, perjury, the suppression of evidence or other police

conduct undertaken in bad faith.  Such conduct could include

failing to provide documents or other testimony or providing

false documents, such as a false DD5, or other false testimony,

to either the grand jury or the district attorney, so long as

such conduct by the defendant had an impact on the grand jury's

decision to indict Mr. Manganiello.

        Malice.  With respect to the fourth element, to show

malice here, the plaintiff must show that the criminal

prosecution was commenced or continued for a purpose other than

to secure a conviction of a guilty person, or that it was

commenced or continued out of ill will or reckless disregard

for the rights of the accused.  A prosecution is commenced or

continued with reckless disregard for the rights of the accused

when it is commenced without any reasonable belief that the

accused has actually committed the offense for which he is

charged.  If you find that the defendant whom you are

considering did not have probable cause to believe that the

plaintiff committed the crime for which he was charged, you

may, but are not required, to infer that the defendant acted

maliciously.

        Proximate cause.  The plaintiff must also prove by a

preponderance of the evidence that the conduct of the defendant

whom you are considering was a proximate cause of his injuries.

        Proximate cause means that there must be a sufficient

86NMMANT                    Charge

1    causal connection between a defendants' acts or omissions and

2    an injury or damage sustained by the plaintiff.  An act is a

3    proximate cause if it was a substantial factor in bringing

4    about the plaintiff's injuries.  The plaintiff's injury or

5    damage must be either a direct result or a reasonably probable

6    consequence of the defendants' conduct.

7            Put another way, the issue is whether a reasonable

8    person would view the defendants' conduct as the cause of the

9    plaintiff's injuries.

10           There may be more than one proximate cause of an

11   injury or damage.  Many factors or the conduct of two or more

12   people may operate at the same time, either independently or

13   together, to cause an injury.

14           The defendants are not liable if the plaintiff's

15   injuries were the result of an independent cause that

16   intervened between the defendants' conduct and the plaintiff's

17   injury, and that produced injuries that were not reasonably

18   foreseeable by the defendant whom you are considering.

19           I think that finishes the second aspect and we are now

20   ready to talk to you a little bit about damages.

21           If you find that plaintiff has proven all of the

22   elements of his claim for relief, you will then consider

23   damages.  You should not interpret the fact that I am giving

24   instructions about damages now as an indication that I believe

25   that the plaintiff should, or should not, be awarded damages.

86NMMANT                        Charge

1    It is your task and yours alone to decide whether the defendant

2    whom you are considering is liable.  Only if you find that a

3    defendant is liable may you reach the issue of damages.

4         The law permits me to charge you on damages now so

5    that in the event you decide that one or more of the defendants

6    are liable and thus you reach the issue of damages, you will

7    not have to file back and listen to my charge on damages.

8         When a party has caused damage by his conduct, the

9    injured plaintiff need not prove the existence and amount of

10   damages with any kind of mathematical certainty.  Instead, the

11   plaintiff need only provide a reasonable basis for determining

12   the amount of damages.

13        You may award compensatory damages, also known as

14   actual damages, only for injuries that the plaintiff proves

15   were caused by the allegedly wrongful conduct of the defendant

16   whom you are considering.  The damages that you award must be

17   fair compensation, no more and no less.  You may not award

18   compensatory damages for speculative injuries, but only for

19   those injuries that a plaintiff has actually suffered, or which

20   he is reasonably likely to suffer in the future.

21        If you find in favor of the plaintiff, then you must

22   award the plaintiff such sum as you believe will fairly and

23   justly compensate him for any injury you believe he actually

24   sustained as a consequence of the conduct of the defendant.

25        You shall award actual damages only for those injuries

1   which you find that a plaintiff has proven by a preponderance

2   of the evidence.  Moreover, you may not simply award actual

3   damages for any injury suffered by the plaintiff.  You must

4   award actual damages for those injuries that are a direct

5   result of actions by a defendant whom you have found is liable

6   to the plaintiff.  Thus, even if you find that a defendant

7   deprived the plaintiff of his rights, you must ask whether the

8   plaintiff has proven by a preponderance of the evidence that

9   the deprivation actually and proximately caused each of the

10  damages that he claims to have suffered.

11       If you return a verdict for plaintiff, then you must

12  award him such sum of money as you believe will fairly and

13  justly compensate him for any injury you believe he actually

14  sustained, including any pain and suffering, as a result or a

15  consequence of the conduct of the defendants.

16       The plaintiff is entitled to only one recovery, if at

17  all, sufficient to reasonably compensate him for his injuries.

18  I instruct you that if you find that one or more of the

19  defendants are liable to the plaintiff, you may not award

20  additional compensation or compensatory damages for the same

21  injury, even if such injury resulted from more than one

22  wrongful act from the actions of more than one defendant.  If

23  you can identify separate injuries resulting from separate

24  violations, you may award an amount of compensatory damages

25  equal to the total of the damages you believe will fairly and

86NMMANT                        Charge

1    justly compensate the plaintiff for the separate injuries he

2    has suffered.  But you may not compensate the defendant for the

3    same injury more than once because you find one or more

4    defendants to be liable for the same injury.

5         In determining the amount of any damages that you

6    decide to award, you should be guided by dispassionate common

7    sense.  Computing damages may be difficult, but you must not

8    let that difficulty lead you to engage in arbitrary guesswork.

9    You must use sound discretion in fixing any award of damages,

10   drawing reasonable inferences from the facts in evidence.  You

11   may not award damages based on sympathy or speculation.  Your

12   award must be fair and just.  It should neither be excessive

13   nor inadequate, but it should be reasonable.

14        You are instructed that any person who claims damages

15   as a result of an alleged wrongful act of another has a duty

16   under the law to use reasonable efforts to mitigate or minimize

17   those damages.  The plaintiff may not recover in full for

18   damages that could have been reduced with reasonable effort;

19   obviously, taking into consideration all the evidence that you

20   heard about him and his condition.

21        Nominal damages.  If you return a verdict for the

22   plaintiff, but find that the plaintiff has failed to prove by a

23   preponderance of the evidence that he suffered any actual

24   damages, then you must award the plaintiff nominal damages not

25   to exceed the sum of one dollar.  Nominal damages are the law's

1  way of recognizing that constitutional and other rights must be

2  scrupulously observed, even when these violations have not been

3  shown to have caused actual injury.  You should not award

4  nominal damages out of sympathy for the plaintiff if you

5  believe that the plaintiff has failed to prove his case.

6      Punitive damages.  If, and only if you have awarded

7  the plaintiff either compensatory or nominal damages, the law

8  permits the jury, under certain circumstances, to award the

9  plaintiff punitive damages in order to punish the wrongdoer or

10  wrongdoers for the violation of constitutional rights, or some

11  extraordinary misconduct, and to serve as an example or warning

12  to others not to engage in such conduct.

13      If you, the jury, should find, from a preponderance of

14  the evidence, that the conduct of a defendant that proximately

15  caused injury or damage to the plaintiff was maliciously, or

16  wantonly, or oppressively done, then you may, in the exercise

17  of discretion, if you unanimously choose to do so, award such

18  amount as you shall unanimously agree to be proper as punitive

19  damages.

20      An act or a failure to act is maliciously done if

21  prompted or accompanied by ill will, or spite, or grudge,

22  either toward the injured person individually or toward all

23  persons in any group or category of which the injured person is

24  a member.

25      An act or a failure to act is wantonly done if done in

86NMMANT                    Charge

1    reckless disregard of, or callous disregard of, or indifference

2    to the rights of another person.

3           An act or a failure to act is oppressively done if

4    done in a way or manner that injures, or damages, or otherwise

5    violates the rights of another person with unnecessary

6    harshness or severity, as by misuse or abuse of authority or

7    power, or by taking advantage of some weakness or disability or

8    misfortune of another person.

9           Whether or not to make an award of punitive damages is

10   a matter exclusively within the discretion of the jury.  When

11   awarded, the amount of such extraordinary damages must be fixed

12   with calm discretion and sound reason and must never be awarded

13   or fixed in an amount because of any sympathy, or bias or

14   prejudice with respect to any party in the case.  In fixing the

15   amount of punitive damages, you must consider the degree of

16   responsibility of the conduct of the defendant whom you are

17   considering and the relationship between the amount of punitive

18   damages to any actual harm inflicted upon the plaintiff.

19          At this stage of the trial you are directed to

20   determine only if an award of punitive damages is in order.  If

21   you find that punitive damages are in order, I will then

22   instruct you on how to determine the amount of punitive

23   damages.  There is only one more portion, which is the final

24   portion of these charges, and they have to do essentially with

25   your role that you are about to embark upon.

86NMMANT                         Charge

This case will be decided on the basis of the answers that you give to certain questions which will be on the verdict sheet. As you will note from reading the questions, you may not need to consider certain questions at all depending on your answer to one or more preceding questions.

In this court, while a jury of six can deliberate and reach a verdict, if there are more than six, which there are here, they are not considered alternates, but are full-fledged jurors. In this case, all eight of you will deliberate. There is also the rule in this court that the jury must be unanimous. When all eight of you have agreed on any answer, the foreperson of the jury will write down the answer in the space provided. When you have answered the requisite number of questions, the foreperson will sign the verdict sheet and signal the marshal that you are ready to report your verdict to the Court. The foreperson will then be taken through the verdict sheet by my courtroom deputy.

Do not assume from the facts or from the wording of the questions or from my instructions on them what the answers should be or that I have any view about what the answers should be. Again, I have no power to tell you what the answers should be.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for himself or herself, but you

86NMMANT                    Charge

should do so only after a consideration of the case with your

fellow jurors, and you should not hesitate to change an opinion

when convinced that it is erroneous.  You are not bound to

surrender your honest convictions concerning the effect or

weight of the evidence for the mere purpose of returning a

verdict based on the opinion of other jurors.  Discuss and

weigh your respective opinions dispassionately, without regard

to prejudice or favor for either party, and adopt that

conclusion which in your good conscience appears to be in

accordance with the truth.

        Once you get into the jury room, the foreperson, juror

no. 1, unless you agree on another, will be responsible for

signing all communications to the Court and for handing them to

the marshal during your deliberations.

        If during your deliberations you want to see any of

the exhibits, you may request that they be brought into the

jury room.  If you want any of the testimony read, you may also

request that.  Please remember that it is not always easy to

locate what you might want, so be as specific as you possibly

can.  In requesting portions of the testimony, let me know the

name of the witness, the subject matter, and, if possible and

appropriate, direct or cross.

        In addition, you may request to see any portion or all

of my instructions on the law.

        Your requests for exhibits, or testimony, in fact any

86NMMANT                        Charge

1    communications with the Court, should be made to me in writing,

2    signed by your foreperson, and given to one of the marshals.

3    In any event, do not tell me or anyone else how the jury stands

4    on any issue until a unanimous verdict has been reached.

5             Finally, members of the jury, if you remain seated

6    where you are briefly while I confer with counsel to see if

7    there are any additions or corrections they would like to make.

8    In this regard, I ask you not to discuss the case while seated

9    in the box because there is the possibility that I might find

10   it proper to give you additional instructions which you may not

11   presently have received.  Please remain where you are just for

12   a few minutes, and we will come back to you and give you a

13   verdict sheet and send you on your way.

14             Would the lawyers come to the side bar.

15             (At the side bar)

16             THE COURT:  As I have indicated, I have marked as

17   court exhibits each of the items that you've provided me with.

18   Court Exhibit 5 is the plaintiff's proposed verdict sheet.

19   Court Exhibit 4 is the defendants' proposed verdict sheet.

20   Court Exhibit 3 is the plaintiff's proposed instructions to the

21   jury.  Court Exhibit 2, I hope -- I don't know where Court

22   Exhibit 2 is.  I think it's attached.

23             THE LAW CLERK:  It's attached to the objections, the

24   letter.

25             THE COURT:  And Court Exhibit 1 is a letter from the

86NMMANT

1    Corporation Counsel, dated June 21, which has all of the

2    concerns that they had as of Saturday evening.

3            Please don't tell me anything about any of what I've

4    gotten and looked at and reviewed.  I have a verdict sheet.

5    Have you seen the verdict sheet?

6            MR. JOSEPH:  I believe I have, Judge.

7            THE COURT:  Have you seen the verdict sheet?

8            MR. ZUCKERMAN:  Yes, we saw it this morning.

9            THE COURT:  Is there anything other than in these

10   exhibits which you're now protected by?

11           MS. OKEREKE:  Yes, your Honor.  There is nothing in

12   the jury charge or the verdict sheet which reflects a qualified

13   immunity defense.

14           THE COURT:  I am going to give you a copy of the 2007

15   Court of Appeals decision because you apparently didn't get my

16   drift at the charging conference.  What it says is that at this

17   juncture all that you're supposed to do is get from the jury a

18   little bit of the factual feelings they have so that the judge

19   can make that decision, and indeed that's exactly what I did in

20   my verdict sheet and that's precisely what the Second Circuit

21   asked me to do.  But you have an objection.  Anything else?

22           MS. OKEREKE:  Yes.  Additionally, to instruction 2,

23   the portion -- I don't remember the exact instruction number.

24   It's not No. 2.  But the portion where it reads:  The documents

25   in this lawsuit that defendants are -- or the jury is to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86NMMANT

```
 1    determine whether or not they found that individuals did not
 2    produce evidence or other documents in this lawsuit, it's not
 3    clear.  Defendants just object to it.
 4            THE COURT:  Very well.
 5            MS. OKEREKE:  Additionally, defendants would request
 6    that the jury be instructed that they have heard several
 7    different -- probable cause mentioned several times in
 8    different contexts, in the context of a search warrant, in the
 9    context of an arrest, but this case is about malicious
10    prosecution and it's a separate probable cause determination.
11            THE COURT:  Denied.
12            MS. OKEREKE:  Two more.  We would also request an
13    instruction that the jury be charged that only the testimony
14    that they are to consider, whether it was truthful or not, was
15    that given during the grand jury hearing.
16            THE COURT:  I don't understand.  Didn't you have a
17    chance in this letter I only got the day before yesterday --
18            MS. OKEREKE:  These are all addressed to the
19    amendments which were added from the charging conference on
20    Friday.
21            THE COURT:  But indeed this letter dated the 21st
22    should have included any of them.
23            MS. OKEREKE:  These address the amendments that we
24    received today.  For instance --
25            THE COURT:  Indeed, I told you that Saturday evening
```