UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ANTHONY MANGANIELLO,

PLAINTIFF

- Against-

LUIS AGOSTINI, et. al.,

DEFENDANTS

-----------------------------------------------------------------X

CIVIL ACTION No.:  07 CV 3644 (HB)

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## POST TRIAL MOTIONS

Respectfully submitted,

Michael H. Joseph, Esq.
OSORIO & ASSOCIATES, LLC
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168
ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

POINT I:    DEFENDANTS' RULE 50 MOTION SHOULD BE DENIED
            BECAUSE THERE WAS SUFFICIENT EVIDENCE
            TO SUPPORT DEFENDANT'S LIABILITY FOR
            MALICIOUS PROSECUTION.................................................1

    A.  Plaintiff Established Sufficient Evidence At Trial To Rebut Any
        Probable Cause Presumption Created By The Indictment.................10

    B:  Plaintiff Established Each Element Of Malicious Prosecution ............14

        I.    Agostini and Abate Played A Role In Commencing
              And Continuing The Proceeding.................................15
        II    There Was No Of Probable Cause ..............................16

        III.  There Was Sufficient Evidence That Defendants
              Acted With Malice ..........................................19

POINT II:   THE DEFENDANTS ARE NOT ENTITLED TO
            QUALIFIED IMMUNITY .......................................21

POINT III: THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL .........22

    A.  The Court Did Not Abuse Its Discretion In Not
        Bifurcating The Trial..........................................22

    B.  The Events Which Occurred On February 12, 2001 Were
        Admissible Evidence And Relevant To The Issues In Controversy.....23

    C.  Dr. Latif Was A Treating Physician And No Rule 26
        Expert Disclosure Was Required.................................24

    D.  The Court's Conduct Did Not Deprive The Defendants Of A Fair Trial.....26

    1.  The Court's Comments Do Not Entitle Defendants To A New Trial........26

            A. The Court's Commentary on the Weight of the
               Evidence Was Proper.....................................26

            B. The Court's Comments Were Not Hostile or Prejudicial ........27

            C. The Court's Comments Regarding Points of Law Were Proper.......28
    2.  The Court Did Not Prevent Defendants From Presenting Their Case..........30

E. The Verdict Was Consistent.................................................................................31

F. The Missing Evidence Charge Was Warranted And Relevant To This Action .......32

Defendants Points G, H and I are Baseless.........................................................33

POINT IV:     THE JURY'S AWARD WAS NOT EXCESSIVE ............................................33

CONCLUSION.................................................................................................................35

**POINT I:    DEFENDANTS' RULE 50 MOTION SHOULD BE DENIED BECAUSE
THERE WAS SUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S
LIABILITY FOR MALICIOUS PROSECUTION**

There was overwhelming proof at trial that Plaintiff satisfied all the elements of malicious

prosecution. The burden in a Rule 50 motion is particularly heavy after the jury has returned a

verdict. Cross v. N.Y.C.T.A., 417 F.3d 241 (2d Cir. 2005). The Court may set aside a verdict

only if there was a complete absence of evidence supporting the verdict and the jury's findings

must have been the result of surmise and conjecture, or there is such overwhelming evidence in

the movant's favor that reasonable jurors could not arrive at a verdict against him. Id.

The following facts were established at trial. On February 12, 2001, Plaintiff, a security

officer, responded to a call at 1700 Metropolitan Ave., Apt. 5E, at about 8:45 a.m., and although

Mr. Acosta was also dispatched, he never arrived. (Def. Ex. A, p. 56, 57, Ex. 1, 2).When Plaintiff

arrived, Sgt. Rose was at the apartment and P.O. Ortiz and P.O. Rodriguez arrived a few minutes

later. (Def. Ex. A, p. 58). Plaintiff left the building with Ortiz and Rodriguez at 9:04 a.m. and did

not return until about an hour later, when he received a call that Acosta was shot in the basement.

(Def. Ex. A, p. 57-64, 151, 152).  When Richard Huello, a verizon employee arrived at the

building's basement at 9:25 a.m., he heard a walkie talkie, banged on the door (where Acosta was

later found), and there was no response. (Def. Ex. A, p. 229, 409). Therefore, Acosta was  shot

sometime between 8:45 a.m. and 9:25 a.m.

Plaintiff responded to the basement after receiving a call that Acosta had been shot. (Def. Ex.

A, p. 61, 62). As Plaintiff exited the basement, he was approached by officers, patted down and

brought to the 43rd precinct. (Def. Ex. A, p. 62-65). Although the defendants testified that

Plaintiff was not initially a suspect, Sgt. McGovern testified that Plaintiff was arrested for

Acosta's murder at the scene.  (Ex.1, p. 163, 195, 291, 342, 466).

Plaintiff was brought to the precinct and questioned by Agostini at which point, Plaintiff provided his name, address and phone number. (Def. Ex. A, p. 65, 66). Agostini asked Plaintiff if he knew of anyone who had a problem with Acosta. Plaintiff told him about an incident where some Blood gang members threw Acosta through a window and another where local thugs threatened to shoot him. (Def. Ex. A, p. 66, 68). Agostini then accused Plaintiff of killing Acosta, even though Agostini had no information that tied him the murder. (Def. Ex. A, p. 68, 217). Abate and his supervisor Lt. Scott conceded that on February 12, 2001, there was no evidence connecting Plaintiff to the murder. (Def. Ex. A, p. 358, 456, 457). Plaintiff said to Agostini "Are you fucking crazy? ... I had nothing to do with this". (Def. Ex. A, p. 68). In response, Agostini, got angry stood up, looked at Plaintiff "like he was a piece of garbage", and he and Abate stripped him of his clothes. (Def. Ex. A, p. 68). While laughing, they removed Plaintiff's jacket, shirt, belt and left him sitting in a tank top and pants. (Def. Ex. A, p. 69). Mr. Agostini ripped a band aid off Plaintiff's hand and said "you won't be needing this". (Def. Ex. A, p. 69, 353).

Despite Plaintiff's cooperation, Agostini prepared a DD5 which falsely stated that Plaintiff was evasive when questioned and that he said that he did not know his address and that his telephone number was unlisted. (Def. Ex. A, p. 200, 202, Ex. 3). Nevertheless, Agostini admitted that Plaintiff answered his questions about where he was when he received the call and when he saw Acosta during the morning. (Def. Ex. A, p. 200, 201). Agostini took notes of what Plaintiff said during the interview, all of which disappeared. (Def. Ex. A, p. 202).

Abate, interviewed witnesses, conducted an extensive canvass, and searched Plaintiff's car but discovered nothing connecting Plaintiff to the murder and gun shot residue tests of Plaintiff's hands and clothes were negative. (Def. Ex. A, p. 208, 227, 337, 341, 342, 358, 374, 608, 609).

2

Mario Manganiello arrived at the 43rd precinct and after seeing his brother who was pale and disheveled with electrodes attached to his chest in an interrogation room, he called a lawyer named Richard Ross. (Def. Ex. A, p. 389). Defendants admitted there was no probable cause to believe that Plaintiff was the murder, but they considered him a suspect because a lawyer called. (Def. Ex. A, p. 214-217, 218, 219, 353, 355). After Plaintiff met with Mr. Ross, he was put in a cell. (Def. Ex. A, p. 69, 70). Plaintiff asked Agostini for something to wear because he was cold and his clothes had been taken, and Agostini laughed, said "yeah right" and walked away. (Def. Ex. A, p. 69, 70). At 10:25 p.m., A.D.A. Doudes told Agostini that he could not arrest Plaintiff, nevertheless Agostini left Plaintiff in a cell until 5:00 a.m. (Def. Ex. A, p.70, 71, 222, 223). After being released Plaintiff attempted to put on his shoe laces and Agostini shoved him repeatedly while saying "No, No, No, you don't put the fucking shoe laces on at my station house.... get out of my fucking station house now". (Def. Ex. A, p. 70, 71).

On Feb. 12, 2001, Det. Martinez created a DD5 documenting that P.O. Rodriguez and P.O. Ortiz, told him that Plaintiff responded to apartment 5E, seemed normal and left the building with them. (Def. Ex. A, p. 173, 174, 413, Ex. 2). However, Agostini created a DD5 two weeks later, which states that Plaintiff left apartment 5E before the officers, which falsely implied that he was alone in the building when Acosta arrived. (Def. Ex. A, p. 189, Ex. 4). Even Agostini admitted that the statements of Rodriguez and Ortiz in his DD5 were starkly different than those given to Det. Martinez on February 12, 2001. (Def. Ex. A, p. 190). Agostini's notes of the officers' interview have disappeared. (Def. Ex. A, p. 192).

Two days after A.D.A. Doudes told Agostini that there was no probable cause to charge Plaintiff, he met with Terrance Alston, a bloods gang member who was incarcerated. (Def. Ex. A,

3

p. 243, 475). Agostini knew that Alston was in jail on Feb. 12, 2001 and for a long time prior,

therefore he could not possibly have information about the murder. (Def. Ex. A, p. 82, 244, 245).

Prior to Agostini meeting with Alston, Det. Parker (Alston's handler) interviewed him for an hour

about the murder and Alston did not say anything about Plaintiff hiring him to kill Acosta, nor did

he say that he knew someone who sold Plaintiff the murder weapon. (Def. Ex. A, p. 475, 476,

484). Agostini testified that Alston never told him that Plaintiff hired him to kill a security guard,

but he created a DD5, which says that Plaintiff hired Alston to kill another security guard. (Def.

Ex. A, p. 264, 265, Ex. 5). Plaintiff never met Alston and the DD5 regarding Alston  was

fabricated. (Def. Ex. A, p. 78, 79, 82). Det. Parker confirmed that Alston's story came about after

he met with Agostini. (Def. Ex. A, p. 476). Alston also told Agostini that Plaintiff wanted Acosta

killed over a girl, but Agostini verified this was false. (Def. Ex. A, p. 327).

    Alston told Agostini that his friend Johnny Baker sold Plaintiff a .22 caliber gun, the same

caliber as the Acosta murder weapon. (Def. Ex. A, p. 250, 251). Agostini interviewed Baker who

said that Alston was lying and he wrote out a statement, which disappeared. (Def. Ex. A, p. 251,

258). Agostini believed Baker, and when he confronted Alston about his lies, Alston said that he

did not want Agostini to interview witnesses he produced without him present and that he will get

Agostini someone else to implicate Plaintiff in four weeks, if he gets him out of jail. (Def. Ex. A,

p. 248, 251, 252, 255, 258). Agostini admitted that it was his responsibility to evaluate witness'

credibility and he knew that Alston was not believable because he was playing games to get out of

jail. (Def. Ex. A, p. 248, 254- 256, 312, 314). Agostini didn't create any paperwork documenting

that Alston was playing games to get out of jail or that he didn't want his witnesses interviewed

without him there or that he promised to produce another witness only if he got out of jail.  (Def.

4

Ex. A, p. 253-257). Agostini admitted that he was supposed to drop informants that lie, but, rather than drop Alston, he spoke to the D.A. and Alston was released in exchange for his testimony implicating Plaintiff. (Def. Ex. A, p. 249, 315, 647).

While Agostini claims that he told the A.D.A. everything, the prosecutor testified that he did not raise any concerns to her about Mr. Alston playing games to get out of jail nor did he tell his supervisors about this. (Def. Ex. A, p. 330, 457, 647).

After Agostini learned that Alston lied about Baker, he and Abate approached Michael Booth, a local bookie and loan shark. (Def. Ex. A, p. 268, 269). While defendants claim that Mr. Tartone told them that Booth had information, Abate admitted he knew Booth from "the street". (Def. Ex. A, p. 358, 359). The defendants told Booth that they had information that a Parkchester security officer tried to buy a gun from him. (Def. Ex. A, p. 272, 273). At first, Booth knew nothing about this and didn't want to talk to the defendants. (Def. Ex. A, 271, 272). Then defendants brought Booth to the precinct, searched him, found a knife and betting slips with names and monetary amounts on them. (Def. Ex. A, p. 271, 272). Agostini, with Abate present told Booth that they would give the organized crime bureau his name, at which point Booth wrote out a statement that Plaintiff tried to buy a gun from him and Agostini created a DD5 documenting the false statement. (Def. Ex. A, p. 84, 272, 273). Plaintiff never had any such conversation with Booth. (Def. Ex. A, p. 84).  After Booth signed the statement, he was given back the knife, left the police station, no charges were filed, the gambling slips disappeared and Booth's name was withheld from the organized crime bureau. (Def. Ex. A, p. 273, 274). In the seven years after Booth falsely implicated Plaintiff, he was never arrested, even though he was operating an illegal gambling and loan sharking operation. (Def. Ex. A, p. 275). While Agostini

5

claims he told the A.D.A. everything, he never told the A.D.A. that Booth was a loan shark and bookie, nor did he or Abate give the gambling slips to the A.D.A. or tell the A.D.A. that they told Booth what to say and coerced him into signing a false statement implicating Plaintiff. (Def. Ex. A, p. 275, 321). Nor did Agostini tell the A.D.A. that he and Abate allowed Booth to operate his illegal businesses in exchange for the statement. (Def. Ex. A, p. 313, 636, 637). The A.D.A. never authorized defendants to withhold criminal charges against Booth in exchange for a statement implicating Plaintiff. (Def. Ex. A, p. 638). Booth testified falsely at Plaintiff's murder trial that Plaintiff tried to buy a gun from him. (Def. Ex. A, p. 638).

After Agostini talked to A.D.A. Scaccia and Alston was released, he produced Mark Damon who with Alston present, said that he sold Plaintiff a .22 caliber gun. (Def. Ex. A, p. 259). Agostini prepared a DD5 in which Damon said that in January, 2001, he sold Plaintiff a .22 caliber gun. (Def. Ex. A, p. 86, 258- 260, Ex. 7). Plaintiff never met Damon, never purchased a .22 caliber handgun and the information in the DD5 was fabricated. (Def. Ex. A, p. 86). Damon subsequently admitted that he lied because Alston was forcing him to falsely implicate Plaintiff. (Def. Ex. A, p. 261, 641). Agostini, who was the lead detective, didn't interview Damon because Alston did not want him to. (Def. Ex. A, p. 262, 263).

Agostini admitted that he knew Alston had lied when he charged Plaintiff with Acosta's murder and obtained an arrest warrant by going in front of a Judge and presenting the fabricated evidence and witness accounts. (Def. Ex. A, p. 246, 247, 275). The fabricated information that Agostini provided caused the D.A. to obtain an arrest warrant authorizing Plaintiff's arrest for Acosta's murder. (Def. Ex. A, p. 361, 362). Mr. Abate testified that Agostini provided the D.A. with all the information that lead to the authorization for Plaintiff's arrest. (Def. Ex. A, p. 386).

6

Defendants erroneously claim that it was the D.A.'s decision to commence the charges, because the defendants provided the information. (Def. Ex. A, p. 357, 358).

Agostini falsely testified at Plaintiff's murder trial that when he asked Plaintiff for his address, Plaintiff said that he did not know and when Plaintiff was asked for his phone number, he said it was unlisted. (Def. Ex. A, p. 66, 203, 204). Abate testified falsely at a pre-trial hearing, that Plaintiff was evasive to questioning and that he said he did not recall his address. (Def. Ex. A, p. 347, 348). Plaintiff's pedigree information including his address was put on an arrest report on February 12, 2001, which disappeared. (Def. Ex. A, p. 204).

Two weeks after the shooting, Mr. Riaz, a cab driver told Agostini one of his passengers, while talking on a cell phone said he witnessed the murder. (Def. Ex. A, p. 233). The passenger, Alfred Vasquez admitted that he said that he witnessed the murder, but told Agostini that he was just making it up. (Def. Ex. A,p. 234, 235). Vasquez was not further investigated, and his finger prints were not compared with the prints found at the scene. (Def. Ex. A, p. 235).

On March 8, 2001, less than a month after the murder, Det. Martinez learned that a .22 caliber handgun was recovered from Cynthia Taylor in the Parkchester Complex and he ordered that an analysis of the gun he performed, but the results disappeared. (Def. Ex. A, p. 423, 424).

On April 20, 2001, Plaintiff pulled into a gas station when Abate approached him with his gun drawn, grabbed him, threw him against the car, handcuffed him and threw him into the back of the car. (Def. Ex. A, p. 73, 74, 361). When they arrived at the precinct, Abate said to Agostini " he's all yours now we got him good" and Agostini laughed. (Def. Ex. A, p. 74). Then defendants strip searched Plaintiff, and laughed at him while doing so. (Def. Ex. A, p 74).

7

Alston falsely testified before the grand jury that Plaintiff hired him to kill another security guard because of a conflict with a girl. (Def. Ex. A, p. 89-91, Def. Ex. B, p. CL-5- CL. -7). Tartone falsely testified that he heard Plaintiff ask a co-worker if they knew of anyone selling a gun. (Def. Ex. A, p. 99). Cobb likewise testified falsely that at 10:00 am, he approached the basement of the building, heard four shots and saw Plaintiff come out of the basement door. (Def. Ex. A, p. 92, 93, Def. Ex. B, Cl. 2, 3). Plaintiff never saw Mr. Cobb that morning. (Def. Ex. A, p. 94).The grand jury was not informed that Cobb initially told P.O. Perez, that he heard one shot but said nothing about seeing Plaintiff leave the basement and that he told Sgt. Ohle that it sounded like the shot came from outside the building. (Def. Ex. A, p. 61, 232, 403, 430, 519, 520, Ex.9). The grand jury was not informed that Mr. Huello establishes that Acosta was killed before Cobb arrived on the scene and that Huello was working directly across from where Acosta was found before Cobb arrived and he didn't hear any shots or see the Plaintiff. (Def. Ex. A, p. 228-230, 339, 408, 409, 430,  Ex. 8).  Abate who knew that Cobb did not initially report seeing Plaintiff leave the basement, conceded that Cobb's statements did not create probable cause to believe that Plaintiff was Acosta's murderer. (Def. Ex. A, 232, 343, 344, 358).

Agostini falsely testified at a pre-trial hearing that he found a note in Plaintiff's locker which said "I feel like killing somebody" when the note said "I pray every day I will never have to kill someone". (Def. Ex. A,p. 266, 267).  Agostini also falsely testified at a pre-trial hearing that Mr. Ross after speaking with Plaintiff, asked him and Abate, "Was it intentional" . (Def. Ex. A, p. 267). However, Mr. Ross never made any such statement. (Def. Ex. A, p.  354, 389).

During the trial of this action, Agostini gave contradictory testimony on 28 occasions[1] and Abate gave contradictory testimony on 11 occasions[2]. Additionally, the defendants' testimony contradicted each other. Agostini said that he did not arrest Plaintiff on Feb. 12, 2001 and Plaintiff was put in a cell while Abate was the lead detective. (Def. Ex. A, p . 219, 220). To the contrary, Abate denied putting Plaintiff in a cell and testified that Plaintiff was put in the cell after Agostini became the lead detective. (Def. Ex. A, p. 345-347, 372).

While Agostini testified that he gave the entire case file, including his handwritten notes to the D.A., he previously testified at a pre-trial hearing that he never gave her his spiral notebook (with the hand written notes). (Def. Ex. A, p. 167, 168, 170). Contrary to Mr. Agostini's testimony, A.D.A. Scaccia testified that the case file disappeared when she asked Agostini to bring it to her for copying. (Def. Ex. A, p. 616, 617). Ms. Scaccia also admitted that she previously represented to the criminal trial Judge that she never had possession of the homicide case file. (Def. Ex. A, p. 610, 612). A.D.A. Scaccia also testified that Agostini never gave her copies of the hand written interview and investigative notes. (Def. Ex. A, p. 614). Ms. Scaccia testified that as an A.D.A., she is obligated to disclose to the defense, all paperwork that is created as part of any investigation, including hand written notes taken from the witness because the accused has a right to confront the witness with what they said on prior occasions. (Def. Ex. A, p. 615). Ms. Scaccia further testified that even though the prosecution was pending

---

[1] Def. Ex. A, p. 158, 163, 164, 165, 167, 168, 170, 174, 175, 191, 192, 202, 203, 206, 207, 208, 209, 212, 214, 215, 216, 217, 223, 224, 236, 237, 238, 239, 240, 241, 242, 244, 245, 247, 248, 249, 254, 255, 256, 261, 262, 263, 264, 265, 266, 271, 272 .

[2] Def. Ex. A, p. 339, 342, 343, 344, 348, 349, 350, 351, 352, 353, 354, 355, 358, 359, 360, 361, 362, 363.

9

for over three years, there were notes that were never turned over to Plaintiff's criminal defense lawyer because they were lost. (Def. Ex. A, p. 616, 617, 618).

**A. Plaintiff Established Sufficient Evidence At Trial To Rebut Any Probable Cause Presumption Created By The Indictment**

The jury was properly instructed that the grand jury indictment created a presumption of probable cause and what had to proven to rebut the presumption. (Def. Ex. A, p. 788). The jury found Abate and Agostini liable for malicious prosecution which establishes they found that the probable cause presumption was rebutted, which was confirmed by their positive answer to question number two (for Agostini).

The presumption was rebutted because there was evidence to support the jury's findings that Agostini suborned Alston's perjury in the grand jury, destroyed exculpatory evidence, fabricated evidence and failed to make full disclosure to the D.A. as such, the verdict should not be disturbed. An indictment is stripped of its presumptive force if it was obtained through improper means. Richards v. City of New York, 2003 WL 21036365 (S.D.N.Y. 2003). The probable cause presumption is rebutted by evidence that the indictment was procured by fraud, perjury, suppression of evidence, withholding of evidence or other bad faith conduct. Savino v. City of New York, 331 F.3d 63 (2d Cir 2003). The presumption is also rebutted if an officer's confidential informant testifies falsely or the police encouraged or pressured a witness to testify falsely. Lebman v. Kornblau, 134 F.Supp.2d 281 (E.D.N.Y. 2001); Reid v. New York County Dist. Atty. Marrinaccio, 2004 WL 1488194 (S.D.N.Y. 2004). Limone v. U.S., 497 F.Supp.2d 143, 208 (D.Mass. 2007). A grand jury's decision to indict does not shield officers who deliberately supply misleading information that influenced the decision because officers cannot

10

hide behind the decision of those whom they have defrauded. Limone, 497 F.Supp.2d at 208. In Limone, the Court held officers liable for malicious prosecution, notwithstanding the Plaintiff's indictment and conviction, where the officers procured an informant who falsely implicated the Plaintiffs. In Richards, supra, the Court held that officers who fail to advise the prosecutor of exculpatory evidence commit misconduct sufficient to rebut the presumption. Richards. supra 2003 WL 21036365. In Lehman, supra, the Court found evidence that informants gave perjured testimony to the grand jury sufficient to rebut the presumption in a malicious prosecution case against the officers. In Reid, the Court found the presumption was rebutted where the officers enticed a witness to falsely implicate the Plaintiff.

Here Plaintiff established that his indictment was based on perjury and fraud because he reviewed the grand jury testimony of Alston, Tartone and Cobb, which was in evidence and testified that they were all fabrications and the events which these witnesses testified to, did not occur. Where a Plaintiff testifies that a statement is false, a jury is entitled to credit the Plaintiff's testimony and reject the defendants'. Jocks v. Tavernier, 316 F.3d 128, 138 (2d Cir 2003).

Here, there was ample evidence for the jury to find that Agostini caused and aided Alston's perjury in the grand jury by getting him out of jail and by failing to tell the prosecutor he was lying to get out of jail. Further, the jury had ample evidence to find that Agostini by getting Alston released, in order to secure another witness (Damon) to falsely testify against Plaintiff, bolstered Alston's credibility, which caused the D.A. to pursue the prosecution. When the police withhold information from the prosecutor, the probable cause presumption is rebutted. Borunda v. Richmond, 885 F.2d 1384 (9th Cir 1988).

11

There was also evidence at trial to support a finding that Cobb's false grand jury testimony was caused by Agostini's failure tell the A.D.A., that (i) Cobb gave contradictory statements, (ii) Plaintiff was with two police officers when Acosta was shot, (iii) Cobb's version of the facts could not possibly be true in light of Huello's statement and (iv) that Agostini fabricated a DD5 to falsely imply that Plaintiff was alone in the building when Acosta arrived. Evidence that the police misrepresented, falsified or withheld evidence or failed to make a complete statement of facts either to the Grand Jury or to the D.A. rebuts the probable cause presumption. Colon v. City of New York, 60 N.Y.2d 78 (1983). Officers may not purposely withhold or ignore exculpatory evidence that, if considered, would void probable cause. Crews v. County of Nassau, 2007 WL 4591325 (E.D.N.Y. 2007). Further, there was ample evidence that Agostini destroyed exculpatory evidence including investigatory and interview notes that undermined Cobb's testimony. As a result, the grand jury was never informed that Alston had lied in an attempt to falsely implicate Plaintiff, and that he was let out of jail in exchange for his testimony. (Def. Ex. A, p. 646, 647, 659). That the jury found that defendants engaged in the aforesaid misconduct is corroborated by the jury's decision to award punitive damages. (Def. Ex. A, p. 822).

Agostini's argument that he is entitled to judgment as a matter of law because he did not affirmatively lie before the grand jury misstates the law because once the presumption of probable cause is rebutted, the jury is free to consider the elements of a malicious prosecution case against both defendants. Further, Agostini by suborning Alston's perjury in the grand jury and in failing to make a full statement of the facts to the grand jury and D.A. engaged in misconduct sufficient to rebut the presumption of probable cause. Stated differently whether or not Agostini testified falsely before the grand jury does not end the inquiry because by causing, inducing and

12

encouraging Alston to testify falsely, and by helping Alston coerce another witness to falsely implicate Plaintiff, thereby bolstering Alston's credibility, Agostini caused perjury to occur before the grand jury. In this case, Alston's fabricated testimony was the only evidence presented to the Grand Jury that directly tied Plaintiff to Acosta's murder. Mr. Cobb's testimony while false, and while arguably placing Plaintiff at the scene, did not establish Plaintiff as the murderer or differentiate the Plaintiff from other people also at the scene, such as Mr. Huello. Likewise, Mr. Tartone's testimony that he overheard Plaintiff looking to buy a gun did not tie Plaintiff to Acosta's murder, nor did any of the other witnesses that testified before the grand jury implicate the Plaintiff in Acosta's murder. Succinctly stated, there were no grounds for Plaintiff to be indicted without Alston's perjured testimony, which Agostini suborned. Therefore, Agostini engaged in misconduct that resulted in perjury before the grand jury.

Further, Abate is not entitled to judgment as a matter of law simply because he did not testify before the grand jury, rather, once the presumption of probable cause is rebutted, Abate is liable for malicious prosecution if the Plaintiff established the elements of malicious prosecution against him. As stated more fully below, there was adequate evidence to support the jury's finding that both defendants maliciously prosecuted the Plaintiff.

Further both defendants engaged in misconduct which affected the prosecutor's decision to prosecute Plaintiff, including threatening and coercing Booth to falsely implicate the Plaintiff which caused the prosecutor to commence and continue the prosecution.

Finally, Defendants' arguments that they did nothing wrong, merely interviewed witnesses, followed up on leads, investigated the homicide and kept the District Attorney fully informed was

13

considered and rejected by the jury.

There was also evidence that the A.D.A misrepresented the nature of the deal with Alston to the Court that supervised the Grand Jury, thus the Prosecutor's independent judgment was compromised. This alone is sufficient to rebut the presumption. Borunda, 885 F.2d at 1390; Lehman v. Kornblau, 134 F.Supp.2d 281 (E.D.N.Y. 2001). The Court ordered the D.A. to identify any deals made with Alston so that his credibility could be evaluated. Ms. D'Andre affirmed to the Court that the agreement with Alston was not made to secure his testimony against the Plaintiff and that Alston's testimony was not a condition precedent to any deal made with him, when in fact, the opposite was true. (Def. Ex. A, p.646, 647, 659-665). Further, Ms. D'Andrea represented that Alston was working on unrelated drug cases with Det. Parker, even though Parker was not working on any drug cases at the time. (Def. Ex. A, p. 475, 648, 664).

## B:   PLAINTIFF ESTABLISHED EACH ELEMENT OF MALICIOUS PROSECUTION

Defendants ask this Court to apply the incorrect legal standard because they assume the truth of their client's testimony when to reach the findings which it did, the jury must have rejected their testimony and credited the Plaintiff's testimony. It is the jury's task, not the Court's, to resolve conflicts in the testimony. Correia v. Fitzgerald, 354 F.3d 47 (1 Cir 2003). The Court should not disturb a jury verdict unless, without weighing the evidence or assessing witness credibility, it concludes that reasonable people could have returned a verdict only for the moving party. Randall v. Prince George's County. Md., 302 F.3d 188 (4th Cir. 2002).

The jury's finding that Defendants maliciously prosecuted the Plaintiff was supported by facts established at trial. The elements of malicious prosecution are that a prosecution was initiated or continued against the Plaintiff, brought with malice and without probable cause to believe that it

14

could succeed and that the prosecution terminated in the plaintiff's favor. <u>Boyd v. City of New York.</u> 336 F.3d 72, 76 (2d Cir. 2003). Defendants concede the final element.

Here the bulk of defendants' arguments reiterate contentions that were previously considered and rejected in the summary judgment decision. <u>Manganiello v. City of New York</u>, 2008 WL 2358922, (S.D.N.Y. 2008). At trial Plaintiff established the pertinent facts which supported the Summary Judgment decision, thus defendants' claims are barred by the law of the case doctrine.

## I.    Agostini and Abate Played A Role In Commencing And Continuing The Proceeding

It is undisputed that Agostini signed the felony complaint, an affidavit which commenced the process of formally charging Plaintiff with Acosta's murder. (Def. Ex. A, p. 247, 619). An officer by filing charges initiates the prosecution, thus the first element has been satisfied. <u>Ricciuti v. New York City Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997). Abate testified that Agostini provided the A.D.A. with the information that lead to the authorization for Plaintiff's arrest. (Def. Ex. A, p. 386). Agostini also commenced the prosecution because he applied for the arrest warrant. <u>See Phelps v. City of New York</u>, 2006 WL 1749528 (S.D.N.Y. 2006).

There was also sufficient evidence that Abate commenced and continued the prosecution. Abate originally targeted Plaintiff as the murderer even though he knew there was no probable cause. Abate and Agostini acted together in threatening and coercing Booth into falsely implicating the Plaintiff, which is sufficient to make a defendant an initiator in a malicious prosecution action. <u>See Limone v. U.S.</u>, 497 F.Supp.2d 143, 211 (D.Mass. 2007).

Abate also continued the prosecution by falsely testifying at a pre-trial hearing that Plaintiff was evasive when initially questioned, even though he knew the prosecution was baseless since he

15

admitted that he did not have probable cause to believe that Plaintiff murdered Acosta.

Defendants claim that it was the prosecutor who really commenced the charges because she interviewed the witnesses was argued during trial and obviously rejected by the jury, as was the defendants' contention that they did nothing more than honestly report what witnesses told them. The jury's verdict in this respect was supported by the evidence because the prosecutor gave conflicting testimony and there was evidence that the defendants manipulated and coerced witnesses. Persons who conspire to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings and the jury's verdict are jointly liable for malicious prosecution. Mejia v. City of New York, 119 F.Supp.2d 232 (E.D.N.Y. 2000). Further, there was conflicting testimony concerning the defendants' involvement in commencing criminal actions, which the jury resolved against the defendants given their repeatedly contradictory testimony. A.D.A. Scaccia testified that the detectives bring the arrest to the District Attorney and the information for the charges is provided by the detectives. (Def. Ex. A, p. 660). Det. Martinez testified that it was the lead investigator's decision whether or not to present a case to the district attorney. (Def. Ex. A, p. 410). As discussed above, the jury had adequate grounds to reject the defendants' contentions that it was the D.A.'s decision to commence charges based on the evidence of their misconduct.

## II.   There Was No Of Probable Cause

A jury's resolution of the probable cause issue should not be disturbed where there is conflicting evidence about what the police officers knew and what other leads they should have pursued. Smiddy v. Varney, 665 F.2d 261 (9th Cir. 1981). Probable cause is the knowledge of facts strong enough to justify a reasonable belief that there are lawful grounds for prosecuting a

16

person for a crime. Rounseville v. Zahl, 13 F.3d 625 (2d Cir. 1994). Probable cause requires more than rumor, suspicion, or a strong reason to suspect that the defendant committed the crime. U.S. v. Fisher, 702 F.2d 372, 374 (2d. Cir. 1983). Lack of probable cause means absence of reasonable grounds to believe the defendant guilty, or to justify a strong honest suspicion of his guilt. Engleman v. Progressive Machinery Corp., 156 F.Supp 46 (D.Mass 1957).

Here, there was no direct evidence tying Plaintiff to the murder. There were no witnesses to the shooting, the gun shot residue tests were negative, a search of Plaintiff's car yielded negative results and despite a canvass of the crime scene, there was no evidence which tied Plaintiff to the crime. Both Agostini and Abate admitted that on February 12, 2001, there was no evidence that tied Plaintiff to the murder, as did their supervisor Lt. Scott. As Mr. Cobb was interviewed on February 12, 2001, what ever he had to say did not create probable cause. Moreover, the evidence established that Plaintiff was with two police officers when Mr. Acosta was shot.

Further there was extensive evidence that the defendants manufactured probable cause, where there was in fact none. Where a confidential informant provides false information and officers fabricate evidence there is sufficient evidence of a lack of probable cause to support a malicious prosecution finding. See Richardson v. City of New York, 2006 WL 2792768 (E.D.N.Y. 2006); Linnone, supra. Here Agostini charged Plaintiff with Acosta's murder based upon the word of Alston, whom he knew was lying to get out of jail. Agostini admitted that he doubted Alston's credibility and was supposed to drop him as an informant. To the contrary Agostini aided Alston's perjury by (i) bringing him to the D.A., (ii) not advising the D.A. that Alston was lying to get out of jail, (iii) helping Alston get out of jail which rewarded his perjury (iv) getting Alston out of jail so he could coerce Damon to falsely implicate Plaintiff, thereby bolstering Alston's credibility and

17

(v) failing to advise the D.A. that Alston was obviously suborning Damon's perjury. Agostini

knew Damon was lying because Alston said he needed four weeks on the street to find another

witness that would say he sold Plaintiff a gun and that Alston did not want Agostini to interview

witnesses without him there. Officers have a duty to assess a witness' reliability and if

circumstances call into doubt the witness's veracity, to investigate the allegations and corroborate

them. Jovanovic v. City of New York, 2006 U.S. Dist. LEXIS 59165. The failure to make a

further inquiry when a reasonable person would have done so evidences a lack of probable cause.

Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996). Officers evaluating a probable

cause determination must sift through conflicting information and resolve discrepancies. Golino v.

City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991). Not only did Agostini fail to corroborate

Alston's statements, he actually encouraged and rewarded his lies.

Further the evidence established that Agostini and Abate threatened Booth into signing a

false statement and testifying falsely at Plaintiff's trial. Defendants rewarded Booth's perjury by

destroying evidence that he was involved in criminal activity and looking the other way while he

operated his criminal businesses. Enticing or threatening a witness to falsely implicate another is

sufficient to support a finding that there was no probable cause. Lehman, 134 F.Supp.2d at 201;

Reid v. New York County Dist. Atty. Marrinaccio, 2004 WL 1488194 (S.D.N.Y. 2004).

There was also substantial evidence that Agostini fabricated evidence to undermine Plaintiff's

alibi and both defendants lied that Plaintiff was evasive to questioning at pre-trial hearings and/or

at the murder trial. There was also evidence that Agostini destroyed evidence that would have

contradicted his testimony and the accounts of the witnesses who testified against Plaintiff and

evidence that was exculpatory to Plaintiff. Agostini also testified falsely in a pre-trial hearing

18

when he said that Plaintiff's lawyer asked him if the shooting was intentional and that he found a note found in Plaintiff's locker that said I feel like killing someone, when the note really said I pray every day that I will never have to kill anyone. False statements are evidence of a lack of probable cause. Chandler v. U.S. 875 F.Supp. 1250, 1269 (N.D.Tex. 1994).

Additionally, the defendants failed to investigate likely suspects, such as the gang members who previously assaulted Acosta, the thugs who threatened to kill him, the man who admitted being present when Acosta was shot, and the person who was arrested a few blocks from where the murder occurred, two weeks after the murder with the same caliber gun which killed Acosta.

While defendants claim there was probable cause because of an altercation occurred between Plaintiff and Acosta, the only evidence was a DD5 containing a statement by Harry Plaza, who did not testify at trial. The jury was justified in giving it little weight because the Plaintiff testified that the incident didn't occur and the prosecutor did not know who Plaza was. The jury logically concluded that Plaza's statement was not incredibly important since he did not testify at the grand jury or at trial.  Likewise, given the amount of fabricated evidence in this case, the jury was justified in not assuming the truth of a document created by the police without corroboration.

Finally, the defendants are not shielded by the D.A.'s independent judgment because as stated more fully above, the D.A. was mislead and their independence was compromised.

### III. There Was Sufficient Evidence That Defendants Acted With Malice

There was sufficient evidence that defendants acted maliciously because they prosecuted Plaintiff without probable cause. Malice means commencing a proceeding due to a wrong or improper motive, something other than a desire to see justice served. Lowth, 82 F.3d at 573. A

19

lack of probable cause creates an inference of malice. Boyd, 336 F.3d at 76.  Here, there was a
lack of probable cause sufficient to support the jury's finding of malice.

There was also evidence that the defendants bore a personal animosity towards Plaintiff.
Evidence that a defendant acts out of anger or spite, is sufficient to support a jury's finding of
malice. Lowth, 82 F.3d at 573; Cook v. Sheldon, 41 F.3d 73, 79 (1977). Agostini and Abate in
retaliation for Plaintiff's strong denial of involvement in the murder, got angry, "looked at him like
he was a piece of garbage", stripped him of his clothes and considered him a suspect.  Further, it
was evident that both of them played a role in Plaintiff's arrest on February 12, 2001, even though
they knew they had no probable cause.  Agostini, put Plaintiff in a cell and when he asked for
something to wear, he laughed at him and walked away. Even though, Agostini knew at 10:25
pm, that he wasn't authorized to hold Plaintiff in custody, he left Plaintiff in a cell until 5:00 a.m.
17 hours in total. After being released, Plaintiff tried to put on his shoe laces, and Agostini
repeatedly shoved him and said " No, No, No, you don't put the fucking shoe laces on at my
station house.... get out of my fucking station house now". (Def. Ex. A, p. 70, 71).  This crude
treatment strongly evidences  malice.  Malice may also be inferred from wanton, reckless or
grossly negligent disregard of the accused's rights, inconsistent with good faith. Cox v. County of
Suffolk, 780 F.Supp. 103, 108 (E.D.N.Y. 1991). Also indicative of malice were the events of
April, 20, 2001 when Abate approached Plaintiff with a drawn gun, violently manhandled him
while arresting him and then humiliated the Plaintiff by laughing at while he was strip searched.
(Def. Ex. A, p. 73, 74, 361  Defendants' unprofessional behavior, which they did not deny[3],

---

[3]With the exception of approaching Plaintiff with their guns drawn.

combined with the strong proof of evidence fabrication, evidence destruction, subornation of perjury, coercion of witnesses and the commission of perjury by both defendants provided the jury an adequate basis to find that the defendants acted with malice.

**POINT II:    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

When Plaintiff's prosecution occurred, it was clearly established that defendants' actions were unlawful. Defendants' contention that a finding that Abate did not misrepresent facts to the prosecutor or lie to the grand jury entitles him to qualified immunity is flawed because once the grand jury presumption is rebutted, then the Court must focus on whether the facts taken in the light most favorable to the non-moving party, show the officer's conduct violated a constitutional right. As the Court previously determined in its summary judgment decision, the facts favorable to the Plaintiff, establish that defendants violated Plaintiff's constitutional rights to be free from malicious prosecution and not to he indicted without probable cause. Manganiello v. City of New York, 2008 WL 2358922 (S.D.N.Y. 2008). Here, a jury has determined that defendants violated Plaintiff's constitutional rights to be free from malicious prosecution and not to be indicted without probable cause and did so by wilfully engaging in misconduct.

Thus, the Court must consider whether the right was clearly established, i.e, would it he clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Manganiello v. City of New York. 2008 WL 2358922 (S.D.N.Y. 2008). It was settled law in 2001 that fabricating evidence, committing perjury, suborning perjury and destroying evidence were clearly unlawful. It is fundamental to our system of justice, that those who uphold the law are prohibited from fabricating evidence and framing people for crimes they did not commit.

21

Linnone v. Condon, 372 F.3d 39 (1st Cir. 2004) [finding the prohibition against using fabricated evidence in a criminal case to be established in 1952]. In 1997, the Second Circuit held that a defendant is not entitled to qualified immunity if they created false information and forwarded it to prosecutors. Ricciuti,124 F.3d at 129.  An officer is not entitled to qualified immunity if he procures false testimony of another by unlawful means or deliberately conceals exculpatory evidence, Geter v. Fortenberry, 882 F.2d 167 (5 Cir. 1989). Those who give false evidence knowingly violate the law and are not entitled to qualified immunity. Mejia, 119 F.Supp.2d at 272. This Court in its prior decision found that if the Defendants falsified evidence and suborned perjury then it would be clear to a reasonable officer that this conduct was unlawful. Manganiello v. City of New York, 2008 WL 2358922 (S.D.N.Y. 2008).  Here, the jury's verdict establishes that the defendants Abate and Agostini falsified evidence, committed perjury and suborned perjury. Since Defendants could not reasonably mistake that the law permitted fabrication of evidence, suborning of perjury and perjury, they are not entitled to qualified immunity.

### POINT III: THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL

Defendants contention that they were denied a fair trial is baseless and there is no factual basis which would even arguably entitle them to a new trial.

#### A. The Court Did Not Abuse Its Discretion In Not Difurcating The Trial

Courts have broad discretion to decide whether to bifurcate issues of liability and damages. Simpson v. Pittsburgh Corning Corp., 901 F.2d 277, 283 (2d Cir 1990). Bifurcation is the exception, not the rule and the requesting party has the burden to establish that bifurcation is warranted. Providencia V. v. Schutlze, 2007 WL 1582996 (S.D.N.Y. 2007). The piecemeal trial of separate issues in a lawsuit is not the usual course. Ferrante v. Metro-North Commuter R.R., 2007 WL

1793447 (S.D.N.Y. 2007). The possibility that proof of damages may influence a jury's determination of liability is often present in injury cases and this abstract possibility does not justify bifurcation because limiting instructions are the usual method of avoiding prejudice. Id.

Here, the damage evidence did not influence the jury because they rendered defense verdicts for some defendants. Further, the jury was instructed to consider damages only if liability was established. (Def. Ex. A, p. 791).

## B. The Events Which Occurred On February 12, 2001 Were Admissible Evidence And Relevant To The Issues In Controversy

Defendants' argument largely misunderstands the legal concepts of a malicious prosecution case. While fraud and misconduct that affects the grand jury was an issue in this case, it was not the only issue and Plaintiff was entitled to present relevant evidence that bore on the other elements of the malicious prosecution claim including damages. F.R.E. 401. The events of February 12, 2001, were admissible evidence of malice and motive, as discussed above. Evidence that a prosecution is pursued in disregard of the truth because an officer is frustrated in being unable to prove a suspect guilty evidences motive and malice in a malicious prosecution case. Chandler v. U.S., 875 F.Supp. 1250 (N.D.Tex. 1994). Further, Plaintiff's initial questioning was relevant because defendants fabricated evidence of and testified falsely to statements which Plaintiff did not make. That there was no timely claim for false arrest, does not render the evidence of the initial encounter irrelevant.

Further, defendants argument that Plaintiff improperly asked what facts created probable cause, when a lack of probable cause is an element of the claim defies logic. Plaintiff was properly allowed to inquire as to what probable cause existed on February 12, 2001, to put the defendants' later fabrication of evidence in context. Further, the fact that a search warrant was obtained even though

23

there was no probable cause had bearing on the fabrication issue and whether defendants mislead prosecutors, especially since the affidavits disappeared.

The details of Plaintiff's April, 2001 arrest and incarceration were admissible because it had bearing on Plaintiff's damages and tended to establish malice. A successful malicious prosecution plaintiff may recover compensation for being arrested and for incarceration. Heck v. Humphrey, 512 U.S. 477, 483; 114 S.Ct. 2364, 2371 (1994). Thus Plaintiff's arrest and incarceration were properly admissible as damages evidence. Further, the Court exercised a balanced approach by prohibiting Plaintiff from offering testimony that he was arrested in front of his mother, to avoid prejudicing defendants. The court has broad discretion in making evidentiary rulings at trial and any assertion that the Court abused its discretion is meritless. U.S. v. Weiss, 930 F.2d 185 (2d Cir. 1991).

## C.    Dr. Latif Was A Treating Physician And No Rule 26 Expert Disclosure Was Required

Defendants erroneously claim that Dr. Latif was improperly allowed to offer opinions on causation and disability. Courts have wide discretion to admit expert opinions which will not be overturned but for manifest error. McCullock v. H.B. Fuller Co., 61 F.3d 1038 (2d Cir.1995).

Defendants incorrectly argue that Dr. Latif improperly offered opinions under F.R.E. 703 without exchanging a report because the Rule 26 reporting requirements do not apply to treating physicians like Dr. Latif. Treating physicians are not subject to Rule 26 and may offer opinions they formed during treatment including causation, severity, disability, permanency and future impairment without submitting an expert report. Zanowic v. Ashcroft, 2002 WL 373229 (S.D.N.Y. 2002); Cruz v. Henry Modell & Co., Inc. 2008 WL 905356 (E.D.N.Y. 2008); Martinez v. Port Authority of N.Y. and N.J.,2005 WL 2143333 (S.D.N.Y. 2005),Santoro v. Signature Const., Inc. 2002 WL 31059292 (S.D.N.Y. 2002); Shapardon v. West Beach Estates, 172 F.R.D. 415 (D.Hawaii,1997); Piper v.

24

Harnischfeger Corp., 170 F.R.D. 173,(D.Nev. 1997); Baker v. Taco Bell Corp. 163 F.R.D. 348, 349 (D.Colo. 1995). Dr. Latif properly offered opinions on causation, disability and permanency because she developed said opinions while treating her patient, not for litigation.

Here defendants were on notice of Dr. Latif's opinions because all of her notes which contained the Plaintiff's history, diagnosis, and opinions on causation and disability, were provided to defense counsel, who also took her deposition. Thus, Defendants claims that they were unable to voir dire Dr. Latif is baseless because they did not ask for a voir dire and they were free to explore her qualifications on cross examination, but opted not to. Here, Defendants chose not to retain an expert, even though they knew what Dr. Latif's opinions were. That defendants tactically choose to focus on disputing liability and ignore damages does not entitle them a new trial.

Next, Defendants' contention that Dr. Latif's opinions were speculative because she based them in part on the patient's history is frivolous. Defendants did not raise any *Daubert* challenge to Dr. Latif, as such, it was waived and even if not waived, it is meritless. Medical expert opinions are admissible if an they are based on information of a type reasonably relied upon by experts in the field. Fed.R.Evid. 703. Reliance by doctors on a patient's history is an accepted methodology, and if there is an inaccuracy in the history, that may be explored on cross examination but it does not affect admissibility. Walker v. Soo Line R. Co., 208 F.3d 581 (7 Cir 2000). Doctors make medical life and death decisions based upon their physical examinations and a patient's history. Heller v. Shaw Industries, Inc.,167 F.3d 146, 155 (3d Cir.1999). These are the tools of the trade and suffice as the foundation for a medical expert's opinion. Id. at 156. Dr. Latif's opinions were properly admitted because they were not hypothetical, rather they were based on her own observations of the Plaintiff, the history and his symptoms. Courts should defer to the expert's opinion of what data they found

to be reasonably reliable. Greenwood Utils.Comm'n v. Mississippi Power Co., 751 F.2d 1484, 1495

(5th Cir.1985). A physician's opinions are admissible as long as they expresses a degree of certainty

in their opinion. See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 751 (3d Cir.1994). Dr.

Latif's testimony unquestionably met this standard.

Finally, the Court didn't bolster Dr. Latif's testimony, rather in response to several baseless

objections, the Court explained its evidentiary ruling, which were previously made in limine.

### D. The Court's Conduct Did Not Deprive The Defendants Of A Fair Trial

The lack of side bars did not deprive Defendants of a fair trial because the need for sidebars was

eliminated by the Court ruling on objections *in limine.* Courts have inherent authority make rulings

*in limine* which enables the Court to rule in advance on forecasted evidence and avoid interruption

of the trial. Ferrante, supra; Palmieri v. Delaria, 88 F.3d 136, 141 (2d Cir.1996).

### 1. The Court's Comments Do Not Entitle Defendants To A New Trial.

Because a trial judge has considerable discretion, the standard for reversal based on judicial

misconduct is quite high. Vasey v. Martin Marietta Corp. 29 F.3d 1460 (10th Cir. 1994). During this

trial, there were no improper comments and the jury was instructed that the Court had no opinion on

the issues. (Def. Ex. A, p. 722). A Judge's comments require reversal only if he expresses an opinion

on an ultimate issue or argues for one of the parties. Shah v. Pan American World Services, Inc. 148

F.3d 84 (2d Cir. 1998). None of the comments cited by defendants meet this standard.

### A. The Court's Commentary on the Weight of the Evidence Was Proper

Defendants' erroneously claim that the Court minimized the importance of an alleged shoving

match between Plaintiff and deceased. The Court properly gave a cautionary instruction that if the

defendant could not establish the altercation occurred in close proximity to the shooting, it should

26

be given less evidentiary weight, which was a proper instruction. U.S. v. Prevatte, 16 F.3d 767 (7th

Cir. 1994). [Requiring close proximity in time to be evidence of motive]. The Court did not minimize

the evidence, but commented on the lack of foundation and gave a limiting instruction.

The Court did not bolster the importance of Booth not being arrested, rather in response to an

objection, the Court restated an in limine ruling that the evidence was relevant for Booth, but not with

respect to Alston. See F.R.E. 401.The Court did not imply that any evidence should be given any

weight and exercised caution in not explaining why it was relevant, so as not to taint the jury. The

comment was invited by counsel and could have been avoided by paying closer attention to the

Court's in limine rulings. Finally the jury was instructed that it was for them determine what weight

to give to evidence and to draw no inferences from the evidentiary rulings. (Def. Ex. A, p 770-772).

### B) The Court's Comments Were Not Hostile or Prejudicial

The Court in asking Agostini whether his testimony changed in the last ten minutes, properly

summarized Mr. Agostini's testimony in order to expedite the trial when the witness gave a series of

evasive and contradictory answers. Reversal is not required where the judge emphasizes evidence or

expresses skepticism at a witness answer, provided the witness has an opportunity to respond, an

opportunity which was given to Agostini.Vasey, 29 F.3d at 1469.

Defendants' remaining contentions address instances where the Court asked questions to clarify

issues. Judges are allowed to ask witnesses questions to ascertain facts. clarify the issues and assist

the jury in eliminating immaterial matters. Vasey, supra. The Court merely asked the defendant if

losing investigatory notes was a common occurrence and what the witness' knowledge of the legal

requirements were concerning documents that had to be given to a criminal defendant. The Court did

not berate Agostini for his testimony that Plaintiff said his phone was unlisted, the Court merely asked

if the witness inquired further. The Court did not make it appear that Agostini was responsible for Alston's release, that was already apparent from the record. Rather the Court responded to the witness' comment that Alston was negotiating to get out of jail in exchange for providing a witness and the witness responded that he spoke to the A.D.A. to make it happen. (Def. Ex. A, p. 315). Asking numerous probing questions of witnesses is unquestionably proper. Shah, 148 F.3d at 98.

Likewise, the Court did not insinuate anything with respect to Abate's testimony, rather the Court asked questions to clarify the witness' answer. (Def. Ex. A, p. 357). Contrary to defendants' assertions, the information the defendants provided to the prosecutor was a central issue in the case.

### C. The Court's Comments Regarding Points of Law Were Proper

Defendants were not prejudiced by the Court asking whether Plaintiff was read his Miranda rights because there was conflicting evidence as to whether the Plaintiff was arrested and by whom. The Court's question merely clarified the witness' testimony.

The claim that the Court's comments during Nieves' testimony were prejudicial is baseless because the Court in overruling an objection merely stated that the evidence was relevant to malice. Since the jury found for Nieves, the comment wasn't prejudicial. Defendants' claim that the Court insinuated that the jury find malice is baseless because the jury was charged that they alone were to determine what inferences were to draw from the evidence and not to infer from evidentiary rulings that the Court has any opinion. (Def. Ex. A, p 770, -772). Nor did the comment lower the burden for malice because the jury was properly charged on the issue of malice. (Def. Ex. A, 789).

The objection to Defendants' summation was proper because defendant published an exhibit which was not in evidence to the jury. (Def. Ex. A, p. 763). The procedure during trial was that

28

exhibits were formally moved in evidence[4]. The defendants attempted to put several hundred DD5s in evidence at once and the Court directed defendants to provide a list of the DD5s, so that relevancy could be determined. (Def. Ex. A, p. 326). While defendants put some DD5s in evidence, exhibit Z-7, was not introduced. (Def. Ex. A, p. 317, 705). The Court concurred that exhibit Z7 was not put in evidence and instructed defense counsel that even though they pre-marked exhibits, only those that were introduced were in evidence. (Def. Ex. A, p. 705, 706). Despite being told to provide a list, Defendants rested without putting any exhibits into evidence or providing a list of exhibits. (Def. Ex. A, p. 694). Thus, Plaintiff had a good faith basis to object the use of documents during summation that were not in evidence. The Court in front of the jury minimized Plaintiff's comments by stating that it was not a big deal. (Def. Ex. A, p. 706). Nevertheless, defense counsel kept the blown up exhibit in front of the jury, continued to discuss its contents and the Court gave all the DD5s, including Z7 to the jury. (Def. Ex. A, p. 707, 708, 804, 805). During the trial the Court wanted counsel to show blow ups to their adversary prior to publication. Defendants caused the confusion because for tactical reasons they published the blow up to the jury, without showing it to the undersigned. Had defendants shown the undersigned the blow up prior to their summation, this issue could have been resolved outside the jury's presence. (Def. Ex. A, p. 407, 706-708). Regardless, a party seeking a new trial because of opposing counsel's statements faces a heavy burden, as an attorney's conduct rarely infects a trial with such undue prejudice that reversal is required. Marcic v. Reinauer Transp. Co., 397 F.3d 120, 124 (2d Cir.2005). Only if counsel's conduct created undue prejudice which played on the jury's sympathy, should a new trial be granted. Matthews v. CTI

---

[4] Def. Ex. A, p. 284, 285, 286, 287, 288, 289, 290, 293, 294, 295, 298, 299, 302, 303, 304, 306, 309, 366, 367, 806 .

Container Trans. Int'l, Inc., 871 F.2d 270, 278 (2d Cir.1989). A single objection during an 800 page transcript did not cause an unfair trial. Regardless, defendants waived the objection by failing to move for a mistrial. A party who does not demand a mistrial until after the jury's verdict has waived any objection. See U.S. v. Blume, 967 F.2d 45, 48 (2d Cir.1992).

### 2. The Court Did Not Prevent Defendants From Presenting Their Case

Defendants erroneously claim that they were prevented from showing the "breadth" of their investigation because the Court allowed them to ask twenty pages of irrelevant questions, and after being told to move on to something relevant, they asked ten more pages of irrelevant questions. (Def. Ex. A, p. 297, 302, 307). Evidence can be excluded if its introduction is a waste of time. F.R.E. 403.

Further, defendants cite portions of the Court's comments and take them out of context. The court's comments and rulings may not be viewed in isolation but must be evaluated in light of the record as a whole. U.S. v. Rosa, 11 F.3d 315 (2d Cir.1993). The trial lasted about a week and the transcript is over 800 pages, therefore, a few isolated comments did not create an unfair atmosphere.

Defendants claim that the Court's comment not to interrupt the Judge was improper is nonsensical. After defense counsel interrupted the Court, the Court cautioned counsel that only one person could speak at a time to ensure an accurate record. (Def. Ex. A, p. 296,. 297). Defense counsel concurred with the Court's reasoning by stating " That is true". (Def. Ex. A, p. 297).

Defendants' claim that Court curtailed their presentation is erroneous because the Court was within its discretion in denying defendants' request to read the whole grand jury transcript into the record, since it was already in evidence. The Court simply directed both counsel to refer to relevant sections of the transcript, when questioning witnesses, which defense counsel declined to do. The Court's comments "Did you get my drift" and "No Way, Put Another Question" were in response

30

to defense counsel's argumentative tone and attempts to flout the Court's ruling. (Def. Ex. A, p. 322, 540). Cutting comments made to counsel do not mandate reversal. Vasey, supra. Regardless, counsel was allowed to read the grand jury transcript to the jury in their summation which they did. (Def. Ex. A, p. 715-717). Finally, the Court even handedly sustained objections to both counsels' questions and there is no evidence that proves otherwise.

### E  The Verdict Was Consistent

The jury's verdict was not inconsistent. It was determined that Abate maliciously prosecuted Plaintiff and that punitive damages should be awarded after a proper legal instruction. Where there is a view of the case that makes the jury's answers consistent, they must be resolved that way. Atlantic & Gulf Stevedores. Inc. v. Ellerman Lines, Ltd, 369 U.S. 355, 364;  82 S.Ct. 780. 786 (1962). A verdict should not be disturbed because of an alleged inconsistency where there is a conceivable theory that harmonizes the jury's answers. The jury's finding that Abate did not testify falsely in the grand jury or provide false evidence to the prosecutor, does not negate the malicious prosecution finding because the jury could have found that while Abate did not testify before the grand jury, he committed perjury in a pre-trial hearing and coerced Booth into fabricating evidence and giving false trial testimony. The jury found that Agostini forwarded the manufactured evidence to the D.A., which Abate participated in creating. One who actively participates in the continuation of proceedings initiated by another is jointly liable for malicious prosecution. Restatement (Second) Torts § 655 This theory harmonizes the verdict and resolves any inconsistency. Further the Court instructed the jury that it would not be illogical, i.e., inconsistent to answer yes to question 1 and no to question 2. (Def. Ex. A, 815, 816).

31

## F.  The Missing Evidence Charge Was Warranted And Relevant To This Action

First, defendants' contention that the charge was poorly worded is meritless because it stated the applicable law. Cordius Trust v. Kummerfeld, 2008 WL 113664 (S.D.N.Y. 2008). Next, defendants erroneously contend that the charge was prejudicial because it did not mention what evidence it pertained to, however they never asked the Court to mention any evidence, so the objection was waived.  Further, as there was extensive evidence that the homicide file disappeared under suspicious circumstances, the charge's applicability was evident.

Defendants' erroneously argue that because the case file disappeared after the indictment, its disappearance is irrelevant. Plaintiff faced murder charges while deprived of exculpatory evidence that undermined the State's case and supported his contention that he was with police officers when the murder occurred. Thus, the file's disappearance was strong proof of evidence destruction, lack of probable cause and malice. An adverse evidence charge can be given for negligent or intentional conduct resulting in missing evidence. Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267 (2d Cir 1999). Thus, the charge's applicability is undeniable.

Likewise, the claim that the A.D.A. had the file when the case was presented to the grand jury is contradicted by the record because Ms. Scaccia also testified that she never had possession of it and Agostini testified that he never gave Ms. Scaccia the investigatory notes. The jury was entitled to choose which of Ms. Scaccia's conflicting stories to believe.

Finally, the charge was applicable to the disappearance of the D.A.'s file, which had been subpoenaed because it contained evidence concerning the deal with Alston, and its disappearance prejudiced Plaintiff.  Likewise, the jury was entitled to reject Scaccia's claim that the file could not be located after being stored, since storing a file generally ensures the ability to later find it.

### Defendants Points G, H and I are Baseless

The Court was within its discretion to deem all motions made and reserve decision to expedite the proceedings. Since the Court deemed them made, there was no prejudice.

The verdict sheet was adequate for the Court to consider qualified immunity. As discussed above, if the jury found defendants liable for malicious prosecution and answered yes to question number 2 (for any defendant), then qualified immunity is inapplicable. Thus, the jury resolved the necessary factual issues in Plaintiff's favor. Defendants waived objections to the verdict sheet by not providing factual questions for the jury to answer. It is defendants' obligation to request that the jury be asked factual questions and if the request isn't made, defendant is not entitled to have the court, in lieu of the jury, make the finding and qualified immunity has been waived. Kerman v. City of New York, 374 F.3d 93, 120 (2d Cir 2004).

The jury was properly instructed on the probable cause element because the charge language was taken verbatim from applicable case law.

### POINT IV: THE JURY'S  AWARD WAS NOT EXCESSIVE

A § 1983 Plaintiff is entitled to compensatory damages for pecuniary loss, humiliation, arrest, imprisonment, injuries, damage to reputation, mental anguish and suffering. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305; 106 S.Ct. 2537, 2545 (1986); Heck, 512 U.S. at 483; 114 S.Ct. at 2371. Here, the jury's verdict was supported by significant  evidence of Plaintiff's damages. Dr. Latif, Plaintiff's psychiatrist for seven years testified that she diagnosed Plaintiff with causally related post traumatic stress disorder with anxiety symptoms and major depression. (Def. Ex. A, p. 674, 676, 679, 681, 682, 688). Dr. Latif  observed that Plaintiff was shaky, sweating, trembling and experiencing symptoms of poor sleep, poor memory, poor

33

concentration, chest pain, palpitations, numbness in his extremities and was afraid to leave his

house. (Def. Ex. A, p. 675). Dr. Latif opined that Plaintiff has moderate to severe panic attacks,

which cause him to be unable to function in any capacity. (Def. Ex. A, p. 675-677). Dr. Latif

treated Plaintiff with medications that caused him to be unable to function sexually. (Def. Ex. A,

p. 676- 670). Dr. Latif opined that without medication, Plaintiff is completely nonfunctional.

(Def. Ex. A, p. 679). Dr. Latif explained that the post traumatic stress disorder causes Plaintiff to

constantly recall the trauma, have flashbacks, nightmares, and ruminate about what his life and

career would have been if he wasn't falsely prosecuted. (Def. Ex. A, p. 681- 683). During the last

seven years, Plaintiff showed slight improvement and is very limited occupationally, physically and

psychologically because the severe stress caused a chemical imbalance that permanently disabled

him and his prognosis is poor to fair. (Def. Ex. A, p. 679, 680-685). Dr. Latif further opined that

Plaintiff is unable to pursue any work because his cognitive functioning, emotions, concentration,

understanding and energy levels are so impaired that he cannot function on a daily basis or pursue

any career. (Def. Ex. A, p. 679, 680 684).

The evidence established that Plaintiff lost his career as a security officer and part time

policeman because of the prosecution. (Def. Ex. A, p. 591). A Plaintiff is entitled to recover

significant damages for the present value of his future lost wages/lost earning capacity. <u>Doca v.</u>

<u>Marina Mercante Nicaraguense, S. A.</u>, 634 F.2d 30 (2d Cir 1980); <u>Jocks</u>, 316 F.3d 137. Dr.

Tinari calculated Plaintiff's pecuniary losses including the value of his fringe benefits and opined

that his past lost earnings were $377, 000 and that the present value of his future lost earnings is

$829,000 for the lost 22.9 working years. (Def. Ex. A, p. 591, 594-601). Defendants' claim that

Plaintiff may not have stayed at the same job is irrelevant because a Plaintiff may recover his

earning capacity, based upon his prior earnings. Earl v. Bouchard Transp. Co. Inc., 735 F.Supp.
1167 (E.D.N.Y. 1990).

The jury's award of $1,426,261 was supported by the record because Plaintiff sustained
large pecuniary losses. It was stipulated that Plaintiff had paid $110,000 in attorneys fees for his
criminal defense. (Def. Ex. A, p. 694). A malicious prosecution Plaintiff can recover the legal fees
he paid in the criminal case. Borunda, 885 F.2d at 1389. Therefore, the record supported an
award of $1,310,000 in pecuniary losses. Thus the pain, suffering and wrongful incarceration
portion of the award was only about $116,000, which is in line with the awards in the cases cited
by defendants. The cases cited by defendants are distinguishable because none of them involved
proven pecuniary losses, which made up the bulk of the Plaintiff's award.

However, cases involving proven pecuniary losses are consistent with this jury's award. See
Papa v. City of New York, 194 A.D.2d 527 (N.Y.A.D. 2 Dep't 1993) [approving an award of
$4,000,000 based upon a lost earning capacity of $3,100,500 in a malicious prosecution case] see
also Vitale v. Hagan., 132 A.D.2d 468 (N.Y.A.D 1 Dep't 1987)[affirming an award of $750,000
for malicious prosecution damages where the Plaintiff was never jailed]. Here, the award was not
excessive in light of the evidence of Plaintiff's pecuniary losses and injuries.

### CONCLUSION

For the foregoing reasons, defendants' motion should be denied in its entirety.

Respectfully submitted,

Dated: White Plains, New York
August 4, 2008

OSORIO & ASSOCIATES, LLC

BY:

Michael H. Joseph, Esq.  (MJ8838)
184 Martine Avenue
White Plains, New York 10601
(914) 761-3168

35