**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**ANTHONY MANGANIELLO,**                          :
                                                  :
                                **Plaintiff,**    :
                                                  :    **07 Civ. 3644 (HB)**
                        **- against -**           :
                                                  :    <u>**OPINION & ORDER**</u>
**DET. LUIS AGOSTINI, Individually and as a New** :
**York City Police Detective,**                   :
                                                  :
                                **Defendant.**    :
-------------------------------------------------------------------------x
**Hon. HAROLD BAER, JR., District Judge:**


        The reader's familiarity with the underlying facts of this case is assumed.[1]  Plaintiff

Anthony Manganiello ("Manganiello") brought an action for malicious prosecution pursuant to

42 U.S.C. § 1983 against Defendant Luis Agostini ("Agostini"), nine other police officers of the

New York City Police Department ("NYPD") and the City of New York.  After this Court

granted summary judgment in favor of the City and five of the police officers, a trial proceeded

against Agostini, and four other NYPD officers.  On June 24, 2008, a jury found only Agostini

and another defendant, Shawn Abate ("Abate"), to be liable for malicious prosecution, and

awarded Manganiello compensatory damages in the amount of $1,426,261.  The verdict sheet

asked the jury to apportion compensatory damages among the defendants, and the jury

determined that Agostini was liable for 90 percent of the compensatory damages, or

$1,283,634.90, and Abate, 10 percent, or $142,626.10.

        On August 6, 2008, this Court granted qualified immunity to Abate based on the Court's

view of the law juxtaposed with the jury's answer to a special interrogatory on the verdict sheet.

That same day, following oral argument by the parties as to punitive damages, the jury assessed

punitive damages against Agostini in the amount of $75,000.

        Agostini moves for judgment as a matter of law in favor of Agostini pursuant to Fed. R.

Civ. P. 50 and 59 and for qualified immunity.  In the alternative, Agostini seeks remittitur of the

damages award pursuant to Rule 59 or to set aside the verdict and order a new trial pursuant to

Rule 59.  Manganiello moves for attorneys' fees pursuant to 42 U.S.C. § 1988.  For the reasons

---
[1] *See* this Court's opinion on Defendants' motion for summary judgment. *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008).

set forth below, Agostini's motions are denied, and Manganiello's motion is granted.

## I.  AGOSTINI'S MOTION FOR JUDGMENT AS A MATTER OF LAW

The Second Circuit has instructed that

> [j]udgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. . . . In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, . . . and it may not itself weigh the credibility of witnesses or consider the weight of the evidence . . . .  Thus, judgment as a matter of law should not be granted unless

> '(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the defendant].'

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted) (quoting *Cruz v. Local Union No. 3 of the Int'l Brotherhood of Electrical Workers*, 34 F.3d 1148, 1154 (2d Cir.1994) (internal quotation marks and citation omitted)).

The court "cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation marks and citation omitted).  The court must make credibility assessments, and draw all inferences, against the moving party.  *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993).

Agostini rests his motion on several different arguments, each of which is discussed in turn below.

### A.      Presumption of Probable Cause Created by Grand Jury Indictment

To succeed on his claim for malicious prosecution, Manganiello shouldered the burden of proving, by a preponderance of the evidence, that Agostini initiated a prosecution against him, with malice and without probable cause to believe that it could succeed, and that the prosecution terminated in favor of Manganiello.  *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). That the prosecution terminated in Manganiello's favor is not disputed, as he was acquitted by the jury at his criminal trial.

Agostini asserts that Manganiello failed to prove that Agostini lacked probable cause to believe that the prosecution could succeed.  Specifically, Agostini contends that Manganiello

failed to elicit any evidence during trial which rebutted the presumption of probable cause created by his grand jury indictment.  The rule in the Second Circuit is that:

> '[o]nce a suspect has been indicted . . . the law holds that the Grand Jury action creates a presumption of probable cause.' . . . 'The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury *or to the District Attorney*, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.' . . . Thus, in order for a plaintiff to succeed in a malicious prosecution claim after having been indicted, 'he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'

*Rothstein v. Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82-83 (N.Y. 1983)) (emphasis added).

Here, the jury was properly instructed that the grand jury indictment created a presumption of probable cause and that Manganiello bore the burden to overcome the presumption, under the rule set forth in *Rothstein*.  Manganiello provided enough evidence at trial that a reasonable juror could conclude that Agostini and Abate failed to make a "complete and full statement of facts" to the District Attorney, "misrepresented or falsified evidence," "withheld evidence or otherwise acted in bad faith."  *See id.*  For example, Manganiello testified that when Agostini questioned him at the precinct immediately after Albert Acosta ("Acosta") was shot, Manganiello told him about an earlier incident where some Blood gang members threw Acosta through a window and another where local thugs threatened to shoot Acosta.  (Transcript of Trial ("Tr."), Ex. A to Okereke Decl., at 68.)  A reasonable juror could conclude, since there was no evidence to dispute these allegations, that Agostini had failed to investigate the incidents and that had he investigated, he might have determined that Acosta's killer was linked to those gang members or thugs.  Further, he failed to inform the District Attorney's office of such leads.  Although Manganiello testified that he had cooperated with Agostini and given him his address and telephone number during their interview shortly after the Acosta murder, Agostini accused Manganiello of killing Acosta, prepared a "follow-up report," or "DD5," that implied that Manganiello was evasive when questioned, and later testified at Manganiello's criminal trial that Manganiello had been evasive.  (Tr. 66-68, 200, 202-04, 217.)

The evidence at trial showed that Detective Robert Martinez created a DD5 that documented the fact that two other police officers told him that the morning of Acosta's murder Manganiello had gone to a separate apartment in the building to address an altercation that had been reported there, that Manganiello seemed normal at that time, and that he then left the

3

building *with* the police officers.  (Tr. 173-74, 413.)  However, Agostini created a DD5 two weeks later that stated that Manganiello left the apartment *before* the other officers, which may have left the impression that Manganiello was alone in the other apartment building when Acosta arrived and thus had an opportunity to shoot him.  (Tr. 189.)  Agostini admitted during trial that his DD5 was in "stark contrast" to the DD5 created by Martinez two weeks earlier.  (Tr. 190.)

Soon after Agostini had to release Manganiello because there was no probable cause for his arrest, Agostini met with Terrance Alston ("Alston"), a Bloods gang member who was incarcerated.  (Tr. 243, 475.)  Agostini knew that Alston was in jail on the date of Acosta's murder and for four months before Acosta was murdered.  (Tr. 82, 244-45, 475.)  Alston was a confidential informant to Detective Derek Parker, who specialized in crimes involving the rap and hip-hop industries.  Prior to Agostini's meeting with Alston, Parker had interviewed him for an hour about the Acosta murder, and Alston did not mention that Manganiello had tried to hire him to kill another security guard.  (Tr. 475-76, 484.)  After Agostini met with Alston, he prepared a DD5 that stated that Alston said Manganiello had asked him to kill another security guard as a favor, that Alston asked Manganiello "how much," but Manganiello did not give a price.  (Okereke Decl. Ex. G; Tr. 82.)  Manganiello, however, testified that he had never met or spoken with Alston.  (Tr. 78-79.)

Alston told Agostini that his friend, Johnny Baker, had sold Manganiello a .22 caliber gun, the same caliber as the weapon used in Acosta's murder.  (Tr. 250-51.)  However, when Agostini interviewed Baker, Baker said that Alston had lied, and Agostini believed Baker that Alston had lied.  (Tr. 251, 258.)  When Agostini confronted Alston about his lie, Alston said that he did not want Agostini to interview any witnesses that Alston produced without Alston being present.  Alston indicated to Agostini that he would find a witness who would implicate Manganiello within four weeks, if Alston could be released from jail.  (Tr. 248, 251-52, 255, 258.)  Agostini testified that he thought that Alston was playing games to get out of jail.  (Tr. 248, 252-56, 312, 314-15.)  However, Agostini never brought this to the attention of the District Attorney's office, nor did Agostini memorialize his impression that Alston was lying to get out of jail or that Alston did not want the witnesses that he produced to be interviewed without Alston being present.  (Tr. 253-57, 330, 457, 647.)  Agostini further admitted that he was supposed to cease working with informants who were not credible.  (Tr. 249.)  Agostini testified that he later told the Assistant District Attorney ("Assistant DA") that Alston knew someone who had sold Manganiello a gun but wanted to get out of jail before revealing that information.  (Tr.

315.)  The Assistant District Attorney testified that Alston was released from jail in exchange for his testimony against Manganiello.  (Tr. 647.)

Once Alston was released, Alston produced another witness, Mark Damon, who met with Agostini and the Assistant DA and told them that he had sold Manganiello a .22 caliber gun. (Tr. 259.)  Agostini prepared a DD5 that reported that Damon said, "with permission from [Alston]," that in January 2001 he had sold a .22 caliber gun to an Italian, white, male, heavyset security guard, *i.e.*, a person matching Manganiello's description.  (Tr. 86, 258-60.)  Manganiello testified that he had never met Damon and never purchased a .22 caliber handgun.  (Tr. 86.) Damon subsequently admitted that he had lied because Alston had "made him say it."  (Tr. 261, 641.)

Agostini and Abate approached Michael Booth, a local bookie and/or loan shark.  (Tr. 268-69.)  Agostini told Booth that he had information that a security officer for the Parkchester South Condominium Security Department ("Parkchester"), where Manganiello was a security officer, tried to buy a gun from him.  (Tr. 272-73.)  At first, Booth said he knew nothing about this and did not want to talk with the detectives.  (Tr. 271-72.)  Agostini and Abate brought Booth to the precinct, searched him, found a knife and betting slips with names and monetary amounts on them.  (*Id.*)  Agostini told Booth that they would tell the organized crime bureau about him, and only then did Booth write a statement to the effect that Manganiello had tried to buy a gun from him.  Agostini created a DD5 that documented this statement.  (Tr. 84, 272-73.) Manganiello testified that he had never had such a conversation with Booth.  (Tr. 84.)  After Booth signed the statement, the detectives gave him back his knife, he left the precinct, no charges were filed, the gambling slips disappeared and Booth's name was not given to the organized crime bureau.  (Tr. 273-74.)  Agostini informed the Assistant DA of Booth's statement, and ultimately the Assistant DA called Booth to testify at Manganiello's murder trial that Manganiello had tried to buy a gun from him.  The Assistant DA testified that she never authorized Agostini or any other detective to withhold criminal charges against Booth in exchange for a statement implicating Manganiello. (Tr. 638.)

Further, approximately two weeks after Acosta's homicide, a cab driver told Agostini that he had overheard one of his passengers, Alfred Vasquez ("Vasquez"), tell someone over his cell phone that he had witnessed the murder.  (Tr. 233.)  Agostini questioned Vasquez, and Vasquez told him that although he had told someone on his cell phone that he had witnessed the murder, he was just making it up.  However, Agostini did not investigate Vasquez further or even have

his fingerprints compared with those found at the scene.  (Tr. 234-35.)

Moreover, although Agostini testified that he had given the Assistant DA the entire homicide case file, including his handwritten notes, he had previously testified at a pretrial hearing in the criminal proceedings that he never gave the Assistant DA his spiral notebook, which contained his handwritten notes, including notes of his interview with Manganiello hours after the murder.  (Tr. 167-68, 170.)  The Assistant DA testified that the homicide case file disappeared when she asked Agostini to bring it to her so that she could copy it.  (Tr. 616-17.)  The Assistant DA told the jury that she had represented to the criminal trial judge that she never had possession of the homicide case file.  (Tr. 610-12.)  She also testified that Agostini never gave her copies of the handwritten interview and investigative notes for her to maintain as part of her file.  (Tr. 614.)  She testified that, consequently, such notes were never turned over to Manganiello's criminal defense lawyer.  (Tr. 615-18.)

Finally, in Manganiello's criminal proceedings, and keeping in mind that he was a security guard, Agostini testified at a pretrial hearing that he had found a note in Manganiello's locker that said, "I feel like killing somebody."  In fact, the note said, "I pray every day that I will never have to kill someone."  (Tr. 266-67.)

The testimony described above is just some of the testimony from which a reasonable jury could find that Manganiello successfully rebutted the presumption of probable cause that was created by the grand jury indictment.

Agostini mistakenly relies on a statement by the Second Circuit in *Rothstein* that was particular to the facts of that case, and which neither expresses the general rule nor applies to this case.  In *Rothstein*, the Circuit explained that the plaintiff was required "to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially."  373 F.3d at 284 (quotation marks and citation omitted).  Because the content of the defendant's grand jury testimony was unknown, and the plaintiff's counsel conceded that he had no idea what happened before the grand jury, the Circuit in *Rothstein* held that the plaintiff could not rebut the presumption created by his grand jury indictment and the district court should have granted summary judgment for the defendant.  *Id.* at 284-85.  Agostini argues that Manganiello failed to rebut the presumption because he failed to establish at trial that Agostini testified in bad faith to the grand jury.  However, the crucial difference between *Rothstein* and this case is that the defendant in *Rothstein* was a cooperating witness, not a police officer.  *Id.* at 279.  Where the

defendant is a police officer, like Agostini, as the Circuit articulated in *Rothstein*, the plaintiff's avenue for rebuttal is not limited to proof of misconduct in the grand jury alone. Rather, the plaintiff may show that the officer misrepresented the facts to the District Attorney or otherwise acted in bad faith in a way that led to the indictment. *Id.* at 282-83. Here, Manganiello met this burden.

**B.     Elements of Malicious Prosecution**

Agostini argues that Manganiello failed to prove that Agostini commenced or continued a criminal proceeding against him without probable cause and with malice. To support his argument, Agostini relies primarily on his own trial testimony, but this carries little weight as the Court must make credibility assessments, and draw all inferences, against the moving party. *See Piesco*, 12 F.3d at 343. On this score, Agostini's credibility before me, coupled with his demeanor on the stand and at defense table, was at least questionable and at most perjurious, while Manganiello appeared in all respects credible.

### 1.     Initiation or Commencement of Criminal Proceeding

Manganiello was required to prove that Agostini played an active role in the prosecution, which could include giving advice, encouraging the authorities to act, filing criminal charges against the plaintiff, being instrumental in bringing about the criminal charges, or providing false information to the prosecutors. *See, e.g.*, *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000); *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

In *Mejia v. City of New York*, 119 F. Supp. 2d 232 (E.D.N.Y. 2000), the court observed that witnesses may be considered complaining witnesses if they falsely give the prosecutor information that induced the prosecutor to act.[2] *Id.* at 272. It was significant to the *Mejia* court that "[p]laintiffs' claim is *not* that [the defendants] simply went to prosecutors and related the facts as they honestly believed them to be and then let the prosecutor make his or her determination whether to commence proceedings." *Id.* (emphasis added). Instead, the plaintiff alleged that the defendants misrepresented to prosecutors the true circumstances leading to the arrest and, "thus, induced the prosecutor to commence proceedings based on manufactured evidence [and] further induced the prosecutor to continue the proceedings by giving testimony

---

[2] Although the *Mejia* court made this observation in the context of qualified immunity, not "initiation" of prosecution, qualified immunity and "initiation" of prosecution are conceptually intertwined. "Whether a witness is a complaining witness [for purposes of qualified immunity] is a fact-based question that coincides with the determination of whether the witness played such a role in initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution." 119 F. Supp. 2d at 272.

before the grand jury that was false and/or contained material omissions." *Id.  See also Ricciuti*, 124 F.3d at 130 ("initiation" of prosecution may include preparing false evidence, forwarding it to prosecutors, suborning perjury and committing perjury).

Assessing credibility against Agostini and drawing all inferences in favor of Manganiello, as this Court must, there was enough evidence for the jury to reasonably conclude that Agostini commenced or initiated the criminal prosecution.  For example, in addition to the testimony described above, Abate testified that Agostini provided the District Attorney's office with all the information that led to the authorization for Manganiello's arrest.  (Tr. 386.)  Agostini also signed the felony complaint.  (Tr. 658.)  *See Ricciuti*, 124 F.3d at 130 (holding that "a jury could clearly find" that the defendant initiated the prosecution "because no one disputes that he started the prosecution by filing the charges of second-degree assault").

### 2.      *Absence of Probable Cause*

Manganiello was required to prove that Agostini did not have probable cause to commence or continue criminal proceedings against him.  Probable cause is the knowledge of facts strong enough to justify a reasonable belief that there are lawful grounds for prosecuting a person for a crime.  *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994).  Probable cause requires more than rumor or suspicion.  *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983).

Where officers fabricate evidence, there is sufficient evidence of a lack of probable cause to support a malicious prosecution finding.  *See Richardson v. City of New York*, No. 02 Civ. 3651, 2006 WL 2792768, at *5 (E.D.N.Y. Sept. 27, 2006).  Assessing the witnesses' credibility and drawing inferences in favor of Manganiello, a jury could reasonably conclude that Agostini provided false information to the Assistant DA and fabricated evidence.  For example, Agostini knew that his main witness, Alston, was not credible and yet failed to provide such evidence to the prosecutor.  Further, Agostini's failure to inquire further into various leads, when a reasonable person would have done so, evidences a lack of probable cause.  *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citing *Colon*, 60 N.Y.2d at 82).

The jury was instructed that it could not return a verdict in favor of Manganiello, unless it found, *inter alia,* "the absence of probable cause" for the criminal proceeding against him.  The jury's verdict in Manganiello's favor means that it found an absence of probable cause, and thus chose to credit Manganiello's version of the events and to discredit Agostini's testimony.  Here, there was not "such an overwhelming amount of evidence in favor of" the notion that Agostini

had probable cause to initiate and continue the prosecution, and the jury's verdict was not the result of "sheer surmise and conjecture." *See Galdieri-Ambrosini*, 136 F.3d at 289.

       ***3.     Malice***

Manganiello was required to show that Agostini commenced or continued the criminal prosecution out of malice. "Malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996) (quotation marks and citation omitted). Moreover, "[m]alice may be inferred from the lack of probable cause." *Id.*

The jury was instructed that if they found that Agostini did not have probable cause to believe that Manganiello committed the crime, they could, but were not required, to infer that Agostini acted maliciously. *See Ricciuti*, 124 F.3d at 131 ("[A] jury could find that probable cause for the charges against the plaintiffs was lacking, and that finding alone would support an inference of malice."); *Lowth*, 82 F.3d at 573 ("In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'") (quoting *Conkey v. State,* 427 N.Y.S.2d 330, 332 (N.Y. App. Div. 1980)). Here, since the jury found that there was no probable cause for Manganiello's prosecution, it was entitled to infer the existence of malice.

## C.    Qualified Immunity

Agostini argues that the Court should grant him qualified immunity. Qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)). In *Zellner*, the Second Circuit clarified the appropriate procedures for determining qualified immunity when material facts pertaining to immunity are in dispute. *See id.* at 368. *Zellner* directs that the jury should resolve "any disputed facts that are material to the qualified immunity issue," but the court must make the "ultimate determination of whether the officer's conduct was objectively reasonable." *Id.* (citing *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003)). The jury should make the factual determinations through responses to special interrogatories. *Id.* Because qualified immunity is an affirmative defense, the defendant bears

both the burden of proof and the obligation to request the specific factual interrogatories that would be necessary to enable the court to make the appropriate legal determination. *Id.* at 368. "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. . . . If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Id.*

Here, the defendants' counsel failed to make such a request, *i.e.*, that the jury be asked specific *factual* questions to enable the Court to make a determination as to qualified immunity, despite the Court's having noted on the record that the defendants' counsel should do so.[3]  (*See* Tr. 586-87, 799.)  Nonetheless, despite counsel's failure, the Court presented the jury with a special interrogatory, so that the Court could base its decision on the factual findings made by the jury.  The jury found that Agostini misrepresented the evidence to prosecutors, or failed to provide the prosecutor with material evidence or information, or gave testimony to the grand jury that was false or contained material omissions, *and* knew that he was making a material misrepresentation or omission or giving false testimony.

Based on the jury's factual finding, I had to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The right to be free from malicious prosecution in the absence of probable cause is a well-established constitutional right.  The concern expressed by the Supreme Court in *Saucier*, that "reasonable mistakes can be made as to the legal constraints on particular police conduct" does not come into play here.  *See id.* at 205.  An officer is entitled to the immunity defense "[i]f the officer's mistake as to what the law requires is reasonable." *Id.* Here, the jury's finding was not surmise or conjecture; there was, as described above, evidence that Agostini made material misrepresentations or omissions, such as the Alston's credibility problems, and that he knew he was doing so.  Therefore, it would not have been objectively reasonable for Agostini to believe that his actions or omissions were in sink with clearly established constitutional rights.  Put another way, there could be no disagreement among

---

[3] The defendants' counsel only requested that the Court ask the jury directly, on the verdict sheet, whether each defendant should be granted qualified immunity.  This was not a *factual* question.  As the Court may not ask the jury to decide the *legal* issue of qualified immunity, but must make that determination itself, the defendants' request was denied.  *See Zellner*, 494 F.3d at 367; *Stephenson v. Doe*, 332 F.3d 68, 78-81 (2d Cir. 2003) (holding that district court erred in charging the jury on qualified immunity).

officers of reasonable competence that the conduct was unlawful.  Agostini's affirmative defense of qualified immunity is denied.

## II.  AGOSTINI'S MOTION FOR A NEW TRIAL

The court has significant discretion in deciding whether to grant a Rule 59 motion for a new trial.  *See, e.g.*, *Amato v. City of Saratoga Springs*, 170 F.3d 311, 314 (2d Cir. 1999).  In determining whether to order a new trial under Rule 59, a district court may independently weigh the evidence.  *See, e.g.*, *Song v. Ives Labs, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).  A motion for a new trial "may be granted even if there is substantial evidence to support the jury's verdict."  *Id.*  A jury's verdict, however, should not be disturbed unless it is seriously erroneous:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence . . . ; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.  The judge's duty is essentially to see that there is no miscarriage of justice.

*Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978); *see also Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) ("A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (quotation marks and citation omitted).

Agostini moves for a new trial on several grounds, discussed in turn below.

### A.    Failure to Bifurcate Liability and Damages

Agostini argues that the Court's refusal to bifurcate the liability and damages portions of the trial resulted in undue prejudice.  Fed. R. Civ. P. 42(b) allows a court to bifurcate a trial where doing so would be "conducive to expedition and economy."  Factors to be considered by the court include, but are not limited to,

> (1) whether the issues are significantly different from one another; (2) whether the issues are to be tried before a jury or to the court; (3) whether the posture of discovery on the issues favors a single trial or bifurcation; (4) whether the documentary and testimonial evidence on the issues overlap; and (5) whether the party opposing bifurcation will be prejudiced if it is granted.

*Guidi v. Inter-Continental Hotels Corp.*, No. 95 Civ. 9006, 2003 WL 1846864, at *1 (S.D.N.Y. Apr. 8, 2003) (citing *Dallas v. Goldberg*, 145 F. Supp. 2d 312, 315 (S.D.N.Y. 2001)).  The moving party bears the burden of establishing that bifurcation is warranted.  *Id.*

Prior to trial, the defendants in this case submitted a motion *in limine* that argued, *inter alia*, that substantial prejudice to the defendants would result if the trial were not bifurcated.  The defendants argued, as Agostini does now, that the testimony of Manganiello's expert witness as

to Manganiello's economic losses and the testimony of his treating psychiatrist as to his post-traumatic stress disorder would evoke undue sympathy on the part the jury prior to any deliberation on liability.  At trial, Manganiello called an expert witness, Dr. Frank D. Tinari, an economist, who opined as to Manganiello's economic losses due to having lost his jobs as a Parkchester security guard and as a part-time state police officer and assuming he would be unable to work and would have retired in the year 2023.  (Tr. 594-600.)  Dr. Rehana Latif, a licensed psychiatrist and Manganiello's treating psychiatrist, testified that Manganiello suffers from post-traumatic stress disorder as a result of his criminal prosecution and is unable to function in his daily activities or to work.  (Tr. 679-82.)

Courts have broad discretion to decide whether to bifurcate issues of liability and damages.  *See Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 283 (2d Cir. 1990).  Here, I refused to bifurcate the trial because it did not appear that the defendants would be prejudiced and any possibility of prejudice could be mitigated by a limiting instruction to the jury.  Indeed, I instructed the jury:

> If you find that plaintiff has proven all of the elements of his claim for relief, you will then consider damages.  You should not interpret the fact that I am giving instructions about damages now as an indication that I believe that the plaintiff should, or should not, be awarded damages.  It is your task and yours alone to decide whether the defendant whom you are considering is liable.  *Only if you find that any defendant is liable may you reach the issue of damages.*

(Tr. 790-91.)

As to the expert, Dr. Tinari, I instructed the jury that

> like any other witness, you may reject the expert's opinion if you find the facts to be different from those which form the basis of his opinion.  His opinion is not gospel.  You may also reject an opinion if, after careful consideration of all the evidence in the case, expert and otherwise, you disagree with that opinion.  In other words, you are not required to accept an expert's opinion to the exclusion of the facts and circumstances disclosed by other testimony.  Such an opinion is subject to the same rules concerning reliability as the testimony of any other witness.  It is given to assist you in reaching a proper conclusion; it is entitled to such weight as you find the expert's qualification in the field warrant and must be considered by you, but is not controlling upon your judgment.
>
> *Keep in mind that the testimony of the expert, Dr. Tinari, is relevant only to damages, and you should consider it only if you find one or more of the defendants to be liable for the malicious prosecution.*

(Tr. 779.)

"It is a fundamental proposition that a jury is presumed to follow the instructions of the

trial judge." *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) (quotation marks and citation omitted).  Moreover, the record contains no indication that the jury was unable to follow the limiting instruction.  Nor, in light of the jury's finding that three of the five defendants were not liable, the expert and other witnesses' testimony in connection with damages were not "devastating" to Agostini's defense.  *See United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007) (courts must "presume that juries follow limiting instructions," unless "there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense").

**B.     Manganiello's Testimony about His Detention and Arrest**

Prior to trial, the defendants submitted a motion *in limine* that sought to preclude Manganiello from testifying about Agostini and Abate's questioning of him at the precinct shortly after the homicide.  The Court denied the motion.  The defendants argued, as Agostini does now, that Agostini's conduct during his interview of Manganiello on that date is irrelevant to the issue of whether Agostini acted improperly in connection with the evidence put before the grand jury by the Assistant DA, and that such evidence would be unduly prejudicial pursuant to Fed. R. Evid. 402 and 403.

At trial, Manganiello testified that when he arrived at the precinct for questioning, he was having heart palpitations from running down the street and from what he saw at the scene of the homicide and that, rather than medical attention, he was placed in an "interrogation room" with Agostini.  (Tr. 65.)  After Agostini asked several pedigree questions, including his address and phone number, Manganiello underwent a medical examination by the NYPD Emergency Services Unit and sensors were placed on his chest.  (Tr. 66.)  Agostini refused Manganiello's request for a further medical examination due to his heart palpitations.  (Tr. 66.)  Manganillo testified that Agostini then asked him if he had killed Acosta, and that he responded, "Are you fucking crazy?"  (Tr. 68.)  He testified that Agostini was "pissed off" and looked at him as if Manganiello were a "piece of garbage."  (Tr. 68.)  Agostini and Abate laughed at Manganiello as they stripped him of his clothes, jacket, shirt, belt and keys.  (Tr. 69.)  Manganiello further testified that Agostini ripped off a band-aid from Manganiello's finger and told Manganiello that he would not need it any more.  (Tr. 69.)  When Manganiello was placed in a holding cell with only his pants and T-shirt, he asked Agostini for the rest of his clothes since he was cold, but Agostini laughed and walked away.  (Tr. 70.)  Manganiello was kept in the holding cell overnight and was not released until 5 a.m. the next morning.  (Tr. 70.)  At that time, Agostini

told him to leave but did not give him his car keys.  He also did not permit Manganiello to lace up or tie his shoes at the precinct, but rather told him to get out of the "fucking station house." (Tr. 71.)  Manganiello testified that he was nauseous and dizzy and could not sleep thereafter. (Tr. 71.)

Agostini also argues that the Court should not have permitted Manganiello to testify about his arrest that occurred several months later.  In April 2001, Manganiello was filling up his car at a gas station when two officers with guns pointed ran toward him.  Manganiello testified that he did not know they were police officers and thought he was being carjacked.  He testified that the officers threw him against a car and handcuffed him.  (Tr. 73-74.)  He testified that Agostini said, "now we got him good," and that at the precinct he was strip-searched and put into the holding cell while Agostini and the other detectives were laughing.  (Tr. 74.)  Manganiello ultimately spent ten days in custody at Riker's Island.  (Tr. 76.)

The Court permitted this testimony at trial for it bore directly on the issue of malice, which Manganiello had to prove.  A jury could infer from this testimony that Agostini bore a personal grudge against Manganiello and that this at least in part motivated Agostini to pursue the prosecution.  Moreover, Manganiello was released from the precinct not as a volitional act by Agostini, but only after his supervisors concluded that there was no probable cause for his arrest. A juror might easily infer from Agostini's behavior that Agostini was frustrated that he was unable to obtain an arrest warrant and thereby keep Manganiello in jail even longer.  *See Lowth*, 82 F.3d at 573) (defining malice as "a wrong or improper motive, something other than a desire to see the ends of justice served").  Agostini's treatment of Manganiello is relevant to the issue of malice, and this conduct more than meets the *Lowth* test.

## C.      **Dr. Latif's Testimony**

Agostini argues that Dr. Latif, Manganiello's treating physician, should not have been permitted to testify as to her opinion concerning the cause of Manganiello's post-traumatic stress disorder because this opinion was based solely on statements made to her by Manganiello.  (*See* Tr. 689-90.)  Agostini asserts that in permitting Dr. Latif to testify as to her opinion, the Court allowed her to testify as if she were an expert, despite the fact that Manganiello never proffered her as an expert or provided any Rule 26(a)(2) disclosure.  Agostini further contends that Dr. Latif's testimony to the effect that Manganiello's psychological injuries were caused, to a reasonable degree of medical certainty, by his prosecution was extremely prejudicial to Agostini. (*See* Tr. 681-82.)  Reading the City's brief, one cannot help but wonder if, in its view, only

evidence not prejudicial to its client is admissible.

The Court overruled the defendants' objection to Dr. Latif's testimony, explaining that "[s]he is a treating doctor and relating to us her opinion during the course of that treatment and what it portends.  I can't imagine a better treating doctor type of testimony . . . ."  (Tr. 683.) Agostini argues that the Court's statement improperly bolstered Dr. Latif's testimony.

The law is quite to the contrary: (1) because Dr. Latif was a treating physician, and not an expert witness, Manganiello had no duty to provide any Rule 26(a)(2) disclosure; and (2) Courts in this Circuit have regularly held that treating physicians may testify as to opinions formed during their treatment, including causation, severity, disability, permanency and future impairments, without the obligation to submit an expert report.  *See, e.g.*, *Zanowic v. Ashcroft,* No. 97 Civ. 5292, 2002 WL 373229, at *2 (S.D.N.Y. Mar. 8, 2002) ("There can be no serious dispute that, as a treating physician, Dr. Giovinazzo was free to testify to opinions he formed in the course of treating [plaintiff], without regard to the disclosure requirements of Rule 26(a)(2)."); *see also Smolowitz v. Sherwin-Williams Co.*, No. 02 Civ. 5940, 2008 WL 4862981, at *4 (E.D.N.Y. Nov. 10, 2008) (noting that some cases suggest "that treating physicians may render expert opinion testimony regarding causation even without submitting a detailed report"); *NIC Holding Corp. v. Lukoil Pan Americas, LLC*, No. 05 Civ. 9372, 2007 WL 1467424, at *1 (S.D.N.Y. May 16, 2007) (observing that "treating physicians often are allowed to express their opinions as to the causes of an injury, based on their training and experience").

Here, Dr. Latif's testimony was based solely on her treatment of Manganiello and Manganiello's medical and psychological history as communicated to her by Manganiello himself.  Therefore, Agostini was not denied a fair trial on account of Dr. Latif's testimony.

**D.      Conduct of the Trial**

Agostini asserts that the Court's comments during the trial, and the conduct of the trial, were unduly prejudicial.  Agostini complains that the Court refused to hold side-bar discussions with counsel during the trial and thus all of the Court's comments were made in the presence of the jury.  (*See*  Tr. 270.)  According to Agostini, the Court on several occasions openly criticized the sufficiency or importance of the defendants' crucial evidence.  For example, during the cross examination of a former police lieutenant, the defendants introduced a DD5 that indicated that Manganiello had been involved in a physical altercation with Acosta many years earlier.  The defendants proffered this evidence in an attempt to show that there was probable cause for the prosecution.  During Manganiello's examination on redirect, I addressed the jury and said that

> [t]he reason we are letting any of this in, really, is on a flimsy basis, it seems to me.  But if it's far away from the time of the incident in question, then it really ought not to be given any weight by the jury.  So the only reason that he's asking these questions is because he can't tell when it happened, and if it was long ago it should be given less weight.

(Tr. 462-63.)

Agostini also argues that the Court bolstered the evidence that Manganiello presented in connection with Booth and why he was not arrested after he provided a statement to Agostini. Despite the fact that I previously had denied the defendants' *in limine* motion seeking to exclude such evidence, the defendants' counsel objected to the evidence during the trial.  In response to the objection, I stated:

> Let me clarify how you may have misunderstood the ruling with respect to the motion *in limine*, but the bottom line is that the evidence with respect to Booth and the fact that he had not been arrested was something I found to be relevant, and I can tell you why, but in fact that's partially the way I came out with respect to this and differently with respect to Alston.

(Tr. 272.)  Later in the trial, I also stated, "I will, again, take judicial notice.  That [*i.e.*, threatening a witness] would not be good police practice."  (Tr. 421.)

Agostini further argues that I was "openly hostile" to his explanation about the so-called "missing box" of evidence in the case.  (Defs.' Mem. of Law at 23.)  After Agostini contradicted himself during his testimony, I asked him, "Detective, is there any doubt in your mind that within the last ten minutes you changed from having given it [*i.e.*, the spiral notebook from the box] to her [*i.e.*, the Assistant DA] to not having given it to her?"  (Tr. 170.)  I made several other inquiries of Agostini to the effect of whether it often happens that detectives' notes are misplaced and not turned over to defense counsel in a criminal proceeding.  Agostini argues that the Court's comments regarding the "missing box" were unduly prejudicial and grounds for a new trial, in light of Agostini's "rational" explanation for why the box was missing.[4]

Agostini asserts that the Court "berated" him during his testimony and that the Court made it appear as if Agostini were responsible for Alston's release from jail when I asked him, "Is it your decision whether he gets out of jail or not? . . . Where did you have to go to make that

---

[4] Agostini explained that the box went missing in the course of renovations of the precinct that occurred after he was transferred, and that the box was available to the Assistant DA at the time of the grand jury presentation but went missing three years later when the Assistant DA was preparing for the criminal trial.  (*See* Tr. 202, 204, 612-17.)  He also argues that Agostini, Abate and Martinez each testified that they transposed the notes that they took in their spiral notebooks to their DD5s, which contained the same information and were not lost.  (*See* Tr. 283, 378, 404.)

happen?")  (*See* Tr. 315.)

These remarks do not constitute grounds for a new trial.  The issue is not "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid[, but] . . . whether the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial."  *United States v. Rosa*, 11 F.3d 315, 343 (2d Cir. 1993) (quotation marks and citation omitted).  Further, "asking numerous and probing questions of witnesses" is "unquestionably proper," especially where, as here, my "questioning [related] to inquiries necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings."  *United States v. Manko*, 979 F.2d 900, 905 (2d Cir. 1992).  The Circuit "will reverse on the basis of a judge's improper remarks if the judge expresses [his] opinion on an ultimate issue of fact in front of the jury or [argues] for one of the parties."  *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 98 (2d Cir. 1998) (alterations in original).

All the questions that this Court posed to witnesses were for clarification and due to the fact that, in the case of Agostini, his testimony was frequently contradictory and ambiguous and appeared less than candid and forthcoming.  In any event, the jury was thoroughly instructed that they were not to draw any inferences from the Court's questions:

> I also ask you to draw no inference from the fact that upon occasion I may have asked questions of certain witnesses.  Such questions were only intended for clarifications or to expedite matters and certainly were not intended to suggest any opinion on my part as to the verdict you should render or whether any of the witnesses may have been more credible than any other of the witnesses.

(Tr. 772.)  As the jury is presumed to follow their charge, *see Britt*, 457 F.3d at 272, my comments were hardly a miscarriage of justice and did not lead the jury to a seriously erroneous result.

Agostini asserts that this Court's "unsolicited and prejudicial comments regarding irrelevant points of law or misstatements of the law" caused a miscarriage of justice.  (Defs.' Mem. of Law at 25.)  For example, during Officer Nieves' direct examination by Manganiello regarding her testimony before the grand jury, I stated that "[t]he element here that is most disturbing to, I believe, all of us is that we have to show—indeed the plaintiff has to show that a defendant or more than one acted maliciously, [and] if indeed this woman testified to the effect that—differently than she had heard only a few minutes before, that seems to me to go to that element."  (Tr. 490.)  As the jury was later instructed completely on the meaning of "malice," this was hardly an incorrect statement of the law.  Indeed, a "deliberate act punctuated with

awareness of 'conscious falsity'" is evidence of malice, and if Officer Nieves had deliberately testified falsely, this would "go to that element."  *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) (quotation marks and citation omitted).

Agostini also bases his Rule 59 motion on this Court's prohibition of the use of certain DD5s during defense counsel's summation, *i.e.*, those that had not been introduced into evidence during the trial, even though I had previously explained to counsel that my practice is to review all of the exhibits prior to trial and make preliminary determinations as to which are admissible. As I explained, during the jury's deliberations I do not permit the jury to view exhibits that were not actually introduced into evidence during the trial and authenticated by a witness.  Put another way, simply because this Court rules that an exhibit is "admissible" does not mean that the exhibit is "admitted," nor does it obviate the need for the party that submits the exhibit to the Court to introduce it into evidence.  The defense attorneys' brief mischaracterizes the transcript when they state that "the Court admitted that the DD5s *had in fact* been entered into evidence, and that the confusion was its own fault.  Defendants, however, were not allowed to reopen their closing to utilize the additional DD5s they intended to use, nor was the jury advised of the confusion."  (Defs.' Mem. of Law at 26.)  In fact, what the Court told defense counsel, out of the presence of the jury, according to the transcript, is as follows:

> I just want to clarify . . . .  The DD5s that I presume you were interested in [using in your summation], which were P-2 and Z-7 . . . .  I think what happened is that those were declared admissible on my list of all the evidence that was provided so that I could rule on them, but, as I told you at the outset, I am not anxious having thousands of pieces of paper before the jury.  So the way I limit it, even though I spend the time to go through all of them, is to make sure that I only admit those that actually go to the jury, not whether or not they are admissible; only those that a witness looks at or talks about or identifies.  So far as I am concerned, neither P-2 nor Z-7 pass that test.
>
> On the other hand, from what I can glean from the transcript hurriedly is there was some conversation about putting all of them in, all of the DD5s into evidence.

(Tr. 763.)

After more colloquy, I allowed, assuming no objection or different recollection and assuming the jury asks for them, that the jury might see all of the DD5s.  (Tr. 763.)  Ultimately, while not my practice and over Manganiello's objection, I told defense counsel that he could either reopen his summation to present the two DD5s or have all the DD5s moved into evidence so that the jury, upon request, could see them.  Defense counsel opted for the latter, and indeed the jury asked to see all the DD5s "that were brought into evidence."  (Tr. 767, 804.)  Thus, there

was no prejudice.[5]

Finally, while hardly necessary, the impartiality of this Court is evident throughout the litigation.  The fact is that I granted summary judgment in favor of the City of New York and five police officers, more than half of the individual defendants.  Moreover, at trial, the jury found that two of the four remaining police officer defendants were not liable for malicious prosecution.  On a related matter, and looking at the trial transcript in its entirety, it is evident that any comments of mine to the effect that counsel should hasten their presentations were made equally to Manganiello's attorney as to the defense.  It is perhaps worth noting that the Court's impartiality in this matter was maintained despite the fact that the evidence and testimony failed to cast the NYPD in its "finest" light.

With respect to this Court's rulings on objections and comments to counsel in the presence of the jury, any prejudice was cured by the following limiting instruction to the jury:

> During the trial, I have been called upon to make rulings on various questions.  Those rulings are not evidence and need not be considered by you.  Procedural matters are matters of law and, although you may have been curious about them, you should not consider them.  The rulings I have made during the trial are not any indication of my views of what your decision should be.

(Tr. 772.)

Therefore, Agostini's motion for a new trial based on alleged improper conduct by this Court is denied.

### E.  Consistency of the Jury Verdict

Agostini argues that he is entitled to a new trial because the jury's verdict with respect to another defendant, Abate, was inconsistent.  The jury found that Abate had maliciously prosecuted Manganiello, but when asked whether Abate misrepresented the evidence to prosecutors, failed to provide the prosecutor with material evidence or information, or gave testimony to the grand jury that was false or contained material omissions, *and* knew that he was making such a material misrepresentation or omission or giving false testimony, the jury answered "no."  This was not an inconsistent verdict, as it is conceivable that an officer could commence or continue a prosecution, without probable cause, and motivated by malice, but yet not have committed such egregious acts as those that were listed in the special interrogatory to

---

[5] Similarly, Agostini's argument that this Court caused a miscarriage of justice when it imposed time limits on defense counsel's repetitive and irrelevant questioning of witnesses is without merit.  *See* Defs.' Mem. of Law at 27.  The Court has the obligation to conduct its trials efficiently and without too much duplicative testimony.  See Fed. R. Evid. 403.

the jury.  Based on the jury's answer to this question, this Court determined that Abate's "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and thus granted Abate qualified immunity.  *See Zellner*, 494 F.3d at 367.  The jury's answer does not indicate that the jury misunderstood the instructions, and thus a new trial is not warranted.

**F.     Jury Instruction on Adverse Inference**

Agostini asserts that the Court's adverse inference instruction to the jury concerning documents or other evidence that was not produced in the lawsuit was "so confusing as to be wholly improper and unduly prejudicial and must result in a new trial."  (Defs.' Mem. of Law at 29.)  Specifically, the Court instructed the jury:

> If you find that a party could have produced documents or other evidence in this lawsuit, and that such evidence was at one time within that party's control or in his or her custody, and that this evidence would have been relevant in deciding facts in dispute in this lawsuit, you are permitted, but not required, to infer that the evidence, if produced, would have been unfavorable to that party.
>
> In deciding whether to draw this inference, you should consider whether the evidence that was not produced would merely have duplicated other evidence already introduced.  You may also consider whether the party has offered a reason for not producing this evidence, and whether that reason was explained to your satisfaction.

(Tr. 782-83.)

The instruction accurately stated the law.  *See, e.g.*, *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 2008 WL 113664, at *3-4 (S.D.N.Y. Jan. 11, 2008).  Further, Manganiello showed that Agostini had control over the handwritten notes and other evidence in the box that went missing and had an obligation to timely produce it, that the missing evidence was relevant to Manganiello's defense in the criminal case and to his malicious prosecution claim in this case, and that a reasonable jury could find that Agostini had a "culpable state of mind" when the box went missing.  *See id.* at *3 (quoting *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

The handwritten notes that Agostini took during his interviews of Manganiello and of other witnesses, which were all contained in the homicide case box that went missing, could have been relevant, were they available, to show that Agostini lacked probable cause.  The missing box also contained all the other police officers' handwritten notes.  Moreover, the Assistant DA's file, which may have contained information concerning the agreement reached with Alston for his release from jail, also disappeared, as Manganiello's counsel learned when he

attempted to subpoena it.  The missing relevant information warranted the adverse inference instruction, and were this unfairly prejudicial, it was mitigated by the instruction to the jury to consider whether any party had offered a reason for not producing the evidence, and whether the evidence would have merely duplicated other evidence already produced.  Therefore, the adverse inference instruction was not a miscarriage of justice, nor did it or could it lead to a seriously erroneous verdict.

**G.      Defendants Were Not Permitted to Argue Motions at Close of Evidence**

Agostini argues that he is entitled to a new trial because his counsel were not permitted to argue their Rule 50 and 59 motions following the completion of the plaintiff's and defendants' cases.  (*See* Tr. 694-95, 762.)  It is this Court's practice to assume that all motions which could be made have been made and to reserve decision until after the verdict, and this practice is well within this Court's discretion.  In fact, Agostini offers no case law or other authority to the contrary, and so his motion is denied.  The fact is that, should I believe that the Plaintiff has failed to make out a prima facie case and thus might likely grant the motion and conclude the litigation, I always permit argument.  This was hardly the case here.

**H.      Failure to Issue Special Interrogatories on Qualified Immunity**

Agostini argues that this Court failed to give special interrogatories to the jury on qualified immunity, but as explained in detail above, the Court had no such obligation in the absence of any specific request by the defendants, *see Zellner*, 494 F.3d at 368, and this Court did, in fact, *sua sponte* pose a special interrogatory to the jury on qualified immunity.  Indeed, this Court based its decisions on whether to grant qualified immunity to Agostini and Abate on the jury's factual finding as expressed in its answer to the special interrogatory proposed by the Court and with no assistance from defense counsel.

**I.      Jury Instruction on Probable Cause**

Finally, Agostini asserts that this Court's jury instruction on the probable cause element was misleading and improper.  Specifically, Agostini objects to the portion of the instruction that told the jury that there was no probable cause for the prosecution if the defendants failed to make "a complete and full statement of facts to the grand jury," and that this caused an "immeasurable" prejudicial effect on Agostini.

The language to which Agostini refers is not in the Court's main instruction on probable cause, but rather in the instruction on the evidence required to rebut the presumption of probable cause created by the grand jury indictment, which is discussed at length above.  The Court's

instruction in its entirety was:

> The grand jury's indictment of Mr. Manganiello creates a rebuttable presumption of probable cause. The plaintiff may overcome this presumption by showing by a preponderance of the evidence that the defendant whom you are considering did not make a complete and full statement of facts either to the grand jury or to the district attorney, that he or she misrepresented or falsified evidence, or that he or she withheld evidence or otherwise acted in bad faith, and that this action or omission by the defendant had an impact on the grand jury's decision to indict Mr. Manganiello. Put another way, to rebut the presumption of probable cause created by the grand jury indictment, the plaintiff must establish by a preponderance of the evidence that the grand jury's indictment was the result of fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. Such conduct could include failing to provide documents or other testimony or providing false documents, such as a false DD5, or other false testimony, to either the grand jury or the district attorney, so long as such conduct by the defendant had an impact on the grand jury's decision to indict Mr. Manganiello.

(Tr. 788-89.)

As this language was taken nearly verbatim from the Second Circuit's statement of the law in *Rothstein*, or a logical consequence thereof, Agostini's argument is unavailing. *See* 373 F.3d at 283.

### III.  AGOSTINI'S MOTION FOR REMITTITUR

Finally, Agostini moves pursuant to Rule 59 for an order of remittitur to reduce the total jury award of $1,426,621. The jury's verdict may be overturned where it is so excessive that it shocks the conscience of the court. *See Matthews v. CTI Container Transp. Int'l. Inc.*, 871 F.2d 270, 278 (2d Cir. 1989). "While a jury has broad discretion to award damages as it feels appropriate . . . a jury verdict cannot stand if it is the result of a miscarriage of justice and represents a windfall to the plaintiff without regard for the actual injury." *Denman v. Sanders*, No. 05 Civ. 25, 2006 WL 452018, at *8 (S.D.N.Y. Feb. 24, 2006) (quoting *Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439, 1998 WL 150491, at *5 (S.D.N.Y. Mar. 31, 1998)). In determining whether a damages award is shockingly excessive, the court should consider the amounts awarded in other comparable cases. *See Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997). Agostini argues that recent jury verdicts for compensatory damages in malicious prosecution cases have been in the "range" of $250,000. (Defs.' Mem. of Law at 33.)

A plaintiff in an action pursuant to 42 U.S.C. § 1983, like Manganiello, is entitled to compensatory damages for pecuniary loss, humiliation, injuries, damage to reputation, mental anguish and suffering. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986).

Here, Dr. Latif, Manganiello's psychiatrist for seven years, testified that she diagnosed Manganiello with post-traumatic stress disorder with anxiety symptoms and major depression. (Tr. 674, 676, 679, 681-82, 688.)  Dr. Latif testified that Manganiello suffered from moderate to severe panic attacks, which caused him to be unable to function in any capacity or to work.  (Tr. 675-77.)  Dr. Latif testified that the severe stress caused Manganiello to have a chemical imbalance that has permanently disabled him and his prognosis is poor to fair.  (Tr. 679, 680-85.) She further testified that Manganiello is unable to pursue any work because his cognitive functioning, emotions, concentration, understanding and energy levels are too impaired.  (Tr. 679, 680, 684.)

Moreover, the evidence established that Manganiello lost his jobs as a Parkchester security officer and part-time policeman, and lost his police certification, because of the prosecution.  (Tr. 108.)  Dr. Tinari, Manganiello's expert economist, calculated Manganiello's pecuniary losses conservatively, *e.g.*, by making various reductions from Manganiello's base earnings to account for time that he may have spent out of the workforce, the probability of unemployment or temporary layoffs and job maintenance expenses.  (Tr. 594-95.)  The total amount of past lost earnings calculated by Dr. Tinari was $377,000.  (Tr. 598.)  For future lost earnings, Dr. Tinari assumed that Manganiello would have worked until 2023, when he would have retired at age 61.5 years, based on statistical averages.  (Tr. 599.)  After discounting Manganiello's future lost earnings to present value, Dr. Tinari calculated Manganiello's lost future earnings to be $829,000.  (Tr. 600.)  Thus Dr. Tinari opined that Manganiello's total lost past and future earnings are slightly more than $1.2 million.  (Tr. 600.)

Manganiello was also entitled to recover the $110,000 in attorneys' fees that he paid for his criminal defense, which he would not have had to pay but for the malicious prosecution.  *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988).  Therefore, the record supported an award of $1,310,000 in pecuniary losses, or $1.2 million for past and future lost earnings and $110,000 for attorneys' fees in Manganiello's criminal defense.  Since the jury awarded compensatory damages of $1,426,621, it appears that the pain, suffering and wrongful incarceration portion of the award was therefore approximately $116,600, which is in line with the awards in the cases cited by Agostini.  *See, e.g.*, *Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (affirming award of $150,000 for pain and suffering, several days of false imprisonment, psychological trauma, loss of job opportunities and attorneys' fees).  *See also Papa v. City of New York*, 194 A.D.2d 527, 532 (N.Y. App. Div. 1993) (lost earnings calculated

23

to be over $3 million in malicious prosecution case).

Here, the award does not shock the conscience, especially in light of the fact that the defendants did not produce any evidence to rebut Dr. Latif's or Dr. Tinari's testimony.

Further, the punitive damages award of $75,000 will stand. Punitive damages may be awarded in a Section 1983 action against a police officer in his personal capacity. *See Smith v. Wade*, 461 U.S. 30, 35 (1983). Punitive damages may be awarded when the official's "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56.

Here, during the first stage of the trial, the jury was instructed that

[i]f you, the jury, should find, from a preponderance of the evidence, that the conduct of a defendant that proximately caused injury or damage to the plaintiff was maliciously, or wantonly, or oppressively done, then you may, in the exercise of discretion, if you unanimously choose to do so, award such amount as you shall unanimously agree to be proper as punitive damages.

An act or a failure to act is maliciously done if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually or toward all persons in any group or category of which the injured person is a member.

An act or a failure to act is wantonly done if done in reckless disregard of, or callous disregard of, or indifference to the rights of another person.

An act or a failure to act is oppressively done if done in a way or manner that injures, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person.

(Tr. 794-95.)

Based on these instructions, the jury indicated on its verdict sheet that it unanimously believed that Agostini should be liable for punitive damages. The Court reconvened the jury on August 6, 2008, to hear the parties' oral argument on punitive damages. Then, the jury was instructed that

[y]ou must decide the amount of punitive damages, if any, unanimously and with calm discretion and sound reason. Punitive damages must never be awarded or fixed in an amount because of sympathy or bias or prejudice with respect to any party to the case. You must consider, first, the degree of reprehensibility and the conduct of the defendant and, secondly, the relationship between the amount of punitive damages and the actual harm inflicted upon Mr. Manganiello.

First, in assessing the reprehensibility of the defendant's conduct you should consider whether the harm caused was physical or economic, whether the defendant's conduct showed an indifference to or a reckless disregard for the

health or safety of others, whether the conduct involved repeated action or was an isolated incident, and whether the harm was the result of either intentional malice or deceit or mere accident.   You should also presume that the compensatory damages that you have awarded have made Mr. Manganiello whole for his injuries.   You should award punitive damages only if the defendant's culpability is so reprehensible as to warrant the imposition of further sanctions to achieve punishment and deterrence.

Second, the amount of punitive damages that you award must not seem grossly excessive to you when you compare it against the amount of compensatory damages that you have already awarded against the defendant.

(Tr. 856-57.)

The jury was more than adequately instructed on the law pertaining to punitive damages awards in Section 1983 cases.  Here, the punitive damage award is not grossly excessive:  the jury evidently found Agostini's conduct to be sufficiently reprehensible, and the ratio of punitive damages to the amount of compensatory damages is small.  *See State Farm Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1521 (2003).

Finally, the fact that two jurors indicated that they saw a local newspaper article that reported the jury's verdict as to liability and compensatory damages does not convince me that there was a miscarriage of justice.  (*See* Tr. 844.)  Although the article indicated that punitive damages could triple the money the City would have to pay Manganiello, there is no evidence that this unduly swayed the jurors, as they assessed a much lower amount of punitive damages.  Further, prior to the summations on punitive damages, I asked the jurors whether they were influenced by the article or whether it would impact their deliberation, and they decidedly shook their heads "no."  (Tr. 843-44, 857.)  I then instructed the jury, prior to the summations: "I am going to assume and instruct you that if you did see the article that it should in no way interfere or have a role." (Tr. 844.)  After the summations, I charged the jury: "I want to emphasize that you are not to consider that article nor any other news or comment you may have heard or read in making your decision today."  (Tr. 857.)

Therefore, the punitive damages awarded by the jury will not be disturbed.

### IV.  MANGANIELLO'S MOTION FOR ATTORNEY'S FEES

Manganiello moves, pursuant to 42 U.S.C. § 1988, for attorney's fees in the amount of $215,037.50, based on a total of 587.25 hours spent by his lawyer, Michael Joseph, Esq. ("Joseph").  Joseph's hourly rate is $350, and there were in addition $9,500 in expert fees.

The Civil Rights Attorneys' Fees Awards Act of 1976 states that a district court "may

allow the prevailing party [in a civil rights case] . . . a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  The "district court retains discretion to determine, under all the circumstances, what constitutes a 'reasonable' fee."  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 758 (2d Cir. 1998).

Agostini concedes that Manganiello was the prevailing party but disputes particular aspects of Manganiello's request for attorney's fees, such as Joseph's hourly rate, the amount expended with respect to claims against other defendants that were dismissed on summary judgment or at trial and certain entries on Joseph's time sheet.

The Second Circuit adheres to the lodestar approach in determining attorney's fees, in which "the number of hours reasonably expended on the litigation [is] multiplied by a reasonable hourly rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998).  "The lodestar should be based on 'prevailing market rates.'"  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d at 764 (citation omitted).  The fee applicant bears the burden of documenting the appropriate time expended and hourly rates, and establishing that they are reasonable.  *See Pascuiti v. New York Yankees*, 108 F. Supp. 2d 258, 266 (S.D.N.Y. 2000).  Finally, "the district court . . . may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties."  *See Gierlinger*, 160 F.3d at 876 (quotation marks and citation omitted).

Here, the hourly rate proposed by Joseph is consonant with rates of other attorneys in this district with reasonably comparable skill and experience for similar litigation.  Joseph has practiced law in New York since January 2000 and since May 2004 has been the lead partner with respect to civil litigation matters and state criminal matters at his firm, Osorio & Associates.  During his career, he has tried and arbitrated approximately thirty-five cases and has handled over a thousand matters.  While not all of Joseph's cases have been civil rights in nature, he is correct to point out that his experience in other civil tort cases, as well as his experience in state criminal proceedings, bear upon his expertise in this cause of action for malicious prosecution, a constitutional tort.  (*See* Joseph Decl. ¶¶ 8-10.)  Last year, Judge Robinson approved an hourly rate of $350 for a civil rights litigator in a Section 1983 case.  *Garcia v. Yonkers Sch. Dist.*, 499 F. Supp. 2d 421, 426 (S.D.N.Y. 2007).  *See also Martinez v. Port Auth. of New York & New Jersey*, No. 01 Civ. 721, 2005 WL 2143333, at *26 (S.D.N.Y. Sept. 2, 2005) (approving rates of $400 per hour for partner and $325 per hour for co-counsel in civil rights case).  Pursuant to these precedents and my experience in fee setting, Joseph's hourly rate of $350 is reasonable.

The time spent by Joseph was also reasonable, in light of the complexity of the facts, the numerous witnesses involved and the length of the parties' briefs on summary judgment. That a few of his time entries fail to specify, for example, the subject matter of his various correspondences, does not trouble this Court, as the time spent on each item and the nature of the tasks are not unusual for a Section 1983 case of this magnitude.

While "[i]n determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude . . . hours dedicated to *severable* unsuccessful claims," *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999), the claims that proved unsuccessful here were intertwined with Manganiello's claim against Agostini. For example, several of the defendants who either were dismissed from the case on summary judgment or found not to be liable by the jury testified at the trial, and their trial testimony undoubtedly played a part in the jury's finding of liability against Agostini. The same factual issues applied to all the original defendants, including the City of New York, and thus it is highly probable that Manganiello would have conducted the same discovery even if his original action had been against Agostini alone.

Finally, the Circuit has held that "[t]he most important factor in determining a reasonable fee for a prevailing plaintiff is 'the degree of success obtained.'" *LeBlanc-Sternberg*, 143 F.3d at 760. Here, even though only Agostini was ultimately found to be liable, Manganiello achieved a high degree of success, for the jury awarded him the full amount of compensatory damages that he sought, as well as a modest amount of punitive damages.

Therefore, Joseph is awarded the full amount of attorney's fees requested.

## V. CONCLUSION

For the reasons stated, Agostini's motions pursuant to Fed. R. Civ. P. 50 and 59 for judgment as a matter of law or for a new trial are denied. Manganiello's motion for attorney's fees is granted.

**IT IS SO ORDERED.**
**New York, New York**
**December ___, 2008**

U.S.D.J.

27